**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

NATIONAL ALLIANCE TO END
HOMELESSNESS, *et al.*,

    *Plaintiffs*,

v.

UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT, *et al.*,

    *Defendants*.

Case No. 25-cv-636-MSM-AEM

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
RELIEF UNDER 5 U.S.C. § 705 AND FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.     Congress Created the Continuum of Care Program to Address Homelessness .....................3

A.     Congress Designed the CoC Program to Prioritize Permanent Housing, Stability of
       Funding, and Respect for Local Decisionmaking ..................................................5

B.     Statutes and Regulations Govern HUD's Administration of the CoC Program ...............10

II.    HUD Has Long Structured the CoC Program to Prioritize Permanent Housing,
       Stable Funding, and Respect for Local Decisionmaking ...................................................13

III.   Congress Authorized, and HUD Issued, a Two-Year NOFO for FY 2024 and 2025
       to Promote Efficiency and Stability in CoC Programs .....................................................18

IV.    Defendants Abruptly Rescinded the Two-Year NOFO and Replaced It with a New
       NOFO ...................................................................................................................19

V.     The Administration's Plan to Criminalize Homelessness, End "Housing First," and
       Impose Ideological Conditions ...........................................................................20

VI.    The New NOFO Radically Transforms the CoC Program and Imposes Unlawful
       Conditions ...........................................................................................................23

A.     Permanent Housing Cap and Tier 1 Allocation ...................................................23

B.     Service Requirements Condition ...........................................................................26

C.     Disability Condition ...............................................................................................26

D.     Geographic Discrimination Conditions ...................................................................27

E.     Law Enforcement Conditions ................................................................................28

F.     Exclusionary Conditions ........................................................................................28

VII.   Plaintiffs Rely on CoC Funding and Suffer Harm Due to Defendants' Unlawful
       Actions .................................................................................................................31

LEGAL STANDARD ...........................................................................................................32

ARGUMENT .......................................................................................................................33

I.     Plaintiffs Are Likely to Succeed on the Merits ...................................................35

A.     The Rescission and Replacement of the FY24-25 NOFO Violates the APA ......................37

1.     The Rescission and Replacement is contrary to law and exceeds Defendants' authority ........37

2.      The Rescission and Replacement is arbitrary and capricious ..............................38

B.      The FY25 NOFO Violates the APA ....................................................................41

1.      The FY25 NOFO exceeds HUD's authority .........................................................41

2.      The FY25 NOFO is contrary to law ....................................................................43

3.      The FY25 NOFO is arbitrary and capricious .......................................................48

4.      The FY25 NOFO was unlawfully issued without notice-and-comment .........................58

C.      The Gender Identity Reservation Violates the First Amendment ......................................59

II.     Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief ................................62

A.      Funding Gaps Will Cause Homelessness, Evictions, and Trauma .................................63

1.      Programs face imminent closures because Plaintiffs, their members, and CoC partners cannot fill sudden funding gaps ...............................................................63

2.      Vulnerable people will become homeless due to HUD's decimation of funding for permanent housing and stable renewals .........................................................65

3.      Forcing people from their homes also fractures the trust between them and their service providers, and damages Plaintiffs' real estate interests and investment relationships that are critical to a robust social services network ...................................68

B.      HUD's Sudden and Haphazard Imposition of Foundational Changes to CoC Funding Creates Instability, Uncertainty, and Chaos That Places Plaintiffs in an Impossible Position and Will Lead to Loss of Critical Public Services .........................70

III.    The Balance of Equities and the Public Interest Favor Plaintiffs ....................................75

IV.     The Court Should Enter a Stay and a Preliminary Injunction ..........................................76

CONCLUSION..................................................................................................78

## INTRODUCTION

Congress created the Continuum of Care (CoC) Program to be the federal government's primary response to homelessness. It provides housing and essential services to 750,000 formerly and currently unhoused people, including many disabled and older individuals, veterans, and other individuals and families at risk of experiencing homelessness. The CoC Program has improved long-term stability for communities through its funding of permanent housing, prioritization of renewals of local, effective projects, and efforts to guard against dramatic fluctuations in funding from year to year.

To support even greater stability, in 2024, Congress authorized Defendant U.S. Department of Housing and Urban Development (HUD) to issue a two-year Notice of Funding Opportunity (NOFO) for the CoC program that covered fiscal years 2024 and 2025. This allowed HUD to go through one competition, including soliciting and reviewing applications, and to use the results of that competition to make awards both for fiscal year 2024 and, once funds were appropriated, for fiscal year 2025. HUD conducted that two-year competition and selected awardees. Under the two-year NOFO, renewal awards for FY 2025 were expected this December or January at the latest.

But on November 13—mere weeks before FY 2025 awards would have gone out under the two-year NOFO—HUD abruptly reversed course. It rescinded that NOFO and replaced it with a new fiscal year 2025 NOFO. With this late-breaking NOFO, HUD has said it will not make any FY 2025 awards until May 2026 at the earliest. But programs across the country have grants expiring as soon as January

1

2026—and will now be left without funding for months, forcing them to shutter or scale back their programs, displacing the thousands of formerly homeless individuals and families that rely on those programs for housing.

The extremely late-in-the-game rescission and replacement of the original two-year NOFO is unlawful, even without considering the new NOFO's unlawful terms. HUD blew past a statutory deadline that required it to issue any new NOFO by June. In addition, HUD provided no explanation for its untimely action and failed to consider the serious harm and disruption its action would cause. Worse, the belated decision to rescind and replace the two-year NOFO has upended the network of CoC-funded projects, disrupting Plaintiffs' operations and forcing them to drastically reconfigure their long-time programming, if they can, under an unworkable deadline. For these reasons alone, the rescission and replacement is unlawful.

The new 2025 NOFO is also unlawful even apart from its too-late issuance. It attempts to fundamentally restructure the CoC Program by capping funding for permanent housing—the only strategy Congress has found proven effective at reducing homelessness—and severely limits which existing projects will be prioritized for renewal. In addition, the new NOFO imposes new unlawful conditions that would effectively disqualify most current program participants while preferencing those in favor of the Administration's unsupported agenda of ending permanent housing programs that use a Housing First approach, criminalizing homelessness, and other unrelated policy goals related to

2

immigration, gender, disability, and race. Congress did not authorize these actions—indeed, they are contrary to statute, and regulations. Moreover, these abrupt changes are also arbitrary and capricious because, among other flaws, HUD has failed to articulate any lawful justifications for its decisions and ignored the reliance interests engendered by longstanding funding policies.

Plaintiffs, nonprofits, and local governments have been left scrambling, some with fewer than two weeks left, to make an untenable choice: wholly revamp their programs to comply with the new unlawful conditions imposed by the 2025 NOFO (if that is even possible) or forgo vital federal funding. Those that do not or cannot apply, due to the delayed timeline and the unlawful conditions, will lose their CoC Program funds, forcing them to shutter critical programs and services that have kept people in their communities safe and housed. For many Plaintiffs and/or their members, those decisions are being made now, as they consider whether to participate in the local competitions that begin the process and have deadlines between now and December 15.

To stop these ongoing and imminent irreparable harms—and guard against further delays that will strip Plaintiffs of vital funding to continue serving their communities—Plaintiffs seek expedited preliminary relief.

## BACKGROUND

### I.    Congress Created the Continuum of Care Program to Address Homelessness

Congress enacted what became known as the McKinney-Vento Homeless Assistance Act (Homeless Assistance Act) in 1987 to establish a coordinated federal

response to homelessness, including by providing funds for programs to assist homeless individuals and families. Pub. L. No. 100-77, § 102, 101 Stat. 482, 484-85 (1987), *codified at* 42 U.S.C. § 11301. For 20 years following the passage of the Homeless Assistance Act, HUD administered three separate programs that supported permanent housing for homeless individuals and families. Libby Perl, Cong. Rsch. Serv., RL33764, *The HUD Homeless Assistance Grants: Programs Authorized by the HEARTH Act* (2017), https://perma.cc/K6X2-RJEX.

In 2009, Congress consolidated those existing programs into the Continuum of Care (CoC) Program through passage of the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act. Pub. L. No. 111-22, div. B, tit. III, 123 Stat. 1632, 1680-96 (2009), *codified at* 42 U.S.C. § 11381-11388. With the CoC Program, Congress sought, among other things, to "promote community-wide commitment to the goal of ending homelessness," to help rehouse people "while minimizing the trauma and dislocation" that homelessness causes, and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381. It also "establish[ed] a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." Pub. L. No. 111-22, § 1002 (2009), *codified at* 42 U.S.C. § 11301 note (Finding and Purposes). The CoC Program funds a variety of programs that support homeless individuals and families, including through providing housing through construction, acquisition, rehabilitation, or rental assistance; helping individuals and families secure housing; and providing supportive services such as childcare, job training,

4

healthcare, mental health services, trauma counseling, and life skills training. *Id.* §§ 11360(29), 11383. Today, the CoC Program is the largest federal grant program for homeless services and housing.[1]

### A. Congress Designed the CoC Program to Prioritize Permanent Housing, Stability of Funding, and Respect for Local Decisionmaking

Three key aspects of the CoC program contribute to its ability to meet Congress's statutory goals. Congress designed the program to (1) prioritize funding for permanent housing, (2) encourage stability by prioritizing the renewal of funding where such funding is needed and has previously been used effectively, and (3) give local communities a central role in determining how best to eradicate homelessness in their areas.

**Focus on permanent housing**. On the first aspect—permanent housing—Congress made clear that permanent housing should be prioritized. In particular, the statute requires HUD to "provide bonuses or other incentives" for using funding on strategies that have been proven effective at reducing homelessness. 42 U.S.C. § 11386b(d)(1). It also requires HUD, when awarding grants, to evaluate "the extent to which the recipient will . . . incorporate" strategies "proven to be effective at reducing homelessness." 42 U.S.C. §§ 11386a(b)(1)(B)(iv)(II), 11386b(d)(2). Congress identified two—and only two—strategies as ones that have been proven effective.

---

[1] *Biden-Harris Administration Awards nearly $3.6 Billion in Homelessness Assistance Funding to Communities Nationwide*, U.S. Dep't of Housing and Urban Development News Release (Jan. 17, 2025), https://perma.cc/7FS7-GZLQ.

*Id.* § 11386b(d)(2). Both are permanent housing strategies: "permanent supportive housing for chronically homeless individuals and families" and, for families, "rapid rehousing services"[2] paired with other interventions like providing services to help improve incomes. *Id.* § 11386b(d)(2)(A), (B). Congress authorized HUD to identify other proven effective strategies "based on research and after notice and comment to the public," *id.* § 11386b(d)(2)(C).

The HEARTH Act also sets bare minimum amounts that HUD must allocate to permanent housing for certain communities. First, for any given fiscal year, it requires HUD to allocate at least 30 percent of the funds to permanent supportive housing for "homeless individuals with disabilities" or certain families that include such an individual. 42 U.S.C. § 11386b(a)(1). Importantly, renewals of existing permanent housing grants do *not* count toward this 30 percent minimum. *Id.* § 11386b(a)(2). The upshot is that 30 percent of the funds used for new awards (i.e., non-renewals) must go to permanent supportive housing for this population. The statute also requires that at least 10 percent of funds appropriated for the program in any given year be "used to provide or secure permanent housing for homeless families with children." *Id.* § 11386b(b).

Congress has reiterated this commitment to permanent housing in recent appropriations bills. In the fiscal year 2024 appropriations act, Congress mandated that HUD "provide incentives to create projects that coordinate with housing

---

[2] Rapid rehousing is a type of permanent housing. 24 C.F.R. § 578.3.

providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II. Congress carried those instructions forward in the continuing resolution appropriating CoC funds for fiscal year 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12); § 1105 (appropriating funds pursuant to the same "requirements, authorities, conditions, limitations, and other provisions of the" fiscal year 2024 appropriations act).

**Stability through renewals**. The HEARTH Act explicitly prioritizes renewals for permanent housing. In particular, the statute specifies that appropriated funds "shall be available for the renewal of contracts" for certain costs, including those "associated with permanent housing projects funded under this part." 42 U.S.C. § 11386c(b). The statute identifies two—and only two—factors that HUD must consider when determining whether to renew a permanent housing award: (1) whether "there is a demonstrated need for the project" and (2) whether it "complies with program requirements and appropriate standards of housing quality and habitability, as determined by [HUD]." 42 U.S.C. § 11386c(b). And Congress made clear that even this is not meant to be a *limitation* on when projects can be renewed: The statute specifies that nothing in this section "shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth" elsewhere in the statute. 42 U.S.C. § 11386c(c).

Congress also took steps to ensure that appropriated funding would be available to fund renewal projects. The statute requires HUD to consider "the need

7

within the geographic area for homeless services" in making awards. *Id.* § 11386a(b)(2). That need amount is determined by a regulatory formula that looks to factors related to population size and poverty. *Id.*; *see also* 24 C.F.R. § 578.17(a)(3). But the statute also requires HUD to "increase the estimated need amount" for a particular geographic area as "necessary to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for that area. *Id.* § 11386a(b)(2)(B). Consistent with these directives, after funds are appropriated each year, HUD calculates each Continuum's annual renewal demand (ARD)—the sum needed to fund "all projects within the Continuum eligible to apply for renewal in that fiscal year's competition." 24 C.F.R. § 578.17(b)(2). This is the "maximum award amount" for that geographic area, apart from bonus funding, unless their formula-based need amount is higher, which is rare. 24 C.F.R. § 578.17(b). This ensures that funding is relatively evenly distributed across geographic areas, because, with certain exceptions, no one area can be awarded more than their need or what is necessary to maintain stable funding.

Congress has further promoted stability by helping ensure that renewal projects could provide the same level of service despite rising costs. The statute requires HUD, when providing renewal funding related to "permanent housing," to "make adjustments proportional to increases in the fair market rents in the geographic area." *Id.* § 11382(f).

**Respect for local decisionmaking**. Finally, Congress also designed the statute to respect local communities' central role in addressing homelessness in

8

their regions. Congress recognized that the local "continuum of care [program] process" was an "integral local function" that is "necessary to generate the local strategies for ending homelessness." Pub. L. No. 111-22, § 1002 (2009), *codified at* 42 U.S.C. § 11301 (Findings and Purposes). It accordingly "codif[ied]" that process in federal law. *Id.*

The statute recognizes local Continuums of Care or Continuums, local or regional bodies composed of representatives of various public and private entities involved in addressing homelessness as well as people with lived experience of homelessness. *See* 42 U.S.C. § 11360a(a); *see also* 24 C.F.R. §§ 578.3, 578.5(a). These CoCs are responsible for coordinating the response to homelessness within their geographic areas. 42 U.S.C. § 11360a; 24 C.F.R. § 578.7.

Most relevant here, each Continuum is responsible for applying for CoC Program funds on behalf of its community—and the statute gives Continuums a significant role in determining which projects will receive funding. *See* 42 U.S.C. § 11360a(a), (f). A CoC designates a "collaborative applicant" (which can be the Continuum itself or another organization eligible for CoC funds) that is responsible for applying for funding on behalf of entities within the Continuum's geographic area. *Id.* § 11360a(a), (f); *see also* 24 C.F.R. § 578.9. Each Continuum must run a local competition to determine what projects and service providers will be part of its federal application, and how it will rank them. 42 U.S.C. § 11360a(f); *see also* 24 C.F.R. § 578.9. It then submits an application on behalf of the Continuum and the selected project applicants in that area. 42 U.S.C. § 11360a(f)(1); *see also* 24 C.F.R. §

9

578.15. Applications generally must go through this locally run CoC process. An individual entity can apply on its own only if it "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner." 42 U.S.C. § 11382(i).

HUD's selection process looks to characteristics not only of individual projects, but also of the Continuums and regions themselves. For instance, in evaluating applications and making selections, HUD considers the "methodology" the CoC "used to determine the priority for funding local projects." *Id.* § 11386a(b)(1)(C). HUD must also consider "the need within the geographic area for homeless services." *Id.* § 11386a(b)(2).

### B. Statutes and Regulations Govern HUD's Administration of the CoC Program

The statute sets forth various requirements for HUD's administration of the CoC program. In addition to the requirements described above, the statute establishes timing requirements, eligibility and selection criteria, and conditions to which grantees must agree, as well as other mandates.

**Timing requirements**. For one, the statute establishes timing requirements to ensure that funds are awarded promptly to the communities that need them. It provides that "the Secretary shall release a notification of funding availability"— also known as a "notice of funding opportunity" or "NOFO"—for CoC grants "for a fiscal year not later than 3 months after" Congress has enacted the relevant appropriations statute. *Id.* §11382(b). It then must announce conditional awards "within 5 months" after the application deadline. *Id.* § 11382(c)(2)(A). And once a

10

recipient meets all relevant requirements for a final award (such as obtaining matching funds and passing environmental review), HUD must "obligate the funds for the grant involved" within 45 days. *Id.* § 11382(d)(2).

**Selection criteria**. The statute also sets forth comprehensive criteria to govern HUD's selection of awardees. *Id.* § 11386a. Those statutory criteria include the "previous performance of the recipient regarding homelessness" (as measured by criteria that HUD announces and that must include certain statutorily defined metrics); the recipient's plan to serve homeless individuals and families; the recipient's methodology for prioritizing CoC funds for local projects; and the recipient's ability to coordinate and supplement CoC Program funds with other federal, state, and local resources and entities. *Id.* § 11386a(a). The statute vests the Secretary with authority to define additional criteria, but only as "appropriate to carry out" the program "in an effective and efficient manner." *Id.* § 11386a(b)(1)(G).

Congress has also made clear that HUD cannot adopt criteria that would unduly interfere in state and local policymaking. In particular, 42 U.S.C. § 12711 bars HUD from "establish[ing] any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law" so long as the jurisdiction had authority to adopt, continue, or discontinue it and it does not violate federal law. That provision applies to any "funds made available under programs administered by the Secretary" of HUD. *Id.*

**Grant conditions**. The statute also specifies the "[r]equired agreements"

11

that grant recipients must execute to receive funds under the program. *Id.* § 11386(b). For instance, recipients must agree to operate funded projects in accordance with statutory requirements, to involve individuals experiencing homelessness in project operations where practicable, and to certify that children in family programs are enrolled in school and connected to services such as Head Start and Individuals with Disabilities Education Act programs. *Id.* HUD may also establish "other terms and conditions," but only "to carry out this part in an effective and efficient manner." *Id.* § 11386(b)(8).

**Additional requirements**. The statute and regulations also impose additional requirements. For one, statutes and regulations prohibit discrimination on the basis of disability in CoC programs. In particular, regulations provide that "[n]o qualified individual with handicaps shall, solely on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance from the Department." 24 C.F.R. § 8.4(a). The disabilities protected by this regulation include those with physical and with mental impairments, including substance use disorder. *Id.* § 8.3. By the same token, the statute requires that permanent supportive housing funding be made available for "homeless individuals with disabilities," with no distinction between physical and mental health disabilities. 42 U.S.C. § 11386b(a)(1); *see also id.* 42 U.S.C. § 11360(10)(A)(IV) (defining "homeless individual with a disability" to include individuals with "physical, mental, or emotional impairment, including an impairment caused by

12

alcohol or drug abuse, post traumatic stress disorder, or brain injury"); *accord* 24 C.F.R. § 578.3.

HUD regulations also bar discrimination on the basis of gender identity. HUD's Equal Access Rule requires, among other things, that grantees "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity." 24 C.F.R. § 5.106.

Finally, HUD has also adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. §§ 10.1, 10.2, 10.7-10.10.

## II.  HUD Has Long Structured the CoC Program to Prioritize Permanent Housing, Stable Funding, and Respect for Local Decisionmaking

Consistent with the statute and Congress's goals, HUD has long prioritized stable funding and respect for local decisionmaking, as well as permanent housing.

For one, HUD has long used a two-tier system for applications that promotes stability and respects a Continuum's role in assessing the needs of its own local community. *See* Libby Perl, Cong. Rsch. Serv., RL33764, *The HUD Homeless Assistance Grants: Programs Authorized by the HEARTH Act,* 22 (2017), https://perma.cc/K6X2-RJEX.

Under this system, HUD allocates available funding across two tiers, expressed as a percentage of each geographic area's Annual Renewal Demand (i.e., the amount necessary to fund all eligible renewals). *Id* at 21. For instance, in the most recent fiscal year, HUD allocated 90 percent of each CoC's Annual Renewal

Demand to Tier 1 and 10 percent to Tier 2. *See* Ex. 1, HUD, FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants NOFO, FR-6900-N-25, at 4, 29 (hereinafter "FY24-25 NOFO").

Funding for Tier 1 projects is more predictable: HUD will conditionally award the Tier 1 projects from all CoCs so long as the projects pass eligibility and quality review. Cong. Rsch. Serv., Rl33764 at 23; Declaration of Ann Marie Oliva (NAEH) ¶¶ 55; 79. Those Tier 1 projects compete locally but not nationally. Cong. Rsch. Serv., Rl33764 at 23; Oliva (NAEH) ¶ 55, 79. The regional CoCs conduct a local competition based on the CoC program's requirements and goals and select the projects to list in Tier 1. Oliva (NAEH) ¶ 55. HUD then funds those projects so long as they meet baseline requirements. Cong. Rsch. Serv., RL33764 at 20. This means that CoCs can be reasonably certain that the projects they designate within Tier 1 will be funded. Oliva (NAEH) ¶¶ 55, 79-80.

CoCs more often than not choose to list renewal projects in Tier 1 so that they can ensure consistent services in their local communities. Oliva (NAEH) ¶¶ 79-80; Chanecka (Tucson) ¶ 16. But they do not need to. If a project is no longer needed or is performing poorly, the CoC can reallocate the money from that project to a new project that better meets local needs. Because Tier 1 funding is more assured, CoCs can make these types of decisions without undue risk and instability to the whole system. Whatever the CoC chooses, the protection of Tier 1 funding also ensures that CoCs will have relatively stable funding levels for their communities, even

when the funded projects change. Tier 2 projects are subject to a nationwide competition, and HUD selects the projects that score the highest based on the full merit review. *See* Oliva (NAEH) ¶ 79.

Consistent with Congress's prioritization of stability and renewals and respect for local decisionmaking, the amounts HUD has allocated to Tier 1 have historically been a large percentage of total CoC funding, with the lowest amount since HUD implemented the Tier system being 85 percent of ARD. Oliva (NAEH) ¶ 81. The consistently high allocations to Tier 1 have ensured stable funding streams for each CoC to direct toward projects selected through local competition. As a practical matter, this has meant that, where there is still a need for them, successful projects have received renewal funding. Cong. Rsch. Serv., RL 33764 at CRS-26 (showing that, from 2012 to 2016, 84 percent of awards were for renewal projects). This has ensured continuity in permanent housing projects, which made up 88 percent of awards in FY 2024. *See* HUD's 2024 Continuum of Care Program Funding Awards, HUD, https://perma.cc/PU7C-5DZU.

HUD has also long administered the CoC program with a focus on providing permanent housing. As HUD has found, emphasizing permanent housing is supported by extensive evidence of its effectiveness in reducing homelessness and reoccurrence of homelessness. Oliva (NAEH) ¶¶ 33-43, 45; Declaration of Kathryn J. Kaminski (Santa Clara), Ex. 2 (HUD study found permanent supportive housing had "striking impacts" in reducing subsequent shelter stays for families, compared to transitional housing and service-requirement programs); *see also* Declaration of

15

April Calvin (Nashville) ¶ 9 (seven encampments closed over last four years as hundreds of residents moved into permanent housing); Declaration of Michelle Wilcox (Crossroads) ¶ 37 (data shows that 93% of those placed in Crossroads' housing, following a Housing First approach, never return to homelessness). Thus, for years, HUD has emphasized permanent housing in its project scoring criteria, by which it determines CoC awards. The relevant Notices of Funding Opportunities (NOFOs) have also long noted as a priority "[t]arget[ing] persons with the highest needs and longest histories of homelessness for existing and new permanent supportive housing." HUD, Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2016 Continuum of Care Program Competition, FR-6000-N-25, at 8 (2016) ("FY 2016 NOFO"), https://perma.cc/NMS7-5NAG. This emphasis on permanent housing, coupled with the predictability of HUD's two-tier funding system has created necessary stability for CoCs that rely on these funds to serve their communities.

Additionally, HUD's NOFOs have historically encouraged applicants to adopt a "Housing First" approach, though many providers were using the evidence-based approach before it became a HUD priority. FY 2016 NOFO at 9; HUD, Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and 2014 Continuum of Care Program Competition, FR-5700-N-31B, at 9 (2013) ("FY 2013 NOFO"), https://perma.cc/SK7R-YAL8; Kaminski Decl. (Santa Clara) ¶ 12; Oliva (NAEH) ¶¶ 38-40, 43. At least since 2013, and continuing through the FY24-25 NOFO, HUD awarded points to Continuums that aligned their programs with "Housing First"—

16

which describes principles for addressing homelessness that prioritize access to housing and supportive services without requiring commitments to sobriety or treatment—and deprioritized those that required treatment, service participation, or sobriety as a condition of clients' access to housing. *See* FY 2013 NOFO; *see also* Ex. 1 (FY24-25 NOFO) at 30, 87-88, 95. "Housing First" evolved as a response to the inefficacy of "Treatment First" programs that imposed such requirements. *See* Kaminski (Santa Clara) Ex. 2. According to a HUD issue brief published in 2023, "[t]he George W. Bush administration embraced Housing First principles, which contributed to a 30 percent reduction in homelessness rates in the United States between 2005 and 2007." *Id.* Housing First principles guided the creation, in 2010, of the first national strategic plan to end homelessness (which was also required by the HEARTH Act), and those principles "have been guiding federal homeless programs" since. *Id.*

Relatedly, HUD has historically deprioritized transitional housing solutions without a connection to permanent housing, recognizing the value of transitional housing for crisis housing but balancing the fact that little evidence has found that transitional housing programs are effective in reducing homelessness overall. Oliva (NAEH) ¶¶ 39, 86; Kaminski (Santa Clara) ¶ 12; *see also, e.g.*, FY 2013 NOFO, at 10 ("research shows that transitional housing is generally more expensive . . . more service-intensive . . . and . . . under-utilized because homeless households cannot overcome the barriers to entry.").

This emphasis on a housing first approach is consistent with other federal

laws. Under the Violence Against Women Act (VAWA) and Family Violence
Prevention and Service Act (FVPSA)—two laws that, among other things, fund
housing support for survivors of domestic violence and sexual assault who cannot
safely remain at home—it is illegal for a provider to require participants to take
part in supportive services as a condition of receiving housing assistance; those
services must be voluntary. 34 U.S.C. 12351(b)(3) (VAWA grants for transitional
housing assistance); 42 U.S.C. 10408(d)(2) (FVPSA grants for emergency shelter).

### III.    Congress Authorized, and HUD Issued, a Two-Year NOFO for FY 2024 and 2025 to Promote Efficiency and Stability in CoC Programs

In 2024, to provide for greater stability and efficiency in the CoC Program,
Congress authorized HUD to run a single competition that would cover fiscal years
2024 and 2025. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F,
tit. II, § 242. This two-year funding cycle has enjoyed strong bipartisan support. *See,
e.g.*, Letter from Members of Congress to Secretary Turner (Oct. 28, 2025),
https://perma.cc/S2S9-XZ6V.

In July 2024, HUD issued a two-year NOFO for CoC grants. Consistent with
statutory priorities and HUD's practices for nearly a decade, the FY24-25 NOFO
prioritized permanent housing solutions to homelessness. Ex. 1 (FY24-25 NOFO) at
7-8. Under that two-year NOFO, a Continuum needed to submit only one
application that would cover both fiscal year 2024 and fiscal year 2025 funds. *Id.* at
98. HUD could then review applications once and use the results of that competition
to make awards both for fiscal year 2024 and, once funds were appropriated, for

18

fiscal year 2025. *Id*. This two-year process was designed to reduce the burden on communities and provide greater predictability of funding. HUD made fiscal year 2024 awards in January 2025. Declaration of Sheila Dillon (Boston) ¶ 12.

Funding became available for fiscal year 2025 awards in March 2025. In particular, on March 15, Congress enacted a continuing resolution appropriating $3.544 billion for the Continuum of Care program and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12). Because HUD had issued a two-year NOFO, no new FY 2025 NOFO was required. If HUD wanted to issue a new NOFO for awarding those fiscal year 2025 funds, however, it was required to do so within three months, or by June 15, 2025. 42 U.S.C. § 11382(b) (providing that HUD "shall release" a NOFO for CoC grants for any given fiscal year "not later than 3 months after the date of the enactment of the appropriate Act making appropriations" for that fiscal year).

## IV. Defendants Abruptly Rescinded the Two-Year NOFO and Replaced It with a New NOFO

HUD did not issue a new NOFO by June 15. Instead, on July 3, 2025, HUD announced that it "intend[ed] to publish" a new NOFO for FY 2025 CoC awards. Ex. 3 (July 3 HUD Email); Declaration of Joyce Tavon (MHSA) ¶ 23. But HUD provided no meaningful details about its plan and stated only that the NOFO would "seek to provide opportunities for new types of projects including street outreach and transitional housing programs" and invited applicants to "prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants." *Id.*; *see*

19

*also* Oliva (NAEH) ¶ 72 ("[t]hat email did not include any specificity or detailed instructions that often shape local competitions, leaving our members with no information about how to proceed.").

HUD did not actually rescind the NOFO until several months later—long after the three-month window in which the statute would have permitted HUD to do so. On November 13, 2025— eight months after Congress appropriated FY 2025 funds for the CoC Program—HUD issued a new fiscal year 2025 NOFO. Ex. 2, HUD, FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO (FY25 NOFO). In one sentence of the 128-page November 2025 NOFO, HUD rescinded the FY24-25 NOFO, with no explanation, stating only that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds" in the FY24-25 NOFO.

## V.    The Administration's Plan to Criminalize Homelessness, End "Housing First," and Impose Ideological Conditions

The rescission of the FY24-25 NOFO followed the Administration's efforts to leverage federal funding to advance the executive branch's own agenda without congressional authorization.

**Homelessness Executive Order**. On July 24, President Trump issued an executive order titled "Ending Crime and Disorder on America's Streets" that unilaterally announced a new policy of treating homelessness as a criminal issue rather than a societal challenge requiring systemic solutions. Executive Order No. 14321, 90 Fed. Reg. 35817 (Jul. 29, 2025) (Homelessness E.O.). Without support, the Order declares that "the overwhelming majority" of "individuals living on the

20

streets in the United States" "are addicted to drugs, have a mental health condition, or both." *Id.* § 1. The Order also declares that the "Federal Government and the States have spent tens of billions of dollars on failed programs that address homelessness . . . leaving other citizens vulnerable to public safety threats," *id.*, again without citing any supporting evidence.

The Homelessness E.O. calls for the HUD Secretary and the Secretary of Health and Human Services (HHS) to "end[] support for 'housing first' policies" because, the Order asserts without evidence, the policies "deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency." Homelessness E.O. § 5.

The Homelessness E.O. also takes aim at "drug injection sites" or "safe consumption" sites that aim to reduce the harm from drug use, asserting (again without evidence) that they "only facilitate illegal drug use and its attendant harm." *E.g.*, *id.* § 4. Among other things, the Order directs HHS not to fund such sites, *id.* § 4(a)(i), and to review whether recipients that operate such harm reduction sites are in violation of the terms of their awards and to "freeze" their funding as appropriate, *id.* § 5(c)(2).

The E.O. also calls for the involuntary institutionalization of unhoused people by, among other things, directing the Attorney General to provide technical assistance and grants to states that adopt and implement "maximally flexible" civil commitment and related standards that facilitate the commitment of individuals with mental illness or who "are living on the streets and cannot care for

themselves." *Id.* § 2(a).

In addition, the E.O. makes various directives designed to pressure states and localities to adopt and implement homelessness policies that align with the Administration's views rather than duly enacted congressional priorities. In particular, the Order instructs various agencies, including HUD, to prioritize giving federal funding to grantees based on the policies of the states and municipalities in which they are located. Under the Order, preference should go to jurisdictions that enforce prohibitions on "open illicit drug use," on "urban camping and loitering," and on "urban squatting"; that adopt and enforce standards to commit "individuals who are a danger to themselves or others" or cannot care for themselves; and that substantially implement the Sex Offender Registry Notification Act (SORNA), including by adequately tracking "homeless sex offenders." *Id.* § 3.

**Gender Ideology Executive Order.** The Administration has also sought to leverage federal funding to force the public to shun transgender people and adopt the Administration's views on gender. For instance, in an early executive order on so-called "gender ideology," the President announced that it was "the policy of the United States to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." Exec. Order No. 14168 § 2, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" E.O.). That executive order directed federal agencies to "ensure grant funds do not promote" what the Administration deemed to be the "false" idea that a person can have a gender identity that differs from their biological sex. *Id.* § 3(g). A few months later,

in an executive order broadly addressing federal grantmaking, the President similarly commanded agencies to help ensure that grantees would not deny "the sex binary in humans" or express "the notion that sex is a chosen or mutable characteristic." Improving Oversight of Federal Grantmaking § 4(b)(ii)(B), Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 7, 2025).

## VI.   The New NOFO Radically Transforms the CoC Program and Imposes Unlawful Conditions

The new FY25 NOFO radically restructures the CoC Program by imposing an unprecedented new cap on permanent housing and destabilizing the whole system by dramatically curtailing the funding that will be awarded at Tier 1.

The new NOFO also sets forth several new conditions that on their own and collectively disqualify or disadvantage applicants based on impermissible factors. These unlawful conditions arise at three separate stages of the application review— (1) at the "threshold review" stage where applicants must satisfy all criteria to qualify and proceed to the next stage, (2) at the "merit review" stage where applications receive points based on the CoC's own characteristics and activities as well as the characteristics of the project applicants, with awards going to the highest-scoring applications; and (3) at a final "risk review" stage, where HUD looks to factors purportedly bearing on each applicant's "likelihood of successfully implementing an award" before making a final decision. Ex. 2 (FY25 NOFO) at 89.

### A. Permanent Housing Cap and Tier 1 Allocation

The FY25 NOFO makes two structural changes that completely revamp the CoC program and fly in the face of Congress's focus on permanent housing, program

23

stability, and local control.

First, the FY25 NOFO caps the amount that each CoC can receive for permanent housing projects at 30 percent of the CoC's annual renewal demand, regardless of the project's merit and regardless of how the project would rate in a competition (Permanent Housing Cap). *Id.* at 15. This is unprecedented. Since the program's inception, HUD has never before imposed a cap on permanent housing awards within the CoC program. Oliva (NAEH) ¶¶ 76-77, 98.

The cap marks a major structural shift in what the CoC Program will fund. Based on the CoC Program's statutory requirements and past HUD priorities, CoCs generally devote a substantial portion of their expected funding to permanent housing projects. *See, e.g.*, Oliva (NAEH) ¶ 99 (roughly 87% of all CoC Program funds nationally support permanent housing and many Alliance members spend more than 90% of their CoC grants on permanent housing for seniors, veterans, families with children, and people with physical and mental disabilities); Declaration of Renee M. Willis (NLIHC) ¶ 47 (89%); Tavon (MHSA) ¶¶ 40 (96%), 46 (84%); Dillon (Boston) ¶ 23 (90%); Declaration of Elizabeth Mengers Margargee (Cambridge) ¶ 14 (86%); Declaration of Sunaree Marshall (MLK County) ¶ 16 (92%); Calvin (Nashville) ¶ 7 (87%); Declaration of Shireen McSpadden (San Francisco) ¶ 9 (91%); Declaration of Ann Chanecka (Tucson) ¶ 15 (83%)). In a decade, the percentage of CoC funding awarded to permanent housing projects—the only type of activity that Congress has designated as proven effective, *see* 42 U.S.C.

§ 11386b(d)(2)—has not once been less than 85 percent.[3] Under the FY25 NOFO, many of these ongoing permanent housing projects will categorically be excluded from receiving or even applying for CoC Program funds. The permanent housing solutions that Congress has designated as effective will be left dramatically underfunded in favor of unproven approaches.

Second, the FY 2025 NOFO allocates an unprecedentedly low amount to Tier 1—the category that assures funding to the projects Continuums select in their local competitions so long as those projects meet baseline requirements. Ex. 2 (FY2025 NOFO) at 15. In particular, the NOFO sets the Tier 1 amount at only 30 percent of each CoC's Annual Renewal Demand, *i.e.*, 30 percent of the amount each CoC would need to fully fund all renewals (Tier 1 Allocation). This dramatically departs from past practice, under which Tier 1 has typically been set at 90 percent or greater and has never dipped below 85 percent. Oliva (NAEH) ¶ 81-82. It also will cause massive instability—both for individual projects that Continuums would otherwise put forward for renewal and for Continuums' whole regions. With the Tier 1 Allocation, 70 percent of funding will be allocated to Tier 2—and Continuums and projects will need to compete nationally for that funding. Particularly given the new eligibility and scoring criteria discussed below, many existing projects likely will not be renewed due to their inevitably lower ranking under the drastically different

_____

[3] CoC Award Summary Reports by Component and Project, HUD Exchange (2025), https://www.hudexchange.info/programs/coc/awards-by-component/. To access data, search by year and calculate permanent housing (including rapid re-housing) national percentages.

criteria. Wilcox (Crossroads) ¶¶ 34-58; Declaration of Rush Frazier (YPI) ¶¶ 32-57; Willis (NLIHC) ¶¶ 47-61, 76-83; Tavon (MHSA) ¶¶ 29-30, 40-49; Chanecka (Tucson) ¶ 26; Kaminski (Santa Clara) ¶ 37. And Continuums themselves can no longer rely on relatively stable funding for their regions for the next year. McSpadden (San Francisco) ¶ 26; Declaration of Elizabeth Mengers Magargee (Cambridge) ¶ 13; Chanecka (Tucson) ¶ 24.

### B. Service Requirements Condition

In a complete reversal from past practice, the FY25 NOFO adopts an approach that prioritizes treatment before stable and permanent housing. As part of the merit review, the FY25 NOFO rewards Continuum applicants for conditioning housing on services and treatment ("Service Requirements Condition"). These conditions are reflected in several merit review categories. *See* Ex. 2 (FY25 NOFO) at 66-67, 77-79, 80. For example, a Continuum can receive up to 16 points (out of a total 130) by demonstrating that "program participants are *required* to take part in such services [including substance use treatment] as a condition" of program participation. Ex. 2 (FY25 NOFO) at 77-78 (emphasis added).

### C. Disability Condition

All permanent housing projects serve individuals with a range of disabilities including substance use disorders and mental and emotional impairments. Oliva (NAEH) ¶¶ 23, 36-37, 93; Willis (NLIHC) ¶¶ 49, 78; Wilcox (Crossroads) ¶ 51; Dillon (Boston) ¶ 33. Yet the FY25 NOFO preferences people with only certain disabilities ("Disability Condition"). At the threshold review, as part of the project quality criteria for Permanent Supportive Housing projects, HUD preferences projects

"designed to serve elderly individuals and/or individuals with a physical disability/impairment or a development disability (24 CFR § 582.5) not including substance use disorder," and the units "will prioritize these populations." Ex. 2 (FY25 NOFO) at 61. The Disability Condition effectively requires applicants to de-prioritize individuals with certain qualifying disabilities, including substance use disorder (explicitly) and mental and behavioral health disabilities (implicitly by omission).

The Disability Condition affects both new and renewal projects. The FY25 NOFO makes clear that HUD will not award funds to new projects that do not meet all "project quality" threshold criteria, including the Disability Condition. *Id.* at 55. In addition, HUD claims authority to discontinue funding for any project that does not comply with the Disability Condition, among other criteria. *Id.* at 54 (reserving right to reduce or cancel a renewal project if HUD receives information about non-compliance with the project quality threshold criteria).

### D. Geographic Discrimination Conditions

The FY25 NOFO discriminates against projects based on whether the state or local jurisdiction in which a Continuum is located advances the Administration's view that homelessness requires criminalization and a law enforcement response ("Geographic Discrimination Conditions"). As part of its "Protecting Public Safety" category in the merit review, the FY25 NOFO gives applicants a significant advantage (thirteen points) if their jurisdiction has laws (and enforces such laws) that prohibit "public illicit drug use" and "public camping or loitering"; if the CoC

demonstrates it uses standards like "involuntary commitment" based on state or local law; and if their state "substantially implements and is compliant with" the Sex Offender Registry and Notification Act (SORNA). Ex. 2 (FY25 NOFO) at 86-87.

## E. Law Enforcement Conditions

The FY25 NOFO rewards applicants that take steps to advance the Administration's law enforcement priorities (the "Law Enforcement Conditions"). Continuum applicants receive a higher score during the merit review by working with law enforcement in specific ways: conducting street outreach in partnership with "first responders and law enforcement;" helping to map and identify the location of homeless sex offenders when law enforcement asks; and not impeding "law enforcement or co-response to connect violators of public camping or drug use laws with services." *Id.* at 83, 87. Policy initiative preference points are available to projects that assist with federal immigration enforcement by "voluntarily, thoroughly, and demonstrably facilitat[ing] immigration status verification before distribution of benefits to all recipients" using the SAVE database. *Id.* at 88. The FY25 NOFO also awards ten points to applicants that reduce the number of homeless encampments by "at least 20 percent." *Id.* at 86-87. This new metric, coupled with the points for aggressively reducing the unsheltered population by 20 percent (*id.* at 69), incentivizes local communities to arrest or ticket those in encampments.

## F. Exclusionary Conditions

The FY25 NOFO includes mandatory certifications, retroactive reservations, and a risk review catchall that allows HUD to exclude applicants whose current or

past activities do not align with the Administration's agenda ("Exclusionary Conditions"). Ex. 2 (FY25 NOFO) at 54-55, 65. Because these conditions, except the risk-review catchall, are part of the threshold review, a new project application will be automatically denied if it fails to meet any one of the conditions. *Id.* at 51, 53. Renewal projects can be reduced or rejected too under these same conditions. *Id.* at 65.

**Certifications.** The FY25 NOFO includes two certifications related to race and diversity, equity, and inclusion (DEI) ("DEI-Related Certifications"). First, all applicants must certify that they "will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." Applicant and Recipient Assurances and Certification, HUD, OMB No. 2501-0044 (Feb. 2023), https://perma.cc/N5DW-RF5G. Second, all applicants must "certify affirmatively" that they "will not engage in racial preferences or other forms of illegal discrimination." Ex. 2 (FY25 NOFO) at 51, 53, 65. These DEI-Related Certifications do not define key terms including "DEI," "racial preferences," or "other forms of illegal discrimination." But given the language of multiple Executive Orders issued by this Administration aimed at eliminating DEI, e.g. EO 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity), EO 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing), applicants reasonably understand these certifications are intended to require elimination of all diversity, equity and inclusion efforts. *See* Wilcox (Crossroads) ¶ 49; Frazier (YPI) ¶ 27.

Separately, the "Harm Reduction Certification" requires project applicants to "certify affirmatively" that they "will not operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" Ex. 2 (FY25 NOFO) at 54, 65.

**Retroactive Reservations**. Via three "Retroactive Reservations," HUD "reserves the right to verify [an applicant's] past performance" against new policy priorities related to race, gender, and harm reduction. *Id.* at 55, 65. HUD can reject a project application if "the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination." *Id.* at 65. It can also reject projects that have previously or currently "conduct[ed] activities that rely on or otherwise use a definition of sex other than as binary in humans" ("Gender Identity Reservation"). *Id.* Likewise, HUD can reject applicants based on "evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction'" ("Harm Reduction Reservation"). *Id.* at 54-55, 65. HUD also claims the right to "verify past performance" as it evaluates funding eligibility for evidence the project engages in the activities covered by these reservations. *Id.* at 55.

30

**Risk Review Catchall.** The FY25 NOFO's Risk Review allows HUD to evaluate whether a CoC has a: "History of subsidizing or facilitating activities that conflict with the purposes of this NOFO." *Id.* at 89. It is not clear what types of past activities are covered, nor which "purposes" this catchall refers to or what information HUD plans to consult to make its evaluation. Given the breadth of issues encompassed by the NOFO, including conditions related to race and gender, CoCs could face disqualification, especially if they have previously adopted policies disfavored by the current Administration.

## VII. Plaintiffs Rely on CoC Funding and Suffer Harm Due to Defendants' Unlawful Actions

Plaintiffs include local governments (the "Local Government Plaintiffs") and several nonprofits. The Nonprofit Plaintiffs include two national membership associations, National Alliance to End Homelessness (NAEH) and the National Low Income Housing Coalition (NLIHC), along with Crossroads Rhode Island and Youth Pride, Inc. (the "Nonprofit Plaintiffs").

Plaintiffs rely on CoC Program grants to reduce homelessness. With these CoC Program awards, Plaintiffs serve thousands of their most vulnerable community members including children, seniors, and people with various disabilities. Oliva (NAEH) ¶¶ 7-8, 99-100; Dillon (Boston) ¶ 8; Kaminski (Santa Clara) ¶¶ 11, 38; McSpadden (San Francisco) ¶ 5.

Plaintiffs were awarded CoC funds under the original FY24-25 NOFO and expected their awards to be renewed for FY 2025 under the two-year NOFO. Oliva (NAEH) ¶ 67; Willis (NLIHC) ¶¶ 18, 49, 67; Dillon (Boston) ¶ 12; Magargee

(Cambridge) ¶ 11); Marshall (MLK County) ¶ 12; Calvin (Nashville) ¶ 7; McSpadden (San Francisco) ¶ 10; Chanecka (Tucson) ¶¶ 19-20; Kaminski (Santa Clara) ¶¶ 17-18; Wilcox (Crossroads) ¶ 7; Frazier (YPI) ¶ 8; Tavon (MHSA) ¶ 9. Now, they face the prospect of applying anew under the FY25 NOFO.

The FY25 NOFO sets an application deadline of January 14, 2026, and requires CoCs to complete their local competitions by December 15. Ex. 2 (FY25 NOFO) at 98. Some Plaintiffs' local competitions, like Rhode Island's, close even earlier. Wilcox (Crossroads) ¶ 28; Frazier (YPI) ¶ 59. Defendants' unlawful actions have caused and will continue to cause irreparable harm to Plaintiffs. *See infra* Section II (Irreparable Harm).

## LEGAL STANDARD

The Administrative Procedure Act authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts also have equitable authority to grant a preliminary injunction. *See* The Judiciary Act, § 11, 1 Stat. 73, 78 (1789). The same standards apply to both types of preliminary relief. *Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 65 (D.R.I. 2025) ("Although not definitively decided by the Supreme Court or the First Circuit, it is accepted that Section 705 'stays' under the APA turn on the same factors as preliminary injunctions.") (internal quotation marks and citation omitted).

To obtain preliminary relief of either type, the movant must establish (1) "a likelihood of success on the merits," (2) likely "irreparable harm… absen[t]

preliminary relief," (3) "that the balance of equities tips in [the movant's] favor, and" (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where "the government is the opposing party[,]" the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs satisfy all four requirements.

## ARGUMENT

Defendants have acted unlawfully in rescinding the FY24-25 NOFO and replacing it with the FY25 NOFO ("the Rescission and Replacement"). Defendants' Rescission and Replacement comes long after the statutory deadline for issuing a new NOFO has passed. That alone makes HUD's action contrary to law and in excess of authority. Moreover, the Rescission and Replacement significantly delays when CoC applications will be processed and awarded. Defendants' utter failure to provide any reasoned explanation for the Rescission and Replacement—and their failure to consider the substantial reliance interests of grant applicants and their communities, to whom the loss of CoC funding would be a staggering blow—further renders its actions arbitrary and capricious.

In addition, or alternatively, the FY25 NOFO, in substance, is also flawed and must be set aside. Its defunding of permanent housing strategies proven to reduce homelessness and renewal projects is contrary to the Homeless Assistance Act and its implementing regulations. These funding caps will cause thousands of people to return to homelessness, a consequence HUD ignores, making its actions arbitrary and capricious. The other unlawful conditions—related to service requirements, the deprioritization of certain disabilities, geographic discrimination,

33

law enforcement, and exclusionary conditions—suffer similar deficiencies. Among their many deficiencies, they are part and parcel of HUD's abandonment of long-standing, evidence-based practices, including the "Housing First" approach, in favor of unproven practices without any reasoning or consideration for the reliance interests at stake. For these reasons, the FY2025 NOFO is both contrary to law and arbitrary and capricious.

Additionally, the Gender Identity Reservation in the FY25 NOFO violates the First Amendment because it suppresses expression about gender identity by threatening to reject projects because they previously or currently "conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." Ex. 2 (FY25 NOFO) at 55. The First Amendment does not tolerate that result.

These unlawful actions are causing, and will cause, immense and irreparable harm to Plaintiffs, their members, and their communities. Some of the most vulnerable members of Plaintiffs' communities will lose housing and access to essential services, and effective programs run by Plaintiffs will go unfunded. This abrupt reversal in course leaves Plaintiffs desperate, attempting to determine whether they are eligible for CoC funds, if they can comply with the new conditions in a way that is consistent with their commitment to effective homelessness programs that treat clients with dignity, and how they will retain key staff and continue to provide people in their communities with lifesaving services if all else fails and they lose this essential funding. Plaintiffs seek a stay of the unlawful

34

Rescission and Replacement, and a stay of the FY25 NOFO to curb these catastrophic harms.

## I.    Plaintiffs Are Likely to Succeed on the Merits

The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious," "not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2). "[U]nless and until Congress confers power upon" them, agencies have "literally . . . no power to act[.]" *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And, even when an agency is exercising authority afforded to it by Congress, an agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Agency*, 463 U.S. 29, 43 (1983); *see also Ohio v. EPA*, 603 U.S. 279, 292 (2024) (directing courts to set aside agency action that is "not 'reasonable and reasonably explained.'") (citation omitted). A court may not "substitute its judgment for that of the agency," but should set aside an action if the agency has not "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks and citation omitted). While an agency may make policy judgments, those judgments may not

35

"conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994).[4]

Where an agency is changing its policy positions, it "must be cognizant of the longstanding policies that may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016) (quoting *FCC v. Fox Television Station, Inc.*, 556 U.S. 502, 515 (2009)). "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Station, Inc.*, 556 U.S. at 515–16. In assessing the reasonableness of an agency's explanation for its action, "the Court must look to 'the grounds that the agency invoked when it took the action.'" *New York v. Kennedy*, 789 F. Supp. 3d 174, 205 (D.R.I. 2025) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

---

[4] The FY25 NOFO's rescission of the FY24-25 NOFO and replacement with new and drastically different criteria and conditions, "mark the consummation of [HUD's] decisionmaking process" related to funding priorities and terms and conditions for the CoC program, and is a decision "by which rights [and] obligations" of CoC funding applicants and recipients "have been determined, [and] from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154,177–78 (1997). The FY25 NOFO "rescinds and supersedes any" of the FY24-25 NOFO award determinations for FY25—thus revoking all recipients' rights under those awards. That alone satisfies the *Bennett* test. Further, the FY25 NOFO reflects Defendants' final decision to use the criteria and conditions to select new recipients for the FY25 funds—notwithstanding the fact that those funds were already awarded pursuant to the FY 2024 Appropriations Act and the corresponding two-year NOFO. Courts have held that agency actions establishing eligibility criteria and conditions for receipt of federal funding are final agency action reviewable under the APA. *See, e.g., Rhode Island Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 58, 68 (D.R.I. 2025); *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1057 (D. Or. 2018).

### A. The Rescission and Replacement of the FY24-25 NOFO Violates the APA

#### 1. *The Rescission and Replacement is contrary to law and exceeds Defendants' authority*

Defendants decided to issue a new NOFO in FY25, rather than continuing under the FY24-25 NOFO, far too late under the statute. The November 13 Rescission and Replacement must be set aside as "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). By statute, HUD "shall release" a NOFO for grants for a particular fiscal year "not later than 3 months" after the enactment of the act making the appropriation. 42 U.S.C. § 11382(b). Congress appropriated funds for fiscal year 2025 CoC awards on March 15, 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12), 139 Stat 9, 10 (Mar. 15, 2025). HUD was therefore required to release the NOFO for fiscal year 2025 CoC funds "not later than" three months later—by June 15.

HUD, of course, had already issued the two-year NOFO covering both fiscal year 2024 and 2025. If it wanted to issue a replacement NOFO, it had plenty of time to do so before the June 15 deadline. But it did not. In fact, HUD did not rescind and replace the FY24-25 NOFO until November 13—eight months after Congress appropriated the relevant funding. HUD did not have authority to issue that untimely NOFO when a timely-issued NOFO was already in place, and the Rescission and Replacement of the original NOFO was contrary to § 11382(b)'s timing mandate. *Cf. Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

37

("[U]nless and until Congress confers power on" them, agencies have "literally . . . no power to act[.]"). The Rescission and Replacement must be set aside for that reason alone.

### 2. *The Rescission and Replacement is arbitrary and capricious*

The Rescission and Replacement, which will delay the award of funds and cause massive disruption in essential services, was also unreasonable and unreasonably explained, making it arbitrary and capricious.

For one, HUD offered no justifiable explanation for why it was rescinding and replacing the FY24-25 NOFO at such a late date—eight months after Congress appropriated fiscal year 2025 funding and mere weeks before the existing grant awards would have been renewed with FY 2025 funding, had the FY24-25 NOFO remained in place. While a contemporaneous announcement offered (inadequate) reasons for changing the program, that announcement did not explain why HUD was rescinding an existing NOFO just before awards should have gone out, or why the agency could not wait until a new funding cycle to make changes on a timely basis. *See* HUD, *HUD Sec. Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund* (Nov. 13, 2025), https://perma.cc/334N-5AWQ. Agency action that has "not been explained at all" is quintessentially arbitrary and capricious. *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 889 (W.D. Wash. 2025), *appeal pending*, No. 25-3664.

Nor did Defendants consider the impact the belated swap would have. Most notably, the timing of the Rescission and Replacement inevitably leads to funding

gaps. *See* Calvin (Nashville) ¶ 25; Chanecka (Tucson) ¶ 22; Declaration of Andrew Freeman (Safe Haven) ¶ 5, 10; Dillon (Boston) ¶ 19; Marshall (MLK County) ¶ 15; Tavon (MHSA) ¶¶ 22-24; Willis (NLIHC) ¶¶ 36-48, 70-76. Some providers' existing grants are expiring as early as January 2026. McSpadden (San Franciso) ¶ 12; Tavon (MHSA) ¶22. Under the FY24-25 NOFO, Continuums and organizations expected FY 2025 awards on the normal timeline around December 2025, or January 2026 at the latest—in advance of when their existing one-year FY 2024 grant agreements begin to expire early in calendar year 2026. Oliva (NAEH) ¶¶ 67-68, 73, 135-136; *see also* Kaminski (Santa Clara) ¶¶ 20, 30; Marshall (MLK County) ¶ 15. With the late-stage Rescission and Replacement, funds will not be awarded until May 2026 at the earliest, Ex. 2 (FY25 NOFO) at 5, leaving lengthy funding gaps that will force formerly homeless individuals and families out of their housing and onto the streets, resulting in the loss of gains made in health and mental health treatment and substance use stability, placing them at risk of violence, exploitation and severe trauma. *See infra* Section II; *see also* Oliva (NAEH) ¶¶ 132-137; Wilcox (Crossroads) ¶ 74; Frazier (YPI) ¶ 64. HUD does not appear to have considered these impacts, let alone articulated a satisfactory explanation for choosing that course.

Relatedly, the Rescission and Replacement is arbitrary and capricious because Defendants failed to consider the reliance interests of CoCs, service providers and the individuals and the communities they serve. Before it acts, an agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020). These reliance interests are significant—they include the fact that the

ultimate beneficiaries of the programs awarded funds under the FY24-25 NOFO will lose their housing and will become homeless, that recipients planned their budgets and made sub-contract commitments in reliance on the renewal of grant awards for FY 2025, and that Continuums and program sponsors bear significant administrative burdens in running and applying to local competitions required by any new NOFO. *See infra* Section II. HUD did not consider these impacts, let alone articulate a "satisfactory" explanation for choosing that course. *State Farm*, 463 U.S. at 43.

Though less harmful than the life-or-death consequences for the ultimate beneficiaries of projects selected under the FY24-25 NOFO, HUD likewise did not consider the administrative burdens the switch would cause. Nor did HUD explain why it was abandoning the two-year NOFO that Congress authorized to streamline the CoC application process. Redoing the competition for FY 2025 funds will result in untold hours of administrative work by Continuums of Care that now must run new local competitions on a compressed timeframe and by service-provider applicants that now must prepare and submit new applications (for a dramatically changed program at that).

Defendants' actual rollout of the new NOFO has only made matters worse and contributed to the arbitrariness and capriciousness of the Rescission and Replacement. After issuing the FY25 NOFO many months late, when communities are in urgent need of renewed funding, HUD has—as of December 1—still failed to provide the detailed instructions and actual application that applicants must

40

submit by on or before December 15, 2025 for local competitions and January 14, 2026 for the national competition. Willis (NLIHC) ¶ 38. The actual application is significant as it contains details on the specific information applicants must provide; the delay in releasing it has further contributed to the disruption and uncertainty Defendants' last-minute changes have caused. Willis (NLIHC) ¶¶ 33-39. Defendants have failed to account for this consequential disruption.

Defendants apparently wanted to stop funding certain programs and to impose new conditions. But that does not justify the last-minute Rescission and Replacement. Even if Defendants could lawfully make their changes at *some* point (which they could not, for the reasons explained below, *infra* Section II.B, it was arbitrary and capricious to abandon the FY24-25 NOFO so late in the game given the resulting destabilizing impact.

### B. The FY25 NOFO Violates the APA

#### 1. *The FY25 NOFO exceeds HUD's authority*

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington, Texas v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority . . . violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020).

No statute authorizes Defendants to wholly restructure the CoC Program or to impose the new unlawful criteria and conditions in the FY25 NOFO. To begin, no provision of the statute authorizes a 30 percent cap—or any cap—on permanent housing. The statute requires HUD to award funds "based on criteria" that HUD

41

establishes pursuant to the statute. 42 U.S.C. § 11386a(a). It does not permit HUD to categorically limit certain kinds of projects regardless of how they would rank under the criteria—and it certainly does not permit HUD to impose a cap on the very activities Congress expressly determined to have been proven effective at combatting homelessness. *Id.* § 11386b(d)(2).

Nor does any provision of the statute authorize HUD to impose the host of new criteria and conditions that the FY25 NOFO imposes. The statute prescribes a detailed list of "[r]equired criteria" HUD must consider when awarding grants—including things like the applicant's "previous performance ... regarding homelessness," its plan for reducing the existence and duration of homelessness, its coordination with other entities, and its ability to obtain supplemental funding. 42 U.S.C. § 11386a(b)(1). HUD may also establish additional criteria it "determines to be appropriate to carry out [the CoC statute] in an effective and efficient manner," *Id.* § 11386a(b)(1)(G), but the challenged criteria do nothing to serve efficacy and efficiency goals.

Likewise, no statute authorizes Defendants to impose the Harm Reduction Certification under which applicants must agree that they will not operate "safe consumption sites" or conduct other similar activities that aim to reduce the harm from drug use. Ex. 2 (FY25 NOFO) at 54. This Certification appears to extend beyond the grant-funded program, forcing applicants to agree they will not engage in such activities even with separate funds. *See id.* Defendants lack authority to condition grant funds on what applicants do with non-CoC funds. The statute

42

establishes the "[r]equired agreements" that grantees must enter into with HUD to receive funds under the CoC Program—all of which pertain to the grantee's performance of the CoC-funded program. 42 U.S.C. § 11386(b). The statute authorizes HUD to establish "other terms and conditions," but only "to carry out this part in an effective and efficient manner." *Id.* § 11386(b)(8). This does not permit HUD to require grantees to forswear harm reduction outside the scope of the CoC Program as it does not affect the CoC Program's effectiveness or efficiency. That condition in any event is not "of the same kind" as the ones the statute specifies, and the statute cannot be read to authorize conditions that are different in kind from the ones the statute imposes. *Cf. King, Cnty.*, 785 F. Supp. 3d at 886 (concluding that similar grant of authority in CoC statute could not authorize conditions not "of the same kind" as those in the statute).

### 2. *The FY25 NOFO is contrary to law*

Agency action that is "not in accordance with law" must be set aside. 5 U.S.C. § 706(2)(A). The FY2025 NOFO's destabilization of permanent housing as well as a range of other unlawful conditions render the FY25 NOFO contrary to law.

**Destabilization of Permanent Housing.** HUD expressly designed the FY25 NOFO to redirect the majority of funding away from permanent housing and instead to transitional housing and "supportive services" projects with no housing component.[5] It does this by capping funding for permanent housing at 30 percent of

_____

[5] *See HUD Secretary Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund*, HUD, https://perma.cc/334N-5AWQ.

43

each CoC's renewal demand, and by dramatically reducing the Tier 1 Allocation that allows the regional CoCs to identify and prioritize their most effective projects for CoC funding—and which CoCs typically use to renew permanent housing projects. This effort to defund and destabilize permanent housing flies in the face of the statute's clear commitment to supporting permanent housing as the only strategy Congress identified as having been proven effective in combatting homelessness. *See* 42 U.S.C. § 11386b(d)(2). And it conflicts with various other statutory provisions as well.

First, the FY25 NOFO conflicts with 42 U.S.C. § 11386c's provision regarding renewals. Under that provision, funds "shall be available" for renewals for "permanent housing projects," and HUD "shall determine whether to renew" such projects "on the basis of" the CoC's certification as to two things: (1) that "there is a demonstrated need for the project" and (2) that "the project complies with program requirements and appropriate standards of housing quality and habitability." 42 U.S.C. § 11386c(b). The FY25 NOFO impermissibly provides that HUD will make the decision on whether to renew a permanent housing project based not on the two statutorily identified factors but based on whether a CoC had already hit the FY25 NOFO's baseless 30 percent cap on funding for permanent housing.

Second, the FY25 NOFO's destabilization of permanent housing conflicts with the statute's requirement that HUD provide "incentives" for specified permanent housing activities that Congress determined have proven effective in combatting homelessness (or other proven strategies that HUD identifies after

notice and comment, of which there are none). *See* 42 U.S.C. § 11386b(d). By so dramatically restricting the pool of funding available for permanent housing, Defendants incentivize CoCs and applicants to seek funding for other types of projects whose funding pools are not so limited. This restriction violates the statutory requirement that only permanent housing projects be incentivized.

Third, the FY25 NOFO conflicts with the statute's requirement that "not less than 30 percent" of funding used for new projects go to permanent housing for homeless individuals with disabilities and, in some cases, their families. *Id.* § 11386b(a)(1). Given the FY25 NOFO's multiple structural changes, and in particular the Permanent Housing Cap and Tier 1 Allocation, it is hard to see how Defendants would allocate *any* meaningful funding to new awards for permanent housing—let alone the minimum 30 percent that the statute requires. For years, permanent housing projects have been the majority of most CoCs' projects—and given the importance of maintaining those projects to keep people in their homes— CoCs will likely and predictably choose to prioritize existing permanent housing projects for funding or reallocate funding to create new permanent housing projects based on local need and priorities, include them in Tier 1, and accordingly receive permanent housing awards equal to around 30 percent of their annual renewal demand. That alone will hit the 30 percent Permanent Housing Cap for each CoC. Thus, they will all be ineligible for any new funding for permanent housing, which would exceed the cap. HUD thus could not use 30 percent of the funding for *new* awards on permanent housing awards—at least not unless HUD awarded the

required 30 percent of CoC funding to entirely solo applicants applying outside of the CoC planning process, an option the statute does not generally permit. *See* 42 U.S.C. § 11382(i).

**Service Requirements Condition**. The Service Requirements Condition, which steers funding to programs that make services mandatory for participants, conflicts with the Homeless Assistance Act's prioritization of projects that further proven strategies like permanent supportive housing and rapid rehousing. As part of the statutory criteria for awarding CoC Program funds, HUD must evaluate the extent to which Continuum applicants "incorporate comprehensive strategies for reducing homelessness," 42 U.S.C. § 11386a(b), especially proven interventions like "permanent supportive housing for chronically homeless individuals and families." 42 U.S.C. § 11386b(d)(2). Though these programs must offer services, including substance use treatment, those services are *not* a prerequisite for accessing housing support. *See, e.g.*, 42 U.S.C. § 11385(a) (requiring projects to provide services only "to the extent practicable"); 42 U.S.C. § 11386a(b)(1)(F) (explaining that permanent housing can include assistance for "mental health conditions, substance addiction" and other challenges).

**Disability Condition**. The Disability Condition rewards applicants that deprioritize services to individuals suffering from substance use disorders and mental or emotional impairments. This Condition runs afoul of Congress's unmistakable directive: permanent supportive housing projects must serve *all* homeless individuals with disabilities who meet the criteria, including those with

46

mental, emotional and substance use disabilities. 42 U.S.C. §§ 11386b(a)(1); 42
U.S.C. 11360(10)(A); *see also*, 24 C.F.R. § 578.3 (HUD regulations incorporating
inclusive definition of disability into definition of "chronically homeless"); 24 C.F.R.
§ 578.1 (making no distinction between physical or mental health disabilities).
HUD's regulations likewise prohibit discrimination against people based on
disability. *See* 24 C.F.R. § 8.4(a); 24 C.F.R. § 9.130(b)(1)(ii). Because the Disability
Condition prioritizes services to individuals with physical and developmental
disabilities and deprioritizes services to individuals with all other types of
disabilities, it is contrary to law.

     **Geographic Discrimination Conditions**. HUD has impermissibly chosen
to base its funding decisions for the CoC Program, in part, on whether jurisdictions
have and enforce local laws or policies that align with the Administration's agenda
to criminalize homelessness. Ex. 2, (FY25 NOFO) at 86-87. Congress has expressly
prohibited this type of interference in local decisionmaking: It provided that HUD
may not "establish any criteria" for awarding funds based on "the adoption . . . by a
jurisdiction of any public policy, regulation, or law" so long as the policy or law was
within the jurisdiction's authority and does not violate federal law. 42 U.S.C. §
12711. Moreover, statutory and regulatory provisions require that HUD fund local
jurisdictions based on need—not based on their alignment with the incumbent
Administration's preferences for local policies. 42 U.S.C. § 11386a(b) (explaining
that local need "within the geographic area for homeless services" shall be set by a
formula developed by the Secretary); 24 C.F.R. § 578.17(a) (detailing formula for

Preliminary Pro Rata Need for each geographic area).

**Gender Identity Reservation.** The Gender Identity Reservation, part of the Exclusionary Conditions—which contemplates rejecting projects that have previously or currently "conduct activities that rely on or otherwise use a definition of sex other than as binary in humans," Ex. 2, (FY25 NOFO) at 55, plainly conflicts with HUD's Equal Access Rule, 24 C.F.R. 5.106. That Rule requires that grantees "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity"—conduct that necessarily requires grantees to consider sex to be other than binary. *See*, *id.* Defendants cannot permissibly penalize conduct that a regulation requires.

For all these reasons, the FY25 NOFO must be set aside as contrary to law.

### 3. *The FY25 NOFO is arbitrary and capricious*

The FY25 NOFO must be set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A). The FY25 NOFO, with its wholesale restructuring of the CoC Program and myriad unlawful conditions, fails to consider important aspects of the problem, is unreasoned and unexplained, lacks any evidence-based support, and fails to consider the substantial reliance interests.

**Failure to Address Key Aspects of Problem, Provide Reasoning, Consider Facts and Evidence.** The drastic restructuring of the CoC program through the FY25 NOFO is arbitrary and capricious in myriad ways. Across the board, the FY25 NOFO is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants failed to consider

48

key facts and evidence and failed to address multiple important aspects of the problem. *See State Farm*, 463 U.S. at 43.

To start, though strikingly apparent on its face, HUD failed to consider the likely, devastating increase in homelessness due to the FY25 NOFO, particularly the Permanent Housing Cap, Tier 1 Allocation, and Service Requirements Condition, which dramatically scale back the CoC Program's support for stable permanent housing. Housing programs will be forced to shut down due to the FY25 NOFO and more people will be forced into homelessness—exacerbating the very problem the CoC Program is designed to address. *See infra* Section II. Making things worse, it is not practicable to simply move individuals and families from permanent housing into transitional housing programs, and efforts to do so will place enormous burdens on CoCs and tenants alike and would risk many of those individuals and families becoming homeless again. Oliva (NAEH) ¶ 101; Willis (NLIHC) ¶¶ 48-49, 76-77; *see also* McSpadden (San Francisco) ¶ 31.

HUD offers no explanation, let alone a reasoned one, for abandoning evidence-based practices, like permanent housing and Housing First, in favor of an approach that prioritizes short-term services as well as compulsory treatment and punitive strategies. HUD also offers no explanation for whether or how it considered the impact of slashing renewals of projects that meet the demonstrable needs of the community and provide effective solutions to homelessness.

HUD also failed to consider the evidence supporting the approaches it abandoned, or to offer any contrary evidence supporting its chosen course. Evidence

shows that permanent housing solutions using Housing First approaches are incredibly effective. Oliva (NAEH) ¶¶ 33-43 & nn. 5-7, 9. In fact, HUD itself, in 2023, highlighted a series of studies that found the Housing First model to be more effective, particularly in its ability to create "greater long-term housing stability," to reduce costs (by shortening stays in hospitals, prisons, and elsewhere), and to "successfully house people with intersecting vulnerabilities, such as veterans and people with a history of substance abuse" and "mental illness challenges." *See* Kaminski (Santa Clara) Ex. 2. HUD also did not consider research which it also previously endorsed indicating that requiring treatment "produces inferior housing stability outcomes" and can counterproductively cause individuals experiencing homelessness to "disengage[] from critical services." *Id.*; Oliva (NAEH) ¶¶ 90-91.

HUD's established practice of prioritizing permanent housing, providing stability through renewals, and taking a Housing First approach has been effective. Between 2010 and 2020, the United States reduced homelessness, including a 50 percent reduction in veteran homelessness; a 16 percent reduction in chronic homelessness; and a 29 percent decline in homelessness among families with children, with unsheltered homelessness in this subpopulation plummeting by 72 percent. Oliva (NAEH) ¶ 45. HUD fails to account for why it has departed from the data-driven methods that contributed to this success, and it fails to account for the consequences that departure will cause.

Similarly, the Harm Reduction Certification and Reservation also reflect an unexplained and unreasonable shift. Congress directed that CoC funding

applications "shall take into account barriers faced by individual homeless people." 42 U.S.C. § 11386a(b)(1)(A). But HUD failed to consider that one such barrier may be the inability of individuals to participate in sobriety-based treatment programs, and that "Harm Reduction" can address those barriers by allowing people to access housing before fulfilling sobriety and other treatment requirements. Consistent with Housing First strategies that HUD has long endorsed, harm reduction strategies also seek to house people as quickly as possible without imposing conditions like treatment, sobriety, or employment. *See, e.g.*, Kaminski (Santa Clara) Ex. 2; *see also* Wilcox (Crossroads) Dec. ¶¶ 44-46. For many of the same reasons that HUD's sudden and unexplained abandonment of its commitment to the "Housing First" approach is arbitrary and capricious, so too are the criteria and conditions that threaten to disqualify a project applicant based on evidence that it has engaged in harm reduction activities.

HUD likewise offers no reasoning or explanation for its sudden decision to preference individuals with certain disabilities over others through the Disability Condition. Prioritizing permanent housing for those with physical impairments and developmental disabilities over those with mental impairments and substance use disorders runs counter to research that shows people with disabilities, including but certainly not limited to substance use disorder, thrive in permanent supportive housing. Oliva (NAEH) ¶ 37-39. Likewise, for those with substance use disorders, leading with stable housing—rather than treatment and services—has also been proven effective. Wilcox (Crossroads) ¶ 21; Oliva (NAEH) ¶ 38-39. HUD did not

51

account for this evidence, explain why it rejected it, nor did it offer any evidence to the contrary.

HUD also has provided no explanation for the Exclusionary Conditions, which chill or outright prohibit applicants from engaging in diversity, equity, and inclusion activities or respecting gender diversity. These conditions, moreover, reflect an about face from HUD's prior focus on addressing racial disparities in access to housing programs and promoting LGBTQ+ equity, and HUD failed to provide reasons for the change. *See* Ex. 2 (FY24-25 NOFO), at 9, 10, 37, 38, 91, 97 (emphasizing racial equity as a policy priority and awarding points for providing inclusive access to unhoused LGBTQ individuals and families); FY23 NOFO at 8, 36, 86, 93 https://perma.cc/7T7F-LCZ4 (same); FY18 NOFO, at 52, https://perma.cc/84AP-XDY9 (awarding points for "addressing racial disparities in homelessness"). Indeed, both the FY23 and FY24-25 NOFOs expressly recognized that "gender identity . . . manifests differently for different individuals" and directed CoCs to "address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals." *See* FY23 NOFO, at 8-9; Ex. 1 (FY24-25 NOFO) at 9.

The FY25 NOFO's shift toward punishment of unsheltered persons, including through the Geographic Discrimination and Law Enforcement Conditions, is also unreasonable and unexplained. These provisions reflect a policy preference for criminalizing homelessness that is unsupported by any evidence and inconsistent with statutes addressing homelessness. *See* 24 U.S.C. § 11313(a)(12) (requiring

advisory body to "develop constructive alternatives to criminalizing homelessness and laws and policies that prohibit sleeping, feeding, sitting, resting, or lying in public spaces when there are no suitable alternatives . . . ."). HUD also fails to acknowledge or explain the consequences of this policy preference, namely the impacts of exposing more people to criminal legal system interactions. Oliva (NAEH) ¶ 38-39 ("[o]ne two-year study by the American Psychological Association comparing PSH using a "housing first" approach versus "residential treatment" found that individuals who received immediate, independent housing had more days in their own place, fewer days incarcerated"), 40 ("permanent supportive housing" is more "cost efficient" "because housed people are less likely to use emergency services … including hospitals [and] jails"), 66; Willis (NLIHC) ¶ 18.

Finally, under the Risk Review Catchall, HUD claims new authority to deny or condition an applicant's funding based on its "history of subsidizing or facilitating activities that conflict with the purposes of this NOFO." *See* Ex. 2 (FY 25 NOFO) at 89. This arbitrarily and capriciously appears to be designed to provide HUD with an opportunity to penalize grant recipients for lawful activity that prior HUD policy not only allowed but actively encouraged.

Rather than offer a reasoned explanation for any of the unlawful conditions in the FY25 NOFO, HUD appears to have blindly followed the Homelessness E.O., which calls for the end of Housing First, compulsory services, and law enforcement tools to criminalize homelessness. *See* Homelessness E.O. But, as court after court has made clear, "an agency cannot avert the 'arbitrary and capricious' analysis by

simply deferring to the relevant EO." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025), *appeal pending*, No. 25-1428; *see also, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) ("Furthering the President's wishes cannot be a blank check for OMB to do as it pleases."); *King Cnty.*, 785 F. Supp. 3d at 888–89 ("[R]ote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relation to the agency's underlying action—does not constitute 'reasoned decisionmaking.'"). HUD maintained an obligation to provide sound reasoning for its actions—and it entirely failed to do so.

**Failure to account for existing federal and state legal standards.** The FY25 NOFO also suffers from a failure to account for existing federal and state laws. For example, through its abrupt departure from Housing First and imposition of a new Service Requirements Condition, HUD failed to consider the impact on Plaintiffs that must comply with conflicting state and federal laws. The CoC Program is a vital source of funding to entities that provide housing to survivors of domestic violence and sexual assault. But those entities' programs frequently also rely on funding under the Violence Against Women Act and the Family Violence Prevention Service Act—and those laws outright prohibit grantees from requiring beneficiaries to participate in support services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2). Defendants failed to consider the impact the FY25 NOFO's

Service Requirements Condition would have in systematically disadvantaging domestic violence and sexual assault providers that cannot lawfully require services.

Defendants similarly did not consider the problem the Service Requirements Condition would create for providers in states, such as California, that have codified Housing First by prohibiting service or program compliance as a condition of housing. *See* Cal. Welf. & Inst. Code § 8256. For those entities, too, they cannot lawfully meet the FY25 NOFO's Service Requirements Condition—another consequence Defendants failed to consider.

The Disability Condition and the Gender Identity Reservation pose similar conflicts. With the Disability Condition, if applicants provide different access to services on the basis of disability to comply with the FY25 NOFO, they risk being subject to legal claims for disability discrimination under local, state and federal laws, including the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, 12181-89, and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794, and HUD's regulations for federally assisted activities, 24 CFR § 8.4(b). And if they agree not to "use a definition of sex as other than binary" in carrying out their awards, they would violate a host of laws and regulations requiring them to do just that—i.e., requiring entities to recognize gender identity and accommodate people accordingly. Those laws include HUD's Equal Access Rule, which requires CoC-funded entities to ensure "equal access in accordance with gender identity," including by serving people "in accordance with their gender identity." *See* 24 C.F.R.

§§ 5.100, 5.106. The Gender Identity Reservation also conflicts with other state laws that protect against discrimination on the basis of gender identity. *See, e.g.*, Cal. Gov't Code § 12955(a) (prohibiting housing discrimination on the basis of gender identity and expression, among other protected characteristics); R.I. Gen. Law § 34-37-2.3 (prohibiting housing discrimination on the basis of gender identity or expression, among other protected characteristics). HUD does not appear to have considered how applicants could comply with its new conditions while also complying with these various laws and regulations, nor did it explain its reasons for putting project applicants in this untenable position.

Indeed, when HUD tried to impose similar arbitrary policy conditions barring recognition of gender identity in post-award CoC grant agreements this past summer, multiple courts, including this Court, determined that these conditions likely violated the APA. *Rhode Island Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2025 WL 2988705, at *7 (D.R.I. Oct. 23, 2025) ("[T]he Court must conclude that [HUD] engaged in a baseless and arbitrary process" in imposing new conditions on CoC grants); *King, Cnty.*, 785 F. Supp. 3d at 888 ("The Court concludes that Defendants have failed to demonstrate that the new funding conditions were the result of 'reasoned decisionmaking,' let alone have been 'reasonably explained.' In fact, they have not been explained at all."); *City of Fresno v. Turner*, No. 25-CV-07070-RS, 2025 WL 2721390, at *9 (N.D. Cal. Sept. 23, 2025) (HUD failed to make "the requisite showing under the APA that [it] considered the significant reliance interests of Plaintiffs and grantees like them [that] apply for,

56

spend, and/or seek reimbursement via millions of dollars of federal funding on an ongoing and additive, or even nearly-automatic, basis."). This Court should do the same in this context.

**Failure to Account for Reliance Interests.** The FY25 NOFO's sudden departure from HUD's "longstanding policies" is particularly alarming given the "serious reliance interests" at stake. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (cleaned up). In reliance on longstanding and consistent terms of prior NOFOs and HUD policies, Plaintiffs, the national nonprofit Plaintiffs' members, and countless other providers across the country developed supportive housing systems, invested significantly in building permanent housing, and otherwise aligned their programs in accordance with these accepted best practices for ending homelessness (including serving those living with disabilities beyond physical and developmental disabilities). *See, e.g.*, Oliva (NAEH) ¶¶ 24, 33, 37, 77-78, 86, 128; Wilcox (Crossroads) Dec. ¶¶ 18-21; Marshall (MLK County) ¶ 18; Chanecka (Tucson) ¶ 5; Dillon (Boston) ¶ 5; Magargee (Cambridge) ¶¶ 16-17. As Plaintiffs' own experience shows, renewal projects that are now threatened with total loss of CoC funding have been consistently renewed year after year—because they have proven to be successful and efficacious. *See, e.g.*, Wilcox (Crossroads) Dec. ¶¶ 5, 19-21; Dillon (Boston) ¶¶ 5-6; Kaminski (Santa Clara) ¶¶ 29, 31; Calvin (Nashville) ¶ 9; Declaration of Amy Davidson (San Mateo) ¶ 21; Declaration of Mary Katherine Rand (Mary Parrish Center) ¶ 4. Organizations and governments have invested significant resources of their own into these projects, pursuant to CoC

programs' funding match requirements, among other investments. *See, e.g.*, Kaminski (Santa Clara) ¶ 34; Magargee (Cambridge) ¶ 17; Marshall (MLK County) ¶ 21. HUD's failure to explain its departure from incentivizing permanent supportive housing and rapid rehousing projects, and failure to consider recipients' significant reliance interests, is arbitrary and capricious.

As serious as these reliance interests may be, they pale in comparison to the reliance interests of individuals and households in permanent supportive housing. HUD provides no acknowledgement of their unique needs, the harm that will befall them when they lose housing, or the resulting consequences for the communities in which they live. *See, e.g.*, Oliva (NAEH) ¶¶ 7-9, 133-37 ("[t]he human toll of this harm could prove deadly for formerly homeless individuals and families as many are Veterans, older adults, people with disabilities, or survivors of domestic or sexual violence. There is neither enough temporary housing like emergency shelter, nor enough permanent housing to serve everyone who will become homeless again as a result of these changes in the 2025 NOFO"); Willis (NLIHC) ¶¶ 48-49, 76-78; Kaminski (Santa Clara) ¶¶ 43-44; Davidson (San Mateo) ¶ 23; Dillon (Boston) ¶ 40; Marshall (MLK County) ¶ 19.

### 4. The FY25 NOFO was unlawfully issued without notice-and-comment

Agency action taken "without observance of procedure required by law" must be set aside. 5 U.S.C. § 706(2)(D). Defendants failed to follow required procedures in making the sweeping changes to the CoC Program through the FY25 NOFO. Before taking action that qualifies as a legislative rule under the APA, government

58

agencies must publish "general notice of proposed rule making" and provide the public an "opportunity to [comment]." 5 U.S.C. § 553(b),(c). Under the APA, that requirement dos not apply to matters relating to "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). HUD's regulations, however, have long required HUD to undertake notice and comment even in rulemakings involving grants and other such matters, "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1.

The FY25 NOFO fundamentally overhauls the CoC Program. It sharply limits funding for permanent housing and undermines the stable funding streams on which communities have come to rely, in addition to imposing a host of new criteria and conditions that alter what the CoC Program will fund. If HUD wants to try to make those sorts of substantive changes to the Program, its own binding regulations require it to undertake notice and comment first. *See id.*; *cf. also Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (HUD's changed methods for calculating subsidies for public housing authorities were substantive or legislative rules subject to notice-and-comment). That process will allow it to understand and account for the real-world impacts of its proposed changes—something it has to date entirely failed to consider. Until it does, the FY25 NOFO must be set aside for failure to follow required procedures. 5 U.S.C. § 706(2)(D).

### C. The Gender Identity Reservation Violates the First Amendment

The Gender Identity Reservation—which warns applicants that HUD may reject projects because they previously or currently "conduct activities that rely on

59

or otherwise use a definition of sex other than as binary in humans"—violates the First Amendment. Ex. 2(FY25 NOFO) at 55. While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). The government may not leverage government funding to "aim at the suppression of" what it deems to be "dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). Relatedly, imposing a funding condition "not relevant to the objectives of the program" can also violate the First Amendment. *Agency for Int'l Dev.*, 570 U.S. at 214. And, crucially, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)).

The Gender Identity Reservation transgresses these limits. Indeed, multiple other courts have recently held that similar agency actions barring grantees from using grant funds to "promote gender ideology" likely violate the First Amendment. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *7-8, *12 (D.R.I. Oct. 23, 2025) (holding that provision barring grantees from using grant funds to "promote 'gender ideology'" likely "violate[d] the First Amendment"). *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1220 (N.D. Cal. 2025); *R.I. Latino Arts v. NEA*, 777 F. Supp. 3d 87, 108 (D.R.I. 2025).

For one, the restriction is "entirely untethered to any 'legitimate objective[s]'" of the programs it burdens. *S.F. AIDS Found*, 786 F. Supp. 3d at 1218. Instead, it is

"directed … towards disfavored speech." *Id.* at *1219. Under this Reservation, HUD could reject an applicant's project for using the pronouns that match transgender or nonbinary individuals' gender identity, or by otherwise acknowledging gender diversity. But that "is pure speech that has no relation to" the CoC Program's purpose. *See id.*

Moreover, though the Gender Identity Reservation uses slightly different wording than the Gender Ideology Executive Order, the Reservation aims to carry out its goal. In doing so, it impermissibly threatens funding "for a censorious purpose—aiming to suppress" what the government views to be "the dangerous idea[] of … 'gender ideology.'" *Id.* at 1220; *see also R.I. Latino Arts*, 777 F. Supp. 3d 87, 109-10 (noting that government cannot "use subsidies to suppress 'dangerous ideas'" and concluding that bar on funding art programs that "promote gender ideology" was "a clear First Amendment violation"). The Gender Ideology Executive Order makes clear its goal is "to root out the 'extreme,' 'false claims' of gender identity that contradict the government's view that there is only one 'biological reality of sex'"—in other words, to erase the recognition of transgender and nonbinary people's existence. *S.F. AIDS Found.*, 786 F. Supp. 3d at 1220 (citing "Gender Ideology" Order §§ 1, 2(f)). By threatening the funding of any activities "related to the dangerous ideas it has identified," the Gender Identity Reservation effectuates "precisely the kind of 'invidious viewpoint discrimination' that the Supreme Court has suggested would present First Amendment concerns even in the context of federal subsidies." *Id.* (citing *Finley*, 524 U.S. at 587).

61

The Gender Identity Reservation also unconstitutionally strays beyond the "scope of the federally funded program," *Open Soc'y*, 570 U.S. at 218. As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Id.* (quoting *Rust*, 500 U.S. at 197). The Gender Identity Reservation does just that. Under that Reservation, an applicant risks rejection for speech beyond the scope of the funded program, including using a nonbinary person's preferred pronouns. For these reasons, the Gender Identity Reservation violates the First Amendment.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

This Court has "broad discretion to evaluate the irreparability of alleged harm." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (citation omitted). Where Plaintiffs have "suffer[ed] a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996).[6]

---

[6] "[I]n the context of analyzing claims under the APA, some courts have held that 'once the court reache[s] the conclusion that the rule was indeed illegal . . . there is no separate need to show irreparable injury.'" *Illinois v. Fed. Emergency Mgmt. Agency*, No. CV 25-206 WES, 2025 WL 2716277, at *15 (D.R.I. Sept. 24, 2025) (internal citation omitted); *see also New York v. U.S. Dep't of Just.*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *22 (D.R.I. Sept. 10, 2025) (McElroy, J) (observing that because plaintiffs cannot obtain damages for APA claims, costs

Defendants' actions to rescind the FY24-25 NOFO and to replace it with the FY25 NOFO cause irreparable harm: the actions will increase homelessness due to funding gaps, retraumatize individuals when their access to programs and services is cut off, strain the resources of local communities, harm goodwill, create confusion and chaos, and threaten the missions of social services organizations. Much of this harm stems from how late in the funding cycle the rescission and replacement is occurring, and the unrealistic, compressed re-application timeline set forth in the FY25 NOFO.

## A. Funding Gaps Will Cause Homelessness, Evictions, and Trauma

HUD's actions will create severe, entirely unexpected gaps in funding that jeopardize Plaintiffs' ability to maintain housing for current program participants. The first wave of this harm is imminent, and more will soon follow.

### 1. *Programs face imminent closures because Plaintiffs, their members, and CoC partners cannot fill sudden funding gaps*

Historically, HUD issues a CoC NOFO in June, July or August, provides grantees with about three months to apply, and then issues awards resulting from that NOFO before prior grant agreements expire. Oliva (NAEH) ¶¶ 54, 61 ("between 2016 and 2024" "[t]he time period between competition closing and award, on average, was 124 days with 79 days being the shortest amount of time (FY2024) and 179 days being the longest (FY2022)"; Chanecka (Tucson) ¶ 21; McSpadden (San

---

incurred are irreparable). Plaintiffs have nonetheless provided ample information to establish irreparable harm.

Francisco) ¶ 21. The FY25 NOFO eviscerates that timeline. HUD will not make new awards until May 1, 2026, at the earliest, Ex. 2 (FY25 NOFO) at 5, and after a notice of award is issued, Plaintiffs anticipate several weeks or months of delay before awards are received. Oliva (NAEH) ¶¶ 129-137; Dillon (Boston) ¶ 19. Even if a project sponsor *might* get a new award under the FY 2025 NOFO—which is far from certain and will include far less critical funding than in prior years, *see infra*—HUD's delayed course-reversal means that housing providers, including Plaintiffs—some of whom have FY24 awards expiring as early as January—could be without funding for months. *See, e.g.*, Freeman (Safe Haven) ¶¶ 5, 10 (inability to find replacement funding by January 31, 2026 to keep families housed); *see also* Marshall (MLK County) ¶ 15; Calvin (Nashville) ¶ 25; Chanecka (Tucson) ¶ 22; Dillon (Boston) ¶ 19; McSpadden (San Francisco) ¶¶ 12, 13. As this Court has previously found,

> [i]n life-or-death scenarios—times of crisis, when someone faces domestic violence, homelessness, or a mental health crisis—it practically goes without saying that "there can be no do over and no redress" if services are unlawfully denied and someone suffers for it.

*New York v. U.S. Dep't of Just.*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *22 (D.R.I. Sept. 10, 2025) (McElroy, J). So too here. HUD's unnecessary delay in proceeding with the award of essential funds will push individuals and families at high risk of homelessness out of the homes they depend on.

Plaintiffs and their partners cannot simply fill these gaps. Based on the FY24-25 NOFO, Plaintiffs anticipated not needing to reapply in fiscal year 2025.

*See, e.g.*, Frazier (YPI) ¶ 58; Kaminski (Santa Clara) ¶¶ 30-31; Marshall (MLK County) ¶ 10; McSpadden (San Francisco) ¶ 10; Wilcox (Crossroads) ¶ 8; Willis (NLIHC) ¶¶ 45, 69; Tavon (MHSA) ¶¶ 20-23. Plaintiffs executed contracts with service providers and created budgets with the expectation of two-year funding. *See, e.g.*, Frazier (YPI) ¶ 60; Dillon (Boston) ¶ 10; Calvin (Nashville) ¶ 28; Davidson (San Mateo) ¶ 12; Freeman (Safe Haven) ¶ 5; Kaminski (Santa Clara) ¶¶ 31-33; McSpadden (San Francisco) ¶ 11; Wilcox (Crossroads) ¶ 29; Tavon (MHSA) ¶¶ 20-23. Plaintiffs now face immense obstacles securing alternative sources of funding to maintain their housing projects and current staff levels. *See, e.g.*, Dillon (Boston) ¶ 42; Calvin (Nashville) ¶¶ 28, 17; Freeman (Safe Haven) ¶¶ 5, 10; Wilcox (Crossroads) ¶ 67; Willis (NLIHC) ¶¶ 46-47, 73-75; Tavon (MHSA) ¶ 24. Even for those Plaintiffs that could fill any funding gap temporarily, they must divert resources away from other critical services and programs, such as public health, public safety, and social services programs, harming their local communities. *See, e.g.*, Kaminski (Santa Clara) ¶ 43; Magargee (Cambridge) ¶ 24. When money does not come through, people suffer. *See New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. 2025).

### 2. *Vulnerable people will become homeless due to HUD's decimation of funding for permanent housing and stable renewals*

HUD has long prioritized renewal funding for permanent housing, which prioritizes the most vulnerable and highest-need people. *See, e.g.*, Oliva (NAEH) ¶¶ 5, 78 (noting that "HUD, by statute, must preference existing grants and

renewals," based on a "10-year tenure at HUD … administering the CoC Program Competition," and congressional amendments that "formally authorized the CoC Program" the CoC Program), 128 (renewals are imperative given that "HUD has historically directed CoC to prioritize the *most* vulnerable individuals and families for PSH in particular, and communities have followed that direction") and 83-85; Calvin (Nashville) ¶ 27 (the population served "needs a high level of intervention" and would "have great difficulty finding new permanent housing"); Kaminski (Santa Clara) ¶ 38; Davidson (San Mateo) ¶ 22. In contrast to the FY24-25 NOFO and NOFOs from prior years, which assured consistency in renewal funding for nearly all Tier 1 projects to ensure program stability, the new Permanent Housing Cap and Tier 1 Allocation in the FY25 NOFO eviscerate existing funding for permanent housing and will destabilize local housing and social services. *See, e.g.*, Oliva (NAEH) ¶¶ 116, 119 (attaching exhibit illustrating evisceration of a member's funding for Tier 1 projects); Chanecka (Tucson) ¶ 24; Marshall (MLK County) ¶¶ 7, 16 (PSH programs house 2,144 households); McSpadden (San Francisco) ¶ 26 (funding supports 1,243 housing units); *see also* Calvin (Nashville) ¶ 14; Dillon (Boston) ¶ 40; Magargee (Cambridge) ¶ 18; Willis (NLIHC) ¶¶ 33, 50-53, 69, 78 (funding supports nearly 1,500 households in NC and 770 in CO); Tavon (MHSA) ¶¶ 26-27 (funding supports 3,800 units). Indeed, this sudden deprioritization of permanent housing has already disrupted services. Dillon (Boston) ¶ 18 (new clients are no longer being referred to permanent housing programs); Tavon (MHSA) ¶ 48 (providers have stopped accepting referrals for vacancies due to anticipated cuts).

Vulnerable program participants, including children, older adults, veterans, and people with disabilities, will lose their homes due to HUD's unprecedented and massive cuts. Frazier (YPI) ¶ 64 (loss of funding will lead to 500 young people per year losing access to housing supports); Wilcox (Crossroads) ¶ 67 (loss of funding will lead to 173 households losing housing and more than 600 households losing housing services); *see also* Calvin (Nashville) ¶ 27; Chanecka (Tucson) ¶ 34; Kaminski (Santa Clara) ¶¶ 44-47; Magargee (Cambridge) ¶ 24; Marshall (MLK County) ¶ 20; McSpadden (San Francisco) ¶ 27; Willis (NLIHC) ¶¶ 50, 78. And there is nowhere else for these people to go. Shelters are overstretched, and these individuals are unlikely to find access to affordable housing. Calvin (Nashville) ¶ 27; Chanecka (Tucson) ¶ 34; Dillon (Boston) ¶ 40; Marshall (MLK County) ¶ 20; Willis (NLIHC) ¶¶ 51-52, 79-81. Thousands of people who are currently housed will be forced onto the street, retraumatizing vulnerable individuals, and straining social service and public health services beyond capacity. Marshall (MLK County) ¶ 19; *see also* Kaminski (Santa Clara) ¶¶ 38, 42-43; Davidson (San Mateo) ¶ 23. This flood of de-housing will risk lives, Chanecka (Tucson) ¶ 34, and reverse years of progress that these CoCs have made through evidence-based interventions. Calvin (Nashville) ¶¶ 9, 15; Dillon (Boston) ¶ 5; Kaminski (Santa Clara) ¶ 29; Magargee (Cambridge) ¶ 23.

Given the scale of these cuts, the fundamental uncertainty about the survival of these permanent housing programs constitutes irreparable harm. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d

67

440, 476 (D.R.I. 2025); *accord Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788

F. Supp. 3d 277, 311-313 (D.R.I. 2025); *see also King Cnty.*, 785 F. Supp. 3d at 890

(describing "devastating and irreparable… injuries" from loss of CoC funds to

"Plaintiffs and their operations, and to the vulnerable populations they serve.").

> **3.  *Forcing people from their homes also fractures the
> trust between them and their service providers, and
> damages Plaintiffs' real estate interests and
> investment relationships that are critical to a
> robust social services network***

The rapid loss of funding and the impending program closures will also

compromise the goodwill that Plaintiffs have built with the individuals they serve,

and that Local Government Plaintiffs have established with contractual and

investment partners. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d

12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not

easily measured or fully compensable in damages. Accordingly, this kind of harm is

often held to be irreparable."). Most critically, agencies that serve individuals

experiencing homelessness work hard to develop trusting relationships; severing

those relationships and turning people out into the street will undermine those

relationships and poison future efforts to help a marginalized population who often

distrust systems of care. Oliva (NAEH) ¶ 104 (of the 552 individuals and 290

families experiencing homelessness in City of Providence in 2024, nearly a third

identified as Black and another third as multi-racial), 129, 137; Calvin (Nashville)

¶16; Chanecka (Tucson) ¶ 32; Dillon (Boston) ¶ 41; Magargee (Cambridge) ¶ 25;

Tavon (MHSA) ¶¶ 32-33, 44. Compounding this harm, the FY25 NOFO's

prescriptive requirements—such as forced treatment, encouraging criminalization of homelessness and requiring programs to mis-gender some of the individuals they serve—undermine the trust that is crucial in helping people exit homelessness. Frazier (YPI) ¶¶ 37-38, 76 (if YPI is forced to stop affirming transgender and non-binary identities, they would betray the young people they serve and eliminate the one safe space many of them have); Wilcox (Crossroads) ¶¶ 55, 57.

Plaintiffs also face real estate default, loss of housing units, and resulting loss of investment and partner goodwill due to HUD's rapid defunding of permanent housing. *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (stating that injuries to real estate interests frequently are redressable in equity). For example, MLK County has made tens of millions of dollars of capital investments in permanent housing projects. Marshall (MLK County) ¶ 21; *see also* McSpadden (San Francisco) ¶¶ 7, 8, 28 (developing portfolio of permanent housing requires multi-year process in partnership with numerous stakeholders); Tavon (MHSA) ¶ 26. Loss of access to CoC funds creates a risk that Plaintiffs or other CoC participants will be unable to make loan payments, potentially resulting in default and an additional loss of thousands of housing units. Tavon (MHSA) ¶ 18 (small "mom and pop" property owners, an important part of the PSH housing inventory in Massachusetts may be unable to pay their own mortgages due to loss of income and may never again be willing to rent to this population again); *see also* Marshall (MLK County) ¶ 21; McSpadden (San Francisco) ¶ 13. Similarly, some Nonprofit Plaintiffs own real estate with restrictions that limit their options for operating

69

housing; as a result, without renewal funding, they will be faced with significant financial jeopardy. Magargee (Cambridge) ¶ 25; Wilcox (Crossroads) ¶ 68. Uncertainty in future funding would make it more difficult to recruit private investment and willing landlord partners should funding return in the future. Calvin (Nashville) ¶ 17; Chanecka (Tucson) ¶ 33; Davidson (San Mateo) ¶ 23; Wilcox (Crossroads) ¶ 16; Tavon (MHSA) ¶¶ 32-33, 44; *see also* Oliva (NAEH) ¶ 23-24 ("Recognizing that permanent housing solutions needed business continuity to operate effectively over time, Congress further required that permanent housing should be renewed based on a local determination of need and compliance with program requirements.").

> **B.    HUD's Sudden and Haphazard Imposition of Foundational Changes to CoC Funding Creates Instability, Uncertainty, and Chaos That Places Plaintiffs in an Impossible Position and Will Lead to Loss of Critical Public Services**

The FY25 NOFO requires Plaintiffs to respond to a radically different set of funding priorities within entirely unrealistic deadlines. Continuums are generally required to run a local competition to evaluate, select, and rank project applications from nonprofit housing providers. *See, e.g.*, Magargee (Cambridge) ¶ 18; Dillon (Boston) ¶ 15; Willis (NLIHC) ¶¶ 35-40, 71. The local competition process requires extensive planning and resources often spanning several months, even in years when changes to programming and application are minimal. Dillon (Boston) ¶¶ 15-16; Kaminski (Santa Clara) ¶ 24; McSpadden (San Francisco) ¶ 22; Willis (NLIHC) ¶¶ 36-37, 68. Local Government Plaintiffs must now divert staff and resources to immediately plan and implement an abbreviated competition based on an

unprecedented NOFO, at a time when their staff have other duties, such as preparing for cold-weather interventions and annual Point-in-Time counts of people experiencing homelessness. Calvin (Nashville) ¶ 23; Chanecka (Tucson) ¶ 29; McSpadden (San Francisco) ¶ 24.

Further, project applications for the local competitions must be submitted no later than December 15, 2025, thirty days before the January 14, 2026 deadline for submission of the collaborative application to HUD. Ex. 2 (FY25 NOFO) at 98.[7] This means project applicants have only one to two weeks to prepare and submit applications, creating chaos among CoCs and their partners, including Nonprofit Plaintiffs. *See, e.g.*, Calvin (Nashville) ¶ 24; Dillon (Boston) ¶¶ 16–18; Davidson (San Mateo) ¶ 13; Freeman (Safe Haven) ¶ 11; Kaminski (Santa Clara) ¶ 24; Marshall (MLK County) ¶ 13; McSpadden (San Francisco) ¶ 23; Wilcox (Crossroads) ¶¶ 30-32; Willis (NLIHC) ¶¶ 35-40, 71-72. The dramatic changes to the FY25 NOFO compound this harm. *See New York v. U.S. Dep't of Just.*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *22 (D.R.I. Sept. 10, 2025) ("[T]he confusion and chaos imposed by an overnight change to a [longstanding] interpretation of a law, as well as the resulting change in plans that comes from it, is a form of irreparable harm.").

*First*, the changes in the FY25 NOFO will upend longstanding projects that have been thoughtfully developed to comport with evidence-based, best-practices

---

[7] Some Continuums impose an earlier deadline for logistical and planning purposes. Wilcox (Crossroads) ¶ 28 (Dec. 12 deadline in Rhode Island); Dillon (Boston) ¶ 16 (December 12 leaves partners a "single week to prepare"); Calvin (Nashville) ¶ 22.

71

services delivery. Davidson (San Mateo) ¶ 19; Kaminski (Santa Clara) ¶ 13. Project applicants—including Nonprofit Plaintiffs—cannot implement foundational changes (nor resolve uncertainties about eligibility) in the timeline that they face, and some will be deterred from applying at all. Chanecka (Tucson) ¶ 28; Davison (San Mateo) ¶ 14; Frazier (YPI) ¶¶ 52, 60; Marshall (MLK County) ¶ 18; Wilcox (Crossroads) ¶¶ 29-30, 63; Willis (NLIHC) ¶¶ 22, 25-26, 78-80; Tavon (MHSA) ¶ 22. Applicants likewise cannot summarily overhaul their programs to comply with the new conditions imposed by the FY25 NOFO. Calvin (Nashville) ¶ 24; Chanecka (Tucson) ¶ 21; McSpadden (San Francisco) ¶ 31; Wilcox (Crossroads) ¶¶ 28-33. This frustration of their organizational missions is a type of irreparable harm. *See Woonasquatucket*, 778 F. Supp. 3d at 475. And if individual CoC applicants cannot make these changes, local communities will suffer from the loss of these experienced housing providers. *See* Chanecka (Tucson) ¶¶ 21, 28; Magargee (Cambridge) ¶¶ 20, 30; McSpadden (San Francisco) ¶ 32. The withdrawal of housing providers will imperil the stability of the CoCs, putting people's currently stable housing at risk. Marshall (MLK County) ¶ 22; Magargee (Cambridge) ¶¶ 20, 27 (tenancies at risk "for over 200 stably housed CoC participants").

*Second*, the unlawful threshold and merit review conditions in the FY25 NOFO place Nonprofit Plaintiffs and other project applicants "between a rock and a hard place." *See Rhode Island Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2025 WL 2988705, at *11 (D.R.I. Oct. 23, 2025). They must (within weeks) either betray their principles to treat the people they serve with

dignity and professionalism or instead forego CoC awards and face devastating consequences to their financial health and operations, along with their ability to fulfill their mission and provide assistance to vulnerable people. *See, e.g.*, Frazier (YPI) ¶¶ 59, 63, 72; Wilcox (Crossroads) ¶¶ 31-33, 73; Willis (NLIHC) ¶¶ 83-84; Tavon (MHSA) ¶¶ 28-30; Oliva (NAEH) ¶¶ 129-131. "[S]urely such a high stakes dilemma constitutes irreparable harm in the eyes of this Court." *Kennedy*, 2025 WL 2988705, at *11. And if Nonprofit Plaintiffs are not awarded funding based on these criteria, they will be forced to terminate or drastically reduce housing assistance services to people experiencing homelessness. *See, e.g.*, Rand (Mary Parrish Center) ¶ 8 (684 survivors and their children will lose housing if the organization loses funding); Frazier (YPI) ¶ 64; Wilcox (Crossroads) ¶ 74; Oliva (NAEH) ¶¶ 24, 90, 102-06, 110-11, 120, 126, 133-34 ) (describing harms across the country including that 870 households in permanent housing and 327 in rapid re-housing projects will lose funding in City of Providence and a loss of $11.4 million to support permanent housing placing 700 households at risk of becoming homeless quickly, including 641 children and people with disabilities in Kentucky).

*Third,* the Gender Identity Reservation is imminently causing Nonprofit Plaintiffs and their members irreparable harm because it is forcing them to express the Administration's views on gender as their own as a condition of obtaining funding, in violation of the First Amendment. If they do not, they are being disqualified from receiving funding. Such harms to First Amendment rights are per se irreparable harm. Frazier (YPI) ¶¶ 72; Wilcox (Crossroads) ¶¶ 26, 40-42; Willis

73

(NLIHC) ¶¶ 19, 59, 82. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quotation omitted)).*Lastly,* Local Government Plaintiffs and Nonprofit Plaintiffs that run CoCs face an impossible choice as well: if they include lower-scoring projects in their CoC application, it risks disadvantaging their consolidated application and reducing the size of their CoC's overall award, but omitting these projects would exclude critical services from the continuum. Dillon (Boston) ¶¶ 36-37; Marshall (MLK County) ¶ 9. For example, housing providers serving domestic violence survivors cannot require participation in supportive services, due to conflicts with other federal laws, and their applications will have a less competitive score. *See* Dillon (Boston) ¶ 36; Freeman (Safe Haven) ¶¶ 8–9; Rand (Mary Parrish Center) ¶ 10; Wilcox (Crossroads) ¶ 38. Similarly, projects that serve individuals with mental health disabilities, including substance use disorder, will be less competitive. Dillon (Boston) ¶ 33; Kaminski (Santa Clara) ¶¶ 11, 38; Wilcox (Crossroads) ¶ 50. This change in scoring criteria effectively forces CoCs to abandon some of the most vulnerable people in their communities. *See* Dillon (Boston) ¶ 34 (housing for people with substance use disorder a "significant need"); Rand (Mary Parrish Center) ¶¶ 7-8 ("There are no comparable programs in this community that could absorb these [684] survivors if our programs close . . . . Many will be left with only two options: return to their abuser or face unsheltered homelessness.").

* * *

The harms from HUD's illegal attempts to rescind and replace the FY24-25 NOFO and radically overhaul the CoC Program with the FY25 NOFO cannot be overstated. Plaintiffs are rapidly approaching a cliff: by mid-December, they must decide if they can proceed with new unlawful conditions, and even if they can, they must grapple with uncertainties about threshold eligibility and dramatic changes to merit review scoring that make their applications less competitive. Thousands of their most vulnerable community members—including people with severe disabilities, veterans, older adults, and children—face a return to the streets, traumatizing them further and completely overwhelming social services systems that are already at capacity. Simply put, Plaintiffs need immediate relief to redress harms of this scale.

### III.    The Balance of Equities and the Public Interest Favor Plaintiffs

The equities and public interest, which merge when the government is a party, tip sharply in Plaintiffs' favor. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Preserving Plaintiffs' rights, and preventing the government from enforcing potentially unlawful conditions, clearly serves the public interest. An agency is not harmed by an order prohibiting it from violating the law. *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025); *see Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (it is "always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up).

Plaintiffs face immediate and irreparable harm from the rescission of the FY24-25 NOFO and the implementation of the FY25 NOFO; they threaten vital

renewal funding for vulnerable individuals at risk of homelessness. By contrast, Defendants' interest in proceeding with this NOFO before the legality of its actions has been adjudicated is minimal, particularly where the federal government issued this NOFO well past the statutory deadline. If Defendants are permitted to proceed with evaluating applications and making awards under the FY25 NOFO, Plaintiffs will be deprived of necessary grant funds and the harms to their communities, including increased homelessness, cannot be reversed even if Plaintiffs later prevail on the merits. Without an injunction, CoC funds will be allocated to other jurisdictions, and Plaintiffs will have no possibility of securing the funds necessary to avoid the irreparable fiscal and programmatic harms described above. The equities therefore tilt strongly in favor of Plaintiffs.

## IV.    The Court Should Enter a Stay and a Preliminary Injunction

The Court should stay, under APA Section 705, the rescission and replacement of the FY24-25 NOFO and the FY25 NOFO.

Staying either action will preserve the status quo that existed prior to Defendants' unlawful actions on November 13, 2025. In effect, the FY24-25 would remain operative. Such a stay is needed immediately, or at the very least, prior to December 12, 2025 to prevent further irreparable harm to Plaintiffs and their members and constituents.

Each Continuum must run a local competition, with a deadline of no later than 8:00pm on December 15, 2025. Ex. 2 (FY25 NOFO) at 98. By that date, local applicants, like Nonprofit Plaintiffs, including members of NAEH and NLIHC, will

be forced to decide whether to forgo submitting an application to the CoC program, or to represent that they will comply with numerous unlawful conditions. The CoCs will likewise suffer as a result—as the FY25's unlawful conditions will lead some effective and expert local organizations to decline to apply, while others will submit applications hamstrung by compliance with unlawful conditions that will hamper their critical work to address homelessness. That, combined with the unlawful scoring regime set forth in the 2025 NOFO, will irretrievably harm the ability of CoC applicants to compete for funds for their local communities.

For these reasons, Plaintiffs seek a stay by December 12, 2025 at 3pm. If the Court grants relief by 3pm on December 12, 2025, Plaintiffs will have one business day to communicate any ordered relief to local applicants and communities.

Plaintiffs additionally request relief to mitigate the devastating harms that will occur to Plaintiffs, associational Plaintiffs' members, and the communities they serve if funding is further delayed. In particular, Plaintiffs request that, upon entry of the stay, the Court also issue a preliminary injunction requiring Defendants to take the administrative steps they would have taken in the ordinary course to process eligible renewals of FY 2025 funding under the FY24-25 NOFO, not including obligation of funds. This will ensure that, if Plaintiffs prevail at final judgment in obtaining an order requiring Defendants to make awards under the FY24-25 NOFO, Defendants will be positioned to make those awards quickly— protecting Plaintiffs from continued delays and their ruinous impacts.

Because so many of the numerous harms to Plaintiffs relate to the significant

delays caused by HUD's unlawful process, imposed months later than allowed by law, Plaintiffs further intend to request (via separate motion concurrently filed) an expedited schedule for production of the administrative record and summary judgment briefing. Numerous CoC grants expire as soon as January, and local grantees will be unable to sustain their operations for long after that date, at risk of having to shut down programs and push people out of their housing at the height of the winter months. *See, e.g.*, Oliva (NAEH) ¶¶ 134-37; Tavon (MHSA) ¶ 38. Accordingly, their Motion for Expedited Production of the Administrative Record and Briefing Schedule for Summary Judgment proposes a schedule that concludes summary judgment briefing on February 9, 2026. This schedule would allow for a final judgment, and time for all parties to comply with any orders that flow from it, by the beginning of March, at which point large swaths of Plaintiffs and their members will suffer further irreparable gaps in funding for the critical housing programs they offer and on which their communities rely.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Relief under 5 U.S.C. § 705 and for Preliminary Injunction.

December 1, 2025                          Respectfully submitted,

                                          */s/ Amy R. Romero*
TONY LOPRESTI +                           AMY R. ROMERO
   (CA Bar No. 289269)                       (RI Bar No. 8262)
COUNTY COUNSEL                            KEVIN LOVE HUBBARD +
KAVITA NARAYAN +                             (MA Bar No. 704772)

(CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
    (CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
*Counsel for Plaintiff County of
Santa Clara*

DAVID CHIU +
    (CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
    (CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
    (CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY
SARA J. EISENBERG +
    (CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE
    LITIGATION
RONALD H. LEE +
    (CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND
    AFFIRMATIVE LITIGATION
MICHAEL LEVIN GESUNDHEIT +
    (CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org
*Counsel for Plaintiff City and County
of San Francisco*

WALLACE W. DIETZ +
    (TN BPR No. 009949)
DIRECTOR OF LAW

DELUCA, WEIZENBAUM,
    BARRY & REVENS, LTD.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
    Lawyers' Committee for RI
*Counsel for All Plaintiffs*

LYNETTE LABINGER
    (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
    ACLU Foundation of RI
*Counsel for All Plaintiffs*

ANTONIA K. FASANELLI +
    (DC Bar No. 481856)
KATHRYN M. SCOTT + ^
    (WA Bar No. 38978)
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org
*Counsel for Plaintiffs National Alliance to
End Homelessness and National Low
Income Housing Coalition*

ALESHADYE GETACHEW +
    (DC Bar No. 1007161)
YENISEY RODRÍGUEZ +
    (DC Bar No 1600574)
KRISTIN BATEMAN +
    (DC Bar No. 90037068)
MADELINE H. GITOMER +
    (DC Bar No. 1023447)

JOHN K. WHITAKER +
    (TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
    (TN BPR No. 041470)
ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov
*Counsel for Plaintiff Metropolitan
Government of Nashville and Davidson
County*

DAVID J. HACKETT +
    (WA Bar No. 21236)
GENERAL COUNSEL TO KING COUNTY
    EXECUTIVE AND SPECIAL DEPUTY
    PROSECUTOR
ALISON HOLCOMB +
    (WA Bar No. 23303)
DEPUTY GENERAL COUNSEL TO KING
    COUNTY EXECUTIVE AND SPECIAL
    DEPUTY PROSECUTOR
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov
aholcomb@kingcounty.gov
*Counsel for Plaintiff Martin Luther
King, Jr. County*

AMAN T. GEORGE +
    (DC Bar No. 1028446)
CARRIE Y. FLAXMAN +
    (DC Bar No. 458681)
ROBIN F. THURSTON +
    (DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
agetachew@democracyforward.org
yenisey.rodriguez@democracyforward.org
kbateman@democracyforward.org
mgitomer@democracyforward.org
ageorge@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org
*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and
Youth Pride, Inc.*

TOBY MERRILL +
    (MA Bar No. 601071)
CASSANDRA CRAWFORD +
    (NC Bar No. 45396)
GRAHAM PROVOST +
    (DC Bar No. 1780222)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org
*Counsel for Plaintiffs City of Boston, City
of Cambridge, Martin Luther King, Jr.
County, Metropolitan Government of
Nashville and Davidson County, City of
Tucson*

+ Pro hac vice motion forthcoming
^ Not admitted in the District of Columbia. Practice supervised by members of the
DC bar.

80