## DECLARATION OF ANN MARIE OLIVA

I, Ann Marie Oliva, declare the following under penalty of perjury:

1.      My name is Ann Marie Oliva.

2.      I have personal knowledge of the facts contained in this declaration. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

3.      I am the Chief Executive Officer of the National Alliance to End Homelessness (the "Alliance"). I have dedicated my career to educating the public on the nature of homelessness and its solutions, and to advancing best practices within the homeless services sector.

4.      I have worked in homelessness assistance for more than 30 years. Early in my career I helped to implement the first HUD-funded Continuum of Care (CoC) in the nation (Washington, DC–called the D.C. Initiative), and was for more than nine years a lead member of the District's team that responded to HUD's Notices of Funding Opportunity (NOFOs) for the legacy programs that Congress consolidated in 2009 to form the Continuum of Care Program.

5.      I worked as a HUD technical assistance provider to help CoCs comply with HUD policy and regulations, respond to natural disasters (including Hurricane Katrina), and use data to better inform local decision making. From 2007 to 2017 (spanning three Administrations), I served as HUD's Director of the Office of Special Needs Assistance Programs, then the Deputy Assistant Secretary for Special Needs and a member of the Senior Executive Service. During my 10-year tenure at HUD, I administered the CoC Program competition, and many of the operational structures currently in place were implemented under my leadership. I also oversaw the implementation of the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which amended the McKinney-Vento Act and formally authorized the CoC Program. This included leading the drafting and clearance of applicable regulations, including the

1

current CoC Interim Rule. I also partnered with the Veteran's Administration to design and implement evidence-based programs for Veterans experiencing homelessness that led to an overall decrease of more than 50 percent in Veteran homelessness.

6.      On November 13, 2025, HUD rescinded its original NOFO for fiscal years 2024 and 2025 (a two-year NOFO) and replaced it with a new fiscal year 2025 NOFO.

7.      The new 2025 NOFO imposes unprecedented changes to HUD's funding commitments, including a 30 percent cap on permanent housing investments for people experiencing homelessness. HUD's cut to permanent housing alone will likely force more than 170,000 people back onto the streets or into shelters. Program participants are some of the most vulnerable members of our society and include families with children, unaccompanied youth, people with disabilities (including physical, mental, behavioral, and substance use related), people who are experiencing homelessness for the first time as well as people considered chronically homeless, people who are fleeing or attempting to flee domestic violence, as well as people who are older or veterans (in the majority of cases elderly veterans).

8.      Under the 2025 NOFO, entities who received CoC program funds will surely face a cascading crisis: CoCs will be forced to eliminate or drastically reduce permanent supportive housing and rapid re-housing programs; CoC-funded permanent housing sites will face immediate operating shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement. CoCs in turn will be forced to redirect limited funds away from reducing unsheltered homelessness and into emergency stabilization efforts simply to prevent widespread returns to homelessness. And this is a brief and incomplete snapshot of all the cascading consequences.

9.     The return to unsheltered homelessness carries catastrophic consequences: exposure to extreme weather events; life-threatening infections; unmanaged chronic illnesses; predatory violence; sexual assault; and the escalation of behavioral health crises. Research consistently shows that mortality rates among people experiencing unsheltered homelessness are several times higher than for housed populations and for individuals with disabilities who lose permanent housing, the risk of premature death increases dramatically within months. This policy shift will not only erase years of progress in stabilizing the most vulnerable people in our communities, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life.

## A.     Alliance Mission and Structure

10.     The Alliance has substantial expertise in the factors driving homelessness as well as evidence-based and emerging best practices that end people's homelessness.

11.     The Alliance is a nonprofit, nonpartisan membership organization that seeks to ensure that no American is homeless and does so by mobilizing all sectors of American society in an alliance to end homelessness.

12.     The Alliance was founded in 1983 by a group of leaders concerned about the growing homeless population at the time. Originally called the National Citizens Committee for Food and Shelter, the organization was renamed the National Alliance to End Homelessness in 1987, as its focus shifted from emergency aid to finding more permanent solutions.

13.     The Alliance's members play a significant role in the organization in at least three ways.

14.     First, Alliance members guide the Alliance's agenda and activities through various means. They sit on a series of formal councils and advisory bodies that advise the Alliance on its various workstreams, including its Leadership Council, Research Council, Community Strategic

Team (Lived Experience Advisors Council), and Capacity Building Network. To take just one example, the Capacity Building Network is an advisory body comprised of Alliance members who serve for two-year terms. That group advises the Alliance's Center for Capacity Building in the development of technical assistance, training, and resources—services that the Alliance provides to its members and communities around the country to help them implement data-driven and equitable systemic responses to homelessness.

15.     Members also help guide the Alliance's activities by shaping the content and agenda of the Alliance's conferences. The conferences are the central forum in which Alliance members convene on a biannual basis to share best practices and lessons learned from their communities, drive innovations, and build lasting solutions for ending homelessness. Alliance members help shape those conversations by responding to calls for presentations with proposed talks and panels and by filling out robust surveys at the end of conferences that inform future conferences.

16.     Second, Alliance members provide crucial financial support that facilitates Alliance activities. Members pay registration fees that provide up to 85 percent of the funds necessary to run the annual conferences, and some members provide direct donations that fund the Alliance's broader activities.

17.     Finally, Alliance members comprise roughly a quarter of the Alliance's Board of Directors. In that capacity, Alliance members play a direct role in leading the organization, setting priorities, and in selecting Alliance leadership, including future board members and the Alliance's officers.

**B.     Alliance Members and How we Support Them**

18.     We have more than 10,000 members that span all 50 states. Our members include nonprofit organizations, people with lived experience of homelessness, service providers,

practitioners, researchers, funders, businesses, and local and state government entities dedicated to ending homelessness. Our members, many of whom currently receive Continuum of Care (CoC) grants from the U.S. Department of Housing and Urban Development or have in the past, focus on making homelessness in the United States rare, brief, and a one-time occurrence through the provision of coordinated, compassionate, and high-quality homelessness response services. Nearly 5,000 members registered for our most recent webinar on the 2025 NOFO, requiring the Alliance to increase our normal 3,000-member capacity for such events. More than 4,000 people attended the event in real time, demonstrating the interest among our members on this topic. The Alliance serves its members in several ways, including but not limited to (1) conducting and disseminating research to provide data and evidence-based strategies for developing effective solutions to end homelessness; (2) educating opinion leaders and policymakers about proven solutions and advocating for policies that support sustainable solutions to ending homelessness; (3) collaborating with public and private sectors to build the capacity of local communities and CoCs to implement solutions; (4) offering intensive, on-the-ground technical assistance tailored to its members' local needs, including how to manage the CoC or track data; and (5) fostering a collaborative approach to ending homelessness by convening members across the country—through annual conferences and other fora—to share best practices and learn from one another.

19.    The Alliance also offers its members specific services regarding the U.S. Department of Housing and Urban Development (HUD) Continuum of Care (CoC) grant program, including analysis and training on HUD's priorities in the grant program. Such services facilitate the ability of Alliance members to compete for and comply with grants issued under the program. In addition, we analyze grant requirements issued in NOFOs for CoCs and advise our members on

how to create the most effective, efficient, and equitable homeless response system under a competition's process and requirements.

## C.    History of Continuum of Care Program

20.    Passed in 1987, the Stewart B. McKinney Homeless Assistance Act, later renamed the McKinney-Vento Homeless Assistance Act, is the United States' first comprehensive federal law to address homelessness with a stated purpose of ending homelessness and promoting a community-wide commitment to this goal. The McKinney-Vento Act served as the center of federal policy and programs for addressing homelessness - funding emergency shelters, transitional housing, rental assistance, food, and health services.

21.    The McKinney-Vento Act was substantially amended and reauthorized in 2009 by the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which modernized and streamlined the nation's approach to homelessness. Through the HEARTH Act, Congress codified the CoC Program into law and established the CoC as a central part of the national response to homelessness. It also established performance indicators for CoCs. Congress enshrined the goal of bringing vulnerable individuals and families to safe and stable housing as quickly as possible without creating unnecessary steps or additional barriers to housing and services, and without using housing as a reward for behavior modification.

22.    The CoC Program Interim Rule, released in the Federal Register on July 31, 2012, provides the regulatory framework for the CoC Program. Homeless Emergency Assistance and Rapid Transition to Housing: Continuum of Care Program, 77 Fed. Reg. 45422 (July 31, 2012). The interim rule went into effect on August 30, 2012. Public comments were solicited at that time. Although it is titled an "interim rule," these regulations are published in the Code of Federal Regulations and, along with the statutes discussed above, have governed HUD's administration of

CoC Program since that time. Appropriate amendments were subsequently made through the rulemaking process in response to the Violence Against Women Reauthorization Act of 2013.

23.    In addition to modernizing the federal government's approach from managing homelessness to solving it, Congress specifically prioritized permanent housing for homeless individuals and families with disabilities and homeless families. It set aside funds for this purpose and defined "proven strategies" as (1) permanent supportive housing for chronically homeless individuals and families and (2) rapid re-housing for homeless families. Recognizing that permanent housing solutions needed business continuity to operate effectively over time, Congress further required that permanent housing should be renewed based on a local determination of need and compliance with program requirements.

24.    Today, the CoC Program funds critical housing and services to support individuals and families experiencing homelessness, mainly by accessing and maintaining permanent housing. The CoC Program currently funds nearly 7,000 individual projects. The primary goal of a CoC is to end homelessness in a specific geographic area through development and implementation of a unified, community-wide strategy to prevent and end homelessness. Key responsibilities of CoCs include, but are not limited to coordinating all aspects of services for individuals and families experiencing homelessness, from street outreach to emergency shelter, transitional housing, and permanent housing; managing funding to operate the Continuum of Care Program, which involves planning how to use HUD funding to support the community's homeless population; collecting data such as point-in-time counts and annual or biannual counts of the homeless population, as well as an annual enumeration of emergency systems, transitional housing units, permanent housing beds and other beds/services that make up a community's homeless assistance system;

and fostering collaboration among a wide range of partners to ensure that services are delivered efficiently and effectively.

25.     A CoC is a regional or local planning body that coordinates housing and services for individuals and families experiencing homelessness. Stated differently, it is a group of stakeholders that agree to work together to address the needs of people experiencing homelessness and housing insecurity in a community. Key partners include people with lived experience of homelessness, nonprofit providers, local and state government, hospitals and care providers, affordable housing developers, landlords, law enforcement, universities, and other community and faith-based organizations.

26.     A CoC Board is responsible for the overall direction of the CoC and is the decision-making body for the CoC. The CoC Board is composed of a diverse body of members with an interest in preventing and ending homelessness who are elected by the CoC.

27.     Under the CoC program, a Collaborative Applicant is the entity that applies for CoC Program funds on behalf of the community and generally staffs and operates the administrative aspects of a CoC such as developing a CoC system, evaluating the outcomes of projects for which funds are awarded, participating in the Consolidated Plan(s), preparing and submitting the application to HUD on behalf of the CoC, setting performance targets for programs in consultation with recipients and subrecipients, monitoring recipients and subrecipients, enforcing compliance with program requirements, and conducting counts of people experiencing homelessness.

28.     Under the CoC program, a Project Applicant is an organization that intends to apply for CoC program funding.

29.     Alliance members include both Collaborative Applicants and Project Applicants.

30.     CoC programs can use a range of approaches or models in their program design.

**D.     Permanent Housing Strategies Proven to Reduce Homelessness**

31.     The George W. Bush Administration recognized that homelessness was solvable and that ending homelessness was a realistic goal. The Bush Administration set a bold target of ending chronic homelessness in ten years and prioritized achieving this through permanent housing solutions.

32.     Permanent housing with services can quickly and successfully rehouse individuals and families experiencing homelessness without imposing preconditions and barriers to entry, such as sobriety, treatment, or service participation requirements. Tailored supportive services are offered to maximize housing stability and prevent returns to homelessness as opposed to addressing predetermined treatment goals prior to permanent housing entry.

33.     Originally introduced in 1992, and adopted by many localities, permanent supportive housing (PSH) gained traction at the federal level in 2003 as an evidence-based approach to reduce, prevent, and end chronic homelessness in the United States. Rapid re-housing (RRH) was introduced as a Congressionally directed demonstration program in 2008 and was expanded in the Homelessness Prevention and Rapid Re-Housing Program funded through the American Recovery and Reinvestment Act of 2009.  Between 2010 and 2016, permanent housing with services, including PSH and RRH, were the federal government's response of choice to reducing homelessness. The overall number of people experiencing homelessness declined each year.[1] Although PSH and RRH are both proven strategies to reduce homelessness, they differ in implementation.

---

[1] U.S. Dep't of Hous. & Urban Dev., *The 2016 Annual Homeless Assessment Report (AHAR) to Congress*, OFF. OF CMTY. PLANNING & DEV. (Dec. 2017), https://www.huduser.gov/portal/sites/default/files/pdf/2016-AHAR-Part-2.pdf; U.S. Dep't of Hous. & Urban Dev., *The 2024 Annual Homelessness Assessment Report (AHAR) to Congress*,

34.     There is a large and growing evidence base demonstrating that permanent housing with services is an effective solution to homelessness. People experiencing homelessness who access housing faster with the appropriate services are more likely to remain stably housed. This is true for both PSH and RRH. PSH has a one-year housing retention rate of up to 98 percent and some communities see as high as 100 percent (based on CoC-level data[2]). Studies have shown that rapid re-housing helps people exit homelessness quickly—in one study, an average of two months—and remain housed. A variety of studies have shown that between 75 percent and 91 percent of households remain housed a year after being rapidly re-housed.[3]

35.     Today, roughly 87 percent of the CoC Program's funding goes to permanent housing approaches that end homelessness. In addition to PSH and RRH, this includes joint component TH-RRH (provides crisis housing *and* rapidly connects people to housing).[4]

36.     PSH is targeted to individuals and families with chronic illnesses, disabilities, mental health issues, or substance use disorders who have experienced long-term or repeated homelessness. This particular subpopulation is often very expensive to communities for costs associated with police, corrections, and emergency health care. Helping this subpopulation into housing while providing them with services to maintain housing allows local communities to avoid significant costs while improving the health and well-being of their communities.

---

Off. of Cmty. Planning & Dev. (Dec. 2024), https://www.huduser.gov/portal/sites/default/files/pdf/2024-AHAR-Part-1.pdf.
[2] National Summary of Homeless System Performance 2019-2023, HUD (June 11, 2024),
https://files.hudexchange.info/resources/documents/National-Summary-of-Homeless-System-Performance.pdf.
[3] Daniel Gubits, *et al.*, *Understanding Rapid Re-housing: Systematic Review of Rapid Re-housing Outcomes Literature*, U.S. Dep't of Housing & Urban Dev. (July 7, 2018),
https://www.huduser.gov/portal/sites/default/files/pdf/Systematic-Review-of-Rapid-Re-housing.pdf.
[4] HUD's 2024 Continuum of Care Program Funding Awards, HUD,
https://files.hudexchange.info/reports/published/CoC_AwardComp_NatlTerrDC_2024.pdf. (2024),
https://files.hudexchange.info/reports/published/CoC_AwardComp_NatlTerrDC_2024.pdf; *see also* Katherine Hapgood, *Trump admin looks at deep cuts to homeless housing program*, POLITCO (Sep. 29, 2025, 7:44P),
https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-housing-program-00585770.

37.    PSH has been found to be a particularly effective approach to ending homelessness for high-need populations, such as individuals and families with a disability who experience chronic patterns of homelessness, for communities that implement it with fidelity to the model. Positive outcomes include: a significant decrease in use of shelter stays, positive shifts in health use from crisis to preventive care, reduction in justice system interactions, improved child welfare outcomes, and cost-effectiveness. For this reason, "[s]ince 2005, HUD has encouraged CoCs to create new PSH dedicated for use by persons experiencing chronic homelessness."  HUD Office of Community Planning and Development, Notice on Prioritizing Persons Experiencing Chronic Homelessness and Other Vulnerable Homeless Persons in Permanent Supportive Housing (July 25, 2016), https://homelessnesssolutions.net/wp-content/uploads/2025/12/CPD-16-11-Notice-on-Prioritizing-Persons-Experiencing-Chronic-Homelessness-and-Other-Vulnerable-Homeless-Persons-in-PSH.pdf.  In accordance with the HEARTH Act's goal of bringing vulnerable individuals and families to safe and stable housing, since at least this 2016 Notice, HUD has "strongly encouraged" CoCs to prioritize individuals and families who experience chronic patterns of homelessness and who may have the most "severe service needs" for available PSH units.  This directive is backed by strong evidence showing that prioritization of these populations for PSH is effective in reducing chronic homelessness, which has been confirmed by the experience of CoCs that have followed this Notice in their supportive housing systems.

38.    More extensive studies have been completed on PSH that use a Housing First approach.  The "Housing First" approach prioritizes providing immediate permanent housing with supportive services and without preconditions. Housing First was developed as an approach in the 1990s to serve people with disabilities that experience chronic patterns of homelessness and other vulnerable members of our society. Studies of that approach have found that clients report an

increase in perceived levels of autonomy, choice, and control. A majority of clients are found to participate in the optional supportive services provided, often resulting in greater housing stability. Clients using supportive services are more likely to participate in job training programs, attend school, discontinue substance use, have fewer instances of domestic violence, and spend fewer days hospitalized than those not participating. This is also true even among persons with problematic substance use who also have criminal records. One study found PSH using a Housing First approach "with client-centered practices foster housing retention of a traditionally difficult-to-house population and is in line with other research *linking Housing first with superior housing retention rates compared with abstinence-based programs*." (emphasis added).[5]

39.     One two-year study by the American Psychological Association comparing PSH using a "housing first" approach versus "residential treatment" found that individuals who received immediate, independent housing had more days in their own place, fewer days incarcerated and reported having more choice over treatment when compared to individuals who had residential treatment or transitional housing prior to entry into community housing. In this observational study, there were no clinical advantages for individuals who had residential treatment or transitional housing prior to entry into community housing, but they did incur higher substance abuse service costs.

40.     Finally, PSH has been found to be cost efficient. Providing access to housing generally results in cost savings for communities because housed people are less likely to use emergency services, including hospitals, jails, and emergency shelter, than those who are homeless. One study found an average cost savings on emergency services of $31,545 per person

---

[5] Clare Davidson, *et al.*, *Association of housing first implementation and key outcomes among homeless persons with problematic substance abuse*, PSYCHIATRIC SERV. (Nov 2014), https://pubmed.ncbi.nlm.nih.gov/25022344/.

housed in a PSH Housing First program over the course of two years.[6] Another study showed that a PSH Housing First program could cost up to $23,000 less per consumer per year than a shelter program.[7]

41.    Rapid re-housing is employed for a wide variety of individuals and families. It provides short or medium-term rental assistance and services. The goals are to help people obtain housing quickly, increase self-sufficiency, and remain housed. The core components of rapid re-housing—housing identification, rent and move-in assistance, and case management and services—use permanent housing to anchor stability and self-sufficiency.[8]

42.    In 2022, according to HUD data, 58 percent of family households and 65 percent of adult-only households who used RRH assistance to subsidize their permanent housing exited the RRH program during the reporting period. Nearly all households that left the RRH program remained in permanent housing immediately after leaving the program (81 percent of adult-only households and 88 percent of family households). Adult-only households were more likely to exit to permanent housing with a subsidy (41 percent) than to permanent housing without a subsidy (35 percent). Families, in contrast, were slightly more likely to exit to permanent housing without a subsidy (43 percent) than with one (41 percent).[9]

---

[6] Jennifer Perlman, PSYD & JOHN PARVENSKY, *Denver Housing First Collaborative: Cost Benefit Analysis and Program Outcomes Report*, *Colorado for the Homeless* (Dec. 11, 2006), https://shnny.org/uploads/Supportive_Housing_in_Denver.pdf.

[7] Ana Stefancic and Sam Tsemberis, *Housing First for long-term shelter dwellers with psychiatric disabilities in a suburban county: a four-year study of housing access and retention*, J OF PRIMARY PREVENTION (Jul 2007), https://pubmed.ncbi.nlm.nih.gov/17592778/.

[8] *Rapid Re-Housing Works*, NAT'L ALL. TO END HOMELESSNESS (Mar. 23, 2022), https://endhomelessness.org/resources/toolkits-and-training-materials/rapid-re-housing-works/; *Family Options Study: Short-Term Impacts of Housing and Services Interventions for Homeless Families*, HUD OFFICE OF POLICY DEVELOPMENT & RESEARCH (July 2015), https://www.huduser.gov/portal/portal/sites/default/files/pdf/familyoptionsstudy_final.pdf.

[9] *2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States*, HUD OFFICE OF COMMUNITY PLANNING & DEVELOPMENT, 2022 AHAR Part 2, 7-7 (May 2024) https://www.huduser.gov/portal/sites/default/files/pdf/AHAR-Part-2-2022.pdf.

43.     Because of its ability to achieve proven results, HUD, with the support of Congress, has been promoting "Housing First" as a policy priority across administrations for nearly 20 years. Research and evidence about this approach shows it is highly effective in creating housing stability for the program participants and providing cost savings for local systems of care. Although any program or system can use this general approach, Housing First is most often associated with two permanent housing interventions, PSH and RRH, funded through the CoC Program.

44.     Unfortunately, despite their proven success, the reality is homeless response systems lack the resources to extend, and fully implement, permanent housing and services at scale for the vast majority of people experiencing homelessness. CoCs are typically only able to serve a fraction of the people who are eligible for help. In 2022, homeless response systems only had the capacity to place 16 percent of households who were served in the nation's shelters into permanent housing. For example, an Alliance member in Texas who deploys permanent housing strategies has experienced a 24 percent decrease in unsheltered homelessness and 19 percent decrease in overall homelessness since 2021. Despite this sustained progress, there are still 3,718 individuals experiencing homelessness on any given night in their CoC and not enough resources at scale to immediately re-house them all. Homeless response systems cannot reach as many people as needed, and lack the resources needed to fully implement strategies proven to reduce homelessness: permanent housing and services. The problem is not the insufficiency of those strategies.

45.     Between 2010 and 2020, our nation reduced homelessness: a 50 percent reduction in veteran homelessness; a 16 percent reduction in chronic homelessness; and a 29 percent decline in homelessness among families with children, with unsheltered homelessness in this subpopulation plummeting by 72 percent. Adhering to data-driven methods as a criterion for

receiving federal funding has allowed CoCs to effectively transform the lives of veterans, children, and families, and resulted in these drastic percentage reductions. With federal resources in short supply, it makes sense to use them in support of effective strategies.

**E.    The CoC NOFO Competition Process**

46.    Responding to a NOFO requires CoCs to spend several months implementing a local competition process and additional time to complete the application.

**1.  Typical Stages of CoC NOFO Competitions**

47.    There are four milestone phases of the CoC Program Competitive Process: (1) CoC Program Registration, (2) Grant Inventory Worksheets Review Process, (3) Notice of Funding Availability/Opportunity Process, and (4) Conditional Award Announcement.

**(1) CoC Program Registration**

48.    This kicks off the competitive process for CoCs. CoC Collaborative Applicants register their intent to apply for CoC funding and indicate which geographic areas are represented in their CoC.

**(2) Grant Inventory Worksheet Process: Sets Total Renewal Funding Amounts (ARD) Available for CoCs Before Competition Opens**

49.    During the Grant Inventory Worksheet (GIW) process, HUD sends initial GIW Worksheets to CoCs to review and reconcile. This is the process by which CoCs confirm which projects are eligible for renewals in that competition year. This in turn enables HUD to determine a CoC's final need amount (the maximum amount of renewal funding for which a CoC is eligible to apply) as well as maximum amounts for Bonus and CoC Planning. Bonus funding has historically prioritized permanent housing.

50.    HUD must set the maximum amount of renewal funding for which a CoC is eligible to apply during a competition cycle. This maximum amount is known as the CoC's Annual

Renewal Demand (ARD). HUD identifies the Annual Renewal Demand (ARD) amount for each CoC through the Grant Inventory Worksheet (GIW) process. CoCs are also eligible to apply for available bonus funding.

51.     The Grant Inventory Worksheet (GIW) is a spreadsheet used by HUD to track eligible renewal projects for the CoC Program Competition. It lists each project's grant number, operating year, and the Annual Renewal Demand (ARD), which is calculated from the project's renewal budget line items. The ARD gets set during the Grant Inventory Worksheet process before the competition opens.

52.     Collaborative Applicants use the GIW to verify local project information and calculate the total estimated renewal funding needed for CoC renewal project funding. HUD and CoCs use the GIW process to agree on what projects are eligible for renewal in a given year.

53.     The ARD amount is based on the budgets of all existing projects within a specific CoC's geographic area that are eligible to have their funding renewed in the annual competition. Nearly all existing CoCs have grants that renew each year. The ARD is a "primary factor in determining how much a CoC can apply for."[10] Since the ARD represents the demand for funding to continue serving people in existing programs, accurately determining the ARD ensures that existing, effective programs can be prioritized for renewal funding and can continue to assist program participants to remain stably housed, or ineffective programs can safely be "reallocated" to new projects.

**(3) Notice of Funding Availability/Opportunity (NOFO) Process**

54.     The publication of the NOFO marks the beginning of the application process for which CoCs may apply for CoC grant funds. Historically, HUD issues a NOFO in June, July or

---

[10] HUD, *Determining the Amount of Available CoC Program Funds* 4, HUD, *Determining the Amount of Available CoC Program Funds* 4, https://perma.cc/M6VL-G5T4.

August. The NOFO provides the date when applications are due to HUD (the closing date, which is typically at least 3 months from the issuance of the NOFO).

55.    Each NOFO has a multistep application process in the competition which includes both a local and national competitive process:

a.  Every CoC holds a local competition to determine which projects should be included in the application to HUD, and in what ranked order. This process identifies which projects the CoC will submit to HUD as Tier 1 or Tier 2. CoCs may use local criteria in addition to the criteria required by HUD in the CoC NOFO.

b.  Once HUD receives the CoC and project applications in ranked order from the CoC, it conducts various reviews and scoring.

c.  This includes a pass/fail threshold review for project eligibility and project quality. Generally, renewal Project Applicants are presumed to have met these threshold criteria through previously approved grant applications unless there are significant monitoring findings, adverse determinations from the Office of Inspector General, or other deficiencies.

d.  HUD also conducts a risk review of projects to assess risk and past performance such as having proper financial controls, effective management systems, results of audits, etc.

e.  Projects that pass the threshold and risk reviews move to the next phase of the process. Tier 1 projects that move forward are "held harmless" and prioritized for funding.

f.  HUD scores CoC applications according to the NOFO requirements.

g.  Tier 2 projects are then scored according to the NOFO, using a combination of factors that includes the overall CoC score.

    h.   Other funding set-asides -like the Youth Homelessness Demonstration Program or the Domestic Violence set-aside, may be considered separately depending on direction from Congress and internal HUD priorities.

    i.   HUD then applies the selection process outlined in the NOFO to all Tier 2 projects.

    i.   HUD determines the amount needed for planning funds and statutorily required increases to rental assistance, operating and leasing line items (and any others determined by Congress in the appropriation), and makes final award determinations based on the amount of funding available.

56.    CoCs can reallocate funds from existing, lower-performing projects to create new, higher-performing projects without decreasing their total ARD amount.

### (4) Conditional Award Announcement

57.    HUD is required by the statute to issue, "within 5 months after the last date for the submission of applications," an announcement of "the grants conditionally awarded" as a result of the competition.  42 U.S.C. § 11382(c)(2)(A). Awards are usually announced in December or January.

58.    The awards are "conditional" because of technical/administrative requirements set forth in the statute related to "site control, matching funds, and environmental review." 42 U.S.C. § 11382(d)(1)(A).  Site control means, for awards for housing acquisition, construction, rehabilitation, operation, or for supportive services associated with a housing site, the recipient has ownership or the right to control the property. 24 C.F.R. §  578.25. Matching funds means the recipient has demonstrated it has satisfied the requirement that it contribute a 25 percent of the grant award from funds or other in-kind contributions from other sources. 5 C.F.R. § 578.73. Environmental review means the recipient has demonstrated it has satisfied obligations under federal environmental laws, for example, the project is either exempt from environmental review,

or any required review has been completed.  24 C.F.R. § 578.99.  HUD refers to this step as "Issues and Conditions," typically, HUD allows recipients to upload the required documentation in its online grant application portal, "e-snaps," then an assigned HUD representative reviews the information. Once these technical requirements are complete and have been reviewed, HUD typically issues the grant award agreement.

59.    Recipients have 9 months from the date of the conditional award announcement to meet these technical/administrative requirements, which triggers the 45-day clock for HUD to obligate and disburse funds. 42 U.S.C. § 11382(d)(1)(A), (2).

**2.  Typical Timing of CoC NOFO Competitions**

60.    There has always been a clear sequence of steps and communication offered by HUD so that CoCs, homeless service providers, and other interested parties are able to plan before opening their local competitions.

61.    Between 2016 and 2024, the CoC Program competition was open for an average of 81 days with 60 days being the fewest days allotted (FY2022). The time period between competition closing and award, on average, was 124 days with 79 days being the shortest amount of time (FY2024) and 179 days being the longest (FY2022).

**F.    The 2024/2025 NOFO Was a Two-Year Competition**

62.    Congress authorized HUD in 2024 to run a two-year NOFO to free up CoCs to focus more on strategic planning and performance evaluation to better prevent and end homelessness in their communities.

63.    On July 31, 2024, HUD published the FY2024 and FY2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants Notice of Funding ("2024/2025 NOFO"), meaning CoCs would submit one CoC Application to receive funds for Fiscal Years 2024 and 2025. The 2024/2025 NOFO indicated that the score CoCs

received in the 2024 submission would be carried forward to FY 2025 funds, subject to appropriations, and that project applications submitted in 2024 would not need to be resubmitted in 2025 to be considered for renewal. HUD's notice provided assurance that there would not be a full competition process in 2025. CoCs conveyed the information in HUD's notice to CoC subrecipients during the 2024 local and national competition process.

64.    Our members engaged in a lengthy local competition process beginning on July 31, 2024, until October 30, 2024 (91 days). Prior to that, our members who are Collaborative Applicants spent time working with Project Applicants with renewal funding to review Grant Inventory Worksheets (GIWs).

65.    Consistent with HUD's practices for nearly a decade, the 2024/2025 NOFO prioritized permanent housing solutions to homelessness.

66.    The 2024/2025 NOFO also emphasized certain policy priorities, including a Housing First approach, addressing racial inequities, improving assistance to LGBTQ+ individuals, decriminalizing homelessness, and expanding permanent housing. These goals are consistent with several years of policy priorities identified by HUD through CoC funding competitions and the McKinney-Vento Act. Each CoC competition since 2015 has included opportunities to apply for Permanent Housing Bonus funds and scoring incentives for adopting a Housing First approach, and has required CoCs to identify strategies they take to prevent criminalization of homelessness; each competition since 2017 has required CoCs to describe how they address the needs of LGBTQ+ individuals and their families; and each competition since 2018 has included questions about how CoCs are evaluating and addressing racial disparities.

67.    The 2024 CoC competition awards were announced on January 17, 2025.  As is typical, most grants were awarded for a period of 12 months. Renewal grants begin the day after

the previous grant expires. Renewal grants awarded in the 2024 competition began at some time during the 2025 calendar year. These were mostly one-year grants, but with the expectation of renewal based on HUD's announcement that the funds be renewed the following year, assuming Congress appropriated the money.

68.      Our members relied on this two-year NOFO to enter into contracts with project sponsors with the expectation that project sponsors would have funding for two years.

**G.      HUD Plans to Reissue a New NOFO To Replace the 2024/2025 NOFO**

69.      On March 15, 2025, Congress appropriated $3.544 billion to the CoC Program for the 2025 fiscal year. Once Congress appropriates funds to HUD, the agency's Secretary is required to issue a notification for funding available for CoC Program grants. Moreover, HUD must issue the notice of available funding by no later than three months after Congress has made the appropriation. Here, HUD was required to issue any new NOFO for the CoC Program by June 15, 2025.

70.      HUD did not issue a new NOFO by June 15, 2025.

71.      Instead, on July 3, 2025, HUD announced that it intended to publish a new NOFO for FY2025 CoC awards.

72.      That email did not include any specificity or detailed instructions that often shape local competitions, leaving our members with no information about how to proceed.

73.      More than four months after our members received HUD's email, HUD issued the FY2025 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO ("2025 NOFO") on November 13, 2025, with a deadline for submitting completed applicants on January 14, 2026. HUD stated that awards would be made by May 1, 2026. If the two-year NOFO had been left in place, CoCs would have reasonably expected awards to be announced around December 2025.  At the very least, CoCs expected HUD to process renewal

FY25 grant awards and agreements in advance of when the FY24 grant awards begin to expire in Calendar Year 2026.

74.     Funding appropriated by Congress in a given Fiscal Year is used to fund projects that would otherwise expire in the following Calendar Year. This lag gives HUD time to run the CoC Competition. For example, money appropriated by Congress for FY2024 renewed projects that expire in Calendar Year 2025. Each project has a "start date" that coincides with when the original grant agreement (or amended agreement) with HUD was signed and when the project began operating. Hence, these start dates may be staggered and span the entire calendar year. Some projects run out of funds early in the calendar year while others begin to run out of funds later in the calendar year. Under the new 2025 NOFO, HUD has announced that they expect to make awards in May 2026. Therefore, all renewal projects with start dates between January and May will be without funds for that period of time, if they are funded at all.

**H.     The 2025 NOFO Radically Alters the CoC Program**

75.     The Alliance and our members have grave concerns with the 2025 NOFO. In a matter of months, it will destabilize and devastate the CoC Program, destroying the success built over decades. Declarations submitted in this case and in *State of Washington v. U.S. Department of Housing and Urban Development*, many of which were submitted by Alliance members, also discuss these changes in detail. Accordingly, I focus here on three massive shifts to the program in the 2025 NOFO: deprioritization of permanent housing, the shift away from protection of renewals, and the shift toward temporary and unproven strategies.

### 1.     Funding Cap Deprioritizes Permanent Housing

76.     HUD's decision to drastically cap funding available for permanent housing strategies—which have been proven to reduce homelessness—alone is a wholesale reversal in the CoC Program's priorities and conditions.

77.     The primary goal of the Homelessness Assistance Act is to promote permanent housing by emphasizing and supporting long-term housing solutions for homeless individuals and families. The HEARTH Act shifted the McKinney-Vento Act's focus *away* from temporary shelters to getting people into stable, long-term housing and services quickly. Nevertheless, the 2025 NOFO announces an "[i]nvestment in Transitional Housing and Supportive Service Only Projects." FY25 NOFO at 15. To invest in more transitional housing and supportive services only projects, the NOFO caps CoC funding for permanent housing at 30 percent. For example, if you are a CoC with an ARD of $6,200,000, only $1,860,000 of that can be used to support permanent housing eligible under this NOFO. Since 2009, after passage of the HEARTH Act, HUD has *never* capped the ability of CoCs to apply for PH programs (subject to appropriations).

### 2.     Tier 1 Cap Fails to Protect Renewals

78.     HUD, by statute, must preference existing grants and renewals. But in addition to the 30 percent cap on permanent housing, HUD has imposed an additional 30 percent cap on projects considered "protected" in Tier 1.

79.     CoCs rank projects into two tiers, and HUD selects projects based on how they rank individual projects and whether they fall within tier 1 or 2. Depending on a CoC's score, a CoC could lose some or all its funding if it is ranked in Tier 2. Absent significant issues or major red flags, a CoC's projects located in Tier 1 would most likely be funded based on being higher performing projects that deliver on outcomes in alignment with reducing homelessness. CoCs are also likely to place into Tier 1 the projects that are most critical to meeting community needs (and, due to their performance and importance to the community, these Tier 1 projects are mostly renewal projects).  Projects ranked in Tier 2 are subject to a national competition based on the score received by the CoC on rating criteria that assess systemwide performance, governance, approaches to homelessness, and implementation of HUD's policy priorities.

80.     This focus on renewal for projects ranked within Tier 1 ensured that CoCs could budget around a steady stream of funding and ensure stability for individuals and families living in CoC funded-housing and receiving CoC-funded services. And although the tier system was created administratively, the structure and procedures for awarding CoC funds must still work in service of implementing the McKinney-Vento Act, namely, to end homelessness by prioritizing stable funding for proven strategies such as permanent housing.

81.     As applied, Tier 1 is set as a percentage of a CoC's Annual Renewal Demand. Consistent with statutory and regulatory mandates for renewals, Tier 1 is generally set at a percentage commensurate with the amount of funding for projects eligible to receive renewal funds.  To my knowledge, since HUD implemented the Tier system in 2012, it has not allocated less than 85% of a CoC's Annual Renewal Demand to Tier 1 projects.

82.     Under the 2024/2025 NOFO, **90 percent of the ARD was available to fund projects ranked in Tier 1**, meaning the funds were "held harmless" and not dependent on a CoC's overall score from HUD's scoring criteria, and **10 percent of the ARD was available to fund projects ranked in Tier 2**, meaning these projects were dependent on a CoC's overall score. This 90/10 allocation ensured that a vast majority of renewal funding (subject to the local competition) is protected to avoid disruption even if a CoC does not receive a high score.

83.     Typically, the factors that a CoC is rated on incentivize CoCs to have robust local processes to ensure the most effective projects are ranked in Tier 1. Further, HUD has included scoring incentives to create more permanent housing.  As a result, CoCs have been inclined to prioritize those projects, like permanent supportive housing and rapid re-housing, that are the highest performing and most effective, as this also increases the likelihood of scoring well and being awarded Tier 2 projects.

84.    The 2025 NOFO is inconsistent with the agency's funding obligations and parameters under the Homelessness Assistance Act.

85.    The purpose of the Homelessness Assistance Act is to support—and concurrently fund—proven permanent housing options. The 2025 NOFO's drastic caps to both PH and their renewal odds severely undercuts the federal goal set by Congress to ensure that individuals and families who become homeless return to permanent housing within 30 days. Prioritizes Inflexible, Temporary and Harmful Solutions

86.    Historically, the CoC Program has prioritized the development and renewal of permanent housing projects, including Permanent Supportive Housing (PH-PSH) and Rapid Re-Housing (PH-RRH), as the cornerstone of an evidence-based strategy to end homelessness. Prior CoC competitions have not emphasized transitional housing and treatment because HUD has historically deprioritized transitional housing solutions without a connection to permanent housing. HUD has recognized the value in transitional housing in certain crisis situations but recognizes that research has not shown strong evidence that transitional housing programs are effective in reducing homelessness overall.[11]

87.    The NOFO effectively shifts resources away from proven permanent housing solutions and redirects them to transitional housing or supportive service-only projects that do not provide long-term housing stability and undermine the prospect of achieving self-sufficiency.

88.    This approach contradicts the evidence-based design of the CoC Program, which was intentionally created to prioritize permanent housing solutions as the most effective means of

---

[11] *See* Martha R. Burt, *Life After Transitional Housing for Homeless Families*, URBAN INSTITUTE (May 3, 2010), https://www.urban.org/research/publication/life-after-transitional-housing-homeless-families. Also see section on "Families with Children" in HUD, *Housing First: A Review of the Evidence*, (Spring/Summer 2023), https://archives.huduser.gov/portal/periodicals/em/spring-summer-23/highlight2.html.

reducing homelessness, improving health and public safety outcomes, and reducing reliance on emergency systems.

89.     The FY 2025 NOFO will effectively force CoCs to implement a "one-size-fits-all" approach, imposing restrictive, time-limited supports that fail to account for local variations in housing markets, service gaps, and the complex, long-term needs of clients.

90.     "Treatment first" or mandatory-service models are less effective and more costly at ending homelessness and may exclude the most vulnerable individuals who cannot meet these requirements.[12] This approach undermines our members' ability to tailor interventions to promote stability and self-sufficiency, leaving vulnerable individuals and families (including homeless youth and survivors of domestic violence) – particularly those with disabilities or histories of chronic homelessness – at heightened risk of program failure, housing loss, and a return to homelessness.  Relatedly, the FY 2025 NOFO contains a condition related to whether a project or project applicant offers purportedly engages in "harm reduction" "activities" (which is not defined).  Generally speaking, services like "safe-consumption sites" or "needle exchanges" are not co-located with CoC-funded PSH or RRH programs; however, "harm reduction" is a broad, encompassing term, and this disqualifying condition similarly retreats from HUD's past endorsement of Housing First (as an approach within the umbrella of  harm reduction) and interferes with local decision-making as well as the relationship between providers and clients.

91.     Compounding this harm, the alternative models prioritized by the NOFO often require participants to comply with rigid, coerced treatment plans including mandatory substance-use treatment, mental health programming, and intrusive case management directives to remain

---

[12] Sam Tsemberis, Leyla Gulcur, and Maria Nakae, *Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals with a Dual Diagnosis*, AMERICAN J PUBLIC HEALTH (April 2004) (94:4), https://pmc.ncbi.nlm.nih.gov/articles/PMC1448313/.

eligible for housing. For people with disabilities, trauma histories, or complex behavioral health conditions, these requirements strip away personal autonomy and dignity, forcing individuals to engage in services that may not be clinically appropriate, wanted, or effective. These unsound mandates will lead directly to further housing loss, re-traumatization, and disengagement from care, pushing individuals into crisis, hospitalization, incarceration, or back onto the streets.

92.    For example, the new merit review criteria prioritize or reward applicants who require participants to enroll in services to receive housing (the "Mandatory Treatment" Condition). The challenged NOFO awards up to sixteen points (out of a maximum of 130) for not only offering supportive services but demonstrating that the proposed project will require program participants to take part in supportive services, which can include substance use treatment. Sixteen points is a large set of points for some communities and statistically significant.

93.    The 2025 NOFO likewise harms people with disabilities. As part of the threshold review, the project quality criteria for new Permanent Supportive Housing rewards projects that exclude those with substance use disorder and those who have mental and behavioral health disabilities. (2025 NOFO at p. 61). Many—if not all—Permanent Housing projects serve individuals with all types of disabilities, as required by statute.

**I.    Impact and Harms of 2025 NOFO on Alliance Members and on Our Nation's Most Vulnerable Citizens**

94.    Twenty-two Alliance members submitted declarations in a similar case about the 2025 NOFO, *Washington v. HUD*, 25-cv-626 (D.R.I.).[13]

---

[13] They include the (1) Washington State Department of Commerce, (2) New York State Office of Temporary and Disability Assistance, (3) New York City Department of Social Services, (4) Supportive Housing Network of New York, (5) Rhode Island Housing and Mortgage Finance Corporation, (6) Colorado Department of Local Affairs, (7) Delaware State Housing Authority, (8) Housing Alliance Delaware, Inc., (9) D.C. Department of Human Services, Family Services Administration, (10) Illinois Office to Prevent and End Homelessness, (11) Kentucky Housing Corporation, (12) Maine Continuum of Care Board of Directors, (13) Maryland Department of Housing and Community Development, (14) Massachusetts Executive Office of Housing and Livable Communities, (15) Michigan Coalition Against Homelessness, (16) Minnesota Housing Finance Agency, (17) New Jersey Department

95.     As those declarations and others submitted by our members in this case show, under the 2025 NOFO, entities who received CoC Program funds will surely face a cascading crisis: CoCs will be forced to eliminate or drastically reduce PSH and RRH programs; CoC-funded permanent housing sites will face immediate operating shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement. CoCs in turn will be forced to redirect limited funds away from reducing unsheltered homelessness and into emergency stabilization efforts simply to prevent widespread returns to homelessness.

96.     The return to unsheltered homelessness carries catastrophic consequences to the people that the CoC Program was designed to protect: exposure to extreme weather events; life-threatening infections; unmanaged chronic illnesses; predatory violence; sexual assault; and the escalation of behavioral health crises. Research consistently shows that mortality rates among people experiencing unsheltered homelessness are several times higher than for housed populations and for individuals with disabilities who lose permanent housing, the risk of premature death increases dramatically within months. This policy shift will not only erase years of progress in stabilizing the most vulnerable people in our communities, but it will also directly result in avoidable medical crises, suffering, and preventable loss of life.

**1.     Dramatic Caps on Permanent Housing Will Gut the Homelessness Response in this Country**

97.     To start, the 30 percent cap on permanent housing will increase homelessness. To invest in more transitional housing and supportive services only projects, the 2025 NOFO limits

---

of Community Affairs, (18) New Jersey Housing and Mortgage Finance Agency, (19) Oregon Housing and Community Services, (20) Commonwealth of Pennsylvania Department of Community and Economic Development, (21) Department of Housing and Community Development for the State of California, and (22) California Interagency Council on Homelessness.

the amount of money eligible to a CoC funding long-term housing solutions (i.e., permanent housing) to 30 percent.

98.    Since implementation of the HEARTH Act, HUD has never capped the ability of CoCs to apply for permanent housing (PH) programs (subject to appropriations).

99.    A critical problem with this approach is that in our country today, roughly 87 percent of all CoC Program funds are slated to support permanent housing in some capacity. And while this is a national average, many Alliance members actually spend more than 90 percent of their ARD on PH programs that provide a lifeline for seniors, veterans, families, and people with physical and mental disabilities. By capping long-term housing to just 30 percent of the $3.918 billion available in this competition, this cap disinvests permanent housing systems in this country of about $2.5 billion dollars of congressional appropriations. Not only does this remarkable cap depart from local planning and investments during the last decade, but HUD's overreach prevents communities from setting local priorities to end homelessness.

100.    The FY 2025 NOFO's cap on permanent housing funding marks a shift toward time-limited, less stable interventions and will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long term rental subsidies and intensive supportive services to maintain stability. If the 30 percent cap on permanent housing is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits.

101.    Additionally, current PH-assisted clients will not be eligible to access Transitional Housing projects the NOFO aims to create given HUD definition of homelessness. Additionally, current PH-assisted clients will not be eligible to access Transitional Housing projects the NOFO

aims to create given HUD definition of homelessness and eligibility criteria. Thousands of households will also lose access to supportive services. For these households, the disinvestment in PH is not merely a service reduction, it is a life-threatening disruption that reverses years of progress to stability and self-sufficiency. Project applicants and housing/service providers will face immediate operational and financial crises. Projects that were designed, funded, and staffed around evidence-based permanent housing models will be forced either to downsize, convert to entirely different interventions, such as costly or infeasible transitional housing, or close altogether. Providers will be required to rapidly rework budgets, reassign staff, and make difficult decisions about which households to evict due to reduced capacity. Many communities have built their homeless response systems around permanent supportive housing and rapid re-housing as the backbone of stability. This sudden shift guts that foundation.

102.    An Alliance member who submitted testimony in *Washington v. HUD* states that this cap places California's homelessness system at immediate risk. This is alarming given that California's CoCs—by far the largest in the nation—position permanent housing interventions as the backbone of their local strategies. Historically, California CoCs have dedicated approximately 90 percent of program funding to PSH, RRH, or Joint TH–RRH programs. The 30 percent cap on PH will result in defunding the very programs responsible for stabilizing tens of thousands of Californians who have already exited homelessness. *See* Declaration of Meghan Marshall (California Interagency Council on Homelessness) (No. 29, *Washington v. HUD*) ¶ 17. This provision also directly threatens the viability of California's state-funded housing portfolio. The State has invested billions of dollars to acquire, develop, and preserve permanent housing. By limiting CoCs to 30 percent Permanent Housing funding, HUD effectively removes the operating

and services foundation upon which a significant portion of California's state-funded housing rests.

103.    Another member, the Minnesota Housing Finance Agency (Minnesota Housing), partially funds about 52 PSH properties in Minnesota through the CoC Program. Their level of funding at risk could lead to evictions, lost affordable housing units, and destabilization of the operations and financial viability of properties that house and serve extremely vulnerable populations in Minnesota. *See* Declaration of Jennifer Leimaile Ho (Minnesota Housing Finance Agency) (No. 20, *Washington v. HUD*) ¶ 8.

104.    According to their last point-in-time count, another member, the City of Providence (Providence) estimates that 552 individuals and 290 families were experiencing homelessness (sheltered and unsheltered). More than a thousand additional households were in permanent-supportive housing or transitional housing at the time of the survey. Nearly a third identified as Black, and another third as multi-racial. In 2024, 870 households were enrolled in Providence-based permanent housing projects, and 327 in rapid re-housing projects. Given projected losses under this cap, Providence expects "a precipitous spike" in the City's unsheltered homelessness, especially for those with recurring service needs and extremely low incomes housed by these projects.

105.    Another member in New York, which has also dedicated the bulk of program funds to creating and maintaining permanent supportive housing, told us that this sudden redirection of funding through the 30 percent cap will displace over 9,000 households.

Similarly, a member in Arizona currently dedicates 92 percent of CoC funding to permanent housing. Under the 2025 NOFO, this CoC is projected to lose more than $32 million in funding for PH and 2,233 beds.

106.    A member CoC located in Kentucky currently has approximately $17.8 million in permanent housing projects. Even if the CoC placed only PH projects in Tier 1, excluding from Tier 1 any other project types, $11.4 million worth of PH projects would, under the new rules, be cut entirely for this member CoC. This means nearly 700 households are at risk of becoming homeless quickly, including families with children and elderly individuals with disabilities. This member estimates that approximately 1,220 people (including children and 641 individuals with disabilities) would lose their current housing over the next 12 months, returning to unsheltered homelessness due to the incredibly weak and under-resourced emergency shelter capacity across the state. If this CoC does not receive the PH assistance expected under the 2024/2025 NOFO, people who become homeless for the first time in the coming months and years, as well as those who are facing chronic homelessness, will not have a pathway to housing stability that the Kentucky CoC currently provides. This will lead to both more people experiencing unsheltered homelessness and increased overcrowding and lengths of stay in emergency shelters in Kentucky.

107.    One member analogized the magnitude of the harm as "expecting to receive a gallon of support from HUD every year for more than a decade to support your entire CoC and all of a sudden, late in the year, they announce you are only eligible for a teaspoon."

108.    The Alliance completed a state-level analysis of the impact of HUD's cuts to permanent housing using publicly available data compiled from several sources including HUD's posted 2025 Annual Renewal Demand, 2024 CoC Award Announcements and the 2024 Housing Inventory Count. The calculations account for local variations in factors like housing and planning costs.

109.    This analysis, which we think significantly understates the devastation that members face given some limitations of the data, shows that the 30 percent cap on permanent

housing will impact all but one state, and this impact will be felt most strongly in states that rely most heavily on federal funding.

110.    This analysis shows projected losses after the cap for:

a)    a member CoC in Louisiana (currently dedicating 90 percent of program funding to PH) is $24 million in funding for PH and 2,052 beds;

b)    a member CoC in Ohio (currently dedicating 92 percent of program funding to PH) is $33 million in funding for PH and 3,948 beds;

c)    a member CoC in Texas (currently dedicating 54 percent of program funding to PH) is $793,000 in funding for PH and 61 beds;

d)    a member CoC in Utah (currently dedicating 91 percent of program funding to PH) $7 million in funding for PH and 585 beds;

e)    a member CoC in West Virginia (currently dedicating 46 percent of program funding to PH) is $155,000 in funding for PH and 15 beds; *and*

f)    a member CoC in Wisconsin (currently dedicating 81 percent of program funding to PH) is $13 million in funding for PH and 969 beds.

111.    It's worth noting that the permanent housing system in Louisiana includes renewal of a special grant appropriated by Congress to permanently house people after Hurricane Katrina. It was the largest single award the homeless office at HUD ever processed, and it helped Louisiana residents recover from the storm. The City of New Orleans went on to be the first CoC to announce an end to Veteran homelessness. This highlights that many of these systems have received investments from multiple sources to make real gains. This 30 percent cap is like taking a hatchet to that progress without any explanation.

112.    Given the magnitude of these losses, CoCs will need to make requests for emergency funding from State and local government or philanthropic partners, reduce the number of housing units, reduce or discontinue services, or lose their share of PSH units to standard low-income units. Without funding, PSH properties struggling to maintain even the most basic of operations will likely default on loans and lose federal Low-Income Housing Tax Credits. For example, our member Minnesota Housing reports it is likely to see an increased demand in funding from limited state resources for new permanent supportive housing projects. For people experiencing or at risk of homelessness in Minnesota, this could mean increased evictions, loss of new housing opportunities, and an overall increase in housing instability if permanent supportive housing properties are unable to operate and construction of new properties is less likely to keep pace with increasing demand.

113.    In short, the 30 percent cap directly undermines the Homelessness Assistance Act, destabilizes its long-term investments in permanent housing, and reverses more than a decade of coordinated homelessness strategy.

**2.    Failing To Protect Renewal Funding Will Destabilize CoCs Across the Country**

114.    HUD has created immediate instability in the operating budgets of thousands of permanent housing units nationwide. It does so by disrupting the two-year funding cycle authorized by Congress and creates undue uncertainty for projects that were expected to receive a second year of funding.

115.    In addition to the 30 percent cap on permanent housing, the 2025 NOFO also fails to protect renewal funding, which will severely and negatively impact nearly all CoCs.

116.    The 2024/2025 NOFO set Tier 1 at approximately 90 percent of ARD, protecting renewal projects–especially PH–from funding loss. By contrast, setting Tier 1 at 30 percent of ARD means that renewal projects nationwide, including the majority of PSH and RRH programs,

are collectively at enormous risk of partial or full defunding. These programs have historically relied on federal renewal stability and are financed, staffed, and occupied based on multiyear renewal expectations.

117.    With only 30 percent of renewal funding protected, the nation will suffer widespread loss of rental assistance, supportive services, and operating funds across permanent housing units. This places tens of thousands of formerly homeless and currently stable individuals and families at immediate risk of housing instability and potential return to homelessness.

118.    The 30 percent cap on PH together with the unbalanced tiering changes completely pulls the rug from underneath the vast majority of our members.

119.    For example, I've attached, at Exhibit A, an anonymous example of ranking sheet used by a CoC (and Alliance member) in their local competition to illustrate the destabilizing impact of tier allotments on a CoC. In this example, under the 2024/2025 2025 NOFO, the CoC was eligible for about $6M in CoC funding given its ARD. After completing its local competition and ranking, this CoC had between 10 and 12 projects with guaranteed funding. Almost every project ranked in Tier 1—the protected funding pool—was a renewal for permanent supportive housing. Under a 30 percent limit for Tier 1 (ignoring, for the sake of this example, the separate PH cap), this same CoC can now guarantee funding for 2.5 projects, at best, with the remaining 10 now shifting down to Tier 2. And the funding even for the 2.5 projects is not guaranteed unless the CoC can certify the slew of new, unlawful threshold and merit scoring criteria on such a late and compressed timeline.

120.    The 30 percent cap will harm CoCs with more rural areas. For example, we have a member CoC in Kentucky with an ARD of $21 million. At 30 percent, Tier 1 will equal $6.4 million. This CoC must place the remaining $15 million in Tier 2, regardless of project type or

how effective the project has been for the community. Because the Tier 2 scoring criteria favors larger metropolitan areas, and this CoC has a larger percentage of rural areas than other CoC's, the member CoC in Kentucky is at a higher risk of losing more than $15 million (70 percent of its current funding) in a matter of months.

121.    Another member is set to lose $11.4 million for a CoC with 64 percent of permanent housing renewals. While the member is unable to predict the exact number of households and units impacted by this loss of renewal resources at this time, a 64 percent reduction in currently supported PH grants sets as many as 668 families who are at serious risk of homelessness losing their rent assistance. About 1,575 units are predicted to lose their permanent housing subsidy and supportive services. An increase in homelessness of this magnitude will overwhelm an already under-resourced emergency shelter system in this CoC's area. Even after receiving $2.6 million in Emergency Solutions Grants (ESG) for fiscal year 2025 funding, the CoC was only able to assist 27 emergency shelters, 10 of which exclusively serve survivors of intimate partner violence. It is likely that many of these shelters will lack the capacity to respond to a significant increase in local homelessness.

122.    One of our members currently has a staggering 71 projects eligible for renewal funding. The projects include 50 permanent housing projects that include PSH-RRH, and joint component, and 16 Supportive Services Only (SSO) projects including those dedicated to street outreach and coordinated entry. The current award amount for the 71 projects eligible to renew through the FY 2025 funding round is $21.5 million, with $15.4 million in PH projects accounting for this CoC's total ARD. All of this is now at risk.

123.    The 2025 NOFO will gut this very successful CoC. During the 12-month reporting period, 964 people retained (representing 98.4 percent) their PSH or exited to other permanent

housing destinations. Of those who exited permanent housing programs to other permanent housing during the same 12-month reporting period, only 9 percent returned to homelessness after two years. This is compared to a return rate of 16 percent for those exiting from emergency shelters.

124.    Even setting aside the drastic drop in funding for PH under the 2025 NOFO, CoCs who have existing and effective homelessness response systems are already unable to meet the demand. This is true despite historical investments in PSH that ranged between 80-90 percent. Take our member, the City of Providence, as an example. Rhode Island's shelter system is already at full capacity each night, with constituents sometimes needing to wait a month or more to be able to access a crisis bed.

125.    Providence has been working to identify any available general fund resources to supplement warming centers and seasonal shelters and hire a Housing Support Coordinator position to coordinate interdepartmental and inter-agency response to homelessness. Providence has also applied for grants to provide basic needs services to people living outside via expanded outreach and diversion programs, needle cleanups, and expanded work programs (such as Amos House's A Hand Up program to address panhandling). Public safety co-response programs and the Mobile Health 1 initiative are responding to thousands of calls per year with limited capacity to address surge demand. Despite Providence's best efforts, there are no additional resources that could be identified to increase services without needing to terminate other activities in the municipal budget (such as support to community centers, non-violence initiatives, or early childcare programs), as only 4 percent of the city's budget is discretionary.

126.    According to HUD's own data, nearly 19,000 people on average became homeless for the first time each week in 2023. CoCs, even the highest performing ones, cannot keep up with

the current demand for rehousing assistance. Deprioritizing renewals for proven strategies that reduce homelessness and displacing permanently housed residents in those programs who have overcome homelessness and trauma will set even the highest performing localities like Dallas and Miami back. Most CoCs will be set back years.

127.    Another member will have to eliminate a staggering $29 million in PSH in favor of dramatically different programs. Assuming for a second this is even possible—which it is not— this particular member will have to shift away from proven strategies to reduce homelessness, namely PH and RRH. Consequently, this same member would lose funding for at least 10 full-time staff members dedicated to homelessness response, and nonprofit partners would lose funding for approximately 126 full-time staff members.

128.    In sum, funding dedicated for renewing existing permanent housing programs will face abrupt shortfalls, forcing them to either reduce or eliminate essential housing subsidies and supportive services. This directly destabilizes programs that currently house individuals with disabilities, chronic homelessness histories, and other high-needs populations including homeless youth, older adults and survivors of domestic violence, undermining years of system-level planning and investment in housing stability. Indeed, HUD has historically directed CoCs to prioritize the *most* vulnerable individuals and families for PSH in particular, and communities have followed this direction. Hence, those are the people who stand to lose their housing as a result of HUD's actions. For clients of the CoCs, the consequences are dire: the loss of permanent housing subsidies will result in involuntary exits to unsheltered homelessness, heightened exposure to health risks, and, for the most vulnerable populations, increased risk of mortality. The policy deprioritizes evidence-based permanent housing programs, erodes the hard-won stability of CoC

systems, and threatens the safety and lives of the individuals these programs were designed to protect.

### 3. Harms of the Late and Compressed Timeline

129.    Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our members' processes. This will require more time, money, and effort to comply, and is practically infeasible to do so by January. Our members are in an impossible bind. They must within weeks either betray their principles to treat the tenants they serve with dignity and trust, or instead forgo CoC awards and face devastating consequences to their financial health and operations, along with their ability to fulfill their mission and provide assistance to individuals and families experiencing or at risk of experiencing homelessness.

130.    For project applicants and direct service providers, the compressed timeline and reconfigured funding priorities create acute operational challenges: organizations must rapidly rewrite new project applications, redesign budgets, and pivot program models with little notice nor guidance from HUD, all while bracing for rental assistance cuts, staffing disruptions and losses, broken landlord partnerships, and contract losses.

131.    Meanwhile, CoCs face an unprecedented administrative burden as they are forced to unwind two-year planning cycles, realign local priorities, interpret new federal funding requirements, and manage community-wide financial and programmatic fallout — all within a dramatically shortened timeframe.

132.    Even when applications are received at HUD, reduced staffing at HUD along with significant changes to the application process, scoring methodology, selection criteria, and funding process will only delay this further (based on my historical knowledge and understanding of HUD's systems). HUD's reduced staff capacity in the field will also further delay getting grant

agreements executed and funds disbursed. Although renewal project start dates are retroactive to the day after the prior grant expired, new project start dates are dependent upon when grant agreements are executed. Based on the very limited information provided by HUD, if the agency in any way prioritizes the creation of new reallocated projects over renewal of existing projects, this will create further delays and gaps in funding.

133.    These additional delays in funding will increase rates of homelessness as our members will not be able to keep their programs operational without timely funding. Formerly homeless individuals and families will face eviction, landlords will both lose critical rental assistance payments and be forced to incur court costs, and our members will have to resort to laying off staff. The human toll of this harm could prove deadly for formerly homeless individuals and families as many are Veterans, older adults, people with disabilities, or survivors of domestic or sexual violence. There is neither enough temporary housing like emergency shelter, nor enough permanent housing to serve everyone who will become homeless again as a result of these changes in the 2025 NOFO. In 2024, no community had enough permanent housing to serve everyone experiencing homelessness. In that same year, the demand for homeless services increased by 12 percent.

134.    Many of these providers will not be able to bridge that gap in funding for any significant length of time. For example, one member explains that "[w]ith such short notice, we cannot expect to find replacement funding. If we lose that funding, approximately 45 families comprised of 151 children and adults will lose the housing we found for them as of January 31, 2026."

135.    We have members with grants set to expire on January 31.  In previous years, agencies would "front" the rental funds until grant agreements were executed because funds are

obligated under the Continuum of Care Program upon receipt of award letters. One member in this position fears "there are too many unknowns this year for any nonprofit agency to agree to do that in the current conditions."

136.    Another one of our members who has three (3) grant agreements expiring on January 31, 2026, totaling $1.8 million serving 121 formerly homeless individuals and families, supported by 12 full-time staff. Short-term impacts are already devastating - all permanent supportive housing projects in their CoC have halted new program participant referrals as they approach winter months with regular temperatures now averaging below freezing. Two of the three projects have an operational range of just one month, meaning they will begin to wind down operations in February 2026. The largest PSH project is now facing closure which will harm current relationships with 44 landlords in the region, many of whom stopped working with homeless service providers after prolonged periods without receiving rent during the COVID-19 pandemic. Long-term impacts will be more catastrophic as the region already has over 800 people experiencing homelessness in overflow motels as all emergency shelters are at capacity. Most affordable housing developments and shelters seeking to open face harsh opposition from the community. The CoC has been unable to successfully open a new shelter in more than two years, while multiple shelters have closed during that time.

137.    For a CoC member in the south, these impacts will destabilize local systems, erode trust between federal partners and communities, and ultimately place the highly vulnerable households with disabilities currently served by 959 permanent housing units at significantly heightened risk of returning to homelessness — triggering a surge in unsheltered homelessness, particularly in rural and distressed communities that lack local infrastructure beyond the CoC Program, including already weak or nonexistent emergency shelter system capacity.

EXECUTED this 1st day of December, 2025.

_____
Ann Marie Oliva

# EXHIBIT A

| | Project Name | # of Beds | Score | Status | Type | Rank | Amount Requested from HUD | Reallocated Funds | Cumulative Ranked Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Member Ranking Sample Under 2024/2025 NOFO** | | | | | | | | |
| 1 | PROJECT 1 - Renewal PSH | 26 | 84 | Accepted | PH-PSH | 1 | $500,000 | | $500,000 |
| 2 | PROJECT 2 - Renewal PSH | 46 | 82 | Accepted | PH-PSH | 2 | $1,200,000 | | $1,700,000 |
| 3 | PROJECT 3 - Renewal PSH | 31 | 79 | Accepted | PH-PSH | 3 | $800,000 | | $2,500,000 |
| 4 | PROJECT 4 - Renewal PSH | 23 | 78 | Accepted | PH-PSH | 4 | $400,000 | | $2,900,000 |
| 5 | PROJECT 5 - Renewal PSH | 33 | 77 | Accepted | PH-PSH | 5 | $925,000 | | $3,825,000 |
| 6 | PROJECT 6 - Renewal PSH | 6 | 72 | Accepted | PH-PSH | 6 | $150,000 | | $3,975,000 |
| 7 | PROJECT 7 - Coordinated Intake Renewal | NA | 70 | Accepted | SSO - CI | 7 | $500,000 | | $4,475,000 |
| 8 | PROJECT 8 - HMIS Renewal | NA | 70 | Accepted | HMIS | 8 | $40,000 | | $4,515,000 |
| 9 | PROJECT 9 - Renewal PSH | 18 | 65 | Accepted | PH-PSH | 9 | $490,000 | | $5,005,000 |
| 10 | PROJECT 10 - Renewal PSH | 8 | 58 | Reduced Reallocated | PH-PSH | 10 | $220,000 | $ (130,000) | $5,225,000 |
| 11 | PROJECT 11 - Renewal PSH | 7 | 56 | Reduced Reallocated | PH-PSH | 11 | $175,000 | $ (120,000) | $5,400,000 |
| 12 | PROJECT 12 - Renewal RRH | 10 | 54 | Accepted | PH-RRH | 12 | $180,000 | | $5,580,000 |
| 12 | PROJECT 12 - Renewal RRH | | 54 | Accepted | PH-RRH | 12 | $120,000 | | $5,700,000 |
| 13 | PROJECT 13 - Renewal PSH | | 70 | Accepted | PH-PSH (Services Only) | 13 | $250,000 | | $5,950,000 |
| 14 | PROJECT 14 - NEW DV Bonus | 15 | 98 | Accepted | PH-RRH | 14 | $500,000 | | $6,450,000 |
| 15 | PROJECT 15 - NEW - Reallocation/CoC Bonus | | 102 | Accepted | PH-PSH (Services Only) | 15 | $200,000 | $200,000 | $6,650,000 |
| 16 | PROJECT 16 - NEW - Reallocation/CoC Bonus | | 95 | Accepted | PH-PSH | 16 | $220,000 | $50,000 | $6,870,000 |
| 17 | PROJECT 17 - NEW - Coordinated Intake Expansion (CoC Bonus) | | 70 | Accepted | SSO - CI | 17 | $200,000 | | $7,070,000 |
| 18 | PROJECT 18 - NEW - HMIS Expansion (CoC Bonus) | | 70 | Accepted | HMIS | 18 | $100,000 | | $7,170,000 |
| | **Total** | | | | | | $7,170,000 | $ - | $7,170,000 |

| | |
|---|---|
| PPRN - Preliminary Pro Rata Need | $4,000,000 |
| FPRN - Final Pro Rata Need | $6,200,000 |
| ARD - Annual Renewal Demand | $6,200,000 |
| CoC Bonus (12% FPRN) | $744,000 |
| DV Bonus (15% PPRN) | $600,000 |
| | |
| Tier 1 (90% ARD) | $5,580,000 |
| **Amount of ARD (Renewal Funds) in Tier 2 (10%)** | **$620,000** |
| Portion of PROJECT 12 straddling Tiers | $120,000 |
| PROJECT 13 | $250,000 |
| Reallocated Renewal funds from PROJECTS 10, 11 applied to new projects (15, 16) | $250,000 |
| | |
| TOTAL PH Funds Requested | $6,330,000 |
| TOTAL PH Funds Ranked in Tier 1 | $5,040,000 |

| Key |
|---|
| Protected Permanent Housing & Operational Renewal Funding Without 30% CAP and Tiering Changes |
| Unprotected Permanent Housing & Operational Renewal or New Funding |

In this anonymized sample, the CoC has prioritized renewal PSH and HUD mandated projects (HMIS, Coordinated Intake) in Tier 1. 90% of the renewal funds are "safe" and were renewed as they passed threshold review and were ranked in Tier 1. The CoC reallocated $250,000 from two renewal projects; those funds were applied to 2 new projects that were ranked in Tier 2 along with the DV Bonus project and Expansion requests for HMIS and Coordinated Intake. The CoC's Ranking Committee prioritized high performing projects and rankings consider the impact of displacing households currently in units supported by CoC grants. $620,000 of renewal funds were in Tier 2.

| | Project Name | # of Beds | Score | Status | Type | Rank | Amount Requested from HUD | Reallocated Funds | Cumulative Ranked Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Member Ranking Sample Under NEW 2025 NOFO** | | | | | | | | |
| 1 | PROJECT 1 - Renewal PSH | 26 | 84 | Accepted | PH-PSH | 1 | $500,000 | | $500,000 |
| 2 | PROJECT 2 - Renewal PSH | 46 | 82 | Accepted | PH-PSH | 2 | $1,200,000 | | $1,700,000 |
| 3 | PROJECT 3 - Renewal PSH | 31 | 79 | Accepted | PH-PSH | 3 | $160,000 | | $1,860,000 |
| 3 | PROJECT 3 - Renewal PSH | | | | | 3 | $640,000 | | $2,500,000 |
| 4 | PROJECT 4 - Renewal PSH | 23 | 78 | Accepted | PH-PSH | 4 | $400,000 | | $2,900,000 |
| 5 | PROJECT 5 - Renewal PSH | 33 | 77 | Accepted | PH-PSH | 5 | $925,000 | | $3,825,000 |
| 6 | PROJECT 6 - Renewal PSH | 6 | 72 | Accepted | PH-PSH | 6 | $150,000 | | $3,975,000 |
| 7 | PROJECT 7 - Coordinated Intake Renewal | NA | 70 | Accepted | SSO - CI | 7 | $500,000 | | $4,475,000 |
| 8 | PROJECT 8 - HMIS Renewal | NA | 70 | Accepted | HMIS | 8 | $40,000 | | $4,515,000 |
| 9 | PROJECT 9 - Renewal PSH | 18 | 65 | Accepted | PH-PSH | 9 | $490,000 | | $5,005,000 |
| 10 | PROJECT 10 - Renewal PSH | 8 | 58 | Accepted | PH-PSH | 10 | $220,000 | | $5,225,000 |
| 11 | PROJECT 11 - Renewal PSH | 7 | 56 | Accepted | PH-PSH | 11 | $175,000 | | $5,400,000 |
| 12 | PROJECT 12 - Renewal RRH | 10 | 54 | Accepted | PH-RRH | 12 | $300,000 | | $5,700,000 |
| 13 | PROJECT 13 - Renewal PSH | | 70 | Accepted | PH-PSH (Services Only) | 13 | $250,000 | | $5,950,000 |
| 14 | PROJECT 14 - NEW DV Bonus | 10 | 98 | Accepted | PH-RRH | 14 | $400,000 | | $6,350,000 |
| 15 | PROJECT 15 - NEW - Reallocation/CoC Bonus | | 102 | Accepted | PH-PSH (Services Only) | 15 | $200,000 | | $6,550,000 |
| 16 | PROJECT 16 - NEW - Reallocation/CoC Bonus | | 95 | Accepted | PH-PSH | 16 | $220,000 | | $6,770,000 |
| 17 | PROJECT 17 - NEW - Coordinated Intake Expansion (CoC Bonus) | | 70 | Accepted | SSO - CI | 17 | $200,000 | | $6,970,000 |
| 18 | PROJECT 18 - NEW - HMIS Expansion (CoC Bonus) | | 70 | Accepted | HMIS | 18 | $100,000 | | $7,070,000 |
| | **Total** | | | | | | $7,070,000 | $ - | $7,070,000 |

| | |
|---|---|
| PPRN - Preliminary Pro Rata Need | $4,000,000 |
| FPRN - Final Pro Rata Need | $6,200,000 |
| ARD - Annual Renewal Demand | $6,200,000 |
| CoC Bonus (20% FPRN) | $1,240,000 |
| DV Bonus (10% PPRN) | $400,000 |
| PH Cap (30% of ARD) | $1,860,000 |
| | |
| Tier 1 (30% ARD) | $1,860,000 |
| | |
| Amount of ARD (Renewal Funds) in Tier 2 (70%) | $4,340,000 |
| Portion of PROJECT 2 straddling Tiers | $120,000 |
| | |
| TOTAL PH Funds Requested (max 30% of ARD all in Tier 1) | $1,860,000 |
| TOTAL of Renewal PH Funds Cut | $3,720,000 |

**Key**

Protected Permanent Housing Renewal Funding under 30% CAP and Tiering Changes

Unprotected Permanent Housing Renewal Funding Loss Due to 30% CAP and Tiering Changes

Operational Funding at Risk of Loss Due to Tiering Changes

In this anonymized sample using the same project portfolio, the same CoC will only be able to fully rank 2 renewal PSH projects and 20% of a 3rd in Tier 1. Over $5 million in PH renewal funds are unable to be included because of the 30% cap on PH. Nine of the CoCs renewal PH projects would be lost (assuming PROJECT 3 is not viable if funded at only 20% of prior year level). Additionally, the CoC's HUD mandated projects (HMIS and Coordinated Intake) would be at risk of nonrenewal as the CoC would seek to maximize PH funding. Additionally, it is unlikely the CoC will be able to apply for the full ARD under the 2025 prioritized program components of TH and SSO given the extreme time constraints and uncertainty related to being able to certify all of the new requirements and restrictions (DEI, gender, service participation requirements, criminalization and involuntary treatment).

| Key |
|---|
| Protected Permanent Housing Renewal Funding under 30% CAP and Tiering Changes |
| Unprotected Permanent Housing Renewal Funding Loss Due to 30% CAP and Tiering Changes |
| Operational Funding at Risk of Loss Due to Tiering Changes |

| Key |
|---|
| Protected Permanent Housing & Operational Renewal Funding Without 30% CAP and Tiering Changes |
| Unprotected Permanent Housing & Operational Renewal or New Funding |