**DECLARATION OF RENEE M. WILLIS**
**(NATIONAL LOW INCOME HOUSING COALITION)**

I, Renee M. Willis, declare the following under penalty of perjury:

1.     My name is Renee M. Willis. I am over 18 years old. I submit this Declaration in support of Plaintiffs' for Stay and Preliminary Injunction. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

2.     I am the President and Chief Executive Officer at the National Low Income Housing Coalition (NLIHC), a nonprofit organization headquartered in Washington, D.C. I have been in that role since May 2025. In that capacity, my roles and responsibilities include leading a team of over 40 policy advocates, researchers, organizers, and more toward the goal of achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes that are accessible and affordable in communities of their choice. Immediately prior to this permanent appointment, I served as Interim President and Chief Executive Officer from January 2025 to May 2025. In that interim role, I assumed full executive leadership of the organization, guiding its strategic direction, overseeing cross-departmental governance, managing organizational operations, and working closely with board leadership and legal counsel to inform critical decision-making, including matters related to national policy advocacy and funding priorities.

3.     Prior to that, I served as Senior Vice President for Racial Equity, Diversity, and Inclusion at NLIHC from 2021 to January of this year. In that role, I worked to ensure that NLIHC's commitment to racial equity, diversity, and inclusion was woven through its culture, policies, programs, and practices. From 2015 to 2021, I served as NLIHC's Vice President for Field and Communications, during which time I worked closely with our membership, including homeless services providers, to educate them on federal policy and to support them in achieving their missions.

4.      Prior to my work at NLIHC, I served as housing services chief with Arlington County, Virginia, as administrator of the Office of Landlord-Tenant Affairs for Montgomery County, Maryland, and as advocate and manager for the Public Justice Center's Tenant Advocacy Project.

5.      I have over 30 years of experience in housing policy and related work at the community, regional, and national level.

6.      The facts contained in this declaration come from my personal knowledge and communications I have had with my staff and the staff of the member organizations that NLIHC serves.

## I.    <u>The National Low Income Housing Coalition</u>

7.      NLIHC is a nonprofit organization headquartered in Washington D.C. It is dedicated to achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes that are accessible and affordable in communities of their choice.

8.      NLIHC's over 1,000 dues-paying members include state and local housing coalitions, tenants of public and assisted housing and other impacted people, nonprofit housing providers, homeless service providers, fair housing organizations, public housing agencies, private developers and property owners, local and state government agencies, faith-based organizations, researchers, and concerned citizens.

9.      While its members are drawn from the entire spectrum of housing interests, NLIHC does not represent any one segment of the housing industry. Rather, NLIHC focuses on advocating for policy and funding improvements for extremely low-income people who receive or need federal housing assistance, including people experiencing and at risk of homelessness.

10.     NLIHC provides a variety of support to its members to assist in their missions and assist them in serving their communities. This includes educating

members about new or proposed legislation, executive orders, or grant opportunities; convening members to share best practices and problem solve; undertaking factual and policy research to support members' missions; providing support to members undertaking policy advocacy, and more.

## II.   **NLIHC has long advanced its mission and those of its members through the Continuum of Care Program**

11.    Since the program's creation, the CoC Program has worked to provide coordinated distribution of funding and services to people experiencing or at risk of homelessness in particular geographies, with the goal of creating "a system-wide response to ensure that homelessness is rare, brief, and nonrecurring."[1]

12.    The CoC Program is the single largest source of federal funding to combat homelessness. The program's long-time focus on providing *permanent* housing (PH) programs, such as rapid re-housing and permanent supportive housing, has been critical to advancing what NLIHC sees as the primary purpose of federal low-income housing policy: housing stability.

13.    NLIHC members across at least twenty states directly receive CoC funding, or are housing providers who utilize funding from the CoC program.[2] These members collectively were allocated over $160 million through the FY24 CoC Notice of Funding Opportunity process.

---

[1] NLIHC, *The Advocates' Guide: An Educational Primer on Federal Programs and Resources Related to Affordable Housing and Community Development* (2025 ed.) (Advocates' Guide) at 8-54, https://nlihc.org/sites/default/files/AG-2025/2025-Advocates-Guide-Final.pdf.

[2] These states include Alabama, Alaska, California, Colorado, Delaware, Georgia, Kentucky, Massachusetts, Minnesota, Nevada, New Mexico, New York, North Carolina, Ohio, Oregon, Rhode Island, Texas, Vermont, Washington, and West Virginia.

14.    Since 1997, NLIHC has published an annual "Advocates' Guide" that provides research program summaries, and advocacy tools for those involved in low-income housing work, comprising hundreds of pages of resources written by a variety of leading experts about the ways to improve housing opportunities for low-income people in America.[3]

15.    For over a decade, one of the sections of the Advocates Guide has been an overview of the Continuum of Care program, summarizing the history of the program, the mechanisms by which grants may be applied for and awarded, current regulatory and legislative activity related to the program, and resources for local advocates involved in the CoC program.[4]

16.    NLIHC's work also includes undertaking research for and providing policy advice to members on topics implicated by the 2025 NOFO.

17.    For example, NLIHC has long emphasized the critical importance of Housing First policies in ending homelessness, providing members and the public resources to understand the benefits of the housing first model and organizing research on its effectiveness.[5] As NLIHC has noted, the Housing First approach has also long been the priority for CoC programs because it is "proven to be effective for most individuals and families," and the best use of "scarce federal resources" when the goal is to prioritize "high-performing shelter and service providers that are most effective in addressing homelessness."[6]

---

[3] Advocates' Guide, *supra* n. 1.

[4] *See* Advocates' Guide, *supra* n. 1 at 8-54–8-56.

[5] *See*, *e.g.,* NLIHC, *Housing First: A Critical Strategy to End Homelessness*, https://nlihc.org/sites/default/files/Housing-First-A-Critical-Strategy.pdf

[6] *Id* at 2.

18.    NLIHC has also shared extensive resources highlighting the ways the criminalization of homelessness is both inhumane and ineffective. The criminalization of homelessness

> violate[s] constitutional, civil, and human rights, traumatize homeless individuals and negatively impact their physical and mental health (including creating police encounters than can lead to unnecessary use of force or death), create arrest records, fines, and fees that stand in the way of homeless people securing jobs or housing, and perpetuate racial inequity.[7]

19.    NLIHC also provides resources and research on the unique housing challenges faced by LGBTQIA people, who disproportionately live in poverty and often face discrimination in access to housing—discrimination that is legal in many jurisdictions that do not include LGBTQIA status as a protected characteristic.[8] Huge portions of LGBTQIA people, and particularly those who are transgender or nonbinary, experience homelessness at some point in their life, and have substantially fewer alternative housing or shelter options if their living situation becomes unsafe.[9]

20.    And NLIHC has long opposed hugely disruptive immigration enforcement efforts at shelters and targeted at mixed-status immigrant households who may be receiving federal benefits, which will create more housing insecurity and make it more difficult for communities to address pressing housing needs.[10] Demonization of immigrants and the co-option of federal housing programs into arms

---

[7] Advocates' Guide, *supra* n. 1 at 6-48.

[8] *See, e.g.*, NLIHC Opportunity Starts at Home, *LGBTQIA+ Equity and Housing Fact Sheet*, https://www.opportunityhome.org/resources/lgbtq-rights-and-housing-fact-sheet/ [https://perma.cc/S3QE-DCUS] (archived Nov. 30, 2025).

[9] *Id.*

[10] *See, e.g.*, NLIHC, *Targeting Immigrants Will Not Solve the Affordable Housing Crisis*, https://nlihc.org/sites/default/files/Targeting%20Immigrants%20-%20Facsheet.pdf.

of immigration law enforcement will send many families needlessly into crisis. Rather than strengthening housing access or stability, these developments will increase displacement risk, fracture support networks, and deepen instability for families already facing economic vulnerability.

### III.    The 2025 NOFO and its impact on NLIHC members

21.    On November 13, 2025, NLIHC became aware of the issuance of the 2025 NOFO.

22.    After reviewing the terms of the 2025 NOFO, NLIHC identified several substantial changes from the 2024 NOFO and the way the CoC program has been managed in the past. The NOFO also envisions an extremely compressed timeline for preparing new applications. The NOFO was issued on November 13, 2025, with a deadline for applications in the local competition on or before December 14, 2025, and a national competition deadline of January 14, 2026.

23.    A number of NLIHC's members receive CoC funding, have been operating under awards issued pursuant to the FY24-25 NOFO, and are trying to understand the impact of the recently issued FY25 NOFO on their operations.

24.    NLIHC has been in contact with its member organizations who receive CoC funds, and has been working to put together resources for its members and the public to understand the impact of HUD's proposed changes to the CoC program. NLIHC has distributed a variety of written guidance to members and the public about the destabilizing changes envisioned by the 2025 NOFO,[11] and recently convened a

---

[11] NLIHC, *Trump Administration Releases CoC Funding Notice Drastically Cutting Funding for Permanent Housing and Putting 170,000 People at Risk of Homelessness* (Nov. 14, 2025), https://nlihc.org/resource/trump-administration-releases-coc-funding-notice-drastically-cutting-funding-permanent; NLIHC [https://perma.cc/UJR8-VJDQ] (Archived Dec. 1, 2025), *Congress Expected to Vote on Final FY26 HUD Funding Bill After Thanksgiving—Take Action Today to Protect Vital Housing Resources, Including Assistance for Over 170,000 People Formerly*

webinar for affected members and others to understand the rapidly changing CoC landscape at HUD.

25.     All of NLIHC's members who receive CoC funding are impacted by the dramatic shifts in HUD's management of the CoC program, and many of them (and the tenants they serve) are set to face extraordinary harms as a result of HUD's sudden attempt to restructure the program.

26.     Many of NLIHC's members:

a.  Had not been preparing for the need for a renewal application for FY25 CoC funds;

b.  Do not have adequate time to prepare an application for FY25 CoC funds on the extraordinarily compressed timeline imposed by HUD;

c.  Are likely to lose catastrophic amounts of program funding under HUD's new proposed 30 percent cap on permanent housing, and HUD's new proposed 30 percent cap on (and changes to) Tier 1 funding, with no practicable way to continue significant portions of their services or keep many of the tenants they served housed next year;

d.  Are at risk of to becoming ineligible for CoC funding under HUD's new threshold criteria and scoring requirements, often simply for *complying* with the requirements of the program under previous administrations; and

---

*Experiencing Homelessness* (Nov. 24, 2025), https://nlihc.org/resource/congress-expected-vote-final-fy26-hud-funding-bill-after-thanksgiving-take-action-today [https://perma.cc/P2TW-VVZ2] (Archived Dec. 1, 2025).

e. Are likely to face significant funding gaps caused by delays in the disbursement of any FY25 funds that they *do* ultimately secure through FY25 grant applications.

27.    The experiences of NLIHC members North Carolina Coalition to End Homelessness and Colorado Coalition for the Homeless are representative of the impacts that NLIHC members in the CoC program will experience.[12]

## A.    North Carolina Coalition to End Homelessness

28.    The North Carolina Coalition to End Homelessness is an NLIHC member heavily involved in the CoC program in the state of North Carolina.

29.    NCCEH is the collaborative applicant for the "Balance of State" CoC in North Carolina. A BoS CoC is the CoC that covers the remainder of a state that isn't already covered by more local or regional CoCs. In practice, a BoS CoC serves as the CoC for most of a state's rural areas and smaller cities, which don't otherwise have dedicated CoCs.

30.    As the collaborative applicant, NCCEH provides joint support to every program that receives funding through the BoS CoC, fulfilling a number of managerial and administrative tasks on behalf of those programs that would be inefficient and impractical to duplicate across each smaller program in the BoS CoC. The collaborative applicant organizes and submits the CoC application, coordinates directly with HUD, undertakes performance monitoring, and more.

---

[12] NLIHC members have also submitted declarations about the changes to the CoC program in parallel litigation brought by a coalition of state attorneys-general. *See Washington v. HUD*, 25-cv-626 (D.R.I. Nov. 25, 2025), ECF Nos. 13-5 (Supportive Housing Network of New York), 13-6 (Rhode Island Housing and Mortgage Finance Corp.), 13-10 (Housing Alliance Delaware, Inc.), 13-19 (Michigan Coalition Against Homelessness).

31.     As the collaborative applicant for the North Carolina BoS CoC, NCCEH serves the CoC for 79 different counties in the state. This program currently provides permanent housing to nearly 1,500 households in North Carolina.

32.     NCCEH is also the Homeless Management Information System (HMIS) lead agency for the NC Balance of State CoC, serving all 79 of the BoS counties plus two additional counties (Durham and Orange). Every community being served by a CoC is required by law to have an HMIS that collects standardized tenant level data and data on the provision of housing and services to program participants, facilitating standardized data across administrative tasks like CoC grant applications and annual reports. Because the communities served by the BoS CoC are each small and have fewer resources, it is impracticable for them to each operate a discrete HIMS. The HIMS functionality is instead aggregated into one provider covering all of them (plus Orange and Durham) – NCCEH.

> 1.     <u>HUD's proposed timeline for soliciting, considering, and awarding FY25 grants is unrealistic and imposes unworkable costs on grantees like NCCEH</u>

33.     NCCEH manages the complex process of preparing grant applications under the CoC program, a process that typically takes many months.

34.     In the past, the NCCEH process of preparing applications in response to NOFOs from the CoC program has proceeded roughly as follows, with many of these responsibilities being conducted concurrently:

> a.  HUD releases the NOFO and corresponding application materials for the forthcoming fiscal year, typically in late spring or early summer;
>
> b.  NCCEH prepares relevant training materials, policies, application materials, internal deadlines, and project scorecards for the ecosystem of programs and projects under the BoS CoC, a

process that typically takes roughly six weeks and that NCCEH typically undertakes *prior* to the competition. However, when a new NOFO substantially departs from prior practice, this work has to be done during the competition period.

c. NCCEH launches the competition, alerting partners and potential applicants of the opportunity to apply to be part of next year's CoC program. Typically, applicants are given roughly a month to submit application materials;

d. NCCEH reviews and scores the initial proposals and provides feedback to applicants;

e. NCCEH makes final decisions about how to score and prioritize applications, implements the opportunity for applicants to appeal their final scoring if applicable, and gathers project proposals alongside the cross-cutting collaborative CoC application (about the CoC itself rather than the projects), to finalize and submit to HUD.

35.     In total, from the time that NCCEH has a new HUD NOFO and grant application materials in hand, it typically takes at least two to three months to prepare NCCEH's actual application (even when the NOFO hasn't changed substantially from one year to the next), which is the complex product of a substantial amount of work and coordination across multiple different entities. This process also typically involves ongoing coordination with HUD staff to understand a NOFO and answer technical questions raised by the grant materials.

36.     In NCCEH's experience, once a CoC NOFO cycle has closed, it takes months for HUD to evaluate and award applicants and actually execute contracts to disburse the funding.

37.     Given the substantial administrative burden of preparing CoC applications, NCCEH hoped and expected that the previously-planned two-year funding cycle for CoC grants would alleviate some of this burden, by allowing the four-to-six month application process to only need to be completed once every two years, with a relatively pro-forma extension for the second year of grants. However, the rescission of the prior NOFO and new FY25 NOFO released in mid-November have added to, rather than simplified, the administrative complexity.

38.     As of today, HUD still has not released application materials for the FY25 NOFO to the public or NCCEH, preventing NCCEH from even beginning the process of preparing an FY25 application with its partners.

39.     It is not possible for NCCEH to prepare a CoC application for FY25 by the January 14 deadline of the quality and comprehensiveness that it would normally strive for in its CoC applications, even though NCCEH staff are working at a breakneck pace to try and adapt to HUD's compressed timeframe. And this year's application process is particularly difficult given the very substantial differences from last year's application, which have to be understood, incorporated into NCCEH's competitive process, and explained to NCCEH's partners before they are able to prepare new materials even if local partners are able to comply with the new requirements. NCCEH's local competition closes on December 15.

40.     HUD's new proposal also places unrealistic burdens on NCCEH and other CoC programs seeking to maintain continuous funding for their organizations and projects. HUD currently estimates that award notices will be finalized by May 1, a timeline that NCCEH believes is extremely unlikely given the compressed nature of HUD's FY25 NOFO process. But if HUD hits the May 1 date (which is already substantially later than prior practice—2024 NOFO awards were announced on January 17, 2025), it typically takes an additional one-to-two months for contracts to

be signed between HUD and award recipients, which is what actually allows funding to begin being used on awarded projects.

41.    If HUD had not suddenly reversed course on the two-year funding commitment it had made as part of the FY24 funding cycle, NCCEH would have expected renewal project awards for FY25 to be made by January 2026.

42.    NCCEH is the collaborative partner for nearly $4 million of CoC projects that will be expended by the end of April 2026. HUD's current timeline likely means that NCCEH or the tenants it serves will need to find funding to cover months of funding while waiting for HUD's FY25 grant process to finish and begin disbursing awards. NCCEH and its partners do not have the capacity to find that level of stopgap funding.

43.    The challenges of finding stopgap funding are further exacerbated by the extraordinary uncertainty introduced by the substantive changes in HUD's policy for FY25, including the cap on Tier 1 funding, discussed in the section below. In order to keep tenants in homes, NCCEH and its partners would have to not only find an unprecedented amount of additional funding to float while waiting for HUD disbursements, they would have to do so without any certainty that the CoC funding they would normally expect will actually be renewed.

> 2.    The substantive changes to the FY25 NOFO are catastrophic for NCCEH's programs

44.    NCCEH is the collaborative partner for NC BoS CoC projects that have been awarded $23.8 million under the FY24 NOFO. Of these funds, 89 percent (roughly $21.2 million) go towards permanent housing projects.

45.    Given the 30 percent cap on PH in the FY25 NOFO, NCCEH will need to reduce its commitment to PH projects by at least 66 percent for next year. The reduction could be even more dramatic than that, given that a number of individuals

NCCEH serves through PH programs may not qualify under the narrower standards of the FY25 NOFO, targeting elderly or *physically* disabled individuals only.

46.    The population of individuals that NCCEH serves via PH is extremely vulnerable. The majority of these individuals are genuinely unable to work or function in the way that would be necessary to afford stable housing. NCCEH does not expect any meaningful portion of these individuals to simply be able to reallocate resources and pay market rent for their homes if PH funding disappears. For example, many disabled tenants cannot work, and receive Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI) for a disability. Disability income will not increase to cover rental assistance that evaporates under HUD's new NOFO.

47.    Nor is it practicable to simply move these individuals from PH into transitional housing programs. To qualify for transitional housing programs, PH tenants would likely need to prove that they are at imminent risk of losing housing within 14 days, supported by a variety of paperwork and evidence. *See*, *e.g.*, 24 C.F.R. § 576.500 (recordkeeping requirements for homelessness status). To transition these individuals from PH to transitional housing as HUD seems to contemplate would place extraordinary administrative burdens on NCCEH and other CoCs to prepare this documentation for tenants (something NCCEH has never done before), and to do so on a rapid timeline for the majority of their tenants, before CoC funding expired. The likely result of this transition is not that NCCEH's PH tenants would simply shift to a new administrative system; it is that many of those individuals and families would become homeless. This transition would be cruel, unnecessary, and would risk losing contact with many families and individuals who currently have stable housing provided by the CoC system.

48.     The FY25 NOFO's setting Tier 1 to a maximum of 30 percent of a CoC's annual renewal demands also has extremely destabilizing effects on NCCEH and the programs and people it serves.

49.     First, HMIS funding is awarded as part of the CoC grant that NCCEH typically applies for. Six of NCCEH's eighteen staff members are funded through CoC HMIS funding.

50.     It has been NCCEH's normal practice to include HMIS funding in its Tier 1 Annual Renewal Demands. However, the 30 percent cap on Tier 1 on the Priority Listing of ARDs will force NCCEH to choose between designating and seeking to protect HMIS funding (which is critical to NCCEH's operations and supports the CoC programs of more than 80 counties in North Carolina) and maximizing every potential dollar of Tier 1 PH funding in NCCEH's application.

By dropping HMIS from Tier 1 on NCCEH's Priority Listing, NCCEH would likely lose funding for a third of its staff, and destroy CoC administrative capacity for the least-well-resourced municipalities in the state, who do not have the resources or experience to build new in-house HMIS's to make up for the disappearance of NCCEH. That decline in administrative capacity will make it impossible for the counties served by the BoS CoC to effectively compete for and manage CoC funds in the future. And rebuilding that administrative capacity at a later date would take years.

51.     Second, in previous CoC funding cycles, there have been instances in which NCCEH projects funded in a prior fiscal year expend the entirety of their grant allocation before the subsequent year's application is finally awarded and contracted by HUD. As described in the prior section, that gap period is likely to be particularly long in 2026 under HUD's contemplated timeline. However, in prior years, the vast majority of projects were at least able to face this uncertainty knowing that they were Tier 1 projects that were very likely to secure funding once the CoC grant process was

completed. This year, grantees and projects will be asked to find or float funding for months for a huge volume of funding whose ultimate fate is extremely uncertain.

52.    Finally, the policy changes envisioned in the FY25 NOFO are unworkable and will harm NCCEH and its partners.

53.    For example, the FY25 NOFO seems to suggest that HUD may reject projects that previously conducted "activities that rely on or otherwise use a definition of sex other than as binary in humans." *See* NOFO at 55, 65. These terms aren't defined further in the FY25 NOFO, and it is unclear what HUD envisions them to mean. But NCCEH notes that in previous years, for example, HUD *required* CoCs to conduct a "Point in Time" count to survey homeless populations that included gender responses such as "Non-Binary," "Questioning," "Transgender," "Different Identity," "Culturally Specific Identity (e.g., Two-Spirit)," or "More Than One Gender."[13]

54.    HUD also threatens to reject projects that previously conducted "activities that subsidize or facilitate racial preferences or other forms of illegal discrimination." *See* NOFO at 55, 65. But, for example, HUD previously required CoC applicants to affirmatively describe their "experience in effectively addressing the needs of underserved communities, particularly Black and Brown communities, who are substantially overrepresented in the homeless population."[14]

55.    NCCEH has been a longtime partner of HUD's and has sought to comply with HUD's directives, but the FY25 NOFO suggests that the tenants served by NC

---

[13] HUD, *HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations, NC-503 North Carolina Balance of State CoC*, Jan. 31, 2024,
https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_NC-503-2024_NC_2024.pdf.

[14] HUD, *FY 2024 and 2025 Continuum of Care (CoC) Application: Detailed Instructions for Collaborative Applicants* at 6 (July 31, 2024),
https://partnersforhome.org/wp-content/uploads/2020/07/FY-2024-CoC-Application-Detailed-Instructions-07-31-24.pdf

BoS CoC grantees could be cut off from critical funding simply because NCCEH has complied with HUD's prior requests.

56.    Similarly, these policy reversals could result in NCCEH losing an additional seven of its eighteen staff who are funded entirely through a CoC Planning Grant to support the NC BoS CoC.

## B.    Colorado Coalition for the Homeless

57.    Another of NLIHC's members, the Colorado Coalition for the Homeless, has been arguably the state's leading force in establishing Colorado's CoC ecosystem. CCH facilitated efforts that established Colorado's BoS CoC (and was the collaborative applicant for the CoC for 25 years) and helped establish the Metropolitan Denver Homelessness Initiative (Metro Denver's CoC).

58.    CCH has received CoC awards continuously since 1999.

59.    Today, CCH is the largest funded partner of the Metropolitan Denver Homelessness Initiative (MDHI)—the CoC covering the Denver area. CCH shares responsibility with the state of Colorado as the BoS CoC for Colorado.

60.    CCH is the single largest provider of PH in the state of Colorado.

61.    CCH has been awarded over $17 million in funding through MDHI's COC (either directly or as a subrecipient) under the FY24 NOFO, more than 99 percent of which goes towards PH. In total, CCH accounts for half of MDHI's CoC funding, and all of these funds are currently renewals rather than new projects.

62.    CCH has also been awarded over $1.3 million in funding through the Colorado BoS CoC, 96 percent of which goes towards PH.

63.    In total, CCH serves over 1,000 people in more than 770 households through the CoC program.

1.    HUD's proposed timeline for the FY25 grant cycle is unworkable for CCH

64.    The process by which the FY24 NOFO was rescinded and replaced by FY25 also puts unrealistic burdens on CCH. HUD's FY 2024 NOFO for CoC funds was a two-year NOFO, and it instructed CoCs that they were only required to submit one CoC application for both FY24 and FY25 funds. Because this was a two-year NOFO, up until July 2025 (when HUD suggested that FY24 grants may not be renewed for FY25) HUD had communicated to CCH and other CoC participants that the FY24 grants would be two-year awards that would not need to be separately renewed for FY25.

65.    The CoC funding that CCH receives through MDHI goes through a similar process as what was described re: NCCEH above. From the time a HUD NOFO is issued until MDHI submits a CoC application incorporating funding from CCH typically takes at least three months, which includes review of the NOFO and application materials, initial proposal development by CCH, initial review by MDHI, feedback and revisions by CCH and other partners in consultation with MDHI, and then final submission by MDHI to HUD.

66.    Given the late date of the NOFO release (and the fact that the grant application for FY25 has not yet even been released), CCH cannot feasibly put together a CoC application that meaningfully responds to the changes in HUD's FY25 NOFO by the January 14, 2026 deadline, either as an MDHI partner or for the Colorado BoS. The deadline for project applications to MDHI for their local competition is December 12; the deadline for applications for the Colorado BoS local competition is December 19.

67.    After submission to HUD, it can still be many months until HUD reviews and awards applications and actually executes a contract for CoC funding.

68.     Historically, the length of time that it takes for HUD to actually contract and disburse awarded CoC grants has occasionally created gaps in funding for permanent housing projects, whereby the prior grant's funding has been exhausted prior to the new year's grant money being disbursed.

69.     These sorts of delays create substantial hardships, and CCH has been forced to find money from other programs or from cash reserves to temporarily fund the rent for the individuals it supports through the CoC program. Notably, however, CCH is a non-profit entity with limited cash reserves and capacity to cover lengthy gaps in CoC funding.

70.     CCH has four awards totaling over $6 million whose funding will expire during Q1 2026. Delays in HUD's resolution of FY25 applications and disbursals of FY25 funds will require these projects in particular to find many months of funding if tenants are to remain in housing. CCH cannot predict at this time how long it may be able to cover such a funding gap; it is unlikely CCH would be able to meet a gap longer than two months, and the challenges of doing so are amplified given the uncertainty about whether CCH ultimately would receive funds under the CoC program after HUD makes FY25 decisions. And even notifying tenants of the possibility of non-renewal will have tremendous negative impacts on their mental health and overall health.

2.     <u>The sudden substantive shifts in HUD's management of the CoC Program will be catastrophic for CoC's projects and tenants</u>

71.     Additionally, CCH is not able to comply, or would face substantial challenges in complying with many of the new provisions of the FY25 NOFO.

72.     The dramatic shifts in the CoC program away from stable, continuous, and permanent housing envisioned by the FY25 NOFO would be catastrophic for CCH and the tenants it serves. A 30 percent cap on CoC funding for permanent

supportive housing would put at least 40 percent of CCH's PH funding at risk (assuming that MDHI's CoC prioritized only CCH funding for Tier 1 protections; otherwise, this number would be higher), and endanger the housing for more than 460 people across 320 households who receive permanent supportive housing through CCH's CoC operations.

73.    HUD suggests these changes will encourage "accountability" and push tenants towards "self-sufficiency," and has called the long-standing prioritization of stable, permanent housing a "self-sustaining slush fund."[15] But HUD appears to deeply misunderstand, or is mischaracterizing, the tenants that CCH and other CoCs serve. Many of CCH's tenants are going to need subsidized housing every day for the rest of their lives, with homelessness as the only realistic alternative. Many of them live with disabilities that prevent them from ever attaining adequate employment that would allow them to afford and sustain housing. Using this NOFO to push these tenants out of permanent housing will result in them returning to homelessness, not getting new jobs.

74.    Further, CCH cannot simply flip a switch and transition its tenants from PH towards other programs like transitional housing. Redesigning its CoC program to prioritize other types of housing would require re-evaluating hundreds of existing tenants to identify whether they meet the criteria for transitional housing. Many of CCH's disabled tenants likely would not meet the requirements for transitional housing, which typically require people to be literally homeless at the time they enter transitional housing, and have a viable exit plan from transitional housing.

75.    Tenants also have lease rights under PH, and converting their units into a transitional housing scheme raises fair housing concerns, disability discrimination

---

[15] HUD, *HUD Secretary Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund*, https://www.hud.gov/news/hud-no-25-132 [https://perma.cc/Y9CN-5QUD] (archived Nov. 30, 2025).

concerns, and might require the issuance of mass notices of evictions. Other significant challenges would involve staff retraining, and a substantial expenditure of relocation expenses for each tenant. Changing the type of housing and lease structure also may not be permissible for some projects, given conditions attached to the funding that capitalized the housing and/or that supports operation of the housing development itself. HUD does not appear to have considered any of the plethora of legal, logistical, or procedural challenges that would flow from trying to transition tenants en masse from permanent to transitional housing.

76.     Other provisions in the FY25 NOFO are equally impractical, unfair, or simply unclear. For example, as described above, the sex binary provision is confusingly written and unclear in its scope. CCH has never taken steps to investigate or confirm the self-reported sex of its tenants.

77.     The FY25 NOFO also requires CoCs to demonstrate that "substance use treatment is available on-site for at least 30% of projects," and that the CoC create or maintain a minimum volume of projects in each geographic area that condition services on substance abuse treatment.[16] NOFO at 77-78. This unfunded requirement would necessitate drastic changes to CCH's model and staff deployment—like more compliance enforcement staff, higher staffing ratios to track treatment, more crisis response for tenants who refuse services, more licensed behavioral health staff and supervisors (of which there already exists a significant national shortage). And CCH

---

[16] The NOFO does not make clear whether substance abuse treatment is only a requirement under this provision for tenants who actually have a substance use disorder, simply stating that for these projects, "program participants are required to take part in such services as a condition of continued participation in the program." NOFO at 78. It is unclear whether this language is the product of imprecise drafting, or whether HUD actually intends to require tenants to undergo substance use treatment even if they don't have a substance use disorder.

expects that it would lose existing staff who do not want to work under a mandatory treatment model.

78.    CCH has historically (in collaboration with HUD) prioritized nationally recognized, evidence-based models for addressing homelessness that prioritize housing stability and actively *avoid* interventions like forced treatment. Evidence from forced treatment programs shows that they lead to far more frequent escalations and conflict between staff and tenants, increased need for law enforcement and emergency room services, and ultimately endanger (rather than help) tenants whose main need is stable housing.

## IV.    <u>Conclusion</u>

79.    The experiences of NCCEH and CCH are representative of the impacts that NLIHC members (and the tenants they serve) are likely to experience under HUD's dramatic policy changes but are not an exhaustive accounting of the effects on all NLIHC's members.

80.    These impacts are likely to result in catastrophic changes to the CoC ecosystem, including the outright disappearance of long-time housing providers and, most importantly, the loss of housing for huge numbers of people in our country who can least afford it.

I declare under penalty of perjury as described in 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this <u>1st</u> day of December, 2025

Renee M. Willis
President and Chief Executive Officer
National Low Income Housing Coalition