## DECLARATION OF MICHELLE M. WILCOX, PRESIDENT & CEO, CROSSROADS RHODE ISLAND

I, Michelle M. Wilcox, declare as follows:

1.      I am over the age of 18 and competent to testify to the facts contained in this Declaration. I am the President and CEO of Crossroads Rhode Island (Crossroads), a nonprofit organization headquartered in Providence, Rhode Island.

2.      I have served as President and CEO of Crossroads since 2024. In this capacity, I have direct responsibility for overseeing Crossroads' operations, programs, and services, and I am familiar with the needs of the individuals and families we serve. Prior to serving as President and CEO, I have worked with Crossroads (previously known as Traveler's Aid Society of Rhode Island) since 1993. The facts set forth in this declaration are based on my personal knowledge, information provided to me by Crossroads staff in the course of their duties, by Crossroads clients, and review of Crossroads' records. If called as a witness, I could and would testify competently to the matters stated herein.

## I.    CROSSROADS' MISSION AND SERVICES

3.      Crossroads Rhode Island is a non-profit housing and homeless services organization. Established in 1894 as Traveler's Aid Society of Rhode Island, Crossroads Rhode Island has since grown and evolved to become the largest provider of homeless services in the state of Rhode Island, and the only developer of affordable housing exclusively for this population. With headquarters in Providence, Rhode Island, Crossroads provides programs and services statewide.  Our Mission is to help those experiencing homelessness secure stable homes.

1

4.    Crossroads offers a range of services to people experiencing homelessness, including housing, basic needs, emergency shelter, case management, referrals, and education and employment services. Using a Housing First model that prioritizes stable housing as the primary intervention to end homelessness, we provide in-home, client-centered case management and clinical support.

II.    <u>CROSSROADS' HUD GRANTS</u>

5.    My organization has applied for and received a competitive grant from HUD for the Continuum of Care Grant Program ("CoC Grant"), since approximately 2012 and prior to that, Supportive Housing Program (SHP) grants since the early 1990's.

6.    Crossroads is the direct recipient of four grants, all included in one contract. Upon funding approval, HUD sends contracts directly to Crossroads for signature. Crossroads is the subrecipient of an additional contract and the subrecipient Program Agreement is sent from the pass through entity, Rhode Island Housing, to Crossroads for signature.

7.    Currently, Crossroads is operating under and relying on four CoC grants totaling $2,163,299 for CoC FY 2024. Crossroads applied for these grants pursuant to the two-year FY 24-25 NOFO and and executed the award notices on June 4, 2025.

8.    HUD's FY 24-25 NOFO for CoC funds was a two-year NOFO, and it instructed CoCs that they were only required to submit one CoC application for both FY 2024 and FY 2025 funds. Because this was a two-year NOFO, Crossroads was under the impression that it did not need to apply for FY 2025 funds for its awards to be renewed.

9.     Crossroads receives three CoC grants for permanent housing. One of the permanent supportive housing grant provides funding for supportive services, operating, leasing and rental assistance for 101 households, including individuals, youth, families and older adults, living in a variety of Crossroads' owned and managed buildings. The current contract runs through October 31, 2026, and we had no reason to believe that the grant would not be renewed.

10.     Another permanent housing grant provides supportive services to 25 residents within Crossroads' owned Traveler's Aid Housing, who have now all moved into Summer Street Apartments. This grant was expanded in the FY 2023 NOFO to provide supportive services to up to 125 individuals. The current contract runs out December 31, 2025, with a renewal contract signed for January 1, 2026 through December 31, 2026. We had no reason to believe that this grant would not be renewed in FY 2025.

11.     The third permanent housing grant, referred to as Rapid Rehousing Program, provides supportive services and rental assistance for 21 families experiencing homelessness now living in private market apartments. The current contract runs out December 2025, with a renewal contract signed for January 1, 2026 through December 31, 2026. We had no reason to believe that this grant would not be renewed in FY 2025.

12.     Crossroads also receives a CoC grant for supportive services. This grant provides services to support the implementation of RI CoC's Coordinated Entry System, with specific focus on the diversion/housing problem solving and rapid resolution

supports to stabilize individuals and families experiencing homelessness, with an additional focus on domestic violence survivors. We have served 679 people in the current grant. The current contract runs out December 31, 2025 with a FY 2024 renewal contract for January 1, 2026 through December 31, 2026. We had no reason to believe that this grant would not be renewed in FY 2025.

13.    Crossroads also receives a sub-agreement with CoC federal funds, awarded by Rhode Island Housing. This grant provides rental assistance for up to 26 households residing in private market apartments as well as Crossroads' owned property. The current subaward runs out December 31, 2025, and our understanding is that RI Housing has signed a new contract for FY 2024 for the January 1, 2026 through December 31, 2026 period.

14.    Crossroads relies heavily on the CoC Grants to fund critical services to support individuals and families experiencing homelessness, many of whom experience chronic homelessness. Funds support leasing and rental assistance and/or operating costs for properties that we own, properties that we manage and rental units in the private market.  Funds also pay for case management supportive services for the individuals and families enrolled, which is critical in maintaining housing stability. There are hundreds of families and individuals who participate in these programs.

15.    If Crossroads cannot apply for HUD funding, or is disqualified from competing for funding after applying, because of new conditions in the FY25 NOFO, it would be extremely detrimental to Crossroads and its mission. Without this funding,

the most vulnerable people who have experienced homelessness will lose their housing and associated supportive services. This will lead to an increase in homelessness.

16.     Without the renewal funds for any of the above grants, residents who are now stably housed will be responsible for paying 100% of the rental cost which is not feasible for the very low-income population we serve. This will result in returns to homelessness. Private market landlords will lose this guaranteed rent and be forced to charge residents higher rents. For the vast majority of households, this will not be possible which will lead to landlords faced with the legal cost of evictions and lost rent as families are unable to pay and the time it takes to lease up to new families.

17.     Also, Crossroads will face a similar burden, as there are very few other options for this type of rental support. Crossroads apartments supported by rental assistance or operating funds will lose those funds. Because many of these properties are deed restricted, Crossroads is limited to who we can rent to, and how much we can charge.  This will lead to increased vacancy and not enough rent to support operations. And last, staff associated with these programs will lose employment contributing to an increased number of unemployed people.

III.     <u>CROSSROADS HAS INVESTED SIGNFICANTLY IN ALIGNING ITS HOUSING PROGRAMS WITH LONGSTANDING HUD POLICIES</u>

18.     **Using a Housing First approach**. For the past decade and most recently, under the HUD 24-25 CoC NOFO, all permanent housing, which includes both Rapid Rehousing and Permanent Supportive Housing programs, were required to follow "a housing-first approach" and funded projects that helped individuals and families move quickly into permanent housing without preconditions so that participants

could choose the services they need to improve their health and well-being while remaining in their housing.

19.     Since 2014, Crossroads has operated and delivered our programs and services using the Housing First approach. Our model provides a wide array of supportive services and supports delivered in vivo – in our clients' homes. The Housing First model is founded on the belief that stable housing is the necessary first step to address other challenges, so services are offered to support residents, but they are not mandatory.

20.     While services aren't required, we proactively engage with residents and use every engagement as an opportunity to offer services. This builds relationships, trust, and often can contribute towards willingness to engage. Research suggests, and we have found, that this low-barrier approach can be more effective, as people are more likely to engage with services when they choose to.

21.     Additionally, when it comes to individuals with substance use disorder, our many years of housing clients based on Housing First has provided us with extensive examples that demonstrate that when we place people in housing and then provide services and voluntary access to treatment, individuals with substance use disorder are in a better position to engage in these supports.

22.     **Decriminalizing homelessness**. Consistent with the required focus on Housing First principles described above and with HUD's approach in the preceding several years, the FY24-25 NOFO urged CoC applicants to "work with law enforcement and their state and local governments to enlist their support for housing people

6

residing in encampments, and to avoid practices that criminal homelessness," and to "promote participant choice."

23.    Following this approach, Crossroads cooperates with law enforcement to ensure the safety of our clients and to ensure they have a safe, stable environment. We are supportive of the police and work closely with them to support the transition of people in encampments to safe shelter and housing. As living outside is far less safe than being in a shelter or housing, our staff works with local law enforcement in a way that facilitates the quickest and safest transition from unsafe activities to safer ones. However, Crossroads staff do not and must not engage in activities which are enforcement of local laws as we are not a law enforcement entity. Our work with law enforcement is voluntary and aimed to support the safety of the people we serve, not to enable us to serve as proxy for law enforcement.

24.    As the clients we serve had often had poor experiences with law enforcement, it is important that as we work in gaining trust with clients to engage in services and transition to a safer environment, we cannot be seen as part of law enforcement, but instead supportive of them in helping the people we serve.

25.    **Addressing racial inequities**. The FY24-25 NOFO stated that proposed CoC projects "should address racial inequities to ensure successful outcomes for all persons experiencing homelessness" by "using proven approaches," including by doing things like "partnering with a racially diverse set of community partners and people experiencing homelessness and partnering with organizations with experience

serving underserved populations," and taking steps to identify and eliminate the barriers that result in racial inequities. Our mission to help those experiencing homelessness secure stable homes is deeply connected to diversity, equity and inclusion. We recognize that homelessness affects people from all backgrounds, but systemic barriers mean some communities, including people of color, are impacted more than others. By centering equity in our work, we aim to remove those barriers of racial inequities and ensure everyone has fair access to housing and support.

26. **Improving assistance to LGBTQ+ individuals**. HUD's regulation requires HUD grant recipients, to ensure that "[e]qual access to CPD programs, shelters, other buildings and facilities, benefits, services, and accommodations is provided to an individual in accordance with the individual's gender identity." 24 C.F.R. § 5.106. Crossroads' mission and core values work to create broader opportunities for the people we serve to be able to present as their authentic selves. We are committed to creating inclusive, welcoming spaces where all people feel valued and supported on their journey to stable housing. In providing direct client services, we use clients' preferred pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth, recognize gender identity in providing direct assistance, and accommodate the needs of our transgender and nonbinary clients that we serve, especially in congregate shelters where placement is based on gender identity.

IV.   **HUD'S FY2025 COC PROGRAM NOFO PLACES CROSSROADS IN AN IMPOSSIBLE POSITION**

27.     The timing and substance of HUD's FY25 Continuum of Care Program Notice of Funding Opportunity (NOFO), issued on November 13, 2025, make it impossible for Crossroads to compete for or receive HUD funding while remaining true to our mission and values.

A.     **Timing**

28.     Typically, the NOFO for the next year of CoC funding is issued in July or August. The NOFO for FY 2025, however, was not issued until November 13, 2025. The RICoC Local Competition was announced on November 21, 2025, with the information session webinar for new and renewal grantees held on November 25, 2025. Applications are due to HUD on January 14, 2026, but the Rhode Island local CoC competition ends on December 12, 2025. This gives us just 16 days to attempt to redesign our project and apply. It also forces Crossroads to either end operations or risk continuing them without certainty that we will receive a renewal award for our HUD-funded work and that costs will be reimbursable.

29.     Crossroads operates in a January 1 – December 31 fiscal year. Our budget for 2026 has been drafted and our board review and approval process has begun. The rescission of the prior NOFO, in which we had anticipated level renewal funding, the delay in issuing the new NOFO, and the resulting abbreviated timeframe for submission of applications, is already having a harmful impact on Crossroads. We have no time to thoughtfully plan program and staffing changes that will be required as a result of this new structure.

30.     Responding to the CoC NOFO is always a complex and involved process, however the breadth and depth of the changes in this NOFO are so involved, we will not be able to process them and submit a thoughtful and effective response in the limited time provided, as it will require new priorities, policy changes and new program design. This leaves us at significant risk for making an error on the application submission which could easily result in our project applications being disqualified by HUD.

31.     Normally, we receive guidance from the Collaborative Applicant, but they are under pressure to get the process done per the regulations and because there are so many changes, they are not able to help as much as they usually do. With this abbreviated timeframe and quick turnaround, the RI CoC also needs to adjust the competition scoring. Crossroads won't know what the scoring and ranking of our current projects is until after the next RI CoC board meeting on December 4 when they will approve the revised scoring criteria, leaving us only one week to submit our renewal applications by the deadline of December 12.

32.     If there were more time, the Collaborative Applicant and the RI CoC Board would bring Crossroads and the other grantees together to plan a strategic CoC-wide response. However, with this late and rushed timeline, we do not have any time to engage in those thoughtful, strategic planning conversations and efforts.

33.     Furthermore, for the reasons described below, the requirements and eligibility criteria are so fundamentally contrary to our mission and program delivery,

that we only have until December 12 to make the impossible choice of deciding whether or not to apply.

**B.    New Requirements that Conflict with Crossroads' Mission and Service Delivery Model**

34.     **Housing First.** The NOFO for FY 2025 abandons the Housing First model mandated by prior NOFOs, adopted by Crossroads since 2014 and, among other things, now requires clients to participate in treatment and other supportive services, in some cases up to 40 hours per week, as a condition of housing. The FY25 NOFO fundamentally changes the scoring criteria for housing projects. Unlike prior years, which scored projects based on voluntary service participation consistent with Housing First principles, the new NOFO scores projects on "the extent in which service participation is required (with onsite services preferred)." These requirements undercut person-centered, voluntary engagement, which is proven to reduce harm, improve medical adherence, and support vulnerable groups.

35.     A shift to mandatory service participation will negatively impact Crossroads' ability to deliver our mission, as we know that clients will feel threatened and disempowered when asked to sign participation agreements. This will result in some people refusing housing and services. The Housing First model has worked because it gives clients choice. Mandatory service participation takes away that choice. This requirement is, in effect, coercion, because it is not the client's choice.

36.     Mandatory service participation will also lead to increased program terminations, as Crossroads will be forced to exit individuals who choose not to engage

in these required services. The very nature of requiring participation will also lead to higher incidences of service refusal.

37.     We know, from research and more than 10 years of offering services with a Housing First model, that services are more successful when individuals choose to engage with them, and are not forced to engage with them. Our data has shown that 93% of those placed in our housing, following a Housing First approach, never return to homelessness. Personal autonomy is a basic tenet of Crossroads' service delivery model, and this requirement would mean that we either risk being ineligible for these funds if we do not implement the requirement, or conflict with our mission if we do.

38.     Additionally, Crossroads receives multiple Family Violence Prevention Services (FVPSA) grants, passed through from the Rhode Island Coalition Against Domestic Violence, and we use this grant money to provide housing services and supports to victims and survivors of domestic violence. Under FVPSA, it is illegal for a provider to require beneficiaries to participate in support services as a condition of receiving housing assistance, and those services must be voluntary. 42 U.S.C. § 10408(d)(2). Thus, as a subrecipient of FVPSA awards, Crossroads will be unable to mandate participation in supportive services, and we would face a great disadvantage because we cannot receive the 29 points (of the 130 points available) that are granted to programs that mandate participation in supportive services.

39.     Under the new NOFO scoring criteria that favor mandatory service participation, Crossroads' approach—which has proven effective for years and is consistent with research-based best practices and FVPSA requirements—would be disadvantaged in competition for funding.

40.     **Assistance to LGBTQ+ individuals.** The FY25 NOFO states that HUD will reject a project if there is evidence that the CoC has previously or currently engaged or engages in activities "that rely on or otherwise use a definition of sex as other than binary in humans." The FY25 NOFO also prohibits using grant funds to "promote 'gender ideology,' as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." This is not only contrary to past HUD NOFOs, HUD regulations and RI state law, but Crossroads cannot and will not meet this requirement.

41.     As discussed above, Crossroads treats people in accordance with their gender identity. People who identify as transgender or non-binary make up a disproportionate percentage of those experiencing homelessness. This new restriction will result in our no longer being able to serve some of the most vulnerable individuals in our communities. These are the people who are most often bullied, harassed and victims of violence. With this restriction, we are placed in a position of knowingly disrespecting and misidentifying people we serve. The result will be that Crossroads loses the trust and confidence of those whom it is our mission to serve, and more individuals will be homeless and isolated from services and supports.

42.    Under the new NOFO, Crossroads' practice of treating people in accordance with their gender identity—which is consistent with state and federal law and aligned with its mission of reducing homelessness to marginalized populations—would be disadvantaged in competition for funding.

43.    **Harm Reduction**. The FY25 NOFO prohibits applicants from engaging in "any activities under the pretext of 'harm reduction.'" The NOFO also allows HUD to reject renewal projects if there is evidence the project "engages or engaged in activities under the pretext of harm reduction." Harm reduction is a proven evidence-based approach that is central to Crossroads' mission and service delivery model wherein we meet people where they are without judgment and without requiring abstinence as an immediate goal.

44.    We employ a range of harm reduction practices and offer our staff and the people we serve with the opportunity to be trained in the delivery of Narcan (Naloxone) and ensure they have easy access to this life-saving medicine. Staff, clients and residents who have completed the Narcan training receive a supply of Narcan. In addition, Nalox Boxes are located in many of Crossroads facilities and housing programs. These have been used countless times to reverse the effects of opioid overdose among the people we serve. Abstinence does not work for everyone and without the option of having Narcan available, we will be putting our clients' lives in jeopardy.

45.    Other harm reduction practices that are central to our mission include provision of fentanyl test strips to avoid life-threatening drugs. We also provide sharps containers in multiple locations as part of harm reduction. These offer safety

14

to clients and staff as they reduce the potential for needle sticks resulting from inappropriate disposal of used needles.

46.   Finally, as abstinence does not work for all people, we work to provide an array of options for clients in how they wish to seek treatment. This may include Medically Assisted Treatment (MAT), which is evidence based and provides clients with choices and options for living a full life.

47.   The prohibition from engaging in harm reduction activities in the FY25 NOFO would have a significant impact on Crossroads' ability to deliver on our mission, and this requirement would mean that we either risk being ineligible for these funds if we do not implement the requirement, or conflict with our mission if we do.

48.   **Addressing Racial Inequities**. The FY25 NOFO states that HUD will reject a project if there is evidence that it has previously or currently engaged or engages in "racial preferences or other forms of illegal discrimination." How this will be assessed is unclear, but it seems likely that Crossroads' compliance with past HUD requirements regarding racial equity and diversity, equity and inclusion (DEI) programs, will be viewed as a basis for taking away funding.

49.   The NOFO also includes a certification that the applicant will not use federal funding to promote diversity, equity and inclusion mandates, policies, programs or activities that violate any applicable federal anti-discrimination laws. The NOFO further provides that applicants' compliance "in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of [The False Claims Act]." Crossroads has always complied with

federal anti-discrimination laws. However, the DEI Executive Orders and statements from the Department of Justice indicate that the government intends to enforce a legally unsupported, novel interpretation of federal anti-discrimination law as prohibiting all aspects of programs focused on diversity, equity, and inclusion.

50.     **Serving people with mental health and substance use disabilities.** The FY25 NOFO requires that Permanent Supportive Housing be designed to serve elderly individuals with physical disability/impairment or a developmental disability. This new criteria excludes individuals with substance use disorder (explicitly) and mental health disability (implicitly by omission). Limiting permanent supportive housing only to elderly individuals or individuals with physical disability impairment or a developmental disability, and excluding all other individuals with disabilities, will have a terrible negative impact on Crossroads' ability to carry out our mission and the CoC programs we operate.

51.     While people with physical and developmental disabilities are present in the population of those experiencing homelessness, the prevalence of mental illness and substance use among this population is also extraordinarily high. All people who experience homelessness have trauma and as a result, this trauma can lead to substance use as a coping mechanism. Substance use and homelessness are interconnected in a cycle which is often addressed through the provision of permanent housing and supportive services. This new exclusion of people with substance use disorder and mental illness will prohibit some of the people most in need of these services from receiving them.

52. **Immigration Verification**. The FY25 NOFO incentives projects that choose to verify immigration status with preference points. Crossroads does not, nor is it legally required, to verify immigration status for its services. 8 U.S.C. § 1642(d). It has long been Crossroads' policy to provide low-barrier services to people experiencing homelessness without preconditions or requiring personal information unrelated to the delivery of shelter and services. While some of our housing programs do require that we verify immigration status, those who do not have legal status are not automatically disqualified from housing.

### C.  New Jurisdictional Criteria and Preferences that Place Crossroads at a Competitive Disadvantage

53. The FY25 NOFO also includes scoring factors tied to the existence of state or local laws where the project is located, entirely outside the control of the applicant organization. For example, the new NOFO has criteria that prioritize projects in jurisdictions that prohibit public illicit drug use and public camping or loitering and enforce such prohibitions. Additionally, the FY25 NOFO states that applicants must cooperate, assist and not interfere or impede with law enforcement to enforce local laws such as public camping and public drug use.

54. **Public Camping Prohibition**. Under this criteria, Crossroads will likely be penalized and no longer eligible for funding because its services are located in Providence, Rhode Island. The City of Providence has a law that prohibits fining anyone for camping on public property, Providence, R.I., Ordinance 2025-11 (Apr. 3, 2025), and the State of Rhode Island has a Homeless Bill of Rights, enacted at R.I. Gen. Law § 34-37.1-3, which provides that "a person experiencing homelessness . . .

has the right to a reasonable expectation of privacy in his or her personal property to the same extent as personal property in a permanent residence." Both the municipal ordinance and the state law appear to conflict with the preference for prohibitions on public camping, and thus Crossroads will be at a competitive disadvantage for reasons entirely outside of its control.

55.    Furthermore, this scoring preference would be detrimental to Crossroads as we have no way of understanding what level of and type of cooperation is necessary to result in the awarding of points. This requirement will have a chilling effect on our ability to engage with the unhoused clients we serve, many of whom have had poor experiences with law enforcement, and our independence as a service provider would be threatened by a requirement that we engage with law enforcement and take up a law enforcement role.

56.    **Harm Reduction Prohibition**. Crossroads may also be at a competitive disadvantage because R.I. Gen. Law § 23-12.10, effective March 1, 2022, authorizes a four-year pilot program to prevent drug overdoses through the establishment of "harm reduction centers" where persons may safely consume pre-obtained substances. Because Crossroads' services are located in Rhode Island, and due to this state law, Crossroads' application may be rejected or at a competitive disadvantage, as HUD may view this law as not enforcing prohibitions against public illicit drug use.

57.    This scoring preference would also be detrimental to Crossroads as we have no way of understanding what level of and type of cooperation is necessary for

enforcement of local public drug use laws. As discussed above, our clients have often had poor experiences with law enforcement and many are in recovery, and this requirement will have a chilling effect on our ability to engage with the unhoused clients we serve. Crossroads has and will continue to cooperate with law enforcement, but that cooperation is voluntary and aimed to support the safety of the people we serve, not to enable us to serve as proxy for law enforcement.

58. **SORNA**. Additionally, the new FY25 NOFO adds a scoring preference for projects located in jurisdictions that substantially implement and complies with SORNA. Rhode Island is included on a Department of Justice-generated list of jurisdictions that have not substantially implemented SORNA, and thus Crossroads will be at a competitive disadvantage for reasons entirely outside of its control.

### D. Retroactive Application of New Standards

59. Crossroads is particularly concerned that the FY25 NOFO penalizes organizations for activities they were previously required or encouraged to undertake.

60. Prior HUD NOFOs and policies required or strongly encouraged organizations to promote racial equity, address disparities, support LGBTQ+ populations, and implement voluntary services consistent with Housing First principles. Crossroads has operated in good faith compliance with these requirements for years.

61. The new NOFO now appears to penalize these very same activities, creating an impossible situation where organizations are penalized for following previous federal guidance.

62. The FY25 NOFO also introduces a "risk review" with a new criterion: "History of subsidizing or facilitating activities that conflict with the purposes of this

NOFO." This criterion is impermissibly vague and would allow HUD to target any organization deemed not aligned with the current administration's views, regardless of the organization's performance or outcomes in serving homeless populations.

63.    This provision creates enormous uncertainty and risk for Crossroads. We have no way of knowing what past activities might be deemed to "conflict with the purposes of this NOFO." Our longstanding work, which we had invested in to be aligned with federal laws and longstanding HUD priorities, could all potentially be characterized as conflicting with the NOFO's new requirements.

### E.    Tier Structure Changes and Funding at Risk

64.    The FY25 NOFO dramatically changes the tier structure from the FY2024 NOFO, which had 90% of funding in Tier 1 (protected/ "held harmless") and 10% in Tier 2 (at risk based on CoC score), to a structure of 30% of funding in Tier 1 and 70% in Tier 2 in the FY2025 NOFO.

65.    The change in the structure of renewal funding from Tier 1 to Tier 2 will have a significant and dramatic negative effect on Crossroads. It is possible that none of our existing grants will receive renewal funding under this new structure.

66.    This change puts the vast majority of Crossroads' renewal funding at risk based on factors outside our control, including how the Rhode Island CoC is scored on HUD's new merit review criteria. The RI CoC has 37 annual grants with 25 of them providing permanent housing. The new structure will limit RI to applying for only a very few renewal grants in Tier 1. Based on the new scoring criteria in the FY25 NOFO, and for the reasons discussed above, it is unlikely that any of Crossroads' three permanent housing grants will be in Tier 1.

67.    This would mean that approximately 173 households living in apartments either owned by Crossroads or owned by private individuals will lose their housing and supportive services. And more than 600 households would lose housing services. The availability of the CoC renewal funds is critical to our ability to deliver on our mission. These funds total $2,580,499 and Crossroads does not have replacement funds available. Nearly all of our funding comes through grants and contracts, and we would not be able to use funds awarded to us for other programs and services to make up for the loss of the CoC funds.

68.    The properties that Crossroads owns in which we provide permanent housing have affordability and other deed restrictions which limit our options for operating the housing. For example, we cannot charge market rents for these apartments. If CoC funding is eliminated, our obligation to continue to operate these permanent housing programs does not. Other deed restrictions include limiting who we can serve in terms of income levels and history of homelessness, for example. Without CoC renewal funding, Crossroads will be faced with significant financial jeopardy and forced to make decisions of how to reallocate limited resources in order to comply with these programmatic obligations.

69.    Additionally, the FY25 NOFO changes the Tier 2 project scoring to account for "commitment to service participation requirements" rather than "commitment to housing first," further disadvantaging Crossroads' voluntary services approach for the reasons described above.

70.    Crossroads also operates as a CES lead in the provision of Housing Problem Solving (HPS) for the RI CoC. Crossroads' CES program has been highly effective in helping to prevent and rapidly respond to households newly entering homelessness. The new structure would place our CES grant also in Tier 2 with the other CES, HMIS and CoC Planning grants. As the criteria for scoring Tier 2 has changed drastically, it is unclear how much Tier 2 funding the RI CoC will receive. The CES services we provide under this grant are a critical piece of the Rhode Island continuum of care, and the loss of these funds would have a very negative impact on our homeless response system in Rhode Island.

**F.     Post-Award Conditions and Compliance with Executive Orders**

71.    As the FY25 NOFO includes post-award requirements, such as compliance with Executive Order 14218, Ending Taxpayer Subsidization of Open Borders; Executive Order 14202, Eradicating Anti-Christian Bias; Executive Order 14205, Establishment of the White House Faith Office; Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferences; Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government; Executive Order 14182, Enforcing the Hyde Amendment; and Executive Order 14321, Ending Crime and Disorder on America's Streets.

72.    For all the reasons discussed above, Crossroads genuinely fears that in performing its lawful activities and program delivery, we will be accused of violating the above post-award conditions to which HUD insists we must agree. This fear is

amplified by many statements by the federal government that it will use the False

Claims Act as a "weapon" against nonprofits.

## V.   THE IMPOSSIBLE CHOICE AND IRREPARABLE HARM

73.    The new funding conditions present Crossroads with an impossible

choice. Crossroads could forgo applying for or accepting HUD grant awards and face

devastating consequences to our organization's financial health, our ability to provide

housing assistance to vulnerable people who are homeless and at risk of homeless-

ness, and our ongoing operations. Or, Crossroads could attempt to comply with the

new conditions and betray our mission, abandon the clients we serve, jeopardize com-

pliance with professional ethical standards, and face enormous risks of litigation and

government investigation under the False Claims Act for activities we have under-

taken in good faith for years.

74.    If Crossroads cannot receive HUD funding under these conditions, we

will be forced to terminate or drastically reduce housing assistance services to Rhode

Island residents experiencing homelessness. Hundreds of formerly homeless Rhode

Islanders would be at immediate risk for losing their housing if Crossroads lost the

HUD CoC funding. Currently there are 173 households in permanent housing receiv-

ing services, and more than 600 households annually who receive housing problem

solving and rapid resolution supports. Individuals and families would be forced back

into homelessness which would result in the loss of gains made in health and mental

health treatment and substance use stability, placing them at risk of exploitation,

survival crime, and severe trauma.

75.     The harm extends beyond individuals and families served by Crossroads to the broader Rhode Island community. Research has shown that individuals and families experiencing homelessness utilize emergency services such as hospitals at much higher rates than those that are housed, costing the state of Rhode Island potentially millions of dollars. As the largest provider of housing and supportive services for families and individuals who have experienced homelessness in Rhode Island, the loss of CoC funding would be catastrophic. People with disabling conditions living unsheltered on the street or staying in emergency shelters would remain homeless for months or years if supportive housing is no longer available. HUD CoC funding provides Crossroads with the resources to house those households with the highest acuity whether they live in Providence, Warwick, Middletown, or anywhere else in the state.

76.     Should Crossroads face a drastic reduction in the CoC program funds, the impact on our staff would be profound. Staff members working in the CoC-funded properties and programs may face lay-offs, which would lead to the loss of income and potential loss of the staff members' housing. Some of our staff are currently working two jobs just to make ends meet, and additionally about 7-8% of our workforce are individuals with lived experience of homelessness.

77.     Program reductions impact morale, which would also lead to other employees feeling insecure about their employment and could result in voluntary terminations as staff look to other opportunities with greater stability, which would lead to staff shortages throughout Crossroads.

78.    If, alternatively, Crossroads were to apply for funding under the new NOFO, we would face profound harm to our mission and operations. We would be forced to abandon evidence-based approaches and embrace a punitive, nonsensical model that will have far reaching impacts for both the people we serve and those who work in this field. We also would be exposing ourselves to False Claims Act liability for past activities undertaken in good faith compliance with previous federal requirements.

79.    These changes would fundamentally destroy Crossroads' mission and effectiveness. These changes would lead to unbelievable fear and uncertainty for our clients. Those that have already experienced so much trauma and difficulty, who are now housed and stable, will be faced with the prospect of returning to homelessness through no fault of their own – when the system that was supposed to help them, turned its back on them.

80.    Moreover, the vagueness of the new requirements creates impossible uncertainty. Crossroads has no clear guidance on what activities would be deemed to "cooperate" with law enforcement, "promote gender ideology" or constitute "illegal DEI" under the administration's new interpretations. Even if Crossroads attempted to comply, we face the constant threat of investigation, funding termination, and False Claims Act liability based on retroactive application of vague standards to activities we have undertaken for years in good faith.

81.    Crossroads fears that if it agrees to the new funding conditions, it could face not only loss of grant funds mid-program, but federal government investigation,

private party litigation under the False Claims Act, and potential liability for activities that were previously encouraged or required. These potential consequences make Crossroads deeply concerned about applying for or accepting awards under the new NOFO. To attempt to mitigate these risks, Crossroads would have to fundamentally change its identity, abandon its mission, and betray the vulnerable individuals and families it exists to serve.

## VI.   CONCLUSION

82.    The FY25 NOFO places Crossroads in an impossible position where we cannot compete for or accept HUD funding without abandoning our mission, betraying the vulnerable populations we serve, and violating professional ethical standards. At the same time, we cannot forgo HUD funding without ending critical housing assistance services that dozens of vulnerable young people depend on.

83.    Without preliminary relief from the Court, Crossroads will suffer irreparable harm, and individuals and families experiencing homelessness throughout Rhode Island will be denied access to the specialized, affirming services they desperately need.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 26, 2025.

Michelle M. Wilcox
President & CEO, Crossroads Rhode Island.