# DECLARATION OF RUSH FRAZIER, EXECUTIVE DIRECTOR, YOUTH PRIDE, INC.

I, Rush Frazier, declare as follows:

1. I am over the age of 18 and competent to testify to the facts contained in this Declaration. I am the Executive Director of Youth Pride, Inc. (YPI), a nonprofit organization headquartered in Providence, Rhode Island.

2. I have served as Executive Director of Youth Pride since 2021. In this capacity, I have direct responsibility for overseeing YPI's operations, programs, and services, and I am familiar with the needs of the individuals and families we serve. The facts set forth in this declaration are based on my personal knowledge, information provided to me by YPI staff in the course of their duties, by YPI clients, and review of YPI's records. If called as a witness, I could and would testify competently to the matters stated herein.

## I. YOUTH PRIDE'S MISSION AND SERVICES

3. Youth Pride's mission is to meet the unique, ongoing needs of LGBTQ+ youth and young adults in Rhode Island through direct service, support, advocacy, and education. YPI was founded in 1992 as a support group at the Young Women's Christian Association (YWCA) of Greater Rhode Island and became an independent tax-exempt nonprofit organization in 1994. YPI is the only nonprofit in Rhode Island specifically dedicated to meeting the needs of LGBTQIA+ youth ages 23 and under.

4. YPI's core values are Leadership, Affirmation, and Community. We are committed to affirming all youth for who they are and how they express themselves, and creating a caring, respectful, and diverse community where young people feel empowered and valued.

Youth voices drive our processes, and we seek to develop leadership skills both within and outside our organization.

5. YPI provides comprehensive services for LGBTQ+ youth, and all youth who come through our doors for assistance regardless of race, sexual orientation or gender identity, including: one-on-one counseling with licensed mental health professionals; support groups including Gender Spectrum (for trans, genderqueer, and gender non-conforming youth), The Way Out (peer support), and Queer Gourmet (cooking skills); a drop-in center that serves as a safe space for youth; a Basic Needs Pantry providing food, gender-affirming clothing, toiletries, and school supplies to over 700 youth annually; free and confidential HIV testing and safer sex items; and case management services.

6. As part of its effort to address all of the challenges facing LGBTQ+ youth, and all other youth who come to us for services, YPI also provides housing assistance for youth ages 18-24.

## II.    YOUTH PRIDE'S HUD GRANTS

7. YPI has received federal funding through HUD's Youth Homelessness Demonstration Program (YHDP) to provide housing assistance for LGBTQ+ youth ages 18-24. Thanks to funds awarded through HUD, YPI is able to assist individuals who are housing insecure, unstably housed, homeless, or in danger of losing housing. YPI can assist with security deposits, first/last month rent, back rent, and related housing stabilization costs.

8. Pursuant to the two-year Notice of Funding Opportunity for the CoC program for fiscal years 2024 and 2025 ("FY24-25 NOFO") HUD issued in 2024, YPI was awarded Grant RI0120Y1T002402, and was slated for renewal via a grant agreement for YHDP renewal and replacement projects as of September 5, 2025. The grant period in that renewal

agreement provides for $183,260 from January 1, 2026, through December 31, 2026. This grant provides funding for rental assistance, supportive services, and case management services to LGBTQ+ youth, and any other youth who come to Youth Pride, experiencing housing instability.

9. YPI also partners with the Rhode Island Coalition to End Homelessness, which provides a staff member who comes to YPI's drop-in center weekly to assist youth with housing applications, subsidized housing, transportation to appointments, understanding government benefits like SNAP, GED education, mental health resources, food pantries, and immigration services.

10. If YPI cannot apply for HUD funding, or is disqualified from competing for funding after applying, because of new conditions in the FY25 NOFO, it would be extremely detrimental to YPI and its mission. Without this funding, YPI would be unable to provide housing assistance to LGBTQ+ youth, who are disproportionately represented among homeless youth populations. Studies show that LGBTQ+ youth make up approximately 40% of youth experiencing homelessness, despite representing only 7% of the overall youth population. Without HUD funding, dozens of young people would lose access to housing assistance and supportive services critical to their safety and wellbeing.

### III. HUD'S FY25 COC PROGRAM NOFO PLACES YPI IN AN IMPOSSIBLE POSITION

11. HUD's FY25 CoC NOFO imposes new threshold and selection criteria that make it impossible for YPI to compete for or receive HUD funding while remaining true to our mission and values.

3

### A. Prohibition on Speech and Activities that "Use a Definition of Sex Other than as Binary"

12. The FY25 NOFO prohibits awards to grant recipients that "conduct activities that rely on or otherwise use a definition of sex as other than binary in humans."

13. YPI cannot and will not meet this requirement. Our organization exists specifically to serve and affirm LGBTQ+ youth, including transgender, non-binary, and gender non-conforming young people, and honor all the youth we serve as they come through our doors. Homelessness, poverty, and hunger have no gender.

14. Moreover, YPI has several valued staff members who identify as transgender and/or non-binary, including our Executive Director, who is YPI's first Black, nonbinary trans Executive Director in the organization's 31-year history. We affirm the skills and value they bring to our work each day.

15. YPI operates a weekly support group called Gender Spectrum specifically for young people ages 13-23 who identify as trans, genderqueer, gender non-conforming, or are questioning their gender identity or expression. This group is a core part of our programming and has been for years. Topics discussed include coming out, relationships, fashion, politics, and pop culture, and anything else that matters to the youth we serve.

16. In all our services—counseling, case management, housing assistance, and drop-in center support—YPI staff affirm clients' self-declared names and pronouns to demonstrate support for people who do not identify with the sex they were assigned at birth. We recognize gender identity in providing direct assistance and accommodate the needs of transgender and non-binary youth as appropriate for their care. This practice is consistent

with professional social work ethics and is essential to building the respectful, authentic relationships necessary for effective youth services.

17. YPI's Basic Needs Pantry specifically includes gender-affirming clothing to help youth express their authentic identities. This is a critical service for transgender and non-binary youth who may not have family support or financial resources to obtain appropriate clothing.

18. Certifying that YPI will not "use a definition of sex as other than binary" would directly contradict our organizational mission, our daily practices, and our fundamental values of affirming all youth for who they are and how they express themselves. YPI cannot make this certification without betraying the transgender and non-binary youth we serve and the staff members who work tirelessly to support them.

### B. Prohibition Against Speech and Activities Promoting "Gender Ideology"

19. The FY25 NOFO also prohibits using grant funds to "promote 'gender ideology,' as defined in E.O. 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

20. YPI's entire organization is built on affirming LGBTQ+ youth, including transgender and non-binary young people. In providing direct client services, many of YPI's staff affirm the pronouns our clients self-declare, recognize their gender identity in providing assistance, and create programming specifically designed to support transgender and gender non-conforming youth. YPI cannot continue these essential practices while complying with the NOFO's condition not to "promote gender ideology."

5

21. This prohibition creates profound uncertainty about whether YPI's core activities—including our Gender Spectrum support group, our use of affirmed pronouns and names the youth we serve choose, our provision of gender-affirming clothing, our counseling that affirms clients' gender identities, and our advocacy for transgender youth rights—would be deemed to "promote gender ideology" under the government's interpretation.

### C. Prohibition on Speech and Activities Focused on Harm Reduction

22. The FY25 NOFO prohibits applicants from engaging in "any activities under the pretext of 'harm reduction.'" The NOFO also allows HUD to reject renewal projects if there is evidence the project "engages or engaged in activities under the pretext of harm reduction."

23. YPI provides safer sex items and free, confidential HIV testing as part of our health services to LGBTQ+ youth. We also connect youth with substance abuse resources and mental health services without requiring abstinence as a precondition for receiving support. Our Basic Needs Pantry provides essential supplies to youth regardless of their current circumstances.

24. The phrase "under the pretext of harm reduction" is vague and could be interpreted to encompass a wide range of speech and activities in which YPI engages in support of our clients. YPI is concerned that our provision of safer sex items, HIV testing, and non-judgmental support services could be characterized as "harm reduction" speech and activities that would render us ineligible for funding.

25. Additionally, YPI partners with the Rhode Island Department of Behavioral Health, Developmental Disabilities and Hospitals (BHDDH) through SAMHSA funding for programs involving intensive case management for youth experiencing homelessness with comorbid mental health challenges. This work explicitly involves harm reduction approaches. The prohibition on harm reduction activities in the HUD NOFO creates uncertainty about whether HUD would deem our organization's overall approach prohibited.

### D. Prohibitions on DEI Activities

26. The FY25 NOFO requires that applicants certify that they "will not engage in racial preferences or other forms of illegal discrimination" and states that HUD may reject projects if there is evidence the applicant "has previously or currently engaged or engages in racial preferences or other forms of illegal discrimination." The certification does not define "racial preferences" or "other forms of illegal discrimination." But the FY25 NOFO requires applicants to complete HUD-424B at the time of application, and HUD-424B includes a certification that the applicant "will not use federal funding to promote diversity, equity and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal anti-discrimination laws."

27. YPI has always complied with federal anti-discrimination laws. However, the DEI Executive Orders and statements from the Department of Justice indicate that the government intends to enforce a legally unsupported, novel interpretation of federal anti-discrimination law as prohibiting all aspects of programs focused on diversity, equity, and inclusion.

7

28. YPI's mission is grounded in the professional ethics of social work, which requires advocates to address clients without judgment or conditional service related to the identities and life experiences they disclose: to meet clients where they are. Building respectful, authentic relationships with our clients is imperative to our mission. To address homelessness among LGBTQ+ youth by taking a multi-faceted approach (with particular consideration to the traumatic nature of experiencing homelessness and discrimination), we must acknowledge and honor the unique backgrounds and diversity within our own staff and clientele.

29. YPI specifically serves LGBTQ+ youth precisely because this population faces unique challenges and barriers, including family rejection, discrimination in schools and housing, disproportionate rates of homelessness, and heightened mental health risks. Our specialized services are designed to meet the specific needs of this marginalized population. It is unclear whether our mission and focus on serving LGBTQ+ youth would be deemed "illegal discrimination" under the administration's new interpretation of federal anti-discrimination law.

30. YPI also facilitates fee-for-service trainings in the community dealing with cultural competency and nonviolent conflict resolution, and work with the Rhode Island Attorney Generals Office's Hate Crime and Bias Education and reporting work

31. YPI is concerned that certifying compliance with federal anti-discrimination laws as newly interpreted by this administration would require us to abandon our core mission of serving LGBTQ+ youth, and specifically people of color within that already marginalized group,

8

and to adopt a view antithetical to our true beliefs about affirming diverse identities and experiences.

### E. Forced Service Participation Preferences

32. The FY25 NOFO fundamentally changes the scoring criteria for housing projects. Unlike prior years, which scored projects based on voluntary service participation consistent with Housing First principles, the new NOFO scores projects on "the extent in which service participation is required (with onsite services preferred)."

33. YPI's approach to youth services is built on meeting young people where they are and respecting their autonomy. Our counseling is voluntary. Our drop-in center is structured so that youth can utilize the space in whatever comfortable and respectful way they see fit. We provide resources and support without coercing participation in services. This approach is consistent with best practices in youth development and trauma-informed care. It is also consistent with the National Association of Social Workers code of ethics, which states that social workers must respect each client's right to self-determination.

34. Many LGBTQ+ youth have experienced rejection, judgment, and coercion from family, schools, religious institutions, and other authority figures. Creating a safe space where services are available but not mandatory is essential to building trust and engagement with this population. Requiring service participation as a condition of housing assistance would undermine our ability to effectively serve vulnerable LGBTQ+ youth and could deter young people from seeking help.

35. Under the new NOFO scoring criteria that favor forced service participation, YPI's approach—which has proven effective for years and is consistent with research-based best practices—would be disadvantaged in competition for funding.

9

### F. Law Enforcement Cooperation Preferences

36. The FY25 NOFO includes new rating criteria for street outreach projects that score applicants on "the extent in which they cooperate with law enforcement to enforce local laws such as public camping and public drug use laws."

37. While YPI does not currently operate street outreach as a standalone funded project under HUD CoC grants, our case managers and staff do conduct outreach to connect LGBTQ+ youth living on the street with housing and services. This work would be compromised if we were required to cooperate with law enforcement in ways that could criminalize the young people we serve.

38. LGBTQ+ youth, particularly transgender youth of color, face disproportionately high rates of negative interactions with law enforcement. Many of the youth we serve have experienced harassment, discrimination, or violence from police. Requiring cooperation with law enforcement to enforce camping and drug use laws would destroy the trust necessary for effective outreach and could endanger the safety of the vulnerable youth we serve.

### G. Jurisdictional Preferences

39. The FY25 NOFO establishes Jurisdictional Criteria that may render projects ineligible for funding based on policies of the state or local jurisdiction where the project is located, entirely outside the control of the applicant organization.

40. For example, the new NOFO has criteria that prioritize projects in jurisdictions that prohibit public illicit drug use and public camping or loitering and enforce such prohibitions, and projects located in jurisdictions that substantially implement and complies with SORNA. Additionally, the FY25 NOFO states that applicants must

cooperate, assist and not interfere or impede with law enforcement to enforce local laws such as public camping and public drug use.

41. Under the public camping and loitering criteria, YPI will likely be penalized and no longer eligible for funding because its services are located in Providence, Rhode Island. The City of Providence has a law that prohibits fining anyone for camping on public property, Providence, R.I., Ordinance 2025-11 (Apr. 3, 2025), and the State of Rhode Island has a Homeless Bill of Rights, enacted at R.I. Gen. Law § 34-37.1-3, which provides that "a person experiencing homelessness . . . has the right to a reasonable expectation of privacy in his or her personal property to the same extent as personal property in a permanent residence." Both the municipal ordinance and the state law appear to conflict with the preference for prohibitions on public camping, and thus YPI will be at a competitive disadvantage for reasons entirely outside of its control.

42. Furthermore, this scoring preference would be detrimental to YPI as we have no way of understanding what level of and type of cooperation is necessary to result in the awarding of points. This requirement will have a chilling effect on our ability to engage with the unhoused clients we serve, many of whom have had poor experiences with law enforcement, and our independence as a service provider would be threatened by a requirement that we engage with law enforcement and take up a law enforcement role.

43. Rhode Island is also included on a Department of Justice-generated list of jurisdictions that have not substantially implemented SORNA, and thus YPI will be at a competitive disadvantage for reasons entirely outside of its control.

11

44. YPI may also be at a competitive disadvantage because R.I. Gen. Law § 23-12.10, effective March 1, 2022, authorizes a four-year pilot program to prevent drug overdoses through the establishment of "harm reduction centers" where persons may safely consume pre-obtained substances. Because YPI's services are located in Rhode Island, and due to this state law, YPI's application may be rejected or at a competitive disadvantage, as HUD may view this law as not enforcing prohibitions against public illicit drug use.

45. This scoring preference would also be detrimental to YPI, as we have no way of understanding what level of and type of cooperation is necessary for enforcement of local public drug use laws. As discussed above, our clients have often had poor experiences with law enforcement and many are in recovery, and this requirement will have a chilling effect on our ability to engage with the unhoused clients we serve.

### H. Immigration Verification Condition

46. The 2025 NOFO also incentives projects that choose to verify immigration status with preference points. YPI does not, nor is it legally required, to verify immigration status for its services.

47. Being required to verify immigration status places several burdens on YPI services. It requires us to turn away clients without documentation, which harms our reputation as a safe venue to receive services in the community. It also requires additional staff and staff training, as well as developing policies or using outside verification services to verify immigration status, which could include additional costs. YPI would further be required to work outside the parameters of our stated mission to serve all youth regardless of race, gender, ethnicity, gender expression, sexual orientation or legal status.

12

### I. Retroactive Application of New Standards

48. YPI is particularly concerned that the FY25 NOFO penalizes organizations for activities they were previously required or encouraged to undertake.

49. Prior HUD NOFOs and policies required or strongly encouraged organizations to promote racial equity, address disparities, support LGBTQ+ populations, and implement voluntary services consistent with Housing First principles. YPI has operated in good faith compliance with these requirements for years.

50. The new NOFO now appears to penalize these very same activities, creating an impossible situation where organizations are penalized for following previous federal guidance.

51. The FY25 NOFO also introduces a "risk review" with a new criterion: "History of subsidizing or facilitating activities that conflict with the purposes of this NOFO." This criterion is impermissibly vague and would allow HUD to target any organization deemed not aligned with the current administration's views, regardless of the organization's performance or outcomes in serving homeless populations.

52. This provision creates enormous uncertainty and risk for YPI. We have no way of knowing what past activities might be deemed to "conflict with the purposes of this NOFO." Our longstanding work affirming transgender youth, affirming the pronouns our clients self-declare, providing gender-affirming clothing, and advocating for LGBTQ+ rights could all potentially be characterized as conflicting with the NOFO's new requirements.

### J. Tier Structure Changes and Funding at Risk

53. The FY25 NOFO dramatically changes the tier structure from the FY24-25 NOFO, which had 90% of funding in Tier 1 (protected/ "held harmless") and 10% in Tier 2 (at risk based

13

on CoC score), to a structure of 30% of funding in Tier 1 and 70% in Tier 2 in the FY25 NOFO.

54. The change in the structure of renewal funding from Tier 1 to Tier 2 will have a significant and dramatic negative effect on YPI. This change puts the vast majority of YPI's renewal funding at risk based on factors outside our control, including how the Rhode Island CoC is scored on HUD's new merit review criteria. It is possible that none of our existing grants will receive renewal funding under this new structure.

55. Additionally, the NOFO changes the Tier 2 project scoring to account for "commitment to service participation requirements" rather than "commitment to housing first," further disadvantaging YPI's voluntary services approach.

### K.  Youth Homelessness Demonstration Program (YHDP) Competitive Awards

56. Under prior NOFOs, YHDP renewal/replacement projects were selected noncompetitively before ranked projects in tiers were considered. The FY25 NOFO eliminates this protection, making all YHDP projects—including those serving LGBTQ+ youth—competitively awarded and subject to all the new eligibility and scoring criteria described above.

57. This change particularly harms organizations like YPI that serve LGBTQ+ youth through YHDP funding, as we are now subject to requirements that are fundamentally incompatible with our mission to affirm and support transgender and non-binary young people, along with all LGBTQ+ youth.

### L. Timing of FY25 NOFO

58. YPI received an award in response to HUD's FY24-25 NOFO, which was posted as a two-year NOFO, with instructions that problem applicants only needed to submit one application for both FY 2024 and FY 2025 funds. Because YPI was awarded its YHDP grant under this two-year NOFO, YPI was under the impression that it did not need to apply for FY 2025 funds for its awards to be renewed.

59. Even in years where it is a one-year NOFO, the NOFO for the next year of CoC funding is usually issued in July or August. On November 13, 2025, HUD rescinded the two-year FY24-25 NOFO, and issued a new one, including, among others, the changes listed above. Applications for this new FY25 NOFO are due January 14, 2026, but the Rhode Island local competition ends on December 12, 2025. That give YPI a much shorter window (less than 3 weeks) to redesign our project and apply. It also forces YPI to either end operations or risk continuing them without certainty that we will receive a renewal award for our HUD-funded work and that costs will be reimbursable.

60. YPI's budget for 2026 has been drafted and our board review and approval process has begun. The delay in issuing the NOFO, and the resulting abbreviated timeframe for submission of applications, is already having a harmful impact on YPI. We have no time to thoughtfully plan program and staffing changes that will be required as a result of this new structure.

61. The shortened timeframe will has put additional pressure on YPI's already substantial fundraising efforts to close the difference if we do not receive a renewal award, especially since much of this funding goes to pay the full-time case manager and clinical staff that deliver these services.

15

62. The inability to ensure that we are fully financed for each employee's contract term also makes talent acquisition more difficult. This could result in YPI being understaffed. We know from past experience that understaffing leads to center closures and interruption of service delivery to our clients, and leads to poorer employee satisfaction which only exacerbates the inability to hire new staff. This overburdens existing staff and curtails the services and programming that we can offer.

## IV. THE IMPOSSIBLE CHOICE AND IRREPARABLE HARM

63. The new funding conditions present YPI with an impossible choice. YPI could forgo applying for or accepting HUD grant awards and face devastating consequences to our organization's financial health, our ability to provide housing assistance to vulnerable LGBTQ+ youth, and our ongoing operations. Or, YPI could attempt to comply with the new conditions and betray our mission, abandon the transgender and non-binary youth we serve, jeopardize compliance with professional ethical standards, and face enormous risks of litigation and government investigation under the False Claims Act for activities we have undertaken in good faith for years.

64. If YPI cannot receive HUD funding under these conditions, we will be forced to terminate or drastically reduce housing assistance services to LGBTQ+ youth experiencing homelessness. Approximately 500 young people per year would lose access to housing support, placing them at risk of continued homelessness, exploitation, survival crime, and severe trauma.

65. LGBTQ+ youth face extraordinarily high rates of homelessness. According to research, LGBTQ+ youth make up approximately 40% of youth experiencing homelessness despite

16

representing only 7% of the youth population. Family rejection due to sexual orientation or gender identity is a leading cause of LGBTQ+ youth homelessness.

66. LGBTQ+ youth experiencing homelessness face heightened risks of violence, sexual exploitation, and victimization on the streets. Transgender youth, particularly transgender youth of color, face especially high risks of violence and discrimination. Without safe, affirming housing and services, these risks are compounded.

67. The mental health impacts of family rejection, discrimination, and homelessness on LGBTQ+ youth are severe. LGBTQ+ youth already experience higher rates of depression, anxiety, and suicidal ideation compared to their peers. When these youth also experience homelessness without access to affirming support services, the risks of suicide, substance abuse, and long-term trauma increase dramatically.

68. YPI's housing assistance services are specifically designed to meet the unique needs of this vulnerable population, many of whom have been rejected by their families, face discrimination in accessing mainstream services, and need affirming support to heal from trauma. Our work has proven effective because we meet young people where they are, affirm their identities, and provide non-judgmental support as they navigate paths out of homelessness. Without HUD funding, these critical services would end, leaving some of Rhode Island's most vulnerable youth without support.

69. If the new NOFO requirements prevent YPI from continuing to receive HUD funding, dozens of LGBTQ+ youth per year will lose access to these critical services. Young people who are already marginalized, vulnerable, and facing extraordinary challenges will be left without the specialized support they need to achieve housing stability and safety.

70. The harm extends beyond individual youth to the broader Rhode Island community. YPI's work helps stabilize vulnerable young people, connects them with education and employment opportunities, reduces trauma and pathways toward incarceration, and promotes public health. When LGBTQ+ youth have access to affirming housing assistance and support services, they are better able to participate fully in society as healthy, contributing members of their communities.

71. The termination or drastic reduction of YPI's housing services would also harm YPI staff, many of whom are themselves members of the LGBTQ+ community and some of whom have experienced homelessness. Staff members who identify as transgender or non-binary would be particularly harmed by requirements that they deny their own identities as a condition of continuing their work serving vulnerable youth.

72. If, alternatively, YPI were to accept funding under the new conditions, we would face profound harm to our mission and operations. We would be forced to:

a. Stop operating our Gender Spectrum support group for transgender and non-binary youth;

b. Cease using preferred names and affirming chosen pronouns for transgender and non-binary clients;

c. Eliminate gender-affirming clothing from our Basic Needs Pantry;

d. Change our counseling approach to no longer affirm transgender and non-binary identities;

e. Potentially terminate transgender and non-binary staff members or ask them to hide their identities;

f. Abandon our advocacy for LGBTQ+ youth rights and policy improvements;

18

g. Potentially implement mandatory service participation requirements that would undermine trust with vulnerable youth;

h. Expose ourselves to False Claims Act liability for past activities undertaken in good faith compliance with previous federal requirements.

73. These changes would fundamentally destroy YPI's mission and effectiveness. We cannot serve LGBTQ+ youth while denying the existence or validity of transgender and non-binary identities. We cannot build trust with young people who have experienced rejection and trauma by refusing to affirm who they are. We cannot remain true to professional social work ethics while imposing the government's ideology on vulnerable clients.

74. Moreover, the vagueness of the new requirements creates impossible uncertainty. YPI has no clear guidance on what activities would be deemed to "promote gender ideology" or constitute "illegal discrimination" under the administration's new interpretations. Even if YPI attempted to comply, we face the constant threat of investigation, funding termination, and False Claims Act liability based on retroactive application of vague standards to activities we have undertaken for years in good faith.

75. YPI fears that if it agrees to the new funding conditions, it could face not only loss of grant funds mid-program, but federal government investigation, private party litigation under the False Claims Act, and potential liability for activities that were previously encouraged or required. These potential consequences make YPI deeply concerned about applying for or accepting awards under the new NOFO. To attempt to mitigate these risks, YPI would

have to fundamentally change its identity, abandon its mission, and betray the vulnerable youth it exists to serve.

76. For many LGBTQ+ youth, YPI is the only place where they feel truly safe, accepted, and affirmed. Young people who have been rejected by families, bullied in schools, and discriminated against in other settings come to YPI to find community and support. If we were forced to stop affirming transgender and non-binary identities, we would betray these young people and eliminate the one safe space many of them have.

## V. CONCLUSION

77. The FY25 CoC Program NOFO places YPI in an impossible position where we cannot compete for or accept HUD funding without abandoning our mission, betraying the vulnerable LGBTQ+ youth we serve, and violating professional ethical standards. At the same time, we cannot forgo HUD funding without ending critical housing assistance services that dozens of vulnerable young people depend on.

78. Without preliminary relief preventing enforcement of the unlawful provisions in the FY25 NOFO, YPI will suffer irreparable harm, and LGBTQ+ youth experiencing homelessness throughout Rhode Island will be denied access to the specialized, affirming services they desperately need.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 26, 2025.

*Rush Frazier* 11/26/2025

Rush Frazier
Executive Director, Youth Pride, Inc.

20