## DECLARATION OF SHEILA A. DILLON

I, SHEILA A. DILLON, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1. My name is Sheila A. Dillon. This declaration is based on my knowledge, professional education and experience, and review of relevant records. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of the City of Boston.

2. I have been employed as the Chief and Director of the Mayor's Office of Housing ("MOH") of the City of Boston since 2013. Prior to my current role I was the Director of the Massachusetts Bureau of Rental Assistance. I have spent more than 30 years of my career in affordable housing and community development programs, including the oversight of programs to address homelessness.

3. MOH is responsible for addressing homelessness, creating and preserving affordable housing, and ensuring that renters and homeowners can secure and maintain safe, stable housing. MOH also develops and implements the City of Boston's housing creation and homelessness prevention plans and collaborates with local and national partners to find new solutions for homelessness and to build more accessible housing, particularly for those with lower incomes.

4. As the Chief and Director of MOH, I oversee all functions of MOH, including our homelessness prevention and family stabilization programs.

5. In furtherance of this work, MOH routinely applies for and receives various grants from HUD, including Continuum of Care ("CoC") grant funding. MOH has

received CoC funding every year for more than twenty-five years due to the strong performance of the City of Boston in implementing permanent supportive housing programs that stabilize households exiting homelessness. The City of Boston CoC (the "Boston CoC") has consistently received increases in its CoC award in the form of new funding for CoC Bonus projects, Domestic Violence ("DV") Bonus projects, and other competitive funding opportunities. This is a result of Boston's strong performance on the CoC application and on its overall system performance, as demonstrated by decreases in unsheltered homelessness, homelessness among veterans, and chronic homelessness in Boston.

6. Since 2007, Boston has reduced homelessness among veterans by 56%, chronic homelessness by 26%, and unsheltered homelessness by 57%. For decades, Boston has consistently had one of the lowest rates of unsheltered homelessness of all major cities in the United States. Boston was also cited by the U.S. Department of Veterans Affairs for being among three cities in the nation that ended chronic homelessness among veterans.[1]

7. The Boston CoC consists of housing and service providers and other stakeholders for individuals and families experiencing homelessness. It is led by a Steering Committee of partner organizations.

8. In Boston, approximately 1,617 formerly homeless individuals and families are in permanent housing funded by CoC grants. These households include some of the most vulnerable members of the community: 1,449 people with disabilities, 194 children, 450 seniors over age 65, and 207 veterans, 174 of whom have a disability. Overall, 65% of Boston's CoC grant funds are dedicated to permanent supportive housing programs, which exclusively

---

[1] *See* VA Homeless Programs: VA 25 Cities Initiative, available at: https://www.va.gov/homeless/25cities.asp

DECLARATION OF SHEILA A. DILLON - 2

fund housing for formerly homeless households which include people with disabilities. Providing homeless individuals and families with permanent supportive housing reduces their reliance on other publicly funded systems — such as jails, hospital inpatient programs, emergency shelters, psychiatric institutions, and emergency rooms — creating net savings for taxpayers. A 2015 analysis found that in Massachusetts, permanent supportive housing programs save taxpayers $13,401.00 per person per year. [2]

9. HUD issued a Notice of Funding Opportunity ("NOFO") on July 31, 2024 for the CoC program covering both the 2024 and 2025 federal fiscal years (the "2024-2025 NOFO"). The 2024-2025 NOFO stated that successful applicants for 2024 funding would not need to submit a new application for FY 2025.

10. The City of Boston applied as the Collaborative Applicant for the Boston CoC on October 29, 2024. In accordance with the NOFO, Boston CoC's application was for FY 2024 and FY 2025 funding. HUD set the expectation that this application would serve as the basis for the award of funding for all CoC-funded projects between April 1, 2025 and December 31, 2027 and projects were planned accordingly. *See* 2024-2025 NOFO, p. 4. MOH communicated this expectation to grantees, who planned their budgets and programming around this expectation.

11. HUD awards points to CoC applicants based on a variety of metrics, including past performance and success in grant management. In 2024, HUD awarded the Boston CoC 158.75 out of 200 total points, 7.25 points above the national median.

12. In the 2024 CoC awards, which were announced on January 17, 2025,

---

[2] *See* "Home & Healthy for Good: Progress Report 2015", Massachusetts Housing and Shelter Alliance, December 2015. Available at: https://archives.lib.state.ma.us/entities/journalfile/781879ae-1c95-4b22-95ad-c0d820e85037

DECLARATION OF SHEILA A. DILLON - 3

HUD awarded a total of $47,933,147.00 to the Boston CoC. These awards were made in the form of 39 separate grants. Thirty-six of these grants were awarded to 18 different subrecipient nonprofit agencies who provide housing and supportive services to over 2,000 households, including homeless adults and young adults, people with substance use and mental health disorders, disabled individuals, veterans, and survivors of domestic violence. See **Exhibit A** for a full list of grants. Three additional grants made directly to the City of Boston support CoC planning and administration, and costs associated with the HUD-mandated Homeless Management Information System (HMIS).

13. Each grant had a designated start date and an end date one year later. The start dates were staggered from April 2025 through February 2026 and thus had corresponding end dates in March 2026 through January 2027. Therefore, these grants, which were awarded in 2024, have end dates as early as next March and throughout 2026.

14. Typically, the NOFO for the next year of CoC funding is issued in July or August of the prior year. The NOFO for FY 2025 was not issued until November 13, 2025. Applications are due January 14, 2026. The process established by the NOFO typically requires the CoC to complete a 100-plus page application, and requires an individual project application of approximately 50 pages for each grant. To date, HUD has not released any of these applications.

15. The Boston CoC must run its own application process for nonprofit subrecipients in accordance with HUD's requirements. This process includes developing and publishing Boston CoC's policies for acceptance and scoring of projects in accordance with HUD's new priorities, holding a public application process for new projects, conducting review and scoring of new applications and renewal applications, and preparing the as-yet-unreleased

DECLARATION OF SHEILA A. DILLON - 4

applications for HUD's ultimate review by January 14, 2026. HUD requires that subrecipients submit project applications to the CoC by December 15, 2025. Considering the amount of funding, number of projects, and changes to the NOFO, this timeline is extremely aggressive.

16. As a result, the Boston CoC has limited time to solicit applications, and subrecipients have minimal time to decide whether and how to apply. The Boston CoC is currently preparing its scoring criteria and local applications, which will be released on December 5, 2025. Local applications are due to the Boston CoC on December 12, 2025, meaning that non-profit partners will have a single week to prepare their applications based on HUD's new criteria. Within this tight timeframe, nonprofit partners who currently provide permanent housing services will have to decide between devising new programs in accordance with the NOFO's priorities, or foregoing CoC funding. The Boston CoC will notify applicants whether they have been accepted by December 30, 2025. In light of this timing the Boston CoC has set a January 9, 2025 deadline for e-snaps applications, which will then give the Boston CoC only five days to prepare its final application for HUD by January 14, 2025.

17. Some current subrecipients who have developed and refined successful, evidence-based programs will be unable to certify their compliance with new award conditions or will be otherwise ineligible or non-competitive because of the rapid shifts in HUD's priorities; some will choose not to apply; and some will be unable to overhaul their programs within this short window. The compressed schedule will cause the Boston CoC to lose the benefit of its experienced partners, and its ability to provide stable services with continuity for its vulnerable community members will be compromised.

18. The NOFO's expectation of rapid policy changes in a short time frame has already disrupted services for homeless households in Boston. As of November 24, 2025, Boston

DECLARATION OF SHEILA A. DILLON - 5

CoC's Coordinated Access System has stopped referring new clients to certain permanent housing programs funded by these grants because of the planned cuts to funding for those services.

19. Awards are not scheduled to be announced or issued until May 2026. Two large grants that fund permanent housing, totaling over ten million dollars, will expire well before this date, on March 31, 2026. (Grant No. MA0043L1T002417 to Metropolitan Boston Housing Partnership, Inc. for $10,255,345.00 and Grant No. MA0037L1T002417 to Kit Clark Senior Services, Inc. - Walnut Community House for $ 85,193.00). Ordinarily, even after notice of award, there is a delay of several weeks or months before awards are received. Therefore this long timing gap between grant end date and announcement of the new program awards means that the programs, which do not have large capital reserves, and will not have any assurance of eventual funding, will likely be forced to evict residents and break leases. We know from research that forced moves, such as evictions, are linked to long lasting consequences such as PTSD, and higher emergency department usage[3] as well as poorer health outcomes for mothers and their children, including adverse birth outcomes and childhood health outcomes.[4] Four additional grants totaling approximately $5,363,222.00 expire on May 31, 2026: Pine Street Inn ("PSI")/Chronically Homeless Housing, Grant No. MA0362L1T002412, for $558,614.00; PSI/Long Term Stayers, Grant No. MA0428L1T002411, for $1,981,712.00; Homestart/Apartment Connection, Grant No. MA0003L1T002416 for 2,466,539.00; and New

---

[3] See Smith, et. al. *Eviction, post-traumatic stress, and emergency department use among low-income individuals in New Haven*, CT (Preventive Medicine Reports, 2022) Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9502672/#fn-group1

[4] See Desmond and Kimbro. *Eviction's Fallout:Housing, Hardship, and Health* (Social Forces, 2015) Available at: https://academic.oup.com/sf/article-abstract/94/1/295/1754025?redirectedFrom=fulltext

DECLARATION OF SHEILA A. DILLON - 6

England Center and Home for Veterans ("NECHV")/Veterans Welcome Home, Grant No. MA0589L1T002408, for $356,357.00.

20. Because new awards will not be announced until sometime in May 2026, there will be a significant funding gap prior to the execution of new awards. The impacted organizations will have to end operations or risk moving forward without reliable funding, and the people they serve will risk becoming unhoused.

21. Every other CoC grant awarded to the Boston CoC in 2024 has a scheduled end date in 2026 except for a grant designated for MA-500 CoC Planning Application FY 2024 which expires on January 31, 2027. This later grant is used to support planning and coordination efforts for the CoC's homelessness response system. All balances available to the City of Boston in CoC funding are from the CoC grants awarded in 2024 and not from any 2025 awards, and these balances will no longer be available as the grants expire throughout 2026.

22. In addition to the harms caused by the delayed and unexpected nature of the FY 2025 NOFO, the Boston CoC will be harmed by unprecedented changes to HUD policy in the NOFO.

23. Contrary to longstanding practice, the FY 2025 NOFO allows no more than 30% of funding for permanent housing. Currently, 90% of the Boston CoC grants support permanent housing, and this percentage has been consistent for approximately nine years, in reliance on past HUD practice. Each year since FY 2015, between 87 and 95 percent of Boston CoC grants have supported permanent housing. These grants currently fund housing for approximately 1,617 households.

24. For example, programs funded by CoC grants, such as the 24-month long Rapid Rehousing program, fund leases for Boston households. The Rapid Rehousing program

DECLARATION OF SHEILA A. DILLON - 7

currently funds housing for more than 300 households. The NOFO classifies these funds as permanent housing, and they will be subject to the new 30% cap, meaning at least some of these funds will end before the leases do, leaving private landlords unpaid and residents subject to eviction. *See* NOFO, p. 15.

25. The shift from funding for permanent housing to transitional housing will harm individuals who become unhoused as a result of the new cap on permanent housing. Transitional Housing programs are restricted to serving homeless households, meaning that current residents of permanent housing could not move into transitional housing without re-entering homelessness first.

26. In the preceding 2024-2025 NOFO, which HUD issued on July 31, 2024, HUD identified permanent housing as its top priority after ending homelessness. HUD advised in the 2024-2025 NOFO that applicants should "***Use a Housing First approach.***" The NOFO explained that "CoC Program funded projects should help individuals and families move quickly into **permanent housing without preconditions** and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing." *See* 2024-2025 NOFO at p. 8 (emphasis added). This is in keeping with HUD's decade-long prioritization of the Housing First model, and has led to the successful placement and stabilization of thousands of vulnerable households in service-enriched housing. Without Housing First opportunities, most of these households would not have qualified for housing, due to the high screening and credit standards present in most mainstream housing application processes. People with a history of homelessness often have poor credit and / or minor criminal records with charges directly related to their experience of homelessness, such as loitering and vagrancy.

DECLARATION OF SHEILA A. DILLON - 8

27. By contrast, the FY 2025 NOFO prioritizes mandatory treatment and required supportive service participation and penalizes applicants that follow the longstanding Housing First model. Per HUD program rules, Transitional Housing may only be used by homeless individuals, meaning current residents of Permanent Supportive Housing likely cannot be moved to Transitional Housing, but rather will become homeless when the programs are cut.

28. Additionally, the FY 2025 NOFO imposes a threshold review allowing HUD to reject eligibility based on "evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." (NOFO, p. 55). This criterion is in direct contradiction with HUD's regulations: 24 C.F.R. § 5.106 applies to the CoC program and requires "equal access in accordance with the individual's gender identity." The criterion also conflicts with previous data standards that included reporting non-binary and transgender persons to HMIS. In accordance with HUD's previous data reporting requirements, Boston CoC historically reported the gender of each person served into the Homeless Management Information System ("HMIS"). As required, Boston CoC annually reported HMIS aggregate data on non-binary and transgender persons to HUD.

29. The 2024-2025 NOFO further listed "***Improving Assistance to LGBTQ+ Individuals***" as a HUD policy priority, and instructed applicants that "CoCs should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes." *See* 2024-2025 NOFO at p. 9.

30. Similarly, the 2024 HUD Consolidated Plan response template repeatedly required applicants to analyze racial disparities in housing. Applicants were asked to "assess the

DECLARATION OF SHEILA A. DILLON - 9

need of any racial or ethnic group that has disproportionately greater need" (2024 Con. Plan sections NA-15, NA-20, NA-25), to discuss "[i]ncome categories in which a racial or ethnic group has disproportionately greater need" (2024-2025 Con. Plan section NA-30), and to "[d]escribe the Nature and Extent of Homelessness by Racial and Ethnic Group." (2024 Con. Plan section NA-40). Applicants were further asked if there were areas where "racial or ethnic minorities or low-income families are concentrated" and later if there were "other strategic opportunities in any of these areas?" (2024 Con. Plan section MA-50).

31. The 2024-2025 NOFO had similar requirements. ***Racial Equity***" was a priority, and the NOFO instructed applicants that "responses to preventing and ending homelessness should address racial inequities to ensure successful outcomes for all persons experiencing homelessness using proven approaches, such as: partnering with a racially diverse set of community partners and people experiencing homelessness and partnering with organizations with experience serving underserved populations." *See* 2024-2025 NOFO at p. 9.

32. By virtue of having followed HUD's prior regulations and rules, the Boston CoC could now be at risk of losing eligibility for funding.

33. HUD's criteria for new program applications penalize new permanent supportive housing ("PSH") projects that serve individuals with mental health disabilities or substance use disorder who are under age 62 or do not have physical or developmental disabilities. *See* NOFO, p. 61. This is a stark departure from the prior criteria and is in conflict with the regulatory definition of PSH, which makes no distinction between physical or mental health disabilities. *See* 24 CFR § 578.1 ("Permanent supportive housing means permanent housing in which supportive services are provided to assist homeless persons with a disability to live independently."). The criteria is also in tension with federal regulations governing who

DECLARATION OF SHEILA A. DILLON - 10

should be accepted into CoC-funded PSH, which contemplate inclusive services for those with substance use disorder: "Recipients may limit admission to or provide a preference for the housing to subpopulations of homeless persons and families who need the specialized supportive services that are provided in the housing (e.g., substance abuse addiction treatment, domestic violence services, or a high intensity package designed to meet the needs of hard-to-reach homeless persons). While the housing may offer services for a particular type of disability, no otherwise eligible individuals with disabilities or families including an individual with a disability, who may benefit from the services provided may be excluded on the grounds that they do not have a particular disability." 24 C.F.R. § 578.93(b)(7).

34. To be competitive for funds under these new criteria, Boston CoC programs would be forced to choose between housing certain individuals with mental health disabilities and substance use disorder, a significant need in the community, and receiving CoC funds. *See* NOFO p. 12 (Citing a nationwide study which indicates that 75% of those experiencing homelessness report substance use disorder, and 78% report mental health conditions); *see also* 24 C.F.R. § 578.93(b) (CoCs may prioritize housing for specific subpopulations based on need). For example, Grant No. MA0043L1T002417 to Metropolitan Boston Housing Partnership, Inc., described in paragraph 18 above, supports housing for 341 households with disabilities including mental health disabilities and substance use disorder. If Metropolitan Boston Housing submitted the application for this program under the current NOFO, its application could be denied based on HUD's new scoring criteria.

35. The FY 2025 NOFO also includes preferential scoring for mandatory treatment and services, like conditioning housing on compulsory substance use treatment. *See* NOFO pp. 66-67, 77-79, 80 ("Availability of Treatment and Recovery Services"; "Participation

DECLARATION OF SHEILA A. DILLON - 11

Requirements for Supportive Services"; and "Objective Criteria and System Performance" metrics).

36. These forced treatment preferences systematically disadvantage organizations that provide housing to survivors of domestic violence and sexual assault who cannot safely remain at home, and therefore threaten to leave support for those populations critically underfunded. Organizations that support survivors of domestic violence and sexual assault would commonly seek and receive grants not just under the CoC program, but also under the Violence Against Women Act ("VAWA") and Family Violence Prevention and Service Act ("FVPSA"). Under VAWA and FVPSA, it is illegal for a provider to require beneficiaries to participate in support services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA grants for transitional housing assistance); 42 U.S.C. § 10408(d)(2) (FVPSA grants for emergency shelter). Thus, under the FY2025 NOFO's forced treatment and service participation preferences, CoCs whose grantees include organizations serving survivors face great disadvantage because they cannot receive the substantial points that are granted to programs that mandate participation in supportive services.

37. As a result of this scoring disadvantage, if CoCs include organizations that serve domestic violence and sexual assault survivors in their priority listings, it will significantly disadvantage their overall applications. CoCs therefore face the impossible choice of excluding these important services from the application or including them and risking reducing the size of the CoC's eventual award.

38. Additionally, organizations serving survivors will likely seek to end their permanent housing grants due to HUD's imposed 30% cap on permanent housing and reallocate funding to a new project type. To meet the NOFO's threshold criteria for new Transitional

DECLARATION OF SHEILA A. DILLON - 12

Housing, a project must "require program participants to take part in supportive services." Therefore, organizations serving survivors could not qualify for a new Transitional Housing grant under the NOFO, reducing the availability of already-scarce housing opportunities dedicated to survivors in the CoC.

39. Lastly, the reduction in available funding for permanent housing would require Boston to eliminate approximately $29 million in permanent housing projects in favor of new services-only and temporary housing projects with strict mandatory service, treatment, and employment requirements. New transitional housing programs will be judged on whether they can provide 40 hours per week of "customized services" for each participant who is not employed, not over 62, or not physically or developmentally disabled. *See* 2024-2025 NOFO p. 57. This is an incredibly difficult standard for providers to meet, especially for participants with mental health challenges or substance use disorders, and is unrelated to any evidence-based treatment standards.

40. Boston has no alternative funding to renew these grants. Eliminating the required $29 million would mean approximately 1,100 households would lose their housing. Boston's shelters are already significantly overstretched, and will be unable to house all of the affected individuals. The current total shelter capacity (including overflow space) for individuals is 1,251 beds on a nightly basis. As of November 24, 2025, 1,353 people were staying in Boston shelters, with over a hundred people sleeping on mats and cots in halls and common rooms. Adding hundreds of additional newly homeless individuals who need emergency shelter would completely overwhelm a system that is already over capacity. If the NOFO's outlined process moves forward as scheduled, some of the people currently housed in permanent supportive housing will be unsheltered when HUD's grants begin to expire in March. The resulting increase

DECLARATION OF SHEILA A. DILLON - 13

in homelessness would strain Boston's streets, jails, emergency rooms, and mental health treatment providers. A 2020 study found that in Massachusetts, people experiencing homelessness who were placed in permanent supportive housing incurred $5,267.00 less in annual health care costs than those who were not.[5]

41.     Beyond the risks of losing access to housing or shelter, the Boston CoC's clients are likely to lose trust in the CoC's ability to provide reliable services if the current model is disrupted on HUD's planned timeline. Clients who are asked to leave their stable housing programs may not accept further assistance from the Boston CoC.

42.     Boston landlords would lose up to $33.4 million in annual rent payments funded through CoC. The NOFO would jeopardize funding for approximately 10 full-time City staff members dedicated to homelessness response, and approximately 126 full-time staff members at non-profit partners who provide homelessness prevention services.

43.     The programs funded by Boston CoC rely on numerous community partners to operate. Boston CoC funds go towards project-based, sponsor-based, and tenant-based rental assistance, *see* 24 C.F.R.§ 578.51(c)-(e), as well as supportive services including substance use treatment providers. For example, Metro Housing Boston's Grant No. MA0043L1T002417, described in paragraphs 18 and 34, funds approximately 19 different supportive service partners. Property owners, service providers, and other businesses in Boston rely on these payments, and may be less willing to work with the Boston CoC if their contracts are disrupted by these rapid policy changes.

---

[5] *See* Brennan et. al, *The Preventive Effect of Housing First on Health Care Utilization and Costs Among Chronically Homeless Individuals,* published December 12, 2020. Available at: https://www.bluecrossmafoundation.org/publication/preventive-effect-housing-first-health-care-utilization-and-costs-among-chronically

DECLARATION OF SHEILA A. DILLON - 14

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 26 day of November, 2025.

*[signature]*
Sheila A. Dillon
Chief and Director
Mayor's Office of Housing
City of Boston

## Exhibit A : List of FY24-25 Programs

| Grantee Name | Project Name | HUD Grant # | Start | End | Grant Total (AWARDED) |
|---|---|---|---|---|---|
| Metro Housing Boston | Consolidated TRA | MA0043L1T002417 | 4/1/2025 | 3/31/2026 | $ 10,255,345 |
| Kit Clark Senior Services | Walnut Comm. Housing | MA0037L1T002417 | 4/1/2025 | 3/31/2026 | $ 85,193 |
| Pine Street Inn | Chronically Homeless Housing | MA0362L1T002412 | 6/1/2025 | 5/31/2026 | $558,614 |
| Pine Street Inn | Long Term Stayers Consolidated | MA0428L1T002411 | 6/1/2025 | 5/31/2026 | $1,981,712 |
| HomeStart | Apartment Connection | MA0003L1T002416 | 6/1/2025 | 5/31/2026 | $2,466,539 |
| New England Center and Home for Veterans | Veterans Welcome Home | MA0589L1T002408 | 6/1/2025 | 5/31/2026 | $356,357 |
| Pine Street Inn | Housing Works Partnership | MA0552L1T002408 | 7/1/2025 | 6/30/2026 | $2,328,806 |
| Boston CoC | HMIS Consolidated | MA0001L1T002416 | 7/1/2025 | 6/30/2026 | $1,383,471 |
| Metro Housing Boston | SRO | MA0305L1T002416 | 7/1/2025 | 6/30/2026 | $521,610 |
| HomeStart | Chronic Stabilization Program | MA0510L1T002409 | 7/1/2025 | 6/30/2026 | $231,715 |
| Boston CoC | Coordinated Access | MA0532L1T002409 | 7/1/2025 | 6/30/2026 | $284,705 |

DECLARATION OF SHEILA A. DILLON - 16

| | Expansion (CAPE) | | | | |
|---|---|---|---|---|---|
| HomeStart | Welcome Home | MA0330L1T002413 | 7/1/2025 | 6/30/2026 | $896,500 |
| HomeStart | Chronic Consolidated Leasing | MA0027L1T002417 | 8/1/25 | 7/31/26 | $2,487,737 |
| Pine Street Inn | First Home Consolidated Expansion | MA0017L1T002417 | 9/1/25 | 8/31/26 | $967,620 |
| Pine Street Inn | REACH Consolidated Grant | MA0058L1T002417 | 9/1/25 | 8/31/26 | $2,164,644 |
| Heading Home | Homeless to Housing | MA0025L1T002417 | 9/1/25 | 8/31/26 | $288,372 |
| Metro Housing Boston | J1 2006 SRA | MA0425L1T002413 | 9/1/25 | 8/31/26 | $107,302 |
| St. Francis House | Pathways + Income SSO-CE | MA0691L1T002405 | 9/1/25 | 8/31/26 | $408,098 |
| Hildebrand | Hildebrand Family Self-Help Center - PSH Program | MA0797L1T002401 | 10/1/25 | 9/30/26 | $698,015 |
| Casa Myrna Vazquez | STEP II | MA0758D1T002402 | 10/1/25 | 9/30/26 | $1,605,969 |
| Metro Housing Boston | H1 2005 PRA | MA0351L1T002415 | 10/1/25 | 9/30/26 | $80,463 |
| Pine Street Inn | CoC 24 SSO-CE (PSI - PMH) | MA0795L1T002401 | 10/1/25 | 9/30/26 | $695,666 |
| Bridge Over Troubled Waters | Bridge RRH+ Replacement | MA0711Y1T002403 | 10/1/25 | 9/30/26 | $1,389,091 |

DECLARATION OF SHEILA A. DILLON - 17

| The Home for Little Wanderers | The Home TH-RRH | MA0712Y1T002403 | 10/1/25 | 9/30/26 | $464,401 |
| --- | --- | --- | --- | --- | --- |
| Justice Resource Institute | JRI RRH+ Replacement | MA0713Y1T002403 | 10/1/25 | 9/30/26 | $290,298 |
| Ecumenical Social Action Committee | FAST | MA0714Y1T002403 | 10/1/25 | 9/30/26 | $741,351 |
| The Home for Little Wanderers | Roxbury Village YHDP | MA0715Y1T002403 | 10/1/25 | 9/30/26 | $161,045 |
| Casa Myrna Vazquez | Bridge to Safety | MA0716L1T002403 | 11/1/25 | 10/31/26 | $1,445,608 |
| Metro Housing Boston | Consolidated SRA | MA0042L1T002417 | 11/1/25 | 10/31/26 | $4,278,596 |
| FamilyAid Boston | Home Advantage Collaborative | MA0002L1T002414 | 12/1/25 | 11/30/26 | $967,793 |
| Massachusetts Housing & Shelter Alliance | Home Front | MA0363L1T002413 | 12/1/25 | 11/30/26 | $339,264 |
| HomeStart | Pathways Navigation SSO-CE | MA0690L1T002405 | 12/1/25 | 11/30/26 | $820,627 |
| Bay Cove Human Services | Home at Last | MA0399L1T002413 | 12/1/25 | 11/30/26 | $842,493 |
| The Home for Little Wanderers | Joint TH-RRH for Transitional Age YYA | MA0798L1T002401 | 12/1/25 | 11/30/26 | $800,615 |

DECLARATION OF SHEILA A. DILLON - 18

| The Home for Little Wanderers | Joint TH-RRH for Victims of Gender-Based Violence (New) | MA0799D1T002300 | 12/1/25 | 11/30/26 | $778,357 |
| --- | --- | --- | --- | --- | --- |
| Justice 4 Housing | Stabilization & Emergency Assistance (SEA) Program | MA0800D1T002401 | 1/1/26 | 12/31/26 | $1,085,398 |
| Massachusetts Housing & Shelter Alliance | Home and Healthy for Good | MA0307L1T002416 | 1/1/26 | 12/31/26 | $656,276 |
| Metro Housing Boston | E4 1999 Tier 2 PRA | MA0044L1T002417 | 1/1/26 | 12/31/26 | $482,780 |
| Boston CoC | CoC Planning 2024 | MA0822L1T002400 | 2/1/26 | 1/31/26 | $1,500,000 |