## DECLARATION OF ELIZABETH MENGERS MAGARGEE

I, ELIZABETH MENGERS MAGARGEE, declare under penalty of perjury as set forth in 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 18 years, am competent to testify as to matters in this declaration, and make it based on personal knowledge and my review of relevant records.

2. I am the Planning and Development Manager for the City of Cambridge's ("City") Department of Human Services Programs ("DHSP"). I have served in this position since 2018. Prior to my current role, I served as the Continuum of Care Homeless Services Planner for DHSP from 2011 through 2018.

3. Among my duties as Planning and Development Manager, I am responsible for the administration of the City's Continuum of Care Program known as the Cambridge CoC, MA-509 ("CoC"). Cambridge DHSP serves as the Collaborative Applicant for the CoC.

4. Since the mid-1990s, DHSP has convened and coordinated a group of organizations and individuals that constitute a CoC that works to address homelessness in the City. The CoC uses a coordinated community-based process of identifying needs and building a system of housing and services to address the needs of homeless persons.

5. DHSP routinely applies for and receives various grants from the U.S. Department of Housing and Urban Development ("HUD"), including CoC Program grant funding, to fund and support these homelessness support programs. DHSP has received grant funding through the CoC process since 1997.[1] The CoC has been a steady source of funding to help the City respond to homelessness. Consistent renewal of the CoC's grant funds allows for stability for the critical

---

[1] The HEARTH Act of 2009 consolidated the Supportive Housing Program ("SHP") and Shelter plus Care ("S+C") grant programs into the Continuum of Care grant program. The initial grants received through the CoC process were SHP and S+C grants; in 2012, these grant programs melded into the CoC Grant Program when the HEARTH Act Continuum of Care Interim rule went into effect.

1

programs that enable the City to house our most vulnerable residents. The City manages the local competition process and communicates the requirements and procedures to the nonprofit subrecipients of CoC program funds.

6. The City relies on the CoC grant funds as one of its primary funding sources to address homelessness in the community through provision of Permanent Housing.

7. Permanent Housing, as defined in 24 C.F.R. § 578.3, means community-based housing without a designated length of stay and includes both Permanent Supportive Housing and Rapid Rehousing. To be Permanent Housing, the program participant must be the tenant on a lease for a term of at least one year, which term is renewable for a minimum of one month, and is terminable only for cause. Permanent Supportive Housing means Permanent Housing in which supportive services are provided to assist homeless persons with a disability to live independently, which includes housing subsidies paired with stabilization case management.

8. There were 575 people experiencing homelessness in the City on January 29, 2025, the most recent point-in-time count reported to HUD. In Federal Fiscal Year 2024 (October 1, 2023 – September 30, 2024), 1,827 people were served by the Cambridge CoC in Emergency Shelter, Transitional Housing, Rapid Rehousing, and Permanent Supportive Housing projects. 7% of those served by the CoC were under the age of 18; 13% were young adults aged 18-24; 50% were adults between 25-54; and 30% were adults aged 55 and older. 74% had a disabling condition; 13% were veterans; and 15% were domestic violence survivors.

9. On July 31, 2024, HUD published the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants. This Notice of Funding Opportunity ("NOFO") indicated that the score CoCs received in the 2024 submission would be carried forward for FY 2025 funds, and that project applications

submitted in 2024 would not need to be resubmitted in 2025 to be considered for renewal. HUD's notice provided assurance that there would not be a full competition process in 2025. The CoC conveyed the information in HUD's notice to CoC subrecipients during the 2024 competition process.

10. The FY 2024 and FY 2025 NOFO also emphasized certain goals, including a Housing First approach, addressing racial inequities, improving assistance to LGBTQ+ individuals, decriminalizing homelessness, and expanding permanent housing. These goals are consistent with several years of policy priorities identified by HUD through CoC funding competitions. Each CoC competition since 2015 has included opportunities to apply for Permanent Housing Bonus funds and scoring incentives for adopting a Housing First approach and has required CoCs to identify strategies they take to prevent criminalization of homelessness; each competition since 2017 has required CoCs to describe how they address the needs of LGBTQ+ individuals and their families; and each competition since 2018 has included questions about how CoCs are evaluating and addressing racial disparities.

11. In the 2024 CoC awards, which were announced January 2025, HUD awarded $6,379,162 to the CoC.

12. On November 13, 2025, HUD issued a 2025 CoC NOFO, with a deadline of January 14, 2026. The new awards are not expected until May 1, 2026. In order to compete for those awards, the CoC and its subrecipients must now divert time and resources from current programs towards participating in the competitive process with reductions in guaranteed renewed funding and zero opportunity over the last half year to seek alternate funding resources where the CoC and the subrecipients relied on the 2-year funding cycle.

13. The 2025 CoC NOFO sets the Tier 1 threshold, the amount of funds most likely to be renewed, at 30% of Annual Renewal Demand ("ARD"). This means that 70% of renewal funds are at risk of nonrenewal. Since 2015 the Tier 1 threshold for CoC competitions has ranged between 85% and 95% of ARD, and the Tier 1 threshold for the 2024-2025 NOFO was set at 90% of ARD. The 2025 CoC NOFO requires that CoCs cap the amount of funding for Permanent Housing Projects at 30% of their ARD. For the Cambridge CoC, this means that the maximum amount it can apply for in Permanent Housing projects is $1,822,064.

14. Over 81% of Cambridge's FY 2024 CoC grant funds are used to support Permanent Supportive Housing ("PSH") projects that provide housing and case management services to over 200 people with disabling conditions who have experienced chronic homelessness. Additionally, 4.8% of funds are used for a Rapid Rehousing ("RRH") project serving survivors of domestic violence. Combined, more than 86% of Cambridge's FY 2024 CoC grant funds support Permanent Housing projects. These Permanent Housing projects account for $5,498,442 of the $6,379,162 in the Cambridge CoC's FY 2024 CoC awards. These grants support 214 units of supportive housing operated by nonprofit subrecipients and the ability of the subrecipients to manage and deliver essential services related to the housing.

15. Consistent with longstanding HUD priorities and practice, throughout multiple presidential administrations, the City has applied a consistent approach to the awarding of CoC funding over the previous several years. Since 2013, the City has used between 80% and 88% of CoC grant funds to support Permanent Housing Projects.

16. Since 2014, the CoC Program has focused on Housing First, implementation of Coordinated Entry, and increasing resources for Permanent Supportive Housing. This focus has enabled the CoC to disrupt cycles of chronic homelessness and provide safe, stable housing for

our community's most vulnerable residents. The CoC has consistently achieved a 95% to 98% retention rate in Permanent Supportive Housing programs since reporting began for System Performance Measures ("SPM").

17. HUD Notices for several years have acknowledged the need to prioritize the limited PSH inventory for the people in our community with the longest durations of homelessness and highest severity of service needs.[2] HUD's policy and funding have prioritized CoCs that increase availability for low-barrier Permanent Housing using a Housing First approach. HUD has expressed this policy and these funding priorities through past CoC competitions, Notices, and technical assistance. As a result, the CoC has relied on these priorities in developing its housing programs. The City has committed $498,000 in local funds in the current Fiscal Year (July 1, 2025 through June 30, 2026) to supplement CoC grant funds to support housing navigation and stabilization services for individuals transitioning from long-term homelessness into permanent housing programs.

18. The new FY 2025 NOFO now directs the CoC to reduce CoC grant funding for these critical Permanent Housing programs by 67%, a reduction of $3.6 million compared to the prior year, and forces CoCs to go through a delayed and compressed competition process after having been told the 2-year NOFO would avoid the burdensome application process for 2025 funds. These new requirements are contrary to HUD's prior notices that CoC projects would be renewed based on the 2024 scoring process.

CoCs are generally required to run a local competition to evaluate, select, and rank project applications to prioritize for CoC funding. The FY 2025 NOFO requires project applications to be submitted to the CoC by December 15, 2025. The CoC's local competition

---

[2] https://www.hud.gov/sites/documents/16-11cpdn.pdf.

5

closes on December 15, 2025. The CoC has limited time to solicit applications, and subrecipients have minimal time to decide whether and how to apply. Some current subrecipients who have developed and refined successful, evidence-based programs will be unable to certify their compliance with new award conditions or will be otherwise ineligible or non-competitive; some may choose not to apply; and some will be unable to overhaul their programs within this short window. The CoC will lose the benefit of experienced partners, and its ability to provide stable services with continuity for its vulnerable community members will be compromised.

19. The new FY 2025 NOFO requirements are a drastic change from the role HUD has demonstrated over the years as a partner in funding evidence-based supportive housing projects.

20. These changes place program participants, nonprofit subrecipients, the City, and the CoC in an untenable position. For example, the City now must communicate to subrecipients that projects that have been successful in stabilizing formerly chronically homeless people will no longer be prioritized for funding, which harms the goodwill and relationship between the City and its subrecipient partners. It is not possible to implement all of the changes on such short notice, resulting in previously successful subrecipients and projects suddenly losing support and funding and putting tenancies at risk for over 200 stably housed CoC participants.

21. HUD's suggestion that funding for Permanent Housing programs causes rising rates of homelessness across the country fails to acknowledge that the primary reason for increasing homelessness is the lack of affordable housing. HUD's new suggestion that Permanent Housing projects convert to Transitional Housing projects is unsupported by evidence and does not address the crisis the new funding limitations will create, including but not limited

to, people facing eviction, increasing numbers of people trying to access shelter systems that are at capacity, obligations project operators have for enforceable leases, etc.

22. The impact of these new FY 2025 NOFO requirements would have drastic and tragic consequences for homelessness reduction efforts in the City.

23. Requiring the CoC to reduce the amount of funding for Permanent Housing projects will increase homelessness in the community in two ways. First, the current participants of projects that are not included in the 30% cap will lose safe stable housing. Even if these projects convert to the Transitional Housing component, as HUD has suggested, they will no longer be eligible because they are currently housed and have tenancies and so do not meet HUD's definition of homelessness required to be eligible for Transitional Housing. Second, the significant reduction of Permanent Housing inventory available to the CoC will exacerbate the existing bottleneck of people who are eligible, prioritized for Permanent Housing by the Coordinated Entry system, and awaiting referrals for placement in housing. The CoC currently has over 375 people who are homeless awaiting placement in supportive housing projects. Furthermore, records show that over the past five years, tens of thousands of households have been on the Cambridge Housing Authority's waitlist, demonstrating the immense unmet need for affordable housing in the community. The Cambridge CoC needs more, not less, supportive housing, and the requirement to limit the amount of Permanent Housing funding to 30% of ARD will reverse progress our community has made to provide appropriate supportive housing for people with histories of long durations of homelessness and complex service needs.

24. If the CoC loses over $3.6 million in CoC program funds for Permanent Housing it will face significant challenges at a time when the local economy is forcing difficult budget decisions. The CoC awards constitute a major portion of the City's budget for Homelessness and

Housing Stability, almost all of which passes through to the nonprofit subrecipients operating the City's programs. The 2024 CoC awards of $6,379,162 represent over 40% of Cambridge's proposed FY26 $15.5 million budget for homelessness and housing stability programs. Meanwhile, the City is working to reduce departmental budgets to adjust to lower projected tax revenue and it would be very challenging to fill the federal funding gap, which would lead to evictions and negative outcomes for tenants and further strain on the emergency shelter system in Cambridge and the Greater Boston region. A loss of CoC funds for Permanent Housing may result in the return to the streets of the City and the greater region of more than 100 previously housed residents whose needs for services and supports will overwhelm the City's social, medical, and emergency services. The loss of CoC supported housing will fall directly on the City with severe financial and social consequences. To the extent the City can redirect resources to fill the federal funding gap, it would mean making difficult trade-offs and reducing funding for other vital City programs.

25. The 30% cap on Permanent Housing projects will also significantly impact the nonprofit subrecipient agencies who operate projects. The CoC's four largest grants are Permanent Housing projects that operate leasing projects. In these projects, the nonprofit subrecipients are the leaseholders and are required to enter into 12-month leases. This is different than projects with rental assistance funds where the program participant is the leaseholder. If funding is cut, agencies may be faced with significant financial obligations as they will still hold leases with no ability to request reimbursement. Additionally, the agencies work hard to develop trusting relationships with participants and may be forced to sever those relationships, disrupting years of trust and support, which could contribute to further marginalization of households who in many cases mistrust systems of care.

26. This 30% cap will destabilize the entire system of service provision that has been designed to meet the needs of the most vulnerable households in our community.

27. The publication of the NOFO this late in 2025, its compressed timeline, and the drastic changes it requires with little time to thoughtfully plan, disadvantages communities like the City that worked diligently to achieve HUD's policy priorities, across multiple administrations, of Housing First, reducing racial disparities in homeless services, preventing the criminalization of homelessness, and operating inclusive, low-barrier systems of care for people experiencing homelessness. The scoring criteria and overly prescriptive requirements of this NOFO require the CoC and applicants to rework years of planned programming or lose the stable source of federal funds the community has relied on since the 1990s. The compressed timeline gives the City little time to make any adjustments.

28. For example, the FY 2025 NOFO imposes threshold eligibility criteria that could result in HUD refusing funding due to the CoC's prior compliance with HUD requirements relating to addressing racial inequities or improving services to LGBTQ+ populations. The CoC acknowledges the need for a full continuum of comprehensive services to address the complex challenges of homelessness in our community and the CoC would benefit from new and expanded Supportive Services Only ("SSO") and Transitional Housing projects. However, the threshold criteria in place for these new projects fails to acknowledge the critical role of Permanent Housing in the continuum of services. It also fails to respect the expertise and autonomy of CoCs regarding their local context and of individuals to define their own personal identity and service preferences.

29. The CoC is working hard to collaborate productively with various stakeholders and partners in the community – including individuals in crisis, service providers, law

enforcement at local, state, university level, behavioral health outreach workers, library social workers, harm reduction programs, public health professionals, public works, faith community, court system, and the business community – to respond to the complexities of homelessness in our community. The challenges of working to address the myriad challenges of encampments, in particular, are difficult and require strong partnerships with the full range of the community. This is an issue that the CoC continuously works to improve. The NOFO's prescriptive requirements to criminalize homelessness will slow down progress to meaningfully tackle these challenges in a manner that respects the local values, environment, and respect for human dignity.

30.     When HUD has previously implemented policy changes, it has done so gradually, recognizing that significant policy changes cannot responsibly happen overnight. This has given CoCs an opportunity to work within the local context to thoughtfully plan and adopt new policies and programs that work at the local level. The scale and scope of the changes contained in the 2025 NOFO disrupt and do not support CoCs, and the impacts will be harmful for the residents of Permanent Housing projects, project operation by nonprofit subrecipients, the emergency shelter system that is already at capacity, and the entire system of care designed to address the crisis of homelessness in the community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of November, 2025

Elizabeth Mengers Magargee