# DECLARATION OF APRIL CALVIN

I, April Calvin, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of Tennessee. This declaration is based on my knowledge, professional education and experience, and review of relevant records. I am over the age of eighteen and suffer from no legal incapacity.

2. I am the director of the Office of Homeless Services ("OHS") for Nashville. In this role, I provide leadership in collaboration with the Mayor, Metro Council, Metropolitan Development and Housing Agency, and the Homelessness Planning Council. My responsibilities include overseeing OHS's role as Homeless Management Information System ("HMIS") Lead. The HMIS system is the critical database that holds unduplicated client data for over forty-five agencies serving Nashville's homeless population. The data is used for strategic planning, coordinating services, and analyzing highest and best use of funds, as well as generating certain reports required by HUD. OHS also serves as Coordinated Entry ("CE") Lead, prioritizing service delivery for specific vulnerable populations as identified by HUD. And as the Collaborative Applicant for the Nashville-Davidson County Continuum of Care ("Nashville CoC"), OHS plans, coordinates, monitors, trains, and educates the Nashville CoC regarding best practices as identified by HUD.

3. The Nashville CoC is made up of one-hundred twenty-eight community partners that work together to end homelessness in Nashville and Davidson County by addressing the recovery and supportive service needs for people experiencing homelessness.

4. I am responsible for all OHS grant applications, including the Continuum of Care Competition and Youth Homeless Demonstration Program Grants ("CoC Grant"). OHS manages

the local competition process and communicates the requirements and procedures to the nonprofit recipients of CoC Grant funds. OHS completes and submits the application for the CoC Grant.

5. Metro Nashville relies on CoC Grant funds as one of its primary sources to address homelessness in the community. For 2024, CoC Grant funds went to ten funded agencies of the Nashville CoC. Throughout 2024, 10,874 people experienced homelessness in Nashville Davidson County, according to the HMIS shared database. Of those 10,874 people experiencing homelessness, 1,947 people across 1,065 households, including 488 people experiencing chronic homelessness, 866 people with disabilities, 846 children, and 489 survivors of domestic violence were served by CoC funding. Additionally, in 2024, 1,367 people across 666 households in Nashville Davidson County were housed by CoC funding. And in February 2025 alone, CoC funding helped provide $360,868.65 in rental assistance to 609 households.

6. A Notice of Funding Opportunity ("NOFO") was issued on July 31, 2024, for the CoC Grant covering both the 2024 and 2025 fiscal years (the "2024–25 NOFO.") The 2024–25 NOFO stated that successful applicants for 2024 funding would not need to submit a new application for FY 2025. OHS submitted an application on October 29, 2024. In preparing this application as well as budgeting and planning for projects, OHS relied on HUD's statement that a new application would not be required for the FY2025 and advised its CoC members accordingly.

7. The Nashville CoC was awarded $11,846,313 from the 2024–25 CoC Grant for FY 2024. In keeping with historical practice, approximately eighty-seven percent of those funds have been directed towards Permanent Housing.

8. Permanent Housing means community-based housing without a designated length of stay and includes both Permanent Supportive Housing and Rapid Rehousing. In Permanent Housing, the program participant must be the tenant on a lease for a term of at least one year, that

is renewable for a term that is a minimum of one month, and that is terminable only for cause. Permanent Supportive Housing means permanent housing in which supportive services are provided to assist homeless persons with a disability to live independently. This includes housing subsidies paired with stabilization case management. Rapid Rehousing means short-term and medium-term rental assistance and supportive services for those experiencing homelessness with or without a disabling condition. In Davidson County, there are currently 826 people in Permanent Housing, including 302 children, 436 disabled persons, 220 survivors of domestic violence, 80 who are sixty-five or older, and 23 veterans.

9. Our focus on Permanent Housing has yielded overwhelmingly positive results. For example, seven encampments across Davidson County have closed over the course of the last four years. Those encampments had a total population of approximately five hundred residents, with the average resident having been homeless for five years or more. The majority of those residents are currently in permanent housing. Only twelve percent returned to unsheltered homelessness. Additionally, over the past three years Nashville's homeless population's mortality rate has decreased by forty-five percent.

10. As one example of how CoC Grant funds are used, in 2024, CoC member Metropolitan Development and Housing Agency ("MDHA") received $3.3 million directly from HUD for the Shelter Plus Care voucher program. That HUD initiative targets people with chronic disabling conditions who are also experiencing chronic homelessness. MDHA uses CoC Grant funds to subsidize rent through vouchers, and other non-profit organizations provide ongoing wraparound supportive services. MDHA currently provides vouchers to more than 320 clients.

11. HUD has long prioritized a "Housing First" approach. As exemplified by the 2022, 2023, and 2024–25 CoC Grant NOFOs, the Housing First approach "prioritizes rapid placement

and stabilization in permanent housing." And adopting a Housing First approach historically has been a way to earn points toward funding opportunities. The Nashville CoC includes ongoing wraparound supportive services as part of its Permanent Housing plan.

12. These NOFOs have also asked applicants to demonstrate a commitment to reducing racial disparities in homeless services and offering inclusive services. Indeed, applicants who could show compliance with HUD's stated priorities were awarded points toward funding opportunities. For example, the Nashville CoC identified its Equity and Diversity Committee that had focused on these concerns since 2020. Nashville's CoC Grant awards have only increased since that time.

13. On November 13, 2025, HUD issued a 2025 CoC Grant NOFO. With virtually no advanced notice, this NOFO violates the commitments HUD made that we would not have to go through another scoring process and that Nashville CoC members could rely on FY 2024 funding commitments.

14. The 2025 NOFO requires the Nashville CoC to cap the amount of funding for Permanent Housing projects at 30% of its Annual Renewal Demand ("ARD"). For the Nashville CoC, this means that the maximum amount it can apply for in Permanent Housing projects is approximately $3,414,184, or approximately $8.4 million less than it received for FY 2024.

15. Should the Nashville CoC be limited to a 30% renewal for Permanent Housing funds, it is inevitable that a large number of clients currently in Permanent Housing will lose years-long safe, stable housing. Given that these clients experience a disability of some kind—as required for program participation—they would be at a high risk of returning to unsheltered homelessness. Indeed, clients who are currently in subsidized Permanent Housing would not qualify for transitional housing programs unless they first return to homelessness.

16. Additionally, Nashville CoC members have invested significant time and effort to develop relationships with clients. Having to sever those relationships would not only have the immediate effect of taking away safe, stable housing, but would also poison future efforts to help a marginalized population who often distrust systems of care.

17. Nashville CoC members have also invested significant time and effort to develop relationships with partners in the community. CoC members work with one-hundred sixty-four landlords to use CoC Grant funds to pay four-hundred fifty-seven leases. A large reduction in the program likely would make it more difficult to find willing partners in the future, as these landlords would not receive the incentives needed to reduce housing barriers for our unhoused population.

18. Further, the 30% cap will significantly affect the members of the Nashville CoC. If funding is cut, members may face significant financial obligations with no ability to request reimbursement. To illustrate this impending funding problem, CoC Grant awards fund forty-three staff positions across the Nashville CoC.

19. The 2025 NOFO also has significant other drastic changes from prior NOFOs and practice. For example, it abandons the Housing First model mandated by prior NOFOs. It requires forced participation in treatment and other supportive services, in some cases up to 40 hours per week. The 2025 NOFO states that HUD will reject a project if there is evidence that the CoC has previously or currently engaged or engages in "racial preferences or other forms of illegal discrimination" or engaged or engages in activities that "rely on or otherwise use a definition of sex other than as binary in humans." The 2025 NOFO also includes scoring factors tied to the extent to which existing projects require service participation and the existence of state or local laws that cover the CoC's entire geographic area that prohibit camping. As a result of these changes, the Nashville CoC's compliance with past HUD requirements regarding racial equity,

respect for an individual's gender identity, and other Housing First principles could be viewed as a basis for refusing funding.

20. All these changes are radical policy shifts that are unprecedented. Further, HUD has set a compressed application timeline. Complying with such drastic and abrupt changes on that compressed timeline would require CoC Members to rapidly create and implement new programs, which itself would require additional expense of both money and time.

21. HUD has set an application deadline of January 14, 2026, sixty days from the release of the 2025 NOFO. In previous years, at least ninety days were given to complete the application process. And that ninety-day schedule did not require drastic, fundamental program changes.

22. OHS is responsible for managing the competition to evaluate, select, and rank projects to prioritize for CoC funding. Under the 2025 NOFO, CoC members seeking CoC Grant funds must submit applications to the Collaborative Applicant a minimum of 30 days prior to January 14, 2026, that is, December 15, 2025. But given local and state laws governing approval processes and open meetings, the local competition may close sooner.

23. OHS has been forced to divert staff and resources from other important work in order to complete the application process. For example, resources that would have staffed Nashville's Emergency Overflow Cold Weather Shelter instead must be diverted to completing the application on a compressed schedule. OHS is faced with completing this work over the Thanksgiving, Christmas, and New Year's holidays. Even without the interruption of the holidays, it would be virtually impossible to complete this process with the due diligence previously undertaken.

24. And Nashville CoC members had no warning of—and thus no time to prepare for—such change. This is particularly concerning given that, according to the 2024–25 NOFO, projects throughout that two-year period would be based on the same scoring metrics; that is, funding for this year's projects would be based on last year's scores. Some current recipients who have developed and refined successful, evidence-based programs will be unable to certify their compliance with new award conditions or will be otherwise ineligible or non-competitive; some will choose not to apply; and some will be unable to overhaul their programs within this short window. The CoC will lose the benefit of experienced partners, and its ability to provide stable services with continuity for its vulnerable community members will be compromised.

25. And even under the new funding scheme, awards are not scheduled to be announced or issued until May 2026. But that is too late for some members of the Nashville CoC. For example, Nashville CoC member Safe Haven Family Shelter, which provides Rapid Rehousing and served 377 people in 2024, has a period of performance that ends on January 31, 2026. Member Urban Housing Solutions, which provides Permanent Supportive Housing and served 119 people in 2024, has a period of performance that ends on April 30, 2026. The impacted members of the Nashville CoC would have to end housing assistance or risk moving forward without reliable funding.

26. If the Nashville CoC cannot reconfigure its entire housing crisis system to comply with the 2025 NOFO requirements and priorities on a compressed timeline, it risks losing all CoC Grant funding. That would be detrimental to its clients. Such a result would cause Nashville to suffer significant impacts on its ability to serve the homeless community.

27. One likely result is that the vast majority of Permanent Housing would go away. This would be especially detrimental to those in Permanent Supportive Housing, as each of them has some disabling condition, a program requirement. As a result, this population needs a high

level of intervention. Indeed, as CE Lead, we have identified this population as highly vulnerable based on HUD's previously recommended standard. It is likely that this population would have great difficulty finding new permanent housing, meaning people will be forced into shelters or out on the street. That, in turn, would increase the strain on the whole system. Shelters would likely have more demand than they could accommodate.

28. OHS does not have time to seek funding from alternative sources. Nashville's budget is fixed for the fiscal year ending June 30, 2026. Having relied on federal funding for these housing programs as well as HUD's representations regarding the 2024–25 NOFO, OHS will be unable to make up the difference.

29. OHS has not sought alternative funding to support the HMIS database software or CE activities and staffing. The HEARTH Act of 2009 requires all communities to have an HMIS with the capacity to collect unduplicated counts of individuals and families experiencing homelessness. The denial of federal funding would hinder the ability of Nashville to collect the necessary data to ensure that individuals and families experiencing homelessness are properly accounted for, to inform policy and decision making, and to perform needs analyses and establish funding priorities.

30. Partner organizations would also be significantly impacted by a denial of federal funding. Nashville CoC members would have to purchase their own license to access the HMIS database at significant cost. Furthermore, without funding for the HMIS shared database and CE, the ability of Nashville CoC members to serve the homeless population would be significantly hampered. Federal law requires the CE Lead to make referrals for supportive services. Funding for the HMIS shared database and CE are essential for CoC infrastructure and to ensure that

individuals and families experiencing homelessness or at risk of homelessness receive referrals for the supportive services they need.

EXECUTED November 25, 2025.

_____
April Calvin