**<u>DECLARATION OF COUNTY OF SANTA CLARA DIRECTOR FOR OFFICE OF SUPPORTIVE HOUSING KATHRYN J. KAMINSKI</u>**

I, KATHRYN J. KAMINSKI, declare as follows:

1.      I am a resident of the State of California. I have personal knowledge of all facts stated in this declaration, and if called to do so, I could and would testify to them competently under oath.

2.      I am the Director of the County of Santa Clara Office of Supportive Housing (OSH or the "Department"), a position I have held from August 18, 2025, to present. Prior to this position, I served as Acting Director from July 2024 until August 2025 and as Deputy Director of OSH for four years, overseeing OSH's contracts and grants team, fiscal team, Continuum of Care (CoC) team, and the supportive housing system, which encompasses services including emergency shelter, short-term financial assistance to quickly prevent or lift households out of homelessness, interim and transitional housing, rapid rehousing, and permanent supportive housing. Prior to serving as Deputy Director, I served as the CoC Quality Improvement Manager for approximately three years, overseeing the county-wide CoC efforts including policy development and implementation, system performance measurement, the CoC collaborative application, and federal grant compliance. Prior to becoming employed with the County of Santa Clara, I worked from January 2015 to September 2017 as a Development Officer for the City of San José Housing Department, where I managed HUD grants such as the Community Development Block Grant (CDBG), Emergency Solutions Grant (ESG), and Housing Opportunities for People with AIDS (HOPWA) programs, including compliance with federal regulations, budgeting, reporting, contract development, subrecipient management and monitoring, and program evaluation. Prior to employment with the City of San José, I was employed from September 2011 to December 2014 as a Senior Associate at TDA, Inc., a

national consulting firm, where I provided training and technical assistance to grantees receiving federal funding from HUD. Overall, I have fourteen years of experience with a broad variety of activities relating to grant management and program oversight for HUD-funded programs.

3.      In my role as Director of OSH, I oversee the Department budget, the administration of all grants and contracts, delivery of services, and management of the County's affordable housing loan portfolio.

## Background on OSH and the CoC Grant Program

4.      OSH's mission is to increase the supply of housing and supportive housing that is affordable and available to extremely low-income and/or special needs households. OSH supports the County of Santa Clara's mission of promoting a healthy, safe, and prosperous community by working to end and prevent homelessness.

5.      Since the late 1980s, government agencies and community-based organizations in Santa Clara County have partnered to address the needs of homeless individuals and families. In 1992, these organizations formed the Santa Clara County Collaborative on Affordable Housing and Homeless Issues (the "Collaborative"), an unincorporated association. In addition to improving coordination and services, the Collaborative was formed to meet the 1995 HUD requirement that all communities submit a collective application for HUD CoC funds.

6.      From 1992 to 2013, the Steering Committee of the Collaborative served as the governing board for administration of CoC program funds and as the primary entity for planning and coordinating homeless services.

7.      In 2013, regional local governments, non-profit housing leaders, and other stakeholders came together to reorganize the structure of the Santa Clara County Continuum of Care ("Santa Clara County Continuum" or the "Continuum") to improve regional coordination of

federal, state, and local resources toward reducing homelessness in the county. Through this process, OSH was designated as the Collaborative Applicant on behalf of the Santa Clara County Continuum. The role of the Collaborative Applicant is to submit the annual application to HUD for CoC Program funds on behalf of all grantees in the Continuum's geographic area, and to administer the CoC to ensure that the operation of the Continuum and use of grant funds meet HUD's requirements. The Continuum's collaborative application includes project applications from the County of Santa Clara and on behalf of non-profit organizations that receive their CoC grant funds directly from HUD.

8.     A large portion of CoC funding for which the County of Santa Clara is the recipient supports rental assistance and/or case management for residents of Permanent Supportive Housing (PSH) programs, which provide services such as case management and clinical, educational, vocational, and housing services to help chronically homeless households obtain and keep their housing. The rental assistance and case management services supported through HUD CoC project grants are provided to residents of PSH developments throughout the county. Case management matches clients to the services and resources they need to remain stably housed.

9.     In addition to PSH programs, a significant portion of CoC funding in Santa Clara County supports Rapid Rehousing (RRH) programs, which provide time-limited rental assistance for up to two years, paired with supportive services such as case management and clinical, educational, vocational, and housing services to help individuals and families in Santa Clara County exit homelessness and return quickly to permanent housing. RRH is a key component of the Santa Clara County Continuum's response to homelessness because it connects people to housing as quickly as possible by providing rental assistance and other supportive services like

housing search and case management for up to two years.

10.     As of the last "Point-in-Time Count" in 2025,[1] over 10,000 individuals in Santa Clara County were experiencing homelessness, but the true number is most likely higher. The individuals and families served by these CoC grants are some of the most vulnerable residents of the county. Many struggle with psychiatric conditions, chronic health problems, mental health and substance use disorders, family trauma, and other challenges, and require additional and ongoing case management support and services in order to help ensure that they maintain housing stability. The households served by CoC grants are as diverse as the population of Santa Clara County as a whole and include veterans, seniors, survivors of domestic violence, families with children, former foster youth, and people with disabilities.

11.     CoC funding for PSH and RRH programs supports rental subsidies and services that have been critical to assisting thousands of residents in not only resolving their homelessness but also achieving housing stability. The housing case management provided with CoC funding includes building life skills such as—and assisting with—applying for housing and jobs, paying rent and utilities, and connecting to food resources and other basic needs. Housing vouchers and rental subsidies do not cover the entire amount of rent; thus, these services are essential for supporting residents to create a plan to cover their portion of the rent and to stay housed. Case managers also support residents with the annual voucher renewal process and assist tenants in interactions with their landlords. CoC funds are also used to provide or connect residents to mental health and substance use treatment services, financial literacy tools, health insurance and

---

[1] The Point-in-Time Count is a bi-annual census of sheltered and unsheltered people experiencing homelessness on a single night in January. As a condition of funding, HUD requires Continuums to conduct this annual count, as well as an inventory of beds and housing units that serve people experiencing homelessness. Continuums must submit this data to HUD. *See* https://www.hudexchange.info/programs/hdx/pit-hic/#2025-pit-count-and-hic-guidance.

healthcare, and job training. While housing vouchers make housing affordable for individuals and families in CoC-funded programs, the supportive services are critical in assisting households in stabilizing their housing, meeting their basic needs, and improving their income and quality of life. Without these wrap-around services, households may be at risk of losing their housing vouchers/subsidies and their homes.

### The County Has Invested Significantly in Aligning Its Housing Programs With Longstanding HUD Policies

12.     The County has invested significantly in housing models that align with HUD's historical prioritization of PSH programs and alignment with the "Housing First" model through the CoC program competition. My understanding is that HUD and other federal agencies have long considered Housing First to be a best practice to address homelessness. For example, I am familiar with an issue brief by the National Low Income Housing Coalition and National Alliance to End Homelessness, attached hereto as **Exhibit 1**, which cites various federal government agency publications and policy documents showing that the Centers for Disease Control and Prevention, the Veterans Administration, and HUD each separately espoused Housing First principles as best practices to address homelessness. My understanding is that HUD began prioritizing the Housing First approach in the CoC program during the 2013 CoC Notice of Funding Availability (NOFA). In the same NOFA, HUD deprioritized Transitional Housing projects, stating that "recent research shows that transitional housing is generally more expensive than other housing models serving similar populations, it is often more service-intensive than most homeless households need, and that the criteria for entry into many transitional housing programs are so rigorous that transitional housing beds are under-utilized because homeless households cannot overcome the barriers to entry." Starting with the 2013 NOFA and in every CoC funding opportunity since 2013, new Transitional Housing projects

have not been eligible for CoC awards. This shifted abruptly in HUD's Fiscal Year 2025 Notice of Funding Opportunity ("FY 2025 NOFO"), which allows new Transitional Housing projects to be included in the CoC application.

13.　Housing First is a model that pairs housing support with substantial supportive services designed to help residents successfully maintain their housing and increase self-sufficiency. It is evidence-based and supported by numerous studies that consistently show that people are more likely to maintain their housing and avoid returning to homelessness in Housing First programs than in Treatment First programs, which require participants to be treated for underlying conditions, such as substance use and/or mental health issues, before receiving permanent housing. I am familiar with a policy brief entitled "Housing First: A Review of the Evidence" published by HUD in Spring/Summer 2023, attached hereto as **Exhibit 2**. As this policy brief explains, research has shown that Housing First programs improve housing stability and reduce homelessness more effectively than Treatment First programs.[2] In addition, Housing First provides flexibility to address the needs, goals, or challenges each program participant may have, and to work with residents to address any issues that arise to avoid returning to homelessness. Santa Clara County's local data demonstrate the effectiveness of this model, with 95% of households in Housing First–based PSH programs maintaining their housing for at least 12 months.

14.　HUD's prioritization of permanent housing programs that are implementing the Housing First model enabled the Santa Clara County Continuum to increase its annual CoC

---

[2] The HUD policy brief cites numerous peer-reviewed papers, such as Yinan Peng et al., *Permanent Supportive Housing With Housing First to Reduce Homelessness and Promote Health Among Homeless Populations With Disability: A Community Guide Systematic Review*, 26(5) J. PUB. HEALTH MGMT. PRAC. 404 (2020), available at https://pubmed.ncbi.nlm.nih.gov/32732712/.

award from less than $11 million in 2010 to nearly $50 million in 2024, largely for renewal projects that the Continuum has been able to stably fund year after year. During that same period, the Santa Clara County CoC awards for permanent housing programs—which comprise the bulk of the total award—increased from approximately $7.8 million in 2010 to over $44 million in 2024. As explained in more detail below, this investment has allowed the Continuum to significantly grow its capacity to permanently house homeless individuals and families over the years, although the number of households entering homelessness has simultaneously increased—primarily due to the rising cost of housing, which research has shown is the key driver of homelessness across United States.[3]

## HUD's Two-Year FY 2024-2025 NOFO

15.     The Consolidated Appropriations Act of 2024 authorized HUD to release a single two-year Fiscal Year 2024 and Fiscal Year 2025 Notice of Funding Opportunity ("FY 2024-2025 NOFO").

16.     On October 30, 2024, as the Collaborative Applicant on behalf of the Santa Clara County Continuum, OSH submitted its application to HUD for the FY 2024-2025 NOFO.

17.     Awards for the FY 2024-2025 NOFO, which HUD announced in January 2025, included over $47 million in grant funding for the Santa Clara County Continuum. The County of Santa Clara was the direct recipient for $33 million of that amount.

18.     Attached hereto as **Exhibit 3** is a true and correct copy of HUD's summary report reflecting all 20 of the CoC grants awarded through HUD's FY 2024-2025 NOFO for which the

---

[3] Gregg Colburn and Clayton Page Aldern, *Homelessness is a Housing Problem: How Structural Factors Explain U.S. Patterns* (Mar. 2022), https://homelessnesshousingproblem.com/. Colburn and Aldern's research showed that communities with high levels of homelessness all had high housing costs and tight rental markets. There was no correlation between high levels of homelessness and other factors they studied, such as mental health, substance use, or poverty.

County of Santa Clara is the direct recipient.

19.     The County of Santa Clara has used these grant funds to deliver services through staff at the Office of Supportive Housing and subcontracts with non-profit service providers selected through competitive procurements.

20.     Many of the grant awards under the FY 2024-2025 NOFO for which the County of Santa Clara is the recipient are renewals that have been ongoing for several years through different federal administrations. Under the terms of the FY 2024-2025 NOFO, all of the County's renewal grants were eligible for renewal in 2025 without needing to undergo a new competition.

**HUD's FY 2025 NOFO Presents Significant Issues and Challenges for the Santa Clara County Continuum**

21.     On November 13, 2025, HUD changed course and released a FY 2025 NOFO to initiate a new funding competition among CoCs.

22.     The FY 2025 NOFO imposes a series of changes, including but not limited to a 30 percent cap on renewal projects for PSH, RRH, and Joint Transitional Housing-RRH renewal projects; significant shifts in policy priorities, including a turn from Housing First strategies and toward mandatory treatment services; new threshold application certifications regarding use of "harm reduction" practices, past or present engagement in "racial preferences or other forms of illegal discrimination," and use of "a definition of sex other than as binary in humans"; unrealistic changes to Merit Review scoring; vague Risk Review criteria; and post-award conditions that span a variety of subjects, ranging from "Gender Ideology" to "harm reduction" practices.

23.     In my own experience, I am not aware of HUD ever having made changes to the CoC program this abruptly and without the opportunity for Continuums to prepare for and

respond to the changes. In past years, when HUD has considered significant changes to the CoC program, it has either tested those changes through a demonstration program, such as the Youth Homelessness Demonstration Program, which allowed grantees to apply for waivers to test new strategies or models; signaled upcoming changes months ahead of time; or implemented changes incrementally over time. No changes that I have seen have been as significant as those announced in the FY 2025 NOFO.

24.     The short timeline between the NOFO announcement and the January 14, 2026, deadline to submit a consolidated application to HUD makes it especially difficult to understand, plan for, and implement the proposed changes effectively, particularly when several of the County's CoC grants will expire before or shortly after the 2025 awards are expected to be announced on May 1, 2026. The CoC requirement to hold a local competition requires Continuum staff and partners to review the NOFO; design a competition that will be responsive to HUD's new policy priorities, eligibility requirements, and evaluation criteria; implement the local competition; and write and submit the collaborative application to HUD. Under the current compressed timeline, Continuums have until December 30, 2025, to notify all of the project applicants whether they will be accepted, rejected, or reduced. By January 14, 2026, Continuums must submit a consolidated application to HUD. Under normal circumstances, the Santa Clara County Continuum plans for the competition months in advance of the release of the NOFO, based on the fact that HUD has not made significant changes in past years without prior notice. In years with few changes, Continuums could utilize processes and materials already developed that had been effective in ranking local projects and responding to HUD's priorities. The abrupt shift in priorities and policy changes necessitate an entirely revamped local competition to respond to the FY 2025 NOFO. Every year, OSH, as the Collaborative Applicant, provides

workshops and technical assistance to current grantees and new applicants. The short timeline and significant changes will result in fewer opportunities to educate local partners about the new requirements.

25.     HUD's delay in providing e-snaps guidance further adds to the challenges for CoCs to prepare for the competition. As of the morning of the date of this declaration, HUD has not yet released e-snaps guidance or made project application forms available in e-snaps. *E-snaps* is the electronic CoC Program Application and Grants Management System that HUD's Office of Special Needs Assistance Programs uses to support the CoC Program funding application and grant awards process. Based on my experience with the e-snaps application process, the forms will need to be redesigned to reflect the substantial changes in the FY 2025 NOFO. Potential applicants are currently unable to view the new forms to prepare project applications.

26.     In addition to the major policy shifts and compressed timeline, there are multiple requirements included in the FY 2025 NOFO that are not relevant to the evaluation or eligibility of the programs that could be funded. For example, the NOFO states that awards will not be used to fund any project, service provider, or organization that "operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'" In Santa Clara County, housing programs do not operate drug injection sites or otherwise engage in these activities. I am not aware of any CoC-funded housing program in the nation that co-locates drug injection sites with housing or permits the use or distribution of illicit drugs at a housing site. But, confusingly, the NOFO also variously phrases this requirement as being that either "the project applicant" or "the

project" must not carry out these activities. Even with the many years of experience I have in working on HUD grant management, it is not clear to me if this requirement is limited to activities supported by CoC funds. Instead, it might disqualify a project applicant if those activities are carried out *anywhere* in its entire organization—even if in a context unrelated to housing programs and not funded by CoC funding.

27. The FY 2025 NOFO further states that awards will not be used to conduct activities that "subsidize or facilitate racial preferences or other forms of illegal discrimination." In addition, under the Project Quality Threshold, the NOFO states that HUD reserves the right to verify past performance and evaluate the eligibility of a project application if HUD finds evidence that the project has previously conducted or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination. The HUD Applicant and Recipient Assurances and Certifications (HUD-424B) also includes a new certification that the applicant will not use federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities the violate any applicable Federal antidiscrimination laws. It is not clear to me what activities within the context of providing housing programs would comprise "promoting" DEI.

28. The FY 2025 NOFO also states, under the Project Quality Threshold, that HUD reserves the right to verify past performance and evaluate the eligibility of project applications if HUD finds evidence that a project used "a definition of sex other than as binary in humans." This has the potential to eliminate all previously funded CoC projects from qualifying through the 2025 NOFO if an awardee had previously complied with HUD mandates. The 2024 Homeless Management Information System (HMIS) data standards, required by HUD for all CoC grantees, revised the responses for the "gender" field in HMIS to include "Non-binary" and "Culturally

Specific Identity (e.g., Two-Spirit)" and "Different Identity."

**The County's Reliance on the FY 2024-2025 NOFO**

29.     OSH depends heavily on the CoC grant program to fund critical housing subsidies and services to support individuals and families experiencing chronic homelessness. The County's partnerships with HUD, the State of California, local jurisdictions, and non-profits— and the coordination of these efforts through the Santa Clara County Continuum—have resulted in huge strides in meeting community needs to reduce homelessness, even amid unprecedented challenges. For example, from 2015 to 2019, the County's supportive housing system helped nearly 9,000 households move from homelessness to permanent housing and doubled both the number of supportive housing units and temporary shelter capacity. Since 2020, the County's supportive housing system has helped over 19,000 people move from homelessness to permanent housing.

30.     Of the grants that were awarded to the Santa Clara County Continuum from the FY 2024-2025 NOFO, 17 grants, amounting to approximately $30 million in funds, have terms that expire during calendar year 2026. These include grants for rapid rehousing for families and youth, and for housing case management for individuals with disabling conditions. As noted, under the terms of the FY 2024-2025 NOFO, I expected that these grants would be renewed. However, I now have serious concerns that these projects will be stripped of some or all of their CoC funding under the FY 2025 NOFO. Under the terms of the FY 2024-2025 NOFO, all of the County's renewal grants were eligible for renewal in 2025 without needing to undergo a new competition.

31.     Because so many of the County's HUD CoC grants are renewals, the County has ongoing obligations through established contractual relationships with service providers. My

understanding is that the purpose of the renewal process that HUD established was to create stability for permanent housing programs through the renewal process, recognizing that permanent housing programs require long-term funding and programmatic commitments from grantees. However, the process established by HUD allows for the reallocation of grant funding through the local competition process. Awards are not guaranteed as the CoC program is not an "entitlement" program. CoC project funding, including for some of the County's projects, has been reallocated when other projects demonstrated stronger outcomes. Additionally, because the dates of HUD's awarded grant terms do not line up with the County's fiscal calendar, each year the County enters into a number of service agreements that begin on July 1, the beginning of the County's fiscal year, with the expectation that HUD CoC grant funds that were included in HUD announcements of awarded projects will be forthcoming.

32. The abrupt abandonment of the two-year FY 2024-2025 NOFO has put the County in a very difficult position. The County entered budget planning with the understanding that, once HUD decided to issue a two-year FY 2024-2025 NOFO, the funding awarded under the NOFO would be processed for FY 2025 when Congress appropriated the funds, which occurred as part of the Continuing Resolution passed in March 2025. The County's fiscal year runs from July 1 through June 30. CoC grants have varying operating periods that span across County fiscal years. The County has entered into contracts with subrecipients for the County's fiscal year 2025-2026 period (July 1, 2025 to June 30, 2026) to provide CoC-funded services based on its expectation that FY 2024 CoC awards would be renewed for the FY 2025 CoC period, as the two-year FY 2024-2025 NOFO announced. Therefore, the County's contracts for its fiscal year 2025-2026 are based on the expectation that the County would receive CoC funding for both the FY 2024 and the FY 2025 CoC periods.

33.     In reliance on HUD's CoC grant award announcement in January 2025, the County had to budget for all of its awarded funds for subcontracts with service providers to deliver the CoC programs. The County has entered into subcontracts with service providers obligating more than $27.6 million in FY 2024-2025 HUD CoC grants. Four of the County's CoC grants have awards issued under the FY 2024-2025 NOFO that will expire prior to the end of the County's fiscal year (June 30, 2026). The County has executed agreements through the end of the fiscal year and included a portion of the FY 2025 renewal grant award. This obligation is approximately $1.5 million in CoC funding.

34.     The County has also invested heavily in its grants awarded under the FY 2024-2025 NOFO through its required matching contributions, which include matching funds from the County General Fund, and housing vouchers (in partnership with the Santa Clara County Housing Authority).

35.     In total, the FY 2024-2025 HUD CoC grants for which the County of Santa Clara is the direct recipient provide supportive services and/or rental subsidies to more than 1,500 households annually, including chronically homeless individuals and households and individuals with disabilities.

**Irreparable Harm from the FY 2025 NOFO**

36.     The FY 2025 NOFO threatens to deprive the County of Santa Clara of substantial funding for its unhoused population.

37.     I am concerned that the various conditions and certifications imposed by the FY 2025 NOFO may preclude the Santa Clara County Continuum from funding any of its projects. The threshold application certifications alone could prevent Santa Clara CoC from getting its application approved. The threshold certification allows, for example, HUD to "reserve[] the

right to verify past performance and evaluate the eligibility of a project application . . . for . . . evidence that the project has previously or currently . . . use[d] a definition of sex other than as binary in humans" or "conduct . . . activities under the pretext of 'harm reduction.'" The Santa Clara County Continuum has complied with HUD's 2024 HMIS data standards, which require the Continuum to collect data on diverse gender identities. It appears that, under the terms of the FY 2025 NOFO, HUD could attempt to disqualify the Continuum's projects because of this past compliance. In addition, I am aware that the County's Public Health Department provides limited services that could fall within the definition set forth in the "harm reduction" certification. However, these services are not operated by OSH or funded by HUD, nor are they directly connected to any housing, outreach, or supportive services programs supported by HUD funds.

38.     The human cost of this potential loss of funding would be significant. Thousands of Santa Clara County residents who are experiencing or are at risk of homelessness rely on these CoC-funded programs. In total, as of October 2025, the Santa Clara County CoC grants providing permanent housing were serving over 2,600 people, including over 2,025 adults and 570 minor children. People housed in these programs include 846 seniors, 1,283 people with mental health disorders, 770 people with chronic health conditions, 347 people with developmental disabilities, and 756 people with physical disabilities. All households in PSH programs have a disabling condition, as the eligibility for PSH programs has included a requirement that people served have a disabling condition that "is expected to be long-continuing or of indefinite duration and substantially impedes the individual's ability to live independently." In fact, HUD requires that CoC programs "must, to the maximum extent feasible, ensure that people with more severe service needs and levels of vulnerability are prioritized for housing and

homeless assistance."

39.     The loss of CoC funding would likely result in participants of these programs losing their housing and being unable to access services they have relied on to achieve and maintain stability and independence. Loss of housing interventions such as RRH would also increase the burden on the County's emergency shelter/temporary housing programs and other safety-net programs because, without access to rental assistance, the households are more likely to become homeless or chronically homeless.

40.     The FY 2025 NOFO's 30 percent cap on PSH and RRH renewal, in particular, is detrimental to the County due to its significant investment in such programs, which are an integral component of the County's supportive housing system. As of October 2025, grants awarded to the Santa Clara County Continuum for these renewals were collectively serving 1,450 households (1,843 total people) in PSH programs and 325 households (754 total people) in RRH programs. And, according to the County's 2024 annual report on the Supportive Housing System, our system helped connect nearly 17,500 individuals to permanent housing between 2020 and 2024, including serving 5,514 individuals through RRH (74% of whom remained housed following this intervention) and 3,789 individuals through PSH (95% of whom remained housed following this intervention). Both forms of housing are now disfavored by HUD under the FY 2025 NOFO.

41.     I understand that, if the FY 2025 NOFO stands as is, the County faces the potential loss of up to $33 million in funding for rental assistance, supportive services, and case management to serve thousands of Santa Clara County residents. The Santa Clara County Continuum as a whole faces a potential loss of nearly $48 million in funding.

42.     While the County leverages a combination of federal, state, and local funds

toward its homelessness response, CoC funding represents approximately 37.4% of the County of Santa Clara's entire PSH and RRH program budget. Beyond slashing more than a third of our budget, the loss of this funding would ripple through our entire system and undermine decades of efforts to end homelessness in our community. The abrupt shift from permanent housing programs to short-term transitional housing and outreach/support services–only programs would undoubtedly increase homelessness and put a strain on our local temporary housing/shelter system. Local data show that, for most households, temporary housing programs alone are not enough to end their homelessness. In 2024, only 22% of those served in temporary housing in Santa Clara County went on to permanent housing—with the other 78% either remaining in shelter or returning to the street or their vehicle. Of the individuals and families who successfully exited temporary housing to permanent housing, 50% did so with the support of a housing subsidy (PSH, RRH, or another housing subsidy). Without these critical resources, unhoused people in our community would remain in shelters or live in their vehicles or encampments for longer periods of time, and the number of people experiencing street homelessness would increase.

43.     Without the HUD CoC grant funds, the County would be forced to choose between redirecting County General Funds away from other services and programs—not just housing-related, but in other critical County service areas such as public health, public safety, and social services—to try to make up for the loss and maintain this baseline level of service, or to consider dramatically cutting the programs, which would certainly lead to higher rates of homelessness and strains on other parts of the County's supportive housing system and other County safety-net programs.

44.     The County, like entities across California and the nation, is facing budget deficits

that seriously strain the County General Fund resources the County has available to fund programs if longstanding federal grant funds are cut off. To meet the County's obligation to deliver a balanced budget, County departments, agencies, and executive leadership made very difficult choices—including cutting programs, services, and staff positions—in the most recent fiscal year's Adopted Budget to close a $250 million budget deficit while maintaining critical services for the community. If the County were deprived of its CoC funding, it would struggle to sustain its CoC-funded services that serve homeless families with children; unhoused transition-age youth (ages 18–24); chronically homeless adults; and survivors of domestic violence, sexual assault, human trafficking, and/or stalking. With planning for the County's annual budget for the upcoming fiscal year, which begins on July 1, 2026 and runs through June 30, 2027, already well underway, a loss of the County's CoC funding would be a major and immediate disruption.

45.    In addition to the harms to the community, the loss of CoC funds would create operational harms. Under the CoC program, the Santa Clara County Continuum is required to have a Homeless Management Information System (HMIS), a software system for coordinating case management services and client information across homelessness assistance and service providers within the region. The County of Santa Clara manages the HMIS for the Continuum, including through $2.95 million in contracts with a software vendor, as well as OSH staff members providing administrative support and data analysis services. HMIS administration and licenses support data collection and analysis for many purposes, including prioritizing the most vulnerable homeless households and matching them to programs; reporting client outcomes for all homelessness services and programs as required for federal (including HUD) and state grants, as well as local funding partners; reporting system-wide performance measures as required by HUD and state grants; performing the annual homeless population count and housing inventory

as required by HUD; and conducting analyses to improve system performance overall to meet the needs of the population, evaluate program efficacy, and better understand our client population. Through the FY 2024-2025 NOFO, HUD renewed the County's $1.5 million grant for HMIS administration, which accounts for slightly more than 50% of the County's direct HMIS costs. Not only HUD but also the State of California require the maintenance of HMIS to meet grant requirements (including reporting requirements under those grants). Therefore, without this grant (which has a term beginning June 1, 2025), the County would be forced to redirect funding away from other programs and services toward HMIS in order to remain in compliance.

46.     Another grant renewed by HUD through the FY 2024-2025 NOFO would provide $1.5 million toward CoC planning and administration costs that are incurred by the County in doing work that is necessary for HUD grant compliance, such as developing the Community Plan to End Homelessness and providing technical assistance and training on CoC requirements to service providers. Thus, losing the CoC grants for HMIS and for CoC planning/administration would devastate the infrastructure that holds up the County's supportive housing system and create negative impacts that go well beyond just CoC-funded programs.

47.     The loss of CoC funds would also have a direct and deleterious impact on the County. CoC Grants currently fund approximately 20 full-time equivalent positions within OSH (approximately 14% of the Department). OSH's employees are incredibly dedicated public servants who are called upon to tackle one of society's most heartbreaking and intractable problems. Our staffing and resources already strain to meet the demand of serving the County's nearly 10,000 homeless residents. The loss of funding for these positions could mean that the Department is forced to make personnel and/or resource cuts, which would harm our ability to

administer contracts and grants, provide direct services to homeless clients, and manage programs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED at San José, California this 26th day of November, 2025.

Kathryn J. Kaminski

# EXHIBIT 1

# THE CASE FOR HOUSING FIRST





**H**ousing First is a proven model for addressing homelessness that prioritizes access to permanent, stable housing, linked with voluntary services as needed. Housing First recognizes that stable housing is a prerequisite for effective psychiatric and substance abuse treatment and for improving quality of life. Once stably housed, individuals are better able to take advantage of wrap-around services – to help support housing stability, employment, and recovery. Without stable housing, attaining these goals becomes much more difficult.

Because federal resources to address homelessness are scarce, it is critical that communities use these resources effectively to serve as many people as possible by investing in approaches like Housing First that have proven to be the most successful in getting people off the streets and into housing.

## THE EVIDENCE FOR HOUSING FIRST

Housing First rapidly ends homelessness, is cost-effective, and positively impacts quality of life and community functioning. This model is particularly effective among people who have been homeless for long periods of time and have serious psychiatric disabilities, substance use disorders, and/or other disabilities. Housing First results in higher rates of housing retention.

The Community Preventive Services Task Force (CPSTF), an independent panel of public health and prevention experts appointed by the director of the U.S. Centers for Disease Control and Prevention (CDC), recommends Housing First programs. The CPSTF recommendation is based on evidence from a systematic review of 26 studies, which found that Housing First programs decrease homelessness, increase housing stability, and improve quality of life for people experiencing homelessness. The CPSTF also found that the economic benefits exceed the intervention cost for Housing First programs; in fact, every dollar invested in Housing First programs results in $1.44 in cost savings.

Despite the clear benefits of Housing First, Congress has not funded long-term solutions at the scale necessary. To address homelessness, Congress should expand rental assistance to all eligible households, build and preserve homes affordable to people with the lowest incomes, and expand voluntary supportive services. Without this investment, more people are pushed into homelessness every day. For example, while 207 people experiencing homelessness secure housing every day in Los Angeles County, 227 people enter homelessness daily.

## EARLY EVALUATIONS

The Pathways to Housing program, one of the early versions of Housing First, has greatly informed the field of homeless services. Between 2000 and 2004, there were three major studies of the Pathways model in New York City. These initial studies found:

- A 2000 study found that after five years, 88 percent of Pathway participants remained housed, compared to only 47 percent of the residents in the control group.

- A 2004 study found that after 24 months, Pathways participants spent almost no time experiencing homelessness, while participants in the city's residential treatment program spent about a quarter of their time experiencing homelessness on average.

- A 2004 random assignment study found that homelessness programs that eliminated barriers to services, like Housing First, were more successful in reducing homelessness than programs where housing and services were contingent on sobriety and progress in treatment. When individuals were provided access to stable, affordable housing, with services under their control, 79% remained stably housing at the end of 6 months, compared to 27% in the control group.

- A 2004 long-term study found that participants in the Housing First model obtained housing earlier, remained stably housed after 24 months, and reported higher perceived choice than participants in programs where housing and services were contingent on sobriety and progress in treatment.

## MAJOR EVALUATIONS

There have been four randomized controlled trials, considered the "gold standard" of research designs, studying Housing First. These major studies found that Housing First resulted in large improvements in housing stability.

For example, Canada conducted a significant evaluation, encompassing five cities – Vancouver, Winnipeg, Toronto, Montreal, and Moncton – and over 2,000 participants, making it the world's largest study on Housing First. The study found:

- **Housing First rapidly ends homelessness.** Participants in Housing First rapidly obtained housing and retained their housing at a much higher rate than the treatment as usual group. After two years, 62% of the Housing First participants were housed the whole time compared to 31% of those who were required to participate in treatment prior to the receipt of housing.

- **Housing First is a good investment.** The economic analysis found some cost savings and cost offsets. Every $10 invested in Housing First services resulted in an average savings of $9.60 for high-needs participants and $3.42 for moderate needs participants. Significant cost savings were realized for the 10 percent of participants who had the highest costs at study entry; for these individuals, every $10 invested in Housing First services resulted in an average savings of $21.72.

- **Housing First can improve quality of life and other outcomes.** Having a place to live and the right supports can lead to other positive outcomes beyond those provided by existing services. Housing stability, quality of life, and community functioning outcomes were all more positive for participants in Housing First programs.

## RECENT STUDIES

Additional evaluations of Housing First have been completed in recent years. These evaluations found:

- **Housing First programs reduce homelessness, increase housing stability, and improve quality of life for people who are experiencing homelessness.** Evidence from a systematic review shows that Housing First programs more effectively reduce homelessness and improve housing stability for unhoused individuals. Housing First programs also lead to reduced hospitalization and use of emergency health departments by people experiencing homelessness. A 2021 study found that Housing First programs decreased homelessness by 88% and improved housing stability by 41%, compared to Treatment First programs. A recent study found that Housing First programs not only substantially reduced veteran homelessness, but also prevented a large increase in veteran homelessness. Both older and younger adults experiencing homelessness benefit from Housing First.

- **Housing First can lead to better treatment outcomes.** While an earlier study found no difference in treatment outcomes between Housing First and high-barrier programs, some more recent studies indicate that Housing First participants are more likely than others to report reduced usage of alcohol, stimulants, and opiates. A 2015 study found that Housing First programs are more effective at increasing outpatient service utilization, as well as outreach to and engagement of clients who are not appropriately served by the public mental health system. Critics' fears about increased substance use and psychiatric symptoms have not been supported by research findings.

- **Housing First can reduce healthcare and other costs.** A systematic review found that the economic benefits exceed the intervention cost for Housing First programs in the U.S., with societal cost savings of $1.44 for every dollar invested. The economic benefit due to the intervention is the combined savings from healthcare, emergency housing, judicial services, welfare and disability costs, and benefits

from increased employment. Studies also show that Housing First reduces hospital visits, admissions, and duration of hospital stays among homeless individuals, and overall public system spending is reduced by nearly as much as is spent on housing. The average cost savings to the public ranges from $900 to $29,400 per person per year after entry into a Housing First program.

## FEDERAL SUPPORT

HUD, the U.S. Interagency Council on Homelessness (USICH), and the U.S. Department of Veterans Affairs (VA) announced on January 26 that more than 140,000 people experiencing homelessness have been permanently housed using the Housing First approach through "House America," a national initiative to address the homelessness crisis. HUD and USICH helped 105 communities permanently house more than 100,000 households experiencing homelessness and add over 40,000 deeply affordable housing units to their development pipelines. Furthermore, the VA helped permanently house more than 40,000 veterans experiencing homelessness in 2022, exceeding by 6.3 percent the department's goal of housing 38,000 veterans.

The VA cites Housing First as a best practice and uses this approach in its HUD-Veterans Affairs Supportive Housing (HUD-VASH) program. Today, the HUD-VASH Program serves nearly 90,000 veterans using the Housing First model with 137 public housing authorities across the nation. Results from the 2022 Point-in-Time Count show an 11% decline in the number of veterans experiencing homelessness since early 2020, the biggest drop in veteran homelessness in more than five years.

The USICH and HUD cite Housing First as a best practice. In a 2016 memo, USICH urges local officials:

> "The U.S. Interagency Council on Homelessness (USICH) and HUD cite Housing First as a best practice. In its 2022 *Federal Strategic Plan to Prevent and End Homelessness*, USICH recommits the federal government to Housing First, referring to the model as "a proven solution that leads to housing stability as well as improvements in health and well-being."

HUD emphasizes the success of Housing First in its House America initiative, and in treating the most difficult category of homelessness:

> "Permanent supportive housing models that use a Housing First approach have been proven to be highly effective for ending homelessness, particularly for people experiencing chronic homelessness who have higher service needs. Studies such as HUD's "The Applicability of Housing First Models to Homeless Persons with Serious Mental Illness" have shown that Housing First permanent supportive housing models result in long-term housing stability, improved physical and behavioral health outcomes, and reduced use of crisis services such as emergency departments, hospitals, and jails."

For more information, contact Sarah Saadian, Senior Vice President of Public Policy at the National Low Income Housing Coalition, at ssaadian@nlihc.org, or Steve Berg, Vice President for Programs and Policy at the National Alliance to End Homelessness, at sberg@naeh.org.



**EXHIBIT 2**

HUD.GOV
U.S. Department of Housing and Urban Development

Archives
Disclaimer: Archived pages are no longer updated and may contain broken external links.

HUD USER HOME

# EVIDENCE MATTERS | Transforming Knowledge Into Housing and Community Development Policy

**Spring/Summer 2023**

**IN THIS ISSUE:**

**Housing First Works**
**Housing First: A Review of the Evidence**
**Housing First in Action**

## Housing First: A Review of the Evidence

### Highlights

- Several studies have found that, compared with the treatment first model, Housing First approaches offer greater long-term housing stability, especially among people experiencing chronic homelessness.
- Some studies have found that Housing First programs may also reduce costs by shortening stays in hospitals, residential substance abuse programs, nursing homes, and prisons.
- Research suggests that Housing First programs successfully house people with intersecting vulnerabilities, such as veterans and people with a history of substance abuse, mental illness challenges, domestic violence, and chronic medical conditions such as HIV/AIDS.

The early 1980s marked the beginning of what could be considered the "modern era of homelessness."[1] A sequence that included two severe recessions at the start of the decade, persistent inflation, and an economic shift marked by deindustrialization hit many central cities hard. This economic shift, along with the widespread deinstitutionalization of individuals experiencing mental illness, cuts to core programs at HUD and other agencies funding social services, and an inadequate supply of affordable housing facilitated a dramatic rise in homelessness. In central areas of many major cities, zoning changes prohibited the boarding houses and single-room occupancy buildings that had traditionally accommodated individuals at risk of homelessness, and rising property values made them redevelopment targets. Most notably, since the early 1980s, rents in metropolitan areas have increased steadily while wages have stagnated.[2] These

factors combined to change the frequency and nature of homelessness in America; a report from the National Academies of Sciences, Engineering, and Medicine notes, "The typical homeless person of the 1980s was younger (less than 40 years old), more impoverished, and had a higher burden of co-occurring medical, mental health, and substance use disorders than previous generations of persons experiencing homelessness."[3] For the first time, women and families appeared in significant numbers among those seeking assistance.[4] Previous typographies of those experiencing chronic homelessness as mainly poor, older alcoholic males or transient individuals unwilling to shackle themselves to the constraints of industrialized employment and modern society ("tramps" or "hobos") were fundamentally challenged by these developments.



Sam Tsemberis and his colleagues founded Pathways to Housing in New York City in 1992, allowing individuals experiencing homelessness to access housing and services with the only requirements that tenants pay 30 percent of their income toward rent by participating in a money management program and meet with a staff member at least twice a month.
*Photo courtesy of Allison Zapata*

In their study of the changing nature and demographics of homelessness in the 1990s, Kuhn and Culhane categorized homelessness into three temporal groups: transient (roughly 80% of those using a shelter), episodic (10% of all shelter users), and chronic (10% of all shelter users).[5] Individuals experiencing transient homelessness do so briefly and only once, often because of an acute disruption such as loss of employment or a costly medical event. Individuals experiencing episodic homelessness have repeated, albeit brief, shelter stays. The final group, individuals experiencing chronic homelessness, are the hardest to house, often because they have significant medical issues, disabilities, or unique service needs. Related studies from the same authors found that adults experiencing chronic homelessness disproportionately used the shelter system, accounting for 53 percent of all shelter days despite representing only 18 percent of all homeless individuals assessed in the study.[6] Stories about the disproportionate and costly use of hospital systems by individuals experiencing chronic homelessness were

further reinforced by media reports, especially Malcolm Gladwell's New Yorker story "Million Dollar Murray."[7] A 2010 report from the U.S. Department of Health and Human Services (HHS) found similarly that "the top 5 percent of hospital users — overwhelmingly poor and housing insecure — are estimated to consume 50 percent of health care costs."[8] Such chronically homeless individuals are more likely to have documented issues concerning substance use, mental health, trauma, and chronic medical conditions, including HIV/AIDS. Although this subpopulation of individuals experiencing homelessness is a minority of all individuals experiencing homelessness, this group is the most visible and is often a target of media coverage and political rhetoric.

The response to this contemporary rise in homelessness rates and the emergent, highly visible phenomenon of individuals experiencing chronic homelessness was a "treatment first" model — also frequently referred to as a "linear" or "staircase" model. In this model, individuals experiencing homelessness must be treated for underlying issues, such as addiction or mental health issues, before becoming eligible for independent, sustained housing. This model involves progression on a continuum of different types of assistance: emergency shelter, transitional living arrangements, and permanent housing.[9] Often, this meant that individuals entered highly regulated, congregate facilities; accessed relevant treatment services while stabilizing in this transitional program; improved in treatment; and became ready for independent, permanent housing. Those who relapsed or left the program at any point forfeited their opportunity for housing assistance. This system came to prominence during the 1990s, a period when many policymakers in the federal government were deeply concerned about increasing household self-sufficiency and minimizing dependence on government programs — perhaps best captured in the epigraph of the United States Interagency Council on Homelessness' 1994 strategic plan, in which President Clinton wrote, "Work organizes life." In other words, housing was available only to individuals experiencing homelessness who were willing to work for it.

Testing an alternate approach, Sam Tsemberis and his colleagues founded Pathways to Housing in New York City in 1992, allowing individuals experiencing homelessness to access scattered-site housing and assertive community treatment (ACT) services without requiring commitments to sobriety or treatment. Pathways to Housing's only requirements were, first, that tenants pay 30 percent of their income (usually Supplemental Security Income) toward rent by participating in a money management program, and second, that tenants must meet with a staff member at least twice a month.[10]

This alternative to the treatment first approach was found to be more effective by several studies. As the model evolved and gained popularity, it came to be known as Housing First. The George W. Bush administration embraced Housing First principles, which contributed to a 30 percent reduction in homelessness rates in the United States

between 2005 and 2007.[11] The HEARTH Act of 2009 further entrenched Housing First principles in federal policy, expanding the availability of permanent housing to families, youth, and nondisabled single adults and authorizing rapid rehousing (RRH) assistance.[12] In addition, this act mandated the creation of a national strategic plan to end homelessness, which was released in 2010.[13] Since that time, Housing First principles have been guiding federal homeless response programs. This article summarizes the evidence that underpins the Housing First approach.

## What the Evidence Says

### *The Limitations of Treatment First*

Despite the widespread adoption of the treatment first model in federal programs, many of which had no actual permanent housing component, critics doubted the potential of this paradigm to address issues of contemporary homelessness — especially those concerning individuals experiencing chronic homelessness. Long before the rise of contemporary homelessness, sociologists such as Erving Goffman had questioned the intentions and efficacy of treatment models that imposed rigid conditions on patients, which often were intended as much to institutionalize and control the patient as to effect any sort of "cure." Moreover, emerging evidence suggested that the treatment first model lacked relative effectiveness. In a study evaluating outcomes for people experiencing chronic homelessness based on data from 11 communities receiving coordinated funding from HUD, HHS, and the U.S. Department of Veterans Affairs, Tsai et al. found that, although participants in both transitional housing and Housing First programs experienced improved psychosocial outcomes over time, participants in the Housing First program were independently housed for longer periods despite experiencing homelessness for longer periods at the study's baseline.[14] Because the study was not randomized, the authors caution that participants in the transitional housing programs group were more likely to have severe substance use issues and report greater satisfaction with transitional housing. Nevertheless, they conclude, "These results suggest that clients with substance use disorders do experience more problems living independently, but prior transitional/residential treatment may not particularly benefit them any more than Housing First approaches, especially on independent housing outcomes."[15]

A systematic literature review and metanalysis of four RCTs that compared the effectiveness of Housing First programs with treatment first programs found that Housing First significantly improved housing stability. *Photo courtesy of U.S. Department of Housing and Urban Development Flickr*



Other studies have found that the imposition of external values and lack of agency on the part of the consumer (i.e., individuals experiencing homelessness) critically limit the capability of the treatment first model. Henwood et al. note, "Providers in [treatment first] programs attempted to have consumers conform to system-centered goals, which at times appeared to overlook the individuals that the system was intended to serve, resulting in higher rates of disengagement from services."[16] Put differently, the rigid nature of the treatment first model produces inferior housing stability outcomes for individuals experiencing homelessness and can result in disengagement from critical services. Furthermore, retrospective analysis from HUD's Family Options Study indicates that families experiencing homelessness may face unique, relative barriers to accessing transitional housing. In addition, outcomes for families in the project-based transitional housing group were not significantly different than usual care.[17]

### Chronic Homelessness

To assess the effectiveness of Housing First and the role of consumer choice, a randomized controlled trial (RCT) was performed on the Pathways to Housing program in 2004. Participants were assigned randomly to either a Housing First experimental group or a local Continuum of Care control group to receive treatment as usual (TAU). Eligibility for this study reflected key characteristics of the chronically homeless population: participants must have spent half of the previous month living on the street or in public places, exhibited a history of homelessness over the previous 6 months, and been diagnosed with an Axis I mental health disorder. The results indicate that Housing First participants experienced significantly faster decreases in homeless status and

increases in stably housed status than the TAU group did, with no significant differences in either drug or alcohol use. Overall, the Housing First experimental group demonstrated a housing retention rate of approximately 80 percent, roughly 50 percentage points above that of TAU, which, the authors noted, "presents a profound challenge to clinical assumptions held by many Continuum of Care supportive housing providers who regard the chronically homeless as 'not housing ready.'"[18]

Four major RCTs have been performed to compare the effectiveness of Housing First programs with treatment first programs. Three of these RCTs were conducted in the United States, and the other was conducted in Canada. In a review of these RCTs, Tsai notes that two RCTs conclusively found that Housing First led to quicker exits from homelessness and greater housing stability than did TAU.[19] In the Canadian trial, an RCT in five of Canada's largest cities known as At Home/Chez Soi, analysis revealed that, in findings similar to those of the American RCTs, "Housing First participants spent 73% of their time in stable housing compared with 32% of those who received treatment as usual."[20] Baxter et al. also performed a systematic literature review and metanalysis of these four RCTs, finding that Housing First resulted in significant improvements in housing stability.[21] This study also found that no clear differences existed between Housing First and TAU for mental health, quality of life, and substance use outcomes, ultimately concluding, "The combination of a strong, positive impact on housing with little additional impact on mental health and substance use, compared with TAU, is consistent with the findings of other reviews."[22] Rog et al. performed a similarly extensive literature review to describe various permanent supportive housing (PSH) programs, assess the methodological quality of existing studies, and assess the effectiveness of PSH compared with TAU. In assessing the evidence base for PSH, which included a review of eight literature reviews, seven RCTs, and other quasi-experimental studies, Rog et al. were able to examine several major studies examining the effectiveness of Housing First, finding, "All studies found that participants in Housing First had significantly less homelessness compared with participants receiving standard care, day treatment with no housing, or housing that was contingent on treatment and sobriety."[23] These findings were confirmed in a more recent analysis by researchers from the Centers for Disease Control and Prevention (CDC) and HUD's Office of Policy Development and Research (PD&R): in a systematic review of 26 studies comparing Housing First with treatment first or TAU programs, Peng et al. found that, compared with treatment first programs, Housing First programs decreased homelessness rates by 88 percent and improved housing stability by 41 percent.[24] This analysis also found that participants in Housing First programs reported improved quality of life, community integration, and positive life changes compared with clients in TAU programs.

In addition to the consistent evidence that Housing First programs increase housing stability among people experiencing chronic homelessness, some evidence indicates that Housing First programs may also limit costs more effectively than do treatment first

programs. In a study of adults who had been homeless for at least a month and had a chronic medical condition, Sadowski et al. found that, using an intent-to-treat analysis, participants in Housing First reported a significant reduction in costly emergency room visits and hospitalizations compared with TAU — 24 percent and 29 percent, respectively.[25] Based on these findings, Basu et al. evaluated the relative costs of Housing First versus treatment first programs, assessing differences in hospital days, emergency room visits, outpatient visits, days in residential substance abuse programs, nursing home stays, legal services (including days in incarceration), days in shelter housing, and case management between the two programmatic models.[26] Basu et al. found that participants in Housing First programs had decreased costs because they spent fewer days in hospitals, emergency rooms, residential substance abuse programs, nursing homes, and prisons or jail. On the other hand, Housing First participants incurred higher costs from higher outpatient visits per year and a greater number of days in stable housing than TAU participants. Ultimately, a comprehensive cost analysis from this RCT found that Housing First saved $6,307 annually per homeless adult with a chronic medical condition, with the highest cost savings occurring for chronically homeless individuals, at $9,809 per year.[27] The authors note that, if scaled, these savings would amount to $5.5 billion over the next 10 years. However, note that this RCT was performed in only one U.S. city, and other studies have associated Housing First models with higher costs. For example, HUD's own Family Options Study found that PSH for families was more expensive than TAU. The previously referenced report from the National Academies of Sciences, Engineering, and Medicine similarly concluded that sufficient evidence does not yet exist to conclude that PSH reduces healthcare costs. Nevertheless, although evidence about relative costs is less certain, evidence of positive outcomes is not; furthermore, evidence also exists for improved outcomes for important subpopulations that experience intersecting, challenging vulnerabilities.

Long-term evidence from HUD's Family Options Study indicates that having priority access to permanent housing offers substantial benefits for families.



*Families With Children*

The Housing First model has been adopted largely by programs that serve individuals — that is, single adults in households without children rather than families — in part because chronic homelessness is much less common among households with minor children. However, many of the most effective tools for serving families experiencing homelessness broadly adhere to the core principles of the Housing First model. Beginning in 2010, HUD began enrolling families in emergency shelters in the Family Options Study, an RCT performed in 12 communities to gather evidence about which types of housing and services programs work best for homeless families. Families were assigned to one of four treatment groups: permanent housing subsidies (SUB), community-based rapid rehousing (CBRR), project-based transitional housing (PBTH), and usual care (UC). Of these four, the first two — SUB, in which families receive priority access to a permanent housing subsidy with no dedicated supportive services, and CBRR, in which families receive priority access to temporary rental assistance — represent strategies that are broadly aligned with the principles of Housing First in that they do not require service participation or have preconditions for receiving assistance. The other two groups — PBTH, in which families receive temporary accommodation, often with intensive service requirements, and UC — represent alternatives to the Housing First approach in the form of transitional and emergency shelters. Long-term evidence from the Family Options Study indicates that having priority access to deep, permanent housing offers substantial benefits for families. Specifically, "assignment to the SUB group more than halved most forms of residential instability, improved multiple measures of adult and child well-being, and reduced food insecurity."[28] Families

assigned to the CBRR group had housing stability outcomes that were comparable to those of UC families but at a substantially lower cost because they avoid the use of costly transitional housing programs. Perhaps most important, compared with UC, the treatment first group (PBTH) exhibited no impacts on eight indicators concerning family well-being and self-sufficiency, and assignment to the PBTH intervention did not facilitate improved family preservation or child well-being outcomes compared with UC. The authors conclude, "The striking impacts of assignment to the SUB group in reducing subsequent stays in shelter and places not meant for human habitation provide support for the view that, for most families, homelessness is a housing affordability problem that can be remedied with permanent housing subsidies without specialized homeless-specific psychosocial services."[29] As for the more treatment first-aligned PBTH group, the authors state that "[o]verall, 3 years after assignment, the study did not find evidence that the goals of this distinctive approach to assisting families facing unstable housing situations were achieved relative to leaving families to find their way out of shelf without priority access to the program."[30]

### Rapid Rehousing

Housing First can also include RRH programs, in which individuals experiencing homelessness are given temporary assistance that quickly moves them into private housing while providing time-limited services in some cases. This programmatic model corresponds with Housing First principles and can be an effective intervention for individuals and families who fit the typology of experiencing episodic or transient homelessness. A review of RRH program outcomes by Abt Associates for PD&R confirms this expectation; in a review of 18 studies measuring exits to permanent housing from RRH programs, the expected range for successful transition to permanent housing was 71 to 84 percent.[31] RRH programs within a Housing First framework also are successful at avoiding returns to homelessness, thus preventing many individuals and families from experiencing episodic or chronic homelessness. The largest study examining returns to homelessness from RRH programs to date is the Supportive Services for Veteran Families program, which provided RRH assistance for homeless veterans and their families. This study found that RRH assistance prevented 84 percent of individuals and 91 percent of families from returning to homelessness after 1 year.[32] Another study found that, of the 1,500 families who exited from RRH programs, only 6 percent were found to have returned to homelessness after 1 year.

## Housing First and Relevant Subpopulations

According to the Substance Abuse and Mental Health Services Administration, in 2010, 26.2 percent of all sheltered persons who were homeless had a severe mental illness, and 34.7 percent of all sheltered adults who were homeless had chronic substance use issues. Of those who experienced chronic or long-term homelessness, approximately 30 percent had a mental health condition and 50 percent had co-occurring substance use problems.[33] In addition, previous studies have found that having HIV/AIDS-positive

status and experiencing homelessness frequently co-occur, with Culhane et al. finding that individuals using homeless shelters in Philadelphia had nine times the risk of having HIV/AIDS-positive status than did the general population.[34]

### Individuals Experiencing Mental Illness

As mentioned previously, the first major RCT in the United States examining the effect of Housing First on homelessness was the Pathways to Housing evaluation, which concluded, "Our findings indicate that ACT programs that combine a consumer-driven philosophy with integrated dual diagnosis treatment based on a harm-reduction approach positively affect residential stability and do not increase substance use or psychiatric symptoms."[35]

Canada's multicity At Home/Chez Soi study was launched in 2008 to test the effectiveness of Housing First as an approach for addressing homelessness among people experiencing severe mental illness. Canada, like the United States, saw a wave of deinstitutionalization during the 1970s. Following federal policy changes during the 1990s that slashed the number of affordable housing units created, significant numbers of people with severe psychiatric disabilities living on deficient incomes found themselves no longer able to sustainably access housing, leading to a rise in homelessness rates.[36] As with the Pathways for Housing evaluation, the At Home/Chez Soi experimental group received priority access to housing and supportive services, and the control group received TAU.[37] In findings much like those of similar U.S. studies, Housing First proved to be more effective than TAU at achieving housing stability: During the 2-year course of the study, Housing First participants spent 73 percent of their time stably housed, whereas the control group was stably housed only 32 percent of the time. In the last 6 months of the study, 62 percent of Housing First participants were housed the entire time compared with 31 percent of TAU participants. Moreover, Housing First participants also displayed greater improvements in community functioning and quality of life than did TAU participants, although these effects began to fade for the "high need" experimental subgroup receiving ACT after 2 years.[38]

### Individuals With Substance Use Issues

As mentioned previously, studies have found elevated substance use among individuals experiencing homelessness; one major study found that the occurrence of drug and alcohol disorders was as high as 78 percent of all individuals experiencing chronic homelessness. In addition, for these individuals, substance use can be a barrier to accessing housing, with many expressing concern that providing housing to such individuals will result in property damage, worsening addiction, and community harm — all of which imply the need for transitional, treatment first housing programs. Davidson et al. assessed the relationship between Housing First program components and substance use across nine scattered-site projects in New York City. More specifically, the authors examined the relationship between programmatic fidelity and substance use

outcomes, hypothesizing that clients in programs with higher fidelity to Housing First principles (lower barriers) would experience superior housing stability and lower rates of substance use at followup than clients in lower fidelity programs. As with all previous studies, clients in programs that maintained higher fidelity to Housing First principles were less likely to be discharged from the program, and they remained stably housed. The study also assessed alcohol, cannabis, and stimulant or opioid use during the evaluation period. The authors conclude that "[t]here was no association between fidelity in implementation of supportive housing components and client substance use. On the other hand, clients in consumer participation–consistent programs were less likely than others to report using stimulants or opiates at follow-up."[39] In other words, programs maintaining greater fidelity to Housing First principles resulted in increased therapeutic trust and alignment with supportive services, which, in turn, reduced high-risk substance use even when the programs did not mandate sobriety.



Roosevelt Gardens in Austin, Texas, provides 40 units of supportive affordable housing for people living with HIV. All units receive HUD's HOPWA assistance. *Photo courtesy of Jleitner Photography*

### Individuals Living With HIV/AIDS

Since the emergence of HIV/AIDS in the early 1980s, the association between HIV and homelessness has been clear. A report from the Congressional Research Service notes, "In the earlier years of the epidemic, as individuals became ill, they found themselves unable to work, while at the same time facing health care expenses that left few resources to pay for housing."[40] Without stable housing, individuals with HIV who are experiencing homelessness may not have a secure location to receive, store, and take medications, often leading to decreased adherence to treatment protocols and increased viral loads that increase the likelihood of transmission. Nearly four decades later, the financial and medical vulnerability associated with HIV/AIDS continues to

increase the likelihood that an individual will experience homelessness. Because of intersecting areas of vulnerability involving healthcare access, financial precarity, lack of shelter, and socioeconomic stigma, individuals experiencing homelessness are more likely to engage in high-risk behaviors that increase the likelihood of HIV transmission such as needle sharing, transactional sexual relationships, and unprotected sex. Accordingly, Congress enacted the Housing Opportunities for Persons with AIDS (HOPWA) housing program as part of the Cranston-Gonzalez National Affordable Housing Act of 1990. HOPWA is a grant program administered by HUD that distributes funds by formula allocation and competitive grant competitions to eligible metropolitan statistical areas that meet minimum HIV/AIDS case requirements based on CDC data. To be eligible for HOPWA assistance, individuals must test positive for HIV/AIDS and earn incomes that do not exceed 80 percent of the area median income. HIV-positive individuals and their families receive housing assistance and supportive services as part of the program. However, jurisdictions can use HOPWA funds to develop and operate multifamily residences; fund short-term rental, mortgage, and utility assistance programs as well as rental assistance programs for PSH; construct or acquire and rehabilitate property for single-room occupancy housing; provide supportive services; and offer housing counseling and referral services.[41] HOPWA funds are used primarily for housing assistance; HUD data indicate that, for the 2014 to 2015 program year, 69 percent of all HOPWA grant funds were used for housing assistance.

In 2003, CDC and HUD initiated the Housing and Health Study, an RCT assessing the effects of HOPWA rental assistance on the health and housing outcomes of unstably housed individuals living with HIV/AIDS. Treatment group members received HOPWA housing and services, whereas individuals in the control group received only social and health services. After 18 months, 82 percent of the treatment group members were stably housed compared with 51 percent of control group members. After the same amount of time, 15 percent of the treatment group were unstably housed compared with 44 percent of the control group. Individuals in the treatment group experienced relative mental health improvements, with notable improvements in perceived stress and depression. Although some issues with research design generally limited the study's ability to compare the two groups, participants who were homeless during followup had 2.5 times the odds of having a detectable viral load compared with those who had been stably housed.[42] Another similar RCT, the Chicago Housing for Health Partnership study, found that after 12 months the group that received housing assistance, had higher rates of intact immunity and were more likely to have undetectable viral loads. These findings were recently confirmed in a 2020 analysis performed by CDC, HUD, and academics.[43] Providing housing also reduced the use of high-cost emergency health services. The authors note, "Compared to those in the usual care group, those in the treatment group showed 29% reduction in hospitalizations, a 29% reduction in the number of days spent in the hospital, and a 24% reduction in visits to the emergency room."[44]

### Domestic Violence

Another group shown to benefit from Housing First programs is survivors of domestic violence. An analysis from the National Center for Children in Poverty found that, among mothers with children who were experiencing homelessness, 80 percent were survivors of domestic violence.[45] A 2005 study of homelessness in four major Florida cities found that approximately one out of every four women experiencing homelessness lacked stable housing primarily because of experiences with violence.[46] Individuals experiencing homelessness, in turn, will also experience domestic violence because of their publicly exposed daily activities, sleeping patterns, and routines. Recently, a team from Michigan State University, with support from the Washington State Coalition Against Domestic Violence, the Office of the Assistant Secretary for Planning and Evaluation in HHS, and the Gates Foundation completed a study to assess the effects of Housing First programmatic assistance on domestic violence survivors experiencing homelessness. For this program, adherence to the Domestic Violence Housing First (DVHF) model included mobile, housing-focused advocacy; flexible financial assistance for housing and other needs; and community engagement. The study found that adherence to this survivor-centered, low-barrier service model yielded a statistically significant difference between DVHF recipients and those receiving TAU, with DVHF recipients experiencing improved outcomes[47] in the categories of housing instability, physical abuse, emotional abuse, stalking, economic abuse, use of the children as an abuse tactic, depression, anxiety, posttraumatic stress disorder, and children's prosocial behaviors.

### Conclusion

Overwhelming evidence from several rigorous studies indicates that Housing First programs increase housing stability and decrease rates of homelessness. The best available evidence indicates that Housing First programs successfully house families and individuals with intersecting vulnerabilities, such as veterans, individuals experiencing substance use or mental health issues, survivors of domestic violence, and individuals with chronic medical conditions such as HIV/AIDS. Although findings concerning the relative costs of Housing First programs — as well as the model's ability to facilitate secondary outcomes such as sobriety or mental stability — are less certain, preliminary evidence indicates that the Housing First approach does not facilitate negative outcomes compared with treatment first programs. Rather, Housing First programs appear to reduce the use of hard drugs, improve the health status of people living with HIV/AIDS, and reduce the use of costly emergency services, all of which are indicators of improved health.

In December 2022, the Biden-Harris administration released *All In: The Federal Strategic Plan to Prevent and End Homelessness*.[48] The plan aims to decrease overall homelessness in the United States by 25 percent by January 2025. As noted in the introduction message by HUD Secretary Marcia Fudge, this new strategic plan restores the Housing First approach as the nation's guiding policy for addressing homelessness, coupling

Housing First principles with homelessness prevention resources and strategies to reduce inflows into homelessness. In addition, the plan recommends a person-centered, trauma-informed approach that employs evidence-based solutions. By prioritizing housing stability and restoring the dignity of those experiencing homelessness, this policy presents a more humane, proven strategy than treatment first approaches. President Biden eloquently summarizes the benefits of the strategic plan in his conclusion: "When we provide access to housing to people experiencing homelessness, they are able to take steps to improve their health and well-being, further their education, seek steady employment, and bring greater stability to their lives and to the community that surrounds them.... By ensuring more Americans have safe, stable, and affordable homes, we can build a stronger foundation for our entire Nation."[49]

1. National Academies of Sciences, Engineering, and Medicine. 2018. *Permanent Supportive Housing; Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness,* Washington, DC: The National Academies Press.
2. Bruce Katz. 2006. "Racial Division and Concentrated Poverty in U.S. Cities," presentation at Urban Age Conference, Johannesburg, South Africa.
3. National Academies of Sciences, Engineering, and Medicine.
4. Peter H. Rossi. 1990. "The old homeless and the new homelessness in historical perspective," *American Psychologist* 45:8, 954–9.
5. Dennis P. Culhane and Randall Khun. 1998. "Patterns and Determinants of Public Shelter Utilization Among Homeless Adults in New York City and Philadelphia," *Journal of Policy Analysis and Management* 17:1, 23–43.
6. Ibid.
7. *See* Malcolm Gladwell. 2006. "Million-Dollar Murray: Why problems like homelessness may be easier to solve than to manage," *The New Yorker,* 5 February.
8. National Academies of Science, Engineering, and Medicine.
9. Stephen Eide. 2020. "Housing First and Homelessness: The Rhetoric and Reality," The Manhattan Institute.
10. Sam Tsemberis, Leyla Gulcur, and Maria Nakae. 2004. "Housing First, Consumer Choice, and Harm Reduction for Homeless Individuals with a Dual Diagnosis," *American Journal of Public Health* 94, 651–6.
11. Kim Johnson. 2021. "Additional Housing Programs: Housing First," 2021 Advocates' Guide, National Low Income Housing Coalition.
12. Josh Leopold. 2019. "Five Ways the HEARTH Act Changed Homelessness Assistance," *Urban Wire,* Urban Institute.

13. *See* United States Interagency Council on Homelessness. 2010. "Opening Doors: Federal Strategic Plan to Prevent and End Homelessness."

14. Jack Tsai, Alvin S. Mares, Robert A. Rosenheck. 2010. "A multi-site comparison of supported housing for chronically homeless adults: 'Housing first' versus 'residential treatment first,'" *Psychological Services* 7:4, 219–32.

15. Ibid.

16. jamin F. Henwood, Leopoldo J. Cabassa, Catherine M. Craig, and Deborah K. Padgett. 2013. "Permanent supportive housing: Addressing homelessness and health disparities?" *American Journal of Public Health* 103: Suppl 2, S188–192. *See also* Michael Allen. 2003. "Waking Rip van Winkle: Why developments in the last 20 years should teach the mental health system not to use housing as a tool of coercion," *Behavioral Sciences & the Law* 21:4, 503–21; Victoria Stanhope, Benjamin F. Henwood, and Deborah K. Padgett. 2009. "Understanding service disengagement from the perspective of case managers," *Psychiatric Services* 60, 459–64.

17. Daniel Gubits, Marybeth Shinn, Michelle Wood, Stephen Bell, Samuel Dastrup, Claudia D. Solari, Scott R. Brown, Debi McInnis, Tom McCall, and Utsav Kattel. 2016. "Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families," U.S. Department of Housing and Urban Development, Office of Policy Development and Research.

18. Tsemberis et al.

19. Jack Tsai. 2020. "Is the Housing First Model Effective? Different Evidence for Different Outcomes," *American Journal of Public Health* 110:9, 1376–7.

20. Ibid.

21. Andrew J. Baxter, Emily J. Tweed, Srinivasa Vittal Katikireddi, and Hilary Thomson. 2019. "Effects of Housing First approaches on health and well-being of adults who are homeless or at risk of homelessness: systematic review and meta-analysis of randomised controlled trials," *Journal of Epidemiology and Community Health* 73:5, 379–87.

22. Ibid.

23. Debra J. Rog, Tina Marshall, Richard H. Dougherty, Preethy George, Allen S. Daniels, Sushmita Shoma Ghose, and Miriam E. Delphin-Rittmon. 2014. "Permanent Supportive Housing: Assessing the Evidence," *Psychiatric Services* 65:3, 287–94.

24. Yinan Peng, Robert A. Hahn, Ramona K. C. Finnie, Jamaicia Cobb, Samantha P. Williams, Jonathan E. Fielding, Robert L. Johnson, Ann Elizabeth Montgomery, Alex F. Schwartz, Carles Muntaner, Veronica Helms Garrison, Beda Jean-Francois, Benedict I. Truman, Mindy T. Fullilove; Community Preventive Services Task Force. 2020. "Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health among Homeless Populations with Disability: A Community Guide Systematic Review," *Journal of Public Health Management Practice* 26:5, 404-–11.

25. Laura S. Sadowski, Romina A. Kee, Tyler J. VanderWeele, and David Buchanan. 2009. "Effect of a housing and case management program on emergency department visits and hospitalizations among chronically ill homeless adults: a randomized trial," *Journal of the American Medical Association* 301:17, 1771–8.

26. Anirban Basu, Romina Kee, David Buchanan, and Laura S. Sadowski. 2012. "Comparative Cost Analysis of Housing and Case Management Program for Chronically Ill Homeless Adults Compared to Usual Care," *Health Services Research* 47:1, 523–43.

27. Ibid.

28. Gubits et al., 2016.

29. Ibid.

30. Ibid.

31. Ibid. Note: These studies were weighted according to size.

32. Daniel Gubits et al. 2018. "Understanding Rapid Re-housing: Systematic Review of Rapid Re-housing Outcomes Literature," U.S. Department of Housing and Urban Development, Office of Policy Development and Research.

33. Substance Abuse and Mental Health Administration. 2011. "Current Statistics on the Prevalence and Characteristics of People Experiencing Homelessness in the United States."

34. Dennis P. Culhane, Erica Gollub, Randall Kuhn, and Mark Shpaner. 2001. "The Co-Occurrence of AIDS and Homelessness: Results from the Integration of Administrative Databases for AIDS Surveillance and Public Shelter Utilisation in Philadelphia," *Journal of Epidemiology and Community Health* 55, 515–20.

35. Tsemberis et al.

36. Aubry et al. 2015.

37. The experimental group was further divided into two groups: "High need" individuals received ACT while "moderate need" individuals received ICM. Tim Aubry, Paula Goering, Scott Veldhuizen, Carol E. Adair, Jimmy Bourque, Jino Distasio, Eric Latimer, Vicky Stergiopoulos, Julien Somers, David L. Streiner, and Sam Tsemberis. 2016. "A Multiple-City RCT of Housing First with Assertive Community Treatment for Homeless Canadians with Serious Mental Illness," *Psychiatric Services* 67:3, 275–81.

38. Aubry et al. 2016.

39. Clare Davidson, Charles Neighbors, Gerod Hall, Aaron Hogue, Richard Cho, Bryan Kutner, and Jon Morgenstern. 2014. "Association of housing first implementation and key outcomes among homeless persons with problematic substance use," *Psychiatric Services* 65:11, 1318–24. Note: "Consumer participation-consistent" is used to refer to programs with greater fidelity to Housing First principles.

40. Congressional Research Service. 2016. "Housing for Persons Living with HIV/AIDS."

41. Ibid.

42. Richard J. Wolitski, Daniel P. Kidder, Sherri L. Pals, Scott Royal, Angela Aidala, Ron Stall, David R. Holtgrave, David Harre, and Cari Courtenay-Quirk. 2010. "Randomized trial of the effects of housing assistance on the health and risk behaviors of homeless and unstably housed people living with HIV," *AIDS Behavior* 14:3.

43. Peng et al.

44. Sadowski et al.

45. Yumiko Aratani. 2009. "Homeless Children and Youth: Causes and Consequences," National Center for Children in Poverty, Mailman School of Public Health – Columbia University. More recent data from HUD's Family Options Study found that 49 percent of all homeless individuals had experienced domestic violence as an adult. For more see: Gubits et al.

46. Jana L. Jasinski, Jennifer K. Wesely, Elizabeth Mustaine, and James D. Wright. 2005. "The Experience of Violence in the Lives of Homeless Women: A Research Report."

47. Judy Chen and Cris M. Sullivan. 2022. "Domestic Violence Housing First Demonstration Evaluation Project: Final Report of Findings through 24 Months," Prepared for Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services.

48. United States Interagency Council on Homelessness. 2022. "All in: The Federal Strategic Plan to Prevent and End Homelessness."

49. Ibid.

**Evidence Matters Home**     **Next Article**

*The contents of this article are the views of the author(s) and do not necessarily reflect the views or policies of the U.S. Department of Housing and Urban Development or the U.S. Government.*

**Note:** Guidance documents, except when based on statutory or regulatory authority or law, do not have the force and effect of law and are not meant to bind the public in any way. Guidance documents are intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

**HUD USER Helpdesk**
**P.O. Box 23268**
**Washington, DC**
**20026-3268**
**Toll Free: 1-800-245-**
**2691**
**Fax: 1-202-708-9981**

**Privacy Statement**
**Download Adobe**
**Acrobat Reader to**
**view PDF files**
**located on this site.**

# EXHIBIT 3

| State | CoC Number | CoC Name | Organization Name | Project or Award Name | FY 2024 Amount |
|-------|-----------|----------|-------------------|----------------------|----------------|
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | CA-500 CoC Planning Project FY2024 | $1,500,000 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | RELIGHT Project | $1,680,036 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Immanuel-Sobrato Community | $944,697 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Housing Case Management for Medical Respite | $1,669,293 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Second Street Studios | $615,561 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | CoC GRANT 5022 | $5,450,415 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Calabazas Apartments | $741,016 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Leigh Ave | $610,091 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Renascent Place | $713,605 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | SCC Coordinated Assessment System | $138,644 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | SCC RRH for Families & Youth | $2,919,238 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Samaritan Inns | $721,603 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | CASA 200 | $1,392,162 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | SCC HMIS Consolidation | $1,600,696 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | CCP Placement Project | $7,741,946 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | CoC GRANT 5320 | $543,830 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | 2024 DV Bonus TH-RRH | $599,781 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Ira D. Hall | $301,095 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | Alvarado Park | $124,633 |
| California | CA-500 | San Jose/Santa Clara City & County CoC | County of Santa Clara by and through Office of Supportive Housing | CoC GRANT 5022 Expansion | $2,904,831 |