I, Shireen McSpadden, declare as follows under the penalties of perjury:

1. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set forth below.

2. I am the Executive Director of the City and County of San Francisco's Department of Homelessness and Supportive Housing ("HSH"). In that role, I oversee the entire homelessness response system of care for the City and County of San Francisco.

3. HSH is focused on making homelessness in San Francisco rare, brief, and one-time through the provision of coordinated, compassionate, and high-quality homelessness response services.

## The San Francisco Continuum of Care

4. The Continuum of Care ("CoC") program administered by the U.S. Department of Housing and Urban Development ("HUD") funds critical housing and services programs to support individuals and families experiencing chronic homelessness in permanent housing. HSH and its predecessor agency has served as the Collaborative Applicant for the San Francisco CoC for over twenty years.

5. CoC funds support more than 1,800 permanent housing units across 60 housing projects. These permanent housing units house more than 1,900 program participants, including children, seniors, veterans, and persons with serious physical, developmental, and mental disabilities.

## Alignment with Housing First

6. HUD has long adopted a "Housing First" approach to addressing homelessness, and for years this approach was reflected in CoC NOFOs. Housing First is a model for addressing homelessness that prioritizes providing individuals with immediate access to safe, stable, and permanent housing—without preconditions such as sobriety, treatment participation, or a clean criminal record. The approach is grounded in the belief that people must have their

basic needs met—like housing and food—before they can effectively address other challenges, such as health, substance use, or employment.

7. In line with HUD's longstanding "Housing First" priority, which California has codified, the San Francisco CoC has invested significant efforts to develop permanent housing units that can be rented to qualifying program participants. These efforts include multi-year processes for developing new permanent housing projects that pull together various capital funding streams, involve regulatory approvals at all levels of government, and require coordination with and input from numerous stakeholders as part of San Francisco's Consolidated Plan.

8. Developers and housing providers in San Francisco have relied on the commitment to Housing First at the federal and state level with the expectation that operating funds, including rental subsidies such as CoC grant funds, are relatively stable from year to year.

9. Today, approximately 91% of San Francisco CoC funding is used for permanent housing.

## The 2024 NOFO

10. San Francisco CoC was most recently awarded CoC funding under the FY2024 and FY2025 Continuum of Care Competition Notice of Funding ("2024 NOFO"). Pursuant to this two-year NOFO, the San Francisco CoC received more than $56 million in fiscal year 2024 and expected another $56 million in funding in fiscal year 2025, provided performance benchmarks were met.

11. HSH relied on this two-year NOFO to enter into contracts with project sponsors with the expectation that projects sponsors would have funding for two years and incorporated this expected funding into a two-year budget for San Francisco CoC.

12. HUD's rescission of the 2024 NOFO has created immediate budgetary uncertainty. For the San Francisco CoC, the next renewal date for CoC grant funding is January 1, 2026. Nine grants in total expire before July 1, 2026.

13. This loss of expected funding also threatens the financial viability of non-profit providers that own and operate permanent supportive housing. A significant number of housing projects are operating at a loss even with full funding from CoC grants. In other cases, projects operated by non-profits have a master lease for an entire building and require CoC funds to make immediate rental payments to the building owner.

**The 2025 NOFO**

14. The FY 2025 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO ("2025 NOFO") represents a radical and drastic departure from a Housing First philosophy.

15. The 2025 NOFO preferences projects that require program participants to take part in supportive services. In line with a Housing First approach, HSH has historically encouraged, but not mandated, participation in supportive services.

16. Specifically, the 2025 NOFO reduces "Tier 1" non-competitive renewal funding to 30 percent of the San Francisco's CoC's Annual Renewal Demand from the prior year's 90 percent, which eliminates a vast majority of permanent housing projects from "Tier 1."

17. In addition, no more than 30 percent of a CoC's Annual Renewal Demand under this NOFO can fund permanent housing projects, including permanent supportive housing and rapid rehousing.

18. This defunding of permanent housing reverses over 20 years of consistent renewal funding for permanent housing projects, which protect vulnerable persons at high and chronic risk of homelessness.

19. The 2025 NOFO also contains eligibility and review criteria that are unprecedented, unclear, and/or beyond HSH's control. For example, the 2025 NOFO:

   a. Penalizes an applicant's past or current activities that use a definition of sex other than as binary in humans, which appears to conflict with HUD's own requirement to provide equal access on the basis of gender identity and could penalize HSH

3

for following HUD data standards relating to its Homeless Management Information System (HMIS), which recognizes non-binary gender identity.

b. Penalizes an applicant's inclusion of individuals with substance use disorders and other mental health disorders as part of the target housing population for permanent housing, even though those individuals are often unhoused and make up 42% of the San Francisco CoC's current adult permanent housing participants.

c. Penalizes an applicant where non-profit charitable organizations that operate CoC projects do not voluntarily verify immigration status, even though these nonprofit partners are specifically exempted by federal law from doing so in order to facilitate their distribution of assistance.

d. Preferences an applicant with a governance board that includes representatives of law enforcement, even though there is no such requirement in CoC regulations and HSH cannot change board membership until a seat becomes available.

e. Preferences an applicant in a state that substantially implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act, which, based on available information from the U.S. Department of Justice, does not include California.

20. Based on changes to the 2025 NOFO's eligibility criteria and additional assurances and certifications HUD requires of all HUD funding applicants, the San Francisco CoC's compliance with past HUD requirements regarding racial equity, respect for an individual's gender identity, and Housing First principles may be viewed as a basis for denying funding.

21. The 2025 NOFO also imposes significant time pressure on HSH and project sponsors. HUD has historically issued the CoC NOFO in July or August and provided grantees with approximately three months to respond to a NOFO that had minimal changes or updates. The 2025 NOFO was not issued until November 13, 2025, and HSH only has until January 14,

2026—a mere two months, including the holidays—to submit its consolidated application based on dramatically different funding priorities and criteria.

22. Prior to its application, HSH needs to first run a local competition soliciting housing providers to submit proposals eligible for CoC funding. This process typically entails months of preparation, including identifying opportunities for new projects and potential project sponsors, seeking community input on housing needs, and developing a scoring tool consistent with the applicable NOFO.

23. As required by the 2025 NOFO, the deadline for project applicants to submit proposals to the San Francisco CoC is December 15, 2025. Given the Thanksgiving holiday, the soonest that the San Francisco CoC's Local Homelessness Coordinating Board can meet and approval a required scoring tool tailored to the 2025 NOFO is December 1, meaning that applicants will only have two weeks (between December 1 and 15) to submit their applications.

24. HSH therefore must commit limited employee time and resources to run a new local CoC competition under immense time pressure while planning for anticipated CoC funding cuts.

### Impact of 2025 NOFO on the San Francisco CoC and the Community

25. The bulk of the San Francisco CoC's housing portfolio consists of permanent housing. The 2025 NOFO's shift away from Housing First will upend the San Francisco CoC's portfolio of permanent housing units and lead to increased homelessness in San Francisco.

26. The 2025 NOFO's funding caps on renewal funding and permanent housing translate to a loss of $32.2 million in funding for Tier 1 projects, which will result in the loss of rental subsidies for 1,074 housing units. Tier 2 permanent housing projects awarded in fiscal year 2024 will no longer be funded, representing an additional loss of $5.1 million that funds rental assistance for 169 housing units serving seniors, adults, youth, and survivors of domestic violence. This mean that under the current NOFO, the San Francisco CoC will lose at least $37.3 million for permanent housing projects.

27. The elimination of the CoC rental subsidy means program participants' rent obligations will increase significantly beyond 30% of their income, resulting in eviction and a return to homelessness, accompanied by reduced access to supportive services and medical care.

28. The 2025 NOFO's abandonment of Housing First further jeopardizes existing projects that are funded by a blended stream of CoC and state funding, because California mandates that all State-funded housing programs serving people experiencing or at risk of homelessness comply with Housing First.

29. The 2025 NOFO also severely disadvantages the San Francisco CoC's ability to secure funding for housing projects HUD now prioritizes, such as sober independent living, street outreach services and transitional housing, and recovery-focused shelters, as part of the national CoC competition.

30. Because there was no expectation that HUD would drastically shift money away from permanent housing to transitional housing and other services, HSH may not be able to obtain competitive applications—given the extraordinarily compressed two-week window—from qualified project sponsors with the requisite technical knowledge and experience.

31. Existing project sponsors also cannot immediately overhaul their projects, which have been carefully geared to Housing First policy goals, to meet the priorities set forth in this NOFO. For example, because permanent housing is based on a rental model, project sponsors cannot simply impose supportive service requirements on to program participants' preexisting lease agreements.

32. The 2025 NOFO therefore significantly impacts HSH's ability to advance a competitive consolidated application to the national competition, frustrating the goals of the San Francisco CoC to secure funds for critically needed homeless housing. The San Francisco CoC is further disadvantaged by review criteria in the 2025 NOFO that are difficult if not impossible to meet.

33. The 2025 NOFO threatens HSH's ability to secure any funding under the 2025 NOFO. HSH is already under tremendous budgetary pressure, and any reallocation of its own

funds to make up the loss of this funding would require moving those funds away from other critical services. The loss of these CoC program grants would severely impair HSH's ability to assist those facing homelessness and housing instability.

    I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on November 26, 2025, at San Francisco, California.

DocuSigned by:

*Shireen McSpadden*
CAD7B781896B449

SHIREEN MCSPADDEN