# DECLARATION OF JOYCE TAVON

I, Joyce Tavon, declare the following under penalties of perjury:

1. My name is Joyce Tavon.

2. I have personal knowledge of the facts contained in this declaration. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

3. I serve as the Chief Executive Officer of the Massachusetts Housing and Shelter Alliance (MHSA). I am personally knowledgeable about the organization's mission and operations. I have dedicated my career to the mission of reducing and ending homelessness, especially through housing solutions. I have a background in leading nonprofit organizations and in planning, program development, public policy, and systems change.

4. I have extensive experience with the U.S. Department of Housing and Urban Development (HUD) Continuum of Care (CoC) program since its inception in the mid-1990s. First, as executive director of a nonprofit organization, I prepared numerous applications and oversaw project implementation. As a consultant for several years, I assisted multiple communities in planning and preparing annual HUD Collaborative Applications. Later, I served as a consultant to a national technical assistance provider for CoCs around the country. Starting in 2015, I helped organize and co-convene all the CoCs in Massachusetts for purposes of networking, information-sharing, and improving the statewide homeless response system – a statewide collaboration that continues to this day.

## MHSA Mission, Activities, and Services

5. MHSA is a nationally recognized nonprofit organization working to end homelessness among individuals through advocacy and the development of housing solutions.

For more than 30 years, MHSA has been a policy driver and a catalyst for change. Partnering with nearly 100 community-based agencies across the state, MHSA has sparked innovation, reimagining the traditional emergency shelter system to create permanent housing offering essential wraparound services and accessible health care.

6. MHSA was created in 1988 by local community-based organizations seeking solutions to homelessness, with a particular focus on individuals experiencing homelessness. MHSA is a 501(c)3 nonprofit organization. We draw on the expertise of nearly 100 member agencies statewide to develop and advocate for innovative housing and support services for people who are experiencing homelessness. Nearly 50 MHSA members receive CoC funding.

7. MHSA members include community-based organizations that provide permanent supportive housing, rapid re-housing, transitional programs, emergency shelter, street outreach, health care, and much more.

8. MHSA co-convenes the 11 Massachusetts CoCs for regular collaboration and strategizing. MHSA gathers and analyzes data as reported by the CoCs in the HUD Housing Inventory Charts, especially regarding permanent supportive housing. MHSA has also collected and analyzed data on recent HUD funding awards for all 11 CoCs in Massachusetts to assess the statewide impact of the Fiscal Year 2025 CoC Notice of Funding Opportunity (NOFO).

9. As a part of our work, MHSA is the subrecipient for three CoC projects: two in the City of Boston (MA-500) and one in the Massachusetts Balance of State (MA-516). For Federal Fiscal Year 2024, MHSA is receiving a total of $2,792,055 in federal funds under the CoC program. These funds enable MHSA to provide permanent supportive housing through master leasing for 115 tenants who previously experienced chronic homelessness. Of the tenants

who are currently housed, 21 are veterans; 64 are age 55 and above; and 18 have physical disabilities. 42 tenants have been housed for five or more years – including 4 who have been housed since 2006. Eleven private landlords rely on MHSA's CoC funding for rental income. As part of our strategic planning process, MHSA has been working to transition our role as a subrecipient and leaseholder to partner agencies; however, the uncertainty introduced by the FY 2025 CoC NOFO has complicated that transition, and we remain the current leaseholder.

10. As an advocate, convener, and innovator, MHSA holds strategy meetings, conferences, webinars, trainings, and other events to strengthen local and statewide responses to homelessness. We bring together service providers, public officials, community partners, and other stakeholders to develop and implement cost-effective solutions to homelessness, including testing innovative models that bring together health care and housing. As mentioned above, MHSA collects and analyzes data on the permanent supportive housing sector in Massachusetts to inform statewide planning. We convene a monthly Community of Practice for permanent supportive housing providers, and we support local communities in expanding permanent supportive housing. In our role as an intermediary of state funds, we administer state resources that fund the services and operations for permanent supportive housing (and some of those state resources are paired with CoC funds). MHSA also engages with the media and publishes written resources related to solutions to homelessness.

11. MHSA is also a member of the National Alliance to End Homelessness (the "Alliance" or "NAEH"). MHSA pays for our staff to attend and participate in Alliance conferences and frequently participate in other NAEH events, including trainings, discussions, and advocacy sessions. Additionally, MHSA staff regularly accesses educational materials and

critical industry updates from the NAEH newsletter, CEO Corner, and NAEH website to inform our work.

### The 11 Massachusetts Continua of Care

12. The CoC program administered by HUD funds critical housing and services to support individuals and families who have experienced chronic homelessness. CoC funds come to Massachusetts through 11 CoCs, which in turn fund subrecipients. MHSA has received CoC funding as a subrecipient since 2005, and we are deeply engaged with service providers across Massachusetts who also receive CoC funding. In the early 2000s, HUD began to incentive the use of CoC funds for permanent supportive housing. CoC funds played a lead role in building up the permanent supportive housing inventory in Massachusetts. As resources were increasingly directed to permanent supportive housing, chronic homelessness began to drop.

13. CoC funds currently support more than 3,800 permanent supportive housing units across 125 housing projects in Massachusetts. That equates to approximately 40% of Massachusetts' statewide supportive housing inventory for people who are disabled and have experienced homelessness. These permanent supportive housing units house more than 4,840 program participants, including children, seniors, veterans, and persons with serious physical, developmental, and mental disabilities. They include units in Low Income Housing Tax Credit projects; units in projects owned by nonprofit organizations; congregate and scattered site units; and units owned by small property owners.

14. CoC funds also support other forms of permanent housing, including rapid re-housing and joint transitional housing-rapid re-housing programs, which collectively serve 1,250 people across Massachusetts.

## CoC Program's Focus on Permanent Housing

15. Research nationwide has shown that low-barrier, permanent supportive housing is a cost-effective solution to homelessness for people with complex medical and behavioral health conditions. Here in Massachusetts, a 2020 Blue Cross Blue Shield of Massachusetts Foundation study demonstrated the effectiveness of a permanent housing and supportive services program in reducing total health care utilization and costs among chronically homeless individuals.[1]

16. Massachusetts CoCs have invested significant efforts to develop permanent housing units that can be rented to eligible program participants. These efforts include multi-year processes for developing new permanent housing projects that pull together various capital funding streams, involve regulatory approvals at all levels of government, and require coordination with and input from numerous stakeholders.

17. Developers and housing providers in Massachusetts have relied on the program's commitment to permanent housing and its emphasis on renewals with the expectation that operating funds, including rental subsidies such as CoC grant funds, are relatively stable from year to year.

18. Small "mom and pop" property owners are an important part of the permanent supportive housing inventory in Massachusetts. In many cases nonprofits hold the lease and sublease to tenants who would have a hard time competing in the private market due to complex medical and behavioral health challenges. Small property owners benefit from the reliability of rent and the supportive services that nonprofits provide to help keep tenants stabilized. With CoC funding in jeopardy, these small property owners may never be willing to rent to this population

---

[1] https://www.bluecrossmafoundation.org/publication/preventive-effect-housing-first-health-care-utilization-and-costs-among-chronically

again – and the small property owners may be unable to pay their own mortgages due to the loss of income.

19. Today, approximately 86% of CoC funding in Massachusetts is used for permanent housing, including permanent supportive housing, rapid re-housing, and the transitional housing – rapid re-housing joint component.

## The 2024 NOFO

20. HUD's FY 24-25 NOFO for CoC funds was a two-year NOFO, and it instructed CoCs that they were only required to submit one CoC application for both FY 2024 and FY 2025 funds. Because this was a two-year NOFO, the 11 Massachusetts CoCs were under the impression that they did not need to apply for FY 2025 funds for their FY 2024 awards to be renewed.

21. The 11 Massachusetts CoCs relied on this two-year NOFO to enter into contracts with subrecipients, including MHSA.

22. HUD's rescission of this NOFO has created immediate budgetary uncertainty. By not honoring the original two-year NOFO, releasing the 2025 NOFO so late in the year, and including drastic policy shifts in the NOFO, HUD is forcing CoCs to redesign their entire homeless response systems within weeks and conduct local competitions for which they have not had the opportunity to prepare adequately. FY 2024 grant expiration dates are staggered throughout calendar year 2026, and some projects will lose funding as early as the end of January. The 2025 NOFO does not anticipate making awards until May, setting up a budget gap that will lead to irreversible harm, including the loss of housing units. Furthermore, the drastic policy shifts in the NOFO and HUD's intention to penalize applicants who have complied with

HUD's previous priorities raise the question of whether Massachusetts CoCs will receive any funding at all.

23. In reliance on this expected two-year funding, Massachusetts CoCs had not organized new local CoC competitions. While HUD alerted CoCs in its July 3rd email that it would be holding a competition for FY 2025 funds, HUD did not provide any guidance. This left CoCs in limbo and CoCs were not able to organize plans for local competitions, which typically entail months of preparation, including identifying opportunities for new projects and potential project sponsors. Instead, these 11 Massachusetts CoCs are now under immense pressure to run new local CoC competitions while planning for anticipated CoC funding cuts. Furthermore, this unexpected competition is hitting during the winter when providers need to focus on winter shelter response and CoCs are beginning to plan for the annual Point-in-Time Count.

24. Most Massachusetts CoCs and providers do not have the ability to find funds in other places to "float" some projects for brief gaps, particularly if there is no certainty that reimbursement will be coming. Uncertainty and gaps in CC funding will lead directly to loss of housing units.

**The 2025 NOFO**

25. The 2025 NOFO caps permanent housing at 30% of a CoC's Annual Renewal Demand (ARD). As mentioned above, approximately 86% of Massachusetts CoCs' current funding supports permanent housing. Complying with a 30% cap on permanent housing will require draconian cuts to existing housing.

26. The 2025 NOFO also reduces "Tier 1" non-competitive renewal funding to 30% of each CoC's ARD from the prior year's 90%. All Tier 2 projects will be subject to the CoC's score, which is based on eligibility and review criteria that are vague, out of CoCs' control, and

that penalize projects that have complied with HUD's previous priorities. Given that most CoC funding in Massachusetts supports permanent housing, Massachusetts CoCs are now being forced to make impossible choices. For roughly every three permanent housing units, only one can be included in Tier 1 (the "safer" option), leaving the other two to be included in the much riskier Tier 2 or – due to the 30% cap on permanent housing – not eligible for funding at all. Furthermore, the NOFO gives HUD the option to not fund Tier 1 projects from applicants who have followed HUD's priorities in the past – which means current CoC applicants can be denied simply on the basis of having followed HUD's prior requirements.

27. There are 125 permanent supportive housing projects in Massachusetts currently operating with FY 2024 HUD CoC funds. Most use those funds to cover rent for approximately 3,800 units. Currently the 11 CoCs are faced with untenable decisions about project ranking: how do you decide which funds for these 3,800 units statewide will be included within the 30% cap for permanent housing and within the 30% renewal cap for Tier 1? Highly disabled people, elderly, veterans, and families are scattered across all 125 projects. It is not possible to pull apart existing projects and try to protect those households that HUD currently deems the "most vulnerable" under its new definitions.

28. Most importantly, the impossible decisions that HUD is forcing CoCs to make are not just about units – they are about people, about which individuals and families will be given a chance to stay in their housing, and which will be evicted.

29. The 2025 NOFO preferences projects that require program participants to take part in supportive services. In line with HUD's approach prior to the 2025 NOFO, MHSA and other Massachusetts CoC-funded providers are required to offer supportive services, and tenants are encouraged – but not required – to participate in those services. This low-barrier approach is

evidence-based and has resulted in successful housing outcomes by stabilizing people who were traditionally considered the most challenging to house. Imposing service requirements is contrary to best practice and would result in an inability for providers to house people experiencing the most complex challenges. Furthermore, tenants in permanent supportive housing have leases; providers cannot now impose service requirements because of existing lease agreements.

30. Based on changes to the 2025 NOFO's eligibility criteria, Massachusetts organizations receiving CoC funding – including MHSA – may now be refused funding on the basis of compliance with past HUD requirements regarding racial equity, respect for an individual's gender identity, and harm reduction activities. This is mindboggling – Massachusetts CoCs have spent decades building up a strong homeless response system in alignment with HUD's priorities, and HUD is now penalizing those CoCs for compliance with its own previous mandates as well as for factors well outside of the CoCs' control.

**Impact of 2025 NOFO on the MHSA Members and the Community**

31. The 2025 NOFO will have a severe impact on the ability of MHSA members and Massachusetts communities statewide to address homelessness.

32. CoC providers use the majority of CoC funds to pay rent directly to landlords for permanent housing units and to make payroll for their own staffs. Any delay from HUD in receiving CoC funds causes severe pressure on nonprofits' cash flow and ability to meet obligations to landlords and staff. HUD has required CoCs to house the most vulnerable households in CoC-funded units. Landlord partners have taken risks on housing individuals and families who often have poor credit and tenancy histories, as well severe disabilities which limit income and pose challenges to being a good tenant. Nonprofits cannot sustain more than a month

or two of delays in receiving funds from HUD without facing the need to stop payment for rent – and some cannot even sustain that gap, particularly with future reimbursement uncertain.

33. When service providers are forced to stop payment on rent, landlords will evict people who will then return to homelessness. Under many of the leasing arrangements, the nonprofits hold the lease with the landlord and sublease to the tenant. Landlords and nonprofits will bear the significant financial costs for evictions, and tenants will bear the consequences of having an eviction on their records. Landlords will feel burned and less likely to ever participate in affordable housing/subsidized housing projects in the future, thus permanently losing access to what is, effectively, subsidized affordable housing throughout the community.

34. CoC funds are often paired with state funding and/or packaged as part of affordable housing projects. The loss of CoC funds for permanent housing will jeopardize these projects.

35. With extremely low vacancy rates and among the highest rental costs in the country, CoCs in Massachusetts are unlikely to be in a position to quickly move extremely low-income, disabled individuals and families from CoC-funded permanent housing into other housing. Homeless shelters in Massachusetts are overburdened and unsheltered homelessness is growing statewide. In rural and suburban areas of the state where transportation is a challenge, people who have lost housing will have difficulty accessing local resources to stay safe – particularly in small communities that might not have much indoor public space available to shelter from harsh winter or summer weather conditions. The consequences of the 2025 NOFO will be catastrophic: more than 3,800 households with disabilities statewide are in danger of being on the streets or in encampments.

36. The 2025 NOFO irreparably harms tenants in CoC-funded housing, as well as tenants in permanent supportive housing more broadly. Tenants might not know what type of funding supports their units, and some are already experiencing anxiety and re-traumatization as they learn about HUD's drastic shift away from permanent housing and are uncertain about the future of their own housing. For those who are evicted due to HUD's actions, the re-traumatization will be even worse.

37. The ripple effects from loss of thousands of units of housing will be widespread. Hospitals will be faced with more people coming to their emergency departments with nowhere else to go. Law enforcement will be diverted from their public safety responsibilities to respond to growing unsheltered homelessness. Local businesses will see the impact of growing encampments in our communities.

38. Across the 11 Massachusetts CoCs, there are 12 projects with contracts that expire January 31, 2026. They include six projects that fund 76 units of permanent supportive housing, all with small nonprofit organizations heavily concentrated in rural communities. These organizations do not have the funding to float or cover rent and operations for these projects. The small cities and towns where they are located are the least likely to have resources to assist.

39. Without some clear assurance that funds will continue beyond their current contract end dates, nonprofit organizations must start contingency planning now. They are faced with very difficult decisions:

    a. Do they fill units that become vacant in housing they have leased and potentially put newly housed individuals and families at risk of a return to homelessness within months?

b. What message do they give to the landlords with whom they lease units about whether funding will continue for another year? Many of them have longstanding relationships with landlords, and if they abruptly end leases during 2026, that will damage any future opportunities to partner with these landlords. Landlords do not necessarily follow the nuances of federal funding. It is the nonprofit in their community whose reputation will be damaged.

c. If nonprofits have leases that end early in 2026, do they renew them and potentially add to their liability, or start a process of attrition of critically needed housing units at a time when homelessness is so high in their communities?

d. As tenants hear word through the news about threats to this CoC resource, what do nonprofit organizations tell them about how much time they might have left in their housing?

40. As one example, a Massachusetts CoC – referenced here as "CoC A" – has received CoC funding since the 1990s and includes MHSA members. It includes small cities with high concentrations of poverty as well as many suburban communities with growing unsheltered homelessness. 96% of CoC A's ARD goes to permanent housing: 75% of the CoC's ARD funds permanent supportive housing, and approximately 22% of their ARD funds domestic violence rapid re-housing. Only 1% of ARD funds support services only (coordinated entry), and 2% of ARD is HMIS.

41. CoC A funds nearly 350 permanent supportive housing units. 75% of these are for individuals, and 25% are for families. 101 children are served by the CoC. Of the heads of households served by the CoC A across project types, 42% are elders (60+); 24% are survivors

of domestic violence; 79% have a mental health disability; 43% have a substance use disability; 14% have a developmental disability; 36% have a physical disability; and 45% have a chronic health disability. 2% are Veterans; 13% have earned income; 25% collect SSDI; and 69% rely on SNAP.

42. CoC A's local competition closes on December 14, in accordance with the 2025 NOFO's requirements. This deadline makes it impossible to completely reimagine the homeless service system – as required by the NOFO – in any way that would represent thoughtful strategies to best meet the needs of program participants or the broader community. The NOFO timeline and drastic policy changes are forcing CoC A to react to the NOFO document rather than thoughtfully plan according to HEARTH Act goals.

43. CoC A has previously complied with HUD's commitments for which it will now be penalized in the 2025 NOFO competition.

44. Loss of CoC funds would then lead to a loss of income for permanent housing projects developed and owned by a nonprofit funded by CoC A, leaving the nonprofit unable to pay the mortgage. Additionally, CoC A will experience the irreversible harms described above as it relates to the destruction of landlord relationships; the financial and other costs of evictions for landlords, nonprofits, and tenants; and the inability to make payroll, which could result in the need for staff layoffs.

45. CoC A needs relief immediately because they have already been forced to make adjustments to expenses in existing grants to limit harm in anticipation of severe cuts and/or programmatic changes in next year's projects.

46. As a second example, "CoC B" has been operating and receiving annual CoC grants since the 1990s. 84% of CoC B's funds are used for permanent housing, funding over 430

housing units. Over 300 of those units are permanent supportive housing units, which CoC B uses to serve disabled and elderly people with very long histories of homelessness and high service support needs.

47. CoC B's local competition will close December 15, 2025. CoC B will need to select which organizations to submit in its application to HUD by December 30, 2025. Like CoC A, CoC B is being forced to make impossible decisions in a very short timeframe.

48. Many of CoC B's providers operate permanent supportive housing programs in scattered-site units using housing that is rented from private landlords. The providers have stopped accepting referrals for vacancies – recognizing that many permanent housing projects will lose funding, they do not want to undertake obligations they will be unable to fulfill. This includes avoiding getting into a lease agreement that would expire after June 30, 2026 (because if their grant is not renewed they will be required to continue to pay rent but will not have the funds to do so). It also includes not wanting to put someone in a permanent housing placement when they will need to terminate the housing assistance in less than a year. CoC B's community is entering the coldest months of the year and they do not have enough shelter beds for all those experiencing homelessness in their community. Usually at this time of year CoC B would be working hard to quickly fill every vacancy, because each person housed is one less person who will be unsheltered in the winter. This is a strong focus for CoC B because its winters are often severe, and the community has had residents experiencing homelessness freeze to death in prior winters.

49. The drastic and irreparably harmful changes in the 2025 HUD NOFO are not due to federal budget constraints – this is not a budget cut. HUD is making a significant policy change on an impossibly short timeline, giving communities no time to do the planning that

would be needed to truly reimagine their homeless response systems while protecting the tenancies of thousands of individuals and families with disabilities. Furthermore, HUD is penalizing the very network of strong, effective service providers that it supported in building up over the past decades – simply because they complied with HUD's previous directives.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on November 30, 2025.

*Joyce Tavon*
JOYCE TAVON