## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS, *et al.*,

        *Plaintiffs*,

   v.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, *et al.*,

        *Defendants*.

Case No. 25-cv-636-MSM-AEM

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR RELIEF UNDER 5 U.S.C. § 705 AND
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ADDITIONAL FACTUAL BACKGROUND ...................................................... 2

ARGUMENT ...................................................................................................... 3

  I.   Plaintiffs Are Likely to Succeed on Their Challenges to the Rescission of the FY24-25 NOFO .......................................................................................... 3

    A.   The rescission of the FY24-25 NOFO is reviewable ...................................... 4

      i.   The rescission of the FY24-25 NOFO is discrete final agency action ........ 4

      ii.  Plaintiffs have standing to challenge the rescission of the FY24-25 NOFO. .................................................................................................... 7

      iii.  Whether to rescind the FY24-25 NOFO is not committed to agency discretion by law. ................................................................................. 9

    B.   The rescission of the FY24-25 NOFO violates the APA. ............................ 11

      i.   The rescission of the FY24-25 NOFO is contrary to law and exceeds Defendants' statutory authority. .............................................................. 11

      ii.  The rescission of the FY24-25 NOFO is arbitrary and capricious .......... 14

    C.   Plaintiffs' requested injunctive relief is proper and warranted. ................. 17

  II.  Absent Preliminary Relief, Plaintiffs and Their Members Will Be Irreparably Harmed ........................................................................................ 21

  III.  The Equities and the Public Interest Strongly Favor Preliminary Relief ...... 23

  IV.  No Bond Is Warranted, and Any Stay Would Be Premature and Unwarranted ................................................................................................. 24

CONCLUSION .................................................................................................. 26

## INTRODUCTION

Defendants spend a third of their opposition brief baselessly challenging this Court's jurisdiction and authority to grant Plaintiffs' requested relief, another third contesting claims that Plaintiffs are not currently pursuing, and the final third making arguments that fail to effectively address the issue central to Plaintiffs' current request for emergency relief: the improper rescission of the FY24-25 NOFO (Counts I and II of Plaintiffs' Complaint). It is uncontested that Defendants have rescinded the two-year NOFO well past the statutory deadline; that, yet again, Defendants intend to issue an untimely new NOFO; and that, under that as-yet-nonexistent new NOFO, awards likely will not be issued until May 2026 at the absolute earliest, and likely much later. This is not just an irresponsible way to administer a program that houses hundreds of thousands of our nation's most vulnerable residents—it's also illegal.

The unlawfully timed and arbitrary and capricious nature of Defendants' decisionmaking has wrought chaos and confusion and irreparably harms Plaintiffs, their members, and the communities they serve. Congress authorized a two-year NOFO to increase stability; Defendants' actions fly in the face of such goals and will result in increased homelessness—the very opposite of the intended outcome of the Continuum of Care (CoC) program.

Plaintiffs' requested relief is the only way to mitigate the irreparable harms suffered by Plaintiffs and, for the national nonprofits, their members. The rapidly approaching funding gap resulting from Defendants' unlawful actions is currently

hamstringing Plaintiffs and their members in their efforts to serve clients during the coldest months of the year. The funding gap will prevent them from maintaining permanent housing programs and will create mission-threatening damage to their ability to provide services, leading to vulnerable clients being forced out of their homes.

Absent Defendants' unlawful actions, Plaintiffs and their members, under the FY24-25 NOFO, would have soon received a second year of awards for the HUD CoC program—our country's primary federal response to addressing homelessness. Plaintiffs request that this Court stay the rescission of the FY24-25 NOFO pursuant to section 705 of the APA and issue preliminary relief preventing Defendants from rescinding or otherwise replacing the FY24-25 NOFO through a new agency action and requiring Defendants to begin processing FY25 renewal awards consistent with the FY24-25 NOFO. The requested relief is necessary to restore the status quo and provide relief to the organizations and local governments that work tirelessly to provide housing to those who need it most.

## ADDITIONAL FACTUAL BACKGROUND

A week after Plaintiffs filed this case, and just hours before the scheduled TRO hearing, Defendants withdrew the FY25 NOFO that they issued on November 13. (ECF No. 39). Defendants explained that they needed "to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." *Id.* HUD's notice to grantees and applicants added that a "modified NOFO" would be reissued "well in advance" of the deadline for obligation of FY25 funds, *i.e.*, September 30, 2027.

2

Supplemental Declaration of Ann Marie Oliva ("Oliva (NAEH Suppl. Decl.)") ¶ 6. HUD made clear that it was not reinstating the FY24-25 NOFO, but rather "still intend[ed] to … make changes to the previously issued NOFO to account for new priorities." Administrative Record (AR) 2.

Before the FY25 NOFO was withdrawn, Plaintiffs and their members had dedicated countless hours and resources to meet the demands of the FY25 NOFO on its compressed timeline. Oliva (NAEH Suppl. Decl.) ¶ 21. Those resources have gone to waste and communities are now at a standstill. *See id.* ¶¶ 19-22.

## ARGUMENT[1]

### I.      Plaintiffs Are Likely to Succeed on Their Challenges to the Rescission of the FY24-25 NOFO.

Contrary to Defendants' contentions, Plaintiffs are likely to succeed on their challenges to the rescission of the FY24-25 NOFO under section 706(2) of the APA— and the Court *can* grant Plaintiffs' requested preliminary relief on the basis of those claims. No threshold barriers preclude review of Plaintiffs' claims; the rescission violates the APA; and Plaintiffs' requested relief is warranted.

---

[1] Plaintiffs do not address, and the Court need not consider, sections I.A and I.B of Defendants' brief, which address Plaintiffs' challenges to the FY25 NOFO and claims under section 706(1) of the APA for agency action unlawfully withheld or unreasonably delayed. *See* Defs.' Mem. at 8–30. While Plaintiffs disagree that their challenges to the FY25 NOFO are moot—given that Defendants withdrew the FY25 NOFO due to this litigation and have all but promised to reissue another NOFO with similar terms—Plaintiffs no longer need preliminary relief with respect to the now-withdrawn FY25 NOFO. And although Plaintiffs intend to amend their complaint and pursue a section 706(1) claim at summary judgment, Plaintiffs have not sought preliminary relief with respect to any section 706(1) claim.

### A. The rescission of the FY24-25 NOFO is reviewable.

Defendants raise multiple threshold challenges to the reviewability of Plaintiffs' claims, but those challenges all fail. The rescission is a reviewable final agency action; Plaintiffs have standing to challenge it; and whether to rescind the NOFO is not committed to agency discretion by law.

### i. The rescission of the FY24-25 NOFO is discrete final agency action.

The rescission of the FY24-25 NOFO is a reviewable final agency action. For APA review to be available, a plaintiff must challenge a (1) "discrete" agency action that is "final" in the sense that it (2) "marks the consummation of the agency's decisionmaking process," and (3) determines "rights or obligations" or produces "legal consequences." *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (cleaned up) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The rescission of the FY24-25 NOFO satisfies all three criteria.[2]

First, the rescission is a "discrete" agency action. On November 13, Defendants issued a new FY25 NOFO that "rescind[ed] and supersede[d] any mention of" FY 2025 awards in the FY24-25 NOFO. Declaration of Amy Romero, Ex. 2 at 15 (ECF No. 6-2) (FY25 NOFO). This reflects a specific "decision[]" that Defendants made and that Plaintiffs seek to have set aside. *New York*, 133 F.4th at

---

[2] Defendants spend paragraphs (at 31–32 and 35) arguing that the since-withdrawn November 13 FY25 NOFO, the anticipated future FY25 NOFO, and the December 8 withdrawal of the November 13 FY25 NOFO are not challengeable final agency actions. These are red herrings. Plaintiffs do not challenge a future NOFO or the December 8 withdrawal, and they no longer seek preliminary relief with respect to the November 13 FY25 NOFO.

67. It does not matter that a "series of events" led up to the rescission. *See* Defs.' Mem. at 32, (ECF No. 45). The fact that Defendants foreshadowed that they would rescind the FY24-25 NOFO—by announcing their intent in July—does not make the rescission itself any less discrete or actionable. [3] Indeed, if that were enough to render an action insufficiently discrete, agencies could regularly insulate their actions from review just by previewing them first. Contrary to Defendants' contention (at 33), the fact that Plaintiffs challenge a rescission that Defendants had previewed does not turn their claims into "generalized complaints about agency behavior," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006), or an attempt to seek "wholesale improvement of [an agency] program by court decree," *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 891 (1990). Rather, Plaintiffs challenge the discrete agency action of rescinding the FY24-25 NOFO.

Second, the rescission is final in the sense that it "marks the consummation of the agency's decisionmaking process." *New York*, 133 F.4th at 67 (cleaned up). Defendants appear to concede as much. *See generally* Defs.' Mem. at 32–35. Defendants made, and announced, a final decision to rescind the FY24-25 NOFO when they published the November 13 FY25 NOFO. And while Defendants later withdrew the November 13 FY25 NOFO, they made very clear that they were not

---

[3] Defendants also cite the closing of the FY24-25 NOFO on the grants.gov website on January 23. Defs.' Mem. at 32. But that did not foreshadow or functionally amount to a rescission of the FY24-25 NOFO. HUD did not announce that it was closing the NOFO for good, nor did communities understand it to amount to a rescission. Oliva (NAEH Suppl. Decl.) ¶¶ 45-47. Indeed, HUD had made awards under the NOFO the week before, and it is typical for HUD to close a NOFO once awards are made. *Id.* ¶ 46.

thereby undoing the rescission of the FY24-25 NOFO. Instead, HUD stated that it "still intend[ed] to … make changes to the previously issued [FY24-25] NOFO to account for new priorities"—"instead of processing renewals"—and that it would "reissu[e] a modified NOFO" later. Administrative Record (AR) 2 (ECF No. 44 at 5).

Third, the rescission determines rights or obligations and produces legal consequences. As courts have repeatedly held, actions that establish eligibility criteria for federal funding are final agency action reviewable under the APA. *See, e.g.*, *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056–59 (D. Or. 2018) (collecting cases); *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same). By the same token, an action that eliminates existing eligibility criteria—and thereby changes the terms on which funds will be awarded—is necessarily final agency action as well. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that the APA "makes no distinction … between initial agency action and subsequent agency action undoing or revising that action").

In claiming that the rescission did not produce legal consequences, Defendants emphasize (at 34) that the FY24-25 NOFO provided no "guarantee" of renewals or that applicants would not need to reapply in FY 2025. But this ignores the "pragmatic approach" that the Supreme Court requires courts to "take[] to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016). Even though HUD "reserve[d] the right" to change the NOFO, it provided that, absent further action, applicants were "not required to apply for renewal for FY

2025 funds." FY24-25 NOFO at 4; *see also* Oliva (NAEH Suppl. Decl.) ¶¶ 44-47 (explaining that HUD took steps to process FY25 renewals in January and June 2025 consistent with the FY24-25 NOFO). That set the default—a default that HUD discarded when it rescinded the NOFO. That produced legal consequences—both by newly requiring applicants to reapply and by eliminating the expectation of renewal funding based on the FY24-25 competition.

### ii. *Plaintiffs have standing to challenge the rescission of the FY24-25 NOFO.*

Plaintiffs have standing to challenge the FY24-25 NOFO rescission. Defendants' primary argument to the contrary appears to be that Plaintiffs' harms are not redressable because the Court does not have the authority to order specific relief. But for purposes of standing, their argument is foreclosed by Supreme Court and First Circuit precedent, which makes clear that the availability of relief is a merits question and not one that goes to standing. And because Plaintiffs' injuries would be redressed by the funding renewals under a restored FY24-25 NOFO, Plaintiffs have standing to pursue their claims.

"[S]tanding is an essential . . . part of the case-or-controversy requirement" for an Article III court to maintain jurisdiction over a case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). But the question of whether plaintiffs will prevail on the *merits* of their claims—including whether the court may order the relief Plaintiffs seek—is not jurisdictional, and Defendants' merits arguments cannot deprive a court of "the statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original).

Thus, courts maintain jurisdiction over cases even where a defendant questions the "legal availability of a certain kind of relief." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013); *see also id.* at 175 ("Courts often adjudicate disputes where the practical impact of any decision is not assured."). While a defendant may argue that a plaintiff's requested relief implicates questions of "justiciability, and judicial and equitable power," those questions do not "control the standing issue," and are "better . . . resolved in another context." *NAACP, Boston Chapter v. Harris*, 607 F.2d 514, 523 (1st Cir. 1979); *see also Soule v. Conn. Ass'n. of Schools, Inc.*, 90 F.4th 34, 51 (2d Cir. 2023) ("to the extent there may be legal obstacles to the requested injunction, 'the legal availability of a certain kind of relief' goes to the merits, not jurisdiction" (quoting *Chafin*, 568 U.S. at 174)).

Defendants contend that this Court cannot remedy Plaintiffs' injuries by mandating contract renewals. Defs.' Mem. at 36; *see also id.* at 48–49 (Defendants arguing this point at greater length elsewhere in their brief). Thus, they argue, Plaintiffs' injuries are not redressable and they do not have standing. But Defendants' arguments go to the *merits* of the case; for the purpose of *jurisdiction*, Defendants' arguments about the scope and ultimate availability of relief do not deprive this Court of the power to adjudicate Plaintiffs' claims. *NAACP, Boston Chapter*, 607 F.2d at 523.

Defendants further suggest that Plaintiffs do not have standing because, in Defendants' view, a restoration of the FY24-25 NOFO alone "would not lead to contract renewals for any recipients" because it "did not make any binding

8

guarantees with respect to the 2025 CoC renewals." Defs.' Mem. at 36. But Defendants mischaracterize the relief at issue in this case—Plaintiffs seek an order vacating the rescission of the FY24-25 NOFO and requiring Defendants to make FY 2025 awards pursuant to the FY24-25 NOFO, which would clearly and fully redress Plaintiffs' injuries. *See* Compl. at 70.[4]

### iii. *Whether to rescind the FY24-25 NOFO is not committed to agency discretion by law.*

Defendants also err in contending (at 36–38) that the rescission of the FY24-25 NOFO is "committed to agency discretion by law" and is thus unreviewable under 5 U.S.C. § 701(a)(2). The Supreme Court has emphasized that this exception to the strong "presumption of judicial review" under the APA is "quite narrow[]." *Dep't of Com. v. New York*, 588 U.S. 752, 771–72 (2019) (cleaned up). An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that … the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 599–600 (1988). Only in those "rare instances" in which there is "no law to apply" is it appropriate to deem an action "committed to agency discretion" and therefore unreviewable. *Id.* at 599.

---

[4] Defendants' invocation of *Murthy v. Missouri* does not help their case. Defs.' Mem. at 36 (citing 603 U.S. 43, 73 (2024)). In *Murthy*, the Court held that the plaintiffs had failed to show that their injuries were redressable because their injuries appeared to be traceable to third parties who were not before the court at all. *Murthy*, 603 U.S. at 73-74. *Murthy* is not instructive here, where Plaintiffs seek relief from injuries caused directly by Defendants' actions.

Despite Defendants' assertions to the contrary, this is not such an instance. The statute governing the CoC program sets forth standards that cabin HUD's discretion in awarding grants—including by establishing criteria that HUD must consider and the conditions it must impose, 42 U.S.C. §§ 11386(b), 11386a(b)(1); limiting the additional criteria and conditions HUD can adopt, *id.* § 11386a(b)(1)(G); and establishing timelines for releasing notices of funding opportunity and for making awards, *id.* § 11382(b), (d). These provisions supply "meaningful standard[s]" for evaluating HUD's rescission of the FY24-25 NOFO here. *See Webster*, 486 U.S. at 600.

In contending otherwise, Defendants emphasize (at 37) that the rescission of the FY24-25 NOFO was a "policy-driven" decision to depart from the "policy priorities" of the previous Administration. But that is beside the point. The fact that an agency takes an action to effectuate new leadership's policy priorities does not mean that Congress gave the agency unreviewable discretion to take that action. And, here, the detailed statute governing the CoC program establishes "meaningful standards" for assessing Defendants' exercise of discretion. *See Webster*, 486 U.S. at 600.

Nor is the rescission, as Defendants suggest (at 37), the type of decision "that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (quoting 5 U.S.C. § 701(a)(2)). Those traditional categories include a "decision not to institute enforcement proceedings," an intelligence agency's decision "to terminate an employee in the interests of national

security," and "[t]he allocation of funds from a lump-sum appropriation" where Congress has not "statutorily restrict[ed] what can be done with those funds." *Id.* Defendants' decision to rescind the FY24-25 NOFO—against the statutory backdrop prescribing criteria and conditions and setting timelines for CoC awards—bears no resemblance to those traditional categories of decisions committed to agency discretion. *Cf. Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021) (holding that agency funding decisions were reviewable where Congress "circumscribed agency discretion to allocate resources by putting restrictions in the operative statute" (cleaned up)).

### B. The rescission of the FY24-25 NOFO violates the APA.

The rescission of the FY24-25 NOFO must be set aside under section 706(2) of the APA both because (1) it is contrary to law and exceeds Defendants' statutory authority and (2) it is arbitrary and capricious.

#### i. *The rescission of the FY24-25 NOFO is contrary to law and exceeds Defendants' statutory authority.*

As Plaintiffs explained in their motion, the rescission of the FY24-25 NOFO exceeds Defendants' authority and is contrary to law because the statute required them to issue the NOFO for FY 2025 funding no more than three months after the funds were appropriated, *i.e.*, by June 15, 2025. *See* Pls.' Mem. at 37–38, (ECF No. 5-1). Defendants make three arguments in response, and all are meritless.

First, Defendants err in suggesting (at 39) that HUD in fact rescinded the NOFO much earlier, such that there was no NOFO "in effect" as of the June 15 deadline. In particular, they claim that HUD had rendered the FY24-25 NOFO "a

nullity" in January 2025 when the agency closed the NOFO on grants.gov. That makes no sense. When HUD closed the FY24-25 NOFO on grants.gov, it had already received and reviewed applications and had just made awards for FY 2024 under that NOFO. Oliva (NAEH Suppl. Decl.) ¶ 46. And under the terms of that NOFO, HUD could "award available FY 2025 funds … based on" that completed competition. FY24-25 NOFO at 4. HUD, moreover, did not communicate to anyone that it was rescinding the NOFO at that time, nor did CoCs understand the removal from grants.gov that way. Oliva (NAEH Suppl. Decl.) ¶ 46. Indeed, it is typical for HUD to close a NOFO on grants.gov once awards are made. *Id.*

Second, Defendants miss the mark in emphasizing (at 39–41) that missing a deadline for taking an action does not prevent an agency from belatedly taking that action. Whether an agency can still take action after a deadline has passed is a question of congressional intent. *Dolan v. United States*, 560 U.S. 605, 610 (2010) (looking to "statutory language" and "context" and the "purposes that a time limit is designed to serve" to determine "the consequences of [a] missed deadline"). Most often, where Congress directs an agency to take action and to do so by a particular time, it does not thereby intend to "preclude action later." *Nielsen v. Preap*, 586 U.S. 392, 411 (2019) (cleaned up). That is because "an official's crucial duties are better carried out late than never." *Id.* Limiting the agency's ability to act after the deadline would be "counterintuitive," so if Congress had meant to set such a limit, "it would have said" so. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 163 (2003).

The same logic does not apply where, as here, the agency has already taken the required action—*i.e.*, it already issued the required NOFO when it issued the FY24-25 NOFO. In such circumstances, barring the agency from acting after the deadline would not "strip the government of authority to get the job done." *Castaneda v. Souza*, 810 F.3d 15, 40 (1st Cir. 2015) (Barron, J., for equally divided en banc court) (cleaned up) (concluding that agency lacked authority to take action after the time limit there). There is nothing "counterintuitive," *Barnhart*, 537 U.S. at 163, about limiting the agency's authority in such circumstances—as there is no tension between the mandate that the agency take action and the mandate that the agency do so by a particular deadline. Both mandates can be honored. Indeed, limiting the agency's authority in those circumstances is the only way to avoid rendering the deadline provision meaningless. If an agency could take a required action (by the deadline or even after) and then rescind it and take a new action at any time it wanted, the statutory time limit would be "void[] or insignificant," contrary to "a cardinal principle of statutory construction." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted).

Third, Defendants mistakenly suggest that the statute cannot bind them to issue any new NOFO by June 15 because the FY24-25 NOFO "reserved HUD's right" to issue a new NOFO for FY 2025 funds. *See* Defs.' Mem. at 41–42 (alterations omitted). While HUD might have reserved its right to revise the FY24-25 NOFO in the future, it could not validly reserve the right to do so in contravention of the statutory deadline. The statute contains no exception from its

deadline that would allow HUD to reserve the right to violate it. *See* 42 U.S.C. § 11382(b).

### ii. *The rescission of the FY24-25 NOFO is arbitrary and capricious.*

The rescission of the FY24-25 NOFO is likewise arbitrary and capricious. Defendants' argument in opposition assumes that it is presumptively reasonable for "a new Administration to abandon the policy priorities of the prior Administration." Defs.' Mem. at 42. Pursuant to this theory, Defendants contend, without support, that because the FY24-25 NOFO reflected certain priorities of the previous administration, Defendants' decision to rescind that NOFO was *per se* reasonable. This stunning contention finds no support in statute or precedent and would leave federal agencies completely untethered from the APA's requirement of reasoned decisionmaking. There exists no change-in-administration exception to the APA's requirement that agencies act reasonably and explain the bases for their actions. A new administration may "come into office with policy preferences and ideas," but it still must engage in "[r]easoned decisionmaking under the [APA]." *Dep't of Commerce*, 588 U.S. at 783, 785; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025) ("[F]urthering the President's wishes cannot be a blank check for the Agencies to do as they please." (quotation marks omitted)), *appeal filed*, No. 25-1428 (1st Cir. May 1, 2025). Thus, whenever an agency changes its policies, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior

policy." *Fox Television Stations*, 556 U.S. at 515–16. Defendants have provided no such reasoned explanation for their belated rescission of the FY24-25 NOFO.

Moreover, Defendants' sweeping argument that a new administration may reasonably take action to reflect new policy priorities, without further explanation or consideration, and no matter how drastic, fails to account for the fact that the CoC program is a statutory program reflecting certain policies chosen by *Congress*. *See, e.g.*, Pls.' Mem. at 7–8. And Defendants still "entirely fail to consider" the impact of the *timing* of the rescission. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Mid-November was far too late to reasonably change CoC program policies for FY 2025, much less to overhaul them, and Defendants in no way acknowledged—much less accounted for—the chaos and inevitable funding gaps that their tardy decision would cause at such a late date. *See, e.g.*, Pls.' Mem. at 38–39. If HUD wanted to make changes to CoC program policies, it could have attempted to do so much earlier, when the changes would not have been so disruptive. To the extent that it failed to make its desired changes in a timely manner, there was an obvious alternative path: to wait to take the desired action until the following year, and to do so in a timely manner. Defendants simply have no reasonable explanation for their untimely rescission of the FY24-25 NOFO, mere weeks before renewal awards would otherwise have gone out, rather than waiting until the next year to issue a new NOFO for FY 2026 reflecting their policy priorities.

15

Defendants also attempt to brush aside the reliance interests of CoCs, local governments, service providers, and the individuals and communities they serve in having stable funding. Defendants emphasize that the FY24-25 NOFO itself did not necessarily *guarantee* the renewal of every eligible award, but they entirely ignore the expectation that the NOFO itself set as well as the broader context that reasonably created reliance interests for recipients and beneficiaries of those funds. *See* Defs.' Mem. at 44–45. That context includes the statute pursuant to which HUD implements the CoC Program, which is designed specifically to provide for funding stability and permanent housing, as well as the agency's longstanding practice in administering CoC awards. *See* Pls.' Mem. at 5–8, 13–16; *see also Pacito v. Trump*, 772 F. Supp. 3d 1204, 1223 (W.D. Wash. 2025) (explaining that when agencies change their policies they must "assess[] the reliance interests they engendered through their longstanding [agency] infrastructure and standard [agency] practices"), *appeal filed*, No. 25-1313 (9th Cir. Mar. 3, 2025). Defendants' decision to belatedly cast aside the FY24-25 NOFO—inevitably creating lengthy and irreparable funding instability for numerous entities, and in turn forcing previously unhoused individuals out of their homes—in no way reflects those statutory priorities. They undoubtedly failed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020); *see also id.* at 31 (rejecting the argument that plaintiffs lacked valid reliance interests because the program "provided benefits only in two-year increments").

Defendants cannot cure these myriad problems with better reasoning on remand because, at this point, it is far too late for any rescission of the FY24-25 NOFO to be reasonable. To effectuate any such rescission, Defendants would have to account for and justify the funding delays and associated human suffering that would result. That is not possible at this late date and in the particular circumstances here.[5]

### C. Plaintiffs' requested injunctive relief is proper and warranted.

The Court can properly award Plaintiffs' requested preliminary injunctive relief: (1) preliminarily enjoining Defendants from rescinding or otherwise replacing that NOFO through a new agency action,[6] and (2) requiring HUD to begin processing the renewal awards for those that HUD selected for awards in the FY24 competition—alongside the requested section 705 stay.

Defendants mistakenly contend (at 48-49) that vacating and setting aside an agency action is the only relief available for an APA section 706(2) claim. In fact, injunctive relief is warranted where, as here, setting aside an agency action alone is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed*

---

[5] Defendants make two additional arguments in this section of their brief. They contend that Plaintiffs cannot challenge the December 8 withdrawal of the FY25 NOFO as arbitrary and capricious. Defs.' Mem. at 45–46. Plaintiffs do not bring any claims against that withdrawal. They also wrongly assert that the Court can only stay the rescission and cannot bar HUD from replacing the FY24-25 NOFO with a new FY 2025 NOFO. That is incorrect for the reasons explained below. *See infra* Section I.C.

[6] Plaintiffs join this request for relief, which the states made in their motion for leave to supplement Plaintiff States' motion for preliminary injunction. *See* Mot. at 2, State of *Washington v. HUD*, 25-cv-626 (ECF No. 49).

*Farms*, 561 U.S. 139, 165–66 (2010). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from … conduct based on the disputed agency [action]." *Chamber of Com. of U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 612 (D. Mass. 2020) (vacating and enjoining enforcement of a rule). Here too, injunctive relief is warranted because Defendants have clearly indicated they intend to abandon the FY24-25 NOFO for good and issue a new NOFO again.

Defendants rely on *Monsanto*, 561 U.S. 139, but that case fails to advance their argument. There, the Supreme Court disapproved an order barring an agency from acting on a petition for deregulation until it conducted an environmental review. *Id.* at 149. The Supreme Court's decision hinged on the fact that the district court had simultaneously vacated the contested agency action, and the parties acknowledged that the district court's injunction "d[id] not have any meaningful practical effect independent of" vacatur. *Id.* at 165. Given the overlap between the remedies, the Court merely held that no injunction "was warranted" because vacatur alone provided complete redress. *Id.* at 166. Properly understood, then,

*Monsanto* "suggest[s] an injunction may be warranted if vacatur does not sufficiently redress the plaintiff's injury." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024).

Not only is this relief available as an equitable matter, but preliminary relief under section 705 of the APA can include "all necessary and appropriate process … to preserve status or rights" pending final resolution of the case. 5 U.S.C. § 705. Contrary to Defendants' claims, section 705 makes no distinction between claims brought under section 706(1) and those brought under section 706(2). Here, the relevant "status or rights" that Plaintiffs seek to preserve is their right to receive timely renewal awards under the FY24-25 NOFO.

The fact that protecting that right requires HUD to take some action—*i.e.*, to begin processing renewals while the case moves to resolution on the merits—does not turn the relief that Plaintiffs seek into a mandatory injunction. *See Braintree Labs., Inc. v. Citigroup Glob. Markets, Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) (citing precedent that an order requiring actions that were ongoing during the "the last uncontested status" was properly viewed as "prohibitory"). But whether the injunction is "mandatory" or "prohibitory" is beside the point. *See id.* at 41 (noting that the need for a mandatory injunction is "measured according to the same four-factor test"); *United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) ("First Circuit authority does no more than suggest that courts disfavor injunctions that disturb, rather than preserve, the status quo."). A "mandatory" preliminary injunction is appropriate where "the status quo is a

19

condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury" on the plaintiff. *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984) (recognizing that a "mandatory" injunction can "preserve the status quo"); *accord O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 979 (10th Cir. 2004) (en banc) (Murphy, J., concurring) ("It is not at all difficult to envision situations where a mandatory injunction would preserve the status quo . . . ."), *aff'd and remanded*, 546 U.S. 418 (2006). That is the case here.

In these circumstances, it is fully within the Court's power to issue a preliminary injunction requiring some affirmative action. Consistent with that power, courts entering preliminary relief in APA cases might maintain the status quo by requiring the government to take particular steps necessary to preserve the parties' preexisting rights or status. *See, e.g.*, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018) (preliminarily enjoining defendants "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments"), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part*, 591 U.S. 1 (2020); *Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell*, 100 F. Supp. 3d 1122, 1169 (D.N.M. 2015) (entering a status-quo-preserving preliminary injunction that required an agency to continue making funds available under the agreements that preceded the litigation). But for the unlawful actions challenged in Plaintiffs' suit,

20

Defendants would be processing renewals under the FY24-25 NOFO. An order requiring them to begin taking those steps[7] is thus a proper preliminary injunction.

A stay of the FY24-25 NOFO rescission alone cannot prevent the irreparable harm that Plaintiffs face.

## II.    Absent Preliminary Relief, Plaintiffs and Their Members Will Be Irreparably Harmed

The irreparable harm to Plaintiffs and their members is well documented in Plaintiffs' opening brief and the supporting declarations. The rescission of the FY24-25 NOFO will irreparably harm Plaintiffs and their members including loss of expected funding for critical CoC-funded housing and services starting in January 2026, harm to their reputations and loss of goodwill with partners that provide CoC-funded housing, and loss of staff and expertise as Plaintiffs and their members are forced to manage budget shortfalls and program closures. *See, e.g.*, Pls.' Mem. at 63–73.

The irreparable harm to Plaintiffs and their members is also necessarily connected to the life-threatening consequences for the thousands of individuals and families who will be forced back into emergency shelters or unsheltered homelessness. But that does not mean that Plaintiffs have relied solely on "harms to the homeless populations they serve" or third parties. Defs.' Mem. at 46. Indeed, Courts have recognized that plaintiffs suffer irreparable harm, along with the communities they serve, when they demonstrate injury to their own operations and

---

[7] Those steps are described in the accompanying declaration. Oliva (NAEH Suppl. Decl.) ¶ 51.

missions caused by the imminent loss of critical grant funds. *See, e.g.*, *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 890 (W.D. Wash. 2025) (recognizing irreparable injuries "both to Plaintiffs and their operations, and to the vulnerable populations they serve"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 56 (D.D.C. 2025) (recognizing that shuttering of programs and loss of staff are irreparable harms where funding freeze made it more difficult for plaintiffs to carry out their missions); *see also Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (explaining that business's "destruction in its current form" commonly qualifies as irreparable harm), *cert. denied*, 145 S. Ct. 2751 (2025).

Defendants minimize the catastrophic (and predictable) consequences of their actions by claiming that grantees can easily stomach funding gaps until spring 2026, like in prior years. *See* Defs.' Mem. at 26, 46. That is simply untrue for many providers and local governments with grants expiring early in 2026 with no replacement funds readily available. *See, e.g.*, Oliva (NAEH Suppl. Decl.) ¶¶ 23, 25, 27, 29. As it stands, even if HUD issues a new NOFO this December, it would be practically impossible to issue renewal awards any time before May 1, 2026, *id.* ¶ 37, and it would take even longer for grantees to have access to those funds. More broadly, HUD's stated goal of deprioritizing renewals and applying radically different conditions to FY25 CoC awards means that, unlike prior years, it would be extremely risky and irrational for Plaintiffs and their members to cover costs using

other sources with no indication of when or if HUD will award FY25 renewal grants. *Id.* ¶ 35.

The uncertainty and inability to plan have only gotten worse. HUD now insists its only legal obligation is to make FY25 CoC awards by September 2027 "at the earliest," Defs.' Mem. at 50, i.e., almost two years after the first CoC grants will have expired in January 2026. Immediate and irreversible consequences for Plaintiffs, their members, and their communities are already occurring. For one, organizations that provide housing to vulnerable groups are opting out of the CoC program and local competitions, leaving CoCs scrambling to identify other options to keep people housed and to carry out their missions. *See* Oliva (NAEH Suppl. Decl.) ¶ 24 (provider responsible for administering more than half of Plaintiff City of Boston's permanent supportive housing portfolio, including housing 586 households with disabilities, will not apply for CoC funding). In addition, as HUD unilaterally extends its timeline for awarding FY25 CoC funds, Plaintiffs and their members will be forced to cut staff, limit their programs (indeed, some are already starting to close their waitlists for CoC-funded housing), and divert resources away from other vital services and programs to fill the funding gaps that could last for well over a year. *See id.* ¶¶ 22–29.

### III.   The Equities and the Public Interest Strongly Favor Preliminary Relief

The balance of the equities and the public interest strongly favor preliminary relief. *See* Pls.' Mem. at 75–76. Defendants again fail to address the significant harm to Plaintiffs and the public—loss of essential housing, programs, and services,

an increase in homelessness, and diversion of community resources away from other essential public services—all caused by Defendants' unlawful actions and their delays in awarding CoC FY25 grant funds.

Rather than addressing those harms, Defendants argue that they suffer irreparable harm because preliminary relief will "effectively bar" HUD from setting "housing policies and priorities," and "effectuating statutes enacted by representatives of its people." Defs.' Mem. at 47 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). That is not the case. Preliminary relief will ensure that Defendants follow statutory requirements when awarding FY25 CoC awards and will prevent them from effectuating policy priorities in the arbitrary and capricious manner they have chosen. Because Plaintiffs have demonstrated likely success on the merits, and "there is generally no public interest in the perpetuation of unlawful agency action," the public interest favors preliminary relief here. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up).

## IV.    No Bond Is Warranted, and Any Stay Would Be Premature and Unwarranted

Defendants have requested "a bond equal to the size of any payment that the Court orders on a preliminary basis here." Defs.' Mem. at 52. But Plaintiffs do not request that the Court order any payment on a preliminary basis. Pls.' Mem. at 77 ("Plaintiffs request that, upon entry of the stay, the Court also issue a preliminary injunction requiring Defendants to take the administrative steps they would have taken in the ordinary course to process eligible renewals of FY 2025 funding under

the FY24-25 NOFO, not including obligation of funds."). The Court can deny Defendants' request for a bond on that basis alone.

To the extent that Defendants might seek a bond of some other amount, such a bond would not be warranted either. Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount" of a bond, "including the discretion to require no bond at all." *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 477.

No bond is warranted here for two reasons. *First*, Defendants do not face any irrecoverable loss of funds. Unlike in the cases they cite (at 65), Defendants do not face the prospect of forever losing CoC FY25 funds if the Court were to later determine Defendants were "wrongfully enjoined" because, here, Plaintiffs have not requested any disbursement of CoC funds. *Second*, requiring nonprofit Plaintiffs and local government Plaintiffs to post any meaningful bond, let alone bond equivalent to their FY25 CoC awards—i.e., millions of dollars—would "have the effect of denying the plaintiffs their right to judicial review of administrative action." *NRDC v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971). For that reason, several courts have declined to set bonds in similar circumstances. *See, e.g.*, *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 477 ("In a case where the Government is alleged to have unlawfully withheld large sums of previously committed funds to numerous recipients, it would defy logic—and contravene the very basis of this opinion—to hold the Nonprofits hostage for the resulting harm."); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130

(D.D.C. 2025) (same); *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 n.4 (D.D.C. 2020) (bond is inappropriate where plaintiff seeks "to vindicate important interests, and there is no risk that Defendants will suffer monetary harm"). The Court should exercise its discretion and decline Defendants' request for a bond.

Finally, the Court should deny Defendants' request for a stay. Defendants' request for the Court to stay any injunction that it issues pending appeal is premature—as no injunction has been issued—and likely inconsistent with the requirements of Federal Rule of Appellate Procedure 8(a). In any event, no stay is warranted because Defendants could not demonstrate likely success on appeal or that they will suffer any irreparable harm to warrant a stay.

## CONCLUSION

For all these reasons, and those in Plaintiffs' motion, the Court should enter a stay under 5 U.S.C. § 705 and issue a preliminary injunction.

December 17, 2025                    Respectfully submitted,

AMY R. ROMERO                        */s/ Kristin Bateman*
  (RI Bar No. 8262)                  KRISTIN BATEMAN +
KEVIN LOVE HUBBARD +                   (DC Bar No. 90037068)
  (MA Bar No. 704772)               ALESHADYE GETACHEW +
DELUCA, WEIZENBAUM,                    (DC Bar No. 1007161)
  BARRY & REVENS, LTD.              MADELINE H. GITOMER +
199 North Main Street                 (DC Bar No. 1023447)
Providence, RI 02903                AMAN T. GEORGE +
(401) 453-1500                        (DC Bar No. 1028446)
amy@dwbrlaw.com                     SIMON C. BREWER +
kevin@dwbrlaw.com                     (CT Bar No. 441889)*

Cooperating counsel,
  Lawyers' Committee for RI

*Counsel for All Plaintiffs*

TONY LOPRESTI +
  (CA Bar No. 289269)
COUNTY COUNSEL
KAVITA NARAYAN +
  (CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
  (CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

DAVID CHIU +
  (CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
  (CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
  (CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY
SARA J. EISENBERG +
  (CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE
  LITIGATION
RONALD H. LEE +
  (CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND
  AFFIRMATIVE LITIGATION

CHRISTINE L. COOGLE +
  (DC Bar No. 1738913)
YENISEY RODRÍGUEZ +
  (DC Bar No. 1600574)
CARRIE Y. FLAXMAN +
  (DC Bar No. 458681)
ROBIN THURSTON +
  (DC Bar No. 1531399)

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

LYNETTE LABINGER
  (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
  ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

ANTONIA K. FASANELLI +
  (DC Bar No. 481856)
KATHRYN M. SCOTT +
  (WA Bar No. 38978)*
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

27

MICHAEL LEVIN GESUNDHEIT +
  (CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org

*Counsel for Plaintiff City and County
of San Francisco*

WALLACE W. DIETZ +
  (TN BPR No. 009949)
DIRECTOR OF LAW
JOHN K. WHITAKER +
  (TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
  (TN BPR No. 041470)
ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan
Government of Nashville and Davidson
County*

*Counsel for Plaintiffs National Alliance
to End Homelessness and National Low
Income Housing Coalition*

TOBY MERRILL +
  (MA Bar No. 601071)
CASSANDRA CRAWFORD +
  (NC Bar No. 45396)
GRAHAM PROVOST +
  (DC Bar No. 1780222)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org

*Counsel for Plaintiffs City of Boston,
City of Cambridge, Martin Luther King,
Jr. County, Metropolitan Government of
Nashville and Davidson County, City of
Tucson*

DAVID J. HACKETT +
  (WA Bar No. 21236)
GENERAL COUNSEL TO KING COUNTY
  EXECUTIVE AND SPECIAL DEPUTY
  PROSECUTOR
ALISON HOLCOMB +
  (WA Bar No. 23303)
DEPUTY GENERAL COUNSEL TO KING
  COUNTY EXECUTIVE AND SPECIAL
  DEPUTY PROSECUTOR
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov
aholcomb@kingcounty.gov

28

*Counsel for Plaintiff Martin Luther King, Jr. County*

+ Admitted *pro hac vice*

* Not admitted in the District of Columbia; practicing under the supervision of members of the D.C. Bar.