Participants explained how the health or death of loved ones could lead them to homelessness. One participant noted: "I took care of my mom before that so—after she passed away, I had nothing. I became homeless after that, because there was no income for me, nothing after that. The job gets cut off, and she was on housing and the day she died is the day they closed the house and threw me out."

## OTHER REASONS

Some participants discussed reasons for leaving their last housing that we did not classify as economic, social, or health-related. These reasons included leaving an area for a job, relationship, or for family, living in deteriorating housing conditions, having a program (such as a substance use treatment program) end, entering an institution, or being impacted by a fire or natural disaster (Figure 16). We found that 9% of people left the area for a job or relationship, 6% left because conditions were poor, and 6% left because a program they were in which supplied housing ended. Two percent each reported leaving to enter an institution (such as a jail, prison, or hospital) or due to a fire or other natural disaster.

A participant explained how a move to a new area could not work out: "My dad had been trying to talk me into moving with him [to Florida] anyway, so I decided to take him up on that offer… and it ended up being the worst thing I could have ever done for myself. And so we ended up moving back... it took everything we had… all of our money, took everything. And then when we got here we had nothing."

### Climate-Related Housing Loss

Some participants discussed losing housing due to climate emergencies, such as wildfires. Overall, 1% of all participants noted this as a reason, but responses were concentrated in certain regions. A participant shared: "I was staying with my sister and my niece, and then their house went up in flames while I was in the hospital. Then I ended up in a care home for a little bit, and then [I had] no place to go."



**FIGURE 16** Other Reasons for Leaving Last Housing

Left the area for a job, family, etc.
9%

Poor housing conditions
6%

Program ended
6%

Went into an institution
2%

Fire or natural disaster
2%

Other reason
2%

### Housing Conditions

Sometimes people left housing because the conditions deteriorated to the point that the home was no longer habitable. Among all participants, 6% noted this as a reason for leaving their last housing. One participant share: "Nothing worked—the trash compactor and the disposal was clogged, my bathroom, this pipe was leaking—broken, the toilet kept overflowing. It's just very hard to live in that house."

## PRIMARY REASON FOR LEAVING LAST HOUSING

In this section, we discuss the primary reason that participants identified as contributing to their housing loss.

Overall, participants reported that loss of income was the most important for them to leave their last housing: 12% of all participants did (Figure 17). Nine percent noted a conflict with residents of their household was the primary reason.

DOJ-HUD-AR00797



**Figure 17** Primary Reasons for Leaving Last Housing, All Participants

Lost or reduced income
12%

Conflict among residents
9%

Didn't want to impose/wanted own space
7%

Conflict with property owner
7%

Someone else became sick, disabled, or died
6%

Building was sold or foreclosed
6%

Violence or abuse in the household
5%

Breakup between residents
4%

Participant's substance use
4%

Other needed more space
4%

**Figure 18** Primary Reasons for Leaving Last Housing, Non-leaseholders

Conflict among residents
13%

Didn't want to impose/wanted own space
11%

Conflict with property owner
7%

Building sold or foreclosed; owner/primary leaseholder change
7%

Someone else became sick, disabled, or died
7%

Lost or reduced income
7%

Others needed more space
6%

Participant's substance use
5%

Violence or abuse in the household
5%

Housing costs were too high
4%

**Figure 19** Primary Reasons for Leaving Last Housing, Leaseholders

Lost or reduced income
21%

Conflict with property owner
7%

Someone else became sick, disabled, or died
6%

Violence or abuse in the household
6%

Breakup between residents
6%

Building sold or foreclosed; owner/primary leaseholder change
5%

Conflict among residents
4%

Left area for a job, family, etc.
4%

Program ended
4%

Housing costs increased
4%

DOJ-HUD-AR00798

However, when we look at reasons separately for non-leaseholders and leaseholders, a different pattern emerges: non-leaseholders were more likely to report social reasons and leaseholders economic ones. A similar proportion of all participants (5%), non-leaseholders (5%) and leaseholders (6%) left due to violence in the home.

In examining the most important reason for non-leaseholders to leave their last housing, the most common reasons were ones we classified as social: conflict between residents (13%) and not wanting to impose on others/wanting more space (11%) (Figure 18). These reasons reflect the stress of living with others, often in overcrowded situations, with limited money or space. After these two leading reasons, there were multiple others with similar proportions. Seven percent reported conflict with the property owner, which could reflect non-leaseholders not being allowed to stay in properties without their names on leases. A similar proportion (6%) reported that their building was sold or foreclosed upon, there was a change in ownership, or the primary leaseholder lost their housing (reflecting that when one is a non-leaseholder, if the leaseholder has to vacate, others living with them do as well). Others included a household member becoming sick, disabled, or dying, or a loss of household income.

Among leaseholders, economic reasons predominated. Figure 19 presents the 10 reasons leaseholders reported most frequently. One in five (21%) leaseholders noted reductions in income as the most important reason they entered homelessness. Leaseholders noted this as the primary reason at least three times more frequently than any other reason.

## HOMELESSNESS PREVENTION

### Limited Support Before Becoming Homeless

Homelessness prevention programs, when targeted appropriately, can prevent homelessness effectively at a reasonable cost. What complicates the design of prevention programs is that among a large group of people who seem to be at risk of becoming homeless, only a small proportion do. Because our study, by design, included only those who became homeless, it is possible that those who received effective homelessness prevention never entered our sample. Thus,

perhaps it is not a surprise that few in our study received homelessness prevention services–because it is possible those who did never became homeless.

To understand the experiences of those who did become homeless, we asked participants whether they sought and received help from any source (e.g., family, friends, government agencies, community based organizations, legal services, etc.) prior to homelessness. We included a broad definition of what we considered support, including advice from friends and family who experienced a similar situation before, information about housing resources, and transportation support to search for alternate housing. Participants could choose more than one source of support if applicable.

In the survey, few reported seeking or receiving any support. One in three participants (36%) reported seeking help from any source before their homelessness began. Seeking support was more common for adults in homeless families, where 61% sought assistance. The most common sources of support sought across all participants were friends and family (22%); community-based organizations, religious organizations, or domestic violence services (16%); and government agencies (8%) (Figure 20). Adults in families sought help from any source more frequently than single adults and TAY.

Twenty-three percent of all participants received help. Adults in homeless families were more likely to receive help; nearly half (48%) of adults in families received help of any kind (compared to 21% of single adults and 24% of TAY). The most common reported types of support received were from friends and family, community-based organizations, and government agencies. Adults in families received help from any source more frequently than single adults and transition age young adults.

No matter the cause of the housing loss, in in-depth interviews, few reported awareness of eviction or homelessness prevention resources prior to their becoming homeless. As one participant said, "I didn't know about services or organizations that were available at the time when I was searching that could help me." With the minimal amount of warning that participants received prior to becoming homeless (i.e., median of 5 days among all participants), participants may have found seeking help to be unrealistic.

DOJ-HUD-AR00799

## Financial Support Would Have Prevented Homelessness

To understand what participants believed may have prevented their homelessness, we asked them to engage in a thought experiment about the likelihood that their homelessness could have been prevented had they received financial intervention. We provided all participants with three different scenarios and asked them whether each intervention would have prevented their becoming homeless for at least two years.[29] The interventions were: (1) a monthly rental subsidy worth $300-$500; (2) a one-time payment of $5,000 to $10,000; or, (3) a voucher that limits rent contribution to 30% of their income (such as a Housing Choice Voucher).

We asked participants whether, with financial intervention, they would have been able to stay in the same housing or have to move to a different location.[30] Even with financial help, 72% of participants from non-institutional settings reported that they would have needed to move to a different housing situation (81% of non-leaseholders and 59% of leaseholders).

However, many of these participants believed the intervention would have allowed them to obtain alternate housing. Seventy percent of all participants believed that a shallow subsidy of $300-$500 a month would have allowed them to avoid homelessness for at least two years (Figure 21). Eighty-two percent of participants believed that a one-time lump sum payment between $5,000-$10,000 would have kept them housed for at least two years. The highest proportion of participants (90%) reported that an ongoing subsidy that capped their housing costs at 30% of their income (such as a Housing Choice Voucher) would have prevented their homelessness.

Among those who entered homelessness from an institutional setting, 71% believed a shallow monthly subsidy would have prevented their homelessness, 83% reported a lump-sum payment would have done so, and 93% believed that a permanent subsidy would have.



**FIGURE 20** Sources of Homelessness Prevention Help Sought Prior to Homelessness by Family Structure

● Community based organization or nonprofit   ● Friends or family   ● Government agency   ● Legal services
● Other

**All**
| | |
|---|---|
| 16% | |
| 22% | |
| 8% | |
| 3% | |
| 4% | |

**Adults in families**
| | |
|---|---|
| 33% | |
| 44% | |
| 15% | |
| 8% | |
| 8% | |

**Single adults**
| | |
|---|---|
| 15% | |
| 20% | |
| 7% | |
| 2% | |
| 4% | |

**TAY**
| | |
|---|---|
| 18% | |
| 23% | |
| 3% | |
| 1% | |
| <1% | |

DOJ-HUD-AR00800

CHAPTER 2: PATHWAYS TO HOMELESSNESS



**FIGURE 21** Participant Report of Effect of Hypothetical Homelessness Prevention Interventions by Family Structure

● $300–$500/month shallow subsidy   ● $5,000–$10,000 one-time payment   ● Housing voucher

**All**
- 70%
- 82%
- 90%

**Adults in families**
- 56%
- 73%
- 94%

**Single adults**
- 71%
- 83%
- 90%

**TAY**
- 76%
- 81%
- 85%

Participants may have been overly optimistic in their assessments. However, the high proportion of all participants who thought that these interventions could have prevented their homelessness highlights the role that high housing costs play in homelessness and may suggest an untapped potential for prevention. Even those who had substantial substance use or mental health conditions, had experienced an interpersonal conflict that immediately precipitated homelessness, or had exited institutional settings, believed that having financial resources to pay for housing would have meaningfully prevented their homelessness.



© Sam Comen

> The high proportion of all participants who thought that these interventions could have prevented their homelessness highlights the role that high housing costs play in homelessness and may suggest an untapped potential for prevention.

DOJ-HUD-AR00801

## SUMMARY

In this chapter, we learned that those who became homeless did so after losing tenuous holds on housing. One in five came from institutional settings. Among those who came from housing situations, more than half came from non-leaseholder settings where they held few legal rights. Many had entered non-leaseholder situations after a series of losses; they entered suboptimal housing situations in a fruitless effort to stay out of homelessness. When the stress of living in overcrowded housing became too much, these housing options fell apart with little warning. Those who came from leaseholder arrangements lived in places they could barely afford and had no cushion to protect them if something went wrong. Despite legal protections, they had little warning before entering homelessness.

Few who lost housing had asked for help prior to exiting their housing, and even fewer received it. In-depth interviews revealed that many participants were not aware help existed and didn't know where to turn. Those who were aware did not receive the assistance they needed to prevent homelessness. Those who entered from institutional settings had little assistance before exiting into homelessness. It is possible that those who received this assistance never entered homelessness. Participants were able to tell us what they thought would have prevented their homelessness. The vast majority believed that receiving help paying the rent—either through shallow subsidies, deep subsidies (like Housing Choice Vouchers) or one-time payments—would have made an enormous difference.

### KEY TAKEAWAYS

- Homelessness is inextricably linked to deep poverty. The median monthly household income preceding homelessness was $960 ($1400 for leaseholders and $950 for non-leaseholders).

- One in five participants entered homelessness from an institutional setting.

- Precarious living situations often precede homelessness; 60% of participants in non-institutional settings prior to homelessness were not on a lease agreement.

- Participants reported minimal notice before losing their housing. Leaseholders received a median of 10 days notice, while non-leaseholders reported a single day.

- Trajectories to homelessness differ. Some participants reported a rapid transition to homelessness, while others reported using limited financial resources and social networks to slow their descent into homelessness.

- Leaseholders reported that an economic reason contributed to their homelessness more often than non-leaseholders. Non-leaseholders were more likely to report a social reason. However, participants spoke to structural conditions (e.g., high housing costs, crowded housing, low-income, etc.) that preceded the social reasons.

- Most participants believed that interventions that provided financial assistance could have prevented their homelessness. Participants overwhelmingly believed that shallow monthly subsidies, a lump-sum payment, or rental assistance that reduced rental burdens would have been effective.

DOJ-HUD-AR00802



© Sam Comen

DOJ-HUD-AR00803

CHAPTER 3

# EXPERIENCES During Homelessness

In this chapter, we review the experiences of study participants during homelessness. We begin with an overview of where people stayed while homeless, recognizing that these environmental contexts shape the experience of homelessness. We then discuss participants' physical health, mental health, use of substances, experiences of violence, and interactions with the police.

We conducted interviews between October 2021 and November 2022, when the COVID pandemic altered many facets of life. Due to the public health emergency, there were many changes to services and benefits. During the pandemic, many congregate shelters decreased their capacity, or changed their rules. At the time of our data collection, many shelters were still operating on limited capacity, or closing new admissions due to outbreaks of COVID. Participants might have changed decision-making about whether to stay in shelters based on concerns about infection or may not have been able to access them due to limitations. Many communities were operating enhanced non-congregate shelters, such as those from Project RoomKey,[31] providing opportunities for non-congregate shelter that had not existed prior to the pandemic.

## Where Did People Stay?

People experiencing homelessness stay in a variety of settings: in unsheltered settings (with or without vehicles), in emergency shelters, couch surfing with family and friends, and in short-term institutional settings (including jails and hospitals). Although people experiencing homelessness view staying in a vehicle as distinct from being unsheltered without a vehicle, the Federal Government considers both to count as unsheltered. Because those who experience homelessness view staying in vehicles differently than in unsheltered settings without one, we present these



*Most of the time we're running around, trying to figure out where we're going to sleep at night or how we're going to be housed, or it's about to start raining soon. And we worry about that. We're not worried about going to the doctors or going to see somebody or going to get help with our mental state.*

— CASPEH participant

data separately. Experiences of homelessness are not static; people move between settings. Thus, we present the locations where people stayed in three ways: where they stayed the prior night; where they stayed most often in the last six months during this episode of homelessness; and every place they stayed while homeless (within the last six months). More than three-quarters of participants (76%) stayed in unsheltered settings the night prior to their interview; 20% stayed in a vehicle, and 56% without a vehicle. Nineteen percent stayed in an emergency shelter, 0.3% stayed in a domestic violence shelter, 2% stayed in a motel, hotel, or trailer paid for by the government or an organization (e.g., as part of a COVID program), 0.1% stayed in a motel or hotel paid for by self or family, 1% stayed with family or friends, and 0.5% stayed in institutional settings, such as hospitals or jails.

DOJ-HUD-AR00804

Among those who spent the prior night in a vehicle, 51% spent the night in a car, van or truck and 49% in an oversized vehicle (such as an RV or converted commercial vehicle). A minority (13%) of those who stayed in vehicles stayed in a safe parking site or authorized place for people who live in vehicles. The rest were either on a public street (77%), on private property (10%), or at a public rest stop (1%).

We asked where people spent the most time during the past six months of this episode of homelessness. If people had been homeless for less than six months, we asked where they had spent the most time during their episode of homelessness. The responses were similar to where participants had been the previous night: 78% were in unsheltered settings (21% in a vehicle, 57% unsheltered settings without a vehicle). Fifteen percent reported that they spent the most time in an emergency shelter, 0.3% in a domestic violence shelter, 2% in a motel, hotel, or

trailer paid for by the government or organization, 2% in a motel or hotel paid for by self or family, 0.5% in a substance use treatment program, and 2% with friends and family.

Where people stayed differed by family structure. Adults in families were most likely to spend most of their nights homeless in a sheltered setting; 59% reported that they were primarily sheltered (compared to 19% of single adults and 26% of TAY). Adults in families and single adults reported living in vehicles more frequently than TAY (22% of adults in families, 21% of single adults, 12% of TAY).

Looking at every place participants spent time while homeless in the prior six months (or since they became homeless, if their current episode was less than 6 months) presents a different picture (Figure 22). By asking this way, we see that people have multiple experiences, although almost all had spent time unsheltered. Many more report staying with family



**FIGURE 22** All Places Participants Slept For At Least One Night in the Last 6 Months, by Family Structure

● Outdoors  ● Vehicle  ● Motel/hotel paid for by you/family/friend
● Motel/hotel paid for by government or organization  ● Shelter  ● Other

**All**

| | |
|---|---|
| Outdoors | 76% |
| Vehicle | 46% |
| Motel/hotel paid for by you/family/friend | 38% |
| Motel/hotel paid for by government or organization | 12% |
| Shelter | 16% |
| Other | 19% |

**Adults in families**

| | |
|---|---|
| Outdoors | 43% |
| Vehicle | 48% |
| Motel/hotel paid for by you/family/friend | 50% |
| Motel/hotel paid for by government or organization | 28% |
| Shelter | 37% |
| Other | 22% |

**Single adults**

| | |
|---|---|
| Outdoors | 79% |
| Vehicle | 45% |
| Motel/hotel paid for by you/family/friend | 37% |
| Motel/hotel paid for by government or organization | 11% |
| Shelter | 14% |
| Other | 18% |

**TAY**

| | |
|---|---|
| Outdoors | 79% |
| Vehicle | 59% |
| Motel/hotel paid for by you/family/friend | 52% |
| Motel/hotel paid for by government or organization | 7% |
| Shelter | 18% |
| Other | 26% |

DOJ-HUD-AR00805

or friends or institutional settings at least once than reported these as where they stayed the last night or the most. Ninety percent of participants spent at least one night in an unsheltered setting in the prior six months; almost half (46%) spent at least one night in a vehicle; and three-quarters (76%) at least one night unsheltered without a vehicle. Thirty percent stayed in an emergency shelter at least one night in the prior six months, 2% stayed in a domestic violence shelter, 12% in a motel, hotel or trailer paid for by the government or an organization. Thirty-eight percent stayed in a motel/hotel paid for by self or family, 31% spent at least one night staying temporarily with family or friends; and 7% spent at least one night in a substance use treatment program.

## Shelter Access and Suitability

Forty-one percent of participants noted that, during this episode of homelessness, there was a time that they wanted shelter but could not access it, showing unmet need (and desire) for shelter. Those who didn't report this included both those who received shelter when they wanted it and those who did not want it.

Participants residing in congregate shelters reported being satisfied, generally, with their living arrangements. They appreciated having access to a place to bathe, hot food, and case management services. In contrast, some living in encampments held negative views of congregate shelters. They reported concerns about COVID and other health risks of sleeping in close quarters. They noted burdensome rules about securing a bed, curfews, and the need to vacate during the day as disincentives to shelter stays. Those living in unsheltered settings perceived the case management services offered in shelters to be ineffective for securing permanent housing.

## Vehicular Homelessness

Many participants reported living in their vehicles when they first became homeless. Although some managed to reside in their vehicles for an extended period, many lost this option. They did not give up their vehicles by choice. Vehicle residents reported needing to be vigilant to avoid having their vehicles ticketed and towed. Instead, participants reported that their vehicle became inoperable or that, after multiple tickets, their vehicle was towed. Participants noted preferring their vehicles to other unshel-

tered settings or congregate shelters; having their own vehicle allowed them to secure their belongings and feel more safe than when they slept outside, while allowing them to live without the restrictions of congregate settings.

## Use of Domestic Violence Shelters by Survivors of IPV

In in-depth interviews, some survivors of intimate partner violence discussed facing barriers to entering domestic violence shelters. They described being turned away because either all available beds were full or because there were beds available only for women with children. Others described difficulty accessing domestic violence shelters because they didn't know how to. Participants who entered domestic violence shelters mentioned varied experiences receiving adequate support and access to services; some described positive and helpful interactions and others reported limited support. A participant described the challenge of trying to access services while dealing with her own trauma: "It seems like you have to stay on top of the people that are supposed to be helping you to get the help that you're supposed to need, and like that's really hard. When you're going through trauma, it's hard to even get up sometimes, like you feel really low. I feel like your advocates that are supposed to be helping you, [they] should be reaching out to you to make sure that you're okay because you're already in a bad place."

# PHYSICAL HEALTH AND USE OF HEALTHCARE SERVICES

Homelessness takes a toll on health. Health problems—including physical and mental health conditions and substance use—can increase the chance that someone becomes homeless. All can interfere with the ability to function— including interfering with work or social relationships—and make it harder to compete in a difficult housing market. People who become homeless are more likely than those who don't to have health problems. Being homeless has deleterious impacts on health, worsening these problems and furthering the disparities between those with and without housing. The experience of being homeless brings with it stress, exposure to violence and harsh environmental

DOJ-HUD-AR00806

conditions, lack of access to food and ways to pre-pare it, inability to sleep and other challenges. The experience of homelessness can be all-consuming, leading people to engage in unhealthy behaviors such as using cigarettes, alcohol, or illicit drugs to stay awake (or go to sleep), lessen hunger pains, or manage untreated mental health conditions. These, in turn, worsen health.

People who are homeless lack money, transportation, telephones, and addresses to receive mail or access to the internet—all of which interfere with the ability to get preventive and longitudinal healthcare or to receive treatment for substance use. While homeless, people lack time, energy, and focus. The constant need to manage day-to-day issues that people with housing are protected from—threats of violence, exposure to cold (or heat, or rain), finding an electri-cal outlet, ensuring that belongings don't get stolen, and trying to find food and a place to sleep or just rest—is exhausting. In the face of this exhaustion, people who experience homelessness may find it difficult to think about addressing health problems, taking medications, or receiving treatment for, reducing or quitting smoking, alcohol, or substance use. As a result, people who become homeless are more likely to have health problems than people who don't become homeless, and once homeless, they are more likely to have their health problems worsen and less likely to be able to seek the care that would address these problems.

### Physical Health Status

Nearly half (45%) of study participants reported having fair or poor health (as opposed to good, very good, or excellent) (Figure 23). Self-reported fair or poor health is a simple but important measure of health; those who report it have a higher likeli-hood of being hospitalized or dying in the coming years. In the general population, rates of fair or poor health are elevated in older adults. Our finding is significantly higher than would be expected in older adults in the general population. Among the general non-institutionalized population age 65 and older in the United States, 22% report fair or poor health. Despite the median age of 47, twice the proportion of participants in this study reported fair or poor health than those 65 and older in the general popu-lation. We found the highest reports of fair or poor



**FIGURE 23** Self-Reported Fair or Poor Health Status by Age

All
45%

18-24 years
28%

25-49 years
40%

50+ years
53%

health among the oldest participants. More than half (53%) of those 50 and older reported that their health was fair or poor (compared with 28% of those 18-24).

People experiencing homelessness are more likely to underreport chronic health conditions, because they have poor access to healthcare. People who don't receive healthcare are less likely to know that they have chronic health problems such as diabetes or high blood pressure. Nevertheless, participants reported high prevalence of chronic diseases. Sixty percent of participants reported having at least one chronic health condition and 28% at least two.[32] Hypertension (30%) and asthma or chronic obstruc-tive pulmonary disease (COPD) (25%) were the most prevalent conditions, while 15% of participants noted having a heart condition or having had a stroke, 11% had diabetes, and 11% liver disease. As in the general population, the likelihood of having a chronic health condition increased with age, but all age groups reported higher proportions than would be expected. Forty-one percent of young adults reported a chronic health condition, slightly over half (55%) of those 25-49, and almost two-thirds (68%) of adults 50 and older did. In Figure 24, we outline the prevalence of chronic diseases by age.

Function, meaning the ability to engage in activi-ties of daily living (ADL: dressing, bathing, eating, transferring [out of a bed or chair], and toileting) is an important component of health. Having difficulty with any ADLs places people at risk of requiring

DOJ-HUD-AR00807



**FIGURE 24** Self-Reported Chronic Health Conditions by Age

● Asthma, chronic bronchitis, emphysema or COPD  ● Cancer  ● Diabetes  ● Heart problems or stroke
● High blood pressure  ● HIV/AIDS  ● Liver disease  ● Weak kidneys or chronic kidney disease

**All**
25%
7%
11%
15%
30%
3%
11%
6%

**25-49 years**
27%
5%
8%
12%
21%
3%
8%
6%

**18-24 years**
29%
4%
9%
6%
9%
<1%
4%
3%

**50+ years**
23%
10%
15%
18%
42%
3%
15%
7%

future nursing home placement, with the highest risk for those having difficulty with three or more ADLs. Thirty-four percent of participants indicated that they had difficulty performing at least one ADL; 23% reported difficulty with at least two. Among participants 50 and older, approximately 43% reported difficulty with at least one ADL, and 31% reported difficulty with at least two. Almost a quarter (22%) of participants reported difficulty with mobility, which was more common in those 50 and older (32%). One in five (20%) reported using a mobility aide, such as a cane, crutches, walker, or wheelchair; such use was more common in those 50 and older (33%).

Participants reported that their mobility challenges negatively impacted their lives. Their mobility aids were in poor repair and their mobility challenges hindered visits to prospective housing units. They found that many congregate shelters and permanent housing were inaccessible. As one participant reported: "I was trying to rent a room; the doors are not wide enough for the wheelchair that I had. They're not wheelchair accessible. I'd have to put myself in a place that I really probably wouldn't like if I found one that specifically catered to wheelchairs."

DOJ-HUD-AR00808

## Pregnancy

Pregnancy was common. Among those assigned female at birth aged 18-44, 26% reported having been pregnant at some point during this episode of homelessness. Among those aged 18-24, 40% reported a pregnancy during this episode of homelessness; among those 25-34, 22% did; 35-44, 26% did (Figure 25). We asked participants to report if they were currently pregnant. At the time of the interview, 8% of those aged 18-44 were pregnant.

Participants described the experience of pregnancy while homeless. As one participant said: "It's uncomfortable. Got to use the bathroom 2:00, 3:00 in the morning,… [my friend] has an apartment. I park in her parking lot so she [leaves] her door open, I use their bathroom and I come back out. But it's uncomfortable. My damn back hurt, and I'm four months pregnant."

## Access to Healthcare

To assess access to healthcare, we asked participants whether they had health insurance (and which kind), whether they had a regular source of healthcare other than the emergency department (ED), and if so, if they had an identified primary care provider. Having insurance is an important precursor for medical care, but obtaining insurance is not the only barrier that people experiencing homelessness face. Other barriers, including lacking phones, time, transportation, knowledge of where to go, concerns about leaving belongings unattended or of facing stigma in health settings may be more important. Having a non-ED regular place for care and a primary care provider suggests that one has some engagement with longitudinal healthcare and a place to call when they need care. However, it doesn't ensure one will receive care. To assess non-emergent care, another measure of access, we asked when was the last time participants saw a healthcare provider outside of the ED. The frequency with which one should see a healthcare provider (outside the ED) is related to several factors, including age and underlying health conditions. However, due to the high prevalence of health problems in this population, we considered not having seen a provider outside the ED in longer than a year a marker of poor access. To assess whether they had unmet need for healthcare, we asked (separately) whether they had a need for



FIGURE 25 Proportion of Adults Age 18-44 Assigned Female at Birth Who Were Pregnant at Any Time During Their Current Episode of Homelessness by Age

**All**
26%

**18-24 years**
40%

**25-34 years**
22%

**35-44 years**
26%

healthcare and had been unable to receive it, and whether they had been prescribed medication and unable to obtain it. Medicaid (known as Medi-Cal in California) relaxed rules on needing to re-enroll, due to the pandemic during the period of our study allowing more people to remain insured than otherwise might have. Some health services had switched to telehealth, providing both opportunities and barriers for people experiencing homelessness. People may have accessed care more, due to having COVID, or less, due to fears about acquiring COVID. Our results should be understood in the context of the disruptions of the pandemic.

With Medicaid expansion in California, at the time of the study most participants would have been eligible for Medicaid[33] based on their low incomes. Eighty-three percent of participants reported having health insurance, most frequently Medicaid (Figure 26).[34] Young adults were less likely to have coverage (65% of adults aged 18-24 compared to 82% of adults aged 25-49, and 86% of adults 50 and older).

Approximately half of participants (52%) reported having a regular source of healthcare other than the ED. Having a regular source of care was more common among those who were sheltered (64%) versus unsheltered (48%).[35] Fewer (39%) reported having a primary care provider. Six in ten (61%) reported

DOJ-HUD-AR00809

having seen a healthcare provider outside of the ED in the past year; 49% reported having done so in the prior six months (Figure 27). Almost one-quarter of participants (23%) reported having an unmet need for care in the past six months. The same proportion (23%) indicated an inability to get needed medication in the past six months.

Participants described challenges they faced trying to enroll in Medicaid. They noted that enrollment processes were time consuming and confusing. Even if insured, participants reported having difficulty finding healthcare providers who accepted Medicaid. Participants reported that their difficulty maintaining a phone—keeping one safe (from being lost or stolen), charged, and paid for—limited their ability to schedule and attend appointments and receive communications from their healthcare providers. Transportation was a significant barrier, particularly in areas where clinics were far away and public transportation was limited. When providers substituted telehealth appointments for in-person visits due to the pandemic, participants reported being unable to access care due to their not having access to a reliable smartphone and power source.

Participants described a range of experiences with healthcare. Some distrusted the healthcare system, resulting from prior negative experiences. Some noted that treatment had improved their quality of life or saved their lives. Others reported feeling that they received substandard treatment. Participants, particularly those who identified as Black and/or Latino/x, reported experiencing discrimination and stigma when they sought healthcare, creating additional barriers. These participants reported facing longer wait times for appointments than others, experiencing microaggressions from administrative staff regarding their names or the way they looked, and that their clinicians hadn't taken their medical concerns seriously. One participant explained: "When I went to the gastro doctor… From my name, they can't tell my race, okay? So, when I showed up with locks, dressed very eccentric for my race, you know; he's like, 'Oh, I didn't know.' I said, 'Didn't know what? What, did I scare you?' He's like, 'No, on the phone you sound so proper.' I said, 'Oh, you didn't know I was Black.'"



**FIGURE 26** Health Insurance Coverage Type by Age

● Medicaid and Medicare   ● Medicaid only   ● Medicare only   ● Other health insurance   ● No health insurance

**All**
- 4%
- 71%
- 5%
- 4%
- 17%

**25-49 years**
- 1%
- 78%
- 1%
- 2%
- 18%

**18-24 years**
- <1%
- 54%
- 3%
- 9%
- 35%

**50+ years**
- 7%
- 64%
- 10%
- 6%
- 14%

DOJ-HUD-AR00810



**FIGURE 27** Time Since Last Visit with a Health Care Provider by Age

● Six months or less   ● More than 6 months to 1 year   ● More than 1 year to 5 years
● More than 5 years   ● Never

**All**
- 49%
- 12%
- 23%
- 14%
- 2%

**25-49 years**
- 45%
- 13%
- 26%
- 14%
- 1%

**18-24 years**
- 51%
- 12%
- 24%
- 10%
- 2%

**50+ years**
- 54%
- 10%
- 19%
- 14%
- 3%

Participants connected their challenges accessing care to worsening of their health. Throughout the study, we heard a common theme: if participants were housed, they would be more able to prioritize their healthcare and face fewer barriers to care, leading to improved health. As one participant said: "(If I had housing) I would start hitting [AA/NA] meetings. I would go to an outpatient behavioral health drug treatment program. It's a volunteer basis. And I would do that. I would be working. Services I would be accessing, definitely behavioral health. I would get a primary doctor and get my health in order. I would probably join a club or two, like photography? You know? Something fun... It would change everything."

### Acute Health Care Utilization

In the past six months, 38% of participants reported a visit to the ED that did not result in a hospitalization (Figure 28). For comparison, in 2019, approximately 22% of Americans aged 18 and older had visited the ED at least once in the prior *year*.[36] As in

most reports, a small group of people made the majority of the visits by using the ED repeatedly. In our study, 9% visited the ED at least three times in the last six months.

In the prior six months, 21% reported an inpatient hospitalization for a physical health reason (Figure 29). Adults aged 50 and older (25%) and young adults aged 18-24 (29%) reported a higher rate of hospitalizations. These rates are substantially higher than similarly aged adults in the general population.

The high proportion of people reporting ED visits and inpatient hospitalizations reflect several factors, including the overall poor health of those who are homeless, the deleterious impacts of homelessness on health, the lack of access to non-emergency healthcare, and the limited options to treat people who are ill as outpatients (lowered admission thresholds).

Participants reported few options for places to recover from illnesses when they didn't feel well. They reported the inability to get adequate sleep or rest while in unsheltered settings and noted that

DOJ-HUD-AR00811



**FIGURE 28** Emergency Department Visits in the Last Six Months by Age



**FIGURE 29** Physical Health Hospitalizations in the Last Six Months by Age

many shelters required guests to leave during the day. Those who were hospitalized noted the lack of adequate post-hospitalization care (e.g., recuperative care/medical respite). Participants described hardships they experienced when discharged from inpatient stays to unsheltered situations. Those who lived in vehicles noted that while they were hospitalized, they risked their vehicles being ticketed or towed. Some participants noted that they had access to recuperative care following hospitalizations: "It's a good thing and it's a bad thing being in this situation. It's a good thing, because of my medical condition…I have shelter. The bad thing is because I have a heart condition. That's a bad thing for me to get housing in this situation. I wish I didn't have my health condition and still have housing."

## BEHAVIORAL HEALTH
### Mental Health

Many who experience homelessness have had past trauma. The experience of homelessness is highly stressful—exposing participants to worry, poor sleep, violence, and hopelessness. Mental health problems can increase one's risk for homelessness and be exacerbated by homelessness. It is not surprising that many participants reported mental health symptoms. To receive a diagnosis of a mental health condition, one needs to have accessed mental health treatment. Because access to treatment can be limited, we asked about specific symptoms rather than diagnoses.

To determine current symptomatology, we asked participants to report on mental health symptoms in the prior 30 days. We asked whether participants experienced serious depression (symptoms of sadness, hopelessness, loss of interest, difficulty with daily functioning) or serious anxiety (uptightness, unreasonably worried, unable to relax). We asked if they had ever experienced hallucinations (saw things or heard things that weren't there) or had difficulty concentrating or remembering things.

Current mental health symptoms were common (Figure 30). Two-thirds (66%) of participants reported experiencing symptoms of either depression, anxiety, trouble concentrating or remembering, or hallucinations in the past 30 days. Many experienced more than one type of symptom. Half (51%) experienced anxiety, half (48%) experienced depression, one-third (37%) reported trouble concentrating or remembering, and 12% reported hallucinations.

We asked participants about their access to and receipt of treatment for mental health concerns. We asked all participants if they had received outpatient mental health counseling or treatment in the prior 30 days. Similarly, we asked whether they had been

DOJ-HUD-AR00812



**FIGURE 30** Current Self-Reported Mental Health Conditions by Family Structure

● Any mental health condition  ● Anxiety  ● Depression
● Trouble remembering, concentrating, or understanding  ● Hallucinations

**All**
- 66%
- 51%
- 48%
- 37%
- 12%

**Adults in families**
- 59%
- 43%
- 39%
- 27%
- 5%

**Single adults**
- 67%
- 51%
- 49%
- 38%
- 13%

**TAY**
- 62%
- 48%
- 45%
- 36%
- 13%

prescribed medication for a mental health concern as an outpatient in the prior 30 days. Finally, we asked about whether they had ever had a mental health hospitalization, and if so, if they had in the prior six months.

> " *I just want to get in a place. This pain that I'm feeling, emotional and physical pain, you know. If I can just get beyond that, most of it be solved by getting in a place. I'd be so happy to be in my own place.* "

Despite two-thirds (66%) of participants reporting current mental health symptoms, only 18% of all participants had received either mental health counseling or medications in the prior 30 days; 9% had received mental health counseling and 14%

medications for mental health conditions. Among those who reported current mental health conditions, 24% reported receiving either counseling or a prescription for a medication currently. Five percent reported a hospitalization for a mental health problem in the prior six months.

Participants discussed daily stress, anxiety, and feelings of hopelessness associated with homelessness, as well as symptoms of severe depression, mania, psychosis, and panic attacks that occurred while homeless. They described how homelessness worsened their mental health symptoms through a variety of mechanisms, including inability to maintain medications that had kept them stable, lack of sleep, experiences of violence, and experiences of shame and stigma associated with homelessness. Participants reported numerous barriers to accessing mental health treatment, such as the inability to obtain counseling due to challenges with navigating mental health services or not having a phone to make appointments. Without access to services, participants noted deploying other strategies to

DOJ-HUD-AR00813

manage symptoms, including self-segregating from other individuals to decrease exposure to loud noises or difficult interactions and self-medicating with drugs or alcohol. Participants discussed difficulty accessing medications or losing their existing medications. As one participant reported: "But day to day, I have social anxiety, physical anxiety, and hopelessness. Those are more to do with mental health. I haven't had my meds… a couple weeks ago when I had to leave a different place, all my things were taken. So, I haven't had meds in a couple weeks, and I'm on a few of them. So, definitely depression has been a lot worse, and it's a bad time to have all this because I'm trying to get into a new place, get a job, whatever."

### Substance Use

Substance use patterns change over time; it is common for people to fluctuate between periods of heavy use and cessation. People increase and decrease their use of substances for a myriad of reasons (e.g., response to trauma, to self-medicate mental health challenges, concerns about health or legality). We asked about current use (including whether they used, what substances, and the frequency), including non-fatal overdose experiences during this episode of homelessness and availability of naloxone. We asked similar questions about alcohol use. We asked participants how their use changed during this episode of homelessness, whether they had sought and received help, whether they had had difficulty accessing treatment that they wanted, and whether they felt that their substance use was causing them social or legal problems. To help us understand why people used, didn't use, changed their use patterns, or engaged (or didn't engage) in treatment, and the consequences of those decisions, we used in-depth interviews.

We describe current regular use of cocaine, amphetamines, and non-prescribed opioids as use three times a week or more. By this definition, one third (35%) of participants reported currently using cocaine, amphetamines, or non-prescription opioids regularly (Figure 31). Thirty-one percent of participants report current regular use of methamphetamines; 3% cocaine, and 11% non-prescribed opioids. In the prior six months, 13% of all participants report using injection drugs. During this episode of homelessness, 11% of participants reported experiencing an overdose; one-quarter (26%) reported having access to naloxone.



**FIGURE 31** Current, Regular Substance Use by Family Structure

- ● Any substance 3+ a week
- ● Amphetamines 3+ times a week
- ● Cocaine 3+ times a week
- ● Opioids 3+ times a week

**All**
- 35%
- 31%
- 3%
- 11%

**Adults in families**
- 13%
- 13%
- <1%
- 1%

**Single adults**
- 36%
- 33%
- 3%
- 11%

**TAY**
- 40%
- 18%
- 18%
- 29%

DOJ-HUD-AR00814



**FIGURE 32** Self-reported Changes in Substance Use Since Homelessness (of Participants Who Ever Used Substances) by Family Structure

● Increased a lot  ● Increased a little  ● Stayed about the same  ● Decreased a little  ● Decreased a lot

**All**
20%
8%
38%
7%
28%

**Adults in families**
10%
5%
33%
6%
46%

**Single adults**
20%
8%
38%
7%
27%

**TAY**
43%
11%
21%
11%
13%

To assess current alcohol use, we asked standardized questions to assess regular drinking and heavy episodic drinking (drinking 6 or more drinks in one sitting). Using standard definitions, we defined regular drinking as drinking three or more times a week until buzzed or drunk or drinking less frequently but more heavily, like getting drunk regularly on weekends. We assessed current unhealthy alcohol use using commonly accepted definitions of heavy alcohol consumption.[37] We defined unhealthy alcohol use as either heavy use[38] or heavy episodic use (consuming 6 or more drinks in a single sitting monthly or more often). Sixteen percent reported heavy episodic drinking at least monthly and 9% report heavy episodic drinking at least weekly. Eleven percent of women and 21% of men reported either unhealthy drinking or heavy episodic drinking at least monthly.

One measure of substance use is the frequency and amount people use. Another is the consequences of that use. To assess that, we asked whether participants believed that their use was currently causing them health, legal, social, or financial problems; 24% reported that it did. Single adults were more likely (26%) than TAY (17%) or adults in families (9%) to report this. Looking only at those with current regular use of drugs or alcohol, 46% reported that it was currently leading to health, legal, social, or financial problems.

We were interested in knowing how participants' drug use changed during this episode of homelessness (Figure 32). Of those who reported substance use at some point in their lives, 28% noted that their drug use increased either a little (8%) or a lot (20%) during this episode of homelessness, 38% noted that it didn't change, and 35% reported that it decreased either a little (7%) or a lot (28%). These statistics differed by family category. Transition-aged young adults were much more likely to note an increase (a little or a lot) during this episode (54%); adults in families were more likely to note a decrease during this episode (52%); and single adults were equally as likely to report increases as decreases.

DOJ-HUD-AR00815

### JOHN'S STORY

John is living in an encampment with about 20 other people on a riverbed—a spot that is well known to the local police. Early morning raids mean that he often must quickly gather his things and leave, or he might be searched and arrested. He has started using methamphetamine to stay up all night. He used to drink, but when he passed out in the encampment his things would get stolen and he would miss the others' signals that the police had arrived. Methamphetamine makes him feel antsy and wired. Sometimes he isn't able to sleep for several days in a row, which makes him feel worse. But right now, he doesn't see a way to be sober given where he is living.

Combining these measures gives us one indicator of drug or alcohol use severity. Of all participants, 45% currently used either methamphetamines, cocaine, or non-prescribed opioids three or more times weekly or engaged in heavy episodic drinking (6 drinks) at least once a month. Single adults (47%) and TAY (48%) were more likely than adults in families (16%) to report this.

Homelessness can limit access to substance use treatment. Currently, 6% of all participants (8% of those who reported ever using drugs or alcohol regularly) were receiving any substance use treatment. The most common forms of substance use treatment that participants received included 12-step programs (such as AA or NA), outpatient or one-on-one counseling, or opioid replacement therapy (such as buprenorphine or methadone). Eleven percent of all participants indicated that they currently wanted substance use treatment but were unable to receive it. Among those who report current regular use of methamphetamine, cocaine, opioids, or heavy episodic alcohol use, 20% indicated that they currently wanted substance use treatment but were unable to receive it; 4% of those who do not report current regular use reported that they did.

Participants who reported spending most of their time unsheltered were more likely to report current regular use of drugs or heavy episodic drinking than those who were primarily sheltered (52% vs. 19%). There are several explanations for this difference. Many shelters do not admit guests who are intoxicated or showing other signs of substance use. The rules may vary from allowing all, to allowing individuals so long as they don't use during the time that they are in shelter, to not allowing anyone who uses at all. Some shelters don't allow use on site but don't allow individuals to leave during their stay, making it difficult for those who use to stay there. Individuals who use may have had behaviors that led them to be asked to leave or may have found the rules difficult. Those who do not have access to shelter may have used to help cope with the challenges of being unsheltered.

Participants explained that their substance use had caused them problems (with their health, the law, relationships, work), but had also played important roles for them (helping them cope with trauma, pain or depression; helping keep them alert; or numbing them to their circumstances). In-depth interview participants who used drugs and alcohol discussed how drug use or heavy alcohol use contributed to losing their homes or custody of their children. They described how illicit substance use had exposed them to criminal charges, probation or parole violations, and produced negative impacts on their health and well-being. But, people who use drugs or alcohol tend to recognize ways in which this use benefits them (even if they recognize the overall pattern is detrimental). Participants who used drugs and alcohol described how substance use helped them form social relationships, which enhanced safety and security. Those using methamphetamine described the benefits of staying awake to protect themselves from assault or theft and having energy to engage in recycling and other ways to gain income. Participants reported using substances to cope with depression, anxiety, and the routine trauma of experiencing homelessness. In many cases, the same participant described the ways that substances not only caused them harm but also helped them cope. As one participant noted: "For the most part, the drugs that I do, I stay up, I stay focused, and it keeps

DOJ-HUD-AR00816

me with a numb attitude. It keeps me out of reality. And when you're sober, you come back to reality and that hurts. You feel it more when you're sober."

Participants reported engaging in efforts to decrease the harm that drugs and alcohol caused them. Some participants noted that they substituted alcohol for illicit drugs to reduce the risk of targeting by police. Others reported reducing alcohol use in order to stay more alert, or remaining abstinent from opioids to prevent overdose.

Participants described how homelessness complicated efforts to reduce their use or maintain sobriety. They discussed how using substances built a community that they were reluctant to leave—by stopping use, they would lose relationships they had developed. Participants reported that having few choices of where to stay limited their ability to avoid being around others who used substances, making it difficult to reduce or stop using. Without access to medications to manage withdrawal symptoms, participants found it difficult to stop use. Participants discussed numerous barriers to receiving treatment or other help to reduce use or enter recovery. They reported times where they were ready to engage with treatment services but they were unavailable, either because there weren't openings at local treatment facilities and wait times were long, or the staff were unresponsive to their needs, or the treatment was far away. Some participants discussed their concern that by seeking help for substance use, they could risk losing custody of their children.

Substance use, for many participants, was related to their homelessness. Some reported increased use as a way to cope with the challenges of homelessness. Others reported decreasing their use as a coping strategy, because they felt doing so would keep them safer or allow them to exit homelessness earlier. Some reported that obtaining housing would eliminate their need to use substances, noting that they would likely quit once they were housed. A participant shared: "Well, if I found housing, I'd probably wouldn't even get high at all... Like there's stuff that I do [that's] out of character, I probably wouldn't do it otherwise. But as long as I'm out here, I have to do it. It's like a survival tactic." Participants explained that if they were housed they would be better situated to address their substance use. For some, housing



**FIGURE 33** Proportion of Participants Who Experienced a Jail Stay During Current Episode of Homelessness, by Family Structure

**All**
30%

**Single adults**
32%

**Adult in families**
12%

**TAY**
33%

would make going through symptoms of withdrawal less challenging. Others noted that housing would allow them to access medication assisted treatment for their substance use more easily and safely. Others noted that housing would give them the sense of safety and security that they needed to reduce or stop their use.

## Tobacco Use

Compared to approximately 10% of adults in California, 70% of study participants smoked cigarettes currently. More than half, 54%, smoked daily. Daily smoking was less common among adults in families (33%) and TAY (47%) compared with single adults (56%).

## Criminal Justice Involvement

In previous chapters, we described how many participants were incarcerated during their lifetime, how exiting prison or a prolonged jail stay led a large proportion to homelessness, and how few who had entered homelessness from carceral settings had received transition resources. Here, we examine a different issue—that of jail stays during the current episode of homelessness.[32] At the time of the interview, 13% of participants were under community

DOJ-HUD-AR00817

supervision, either parole (from prison) or probation (from jail). Nearly a third (30%) of participants reported a jail stay during their current episode of homelessness (Figure 33). In accordance with the federal definition of homelessness, we counted any jail stay that lasted more than three months as starting a new episode of homelessness (as opposed to the current episode), so this proportion underestimates the true toll of arrests and incarcerations. The frequency of short-term jail stays reflects the revolving door between jail and homelessness: jail stays increase the risk of homelessness and homelessness increases the risk of jail stays.

Incarceration wasn't the only interaction with the criminal justice system for participants. In in-depth interviews, participants noted frequent interactions with police—particularly in encampments, participants felt that they were being surveilled. They described interactions with police that included being checked for outstanding warrants, probation violations, and having themselves or their belongings searched to assess for possession of illicit substances. Participants noted that minor drug offenses propelled them back into the carceral system. One participant shared: "On probation [the police] would just show up and, man, there they are tapping on my shoulder, and they'd want to search me. And they'd find drugs on me or something, and off to jail we went."

> " *The numero uno is housing... [If I had housing I would] have to see people that use all the time, but I don't have to live with them. I can go home and shut my door and say, 'no.' Okay? You have to have some will power to do this. And I know how to do it. [While I am homeless] there's nowhere to hide here. There's nowhere to go.* "

To quantify negative interactions with the police, we asked all participants whether they had been roughed up by the police or felt that the police were harassing them when they were experiencing homelessness.[10] Forty-seven percent said that they had.

## Confiscations and Forced Displacements

Participants spoke about the impact of forced displacements on their lives. Forced displacements, or sweeps, occur when municipal officials (e.g., police officers, sanitation workers) resolve a homeless encampment by confiscating or disposing of all belongings that individuals living in the encampment do not, or cannot, remove themselves. Individuals are then requested or required to physically relocate from the area. Sometimes individuals targeted for sweeps are given referrals to services or access to temporary shelter beds, but often, services are not provided. Forced displacements occur with varied frequency. In the survey, we asked participants if they had their belongings taken away by authorities (such as police or other government workers) in the prior six months (if they had been homeless for shorter than six months, we asked about the time that they had been homeless). A significant proportion of participants had this experience: 36% noted that it had happened at least once in the prior six months. Among all participants, 11% had had this happen once, 10% 2-3 times, and 15% more than 3 times. Those who had spent most of their time unsheltered were more likely to have had this happen at least once (42%) than those who had spent most of their time in sheltered locations (15%).

Participants spoke about the impact of forced displacements and confiscation on their lives. Participants described how forced displacements resulted in their losing critical materials and supplies, including medications and cell phones. They discussed how displacement resulted in the loss or destruction of personal documents that they needed to apply for housing and other services, including birth certificates and state-issued IDs. Some expressed concern that they could lose their pets if the displacement occurred while they were away from their encampment.

DOJ-HUD-AR00818

## Experiences of Violence

In previous chapters, we reviewed the prevalence of physical abuse or violence and examined how often violence contributed to or precipitated homelessness. In this chapter, we examine violence that occurred during the current episode of homelessness. We asked about both physical and sexual violence and asked participants to report on their relationships (or lack thereof) to perpetrators. In in-depth interviews, we explored the experience of violence and how it intersected with participants' homelessness. While past experiences of violence increase the risk of homelessness, homelessness increases the risk of violence.

More than a third (38%) experienced either physical or sexual violence during this episode of homelessness. Those who spent most of their time unsheltered without a vehicle reported similar rates of violence (42%) to those who were in vehicles (39%) but higher than those who spent most of their time in sheltered locations (26%).

More than one-third (36%) of all participants experienced physical violence during their current episode of homelessness. Of those who experienced physical violence, half (49%) reported that the violence was committed by a stranger and 21% by an intimate partner. Women were more likely than men to report that their perpetrator of physical violence was an intimate partner: 39% of cis-women did, versus 23% of non-binary, transgender, or participants with other gender identities and 13% of cis-men.

Ten percent of participants experienced sexual violence during their current episode of homelessness. Cis-women (16%) and non-binary, transgender, or other gender participants (35%) experienced sexual violence more frequently than cis-men (7%). As with physical violence experienced during homelessness, approximately half (54%) who experienced sexual violence reported the perpetrator was a stranger. One in five (22%) indicated that an intimate partner perpetrated this violence. Cis-women (21%) and cis-men (21%) reported similar proportions, but nearly half (46%) of non-binary, transgender, or participants with other gender identities who reported sexual violence reported that it was perpetrated by an intimate partner.

Participants explained that homelessness left them more vulnerable to violence. Without the protection of home, participants had less protection against violence perpetrated by strangers. Participants reported frequent harassment by members of the housed community, which they connected to the stigma of homelessness. Some participants experienced physical violence as a result of personal conflict with other encampment or shelter residents, acquaintances' gang involvement, or in the course of being robbed of their belongings. Others reported being physically harassed by law enforcement officers.

Participants noted that being homeless decreased their protection from intimate partner violence, as being homeless could facilitate the ability of perpetrators to locate them. Participants noted that, at times, they remained in abusive situations due to their need for shelter, stability, safety, and material resources. With choices constrained, they had less ability to exit abusive relationships. Alcohol and substance use could exacerbate experiences of intimate partner violence. Some described experiencing more physical abuse when their partner was under the influence, intoxicated, or going through withdrawal; others reported self-medicating to address the trauma of abuse.

## Income

Participants reported low total household incomes (including income from work (formal and informal) and income benefits). In the previous month, the median income in individuals' personal households (all those with whom they currently shared income and expenses) was $400 (IQR $100-1000).[41] Approximately 16% reported no current income; of those who reported any income, the median monthly income was $600 (IQR $221-1060).

## Work and Employment

The pandemic may have changed employment patterns. For many, employment opportunities decreased due to pandemic-related economic disruptions. One quarter (24%) of participants reported COVID-related health and safety concerns as a barrier to work. Six percent of all participants (8% of those under 62 without a disability) reported working at least 20 hours for pay in the week prior

DOJ-HUD-AR00819



**FIGURE 34** Sources of Income in the Last 30 Days by Family Structure

● A job  ● A pension  ● Benefits  ● Did not receive any income in the last 30 days
● Money shared by someone familiar  ● Panhandling or asking people for money
● Recycling/selling used goods or other odd job  ● Other

**All**
- 18%
- 2%
- 76%
- 4%
- 16%
- 15%
- 40%
- 3%

**Adults in families**
- 35%
- <1%
- 93%
- 1%
- 13%
- 3%
- 20%
- 2%

**Single adults**
- 16%
- 2%
- 76%
- 4%
- 16%
- 15%
- 42%
- 3%

**TAY**
- 26%
- 0%
- 59%
- 3%
- 21%
- 22%
- 47%
- 8%

Participants could have reported more than one source of income.

to the interview. Overall, 18% reported income from a job in the month; 11% from informal employment or gig work and 8% from formal employment. More than a third (40%) reported income from recycling or odd jobs. Two percent of participants had income from a pension or retirement fund. When we restricted the data set to those younger than 62 and without a physical or mental health disability, 13% reported income from informal employment or gig work and 12% from formal employment. Figure 34 presents participants' income sources in the past month.

Participants faced extended disconnections from the formal labor market. Seventy percent reported that it had been longer than two years since they last worked a paying job for 20 hours a week or more. Sixty-two percent of those younger than 62 without a physical or mental disability reported the same. Nonetheless, participants were interested in finding a job. Of all participants, 44% reported they were looking for employment. Among those younger than 62 and without a disability, 55% were looking for work.

DOJ-HUD-AR00820

**❝** *Being homeless is a full time job.* **❞**

Participants noted numerous barriers to engaging in paid work. The conditions of homelessness required time and energy that reduced participants' ability to earn income. Just as the lack of well-paid work had interfered with participants' ability to maintain housing, their homelessness restricted their ability to engage in paid work. While homeless, they reported spending their time accessing services, searching for housing, safeguarding belongings, and meeting basic needs. As one participant summarized it: "Being homeless is a full time job."

In the survey, we asked all participants to report what interfered with their ability to engage in paid work. Participants reported multiple barriers. Half (52%) of participants indicated that they were unable to work due to problems related to their older age, health, or disability. Half of participants (50%) indicated that transportation to or from the workplace hindered their ability to work. One in five (20%) participants reported that having a record of arrests or prior convictions, and being on community supervision following incarceration posed challenges to employment. Eight percent of all participants reported that caretaking responsibilities interfered with work, but 51% of adults in families did.

Participants described the complex interplay between their work, their homelessness, and their health, noting that health conditions interfered with work, and work could produce health problems. One participant described how staff at a shelter helped him secure a job, but he then got hurt on the job: "I got a job in [retail store] by staying at that shelter... I worked there for a long time till I fell down and got hurt there, and then I couldn't work for a year because my back and my hip." Participants recognized that their inability to work served as a major barrier to housing. As one participant said, in response to what was keeping him from regaining housing: "Being able to work. Right now, that is preventing me from paying rent. Because I can't move my arm…And the stroke I got."

## Benefits

Benefits are a critical source of income for those experiencing homelessness. During the COVID-19 pandemic, many social safety net programs eased eligibility and certification requirements for benefits, reducing some administrative barriers to accessing income support. Since we conducted research during this period, our findings reflect the result of pandemic-related increased access.

### Nutrition Benefits

#### CalFresh

CalFresh, California's Supplemental Nutrition Assistance Program (SNAP), is a federally-funded, county-administered benefits program that helps low-income individuals purchase groceries and other food items. At the start of the pandemic, CalFresh increased its monthly benefit amount to eligible individuals. California's Department of Social Services requested federal waivers to ease initial application and re-certification requirements (such as eliminating face-to-face interview requirements) for the program. These actions expanded the program's reach. Seventy percent of participants received CalFresh; 68% of single adults; 90% of adults in families; and half (52%) of TAY.[42]

### Income Benefits

#### Social Security

A federally-funded entitlement program, Social Security provides income to retirement-aged individuals. Those who are at least 62 years of age and have paid Social Security taxes for a federally determined time period are eligible to receive benefits; surviving spouses of beneficiaries do as well. Overall, 8% of participants received social security benefits; 36% of participants age 62 or older did.

#### Supplemental Security Income

Supplemental Security Income (SSI) is a federal program which provides monthly payments to adults with limited income who are 65 or older, or individuals of any age who have a disabling condition. While administered by the Social Security Administration, SSI is distinct from Social Security benefits, and those who receive Social Security are not precluded from SSI receipt. Overall, 12% received SSI; 35% of participants age 65 and older; and 17% of participants with a disability did.

DOJ-HUD-AR00821

**Social Security Disability Insurance**

Social Security Disability Insurance (SSDI) provides monthly benefits to people with severe disabilities, as defined by the Social Security Administration, who are unable to work due to their disabling condition. In general, a recipient of SSDI must prove that they are unable to work due to their disability for at least a year; however, exemptions exist (for example, compassionate allowances for individuals with certain medical conditions). Overall, 8% of participants received SSDI; 11% of participants who reported having a disabling condition did. The criteria for SSDI eligibility determination is likely more strict than the one we used to determine having a disabling condition.

**Veterans Administration Income Benefits**

The Veterans Administration (VA) offers benefits to both active-duty veterans and National Guard and Reserves members; however, eligibility for some benefits may differ based on length of service and duty status. Overall, 2% received VA income benefits. Six percent of participants had completed military service (either active duty or served in the National Guard or Reserves). Of those participants, 19% reported receiving VA benefits.

**CalWORKs**

CalWORKs, California's Temporary Assistance for Needy Families (TANF) program, is a federally-funded, locally-administered program that provides monthly assistance to unemployed or underemployed families with minor children. Overall, 5% received CalWORKs; 36% of adults in families did.

**General Relief and General Assistance**

The General Assistance and General Relief (GA/GR) program is designed to provide financial assistance to adults who have not received other income benefits.[43] Thus, only those who did not receive Social Security, SSI, SSDI, VA income benefits, or CalWORKs would be eligible. In California, counties determine both eligibility criteria and the amount of aid offered through GA/GR. Many people who receive GA/GR are able to receive nutrition benefits, such as SNAP (CalFresh). One quarter (28%) of participants received GA or GR. Among those who did not receive any of the other income benefits, 34% received GA/GR.

Participants described their challenges obtaining benefits. They reported being frustrated by challenges completing online benefit forms without the aid of a case manager, because they found the online navigation and interface confusing. These participants used computer terminals in libraries and other public locales, which delete session-specific information once the user logs off. As a result, some participants reported being unable to retrieve passwords and other identifying information the next time they logged on. Participants noted the lack of mobile phones as a barrier to two-factor authentication. Additionally, participants described bureaucratic impediments that resulted in their being turned down for services or remaining on waiting lists for an extended period.

## Discrimination

To assess experiences of discrimination,[44] we administered the Everyday Discrimination Scale (EDS).[45] The EDS is a widely used measure of subjective experiences of discrimination.[46] We asked participants to assess how often in their day-to-day life they were treated with less courtesy or respect than other people, they received poorer service than other people at restaurants or stores, they were treated as if they were not smart,  people acted as if they were afraid of them, or they were threatened or harassed. We asked participants why they believe people discriminated against them from a list of 13 commonly marginalized statuses including housing/homelessness status.[47] Acknowledging that people experiencing homelessness often embody multiple marginalized statuses such as homelessness, race/ethnicity, gender, sexual orientation, and disabilities, participants could indicate multiple reasons. We then asked participants what they believed to be the main reason that people discriminated against them.

Discrimination has been linked to a wide range of adverse health outcomes. A stressor that negatively impacts physical, mental, and behavioral health, discrimination can trigger physiological and psychological responses, such as increased cortisol and adrenaline levels, as well as emotional distress. Most (83%) participants reported experiencing discrimination in their daily lives. Nearly half (47%) of participants indicated that they were treated with less courtesy or respect than other people almost

DOJ-HUD-AR00822

CHAPTER 3: EXPERIENCES DURING HOMELESSNESS



© Sam Comen

every day or at least once a week. Forty percent of participants report being treated as if they are not smart almost every day or at least once a week. Of those who reported any discrimination, 32% of participants believed that their homelessness was the main reason people discriminated against them. Those who were unsheltered were more likely to report their homelessness as the main reason (35%) compared to those living in sheltered locations (20%). Participants specified physical appearance and race as main reasons as well. A smaller proportion 21% shared that their physical appearance was the main reason and 9% indicated that race was the main reason.

Participants described the stigma that they faced due to being unhoused. One participant shared: "Do you know how many people are so close to being homeless? Like one paycheck, and they're going to be homeless…There's some people that are homeless because they're mentally messed up or they're on drugs or whatever… But they just stereotype [everyone] and put them in that category."

Participants highlighted the intersectional nature of discrimination, emphasizing the importance of understanding the complex and interrelated reality of these experiences. Discrimination can occur based on more than one embodied status at a time. One participant shared his experience attempting to apply for an apartment as a Latino/x man with tattoos. He shared: "[Leasing agents are] discriminating because I've got tattoos everywhere. So, if I walk in, they'll give me an application, but that's not going to make it into the records or whatever. So, I just don't waste my time on it… [And] my race plays a big factor out here. They look and they see a brown guy with a bald head and tattoos. What are they going to say? 'He's out here stealing stuff.' It's stressful."

DOJ-HUD-AR00823

## SUMMARY

The experience of homelessness is highly stressful: participants spent much of their time trying to survive and find shelter, food, safety. They reported that these efforts consumed much of their energy, leaving them less able to seek healthcare (including treatment for physical and mental health challenges and substance use) and employment. They reported frequent exposure to violence (often perpetuated by strangers), surveillance by the criminal justice system, and discrimination in multiple arenas. When they had the energy to seek help, they found many doors closed, encountering barriers wherever they turned. These barriers caused their health and economic conditions, which were already poor when they entered homelessness, to worsen. They reported that what they most needed—housing—remained elusive.

### KEY TAKEAWAYS

- Most participants experienced unsheltered homelessness. Nine out of ten participants slept in an unsheltered location at least one night during their current episode of homelessness.

- Participants' health status is far worse than their housed, non-institutionalized counterparts. Nearly half of participants self-reported fair or poor health; 34% had difficulty performing at least one activity of daily living; nearly two-thirds had at least one chronic health condition. The high proportion of participants who were age 50 and over faced even greater health challenges.

- Homelessness presents barriers to physical and behavioral health treatment and care needs. Half reported having a regular place for care. A quarter of participants reported an inability to access prescription medications for physical health conditions; a quarter experienced a time where they needed health care, but were unable to get it. Of those who reported current regular substance use, one in five wanted treatment, but were unable to receive it.

- Pregnancy is common during homelessness. One in four of those assigned female at birth aged 18-44 experienced a pregnancy at some point during their current episode of homelessness. Eight percent were pregnant at the time of interview.

- Stress and feelings of hopelessness characterized many participants' experiences of homelessness.

- Two-thirds of participants reported current mental health symptoms, with serious depression and anxiety symptoms being reported most commonly. Approximately half reported symptoms of either depression or anxiety; 12% reported experiencing hallucinations.

- Participants noted frequent interactions with police. One in three were incarcerated for at least one night during their current episode of homelessness.

- Participants spoke about the adverse impact of forced displacements on their lives; over a third reported losing belongings to confiscations in the prior six months. Participants noted that important documents and medication had been confiscated.

- More than a third of participants experienced physical or sexual violence during this episode of homelessness. The perpetrators of this violence were commonly strangers.

- Although benefits were a key source of income, many who may have been eligible for income benefits didn't receive them.

- Eight out of ten participants reported experiencing discrimination in their daily lives. Housing or homelessness status was most frequently identified as the main reason for discrimination.

DOJ-HUD-AR00824



© Sam Comen

**Toward a New Understanding** The California Statewide Study of People Experiencing Homelessness

DOJ-HUD-AR00825

CHAPTER 4

# BARRIERS & FACILITATORS
## of Returns to Housing

After exploring who experiences homelessness, what life events led to homelessness, and what happens to people while they are homeless, we turn to a different question: what factors interfere with exits from homelessness.

We know that for individuals, housing solves homelessness; if people were housed, they would no longer be homeless. In this chapter, we ask what is getting in the way of people returning to housing, and what would help them do so. Through in-depth interviews, we asked participants about their experiences trying to return to housing: what hopes they had, what challenges they faced, what things would help them.

We heard time and again about participants' eagerness to return to permanent housing— and the seemingly insurmountable barriers they faced. While participants faced many barriers, the primary barrier for all was the high cost of housing.

## INTEREST IN OBTAINING PERMANENT HOUSING

In in-depth interviews, participants expressed an eagerness to obtain permanent housing, because they felt permanent housing would offer needed stability to seek employment and address physical and behavioral health issues. They explained that permanent housing would provide personal safety, security for belongings, access to meal preparation, and protection from the elements. The few participants who expressed concern about permanent housing noted that mental health issues (including PTSD) could make living in housing feel constraining.

> "
>
> *There's just not enough resources out there for people who want to get out of being unhoused... You kind of just seem like you're stuck there. Even if you're trying to get a job, like you have to have an address. And, if you don't have an address, you can't get a job. If you can't get a job, you can't stop being unhoused.*
>
> — CASPEH participant

## CHALLENGES TO ACCESSING HOUSING

Despite the high level of interest in obtaining housing, study participants faced multiple challenges to doing so. Participants described barriers, including the scarcity and high cost of housing, the lack of rental subsidies, the absence of information about how to access housing services, the lack of assistance in identifying housing, and concerns about whether romantic partners, close friends, or pets would be eligible to stay with them.

In the survey, we sought to understand the barriers that participants faced obtaining housing. To do so, we asked participants about a number of potential barriers to housing and asked them to note how much each interfered with housing returns: not at

DOJ-HUD-AR00826

all, a little, a lot, or don't know. We asked questions about costs; formal assistance (housing navigators or case managers); logistical and technical difficulties; family structure and pets; health problems; past history (credit, criminal justice); and discrimination. Through in-depth interviews, participants helped us understand how these problems played out in their lives.

## Housing Costs

Nearly 9 in 10 participants (89%) noted that housing costs negatively affected their ability to re-enter permanent housing; 76% noted that housing costs impacted their ability to re-enter housing a lot. Participants discussed the cost-related barriers to re-entering permanent housing, including their having insufficient income to cover monthly rental costs and lack of cash reserves to cover the security deposit, first and last months' rent. As one participant told us, "I've tried to look for apartments on my own, but I wanted to make sure that I could afford them. And most of them, they want three times the rent, you know. And just for, like, studios or one bedrooms out here, it's, like, $1100, $1200 just for that alone. I'm like, 'whoa', you know? So that means I'm going to have to make $3300, you know. And I wasn't making that. And I'm not going to be making that anytime soon."

## Trade-offs to Make Housing Affordable

Affordability can be a tradeoff. In theory, there might have been housing that a participant could afford, but other barriers, such as being too far away interfered with it being a viable option. More than half (57%) of participants reported that housing they could afford was either too far away or unsafe: 40% noted that this barrier impacted them a lot (Figure 35). Participants discussed these trade-offs in interviews, noting the many challenges of moving elsewhere for lower cost housing. Those who were able to identify housing that fit their budget found the housing was located in neighborhoods the participant considered unsafe, not well-served by public transportation, or too far away from their place of employment or medical care. Participants discussed the need to find housing in the same city or town to remain in proximity of children, family,



**FIGURE 35** Proportion of Participants Who Reported Affordability-Related Housing Barriers

Impacts ability to obtain housing   ● A little   ● A lot

I can't afford housing
89%

Housing I can afford is far or unsafe
57%

and others in their social network. As one participant described their reasoning for not considering moving to a lower cost area: "No, I wouldn't [move there], mainly because my doctors are here. And that's a big concern for me. You know, [to] have the same doctors, they know what's going on, they have all my records, and I know them, too."

In in-depth interviews, we presented participants with a set of hypothetical trade-offs for obtaining housing (e.g., you would need to double up with people you do not know, your place would be inaccessible to public transportation or in another town or city). While participants' responses varied, nearly all expressed being willing to compromise in order to obtain permanent housing. There were common themes to the criteria that participants had in order to accept a housing offer. Participants noted that they would accept a permanent place to live, provided that: (a) the unit was accessible to public transportation, employment, medical care, and/or their social networks; (b) the property owner would accept pets, romantic partners, and/or friends and family members as roommates; and (c) the regulations were no more restrictive than those found in the general housing market (i.e., they were not asked to accept restrictions that people who are not homeless agree to accept).

DOJ-HUD-AR00827

> **There's not much out there for people with low income. I live below poverty. SSI, I get $900.00 a month. You can't live on that. You can't rent a place with that because you need first month's rent, security deposit, plus you need to make three times that amount of rent. I don't make that much. If I pay rent, even if I pay $500.00 a month rent and I have to have a storage unit, I have to pay for food. I can't do it.**

Because of interest in shared housing as a means to decrease housing costs, we asked interview participants about this possibility. Some participants stated that they would be willing to share housing with someone they did not know if (a) they would live with just one other person, (b) they would have their own separate bedroom, or (c) they had the opportunity to get to know the person they would be living with before moving in together.

Although participants were, for the most part, willing to accept housing with others (rather than by themselves or with members of their personal household), they were reluctant to accept housing with people they did not know and hadn't chosen. They expressed concern about being forced to live with someone who might be untrustworthy or irresponsible, unwilling to share the same standard for cleanliness, or would steal their belongings. Others explained that their reluctance to share housing with people unknown to them resulted from their past experiences of physical or sexual violence. The ongoing trauma of these experiences led them to be reluctant to accept housing with someone they didn't know. Some participants expressed reluctance to double up with someone with mental health issues or who is actively engaged in substance use. For some, this was because they felt that it would complicate their efforts to maintain their own sobriety or manage their own mental health issues.

## The Role of Rental Subsidies

Rental subsidies, such as Housing Choice Vouchers, allow individuals to pay only 30% of their household income on housing, with the rest paid for by the subsidy. However, there are long wait lists for vouchers and most who qualify don't receive them. Nationally, only one in four households who meet the criteria for Housing Choice Vouchers receive them. In high cost regions with housing shortages like California, even those who receive vouchers may have difficulty using them. We asked participants about rental subsidies: whether they had heard of them, were on wait lists for them, or had one that they couldn't use. Since we interviewed only those who remained homeless, we did not speak to anyone who was currently using a voucher.

The availability of housing vouchers varied greatly by region. In some regions, we spoke to participants who had never heard of them or never heard of anyone having received them. Other participants described being on waiting lists for them. One described his situation this way: "Finding the help and actually believing that I'm not on a hamster wheel with the people I'm working with. I feel like that's what the Section 8 list is, for sure. I feel like that never goes through. It never goes anywhere. You just stay on that waiting list forever and ever and ever. I mean, I stayed on it one time. My ex was on it. We both were on it, but she actually ended up getting picked for the voucher, but they never told her. And then they couldn't find her on the list. After she got selected, she went to go meet with them, and they couldn't find her on the list anymore. You lose hope after a certain point in time." In one or two regions, we met participants who had vouchers or knew others that did. Participants described vouchers as highly valued and rare, with one participant referring to them as "a golden ticket." Those without vouchers described the voucher distribution process as opaque. The lack of transparency led some participants to suspect that favoritism played a role in voucher determinations. These participants speculated that case managers provided vouchers to clients who were members of their own racial or ethnic group.

Participants identified numerous obstacles to obtaining housing, even for those with a Housing Choice Voucher. Some participants with vouchers reported that available housing was outside of the allowable price range for the voucher and that their ability to use them was limited by discrimination against voucher holders by property owners.

## Lack of Case Management and Housing Navigation Assistance

Participants expressed enthusiasm about receiving assistance to re-enter housing, but described substantial barriers to receiving it. Unsheltered participants, particularly in rural areas, discussed lack of knowledge about providers that could help participants regain permanent housing. When we asked what formal assistance they received to help them exit homelessness, some were unfamiliar that such services existed. It is possible that the disruptions of the pandemic decreased interactions with case managers and housing navigators.

When (in surveys) we asked about barriers to regaining housing, two-thirds (63%) of participants endorsed that not having someone from an agency to help them interfered with their finding housing; 46% said that this negatively impacted them a lot. When asked whether they had received formal assistance in finding housing, fewer than half (46%) reported receiving help from a case manager, housing navigator, or someone else from an agency or community organization during this episode of homelessness. Even among those who received help, almost half had not received help more than once or twice in the prior six months, if at all. Among the 46% who had received help, 15% reported monthly contact in the prior six months, 29% weekly, and 12% daily or almost daily. Thus, overall, only one quarter (26%) of all participants received help (from a provider) finding housing monthly or more frequently in the prior six months. Sheltered participants were more likely to have received help in the prior six months (44%) than unsheltered participants (20%).

In in-depth interviews, participants residing in shelters (congregate or non-congregate) reported more consistent case management service access, including housing navigation. Some noted that shelters required interaction with case managers. Unsheltered participants reported that outreach workers from social service agencies occasionally offered housing navigation assistance, but rarely returned to provide follow-up information. Participants reported difficulties remaining in contact with case managers/housing navigators, due to lack of access to a reliable telephone. Some participants reported missing out on housing opportunities due to the inability to stay connected. Participants remarked that their phones were either broken, misplaced, stolen, or confiscated during forced displacements, or "sweeps." Given sporadic access to electricity, unsheltered participants with working phones struggled to keep them charged. Participants explained how this led to hopelessness.

As one participant explained, "If you called the [resource hotline] or they give you all these resources and other numbers to call. There is none. They put you back in the link of calls and they send you here, they send you there. But nobody has the right information for the right guidance of where you need [to go] – who is the person you need to speak to and how can I get the help... It was ridiculous to a point you give up. You give up."

Whether sheltered or unsheltered, participants reported that housing navigation services varied in quality. Some participants praised their case managers for facilitating efforts to obtain permanent housing, assisting them with paperwork, helping them to collect the necessary documents, and offering other assistance. Others felt that the assistance they received was inadequate. Participants described receiving out-of-date lists, so when they called about a housing unit, it was no longer available. Participants reported that providers gave them information about housing that was market rate, and thus, outside their price range. Some participants believed these negative experiences could reflect service provider caseloads being too large, frequent staff turnover in service organizations due to low pay or labor shortages, and the lack of existing affordable housing to which case managers/housing navigators could refer.

DOJ-HUD-AR00829

## Wait Times and Hopelessness

Almost half of participants (46%) reported that their having "given up or (not having) the time or energy" to look for housing options negatively impacted their ability to re-enter housing; 30% noted this impacted them a lot. Over half (52%) noted being negatively impacted by extended waits on waitlists; 42% noted this impacted them a lot.

As one participant said, "They tell us, "You're on the waiting list," and all this. It's been three years. How long can the waiting list be? We should be priority according to what the news says all the time. We should be priority to get us off the streets, and they don't. Some of these guys have been out here 20 years... I understand you get the elderly and those out of the way, health conditions. But they tell us the same thing all the time. "You're next. You're next."... It's just stressful."

> " *The most stressful thing I could think of is not having secure or stable housing… I know how to survive, but I don't really know how to live. And then the older I get, the higher [more expensive] stuff is starting to become. So once I think that I'm at a manageable level, I'm noticing that I have to make either three times more than I'm already making or four times more... Previously, I had two jobs, but even still having two jobs wasn't enough.* "

## Logistical and Technological Barriers to Receiving Housing

Participants described lacking necessary documentation to re-enter housing. During their homelessness, they had lost track of documents that they needed to regain housing. They discussed having lost birth certificates, government-issued IDs, and other documents due to theft and loss. A common theme was the role that forced displacements played in



© Sam Comen

documents becoming damaged or misplaced. During these forced displacements, authorities would dispose of belongings or leave them unattended and thus exposed to theft or the elements. Participants reported that COVID-related government closures created an additional barrier to obtaining necessary documents, since government agencies responsible for providing this documentation remained closed for an extended time. Participants noted the toll of their recurring exposure to the elements, with documents destroyed due to rain or lost to wind. In the survey, more than half of participants (53%) noted a lack of documents as a barrier to finding permanent housing; 37% of all participants indicated this impacted them a lot.

DOJ-HUD-AR00830



**FIGURE 36** Proportion of Participants Who Reported Family Status Housing Barriers by Family Structure

Impacts ability to get housing ● A little ● A lot

My family or friends are not able to have me live with them

All — 51%
Adults in families — 65%
Single adults — 49%
TAY — 70%

I have children that stay with me

All — 10%
Adults in families — 50%
Single adults — 6%
TAY — 7%

I have a pet

All — 18%
Adults in families — 17%
Single adults — 18%
TAY — 10%



**FIGURE 37** Proportion of Participants Who Report Discrimination and Prior History as a Barrier

Impacts ability to obtain housing ● A little ● A lot

I experience discrimination when I try to rent a place — 43%

I have a record with the criminal justice system — 36%

I have problems with my credit history or past evictions — 49%

## Family Status

Families and friends can be a source of housing support for many individuals, providing places for individuals to live. But many participants noted that their family or friends were not able to provide a place to stay (Figure 36). Half (51%) of all participants noted that their family and friends were unable to accommodate them, with 39% noting it as a barrier that impacted them a lot. This issue was more frequently identified as a barrier among transition age young adults (70%, with 53% indicating it impacted them a lot) and adults in families (65%, with 57% indicating it impacted them a lot) than single adults (49%, with 37% indicating it impacted them a lot). This finding could be because family or friends do not have space or resources for the participant to live with them, or because rental agreements

DOJ-HUD-AR00831

for market-rate or subsidized housing may limit the number of residents permitted to reside in a unit, or the length of time a guest is allowed to stay there.

Among all participants, 10% noted that they were impeded in finding housing because they needed to find housing for themselves and their children; 6% noted that this impacted them a lot. This issue was more common among adults in homeless families, where half (50%) noted it; 35% reported that it impacted them a lot. While having children presented a barrier for housing (either because property owners discriminated against children or because participants could not find affordable spaces with room for their children), housing was critical for those with children to maintain or regain custody.

We asked participants whether having pets was an impediment to their finding housing. Eighteen percent of participants reported this served as a barrier, with 10% noting it impeded them a lot. Participants discussed the challenges of finding housing that allows pets. These participants considered their pets to be part of their family, and would not consider housing that wouldn't allow their pets, despite encountering barriers associated with having a pet.

### Discrimination and Prior History as Barriers

We examined the role that identity-based discrimination and histories of eviction, poor credit history, or a criminal record played in creating barriers to re-entering housing. We defined discrimination broadly to encompass any perceived disparate treatment based on participants' characteristics. Forty-three percent of participants reported that they had experienced discrimination when trying to rent, with one quarter (25%) indicating this barrier impacts them a lot (Figure 37). One in three (36%) participants indicated their carceral record as a barrier, with 21% of participants noting that this negatively impacted their ability to find housing a lot. Nearly half of participants (49%) noted that either problems with their credit history or prior evictions negatively impacted their ability to find housing, with 30% noting it did a lot.

Participants described instances where property owners discriminated against those with rental subsidies/vouchers, those with little or no rental history, and those with a history of incarceration. Participants discussed being discriminated against in the housing market on account of their race or ethnicity. Because of these challenges, participants reported needing to apply for several units, leading to cost-prohibitive application fees that stalled their housing search. One participant shared: "There's so many times of just applying and not even hearing a phone call back to even say that you're not even accepted... If they don't want to have me there, why have me fill out the application and all that?... they were charging like $35.00 credit checks and stuff each time, each application... After so many times of trying, you just give up because that money is just going to them for nothing when they know their answer already."

### Challenges Associated with Physical and Behavioral Health

Some participants encountered challenges due to physical and behavioral health conditions. A quarter (24%) of participants noted they could not find housing that meets their needs due to a physical disability; 14% indicated that this impacted their ability to find housing a lot. More than a quarter (29%) of participants indicated that their mental health or substance use impeded their ability to obtain housing, with 19% noting it impacted their ability to find housing a lot.

Some participants discussed how behavioral health conditions caused them to feel overwhelmed by the bureaucratic hurdles necessary to secure housing. When asked how their mental health impacted their ability to find housing one participant shared: "My mental health, bipolar disorder, because of my mania I don't think more than a day ahead. It's day by day. I try to focus on the day. When I try to think about next week, I get too much anxiety and I freak out and I panic."

DOJ-HUD-AR00832

## WHAT WOULD HELP INDIVIDUALS END THEIR HOMELESSNESS?

Similar to the prevention program thought experiment (Chapter 2), we asked all participants (in the survey) about several hypothetical interventions that could help them re-enter housing right now. We asked participants what they believed would help them obtain housing: (a) a monthly subsidy of $300-$500 dollars, (b) a lump-sum payment of $5,000-$10,000 dollars, (c) a subsidy or voucher that limited their rent to 30% of their income (similar to a Housing Choice Voucher), or (d) a housing navigator (Figure 38). We asked about each hypothetical intervention separately and asked, for each, for participants to rate whether the intervention would help them a lot, a little, not at all, or not sure. Eighty-six percent thought that a monthly subsidy of $300-$500 would help; 65% thought it would help a lot. Ninety-five percent indicated a lump-sum payment of $5,000 to $10,000 (that could help with security deposit, first, and last month's rent) would help, 85% indicated it would help a lot. Ninety-six percent of participants indicated a rental subsidy that would limit their rent to 30% of their income would help; 89% thought it would help a lot. Finally, 94% indicated that a housing navigator would help; 80% thought it would help a lot.



**FIGURE 38** Participant Report of Effect of Hypothetical Interventions to Support Returns to Housing

● Help a little   ● Help a lot

$300-$500 dollars/month shallow subsidy
86%

$5,000-$10,000 one-time payment
95%

Housing voucher
96%

Housing navigation
94%

> ❝ *You be cold and freezing in the tent sometimes. You've got plenty blankets, gloves, hoodie, jackets. But it really makes you appreciate being inside. You can bathe when you want to. You can flush the toilet when you want to. I was going to flush the toilet when I get in my apartment, just so I can hear it. You don't realize how important it is to be inside… I know now that I would cut all my limbs off, if that's what it took to pay my rent for the rest of my life. And I would never have to be outside again. That's what I would do... Having a place, a stable place over your head, is the most honorable thing you can give yourself. Because you can eat, you can sleep, come and go. Yeah, see your grandkids. They come to see you because you have somewhere for them to come to. It's the most beautiful thing.* ❞

DOJ-HUD-AR00833

> Participants wanted housing desperately. And while they suffered immensely, they held out hope for a better future–one in which they could, once more, know the safety and security of home.

## PARTICIPANTS WANTED HOUSING, BUT FACED MANY BARRIERS.

Participants wanted to exit homelessness. They wanted to have a permanent home, knowing that it would provide them a pathway toward health, reunification with their children, employment, safety, and stability. While many had lost hope, they yearned for home. Everywhere they turned, they came up against barriers: they had poor credit, no savings, no phone to receive calls, no documents, transportation, or money for rental applications. Many did not have anyone to help find housing. Those who did considered themselves lucky, but their luck would run out when the person helping them left their job, or they lost their phone. If they were one of the few to get a rental subsidy, they still had to overcome a host of obstacles: discrimination against voucher holders, racial discrimination, no internet, no transportation. The biggest obstacle they faced was costs: they could not make enough money every month to pay the rent. Participants believed, overwhelmingly, that money—a monthly subsidy or one-time payment-- would help them end their homelessness. Participants wanted housing desperately. And while they suffered immensely, they held out hope for a better future–one in which they could, once more, know the safety and security of home.

### KEY TAKEAWAYS

- Nearly all participants expressed interest in obtaining housing. However, significant barriers impacted their ability to do so.

- Housing costs posed the most significant barrier to regaining housing.

- Participants are willing to make trade-offs to access permanent housing.

- Participants noted additional obstacles, including logistical barriers (no phone, transportation, documents); lack of housing navigation support; family considerations; identity-based discrimination; and prior histories of criminal justice involvement, eviction, and poor credit.

- Fewer than half of participants received help from a case manager, housing navigator, or someone else from an agency. Only one quarter of participants received any help finding housing monthly or more frequently in the prior six months.

- Participants overwhelmingly believed that additional money would end their homelessness, whether through shallow subsidies, one-time lump-sum payments, or deep rental subsidies.

DOJ-HUD-AR00834



© Sam Comen

DOJ-HUD-AR00835

CHAPTER 5

# Policy Recommendations

In this chapter, we discuss policy recommendations for local, state, and federal policymakers. Our recommendations include increasing affordable housing, homelessness prevention, appropriate services and supports, and income, and centering racial equity. We highlight where programs or policymakers could leverage or expand existing funding mechanisms to implement these recommendations. For example, the California Advancing and Innovating Medi-Cal (CalAIM) program, California's transformation of their state Medicaid plan (known as Medi-Cal), offers several opportunities to bring key recommendations to scale. We intend for these recommendations to start a conversation, rather than to be comprehensive. Ending the homelessness crisis will take time and demand resources and coordination between local, state, and federal entities.

## INCREASE AFFORDABLE HOUSING OPTIONS AVAILABLE TO EXTREMELY LOW-INCOME HOUSEHOLDS

The median monthly household income in the six months prior to homelessness across all CASPEH participants was $960. Almost all participants met criteria to be considered "extremely low-income" or making less than 30% of the Area Median Income. Participants' inability to afford housing was both the underlying cause of homelessness and the primary barrier to their returning to housing. This finding was true throughout California, not only in the high-cost coastal regions.

Any solution to homelessness must address the lack of affordable housing for extremely low-income households. In 2023, California had only 24 units of housing available and affordable for every 100 extremely low-income households.[48] Shrinking this housing deficit will require investments at every level of government. But, it is essential to end the homelessness crisis. We recommend the following:

**▶ Expand deep rental assistance programs (such as Housing Choice Vouchers).** Funded by the federal government and administered by local housing authorities, Housing Choice Vouchers limit a household's rent to 30% of income. Only one in four households nationwide who qualify for Housing Choice Vouchers receive them. While most Housing Choice Vouchers are tenant-based, some housing authorities use project-based vouchers. Expanding rental assistance programs could provide housing stability for many extremely low-income households.

In addition to advocating for the federal government to support additional vouchers, local jurisdictions could expand locally operated rental subsidy programs with funding from local, state, and federal programs.

**▶ Support usability of existing subsidies.** Expansion of Housing Choice Vouchers (or similar rental subsidies) is necessary, but not sufficient. In certain regions, participants reported having a voucher and not being able to use it. Providing increased housing navigation support, funding for non-rent housing costs (e.g., housing search, security deposits, and move-in costs), incentivizing property owners' acceptance of vouchers, and enforcing anti-discrimination laws could increase use of vouchers in tight rental markets.

**▶ Incentivize production of deeply affordable housing through existing mechanisms, such as the Low Income Housing Tax Credit (LIHTC) program.** California is one million units short of available and affordable housing for extremely low income renters.[49] There is a need to leverage

DOJ-HUD-AR00836

land use tools to achieve affordability by removing local permitting barriers to affordable housing. By incentivizing public-private partnerships in support of development, LIHTC has helped finance nearly all affordable housing in California. Other examples include programs such as Homekey, which provided funding for local governments to purchase pre-existing housing or convert commercial properties to interim or permanent housing.

⚑ **Pilot shared housing; to make them tenable, give clients agency in choosing with whom they live, privacy, and support.** While there is a clear and critical need for housing production, closing the housing gap will take time. Shared housing (an option in which two or more unrelated people live together in a housing unit and share expenses) offers an opportunity to maximize use of limited existing housing. Previous Housing and Urban Development (HUD) programs allowed for shared housing (e.g., two households could split rent). In our in-depth interviews, we engaged participants in a thought experiment about trade-offs they would make in order to obtain permanent housing. While many participants expressed concerns about shared housing, some participants were open to the idea under the condition that they shared with only one other person, had their own bedroom, and had a chance to get to know any potential housemates prior to moving in together. Participants noted that they would not accept shared housing with a housemate whom they didn't have a choice in selecting.

Effective models of shared housing give agency to residents. Shared housing programs should allow for clients to choose whom they live with and provide private bedrooms within the space. Allowing individuals to live with whom they are most compatible with, while providing all residents in the unit their own space, could mitigate conflict among residents. Additionally, shared housing models should integrate mediation services to help residents navigate issues that may arise while living together. Piloting shared housing programs that promote client choice and provide support may be a strategy to increase use of existing housing units.

⚑ **Pilot providing monetary support to facilitate shared housing with family members/friends.** More people entered homelessness from non-leaseholder agreements than from traditional leases. One quarter of individuals in non-leaseholder agreements paid no rent. The second most common reason for leaving housing among non-leaseholders was "not wanting to impose." Pilot programs could explore the ability of rental stipends to facilitate extremely low-income individuals to remain with or move in with members of their social network (family or friends).

## INCREASE HOMELESSNESS PREVENTION

Participants received minimal warning before losing their housing; few knew about or accessed prevention services. Leaseholders' median notice before losing housing was 10 days, while non-leaseholders had a single day. While few reported access to prevention services, many participants engaged with other mainstream systems. We recommend the following:

⚑ **Pilot shallow monthly subsidy or lump-sum payment programs.** Many CASPEH participants believed that a one-time payment of $5000–$10,000 or a shallow monthly subsidy of $300–$500 would have prevented their current episode of homelessness. These interventions can help renters catch up on late rent and avoid pay or quit eviction, help others pay security deposits and moving costs, or make up the difference between income and rent. This recommendation is in line with research on homelessness prevention, which shows that if targeted appropriately, homelessness prevention can reduce episodes of homelessness (and the attendant downstream consequences) at a reasonable cost.

⚑ **Incentivize property owner and tenant mediation processes as a means for eviction diversion.** Incentivizing property owner participation in mediation processes prior to eviction proceedings could allow tenants and property owners to come to a resolution that averts eviction. If they cannot reach agreement, the mediation process could offer tenants additional time to find alternate housing arrangements. Currently, property owner–tenant

DOJ-HUD-AR00837

mediation in California is voluntary. However, dedicated efforts to incentivize landlords to participate in the process could increase its reach.

Nearly half (47%) of participants indicated that eviction or credit history were key barriers to exiting homelessness. Mediation offers a critical pathway to housing stability and avoids a record of eviction. Mediation should be paired with legal support for tenants to navigate the process.

🚩 **Increase homelessness prevention in institutional settings.** One in five participants entered homelessness directly from an institutional setting (jail, prison); few had received prevention services. Embedding robust homelessness prevention in institutional settings (carceral settings, drug treatment, hospitals) could reduce inflows into homelessness.

🚩 **Embed homelessness prevention in mainstream systems where low-income individuals receive services.** Few participants had sought or received prevention services. Embedding screening and prevention services where at-risk individuals seek services (healthcare, social service, domestic violence services, educational settings) could increase awareness and use of prevention services.

## FACILITATE SWIFT EXITS FROM HOMELESSNESS

The median duration of current homelessness episodes was 22 months. Participants spoke about numerous barriers that made re-entering permanent housing difficult. While almost 9 in 10 reported that the cost of housing was the main barrier to re-entering housing, they noted other barriers as well. Participants described the lack of support received for finding housing, difficulty identifying available affordable housing, and challenges with documents. To quicken exits from homelessness, we recommend:

🚩 **Increase housing navigation, with targeted outreach to those in unsheltered settings.** Housing navigation can help clients with searching for housing, negotiating with property owners, and gathering necessary documents. Implementing comprehensive housing navigation services could help people experiencing homelessness overcome barriers to returning to housing.

🚩 **Ease barriers to identifying affordable housing options.** Participants described challenges identifying available affordable housing, complicating their housing search. Tools that make the search for deeply affordable housing easier could ease barriers.

🚩 **Lower barriers for accessing State-issued identification cards and other needed documentation.** Half (52%) of participants noted a lack of documents, such as State-issued identification cards and birth certificates, as a barrier to finding housing. Participants could not afford to replace these, nor did they have access to transportation or other resources to start the replacement process. Improving outreach to assist with document replacement, waiving replacement fees, and providing safe storage would reduce barriers to employment and housing.

## INCREASE ACCESS TO SERVICES TO MATCH CLIENTS' PHYSICAL AND BEHAVIORAL HEALTH NEEDS

Study participants had poor health and poor access to appropriate services. They reported barriers to receipt of routine healthcare, substance use services, and mental health treatment. The aging of the population, poor functional status, high prevalence of chronic illnesses, high rate of pregnancy, and high prevalence of behavioral health needs call for additional services and support—both while people experience homelessness and to support them in housing. Because of the extraordinarily high rate of trauma—before and during homelessness—these services must be offered in a way that adheres to trauma-informed principles.

### Substance Use

🚩 **Increase access to substance use treatment.** Twenty percent of participants who reported current regular substance use indicated that they wanted treatment, but were unable to receive it. Evidence shows that substance use treatment is most effective among those who choose to engage with it. A higher proportion of individuals who used substances regularly live in unsheltered environments. There is a need for increased access for those who want it, particularly those in unsheltered settings. Promising models for low-barrier, outreach-focused services (including medication treatment) should be expanded.

DOJ-HUD-AR00838

🚩 **Increase outreach with harm reduction services (naloxone, needles, drug testing).** Participants report a high rate of substance use, injection drug use, and drug poisoning (overdose). There is a need to increase access to harm reduction services, including those aimed at preventing overdose (naloxone), skin and soft tissue infections, and infectious diseases, particularly in unsheltered settings.

🚩 **Prioritize investments in promising treatments for stimulants.** Participants report high rates of methamphetamine use. There is a need to invest in promising treatments, such as contingency management for those with stimulant use disorders.

🚩 **Increase linkage to harm reduction and substance use treatment through emergency departments.** As with other studies, we found high rates of emergency department (ED) use among those experiencing homelessness and low use of non-ED ambulatory care. To meet the needs of those with substance use disorders, increase ED's capacity to provide and link to substance use treatment and harm reduction services. This capacity could include initiation and linkage to medication treatment for opioid and alcohol use disorders, linkage to residential treatment and distribution of naloxone.

## Provide Appropriate Services to Match Client Needs in Housing

🚩 **Increase availability of permanent supportive housing for those with complex behavioral health needs.** Permanent supportive housing should be aligned with Housing First principles and use evidence-based models of care (e.g., Assertive Community Treatment, Intensive Case Management, Pathways to Housing) that meet the needs of those who have significant behavioral health needs. There is a need for funding to pay for appropriate service provision. For those who are not able to thrive in permanent supportive housing with high levels of support, we recommend expanding availability of behavioral health focused residential care facilities.

🚩 **Create permanent supportive housing responsive to the needs of older adults.** Nearly half of adults experiencing homelessness are 50 or older. By the age of 50, people experiencing homelessness have health and function similar to adults in their 70s and 80s in the general community, with high prevalence of functional and cognitive impairments. Many have co-occurring behavioral health problems. To avoid preventable institutional care, there is a need for housing options that support independence for those with functional and cognitive impairments. Medicaid Home and Community Based Services can fund supports and services, but traditional consumer model in-home supportive services may not meet the needs of this population. There is a need for models of care for older adults that take into account the co-occurrence of behavioral health needs with significant functional and cognitive impairments, narrow social networks, and history of trauma. There is a need for expanded permanent supportive housing with robust services and supports for those with chronic illness and functional or cognitive impairments; using the Home and Community Based Alternatives Waiver offers a promising opportunity. Other potential models (such as integration of the Program of All-Inclusive Care for the Elderly [PACE]) programs with permanent supportive housing) and expanded use of the contract mode of in-home supportive services should be considered.

## Physical and Mental Health Services

🚩 **Increase street medicine outreach.** *Street medicine* is the practice of providing critical health care services to those experiencing unsheltered homelessness. Despite relatively high levels of insurance coverage, only half (51%) of participants noted having a regular place for care. Meeting people where they are to provide care lowers barriers to care among a population with high need.

🚩 **Increase access to full scope reproductive services, prevention, and housing resources for pregnant people.** More than one quarter (26%) of participants assigned female at birth who were aged 18-44 experienced a pregnancy during their current episode of homelessness; 8% were currently pregnant. Increasing access to comprehensive reproductive health services and facilitating connections to housing resources is crucial to the health of pregnant people experiencing homelessness and children.

DOJ-HUD-AR00839

🚩 **Increase access to mental health care in all settings.** Despite a high prevalence of mental health needs, participants reported limited engagement with mental health services. Increasing access to mental health care in both unsheltered and sheltered settings offers a critical opportunity to increase parity between needs and availability of services.

🚩 **Increase availability of recuperative care/ medical respite.** More than one third (38%) of all participants visited the emergency department and one in five (21%) were hospitalized for a physical health condition in the prior six months. Participants spoke of their experiences being discharged from hospitalizations to unsheltered settings, or shelters that did not have the resources they needed for recovery. Recuperative care combines shelter with health services for people exiting hospitals who no longer meet criteria for the hospital but are too ill for sheltered or unsheltered settings. These programs may help decrease length of hospital stay and readmissions and improve health outcomes. With an aging homeless population, the need for recuperative care will increase.

## ADDRESS THE CRIMINAL JUSTICE SYSTEM TO HOMELESSNESS CYCLE

Nearly one in five participants (19%) entered homelessness from an institutional setting, including jail and prison. Thirty-seven percent spent time in prison and 77% spent time in jail at some point in their lifetimes. While experiencing homelessness, 30% of all participants had a jail stay during their current episode.

Participants reported their prior criminal justice records were a barrier to employment and housing. They reported frequent interactions with law enforcement agencies while homeless. We recommend the following:

🚩 **Lower housing barriers for those with criminal justice system records.** Consider prohibiting consideration of criminal justice records in the tenant review processes and taking a more individualized approach to reviewing applicants with criminal justice records.

🚩 **Improve re-entry support for those exiting carceral settings.** Few participants exiting prison or prolonged jail stays reported that they had received re-entry support. Improving re-entry supports, including meaningful connections to permanent housing, healthcare, and employment could result in reductions in homelessness and returns to carceral settings.

🚩 **Reduce carceral responses to homelessness.** Criminal justice responses to survival behaviors, such as sleeping or living in public spaces are associated with increased rate of incarceration and prolongation of homelessness. Using non–law enforcement responses to behavioral health crises increases trust and supports connection to ongoing care. Ticketing and towing of vehicles leads to loss of a resource that can provide safety and security for individuals (as well as transportation to employment and healthcare). Following encampment resolution best practices, including supporting access to low barrier housing, can reduce trauma, loss of documents, and support better health outcomes.

## INCREASE OPPORTUNITIES FOR EARNED INCOME AND BENEFITS UTILIZATION

One in five leaseholders cited reduced or lost income as the biggest reason for leaving their last housing. Many participants have extended disconnections from the labor market. While benefits are a critical source of income for people experiencing homelessness, we found relatively low rates of utilization of many benefits. We recommend the following:

🚩 **Increase evidence-based employment supports.** Given lengthy disconnections from the workforce and the relatively high rate of people actively looking for work, increasing evidence-based employment supports for people living in affordable or supportive housing, those with histories of homelessness, and with behavioral health needs could increase opportunities for earned income. Many participants reported transportation barriers to employment; this should be considered as part of employment support.

DOJ-HUD-AR00840

CHAPTER 5: POLICY RECOMMENDATIONS

▶ **Increase enrollment in income-eligible benefits.** We found low rates of utilization of income-eligible benefits, such as SSI/SSDI. Streamlining processes, removing recertification barriers, increasing affirmative outreach to those experiencing unsheltered homelessness, and connecting participants to benefits when participants interact with other systems could provide crucial income support.

## SUPPORT THOSE IMPACTED BY DOMESTIC VIOLENCE

Fifteen percent of all participants noted that violence or abuse in the household was a reason for leaving their last housing arrangement. In the six months prior to homelessness, 25% of participants experienced physical violence and 6% experienced sexual violence. We recommend the following:

▶ **Increase availability of emergency shelters and permanent housing options for those impacted by domestic violence.** Increased shelter availability could better meet the needs of those impacted by domestic violence. Expanded availability should be coupled with enhanced training of shelter staff to ensure consistent connection of those impacted by domestic violence with coordinated entry systems. While emergency shelters play an important role in allowing those impacted by domestic violence to exit situations swiftly, there is a need for permanent housing to promote exits from shelter settings.

## INCREASE OUTREACH TO THOSE EXPERIENCING UNSHELTERED HOMELESSNESS

Nearly 8 in 10 participants (78%) reported that they spent most of their prior six months in unsheltered settings. Many who started in vehicles lost their vehicles. Those in unsheltered settings had less access to services and higher rates of behavioral health challenges. We recommend the following:

▶ **Invest in sustained outreach into unsheltered communities.** We recommend increasing outreach related to physical health, behavioral health, benefits, and housing navigation services to those living in vehicles, encampments, and other unsheltered places. Increase opportunities for individuals to retain their vehicles, which provided a form of shelter and transportation. Some communities in California have safe parking programs, which often provide access to restrooms, running water, and secure parking to support those experiencing vehicular homelessness.

## CENTER RACIAL EQUITY

Minoritized racial groups are disproportionately represented in homeless populations. Because they have experienced multiple forms of discrimination throughout their lives, services must be aligned with best practices to build trust and reduce harm. Participants experienced discrimination at multiple points across their life course.

▶ **Strengthen anti-discrimination policies and enforcement mechanisms.** Given that participants experienced discrimination on the housing market, there is a need to strengthen anti-discrimination housing policies (such as HUD's Fair Housing Act and California's Fair Employment and Housing Act). These strengthened policies should be coupled with adequate enforcement mechanisms to ensure more equitable housing outcomes.

▶ **Prioritize equity in local coordinated entry systems.** Some coordinated entry processes and assessment tools have perpetuated racial inequities. Coordinated entry should embed racial equity at all steps—from assessments and prioritization to ensuring non-discriminatory practices in housing placement. To accomplish this goal, coordinated entry systems should regularly review data to ensure equitable pathways to permanent housing.

▶ **Lower housing barriers for those with criminal justice system records.** Given the disproportionate impact of incarceration on people of color, lowering barriers for justice-impacted individuals is critical to advancing racial equity.

DOJ-HUD-AR00841

DOJ-HUD-AR00842

## ACKNOWLEDGMENTS

The California Statewide Study of People Experiencing Homelessness (CASPEH) reflects the hard work and dedication of many people. Completing a project of this size, in a state as large and diverse as California, in the midst of a pandemic, could not have happened without their commitment, brilliance, and devotion.

We are endlessly grateful to core BHHI field researchers who spent much of a year traveling throughout the state, honoring the stories of the people experiencing homelessness whom they met. They were indefatigable and brilliant in all that they did. Layan Kaileh (who managed overall operations) brought us all together, and led her team with compassion and wisdom. In addition to doing advance work in each county, she supervised the team, community ambassadors, and county field staff, scouted locations, served as troubleshooter, and kept morale high through long days that were alternatingly too hot, too cold, too wet or too dry. We thank Angelica DeGaetano (who managed our respondent-driven sampling project), Zena Dhatt and Michael Duke (who managed the qualitative interviews), Diana Flores (who got the field team started) for their leadership and commitment. We are grateful to our core team members: Tremone Fucles, Norma Guzman, Tianna Jacques, Amy Lara, Corbin Platamone, Abraham Renteria-Ramirez, Madison Rodriguez, Regina Sakoda, Ivan Smith, Elana Straus, and Grace Taylor. You all brought wisdom, energy, and compassion to the work (and yes, we are at "End Survey"!). We thank BHHI senior staff members Pamela Olsen, Tiana Moore, Kara Young Ponder, Alice Fishman and Tamar Schnepp, who, whenever we needed it, traveled with the team to provide additional leadership, training, support, and organization whenever and however. Their leadership in and out of the field was essential to what we did. We thank BHHI staffers Celeste Enriquez, Cheyenne Garcia, and Karen Valle who stepped out of their usual roles and went into the field when we needed additional help.

We thank Dallas Augustine and Lucy Zhang who joined us in multiple counties to conduct qualitative interviews for those with criminal justice histories and Graham Pruss for joining in multiple counties to conduct qualitative interviews. We thank Jay Bindman, Georgia Bright, Lucy Zhang, Chikwado Akpunonu, Jose Alvarez, Bianca Armenta, Lila Avendano, Dalliana Banuelos, Lydia Barrett, Andrew Cheung, Karla Garcia, Valeria Gomez, Kristofer Hernandez, Andi Ismail, Maryanne Jacoby, Kimberly Lara, Marcus Lou, Jennifer Ly, Sureena Mann, Kimberly Merene, Kim Merida, Raquel Morales Flores, Nneoma Ogele, Charlene Rodriguez, Steve Singleton, Alexis Umoye, and Sophia Yonkers-Talz who served as field researchers in large counties and brought their understanding, sense of humor, willingness to learn, and commitment to the project.

We thank our community ambassadors throughout California who walked besides us, introduced us to each community and setting we entered, and served as our local experts and guides. Your kindness, thoughtfulness, and brilliance made this project what it is. To maintain confidentiality of the counties, we are not naming you here, but we are endlessly grateful for your work and your partnership. We know that we couldn't have done this without you.

We thank our partners in the eight counties we worked in. Coordinating on the ground in eight counties took a village. While we cannot acknowledge people by name, we want to thank the dozens of outreach workers, Point-In-Time-Count leaders, community organizations, university professors and staff, government agency staff, emergency shelter and SIP hotel staff, homeless service response system providers and individuals running street medicine programs for helping us build our venue and encampment databases; set up and randomize at venues, and ensure that we were connected to the right people to make this project a success. We couldn't have done this project without you.

We were supported by an incredible BHHI team who managed the logistics and provided support. We are grateful to Dante Skidmore for somehow keeping track of all the logistics, including innumerable supplies, car and hotel reservations, and whatever else needed to happen and to Alma Yates who worked alongside him. Thanks to Gato Gourley, Alice Fishman, Binh Tran, Sonja Simmons, and Usma Khan for holding us together in many ways and to all our BHHI colleagues who kept everything else running while we were preoccupied with this study.

Our incredible statistics and data science team Jenna Birkmeyer, Sara Colom, Dave Graham-Squire, Kim Nguyen, Eve Perry, Margo Pottebaum, and Mai See Yang and their project manager Regina Sakoda oversaw every number and figure you see. We are grateful to Dave's overall leadership of the team and his wisdom in study design, Gina's incredible organization and project management, and Jenna, Sara, Kim, Eve, Margo and Mai See's continuous work to ensure that our findings are accurate, clear, and comprehensive.

Michael Duke and Kelly Knight served as lead investigators on our qualitative team. They were aided by sub-study co-investigators Dallas Augustine (Incarceration and Homelessness), Kara Young Ponder (Black Experiences of Homelessness in California) and Anita Hargrave (Intimate Partner Violence and Homelessness). Zena Dhatt served as qualitative team project manager with aplomb. Tianna Jacques and Grace Taylor were fabulous core members of the qualitative team. They were aided by numerous field researchers who conducted interviews, and Lucy Zhang, Corbin Platamone, Kweku Djan, Mukund Raghuram, Norma Rodriguez and others who played important roles coding reams of qualitative data. We are so grateful to the qualitative team's commitment to treating the participants and their stories with compassion, rigor, and understanding and making sure that others heard the participants' truth.

DOJ-HUD-AR00843

In designing the questionnaire, we were lucky to have the expertise of Meghan Morris and Cheyenne Garcia who brought their wisdom and energy to leading the effort. Many others, including Shannon Smith-Bernardin, Christine Ma, Monica McLemore, Dallas Augustine and Anita Hargrave helped identify appropriate questions on specific topics and answered our questions. We are grateful to Paul Wesson who was an incredible thought partner in designing the sampling plans, helped us think through complicated weighting plans and guided us through many difficult decisions. We thank Kenny Perez for bringing his energy, brilliance and way too many late nights to guide our programming of the survey instrument and ensure its accuracy.

Kara Young Ponder played too many roles to count, including guiding our wonderful community advisory boards, running the Black Experiences of Homelessness qualitative research project, and supporting our team through difficult days.

Erin Hartman and Robin Craig on the BHHI communications team played key roles in editing and conveying our findings. We are grateful to Elizabeth Weaver and Ranit Schmelzer at Woodside Park Strategies for their communications guidance.

We are grateful to Aaron Schrank for his audio journalism and Sam Comen for his photography for CASPEH's companion documentary project, Unhoused. Many of Sam's incredible photos are featured in this report, alongside the compelling photographs of Barbara Ries. We thank Ellen Sherrod for her layout and design and willingness to work on a tight deadline.

This study depended on the insight, honesty, and brilliance of our three Community Advisory Boards. Our board members were critical partners at all phases of the study. We extend our appreciation to members of our Lived Expertise Advisory Board (Ludmilla Bade, Jesica Giannola, DeForest Hancock, Sage Johnson, Dontae Lartigue, Dez Martinez, Priest Martinez, Robynne Rose-Haymer, Claudine Sipili), our Policy and Practice Advisory Board (Ali Sutton, Bobby Watts, Brenda Grealish, Corrin Buchanan, Cynthia Nagendra, Jamie Almanza, Janey Rountree, Jennifer Loving, Joy Moses, Maria Rodriguez-Lopez, Nan Roman, Nicole Sager, Omar Passons, Patti Prunhuber, Richard Cho, VaLecia Adams Kellum, William Snow), and our Learning Collaborative Advisory Board. To maintain anonymity of the counties, we are not naming our Learning Collaborative Board members here, but we are endlessly grateful for all of your assistance and partnership.

At various times, we called on outside researchers for advice. We are grateful to their willingness to answer our questions. We thank Dennis Culhane, Tianna Paschel, Anita Raj, Ryan Finnigan, Evan White, Sara Kimberlin, Johanna Lacoe, Jill Khadduri, Janey Rountree, Dean Obermark, Ben Henwood, Beth Shinn, and Randall Kuhn.

The project was funded by the Benioff Homelessness and Housing Initiative, California Health Care Foundation and Blue Shield Foundation of California. Our partners at CHCF (Lisa Aliferis, Eric Antebi, Dalma Diaz, Michelle Schneidermann) and BSFC (Karen Ben-Moshe, Courtnee Hamity, Krysten Massa, Rachel Wick) stood by us throughout the process and were true colleagues. We are grateful for their partnership. We are grateful to Marc and Lynne Benioff whose generous donation has provided essential support to the BHHI.

Throughout the process, we had help from colleagues at the California Health and Human Services Department who provided insights and advice. We thank Corrin Buchanan for her wisdom, willingness to answer questions and provide guidance throughout the process. We are grateful to Marta Galan and Irene Farnsworth for their insights and assistance.

Jenna Birkmeyer knew the questionnaire inside and out and worked with the other incredible statistics team members to make sense of (and convey) our findings. We are grateful for her (and the statistics team's) calmness, knowledge, and willingness to go the extra mile. Michael Duke, Zena Dhatt, and Kelly Knight drafted sections that originated from the qualitative research and made sure that they were true to the qualitative data. They brought the experiences of our participants to life and made sure that CASPEH honored their experiences. Kara Young Ponder drafted numerous sections, brought her deep knowledge of race and racism to our work, and made sure that we incorporated the deep wisdom of our advisory boards.

Tiana Moore led the writing effort with brilliance, fearlessness, a deep commitment to find the truth, and a willingness to work hours that no one should work. We are endlessly grateful to her leadership, analytical, organization, and writing skills; her deep knowledge of policy; and her unyielding devotion to this project. None of this could have happened without her.

To those whom we neglected to name, know that we are so appreciative of all of your contributions. While this was, truly, a group effort, the authors take responsibility for any errors that may have slipped through.

Most of all, we thank the 3,200 study participants who answered our questions with vulnerability and honesty. We hope that we have honored what you told us and we commit to work toward a future where you, once again, enjoy the safety and security of home.



**Margot Kushel, MD**

*Director, UCSF Benioff Homelessness and Housing Initiative*

*CASPEH Principal Investigator*

DOJ-HUD-AR00844

## REFERENCES

**1** Our study focuses on adults only. We include all adults, including those in homeless families (those living with minor children while homeless) and transition age young adults (aged 18-24). The experience of children living in homeless families and homeless youth (under age 18) is outside the scope of this project.

**2** The Homeless Emergency Assistance and Rapid Transition (HEARTH) to Housing Act of 2009 is the definition of homelessness used by the Federal Government. It defines homeless individuals and families as those who lack a fixed, regular, and adequate nighttime residence; those who will lose their primary nighttime residence imminently (i.e., within 14 days); or who are fleeing domestic violence, dating violence, stalking, or similar threatening situations.

**3** Our random samples were determined based on the number of people at a given site and the number of people we needed to interview. Our staff kept track of which people we approached for an interview and who we skipped over so that we could accurately determine the percentage of people at each site that we interviewed.

**4** Weighting is a statistical technique in which researchers adjust data to allow them to represent the population studied.

**5** We use the term Latino/x to refer to our participants who indicated Latino/a/x, Hispanic, or Latin American on the CASPEH race measure. We use this term to recognize both those who prefer to use the terms Latino or Latina and those who prefer to use the term Latinx to describe their ethnic and/or racial identity.

**6** Aron, L. & Burt, M. (2001). *Helping America's Homeless: Emergency Shelter or Affordable Housing*. Urban Institute.

**7** Semega, J & Kollar, M. (2022, September 13). Increase in Income Inequality Driven by Real Declines in Income at the Bottom. *Census.gov*. Retrieved from: https://www.census.gov/library/stories/2022/09/income-inequality-increased.html

**8** Harris, B. & Werz, S.S. (2022, September 15). Racial Differences in Economic Security: The Racial Wealth Gap. *U.S. Department of the Treasury*. Retrieved from: https://home.treasury.gov/news/featured-stories/racial-differences-economic-security-racial-wealth-gap

**9** The National Low Income Housing Coalition. (2023). *THE GAP: A Shortage of Affordable Homes*. https://nlihc.org/sites/default/files/gap/Gap-Report_2023.pdf

**10** Shinn, M. & Khadduri, J. (2020). *In the Midst of Plenty: Homelessness and What to Do About It*. Hoboken, New Jersey: Wiley Blackwell Publishers.

**11** Aldern, C.P. & Colburn, G. (2022). *Homelessness is a Housing Problem: How Structural Factors Explain U.S. Patterns*. Berkeley, California: UC Press.

**12** Interquartile range is a measure of the spread of numeric data. The lower value represents the 25th percentile of the data and the upper value represents the 75th percentile. These values provide context to how responses may have differed across participants.

**13** In the United States, Blackness is treated as a racial category at the bottom of a racial hierarchy. This means that those who are perceived as Black, even if they are multiracial, are treated as Black. Scholarship in public health has shown that due to structural, institutional, and interpersonal racism, people with any Black racial identity have similar health outcomes to one another than to other racial groups. Therefore, in our report, we define the category 'Black' as those who identify Black as their sole racial identity and those who identify Black as one of their racial identities.

**14** Race in the United States is extremely complex. We relied on current scholarship about race to inform how we reported race. We recognize that our categories may conceal unique experiences within groups and plan to conduct further analysis on race in the CASPEH at a later time.

**15** For more on the history of racial measures on the census see Mora,G.C. (2014). *Making Hispanics: How Activists, Bureaucrats, and Media Constructed a New America*. Chicago, Illinois: University of Chicago Press.

**16** While we aggregated participants who identified as transgender, gender non-conforming, or other gender identities into a single category because of the size of the sample, we recognize experiences differ across these identities. Our sample included transgender men, transgender women, non-binary, genderqueer, or gender non-conforming individuals, and individuals who indicated another or unknown gender identity.

**17** We did not interview on tribal lands throughout California in order to match the PIT methodology, which, by mandate from HUD, does not count individuals on tribal lands. However, we consulted with Tribal partners throughout the course of the study to ensure that we surveyed Native Americans living in the counties surveyed.

**18** To make these comparisons, we use the U.S. Census in two ways. First, California population estimates were taken from calculations on "Race alone or in combination with one or more other races" in the 2021 American Community Survey 1-Year Estimates (See U.S. Census Bureau. (2021). American Community Survey 1-Year Estimates. Retrieved from: https://data.census.gov/table?q=race+by+age&g=040XX00US-06&y=2021&tid=ACSDP1Y2021.DP05). Additionally, in line with the guidelines provided by the U.S. Census and the U.S. Office of Management and Budget (OMB), we combined those who identified as Native American/Alaskan Native with those who identified as Indigenous to Mexico, Central or South America into one category. (See U.S. Census Bureau. (2022, March 1). About the Topic of Race. Retrieved from: https://www.census.gov/topics/population/race/about.html)

DOJ-HUD-AR00845

19 In the Census and PIT, individuals select a racial identity and separately mark whether their ethnicity is Hispanic/Latino/x. Because we asked the question differently, and asked people to mark a racial identity only (including Latino/x), our findings are not comparable to either the general population or the PIT.

20 Problems understanding or remembering can be a symptom of a variety of health conditions, including cognitive impairment, depression, anxiety, schizophrenia, or developmental delay.

21 Centers for Disease Control and Prevention. (2022, November 6). Suicide Prevention: Risk and Protective Factors. Retrieved from: https://www.cdc.gov/suicide/factors/index.html

22 If a person experiencing homelessness spends 3 or more months in an institutional setting, they are considered to start a new episode of homelessness if they are homeless upon release.

23 If a person was named on the lease or mortgage, we considered them leaseholders.

24 We include those whose personal household didn't include a leaseholder as non-leaseholders. This could include people doubled-up with family or friends, or staying in informal arrangements without the protection of a lease.

25 We will use the term "leaseholder" for those who either held a rental lease or a mortgage.

26 Many report leaving prior to a formal eviction to avoid having an eviction on their record. In this report, we will use the term eviction for either–formal eviction, or, more commonly–leaving under the threat of eviction.

27 While 19% entered homelessness directly from an institution, an additional 4% either had left their last stable housing arrangement to enter an institution for a short time or exited the institution for a short stay in housing. When we include these, jail stays increase to 10% and drug treatment to 3% of those entering homelessness.

28 We did not ask those exiting prisons, jails, or hospitals for these responses.

29 We chose two years because we were not interested in brief delays in homelessness, but also wanted to choose a duration for which participants could project.

30 For those entering from an institutional setting, we assumed that they would have needed to find new housing.

31 California Department of Social Services. Project Roomkey/Housing and Homelessness COVID Response. Retrieved from: https://www.cdss.ca.gov/inforesources/cdss-programs/housing-programs/project-roomkey

32 Self-reported chronic diseases included diabetes, cancer (excluding non-melanoma skin cancer), HIV/AIDS, chronic kidney disease, hypertension, heart problems or stroke, liver disease, asthma or COPD.

33 Most individuals who were undocumented or recent immigrants were not eligible during the study period.

34 Pandemic-related changes, including reductions in barriers to remaining enrolled, may have increased enrollment.

35 We used where participants reported spending the most time in the prior six months to determine shelter status and considered those in vehicles to be unsheltered, consistent with HUD definitions.

36 Clarke T.C., Schiller J.S. (2020). Early Release of Selected Estimates Based on Data From the January–June 2019 National Health Interview Survey. *National Center for Health Statistics*. https://www.cdc.gov/nchs/data/nhis/earlyrelease/earlyrelease 202009-508.pdf

37 Volpicelli, J.R., & Menzies, P. (2022). Rethinking Unhealthy Alcohol Use in the United States: A Structured Review. *Substance Abuse: Research and Treatment* 16, 1-12

38 We defined heavy alcohol use for women as consuming 5 or more drinks at a time, twice a week; 3 or more drinks at a time, 4 or more times a week; or 6 or more drinks at a time weekly or more often. For men, heavy use was defined as consuming 5 or more drinks at a time, two or more times a week; or 6 drinks at a time weekly or more often.

39 If an individual who is homeless enters an institutional setting and stays for more than three months–their homelessness episode is "reset"--meaning–when they exit, they are considered to be in a new episode of homelessness.

40 For this question, we asked about any episode of homelessness, not focused solely on this episode.

41 To calculate income, we asked participants to include income from work (formal or informal) and benefits. We asked participants to not include money from Supplemental Nutrition Assistance Program (SNAP)/CalFresh.

42 We did not count these towards participants' income.

43 California Department of Social Services. (n.d.). Benefits and Services. General Assistance. https://www.cdss.ca.gov/general-assistance

44 Discrimination is defined as the process in which members of a socially defined group are treated differently, often unfairly, due to their membership in that group.

45 Sternthal, M., Slopen, N., & Williams, D.R. (2011). Racial Disparities in Health: How Much Does Stress Really Matter? *Du Bois Review*, 8(1), 95-113.

46 We used the Everyday Discrimination Scale – Short version. We modified this scale by combining the first two questions for brevity and adding housing status to the list of identities that can be discriminated against.

47 Possible answers include: ancestry or national origin; gender; race; age; housing/homelessness status; religion; sexual orientation; criminal record; physical disability; physical appearance; the shade of your skin color; education or income level; other.

48 National Low Income Housing Coalition. (2023). The GAP: A Shortage of Affordable Housing. https://nlihc.org/sites/default/files/gap/Gap-Report_2023.pdf

49 Ibid.

DOJ-HUD-AR00846



Benioff Homelessness
and Housing Initiative

University of California
San Francisco

TWITTER **@ucsfbhhi**
WEBSITE **homelessness.ucsf.edu**
EMAIL **homelessness@ucsf.edu**

DOJ-HUD-AR00847



JAMA Network Open™

Original Investigation | Public Health

# Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic

Caroline Cawley, MPH; Hemal K. Kanzaria, MD, MSc; Barry Zevin, MD; Kelly M. Doran, MD, MHS; Margot Kushel, MD; Maria C. Raven, MD, MPH

## Abstract

**IMPORTANCE**  There has been recent media attention on the risk of excess mortality among homeless individuals during the COVID-19 pandemic, yet data on these deaths are limited.

**OBJECTIVES**  To quantify and describe deaths among people experiencing homelessness in San Francisco during the COVID-19 pandemic and to compare the characteristics of these deaths with those in prior years.

**DESIGN, SETTING, AND PARTICIPANTS**  A cross-sectional study tracking mortality among people experiencing homelessness from 2016 to 2021 in San Francisco, California. All deceased individuals who were homeless in San Francisco at the time of death and whose deaths were processed by the San Francisco Office of the Chief Medical Examiner were included. Data analysis was performed from August to October 2021.

**EXPOSURE**  Homelessness, based on homeless living status in an administrative database.

**MAIN OUTCOMES AND MEASURES**  Descriptive statistics were used to understand annual trends in demographic characteristics, cause and manner of death (based on autopsy), substances present in toxicology reports, geographic distribution of deaths, and use of health and social services prior to death. Total estimated numbers of people experiencing homelessness in San Francisco were assessed through semiannual point-in-time counts. The 2021 point-in-time count was postponed owing to the COVID-19 pandemic.

**RESULTS**  In San Francisco, there were 331 deaths among people experiencing homelessness in the first year of the COVID-19 pandemic (from March 17, 2020, to March 16, 2021). This number was more than double any number in previous years (eg, 128 deaths in 2016, 128 deaths in 2017, 135 deaths in 2018, and 147 deaths in 2019). Most individuals who died were male (268 of 331 [81%]). Acute drug toxicity was the most common cause of death in each year, followed by traumatic injury. COVID-19 was not listed as the primary cause of any deaths. The proportion of deaths involving fentanyl increased each year (present in 52% of toxicology reports in 2019 and 68% during the pandemic). Fewer decedents had contacts with health services in the year prior to their death during the pandemic than in prior years (13% used substance use disorder services compared with 20% in 2019).

**CONCLUSIONS AND RELEVANCE**  In this cross-sectional study, the number of deaths among people experiencing homelessness in San Francisco increased markedly during the first year of the COVID-19 pandemic. These findings may guide future interventions to reduce mortality among individuals experiencing homelessness.

*JAMA Network Open.* 2022;5(3):e221870. doi:10.1001/jamanetworkopen.2022.1870

## Key Points

**Question**  How did the number and characteristics of deaths among people experiencing homelessness in San Francisco during the COVID-19 pandemic compare with those in prior years?

**Findings**  In this cross-sectional study, more than twice as many people died while homeless in the year starting March 17, 2020, compared with any prior year.

**Meaning**  The number of deaths in San Francisco among people experiencing homelessness increased markedly during the COVID-19 pandemic, with most of the increase associated with overdose deaths rather than COVID-19 itself.

Author affiliations and article information are listed at the end of this article.

🔓 **Open Access.** This is an open access article distributed under the terms of the CC-BY License.

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR00848

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 53 of 117 PageID #: 2227

JAMA Network Open | Public Health          Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic

## Introduction

San Francisco has been tracking deaths among people experiencing homelessness using standardized methods since 2016.[1] Early in the COVID-19 pandemic, there was concern about the potential for high rates of COVID-19 transmission and mortality among people experiencing homelessness.[2] To mitigate this risk, San Francisco placed several thousand people experiencing homelessness at high risk of severe complications from COVID-19 in shelter-in-place hotel rooms, reduced the number of people in shelters, and offered mitigation strategies in sheltered and unsheltered settings.[3] In this study, we describe deaths among people experiencing homelessness in the first year of the pandemic (from March 17, 2020, to March 16, 2021) and compare the characteristics of these deaths with those of the deaths in 4 preceding calendar years. We sought to understand the factors associated with mortality among people experiencing homelessness and to inform mortality prevention strategies.

## Methods

In this cross-sectional study, to assess the number of deaths among people experiencing homelessness in San Francisco, California, we reviewed records from the San Francisco Office of the Chief Medical Examiner (OCME).[4] The OCME provides forensic death investigation services for the City and County of San Francisco and generates reports providing manner, cause, location, and date of death. Cases also include autopsy and toxicology reports, except in situations involving a lengthy hospital stay prior to death because, when measured weeks into a hospitalization, postmortem toxicology would not accurately reflect substances that may have been present at the time of admission. We linked these data to the San Francisco Department of Public Health (SFDPH) Coordinated Care Management System (CCMS) to obtain data on demographic characteristics, homelessness history, and the use of medical services, behavioral health services, county jail health services, shelter-in-place hotels, and shelters prior to death for each decedent. The CCMS defines homelessness based on either data on homeless service use or data on self-reported homeless status collected during health or social service encounters. The SFDPH creates a CCMS record for any individual noted as homeless in any San Francisco County health or housing data system, any individual using county behavioral health, homelessness, or jail health services, or any individual using county urgent or emergent medical, mental health, or substance use services. Descriptions of these data sources can be found elsewhere.[1,5] We categorized decedents as homeless if they met at least 1 criterion for the US Department of Housing and Urban Development definition of homelessness.[6] We obtained institutional review board approval from the University of California, San Francisco and adhered to the Protected Health Information and Code of Federal Regulations 42 part 2 protocols governing the use of substance use disorder treatment data. Informed consent was not provided because the study did not involve contact with individuals (all individuals were deceased). Our report follows the Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) reporting guideline for observational cross-sectional studies.

### Statistical Analysis

We calculated homeless death estimates for a 12-month period starting March 17, 2020 (the date of San Francisco's shelter-in-place order), and compared these estimates with the annual estimates for the calendar years 2016 to 2019. We expressed estimates as rates per 100 000 based on semiannual point-in-time counts of homelessness[7] to account for relative changes in the homeless population over time. For example, there were 6858 individuals in 2017 and 8035 individuals in 2019. The 2021 point-in-time count was postponed owing to the COVID-19 pandemic. We used descriptive statistics (SAS, version 9.4 [SAS Institute]) to understand trends in demographic characteristics, living situations, causes and locations of death, toxicology findings, and use of health and social services in the year prior to death.

JAMA Network Open. 2022;5(3):e221870. doi:10.1001/jamanetworkopen.2022.1870

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR00849

JAMA Network Open | Public Health    Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic

## Results

In the first year of the pandemic (from March 17, 2020, to March 16, 2021), there were 331 deaths among people experiencing homelessness, more than double the annual total of any previous year (128 in 2016, 128 in 2017, 135 in 2018, and 147 in 2019). There was an inflection point of increased mortality shortly after shelter-in-place began (**Figure 1**). The all-cause mortality rate also doubled, from 1829 per 100 000 in 2019 to 4119 per 100 000 in the first year of the pandemic (**Figure 2**). The demographic characteristics of decedents remained similar across study years (**Table 1**) and were similar to the general homeless population in San Francisco; most were men aged 40 to 60 years, had been experiencing homelessness for at least 5 years, and disproportionately identified as African American or Black (22%-31%) relative to the general population of San Francisco (5.6%).[8]

The proportion of deaths due to overdose increased since we began gathering data (34% [39 of 116] in 2016, 34% [36 of 107] in 2017, 56% [66 of 118] in 2018, and 72% [98 of 137] in 2019); that trend continued during the COVID-19 pandemic, reaching 82% (178 of 216). Traumatic injuries (including homicides and suicides) were the second leading cause of death each year (**Table 2**), followed by chronic medical conditions (eg, cardiovascular disease and cancer). All decedents were tested for COVID-19. Four individuals tested positive either post mortem or during the hospital

Figure 1. Cumulative Annual Deaths Among People Experiencing Homelessness in San Francisco From January 1, 2018, to March 16, 2021



Figure 2. Annual Deaths and All-Cause Mortality Rates per 100 000 Among People Experiencing Homelessness in San Francisco From January 1, 2016, to March 16, 2021



[a] From March 17, 2020, to March 16, 2021.

JAMA Network Open. 2022;5(3):e221870. doi:10.1001/jamanetworkopen.2022.1870    March 10, 2022    3/7

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR00850

JAMA Network Open | Public Health                    Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic

admission preceding their death, but COVID-19 was not listed as the primary cause of death in any of these cases. Deaths involving fentanyl increased throughout the study period. In 2016 and 2017, there were few fentanyl-involved cases (6% [6 of 97] and 7% [7 of 96] of toxicology reports, respectively), increasing to 30% (32 of 106) of toxicology reports in 2018, 52% (67 of 128) in 2019, and 68% (144 of 213) during the pandemic year. In every year, methamphetamines were the most common substances present in toxicology reports (48% [47 of 97] in 2016, 46% [44 of 96] in 2017, 66% [70 of 106] in 2018, 79% [101 of 128] in 2019, and 77% [164 of 213] during the pandemic).

Of the 869 deaths, 442 (51%) occurred outdoors (eg, sidewalk and park) in all study years. There were 54 deaths in which the death or precipitating incident occurred in shelter-in-place hotel rooms (eg, overdose in shelter-in-place room followed by death while hospitalized), plus an additional 16 shelter-in-place guests who died elsewhere (eg, friend's residence). The all-cause mortality rate for shelter-in-place guests was 1811 per 100 000 (based on the alternate shelter program having served 3864 guests in shelter-in-place hotels or trailers[3]) compared with an estimated 5038 per 100 000 for non–shelter-in-place guests (based on the most recent point-in-time count of unsheltered individuals in San Francisco).

More than 90% of decedents in each year were successfully matched to CCMS, indicating that they were previously known to San Francisco public health and social services. Among those who died in the pandemic year, two-thirds (64% [212 of 331]) used medical services (acute care and/or outpatient [eg, emergency departments and SFDPH primary care clinics]) in the 12 months prior to death compared with 76% (112 of 147) in 2019. Of 331 decedents, 79 (24%) had contact with mental

**Table 1. Characteristics of Deaths Among People Experiencing Homelessness in San Francisco, by Year**

| Characteristic | Decedents, No. (%) | | | | |
|---|---|---|---|---|---|
| | 2016 (n = 128) | 2017 (n = 128) | 2018 (n = 135) | 2019 (n = 147) | Pandemic year (n = 331)[a] |
| Age at death, median (range), y | 49 (21-86) | 54 (24-80) | 52 (22-80) | 46 (18-86) | 47 (0-77) |
| Gender | | | | | |
| Female | 24 (19) | 16 (13) | 18 (13) | 24 (16) | 62 (19) |
| Male | 104 (81) | 111 (87) | 117 (87) | 123 (84) | 268 (81) |
| Transgender | 0 | 1 (1) | 0 | 0 | 1 (<1) |
| Race and ethnicity | | | | | |
| African American or Black | 33 (26) | 39 (30) | 30 (22) | 46 (31) | 90 (27) |
| Asian | 2 (2) | 3 (2) | 6 (4) | 7 (5) | 20 (7) |
| Latino or Latina | 15 (12) | 16 (13) | 16 (12) | 17 (12) | 51 (15) |
| Mixed or other[b] | 4 (3) | 3 (2) | 4 (3) | 2 (2) | 10 (3) |
| White | 70 (55) | 66 (52) | 74 (55) | 72 (49) | 159 (48) |
| Unknown | 4 (3) | 1 (<1) | 5 (4) | 3 (2) | 1 (<1) |
| Length of time homeless in San Francisco, y | | | | | |
| <1 | 13 (14) | 15 (15) | 15 (13) | 26 (20) | 63 (22) |
| 1 to <5 | 20 (22) | 25 (26) | 28 (25) | 32 (25) | 55 (19) |
| 5 to <10 | 25 (27) | 12 (12) | 16 (14) | 14 (11) | 52 (18) |
| ≥10 | 35 (38) | 45 (46) | 53 (47) | 56 (44) | 113 (40) |

[a] From March 17, 2020, to March 16, 2021.
[b] Includes the response options mixed, multiethnic, other, and Native American.

**Table 2. Causes of Death Among People Experiencing Homelessness in San Francisco, by Year**

| Cause of death | Decedents, No. (%) | | | | |
|---|---|---|---|---|---|
| | 2016 (n = 116) | 2017 (n = 107) | 2018 (n = 118) | 2019 (n = 137) | Pandemic year (n = 216)[a] |
| Acute drug toxicity | 39 (34) | 36 (34) | 66 (56) | 98 (72) | 178 (82) |
| Traumatic injury | 31 (27) | 32 (30) | 24 (20) | 14 (10) | 14 (6) |
| Chronic medical conditions | 28 (25) | 27 (26) | 18 (15) | 12 (9) | 12 (5) |
| Complications of chronic alcohol use | 12 (10) | 5 (5) | 6 (5) | 7 (5) | 7 (3) |
| Other | 6 (5) | 7 (7) | 4 (3) | 6 (4) | 5 (2) |

[a] From March 17, 2020, to March 16, 2021.

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR00851

Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic

health services (eg, psychiatric emergency services and behavioral health case management), and 43 (13%) had contact with substance use disorder services (eg, sobering center and residential detoxification), compared with 30% (44 of 147) and 20% (30 of 147), respectively, in 2019 in the 12 months prior to death. Of 331 decedents, 86 (26%) had been in county jail custody in the year prior to death (compared with 35% [52 of 147] in 2019).

## Discussion

Deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths. No deaths in our data set were due to COVID-19 itself, which may speak to the success of San Francisco's efforts to mitigate the spread of the virus in vulnerable populations, including by moving individuals at high risk into noncongregate settings. However, the pandemic had far-reaching effects on outreach, health, and social services (eg, temporary closures or reduced hours for drop-in behavioral health facilities; decreased capacity in residential facilities to allow social distancing; and staff redeployments to COVID-19–related roles) that may have contributed to increased mortality from non–COVID-19 causes. In a study of women who were homeless or unstably housed in San Francisco, some study participants reported increased difficulties getting care for chronic medical conditions, mental health, and substance use during the pandemic.[9] The general population of the US has also experienced an increase in excess deaths not attributed to COVID-19 during the pandemic.[10]

This disruption to services coincided with increasing unintended overdose deaths in San Francisco, driven by the growing presence of fentanyl. There was a continued increase in the proportion of deaths among people experiencing homelessness associated with overdoses compared with 2019 (72% in 2019 and 82% in the study year), which followed a years-long upward trend, and the absolute number of overdose deaths increased markedly. From 2018 to 2019, the Western US experienced a large increase in death rates involving synthetic opioids, such as fentanyl.[11] In Boston, Massachusetts, the synthetic opioid mortality rate among people experiencing homelessness increased by more than 1400% between 2013 and 2018. This homeless cohort's standardized mortality rate from overdose for the years 2003 to 2018 was also 12 times higher than that of the adult population of Massachusetts.[12,13] A study of total overdose deaths in San Francisco found a 50% increase in weekly median overdose deaths since the onset of the pandemic.[14]

COVID-19 mitigation policies may have affected how, when, and where people used drugs and the chances a passerby could intervene in case of an overdose. COVID-19–related effects on the health system may have led to decreased access to treatment. We found that a low proportion of decedents had recent contact with behavioral health services, including office-based substance use disorder treatment programs. Our data on substance use services do not capture information on all of San Francisco's overdose prevention programs (eg, naloxone distribution), but our findings point to a need for more programs to address substance use disorder and overdose risk among people experiencing homelessness. San Francisco's alternative shelter program (shelter-in-place hotels) did not appear to be associated with increased overdose deaths among people experiencing homelessness, as some had feared at the start of the program.[15] The all-cause and overdose-specific mortality rates were lower for shelter-in-place guests than for other people experiencing homelessness, despite their targeting individuals at higher risk of mortality.

Of note, our findings stand in contrast to those elsewhere in the country. For example, in New York City in fiscal year 2020, COVID-19 was the second leading cause of death (after overdose) among people experiencing homelessness (121 deaths through June 30, 2020).[16] While there is no standard tracking of deaths among people experiencing homelessness across the US, 1 grassroots effort has compiled publicly available documentation to discover that there have been at least 553 deaths due to COVID-19 among people experiencing homelessness across 23 US cities and counties.[17]

JAMA Network Open. 2022;5(3):e221870. doi:10.1001/jamanetworkopen.2022.1870

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR00852

## Limitations

The limitations of this study include our lack of data on non-OCME cases and reliance on point-in-time data to estimate people experiencing homelessness.[18] Through their mandate to process all sudden, unexpected, violent, unobserved, overdose, and indigent deaths in San Francisco, the OCME handles most, but not all, deaths among people experiencing homelessness.

There are some system touchpoints not captured by the CCMS, including substance use harm reduction services. Considering the very high prevalence of substance-involved deaths in our study population, having these data would provide important details on additional service encounters prior to death. The CCMS also does not include medical records from certain non-SFDPH health care facilities (eg, Veterans Health Administration records) and does not capture homelessness history from other regions.

## Conclusions

Our findings highlight the importance of tracking deaths among people experiencing homelessness. Examining the cause of death and the location of decedents is critical; without these data, one might have assumed that the increased deaths in the pandemic year were due to COVID-19 infection. Finally, having mortality data linked with other service use data (eg, health care services) allows for the identification of potential gaps and points of intervention to prevent deaths.

### ARTICLE INFORMATION

**Accepted for Publication:** January 23, 2022.

**Published:** March 10, 2022. doi:10.1001/jamanetworkopen.2022.1870

**Open Access:** This is an open access article distributed under the terms of the CC-BY License. © 2022 Cawley C et al. JAMA Network Open.

**Corresponding Author:** Caroline Cawley, MPH, Department of Emergency Medicine, University of California, San Francisco, 1001 Potrero Ave, San Francisco, CA 94110 (caroline.cawley@ucsf.edu).

**Author Affiliations:** Department of Emergency Medicine, University of California, San Francisco (Cawley, Kanzaria, Raven); Benioff Homelessness and Housing Initiative, Center for Vulnerable Populations, University of California, San Francisco (Cawley, Kanzaria, Kushel, Raven); Philip R. Lee Institute for Health Policy Studies, University of California, San Francisco (Kanzaria, Raven); Street Medicine and Shelter Health, San Francisco Department of Public Health, San Francisco, California (Zevin); Departments of Emergency Medicine and Population Health, New York University Grossman School of Medicine, New York (Doran).

**Author Contributions:** Ms Cawley had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

*Concept and design:* Cawley, Kanzaria, Zevin, Kushel, Raven.

*Acquisition, analysis, or interpretation of data:* Cawley, Kanzaria, Zevin, Doran, Kushel.

*Drafting of the manuscript:* Cawley, Kanzaria.

*Critical revision of the manuscript for important intellectual content:* All authors.

*Statistical analysis:* Cawley.

*Obtained funding:* Kanzaria, Kushel.

*Administrative, technical, or material support:* Cawley, Kanzaria, Kushel.

*Supervision:* Kanzaria, Zevin, Doran, Kushel, Raven.

**Conflict of Interest Disclosures:** Drs Kushel, Raven, and Kanzaria receive salary support from the Benioff Homelessness and Housing Initiative, which was supported by a philanthropic gift from Marc and Lynne Benioff. Dr Kushel reported receiving grants from the National Institutes of Health outside the submitted work. No other disclosures were reported.

**Additional Contributions:** The authors thank the San Francisco Office of the Chief Medical Examiner and the Whole Person Integrated Care team at the San Francisco Department of Public Health for their partnership.

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR00853

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 58 of 117 PageID #: 2232

JAMA Network Open | Public Health                    Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic

## REFERENCES

**1**. Cawley CL, Kanzaria HK, Kushel M, Raven MC, Zevin B. Mortality among people experiencing homelessness in San Francisco 2016-2018. *J Gen Intern Med*. 2021. doi:10.1007/s11606-021-06769-7

**2**. Imbert E, Kinley PM, Scarborough A, et al. Coronavirus disease 2019 outbreak in a San Francisco homeless shelter. *Clin Infect Dis*. 2021;73(2):324-327. doi:10.1093/cid/ciaa1071

**3**. City and County of San Francisco. COVID-19 Alternative Shelter Program. SF.gov. COVID-19 data and reports. Accessed August 27, 2021. https://sf.gov/data/covid-19-alternative-shelter-program

**4**. Office of the Chief Medical Examiner. How is a medical examiner different from a coroner? City and County of San Francisco. Accessed February 1, 2022. https://sf.gov/information/how-medical-examiner-different-coroner

**5**. Kanzaria HK, Niedzwiecki M, Cawley CL, et al. Frequent emergency department users: focusing solely on medical utilization misses the whole person. *Health Aff (Millwood)*. 2019;38(11):1866-1875. doi:10.1377/hlthaff.2019.00082

**6**. Henry M, De Sousa T, Roddey C, Gayen S, Bednar TJ. The 2020 Annual Homeless Assessment Report (AHAR) to Congress. US Department of Housing and Urban Development, Office of Community Planning and Development. Accessed February 1, 2022. https://www.huduser.gov/portal/sites/default/files/pdf/2020-AHAR-Part-1.pdf

**7**. San Francisco Department of Homelessness and Supportive Housing. *San Francisco Homeless Count and Survey, Comprehensive Report*. Applied Survey Research; 2020.

**8**. United States Census Bureau. QuickFacts. San Francisco County California. Accessed February 1, 2022. https://www.census.gov/quickfacts/sanfranciscocountycalifornia

**9**. Riley ED, Raven MC, Dilworth SE, Braun C, Imbert E, Doran KM. Using a "Big Events" framework to understand emergency department use among women experiencing homelessness or housing instability in San Francisco during the COVID-19 pandemic. *Int J Drug Policy*. 2021;97:103405. doi:10.1016/j.drugpo.2021.103405

**10**. Woolf SH, Chapman DA, Sabo RT, Zimmerman EB. Excess deaths from COVID-19 and other causes in the US, March 1, 2020, to January 2, 2021. *JAMA*. 2021;325(17):1786-1789. doi:10.1001/jama.2021.5199

**11**. Mattson CL, Tanz LJ, Quinn K, Kariisa M, Patel P, Davis NL. Trends and geographic patterns in drug and synthetic opioid overdose deaths—United States, 2013-2019. *MMWR Morb Mortal Wkly Rep*. 2021;70(6):202-207. doi:10.15585/mmwr.mm7006a4

**12**. Fine DR, Dickins KA, Adams LD, et al. Drug overdose mortality among people experiencing homelessness, 2003 to 2018. *JAMA Netw Open*. 2022;5(1):e2142676. doi:10.1001/jamanetworkopen.2021.42676

**13**. Doran KM, Fockele CE, Maguire M. Overdose and homelessness—why we need to talk about housing. *JAMA Netw Open*. 2022;5(1):e2142685. doi:10.1001/jamanetworkopen.2021.42685

**14**. Appa A, Rodda LN, Cawley C, et al. Drug overdose deaths before and after shelter-in-place orders During the COVID-19 pandemic in San Francisco. *JAMA Netw Open*. 2021;4(5):e2110452. doi:10.1001/jamanetworkopen.2021.10452

**15**. Miguel K, Matier P. Inside look at former San Francisco tourist hotel turned into homeless shelter. ABC7 News. Accessed February 1, 2022. https://abc7news.com/homeless-covid-san-francisco-hotel-five-keys/10700833/#:~:text=ABC7%20News%20got%20a%20look,turned%20into%20a%20homeless%20shelter.&text=SAN%20FRANCISCO%20(KGO)%20%2D%2D%20As,the%20homeless%20on%20the%20streets

**16**. New York City Department of Health and Mental Hygiene, New York City Department of Homeless Services. Fifteenth Annual Report on Deaths among Persons Experiencing Homelessness (July 1, 2019 – June 30, 2020). Accessed February 1, 2022. https://a860-gpp.nyc.gov/concern/nyc_government_publications/pz50gz035?locale=en

**17**. Fowle M, Gray F. COVID-19 homeless deaths. Homeless Deaths Count. Accessed January 15, 2022. https://homelessdeathscount.org/data/covid-19/

**18**. Cowan J. San Francisco's homeless population is much bigger than thought, city data suggests. *New York Times*. November 19, 2019. Accessed January 15, 2022. https://www.nytimes.com/2019/11/19/us/san-francisco-homeless-count.html

Downloaded from jamanetwork.com by guest on 12/22/2025

DOJ-HUD-AR0854

# Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

| July 9, 2024 |
| --- |

**Claudia Gross Shader, Ph.D.**
**Research and Evaluation Director**

**IB Osuntoki**

**David G. Jones, City Auditor**



Seattle Office of City Auditor

DOJ-HUD-AR00855

# Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

## Report Highlights

## Background

Fatal and non-fatal overdoses continue to increase in Seattle and King County. While overdose events and crimes against persons occur all over Seattle, there are certain small geographic areas in the city where these events are co-occurring and concentrated. From July 2022 to July 2023, 10 continuous street segments had a combined count of crimes against persons and overdose incidents of 100 or greater, accounting for a disproportionate amount of co-occurrence.

## What We Found

Overdoses and crimes are concentrated at certain places in Seattle due to specific local conditions that exist at those locations. Diagnosing and disrupting the unique characteristics that contribute to overdose and crime concentrations at a location is best accomplished using an established place-based problem-solving approach that includes implementing evidence-based strategies to address overdoses and crimes. As part of our audit, we examined the use of a place-based problem-solving approach to address overdoses and crime at a case study site in Seattle on Third Avenue from Virginia to Blanchard.

## Recommendations

We recommend that the Mayor's Office designate a high-level project champion to oversee a place-based problem-solving approach that includes implementing evidence-based strategies to address overdoses and crime; working with the Seattle Office of Emergency Management and other departments to use a proven coordination system; seeking technical assistance from and collaboration with federal agencies; and regularly evaluating the City's efforts to address places where overdoses and crime are concentrated.

## Mayor's Office and Council President's Responses

The Mayor's Office generally concurred with the recommendations and stated that they will continue collaborating with stakeholders to expand treatment options and public safety solutions (see Appendix A). City Council President Sara Nelson also provided a written response stating that she plans to support the recommendations legislatively and through collaboration with the Executive and external stakeholders (see Appendix B).



### WHY WE DID THIS AUDIT

This audit was conducted in response to Mayor Bruce Harrell and former City Council President Debora Juarez's request for our office to prepare an audit that identifies and documents evidence-informed approaches for addressing areas in the city where crime and overdose incidents are concentrated.

### HOW WE DID THIS AUDIT

In addition to our research of evidence-informed approaches, we used a case study methodology for this audit that examined a two-block area in Seattle's Belltown neighborhood, specifically Third Avenue from Virginia Street to Blanchard Street, to ensure that our audit findings and recommendations would be applicable and useful to the current conditions in Seattle. We also received technical assistance from the U.S. Department of Justice Bureau of Justice Assistance's Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP) and the Office of National Drug Control Policy's Northwest High Intensity Drug Trafficking Area (NW HIDTA).

**Seattle Office of City Auditor**
David G. Jones, City Auditor
www.seattle.gov/cityauditor

# TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................ 1

**USE A RESEARCH-INFORMED METHODOLOGY FOR PLACE-BASED PROBLEM SOLVING** ........................................................................................................... 8

**USE A PROVEN SYSTEM FOR COORDINATION AMONG AGENCIES** ........................... 14

**USE MULTIPLE DATA SOURCES TO UNDERSTAND THE PROBLEM** ............................ 17

**SELECT AND IMPLEMENT EVIDENCE-BASED STRATEGIES FOR REDUCING CRIME AND OVERDOSE** ........................................................................................ 24

**OBJECTIVES, SCOPE, AND METHODOLOGY** .................................................................. 29

**REFERENCES** .................................................................................................................. 30

**APPENDIX A** ................................................................................................................... 32

Mayor's Office Response ................................................................................................ 32

**APPENDIX B** ................................................................................................................... 33

Council President's Response ......................................................................................... 33

**APPENDIX C** ................................................................................................................... 35

List of Recommendations and Department Response .................................................. 35

**APPENDIX D** ................................................................................................................... 37

Overdose Prevention Strategies .................................................................................... 37

**APPENDIX E** ................................................................................................................... 42

Logic Model – Linkage to Care Initiatives ..................................................................... 42

**APPENDIX F** ................................................................................................................... 43

Crime Prevention Through Environmental Design (CPTED) Report ............................ 43

**APPENDIX G** ................................................................................................................... 55

Case Study Information .................................................................................................. 55

**APPENDIX H** ................................................................................................................... 65

Seattle Office of City Auditor Mission, Background, and Quality Assurance ............... 65

DOJ-HUD-AR00857

# INTRODUCTION

**Audit Overview**

This audit was conducted in response to Mayor Bruce Harrell and former City Council President Debora Juarez's request for our office to prepare an audit that identifies and documents evidence-informed approaches for addressing areas in the city where crime and overdose incidents are concentrated.

In addition to our research of evidence-informed approaches, we used a case study methodology for this audit that examined a two-block area in Seattle's Belltown neighborhood, specifically Third Avenue from Virginia Street to Blanchard Street, to ensure that our audit findings and recommendations would be applicable and useful to the current conditions in Seattle. The following organizations participated in meetings and/or visits at our case study site during our audit:

- Plymouth Housing
- YWCA Seattle/King/Snohomish
- Harborview Third Avenue Clinic
- Evergreen Treatment Services-REACH
- King County Metro Transit
- Downtown Seattle Association
- Belltown United
- West Precinct Advisory Council
- Northwest High Intensity Drug Trafficking Area



Photo: Staff from community organizations gather with the Office of City Auditor and the Seattle Police Department outside Plymouth Housing's Langdon and Anne Simons Senior Apartments during a walking tour at our audit case study site. Source: Office of City Auditor

DOJ-HUD-AR00858

Our audit approach followed two evidence-informed frameworks for community problem-solving from the Substance Abuse and Mental Health Services Administration:

- The Strategic Prevention Framework, and
- 2023 Guide for Engaging Community Coalitions to Decrease Opioid Overdose Deaths

For this audit, the Office of City Auditor received technical assistance from the U.S. Department of Justice Bureau of Justice Assistance's Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP) and the Office of National Drug Control Policy's Northwest High Intensity Drug Trafficking Area (NW HIDTA).

## Landscape of Synthetic Drugs in Seattle

**Synthetic Drugs Are Driving the Increase in Overdoses in Seattle and King County**

As we reported in our 2022 audit, Action is Needed to Explore Ways to Offer an Evidence-Based Treatment for People Who Use Methamphetamine, fatal and non-fatal overdoses continue to increase in Seattle and King County. According to the King County Medical Examiner's Overdose Dashboard, there were 1,338 fatal overdoses in King County in 2023, which represents a 33 percent increase from 2022. In 2023, opioid overdoses (mostly nonfatal) treated by King County Emergency Medical Services (EMS) increased by 44 percent from 2022 to 8,341 overdoses in King County, according to Public Health – Seattle & King County. Seattle accounted for 57 percent (761) of the fatal overdoses and 51 percent (4,254) of the opioid overdoses treated by EMS in 2023 although Seattle made up just 32 percent of King County's population, according to 2020 census data.

Also, as we reported in 2022, poly-substance use is increasingly contributing to fatal overdoses in King County, including Seattle. In 2023, the majority (60.3 percent) of all fatal overdoses involved the combination of an opioid (e.g., fentanyl) and a stimulant (e.g., methamphetamine, cocaine).

Fentanyl and heroin are both opioids. However, unlike heroin, fentanyl is a synthetic opioid, meaning that it can be produced in very large quantities without an agricultural component.[1] Fentanyl is also easier and less costly to make, distribute, and sell than heroin. Synthetic drugs have contributed significantly to the rising overdoses in our

---

[1] The U.S. Drug Enforcement Administration (DEA) indicates that synthetic drugs begin with precursor chemicals that are made in unregulated businesses in China and shipped to Mexico where the chemicals are synthesized into synthetic drugs, such as fentanyl, then distributed to the U.S., including Seattle.

DOJ-HUD-AR00859

area. In 2023, there were 1,087 fentanyl-involved deaths compared with 34 heroin-involved deaths in King County.

**Exhibit 1: Public Health – Seattle and King County's Overdose Dashboard 2013 - 2023**



Source: Public Health – Seattle & King County

**Synthetic Drug Supply in Seattle**

Drug seizures in King County in 2023 indicate that approximately 60 percent of fentanyl is in pill form and 40 percent is in powder form. According to Northwest High Intensity Drug Trafficking Area (NW HIDTA), smoking is the most widespread form of use[2] of synthetic drugs, including fentanyl and methamphetamine, in Washington state today.

According to NW HIDTA, synthetic drug prices demonstrated a notable drop between 2022 and 2023 in Washington state. One gram of methamphetamine that had an average street value of $8.48 in 2022 dropped to $5.88 in 2023. A fentanyl tablet that had a street value of $4.80 in 2022 dropped to $2.44 in 2023. Law enforcement officials reported to us that in 2024 the current street value of fentanyl in Seattle is less than $1 per tablet.

---

[2] Prior to the rise of synthetic drugs, intravenous heroin use had been a widespread form of use in Seattle. In our 2020 report, Five Steps the City of Seattle Should Take to Reduce Trash Around Unsanctioned Encampments, we noted that improperly discarded needles and syringes had required significant City resources to clean up. With the rise of synthetic drugs, injection drug use has now been largely replaced by smoking synthetic drug powder or smoking ground-up synthetic drug tablets, often on pieces of aluminum foil.

DOJ-HUD-AR00860

> *"I've been with the DEA over 25 years, and this is the worst drug crisis I've ever seen in my life."*
>
> *- David Reames, Special Agent in Charge, Seattle Field Division, U.S. Drug Enforcement Administration (DEA)*
>
> Source: The Fight Against Fentanyl, Seattle Channel, October 30, 2023



Another change brought about in the current landscape of synthetic drugs is the frequency of drug use. According to law enforcement officials and behavioral health experts, fentanyl produces a high that is intense but short in duration. Therefore, people using fentanyl may use the drug frequently, up to 20 times per day. People who use fentanyl may also use it in combination with other synthetic drugs, such as methamphetamine, to alter or extend the effects of the fentanyl.

The daily routine of acquiring and using synthetic drugs many times per day has effects on neighborhood health and individual health. In a survey[3] of 138 people at our case study site on Third Avenue, 74 percent of respondents indicated that people are using drugs multiple times per day, and 67 percent noticed people selling drugs multiple times per day. And for some individuals seeking treatment, breaking the routine of acquiring and using drugs throughout the day has been a further challenge to their recovery. Some individuals in a pilot treatment program in Seattle have indicated that they struggle filling their time, and the lure of inexpensive and widely available street drugs hampers their recovery efforts.

---

[3] In January 2024, using the Housing Environment Survey tool, we gathered some preliminary data from 138 people who work or live at the Third Avenue case study site, including permanent supportive housing residents. The survey tool captures various indicators of neighborhood social climate, neighborhood quality, and neighborhood safety. For example, only 11 percent of respondents agreed or strongly agreed that they feel safe in their neighborhood.

DOJ-HUD-AR00861

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

# Crime and Overdose Concentration in Seattle

**10 Continuous Street Segments Had 100+ Crimes Against Persons and Overdose Incidents Combined**

While overdose events and crimes against persons occur all over Seattle, there are certain small geographic areas in the city where these events are co-occurring and concentrated. The Seattle Police Department analyzed data on crimes against persons and overdose incidents responded to by the Seattle Fire Department from July 2022 to July 2023. We found that 10 continuous street segments had a combined count of crimes against persons and overdose incidents of 100 or greater, accounting for a disproportionate amount of co-occurrence.

We selected a case study site for our audit that sits within the location that has the fourth highest concentration of crime and overdose within Seattle. Specifically, between July 2022 and July 2023, at the case study site there were 11 fatal overdoses (64 percent involved a combination of synthetic drugs). Data from the King County Medical Examiner's Office indicates 10 of the 11 fatal overdoses (91 percent) occurred in or outside of the three permanent supportive housing buildings at the location. During this period, there were also 30 overdose calls for service, and 34 crimes against persons (71 percent were assaults). Notably, between January 2023 and July 2023, four staff who worked for the partner organizations within the case study site were victims of these crimes.

**Exhibit 2: Top 10 Continuous Street Segments with the Highest Number of Overdose Responses and Crime Incidents***

| Street Names | Street Number | Joint Count |
|---|---|---|
| Pike St from 2nd to 5th | 201 - 498 | 352 |
| 3rd Ave from Union to Pine | 1400 - 1599 | 344 |
| 3rd Ave from Jefferson to Marion | 500 - 899 | 282 |
| 3rd Ave from Virginia to Battery | 2000 - 2399 | 195 |
| Pine St from 2nd to 5th | 201 - 418 | 148 |
| Broadway from E Union to E Pine | 1400 - 1599 | 119 |
| 9th Ave from Alder to Jefferson (Harborview) | 300 - 499 | 113 |
| 4th Ave from Union to Pine | 1400 - 1549 | 112 |
| S Jackson St from 10th Ave S to Rainier Ave S | 1001 - 1398 | 109 |
| E Pike St from 9th to 11th | 901 - 1098 | 104 |

**Includes Case Study Site**

\* There are differences in the numbers of National Incident-Based Reporting System (NIBRS) Offenses/Codes included in Seattle Police Department (SPD) Data-Driven unit data and those included in the Office of City Auditor analysis of crime against persons in Appendix G.

Source: Data compiled by SPD Data-Driven unit based on request from the Office of City Auditor

DOJ-HUD-AR00862

## Audit Case Study Site: Third Avenue from Virginia to Blanchard

For our audit case study, we focused on a two-block area in Seattle's Belltown neighborhood, specifically Third Avenue from Virginia Street to Blanchard Street, where overdoses and crimes against persons are highly concentrated. This area includes three permanent supportive housing facilities, a homeless shelter for women, a day shelter for women, a medical clinic that provides healthcare for homeless and at-risk patients, and the office for one of the region's largest outreach providers that provides integrated care management and connects people experiencing homelessness with needs including medical care, shelter, mental health, and substance use treatment. See Exhibit 3 on the next page for a map of the area.

This two-block area is an important service hub for many of Seattle's most vulnerable residents. The agencies at this location primarily serve people[4] who are homeless or recently homeless and who have complex needs including physical and mental health challenges, substance use disorder, trauma, victimization, and legal system involvement.

This case study site allowed us to further study the complex issue of fatal overdoses among people who are homeless or recently homeless. In Seattle, fatal overdoses are occurring at a disproportionate rate among people who are homeless or recently homeless. For those living unsheltered or in emergency shelters in King County, including Seattle, fatal overdoses have increased from 59 deaths (12 percent of the total) in 2020 to 316 deaths (24 percent of the total) in 2023.

Although housing is essential for addressing homelessness, new research suggests that housing alone does not sufficiently address overdose risk. Emerging research indicates that individual and environmental risk factors are likely driving high overdose rates in permanent supportive housing (Doran, et al., 2023). This is consistent with Seattle's experience with fatal overdoses in permanent supportive housing. In King County, including Seattle, for people who are recently homeless and living in permanent supportive housing, subsidized housing, or recovery housing, fatal overdoses increased from 73 deaths (14 percent of the total) in 2020 to 279 deaths (21 percent of the total) in 2023.

---

[4] The population demographics include individuals who reside at the location as well as individuals who are served at the location. For example, in 2023, among residents of Plymouth Housing's permanent supportive housing (n=146), 95 percent were aged 50 and up; 77 percent were male; 44 percent were Black, Indigenous, and People of Color (BIPOC); 21 percent reported a developmental disability; 26 percent reported a physical disability; and 61 percent reported mental health issues. Also, in 2023, 81 percent of the total unduplicated clients served at the Harborview Third Avenue Clinic (n =615) were homeless or had unknown housing status. Clients ranged in age from 18 to 96, and the median age was 54. 29 percent of the clients were Black/African American, and 11 percent were Hispanic or Latino/a/x; 51 percent were female, and two percent were nonbinary, genderqueer, or transgender.

DOJ-HUD-AR00863

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

**Exhibit 3: Audit Case Study Site – Third Avenue from Virginia Street to Blanchard Street**



1  Plymouth Housing Sylvia Odom's Place

2  YWCA Opportunity Place

3  Harborview Third Avenue Center (Clinic)

4  YWCA Angeline's Day Center

5  Plymouth Housing Administration Offices

6  Plymouth Housing Langdon & Anne Simons Senior Apartments

7  Evergreen Treatment Services REACH Office

M  King County Metro Stop

Source: Office of City Auditor

DOJ-HUD-AR00864

# USE A RESEARCH-INFORMED METHODOLOGY FOR PLACE-BASED PROBLEM SOLVING

**Section Summary**

Place-based problem solving is useful for both crime prevention and substance use disorder prevention. To effectively address the places in Seattle where overdoses and crime are concentrated, the City of Seattle (City) should follow an established place-based problem-solving methodology, such as the Substance Abuse and Mental Health Services Administration's (SAMHSA) Strategic Prevention Framework, and the City should assign a high-level staff person to oversee this work. SAMHSA provides technical support and funding opportunities for communities seeking to use its research-informed problem-solving methodology.

**Why Place Matters**

Place-based crime prevention efforts are grounded in decades of research, including research specific to Seattle, that shows that crime concentrates at micro-places or "hot spots." Hot spots occur when crime and/or disorder are concentrated in an area such as a street segment, an intersection, or a small cluster of blocks. A study of Seattle found that between 4 and 5 percent of street segments in the city accounted for 50 percent of annual reported crime incidents over a 14-year period.[5]

Crime hot spots occur because the specific local conditions at that place enable crime to concentrate there. One intersection or one block in Seattle does not have the same characteristics as the next block over, nor do they have the same crime problems. Diagnosing and disrupting the unique characteristics that contribute to crime at a hot spot is best accomplished using an established place-based problem-solving approach. As shown in Exhibit 2 earlier in this report, there are certain small geographic areas in the city where crime and overdose events are co-occurring and concentrated, and it would be essential for the City to use a place-based problem-solving methodology in addressing issues there.

---

[5] See (Weisburd, Bushway, Lum, & Yang, 2004). Further, a study that examined crime concentrations over time in eight cities (Weisburd, 2015), found strong support for a law of crime concentration. All eight cities experienced crime concentrating within a narrow percentage bandwidth of total street segments; and for the four cities that tracked data longitudinally, these concentrations remained stable over time (Weisburd, 2015).

DOJ-HUD-AR00865

**The City Has Experience Using Place-Based Problem-Solving Methodology in Rainier Beach**

Fortunately, the City successfully addressed concentrations of crime in Seattle's Rainier Beach neighborhood by using a place-based problem-solving methodology. In 2011, our office published a report regarding crime hot spots in Seattle and recommended that the City consider addressing these locations using an evidence-based problem-solving framework. Subsequently, the project, Rainier Beach: A Beautiful Safe Place for Youth (RB:ABSPY), was initiated in 2013 and funded until June 2016 through a grant to the City from the U.S. Department of Justice Bureau of Justice Assistance. Since 2016, the City has contributed approximately $500,000 annually toward continued project coordination and interventions, as well as ongoing evaluation by George Mason University.[6]

RB:ABSPY used a systematic problem-solving framework inspired by the Substance Abuse and Mental Health Services Administration's (SAMHSA) Strategic Prevention Framework.[7] After three years of implementation and four waves of data collection, a 2018 evaluation report showed that serious violent crime (e.g., homicide, rape, aggravated assault, and robbery) decreased in the hot spots at a higher rate (30 percent decline) than in the precinct as a whole (26 percent decline) (Gill, Jensen, & Prince, 2018). Another report showed significant longer-term improvements in perceptions of crime rates, collective efficacy, and police satisfaction and legitimacy (Gill, Vitter, & Weisburd, 2016) (Gill, Jensen, & Prince, 2018).[8]

Apart from Rainier Beach, the City has not applied a problem-solving framework to other places. In our 2023 Organized Retail Crime report, we recommended that the City should leverage its experience with place-based approaches to address illegal street markets where stolen goods are fenced, including the 12th and Jackson intersection. The City is just beginning to work on this approach with the place-based community-led crime prevention initiative in Little Saigon. The project, Phố Đẹp (Beautiful Neighborhood), is led by Friends of Little Saigon and community stakeholders in partnership with SPD and other City and government agencies.

---

[6] See (Gill & Gross Shader, 2020) (Gill, Vitter, & Weisburd, 2016) (Gill, Jensen, & Prince, 2018)
[7] See SAMHSA Strategic Prevention Technical Assistance Center (Substance Abuse and Mental Health Services Administration, 2019). In addition, RB:ABSPY also incorporated the Communities That Care prevention science model (Hawkins, et al., 2012) (Hawkins, Oesterle, Brown, Abbott, & Catalano, 2014) (Oesterle, et al., 2018), the SARA model (Eck & Spelman, 1987) and the problem-oriented policing model (Goldstein, 1990) (Hinkle, Weisburd, Telep, & Petersen, 2020) adapted for place-based rather than person-based issues.
[8] See Gill et al. (2016), Gill et al. (2018), Gill et al. (2024).

DOJ-HUD-AR00866

**Strategic Prevention Framework for Substance Use Disorder**

The Substance Abuse and Mental Health Services Administration's (SAMHSA) Strategic Prevention Framework (pictured below) is a research-informed comprehensive approach to understanding and addressing the substance misuse and related behavioral health problems facing communities, and to developing and sustaining programs and practices that reduce behavioral health inequities.

## The Strategic Prevention Framework Has Five Elements



1. Assess needs based on data;
2. Build organizational capacity;
3. Develop a strategic plan;
4. Implement effective evidence-based programs, policies, and practices; and
5. Evaluate efforts for outcomes.

The Strategic Prevention Framework is also guided by two cross-cutting principles that are integrated into all five steps: cultural competence and sustainability. SAMHSA indicates that adherence to the principles in the framework increases the likelihood that prevention efforts will produce anticipated outcomes, reduce harmful behaviors, and keep communities healthier and safer. Evaluation in the SPF involves examining both process and outcomes of programs to enhance prevention practice.

SAMSHA provides technical assistance and funding opportunities for communities looking to implement the Strategic Prevention Framework to address substance use disorder. In addition, the U.S. Department of Justice Bureau of Justice Assistance's Comprehensive Opioid, Stimulant, and Substance Use Program also provides technical assistance and funding opportunities to local communities for building and sustaining multidisciplinary public safety and public health responses to the abuse of illicit substances.

DOJ-HUD-AR00867

## Preliminary Findings from Case Study Site

At our case study site on Third Avenue from Virginia to Blanchard, we began to connect with the community organizations at the site in fall 2023, convening on-site meetings and walking tours. Following the Strategic Prevention Framework, we began collecting data regarding the overdoses, crime events, and the specific local conditions at the site. This included a Crime Prevention Through Environmental Design (CPTED) assessment conducted by SPD (see Appendix F) and a survey of 138 people who live, work, or live and work at the location, including residents of permanent supportive housing. In December 2023, we convened a community task force meeting that included community partner organizations, City staff (e.g., Department of Transportation, Mayor's Office), and other governmental agencies (e.g., King County Metro, NW HIDTA). This initial discussion included identifying other key stakeholders and the most effective ways to better connect with the residents of permanent supportive housing and others, including unhoused people who live or receive services at the site.



Photo: Near the corner of Third and Virginia, construction scaffolding and a vacant storefront in the YWCA building create a gathering place for illegal street vending and impede pedestrian access.
Source: Harborview Third Avenue Center

Per the Strategic Prevention Framework, we began to link the data on overdoses, crime, and the specific local conditions at the site with evidence-based strategies for preventing crime and overdose. Some initial opportunity areas that emerged from this process included:

- Activating vacant storefronts, including those in buildings owned by YWCA and Plymouth Housing, to increase guardianship.

DOJ-HUD-AR00868

- Providing more recovery supports, especially for permanent supportive housing residents participating in two pilot programs: Contingency Management for methamphetamine use disorder on-site, and a pilot program to deliver long-lasting Sublocade injections for opioid use disorder.

- Creating a framework for information-sharing and identifying shared values among the community partner organizations and people who live, work, or get services at the site.

In February 2024, we worked with the Mayor's Office, SPD, Plymouth Housing, and the YWCA to apply for a five-year, $1.8 million grant from SAMHSA to extend and strengthen the capacity of local community prevention providers to implement evidence-based prevention programs to help reduce the onset and progression of substance misuse and its related problems. The goals of our proposed approach are to reduce fatal overdoses and improve community safety in the two-block area on Third Avenue from Virginia to Blanchard.

Appendix G includes a draft of the Year 1 objectives for the grant. This includes 22 specific evidence-based strategies for reducing crime and overdoses at this site. The City will be notified regarding the funding decision in August 2024.

## Recommendation 1
**The Mayor's Office should lead the City in addressing places where overdoses and crime are concentrated using a proven problem-solving methodology (e.g., the Substance Abuse and Mental Health Services Administration's Strategic Prevention Framework). This should include continuing the problem-solving work on Third Avenue from Virginia to Blanchard.**

## Recommendation 2
**The Mayor's Office should lead the City in seeking federal technical assistance and funding to address places where overdoses and crime are concentrated.**

DOJ-HUD-AR00869

## A High-Level City 'Project Champion' is Needed

The role of a high-level project champion who can convene City department partners and community stakeholder organizations is consistent with the research on what is effective for place-based problem-solving. This role is best suited for a central City agency that has existing authority to convene City departments, such as the Mayor's Office or its designee. In Snohomish County, for example, the county executive directed its Department of Emergency Management to convene and coordinate its Multi-Agency Coordination (MAC) Group to address the opioid crisis (See next section for more information on the MAC Group).

The City's SAMHSA grant application recognized the need for the City to serve in a convening and coordinating role for the effort. The grant application also recognized that the community partner organizations required additional funding support to participate meaningfully in the work. The application noted, "the heavy demands of the individual organizations' missions currently leave little capacity for coordination and collaboration with the other agencies at the site and with the City government to address the neighborhood conditions."

The grant application named a staff member in the Mayor's Office as the "project champion." This role would oversee the place-based problem-solving effort to address the concentration of overdoses and crime at the site (i.e., Third Avenue from Virginia to Blanchard) on behalf of the Mayor. The role of project champion includes facilitating information sharing and participation among the City agencies in the project and reporting on its progress to the Mayor and external parties.

## Recommendation 3

**The Mayor's Office should identify a "project champion" to oversee the City's efforts to address places where overdoses and crime are concentrated.**

DOJ-HUD-AR00870

# USE A PROVEN SYSTEM FOR COORDINATION AMONG AGENCIES

**Section Summary**

Without a systematic approach to coordinating and collaborating among City departments and other government agencies, the City might not be able to effectively address the places where crime and overdose incidents are concentrated. Snohomish County's MAC Group provides one model for a more coordinated approach, and the Northwest High Intensity Drug Trafficking Area (NW HIDTA) could be a resource to the City for greater coordination with other levels of government.

**The City Needs a Coordination System with Clear Objectives and Goals**

The City does not currently have a system for coordinating all the City departments, City-funded programs, and other government agencies focused on overdose prevention and crime prevention at locations where these events are concentrated. Our 2019 report on the City's approach to unsanctioned encampments noted a similar lack of coordination for the City's field operations related to unsanctioned encampments and recommended that the City consider implementing some of the components of the Federal Emergency Management Agency's (FEMA) standardized strategic coordination approach.[9] Without a consistent coordinating system, the City might not be able to address overdoses and substance use disorder with the level of urgency or comprehensiveness needed. A coordination system, such as the Multi-Agency Coordination (MAC) Group[10] used by Snohomish County, could help ensure that the City's investments are well-coordinated[11] and programs have similar objectives and goals.

A coordinating system should also include organizations with which the City has contracts (e.g., homeless services providers). This would allow the City to ensure better compliance with the City contract terms

---

[9] FEMA's National Incident Management System (NIMS) provides a consistent nationwide template to enable partners to work together to prevent, protect against, respond to, recover from, and mitigate the effects of incidents, regardless of cause, size, location, or complexity. FEMA's NIMS Guidebook indicates that "NIMS defines operational systems, including the Incident Command System (ICS), Emergency Operations Center (EOC) structures, and Multiagency Coordination Groups (MAC Groups) that guide how personnel work together during incidents. NIMS applies to all incidents, from traffic accidents to major disasters."

[10] On November 8, 2017, a joint resolution was approved and signed by the Snohomish County Executive, Sheriff, County Council, and Snohomish Health District Board of Health that affirmed their commitment to ending the opioid epidemic in Snohomish County through strong partnerships, coordination, and collaboration. Executive Somers also directed the Snohomish County Department of Emergency Management to partially activate the Emergency Operations Center to support this effort. The multiple agencies and governments in Snohomish County involved in that effort formed an Opioid Response MAC Group. In May 2023, Executive Somers issued a new Executive Directive that reemphasized the County's commitment to an urgent, robust, and collaborative response to the drug crisis and established a new Disaster Policy Group.

[11] Like Snohomish County's MAC Group, the City of San Francisco's multi-agency approach, the Drug Market Agency Coordination Center (DMACC), is also coordinated through their Department of Emergency Management.

DOJ-HUD-AR00871

and to improve contract terms as necessary. For example, our 2020 audit regarding trash accumulation around unsanctioned encampments found that the "Good Neighbor" provisions in City contracts with service providers did not include language about responsibility for trash accumulation around the facility and that other jurisdictions had "Good Neighbor" provisions that were more specific and robust.

## Lessons Learned from Snohomish County MAC Group

In February 2024, members of the Snohomish County MAC Group met with our office and staff from the Mayor's Office to describe their structure and offer lessons learned from their experience with their coordination system to address the opioid crisis. The MAC Group is staffed with two positions from Emergency Management. MAC Group participants include the County Executive Office, County Sheriff, Human Services Department, Public Health Department, the Office of Neighborhoods (OON), and the Snohomish County Outreach Team (SCOUT).

MAC Group leaders indicated that they have been successful with information sharing. The MAC Group includes a multi-disciplinary data collection committee that includes representatives from Snohomish County's Human Services, the Health Department, Fire/Emergency Medical Services agencies, law enforcement agencies, the Medical Examiner's Office, and the Emergency Management Department. This committee provides near real-time data on overdoses and the synthetic drug landscape, including expedited toxicology reports. In 2023, the MAC Group developed a set of common goals and short-term strategies and long-term objectives that provide clarity of direction and accountability for the participating agencies.

In 2023, the MAC Group began doing more to identify and address "hot spots" that require potential intervention. They combined a quantitative Geographic Information Systems (GIS) analysis of 911 call types and volumes with qualitative feedback from residents and businesses to identify high priority areas. Once they identified the area of highest priority, they established a separate taskforce[12] of agencies and stakeholders to focus solely on that location. Depending on the nature of the location and the work necessary to address the issues, the taskforce has included representatives from several MAC Group participants, the County's Surface Water Management Division, its Solid Waste Division, its Parks Division, the Snohomish Public Utility District, and the Washington State Department of Transportation. Collaboratively, they developed specific strategies to address the site and meet every other week to monitor progress, including physical changes (e.g., reduction in graffiti), need for additional SCOUT and/or OON engagement, ensuring business and community engagement, and vacant space activation.



In response to community input that identified recovery supports as a current gap, the MAC Group is using opioid settlement funds to provide grant funding to community organizations that provide recovery services for people experiencing opioid use disorder in Snohomish County.

---

[12] DHS/FEMA defines a task force as, "Any combination of resources of different kinds and/or types assembled to support a specific mission or operational need." Snohomish County successfully modeled the task force for a similar purpose when it deployed "SAFE teams" during its response to the COVID-19 pandemic.

DOJ-HUD-AR00872

## Recommendation 4

**The Mayor's Office, in collaboration with the Office of Emergency Management, Seattle Fire Department, Seattle Police Department, and other stakeholders, should establish a coordination system such as the Multi-Agency Coordination Group. The group should have well-defined objectives, goals, and reporting mechanisms.**

**Leverage NW HIDTA for Coordination**

The Office of National Drug Control Policy's Northwest High Intensity Drug Trafficking Area (NW HIDTA)[13] has provided our office with technical assistance during this audit, including information on best practices in other jurisdictions, identification of potential funding opportunities, and liaison with other federal agencies. This work has been coordinated out of NW HIDTA's Overdose Response Strategy (ORS) group.

The ORS is implemented by teams made up of drug intelligence officers and public health analysts who work together on drug overdose issues within and across sectors, states, and territories. The mission of the ORS is to help communities reduce fatal and non-fatal drug overdoses by connecting public health and public safety agencies, sharing information, and supporting evidence-based interventions. By sharing information across sectors, the ORS is growing the body of evidence related to early warning signs and prevention strategies.

While SPD is affiliated with NW HIDTA, the City of Seattle had not been working with ORS prior to our office engaging them for this project. The City would benefit from a formalized ongoing relationship with ORS to continue to receive technical assistance resources and coordination with other government agencies.

## Recommendation 5

**The Mayor's Office should formalize an ongoing City relationship with Northwest High Intensity Drug Trafficking Area's Overdose Response Strategy group to continue to leverage its technical assistance resources and coordination with other government agencies.**

---

[13] Created by Congress in 1988, the High Intensity Drug Trafficking Areas (HIDTA) program coordinates and assists federal, state, local, and tribal law enforcement agencies to address regional drug threats with the purpose of reducing drug trafficking and drug production in the United States. The HIDTA program oversees 33 regional HIDTAs in all 50 states, Puerto Rico, the United States Virgin Islands, and the District of Columbia. With HIDTA presence in over 600 counties across the country, an estimated two-thirds of Americans live in a HIDTA-designated county. Northwest HIDTA was created in 1997 and is responsible for supporting drug prevention, treatment, education, training, and enforcement efforts in Washington state.

DOJ-HUD-AR00873

# USE MULTIPLE DATA SOURCES TO UNDERSTAND THE PROBLEM

**Section Summary**

Analyzing data from multiple sources is necessary to select the right evidence-based, place-based interventions. The City's ability to address places where overdoses and crime are concentrated would be improved by routinely analyzing data on concentrations of crime and overdose and participating in a free national information-sharing platform regarding overdose events.

**Data Reveals the Specific Local Conditions That Contribute to the Problems at the Location**

The place-based problem-solving process in the Strategic Prevention Framework requires gathering and analyzing data from multiple sources that will help identify the specific local conditions that are contributing to the problems that occur at the location. Understanding the specific local conditions will in turn help identify the evidence-based prevention strategies that are best suited to disrupt the problem behaviors.

For example, it can be important to analyze patterns in the times of day and days of the week. In Rainier Beach, the community task force identified that youth assault victimization was most likely to occur right after school dismissal. That information helped them implement strategies to best address that critical period. In addition to analyzing the data on crimes and overdose events that occur at the sites, it can be helpful to analyze data from other sources including:

- Administrative data from schools or organizations at the site
- Observational data on physical conditions, activity patterns, or transit patterns
- Asset mapping
- Survey data from people who live or use the area
- Demographic data
- Economic data and local business surveys
- Buildings and physical infrastructure

For our audit case study site on Third Avenue, the blocks contain a mix of older office and commercial buildings with newer residential buildings including market-rate apartments and condos and the three permanent supportive housing buildings. The current vacancy rate in this area is 40 percent, nearly triple Seattle's current overall vacancy rate of 14 percent. The vacant street-level commercial spaces in this area reduce the natural guardianship and create opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form. Third Avenue is a major transportation corridor, and the focus blocks include stops for two King County Metro Transit Rapid Ride bus routes. This stretch of Third Avenue is busy throughout

DOJ-HUD-AR00874

the day with pedestrians and transit riders. For 2023, annual foot traffic for this two-block area was measured at approximately 278,300. A 2023 Crime Prevention Through Environmental Design (CPTED) report conducted by the Seattle Police Department highlighted the unpredictability of the street environment and the potential for violent disturbances to erupt. It also noted a lack of clear and cohesive signage, physical design features, and culturally relevant features that could welcome people to this location and provide clear guidance on the positive intended uses of the space (see Appendix F).

In January 2024, using the Housing Environment Survey tool, we gathered some preliminary data from 138 people who work or live at the Third Avenue case study site, including permanent supportive housing residents. The survey tool captures various indicators of neighborhood social climate, neighborhood quality, and neighborhood safety as shown in Exhibit 4 below.

## Exhibit 4: Preliminary Survey Data for Audit Case Study Site
## Third Avenue from Virginia to Blanchard



**I FEEL SAFE IN MY NEIGHBORHOOD**

3% 8% 13% 40% 36%

- Strongly Agree
- Agree
- Neither Disagree or Agree
- Disagree
- Strongly Disagree

**Open-Ended Survey Responses**

*"Our neighborhood has the potential for so much greatness, yet the level of lawless behavior originating around the YWCA and all the bus stops makes it very unsafe and uninviting."*

*"I stay inside as much as I can to avoid street crime. I don't feel safe so I stay inside as much as I can."*

*"The open air selling of stolen merchandise in front of the YWCA building at 3rd and Lenora makes this side of the street unwelcoming and challenging to traverse. The number of people who congregate in front of the Simon House, Plymouth's low-income housing, makes this side of the street unwelcoming and challenging. These examples are on city sidewalks."*

DOJ-HUD-AR00875

## Combine Data on Overdoses and Crime at the Location

Before our audit, the City had not conducted joint analysis of crime and overdose data to identify places where these incidents are concentrated.[14] While data staff from SPD and SFD indicated that they are aware of areas where crime and overdose responses are concentrated, the City has not combined these data for a spatial analysis. Identifying places where these events are concentrated could help the City develop tailored place-based solutions. The City could also request and analyze the overdose fatalities data from Public Health – Seattle & King County to better understand the relationship between the overdose response and overdose fatality. Understanding the problem and needs is the first step in the Strategic Prevention Framework.

## Free Federal Overdose Mapping and Application Program Could Provide Real-Time Alerts and Information Sharing

The free federal Overdose Mapping and Application Program (ODMAP), developed by the High Intensity Drug Trafficking Area (HIDTA), is a tool that can provide City decision-makers with near-real-time access to overdose information. The system, which has been used in multiple jurisdictions, has functionalities such as the Spike Alerts that can be set up to notify agencies when the total overdoses in an area exceed a pre-determined threshold. ODMAP can also help facilitate the sharing of data across agencies. As of 2022, over 4,000 government agencies across all 50 states were using ODMAP. However, in 2023, the only agencies in King County participating in ODMAP are the King County Medical Examiner's Office and the Bothell Police Department.



We facilitated a meeting in November 2023 between NW HIDTA and the Mayor's Office to start exploring the implementation of ODMAP for the City. Northwest HIDTA assisted the City with the ODMAP access application and set up an Application Programming Interface (API) that enabled the City to contribute the Seattle Fire Department's overdose response data to ODMAP and utilize the functions of the system. The API connection was finalized in May 2024 and staff in the Mayor's Office now have access to ODMAP. In addition, the City would be able to set up accounts for key partners and overlay other datasets (e.g., crime data) onto ODMAP, which will offer the City greater benefit from the system.

---

[14] At our request for this audit, the Seattle Police Department Data-Driven unit analyzed data on crimes against persons and overdose incidents responded to by the Seattle Fire Department from July 2022 to July 2023.

DOJ-HUD-AR00876

## Recommendation 6

**The Mayor's Office should lead the City's implementation of the Overdose Mapping and Application Program (ODMAP).**

**The Mayor's Office implemented this recommendation in May 2024.**

DOJ-HUD-AR00877

**Multi-Agency Law Enforcement Task Forces Can Inform Prevention Efforts And Address Site-Specific Conditions**

The City is missing opportunities to gather specific information about the circumstances of fatal overdoses at hot spots such as the exact location of the fatal overdoses (e.g., hallway, alley, etc.). This type of specific information would be important for in-depth case reviews and could help inform prevention activities.[15]

The Seattle Police Department does not currently investigate fatal overdoses. Therefore, the City is missing opportunities to gather information about the drug distribution organizations that operate in Seattle's overdose hot spots. This information could help the City address the specific local conditions at the site through investigation, and, in some cases, prosecution. For example, the Portland Police Bureau has noted recent changes in drug dealing with the rise of synthetic drugs, including frequently armed dealers who are not local, carry both tablets and powder, and work in groups.

Other jurisdictions investigate fatal overdoses through multi-agency collaborations. For example, the U.S. Drug Enforcement Administration (DEA) is partnering with jurisdictions around the country (e.g., San Diego, Denver, Washington D.C.) in task forces to investigate fatal overdoses. In 2018, the DEA in Los Angeles County started investigating opioid-linked deaths in certain hot spots. Subsequently, through partnerships with Los Angeles Sheriff's Department and local law enforcement, they now review all fatal overdoses to determine whether they can make a case. They have developed tools and trainings for patrol officers to help them quickly identify at the overdose scene whether they would be likely to be able to build a case. Since 2018, in LA County, the DEA and local law enforcement have done over 500 case evaluations. Of those, the DEA has initiated cases on 164. And of those, 108 have resulted in federal indictments. About 70 percent of those indictments were resulting from a death under federal drug distribution statute (U.S. Code 21.841(b)(1)(c)) the remaining indictments were related to other federal charges.

In late 2023, San Francisco established a similar task force with personnel from the San Francisco Police Department, the San Francisco District Attorney's Office, the California Highway Patrol, and the California National Guard. The task force will investigate opioid deaths in San Francisco similarly to homicide cases and employ standard operating procedures to document deaths, gather relevant evidence, and process intelligence to further map out the supply of fentanyl and large crime syndicates.

---

[15] See the Overdose Fatality Review guidance and case studies. Also, see the evaluation of homicide review report, The Milwaukee Homicide Review Commission: A National Model for Violence Prevention, by the Community Oriented Policing Services, U.S. Department of Justice.

DOJ-HUD-AR00878

Federal funding and support are available for these efforts. For example, the DEA supports the task force in San Diego with Special Agents. Also, in April 2024, Utah set up a statewide task force with funding for local law enforcement provided by the U.S. Department of Justice Organized Crime Drug Enforcement Task Force (OCDETF).

In March 2024, our office convened a meeting with the Mayor's Office, Seattle Police Department, NW HIDTA, the DEA, the U.S. Attorney's Office, and the King County Prosecuting Attorney's Office to discuss the possibility of creating a joint law enforcement task force for fatal overdoses in Seattle. The Mayor's Office agreed to take the lead on next steps.

## Recommendation 7

**The Seattle Police Department, in consultation with the Mayor's Office and federal partners, should explore the establishment of a joint law enforcement task force for fatal overdoses.**

DOJ-HUD-AR00879

# SELECT AND IMPLEMENT EVIDENCE-BASED STRATEGIES FOR REDUCING CRIME AND OVERDOSE

**Section Summary**

There are various evidence-based strategies that can reduce crime and overdose incidents at locations where they are concentrated. The evidence-based strategies should be carefully selected to address the specific local conditions that are contributing to problems at that location. The City should actively monitor the outcomes of these strategies and adjust to ensure that they are achieving the desired reductions in overdoses and crime.

**Evidence-Based Strategies to Reduce Crime at Places**

The research on preventing crime at problem places indicates that just as bridge engineers survey the landscape and select a well-tested bridge design that fits the specific needs of the space, public sector practitioners "should understand the crime problem at place before looking for solutions, and then pick solutions that fit" (Eck & Guerette, 2012, p. 368).

Decades of research[16] about place-based crime prevention have identified four groups of evidence-based strategies to prevent crime at place. These place-based crime prevention strategies can also help law enforcement focus on investigating and supporting prosecutions, including drug trafficking and violent crimes:

1. **Increase Guardianship:** Guardians at a place can include staff who are employed to regulate conduct at that location, such as bouncers hired by a bar or nightclub. Guardianship can also be exercised informally by the users of a space, such as shoppers who can easily see from inside the location the activities on the sidewalk or street and would be willing to intervene (e.g., call 911) if needed.

2. **Change the Physical Environment:** This covers a wide range of evidence-based interventions. For example, improving street lighting and remediating vacant lots has strong research evidence for reducing crime at problem places. Crime Prevention Through Environmental Design (CPTED)[17] is a discipline that focuses on the physical design of a location to identify and address elements that may have the potential to attract crime.

---

[16] See for example (Eck & Guerette, 2012) (Gill, Weisburd, & Vitter, 2013) (Gross Shader, Gill, Zheng, & Carleton, 2024).
[17] SPD has several trained CPTED practitioners who can assess the physical environment and make recommendations. See this description of CPTED on SPD's website. See also this 2023 CPTED report for 12th and Jackson and Appendix F for a CPTED assessment conducted by SPD for the case study site.

DOJ-HUD-AR00880

3. **Change/Enforce Rules and Policies:** The use of code enforcement teams and civil nuisance abatement procedures can be effective for reducing crimes in certain locations. Similarly, enacting changes to building codes and alcohol licensing policies can also reduce crime in places. There are also opportunities for small policy changes that can make a big difference on crime. For example, in Rainier Beach, community task force members asked Seattle Public Schools to change the dismissal time for one school, and this change immediately coincided with a reduction in after-school assaults among youth. (See more on Rainier Beach below.)

4. **Build Capacity for Community Problem-Solving:** There is strong evidence that sustained community mobilization efforts, even those with other primary goals (e.g., reducing youth substance use) can result in reductions in crime at the places where these efforts are focused. Similarly, the creation of business improvement districts has been associated with reductions in crime.

### Evidence-Based Strategies to Reduce Youth Crime and Victimization in Rainier Beach

As part of the problem-solving framework in Rainier Beach, community stakeholders for each of the hot spots used data from multiple sources to analyze the specific local conditions at the hot spot. They then identified interventions within these in four evidence-based broad categories that addressed the specific local conditions at each site. These included:



Photo: Corner Greeters with Rainier Beach: A Beautiful Safe Place for Youth. Source: Annie O'Neill

**Increase Guardianship:** Safe Passage team, which provides guardianship and helps students get safely to their after-school destinations

**Change the Physical Environment:** Corner Greeters – pop-up events and activities (e.g., origami, hula-hooping, etc.) led by students from Rainier Beach High School and planned to coincide with typically high-crime days and times in the hot spots

**Change/Enforce Rules and Policies:** Change in school dismissal time. Implement positive behavior supports and restorative practices to reduce formal discipline actions

**Build Capacity for Community Problem-Solving:** Business engagement, community town halls

DOJ-HUD-AR00881

## Overdose Prevention Strategies

The U.S. Department of Health and Human Services has identified four categories of overdose prevention strategies: evidence-based treatment, recovery support, harm reduction, and primary prevention. An appropriate balance of investments in these evidence-based strategies is needed for an effective and efficient response to overdoses and substance use disorder (SUD). An established system of care model, such as the recovery-oriented systems of care, could help the City in identifying and effectively addressing the variety of needs related to SUD. According to the U.S. Centers for Disease Control and Prevention, recovery-oriented systems of care (ROSCs) are "coordinated systems that provide alternatives to acute care models to address the full range of concerns related to substance use in communities." ROSCs promote interagency and community collaborations to provide a wide spectrum of care and support from primary prevention and intervention to evidence-based treatment and recovery. An example is the Alberta Recovery-Oriented System of Care Model, which adopts a recovery-oriented approach for substance use disorder and mental health.

We included a summary of overdose prevention strategies as Appendix D and are summarized below:

1. **Enhanced Delivery of Evidence-Based Treatment:** Proven treatments for substance use disorders include both pharmacological and behavioral. We reviewed evidence-based resource guides from the Substance Abuse and Mental Health Services Administration (SAMHSA) and the Centers for Disease Control and Prevention (CDC) to identify strategies with strong evidence of effectiveness in the treatment of substance use disorder. There are three Food and Drug Administration (FDA)-approved drugs—methadone, buprenorphine, and naltrexone—that have been proven to be safe and effective in treating opioid use disorder (OUD) in combination with behavioral therapies and psychosocial support.

2. **Recovery Support:** Recovery support includes services that assist individuals in their recovery journey. This is a key strategy in the recovery-oriented systems of care and includes psychosocial support and wraparound human services that enhance stabilization and facilitate recovery and wellness. Offering integrated services that support recovery can lead to better long-term outcomes for people with SUD. Examples of recovery support services are recovery housing, peer recovery support, and job placement programs. (See the callout on next page for example of services at the case study site.)

3. **Integrated Harm Reduction:** The role of evidence-based harm reduction principles and practices in reducing overdoses as a part of the continuum of care is well established. Keeping people who

DOJ-HUD-AR00882

use drugs alive and as healthy as possible while linking them to care and support is an essential component of overdose prevention framework. According to SAMHSA, harm reduction "emphasizes engaging directly with people who use drugs to prevent overdose and infectious disease transmission; improve physical, mental, and social wellbeing; and offer low barrier options for accessing health care services, including substance use and mental health disorder treatment." We highlighted two leading strategies from SAMHSA and CDC: Opioid Overdose Prevention Education and Naloxone Distribution (OEND) and Linkage to Care Initiatives. The logic model for Linkage to Care Initiatives is included as Appendix E.

4. **Data Monitoring and Primary Prevention:** This involves multidisciplinary prevention activities for substance use disorder that address both the demand and supply sides ranging from population-level strategies to targeted interventions. It also involves early intervention strategies and surveillance efforts, a key component of a public health approach, to understand the changing nature of the drug overdose crisis.

## Improved Recovery Supports at Case Study Site

Thanks to a new collaboration between the Recovery Café and We Care Daily Clinics, residents in permanent supportive housing (Plymouth Housing and YWCA) at the audit case study site (Third Avenue from Virginia to Blanchard) can now receive free transportation to and from Recovery Café in SODO where they can get medication, spend time at Recovery Café in a drug- and alcohol-free space, and participate in programs, trainings, and community building.



Photo: Mosaic workshop at Recovery Café. Source: Recovery Café

DOJ-HUD-AR00883

**Evaluate Outcomes and Adjust**

The use of the Strategic Prevention Framework requires an element of evaluation. SAMHSA indicates that the evaluation step has a number of important benefits for communities, including:

- Systematically document and describe the prevention activities
- Meet the diverse information needs of stakeholders and funders
- Continuously improve prevention programs and practices
- Demonstrate the impact of a prevention program or practice on substance misuse and related behavioral health problems
- Identify which elements of a comprehensive prevention plan are working well
- Build credibility and support for effective prevention programs in the community
- Advance the field of prevention by increasing the knowledge base about what works and what does not

Activities to address crime and overdose events where they are concentrated should be monitored, evaluated, and improved based on evaluation findings. Evaluation should be incorporated into any strategies at the beginning of the planning process to ensure that it is well thought out. Evaluation can help ensure program efficiency, and the City should improve and innovate through evaluation, research, and continuous quality improvements.

## Recommendation 8

**The Mayor's Office should ensure that the City regularly evaluates its efforts to address places where overdoses and crime are concentrated as required by proven problem-solving methodologies (e.g., the Substance Abuse and Mental Health Services Administration's Strategic Prevention Framework).**

DOJ-HUD-AR00884

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

# OBJECTIVES, SCOPE, AND METHODOLOGY

**Objectives, Scope and Methodology**

To accomplish this audit's objective of identifying evidence-informed approaches for addressing areas in the city where crime and overdose incidents are concentrated, we sought and received technical assistance from the U.S. Department of Justice Bureau of Justice Assistance's Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP) and the Office of National Drug Control Policy's Northwest High Intensity Drug Trafficking Area (NW HIDTA).

We reviewed research literature on crime prevention and overdose prevention; we analyzed administrative data from Seattle Police Department, Seattle Fire Department, and Public Health – Seattle & King County on crime and overdoses; and we convened collaborative meetings between the City and federal agencies.

For this audit, we also conducted a case study of Third Avenue from Virginia to Blanchard. For the case study, we organized and participated in site visits and meetings with the following organizations:

- Plymouth Housing
- YWCA Seattle/King/Snohomish
- Harborview Third Avenue Clinic
- Evergreen Treatment Services-REACH
- King County Metro Transit
- Downtown Seattle Association
- Belltown United
- West Precinct Advisory Council
- Northwest High Intensity Drug Trafficking Area

This audit was written by Claudia Gross Shader, PhD, and IB Osuntoki, MPH, CIA. We received and incorporated input on this audit from reviewers in the Seattle Police Department, Mayor's Office, Department of Economic Development, Department of Neighborhoods, King County Metro, Belltown United, Plymouth Housing, YWCA, NW HIDTA, and Downtown Seattle Association.

We would especially like to acknowledge Dr. Charlotte Gill of the Center for Evidence-Based Crime Policy, George Mason University, and Dr. Michael McDonnell at the Elson S. Floyd College of Medicine, Department of Community and Behavioral Health at Washington State University for their review and comments on a draft of this report.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

DOJ-HUD-AR00885

# REFERENCES

Biondo, B. (2023). *Crime Prevention Through Environmental Design (CPTED) "Snapshot": 3rd Ave Virginia to Blanchard (2000-2100 block)*. Seattle, WA: Seattle Police Department.

Doran, K. M., Torsiglieri, A., Blaufarb, S., Hernandez, P., Melnick, E., & Velez, L. (2023). The POP (Permanent Supportive Housing Overdose Prevention) Study: protocol for a hybrid type 3 stepped-wedge cluster randomized controlled trial. *Implementation Science*. Retrieved from https://implementationscience.biomedcentral.com/articles/10.1186/s13012-023-01278-z

Eck, J. E., & Guerette, R. T. (2012). Place-based crime prevention: Theory, evidence, and policy. In J. E. Eck, R. T. Guerette, D. P. Farrington, & B. C. Welsh (Eds.), *The Oxford handbook of crime prevention* (pp. 354-383). New York: Oxford University Press.

Eck, J. E., & Spelman, W. (1987). *Problem solving: Problem-oriented policing in Newport News*. Police Executive Research Forum. https://www.ncjrs.gov/pdffiles1/Digitization/111964NCJRS.pdf

Gill, C., Weisburd, D., Nazaire, D., Prince, H., & Gross Shader, C. (2024). Building "A Beautiful Safe Place for Youth" through problem-oriented community organizing: A quasi-experimental evaluation. *Criminology & Public Policy*. https://doi.org/10.1111/1745-9133.12657

Gill, C., & Gross Shader, C. (2020). Building a "Beautiful Safe Place for Youth:" The Story of an Effective Community-Research-Practice Partnership in Rainier Beach, Seattle. In R. Stokes, & C. Gill, *Innovations in Community-Based Crime Prevention–Case Studies and Lessons Learned*. New York: Springer.

Gill, C., Jensen, R., & Prince, H. (2018). *Rainier Beach: A Beautiful Safe Place for Youth - 2018 Evaluation Update*. Fairfax, VA: George Mason University: Center for Evidence-Based Crime Policy.

Gill, C., Vitter, Z., & Weisburd, D. (2016). *Rainier Beach: A Beautiful Safe Place for Youth - Final Evaluation Report*. Fairfax, VA: Center for Evidence-Based Crime Policy, George Mason University. Retrieved from http://www.rb-safeplaceforyouth.com/wp-content/uploads/2018/03/2016-GMU-ABSPY-evaluation-report.pdf

Gill, C., Weisburd, D., & Vitter, Z. (2013). *Evidence-Informed Strategies for Youth Victimization and Crime*. Fairfax, VA: George Mason University.

Goldstein, H. (1990). *Problem-oriented policing*. New York, NY: McGraw-Hill.

Gross Shader, C., Gill, C., Zheng, X., & Carleton, B. (2024). City Government as Supercontroller: A Systematic Review of Non-Police Mechanisms that City Governments Can Implement to Reduce Crime at Hot Spots. *Agression and Violent Behavior*. https://doi.org/10.1016/j.avb.2024.101957

Hawkins, J. D., Oesterle, S., Brown, E. C., Abbott, R. D., & Catalano, R. F. (2014). Youth problem behaviors 8 years after implementing the Communities That Care prevention system. A community-randomized trial. *JAMA Pediatrics, 168*(2), 122-129.

Hawkins, J. D., Oesterle, S., Brown, E. C., Monahan, K. C., Abbott, R. D., Arthur, M. W., & Catalano, R. F. (2012). Sustained Decreases in Risk Exposure and Youth Problem Behaviors After Installation of the Communities That Care Prevention System in a Randomized Trial. *Archives of Pediatric and Adolescent Medicine*, 166(2):141-148.

DOJ-HUD-AR00886

Hinkle, J. C., Weisburd, D., Telep, C. W., & Petersen, K. (2020). Problem-oriented policing for reducing crime and disorder: An updated systematic review and meta-analysis. *Campbell Systematic Reviews*, *16*(2), 1–86. https://doi.org/10.1002/cl2.1089

Oesterle, S., Kuklinski, M. R., Hawkins, J. D., Skinner, M. L., Guttmannova, K., & Rhew, I. C. (2018). Long-Term Effects of the Communities That Care Trial on Substance Use, Antisocial Behavior, and Violence Through Age 21 Years. *American Journal of Public Health, 108*, 659-665.

Substance Abuse and Mental Health Services Administration. (2019). *A Guide to SAMHSA's Strategic Prevention.* Rockville, MD: Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/sites/default/files/20190620-samhsa-strategic-prevention-framework-guide.pdf

Weisburd, D. (2015). *The Law of Crime Concentration and Criminology of Place.* San Francisco, 2014: presentation to American Society of Criminology Annual Conference.

Weisburd, D., Bushway, S., Lum, C., & Yang, S.-M. (2004). Trajectories of Crime at Place: A Longitudinal Study of Street Segments in the City of Seattle . *Criminology*, 42:283-322.

DOJ-HUD-AR00887

# APPENDIX A
## Mayor's Office Response

| | |
|---|---|
| **From:** | Walton-Anderson, Natalie |
| **To:** | Myerberg, Andrew; Jones, DavidG; Burgess, Tim |
| **Cc:** | Gross-Shader, Claudia; Eder, Dan; Osuntoki, IB; Gerlach, Catherine; Smith, Sarah |
| **Subject:** | RE: Andrew/Tim: Executive Response to OD and Crime Audit |
| **Date:** | Friday, June 14, 2024 4:23:34 PM |
| **Attachments:** | image002.png |
| | image003.png |

David/Claudia,

Thanks for allowing me time to review the draft and respond. I will be designated from the Mayor's Office and Director of Public Safety Director to lead the coordination efforts with the City Auditor related to the Overdose and Crime Concentration Audit report.

Here is a brief statement from the Mayor's Office below to be included in the report:

"The Mayor's Office is appreciative of the research and thoughtful work represented in the recommendations made by the City Auditor in the Overdose and Crime Concentrations Audit report. Many, if not all, of the recommendations call for continued collaboration with other public safety, behavioral health, and community partners, further building on our work to expand treatment options, service connections, and public safety solutions. We look forward to continuing our partnerships and focus on addressing fatal and non-fatal overdoses within our city and region."

Let me know if there is anything else.

Natalie



**Natalie Walton-Anderson** (she/her/hers)
**Director of Public Safety**
Office of Mayor Bruce A. Harrell, City of Seattle
206-549-0022 City Mobile
Working together to build *One Seattle*

DOJ-HUD-AR00888

# APPENDIX B
## Council President's Response



The complex and interrelated issues of synthetic drug use, crime, and victimization are taking a significant human and economic toll on Seattle and its people. It is imperative that we act swiftly and thoughtfully, and this audit offers our city a blueprint for positive change.

I thank the Office of City Auditor for its examination of the places in Seattle where overdoses and crime are concentrated and its recommendation that the City use a systematic, coordinated, evidence-based approach to tackle these issues. Since taking office in 2022, I've been laser focused on public safety issues and expanding access to on-demand comprehensive substance use disorder treatment. As President of the City Council, I will work to implement the audit's recommendations legislatively and through collaborative leadership with Mayor Harrell's administration and external stakeholders.

The audit notes that because the landscape of drug use in Seattle is rapidly evolving, our existing strategies to address its impacts must be rethought and recalibrated to meet current conditions more effectively. Fentanyl, a synthetic opioid 50 times more potent than heroin, is driving an exponential increase in addiction and overdose fatalities, making the drug crisis playing out on the streets of Seattle our most devastating public health emergency in generations.

According to Public Health Seattle & King County's 2022 Overdose Death Report, "(b)etween 2012 and 2019, the number of overdoses that occurred in King County increased by about 6% each year. ... Since 2019, the number of overdose deaths has grown on an exponential scale, jumping by 20% between 2019 and 2020 and jumping by an additional 39% between 2020 and 2021" and fentanyl was involved in 70% of all confirmed overdose deaths that occurred by its publication date of October 15, 2022. According to the King County Overdose Dashboard, there was a 33 percent increase in overdose fatalities from 2022 to 2023 (1,008 to 1,339 respectively). These trends reveal the limitations of relying on our current harm reduction approach to address a drug that is so cheap, ubiquitous, and deadly.

Furthermore, findings from a case study presented in the audit suggest that modifying our current low-barrier, housing first model for city-funded affordable housing projects may be appropriate. Out of the 11 overdoses that occurred on a segment of Third Avenue during the case study, "data from the King County Medical Examiner's Office indicates 10 of the 11 fatal overdoses (91 percent) occurred in or outside of the three permanent supportive housing buildings." And the widespread availability of drugs within and outside affordable housing hampers efforts of people trying to recover from addiction which indicates the need for more recovery-based services.

By using a place-based framework to map the overlapping concentrations of overdose and crime, the audit confirms what is obvious to many: that today's drug crisis is fueling property and violent crime and is inextricably linked to the persistence of chronic homelessness across the region and beyond.

DOJ-HUD-AR00889

We need not start from scratch to better tackle these interrelated problems. This audit identifies existing resources and evidence-based strategies that have proved effective in other jurisdictions. and it draws on research conducted by the Office of City Auditor informing the recommendations in previous audits on the City's response to Unsanctioned Encampments (2020), Methamphetamine Use Disorder (2022), and Organized Retail Crime (2023). Among the specific actions that we can and should implement right now are:

- Adopt the Substance Abuse and Mental Health Services Administration's (SAMHSA) place-based Strategic Prevention Framework to address crime and overdose hot spots.
- Use Snohomish County's Multi-Agency Coordination Group as a model framework for coordinating City agencies in a unified approach.
- Examine our current contracts with provider agencies and ensure they are meeting the "Good Neighbor" provisions.
- The Mayor's Office just recently joined the federal Overdose Mapping and Application Program, and we must now develop a coordinated plan for using that data in response to overdose spikes.
- Take the DEA and the U.S. Attorney up on their offer to help Seattle investigate and prosecute fatal overdoses as they do in many other jurisdictions including Los Angeles and San Diego.
- Engage in continuous evaluation of our efforts to best ensure that the new strategies and approaches the City adopts avoid unintentionally creating harm.

In sum, we know what we must do, so I urge the Executive and my Council colleagues to act quickly and collaboratively to implement these recommendations in order to improve the lives of everyone who lives, works, or visits the places in Seattle where overdose and crime are currently concentrated.

Sara Nelson, President
Seattle City Council

DOJ-HUD-AR00890

# APPENDIX C

## List of Recommendations and Department Response

### Recommendation 1:

**The Mayor's Office should lead the City in addressing places where overdoses and crime are concentrated using a proven problem-solving methodology (e.g., the Substance Abuse and Mental Health Services Administration's Strategic Prevention Framework). This should include continuing the problem-solving work on Third Avenue from Virginia to Blanchard.**

Mayor's Office Concurrence: **Concur**

### Recommendation 2:

**The Mayor's Office should lead the City in seeking federal technical assistance and funding to address places where overdoses and crime are concentrated.**

Mayor's Office Concurrence: **Concur**

### Recommendation 3:

**The Mayor's Office should identify a "project champion" to oversee the City's efforts to address places where overdoses and crime are concentrated.**

Mayor's Office Concurrence: **Concur**

### Recommendation 4:

**The Mayor's Office, in collaboration with the Office of Emergency Management, Seattle Fire Department, Seattle Police Department, and other stakeholders, should establish a coordination system such as the Multi-Agency Coordination Group. The group should have well-defined objectives, goals, and reporting mechanisms.**

Mayor's Office Concurrence: **Concur**

### Recommendation 5:

**The Mayor's Office should formalize an ongoing City relationship with Northwest High Intensity Drug Trafficking Area's Overdose Response Strategy group to continue to leverage its technical assistance resources and coordination with other government agencies.**

Mayor's Office Concurrence: **Concur**

DOJ-HUD-AR00891

## Recommendation 6:

**The Mayor's Office should lead the City's implementation of the Overdose Mapping and Application Program (ODMAP).**

Mayor's Office Concurrence: **Concur, Implemented May 2024**

## Recommendation 7:

**The Seattle Police Department, in consultation with the Mayor's Office and federal partners, should explore the establishment of a joint law enforcement task force for fatal overdoses.**

Seattle Police Department Concurrence: **Concur**

## Recommendation 8:

**The Mayor's Office should ensure that the City regularly evaluates its efforts to address places where overdoses and crime are concentrated as required by proven problem-solving methodologies (e.g., the Substance Abuse and Mental Health Services Administration's Strategic Prevention Framework).**

Mayor's Office Concurrence: **Concur**

DOJ-HUD-AR00892

# APPENDIX D
## Overdose Prevention Strategies

The strategies described below are not an exhaustive list of strategies to prevent overdoses and substance use disorder but are meant as a reference for decision-makers on evidence-based practices that could be implemented in the City of Seattle.

### Enhanced Delivery of Evidence-Based Treatment

| Treatment Category | Methadone | Buprenorphine | Naltrexone | Contingency Management (CM) | Community Reinforcement Approach (CRA) |
|---|---|---|---|---|---|
| **Overview** | Methadone is the most used medication to treat opioid use disorder (OUD) in the world. There is abundant evidence that show its effectiveness in reducing illicit opioid use, treats OUD, and retains patients in treatment. | Buprenorphine is a medication used to treat OUD and it is available in multiple routes of administration including sublingual film, buccal tablet, injection, and subdermal implants. It has been shown to be effective in retaining patients in treatment and reducing illicit opioid use. | Naltrexone is one of the three FDA-approved medications for the treatment of opioid dependence. Randomized controlled trials has shown its efficacy in reducing return to illicit opioid use, increasing treatment retention, and reducing opioid craving. | CM is a type of behavioral therapy grounded in the principles of operant conditioning. Operant conditioning is a method of learning in which desired behaviors are reinforced with prizes, privileges, or cash. | CRA is commonly used with CM and includes multiple elements such as analyzing clients' substance use, relationship counseling, vocational guidance, and job skills training. CRA therapy also focuses on building social and drug refusal skills. |
| **Used for** | Opioid use disorder | Opioid use disorder | Opioid and alcohol use disorders | Opioid and stimulant use disorders | Opioid and stimulant use disorders |
| **Effectiveness** | Reduces opioid cravings, illicit opioid use, risk of opioid overdose, and increases rate of treatment retention | Reduces opioid cravings, illicit opioid use, risk of opioid overdose, and increases rate of treatment retention | Reduces opioid cravings, illicit opioid use, and increases rate of treatment retention. Prevents return to opioid use after release from controlled environments | Reduces number of days of stimulant use, stimulant cravings, new stimulant use, and HIV risk behaviors | Reduces number of weeks of drug usage, frequency of use, and addiction severity |
| **Available in Outpatient/ Community Settings** | Yes | Yes | Yes | Yes | Yes |
| **Available through** | Opioid treatment program | Any prescriber with the appropriate waiver | Any healthcare provider with prescribing authority | Behavioral therapy and social services programs | Behavioral therapy and social services programs |

DOJ-HUD-AR00893

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

| Treatment Category | Methadone | Buprenorphine | Naltrexone | Contingency Management (CM) | Community Reinforcement Approach (CRA) |
|---|---|---|---|---|---|
| **Route of Administration** | Pill, liquid, and water forms | • Pill, sublingual film<br>• Extended-release injectable<br>• Implant (inserted beneath the skin) | • Oral<br>• Extended-release injectable | Not applicable | Not applicable |
| **Dosing frequency** | Daily | • Daily<br>• Monthly<br>• Every six months | • Daily<br>• Monthly | Not applicable | Not applicable |
| **Combination with other treatment** | Recommended in combination with counseling and behavioral therapies | Recommended in combination with counseling and behavioral therapies | Recommended in combination with counseling and behavioral therapies | Use in combination with pharmacological treatment | Used in combination with CM |
| **Duration of Treatment** | No maximum recommended duration, treatment may continue indefinitely | No maximum recommended duration, treatment may continue indefinitely | No maximum recommended duration, treatment may continue indefinitely | No prescribed time period, typically follow 12-week schedule | 24-week schedule recommended |
| **Opportunities for Low Barrier Treatment** | • Mobile clinics | • Mobile clinics<br>• Permanent supportive housing<br>• Emergency Medical Services/ Overdose Response Team<br>• Controlled environments | • Mobile clinics<br>• Permanent supportive housing<br>• Controlled environments (e.g., jails, prisons, residential rehabilitation programs) | • Mobile clinics<br>• Permanent supportive housing | • Mobile clinics<br>• Permanent supportive housing |
| **Washington State Institute for Public Policy's (WSIPP) Benefit-Cost Result** | Every dollar spent on a program participant generates $2.40 in gross benefit. | Every dollar spent on a program participant generates $1.85 in gross benefit. | Every dollar spent on a program (injectable for opiates) participant generates a negative $0.04 in gross benefit. However, WSIPP analysis assumes a duration of one full year of | Every dollar spent on the program generates $39.74 in gross benefit (for programs with high value contingencies) or $11.67 in gross benefit (for programs with lower value contingencies). | Every dollar spent on a program participant generates $7.62 in gross benefit. |

DOJ-HUD-AR00894

| Treatment Category | Methadone | Buprenorphine | Naltrexone | Contingency Management (CM) | Community Reinforcement Approach (CRA) |
|---|---|---|---|---|---|
| | | | treatment and one corresponding full year of effectiveness, which is not evidence-based. | | |

Sources: The Pew Charitable Trusts; US Food & Drug Administration; SAMHSA Medications for Opioid Use Disorder; SAMHSA Treatment of Stimulant Use Disorders; Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States; Washington State Institute for Public Policy;

## Recovery Support

| Strategy Category | Recovery Housing | Peer Recovery Support | Job Placement Programs |
|---|---|---|---|
| Overview | Recovery housing is a type of recovery supports service designed for those initiating and sustaining recovery from SUD. The recovery housing setting is the service been provided and recovery homes mindfully cultivate prosocial bonds, a sense of community, and a supportive social environment for recovery. | Peer recovery support is a range of activities between people who share similar experiences of SUD. Peer recovery support can vary depending on the program or setting and peer support workers can provide a wide range of services which include helping others develop personal goals and supporting them across the continuum of recovery. | Job placement programs for people with SUD or dual diagnosis help individuals work in jobs of their choosing. This includes evidence-based interventions like the Individual Placement and Support (IPS) and its variant, the customized employment supports (CES). |
| Effectiveness | Recovery housing has been associated with positive outcomes for residents including decreased substance use, reduced likelihood of return to use, lower rates of incarceration, higher income, increased employment, and improved family relationships. | There is developing evidence that the inclusion of standardized peer support programs in treatment and recovery services is beneficial as shown by positive findings on measures including reduced substance use and SUD relapse rates, improved relationships with treatment providers and social supports, increased treatment retention, and greater treatment satisfaction. | According to meta-analyses and systematic reviews, IPS is the only evidence-based employment intervention for adults with behavioral health conditions. IPS has been shown to increase competitive integrated employment compared to usual services in an opioid treatment program. |

DOJ-HUD-AR00895

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

| Strategy Category | Recovery Housing | Peer Recovery Support | Job Placement Programs |
|---|---|---|---|
| **Types** | The National Alliance for Recovery Residences has four levels of housing with different levels of support.<br>• Level 1 (e.g., Oxford Houses)<br>• Level 2 (e.g., sober living homes)<br>• Level 3 (e.g., with standardized peer recovery support services)<br>• Level 4 (e.g., therapeutic community) | There are different types of peer-based positions/programs including peer navigator, peer specialist, recovery specialist, recovery coach, peer practitioner, etc. | IPS offers supported education and technical skills that help individuals consider and pursue the training needed to achieve their work goals. Some programs also refer individuals to other organizations to help them meet their educational goals. |
| **Washington State Institute for Public Policy's Benefit-Cost Result** | Every dollar spent on a participant in sober living houses generates $6.50 in gross benefit. | Every dollar spent on a program participant generates $1.22 in gross benefit. | Not Available |

Sources: SAMHSA Best Practices for Recovery Housing; Peer Recovery Supports; Substance Use Disorders Recovery with a Focus on Employment | SAMHSA Publications and Digital Products; U.S. Department of Labor Individual Placement and Support for People with Co-Occurring SUD(dol.gov); Washington State Institute for Public Policy;

## Integrated Harm Reduction

| Strategy Category | Opioid Overdose Prevention Education and Naloxone Distribution (OEND) | Linkage to Care Initiative |
|---|---|---|
| **Overview** | OEND is the distribution of overdose prevention and response education and naloxone rescue kits to people at high risk of overdosing. It could involve the proactive distribution to high-risk population and their social network or referring people to where such education and kits are available. There are multiple implementation strategies and sites for OEND programs including targeted naloxone distribution, distribution in treatment centers and criminal legal settings, "leave-behind" programs at sites of overdose, acute care/emergency department and primary care settings, and syringe service programs. | Linkage to care initiatives is a framework for coordinating care and services for people with OUD with core components of partnership development and sustainability; outreach activities and active follow-up; OEND; and active referral and wraparound services. It involves using non-fatal overdose and other data from different data sources to identify people who are at risk for overdose or have recently experienced a non-fatal overdose (i.e., program recipients) and link them with evidence-based treatment options and wraparound services (e.g., transportation to treatment, housing assistance, etc.) |

DOJ-HUD-AR00896

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

| Strategy Category | Opioid Overdose Prevention Education and Naloxone Distribution (OEND) | Linkage to Care Initiative |
|---|---|---|
| **Effectiveness** | Research shows that naloxone administration increases the odds of survival during an overdose and that communities enrolled in OEND programs distributing directly to people who use drugs had lower rates of opioid overdose deaths. | Linkage to care strategies have been proven to be effective in the initiation of medications for opioid use disorder treatment and engagement with peer support programs. |

Sources: CDC Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States; SAMHSA Opioid-Overdose Reduction Continuum of Care Approach; CDC Linkage to Care Initiative; SAMHSA Harm Reduction | SAMHSA; CDC Linkage to Care Resource for Action

## Data Monitoring and Primary Prevention

| Strategy Category | Overview |
|---|---|
| **Data Monitoring Programs** | As we discussed on page 20, the City needs a data monitoring tool to be able to assess and analyze overdose data. Data monitoring is an important component in understanding the complex and changing nature of drug overdose. Accurate, comprehensive, and timely data on fatal and nonfatal overdoses can enhance prevention programmatic efforts. The City could use the free HIDTA's ODMAP as its data monitoring tool for identification of overdose spikes, automatic alert messaging to local stakeholders and community partners, post-overdose follow-up for care coordination, and targeting deployment of harm reduction services. |
| **Prevention and Early Intervention Strategies** | There are multiple evidence-based prevention and early intervention strategies that can be implemented in various settings. These strategies include universal programs, targeted programs for youth and young adults, and indicated programs that boost protective factors and eliminate or reduce risk factors for substance use disorder. SAMHSA's Focus on Prevention identified six broad strategies that can be used with the Strategic Prevention Framework to help communities shape their prevention plans. The combination of these strategies can improve their desired results.<br>• Information dissemination<br>• Prevention education<br>• Positive alternatives<br>• Environmental strategies<br>• Community-based and school-based processes<br>• Identification of problems and referral to services |

Sources: SAMHSA Focus on Prevention; National Institute on Drug Abuse Preventing Drug Misuse and Addiction: The Best Strategy; CDC's Overdose Data to Action

DOJ-HUD-AR00897

# APPENDIX E
## Logic Model – Linkage to Care Initiatives
### Centers for Disease Control and Prevention

 **OVERDOSE DATA2ACTION**


## INPUTS


## ACTIVITIES


## OUTPUTS


## SHORT-TERM OUTCOME


## INTERMEDIATE-TERM OUTCOME

## LONG-TERM OUTCOME

### INPUTS

**Data Access**

Accessibility of data (policies)

**Data agreement to receive data from: EMS, ED/health system, justice system, harm reduction services, or others**

Quality data

Data Management Plan[a]

**Partnership**

Established referral and procedures with healthcare, harm reduction, and other social service partners

**Resources**

Comprehensive list of available harm reduction, treatment, and social service resources in the jurisdiction

Overdose education curriculum

**Staffing**

Trained staff on active referral, case management, motivational interviewing, harm reduction strategies, and treatment options

Peer navigators supported with on-the-job coaching and additional support services

Friends and family of people at-risk for an overdose engaged and supported in recovery process

### ACTIVITIES

**Partnership**

Outreach & develop new referral and wraparound service network, including people with lived experience with OUD or recovery

Provide trainings on OUD/wrap-around services resources as well as stigma reduction training for partners

Develop Standard Operating Procedures (SOP)[b]

Sustain and foster the referral network to address changing needs of people at risk for an overdose

**Outreach Activities**

**Initial outreach, and active follow-up with individuals (e.g., unreachable the first time, ensure treatment initiation)**

Assess readiness to change and provide brief motivational interviews

**Overdose Education & Naloxone Distribution**

Educate and train individuals (e.g., person at risk for an overdose, their friends, family or community members) on harm reduction strategies and provide naloxone[c] and train on use

**Referral and Wraparound Services**

Actively refer[d] individuals to treatment and wraparound services[e]

Initiate treatment

**Provide active case management**

### OUTPUTS

**Partnership**

Active referral and wraparound service network

Tailored services provided to address needs

**Outreach Activities**

Active outreach and follow-up with people at risk for an overdose

Completed motivational interview to assess readiness

**Overdose Education & Naloxone Distribution**

Training provided on how to prevent, recognize, and respond to an opioid overdose (e.g., harm reduction strategies, provide naloxone kit and train on use)

**Referral and Wraparound Services**

Appointments scheduled for treatment

Assist in obtaining access to services (e.g., transportation, insurance)

Provide take-home buprenorphine until appointment with provider (within 72 hours)

Continuity of care

### SHORT-TERM OUTCOME

**System and Partners**

Integrated infrastructure among partners to support active referral and case management

Timely coordination and responses of referral services

**Individual-Level**

**Service providers and Clinicians**

Increased knowledge of opioid use disorder, stigma reduction best practices, and evidence-based treatment (i.e., medication for opioid use disorder (MOUD)) among clinicians and service providers

Increased clinicians' capacity to provide treatment and wraparound services

**Program Recipients**

Increased knowledge & self-efficacy to recognize and respond to an overdose and to incorporate harm reduction strategies

Increased behavioral intention to enter treatment

Increase awareness of treatment options and wraparound services available

**Active Referral & Linkage to Treatment**

Increase number of individuals actively referred and linked to treatment

### INTERMEDIATE-TERM OUTCOME

**Behavioral Change**

Increased retention in treatment and wraparound services

Decreased illicit opioid use

**System Outcome**

Enhanced access and continuity of linkage to care services

### LONG-TERM OUTCOME

**Morbidity**

Decrease rate of opioid misuse, opioid use disorder, or non-fatal overdoses

**Mortality**

Decreased drug overdoses death rate, including prescription and illicit opioid overdose death rates

---

[a] CDC requires recipients who collect or generate data with federal funds to develop, submit, and comply with a data management plan (DMP) for each collection or generation of public health data undertaken as part of the award and, to the extent appropriate, provide access to and archiving/long-term preservation of collected or generated data. For more information please see CDC's DMP policy.

[b] SOP should include considerations about screening, development of an individualized plan, and who does the linkage. This should be developed in conjunction with a clinician or addiction specialist in decisions about appropriate care.

[c] The purchase of naloxone is prohibited with CDC's OD2A funds.

[d] Active referral includes directing clients to a service, such as making appointments; providing transportation; providing a "warm hand-off"; or using a peer navigator.

[e] Wraparound services may include arranging for transportation to treatment; assistance with insurance sign-up; securing appointments; HIV/Hep C testing; housing assistance; employment services; and others.

 **Centers for Disease Control and Prevention** National Center for Injury Prevention and Control

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 103 of 117
PageID #: 2277
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

# APPENDIX F

## Crime Prevention Through Environmental Design (CPTED) Report

**Crime Prevention Through Environmental Design (CPTED) "Snapshot" Summary: 3rd Ave Virginia to Blanchard (2000-2100 block)**



**December 2023**

**Final Draft**

**Prepared by: Barb Biondo, Seattle Police West Precinct Crime Prevention Coordinator**
Barbara.Biondo@seattle.gov **/ 206.233.0015**

The following **Crime Prevention Through Environmental Design** "Snapshot" Summary for **3rd Ave: Virginia-Blanchard (2000-2100 block)** was prepared to provide initial guidance for local government and community stakeholders on CPTED-based strategies that can reduce opportunities for crime to occur and create a safer environment. This report is provided in support of a case study being conducted by the Office of the Seattle City Auditor "... to identify and document evidence-informed place-based interventions for reducing substance use disorder-related crime, disorder, and overdose incidents among people using drugs in areas with high levels of concentrated crime to address escalating drug overdoses, fatalities, crime, and victimization." This CPTED Summary is provided as a public service of the Seattle Police Department and is based on CPTED observations and discussion with stakeholders on site: October 25 (daylight), and November 20 (dark).

**CPTED Practitioners Present:** Barb Biondo, Crime Prevention Coordinator, Seattle Police West Precinct

**Disclaimer:** This survey is intended to assist in improving the overall level of safety and is not intended to imply the existing security measures or proposed crime prevention approaches are absolute or perfect.

**Confidentiality:** All information sent to and from the Seattle Police Department is subject to the Washington Public Records Act, Chapter 42.56 RCW, and may be subject to disclosure to a third-party requestor.

_____

## Site Description

The focus blocks 2000-2100 of Third Ave which are in south end of the Belltown neighborhood, fall within two Seattle Police West Precinct patrol beats: Mary 1 and David 1. The blocks contain a mix of early Twentieth Century office - commercial buildings with newer residential buildings, ranging from luxury apartments to permanent supportive housing, some of which is dedicated to housing vulnerable

DOJ-HUD-AR00899

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 104 of 117
PageID #: 2278
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

members of our society. Other land uses in the focus area include the YWCA Opportunity Place which provides a range of services for women including a day center, overnight shelter and permanent housing, and the headquarters for ETS Reach, the region's largest provider of outreach and case management services connecting those in need to housing and treatment for substance use disorder or mental/behavioral health issues. A high-rise condominium building is under construction on the southeast corner of 3rd and Virginia with scaffolding that narrows the pedestrian pathway.

Third Ave is a major transportation corridor[18] – the focus blocks include King County Metro Transit / Rapid Ride stops # 420 and #600.  While this stretch of 3rd Ave is busy throughout the day with pedestrians and transit riders, Amazon's return-to-office policy, with campus located three blocks east, has likely added to the pedestrian and transit riders frequenting the area, though the overall volume of pedestrian traffic has likely impacted by closures of neighboring retailers, shuttered prior to or during the COVID 19 pandemic - Macy's, Bed, Bath & Beyond, Bergman Luggage.

Adjacent alleyways were not included in this CPTED summary.

Observed activity pattern: In addition to pedestrians and transit riders, individuals and groups were observed socializing outside YWCA's Opportunity Place on the east side of 3rd Ave and in front of Plymouth Housing Simon's Apartments on the west side of street. Also observed were several unpermitted street venders in the corner created by construction scaffolding which creates a nook on the public sidewalk where, removed from the flow of pedestrian traffic, black market venders set up shop, selling alcohol, shoes, clothing, and miscellaneous wares in front of a vacant storefront. People gathering in this area at times created a small crowd, leaving pedestrians the challenge of navigating a path through or around the group to pass or catch their bus. During one visit, yelling signaled an assault had just taken place and required police intervention, highlighting the unpredictability of the street environment and potential for violent disturbances to erupt.



---

[18] Pre-pandemic, the 3rd Ave corridor was the primary transit corridor for downtown Seattle and one of the busiest transit corridors in the US serving roughly 2,500 busses and 100,000 riders per day. King County Metro Transit reports average weekday ridership is 61% of pre-pandemic ridership and is hitting 80% of pre-pandemic ridership, with a dozen routes seeing higher ridership than pre-pandemic.

DOJ-HUD-AR00900

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

**Land Use-West side of 3rd Ave** (As identified in modified Google Earth map, above):

1. 2000 3rd Ave: Multi-family high-rise mixed-use building under construction, 459 units, estimated completion in 2024; First Light Seattle
2. 2024 3rd Ave: YWCA Opportunity Place 145 units permanent supportive housing, Work Source Center and Homelessness Employment center for women; 1 ground-level commercial space unoccupied* Asset Map
3. 2028 3rd Ave Harborview Third Ave Center acute and primary care, social services support for downtown residents *Asset Map
4. 2030 3rd Ave Angeline's Day Center services for women including meals, laundry, hygiene and storage and Overnight Shelter 55 beds, case management. Ground level commercial space occupied by Subway *Asset Map
5. 2100 3rd Ave: Multi-family high-rise, Royal Crest Condominium 132 units with 4 commercial ground level units
6. 2112 3rd Ave: Vacant commercial office building with parking, 4 units
7. 2118 3rd Ave: Commercial Office building occupied Skanska Construction
8. 2124 3rd Ave: Commercial Office Building occupied by Swenson, Say, Faget Engineering and Johnson Architecture and Planning
9. 2132 3rd Ave: Commercial Office building occupied by Knack Co-Working

**Land Use-East side of 3rd Ave:**

10. 2133 3rd Ave: Evergreen Treatment Services REACH Office- outreach and case management support for people experiencing homelessness, substance use, and mental health treatment. Also, LEAD (Let Everyone Advance with Dignity)
11. 2119 3rd Ave: Multifamily building Plymouth Housing Langdon & Anne Simons Senior Apartments, 95 apartments for seniors and veterans ages 55+
12. 2113 3rd Ave: Plymouth Housing Administrative building with ground-level commercial space (vacant)
13. 2107 3rd Ave: Army Building office/retail – Coastline Church on ground floor.
14. 2103 3rd Ave: Retail – Coffee Tab - not-for-profit café with training and employment opportunities for local youth/surface parking lot managed by Diamond Parking
15. 2031 3rd Ave: Multi-family high-rise, The Modern 221 units with office and vacant commercial ground-level units
16. 2017 3rd Ave: Multifamily building Plymouth Housing Sylvia Odom's Place Apartments, 65 apartments for independent adults and vacant ground level
17. 2001 3rd Ave: Commercial building housing Swifty Printing

**Other Nearby Land Use:**

Moore Theatre: 1932 2nd Ave - Historic and recently renovated music and theatre performance venue

Holocaust Center for Humanity: 2045 2nd Ave - Center provides support for continued teaching and honoring the history, stories, and lessons of the Holocaust

WA Department of Social and Health Services (DSHS) Belltown Center: 2106 2nd Ave – Provides the following services: Food, cash, medical benefits; Working Connections, Childcare services. Public computers in office lobbies for DSHS-related services

King County Downtown Public Health Center: 2124 4th Ave - Medical/Dental clinic, Women Infants and Children (WIC) nutrition program, health screening for newly arrived immigrants, needle exchange and low barrier buprenorphine clinic for treatment of Opioid Use Disorder

DOJ-HUD-AR00901

Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

**Crime Data Snapshot:**



Figure 1: Source - Office of City Auditor analysis of publicly available from the Seattle Police Department's Crime Database.
*The Crime Against Person analysis was based on distinct count of Reporting Event Number and do not represent the total number of victims.

For a snapshot look at crime in the focus area, the crime data above shows the fluctuation in crime against persons over a 13-month period.  Crime data can be influenced by many factors over time, including police emphasis efforts, the motivation of surrounding area to report crime and changes in the surrounding area.

_____

## CPTED Overview

Crime Prevention Through Environmental Design (CPTED) is a place-based and multi-disciplinary approach to crime prevention through the proper design and effective use of the built environment. CPTED focuses on the design of (or modifications to) the physical environment to reduce crime, increase a sense of safety and improve the quality of life. When proper design is implemented, the offender's perceived risk of being caught will outweigh the value of the reward. Researchers have found a diffusion of crime control benefits to the surrounding areas from applying place-based crime prevention and deterrence strategies. The five guiding CPTED principals are:

1.  **Natural Surveillance:** Natural Surveillance is a design concept that promotes the ability to see and be seen. Natural Surveillance is promoted by features that maximize visibility of people in public areas such as parking lots, building entrances, lobby areas, and restroom access points: doors and windows that look out onto streets and parking areas, pedestrian-friendly sidewalks and streets, front porches, adequate nighttime lighting all support Natural Surveillance.

2.  **Territorial Reinforcement:** This concept uses physical design to provide clear guidance on what the intended (positive) uses are as well as features that signal to potential offenders' predictable consequences for inappropriate (negative) uses. Territorial reinforcement is promoted by features

DOJ-HUD-AR00902

that declare who a space is managed by, defines property lines, and distinguishes private from public spaces using the landscape, pavement design, entryway treatments, and "CPTED" fences (fencing that provides unrestricted lines of sight).

3. **Natural Access Control:** This concept decreases the opportunity for crime to occur by denying access to crime targets and by creating a perception of risk. Natural Access Control is gained by designing streets, sidewalks, building entrances, and neighborhood gateways to clearly indicate public routes. Access to private areas is discouraged through the use of structural elements.

4. **Image and Maintenance:** Care and maintenance serves as an expression of ownership and supports the use of a space for its intended purpose. Deteriorated structures, accumulated litter, graffiti, and abandoned property indicate less control by place managers and signals tolerance of disorder. Well-maintained, clean places promote a positive image, inviting positive uses and discouraging negative use.

5. **Community Activation:** Where the first four CPTED strategies focus on the design of or modifications to the physical environment to reduce opportunities for crime and increase a sense of safety, Community Activation recognizes that the involvement and support of the people who use and have connections to the place is essential to creating and maintaining safe spaces.

Complimentary crime prevention strategies often recommended in conjunction with CPTED approaches include:

- **Lighting**: Lighting is the number one deterrent for crime during nighttime hours. Lighting helps an individual observe their surroundings and respond to a potential threat. While higher illuminance or greater luminance is often with safety, poorly directed light can reduce visibility and thereby reduce safety and security.

- **Guardianship:** Territorial Reinforcement and other CPTED principles are supported by a concept called guardianship. Informal guardians – people on site using the space or facility as intended – help establish and reinforce positive norms, attracting others to the space, with the potential to actively intervene to keep the place safe. This is considered positive guardianship. Guardians can also be negative. People engaged in illegal or intimidating behaviors also exert influence, attracting more unwanted activity and deterring others from using the space for its intended purpose. Many urban places also require the periodic presence of formal guardians – uniformed police or security officers – to reinforce positive uses and intervene for inappropriate or unsafe activity that occurs.

- **Wayfinding:** Wayfinding supports moving pedestrians and vehicles to and from buildings and the property using readily identifiable roadway transitions, sidewalks, clearly stated signage, and focal points. Wayfinding supports Natural Access Control and increases users' awareness of surroundings and the overall safety of pedestrians.

- **Activity Generators**: Places activities in strategic locations where natural surveillance is limited or unavailable. When the surrounding land use and conditions support it, Activity Generators, also called Place-Making[19], attract users and help to establish and support positive behaviors and may

---

[19] More Placemaking Resources: Five Placemaking Projects that Inspire Us; Citizen Lab; Seattle Office of Arts & Culture

DOJ-HUD-AR00903

deter unwanted behaviors. Organized activities, such as concerts in the park, or uses such as food trucks with benches or tables, dog parks, bike and walking trails, and community gardens encourage activities that increase guardianship of the built environment.

- **Target Hardening:** Target Hardening is accomplished by features that prohibit entry or access: window locks, dead bolts for doors, interior door hinges. A note of caution: Excessive target hardening may create a "fortressing" effect and could result in a business, home or park appearing as an unsafe or unwelcoming place.

- **Organized and mechanical security measures:** CPTED focuses on design elements and natural modification of the built environment to accomplish its goals. Natural CPTED elements can be complemented and strengthened using **Organized Strategies,** which utilize the human element, sometimes called 'formal guardians', such as security guards, receptionists, and door greeters. **Mechanical Strategies** can also be built-in to further harden a target. Deadbolt locks, astragal plates, surveillance cameras, and alarm systems all contribute to the Mechanical Strategy of crime prevention.

_____

## Site-Wide Recommendations

1. <u>**Natural Surveillance:**</u>
Ideally, our public spaces afford reliable opportunities for natural surveillance to help us know if an area is safe to enter.  If Natural Surveillance – the ability to see and be seen – is limited, pedestrians and other users of the space may feel unsafe and anxious, some may avoid the area entirely. Where there is poor Natural Surveillance, offenders may feel more comfortable.

<u>Current conditions along the 3rd Ave corridor limit natural surveillance:</u>



i. **Low tree canopies:** Street tree growth blocks sight lines. CPTED Landscape standards require shrubs and ground cover be maintained to a maximum height of 3 feet and tall shrubs and tree canopies are maintained to a minimum 6-8 feet from the ground.

**Recommendation:** Street trees along 3rd Ave and adjacent streets will benefit from pruning and maintenance. Check in spring when trees are leafing out and report



through FIFI if canopy needs to be raised or pruning is needed to allow street lighting to shine through.

Figure 2-3: The above tree's canopy is lower than 6 ft. blocking the amount of the street and adjacent roadway a pedestrian can see. The tree in the image to the right has water shoots obstructing sight lines.  Regular maintenance including raising tree canopies improves the ability to see and be seen and safety on the street. Consult SDOT Urban Forestry for resources and guidance.

DOJ-HUD-AR00904

Case 1:25-cv-00636-MSM-AEM      Document 59-2      Filed 12/31/25      Page 109 of 117
PageID #: 2283
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

ii. **Construction scaffolding and paneling impedes sight lines and provides an environment that supports illegal and unwanted activity:** The presence of scaffolding and a plywood panel wall on the public sidewalk at the construction site at 2000 3rd Ave creates a major impediment for sight lines along the sidewalk and Metro Bus stops. The pedestrian lane is narrowed at either end which can obscure potential threats, leaving pedestrians vulnerable at choke points. The scaffolding also creates conditions that support illegal and unwanted activities, including unpermitted street vending. (discussed below under Image, Maintenance/Reputation).

**Recommendation:** Work with the contractor Build Group, and Seattle Department of Construction and Inspections (SDCI), to explore opportunities to minimize the footprint of the scaffolding and obstruction of sightlines by using transparent materials or angling barricade to improve sight lines.

 

Figure 4-5: Construction scaffolding on the NE corner of 3rd Ave and Virginia St. narrows the pedestrian pathway, creating choke points that limit sight lines and options for pedestrians. Photo on the left shows the entry point from the north and on right, entry from the south.

Ideally, scaffolding will be removed as soon as possible to open full access to the public sidewalk.

iii. **Blocked windows and empty storefronts reduce opportunities for Natural Surveillance -"eyes on the street":** Many of the available, street level commercial space with storefront views onto in the 3rd Ave are vacant or have posters or privacy blinds covering storefront windows, removing opportunity for occupants to see activity on the street. Unobstructed views from windows of open, street level stores and businesses help create the perception of being seen which can deter unwanted activity from taking place while adding vibrancy to the street environment.

**Recommendation:** Explore opportunities to activate vacant businesses and storefronts with uses that benefit the local community with support of Seattle Office of Economic Development and programs like Seattle Restored. Temporary uses – such pop-up businesses, and other creative, place-making approaches have been used in urban neighborhoods for decades to establish and support positive behaviors and deter unwanted activity.

Businesses can limit ads and window displays to 10 percent of the window. Offices and clinics can look for opportunities to open blinds (where the need for privacy doesn't prohibit) or to reconfigure offices, including meeting space or break rooms, to maximize views of the street.

DOJ-HUD-AR00905

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 110 of 117
PageID #: 2284
*Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach*






Figures 6-7-8: Exploring other strategies for marketing will provide an opportunity for the business in top left photo to remove ads from storefront windows, opening views to the street that can attract customers and deter criminal and unwanted activity. Top right and bottom photos depict businesses with open views, adding vibrancy and increasing informal guardianship on the street.

iv. **Parking on Blanchard limits sight lines down an already narrow sidewalk.**

   <u>**Recommendation:**</u> Work with SDOT to explore changing back-in, angle parking to parallel to open sight lines down sidewalk.

v. **Natural light to public sidewalk and building entrances is impeded.**

   <u>**Recommendation:**</u> Clean transparent awnings to allow more sunlight to pass through to brighten sidewalks and entrance ways during the day. Adding lighting of storefronts and under canopies will brighten the street during hours of darkness.

vi. **Assess lighting levels on building facades and entrances, add luminaires where needed to assure pedestrian pathways are evenly lit**. The focus blocks of 3rd Ave lack pedestrian scale lighting and while the cobra streetlamps do light the public sidewalk fairly well, light levels are uneven due to the presence of street trees and building awnings that block the light.

   <u>**Recommendation:**</u> All properties should assess lighting levels, particularly at building entrances, to assure pathways are evenly lit (no dark patches) providing the pedestrian with the ability to see and be seen. Luminaires should be shielded to avoid hampering night vision, and carefully oriented toward pathways, lighting from 5-6 vertical feet, allowing a person to see and recognize a face 30ft ahead. Ensure the light source and color quality is optimized for obtaining quality

DOJ-HUD-AR00906

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 111 of 117
PageID #: 2285
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

image where security cameras are used. Exterior lights are ideally equipped with photo sensors or timers to come on automatically at dusk, off at dawn. Adding lights under awnings that block light from overhead streetlamps will support even lighting along the pedestrian zone.

Lighting levels in alleyways adjacent to the focus area were not reviewed for this summary.

2. **Access Control & Territorial Definition/Reinforcement:**

Design features that delineate public spaces from transitional zones and private spaces help to reduce competing and conflicting use of space**.** In dense urban environments, Territorial Reinforcement is a key CPTED strategy and a two-part concept: First, it's essential to make clear the purpose of the different public and private places that make up an urban business district through use of physical design and culturally relevant features to provide clear guidance on what the intended (positive) uses and predictable consequences for inappropriate (negative) use. Second, in the advent of inappropriate use, it's important the appropriate intervention occurs in a timely manner.

Current conditions along the 3rd Ave corridor that will benefit from enhanced Access Control & Territorial Definition:

i. **The presence of tents and unpermitted street venders gathering in the "eddy[20]" or nook created on the public sidewalk by construction barricade at 2000 3rd Ave**. The persistent presence of illegal vendors at this location creates an environment where negative guardians -

people engaged in illegal or intimidating behaviors exert influence on the street environment, attracting more unwanted activity and deterring others from using the space for its intended purpose. Illegal street vending has known nexus with narcotics activity / organized retail crime (ORC) /EBT Fraud and violent crime. Many "Boosters" engaged in theft and shoplift suffer from substance use disorder, stolen property is sold at illegal street markets, cash is then used to purchase narcotics, with drug dealers often in the vicinity. Drug transactions often lead to conflict, increasing chances for violent crime in the area. Illegal street vending is frequently observed near busy bus stops.



---

[20] Merriam Webster defines eddy as a circular current running contrary to the main current. The construction scaffolding obstructs the public sidewalk, creating an eddy, such as in a stream, that is contrary to flow of pedestrian traffic, making a convenient spot to set up an illegal market – location, location, location!

DOJ-HUD-AR00907

**Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach**



Figures 9-10: The photo on page 9 shows a security camera view of the array of items being sold at illegal street markets, a frequent presence on the SE corner of 3rd and Virginia. The above photo shows pedestrian and transit riders left to navigate a path through or around the market crowd to pass or catch their bus.

**Recommendation:** Work with SDOT Street and Sidewalk Vending program and local business advocacy organizations to develop strategies that deter unauthorized street vending, directing interested entrepreneurs to the street vending permit application process: Call 206.684.ROAD or 684-Road@seattle.gov or Find It / Fix It mobile app. Illegal street vendors in this CPTED focus area and in other locations in our city are often seen at KC Metro Transit bus stops.

**Recommendation:** Work with King County Metro Transit to increase patrol checks of bus stops and shelters and enforce the Ride Right Code of Conduct to increase guardianship and assure transit amenities are used for transit purposes. Request King County Metro Transit police/security increase the frequency of checks, particularly during peak use periods such as commute times and other times of day when vulnerable members of the community, such as the elderly and youth must access transit.



ii. **Businesses / medical clinics and agencies providing social services to the public would benefit from posting clear signage declaring the name and type of business as well as hours of operations and uses and behaviors that are permitted.**

**Recommendation:** Celebrate business entrances site-wide by clearly marking pedestrian and vehicle entry points to direct access/egress to these locations through use of landscape and design features, signage, and art to 'celebrate' or help draw attention and guide customers to your entrance.



Figure 11-12: The flyer and street sign above are from a pilot program in the C-ID's Little Saigon Neighborhood aimed at educating residents on the harmful impacts, for individuals and the community, of participating in illegal street markets. The program is a partnership of the C-ID BIA, Seattle Police and Department of Transportation.

DOJ-HUD-AR00908

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 113 of 117
PageID #: 2287
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

iii. **Parking lots are frequent settings for criminal activity including car theft and prowl, and the sale and use of illegal drugs.**

**Recommendation:** Engage stakeholders surrounding surface lot on NW corner of 3rd and Lenora to collaborate on monitoring the lot and promptly reporting misuse, suspicious or criminal activity: King County Public Health, Coffee Tab, Diamond Parking.

**Commercial businesses can sign up for the** SPD Criminal Trespass Program**, and post Conditions of Entry signs at all pedestrian and vehicle entrances and enforce consistently.**
**Connect with SPD Crime Prevention to schedule a security assessment for your business, office or residential building** for practical ideas on reducing opportunity for crime to occur and enhancing safety: Barbara.biondo@seattle.gov or 206.233.0015

**3.  Image/Maintenance and Reputation:**
Care and maintenance of public infrastructure and private facilities serves as an expression of ownership and supports use of a space for its intended purpose.

Current conditions along the 3rd Ave corridor that signals tolerance of disorder:

i. **In addition to the illegal street market activity described above, the presence of litter and graffiti on both private and public property undermines use of a space for its intended purpose.**

**Recommendation:** Promptly repair any damage, remove graffiti and tagging on private property and report damage graffiti on public property including Metro Transit bus stops and remove graffiti, report on the Find It/ Fix It mobile app.

ii. **Replace missing street trees:** Street trees provide important health, environmental and economic benefits for the whole community.

**Recommendation:** Engage business and property owners to collaborate with the SDOT's Trees for Seattle program to maintain healthy street trees. Street trees are missing in some locations, leaving vacant tree wells which create a pedestrian hazard and collect litter.  Explore installation of SDOT approved tree well grates or porous covering for tree pits to provide ADA accessibility and sustainable conditions for street tree growth and longevity.

**4.  Community Activation:**
The involvement and support of the people who use and have connections to the place is essential to creating and maintaining safe spaces.

The diverse stakeholders on these urban blocks of our city will benefit from establishing and maintaining connections that foster a sense of community and common cause regarding safety and maintaining conditions that create a welcoming and safe environment for all. Existing organizations, such as community councils, can assist but additional support may be required to engage the clinics and social service and permanent supportive housing communities' connection with other residents and

DOJ-HUD-AR00909

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 114 of 117
PageID #: 2288
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

businesses in this southern section of the Belltown neighborhood. Active, community-based organizations in Belltown include the Belltown Community Council, the Belltown Business Association and Belltown United, a coalition of community volunteers, residential and business associations. More information on community groups, community grants, and upcoming events is available by contacting the Seattle Department of Neighborhoods Community Engagement Coordinators.

**Recommendation:** Support the informal guardians of this community exert more influence to establish positive uses as the norm for inside and outside their businesses, clinics, offices and residences and adjacent public areas. Strengthening connections, increasing communication across the sectors, and carefully assessing local assets and needs, will help identify areas where additional resources or support can increase capacity to work together for the betterment of the community and neighborhood.





Figures 13-14: Community activation can take many forms. The top photo shows a placemaking approach in Chicago IL. The mural was created by artist Molly Costello and reflects interviews with over 70 locals for inspiration. Source: Innovation Quarter: Five Placemaking Projects that Inspire Us. The bottom photo shows the interest and involvement of stakeholders of the 3rd Virginia-Blanchard community in the Fall of 2023, collaborating to create a safer street environment for all.

DOJ-HUD-AR00910

# APPENDIX G
## Case Study Information

### Overview of the Case Study Area

Our case study area is geographically focused on a two-block area in Seattle's Belltown neighborhood, specifically Third Avenue from Virginia Street to Blanchard Street, where overdoses and crimes against persons are highly concentrated. This area includes three permanent supportive housing facilities, a homeless shelter for women, a day shelter for women, a medical clinic that provides healthcare for homeless and at-risk patients, and the office for the region's largest outreach provider that provides integrated care management and connects people experiencing homelessness with needs including medical care, shelter, mental health, and substance use treatment. This two-block area is an important service hub for many of Seattle's most vulnerable residents. The agencies at this location primarily serve people who are homeless or recently homeless and who have complex needs including physical and mental health challenges, substance use disorder, trauma, victimization, and justice system involvement. However, there is currently no shared vision for this space or a collective identity. In addition, the heavy demands of the individual organizations' missions currently leave little capacity for coordination and collaboration with the other agencies at the site and with the City government to address the neighborhood conditions.

The blocks contain a mix of older office and commercial buildings with newer residential buildings, including market-rate apartments and condos and the three permanent supportive housing Buildings. The current vacancy rate in this area is 40 percent, nearly triple Seattle's current overall vacancy rate of 14 percent. The vacant street-level commercial spaces in this area reduce the natural guardianship and create opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form. Third Avenue is a major transportation corridor, and the focus blocks include stops for two King County Metro Transit RapidRide bus routes. This stretch of Third Avenue is busy throughout the day with pedestrians and transit riders. For 2023, annual foot traffic for this two-block area was measured at approximately 278,300.

We began applying the Strategic Prevention Framework for our case study site and developed the preliminary assessment and asset map below.

DOJ-HUD-AR00911

Case 1:25-cv-00636-MSM-AEM    Document 59-2    Filed 12/31/25    Page 116 of 117
PageID #: 2290
Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

## Strategic Prevention Framework Step 1: Assessment – Using Multiple Data to Understand the Case Study Site

To understand the problems in the case study site, we analyzed multiple data for the case study site and conducted surveys of residents and workers in the case study site (Housing Environment Survey Results). We provided a summary of our analyses below.

### Public Health – Seattle & King County (PHSKC) Fatal Overdoses

There were 732 fatal overdoses in Seattle between July 2022 and July 2023; 33 fatal overdoses occurred in Belltown (ZIP code 98121); 33 percent of overdoses in Belltown (11 overdoses) occurred at the case study site.

| | |
|---|---|
| Fatal overdose involving fentanyl only | 1 |
| Fatal overdose involving cocaine only | 1 |
| Fatal overdose involving methamphetamine only | 2 |
| Fatal overdose involving combination of multiple substances (fentanyl, cocaine, methamphetamine, methadone) | 7 |
| **Total Number of Fatal Overdoses** | **11** |



### SFD Overdose Response

Between July 2022 and July 2023, the Seattle Fire Department responded to 1,741 overdose calls for service around the city. SFD responded to 30 calls for overdoses in the case study location.



*There might be some overlaps between the fatal overdose data and overdose response data. We did not assess whether the overdoses SFD responded to at the study site led to a fatal outcome.

DOJ-HUD-AR00912

**SPD Crime Against Persons**

The crime data analysis focuses on crime against persons from July 2022 to July 2023 in the case study site. The fluctuation in crime over the 13 months analyzed can be due to multiple influencing factors including changes in the surrounding area and motivation to report crime. Between January 2023 and July 2023, four staff that worked for organizations within the study site were victims of these crimes.

| | July 2022 - Dec 2022 | Jan 2023 - July 2023 | Total |
|---|---|---|---|
| Assault | 9 | 15 | 24 |
| Harassment | 4 | 1 | 5 |
| Menacing Threat | 0 | 2 | 2 |
| Others (Hate Crime, etc.) | 0 | 3 | 3 |
| **Total Crime Against Persons** | **13** | **21** | **34** |



*The crime against persons analysis was based on distinct count of Reporting Event Number and does not represent the total number of victims.

Sources: Office of City Auditor analysis of PHSKC fatal overdose data, SFD overdose response data, and SPD crime data

DOJ-HUD-AR00913