## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

from 71 percent to 65 percent. The share using RRH subsidies in suburban areas increased from 18 percent in 2019 to 26 percent in 2022. Rural areas experienced little change.

### What Were the Other Characteristics of Housings Using RRH Subsidies in 2022?

- Nearly one in every five heads of households and other adults using RRH programs (19%) had a chronic pattern of homelessness before using RRH to rent permanent housing in 2022. This compares with 25 percent of adults staying in shelters.
- The rate of chronic patterns of homelessness among adults in RRH programs was highest in suburban and urban areas, where 22 and 21 percent of all adults in RRH had experienced chronic homelessness. About 13 percent of adults using RRH subsidies in rural areas had chronic patterns of homelessness. The lower rate of chronic patterns of homelessness in rural areas could reflect the reduced shelter capacity in those areas, limiting the amount of time homeless experiences are captured.
- In 2022, 17 percent of adults using RRH subsidies were veterans. This is higher than the rate of veterans among the sheltered population (9%). The high percentage of veterans in RRH programs reflects the considerable RRH resources directed to veterans through the Supportive Services for Veterans and their Families (SSVF) program. More detail on SSVF is at the end of this chapter.
- Veterans comprised a much greater share of adults using RRH subsidies in urban areas in 2022 (22%) than in suburban or rural areas (14%).
- In 2022, 28 percent of adults in RRH were survivors of domestic violence. These data represents survivors of domestic violence who accessed RRH programs that were *not* operated by victim service providers and should not be considered the full estimate of survivorship among people served in rapid rehousing programs. Given the way data are reported, it is not possible to show the percentage of adults in each geographic category who are survivors of domestic violence. However, data are available on the share of adults *currently fleeing* domestic violence by geography. In 2022, rural areas accounted for the highest share of adults in RRH who were currently fleeing unsafe situations (14%).
- Nearly six of every ten heads of households and other adults using RRH subsidies in 2022 had disabilities, 58 percent. This is slightly higher than the 52 percent of adults staying in shelters and may reflect communities' use of RRH to help the most vulnerable people leave homelessness for permanent housing.

### How Did the Other Characteristics Change over Time?

- The share of adults in RRH who were veterans decreased from 22 percent in 2019 to 17 percent in 2022. The *number* also decreased, by 17 percent. The percentage of veterans using RRH subsidies declined across geographic types.
- The percentage of adults in RRH who had chronic patterns of homelessness increased between 2019 and 2022, from 15 to 19 percent. The *number* increased by 39 percent. This may reflect the considerable efforts made by homeless service providers to engage people staying in encampments or other unsheltered settings during the pandemic. The percentage

**EXHIBIT 7.4: Household Composition of People Using Rapid Re-Housing and Staying in Shelters, (by %)**
2019, 2021, and 2022





Data source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.7.2

DOJ-HUD-AR01014

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

of adults using RRH with chronic patterns increased slightly in rural and urban areas but increased more notably in suburban areas (from 15% to 22%).

- The share of adults using RRH subsidies who were survivors of domestic violence remained the same between 2019 and 2022 (28%), while the *number* increased by 18 percent.
- The share of adults using RRH who reported disability increased from 52 percent in 2019 to 58 percent in 2022, reflecting an increased use of RRH programs for the most vulnerable households experiencing homelessness.

# Engagement of Households Using RRH

Data collected through the LSA provides information related to the experience of homelessness and use of permanent housing programs. This includes whether households using RRH rent subsidies spent time in other programs that are part of the community's homeless service system during the reporting period, how long RRH assistance lasted, and their location after the assistance ended.

- As RRH serves households experiencing homelessness, nearly all enrolled in the program having spent the night prior experiencing homelessness.[1] More than half, 54 percent, enrolled in RRH having experienced sheltered homelessness the previous night. Forty-six percent enrolled from an unsheltered situation.
- Between 2019 and 2022, the share of households enrolling in RRH from unsheltered situations has increased. The share has increased from 37 percent to 46 percent. The number of households enrolling in RRH having spent the night prior in unsheltered locations increased by 34 percent or about 14,000 households.
- In 2022, 70 percent of all households that rented housing using RRH subsidies did not use other parts of the homeless service system during the year. This differed considerably by household type. Two-thirds of adult-only households used only RRH subsidies during the year compared with 81 percent of family households.
- One-quarter of all RRH households used both RRH subsidies and a shelter program. A higher share of adult-only households did so (28%) compared with families with children (18%).
- A very small share of both household types used a combination of shelter programs, RRH subsidies, and PSH – less than one percent for families and five percent for adult-only households.
- Use of other programs by households with RRH rent subsidies did not change much between 2019 and 2022.
- Rapid Re-housing programs provide time-limited rent subsidies, rarely lasting more than two years and often for a much shorter period.[2] The length of the subsidy is locally determined. Households in the RRH program during 2022 included those who moved into a housing unit using RRH subsidies after October 1, 2021, as well as households who

**EXHIBIT 7.5: Geographic Location of Households using Rapid Re-Housing, by Percent**
2019-2022



| | URBAN | SUBURBAN | RURAL |
|---|---|---|---|
| | 0% | | 100% |
| **HOUSEHOLDS IN RRH** 2019 | 71.0 | 17.9 | 11.1 |
| 2021 | 70.2 | 18.8 | 11.0 |
| 2022 | 64.6 | 25.6 | 9.8 |
| **ALL SHELTERED HOUSEHOLDS** 2019 | 77.1 | 14.4 | 8.5 |
| 2021 | 78.1 | 15.1 | 6.9 |
| 2022 | 77.8 | 15.0 | 7.3 |

---

1  Some programs enroll people in RRH if they are staying with friends or family on a temporary basis or are otherwise unstably housed.
2  https://www.urban.org/research/publication/rapid-re-housings-role-responding-homelessness

DOJ-HUD-AR01015

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

had started receiving the RRH rent subsidy earlier and continued to do so. Some households using RRH during 2022 would remain in the program after September 30, 2022. Some would only use a few months of assistance. Household with short lengths of time in RRH programs could also have transitioned from shelter programs to RRH during the reporting period.

Length of time reflects the aggregated amount of time households spent using RRH subsidies over the course of the reporting period. Households staying for short periods of time include households that began using RRH subsidies during the last week of the reporting period as well as households that received one-time assistance with rent or security deposits.

- Twelve percent of households that used RRH in 2022 did so for less than one week. This includes households that moved into housing using RRH assistance during the last few days of the reporting period and households that used one-time assistance such as first months' rent and a security deposit. Those households have a length of use of RRH subsidies of just one day.
- More than one-quarter of households used RRH subsidies for between six months and one year (26%).
- Twenty-three percent used RRH subsidies for more than one year, and four percent used RRH rent subsidies for two years or more.

### How Did Length of RRH Subsidy Use Change over Time?

- Between 2019 and 2022, the share of households using RRH for three months or less dropped considerably from 44 percent to 34 percent.
- The share of households that used RRH for 18 months or longer grew from less than five percent in 2019, the year before the onset of the pandemic, to over 10 percent in 2022. This could reflect communities relaxing the time limits for RRH given the disruption of housing markets and the greater difficulty transitioning to permanent housing they could afford on their own during the COVID-19 Pandemic.

### What Was the Exit Location of Households after RRH Assistance Ended?

In 2022, 58 percent of family households and 65 percent of adult-only households who used RRH assistance to subsidize their permanent housing left the RRH program during the reporting period. This means that their subsidy ended but not necessarily that they moved from the housing unit the RRH program subsidized. For most RRH households, LSA data include their housing status at the time of exit.

- Nearly all households that left the RRH program remained in permanent housing immediately after leaving the program (81% of adult-only households and 88% of family households).
- Adult only households were more likely to exit to permanent housing with a subsidy (41%) than to permanent housing without a subsidy (35%). Families, in contrast, were slightly more likely to exit to permanent housing without a subsidy (43%) than

### EXHIBIT 7.6: Additional Characteristics of People Using Rapid Re-Housing Subsidies
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | | |
| **Chronic Homeless Status of Heads of Households and Adults** | | | | | | | |
| Chronic Patterns of Homelessness[a] | 15.0% | 18.0% | 18.7% | 8,775 | 38.9% | 4,499 | 16.8% |
| **Veteran Status of Heads of Households and Other Adults** | | | | | | | |
| Veteran | 22.3% | 20.1% | 16.5% | -5,749 | -17.2% | -2,323 | -7.8% |
| Non-Veteran | 77.5% | 79.4% | 83.1% | 23,018 | 19.8% | 20,814 | 17.6% |
| Unknown Veteran Status | 0.2% | 0.5% | 0.4% | 383 | 111.6% | -66 | -8.3% |
| **Domestic Violence Survivor Status of Heads of Households and Other Adults*** | | | | | | | |
| DV Survivors | 28.2% | 27.0% | 28.4% | 7,081 | 17.8% | 7,650 | 19.6% |
| Not DV Survivors | 71.6% | 72.8% | 71.3% | 16,476 | 16.3% | 11,934 | 11.3% |
| DV Status: Client Does Not know/refused | 0.2% | 0.2% | 0.2% | 160 | 72.5% | 158 | 70.6% |
| **Disability Status of Heads of Households and Other Adults*** | | | | | | | |
| With a Disability[b] | 51.7% | 54.5% | 57.6% | 18,693 | 24.2% | 15,406 | 19.1% |
| Without a Disability | 48.3% | 45.5% | 42.4% | -1,591 | -2.2% | 3,295 | 4.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.7.3

[a]HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/

*Percentages based on people with known domestic violence survivor status and disability status.

[b]HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

DOJ-HUD-AR01016

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

with one (41%).

- Very few households left RRH for permanent supportive housing (PSH), between two and three percent for each type of household.
- A small percentage of households that left RRH went directly to a homeless situation – four percent of adult-only households and two percent of family households.
- Approximately eight percent of both types of households doubled up with family or friends on either a permanent or a temporary basis, after the RRH subsidy ended.

### How Did the Location after RRH Assistance Ended Change over Time?

The share of households that were still using RRH subsidies at the end of the reporting period was higher in 2022 than it was in 2019, but lower than it was in 2021 for both family households and adult-only households. The share of households still using RRH subsidies increased from 30 percent of adult only households in 2019 to 42 percent in 2021. In 2022, the share dropped back to 35 percent. For families, the trend was similar, increasing from 39 to 51 percent of family households between 2019 and 2021 but declining to 42 percent in 2022.

- The share of family households that left RRH to permanent housing without a subsidy decreased considerably, from 60 percent of families in 2019 to 43 percent in 2022. The share that transitioned to other subsidized rental housing after RRH ended increased during the same period, from 24 percent to 41 percent.
- There was no change in the share of families leaving RRH subsidized housing for a homeless situation (2%).
- The share of adult-only households that lived in permanent housing without a subsidy immediately after RRH assistance ended decreased, from 49 percent in 2019 to 35 percent in 2022. Similar to families, the share that transitioned to other subsidized housing after RRH ended increased, from 32 to 41 percent between 2019 and 2022.
- The share of adult-only households that became homeless immediately following the end of RRH assistance increased slightly (from 3% to 4%). The share that died during the reporting period also increased slightly, from one to two percent.



**EXHIBIT 7.7: Characteristics of Rapid Re-housing Households by Geography**
2019-2022

Legend: Chronically Homeless Adult | Veterans | Currently Fleeing Domestic Violence

URBAN HOUSEHOLDS
- 2019: 18.9, 28.4, 10.9
- 2021: 20.6, 25.4, 10.5
- 2022: 20.8, 21.5, 11.0

SUBURBAN HOUSEHOLDS
- 2019: 14.9, 22.5, 9.4
- 2021: 20.8, 19.9, 10.5
- 2022: 22.2, 13.6, 9.9

RURAL HOUSEHOLDS
- 2019: 9.1, 18.3, 14.7
- 2021: 13.2, 14.1, 14.2
- 2022: 12.5, 14.0, 14.4

**EXHIBIT 7.8: Experience of Homelessness Immediately Prior to RRH Enrollment**



| Year | Sheltered | Unsheltered |
|------|-----------|-------------|
| 2019 | 62.9 | 37.1 |
| 2021 | 58.2 | 41.8 |
| 2022 | 54.0 | 46.0 |

### EXHIBIT 7.9: Other Programs Used by RRH Households
2019-2022

| Program Use | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Households | Adult-Only Households | Adult-Child Households | All Households | Adult-Only Households | Adult-Child Households | All Households | Adult-Only Households | Adult-Child Households |
| Used RRH only during reporting year | 71.4% | 67.0% | 78.4% | 71.9% | 67.4% | 81.3% | 69.9% | 65.6% | 80.7% |
| Used shelter programs* and RRH during reporting year | 24.1% | 26.5% | 20.4% | 23.5% | 26.4% | 17.4% | 24.6% | 27.5% | 17.5% |
| Used RRH and PSH during reporting year | 3.3% | 4.7% | 1.0% | 3.4% | 4.6% | 1.1% | 4.0% | 5.0% | 1.4% |
| Used shelter programs; RRH; and PSH during reporting year | 1.2% | 1.9% | 0.2% | 1.2% | 1.6% | 0.2% | 1.5% | 1.9% | 0.4% |

Data Source: Homeless Management Information Systems (HMIS) data
*This includes emergency shelter, transitional housing, and safe haven programs.

DOJ-HUD-AR01017

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

### EXHIBIT 7.10: Length of RRH Subsidy
2019-2022



Data Source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 7.11: Exit Status of Households using RRH
2019-2022



Data Source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 7.12: Destination of Exit for Households using RRH
2019-2022

|  | Adult-Only Households | | | Family Households | | |
|---|---|---|---|---|---|---|
|  | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| **Housing Status for Households that Exited RRH** | | | | | | |
| Permanent supportive housing (PSH) | 3.4% | 2.6% | 2.9% | 3.3% | 2.4% | 1.7% |
| Other types of permanent housing | 86.8% | 83.7% | 80.7% | 89.7% | 89.1% | 88.0% |
| Permanent housing, no subsidy | 48.6% | 40.2% | 34.6% | 60.3% | 55.5% | 42.7% |
| Permanent housing, with subsidy | 32.2% | 37.3% | 40.8% | 24.2% | 29.2% | 40.6% |
| Doubled up with friends or family (permanent) | 6.0% | 6.2% | 5.3% | 5.2% | 4.5% | 4.8% |
| Temporary housing | 2.1% | 3.0% | 3.4% | 2.5% | 2.9% | 3.5% |
| Doubled up with friends or family (temporary) | 1.8% | 2.4% | 2.8% | 2.3% | 2.5% | 3.0% |
| Other temporary housing | 0.3% | 0.6% | 0.6% | 0.3% | 0.4% | 0.5% |
| Homeless | 2.9% | 3.6% | 3.7% | 1.6% | 1.6% | 1.8% |
| Sheltered Homeless | 1.9% | 2.0% | 1.8% | 1.2% | 1.2% | 1.2% |
| Unsheltered homeless | 1.0% | 1.6% | 1.8% | 0.4% | 0.4% | 0.6% |
| Institutional setting | 2.0% | 2.2% | 2.2% | 0.6% | 0.6% | 0.5% |
| Unknown housing status | 2.2% | 3.6% | 5.8% | 2.2% | 3.0% | 4.1% |
| Deceased | 0.6% | 1.4% | 1.5% | 0.1% | 0.3% | 0.3% |

Data Source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01018

**ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES**

# Supportive Services for Veterans and their Families (SSVF)

SSVF offers RRH or homelessness prevention (HP) assistance to veteran households experiencing or at risk of experiencing homelessness. The RRH component of SSVF provides short-term subsidies in permanent rental housing to households leaving homelessness. SSVF RRH has served an increasing number of veterans each year since the program was implemented in FY 2012. The information presented in this section references the SSVF FY 2022 Annual Report, and does not use data from the Longitudinal Systems Analysis platform of HMIS data on which the rest of this chapter is based. This section provides additional information on the characteristics of the participants or veterans served by the RRH component of SSVF, and shows where veterans were staying after they stopped receiving RRH assistance.

The SSVF program primarily served RRH participants in households without children in FY 2022. Seventy-eight percent of SSVF RRH participants were in households without children, and most were living alone.

About 61 percent of the veterans served by SSVF RRH in FY 2022 had exited the program by the end of the year. Of those veterans who stopped receiving the SSVF RRH assistance, nearly two-thirds (65%) transitioned to permanent housing. This includes households that remained in the SSVF supported housing units without ongoing assistance. Of the universe of households that exited to permanent housing, a plurality (45%) exited to PSH that was funded through the HUD-VA Supportive Housing (VASH) program. More than one-quarter exited to rental housing without assistance, and 14 percent to other subsidized rental housing.

Of veterans who stopped receiving SSVF RRH assistance and did not exit to permanent housing, 23 percent returned to the experience of homelessness and eight percent exited to another destination, which includes unknown destinations and deceased.

Excluded from the percentage of veterans and their household members who exited SSVF for permanent housing are the households that received an ongoing housing support beyond the initial term of SSVF. SSVF's Shallow Subsidy service provides veterans (and their household members) two years of additional financial assistance to support stabilization in the housing unit. These veterans remain in permanent housing, but due to the ongoing assistance are not included in veterans that exited SSVF.

**EXHIBIT 7.13:** Household Type and Program Exit Experience of Veterans and Household Members Served in SSVF Rapid Re-Housing Programs
FY 2022

| Total Participants Served | 100.00% |
|---|---|
| **Household Type** | |
| Without children | 77.6% |
| With children | 22.4% |
| **Destination at Exit** | |
| Permanent Destination | 65.1% |
| Homeless Situation | 23.3% |
| Other Destination (including unknown) | 7.8% |
| Institutional Destination | 3.8% |
| **Ongoing Shallow Subsidy Support** | |
| Number of Veterans that Received Shallow Subsidy | 2,457 |

Source: SSVF-HMIS Repository Data for FY 2022
Note: In FY 2022, the U.S. Department of Veterans Affairs modified the methodology they used to analyze household use of SSVF RRH programs. Data presented in this section thus differs from prior reports. For details on this change, please review the SSVF FY 2022 Annual Report.

**EXHIBIT 7.14:** Percent of SSVF RRH Veterans that Exited to Permanent Housing by Destination Type



- ■ Rental Housing without Subsidy
- ■ Rental Housing with VASH (PSH)
- ■ Rental Housing without Subsidy
- ■ Living with Family or Friends on a Permanent Basis
- ■ Other Situations

DOJ-HUD-AR01019

# 2022
# People Living in Permanent Supportive Housing

Overview of Estimates of People in Permanent Supportive Housing..........................................8-2
   How many People Lived in PSH During 2022?..........................................................................8-2
   How Did Estimates of People Living in PSH Change over Time?..............................................8-2
Characteristics of People Living in PSH in 2022..........................................................................8-3
   What Were the Demographic Characteristics of Households in PSH in 2022?..........................8-3
   How Have the Demographic Characteristics of Households in PSH Changed over Time?........8-4
   Where Did Households in PSH Live?..........................................................................................8-4
   How Did the Location of PSH Households Change over Time?..................................................8-4
   What are the Other Characteristics of Households in PSH?......................................................8-5
   How Have Additional Characteristics of Households Living in PSH Changed over Time?........8-5
Engagement of Households with the Homelessness services system..........................................8-5
   How Long Do Households Live in PSH?....................................................................................8-6
   How Has Length of Time in Shelter Programs Changed over Time?..........................................8-6
   Where Do Households Go after Leaving PSH?..........................................................................8-7
   How Did Exit Status and Destination of Exit Change over Time?..............................................8-7
Veterans Using PSH Provided by the HUD-VASH Programs ......................................................8-9
HOMES data and HMIS data......................................................................................................8-9

DOJ-HUD-AR01020

# People Living in Permanent Supportive Housing

## IN 2022

**388,000 people lived in PSH in 2022, 3 percent fewer than did in 2019.**

## Overview of Estimates of People in Permanent Supportive Housing

Approximately **388,000 people lived in Permanent Supportive Housing (PSH)** at some point between October 1, 2021, and September 30, 2022. PSH is designed to serve people who have experienced homelessness, often for long periods of time, and who have disabilities that reduce their ability to maintain housing without additional support. PSH programs provide permanent housing combined with optional intensive supportive services to stabilize people leaving their experience of homelessness in housing they can stay in as long as they comply with the lease. While optional, providers encourage participation in supportive services. PSH has been an important HUD priority for many years, and recent years have seen substantial increased investment in the HUD Veterans Affairs Supportive Housing (VASH) program, which is PSH dedicated to serving veterans. PSH can be based in dedicated properties or in scattered-site units[1] rented in the private market.

### How many People Lived in PSH During 2022?

- An estimated 387,694 people in 292,501 households lived in PSH at some point during 2022. More than two-thirds of all people living in PSH were people in adult-only households (70% or 272,755 people).
- In 2022, just under one-third of PSH residents were people in families with children (30% or 114,016 people).

### How Did Estimates of People Living in PSH Change over Time?

- Between 2019 and 2022, the number of people living in PSH decreased by three percent. Most of this change occurred between 2019 and 2021, with the number of people living

1   Scattered site means project units located at more than one physical location.

### EXHIBIT 8.1: One-Year Estimates of People Using Permanent Supportive Housing
2019-2021

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | # | # | # | # | % | # | % |
| Number of Households | 293,439 | 281,984 | 292,501 | -938 | -0.3% | 10,517 | 3.7% |
| Number of People | 401,428 | 378,346 | 387,694 | -13,734 | -3.4% | 9,349 | 2.5% |
| **People by Household Type** | # | % of Total | # | % of Total | # | % of Total | # | % | # | % |
| Number of PSH Residents in Adult-Only (AO) Households | 266,604 | 66.4% | 262,256 | 69.3% | 272,755 | 70.4% | 6,151 | 2.3% | 10,499 | 4.0% |
| Number of PSH Residents in Adult-Child (AC) Households | 133,407 | 33.2% | 115,011 | 30.4% | 114,016 | 29.4% | -19,391 | -14.5% | -996 | -0.9% |

Data Source: Homelessness Management Information Systems (HMIS) data
Note: percentages in AO and AC households do not sum to 100 due to households appearing in both household types during the reporting period.

### EXHIBIT 8.2: Change in People in PSH, RRH and Shelter Programs
2019, 2021, and 2022

| Population | Change in People 2019-2022 | | Change in Households 2019-2022 | | Change in People 2021-2022 | | Change in Households 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| Living in Permanent Supportive Housing | -13,734 | -3.4% | -938 | -0.3% | 9,349 | 2.5% | 10,517 | 3.7% |
| Using Rapid Re-housing Subsidies | -4,066 | -1.6% | 20,411 | 16.1% | 19,718 | 8.3% | 18,052 | 14.0% |
| Staying in Shelter Programs | -67,774 | -4.7% | -35,758 | -3.2% | 174,893 | 14.4% | 127,938 | 13.6% |

DOJ-HUD-AR01021

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

in PSH decreasing from 401,428 to 378,346. The number of households decreased by less than one percent between 2019 and 2021, as some of the drop in the number of people resulted from PSH serving fewer families and more single adults.

- Between 2019 and 2022, the number of people in family households living in PSH decreased by 15 percent. In contrast, the number of people in adult-only households living in PSH increased by two percent between 2019 and 2022.
- The decline in the number of households between 2019 and 2021 may reflect shortages of staff during the COVID-19 era for referring people to PSH developments and providing housing navigation for scattered-site PSH. The lack of growth in the number of households in PSH during the entire three-year period may reflect increases in rents that meant PSH could serve fewer households with the same resources.
- Between 2021 and 2022, the number of people in adult-only households living in PSH increased from 262,256 to 272,755 (a 4% increase), while the number of people in families with children living in PSH remained largely unchanged, declining by just one percent. A reason for the continued drop in households with children could be that some communities are not emphasizing the use of PSH for families based on the greater numbers of adult-only households that need intensive services as well as permanent housing.

# Characteristics of People Living in PSH in 2022

## What Were the Demographic Characteristics of Households in PSH in 2022?

- In 2022, PSH households were somewhat more likely to be headed by men (63%) compared to households in shelters (60%). This reflects the heavy use of PSH by adult-only households.
- About one percent of residents of PSH identified as transgender (0.7%), questioning (less than 0.1%), or a gender that was not singularly 'male' or 'female' (0.2%). This is similar to the gender characteristics of the sheltered population.
- The share of PSH residents who were elderly or near elderly (aged 55 and older) was much higher than the share of people experiencing sheltered homelessness (40% vs. 18%), reflecting the greater vulnerability of people to chronic health conditions (such as heart disease and diabetes) and disabilities as they age.
- In 2022, a smaller share of people living in PSH belonged to households with Hispanic or Latino/a/x heads, compared to people using shelter programs (14% vs. 23%). In 2022, a larger share of people living in PSH belonged to households

**EXHIBIT 8.3a: Demographic Characteristics of People Living in Permanent Supportive Housing and People Living in Shelters[a]**
By Gender and Age, 2019, 2021, and 2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Permanent Supportive Housing Residents | People in Shelters | Permanent Supportive Housing Residents | People in Shelters | Permanent Supportive Housing Residents | People in Shelters |
| **Gender of Heads of Households** | | | | | | |
| Woman (or girl) | 37.1% | 38.9% | 35.8% | 38.7% | 36.4% | 39.2% |
| Man (or boy) | 62.3% | 60.7% | 63.6% | 60.6% | 63.4% | 60.0% |
| Non-Singular* | 0.1% | 0.1% | 0.1% | 0.2% | 0.2% | 0.3% |
| Questioning | | | <0.1% | <0.1% | <0.1% | 0.1% |
| Transgender | 0.6% | 0.3% | 0.6% | 0.6% | 0.7% | 0.5% |
| **Age of All People in the Household** | | | | | | |
| Under age 18 | 19.4% | 22.7% | 17.7% | 20.6% | 17.4% | 20.7% |
| 18-24 | 4.8% | 9.7% | 4.8% | 8.8% | 5.0% | 9.7% |
| 25-34 | 10.0% | 18.8% | 9.0% | 18.1% | 9.2% | 19.3% |
| 35-44 | 12.4% | 16.5% | 12.6% | 17.5% | 13.4% | 17.8% |
| 45-54 | 19.0% | 15.6% | 16.7% | 15.3% | 16.4% | 14.0% |
| 55-64 | 26.4% | 12.9% | 27.5% | 14.7% | 26.6% | 13.3% |
| 65 and older | 8.0% | 3.6% | 11.8% | 5.1% | 13.6% | 5.1% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.8.1
[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution. Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01022

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

with White, non-Hispanic/non-Latino/a/x heads (40%), compared to people using shelter programs (37%).

- Approximately 44 percent of heads of PSH households identified as Black, African, or African American. This is higher than the share of heads of households using shelter programs who were Black in 2022 (37%).
- A smaller share of people living in PSH belonged to households with Native American heads (2%), compared to people using shelter programs (3%).

### How Have the Demographic Characteristics of Households in PSH Changed over Time?

In general, the characteristics of people using PSH change little year to year. However, data show distinct changes for some populations in their access to PSH programs before and after the onset of the pandemic, comparing 2022 with 2019, the pre-pandemic comparison year. Between 2019 and 2022, the most notable change occurred in the number of elderly adults (people over the age of 64) living in PSH.

- Both the share and the number of people in PSH aged 65 and older increased between 2019 and 2022. The share of people living in PSH aged 65 and older grew from eight percent in 2019 to 14 percent in 2022. The number of people living in PSH aged 65 and older increased by 62 percent over this period.
- In contrast, both the share and the number of people in PSH below the age of 35 decreased between 2019 and 2022. The share of people living in PSH below the age of 35 decreased from 34 percent in 2019 to 32 percent in 2022. The number of people living in PSH below the age of 35 decreased by 12 percent.

### Where Did Households in PSH Live?

- More than three-fourths of households living in PSH did so in urban areas (79%) in 2022. This is similar to the percentage of households staying in shelters who did so in urban areas (78%) but higher than the percentage of households using RRH subsidies in urban areas (65%).
- In 2022, 17 percent of households living in PSH were in suburban areas, slightly higher than the share of households using shelters in suburban areas (15%) but lower than the share of households using RRH subsidies in suburban areas (26%).
- Only four percent of households living in PSH were in rural areas, lower than the share of households staying in shelters in rural areas (7%) and less than half the share of households using RRH subsidies who were in rural areas (10%).

### How Did the Location of PSH Households Change over Time?

- Between 2019 and 2022, the share of households living in PSH located in urban areas increased from 74 to 79 percent, while the share of people staying in shelters there remained relatively flat, and the share using RRH subsidies dropped.

**EXHIBIT 8.3b: Demographic Characteristics of People Living in Permanent Supportive Housing and People Living in Shelters[a]**
*By Ethnicity and Race, 2019, 2021, and 2022*

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Sheltered People | U.S. Population Living in Poverty | Sheltered People | U.S. Population Living in Poverty | Sheltered People | U.S. Population Living in Poverty |
| **Ethnicity of Heads of Households** | | | | | | |
| Hispanic/Latino/a/x | 11.7% | 15.8% | 11.0% | 19.3% | 13.6% | 22.6% |
| Non-Hispanic/Non-Latino/a/x | 88.3% | 84.2% | 89.0% | 80.8% | 87.1% | 77.4% |
| **Race of Heads of Households** | | | | | | |
| Asian or American | 0.8% | 0.7% | 0.7% | 1.1% | 1.1% | 1.0% |
| Black, African, or African American | 42.2% | 40.5% | 44.7% | 38.6% | 43.5% | 36.6% |
| Multiple Races | 3.4% | 3.5% | 3.0% | 3.7% | 3.6% | 4.0% |
| Native American/American Indian or Alaska Native | 1.9% | 3.0% | 1.7% | 3.0% | 2.1% | 3.2% |
| Native Hawaiian or Pacific Islander | 0.5% | 0.9% | 0.4% | 0.9% | 0.8% | 1.0% |
| White, Hispanic/Latino/a/x | 8.7% | 10.8% | 8.0% | 14.0% | 9.8% | 16.9% |
| White, Non-Hispanic/Non-Latino/a/x | 42.5% | 40.6% | 41.4% | 38.3% | 39.8% | 36.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.8.1
[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.
Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01023

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

- The share of households living in PSH located in suburban areas decreased between 2019 and 2022, from 22 percent to 17 percent.

### What Were the Other Characteristics of Households in PSH?

- Thirty percent of PSH households included a veteran in 2022. This reflects the large share of PSH made available to veterans through the HUD-VASH voucher program. HUD-VASH is discussed further at the end of this chapter.
- In 2022, more than one in every five heads of household and other adults living in PSH was a survivor of domestic violence (21%), and four percent were currently fleeing unsafe situations. It is important to note that these data represent survivors of domestic violence who lived in permanent supportive housing that was not operated by victim service providers, which do not report client information. Accordingly, estimates should not be considered the full estimate of survivorship among people served in permanent supportive housing programs. Given the way data are reported, it is not possible to show the percentage of adults in each geographic category who are survivors of domestic violence. However, data are available on the share of people *currently fleeing* domestic violence by type of geography. In 2022, rural areas had the highest share of people in PSH who were currently fleeing unsafe situations, eight percent.
- In 2022, a high percentage of adults living in PSH had a disability, 85 percent, consistent with the targeting of most PSH to people with disabilities. The percentage of adults in PSH with a disability may be less than 100 in part because this includes all adults in the household, not just the adult with the disability that qualified the household for PSH.

### How Have Additional Characteristics of Households Living in PSH Changed over Time?

In general, the share of heads of households and other adults in PSH who had a disability or were domestic violence survivors changed little between 2019 and 2022. The share and number of veterans living in PSH decreased between 2019 and 2022.

# Engagement of Households with the Homelessness services system

Data collected through the Longitudinal System Analysis (LSA) data provides information related to how people engage with the homelessness services system. For households in PSH, this includes information on how long they lived in PSH and the destination of those who exited PSH.

- In 2022, 90 percent of all households living in PSH did not use other parts

**EXHIBIT 8.4: Geographic Location of Residents of Permanent Supportive Housing, Households Using RRH Subsidies, and Households Staying in Shelters**
2019, 2021, and 2022



Data Source: Homeless Management Information Systems (HMIS) data

**EXHIBIT 8.5: Additional Characteristics of People Living in Permanent Supportive Housing**
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| **Domestic Violence (DV) Survivor Status of Heads of Households and Adults\*** | | | | | | | |
| DV Survivors | 20.2% | 19.9% | 21.0% | -1,925 | -3.1% | 2,622 | 4.6% |
| Not DV Survivors | 77.9% | 79.2% | 78.2% | -15,316 | -6.4% | -4,803 | -2.1% |
| DV Status: Client Doesn't know/refused | 1.9% | 1.0% | 0.8% | -3,513 | -59.5% | -378 | -13.6% |
| **Disability Status of Heads of Households and Adults\*** | | | | | | | |
| With a disability[a] | 84.9% | 84.2% | 85.3% | -5,868 | -2.2% | 4,760 | 1.9% |
| Without a disability | 15.1% | 15.8% | 14.7% | -2,692 | -5.7% | -3,027 | -6.4% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.8.2
*Percentages based on people with known domestic violence survivor status and disability status.
[a] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

# ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

of the homelessness services system during the year. This differed somewhat by household type. About 90 percent of adult-only households lived only in PSH during the year compared with 93 percent of family households.

- In 2022, six percent of PSH households used both PSH and a shelter program. A higher share of adult-only households (7%) did so than families with children (4%).
- In 2022, three percent of all households in PSH used RRH subsidies and PSH during the reporting period. Less than one percent used PSH, RRH subsidies, and shelter programs during the reporting period.
- Between 2019 and 2022, the share of households that used only PSH during the reporting period increased slightly (from 88% to 90%).

## How Long Do Households Live in PSH?

- PSH provides long-term subsidized housing. Most households who have left their experience of homelessness for PSH remain in PSH for extended periods of time. In 2022, nearly four in ten households residing in PSH had lived in PSH for five years or more (39%), and more than half (58%) had lived in PSH for more than three years.
- In 2022, only three percent of households had lived in PSH for three months or less, and 16 percent had lived there for less than a year.

## How Has Length of Time in Shelter Programs Changed over Time?

- Between 2019 and 2022, the number of households living in PSH for shorter lengths of time declined. The number

**EXHIBIT 8.6: Characteristics of Adults in Permanent Supportive Housing by Geography**
2019, 2021, and 2022

| Characteristic | Urban Households | | | Suburban Households | | | Rural Households | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Veteran | 28.8% | 32.3% | 29.9% | 36.9% | 25.3% | 29.4% | 20.6% | 39.2% | 29.0% |
| Domestic Violence Survivor | 3.3% | 3.2% | 3.5% | 3.2% | 4.6% | 4.0% | 7.7% | 6.0% | 7.5% |

Data Source: Homeless Management Information Systems (HMIS) data

**EXHIBIT 8.7: Program Use by People Living in PSH**
2019, 2021, and 2022

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Households | Adult-Only Households | Adult-Child Households | All Households | Adult-Only Households | Adult-Child Households | All Households | Adult-Only Households | Adult-Child Households |
| Enrolled in PSH only during reporting year | 88.3% | 87.7% | 91.7% | 89.7% | 89.1% | 94.4% | 90.0% | 89.7% | 92.8% |
| Enrolled in both shelter programs and PSH during reporting year | 6.9% | 7.2% | 5.1% | 6.4% | 6.8% | 3.3% | 6.4% | 6.8% | 3.8% |
| Enrolled in RRH and PSH during reporting year | 3.6% | 3.7% | 2.7% | 3.0% | 3.1% | 2.0% | 2.7% | 2.6% | 2.8% |
| Enrolled in shelter programs, RRH, and PSH during reporting year | 1.3% | 1.4% | 0.6% | 0.9% | 1.0% | 0.4% | 0.9% | 0.9% | 0.6% |

Data Source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01025

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

of households living in PSH for less than three months declined by 23 percent, and the number of households in PSH for between three and six months dropped by 27 percent. This could reflect reduced PSH placements during the pandemic. More recently – between 2021 and 2022 – the number of households in PSH for less than three months *increased* by four percent, as did the number of households in PSH for between three and six months (by 7%).

- Between 2019 and 2022, the *number* of households in PSH for five years or longer increased by 30 percent, and the *share* of households in PSH for five years or longer increased from 30 to 39 percent.

### Where Do Households Go after Leaving PSH?

In 2022, only a small share of households left PSH during the reporting period, which is expected given the long-term nature of the program. Eighty-seven percent of both adult-only and family households living in PSH at some point during 2022 were still living in PSH on the last day of the reporting period. For the 13 percent of households that exited during the 2022 reporting period, LSA data include their destination and housing status at the time of exit.

- More than two in five PSH households transitioned from PSH to another permanent housing destination (41%).
- One in five heads of adult-only households that were not active on the last day of the 2022 reporting period had died at some point during the year.
- Just under two-thirds of family households exited PSH to another permanent housing destination (64%), not including PSH. For the most part, families left to go to their own housing either with a subsidy (30%) or without a subsidy (22%). About one in every five family households (19%) that left PSH was doubled-up with friends or family on either a permanent or temporary basis. A small percentage of family households that left PSH returned to experiencing homelessness (5%).
- The share of adult-only households that left PSH and were living in another permanent housing arrangement was markedly lower than the percent of families who left PSH for another permanent housing arrangement (38% vs. 64%). Adult-only households were almost twice as likely to exit directly to homelessness (9% vs 5%). For adult-only households, exits to experiencing homelessness were distributed evenly across sheltered and unsheltered locations. In contrast, the majority of family households that exited PSH to experiencing homelessness again exited to sheltered locations.

### How Did Exit Status and Destination of Exit Change over Time?

Between 2019 and 2022, the share of households that were no longer in PSH on the last day of the reporting period declined slightly from 15 percent to 13 percent. The number of households exiting PSH decreased by 17 percent over this period.

- Among households that exited PSH, the share of households no longer in PSH who exited to other permanent housing situations decreased for both household types between 2019 and 2022. However, between 2021 and 2022, the share of exits to other permanent housing situations increased modestly for both adult-only and family households.



**EXHIBIT 8.8: Length of Stay of Households Living in Permanent Supportive Housing**
2019-2021

Data Source: Homeless Management Information Systems (HMIS) data



**EXHIBIT 8.9: Exit Status of PSH Households**
2019-2022

Data Source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01026

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

- Between 2019 and 2022, the share of households exiting PSH to experiencing homelessness again increased from six to nine percent, and the *number* of households exiting PSH to experiencing homelessness increased by 10 percent. Increases in the share of PSH exits to experiencing homelessness were experienced by both adult-only households (7% to 9%) and family households (2% to 5%).

- Between 2019 and 2022, the share of heads of adult-only households who died at some point during the reporting period increased from 13 percent to 20 percent, and the *number* of heads of households that died at some point during the reporting period increased by 31 percent (or about 1,500 people). Most of the increase in PSH deaths occurred between 2019 and 2021—that is, during the height of the COVID-19 pandemic. However, deaths between 2020 and 2021 remained well above pre-pandemic levels.

**EXHIBIT 8.10: Destination for Households in Permanent Supportive Housing**
2019, 2021, and 2022

| Housing Status for Households that Exited PSH | All Households | | | Adult-Only Households | | | Families with Children | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Permanent supportive housing (PSH)[a] | 1.7% | 7.0% | 2.4% | 1.7% | 7.1% | 2.3% | 1.7% | 6.2% | 2.9% |
| Other types of permanent housing | 51.1% | 39.1% | 40.8% | 48.4% | 36.3% | 37.6% | 68.8% | 61.5% | 64.1% |
| Permanent housing, no subsidy | 17.6% | 12.9% | 12.8% | 16.2% | 11.3% | 11.5% | 27.1% | 25.3% | 22.4% |
| Permanent housing, with subsidy | 21.5% | 15.8% | 17.5% | 20.2% | 14.5% | 15.8% | 29.8% | 25.6% | 30.0% |
| Doubled up with friends or family (permanent) | 12.0% | 10.4% | 10.5% | 12.0% | 10.4% | 10.4% | 11.9% | 10.7% | 11.7% |
| Temporary housing | 7.3% | 6.5% | 7.0% | 7.2% | 6.0% | 6.8% | 7.8% | 10.3% | 8.5% |
| Doubled up with friends or family (temporary) | 6.3% | 5.3% | 6.0% | 6.2% | 4.8% | 5.8% | 6.9% | 9.3% | 7.7% |
| Other temporary housing | 1.0% | 1.2% | 1.0% | 1.0% | 1.2% | 1.0% | 0.9% | 1.0% | 0.9% |
| Return to Experiencing Homelessness | 6.4% | 6.5% | 8.5% | 7.0% | 6.9% | 9.0% | 2.1% | 3.4% | 4.6% |
| Experiencing Sheltered Homelessness | 4.2% | 3.5% | 4.6% | 4.6% | 3.6% | 4.8% | 1.9% | 2.5% | 2.9% |
| Experiencing Unsheltered homelessness | 2.1% | 3.0% | 3.9% | 2.4% | 3.3% | 4.2% | 0.2% | 0.9% | 1.7% |
| Institutional setting | 9.9% | 9.8% | 10.3% | 10.9% | 10.7% | 11.4% | 3.6% | 3.3% | 2.6% |
| Unknown housing status | 12.4% | 12.2% | 13.5% | 12.2% | 12.5% | 13.4% | 13.3% | 9.9% | 13.9% |
| Deceased | 11.2% | 18.9% | 17.6% | 12.6% | 20.6% | 19.5% | 2.6% | 5.4% | 3.5% |

Data Source: Homelessness Management Information Systems (HMIS) data;
[a]Data on people leaving PSH for other PSH projects include programs that closed and transitioned clients to other PSH programs, projects that merged but administratively transitioned clients, and clients that moved from one PSH project to another for other reasons.

DOJ-HUD-AR01027

ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

# Veterans Using PSH Provided by the HUD-VASH Programs

The HUD-VASH Program for homeless veterans and their families is a PSH program that combines long-term rental assistance with case management and clinical services. HUD provides rental assistance through the Housing Choice Voucher (HCV) program, and the voucher is usually tenant-based and used in scattered-site housing in the private market. The Department of Veterans Affairs (VA) provides case management and clinical services through VA medical centers (VAMCs) and community-based outpatient clinics (CBOCs).

The VA's Homeless Operations Management and Evaluation System (HOMES) provides information about veterans who use HUD-VASH. The VAMCs and CBOCs that administer the HUD-VASH program are required to report data into HOMES, and many do not also provide information to a Homeless Management Information System (HMIS). Although data from HOMES are similar to HMIS data in some respects, the information reported in this section on the characteristics of veterans in HUD-VASH cannot be compared directly to the LSA-based information on veterans in PSH shown earlier in this chapter.

As of the end of FY 2022, 190,332 veterans had been housed through the HUD-VASH program at some point since the program underwent significant expansion in 2008. At the end of FY 2021, 80,501 HUD-VASH vouchers were currently under lease. Some are included in the veterans in PSH reported earlier in this chapter, but many are not.

### HOMES data and HMIS data

- HOMES provides data from the VA's system of care for veterans experiencing homelessness. Submission of data is mandatory for VAMCs and CBOCs. HMIS provides data from the Continuums of Care that serve a broad population of people experiencing homelessness, including veterans. Participation in HMIS is mandatory for grantees of HUD homeless assistance programs but not for all providers of PSH. PHAs that provide HUD-VASH or other housing assistance to people experiencing homelessness are not required to participate in HMIS, although some do.

- Data elements, definitions, and guidelines differ between HOMES and HMIS.

- Both HOMES and HMIS data cover veterans using programs at any time during a year.

Most veterans using HUD-VASH vouchers in 2022 were men, 87 percent.[2] In 2022, half of veterans using HUD-VASH vouchers (50%) identified themselves as White, 43 percent as Black or African American, and 5 percent as some other race. When asked about their ethnicity, eight percent identified themselves as Hispanic or Latino of any race. Veterans using HUD-VASH

2  The information is based on the veteran in the household, excluding other household members who may be in the HUD-VASH unit.

**EXHIBIT 8.11: Characteristics of Veterans Using HUD-VASH PSH**
FY 2020-2022

| Characteristic | % Veterans Vouchered in HUD-VASH | | |
|---|---|---|---|
| | 2020 | 2021 | 2022 |
| **Gender** | | | |
| Male | 87.8% | 87.5% | 87.2% |
| Female | 11.9% | 12.2% | 12.5% |
| Other Gender[a] | 0.3% | 0.3% | 0.3% |
| **Ethnicity** | | | |
| Hispanic/Latino/a/x | 8.6% | 8.8% | 8.2% |
| Non-Hispanic/Non-Latino/a/x | 87.6% | 87.2% | 85.1% |
| Unknown | 3.8% | 4.0% | 6.7% |
| **Race** | | | |
| White | 52.1% | 52.6% | 50.3% |
| Black or African American | 39.3% | 38.5% | 43.0% |
| Other one race | 5.0% | 5.1% | 4.8% |
| Unknown | 3.6% | 3.8% | 2.0% |
| **Age** | | | |
| 18 to 30 | 5.5% | 4.7% | 2.5% |
| 31 to 50 | 27.4% | 27.1% | 22.4% |
| 51 to 61 | 36.5% | 34.6% | 28.0% |
| 62 and older | 30.5% | 33.6% | 47.1% |
| **Destination at Exit[b]** | | | |
| Deceased | 8.8% | 11.9% | 14.9% |
| Homeless | 3.1% | 3.4% | 4.3% |
| Housing[c] | 65.9% | 65.2% | 61.6% |
| Institutional settings[d] | 9.1% | 8.0% | 8.2% |
| Other settings[e] | 13.1% | 11.5% | 11.1% |

Source: Homeless Operations Management Evaluation System (HOMES) data
[a] Gender categories in HOMES database differ from HMIS
[b] Destination is only calculated for veterans who left the program, which is a small proportion of the total veterans described in the other characteristics.
[c] Housing includes a number of situations, including owned and rented housing that may be subsidized or not subsidized and permanent or temporary (such as staying with family or friends) and transitional housing.
[d] Institutional Settings include psychiatric facilities, non-psychiatric hospitals, correctional facilities, and non-VA and VA residential treatment programs.
[e] For destination at exit, unknown destinations are included in "other" settings.

DOJ-HUD-AR01028

**ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022**

housing vouchers typically were 51 years of age or older (75%), with nearly a quarter between the ages of 31 and 50 (22%), and very few (3%) between 18 and 30.

Approximately 62% of Veterans leaving HUD-VASH programs in FY 2022 went to another housing situation (which could be either permanent or temporary), eight percent went to an institutional setting, four percent became homeless, 15 percent were reported as deceased, and 11 percent went to other or unknown settings.

DOJ-HUD-AR01029





The U.S. Department of
Housing and Urban Development
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

DOJ-HUD-AR01030



# CICERO INSTITUTE



## 2024 NATIONAL
# Public Safety and Homelessness Poll

**1. Which of the following three entities do you think is best equipped to successfully prepare inmates for re-entry into society: the government, private for-profit businesses, or nonprofit organizations?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Government* | 30% | 24% | 29% | **27%** |
| *For-Profit Business* | 26% | 20% | 18% | **21%** |
| *Nonprofit Organizations* | 44% | 56% | 53% | **51%** |

**2. Prisons are funded primarily based on the number of inmates they hold. Would you support or oppose tying a portion of prisons' funding to their inmate rehabilitation success rates?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 49% | 50% | 58% | **52%** |
| *Oppose* | 18% | 17% | 11% | **15%** |
| *Unsure* | 34% | 33% | 31% | **33%** |

**3. Would you support or oppose providing bonus funding to prisons that have higher-than-average inmate rehabilitation success rates?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 50% | 55% | 64% | **56%** |
| *Oppose* | 22% | 15% | 16% | **17%** |
| *Unsure* | 28% | 31% | 20% | **26%** |

DOJ-HUD-AR01031

**4.** **Would you support or oppose offering non-violent individuals time off the length of their probation or parole if they maintain steady employment or complete an approved job skills program?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 69% | 73% | 79% | **73%** |
| *Oppose* | 13% | 10% | 11% | **11%** |
| *Unsure* | 19% | 17% | 10% | **15%** |

**5.** **Would you support or oppose reducing the length of probation or parole for non-violent individuals if they successfully complete a substance abuse or mental health program?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 57% | 62% | 68% | **62%** |
| *Oppose* | 25% | 16% | 16% | **19%** |
| *Unsure* | 17% | 23% | 16% | **19%** |

**6.** **Which of the following two options do you think is the biggest root cause of chronic homelessness: mental illness and addiction, or lack of affordable housing and low wages?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Mental Illness and Addiction* | 59% | 59% | 51% | **57%** |
| *Lack of Affordable Housing/Low Wages* | 28% | 23% | 39% | **30%** |
| *Unsure* | 13% | 18% | 10% | **13%** |

**7.** **Should homeless individuals be required to participate in job training, mental health, and sobriety programs as a condition of receiving taxpayer-funded housing benefits?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Yes* | 70% | 67% | 71% | **69%** |
| *No* | 14% | 17% | 16% | **16%** |
| *Unsure* | 16% | 17% | 13% | **15%** |

DOJ-HUD-AR01032

**8.  Do you think it is more compassionate to allow homeless individuals to camp wherever they choose or to move them into shelters?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Camp Wherever They Choose* | 13% | 10% | 10% | **11%** |
| *Move Into Shelters* | 69% | 68% | 78% | **72%** |
| *Unsure* | 18% | 21% | 12% | **17%** |

**9.  Should homeless individuals be allowed to camp on public property such as sidewalks or city parks?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Yes* | 15% | 11% | 20% | **15%** |
| *No* | 73% | 69% | 66% | **69%** |
| *Unsure* | 12% | 20% | 14% | **15%** |

**10.  Would you support or oppose creating designated homeless camping areas with access to hygiene facilities and social services that are away from business and residential areas?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 58% | 68% | 74% | **67%** |
| *Oppose* | 23% | 13% | 14% | **17%** |
| *Unsure* | 19% | 19% | 12% | **17%** |

**11.  Would you support or oppose establishing drug-free zones around homeless service provider facilities?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 57% | 62% | 69% | **63%** |
| *Oppose* | 18% | 10% | 12% | **14%** |
| *Unsure* | 25% | 27% | 19% | **24%** |

DOJ-HUD-AR01033

**12. Would you support or oppose increasing fines and penalties for selling drugs at or near homeless service facilities?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 68% | 61% | 71% | 67% |
| *Oppose* | 15% | 17% | 18% | 16% |
| *Unsure* | 17% | 22% | 12% | 17% |

**13. Would you support or oppose criminal penalties for homeless service providers who knowingly permit drug trafficking or drug use at their facilities?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 59% | 58% | 64% | 60% |
| *Oppose* | 18% | 16% | 19% | 18% |
| *Unsure* | 22% | 27% | 17% | 22% |

**14. Would you support or oppose revoking a homeless service provider's license to operate if they are repeatedly found guilty of allowing drug trafficking or drug use at their facilities?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 73% | 76% | 78% | 75% |
| *Oppose* | 18% | 8% | 14% | 13% |
| *Unsure* | 9% | 16% | 8% | 11% |

**15. Would you support or oppose auditing taxpayer-funded homeless service providers for how they spend their funding?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Support* | 66% | 69% | 64% | 66% |
| *Oppose* | 14% | 7% | 11% | 10% |
| *Unsure* | 20% | 25% | 25% | 23% |

DOJ-HUD-AR01034

**16. How often do you or your family avoid areas where there are individuals sleeping on sidewalks or park benches?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Always* | 34% | 28% | 26% | **30%** |
| *Usually* | 27% | 22% | 19% | **23%** |
| *Sometimes* | 20% | 26% | 36% | **27%** |
| *Never* | 18% | 24% | 19% | **21%** |

**17. How often do you or your family avoid places like convenience stores or gas stations where there are aggressive panhandlers?**

|  | GOP | IND | DEM | ALL VOTERS |
|---|---|---|---|---|
| *Always* | 42% | 30% | 30% | **34%** |
| *Usually* | 21% | 25% | 23% | **23%** |
| *Sometimes* | 19% | 24% | 32% | **25%** |
| *Never* | 18% | 21% | 15% | **18%** |



**DEMOGRAPHICS**

| 33% GOP | 34% IND | 33% DEM | 43% 18–44 | 32% 45–65 | 25% 65+ | 48% MALE | 52% FEMALE |
|---|---|---|---|---|---|---|---|
| **PARTY ID** | | | **AGE** | | | **GENDER** | |

Results for this poll were collected using a sampling frame that gathered responses from 1,117 likely national voters during live calls, online panels, and automated telephone interviews conducted by Cor Strategies, Inc.

The survey was conducted October 7–11, 2024. The margin of sampling error is ±2.94 percentage points. The margin of sampling error may be higher or lower for subgroups. Results presented may not always appear to total 100 percent due to rounding.

Data were post-stratified using weighted demographic information from the U.S. Census Bureau's Current Population Survey Voting and Registration Supplement and the state election authorities.

Demographic information for actual voters in past elections was used to construct sample target weights.

*Cicero Institute paid for all costs associated with this survey.*

DOJ-HUD-AR01035

Services 



Soon after beginning his ministerial career in England in 1852, William Booth abandoned the concept of the traditional church pulpit in favor of taking the gospel of Jesus Christ directly to the people. Walking the streets of London, he preached to the poor, the homeless, the hungry, and the destitute.

When fellow clergymen disagreed with Booth's unconventional approach, he and his wife, Catherine, withdrew from the church to train evangelists throughout England. The couple returned to the East End of London in 1865, where many followers joined their fight for the souls of lost men and women. Within 10 years, their organization, operating under the name "The Christian Mission." had over 1,000 volunteers and evangelists.

Thieves, prostitutes, gamblers, and drunkards were among their first converts to Christianity. And soon, those converts were also preaching and singing in the streets as living testimonies to the power of God.

When Booth read a printer's proof of the 1878 "Christian Mission" annual report, he noticed the statement, "The Christian Mission is a volunteer army." Crossing out the words "volunteer army," he penned in "Salvation Army." From those words came the basis of the foundation deed of The Salvation Army.

From that point onward, converts became soldiers of Christ and were known then, as now, as Salvationists. They launched an offensive throughout the British Isles that, in spite of violence and persecution, converted 250,000 Christians between 1881 and 1885. Their message spread rapidly, gaining a foothold in America and, soon after, in Canada, Australia, France, Switzerland, India, South Africa, Iceland, and Germany.

Today, The Salvation Army is active in virtually every corner of the world and serves in over 100 countries, offering the message of God's healing and hope to all those in need.

# Our Founders

| William Booth |
| --- |

DOJ-HUD-AR01036

| Catherine Booth |
| Evangeline Booth |
| Joe the Turk |
| Eliza Shirley |
| George Scott Railton |
| Samuel Logan Brengle |

# About the Red Kettle



Sharing is Caring is a long-standing motto that succinctly describes the partnership between The Salvation Army and the community.

The iconic Salvation Army red kettle campaign began in 1891 by Captain Joseph McFee, a Salvation Army officer who was looking for a way to cover the cost of the community Christmas meal. Recalling his days as a sailor in Liverpool, England, he recreated the "Simpson's Pot", an iron pot where charitable donations were placed by passersby. Captain McFee placed a similar pot at the Oakland Ferry Landing, at the foot of Market Street where it could be seen by all those going to and from the ferry boats. By 1895 the 'kettle' was used by 30 locations along the west coast and by 1897 the campaign was making its mark in east. That year, the kettle effort in Boston and other locations nationwide resulted in 150,000 Christmas dinners for the needy. The tradition continues still today. Sharing your donation at Christmastime helps The Salvation Army care for homeless and needy families, but also helps serve over 27 million people through a myriad of other services all year long. These include:

- Disaster Response Services which include assisting survivors of natural and man-made disasters to recover and rebuild their lives
- Social Service programs provide food, shelter, clothing, and financial assistance
- Casework and Counseling with programs for health care and residential assistance and abuse counseling
- Youth Services with programs for music, athletics, arts, and crafts, camping and family counseling

DOJ-HUD-AR01037

- [Senior Centers](#) focused on assisting the needs of older adults – including eight Silvercrest centers where seniors' assistance is partially subsidized by federal government dollars
- [Christmas Programs](#) in which the famous Red Kettles are a centerpiece, to help families and individuals financially at year-end with toys, meals and other assistance
- [Human and Sexual Trafficking Advocacy](#) where Army officers and staff are focused on public policy in Washington, D.C., and providing services and advocacy for victims of this international crime
- [Veterans Services](#) provide a range of support, gifts, counseling, housing assistance, and comfort to those in need
- [Prison Services](#) include Bible correspondence courses, gifts/material aid, prerelease job training programs, employment opportunities in cooperation with parole personnel, and spiritual guidance for both prisoners and their families
- [Religious Services](#) provide a place of worship and community without discrimination in every zip code across the United States

# Volunteer to Ring this Year

Volunteering at a Salvation Army's Red Kettle spreads holiday cheer while making a meaningful impact, as every donation collected helps provide essential support to individuals and families in need, fostering hope and compassion in your community.



About The Salvation Army

Leadership

History

Employment Opportunities

Give With Joy

Commitment to Serving All

Newsroom

National Advisory Board

Media Contacts

Annual Reports

Contact Us

Who We Are

← Ways to Give

Donate Money



 Home          About Us ⌄          Services ⌄          More

DOJ-HUD-AR01038

Gift Stocks & Bonds

View Pages

Find Help Near You

Affiliate Sites



About The Salvation Army

Leadership

History

Employment Opportunities

Give With Joy

Commitment to Serving All

Newsroom

National Advisory Board

Media Contacts

Annual Reports

Who We Are

 Ways to Give

Donate Money

 Home                About Us ⌄                                    Services ⌄                More

DOJ-HUD-AR01039





# How Congress Can Reform Government's Misguided Homelessness Policies

Real Solutions for Mental Illness, Drug Addiction, and Crime Cannot be Found in Housing Subsidies Alone



DOJ-HUD-AR01040





3    **Executive Summary**

7    **Homelessness: A Growing Crisis in American Communities**

13    **"Housing First" Is Not Working**

21    **The Time Has Come for Real Reform**

24    **Glossary**

27    **Endnotes**

**fixhomelessness**.org

DOJ-HUD-AR01041

# Executive Summary



America is suffering a complicated homelessness tragedy in myriad cities and rural areas. Huge sums of government money have been thrown at the problem, most notably in housing programs, but also indirectly in the criminal justice system (police, courts, and jails) and hospital emergency rooms. The homelessness epidemic also drains private charitable resources and suppresses economic growth and development in many communities. Lax enforcement of borders is allowing deadly drugs into the country, worsening the conditions found in homeless encampments.

Any efforts to address this web of interlocking crises are doomed to failure if they begin with an inadequate diagnosis of the causes. Though lack of housing is a major factor in what we call homelessness, it is erroneous to view homelessness as *primarily*—let alone solely—a housing problem that can be solved through a "Housing First" approach that

> **With Housing First, the Obama Administration said it could end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020. Additionally, advocates argued that the Housing First approach would end all types of homelessness by 2023.**

ignores untreated mental illness, and with "harm reduction" projects that enable addicts to continue devastating drug habits.

Data from the Department of Housing and Urban Development (HUD) confirm dramatic nationwide increases in homelessness, as illustrated in the charts in the full report (see below). The total number of individuals experiencing homelessness within all five HUD homelessness categories is approaching 1.2 million, and unsheltered homelessness increased 20.5% over the five pre-COVID years – a dramatic shift from the drop of 31.4% between 2007-2014, before Housing First was officially adopted by the federal government.

Children are hit especially hard. The total number of children experiencing homelessness increased from 679,724 in the 2006-2007 school year to 1,508,265 in the 2017-2018 school year, a pre-COVID increase of 122%. The number of children

DOJ-HUD-AR01042

in unsheltered situations (on the street and in vehicles) more than doubled between the 2016-2017 and 2017-2018 school years.

The federal government has attempted to mask the magnitude of the crisis in at least two ways. First, citing the COVID pandemic, HUD stopped collecting relevant data on unsheltered homelessness in 2020. More disingenuously, HUD resorted to an accounting gimmick to reclassify over 100,000 individuals from transitional programs (considered to be experiencing homelessness) to Rapid Rehousing programs (deemed no longer experiencing homelessness). This, even though the individuals were mostly in the same rooms, in the same buildings, being housed by the same agencies, for the same period of time.

The federal policy of Housing First is at the heart of America's deteriorating homelessness problem. Supported by powerful and self-serving interests, this approach is embraced by many state and local jurisdictions, as well as the White House and Congress. Housing (to repeat) should be part of any homelessness program. But, by insisting that subsidized housing be provided to people experiencing homelessness without time limits or any requirements that individuals participate in wraparound services (such as mental illness clinical services and treatment, substance use disorder treatment, job training, and job retention programs), this approach has become a "housing only" solution in practice. **In essence, we have created an enormous federal homelessness assistance program which is functionally equivalent to HUD Section 8 Housing — but with no rules.**

The results have been disastrous. The dramatic shift in the trajectory of homelessness numbers mentioned above correlate with the federal adoption of Housing First. Namely, unsheltered street homelessness rose by more than 20% even as subsidized housing vouchers went up more than 40%.

California provides an alarming example of the failures of Housing First. In 2016, California enacted a law that required that every state dollar spent on homelessness be spent on Housing First programs. **From 2015 (the year before the new state policy) to 2019, unsheltered street-level homelessness in California rose 47.1%** in just four years. California now boasts almost half of America's unsheltered street-level homeless population and nearly one in four of America's overall homeless population, even though it contains only 12% of the U.S. population. Only this year did the state pass a "Care Court" program that may—in a year or two—make it easier to get help for people with serious mental illness. Also, a recent settlement announcement by the LA Alliance for Human Rights commits LA County to more mental health and addiction treatment outreach and beds, not just housing.

Results within other jurisdictions also illustrate the folly of Housing First. In Seattle/King County the number of unsheltered people experiencing homelessness rose to more than 5,500, and gun crimes tied to homelessness encampments jumped 122% during the first half of 2022. In Portland, Oregon, people experiencing homelessness comprised 50% of all arrests between 2017 and 2020, even though their share of the population was less than 2%. In New York City, the number of deaths of people experiencing homelessness more than doubled in a three-year period from 2018 to 2021, up to 640 deaths, with the most frequent cause of death being drug overdose.

## "Housing First" Is Not Working

**Advocates had claimed that shifting to a Housing First approach, with its massive increases in subsidized housing vouchers, would end homelessness in ten years (i.e. by 2023).** The failure of their prediction is rooted in flawed assumptions about the nature of the crisis, especially the prevalence of untreated mental illness and drug use disorders within the homelessness community. In their 2019 ground-

DOJ-HUD-AR01043

breaking study, the California Policy Lab, a non-partisan research institute based at the University of California, found that 78% of the unsheltered homelessness population reported having mental health conditions and 50% reported that their mental health conditions contributed to their loss of housing. Additionally, 75% of the unsheltered population reported substance abuse conditions, and 51% reported that the use of drugs or alcohol contributed to their loss of housing.

Because of the funding restrictions dictating how homelessness assistance dollars are to be spent, the intensive treatment and clinical services most needed by so many people living on the street have become an afterthought. Consequently, the federal Housing First approach has led to the following adverse effects to individuals and families (which are explained more fully in the full report):

1. Elimination of service participation requirements has removed incentives for individuals to participate in effective programs and therapies.

2. Elimination of federal funding for intensive wraparound services has undercut services needed for treatment and recovery (e.g. for mental illness and substance use disorders).

3. The chance to develop customized treatment approaches has been diminished by a one-size-fits-all housing approach.

4. Concurrent defunding of emergency services has led to increased negative outcomes, including death.

5. Program focus has been lost by changing the policy goal from self-sufficiency to increased inputs in the form of housing vouchers.

6. The expansion of this federal Housing First policy to state and local governments has dramatically increased homelessness.

Of course, the deemphasis on treatment of the seriously (and often dangerously) mentally ill did not begin with Housing First. Deinstitutionalization of psychiatric patients is a policy now six decades in effect, dramatically illustrated by the fact that the U.S. has only 5% as many psychiatric beds as it had fifty years ago. One of the most glaring examples of unintended consequence in American health history, the federal policy has led to untold suffering and death by consigning hundreds of thousands of seriously mentally ill people to the streets, homelessness encampments, jails and prisons, instead of to effective treatment.

## The Time Has Come for Real Reform

Immediate policy changes are necessary to reverse the growing homelessness crisis. **Homelessness should be addressed primarily as a mental and behavioral health issue, rather than simply a housing issue.** Increasingly, American citizens demand reform – polling indicates homelessness is now the number one or number two local issue among voters in twenty of the highest populated cities in America, and homelessness continues to be the top statewide issue in many states.

Congress is encouraged to take the following actions to address the crisis, with a goal of helping to move as many people as possible out of homelessness and toward recovery and self-sufficiency. More detailed descriptions and justifications are provided in the full report.

1. Pass legislation directing HUD to eliminate Housing First as the primary approach to address homelessness, including in Notices of Funding Availability (NOFAs), policies, rule-making, guidance, technical assistance, and in federal communications.

2. Pass the Housing PLUS Act to prohibit HUD from restricting or limiting Continuum of Care (CoC) funds (see CoC definition in glossary below) going to providers that require the provision of supportive services (such as addiction treatment or job counseling) or program participation requirements, or to faith-based organizations. The Act also requires that no less than 30% of CoC funding shall be used by recipients that provide or offer access to wraparound services.

DOJ-HUD-AR01044

3. Prioritize economic "self-sufficiency" as the primary measurement of effectiveness of all federal homelessness assistance programs rather than the number of housing vouchers distributed.

4. Prioritize trauma-informed wraparound services in all federal homelessness assistance programs by requiring that a minimum of 40% of CoC funding be used for direct trauma-informed wraparound services (such as mental illness clinical services and treatment, substance use disorder therapy and treatment, job training, and job retention) and limiting housing vouchers to 60% of funding.

5. Require participation in treatment and training activities when enrolled in federally funded homelessness assistance programs, similar to PELL Grants, unemployment assistance, and Temporary Assistance for Needy Families (TANF).

6. Restore funding for emergency programs, which are an important steppingstone on the path to self-sufficiency.

7. Replace the Continuum of Care (CoC) system with a state block grant system to ensure more efficient delivery of services, eliminate conflicts of interest, increase accountability, and improve outcomes. Alternatively, Congress should reform the governance structures of CoCs to eliminate conflicts of interest and expand membership to include state and local elected officials as well as general public stakeholders for greater accountability.

8. Eliminate the Institutions for Mental Diseases Exclusion ("IMD Exclusion") in Medicaid to increase federal reimbursements for inpatient mental illness and substance use disorder treatment. The exclusion currently prevents many mentally ill people from receiving the treatment they need to avoid landing up on the streets or in emergency rooms or jails.

9. Review the budget of the National Institute of Mental Health to ensure its priorities reflect the actual problems of neglect seen in the day-to-day care of the mentally ill, especially those who are homeless.

10. Incentivize local governments to reduce or eliminate building fees and burdensome regulations to enable affordable housing construction.

DOJ-HUD-AR01045



# Homelessness:
## A Growing Crisis in American Communities

Homelessness has skyrocketed in the United States over the last decade and has reached crisis levels in many American cities. This is a tragedy for those caught up in the heartbreaking cycle of homelessness that plagues communities. Attendant issues include overwhelmed emergency rooms, drug overdoses, damage to public spaces, urban decay, overcrowded jails, decreased public safety, and intimidating chaos on many streets. Small businesses are especially hurt, since patrons are reluctant to journey into areas with high levels of homelessness. Fixing the homelessness problem will cost money. But not fixing it is already costing plenty — and letting the problem fester will cost even more.

### HUD Documenting Dramatic Rise in Adult Homelessness

The graphs below, based on data from the U.S. Department of Housing and Urban Development (HUD) *Annual Homeless Assessment Reports* (AHARs) and the U.S. Department of Education (ED) *Annual Federal Data Summary School Years – Education for Homeless Children and Youth*, illustrate the magnitude of the homelessness crisis in the U.S. over the last decade.

The federal government has two different formal definitions of homelessness, as well as methodologies and metrics to measure the number of people experiencing homelessness.

DOJ-HUD-AR01046

HUD primarily tracks adults, while ED tracks child and youth homelessness per the McKinney-Vento Homeless Assistance Act of 1987. While each agency's data is explored separately below, both federal cabinet departments report that homelessness is increasing across all populations, regardless of the differences in how homelessness is defined.

HUD aggregates data from 400 regional Continuums of Care (CoC) that conduct annual "Point-in-Time Counts" (PITCs). Additional data is stored in each CoC's Homelessness Management Information System (HMIS), which reports a variety of demographic and statistical information to HUD for its annual reports. HUD's general definition of a person experiencing homelessness is one who "lacks a fixed, regular, and adequate nighttime residence."[1]

Per HUD's *Annual Homeless Assessment Reports* (AHARs) and PITCs, individuals experiencing homelessness are grouped into five sub-categories based on what type of housing they are living in:

1. **Unsheltered** (also known as street-level homelessness),
2. **Emergency Shelters** (e.g. Citygate rescue missions and Salvation Army centers),
3. **Transitional Housing** (subsidized apartments with wraparound services for up to two years),
4. **Rapid Rehousing** (the most radical form of subsidized "Housing First" units that have no participation requirements), and
5. **Permanent Supportive Housing** (subsidized lease-based housing units, typically supported by vouchers).

Figure 1 illustrates the dramatic nationwide increases in homelessness. The stacked colored bars illustrate those living unsheltered, in emergency shelters, in transitional housing, in rapid rehousing, and in permanent supportive housing (unsheltered number for 2021 is estimated — HUD did not provide data). When totaled together, these latter five cohorts reflect the aggregated year-round homelessness count in the United States. The vertical dotted line is the inflection point when HUD formally shifted federal homelessness policies and funding to a "Housing First" philosophy per the 2013 HUD Notice of Funding Availability (NOFA).



Figure 1: National HUD Data (Adults)

DOJ-HUD-AR01047



## Key Takeaways:

- The total number of individuals experiencing homelessness within all five HUD categories is approaching 1.2 million individuals, not the half a million number that is frequently incorrectly cited by media sources.

- HUD artificially counts those participating in permanent supportive housing and rapid re-housing programs as "not experiencing homelessness" while those in transitional housing programs are counted as "experiencing homelessness."  This gimmick artificially lowers the number of people considered to be experiencing homelessness.  Sound policy decisions require objective and accurate data.

- Even though federal funding of the homelessness assistance system has significantly expanded after the policy shift to the Housing First approach, unsheltered homelessness rose dramatically between 2014 to 2020.  The total number of unsheltered individuals experiencing homelessness increased 20.5% over the five pre-COVID years after HUDs adoption of Housing First.[2]

- In 2022, the Biden Administration did not report the national unsheltered count for 2021.  This omission was likely made to hide the dramatic increases in unsheltered homelessness since the onset of the Housing First approach.

- Prior to the implementation of Housing First, the total number of unsheltered individuals had dropped 31.4% between 2007-2014, when intensive wraparound services for participants were required for most homelessness assistance program participants.  The downward trend ended with HUD's adoption of the Housing First approach.

- The programmatic changes required by the 2013 HUD NOFA (Notice of Funding Availability) penalized service agencies and programs that included service participation requirements and incentivized those that included no such service participation requirements.  Furthermore, funding guidelines and system performance measures prioritized speed-of-placement rather than quality of placement, resulting in replacing high-quality recovery and rehabilitative programs with subsidized housing absent of participation requirements in treatment programs.  **In essence, we have created a federal homelessness assistance program which is functionally equivalent to Section 8 housing with no rules, no treatment programs, and no participation requirements.**

DOJ-HUD-AR01048

**HUD Documents an Even Higher Homelessness Rise of Adults in California**

Figure 2 below focuses solely on the State of California.  As with Figure 1, the stacked colored bars illustrate those living unsheltered, in emergency shelters, in transitional housing, in rapid rehousing, and in permanent supportive housing (unsheltered number for 2021 is estimated — HUD did not provide data).

California state data is revealing because California requires 100% of state funding to go to Housing First programs.  Consequently, 100% of federal and state homeless assistance funds go solely to Housing First programs.

Additionally, the State of California encourages local governments and CoCs to restrict their funding to the Housing First approach.  Consequently, almost all local judications within the state—including the City of Los Angeles and Los Angeles County—require government funding of all types (national, state, and local) to fund Housing First programs.  The State of California, therefore, provides a statistically controlled study of the outcomes of this one-size-fits-all policy.  The results of going "all in" on Housing First have been devastating and have increased human suffering.



Figure 2: HUD Data for California (Adults)

**Key Takeaways:**

- California communities have experienced worse outcomes than other parts of the country.

- California rates of unsheltered homelessness jumped after the 2013 federal implementation of Housing First.  Rates jumped again after California mandated that all state funding for homelessness assistance be restricted to Housing First programs.

- Homelessness in California has been increasing at a faster rate than the rest of the U.S.  **From 2015 to 2019 (starting the year before passage of the law mandating that all state funding be used for Housing First programs), unsheltered homelessness rose 47.1%.**  This increase occurred prior to the COVID pandemic in 2020.[3]

- From 2015 to 2019, following the passage of the law mandating that all state funding go to Housing First programs, overall homelessness in California rose 33.8% (again all before the COVID pandemic).

DOJ-HUD-AR01049

**Department of Education Reports Dramatic Increase in Number of Children Experiencing Homelessness**

The U.S. Department of Education *Annual Federal Data Summary School Years – Education for Homeless Children and Youth* aggregates data provided by local and state school administrators for each Pre-K-12 school student who experiences homelessness.[4] ED's definition of homelessness within Section 725 of the McKinney-Vento Act defines children and youth experiencing homelessness as children who lack a fixed, regular, and adequate nighttime residence at least once over a school year.[5]

The annual report groups children experiencing homelessness into five cohorts based on where they are living:

1. **Unsheltered,**
2. **Motels and Hotels,**
3. **Shelters and Transitional Housing,**
4. **Staying with Others, and**
5. **Location Not Reported.**

Figure 3 illustrates the dramatic increases in nationwide child and youth homelessness. The stacked colored bars illustrate unsheltered, motels and hotels, shelters and transitional housing, staying with others, and those whose location is not reported.

Children often start by staying with others and then move into motels, shelters, or the street, once they overstay their welcome with friends and family. In accordance with ED's codifying guidelines, the first type of homelessness a child experiences categorizes the child's status throughout the year, which does not necessarily reflect the current type of homelessness that child is experiencing. Since most children start experiencing homelessness in the "living with others" category, it is always overrepresented in the data, while those unsheltered and staying in shelters are underrepresented.



Figure 3: National Department of Education Data (Families with Children)

**Key Takeaways:**

- The number of children experiencing homelessness continues to rise.

- The total number of children experiencing homelessness increased from 679,724 in the 2006-2007 school year to 1,508,265 in the 2017-2018 school year, a pre-COVID increase of 122%.

- The total number of children living in shelters, transitional housing, motels, and in unsheltered situations increased from 283,137 in the 2012-2013 school year to 390,760 in the 2017-2018 school year – a 38.1% pre-COVID increase.

- The number of children in unsheltered situations (on the street and in vehicles) more than doubled between the 2016-2017 and 2017-2018 school years – a 104% increase.

- A sizeable percentage of adults experiencing homelessness first experienced homelessness as a child. For example, HUD's point-in-time count survey reports that 20% of adults experiencing homelessness in Los Angeles first experienced homelessness as children. In Seattle and Santa Cruz, the number is 18%, while San Francisco's rate is 15%.

DOJ-HUD-AR01050



## Homelessness is Increasing Despite Dramatic Increases in Federal Funding

The substantial increases in the number of people experiencing homelessness indicated by the HUD and ED data presented above have occurred even as federal funding for programs intended to address homelessness has dramatically increased. In 2022, Congress appropriated more than $7.9 billion for targeted homelessness assistance programs – President Biden has asked for an additional $8.7 billion in the FY 2023 federal budget.[6] This represents more than a three-fold increase from the $2.8 billion spent in 2008.

These amounts do not include the more than $4 billion in directly dedicated homelessness assistance and the more than $64.9 billion in indirect homelessness assistance allocated in the CARES Act and American Rescue Plan COVID-19 relief packages.[7,8] See Figure 4 for an illustration of the year-over-year spending since 2009.



**Figure 4: Federal Homelessness Spending**

DOJ-HUD-AR01051

# "Housing First" Is Not Working



**Federal Government Formally Embraces Housing First in 2013**

The 2013 Housing and Urban Development Notice of Funding Availability (HUD NOFA) formally shifted federal policies and funding to a "Housing First" philosophy, which offers government-subsidized homelessness housing vouchers to individuals with no participation and treatment requirements (such as attending life-skills classes or seeing a drug addiction counselor).[9] **Disconnecting housing subsidies from any participation requirement for rehabilitation and treatment is the most radically negative single change to federal homelessness assistance policy in decades.**

In addition to formally prioritizing the Housing First approach over all other homelessness assistance strategies, the 2013 HUD NOFA also, for the first time, formally funded rapid rehousing subsidies while simultaneously phasing out funding for transitional housing. These changes fundamentally altered the way homelessness assistance is allocated by the federal government.

HUD's implementation of Housing First led to changes in federal regulations, grant application scoring factors, and program guidance to local communities. Taken together, local governments and Continuums-of-Care (CoCs) were heavily pressured to adopt Housing First policies to continue to receive federal funding. Local agencies that did not conform to these guidelines were de-funded. These changes impacted the programs and organizations that make up most of the direct front-line homelessness service providers, including faith-based and transitional housing providers. Housing First has essentially become Section 8 federally subsidized housing vouchers without any rules.

**Disastrous Results**

The results of the shift to Housing First have been disastrous. Shortly after the policy shift away from requiring service participation when receiving homelessness assistance, HUD measured unsheltered homelessness rose from 175,399 in 2014 to 211,293 in 2019, a 20.5% increase in five

DOJ-HUD-AR01052

years (all pre-COVID).[10] During the same period, the number of individuals receiving subsidized Rapid Rehousing and Permanent Supportive Housing vouchers rose from 338,065 to 482,254, a 42.7% increase. **In short, even though the number of housing vouchers increased more than 40%, unsheltered street homelessness increased more than 20%. If the Housing First approach were working to reduce overall homelessness, unsheltered street level homelessness should have dropped dramatically. Instead, the opposite occurred.**

The increase in homelessness has occurred even as permanent supportive "Housing First" units have increased sixfold, and federal spending on homelessness has more than tripled.

The negative impacts of skyrocketing homelessness on communities are manifold, including increased demand on local government resources, including, most notably, the criminal justice system (e.g. police, courts, and jails) and emergency rooms. The growing crisis of homelessness drains non-profit resources, increases drug overdoses, exacerbates urban decay, and suppresses economic growth and development.

**Communities Are in Crisis**

Beyond the bleak national numbers, the data demonstrate especially dramatic rises in the hundreds of cities (and states) that have aggressively embraced the flawed Housing First philosophy — such as Los Angeles, San Francisco, Sacramento, Portland, Seattle, and New York City.

California provides an especially alarming example of the failure of Housing First. As discussed above, the California legislature passed a bill in 2016 that required every state dollar spent on homelessness must be spent on Housing First programs. **Consequently, unsheltered street-level homelessness in California rose 47.1%**

**in just four years and overall homelessness increased 30.7% (pre-COVID).**

California now boasts almost half of America's unsheltered street-level homeless population and nearly one in four of America's overall homeless population (all five HUD AHAR categories), even though it contains only 12% of the United States population.[11] **If Housing First worked as promised by advocates, California should have the lowest rates of homelessness in the U.S., not the highest.**

Some progress was made this year in California where a law recommended by the governor was passed creating Care Courts that at least offer the prospect that—in a year or two—people with severe mental illness who are experiencing homelessness can be required to get treatment. Fought by the ACLU from a misguided fear of civil liberties abuse, the fact that the law was passed overwhelmingly in the legislature is a sign of increasing public desire for reform. Likewise, a successful lawsuit by the LA Alliance for Human Rights commits LA County to increase mental health and substance abuse outreach and treatment as part of its vast housing expenditures. But California still has a long way to go and is moving slowly.

The experiences of other jurisdictions also illustrate the folly of Housing First. In Seattle/King County the number of unsheltered people experiencing homelessness rose to more than 5,500, and the Seattle Police Department reports that gun crimes tied to homelessness encampments jumped 122% during the first half of 2022.[12] In Portland, Oregon, people experiencing homelessness comprised 50% of all arrests between 2017 and 2020, even though the population of people experiencing homelessness was less than 2%.[13] In New York City, the number of deaths of people experiencing homelessness more than doubled in a three-year period from 2018 to 2021, up to 640 deaths, with the most frequent cause of death being drug overdose.[14]

DOJ-HUD-AR01053

Exacerbating the negative effects of federal and state Housing First polices are poorly conceived local policies that significantly raise housing construction costs to make housing unaffordable for many, especially low-income Americans. Chief among them are onerous regulations and exorbitant local construction permitting fees that inflate housing construction costs. Not limited to California, excessive fees and regulations have made housing unaffordable in many parts of the country, especially in communities where the cost of living is the highest.

**Attempts to Mask the Problem**

The federal government has attempted to mask the magnitude of the crisis in at least two ways. First, due to the COVID pandemic, HUD stopped collecting relevant data on homelessness in 2020. More disingenuously, HUD resorted to an accounting gimmick that reclassified assistance programs to produce an artificial, short-term public relations success. After the 2013 HUD NOFA, changes to annual HUD NOFA deprioritized transitional housing in favor of Rapid Rehousing. Consequently, 101,746 individuals were "reclassified" from transitional programs (which are considered to be still experiencing homelessness) to Rapid Rehousing programs (which are deemed no longer experiencing homelessness).

This definitional sleight-of-hand was based on the fact that, though both programs have the same HUD regulatory 24-month limit, HUD considers people living in rapid rehousing programs as no longer experiencing homelessness. This is because they are housed through a "lease" and, therefore, are covered under the Fair Housing Act.[15] On the other hand, people living in transitional housing are still considered by HUD to be experiencing homelessness because those programs often provide housing through a "participation contract" rather than a lease. In short, under current federal policy, Rapid Rehousing participants are considered tenants while transitional housing participants are considered people experiencing homelessness. It is bureaucratic nonsense meant to bolster the claims of Housing First advocates.

It is important to note that the 101,746 reclassified individuals were mostly in the same rooms, in the same buildings, being housed by the same agencies — yet deemed no longer to be experiencing homelessness. These types of short-term accounting gimmicks fail to seriously address the problem of increasing homelessness.

Despite the attempts to hide the true magnitude of the homelessness crisis, the data clearly proves the Housing First advocates wrong.

**Why has Housing First Failed to End Homelessness as Promised?**

More than a decade ago, **progressive Senators and House Members and other advocates of Housing First argued that the approach would end all types of homelessness by 2023.[16] With Housing First, the Obama Administration said it could end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[17]**

Unfortunately however, as documented above, even though federal spending has nearly tripled, homelessness has not ended, but has increased dramatically, even before COVID.

How could advocates have been so wrong about Housing First ending homelessness by 2023? In short, the Housing First approach is fatally flawed. By focusing on rapidly placing individuals into housing regardless of whether the placement is clinically appropriate, the approach works against the achievement of long-term outcomes, such as graduating out of homelessness or attaining lasting housing self-sufficiency. **By ignoring the root causes of homelessness – such as untreated mental illness combined with substance use disorders – Housing First is at best an expensive short-term band-aid that only addresses the symptom of an individual's living on the street.**

DOJ-HUD-AR01054

These flawed theoretical assumptions allowed subsidized housing vouchers to be used as substitutes for mental illness treatment and substance use disorder therapy. In addition, Washington-based policy advocates who had little or no front-line experience providing direct services did not realize how prevalent untreated mental illness and co-presenting substance use disorders were within the community of homelessness. For example, in 2014, the President and CEO of the National Alliance to End Homelessness claimed that only 20% percent of the people experiencing homelessness have a mental illness or a substance abuse problem.

Yet the California Policy Lab, a non-partisan research institute based at the University of California, found in their 2019 ground-breaking study of 64,000 people experiencing homelessness that **78% of the unsheltered homelessness population reported having mental health conditions, and 50% reported that their mental health conditions contributed to their loss of housing.** Additionally, **75% of the unsheltered population reported having substance abuse conditions, and 51% reported that the use of drugs or alcohol contributed to their loss of housing.**[18]

Unfortunately, because of the expense of creating permanent supportive housing, and the funding restrictions dictating how homelessness assistance dollars are to be spent, the intensive treatment and clinical services so many people living on the street need have become an afterthought.

Housing vouchers are subsidies and do not have the ability to treat mental illness, nor do they address substance use disorders. The failure of Housing First is graphically illustrated by the many individuals isolated in apartments in terrible living conditions with no treatment for mental illnesses nor therapy for substance use disorders, whose stories often end in tragedy. For example, a study

of Boston's chronically homeless unsheltered population shows low housing retention and nearly half of the studied cohort (45%) died while housed. The study concludes "Housing stability for this vulnerable population likely requires more robust and flexible and long-term medical and social supports."[19] Similar poor outcomes have occurred in Los Angeles with Project Room Key.

Subsidized housing and converted motels are highly inadequate substitutes for treatment. Housing First warehouses people, without care, into isolated living arrangements in which drug use and untreated mental illness tend to proliferate. The Los Angeles Times reports that the deaths that occurred in Project Room Key units increased the number of deaths due to the unabated presence of methamphetamine and fentanyl.[20] Meth and fentanyl were directly responsible for the increase in overdose deaths and also contributed to other causes of death such as heart failure, suicide due to drug-induced psychosis, and brain hemorrhage.[21]

**Housing First is based on a faulty premise that homelessness is simply a housing issue which can be solved with subsidized housing. In fact, the root cause of most homelessness in the United States is untreated mental illness, often combined with co-presenting substance use disorders (SUDs).** Policies that fail to address these root causes, when combined with policies that make housing unaffordable, only exacerbate the crisis.

### Housing First is Impeding Effective Help

Not only has Housing First led to increases in homelessness, the approach has also harmed families and individuals by impeding service providers from deploying treatments that effectively address the root causes of their predicament.

Specifically, we note the following adverse effects of the federal Housing First approach:

DOJ-HUD-AR01055

 **The elimination of service participation requirements has removed incentives for individuals to participate in effective programs and therapies.**

 **The elimination of federal funding for intensive wraparound services has pulled the plug on the critical services needed for treatment and recovery (e.g. for treatment of mental illness and substance use disorders).**

The elimination of service participation requirements — such as robust case management and treatment for substance use disorders — has adversely impacted many service providers (including many faith-based organizations) by stripping them of their best intervention tools. These organizations had used these requirements successfully for years as an incentive to improve the mental and physical health of program participants and to promote self-sufficiency.

**Service participation requirements have been successfully employed in most other federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996.** For example, Pell Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF), which provides benefits to families in poverty, requires beneficiaries to work or advance their education.

Many Housing First proponents argue that participation requirements are barriers to shelter and housing. They claim that people experiencing homelessness refuse to accept offers of shelter and housing because they do not want to or cannot participate. The growth of homeless encampments shows that refusal of shelter and services exists even with "low barrier" policies. **The real barrier to recovery is the lack of participation in robust treatment services, especially for mental health and substance use disorder issues.**

Participation requirements are the key element to improved health and increased self-sufficiency that leads to reduced numbers of people experiencing homelessness.

For most, homelessness is a medical and clinical issue rooted in untreated mental illness, often combined with substance use disorders. Consequently, the best intervention is robust trauma-informed care along with wraparound services such as mental health treatment, substance use disorder interventions, medical provisions, life-skill classes, and job training and retention.

However, because of the shift in federal policy and funding, many local and county governments have reduced or eliminated treatment services needed to address mental illness and addiction head on. Instead, they often take the short-sighted, least-resistance route of short-term spending on (federally subsidized) housing vouchers rather than providing the long-term treatment and recovery services needed to address the underlying causes of homelessness.

Making matters worse, the few locations where voluntary services are offered are often poorly funded and understaffed. And absent participation requirements, programs like addiction services, workforce training, and life-skills classes are frequently avoided by individuals who might benefit.

**Housing First's prohibition against participation requirements and its myopic emphasis on funding housing subsidies has practically stopped funding treatment programs of any clinical benefit within homelessness programs.** After stopping participation requirements and stopping funding of treatment, it is no wonder why homelessness is skyrocketing.

DOJ-HUD-AR01056



**3** The movement away from customized treatment approaches to a one-size-fits-all housing approach has limited treatment approaches.

Moving an unsheltered individual to housing provides a number of health and emotional benefits. However, housing alone does not lead to sustained mental health nor recovery from addictions. **A housing voucher does not kick a drug habit, address chemical instability, nor teach one how to write a job resume.** Yet Housing First advocates argue housing vouchers will end all types of homelessness. This is akin to providing the same medical treatment to a person with an infection, a broken leg, or experiencing a stroke.

To be clear, Housing First vouchers are a one-size-fits-all approach, with no room for variations in treatment or alternative interventions. Housing *First* has become housing *Only*.

The Institute for Children, Poverty & Homelessness (ICPH), points out that the one-size-fits-all approach does not work for all populations nor in all locations. Specifically, ICPH did a study of New York City's Housing First program, which has been practiced on a large scale for an extended period of time.[22] Though Housing First advocates had promised the recidivism rate would drop, the ICPH found that after "Rapidly Rehousing" 33,000 families from 2005 to 2011, the recidivism back to shelter rate actually increased. ICPH posits that Rapid Rehousing is analogous to a steroid shot — the pain temporarily goes away but comes back quickly, since the underlying issues have not been addressed. ICPH goes on to say that there is a lack of evidence showing long-term success of Rapid Rehousing and Housing First.

Tragically, a one-size-fits-all approach can actually harm individuals experiencing homelessness who need and benefit from customized, trauma-informed wraparound services. When the only

intervention is "housing," little or no treatment is provided and few clinical outcomes are achieved. We will fail if Housing First is the only tool in the toolbox.



**4** The defunding of emergency services has led to increased negative outcomes, including death.

**De-funding of emergency services, like emergency sheltering and mental health services, has reduced critical front-line life-saving services for individuals living on the street.** Before the 2013 HUD NOFA was implemented, funding for the homelessness Continuum of Cares were evenly balanced – funding about one-third each for emergency services, transitional housing, and long-term housing.

After the changes implemented by the 2013 HUD NOVA, the federal government terminated funding of homelessness emergency services and began to phase out funding of transitional housing in favor of funding Housing First vouchers. This destabilized the balance between the three equally important and critical phases of Continuum of Cares described above.

As a result, emergency services have been replaced with housing outreach workers with little expertise and few resources to help those in need. Their objective is limited to recruiting people experiencing homelessness into Housing First programs, along with a bottle of water and words of comfort. Replacing emergency services with housing outreach workers tragically accepts the viewpoint that homelessness is a housing problem rather than a broader humanitarian crisis that can only be addressed through a wholistic program focusing on the treatment of underlying causes.

The de-funding of critical emergency services has particularly restrained the ability of faith-based and non-profit agencies to help individuals in need.

DOJ-HUD-AR01057



**5**

**In changing the ultimate goal from self-sufficiency to maximizing the number of vouchers distributed, Housing First has led to a loss of program focus.**



**6**

**The expansion of Housing First to state and local governments has dramatically increased homelessness.**

The federal government currently measures success in addressing homelessness by how many, and how quickly, taxpayer-subsidized housing vouchers are distributed — regardless of whether the vouchers actually help pull people out of homelessness. **The government should instead gauge success by measuring self-sufficiency: the number of people who exit from homelessness over a sustained period.**

Federal programs instruct Continuums of Cares to avoid objective, performance-oriented metrics. In fact, instead of measuring "outcomes," HUD's performance system measures "outputs" based on process-related performance of CoCs in providing housing. Even HUD's metrics of income increases are belied by equating earned income from a job with government subsidies from various government programs. This represents yet another example of measuring the wrong thing.

**The fatal flaw of Housing First should be obvious — the federal government is not measuring how many individuals attain self-sufficiency every year (i.e. no longer needing government-subsidized housing vouchers). Instead, they measure failure — the number of people dependent on government handouts.**

Unfortunately, many Housing First advocates have aggressively resisted efforts to have meaningful and truthful measurements because this would spotlight how Housing First has failed to truly reduce the number of people experiencing homelessness.

Housing First grants have induced state and local governments to adopt the Housing First model, despite its failures. Contrary to the promises of Housing First advocates, the approach has not ended homelessness where it has been implemented. On the contrary, in many locales such as Los Angeles and San Francisco, as well as California as a whole, **adoption of the Housing First experiment has substantially increased the number of people experiencing homelessness.**

According to a recent survey, most citizens blame local mayors and city councilmembers for increases in homelessness.[23] But it is appropriate to lay much of the blame at the feet of the federal government. Since HUD exclusively promotes and funds Housing First throughout the U.S., many municipalities are limited in their responses to homelessness. Knowing that Housing First has not worked at a national level, why would we want to push this flawed policy onto local governments?



**7**

**The issue of untreated mental illness is an inescapable and neglected part of the homelessness puzzle.**

Starting in the Depression years of the 1930s and accelerating over the decades, the long-term neglect of mental hospital care by state governments became an embarrassment and even, in some cases, scandalous. Instead of improving care, policy makers de-institutionalized state mental health hospitals. The 1965 Medicaid bill, which provided support for funding of

DOJ-HUD-AR01058

state facilities that serve lower income people, specifically left out individuals in the age categories between 21 and 65, who often present with significant and serious mental illnesses and conditions. It was thought that this "Institutions of Mental Disease ("IMD") Exclusion would hold down costs, take advantage of new medications, protect civil liberties and somehow enable people with mental illness or substance abuse issues to get good local community-based care.

In practice, however, it succeeded mainly in justifying states' increasing failures to provide their own adequate funding for professional psychiatric care in state hospitals, while the patients released to home care and local clinics most often received ineffective or insufficient treatment. Among other things, small community clinics seldom can afford on-site professional psychiatric personnel that meet the needs of the seriously mentally ill. This meant that people treated at home or at smaller mental health clinics often wound up on the streets or in jail due to a lack of settings that could appropriately respond to crises, stabilize, and in many cases, provide residences for those experiencing serious mental illness.

There are now only five percent as many psychiatric beds in state hospitals as we had a half century ago. Indeed, **there are more people in psychiatric care in prisons than in hospital care making jails, prisons, and homeless encampments modern-day asylums.**

As Dr. Thomas Insel, recent Director of the National Institute of Mental Health, notes in his book *Healing*, "We so overcorrected the problematic state of institutions in the 1960's that we effectively created an enormous deficit in funded psychiatric beds." Federal funding for mental illness, meanwhile, tends to go to programs that assist persons with tractable neuroses, rather than resistant psychoses. Even middle-class and wealthy Americans in many communities find hospital care and long-term adult residences for mental illness hard to acquire, which is a largely unreported calamity for thousands of families in America and is reflected, among other things, in rising suicide rates. But the impact on homelessness is especially acute.

DOJ-HUD-AR01059

# The Time Has Come for Real Reform



As described in this report, Housing First has been an abject failure in addressing the growing crisis of homelessness. The approach is built on a false premise—that homelessness is primarily a housing issue rather than a mental illness issue with co-presenting substance use disorders.

A reverse course is needed. **Rather than seeking to increase the number of taxpayer-subsidized housing vouchers, our goal should be to help move as many people as possible into recovery and stability, and then toward self-sufficiency with supported long-term sobriety.**

To that end, the two most important tools to end homelessness are: 1) the promotion and funding of trauma-informed mental and behavioral health treatment, integrated and directly tied to the provision of affordable housing; and 2) the development of truly affordable housing construction through the elimination of local building fees and excessive regulatory requirements.

Citizens in communities around the country are increasingly exasperated by the results of misguided government policies. Polling indicates homelessness is now the number one or number two local issue among voters in twenty of the highest populated cities in America, and homelessness continues to be the top statewide issue in almost all polls in California.[24]

Congress is encouraged to take the following specific actions as soon as possible to begin to address the national homelessness crisis:

DOJ-HUD-AR01060

1. **Pass legislation directing HUD to eliminate Housing First as the primary approach to address homelessness.** Housing First prioritization should be eliminated in NOFAs, policies, rule-making, guidance, technical assistance, and in federal communications. Additionally, appropriations should specifically eliminate government funding for any program or regulation that only provides housing vouchers (i.e. has no service participation requirements).

2. **Pass the Housing PLUS Act.** Sponsored by Rep. Andy Barr (KY-6), H.R. 6018, the Housing PLUS Act, would prohibit the HUD Secretary from restricting or limiting Continuum of Care (CoC) funds going to providers that require the provision of supportive services (such as addiction treatment or job counseling) or program participation requirements, or to faith-based organizations. By requiring that no less than 30% of CoC funding be used by recipients that provide or offer access to wraparound services, the bill will provide much needed flexibility to allow local communities to customize their efforts to individual needs. However, the 30% provision within H.R. 6018 should be amended to no less than 40%.

3. **Prioritize economic "self-sufficiency" as the primary measurement of effectiveness of all federal homelessness assistance programs.** In order to receive federal funding, all tribal, state, regional, and local governments, as well as CoCs should also prioritize "self-sufficiency" as the number one measurement of homelessness assistance program effectiveness.

4. **Prioritize trauma-informed wraparound services.** The CoC program should require a minimum of 40% of all federal homelessness assistance funding to be used for direct trauma-informed wraparound services, such as mental illness clinical services and treatment, substance use disorder treatment, job training, and job retention (i.e. funding for housing vouchers should be limited to 60% of funding across all homelessness assistance programs).

5. **Require program participation in all federally funded homelessness assistance programs.** To receive federal housing support, participants should be required to participate in self-sufficiency, health, life skills, behavioral health services and treatment plans, similar to what is done for Pell Grants, TANF, and unemployment insurance benefits.

6. **Restore funding for emergency programs.** As phase one in the Continuum of Care, 25% to 33% of all federal homelessness assistance funding should be allocated to emergency services. The other 67% to 75% of the funding would go to the second and third phases of the CoC, for transitional housing and longer-term housing, respectively. Additionally, rules and regulations that impede faith-based organizations, and other non-profits, from helping people experiencing homelessness should be eliminated.

7. **Replace the Continuum of Care (CoC) funding system with a state block grant system. If moving to a state block grant system is not feasible, then reform the existing CoC governance model.** State block grants, built on the premise that states have a better understanding of local conditions than the federal government, provide a more efficient means of funding CoCs. If a state block program is not feasible, then Congress should reform the governance structures of Continuums of Cares by restricting any type of CoC membership of agencies that receive CoC funds (e.g. stop self-dealing conflicts of interest). Additionally, CoC board membership should be expanded to include state and local elected officials, as well as general public stakeholders, to increase accountability.

8. **Eliminate the Institutions for Mental Diseases Exclusion ("IMD Exclusion") in Medicaid** to increase federal reimbursements for inpatient mental illness treatment. Due to the IMD Exclusion, many mentally ill people do not receive treatment, or are prematurely terminated from treatment. Consequently, they land up on the streets or in jail or prisons. Follow-up clinical services should also be reimbursed in order to allow discharged hospital patients to receive ongoing treatment to continue to improve and get well.

9. **Review the budget of the National Institute of Mental Health** to ensure its priorities reflect the actual problems of neglect seen in the day-to-day care of the mentally ill, especially those who are homeless.

10. **Incentivize local governments to eliminate local building fees for affordable housing construction.** Local governments should be incentivized to streamline building codes and eliminate unnecessary regulations that unnecessarily inflate the cost of housing.

DOJ-HUD-AR01061

# Produced by Discovery Institute's Center on Wealth and Poverty

## Dr. Robert G. Marbut Jr.

Lead Writer, Project Coordinator, and Discovery Institute Senior Fellow. Dr. Marbut worked in three different U.S. Presidential Administrations, including being selected as a White House Fellow to President George H.W. Bush and serving as the Executive Director of the U.S. Interagency Council on Homelessness from 2019 to 2021. He was a San Antonio City Councilperson/Mayor-Pro-Tem, and was the Founding President & CEO of *Haven for Hope Transformational Campus*.

## Steven J. Buri

Contributor and Discovery Institute President. Mr. Buri has served in various capacities in government at the local, state and federal levels. He served as Deputy Mayor then as Mayor of the City of Newcastle, Washington. He was selected by the American Council of Young Political Leaders to participate as part of a bi-partisan political delegation to Nepal to share policy lessons from the United States and to promote the adoption of a new Nepalese constitution.

## Erik L. Nutley

Editor and Discovery Institute Program Director. Mr. Nutley retired from the U.S. Air Force in 2008, after a career as a squadron commander, instructor pilot, engineer, and Assistant Professor of aeronautical engineering at the U.S. Air Force Academy. As a Department of Defense civilian in the Pentagon, he conducted program oversight of multi-billion-dollar Air Force and Navy aircraft procurement programs.

## Ambassador Bruce Chapman

Contributor and Discovery Institute Chairman of the Board. Ambassador Chapman was appointed by President Ronald Reagan to the position of Director of the United States Census Bureau and served as the United States Ambassador to the United Nations International Organizations in Vienna. He was also the Director of the White House Office of Planning and Evaluation, which worked on many poverty issues.

## Paul Webster

Contributor, Editor and Discovery Institute Researcher. Mr. Webster is the Founder and Director of Hope Street Coalition. He has an extensive background in legislation, public policy, administration, and program delivery. He served as a senior policy advisor in the U.S. Department of Housing and Urban Development and was the Vice President of a homelessness services provider.

## For more information

Visit www.FixHomelessness.org or email info@discovery.org.

Contact Dr. Robert G. Marbut Jr. at 210-260-9696.

DOJ-HUD-AR01062

# Glossary

**Affordable Housing –** Taxpayer-subsidized housing for people at or below a region's median income. According to HUD, affordable housing is intended for people paying no more than thirty percent of their gross income for housing costs, including utilities.

**American Rescue Plan –** An Act of Congress, passed in 2021, which provided $1.9 trillion in economic stimulus. The American Rescue Plan provided $4 billion in direct support to state and local programs for people experiencing or at risk of homelessness, as well as $51.6 million in indirect homelessness assistance.

**Annual Homelessness Assessment Report (AHAR) –** An annual report requiring HUD to provide to Congress nationwide counts of homelessness compiled from regional Point-in-Time Counts, Housing Inventory, and HMIS data reporting from CoCs. The number of people experiencing homelessness is reported in five major categories based on type of housing: Unsheltered, Emergency Shelters, Transitional Housing, Rapid Rehousing, and Permanent Supportive Housing.

**Barriers to Housing –** Barriers are challenges that act to prevent individuals and families from getting and maintaining housing. Examples of barriers are lack of income, unemployment, criminal convictions, lack of identification, mental illness, and substance use disorders.
Behavioral Health – Refers to how behaviors impact an individual's well-being, distinct from mental illnesses. Substance use disorders, alcoholism, and gambling fall under the general umbrella of behavioral health.

**CARES Act –** Congressional legislation (The Coronavirus Aid, Relief, and Economic Security Act of 2020, and the Coronavirus Responses and Consolidated Appropriations Act of 2021), which provided economic assistance to individuals, families, businesses, and tribal, state, and local governments impacted by the Covid-19 pandemic. Both Acts provided expedited funding and regulatory changes to governments to address the impacts of the COVID-19 virus, including homelessness.

**Case Management –** A service provided by homelessness assistance providers that coordinates overall treatment for people experiencing homelessness.

**Continuum of Care (CoC) –** A CoC is a self-appointed regional or local planning body, organized to fulfill the responsibilities prescribed in the CoC Program Interim Rule for a defined geographic area, that coordinates housing and services funding for families and individuals experiencing homelessness. CoCs determine local funding allocations, with many of the member agencies receiving federal funds themselves.

**Chronic Homelessness –** The state of experiencing homelessness – living in a place not meant for human habitation – for at least twelve months or four separate occasions in the last three years and eligible for Social Security disability payments due to a disability.

**Disability –** The physical, intellectual, and developmental inability to do any substantial gainful activity, which can be expected to result in death, or which has lasted for a continuous period of twelve months or more. Chronic homelessness and a diagnosis of substance use disorder are considered disabilities and qualify people experiencing homelessness for Social Security Disability Income.

**Encampments –** Locations where two or more people experiencing homelessness live in an

DOJ-HUD-AR01063

unsheltered area. Encampments are typically made up of tents and improvised structures and can be in either urban or rural settings.

**Emergency Shelter –** A facility that provides temporary shelter for people experiencing homelessness.

**Housing Unit –** A house, apartment, group of rooms, or single room occupied or intended for occupancy as separate living quarters.

**Housing First –** An approach that centers on solving homelessness by providing taxpayer funded housing vouchers free of charge to people experiencing homelessness. Per HUD and the Housing First philosophy, participation in treatment services are not allowed to be mandatory.

**Housing Management Information System (HMIS) –** HMIS is a local information technology system used to collect client-level data and data on the provision of housing and services to individuals and families experiencing homelessness and persons at risk of homelessness. Each Continuum of Care (CoC) is responsible for selecting an HMIS software solution that complies with HUD's data collection, management, and reporting standards.

**HUD –** U.S. Department of Housing and Urban Development is the lead funding agency on most federal programs to address homelessness.

**Intensive Case Management –** A program for people with severe and persistent mental health issues that severely impact their ability to meet basic needs, maintain medication compliance, managing symptoms, attending and scheduling appointments, life skill classes, employment training, and connecting to specialized services.

**McKinney-Vento Act –** The federal law that provides regulations and funding of many homelessness assistance programs. The Act originally created fifteen programs providing a spectrum of services to people experiencing homelessness, including Supportive Housing Program, Shelter Plus Care Program, and Emergency Shelter Grant Program. It also established the United States Interagency Council on Homelessness. Later, the HEARTH Act of 2009 consolidated many of these programs, established the federal definition of chronic homelessness, and authorized the Continuum of Care Program as the means to distribute federal grants to communities for homelessness assistance.

**Mental Health / Mental Illness –** Mental illness refers to "conditions that affect a person's thinking, feeling, mood, or behavior." These can include but are not limited to depression, anxiety, bipolar disorder, or schizophrenia. Mental health reflects "our emotional, psychological, and social well-being."

**Notice of Funding Availability / Notice of Funding Opportunity (NOFA/NOFO) –** The public notice by the federal government of grants and other funding available to address specific needs or issues. NOFAs / NOFOs define what eligible activities qualify for funding, how to apply for funds, and what specific information should be included in proposals to describe projects and justify funding awards.

**Outcomes vs. Outputs –** Outcomes are the desired end-game goals to be accomplished (e.g. how many people exit homelessness). Outputs are sub-step actions that contribute towards accomplishing outcomes (e.g. how many hygiene kits are given out).

**Outreach Services –** Services that attempt to engage and persuade people experiencing homelessness to go into a trauma-informed treatment program or to accept housing.

**Overhead Construction Costs –** Overhead construction costs include cost of permitting fees, utility hook-ups, and germane and non-germane building codes, as well as the impact of regulations such as parking ratios, environmental reviews, and financing. California has some of the highest building fees and regulatory costs due to laws like the California Environmental Quality Act


DOJ-HUD-AR01064

(CEQA). In California, it is common to have more than $100,000 overhead construction costs per housing unit.

**Participation Requirements –** See Service Participation Requirements below.

**Permanent Supportive Housing –** Leased-based taxpayer subsidized housing for people experiencing homelessness. Per HUD, participation treatment requirements and services are not allowed to be mandatory.

**Point-in-Time Count (PITC) –** The Point-in-Time Count is a count of people experiencing homelessness (both unsheltered and sheltered) on a single night in January. A PITC is required by HUD for communities that receive federal homelessness assistance funds and is one of the responsibilities of the local Continuum of Care.

**Preconditions –** Preconditions, distinct from service participation requirements, are pre-qualifying conditions for individuals to participate in a program based on screening requirements. Preconditions and screening requirements could include sobriety, absence of a serious mental illness, or ability to work.

**Rapid Re-Housing (RRH) –** An intervention that provides short-term (up to three months) and medium-term (4-24 months) tenant-based rental assistance and supportive services to households experiencing homelessness. The practice of quickly moving people experiencing homelessness into taxpayer subsidized lease-based housing for a maximum of 24 months. Per HUD and the Housing First philosophy, participation treatment requirements and services are not allowed to be mandatory.

**Services –** A wide array of assistance activities provided by service agencies for people experiencing homelessness. Services include, but are not limited to, trauma-informed care, case management, job skills training, life skill classes, laundry, hygiene care, substance use disorder treatment, treatment for mental illness, dental care, and health care.

**Service Participation Requirements –** As with Pell Grant and Temporary Assistance for Needy Families (TANF), these are required activities persons must participate in to continue in a program and receive taxpayer funded assistance. Activities can include attending meetings with case managers or job training and life skill classes, and participation in substance use disorder treatment. Per HUD and the Housing First philosophy, participation treatment requirements and services are not allowed to be mandatory.

**Serious Mental Illness (SMI) –** A mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities of daily living.

**Substance Use Disorder (SUD) –** Clinically significant impairment, including health problems, disability, and failure to accomplish responsibilities at work, school, or home caused by the recurrent use of alcohol and/or drugs.

**Transitional Housing (TH) –** Transitional Housing provides temporary housing with supportive services to individuals and families experiencing homelessness, with the goal of interim stability and longer-term goal of successfully moving into permanent housing. Transitional Housing programs cover the costs for both housing and accompanying supportive services for program participants for up to 24 months.

**Trauma Informed Care –** A customized approach of care that addresses an individual's underlying history of trauma.
Wrap Around Services / Robust Services – A wraparound approach customizes treatment services based on the individual needs of people experiencing homelessness.

DOJ-HUD-AR01065

# Endnotes

1. US Department of Housing and Urban Development, HUD Exchange, "Category 1 Literally Homeless," accessed August 31, 2022, https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/category-1/.

2. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

3. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

4. US Department of Education, National Center on Homeless Education, "Data and Statistics on Homelessness," accessed August 31, 2022, https://nche.ed.gov/data-and-stats/.

5. National Archives, Federal Register, "McKinney-Vento Education for Homeless Children and Youths Program," accessed August 31, 2022, https://www.federalregister.gov/documents/2016/03/17/2016-06073/mckinney-vento-education-for-homeless-children-and-youths-program

6. United States Interagency Council on Homelessness, "FY 2023 Proposed Federal Budget for Homelessness," accessed August 31, 2020, https://www.usich.gov/tools-for-action/fy-2023-proposed-federal-budget-for-homelessness.

7. National Low Income Housing Coalition, "Coronavirus Response Packages, Updated May 12, 2020," accessed August 2022, https://nlihc.org/sites/default/files/Coronavirus-Budget-Chart.pdf.

8. United States Interagency Council on Homelessness, "Making the Most of the American Rescue Plan: A Guide to the Funding That Impacts People Experiencing Homelessness," accessed August 31, 2022, https://www.usich.gov/resources/uploads/asset_library/USICH_American_Rescue_Plan_Guide.pdf.

9. US Department of Housing and Urban Development, Docket No. FR-5700-N-31B, Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and 2014 Continuum of Care Program Competition.

10. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

DOJ-HUD-AR01066

11. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

12. Tammy Mutasa, "Growing crime rate at Seattle's homeless camps prompts anxiety, demands for solutions," May 20, 2022, KOMO News, accessed August 31, 2022, https://komonews.com/news/operation-crime-justice/crime-at-seattles-homeless-camps-prompts-anxiety-demands-for-city-crackdown.

13. Piper McDaniel, "Homeless people are more likely to be victims of violence than housed people," July 13, 2022, Street Roots, accessed August 31, 2020, https://www.streetroots.org/news/2022/07/13/violence-conflated.

14. Kevin Duggan, "Lost and Forgotten: Record Number of Homeless Died in New York Last Year, Report Finds," AMNY Newsletter, March, 22, 2022, accessed August 31, 2022, https://www.amny.com/news/record-homeless-died-new-york-last-year-report/.

15. 24 CFR 578.3 Definitions: Permanent housing means community-based housing without a designated length of stay, and includes both permanent supportive housing and rapid rehousing. To be permanent housing, the program participant must be the tenant on a lease for a term of at least one year, which is renewable for terms that are a minimum of one month long and is terminable only for cause.

16. Tina Trenkner, "Are Cities' Pledges to End Homelessness Working?" March 26, 2012, Governing, accessed August 31, 2022, https://www.governing.com/archive/gov-homelessness-rising-decade-after-pledges-to-end-it.html.

17. US Department of Housing and Urban Development, HUD Exchange, "USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness," June 2015, accessed 31 August 2022, https://www.hudexchange.info/resource/1237/usich-opening-doors-federal-strategic-plan-end-homelessness/#:~:text=The%20Plan%20is%20focused%20on,ending%20all%20types%20of%20homelessness.

18. Janey Rountree, Nathan Hess, and Austin Lyke, "Health Conditions Among Unsheltered Adults in the U.S." October 2019, California Policy Lab Policy Brief, accessed 31 August 2022, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

19. Jill Roncarati, Henning Temeier, Rebecca Tachick, Tyler VanderWeele, and James J O'Connell, "Housing Boston's Chronically Homeless Unsheltered Population: 14 Years Later." Medical Care 59, Suppl 2 (2021): 170-174, accessed September 13, 2022, https://pubmed.ncbi.nlm.nih.gov/33710091/.

20. Ananya Roy and Chloe Rosenstock, "We Do Not Forget: Stolen Lives of LA's Unhoused During the COVID-19 Pandemic," UCLA Luskin Institute on Inequality and Democracy, December 1, 2021, accessed September 13, 2022, https://escholarship.org/uc/item/9104j943.

DOJ-HUD-AR01067

21. Emily Alpert Reyes, Benjamin Oreskes, and Doug Smith, "Why did so many homeless people die while staying at one hotel using Project Roomkey?" Los Angeles Times, June 28, 2021, accessed September 13, 2022, https://www.latimes.com/homeless-housing/story/2021-06-28/la-homeless-people-died-after-entering-covid-hotel-why.

DOJ-HUD-AR01068



# How Congress Can Reform Government's Misguided Homelessness Policies



**fixhomelessness**.org

DOJ-HUD-AR01069

# CICERO INSTITUTE

# SEX OFFENDERS:
# An Overlooked but Significant Subpopulation of the Homeless

*April 2025*

*Authored by:*

**Devon Kurtz**
*Public Safety Policy Director*
*Cicero Institute*

DOJ-HUD-AR01070

# EXECUTIVE SUMMARY

The homeless population in the United States is very diverse. Over the last decade, scholars have made considerable progress in advancing our understanding of the various subpopulations and the myriad drivers of homelessness that are associated with each. But even as researchers have found a history of criminal offending in a sizeable proportion of homeless people, analyses of criminal history and homelessness remain simplistic and underdeveloped. Homeless sex offenders present a special case of interest within this subpopulation because of their unique set of social and legal barriers to housing and their risk profile, which is exacerbated by homelessness.

This study investigates the prevalence of homelessness among registered sex offenders in 41 states and, in turn, compares those findings to state-level homelessness data from the U.S. Department of Housing and Urban Development (HUD) to determine the extent to which sex offenders are a prominent subpopulation of homelessness. The use of Point-in-Time Count data, which is known to undercount unsheltered homeless individuals, creates many limitations to the results, but given the PIT Count's use by officials, it still provides useful information to policymakers. The results of this study indicate that more than 10 percent of unsheltered homeless populations are registered sex offenders in 32 states, and more than half are registered sex offenders in eight states. As a proportion of total homeless populations, only nine states had more than 10 percent registered sex offenders. Median results for homeless sex offenders were higher than those of all HUD-tracked unsheltered homeless subpopulations selected for comparison and were similarly sized to all but two of the HUD-tracked total homeless subpopulations selected for comparison. No geographic patterns were tested conclusively, but results show some evidence of higher proportions of sex offenders among unsheltered homeless in the Midwest, northern Mountain West, and Southern New England. The results of this study should inform policymaking and practice in states where sex offenses are a sizeable subpopulation, as this population has several distinctive risks and needs that may not be well addressed by conventional homelessness interventions. Moreover, this study aims to spur additional research into the connection between sex offenses and homelessness, especially in relation to public safety implications and potential drivers of the variability in homeless rates of sex offenders among states.

DOJ-HUD-AR01071

# Introduction

The U.S. had 771,480 homeless individuals living in shelters or on the street, according to the U.S. Department of Housing and Urban Development's (HUD) Annual Homeless Assessment Report (AHAR) delivered to Congress at the end of 2024.[1] The report showed homelessness has increased across subpopulations, with nearly every category reaching record levels.[2] These increases held across geographical regions as well, with all but seven states seeing a rise in the number of homeless people.[3] As America's homelessness crisis worsens, scholars and policymakers alike have sought a better understanding of homeless people and the reasons they may have become homeless.

One of the largest studies of homelessness to date, Kushel et al. (2023), surveyed 3,200 homeless people in California and interviewed more than 300 to understand the backgrounds of homeless individuals better.[4] The findings were remarkably diverse, indicating that homeless people come from a broad cross-section of society and end up homeless due to a variety of economic, social, legal, and personal factors.[5] There was, however, a surprisingly consistent theme that the report found, but did not explore in as much depth: incarceration for criminal offenses. Kushel et al. (2023) found that 37 percent of homeless people had been to prison in their lifetime, and 79 percent had been to jail.[6] One in five had entered their recent episode of homelessness following a prison or long jail sentence. But many were also victims of crime—half reported physical or sexual violence, with 15 percent experiencing sexual violence specifically.[7] Yet, even in this exploration of criminal justice involvement, very little nuance was afforded to different types of criminal offenders or how that could impact their loss of housing or ability to attain new housing successfully. In particular, sex offenders, who arguably face the steepest personal, social, and legal barriers to housing and reintegration after prison, were not even mentioned in the report.[8]



DOJ-HUD-AR01072

Very few homelessness advocacy and research centers have given sex offenders attention. The research databases of the National Alliance to End Homelessness, the Homelessness Policy and Research Institute at the University of Southern California, and the Initiative on Health and Homelessness at the Harvard Chan School of Public Health do not contain a single reference to sex offenders or the restrictive policies they face in finding a place to live. The database at the Benioff Homelessness and Housing Initiative at the University of California at San Francisco turns up only one result from a search of the term "sex offender"—a blog post about potential sex offense prosecution for public urination.[9] Though a commonly held misconception, it is extremely rare for an individual to be prosecuted and placed on a sex offender registry for public urination.[10]

While homelessness scholars have largely ignored the connection between sex offenders and homelessness, criminologists have not. Harris, Levenson, and Ackerman (2014) found that two to five percent of the nation's registered sex offenders are homeless, a significantly higher rate than that of the general population, which sits below one percent.[11] But even that measure masks the true relevance of sex offenders to homelessness research and policy, as it captures the proportion of sex offenders who are homeless, but not the proportion of homeless people who are sex offenders. This study seeks to address that research gap by comparing the population of homeless sex offenders in 41 states to the general homeless population to investigate the relevance of sex offenders as a subpopulation worthy of more consideration by scholars, advocates, and policymakers. The particular interventions that may be appropriate to or effective in addressing homelessness in this subpopulation are beyond the scope of this study, but some ideas for further research will be suggested.

# Existing Subpopulations of Homelessness

Scholars and policymakers generally understand that the homeless population is not a monolith. HUD's Annual Homelessness Assessment Report to the U.S. Congress divides the homeless population into broad subpopulations: individuals without families, families with children, unaccompanied youth, veterans, and the chronically homeless.[12] The HUD Continuum of Care Homeless Populations and Subpopulations report includes further subcategorization based on age, race



**4.2%-13.1%**
OF OFFENDERS RELEASED FROM PRISON WERE HOUSED IN A SHELTER AFTER RELEASE.

and ethnicity, gender identity, and characteristics of severe mental illness, substance abuse, HIV status, and exposure to domestic violence.[13] Culhane (2019) explored the rapidly growing and uniquely challenging subpopulation of elderly homeless,[14] Metraux and Culhane (2004) examined the interrelationship between the burgeoning U.S. prison population and the reemergence of homelessness in the early 2000s.[15] The authors of the latter found that between 4.2 and 13.1 percent of offenders released from prison were housed in

DOJ-HUD-AR01073



a shelter after release, a number which varied considerably based on the severity of the offense, though their study notably did not consider the specific category of sexual offenses. Still, the findings suggested that former criminal offenders may constitute a distinct subpopulation. Kushel et al. (2023) found that, two decades later, almost 80 percent of homeless individuals in California, who account for approximately half of the nation's homeless population, had some form of criminal history that resulted in incarceration in jail or prison.[16] That study also found that a combined two-thirds of homeless individuals used some type of hard narcotic, and more than 80 percent experienced some form of mental illness.[17] These findings suggest that some of these characteristics may not constitute distinct subpopulations but rather represent nearly universal characteristics of the homeless population.



**ALMOST 80%** OF HOMELESS INDIVIDUALS IN CALIFORNIA, WHO ACCOUNT FOR APPROXIMATELY HALF OF THE NATION'S HOMELESS POPULATION, HAD SOME FORM OF **CRIMINAL HISTORY THAT RESULTED IN INCARCERATION** IN JAIL OR PRISON.

Despite Kushel et al.'s (2023) comprehensiveness, especially compared to the various HUD reports and smaller-scale studies, the authors still failed to identify sex offenders as a distinct subpopulation or even a category of interest.[18] HUD does make a reference to sex offenders in the regulations for its homelessness programs, 24 CFR 578.93(b)(4), which provides programs with the discretion to exclude sex offenders if the program also includes children.[19] However, homelessness scholars have almost entirely avoided the subject of sex offenders. Among policy organizations that work on both homelessness and criminal justice, the Urban Institute

DOJ-HUD-AR01074

is one of the few that has produced reports that even mention this intersection, though even their research is from decades ago. Roman and Travis (2004) offered the most direct consideration of the subject in their study of prisoner reentry and homelessness, identifying social stigma, pressure on landlords, exclusionary criteria for shelters and housing programs, and legal residence restrictions as unique challenges for sex offenders leaving prison that may increase their likelihood of homelessness.[20] The only other mentions of sex offenders and homelessness by the Urban Institute were far more limited. Theodos, Popkin, Guernsey, and Getsinger (2010) praised an innovative program for the "hard to house" but noted it excluded sex offenders.[21] And Burt et al. (2010) made passing mention of exclusionary program eligibility criteria for people with criminal histories, including sex offenders. They recommended that those requirements be reduced, though the authors stopped short of calling for those changes specifically for sex offenders.[22]

# Sex Offenders and Homelessness

The primary source of information on the intersection of sexual offending and homelessness is within criminological literature on the challenges that the population faces during re-entry, especially due to the litany of restrictions to which they are subjected upon release, which scholars suggest increase homelessness. Harris, Levenson, and Ackerman (2014) found that between two and five percent of the nation's registered sex offenders are homeless, a finding reaffirmed by state-specific studies such as those of South Carolina (Cann and Scott 2020) and Delaware (Metraux and Modeas 2023).[23-25] The potential reasons for such a high rate of homelessness among registered sex offenders are many, ranging from individual-level factors (e.g., cognitive functioning and childhood trauma) to community-level and social structural factors (e.g., public policy, housing affordability, and social stigmatization).

## Individual-Level Causes of Sex Offender Homelessness

Research on individual-level factors influencing sex offender homelessness is relatively limited, though several studies hold homelessness as an implication of their findings. Lee, Tyler, and Wright (2010) do not explicitly mention sex offenders, but they theorize the ways in which at-risk populations become homeless due to a combination of personal vulnerabilities and experiences, which holds considerable relevance for sex offenders.[26] Levenson, Willis, and Prescott (2016) found that male sex offenders were several times as likely to report high adverse childhood experiences (ACE) scores compared to the general male population.[27] Liu et al.'s (2021) systematic review and meta-analysis found a high prevalence of high ACE scores among the homeless population, offering additional insight into Levenson, Willis, and Prescott's (2016) findings.[28] Similarly, findings from Joyal et al. (2013) and Stone, Dowling, and Cameron (2018) present a possible connection between the high prevalence of low cognitive functioning among sex offenders and an overrepresentation of low cognitive functioning among the homeless population.[29-30] Although there are a few studies that approach the issue of individual-level factors that may drive sex offender homelessness, this area of research is critically underdeveloped.

DOJ-HUD-AR01075

# Community-level Causes of Sex Offender Homelessness

Far more research has focused on the impact of various structural factors on sex offenders. Sex offenders are subjected to a wide variety of policies in different states, though these policies tend to fall into four categories: registration, community notification, residence restriction, and civil commitment.

## Registration Policies

The first state to require sex offenders to register with law enforcement was California, which did so in 1947.[31] The original intention of sex offender registries was to provide investigators with a ready-made list of possible suspects in the vicinity of a crime. However, their usefulness to the criminal justice system grew to include providing prosecutors with additional leverage in negotiating plea deals and allowing law enforcement to use charges for an offender's failure to register or other violations as a stand-in for crimes they could not prove.[32] By 1996, all states had created some form of sex offender registry.[33] The U.S. Congress's passage of the Adam Walsh Act in 2005 established a national registry to which all states were required to contribute, including offenses dating back to the 1970s.[34] The Adam Walsh Act also required states to instruct law enforcement to inform the public when sex offenders were being released from prison through so-called "community notification" policies, though not every state is in full compliance with that law.[35]

## Community Notification Policies

Community notification policies vary in content far more than registration policies, which are similar in purpose, though distinct in structure and governance, across states. Despite federal requirements of the Adam Walsh Act, fewer than half of the states have some form of community notification policy, and those that do differ considerably in the scope and implementation of their policies. On one end is California, which leaves notification policies up to local law enforcement agencies; on the other is Alabama, which requires law enforcement to distribute leaflets with identifying information about the released sex offender to everyone living within 1,000 feet of the offender's residential address.[36] Lasher and McGrath (2012) systematically reviewed the literature on policies related to sex offender community notification and their potential impact on employment and housing opportunities.[37] A significant number of studies found an impact, though only the more active forms of community notification, such as those in Alabama, were associated with social destabilization related to employment or housing.[38]



**IN ALABAMA, LAW ENFORCEMENT IS REQUIRED TO DISTRIBUTE LEAFLETS WITH IDENTIFYING INFORMATION ABOUT THE RELEASED SEX OFFENDER TO EVERYONE LIVING WITHIN 1,000 FEET OF THE OFFENDER'S RESIDENTIAL ADDRESS.**

DOJ-HUD-AR01076



## Residence Restrictions

Sex offender residence restrictions, which legally prohibit sex offenders from living in certain areas commonly associated with children, under criminal penalty, are by far the most widely explored sex offender policy as it relates to homelessness. The work of J.S. Levenson has explored the ways these sex offender residence restrictions create collateral consequences for sex offenders far beyond their prison sentence or even the challenges associated with other felony offenses. Levenson and Cotter (2005) surveyed sex offenders about how they navigate the effects of a Florida law forbidding them from living within 1,000 feet of schools and daycares.[39] The authors found that more than half of sex offenders found it more difficult to attain affordable housing, and just under half were unable to live with supportive family members because their residences fell within an exclusion zone.[40] A similar survey in Indiana found that nearly two-thirds of sex offenders feared they might become homeless as a result of residence restrictions in that state.[41] Sex offenders surveyed in a study by Mercado, Alvarez, and Levenson (2008) reported that they had to move more frequently because of residence restrictions, a finding affirmed by Rydberg et al.'s (2018) quasi-experimental study that found that sex offenders were twice as likely to move more than three times following release from prison after a statewide residence restriction went into effect.[42-43] Frequent residence movement is strongly associated with homelessness.[44]

The two strongest studies that investigated the potential of residence restrictions to increase sex offender homelessness were Socia, Levenson, and Ackerman (2014) and Cann and Scott (2020).[45-46] Socia, Levenson, and Ackerman (2014) conducted regression analyses of residence restrictions along with a number of other variables to test their relationships with

DOJ-HUD-AR01077

the prevalence of homeless sex offenders in different counties in Florida.[47] The results showed that a one-percent increase in geographic coverage by a residence restriction in a county led to a one-percent increase in the number of homeless sex offenders.[48] Cann and Scott (2020) analyzed the change in the homeless rate of the South Carolina sex offender registry over more than a decade to examine the potential impact of that state's sex offender residence restriction law.[49] The authors found a significant increase in sex offender homelessness following the adoption of the law, but they could not isolate the impact from other potential explanations.[50]

## Civil Commitment

The U.S. is unique in its policy of civilly committing some sex offenders to psychiatric institutions under distinct procedures from all other types of psychiatric commitment. This practice began in the early twentieth century as part of a movement to classify sex offenders, especially those who committed crimes against children, as "sexual psychopaths."[51] It was relatively unusual for child molesters to receive prison sentences until after the mid-twentieth century.[52] Before then, child molesters most often received probation sentences, and some were committed to psychiatric institutions in connection with their offending patterns. The latter half of the twentieth century brought a dramatic shift in policy towards sex offenders, with increased reliance on long prison sentences and, for a few decades, little attention to obsolete or repealed sexual psychopath laws.[53]

Renewed interest in the civil commitment of sex offenders came towards the end of the twentieth century, with states adopting a new paradigm called "sexually violent predator" laws.[54] These laws allow states to designate certain sex offenders as sexually violent predators, which became a special classification within the sex offender registry that has heightened community notification requirements and permits prosecutors to petition courts to civilly commit such offenders to psychiatric institutions under a lower standard than applies to the general population.[55] Instead of requiring individuals to exhibit signs of severe mental illness and present an immediate danger to themselves or others as evaluated by a psychologist, sexually violent predators need only be shown to have a "mental abnormality," a vague standard that falls outside of the Diagnostics and Statistical Manual (DSM) and essentially allows for broad confinement of offenders who would otherwise not meet commitment criteria.[56] Because the presence of a mental condition justifies civil commitment, sexually violent predator laws have a pretext of treatment. Miller (2010) points out that treatment is fairly limited in these facilities, and committees have strong disincentives to participate in treatment or discuss their crimes or underlying sexual deviance.[57] The result is that those committed tend to stay in psychiatric facilities for periods that may exceed their original prison sentence.[58]

Importantly, civil commitment of sexually violent predators need not happen in lieu of prison. Rather, prosecutors can petition for commitment upon release from prison or even after the individual is back in the community. These laws have been the subject of significant litigation, but ultimately, the U.S. Supreme Court ruled in Kansas v. Hendricks (1997) that they did not violate the Fourteenth Amendment's protections of due process or against double jeopardy.[59] By 2006, more than 4,500 individuals were committed under sexually violent predator laws nationwide.[60]

DOJ-HUD-AR01078

While sexually violent predator statutes may seem less directly relevant to homelessness, it is worth considering that sex offenders who exhibit the highest degrees of mental and social dysfunction and whose crimes would be the most severely stigmatized in the community (such as those who might be classified as sexually violent predators) could be at particularly high risk of homelessness. But if those individuals are committed to psychiatric facilities indefinitely, then they are not homeless. Thus, it is possible that sexually violent predator statutes, unlike the other sex offender policies, could reduce sex offender homelessness through indefinite incapacitation. However, for those sex offenders who are eventually released from psychiatric institutions, homelessness is a very high risk.[61]



**IT IS POSSIBLE THAT SEXUALLY VIOLENT PREDATOR STATUTES, UNLIKE THE OTHER SEX OFFENDER POLICIES, COULD REDUCE SEX OFFENDER HOMELESSNESS THROUGH INDEFINITE INCAPACITATION. HOWEVER, FOR THOSE SEX OFFENDERS WHO ARE EVENTUALLY RELEASED FROM PSYCHIATRIC INSTITUTIONS, HOMELESSNESS IS A VERY HIGH RISK.**

Existing literature on sex offenders describes many relevant individual-level and community-level risk factors for homelessness. However, it has failed as of yet to establish sex offenders as a legitimate subpopulation of homelessness worthy of attention from researchers and policymakers. Although research has established that sex offenders have higher rates of homelessness than the general public, it is not yet clear what proportion of the general homeless population is on the sex offender registry, and it is that question that this study aims to answer. This study has considerable relevance to policy because of the complexities of this population, both in terms of risk profile and the policies to which they are subjected. This study raises further questions about how those complexities may hinder the effectiveness of certain homelessness interventions but will require further research to answer.

# Methodology

This study will use the basic statistical functions of the Statistical Package for the Social Sciences (SPSS) software to analyze the prevalence of sex offenders within the homeless populations of 41 states. Although there is a national sex offender registry overseen by the Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Office of the U.S. Department of Justice, that database is comprised of submissions from 50 separate sex offender registries across the country. Each state registry is separately developed and managed, leading to variability in the quality and labeling of data. While each state maintains a registry and reports data to the national registry, most states are out of compliance with the Adam Walsh Act to some degree, contributing further to the variability in structure and access among states.[62] Of 50 states, nine were removed from this study's

DOJ-HUD-AR01079

sample for various reasons, including refusal of access (Minnesota), inability to provide homeless-specific data (Nevada, New York, Maine, Michigan, West Virginia), or no response (Mississippi, Oregon, South Carolina).

State-level datasets were collected in a variety of formats, including Excel sheets with all the state's sex offenders, databases scraped using the DataMiner plugin, and aggregate counts with no additional context sent by registry managers in response to Freedom of Information Act requests. Each dataset was cleaned to eliminate duplicate entries, offenders who lived out of state, were in prison, deported, institutionalized, or had a verified address. The remaining sex offenders were divided into two categories: those labeled as homeless or a related term, or who had an address that described a state of homelessness (e.g., under a bridge or living in a tent), and those with no address or listed as "whereabouts unknown." Importantly, sex offenders who listed their address as a homeless shelter or transitional housing provider are not labeled as homeless in registries, even though they would be considered homeless by HUD's definition of homelessness for the Point-in-Time (PIT) Count.[63] The decision not to include sex offenders who are not labeled as "homeless" or "address unknown" but may, in fact, be homeless as defined by HUD was necessary due to the difficulty in matching addresses and the large number of states in which no such data collection would even be possible given the structure and availability of the registry. This decision does, however, imply that this study undercounts HUD-defined homelessness on the registry, though evidence that sex offenders are excluded from most homeless shelters suggests that the underestimation may be relatively marginal.

The decision to keep the data explicitly labeled as "homeless" separate from the data labeled "no address" was informed by prior literature on the sex offender registry that attests to the ambiguity of the latter category. The primary limitation of the "no address" dataset is that it is unclear whether the individuals in this category are homeless or if they simply did not provide the required information that would allow them to be categorized otherwise.[64] While it may seem intuitive to include offenders who are missing or who have absconded in this category, offenders who are out of compliance are listed separately within each registry. Cann and Scott (2020) make note of this problem and ultimately decided not to include sex offenders with no address in their sample, with the acknowledgment that this would likely mean their research undercounts homelessness and thus provides only a conservative estimate.[65] The present study addresses this issue by conducting two comparisons: one between sex offenders labeled as homeless and general homeless data and the other between a combined dataset of sex offenders labeled as "homeless" and those labeled "no address," which, in effect, creates an upper and lower bound of the proportion of the homeless population who are sex offenders.

The final major decision about the data was which general homelessness dataset to use for the comparison. HUD's annual census, the Point-in-Time Count, provides the homeless population for each state. Even acknowledging the limitations of the Point-in-Time Counts' rudimentary data collection methods, they remain the most consistent data on homelessness—and the most widely used. The Point-in-Time Count data is divided into two major categories: unsheltered and

DOJ-HUD-AR01080



sheltered homeless.[i] State sex offender registries, however, do not specify the type of homelessness as defined by HUD. Moreover, both the sex offender registry and HUD's Point-in-Time Count classify homelessness as binary and not a spectrum for the purposes of data collection, which in turn ignores potentially relevant but fluid categories of housing insecurity, a severe limitation raised by Socia, Levenson, and Ackerman (2014).[66] While all of these categories can certainly be problematized, a few insights from other scholars informed how this study decided which categories of homelessness it deemed relevant. First, Rolfe, Tewksbury, and Schroeder (2017) investigated homeless shelters in Kentucky, Michigan, Ohio, and Tennessee. They found that 71 percent of homeless shelters in those states had policies to refuse admission of sex offenders, with a nearly equal number conducting sex offender registry checks upon entrance.[67] Stucky and Ottensmann (2014) excluded from their research a group of sex offenders who had listed homeless shelters as their address and were thus not labeled as homeless, which suggests that sex offenders explicitly listed as "homeless" or "transient" are likely best categorized as unsheltered homeless.[68] While these two studies suggest that unsheltered homelessness is the most appropriate categorization because of the relative ambiguity, this study compares the homeless sex offender population to both the unsheltered homeless and total homeless (combined sheltered and unsheltered) populations.

For each of the 41 states examined in this paper, four proportions will be created: (1) the number of registered sex offenders listed as homeless compared to the unsheltered homeless population; (2) the number of registered sex offenders listed as "homeless" or "address unknown" compared to the unsheltered homeless population; (3) the number of registered sex offenders listed as "homeless" compared to the total homeless population; (4) the number of registered sex offenders listed as "homeless" or "address unknown" compared to the total homeless population.

---

i. A related issue that is not as pressing for the purposes of this study is that sex offenders who were homeless but have been provided with permanent supportive housing through a HUD homelessness program are not considered homeless by HUD or by the sex offender registry. Therefore, they would not be included in this sample, though it could be an area for future research to see how successful such programs are at moving sex offenders off the street at scale.

DOJ-HUD-AR01081

# Results

Across the 41 state sex offender registries examined, a total of 21,583 individual sex offenders were identified as homeless, and another 8,796 sex offenders were classified as "address unknown." These figures were analyzed primarily in comparison to the unsheltered and total homeless population at the state level, but an average figure using the combined sample and the combined unsheltered and total homeless populations is also included in Figure 1.

Each of the four measures comparing registered sex offenders and homelessness among the 41 states analyzed has wide variability. Figure 1 shows the results for all states in the sample (N = 41) across all four measures, and then the results for each measure are reported in more detail individually. Results were categorized as small (0.00–0.10), medium (0.10–0.20), large (0.200.50), and exceptionally large (0.50).

### FIGURE 1: RESULTS OF REGISTERED SEX OFFENDERS AND HOMELESS POINT-IN-TIME COUNT COMPARISON BY STATE

| State | Proportion of Unsheltered Homeless on Sex Offender Registry (Labeled Homeless) | Proportion of Unsheltered Homeless on Sex Offender Registry (Labeled Homeless or Address Unknown) | Proportion of Total Homeless on Sex Offender Registry (Labeled Homeless) | Proportion of Total Homeless on Sex Offender Registry (Labeled Homeless or Address Unknown) |
|---|---|---|---|---|
| Alabama | 0.05 | 0.23 | 0.03 | 0.14 |
| Alaska | 0.05 | 0.16 | 0.01 | 0.03 |
| Arizona | 0.13 | 0.20 | 0.06 | 0.10 |
| Arkansas | No Data Available | 0.09 | No Data Available | 0.04 |
| California | 0.05 | 0.05 | 0.03 | 0.03 |
| Colorado | 0.24 | 0.24 | 0.06 | 0.06 |
| Connecticut | 0.22 | 0.53 | 0.04 | 0.09 |
| Delaware | 0.74 | 0.74 | 0.12 | 0.12 |
| Florida | 0.16 | 0.16 | 0.09 | 0.09 |
| Georgia | 0.03 | 0.03 | 0.01 | 0.01 |
| Hawaii | 0.04 | 0.11 | 0.01 | 0.04 |
| Idaho | 0.06 | 0.08 | 0.03 | 0.04 |
| Illinois | 0.50 | 0.50 | 0.05 | 0.05 |
| Indiana | 0.18 | 0.38 | 0.04 | 0.09 |
| Iowa | 0.16 | 0.40 | 0.03 | 0.07 |
| Kansas | 0.21 | 0.21 | 0.06 | 0.06 |

DOJ-HUD-AR01082

**FIGURE 1, CONTINUED**

| State | Proportion of Unsheltered Homeless on Sex Offender Registry (Labeled Homeless) | Proportion of Unsheltered Homeless on Sex Offender Registry (Labeled Homeless or Address Unknown) | Proportion of Total Homeless on Sex Offender Registry (Labeled Homeless) | Proportion of Total Homeless on Sex Offender Registry (Labeled Homeless or Address Unknown) |
|---|---|---|---|---|
| Kentucky | 0.05 | 0.05 | 0.02 | 0.02 |
| Louisiana | 0.06 | 0.18 | 0.02 | 0.08 |
| Maryland | 0.09 | 0.11 | 0.02 | 0.02 |
| Massachusetts | 0.4 | 0.5 | 0.02 | 0.03 |
| Missouri | 0.15 | 0.16 | 0.05 | 0.05 |
| Montana | 0.32 | 0.49 | 0.09 | 0.14 |
| Nebraska | 0.61 | 1.57 | 0.07 | 0.17 |
| New Hampshire | 0.2 | 0.2 | 0.05 | 0.05 |
| New Jersey | 0.01 | 0.06 | 0 | 0.01 |
| New Mexico | 0.01 | 0.07 | 0.01 | 0.03 |
| North Carolina | 0.14 | 0.67 | 0.05 | 0.26 |
| North Dakota | 0.16 | 0.16 | 0.04 | 0.04 |
| Ohio | 0.1 | 0.16 | 0.02 | 0.03 |
| Oklahoma | 0.29 | 0.44 | 0.12 | 0.18 |
| Pennsylvania | 0.08 | 0.16 | 0.01 | 0.03 |
| Rhode Island | 0.03 | 0.66 | 0.01 | 0.14 |
| South Dakota | 0.07 | 0.23 | 0.01 | 0.04 |
| Tennessee | 0.3 | 0.3 | 0.16 | 0.16 |
| Texas | 0.14 | 0.22 | 0.06 | 0.09 |
| Utah | 0.02 | 0.29 | 0.01 | 0.08 |
| Vermont | 0.02 | 0.02 | 0 | 0 |
| Virgina | 0.1 | 0.1 | 0.02 | 0.02 |
| Washington | 0.04 | 0.11 | 0.02 | 0.05 |
| Wisconsin | 1.57 | 1.57 | 0.16 | 0.16 |
| Wyoming | 0.27 | 0.36 | 0.05 | 0.06 |
| **Average** | **0.09** | **0.13** | **0.04** | **0.06** |
| **Median** | **0.14** | **0.2** | **0.03** | **0.05** |

DOJ-HUD-AR01083

(1) The number of states with similar proportions of unsheltered homeless populations on the sex offender registry listed as homeless is reported in Figure 2. The proportions ranged from 0.1 in New Jersey and New Mexico to 0.74 in Delaware, with the true maximum value of 1.57 in Wisconsin noted as an exceptional outlier.[ii] Arkansas was not included in this portion of the analysis because its registry could only provide sex offenders whose addresses were unknown and not explicitly labeled homeless. Nearly half of the sample (N = 19) had proportions between 0.01 and 0.10, indicating a small subpopulation of sex offenders within the unsheltered homeless population. Nine states' proportions fell between 0.10 and 0.20, indicating a medium-sized subpopulation. Eight states had proportions between 0.20 and 0.5, indicating a large subpopulation, while one-fifth (N = 4) had proportions above 0.50, indicating an exceptionally large subpopulation of sex offenders within the unsheltered homeless population. The four states with proportions above 0.50 were Illinois (0.50), Nebraska (0.61), Delaware (0.74), and Wisconsin (1.57). The average result across the whole sample, weighted for population, was 0.09.

### FIGURE 2: FREQUENCY OF PROPORTIONS OF UNSHELTERED HOMELESS ON SEX OFFENDER REGISTRY (LABELED HOMELESS)



(2) The number of states with similar proportions of unsheltered homeless on each state's sex offender registry listed as "homeless" or "address unknown" is reported in Figure 3. The proportions ranged from 0.2 in Vermont to 0.74 in Delaware, with outliers in Nebraska and Wisconsin, both at 1.57. Nebraska's and Wisconsin's outlier results exceeded the total unsheltered homeless populations of those states, which again possibly indicates an undercount of unsheltered homeless people or a misclassification of some number of homeless sex offenders as unsheltered.[69] Arkansas was included in this portion of the analysis

---

ii.  Wisconsin's 1.57 value implies that there are more registered sex offenders listed as homeless than there are unsheltered homeless people in the state. A few possible explanations are that the Point-in-Time Count used to measure unsheltered homelessness undercounts the actual value, which is consistent with the literature on the Point-in-Time Count (Shinn, Yu, Zoltowski, and Wu 2024). Another possibility is that some unknown proportion of Wisconsin's registered sex offenders listed as homeless are sheltered, though there were several entries in the registry not labeled as homeless that listed shelters as their address, so it is unclear the extent to which this is the primary issue with Wisconsin's data.

DOJ-HUD-AR01084

due to the broadened category that includes both sex offenders labeled as "homeless" and those labeled as "address unknown." Just under a quarter of the sample (N = 9) had proportions between 0.01 and 0.1, indicating a small subpopulation of sex offenders within the unsheltered homeless population. Compared to the results in Figure 2, a much larger number of states fell into the medium and large subpopulation groupings with the broadened criteria for what is considered homeless. More than a quarter of the sample (N = 12) fell into each of the medium (0.10–0.20) and large (0.20–0.50) subpopulation categories, and nearly one-fifth of the sample (N = 8) exceeded 0.50. The eight states with registered sex offenders labeled as "homeless" or "address unknown" making up more than half of their unsheltered homeless population were: Connecticut (0.53), Delaware (0.74), Illinois (0.50), Massachusetts (0.50), North Carolina (0.67), Nebraska (1.57) Rhode Island (0.66), and Wisconsin (1.57). The average size of the subpopulation across the whole sample was 0.13.

### FIGURE 3: FREQUENCY OF PROPORTIONS OF UNSHELTERED HOMELESS ON SEX OFFENDER REGISTRY (LABELED HOMELESS OR ADDRESS UNKNOWN)



(3) The number of states with similar proportions of total homeless on each state sex offender registry listed as homeless is reported in Figure 4. The proportions ranged from 0.00 in New Jersey and Vermont to 0.16 in Tennessee and Wisconsin. Nebraska's and Wisconsin's outlier results of the comparisons that were limited to unsheltered homelessness appeared much closer to the results from other states when compared to total homelessness but were both still in the fourth quartile of results. Arkansas was again not included in this portion of the analysis because its registry could only provide sex offenders whose addresses were unknown and not explicitly labeled "homeless." Almost one-third of the sample (N = 13) had proportions between 0.00 and 0.02, and more than half (N = 23) were between 0.02 and 0.10. Only four states in the sample had proportions of their total homeless population on the sex offender registry in excess of 0.10: Delaware (0.12), Oklahoma (0.12), Tennessee (0.16), and Wisconsin (0.16). The average result across the sample was 0.04.

DOJ-HUD-AR01085

**FIGURE 4: FREQUENCY OF PROPORTIONS OF TOTAL HOMELESS ON SEX OFFENDER REGISTRY (LABELED HOMELESS)**



(4) The number of states with similar proportions of total homeless populations on each state's sex offender registry listed as "homeless" or "address unknown" is reported in Figure 5. The proportions ranged from 0.00 in Vermont to 0.26 in North Carolina. Even when the criteria for inclusion were broadened to include sex offenders labeled "address unknown" in addition to those labeled as "homeless," only four states changed to a proportion above 0.10. Just over three-quarters of the sample (N = 32) was between 0.00 and 0.10, and an equal portion (N = 4) was between 0.10 and 0.15 as was between 0.15 and 0.20. The nine states above 0.10 were Alabama (0.14), Delaware (0.12), Montana (0.14), North Carolina (0.26), Nebraska (0.17), Oklahoma (0.18), Rhode Island (0.14), Tennessee (0.16), and Wisconsin (0.16). The average result across the sample was 0.06.

**FIGURE 5: FREQUENCY OF PROPORTIONS OF TOTAL HOMELESS ON SEX OFFENDER REGISTRY (LABELED HOMELESS OR ADDRESS UNKNOWN)**



DOJ-HUD-AR01086

# Analysis & Implications

Sex offenders appear to be a relevant and sizeable subpopulation of the homeless population in many states. When focusing specifically on the unsheltered population, which the literature and structure of the sex offender registries suggest is the most appropriate label for those listed as "homeless" or "address unknown" in the registry, the size of the subpopulation is alarming. There appears to be wider variability in the size of the subpopulation when limited to unsheltered homelessness (with far more states exceeding 0.10 and even 0.20) than when compared with the total homeless population. As a proportion of total homelessness, the majority of states fall below 0.10. These findings have implications for several areas of homelessness research and policy, including geographic variation in homelessness, comparisons to existing subpopulations in the factors that cause homelessness, homelessness interventions and services, and public safety.

## Geographic Variation

Given that the sample is based on state-level jurisdictions, the results of each of the four analyses are presented below in national maps (Figures 6-9). These figures offer a cursory view of potential geographic variations that could be further explored in future studies to determine potential causes of the significant variation in the results among states.

**FIGURE 6: MAP OF STATES BY PROPORTION OF UNSHELTERED HOMELESS POPULATION ON SEX OFFENDER REGISTRY (LABELED HOMELESS)**



DOJ-HUD-AR01087

**FIGURE 7: MAP OF STATES BY PROPORTION OF UNSHELTERED HOMELESS POPULATION ON SEX OFFENDER REGISTRY (LABELED "HOMELESS" OR "ADDRESS UNKNOWN")**



**FIGURE 8: MAP OF STATES BY PROPORTION OF TOTAL HOMELESS POPULATION ON SEX OFFENDER REGISTRY (LABELED "HOMELESS")**



DOJ-HUD-AR01088

**FIGURE 9: MAP OF STATES BY PROPORTION OF TOTAL HOMELESS POPULATION ON SEX OFFENDER REGISTRY (LABELED "HOMELESS" OR "ADDRESS UNKNOWN")**



The precise geographic patterns are hard to discern due to the missing nine states from the sample. Figures 6 and 7 indicate possible geographic patterns of higher proportions of unsheltered homeless on the sex offender registry in the Midwest, the northern portion of the Mountain West, and southern New England. However, those geographic patterns do not hold strongly when compared to the total homeless population in Figures 8 and 9. The Southeast appears to have a potential cluster of higher proportions of total homeless on the sex offender registry in Figure 9, though the absence of data from South Carolina and Mississippi significantly limits the geographic analysis.

## Subpopulations

HUD tracks several different subpopulations of homeless individuals across race, gender, family status, veteran affiliation, exposure to domestic violence, behavioral health, and HIV status.[70] HUD reports state and national statistics of how many homeless people fall into these categories based on the Point-in-Time Count, providing an opportunity to contextualize the size of the homeless sex offender subpopulation with HUD-tracked subpopulations. Most of the subpopulations for race and gender, with the notable exceptions of those identifying as Native American, Asian, Middle Eastern, Native Hawaiian, or as some variant of genderqueer, were far larger than the sex offender subpopulation as well as most other subpopulations unrelated to race and gender and are therefore not included in the comparison in Figures 10 and 11. Figure 10 compares the two measures of the sex offender subpopulation within

DOJ-HUD-AR01089

unsheltered homelessness with the following HUD-tracked unsheltered subpopulations: families, veterans, transgender, non-binary or more than one gender, victims of domestic violence, HIV-positive, and elderly (over 64). Figure 11 compares the two measures of the sex offender subpopulation within the total homeless population with those same HUD-track subpopulations of the total homeless population.

### FIGURE 10: PROPORTIONS OF UNSHELTERED HOMELESS POPULATION IN SUBPOPULATIONS BY STATE[71]

| State | Proportion of Unsheltered Homeless on SOR (Labeled Homeless) | Proportion of Unsheltered Homeless on SOR (Labeled Homeless or Address Unknown) | Proportion of Unsheltered Homeless Identified as Families | Proportion of Unsheltered Homeless Identified as Elderly | Proportion of Unsheltered Homeless Identified as Transgender, Non-Binary, or More Than One Gender | Proportion of Unsheltered Homeless Identified as Veterans | Proportion of Unsheltered Homeless Identified as Victims of Domestic Violence | Proportion of Unsheltered Homeless Identified as HIV-Positive |
|---|---|---|---|---|---|---|---|---|
| Alabama | 0.05 | 0.23 | 0.21 | 0.07 | 0.01 | 0.04 | 0.04 | 0.01 |
| Alaska | 0.05 | 0.16 | 0.02 | 0.02 | 0.00 | 0.04 | 0.01 | 0.00 |
| Arizona | 0.13 | 0.20 | 0.07 | 0.06 | 0.01 | 0.04 | 0.07 | 0.00 |
| Arkansas | | 0.09 | 0.10 | 0.05 | 0.00 | 0.06 | 0.08 | 0.02 |
| California | 0.05 | 0.05 | 0.04 | 0.07 | 0.02 | 0.05 | 0.10 | 0.02 |
| Colorado | 0.24 | 0.24 | 0.04 | 0.04 | 0.01 | 0.09 | 0.08 | 0.01 |
| Connecticut | 0.22 | 0.53 | 0.02 | 0.07 | 0.00 | 0.04 | 0.24 | 0.02 |
| Delaware | 0.74 | 0.74 | 0.01 | 0.05 | 0.00 | 0.05 | 0.01 | 0.02 |
| Florida | 0.16 | 0.16 | 0.11 | 0.10 | 0.01 | 0.06 | 0.07 | 0.02 |
| Georgia | 0.03 | 0.03 | 0.08 | 0.07 | 0.01 | 0.05 | 0.04 | 0.02 |
| Hawaii | 0.04 | 0.11 | 0.10 | 0.09 | 0.01 | 0.04 | 0.07 | 0.00 |
| Idaho | 0.06 | 0.08 | 0.44 | 0.09 | 0.01 | 0.06 | 0.06 | 0.00 |
| Illinois | 0.50 | 0.50 | 0.03 | 0.05 | 0.01 | 0.05 | 0.11 | 0.02 |
| Indiana | 0.18 | 0.38 | 0.03 | 0.04 | 0.01 | 0.05 | 0.01 | 0.01 |
| Iowa | 0.16 | 0.40 | 0.09 | 0.03 | 0.01 | 0.07 | 0.19 | 0.01 |
| Kansas | 0.21 | 0.21 | 0.03 | 0.03 | 0.01 | 0.07 | 0.11 | 0.00 |
| Kentucky | 0.05 | 0.05 | 0.03 | 0.03 | 0.01 | 0.05 | 0.08 | 0.01 |
| Louisiana | 0.06 | 0.18 | 0.02 | 0.05 | 0.01 | 0.03 | 0.05 | 0.01 |
| Maryland | 0.09 | 0.11 | 0.04 | 0.07 | 0.00 | 0.04 | 0.10 | 0.01 |
| Massachusetts | 0.40 | 0.50 | 0.00 | 0.05 | 0.01 | 0.04 | 0.07 | 0.01 |
| Missouri | 0.15 | 0.16 | 0.07 | 0.04 | 0.01 | 0.06 | 0.14 | 0.01 |
| Montana | 0.32 | 0.49 | 0.08 | 0.06 | 0.01 | 0.10 | 0.09 | 0.00 |
| Nebraska | 0.61 | 1.57 | 0.02 | 0.07 | 0.00 | 0.03 | 0.21 | 0.01 |
| New Hampshire | 0.20 | 0.20 | 0.03 | 0.03 | 0.01 | 0.04 | 0.07 | 0.00 |
| New Jersey | 0.01 | 0.06 | 0.04 | 0.06 | 0.00 | 0.05 | 0.12 | 0.02 |

DOJ-HUD-AR01090

**FIGURE 10, CONTINUED**

| State | Proportion of Unsheltered Homeless on SOR (Labeled Homeless) | Proportion of Unsheltered Homeless on SOR (Labeled Homeless or Address Unknown) | Proportion of Unsheltered Homeless Identified as Families | Proportion of Unsheltered Homeless Identified as Elderly | Proportion of Unsheltered Homeless Identified as Transgender, Non-Binary, or More Than One Gender | Proportion of Unsheltered Homeless Identified as Veterans | Proportion of Unsheltered Homeless Identified as Victims of Domestic Violence | Proportion of Unsheltered Homeless Identified as HIV-Positive |
|---|---|---|---|---|---|---|---|---|
| New Mexico | 0.01 | 0.07 | 0.05 | 0.04 | 0.01 | 0.08 | 0.14 | 0.01 |
| North Carolina | 0.14 | 0.67 | 0.14 | 0.04 | 0.00 | 0.03 | 0.03 | 0.01 |
| North Dakota | 0.16 | 0.16 | 0.03 | 0.03 | 0.02 | 0.04 | 0.01 | 0.00 |
| Ohio | 0.10 | 0.16 | 0.06 | 0.03 | 0.01 | 0.03 | 0.07 | 0.02 |
| Oklahoma | 0.29 | 0.44 | 0.11 | 0.03 | 0.01 | 0.05 | 0.14 | 0.01 |
| Pennsylvania | 0.08 | 0.16 | 0.02 | 0.04 | 0.01 | 0.04 | 0.06 | 0.02 |
| Rhode Island | 0.03 | 0.66 | 0.01 | 0.06 | 0.02 | 0.04 | 0.07 | 0.02 |
| South Dakota | 0.07 | 0.23 | 0.24 | 0.03 | 0.02 | 0.06 | 0.13 | 0.00 |
| Tennessee | 0.30 | 0.30 | 0.12 | 0.05 | 0.01 | 0.04 | 0.08 | 0.01 |
| Texas | 0.14 | 0.22 | 0.06 | 0.07 | 0.01 | 0.06 | 0.06 | 0.01 |
| Utah | 0.02 | 0.29 | 0.01 | 0.06 | 0.01 | 0.01 | 0.09 | 0.01 |
| Vermont | 0.02 | 0.02 | 0.00 | 0.04 | 0.03 | 0.04 | 0.10 | 0.01 |
| Virgina | 0.10 | 0.10 | 0.08 | 0.07 | 0.01 | 0.06 | 0.09 | 0.00 |
| Washington | 0.04 | 0.11 | 0.07 | 0.04 | 0.01 | 0.06 | 0.13 | 0.00 |
| Wisconsin | 1.57 | 1.57 | 0.12 | 0.07 | 0.00 | 0.05 | 0.05 | 0.01 |
| Wyoming | 0.27 | 0.36 | 0.13 | 0.06 | 0.01 | 0.03 | 0.09 | 0.00 |
| **Median** | **0.14** | **0.20** | **0.05** | **0.05** | **0.01** | **0.05** | **0.08** | **0.01** |

Comparisons of the median proportions of each subpopulation of the unsheltered homeless population show that sex offenders are far larger than any of the selected HUD-tracked subpopulations. Notably, this pattern held for both sex offenders explicitly labeled as "homeless" (median = 0.14) and the measure that included sex offenders labeled as either "homeless" or "address unknown" (median = 0.20). The smallest subpopulations included in the comparison were unsheltered homeless people identified as having HIV/AIDS (median = 0.01) and as non-binary, transgender, or more than one gender (median = 0.01). Victims of domestic violence were the largest unsheltered subpopulation across states of those tracked by HUD (median = 0.08), and families, elderly, and veterans (medians = 0.05) were each only a fraction of the size of the sex offender subpopulation measures. These comparisons confirm that sex offenders are a significant subpopulation of unsheltered homelessness and warrant greater attention from HUD and researchers.

DOJ-HUD-AR01091

**FIGURE 11: PROPORTIONS OF TOTAL HOMELESS POPULATION IN SUBPOPULATIONS BY STATE**[72]

| State | Proportion of Total Homeless on SOR (Labeled Homeless) | Proportion of Total Homeless on SOR (Labeled Homeless or Address Unknown) | Proportion of Total Homeless Identified as Families | Proportion of Total Homeless Identified as Elderly | Proportion of Total Homeless Identified as Transgender, Non-Binary, or More Than One Gender | Proportion of Total Homeless Identified as Veterans | Proportion of Total Homeless Identified as Victims of Domestic Violence | Proportion of Total Homeless Identified as HIV-Positive |
|---|---|---|---|---|---|---|---|---|
| Alabama | 0.03 | 0.14 | 0.25 | 0.07 | 0.01 | 0.06 | 0.07 | 0.01 |
| Alaska | 0.01 | 0.03 | 0.25 | 0.05 | 0.01 | 0.04 | 0.12 | 0.00 |
| Arizona | 0.06 | 0.10 | 0.21 | 0.07 | 0.01 | 0.07 | 0.08 | 0.02 |
| Arkansas | | 0.04 | 0.27 | 0.07 | 0.01 | 0.08 | 0.09 | 0.02 |
| California | 0.03 | 0.03 | 0.14 | 0.07 | 0.02 | 0.05 | 0.09 | 0.02 |
| Colorado | 0.06 | 0.06 | 0.46 | 0.03 | 0.01 | 0.05 | 0.06 | 0.00 |
| Connecticut | 0.04 | 0.09 | 0.32 | 0.06 | 0.00 | 0.05 | 0.20 | 0.02 |
| Delaware | 0.12 | 0.12 | 0.41 | 0.07 | 0.00 | 0.07 | 0.02 | 0.01 |
| Florida | 0.09 | 0.09 | 0.24 | 0.09 | 0.01 | 0.07 | 0.08 | 0.02 |
| Georgia | 0.01 | 0.01 | 0.22 | 0.06 | 0.01 | 0.05 | 0.07 | 0.02 |
| Hawaii | 0.01 | 0.04 | 0.39 | 0.09 | 0.01 | 0.02 | 0.05 | 0.00 |
| Idaho | 0.03 | 0.04 | 0.41 | 0.08 | 0.01 | 0.08 | 0.08 | 0.00 |
| Illinois | 0.05 | 0.05 | 0.52 | 0.03 | 0.01 | 0.02 | 0.11 | 0.02 |
| Indiana | 0.04 | 0.09 | 0.27 | 0.05 | 0.01 | 0.07 | 0.08 | 0.01 |
| Iowa | 0.03 | 0.07 | 0.28 | 0.04 | 0.01 | 0.05 | 0.14 | 0.00 |
| Kansas | 0.06 | 0.06 | 0.26 | 0.04 | 0.01 | 0.07 | 0.14 | 0.01 |
| Kentucky | 0.02 | 0.02 | 0.22 | 0.05 | 0.01 | 0.07 | 0.10 | 0.01 |
| Louisiana | 0.02 | 0.08 | 0.18 | 0.06 | 0.01 | 0.06 | 0.11 | 0.01 |
| Maryland | 0.02 | 0.02 | 0.32 | 0.01 | 0.01 | 0.05 | 0.07 | 0.01 |
| Massachusetts | 0.02 | 0.03 | 0.76 | 0.02 | 0.00 | 0.02 | 0.04 | 0.00 |
| Missouri | 0.05 | 0.05 | 0.29 | 0.01 | 0.01 | 0.07 | 0.14 | 0.03 |
| Montana | 0.09 | 0.14 | 0.27 | 0.06 | 0.01 | 0.08 | 0.12 | 0.00 |
| Nebraska | 0.07 | 0.17 | 0.26 | 0.06 | 0.01 | 0.05 | 0.12 | 0.01 |
| New Hampshire | 0.05 | 0.05 | 0.32 | 0.07 | 0.01 | 0.06 | 0.08 | 0.00 |
| New Jersey | 0.00 | 0.01 | 0.36 | 0.06 | 0.01 | 0.04 | 0.07 | 0.02 |
| New Mexico | 0.01 | 0.03 | 0.19 | 0.08 | 0.01 | 0.06 | 0.11 | 0.01 |
| North Carolina | 0.05 | 0.26 | 0.28 | 0.06 | 0.01 | 0.06 | 0.06 | 0.01 |
| North Dakota | 0.04 | 0.04 | 0.25 | 0.04 | 0.02 | 0.05 | 0.12 | 0.00 |

DOJ-HUD-AR01092

**FIGURE 11, CONTINUED**

| State | Proportion of Total Homeless on SOR (Labeled Homeless) | Proportion of Total Homeless on SOR (Labeled Homeless or Address Unknown) | Proportion of Total Homeless Identified as Families | Proportion of Total Homeless Identified as Elderly | Proportion of Total Homeless Identified as Transgender, Non-Binary, or More Than One Gender | Proportion of Total Homeless Identified as Veterans | Proportion of Total Homeless Identified as Victims of Domestic Violence | Proportion of Total Homeless Identified as HIV-Positive |
|---|---|---|---|---|---|---|---|---|
| Ohio | 0.02 | 0.03 | 0.29 | 0.05 | 0.01 | 0.05 | 0.10 | 0.01 |
| Oklahoma | 0.12 | 0.18 | 0.19 | 0.04 | 0.01 | 0.06 | 0.11 | 0.01 |
| Pennsylvania | 0.01 | 0.03 | 0.32 | 0.05 | 0.01 | 0.05 | 0.08 | 0.02 |
| Rhode Island | 0.01 | 0.14 | 0.36 | 0.07 | 0.01 | 0.05 | 0.07 | 0.01 |
| South Dakota | 0.01 | 0.04 | 0.22 | 0.03 | 0.01 | 0.03 | 0.15 | 0.00 |
| Tennessee | 0.16 | 0.16 | 0.20 | 0.07 | 0.01 | 0.07 | 0.10 | 0.01 |
| Texas | 0.06 | 0.09 | 0.23 | 0.07 | 0.01 | 0.07 | 0.10 | 0.02 |
| Utah | 0.01 | 0.08 | 0.24 | 0.06 | 0.02 | 0.03 | 0.11 | 0.02 |
| Vermont | 0.00 | 0.00 | 0.38 | 0.06 | 0.01 | 0.03 | 0.09 | 0.00 |
| Virgina | 0.02 | 0.02 | 0.35 | 0.06 | 0.01 | 0.05 | 0.10 | 0.01 |
| Washington | 0.02 | 0.05 | 0.23 | 0.05 | 0.01 | 0.06 | 0.10 | 0.00 |
| Wisconsin | 0.16 | 0.16 | 0.38 | 0.06 | 0.01 | 0.07 | 0.11 | 0.00 |
| Wyoming | 0.05 | 0.06 | 0.20 | 0.05 | 0.01 | 0.07 | 0.11 | 0.00 |
| **Median** | **0.03** | **0.05** | **0.27** | **0.06** | **0.01** | **0.06** | **0.10** | **0.01** |

The sizes of the two measures of the sex offender subpopulation relative to several HUD-tracked subpopulations were much smaller when compared with the total homeless population. Only the proportions of homeless people identified as having HIV/AIDS (median = 0.01) and as non-binary, transgender, or more than one gender (median = 0.01) were smaller than the proportions of sex offenders labeled as "homeless" (median = 0.03) and labeled as "homeless" or "address unknown" (median = 0.05). Veterans and elderly homeless subpopulations (medians = 0.06) were comparably sized to the largest estimate of sex offenders but double the size of the smaller estimate. Families (median = 0.27) and victims of domestic violence (median = 0.10) made up far larger proportions of the total homeless population than either measure of sex offenders. Even though sex offenders seem to be one of the smaller subpopulations of total homelessness, the fact that they are still larger than several HUD-tracked subpopulations further affirms their relevance as a subpopulation.

DOJ-HUD-AR01093

# Causes of Homelessness

The prevalence of registered sex offenders in the homeless population suggests additional complexity in our understanding of the drivers of homelessness. Sex offender residence restrictions and community notification policies have not been considered as part of the mainstream discourse on drivers of homelessness. Still, these findings suggest that they may be relevant. The impact of sex offender policies on homelessness, however, is not as easily theorized as it may seem. While many studies have suggested a connection between residence restrictions and homelessness, some studies offer evidence that the connection may be weaker than previously thought. Huebner et al. (2014) found no impact of the laws restricting where a sex offender resides on where sex offenders actually lived in Michigan and Missouri.[73] Berenson and Appelbaum's (2011) geospatial study found that while more than three-quarters of residences were prohibited by residence restrictions in two counties in New York, nearly all sex offenders simply lived in restricted locations.[74] Gruebsic, Murray, and Mack (2008) contradicted another leading theory that argued that areas outside of sex offender restriction zones are less affordable or accessible and thus further disadvantage sex offenders at risk of homelessness.[75] The prevalence of homeless sex offenders, combined with the conflicting evidence about the extent to which sex offender policies may be a major driver of homelessness, warrants more research by a broader array of scholars than just criminologists.

It is worth noting, however, that even if strong evidence emerges that sex offender policies drive homelessness, Rydberg, Dum, and Socia (2018) found that support for such policies remains very high within the public, regardless of the strength of evidence suggesting their ineffectiveness or harmful effects.[76] As Federman (2021) notes, it is the public, not criminologists, who rightfully decide the direction of public policy in our system of government.[77]

# Interventions and Services

As Theodos, Popkin, Guernsey, and Getsinger (2010) and Burt et al. (2010) note in their analyses of homelessness interventions, sex offenders are often excluded from traditional services, shelters, and housing.[78–79] The U.S. Department of Housing and Urban Development, however, gives programs broad discretion in whether to include sex offenders in their homelessness programs.[80] It is important that programs take care to ensure that their participants are adequately protected from potential criminal activity and violence. It is also imperative that programs attract homeless individuals by making them comfortable, even if that is at the expense of sex offenders. Thus, eligibility requirements for many programs probably should not change even if risk is not a foremost consideration—client comfort alone is enough reason to keep sex offenders excluded. However, excluding sex offenders from existing programs warrants the creation of tailored homelessness programs for sex offenders, which is politically unpopular. This would likely have to be done through the criminal justice system, even at the risk of additional stigmatization, to ensure adequate oversight and specialization among staff. Similarly, because sex offenders are excluded from so many shelters, it is critical that outreach workers are made aware of their high prevalence on the street and adjust their practices and offers for services accordingly.

DOJ-HUD-AR01094



It is possible that the findings of Rolfe, Tewksbury, and Schroeder (2017) and others that a high proportion of homeless shelters exclude homeless people as a matter of policy are only part of the issue.[81] Facilities' geographic locations could also fall within residence restriction zones, categorically excluding sex offenders, even if the program or shelter intends to permit them. This complexity highlights the need for greater consideration of sex offenders when planning projects and discussing homelessness policy, as even when there is political will to include sex offenders in a project, there are additional barriers to successfully integrating them.

## Public Safety

Policymakers must also consider the public safety implications of congregating sex offenders in homeless encampments in parks, near schools, or on city streets. The importance of enforcing laws against unregulated street camping becomes even more apparent in light of the high proportions of sex offenders among the unsheltered population. Moreover, the evidence indicating extremely high rates of current criminal offending within the unsheltered population builds further urgency for a more proactive approach in moving people out of encampments and into shelters.[82] Given the restrictions on admitting sex offenders to shelters, states and localities should consider developing plans to allow sex offenders to camp in a structured, secure environment or rely on criminal justice sanctions to ensure that this population is off the street. Another related option would be for states to make wider use of sexually violent predator statutes to civilly commit sex offenders who also exhibit behavioral health issues to psychiatric facilities.

DOJ-HUD-AR01095

## Limitations and Further Research

This study relied on administrative data sets that varied considerably in structure, content, and labels. Sex offender registry data could not be independently verified beyond its status as official government data. In many states, not all sex offenders are included in public databases, potentially skewing the dataset in any number of different ways. The Point-in-Time Count data used to create the comparison datasets for general homeless populations are notoriously flawed methodologically. They could undercount, overcount, or simply miscount homeless populations, especially the unsheltered. This limitation almost certainly impacted this study, given the illogical outliers in Nebraska's and Wisconsin's results compared to unsheltered homeless populations.

This study did not investigate potential causes of variability among states, though future studies from the Cicero Institute will test several hypotheses based on its findings and the literature referenced herein. Moreover, the statistical analyses used in this study were basic and descriptive, in line with the goals of the study to identify sex offenders as a potentially significant subpopulation of homelessness. Far more research is warranted into the drivers of sex offender homelessness, causes of variability among states, and the impact of different proportions of sex offenders on program success, outreach, camping enforcement, and public safety concerns. All of these areas are of interest to future research by the Cicero Institute.

# Conclusion

Sex offenders are a relevant subpopulation of homelessness that merits far more consideration by scholars and policymakers than they have been afforded. It is undeniable that sex offenders are an inconvenient and difficult population to discuss politically, and similarly difficult to work with in the community. But the alarmingly high numbers of homeless sex offenders across the country demand reconsideration of existing policies that may be ineffective when considering this information. **There must be an urgency to develop innovative programs and policies to more assertively address the humanitarian and public safety crisis unfolding on the streets of America's cities.**

DOJ-HUD-AR01096

## REFERENCES

1. de Sousa, Tonya and Meghan Henry. "The 2024 Annual Homelessness Assessment Report (AHAR) to Congress." U.S. Department of Housing and Urban Development, 2024.
2. Ibid.
3. Ibid.
4. Kushel, M., Moore, T., et al.. "Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness." UCSF Benioff Homelessness and Housing Initiative, 2023.
5. Ibid.
6. Ibid.
7. Ibid.
8. Ibid.
9. Portillo, Lourdes. "America's Homeless Deserve Better Access to Water, Sanitation, and Hygiene." UCSF Benioff Initiative, 2023.
10. Letourneau, Elizabeth J., Jill S. Levenson, Dipankar Bandyopadhyay, Debajyoti Sinha, and Kevin S. Armstrong. "Effects of South Carolina's Sex Offender Registration and Notification Policy on Adult Recidivism." Criminal Justice Policy Review 21, no. 4 (December 2010): 435–58. https://doi.org/10.1177/0887403409353148.
11. Harris, Andrew J., Jill S. Levenson, and Alissa R. Ackerman. "Registered Sex Offenders in the United States: Behind the Numbers." Crime & Delinquency 60, no. 1 (February 2014): 3–33. https://doi.org/10.1177/0011128712443179.
12. de Sousa, Tonya and Meghan Henry. "The 2024 Annual Homelessness Assessment Report (AHAR) to Congress." U.S. Department of Housing and Urban Development, 2024.
13. "HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations." U.S. Department of Housing and Urban Development, 2024.
14. Culhane, Dennis. "The Emerging Crisis of Aged Homelessness: Could Housing Solutions Be Funded From Avoidance of Excess Shelter, Hospital, and Nursing Home Costs?" University of Pennsylvania, 2019.
15. Metraux, Stephen and Dennis Culhane. "Homeless Shelter Use and Reincarceration Following Prison Release." Criminology and Public Policy 3, no. 2. (2004): 139–160).
16. Kushel, M., Moore, T., et al.. "Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness." UCSF Benioff Homelessness and Housing Initiative, 2023.
17. Ibid.
18. Ibid.
19. 24 CFR 578.93 Fair Housing and Equal Opportunity. Code of Federal Regulations.
20. Roman, Caterina Gouvis and Jeremy Travis. "Taking Stock: Housing, Homelessness, and Prisoner Reentry." The Urban Institute, 2004.
21. Theodos, Brett, Susan J. Popkin, Elizabeth Guernsey, and Liza Getsinger. "Inclusive Public Housing: Services for the Hard to House." The Urban Institute, 2010.
22. Burt, Martha, Jenneth Carpenter, Samuel Hall, Kathryn Henderson, Debra Rog, John Hornik, Ann Denton, and Garrett Moran. "Strategies for Improving Homeless People's Access to Mainstream Benefits and Services." U.S. Department of Housing and Urban Development, 2010.
23. Harris, Andrew J., Jill S. Levenson, and Alissa R. Ackerman. "Registered Sex Offenders in the United States: Behind the Numbers." Crime & Delinquency 60, no. 1 (February 2014): 3–33. https://doi.org/10.1177/0011128712443179.
24. Socia, Kelly M., Jill S. Levenson, Alissa R. Ackerman, and Andrew J. Harris. "'Brothers Under the Bridge': Factors Influencing the Transience of Registered Sex Offenders in Florida." Sexual Abuse 27, no. 6 (December 2015): 559–86. https://doi.org/10.1177/1079063214521472.
25. Cann, Deanna, and Deena A. Isom Scott. "Sex Offender Residence Restrictions and Homelessness: A Critical Look at South Carolina." Criminal Justice Policy Review 31, no. 8 (October 2020): 1119–35. https://doi.org/10.1177/0887403419862334.
26. Lee, Barrett A., Kimberly A. Tyler, and James D. Wright. "The New Homelessness Revisited." Annual Review of Sociology 36, no. 1 (June 1, 2010): 501–21. https://doi.org/10.1146/annurev-soc-070308-115940.
27. Levenson, Jill S., Gwenda M. Willis, and David S. Prescott. "Adverse Childhood Experiences in the Lives of Male Sex Offenders: Implications for Trauma-Informed Care." Sexual Abuse 28, no. 4 (June 2016): 340–59. https://doi.org/10.1177/1079063214535819.
28. Liu, Michael, Linh Luong, James Lachaud, Hanie Edalati, Aaron Reeves, and Stephen Hwang. "Adverse Childhood Experiences and Related Outcomes Among Adults Experiencing Homelessness: a Systematic Review and Meta-Analysis." Lancet Public Health 6, no. 11. (2021).
29. Joyal, Christian, Jolyane Beaulieu-Plante, and Antoine de Chanterac. "The Neuropsychology of Sex Offenders: A Meta-Analysis." Journal of the Association for the Treatment and Prevention of Sexual Abuse 26, no. 2. (2013).
30. Stone, Beth, Sandra Dowling, and Ailsa Cameron. "Cognitive Impairment and Homelessness: a Scoping Review." Health and Social Care in the Community 27, no. 4. (2019): 125–142.
31. Leon, Chrysanthi S. Sex Fiends, Perverts, and Pedophiles: Understanding Sex Crime Policy in America. New York, NY: New York University Press, 2011. https://doi.org/10.18574/9780814765302.
32. Ibid.
33. Ewing, Charles Patrick. Justice Perverted: Sex Offense Law, Psychology, and Public Policy. Cary: Oxford University Press USA - OSO, 2011.
34. Ibid.
35. Ibid.
36. Nichols, J. Scott. "A State-by-State Comparison of S/O Registry Restrictions." Fair Shake Reentry Resource Center, 2019.
37. Lasher, Michael P., and Robert J. McGrath. "The Impact of Community Notification on Sex Offender Reintegration: A Quantitative Review of the Research Literature." International Journal of Offender Therapy and Comparative Criminology 56, no. 1 (February 2012): 6–28. https://doi.org/10.1177/0306624X10387524.
38. Ibid.
39. Levenson, Jill S., and Leo P. Cotter. "The Impact of Sex Offender Residence Restrictions: 1,000 Feet From Danger or One Step From Absurd?" International Journal of Offender Therapy and Comparative Criminology 49, no. 2 (April 2005): 168–78. https://doi.org/10.1177/0306624X04271304.
40. Levenson, Jill S., and Leo P. Cotter. "The Impact of Sex Offender Residence Restrictions: 1,000 Feet From Danger or One Step From Absurd?" International Journal of Offender Therapy and Comparative Criminology 49, no. 2 (April 2005): 168–78. https://doi.org/10.1177/0306624X04271304.
41. Levenson, Jill S. and Andrea L. Hern. "Sex Offender Residence Restrictions: Unintended Consequences and Community Reentry." Justice Research and Policy 9, no. 1 (2007): 59–73.
42. Mercado, Cynthia Calkins, Shea Alvarez, and Jill Levenson. "The Impact of Specialized Sex Offender Legislation on Community Reentry." Sexual Abuse 20, no. 2 (June 2008): 188–205. https://doi.org/10.1177/1079063208317540.
43. Rydberg, Jason, E. Grommon, B. M. Huebner, and T. Bynum. "The Effect of Statewide Residency Restrictions on Sex Offender Post-Release Housing Mobility." Justice Quarterly 31, no. 2 (2014): 421–44.
44. Mercado, Cynthia Calkins, Shea Alvarez, and Jill Levenson. "The Impact of Specialized Sex Offender Legislation on Community Reentry." Sexual Abuse 20, no. 2 (June 2008): 188–205. https://doi.org/10.1177/1079063208317540.

DOJ-HUD-AR01097

45. Socia, Kelly M., Jill S. Levenson, Alissa R. Ackerman, and Andrew J. Harris. "'Brothers Under the Bridge': Factors Influencing the Transience of Registered Sex Offenders in Florida." Sexual Abuse 27, no. 6 (December 2015): 559–86. https://doi.org/10.1177/1079063214521472.

46. Cann, Deanna, and Deena A. Isom Scott. "Sex Offender Residence Restrictions and Homelessness: A Critical Look at South Carolina." Criminal Justice Policy Review 31, no. 8 (October 2020): 1119–35. https://doi.org/10.1177/0887403419862334.

47. Socia, Kelly M., Jill S. Levenson, Alissa R. Ackerman, and Andrew J. Harris. "'Brothers Under the Bridge': Factors Influencing the Transience of Registered Sex Offenders in Florida." Sexual Abuse 27, no. 6 (December 2015): 559–86. https://doi.org/10.1177/1079063214521472.

48. Ibid.

49. Cann, Deanna, and Deena A. Isom Scott. "Sex Offender Residence Restrictions and Homelessness: A Critical Look at South Carolina." Criminal Justice Policy Review 31, no. 8 (October 2020): 1119–35. https://doi.org/10.1177/0887403419862334.

50. Ibid.

51. Leon, Chrysanthi S. Sex Fiends, Perverts, and Pedophiles: Understanding Sex Crime Policy in America. New York, NY: New York University Press, 2011. https://doi.org/10.18574/9780814765302.

52. Ibid.

53. Leon, Chrysanthi S. Sex Fiends, Perverts, and Pedophiles: Understanding Sex Crime Policy in America. New York, NY: New York University Press, 2011. https://doi.org/10.18574/9780814765302.

54. Ewing, Charles Patrick. Justice Perverted: Sex Offense Law, Psychology, and Public Policy. Cary: Oxford University Press USA – OSO, 2011.

55. Ibid.

56. Federman, Cary. Democracy and Deliberation: The Law and Politics of Sex Offender Legislation. Ann Arbor, Michigan: University of Michigan Press, 2021.

57. Miller, Jeslyn A. "Sex Offender Civil Commitment: The Treatment Paradox." California Law Review 98, no. 6 (2010): 2093–2128.

58. Ibid.

59. Ewing, Charles Patrick. Justice Perverted: Sex Offense Law, Psychology, and Public Policy. Cary: Oxford University Press USA – OSO, 2011.

60. Miller, Jeslyn A. "Sex Offender Civil Commitment: The Treatment Paradox." California Law Review 98, no. 6 (2010): 2093–2128.

61. Lee, Barrett A., Kimberly A. Tyler, and James D. Wright. "The New Homelessness Revisited." Annual Review of Sociology 36, no. 1 (June 1, 2010): 501–21. https://doi.org/10.1146/annurev-soc-070308-115940.

62. Ewing, Charles Patrick. Justice Perverted: Sex Offense Law, Psychology, and Public Policy. Cary: Oxford University Press USA – OSO, 2011.

63. de Sousa, Tonya and Meghan Henry. "The 2024 Annual Homelessness Assessment Report (AHAR) to Congress." U.S. Department of Housing and Urban Development, 2024.

64. Levenson, Jill S., and Andrew J. Harris. "100,000 Sex Offenders Missing . . . or Are They? Deconstruction of an Urban Legend." Criminal Justice Policy Review 23, no. 3 (September 2012): 375–86. https://doi.org/10.1177/0887403411415398.

65. Cann, Deanna, and Deena A. Isom Scott. "Sex Offender Residence Restrictions and Homelessness: A Critical Look at South Carolina." Criminal Justice Policy Review 31, no. 8 (October 2020): 1119–35. https://doi.org/10.1177/0887403419862334

66. Socia, Kelly M., Jill S. Levenson, Alissa R. Ackerman, and Andrew J. Harris. "'Brothers Under the Bridge': Factors Influencing the Transience of Registered Sex Offenders in Florida." Sexual Abuse 27, no. 6 (December 2015): 559–86. https://doi.org/10.1177/1079063214521472.

67. Rolfe, Shawn M., Richard Tewksbury, and Ryan D. Schroeder. "Homeless Shelters' Policies on Sex Offenders: Is This Another Collateral Consequence?" International Journal of Offender Therapy and Comparative Criminology 61, no. 16 (December 2017): 1833–49. https://doi.org/10.1177/0306624X16638463.

68. Stucky, Thomas D., and John R. Ottensmann. "Registered Sex Offenders and Reported Sex Offenses." Crime & Delinquency 62, no. 8 (August 2016): 1026–45. https://doi.org/10.1177/0011128714556738.

69. Shinn, Marybeth, Hanxuan Yu, Alisa Zoltowski, and Hao Wu. "Learning More from Homeless Point-in-Time Counts." Housing Policy Debate (2024).

70. "HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations." U.S. Department of Housing and Urban Development, 2024.

71. "HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations." U.S. Department of Housing and Urban Development, 2024.

72. Ibid.

73. Huebner, Beth M., Kimberly R. Kras, Jason Rydberg, Timothy S. Bynum, Eric Grommon, and Breanne Pleggenkuhle. "The Effect and Implications of Sex Offender Residence Restrictions: Evidence from a Two-State Evaluation." Criminology & Public Policy 13, no. 1 (February 2014): 139–68. https://doi.org/10.1111/1745-9133.12066.

74. Berenson, Jacqueline A., and Paul S. Appelbaum. "A Geospatial Analysis of the Impact of Sex Offender Residency Restrictions in Two New York Counties." Law and Human Behavior 35, no. 3 (2011): 235–46. https://doi.org/10.1007/s10979-010-9235-3.

75. Grubesic, Tony H., Alan T. Murray, and Elizabeth A. Mack. "Sex Offenders, Housing, and Spatial Restriction Zones." GeoJournal 73, no. 4 (2008): 255–69.

76. Rydberg, Jason, Christopher P. Dum, and Kelly M. Socia. "Nobody Gives a #%&!: A Factorial Survey Examining the Effect of Criminological Evidence on Opposition to Sex Offender Residence Restrictions." Journal of Experimental Criminology 14 (2018): 541–50.

77. Federman, Cary. Democracy and Deliberation: The Law and Politics of Sex Offender Legislation. Ann Arbor, Michigan: University of Michigan Press, 2021.

78. Theodos, Brett, Susan J. Popkin, Elizabeth Guernsey, and Liza Getsinger. "Inclusive Public Housing: Services for the Hard to House." The Urban Institute, 2010.

79. Burt, Martha, Jenneth Carpenter, Samuel Hall, Kathryn Henderson, Debra Rog, John Hornik, Ann Denton, and Garrett Moran. "Strategies for Improving Homeless People's Access to Mainstream Benefits and Services." U.S. Department of Housing and Urban Development, 2010.

80. 24 CFR 578.93 Fair Housing and Equal Opportunity. Code of Federal Regulations.

81. Rolfe, Shawn M., Richard Tewksbury, and Ryan D. Schroeder. "Homeless Shelters' Policies on Sex Offenders: Is This Another Collateral Consequence?" International Journal of Offender Therapy and Comparative Criminology 61, no. 16 (December 2017): 1833–49. https://doi.org/10.1177/0306624X16638463.

82. Walker, Steve and Tanya Sierra. "DA Shares First-of-Its Kind Crime Data, Proposes Three-Point Plan to Address Intersection of Crime and Homelessness." Office of the District Attorney of San Diego. March 21, 2022.

DOJ-HUD-AR01098



2112 Rio Grande Street
Austin, Texas 78705

**ciceroinstitute.org**

DOJ-HUD-AR01099

OFFICE OF
# THE DISTRICT ATTORNEY
### COUNTY OF SAN DIEGO

330 West Broadway
San Diego, CA 92101
(619) 531-4040

SanDiegoDA.com

**SUMMER STEPHAN**
DISTRICT ATTORNEY

**DWAIN D. WOODLEY**
ASSISTANT DISTRICT ATTORNEY

**March 21, 2022**
**For Immediate Release**

**Contact:** **Steve Walker** **(619) 531-3890**
**Tanya Sierra** **(619) 531-3315**
*En Español* **Barbara Medina** **(619) 531-3305**

## DA Shares First-of-Its Kind Crime Data, Proposes Three-Point Plan to Address Intersection of Crime and Homelessness

### *Data Shows Homeless Far More Likely to Be Victims and Perpetrators*

San Diego County District Attorney Summer Stephan today released new data about the intersection of crime and the county's homeless population and proposes a three-point plan to address it. Two years of District Attorney data shows that individuals who are experiencing homelessness become involved with the justice system as victims and perpetrators at dramatically higher rates than the rest of the population.

Cases were analyzed where the criminal conduct met the DA's ethical standard to file felony charges, meaning there was proof beyond a reasonable doubt. When compared to the non-homeless population, and there were much higher rates for individuals currently experiencing homelessness:

| | |
|---|---|
| **Robbery** | *175 times* |
| **Residential Burglary** | *183 times* |
| **Assault** | *130 times* |
| **Arson** | *514 times* |
| **Vandalism** | *222 times* |

Recidivism is a significant issue as well. Of the individuals experiencing homelessness who have been charged with a crime and recidivated in the two-year period studied, 83% had two to four cases filed against them, and 15% had between five and nine cases filed against them.

The data also showed individuals experiencing homelessness are **victimized** at higher rates than the non-homeless population. When compared to the non-homeless population, there are higher rates of victimization in these specific crime categories for individuals currently experiencing homelessness:

| | |
|---|---|
| **Murder** | *19 times* |
| **Attempted Murder** | *27 times* |
| **Robbery** | *15 times* |
| **Domestic Violence** | *15 times* |
| **Aggravated Assault** | *12 times* |
| **Elder Abuse** | *10 times* |
| **Sexual Assault** | *9 times* |

DOJ-HUD-AR01100

"Bringing humane and effective solutions to the complex and growing problem of individuals experiencing homelessness in San Diego County requires a shared strategic plan that creates a sea change," said DA Stephan. "I acknowledge the many public officials, groups and individuals in our cities and county who have been working tirelessly on this issue to bring forward many encouraging efforts. In my role as the county's top public safety official, my goal is to bring solutions driven by my team's unique experience where homelessness, mental health issues and substance use disorders intersect with the criminal justice system. This data showing the drastically higher rates of an individual experiencing homelessness becoming a crime victim or offender demonstrate that homelessness is both a humanitarian and a public safety crisis that must be urgently addressed. It is unacceptable to continue to allow individuals to languish in the throes of mental illness, drug addiction and poverty."

The DA released a three-point proposed plan today with the goal of preventing homeless individuals from becoming involved in the criminal justice system by reducing the number of unsheltered people on the street.

First, provide a **proven technology solution** that can identify shelter or housing space in real time based on the needs of the individual and get that person or family to a shelter, appropriate treatment or housing option. The DA's plan is to partner with a tech company to create an app similar to the one created with the Safe Shelter Collaborative, which finds shelter beds in minutes for victims of crime attempting to escape violence. Additionally, this model will allow the county to keep real time and accurate data regarding shelter use and availability which can help inform policy decisions regarding future needs and investments.

Second, support the development of a 3 Tier **Homeless Enhanced Legal Program** (HELP). San Diego currently operates a nationally acclaimed Homeless Court that helps clear warrants, dismiss charges, and eliminate fines for individuals who are already engaging in services with homeless service providers. However, there are not currently other diversion programs or collaborative courts specifically designed to support individuals experiencing chronic homelessness and co-occuring disorders of substance abuse and mental health. The HELP program is a 3-tier approach to assist homeless individuals who intersect with law enforcement or the criminal justice system.

- **Tier 1** will be a field authorized diversion program that focuses on low level offenses. Successful participation will result in no charges being filed.

- **Tier 2** will be a post-file diversion program that will be a specialized track of the DA Community Justice Initiative (DA CJI) that focuses on homeless specific services. DA CJI is a District Attorney led misdemeanor diversion program developed in 2018, similar to a program developed by the San Diego City Attorney's Office.

- **Tier 3** is a proposal of an expanded or additional Collaborative Court addressing the intersection of homelessness and crime for non-violent felonies and serial misdemeanants. The goal of this collaborative court is to serve high-risk and high-need individuals experiencing homelessness by addressing the root causes that contribute to the individual being homeless, including mental health and substance use disorders, to build stable, healthy, and housed individuals. The San Diego Superior Court has been a national and statewide leader in establishing specialized collaborative courts that address specific challenges such as Veterans Treatment Court, Drug Court, Behavioral Health Court and Reentry Court. The Court would ultimately determine the viability of a HELP Collaborative Court.

Third, as many other states of have done, support a **change in the law** to allow the involuntarily commitment of an individual for up to 72-hours based upon a finding of a psychiatric deterioration by a licensed mental health practitioner. Under current law in California, the only way anyone can be involuntarily held for psychiatric treatment is when the individual presents as a danger to themselves, a danger to others, or is gravely disabled. Existing law does not allow family members, caregivers, a public defender, a prosecutor, a court associated treatment team or law enforcement to get a person treatment, despite the individual's well-documented chronic history of episodes of psychiatric deterioration. Early intervention can be life-changing for a person living with mental illness and helps prevent the person from becoming criminal justice involved. It helps to alleviate the number of times a person is placed on a 72-hour involuntary psychiatric hold and can help the individual receive services, treatment, and medication.

This new proposed three-point plan builds on work already being done by the District Attorney in the past few years to improve outcomes for people in our communities who are grappling with mental health issues and homelessness.

Beginning in 2018, DA Stephan convened two stakeholder symposiums to address the intersection of criminal justice, mental health, and homelessness. The results were documented in the Blueprint for Mental Health Reform: A Strategic New Approach Addressing the Intersection of Mental Health, Homelessness and Criminal Justice in San Diego County.

Since then, collectively with the Board of Supervisors, law enforcement, Behavioral Health Services, and our many partners with lived experience including the National Alliance for Mental Illness NAMI, the county has made great progress in making recommendations set forth in the Blueprint become a reality, including Community Based Crisis Stabilization Centers, Mobile Crisis Response Teams, De-escalation Training for more than 3,000 police officers, a 911 card for families calling about a loved one in distress, and expanded access to Behavioral Health Court and Mental Health Diversion.

# # #

**_About the San Diego County District Attorney's Office_**
_The San Diego County DA's Office prosecutes all felony crimes in the county and misdemeanor crimes committed outside the City of San Diego. The office files about 40,000 criminal cases a year and balances prosecution with numerous crime prevention programs. District Attorney Summer Stephan leads the office of more than 1,000 dedicated employees who pursue fair and equal justice, and support victims daily across San Diego County._

  

🔍   📅
EVENTS   SUBSCRIBE

LOGIN  👤

Become an InCider   ›

⬤ Trending now

| Nearly 5 years after Uri, ERCOT says Texas power grid will ... | 6 dining updates from across the Austin metro | 6 events Dec. 19-21 in the Austin area: caroling, holiday painting ... | New retail, homes and ACC enrollment figures: 6 trending Austin area ... | Austin sees 46% drop in pedestrian crashes after le safety pilot |



CASTLE HILL FITNESS
MEMBERSHIP DISCOUNTS & FREE PAUSES
HOLIDAY SPECIAL · UNTIL DECEMBER 31
LEARN MORE

AUSTIN   /   SOUTH CENTRAL AUSTIN   /   CITY & COUNTY

## Austin's homeless population dispersing after 2 years of camping ban enforcement

  

By **Katy McAfee**, **Ben Thompson** | 4:57 PM May 25, 2023 CDT
Updated 4:57 PM May 25, 2023 CDT

   



*Volunteers collect information during the January survey of Austin's homeless population. (Katy McAfee/Community Impact)*

Austin's unsheltered homeless population is growing, spreading out farther from the city center and living in more secluded areas, a trend that's likely a result of the city's 2-year-old ban on public camping.

**The big picture**

The Ending Community Homelessness Coalition, a nonprofit leading the regional homelessness strategy, identified new trends in Austin's homeless community based on a January point-in-time count of unsheltered residents. The count marked the first in-person survey conducted since the COVID-19 pandemic.

Point-in-time counts are federally mandated efforts used to get a snapshot of an area's homeless

DOJ-HUD-AR01103

12/22/25, 1:14 PM    Austin's homeless population dispersing after 2 years of camping-ban enforcement | Community Impact
Case 1:25-cv-00636-MSN-LRV    Document 50    Filed 12/31/25    Page 91 of 256 PageID
#: 2482

population on any given night.

**By the numbers**

- 2,374 total people experiencing homelessness counted
- 1,266 people counted as unsheltered, or living on the streets and in temporary places such as tents or cars
- 1,108 people counted in shelters or transitional housing



*2023's point-in-time count of the local homeless population identified nearly 2,400 people. (Courtesy Ending Community Homelessness Coalition)*



**Key findings**

- Men and boys had higher rates of homelessness at about 63% of the population counted.
- Black people were <u>overrepresented</u> in the homeless population at about 33% despite making up 7.25% of Austin's total population, according to the 2020 U.S. census.
- Those 35 to 44 years old were the largest age group identified and were mostly unsheltered.
- Veterans made up 9.5% of those counted.
- The shares of Hispanic, Asian and Native American people experiencing homelessness in 2023 all rose since 2020.

**Put in perspective**

ECHO volunteers counted fewer people in the January survey than in 2020 but about 100 more than the count in 2019. However, ECHO representatives cautioned the totals may be undercounted and don't offer a full picture of the local homeless population.

Complicating factors include rainy weather on the night of the count and the broad geographic distribution of unsheltered residents, especially in parks and wooded areas. The survey also didn't account for most or all of the 699 homeless people booked in Travis County Jail on Jan. 28, according to the county sheriff's office.

ECHO also maintains a <u>dashboard</u> with monthly estimates of the regional homeless population that's based on the number of people who seek out services or housing. That data, which ECHO staff said may offer a more accurate systemwide view of homelessness, shows a gradually increasing unsheltered population that passed 4,500 people this spring.

DOJ-HUD-AR01104



Based on that information, around 5,400 people are now experiencing sheltered or unsheltered
homelessness in the Austin area.

### Austin-Travis County homeless population

The number of people experiencing homelessness in Austin and Travis County has increased in recent years.



Source: Ending Community Homelessness Coalition/Community Impact

Made with Flourish • Create a chart

## The impact

An increased homeless presence has been tracked toward the city's edges and in less visible places since
Austinites voted in May 2021 to reinstate a public camping ban. Analysts and service providers at that
time had predicted such a distribution would take place, likely making it harder to find homeless
residents and connect them with supportive services and shelter or housing.

The number of people experiencing homelessness in city parks and green spaces rose from 5.2% as of
early 2020 to 13.6% in 2023, the January point-in-time count found.

"What we're seeing though is a significant increase in the number of folks who are ending up in our parks,
nature preserves and green belts," ECHO Executive Director Matt Mollica said during a May 24
presentation. "And that just makes sense, right? Out of the way, more hidden, less likely to be
encountered by the police."

DOJ-HUD-AR01105

Case 1:25-cv-00636-MSN-LRV    Document 50    Filed 12/31/25    Page 93 of 256 PageID #: 2484



Austin's homeless population remains concentrated around downtown but is spreading out. (Courtesy Ending Community Homelessness Coalition)



In Austin, City Council District 9, which includes downtown, still claims the highest share of those experiencing homelessness. However, the count in the area dropped by more than a third since 2020.

Conversely, the areas farther from downtown—particularly South Austin's District 5, Northwest Austin's District 6 and Northeast Austin's District 1—saw notable jumps in the number of unsheltered residents over the same time.

By **Katy McAfee** 
Government Reporter

Katy joined Community Impact in 2022 and covers transportation and government for Travis County, Rollingwood and West Lake Hills. Prior to CI, Katy graduated from the University of Cincinnati with a bachelor's degree in journalism and a certificate in deaf studies as well as serving as the features editor for her school's student newspaper, The News Record. When she's not writing, Katy enjoys watching movies and spending time outdoors.

By **Ben Thompson**
Government Reporter

Ben joined Community Impact in January 2019 after graduating with a degree in journalism from Northeastern University in Boston. He spent more than two years reporting on Montgomery County and The Woodlands area before moving to Austin in 2021 to cover City Hall and other news throughout the city. Contact Ben with questions, tips or feedback at bthompson@communityimpact.com, and follow him on X, formerly known as Twitter, @BThompson_CI.



## Thanks for reading!

Daily news about your community is *free*, and your support is *invaluable*. Give $10 now towards CI's journalistic mission across Texas.

Become an InCIder

DOJ-HUD-AR01106



## More stories from South Central Austin



**DINING**

Italian restaurant Poeta relocating to East Austin …



**GOVERNMENT**

Austin details planned social service cuts under …



**GOVERNMENT**

Supreme Court declines to hear Austin's petition …



**TRANSPORTATION**

Austin sees 46% drop in pedestrian crashes …



## More stories from Austin Metro



**BUSINESS**

Bricks & Minifigs to open Round Rock …



**BUSINESS**

Cinemark Stone Hill Town Center upgrade coming …



**DINING**

Ike's Love & Sandwiches coming to Pflugerville



**BUSINESS**

Check out these new and coming soon …

Emergencies happen anytime, anywhere —
**know where to go.**

**24/7 ER care**

Ascension
Seton

DOJ-HUD-AR01107

**Austin Metro**

Austin Metro Home

Bastrop | Cedar Creek

Cedar Park | Far Northwest Austin

Georgetown

Lake Travis | Westlake

Leander | Liberty Hill

North Central Austin

Northwest Austin

Pflugerville | Hutto

Round Rock

San Marcos | Buda | Kyle

South Central Austin

Southwest Austin | Dripping Springs

**Houston Metro**

Houston Metro Home

Bay Area

Bellaire | Meyerland | West University

Conroe | Montgomery

Cy-Fair | Jersey Village

Cypress

Heights | River Oaks | Montrose

Katy | Fulshear

Lake Houston | Humble | Kingwood

New Caney | Porter

Pearland | Friendswood | Manvel

Spring | Klein

Sugar Land | Missouri City

The Woodlands

Tomball | Magnolia

**Dallas | Fort Worth Metro**

Dallas | Fort Worth Metro Home

Denton

Flower Mound | Highland Village | Argyle

Frisco

Grapevine | Colleyville | Southlake

Keller | Roanoke | Northeast Fort Worth

McKinney

Plano North

Plano South

Prosper | Celina

Richardson

**San Antonio Metro**

San Antonio Metro Home

Boerne | Fair Oaks Ranch

New Braunfels

North San Antonio

Northeast San Antonio Metrocom

f   X   instagram   in   youtube

(512) 989-6808

TERMS OF SERVICE | PRIVACY POLICY | COOKIE PREFERENCES

© 2005-2025 Community Impact Newspaper Co. All rights reserved.

DOJ-HUD-AR01108

No. 23-175

IN THE

# Supreme Court of the United States

CITY OF GRANTS PASS, OREGON,

*Petitioner,*

*v.*

GLORIA JOHNSON, ET AL., ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

*Respondents.*

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**BRIEF OF *AMICUS CURIAE*
CICERO INSTITUTE
IN SUPPORT OF PETITIONER**

Ryan Vassar
CICERO INSTITUTE
2112 Rio Grande St.
Austin, TX 78705
(512) 815-2028

Jeffrey M. Harris
   *Counsel of Record*
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

March 4, 2024

*Counsel for Amicus Curiae*

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................ii

INTEREST OF *AMICUS CURIAE*............................ 1

INTRODUCTION AND SUMMARY OF
THE ARGUMENT.................................................... 2

ARGUMENT.............................................................. 4

I.   Homelessness is worse today than at any point
     in recent history and public street camps only
     exacerbate the problem........................................ 4

II.  States and localities must have the flexibility
     to address the homelessness crisis with crea-
     tive solutions that work. .................................... 12

CONCLUSION ....................................................... 15

DOJ-HUD-AR01110

ii

# TABLE OF AUTHORITIES

**Cases**

*Martin v. City of Boise,*
    902 F.3d 1031 (9th Cir. 2018)................................10

*Martin v. City of Boise,*
    920 F.3d 584 (9th Cir. 2019)........................2, 12, 13

*Metropolitan Life Ins. Co. v. Massachusetts,*
    471 U.S. 724 (1985)..................................................2

**Statutes**

Grants Pass Municipal Code §5.61.010(B)................2

Grants Pass Municipal Code §5.61.020(A)................2

Grants Pass Municipal Code §5.61.030.....................2

Grants Pass Municipal Code §6.46.090.....................2

**Other Authorities**

*Addressing Homelessness in the States,* Cicero
    Inst. Fact Sheet....................................................4, 5

Jeff Amy, *Georgia Lawmakers: Localities
    Must Apply Homeless Camp Bans,* AP
    (Mar. 27, 2023)......................................................14

DOJ-HUD-AR01111

iii

Michael Corkery, *Fighting for Anthony: The Struggle to Save Portland, Oregon*, N.Y. Times (July 29, 2023)........................................................12

Thomas Fuller, *Death on the Streets*, N.Y. Times (Apr. 25, 2022)........................................................11

Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, The Atlantic (Mar. 8, 2019) ...................................12

Robert B. Hawkins, Jr., Foreword, in Richard W. White, Jr., Rude Awakenings: What the Homeless Crisis Tells Us (1992)..............................5

Christal Hayes, *'The World Doesn't Care': Homeless Deaths Spiked During Pandemic, Not from COVID. From Drugs.*, USA Today (May 28, 2022).................................................11, 12

Cassandra Hemenway, *Confirmed: School Bus Gunshot Came from Encampment Country Club Road Shelter Opens Nov. 15*, The Bridge (Nov. 1, 2023) .....................................................8, 9

Meghan Henry, et al., *The 2016 Annual Homeless Assessment Report (AHAR) to Congress*, Dept. of Hous. & Urban Dev. (Nov. 2016)..............................4

iv

Margot Kushel, MD, et al., *Toward a New
Understanding: The California Statewide
Study of People Experiencing Homelessness*,
UCSF Benioff Homelessness & Housing
Initiative (June 2023) .................................. 5, 6, 7, 8

Paul J. Larkin, *Camping and the Constitution*,
Georgetown J. of L. & Pol'y (forthcoming; last
visited Feb. 22, 2024) .............................................. 5

Eric Leonard, *LAPD Concerned About Increase in
Sexual Violence Against Women Experiencing
Homelessness*, NBC4 (Feb. 27, 2020) ................... 12

C. Y. Liu, et al., *Communicable Disease Among
People Experiencing Homelessness in California*,
Epidemiology & Infection (Mar. 20, 2020) ............. 9

Joe Lonsdale, Cicero Institute July 2022 Update
(July 12, 2022) ........................................................ 1

Katy McAfee & Ben Thompson, *Austin's Homeless
Population Dispersing After 2 Years of Camping
Ban Enforcement*, Community Impact (May 25,
2023) ..................................................................... 14

Jennifer Medina, *Los Angeles Fire Started in
Homeless Encampment*, Officials Say,
N.Y. Times (Dec. 12, 2017) .................................... 12

DOJ-HUD-AR01113

v

Andrew Noh, *New Data Reveals Link Between
    Homelessness and Crime Wave in California*,
    600 KOGO (Mar. 29, 2022) ...................................... 8

Natalie O'Neill, *Blazes That Begin in Homeless
    Camps Now Account for Nearly Half the Fires in
    Portland*, Willamette Week (Nov. 2, 2022) ........... 12

*Public Camping Bans: Guiding the
    Homeless into Shelter*, Cicero Inst.
    (Dec. 28, 2023) ...................................... 4, 8-10, 13-15

Sam Quinones, *Skid Row Nation: How L.A.'s
    Homelessness Crisis Response Spread Across
    the Country*, L.A. Mag. (Oct. 6, 2022) ................ 3, 11

*Recent Killings in Los Angeles and New York
    Spark Anger, Raise Risk for Homeless People*,
    KTLA (Jan. 28, 2022) ............................................ 12

Laurie Roberts, *It's Time for Phoenix to Clean Up
    the Humanitarian Disaster Area Known as 'The
    Zone'*, The Arizona Republic (Mar. 28, 2023) .......... 9

*Sanctioned Camping: A Safer Solution*,
    Cicero Inst. (Dec. 28, 2023) ........................ 3, 6, 7, 10

SOH: State and CoC Dashboard (California),
    Nat'l All. to End Homelessness (last accessed
    Feb. 28, 2024) ...................................................... 6, 7

SOH: State and CoC Dashboard (Oregon), Nat'l
    All. to End Homelessness (last accessed Feb. 28,
    2024) ...................................................................... 7

DOJ-HUD-AR01114

vi

SOH: State and CoC Dashboard (Washington),
    Nat'l All. to End Homelessness (last accessed
    Feb. 28, 2024) ...........................................................6

Tanya de Sousa et al., *The 2023 Annual
    Homelessness Assessment Report (AHAR) to
    Congress*, U.S. Dept. of Hous. & Urban Dev.
    (Dec. 2023) ................................................................4

Steff Danielle Thomas, *Homelessness in US Surges
    to Highest-Recorded Level*, The Hill (Dec. 12,
    2023) ........................................................................4

Steve Twist & Seth Leibsohn, *Phoenix Neglects the
    Homeless, Ignores Rampant Crime in Drug-
    Riddled 'Zone'*, The Arizona Republic (Nov. 17,
    2022) ........................................................................9

DOJ-HUD-AR01115

1

## INTEREST OF *AMICUS CURIAE*[1]

The Cicero Institute is a nonpartisan public policy organization with deep experience in government, legislation and the law, technology, and entrepreneurship. It promotes innovative public policies that harness the strengths of free-market competition and government accountability. And it helps elected leaders fix urgent issues in public systems—fostering prosperity, competent government, and safeguarding American liberty for future generations.

The Institute has been at the forefront of homelessness reform, helping twenty states craft and pass legislation to compassionately and effectively address homelessness. The Institute's model legislation has been enacted in Missouri, Tennessee, Texas and Utah, among others. *See* Joe Lonsdale, Cicero Institute July 2022 Update (July 12, 2022), perma.cc/888X-BC8A. The Institute thus has an important interest in this case.

---

[1] Pursuant to this Court's Rule 37.6, counsel for *amicus curiae* certify that this brief was not authored in whole or in part by counsel for any party and that no person or entity other than *amicus curiae* or its counsel has made a monetary contribution to the preparation or submission of this brief.

2

## INTRODUCTION AND SUMMARY
## OF THE ARGUMENT

Like many other cities, Grants Pass seeks to protect its citizens' health, welfare, and safety by regulating homeless individuals' ability to camp or sleep overnight on its sidewalks or in its parks. *See* Grants Pass Municipal Code §§5.61.020(A), 5.61.010(B), 5.61.030, 6.46.090. It enforces these regulations through civil citations. But for the second time in five years, the Ninth Circuit has allowed federal judges to serve as the nation's "homelessness policy czars" and invalidate these common-sense policies as "cruel and unusual punishment" within the meaning of the Eighth Amendment. App. 156a (opinion of M. Smith, J.). If upheld, that decision will have "dire practical consequences" for thousands of local governments and millions of people across the country. *Martin v. City of Boise*, 920 F.3d 584, 594 (9th Cir. 2019) (M. Smith, J., dissenting from denial of rehearing en banc).

*Amicus* agrees with Petitioner that the Ninth Circuit's decision has "no basis in the Eighth Amendment's text, history, or tradition." Pet'n Br. at 4. And regulating public health and safety falls within the heartland of state police power. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (cleaned up). *Amicus* writes separately, however, to highlight the scope of the homelessness problem and explain why states need the flexibility to craft tailored and workable solutions to it.

3

Not only does enforcing laws regulating camping on public property not constitute "cruel and unusual punishment" under the Eighth Amendment, but doing so is imperative to addressing the homelessness crisis. Homelessness is worse today than at any point in recent history. It is a complex issue that stems from a "mix of economic, mental-health, and substance-abuse factors." App. 140a-143a (opinion of M. Smith, J.). And it has no one-size-fits-all solution. As a result of the lack of temporary shelter, American cities have seen a "dramatic increase" in homeless street encampments. *Sanctioned Camping: A Safer Solution*, Cicero Inst. (Dec. 28, 2023), perma.cc/4GGY-DSED.

But public street camps only exacerbate the problem, and judicial decisions barring state and local governments from addressing these camps are profoundly counterproductive. Crime, mental illness, and substance abuse plague these camps. And they "surround[] the homeless in criminality and predation, not to mention fires, filth, disease, and [fentanyl and meth.]" Sam Quinones, *Skid Row Nation: How L.A.'s Homelessness Crisis Response Spread Across the Country*, L.A. Mag. 131 (Oct. 6, 2022), bit.ly/48FoAfO. Because homelessness "resist[s] any easy solution," App. 140a (M. Smith, J.), states and localities need the flexibility to address its root causes, offer creative solutions, and focus on accountability and outcomes.

Put simply, judicial decisions invalidating prohibitions on public camping have failed those in the homeless encampments as well as residents of surrounding areas. And those decisions have "paralyz[ed] local communities from addressing the pressing issue of homelessness" in their communities. App. 117a

DOJ-HUD-AR01118

4

(O'Scannlain, J., respecting the denial of rehearing en banc). The Court should reverse the decision below.

## ARGUMENT

### I.  Homelessness is worse today than at any point in recent history and public street camps only exacerbate the problem.

Homelessness in America is at an all-time high. *See Public Camping Bans: Guiding the Homeless into Shelter*, Cicero Inst. (Dec. 28, 2023), perma.cc/8TLF-C76A; *see also* Steff Danielle Thomas, *Homelessness in US Surges to Highest-Recorded Level*, The Hill (Dec. 12, 2023), perma.cc/6MA2-DA4Q. In 2023, roughly 20 out of every 10,000 people experienced homelessness. *See* Tanya de Sousa et al., *The 2023 Annual Homelessness Assessment Report (AHAR) to Congress*, U.S. Dept. of Hous. & Urban Dev. 2 (Dec. 2023), perma.cc/L7D7-X5Y8. And four in ten individuals identified as homeless experienced "unsheltered homelessness"—i.e., residing in places "not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods." *Id.* at 2, 24.

According to the Department of Housing and Urban Development, 256,610 individuals experienced unsheltered homelessness in 2023, up from 176,357 in 2016. *Compare id.* at 13 with Meghan Henry, et al., *The 2016 Annual Homeless Assessment Report (AHAR) to Congress*, Dept. of Hous. & Urban Dev. 8-9 (Nov. 2016), perma.cc/Y8HU-B2VX. Those numbers represent a "30 percent [increase] in less than ten years." *Addressing Homelessness in the States*, Cicero Inst. Fact Sheet. This crisis "has left America's once

5

great urban centers dangerous shells of what they once were." *Id.*

Federal, state, and local governments and their non-profit partners often "insist[] that homelessness can be solved by simply building and giving away enough free housing for every homeless individual." *Id.* But those conventional "housing first" approaches to homelessness do not address the root causes of the crisis. "Most of the homeless are not simply without homes, as many of their advocates would have us believe." Robert B. Hawkins, Jr., Foreword, in Richard W. White, Jr., Rude Awakenings: What the Homeless Crisis Tells Us ix (1992). In fact, "[t]he majority suffer from severe problems that are difficult to treat under optimal conditions—problems such as substance abuse, serious mental illness, and family breakdowns." *Id.*; *see* Paul J. Larkin, *Camping and the Constitution*, Georgetown J. of L. & Pol'y, at 15-16 (forthcoming; last visited Feb. 22, 2024) (collecting sources), perma.cc/88JC-6UL5.

The largest representative study of American homelessness reported that "more than 80 percent of homeless individuals suffered from mental illness, and only four percent cited housing costs as the primary reason they became homeless." *Addressing Homelessness in the States, supra*; *see* Margot Kushel, MD, et al., *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness*, UCSF Benioff Homelessness & Housing Initiative (June 2023), perma.cc/B7VF-2PE2. The study also found that "two-thirds of homeless people admitted to regularly using hard narcotics like

6

methamphetamine, crack cocaine, and opiates, with less than half reporting ever receiving treatment." *Id.*

Because most federal resources "prioritize[] longer-term permanent housing programs" at the expense of temporary shelter, shelter resources across the country are "misaligned." *Sanctioned Camping*, *supra*. While the number of unsheltered homeless individuals has increased, "there has not been a significant increase in the number of temporary shelter beds to accommodate these people." *Id.* Indeed, "[t]en times more federal funding is available for permanent housing options than for temporary shelters." *Id.* But temporary shelter options are an important tool to help connect the unsheltered population to critical resources and to move them off the streets. Yet there are often "zero empty beds" for these individuals in major U.S. cities. *Id.*

This misalignment of resources has only exacerbated the homelessness problem. *Id.* Indeed, "[m]any U.S. cities have seen a spike in unsheltered homeless without an increase in temporary housing." *Id.* Take three major American cities that fall within the Ninth Circuit—Seattle, San Francisco, and Portland. Since 2007, Seattle has faced a 246 percent increase in the number of unsheltered homeless individuals. *Id.*; SOH: State and CoC Dashboard (Washington), Nat'l All. to End Homelessness (last accessed Feb. 28, 2024), bit.ly/3IgDYEL. Only 44 percent of those individuals "have a shelter bed available to them." *Sanctioned Camping*, *supra*. San Francisco's unsheltered homeless population increased by 58 percent during that same timeframe. *Id.*; SOH: State and CoC Dashboard (California), Nat'l All. to End Homelessness (last

7

accessed Feb. 28, 2024), bit.ly/3Iht7uk. Yet only 24 percent of those individuals have a bed available to them. *Sanctioned Camping*, *supra*. And in Portland, the number of unsheltered homeless individuals grew by 20 percent. *Id.*; SOH: State and CoC Dashboard (Oregon), Nat'l All. to End Homelessness (last accessed Feb. 28, 2024), bit.ly/3IdZPN4. Yet only 57 percent have a bed available to them. *Sanctioned Camping*, *supra*.

Cities that lack temporary shelter beds have other options available to them that do not require allowing *unregulated* street camping. *See id.* For example, regulated camp sites typically offer potable water, health and recovery services, and security. They also serve as a way to introduce unsheltered homeless individuals to other types of shelter and services. Such camps exist in Austin, Texas, Denver, Colorado, and Madison, Wisconsin. *Id.*

Even in cities that have sufficient temporary shelter for the unsheltered homeless population, street camping is a higher-risk alternative. The limited enforcement of prohibitions on street camping has caused a "dramatic increase" in homeless street encampments. *Id.* Mental illness and substance abuse plague these camps. According to one study, two-thirds of homeless individuals reported "regularly using hard narcotics like methamphetamine, crack cocaine, and opiates," and less than half of those individuals reported having ever received treatment. *Id.*; Kushel, et al., *supra*. More than 80 percent of homelessness individuals reported severe mental health conditions. *Sanctioned Camping*, *supra*. And nearly a quarter had been hospitalized for those issues. *Id.*

DOJ-HUD-AR01122

8

These public camps are hotbeds of crime too. According to the San Diego County District Attorney's crime data, homeless individuals were "514 times more likely to commit crimes" than the average citizen. Andrew Noh, *New Data Reveals Link Between Homelessness and Crime Wave in California*, 600 KOGO (Mar. 29, 2022), perma.cc/G257-29W4. Homeless offenders also reoffended in 98 percent of cases. *Id.* And "[r]oughly half" of homeless individuals in shelters have served time in prison, "with one in five having been released within the preceding three years." *Public Camping Bans*, *supra*; *see also* Kushel, et al., *supra* (finding that nearly one in three homeless people in California had been to prison or a long-term jail stay in the six months prior to their becoming homeless).

Homeless individuals are also primary *victims* of these crimes. Last year in Los Angeles, nearly 25 percent of homicides and 15 percent of all violent crimes "involved homeless individuals as either perpetrators or victims, or both." *Public Camping Bans*, *supra.*

Public street camps have wreaked havoc on American cities from coast to coast. Just four months ago, one Vermont city cleared a homeless encampment and confiscated eight guns after someone in the encampment shot out the windshield of a school bus full of children. Cassandra Hemenway, *Confirmed: School Bus Gunshot Came from Encampment Country Club Road Shelter Opens Nov. 15*, The Bridge (Nov. 1, 2023), perma.cc/PF4E-SWGL. Nearby residents and business owners had noticed that "incidents were escalating" at the encampment, and noted that

DOJ-HUD-AR01123

9

occupants had been breaking windows and yelling at passersby. *Id.*

Across the country, Phoenix recently cleared a 1,000-person encampment called "The Zone" after a "humanitarian crisis" forced the area to be shut down. Laurie Roberts, *It's Time for Phoenix to Clean Up the Humanitarian Disaster Area Known as 'The Zone'*, The Arizona Republic (Mar. 28, 2023), perma.cc/6E3B-TTDH. The area was riddled with drug crimes, violence, and disease. *Public Camping Bans*, *supra*; Steve Twist & Seth Leibsohn, *Phoenix Neglects the Homeless, Ignores Rampant Crime in Drug-Riddled 'Zone'*, The Arizona Republic (Nov. 17, 2022), perma.cc/658B-55LT. Last year, a "burned, deceased newborn baby" was tragically found "lying in the street." Roberts, *supra*.

Street camps also pose innumerable health risks to the individuals who are living there. Homeless individuals are already at a "higher risk of communicable diseases due to the circumstances of their living conditions." *Public Camping Bans*, *supra*. Their "increased exposure[]" to disease, unchecked drug and alcohol use, and mental illness all make them more vulnerable. C. Y. Liu, et al., *Communicable Disease Among People Experiencing Homelessness in California*, Epidemiology & Infection 148 (Mar. 20, 2020), perma.cc/LW4Q-FHRX. As does their "lack of access to hygiene and healthcare facilities." *Id.*

The consequences can be deadly for homeless individuals. The National Institute of Health found that "unsheltered homeless have a nearly three-fold increase in mortality compared to sheltered homeless." *Public Camping Bans*, *supra*. That is in large part due

DOJ-HUD-AR01124

10

to factors like "drug-induced poisonings and infections." *Id.* Tuberculosis, for example, has run rampant in homeless camps. The NIH reported that "the prevalence of tuberculosis among homeless individuals is 20 times higher than that of the general population." *Id.* In 2013, Los Angeles faced "a wave of tuberculosis" on "Skid Row." *Id.* Health workers verified sixty cases among the homeless individuals and identified an additional 5,000 individuals "who were likely exposed." *Id.* Over a two-year period starting in 2016, the San Diego homeless suffered one of the largest outbreaks of Hepatitis A ever, resulting in 465 hospitalizations and 21 deaths. *Id.* "Of those who contracted Hepatitis A," 72%" had "also reported using drugs." *Id.* More recently, King County, Washington, faced a shigella outbreak—an intestinal infection spread by fecal matter. *Id.* Seventy-seven percent of cases were homeless individuals. *Id.*

Despite these serious and well-documented problems, localities have not done enough "to push unsheltered homeless individuals out of dangerous street encampments and into available shelter space and other services." *Id.* For western states, that is in no small part due to the Ninth Circuit's ruling in *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018). That decision held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id.* at 1048.

In practice, *Martin* meant that cities across the western United States that lacked sufficient shelter or shelter alternatives could not "enforce their rules against street camping." *Sanctioned Camping, supra.*

11

And ones that tried were promptly sued. *See* Pet. 8 (noting that "[t]hree days after the Ninth Circuit's initial September 2018 ruling, a plaintiff filed a follow-on suit against Portland" and "[o]ver the ensuing months, more plaintiffs pursued *Martin* theories").

At bottom, the "status quo" under *Martin* has profoundly failed both those in the homeless encampments and the residents of surrounding communities. *See* App. 139a (M. Smith, J.). Indeed, it has "paralyz[ed] local communities from addressing the pressing issue of homelessness." App. 117a (O'Scannlain, J.). Purportedly brought "in the name of compassion and decriminalizing homelessness[,]" these lawsuits "had the effect of surrounding the homeless in criminality and predation, not to mention fires, filth, disease, and the two most dangerous drugs we've known"—fentanyl and meth. Quinones, *supra*.

As Petitioners explain, "the results have been tragic, if predictable: skyrocketing rates of fatal drug overdoses; increasingly volatile behavior on the streets for those who live near encampments; a shocking rise in homicides and sexual assaults committed against the homeless; a resurgence of medieval diseases (such as typhus and tuberculosis) in encampments; a series of fires in major cities, some of which burned out of control for days; and massive amounts of debris, such as needles and excrement, polluting the environment." Pet. 34 (cleaned up); Pet'n Br. at 46-47; *see also* Thomas Fuller, *Death on the Streets*, N.Y. Times (Apr. 25, 2022), nyti.ms/3ThW5QW; Christal Hayes, *'The World Doesn't Care': Homeless Deaths Spiked During Pandemic, Not from COVID. From Drugs.*, USA Today (May 28, 2022), perma.cc/6KY4-

12

Q8HY; Michael Corkery, *Fighting for Anthony: The Struggle to Save Portland, Oregon*, N.Y. Times (July 29, 2023), nyti.ms/49OgqDa; *Recent Killings in Los Angeles and New York Spark Anger, Raise Risk for Homeless People*, KTLA (Jan. 28, 2022), perma.cc/2SD9-QSDL; Eric Leonard, *LAPD Concerned About Increase in Sexual Violence Against Women Experiencing Homelessness*, NBC4 (Feb. 27, 2020), perma.cc/GA5G-YU6G; Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, The Atlantic (Mar. 8, 2019), perma.cc/AWP6-84DG; Natalie O'Neill, *Blazes That Begin in Homeless Camps Now Account for Nearly Half the Fires in Portland*, Willamette Week (Nov. 2, 2022), perma.cc/6CJD-ACBD; Jennifer Medina, *Los Angeles Fire Started in Homeless Encampment*, Officials Say, N.Y. Times (Dec. 12, 2017), nyti.ms/3ThWcMm. The decision below doubled down on *Martin* and will only make things worse.

## II. States and localities must have the flexibility to address the homelessness crisis with creative solutions that work.

For the second time in five years, the Ninth Circuit has allowed federal judges to serve as the nation's "homelessness policy czars." App. 156a (opinion of M. Smith, J.). If upheld, that decision will have "dire practical consequences" for thousands of local governments and millions of people across the country. *Martin*, 920 F.3d at 594 (M. Smith, J., dissenting from denial of rehearing en banc). As discussed, homelessness is a complex issue that stems from a "mix of economic, mental-health, and substance-abuse factors." App. 140a-143a (M. Smith, J.). And it "appears to resist any

DOJ-HUD-AR01127

13

easy solution." *Id.* States and localities thus need the flexibility to address its root causes, offer creative solutions that will protect homeless individuals and surrounding communities alike, and focus on accountability and outcomes. And they should not face an inevitable new lawsuit each time they try to tackle these complex issues.

Localities on the front lines must have "the ability to make tough policy choices unobstructed by court-created mandates that lack any sound basis in law" and have "add[ed] enormous and unjustified complication to an already extremely complicated set of circumstances." App. 163a (Bress, J., dissenting from denial of rehearing en banc). This Court should return this issue to "the people and their representatives." Pet'n Br. at 19 (citation omitted).

Respondents contend that common-sense regulations prohibiting public encampments are "punishing people for universal biological necessities like sleeping and using a blanket to survive cold temperatures when they have no choice but to be outside." BIO 2. But that argument is unavailing as a matter of constitutional law and harmful and counterproductive as a matter of public policy. Enforcing public camping bans is "a compassionate way to redirect unsheltered homeless to existing shelters that are safer and provide resources such as substance abuse treatment or job placement in addition to hygiene facilities and food." *Public Camping Bans*, *supra*. Indeed, this "contributes to better outcomes for homeless individuals and safer communities for all." *Id.*

Several jurisdictions have made great progress by enforcing public camping bans. Indeed, "when tied to

14

fines or temporary jail time for unlawful camping on public lands," these bans have been "an effective means to addressing the growing homelessness crisis." *Id.* And there is no reason to think that civil citations will fare worse. In July 2018, for example, Colorado Springs "banned camping within 100 feet of creeks and other waterways." *Id.* Thirty-three percent of the city's homeless population was unsheltered that year, but by 2022, "that number had dropped to 19 percent." *Id.* That success is due in large part to the "ability to relocate unsheltered homeless individuals to shelters that provide various resources like vocational training, food, and hygiene necessities." *Id.*

The unsheltered homeless population in downtown Austin fell by one-third after voters reinstated the city's camping ban in 2021. *Id.*; *see* Katy McAfee & Ben Thompson, *Austin's Homeless Population Dispersing After 2 Years of Camping Ban Enforcement*, Community Impact (May 25, 2023), perma.cc/B3XW-VD49. As a result, federal data show that "the current homeless population in Austin has declined by five percent compared to 2020, consisting of 19 percent more people seeking formal shelter and 20 percent fewer unsheltered individuals." *Public Camping Bans, supra.* And clearing "the Zone" in Phoenix was another positive outcome. After the city cleared "the Zone," "80% of residents … found more stable shelter." *Id.*

In 2023, Georgia and Utah also passed laws requiring cities and counties to enforce camping bans. *See* Jeff Amy, *Georgia Lawmakers: Localities Must Apply Homeless Camp Bans*, AP (Mar. 27, 2023), bit.ly/4bTwTYx; *Public Camping Bans, supra.* As for Georgia, "the state's 5,245 unsheltered households

15

will be directed to the 7,302 vacant shelter beds that are currently available, as well as additional temporary options like sanctioned camping facilities." *Public Camping Bans*, *supra*. And in Utah, the state's "780 unsheltered homeless households will be directed to the approximately 2,977 available emergency shelter and transitional housing beds are currently open and available." *Id.* Missouri and Tennessee have also recently enacted legislation prohibiting public camping, but those laws are yet to be evaluated. *Id.*

As these examples show, "[r]emoving homeless individuals from unsanctioned camps and placing them in shelters offers them the services they need while reducing crime." *Id.* This Court should ensure that states and localities retain flexibility to address homelessness in ways that work for them. It is the responsibility and duty of elected leaders, not federal courts, to evaluate and balance the complex factors causing this crisis, and to implement the best public policies in response to each area's unique needs and circumstances.

## CONCLUSION

For these reasons, the Court should reverse the decision below.

16

Respectfully submitted,

Ryan Vassar                          Jeffrey M. Harris
CICERO INSTITUTE                       *Counsel of Record*
2112 Rio Grande St.                   Tiffany H. Bates
Austin, TX 78705                      CONSOVOY MCCARTHY PLLC
(512) 815-2028                        1600 Wilson Boulevard
                                      Suite 700
                                      Arlington, VA 22209
                                      (703) 243-9423
                                      jeff@consovoymccarthy.com

March 4, 2024                         *Counsel for Amicus Curiae*



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-5000

OFFICE OF COMMUNITY PLANNING
AND DEVELOPMENT

| | |
|---|---|
| **Special Attention of:** | **CPD-2025-06** |
| CoC Grantees | **Issued:** November 21, 2025 |
| Regional Directors | |
| Field Office Directors | ***This notice withdraws:*** |
|   CPD Directors | Notices CPD-2016-11 and CPD-2014-12 |
| | |
| | **Expires:** This Notice is effective until it is amended, superseded, or rescinded |

---

**Subject**: Withdrawal of Notice on Prioritizing Persons Experiencing Chronic Homelessness and Other Vulnerable Homeless Persons in Permanent Supportive Housing

**Purpose**: This notice withdraws Notice CPD-2016-11, which superseded Notice CPD-2014-12 and provided guidance regarding the order in which eligible households should be served in all CoC Program-funded permanent supportive housing.

1. **Applicability**: This notice, which withdraws Notices CPD-2016-11 and CPD-2014-12, pertains to all recipients administering the Continuum of Care program.

2. **Further Information**:  Questions may be directed to SNAPSinfo@hud.gov

# BRYAN HORN

Digitally signed by: BRYAN HORN
DN: CN = BRYAN HORN C = US O = U.
S. Government OU = Department of
Housing and Urban Development, Office
of Community Planning and Development
Date: 2025.11.21 14:06:11 -05'00'

Bryan W. Horn
Acting Principal Deputy Assistant Secretary
  for Community Planning and Development

DOJ-HUD-AR01132

DOJ-HUD-AR01132



U.S. Department of Housing
and Urban Development

# FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO

FR-6901-N-25

Community Planning and Development

# TABLE OF CONTENTS

I. BASIC INFORMATION...........................................5

A. Summary.............................................................5

B. Agency Contact(s) ................................................7

II. ELIGIBILITY.....................................................10

A. Eligible Applicants...............................................10

B. Cost Sharing or Matching ...................................11

III. PROGRAM DESCRIPTION ...............................13

A. Purpose.............................................................13

B. Goals and Objectives..........................................13

C. Authority............................................................21

D. Unallowable Costs ............................................21

E. Indirect Costs....................................................21

F. Program History .................................................22

G. Other Information................................................24

IV. APPLICATION CONTENTS AND FORMAT.....32

A. Standard Forms, Assurances, and Certifications32

B. Budget...............................................................34

C. Narratives and Other Attachments ....................42

D. Other Application Content .................................42

V. APPLICATION REVIEW INFORMATION ..........59

A. Threshold Review ..............................................59

B. Merit Review ......................................................74

C. Risk Review .......................................................97

D. Selection Process ..............................................98

E. Award Notices..................................................105

VI. SUBMISSION REQUIREMENTS AND

DEADLINES.........................................................107

A. Deadlines .........................................................107

B. Submission Methods ........................................108

C. Other Submissions ..........................................114

D. False Statements.............................................115

VII. POST-AWARD REQUIREMENTS AND

ADMINISTRATION ..............................................117

A. Administrative, National and Departmental Policy

Requirements, and General Terms and Conditions

.........................................................................117

B. Environmental Requirements ...........................119

C. Remedies for Noncompliance ..........................120

D. Reporting .........................................................121

VIII. CONTACT AND SUPPORT ..........................125

A. Agency Contact ...............................................125

B. esnaps.hud.gov ...............................................126

C. SAM.gov ..........................................................126

D. Debriefing and Appeals ...................................126

E. Applicant Experience Survey...........................131

F. Other Online Resources...................................131

APPENDIX ...........................................................133

Appendix I. Definitions .........................................133

# BEFORE YOU BEGIN

If you believe you are a good candidate for this funding opportunity, register in the appropriate systems now and review the application package. If you are already registered, make sure your registration is active and up-to-date.

**SAM.gov Registration**

You must have an active and up-to-date account with SAM.gov, at the time of application and throughout the life of any award.

To register, go to SAM.gov Entity Registration and click Get Started. From the same page, you can also click on the Entity Registration Checklist for the information you will need to register.

It can take several weeks to register in SAM.gov, so please get started now if you are planning to apply. SAM.gov also provides each organization with a unique entity identifier (UEI). A valid UEI is required to apply for funding.

**esnaps.hud.gov Registration**

You must have an active esnaps.hud.gov account to submit your application. See step-by-step instructions at the CoC Registration and Competition home page.

See Section VI.B. Submission Methods.

**Find the Application Package**

Use the Grants Search at Grants.gov and search for opportunity number FR-6901-N-25 . The application package has all the online forms you need to apply. You also need to access the Download Instructions link and review the content before you apply.

If you have other technical difficulties using Grants.gov, access the Support Center on Grants.gov for assistance.

To get updates on changes to this notice of funding opportunity (NOFO), click Subscribe from the View Grant Opportunity page for this NOFO on Grants.gov.

---

**Application Deadline**

See Section VI.A. of this NOFO.

**HUD Listserv**
If you are interested in email notices about upcoming funding opportunities, subscribe to HUD's Funding Opportunities listserv.
**Note**: To help you find what you need, this NOFO uses internal links. In Adobe Reader, you can go back to where you were by pressing Alt + Left Arrow (Windows) or Command + Left Arrow (Mac) on your keyboard.

---

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 123 of 256 PageID #: 2514

# I. BASIC INFORMATION

I.   Basic Information

    A.  Summary

B.  Agency Contact(s)

TABLE OF CONTENTS

DOJ-HUD-AR01136

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 124 of 256
PageID #: 2515

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# I. BASIC INFORMATION

See [Contact and Support](#) section of this NOFO.

## A. Summary

**Federal Agency Name:**

United States Department of Housing and Urban Development (HUD)

**HUD Program Office:**

Community Planning and Development

**Announcement Type:**

Initial

**Program Type:**

Discretionary

**Paperwork Reduction Act Information:**

2501-0044

**Due Date for Intergovernmental Review:**

See [Section VI.C.1.](#)

---

**Key Facts**

**Opportunity Name:**
FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO

**Opportunity Number:**
FR-6901-N-25

**Federal Assistance Listing:**
14.267

**Key Dates**

**Application Due Date: 8PM Eastern Time on**:
02/25/2025

**Anticipated Award Date:**
03/31/2026

**Estimated Performance Period Start Date:**
03/31/2026

**Estimated Performance Period End Date:**
12/31/2027

---

## 1. NOFO Summary

==The Department of Housing and Urban Development (HUD) is issuing this Notice of Funding Opportunity (NOFO) for the 2025 Fiscal Year for public review. HUD understands this NOFO to be enjoined pursuant to a preliminary injunction entered in *State of Washington, et al. v. HUD*, No. 1:25-cv-00626-MSM-AEM (District of Rhode Island), and *National Alliance to End Homelessness, et al. v. HUD*, No. 1:25-cv-00636-==

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 125 of 256
PageID #: 2516

**MSM-AEM (District of Rhode Island). HUD will not implement or enforce this NOFO pending further court order. HUD will issue further clarification on the status of this or any other future Fiscal Year 2025 NOFO as necessary. HUD will provide further notice as to when the application portal will open.**

The Continuum of Care (CoC) Program is a competitive and results oriented program designed to:

- promote a community-wide commitment to the goal of ending homelessness;

- provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse individuals and families experiencing homelessness, persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and youth experiencing homelessness while minimizing the trauma and dislocation caused by homelessness;

- promote access to, and effective utilization of, mainstream programs and programs funded with State or local resources; and

- optimize self-sufficiency among individuals and families experiencing homelessness.

This does not alter all applicable protections and obligations under the original Violence Against Women Act of 1994 (Pub.L. 103-322), codified mainly in 42 U.S.C. 13925 et seq., appearing in 108 Stat. 1796; as well as the Violence Against Women Reauthorization Act of 2022, Pub. L. 117-103) 34 (e.g., 34 U.S.C. 12491 (VAWA).

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is youth ages 24 and younger who are experiencing homelessness, including unaccompanied and pregnant or parenting youth.

**This NOFO establishes two deadlines for submitting applications to HUD.**
   **Application Due Date: 8PM Eastern Time on**:
      Normal Track: 01/28/2026 for $2,655,600.
      Extended Track: 02/25/2026 for $1,262,400 in funding for new Permanent Housing projects for individuals and families with a disability.
   **Anticipated Award Date:**
      Normal Track: 03/31/26
      Extended Track: 04/28/26

## 2. Funding Details

**Type of Funding Instrument**

G (Grant)

**Available Funds**

Funding of approximately **$3,918,000,000** is available through this NOFO.

Additional funds may become available for award. Use of these funds is subject to statutory constraints. All awards are subject to the selection process contained in this NOFO.

On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Public Law 118-42, approved March 9, 2024). Pursuant to the Full-Year Continuing Appropriations and Extensions Act, 2025, HUD will repurpose $100,000,000 in funds previously outlined in paragraph (5) of the Consolidated Appropriations Act, 2024, under the heading 'Department of Housing and Urban Development—Community Planning and Development—Homeless Assistance Grants', to supplement the FY 2025 CoC Program Competition. Approximately $294,000,000 in amounts available pursuant to section 231 of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94, division H, title II, section 231; 42 U.S.C. 11364a) is also being made available as part of this Notice.

Of the $3,918,000,000 HUD is making available:

- Approximately $52,000,000 in funding is available for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in sections IV.D.1.e and IV.D.1.f of this NOFO.

- Approximately $129,000,000 for the renewal of projects originally awarded as part of the Unsheltered and Rural Homelessness Supplemental NOFO.

- Approximately $228,000,000 for the competitive renewal and replacement of expiring YHDP grants.

All requirements in the FY 2025 application process, including requirements for the entire CoC Consolidated Application, and the total amount of funds available are included in this NOFO.

**Number of Awards**
HUD expects to make approximately 7000 awards from the funds available under this NOFO.

**Length of Performance Period:**

12-month project period and budget period

18-month project period and budget period

24-month project period and budget period

36-month project period and budget period

42-month project period and budget period

48-month project period and budget period

60-month project period and budget period

Length of Periods Explanation:

# B. Agency Contact(s)

See [Contact and Support](#) section of this NOFO.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 128 of 256 PageID #: 2519

# II. ELIGIBILITY

II. Eligibility

A. Eligible Applicants

B. Cost Sharing or Matching

TABLE OF CONTENTS

DOJ-HUD-AR01141

Case: 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 129 of 256
PageID #: 2520

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# II. ELIGIBILITY

You are invited to apply if your organization is an eligible entity type and meets the funding conditions included in the NOFO. HUD will review applications from eligible applicants using the criteria in Section V. of this NOFO.

## A. Eligible Applicants

### 1. Eligible Entity Types:

00 (State governments)

01 (County governments)

02 (City or township governments)

04 (Special district governments)

06 (Public and State controlled institutions of higher education)

07 (Native American tribal governments (Federally recognized))

08 (Public housing authorities/Indian housing authorities)

11 (Native American tribal organizations (other than Federally recognized tribal governments))

12 (Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education)

20 (Private institutions of higher education)

25 (Others (see text field entitled "Additional Information on Eligibility" for clarification))

Additional Information on Eligibility

Faith-based organizations may apply on the same basis as any other organization. HUD does not engage in any unlawful and improper conduct, policies, or practices that target faith-based organizations.

Individuals are ineligible applicants.

a. Faith-based organizations may apply for this award on the same basis as any other organization, as set forth at 24 CFR 5.109, and subject to the protections and requirements of 42 U.S.C. § 2000bb et seq. HUD will not, in the selection of recipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

b. A faith-based organization that participates in this program will retain its independence and may continue to carry out its mission consistent with religious freedom and conscience protections in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution, 42 U.S.C. § 2000bb et seq., 42 U.S.C. § 238n, 42 U.S.C. § 18113, 42 U.S.C. §§ 2000e-1(a) and 2000e-2(e), 42 U.S.C. § 12113(d), and the Weldon Amendment, among others. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws. A religious organization's exemption from the Federal prohibition on employment discrimination of the basis of religion, set forth in section 702(a) of the Civil Rights Act of 1964(442 U.S.C. 2000e-1) is not forfeited when the

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 130 of 256
PageID #: 2524

organization participates in a HUD program. See 24 C.F.R. 5.109(i).

c. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws. Nothing in this Notice shall interfere with rights of such Eligible Applicants, as provided under the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, codified at 42 U.S.C. § 2000bb through 42 U.S.C. § 2, nor the processes and guarantees provided in HUD regulations regarding applicants' activities and assessments (see 24 CFR 578.93(b)(2) and 24 CFR 578.93(d)(2) and 24 CFR 5.110 and their right to apply as a qualified solo applicant as provided in Section VIII.D.4 of this NOFO (24. CFR 578.35(b).

To be eligible for funding under the FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO, project applicants must meet all statutory and regulatory requirements in the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act) and the CoC Program Rule found in 24 CFR part 578 (the Rule). For more information on Applicant eligibility see Section V.A.1 of this NOFO.

## 2. Restrictions

### a. Statutory and Regulatory Requirements Affecting Eligibility

You must comply with the current General Statutory and Regulatory Requirements Affecting Eligibility for HUD's Competitive Programs. HUD will review your eligibility before issuing an award. As part of this review, HUD uses SAM.gov and Department of Treasury data.

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

### b. Application Eligibility

Your application is considered for funding if it satisfies the application review requirements in Section V. of this NOFO.

For-profit entities are not eligible to apply for grants or to be subrecipients of grant funds.

## B. Cost Sharing or Matching

This Program requires cost sharing or matching, as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources. 24 CFR 578.73.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for youth experiencing homelessness.

DOJ-HUD-AR01143

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 131 of 256 PageID #: 2522

# III. PROGRAM DESCRIPTION

III. Program Description

A. Purpose

B. Goals and Objectives

C. Authority

D. Unallowable Costs

E. Indirect Costs

F. Program History

G. Other Information

TABLE OF CONTENTS

DOJ-HUD-AR01144

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 132 of 256
PageID #: 2523

# III. PROGRAM DESCRIPTION

## A. Purpose

The Continuum of Care (CoC) Program (24 CFR part 578) is a competitive and results oriented program designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, local governments and Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)) to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs and programs funded with State or local resources; and to optimize self-sufficiency among those experiencing homelessness.

As described in detail below, a "Housing First" approach to homelessness has failed to deliver on the CoC Program's primary goal: to end homelessness.

The FY 2025 CoC Program NOFO funds the renewal of existing CoC grants, including DV Renewal projects and projects originally funded under the Special NOFO to Address Unsheltered and Rural Homelessness, and the competitive renewal or replacement of existing YHDP grants that are expiring in Calendar Year 2026. This NOFO also provides funding for new projects, including those created with DV Bonus, CoC Bonus, and the reallocation of existing renewal projects.

For FY 2025, HUD requires Collaborative Applicants to rank all project applications, except for CoC Planning, and if applicable, UFA Costs project applications.

## B. Goals and Objectives

This section provides context to help applicants better understand how the merit criteria found in section V.B of this NOFO advance HUD's implementation of the Continuum of Care program's goal of ending homelessness.

"Housing First" has been a profound failure by any measure. Far from ending homelessness as promised, chronic homelessness has increased by 75% in just a decade. And that is despite artificially lowered numbers and nearly triple the amount of Permanent Housing since 2007. HUD is returning the CoC program to its original goals of solving homelessness by improving outcomes, expanding competition, and prioritizing treatment, economic independence, and law and order to address the diverse root causes of homelessness.

More than a decade ago, advocates of "Housing First" argued that the approach would end all types of homelessness in 10 years.[1] By focusing on permanently subsidized housing with no conditions, the Obama Administration said it would end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[2]

In 2025, it is evident that those promises have profoundly failed. Last year, homelessness in the U.S. reached the highest number ever recorded at the highest rate of increase ever recorded.[3] Unsheltered homelessness has increased every year since 2015.[4] Between 2023 and 2024, only six states reported a decrease in homelessness.[5]

Case 1:25-cv-00636-MSN-AEM Document 59-4 Filed 12/31/25 Page 133 of 256 PageID#: 2524

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Chronic homelessness, which Permanent Supportive Housing was intended to address, has increased by 74.5% since 2015 to the highest number on record. This is despite a 24.7% increase nationwide in Permanent Supportive Housing beds during the same time. In California alone, chronic homelessness increased 128.1% since 2015 despite a 55.2% increase in Permanent Supportive Housing.[6]

According to the McKinney-Vento Act, HUD considers individuals and families living in Transitional Housing, but not Permanent Housing, to be experiencing homelessness. Although Transitional Housing and Rapid Rehousing are both housing limited to 24-months, HUD chose to consider Rapid Rehousing to be Permanent Housing. The effect of this counting method is artificially lower numbers of people experiencing homelessness, and a system that incentivized the speed at which individuals could receive subsidized housing rather than the quality of services individuals could receive in order to reach self-sufficiency and independent living.[7]

There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness — Permanent Housing. The nation's supply of Permanent Supportive Housing has increased by 111% (more than double) since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5% (more than half).

**1. Improving Outcomes.**

One of the main objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381(4), is to optimize self-sufficiency among individuals and families experiencing homelessness. CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of successful providers, including faith-based providers, and improve the overall performance of the CoC. This NOFO also makes a significant investment in Transitional Housing and Supportive Service Only projects to ensure that those who can recover and achieve self-sufficiency have the support to do so.

**2. Restoring Balance to the Continuum of Care**

From 2007 to 2009 there was a nearly equal distribution of Emergency Shelter beds, Transitional Housing beds, and Permanent Supportive Housing beds.[1] During this time, the number of people experiencing homelessness was decreasing consistently. Beginning in 2010, and reinforced by HUD's 2013 NOFO, the distribution of homelessness assistance grew dramatically and became imbalanced.

The numbers cited above, and the graph from HUD's Annual Homelessness Assessment Report, reference nationwide bed counts. The trend and disparities between Permanent Housing and Transitional Housing is even more apparent when narrowed to CoC-funded housing in particular. Last year, 88% of the CoC national award went to Permanent Housing,

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 134 of 256 PageID#: 2525

and only 1% supported transitional housing projects.[2]

Instead of a balanced continuum of assistance, the CoC Program has become a "one size fits all" response to homelessness that restricts the spectrum of eligible program components to one component, excluding a wide array of community providers in the process. By investing in Transitional Housing and Supportive Service Only projects, HUD intends to restore the "continuum" to the Continuum of Care Program to help able-bodied people move to self-sufficiency. Individuals who are likely to never be able to return to the workforce—over 62 years old, physically disabled, developmentally disabled—should be prioritized for Permanent Supportive Housing. Instead, many Permanent Supportive Housing units prioritize certain disabilities over others at the cost of serving the most vulnerable. Many individuals and families that have these certain disabilities, such as impairment due to substance abuse, are able to recover and regain self-sufficiency and deserve every opportunity to receive treatment and services to help them do so.

To the extent permitted by law, HUD is shifting its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program, and it is also prioritizing Permanent Housing that has robust services with participation requirements.

### 3. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency.

According to a nationwide study, 75% of a survey sample of 64,000 people experiencing unsheltered homelessness reported a substance use disorder and 78% reported a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.[3] Another study found that two-thirds of people experiencing homelessness self-reported regular use of hard drugs like methamphetamine, cocaine, and opiates. Of those, 29% reported wanting treatment and being unable to receive it.[4] Based on HUD's 2024 Point-In-Time Count data, which asks individuals if they wish to self-report substance abuse, 24.7% of individuals experiencing unsheltered homelessness select to self-report substance abuse. The results of ignoring the prevalence of substance use disorder among people experiencing homelessness is deadly.

According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths."[5] The risk of fatal overdose inside Permanent Supportive Housing is noteworthy, and tragic. The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[6] According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[7]

A National Academies of Sciences, Engineering, and Medicine review of studies on Permanent Supportive Housing concluded that "there is no substantial published evidence as yet to demonstrate that Permanent Supportive Housing improves health outcomes or reduces healthcare costs" and that "the studies reviewed did not demonstrate improvements in

DOJ-HUD-AR01147

psychiatric symptomatology or substance use behavior."[8] This review was published in 2018, just prior to the explosion of Fentanyl use in the U.S..

Despite the tragic realities of substance abuse and fatal overdose among people experiencing homelessness or living in Permanent Supportive Housing, there are recipients of CoC funding who reportedly, under the misnomer of "harm reduction", permit, and even encourage, the use and distribution of illicit drugs on their property including by distributing drug paraphernalia like needles, pipes, and foil. This NOFO provides communities opportunities to invest in treatment services and recovery housing, and prohibits recipients from distributing drug paraphernalia or permitting the use and distribution of fatal, illicit drugs on their properties.

CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for individuals and families experiencing homelessness. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

**4. Promoting Economic Self-Sufficiency.**

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. In fact, self-sufficiency is one of only four purposes Congress provided for the CoC Program. CoCs should partner with workforce development centers, employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness to unsubsidized housing and prevent future returns to homelessness.

Although a chief goal of the program is self-sufficiency, HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned, employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[9] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65, with a significant 17.4% under age 18.[10] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[11]

One way to advance both recovery and self-sufficiency is through supportive service participation requirements. Service participation requirements have been successfully employed in most federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996. For example, PELL Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment insurance benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF) requires beneficiaries to work or advance their education.

DOJ-HUD-AR01148

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 136 of 256 PageID#: 252

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

According to a national poll in 2024, there is strong bipartisan support for supportive service participation requirements, with 69% of respondents in favor of "requiring participation in programs for housing benefits."[12]

In accordance with 24 CFR 578.75(h), HUD encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F).

## 5. Creating Competition to Improve Innovation and Accountability.

The Continuum of Care Program was intended to be a "national competition between geographic areas" (42 U.S.C § 11386a), which is also consistent with Office of Management and Budget requirements that federal grants be awarded on a competitive, objective basis, even for renewals. 2 CFR 200.205, 200.309. Last year, 90% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[13] This means that only about 10% of CoC awards were competed on the basis of merit between geographic areas. In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Competition drives outcomes, effectiveness, innovation, and accountability which is why HUD is competing 70% of Annual Renewal Demand on the basis of merit between geographic areas. Increased competition brings the CoC Program back to its original intent as a competitive program, not an entitlement program or block grant. Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that deliver the best results at reducing homelessness and optimizing self-sufficiency. The historic lack of competition has meant that the same projects are awarded every year regardless of their impact on homelessness.

## 6. Ending the Crisis of Homelessness on Our Streets.

The number of people experiencing unsheltered homelessness is at an all-time high.[14] People living on the streets and in encampments have high rates of substance use disorder and mental illness.[15] HUD intends to focus increasingly on reductions in unsheltered homelessness and movement through Transitional Housing and out of Permanent Housing to self-sufficiency.

CoCs should direct resources towards outreach, intervention, and assistance that helps people move out of unsheltered homelessness and regain self-sufficiency. By expanding opportunities for new providers and historically disincentivized program components, HUD is assisting community-wide efforts to address homelessness with the most effective solutions.

## 7. Advancing Public Safety for All.

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 137 of 256
PageID #: 2528

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

Respecting the rule of law is critical to community-wide efforts to address homelessness and protect all residents. According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of individuals experiencing homelessness despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among individuals experiencing homelessness in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[16] One recent study indicates that in some states, as many as half of unsheltered individuals experiencing homelessness are registered sex offenders.[17]

None of the realities above suggest that the entire population experiencing homelessness is engaged in criminal or illicit activity despite significant disproportionality. Data also indicates that people experiencing homelessness are the victims of crime at higher rates than the general public.[18] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to individuals experiencing homelessness. It is common sense to acknowledge the close relationship between unchecked homelessness and illicit activity with its many victims. Enforcing the rule of law is critical to protecting the safety of everyone regardless of their housing status, which in turn promotes one of the core purposes of McKinney-Vento, "community-wide commitment to the goal of ending homelessness." 42 U.S.C. § 11381(1).

In 2024, The City of Seattle reported that 76% of residents surveyed in a downtown neighborhood disagreed or strongly disagreed with the statement "I feel safe in my neighborhood." The respondents included residents of three Permanent Supportive Housing buildings in the neighborhood. The city described a downtown environment that creates "opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form."[19]

The public is supportive of policies that advance public safety related to homelessness. According to national polling in 2024, there is string bipartisan support for public camping bans and stricter enforcement of drug laws, with 72% of voters in favor of "moving individuals into shelters over allowing camping" and 60% of voters in favor of "stricter drug enforcement near service, providers, including penalties for facilities permitting drug activity."[20]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness decreased by one-third.[21] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 14%.[22]

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable individuals experiencing homelessness. In *Grants Pass v. Johnson,* the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

First responders and law enforcement are often the first to encounter our most vulnerable

I. Basic Information   II. Eligibility   III. Program Description   IV. Application Contents and Format   V. Application Information   VI. Submission Requirements and Deadlines   VII. Post-Award Requirements and Administration   VIII. Contract and Support   Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 138 of 256 PageID #: 2529

members of society and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the Continuum of Care. Executive Order 14321 reflects the need for cooperation. CoCs should work with law enforcement, first responders, and their state and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

### 8. Minimizing Trauma for Vulnerable Populations.

One of the purposes of the CoC program is to minimize the trauma associated with homelessness 42 U.S.C. § 11381(2). CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking. Women experiencing homelessness or domestic violence should have access to safe, single-sex spaces and other considerations for personal privacy (24 CFR 578.93(b).

### 9. Expanding Access Based on Merit, not Ideology.

HUD is committed to providing an equal opportunity to every applicant, recipient, and program participant free from discrimination. Part of this commitment is recognizing that faith-based providers deserve a level playing field to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[23]

To the fullest extent permitted by law, HUD will ensure that faith-based organizations can participate in the CoC program and operate consistent with their sincerely held religious beliefs, recognizing all relevant protections provided by subsection c of HUD's Equal Participation Rule, 24 CFR § 5.109, the Religious Freedom Restoration Act, and the First Amendment. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

Likewise, HUD is committed to promoting equal access to CoC programs for homeless individuals and program participants regardless of their race or other protected status. The prior administration wrongly and illegally pressured or required providers to discriminate against participants based on their race, sex, or other protected status. In *Students for Fair Admissions (SFFA) v Harvard*, 600 U.S. 181 (2023), the Supreme Court ruled Harvard's race-conscious admissions violated the Fourteenth Amendment's Equal Protection Clause, effectively ending affirmative action as previously practiced by using race as a "plus" factor for diversity, finding it led to racial stereotyping, lacked a logical endpoint, and failed strict scrutiny by not being narrowly tailored to serve a compelling government interest. HUD believes that these harmful and illegal practices promoted division and waste and wants to increase access to homelessness relief for *all* individuals and families.

[1]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[2]CoC_AwardComp_NatlTerrDC_2024.pdf

[3]Health Conditions Among Unsheltered Adults in the US

[4]CASPEH_Report_62023.pdf

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

Case 1:25-cv-00636-MSN-AEM Document 59-4 Filed 12/31/25 Page 139 of 256 PageID#: 2530

[5] Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic | Public Health | JAMA Network Open | JAMA Network

[6]Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[7]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[8]Evidence of Effect of Permanent Supportive Housing on Health - Permanent Supportive Housing - NCBI Bookshelf

[9]System-Performance-Measures-Data.xlsx

[10]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[11]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[12]2024 National Public Safety and Homelessness Poll | Cicero Institute

[13] Tier 1 of FY24-25 CoC NOFO

[14]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[15]Health Conditions Among Unsheltered Adults in the US

[16]How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

[17]Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless | Cicero Institute

[18]Homeless Data and Plan News Release FINAL 3-21-22.pdf

[19]Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[20]2024 National Public Safety and Homelessness Poll | Cicero Institute

[21]Austin's homeless population dispersing after 2 years of camping ban enforcement | Community Impact

[22]20240304161555229_23-175 Amicus BOM Cicero PDFA.pdf

[23]History of The Salvation Army

[1]Are Cities' Pledges to End Homelessness Working?

[2]USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness - HUD Exchange

[3]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[4] Ibid.

[5] Ibid.

[6]The Future of Housing for the Homeless

[7]How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

## C. Authority

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule). Pursuant to 42 U.S.C 11386a(a) and 42 U.S.C. 11386a(b)(1)(G), the Secretary can establish criteria for the awarding of funds including factors deemed appropriate to carry out the CoC Program in an effective and efficient manner.

FY 2025 funding for CoC Program Competition NOFO, including the competitive or noncompetitive renewal or replacements of YHDP grants under the CoC program, is authorized by the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025). Under this NOFO, HUD will competitively renew or replace YHDP grants under the CoC Program.

HUD is including up to $294,000,000 in funding under Section 231(a)(1) and 231(a)(3) of the 2020 Consolidated Appropriations Act.

HUD is also utilizing authority under the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025) to enable HUD to repurpose $100 million made available for Permanent Supportive Housing to fund CoC projects under this NOFO.

## D. Unallowable Costs

HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## E. Indirect Costs

If you expect to charge indirect costs to the award, submit the Indirect Cost Rate Certification form (HUD-426) with your application.

The HUD-426 form is built into the *e-snaps* Project Applicant Profile where you will complete the information if requesting indirect costs, and you will also see the information transferred within your project application.

Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal. These governmental departments or agencies are not required to submit their proposals unless they are

DOJ-HUD-AR01153

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 141 of 256
PageID #: 2532

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

specifically requested to do so by an awarding Federal agency. The Federal agency's review should be limited to ensuring the proposal is consistent with the principles of this part.

For each applicant or intended subrecipient that meets the conditions for using the de minimis rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

# F. Program History

FY 2025 CoC awards will be made through this NOFO. This NOFO rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024, and includes several changes.

**1. Investment in New Permanent Housing with Robust Supportive Services for Individuals and Families with a Disability.**

This NOFO provides a set-aside of 30% of all ESG and COC funds,[1] as contained in 42 U.S.C. § 11386b, for new permanent housing projects for homeless individuals and families with disabilities, including PH-PSH and PH-RRH. As outlined in the Threshold Criteria in V.A.4, new PH-PSH and PH-RRH projects must serve individuals and families with disabilities.

This NOFO aligns with the program statutory requirements to fund new permanent housing. CoCs have discretion to determine if or how much of their Annual Renewal Demand (ARD) will be used for the creation of new Permanent Housing projects.

For CoCs applying for new Permanent Housing projects, those projects:

- Must be submitted by the Extended Track deadline.

- Must be ranked by the CoC in an Extended Track Priority Listing.

- Must not be included in the Normal Track FY25 CoC Priority Listing.

- May be CoC Bonus projects.

- May be DV Bonus projects, if it meets DV and new project criteria.

- May be the expansion portion of an expanding renewal project.

- May be Transition Grant projects.

- Will not be considered if they exceed the CoC's maximum award based on the CoC's combined Priority listings. In other words, these projects should not, in combination with the Normal Track FY25 CoC Priority Listing, exceed the CoC's maximum award

Case 1:25-cv-00626-MSM-AEM    Document 59-4    Filed 12/31/25    Page 142 of 256
PageID #: 2533

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

amount.

## 2. Two-Track Application Process for Increased Flexibility.

In order to provide time and flexibility for CoCs to solicit new Permanent Housing project applications, HUD is creating a separate deadline for new Permanent Housing projects.

Normal Track: $2,655,600,000 in funding, January 28, 2026 deadline and March 31, 2026 estimated award date. HUD reserves the right to award projects in Tier 1 of CoC Priority Listings prior to the rest of awards.

Extended Track: $1,262,400,000 in funding, February 25, 2026 deadline and April, 22, 2026 estimated award date. For new Permanent Housing projects only.

## 3. FY 2025 CoC Consolidated Application.

All CoCs must complete and submit the FY 2025 CoC Consolidated Application that includes the CoC Application and CoC Priority Lising with all submitted projects ranked or rejected based on the criteria set forth in this NOFO. CoCs applying for new Permanent Housing projects on the Extended Track timeline must submit a separate Extended Track Priority Listing of new Permanent Housing projects. CoCs should not submit projects in Normal Track and Extended Track that, when combined, exceed their maximum award amount.

## 4. Increase in Competition and Expedited Awards.

The Continuum of Care program is a national competition (42 U.S.C. 11386a). Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD). HUD reserves the right to award projects in Tier 1 of CoC Priority Listings prior to the rest of awards.

## 5. Investment in Transitional Housing and Supportive Service Only Projects.

In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of existing Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects.

### 6. Program Components that are eligible under this NOFO.

Provisions at 24 CFR 578.37 provide that CoC funds may be used for projects under five program components: transitional housing, supportive services only, HMIS, permanent housing (including rapid re-housing and permanent supportive housing), and in some cases, homelessness prevention. This NOFO is different than prior years in that applicants may apply for Transitional Housing (TH) and Supportive Services Only (SSO) projects including street outreach. Only designated High Performing Communities (HPC), may carry out homelessness prevention activities through the CoC program and there are currently no HPCs. Therefore, the four components that will be funded through this CoC Program Competition are: (a). Transitional Housing; (b). Supportive Services Only; (c). Permanent Housing; and (d). HMIS. Additionally:

    **a.** HUD will allow renewal project applications for Joint T/PH-RRH component projects, which combine two existing program components in a single project (see section III.G.4of this NOFO for more information). No new Joint TH/PH-RRH component project applications will be allowed.

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 143 of 256
PageID #: 2534

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**b.** Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. These projects must meet the project quality threshold criteria in section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in section V.A.4.b.(5)(b) of this NOFO.

The components are fully described at 24 CFR 578.37.

## 7. Special CoC NOFO grants.

Grants originally awarded funding under the Special NOFO to Address Unsheltered and Rural Homelessness, that are expiring in Calendar year 2026 are eligible to renew under this NOFO.

## 8. Reallocation.

CoCs may reallocate funding from any eligible renewal grant, including grants that have not previously renewed under the CoC Program, so long as the project has an executed grant agreement with an expiration date in Calendar Year 2026. For more information on Reallocation requirements see section III.G.3 of this NOFO.

## 9. Competitive Renewal or Replacement of YHDP Grants.

HUD will competitively renew or replace YHDP projects. Additionally, YHDP projects may be reallocated by CoCs to create new YHDP grants. If significant changes to a renewing YHDP project are needed the YHDP project may replace its current project with a new YHDP Replacement project, that may wholly or in part include activities ineligible under the CoC Program as outlined in section IV.D.1.h of this NOFO.

[1] HUD estimates that this amount is $1,262,400,000.

## G. Other Information

## 1. CoC Program NOFO Requirements.

All requirements for submitting the entire CoC Consolidated Application, including applications for projects eligible for FY 2025 CoC and YHDP funding and the total amount of funds available, are contained in this NOFO. Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

**a.** CoCs should consider the Goals and Objects established in Section III.B of this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests.

**b.** Collaborative Applicants that are designated Unified Funding Agencies (UFAs) or High Performing Communities (HPCs) by HUD during the FY 2024 CoC Program Registration process will maintain their UFA and/or HPC designation for the FY 2025 CoC Program Competition.

**c.** HUD will conduct threshold reviews of project applicants, and project applications for all CoC Consolidated Applications that are submitted by the application submission deadline as described in section V.A.4.

**d.** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended the deadline for application submission.

**e.** HUD will score the FY 2025 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**f.** With the exception of CoC Planning and, if applicable, UFA Cost applications, CoCs must rank all project applications. This includes CoC Bonus, DV Bonus, CoC Renewal (including DV Renewal projects), New CoC Reallocation, New DV Reallocation, and YHDP Renewal and YHDP Reallocation projects. CoC Planning and, if applicable, UFA Costs project applications are not ranked and will be selected provided they pass project eligibility and project quality threshold review.

## 2. Eligible Renewal Project.

YHDP and CoC projects originally funded in FY 2024 or earlier, including projects originally funded under the Special NOFO or DV Bonus are eligible to renew under this NOFO, provided the projects have an expiration date in CY 2026 (between January 1, 2026, and December 31, 2026). Renewal project applications must be submitted by the recipient currently under grant agreement to operate the project. See section IV.D.2 for more information on renewal project requirements.

In cases where an expiring grant agreement is amended to have a new recipient after a renewal application is submitted, the new recipient will be eligible to receive the renewal award (Section V.D.8).

## 3. Reallocation.

Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible CoC renewal projects to create one or more new projects without decreasing the CoC's ARD. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement with an expiration date in CY 2026. Additionally, new projects created through reallocation must meet the project eligibility and project quality thresholds established in sections V.A.4.a and V.A.4.b of this NOFO. For more information on the requirements for projects created through reallocation, see sections IV.D.1.e and IV.D.1.f (DV Reallocation), IV.D.1.g (CoC Reallocation), and IV.D.1.i (YHDP Reallocation) of this NOFO.

To create a Transition Grant through the reallocation process, the CoC must wholly eliminate one or more projects and use those funds to create the single, new transition grant [see section IV.D.1.l of this NOFO].

## 4. Joint TH/PH-RRH Component Project.

The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 145 of 256 PageID#: 2536

**a.** leasing of a structure or units, and operating costs to provide transitional housing;

**b.** short- and medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;

**c.** supportive services;

**d.** costs of contributing data to the HMIS; and

**e.** project administrative costs.

Renewal project applicants must include details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the renewal project application must describe and include the number of the project's TH units and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to pay for the cost of housing program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

## 5. Supportive Services Only (SSO) projects not dedicated to Coordinated Entry.

Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. Projects that are primarily providing these outreach services and identify themselves as such in the project application, must meet the project quality threshold criteria in Section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in Section V.A.4.b.(5)(b) of this NOFO.

## 6. Centralized or Coordinated Assessment System (Coordinated Entry).

In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. The definition of Centralized or Coordinated Assessment (also known as Coordinated Entry) is found at 24 CFR 578.3. 24 CFR 578.7(a)(8) details the responsibilities of the CoC to establish and operate this required system. In addition to the definition and responsibilities established in the Rule, HUD posted on its website, *CPD-17-01: Notice Establishing Additional Requirements for a Continuum of Care Centralized or Coordinated Assessment System*, establishing additional requirements related to the development and use of a centralized or coordinated entry assessment system. These systems help communities assess the needs of program participants and effectively match individuals and families experiencing homelessness with the most appropriate resources available to address their supportive service and housing needs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 146 of 256
PageID#: 253

system with CoC Program funds, other funds, or a combination of the two. Section 578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

**7. Non-Dedicated Permanent Supportive Housing Beds.**

A Permanent Supportive Housing bed within a CoC's geographic area that is not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

**8. Beds Dedicated to Chronically Homeless Individuals and Families.**

A Permanent Supportive Housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications.

**9. DedicatedPLUS Project.**

**a.** A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(1)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(2)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(3)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(4)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(5)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(6)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

**b.** A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness may either be reallocated to create a DedicatedPLUS project or may continue as a renewal project dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing

requirements at 24 CFR 578.9.

**c.** Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2025 CoC Program Competition.

## 10. Participant Eligibility.

Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process. As provided by the Consolidated Appropriations Act, 2025, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Participants eligible to be served by projects funded under this NOFO, are as follows:

**a.** PH-PSH projects awarded CoC funds must serve one of the following:

**(1)** persons eligible to be served by DedicatedPLUS projects as described in section III.G.9 of this NOFO in which case all units funded by the project must be used to serve program participants who meet the qualifications for DedicatedPLUS;

(2) persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act; or

**(3)** for renewal projects, the same population of individuals and families indicated in the expiring grant agreement (e.g., PSH projects originally awarded under the Special NOFO Competition projects through the Unsheltered Set Aside must serve individuals and families who qualify under paragraph (1) or (4) of the definition of homeless).

**b.** TH, PH-RRH, Joint TH/PH-RRH, SSO projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

PH-RRH, TH, Joint TH/PH-RRH, SSO- may serve persons who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**c.** DV Bonus, DV Renewal and DV Reallocation projects must serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 with the following exception:

PH-RRH, Joint TH/PH-RRH, SSO- projects may serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**d.** YHDP Renewal and Replacement projects including YHDP projects created through reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(1)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(2)** have an unsafe primary night-time residence and no safe alternative to that residence; or

**(3)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

## 11. Performance-Based Decisions.

**a.** The CoC must review each project application submitted to the CoC for inclusion on the FY 2025 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listing in rank order.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections V.D.3.a and V.D.3.b of this NOFO. This two-tiered approach for CoCs notifies HUD which projects are prioritized for funding based on project performance, local needs, and gaps.

**b.** Consistent with the requirements of the Consolidated Appropriations Act, 2024:

**(1)** Requests for new CoC project applications are allowed if the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as outlined in section V.B.1.a.(1) of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

## 12. Coordination with Housing and Healthcare.

The Consolidated Appropriations Act, 2024 directs HUD to provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. In the 2025 CoC Program

DOJ-HUD-AR01161

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 149 of 256
PageID #: 2540

I. Basic | II. Eligibility | III. Program | IV. Application | V. Application | VI. Submission | VII. Post-Award | VIII. Contact and | Appendix
Information | | Description | Contents and | Review | Requirements and | Requirements and | Support
| | | Format | Information | Deadlines | Administration

Competition, CoCs may receive up to 4 points on the CoC Application if the FY 2025 CoC Priority Listing includes new TH, PH-PSH or PH-RRH project applications created through reallocation or CoC Bonus that utilizes housing resources and healthcare provided through an array of healthcare services and housing providers. See section V.B.1.c of this NOFO for additional details.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 150 of 256 PageID #: 2541

# IV. APPLICATION CONTENTS AND FORMAT

IV.   Application Contents and Forms

A. Standard Forms, Assurances, and Certifications

B. Budget

C. Narratives and Non-Form Attachments

D.  Other Application Content

TABLE OF CONTENTS

DOJ-HUD-AR01163

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 151 of 256
PageID #: 2542

I. Basic          II. Eligibility    III. Program      IV. Application    V. Application    VI. Submission    VII. Post-Award    VIII. Contract and    Appendix
Information                          Description       Contents and      Information        Requirements and  Requirements and   Support
                                                       Format                              Deadlines          Administration

# IV. APPLICATION CONTENTS AND FORMAT

Applications must include three main elements: a) standard forms, assurances, and certifications; b) budget; and c) narratives and other attachments. The content, forms, and format for each element are included in this section.

You may use this section as a checklist to ensure you submit a complete application.

If you don't provide the required documents in the correct format, your application is incomplete.

Do not submit password protected or encrypted files.

While the CoC Program NOFO is officially posted on Grants.gov, the standard forms, assurances, certifications, budgets, narrative responses, and the ability to include attachments are built into e-snaps, an electronic application system.

HUD does not accept faxed applications or supportive documents.

There are two types of applications under this NOFO that are part of the CoC Consolidated Application;

- CoC Application that includes the CoC responses to the rating factors in Section V.B of this NOFO; and

- Project applications that must be approved by CoCs to be included as part of the CoC Consolidated Application. See Sections IV.D.1 and V.A.4 of this NOFO for information on eligible project applications and submission requirements.

_____ pages is the total maximum length of all narratives.

## A. Standard Forms, Assurances, and Certifications

You must properly complete and submit with your application the standard forms, assurances, and certifications identified below. You can find all forms in the application package or review them and their instructions at Grants.gov Forms. You can also read more about standard forms on HUD's Funding Opportunities page.

The identified forms below are included in the project applicant profile in e-snaps and must be completed by the project applicant before gaining access to the application.

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| Application for Federal Assistance (SF-424) | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| Applicant and Recipient Assurances and Certifications (HUD-424B) | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| Applicant/Recipient Disclosure/Update | Required with the application and completed |

Case 1:25-cv-00636-MSN-AFM    Document 59-4    Filed 12/31/25    Page 152 of 256 PageID#: 2543

| | |
|---|---|
| **Report (HUD-2880)** | in e-snaps via the information from the Project Applicant Profile. |
| **Certification Regarding Lobbying** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Disclosure of Lobbying Activities (SF-LLL)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification for a Drug-Free Workplace (HUD-50070)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Assurances for Construction Programs (SF-424D)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification of Need and Compliance with Housing Quality and Habitability Standards.** | If applicable, required with the application and included in e-snaps. Collaborative Applicants must certify there is a demonstrated need for all PH renewal projects included in the Renewal Project Listing. Additionally, Collaborative Applicants must certify these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing. |
| **Certification for Opportunity Zone Preference Points (HUD 2996)** | If applicable. The HUD-2996 form is not built into e-snaps and must be submitted as an attachment to the CoC application in e-snaps on the Attachment screen if the CoC is requesting Opportunity Zone Preference Points. |
| **Indirect Cost Rate Certification (HUD-426)** | If applicable, required with the application and included in e-snaps. |

Attachment of the forms that are built into e-snaps, as indicated above, is not required. These forms must be completed before you will have access to the e-snaps application screens.

**The following forms are not built into e-snaps but are required to be submitted by Collaborative applicants with the CoC Priority listing:**

DOJ-HUD-AR01165

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 153 of 256
PageID #: 2544

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contracts and Support | Appendix

### 1. Certification of Consistency with the Consolidated Plan Form HUD-2991.

The standard form, Certification of Consistency with the Consolidated Plan (form HUD-2991), in which a state or local official certifies that the proposed activities or projects are consistent with the jurisdiction's Consolidated Plan and, if the project applicant is a state or unit of local government, that the jurisdiction is following its Consolidated Plan per the requirement of 24 CFR part 91. Collaborative Applicants must download a new HUD-2991 and complete it for all project applications submitted and listed on the CoC Project Listings either by submitting one correctly signed and dated HUD-2991 form from the appropriate jurisdiction(s) that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction.

The FY 2025 Form HUD-2991 must be completed and dated between November 1, 2024 and February 25, 2026 and attached to the FY 2025 CoC Priority Listing.

### 2. Tribal Resolution for Projects on Trust Land or Reservations, if applicable.

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE, who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

A CoC that is not a Tribe or TDHE that proposes to locate a new project on a reservation or trust land that is not currently included in the CoC's approved geographic service areas, identified during the CoC Registration process, are required to obtain a Tribal Resolution from the Tribe or TDHE and attach it to the CoC Priority Listing.

## B. Budget

You must submit a budget with your application to support your project narrative.

At a minimum, your budget must indicate direct and any indirect costs.

You must also submit form HUD-426, based on the requirements in Section III.E. of this NOFO.

The project application in e-snaps includes the budget forms available under this NOFO. Project applicants will select the appropriate budget form(s) based on the requested activities and must be completed for the proposed project. Additionally, there is a section to capture indirect cost rate and the HUD-426 form, if applicable.

### Eligible Costs.

Except as otherwise stated below, 24 CFR 578.37 through 578.63 identifies the eligible costs that applicants may request under the CoC Program.

### 1. YHDP Costs.

Eligible costs for YHDP projects originally funded under the YHDP Competition are also eligible YHDP Renewal project costs under this NOFO (see section IV.D.1.h of this NOFO).

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 154 of 256 PageID #: 2545

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

Additionally, YHDP Renewal projects may include the YHDP Special Activities described in IV.B.2 below, subject to Renewal project requirements in sections IV.D.2 including IV.D.2.f.(2) of this NOFO. YHDP Replacement including YHDP Reallocation project applications under this NOFO may include requests for eligible CoC Program Costs, the YHDP activities described in section IV.D.1.i and the YHDP Special Activities in section IV.B.2 below. HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## 2. Special YHDP Activities.

YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**a.** Recipients may carry out the activities below with written notice to the Director of HUD's Office of Special Needs Assistance Programs (SNAPS), subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Director of SNAPS.

**(1)** Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

**(2)** Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

**(3)** In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

**(4)** Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

**(5)** Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

**(6)** Projects may use habitability standards in 24 CFR 576.403(c) rather than the housing standards in 24 CFR 578.75 for short- or medium-term (up to 24 months) housing assistance. Recipients implementing this special YHDP activity must keep documentation of which standards they apply to the units and proof that the units complied with standards before assistance is provided for every unit funded.

**(7)** Recipients may provide moving expenses to a program participant more than once.

**(8)** Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

**(9)** YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness, transitional housing or after the end of housing assistance.

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 155 of 256
PageID #: 2546

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contracts and Support | Appendix

**(10)** Projects using grant leasing funds may pay above the Fair Market Rent (FMR) for individual units as long as the amount paid is consistent with the reasonable rent standards at 24 CFR 578.51(g).

**(11)** Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

**(a)** Security deposits for units in an amount not to exceed 2 months of rent.

**(b)** The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

**(c)** The costs of providing household cleaning supplies to program participants.

**(d)** Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $300 in value per program participant.

**(e)** The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

**(f)** The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

**(g)** Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

**(h)** Payment of utility arrears of up to 6 months per utility.

**(i)** Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

**(j)** In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

**(k)** Legal fees, including court fees, bail bonds, and required courses and equipment.

**(l)** Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the personal vehicle is necessary to reach medical care, employment, childcare, or

other services eligible under this section.

**(12)** Recipients of housing projects (RRH, TH, TH-RRH, and PSH) may use YHDP funds to pay for owner incentive and retention payments before occupancy of the unit, or at any point thereafter, provided that the overall amount paid with program funds per unit occupied by the program participant does not exceed three times the rent charged for the unit. These payments may include signing bonuses (a payment offered to an owner as an incentive for leasing a unit to be occupied by a program participant), repairs to bring the unit into compliance with program requirements, or holding fees to reserve a unit for an individual or family experiencing homelessness.

**b.** *YHDP Exceptions.* Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

**(1)** Projects may provide up to 36 months of RRH rental assistance to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

**(2)** Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after housing assistance ends if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

**(3)** Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in connection with housing assistance, such as the Foster Youth to Independence initiative, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

**(4)** Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

**(5)** Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

**(6)** YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

**c.** *Innovative Activities*. In addition to the specific activities authorized above or in 24

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application and Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSN-AEM   Document 59-4   Filed 12/31/25   Page 157 of 256 PageID# 2548

CFR part 578, other innovative activities to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

YHDP Renewal or YHDP Replacement applications requesting to carry out Innovative Special YHDP Activities must demonstrate the following:

**(1)** The activity is approved by both the Youth Action Board (YAB) and the CoC, as evidenced by letters of support from each organization. For purposes of this section, a YAB is defined as a group of at least 4 youth – aged 24 or younger - with voting power on policy decisions of the CoC (particularly on policies that relate to preventing and ending youth homelessness, and where at least two-thirds of the members have lived experience/expertise of homelessness. The YAB must be a formal committee of the CoC. The YAB should be representative of the youth and young adult population experiencing homelessness in the community;

**(2)** That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

**(3)** The activity is cost-effective; and

**(4)** The activity is not in conflict with fair housing, civil rights, or environmental regulations.

## 3. Rural Costs for Projects Originally Awarded Under the Rural Set Aside of the Special CoC NOFO Competition.

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition may submit applications that include the following costs (Note: CoC Projects not originally funded under the Rural Set Aside of the Special NOFO Competition are not permitted to request funding under this cost category):

**a.** Rent or utility assistance after 2 months of nonpayment of rent or utilities to prevent eviction or loss of utility service. Funds may be used to pay rent or utility arrear payments up to 6 months on behalf of program participants residing in permanent housing.

**b.** Repairs, (such as insulation, window repair, door repair, roof repair, and repairs) that are necessary to make housing habitable to be used for transitional or permanent housing by people experiencing homelessness. The total cost of repairs may not exceed $10,000 per structure.

**c.** *Capacity building activities.* Capacity building activities are those activities that maintain or improve the skills of recipients. Eligible capacity building activities include employee education, job training, staff retention activities such as financial incentives to staff, paying for continuing education opportunities, cross-training within an organization, staff training and professional licensing or certification, and other professional

Case 1:25-cv-00636-MSM-AEM Document 59-4 Filed 12/31/25 Page 158 of 256 PageID #: 2549

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

development activities. An applicant may apply for up to 20% of funds requested as part of the project, including project administrative costs, for capacity building activities.

**d.** ***Emergency food and clothing assistance.*** The cost of providing meals or groceries and clothing to program participants are eligible costs.

**e.** Costs associated with making use of Federal Inventory property programs to house individuals and families experiencing homelessness. Federal Inventory property programs means the Use of Federal Real Property to Assist the Homeless program authorized by title V of the Act, and implemented by 24 CFR part 581, and the Single Family Property Disposition Program authorized by section 204(g) of the National Housing Act (12. U.S.C. 1710(g)) and implemented at 24 CFR part 291 Eligible costs are: preparing and submitting applications to obtain ownership of the real property; transfer taxes; recording fees; closing costs; building permit and zoning fees; attorney's fees; rehabilitation of buildings and structures on the property necessary to bring them into compliance with local building codes and to convert them to the intended homeless assistance use; water, sanitation, sewer and utility hook-up fees and deposits and bringing lines to the property; wells; septic systems; and improving access to the real property from public roads.

## 4. VAWA Costs Information.

Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**a.** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

**(1)** Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

**(2)** Assistance with travel costs. Reasonable travel costs for survivors and their families to travel for an emergency transfer.

**(3)** Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

**(4)** Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

**(5)** Housing Fees. Fees associated with getting survivors into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

Case 1:25-cv-00636-MSN-AEM    Document 59-4    Filed 12/31/25    Page 159 of 256
PageID #: 2550

I. Basic          II. Eligibility    III. Program    IV. Application    V. Application    VI. Submission    VII. Post-Award    VIII. Contact and    Appendix
Information                          Description      Contents and      Information        Requirements and  Requirements and    Support
                                                      Format                               Deadlines         Administration

**(6)** Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

**(7)** Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

**(8)** Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**b.** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

**(1)** Monitoring and evaluating compliance with VAWA confidentiality requirements.

**(2)** Developing and implementing strategies for corrective actions and remedies.

**(3)** Program evaluation of confidentiality policies, practices and procedures.

**(4)** Training on compliance with VAWA confidentiality requirements.

**(5)** Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

**(6)** Costs for establishing methodology to protect survivor information.

**(7)** Staff time associated with maintaining adherence to confidentiality requirements.

## 5. Rural Costs Information.

Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section 2.b.(9) of the Appendix] to use program funds to pay for the following eligible activities:

**a.** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

**b.** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**c.** Staff training, professional development, skill development, and staff retention activities.

HUD has determined that eligible activities paid for under the rural costs category may be included in new project applications or added to eligible renewal projects through expansion. This rural cost category does not apply to projects originally awarded under the Rural Set Aside through the Special NOFO.

HUD published a list of CoCs located in rural areas on the CoC Program page on the HUD.gov website.

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 160 of 256 PageID #: 2551

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br>File name: HUD-424CB<br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424-CBW) | Required with the application | Page limit: Not applicable<br>File name: HUD-424CBW<br>Form location: download instructions |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable<br>File name: ICR Doc.<br>Form location: download instructions |

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br>File name: HUD-424CB<br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424- | Required with the application | Page limit: Not applicable |

Case: 1:25-cv-00636-MSM-AEM Document 59-4 Filed 12/31/25 Page 161 of 256 PageID #: 2552

| CBW) | | File name: HUD-424CBW Form location: download instructions |
| --- | --- | --- |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable File name: ICR Doc. Form location: download instructions |

## C. Narratives and Other Attachments

If applicable, you must upload narrative and non-form attachments in e-snaps.hud.gov. When adding the attachments to the form, you can upload PDF, Word or Excel formats.

Collaborative Applicants will provide narrative responses about the CoC planning body, governance structure, overall performance, and the strategic planning processes in esnaps. The CoC Application describes the CoC's plan for ending homelessness and increasing self-sufficiency and recovery, its system-level performance, and addresses the merit criteria specified in section V.B of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

Project applicants will provide narrative responses to questions in e-snaps that demonstrate their ability to meet project eligibility and project quality threshold requirements.

## D. Other Application Content

### 1. Eligible Project Applications.

The following types of project applications will be eligible for completion and submission under this NOFO.

**a. *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

**b. *UFA Costs projects.*** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project application must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

**c. *CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 20 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications. New projects

DOJ-HUD-AR01174

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 162 of 256
PageID #: 2553

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

created through the CoC Bonus must meet the project eligibility and project quality threshold requirements established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. To be eligible to receive a CoC Bonus project, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**d. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects).*** Are eligible renewal projects that were previously funded, in whole or in part, with DV Bonus funding or were at some point expanded using DV Bonus funding to continue serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. This incorporates by reference all applicable protections and obligations under VAWA as provided for in Section I.A.

**e. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking New Projects (DV Bonus and DV Reallocation Projects).*** A new project that is dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under the paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. As described in section 2.b.(5) of the Appendix , survivors of human trafficking may also qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act because they are often also victims of domestic violence, dating violence, sexual assault, or stalking, however a DV Bonus project may not exclusively serve people fleeing or attempting to flee human trafficking. CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 10 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

- A minimum of $50,000 if 10 percent of the CoC's PPRN is less than $50,000; or
- A maximum of $5 million if 10 percent of the CoC's PPRN is more than $5 million.

See sections V.A.4.b and V.D.3.d of this NOFO for project application requirements and how DV Bonus projects will be reviewed and selected.

**(1)** To be eligible to receive DV Bonus projects, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**(2)** CoCs may reallocate eligible DV Renewal to create new DV Reallocation projects that are dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness act. DV Bonus funding and funding made available from the reallocation of expiring DV Renewal projects may be used for "new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence,

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 163 of 256
PageID #: 2554

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

sexual assault, or stalking."

**(3)** New projects or expansion projects created with DV Bonus or DV Reallocation funding, must meet DV Bonus and DV Reallocation project requirements. Additionally, the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated. If a CoC reallocates funding from a DV Renewal grant and does not use those funds for new project(s) that are 100 percent dedicated to the eligible population established in this section, HUD may condition the project applications to ensure the projects are serving the required subpopulation. If an applicant does not resolve the condition placed on the project, HUD may withdraw the award. To avoid any potential delays in funding or a loss in ARD, CoCs should review the FY 2025 GIW provided by HUD to determine which renewal projects were originally awarded DV Bonus or DV Reallocation funds, including CoC projects that were expanded with DV Bonus or DV Reallocation funding in a prior year competition.

The following restrictions apply to the DV Reallocation process:

**(a)** DV Renewal projects that have a SSO-CE component cannot be reallocated.

**(b)** Reallocated DV Renewal funding cannot be used to expand a CoC or YHDP Renewal grant.

**(c)** DV Renewal projects cannot be reallocated to create new non-DV CoC projects. If HUD determines that a project applicant incorrectly classified one or more new projects as a DV Reallocation, HUD may reclassify the project(s). For example, if the proposed project is not dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served.

**(d)** If a project does not have enough funding available from reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

**f.** ***New Projects Created Through DV Bonus or DV Reallocation Processes.***

**(1)** DV Bonus and DV Reallocation may only be used to create new SSO-Coordinated Entry, Rapid Re-housing (PH-RRH), and Transitional Housing (TH) projects.

**(2)** For PH-RRH and TH projects, the application must demonstrate:

**(a)** The project applicant's experience serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

**(b)** The project's inclusion of victim-centered practices.

**(c)** Demonstration of plan to include survivors with lived expertise.

**(3)** Supportive Services Only Coordinated Entry (SSO-CE) must be designed to implement policies, procedures, and practices that equip the CoC's coordinated entry

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 164 of 256
PageID #: 2555

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

to better meet the needs of people experiencing homelessness who are experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking (e.g., to implement policies and procedures that are trauma-informed, client-centered or to better coordinate referrals between the CoC's coordinated entry and the victim service providers coordinated entry system where they are different). SSO-CE project applications created with DV Bonus and DV Reallocation funding must also demonstrate its plan to involve survivors in policy and program development throughout the project's operation.

**g.** *New Projects Created with CoC Bonus or Through the CoC Reallocation process.* CoCs may apply for the following types of new CoC projects through the CoC Bonus or CoC Reallocation processes:

**(1)** SSO projects.

**(2)** TH projects.

**(3)** PH-PSH projects.

**(4)** PH-RRH projects.

**(5)** Dedicated HMIS project for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps. Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(6)** SSO-CE project to develop or operate a Coordinated Entry system.

Prior to completing a new project application created using CoC Bonus funds or through the reallocation process, project applicants should consult with the CoC to determine which of these options is available to be locally selected as part of the CoC.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

If a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, HUD may reduce the funding amount or reject the new project application during its review.

For new projects created through the CoC Bonus process, HUD must determine the CoC

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 165 of 256
PageID #: 2556

I. Basic       II. Eligibility   III. Program    IV. Application    V. Application    VI. Submission   VII. Post-Award    VIII. Other and    Appendix
Information                      Description      Contents and       and Project       Requirements and Requirements and    Contractual
                                                  Format             Information        Deadlines        Administration     Support

has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**h. *Youth Homeless Demonstration Program (YHDP).*** Consistent with the requirements of the Consolidated Appropriations Act, 2024, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

In order to ensure the best use of federal dollars, HUD will competitively award all YHDP projects, including renewal and replacement YHDP projects. CoCs seeking to reallocate YHDP projects may only reallocate to other youth projects. See section IV.D.1.i below of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section IV.D.1.i and IV.D.1.k below, these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may apply to expand its current project through the YHDP Replacement process. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mixing funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects.

All YHDP Renewal and YHDP Replacement projects, including YHDP reallocation, are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with the NOFO requirements, with the Special YHDP Activities identified in section IV.B.2 of this NOFO, or the requirement that grant funds may only be used to serve homeless youth, age 24 and younger: 24 CFR 578.3, 578.15, 578.23, 578.25, 578.27, 578.29, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73, 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.91, 578.93 except in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located, 578.95, 578.97, 578.99, 578.103(a)(3) - (18) and (b) – (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from time to time, with the exception of 200.306(b)(5) apply. All YHDP Renewal, YHDP Replacement and new YHDP Reallocation projects must comply with 24 CFR 578.93, except that in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located. Federal fair housing and nondiscrimination requirements cannot be waived.

**i. *New YHDP Projects Created through YHDP Replacement processes.*** CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects, including YHDP Reallocation (see section 2.b.(12) of the Appendix for more information).

   **(1)** YHDP Renewal project applicants may submit renewal applications for minor changes to a project, including adding or modifying select Special YHDP Activities under section IV.B.2; however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at IV.D.2 of this NOFO, it must submit a YHDP Replacement project application.

   **(2)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section IV.D.1.j.(3) for more information.

   **(3)** A YHDP Replacement project application must:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSN-AEM    Document 59-4    Filed 12/31/25    Page 166 of 256
PageID#: 255

**(a)** demonstrate that the project is consistent with the CoC's most recent Coordinated Community Plan; and

**(b)** For YHDP replacement projects that are not reallocations, include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Project Priority Listing. If the Collaborative Applicant submits both a renewal and replacement YHDP project application for the same project, HUD will only select the renewal YHDP project application;

**(4)** HUD will only fund new YHDP Reallocation projects through the YHDP Replacement process as described below and in sections IV.D.1.h and IV.B.2 of this NOFO:

**(a)** TH or Crisis Residential Transitional Housing which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services and other supportive services whose purpose is to move youth rapidly into stable housing.

**(b)** SSO, including, but not limited to, housing search and placement services, case management, or street outreach.

**(c)** SSO-CE.

**(d)** SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.

**(e)** HMIS.

**(5)** HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP project applications; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement.

**j.** *Expansion Project.* The process used by eligible renewal project applicants to add

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 167 of 256
PageID #: 2558

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. The new funding being added to the existing renewal must be submitted as a new project in e-snaps. This portion of the project is known as new expansion project. Expansion projects for permanent housing should be included in the Extended Track Priority Listing.

HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects.

The new expansion project applications must meet the project eligibility and project quality thresholds in V.A.4.a and V.A.4.b of this NOFO and must be for the same component as the project being expanded. Additionally, the renewal project being expanded must have an expiration date in CY 2026.

In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new expansion project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed.

**(1)** The following limitations apply to expansion grant applications:

**(a)** If the new expansion project exceeds the amount of funding available to the CoC under the reallocation or Bonus processes, HUD will reduce the funding request for the new expansion project to the available amount, which could affect the activities of the new expansion project.

**(b)** HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

**(c)** Recipients cannot apply to expand a project included in a grant consolidation during the same funding year. If an applicant applies to expand a project included in a grant consolidation, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(d)** CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding cannot be used to expand a YHDP renewal project.

**(e)** If CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families who are fleeing or attempting to flee

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 168 of 256
PageID #: 2559

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and the project must meet all the DV project requirements in sections IV.D.1.e and IV.D.1.f of this NOFO.

**(f)** New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

**(2)** Project applicants expanding an eligible CoC Renewal or DV Renewal project must:

**(a)** submit a separate renewal project application and the new project application with expansion information (both projects must be ranked by the CoC with unique rank numbers);

**(b)** in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

**(c)** indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE projects, how the current activities will be expanded for the CoC's geographic area; and

**(d)** ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation amounts available.

**(3)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

**(a)** submit a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

**(b)** indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants.

**(c)** ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

**(d)** ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections IV.D.1.h and IV.D.1.i of this NOFO.

**(4)** DV Bonus and DV Reallocation Expansion Applications.

**(a)** DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 169 of 256
PageID #: 2560

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix |

24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(b)** Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population; however, only the new project application for the expansion will be considered for DV Bonus funds.

**(c)** If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being expanded, must serve 100 percent individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in sections V.D.3.a, V.D.3.b and V.D.3.c of this NOFO.

**k.** *Consolidation Project.* Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects and renewal Special CoC NOFO Competition projects), may do so through the renewal project application. The projects being combined during a grant consolidation will continue uninterrupted. To be eligible for consolidation, the projects must have the same recipient and be for the same component.

**(1)** The period of performance and budget period of the expiring grants must have end dates in CY 2026. Applicants intending to use the consolidation process must ensure:

**(a)** Budget Line Items (BLIs) for the consolidated project application submitted, exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

**(b)** inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

**(c)** are in good standing with HUD, meaning none of the projects have:

    i. outstanding audit or monitoring findings,
    ii. outstanding obligation to HUD that is in arrears,
    iii. unresolved construction delays,
    iv. a history of poor financial management/drawdown issues,
    v. history of low occupancy levels, or lack experience in administering the project type, or
    vi. other capacity issues.

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 170 of 256
PageID #: 2564

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**(d)** the projects have the same recipient and are for the same component.

**(2)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(3)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually provided they pass project eligibility and project quality threshold requirements:

**(a)** a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families who meet the eligibility criteria in Section III.G.10.(c) of this NOFO, including a project originally funded under the Special NOFO Competition, and a YHDP Renewal project), or a project originally funded under the Special CoC NOFO Competition;

**(b)** a YHDP Renewal project cannot consolidate with a CoC Renewal project (including those projects originally funded **under the Special CoC NOFO Competition) or a DV Renewal project;**

**(c)** a project originally funded under the Special CoC NOFO Competition through the Rural Set Aside cannot consolidate with any other type of project (e.g., a project originally funded with DV Bonus or a project originally funded through the Unsheltered Set Aside in the Special NOFO Competition) except another project originally funded through the Rural Set Aside. This means, a project originally funded under the Special NOFO through the Rural Set Aside can only consolidate with another Special CoC NOFO Competition project originally funded through the Rural Set Aside;

**(d)** a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project;

**(e)** transition grants cannot consolidate with any other project; and

**(f)** recipients cannot apply to consolidate projects and apply to expand the consolidated project during the same funding year. If an applicant applies to expand projects that are involved in a consolidation of grants, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(4)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date CY 2026. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application and Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 171 of 256 PageID #: 2562

different components (e.g., PH and TH).

**(5)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**(6)** HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(7)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**I. _Transition Grant._** A Transition grant is an application to fund a new CoC project through the reallocation process to transition an eligible CoC renewal project (including a Special NOFO project or DV Renewal project) from one program component to another eligible component over a 1-year period. The renewal project transitioning to a new component must be fully eliminated through reallocation. Transition grant applications awarded FY 2025 funds must fully transition to the new component by the end of the 1-year grant term and may only apply for renewal in the next CoC Program Competition under the component to which it transitioned.

**(1)** Renewal Grants expiring in CY 2026 may submit a FY 2025 transition grant application to request a component type change. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309.

**(2)** Applicants wishing to apply for a transition grant must have the consent of its Continuum of Care; and the new project application must meet project eligibility and

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 172 of 256
PageID #: 2563

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

project quality thresholds established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. If the project application identifies the project as a transition grant and the CoC accepts the new transition grant project on the New Project Application Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

**(3)** For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. For example, expiring FY 2024 grants applying to transition to a new component during the FY 2025 funding process will attach a copy of the FY 2024 CoC Program Competition project application.

**(4)** Transition Grant Restrictions: YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component types.

If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement.

## 2. Renewal Project Requirements.

As set forth in 24 CFR 578.33, projects may renew under the CoC Program NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

Awards HUD made under the CoC Program (including projects awarded 1-year of funding under the FY 2024 CoC Program funding opportunity), projects originally awarded under the Special NOFO, and YHDP projects are eligible for renewal with FY 2025 CoC Program funds if they are currently operating and have an expiration date in CY 2026 (the period from January 1, 2026, through December 31, 2026).

**a.** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation ; (2) be for the same program component; and (3) in the case of DV Renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**b.** If HUD conditionally selects a renewal grant for funding that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**c.** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the

Case 1:25-cv-00636-MSN-LRV Document 59-4 Filed 12/31/25 Page 173 of 256 PageID#: 2564

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application and Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

same type of housing as identified in their most recent grant agreement, amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**d.** The total request for each renewing project, including YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. Additionally, where two or more eligible projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to or less than the sum of the original ARA of the renewal projects before consolidation. Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

**e.** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**f.** HUD encourages the consolidation of eligible renewal grants as provided in Section IV.D.1.k of this NOFO. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**g.** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(1)** CoC renewal project applications (including DV Renewal projects and projects originally funded under the Special NOFO) may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(2)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section IV.B.2 and shifting up to 10 percent of funds from one approved eligible activity to another.

**(3)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts. Applicants seeking to make significant changes to their grant, such as shifting more than 10 percent of funds from an approved eligible activity, should contact their Field Office and request a grant agreement amendment.

**(4)** CoC renewal project applicants may also apply to transition an eligible renewal project from one program component to another eligible new component through reallocation and use those funds to create a single, new transition grant (see section IV.D.1.l of this NOFO). YHDP Renewal project applicants are not permitted to utilize the transition grant application process. YHDP applicants must submit a YHDP

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 174 of 256
PageID #: 2565

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Replacement application to change program components.

**(5)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**h. *Actual Per Unit Cost – Renewal Grants.*** Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2025 CoC Program funding process. Project applications for rental assistance cannot request more than 100 percent of the published FMR. New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit. See section V.D.5.a of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**i. *Renewal Project Grant Terms.*** Renewal project applications are limited to a 1-year grant term with 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309. Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

**j. *Compliance and re-evaluation.*** To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year. Further, HUD may condition renewal on compliance with audits for large grant recipients (over $1,000,000) as required by 2 CFR 200.501.

## 3. New Project Requirements.

CoCs are encouraged to submit new projects created through CoC Bonus, DV Bonus, CoC Reallocation, DV Reallocation or YHDP Replacement including YHDP Reallocation. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application in FY 2025.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**a.** HUD will review project subrecipient eligibility as part of the project quality threshold

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 175 of 256 PageID #: 2566

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission and Deadlines | VI. Post-Award Requirements and Administration | VII. Post-Award Requirements and Administration | VIII. Contracts and Support | Appendix |

review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**b.** Any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under (or families headed by youth aged 24 and under, including pregnant or parenting youth) who have an unsafe primary nighttime residence and no safe alternative to that residence.

**c.** Per the Consolidated Appropriations Act, 2024, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance (See more information on System Performance in sections III.B.6 and V.B.1.a.(1) of this NOFO).

**d.** ***New Project Grant Terms.*** The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. The following exceptions apply:

**(1)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (7) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(2)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(3)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(4)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year grant term.

**(5)** The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**(6)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 176 of 256
PageID #: 256

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(7)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

**(8)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(9)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

    **(a)** The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

    **(b)** The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11360(g) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

    **(c)** CoC Planning and UFA Costs grants are not renewable.

**(10)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation process may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 177 of 256
PageID #: 2568

# V. APPLICATION REVIEW INFORMATION

V. Application Review Information

A. Threshold Review

B. Merit Review

C. Risk Review

D. Selection Process

E. Award Notices

TABLE OF CONTENTS

DOJ-HUD-AR01190

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 178 of 256 PageID #: 2569

# V. APPLICATION REVIEW INFORMATION

## A. Threshold Review

HUD reviews each application to make sure it meets the following threshold requirements. If you meet all threshold requirements, your application will advance to a merit review. If you fail to meet one or more threshold requirements, your application is not eligible for HUD funding.

### 1. Eligible Applicant

You must meet the applicant eligibility criteria in this NOFO. Applications from ineligible applicants are not rated or ranked and will not receive HUD funding.

**a. *Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100).*** Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

**b. *Collaborative Applicants.*** Only CoCs with a valid FY 2025 e-snaps registration will have access to the FY 2025 CoC Program and YHDP Funding Opportunity in e-snaps, which includes the Consolidated Application (i.e., the CoC Application, the CoC Priority Listing and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2025 CoC Program and YHDP Funding Opportunity without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

- the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
- the CoC-designated Collaborative Applicant is no longer in business;
- the CoC designates a new Collaborative Applicant; or
- HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

**c. *Indian Tribes and Tribally Designated Housing Entities (TDHE).*** The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms

DOJ-HUD-AR01191

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 179 of 256

"Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-22-02).

Indian Tribes and TDHEs may:

**(1)** create a CoC;
**(2)** be a Collaborative Applicant;
**(3)** be an eligible project applicant; or
**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**d. *Solo Applicants.*** Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2025 funding must submit their solo project application in e-snaps to HUD by 8:00 PM EST, on January 14, 2026. See section VIII.D.4 of this NOFO for additional information regarding the Solo Applicant appeal process.

## 2. Resolution of Civil Rights Matters

Applicants with outstanding, unresolved judgments against them for violations of civil rights laws must resolve those judgments before the application submission deadline or the applicant will be deemed ineligible.

a. An applicant is ineligible for funding if the applicant has received notice of a judgment imposed against them for violations of:

1. the Fair Housing Act or a substantially equivalent state or local fair housing law for discrimination because of race, color, religion, sex, national origin, disability or familial status; or

2. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, or the Violence Against Women Act or substantially equivalent state or local laws.

b. HUD will determine if actions to resolve the judgment taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to resolve the matter include, but are not limited to:

1. Current compliance with a voluntary compliance agreement signed by all the parties;

2. Current compliance with a HUD-approved conciliation agreement signed by all the parties;

3.  Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

4.  Current compliance with a consent order or consent decree; or

5.  Current compliance with a final judicial ruling or administrative ruling or decision.

## 3. Timely Submission of Applications

Late applications are not eligible for funding. See deadlines in <u>Section VI of this NOFO</u>.

Applicants should review and follow the steps outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: <u>https://www.hud.gov/program_offices/comm_planning/coc</u>.

4. Threshold Criteria.

Applicants who fail to meet the following threshold eligibility requirements are ineligible.

**a. *Project Eligibility Threshold.*** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met these requirements through its previously approved grant application unless HUD receives information to the contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

**(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).

**(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal, state, local, or private resources.

**(3)** Project applicants must submit the required certifications specified in this NOFO.

**(4)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section III.G.10 of this NOFO.

**(5)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 181 of 256
PageID #: 2552

I. Basic   II. Eligibility   III. Program   IV. Application   V. Application   VI. Submission   VII. Post-Award   VIII. Contact and   Appendix
Information              Description   Contents and    Review       Requirements and   Requirements and   Support
                                Format     Information    Deadlines      Administration

use a comparable database that meets the needs of the local HMIS.

**(6)** Project applicants must certify affirmatively to the following:

| | |
|---|---|
| The project applicant will not engage in illegal discrimination including illegal racial preferences This is consistent with the objectives outlined in Section III.B.10 above and is consistent with the requirements of 2 CFR 200.300(a). | |
| The project applicant will not operate illegal drug injection sites or "safe consumption sites" in violation of 21 u.s.c. 856. This is consistent with the objectives outlined in Section III.B above and is consistent with the requirements of 2 CFR 200.300(a). | |

**b.** *Project Quality Threshold.* HUD will review all new project applications to determine if they meet the following project quality threshold requirements HUD will not award funds to a new project unless the project was created through reallocation, or the CoC has demonstrated to HUD's satisfaction that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**(1)** HUD will consider any project requesting renewal funding, including renewing YHDP and renewing Special NOFO projects, as having met project quality threshold requirements through its previously approved grant application unless HUD receives information to the contrary or if the renewal project has compliance issues which results in the project not operating in accordance with the Rule.

**(2)** HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

**(3)** HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested.

**(4)** HUD will assess all new project applications for the following minimum project eligibility, capacity, timeliness, and performance standards.

**(a)** project applicants must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 182 of 256
PageID #: 2573

I. Basic Information    II. Eligibility    III. Program Description    IV. Application Contents and Format    V. Application Review Information    VI. Submission Requirements and Deadlines    VII. Post-Award Requirements and Administration    VIII. Contact and Support    Appendix

have never received a CoC Program funded project;

**(b)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(c)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant.

**(5)** HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons:

**(a)** evidence that the project conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences.

**(b)** evidence that the project operates illegal drug injection sites or "safe consumption sites," in violation of 21 U.S.C. § 856

**(6)** Additionally, for HUD to consider new projects as meeting project quality threshold, each new project must meet the following criteria as applicable. If awarded, a recipient must meet all the criteria listed in the criteria column for its component.

| (a) Transitional Housing (TH) | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Transitional Housing projects must receive at least 7 out of 10 points available for this project type. New TH projects that do not receive at least 7 points will be rejected. | 2 | Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing. |
| | 1 | The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals and families exit homelessness within 24 |

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 183 of 256
PageID #: 2574

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

| | | months. |
|---|---|---|
| | 1 | The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure, that at least 50 percent of participants exit to permanent housing within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment, etc) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 2 | Demonstrate that the proposed project will provide 40 hours per week of customized services for each participant (e.g. case |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 184 of 256
PageID #: 2575

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

| | | management, employment training, substance use treatment, etc.). The 40 hours per week may be reduced proportionately for participants who are employed. The 40 hours per week does not apply to participants over age 62 or who have a physical disability/impairment or a developmental disability as defined under 24 CFR 582.5 |
| | 1 | Demonstrate the average cost per household served for the project is reasonable, consistent with 2 CFR 200.404. |

**b) Supportive Services Only (SSO) Standalone (24 C.F.R. 578.37(a)(3) and 578.53)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO – Standalone project applications must receive at least 4 out of the 5 points available for this project type. New SSO standalone projects that do not receive at least 4 points will be rejected. | 1 | The Supportive Services project is necessary to assist people in exiting homelessness and increasing self-sufficiency and the Recipient will conduct an annual assessment of the service needs of the program participants. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |

DOJ-HUD-AR01197

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 185 of 256
PageID #: 2576

I. Basic | II. Eligibility | III. Program | IV. Application | V. Application | VI. Submission | VII. Post-Award | VIII. Contractand | Appendix
Information | | Description | Contents and | Review | Requirements and | Requirements and | Support |
| | | Format | Information | Deadlines | Administration |

| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(c) Supportive Services Only (SSO) Street Outreach**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO project applications that focus on street outreach and indicate so in their project application must receive at least 5 out of the 6 points available for this project type. Projects that do not receive at least 5 points will be rejected. | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | Demonstrate that the applicant has a history of partnering with first responders and law enforcement to engage people living in places not meant for human habitation to access emergency shelter, treatment |

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 186 of 256
PageID #: 2577

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

| | | |
|---|---|---|
| | | programs, reunification with family, transitional housing or independent living. The applicant must cooperate, assist, and not interfere or impede with law enforcement to enforce local laws such as public camping and public drug use laws. |
| | 1 | The applicant has experience providing outreach services consistent with the activity description at 24 CFR 578.53(e)(13) and has demonstrated effectiveness at helping people successfully exit from places not meant for human habitation to emergency shelter, treatment programs, transitional housing or permanent housing programs. |
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(d) SSO-Coordinated Entry (SSO-CE)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 3 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 3 points will be rejected. | 1 | The Coordinated Entry system is easily available and reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's geographic area. |
| | 1 | There is a strategy for |

| | | advertising that is designed specifically to reach households experiencing homelessness with the highest needs. |
|---|---|---|
| | 1 | There is a standardized assessment process. |
| | 1 | The project will ensure program participants are directed to appropriate housing and services that fit their needs. |

**(e) Permanent Housing: Permanent Supportive Housing (PH-PSH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 4 out of the 6 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
| | 1 | The type of supportive services and assistance that will be offered to program participants will ensure that the participant is able to successfully obtain and retain permanent housing and in a manner that fits their needs (e.g. transportation, safety planning, enhanced case management). If the applicant is proposing to expand an existing PH project, it must demonstrate how they are expanding supportive services to program participants, including where appropriate, on-site supportive services. |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 188 of 256
PageID #: 2529

I. Basic          II. Eligibility    III. Program    IV. Application    V. Application    VI. Submission    VII. Post-Award    VIII. Contact and    Appendix
Information                          Description      Contents and      Review           Requirements and  Requirements and   Support
                                                     Format            Information       Deadlines         Administration

| | | The project will serve homeless individuals or families with a disability. The services offered must be designed to serve any type of disability covered under 42 U.S.C. 11360(10), which includes disabled elderly individuals and/or individuals with a physical disability/impairment or a developmental disability (24 CFR 582.5) and not to the exclusion or priority of any one disability over another. |
| | 1 | |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, life skills, substance use treatment) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 189 of 256
PageID #: 2580

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | as Medicare, Medicaid, SSI, and SNAP. |
|---|---|---|
| **(e) Permanent Housing: Rapid Rehousing (PH-RRH)** | | |
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Permanent Housing projects must receive at least 6 out of the 8 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The provision of tenant-based rental assistance will help individuals and families achieve self-sufficiency within 3 months or up to 24 months. |
| | 2 | The type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness. |
| | 1 | The applicant has previously operated homelessness projects where outcomes for employment income were improved compared to the average project in the CoC, or has a plan in place to ensure this. |
| | 1 | The project will serve homeless individuals or families with a disability. The services offered must be designed to serve any type of disability covered under 42 U.S.C. 11360(10) and not to the preference or exclusion of one protected disability over |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 190 of 256
PageID #: 2581

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | |
|---|---|---|
| | | another. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(g) Homeless Management Information System (HMIS)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not | 1 | How the HMIS funds will be expended in a way that furthers the CoC's HMIS implementation and ability to use HMIS as a proactive case |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 191 of 256
PageID #: 2582

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | management tool to promote treatment and recovery. |
| receive at least 3 points will be rejected. | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG reporting) and other reports required by other federal partners. |

**(h) CoC Planning – Collaborative Applicants Only**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project |

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 192 of 256 PageID #: 2583

| | | that will be carried out by the CoC with Planning grant funds are compliant with the provisions of 24 CFR 578.7. |
| | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |

**c. *Project Renewal Threshold.*** CoCs must consider the need to continue funding for projects expiring in CY 2026 (January 1, 2026 to December 31, 2026) when applying for FY 2025 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office; including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application, or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain self-sufficiency and independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 193 of 256
PageID #: 2584

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

**(h)** evidence that the project conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences.

**(i)** evidence that the project operates illegal drug injection sites or "safe consumption sites," in violation of 21 U.S.C. § 856.

## B. Merit Review

HUD expects to evaluate and score your application using the following merit criteria and process. Merit reviewers evaluate and score all applications that pass the threshold review. Merit reviewers may include Federal and non-Federal persons. Reviewers receive a copy of your application to evaluate and score each application separately.

**Merit Review Summary**

| Merit Review Summary | |
|---|---|
| **Criterion** | **Maximum number of points = 130** |
| **a. Project Capacity, Review, and Ranking.** | 9 |
| **b. System Performance.** | 40 |
| **c. CoC Coordination and Engagement.** | 81 |
| **Bonus Points** | |
| **CoC Merger Bonus (V.B.1.e)** | 15 |
| **Policy Initiative Preference Points (V.B.2)** | 4 |

### 1. Rating Factors

Your application must include a response to the following criteria.

HUD will use all of the factors outlined in this section to establish the CoC's score for the FY 2025 CoC Program Competition.

**Rating Factors Details**

**a. *Project Capacity, Review, and Ranking.*** HUD will award up to 9 points to CoCs that demonstrate the existence of a coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Objective Criteria and System Performance.*** | 6 | The CoC must attach the written process or tool it used to review, rate, and rank project applications for this |

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 194 of 256
PageID #: 2585

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | NOFO. This written process or tool must: |
|---|---|---|
| | | Demonstrate it used objective criteria (e.g., cost-effectiveness, performance data, type of population served) to review, rate, and rank project applications and that these factors account for at least 50% of the total available points (up to 1 point). |
| | | Demonstrate that at least 25% of the total points available for housing projects (TH, PH-PSH, PH-RRH) account for the following: |
| | | • Returns to homelessness performance measure (up to 1 point); |
| | | • Employment income performance measure (up to 1 point); and |
| | | • Supportive service participation requirements (up to 3 points). |
| **(2) *Ranking and Selection Process.*** | 2 | The CoC must: |
| | | • Invite new proposals from entities that have not previously received funding; |
| | | • Prior to the application deadline, post on their website all parts of the Consolidated Application, and notify community members and key stakeholders. CoCs that do not have |

|  |  | a website must post this information to a partner website within the CoC (e.g., a city or county website); |
|  |  | <ul><li>Attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed; and</li></ul> |
|  |  | <ul><li>Notify project applicants, in writing outside of *e-snaps*, who submitted their project applications to the CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the NOFO application submission deadline, and where a project application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction.</li></ul> |
| **(3) *Reallocation.*** | 1 | The CoC must show: |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 196 of 256
PageID #: 2587

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

| | | |
|---|---|---|
| | | • Their CoC actively reviews the performance of existing CoC Program funded projects and have a standard process for reallocating funding from lower performing projects to create new high performing projects;<br><br>OR<br><br>• They have cumulatively reallocated at least 20 percent of their CoC's ARD between the FY 2021 and the FY 2025 CoC Program Competitions. |

   **b.** *System Performance.* HUD will award up to 40 points to CoCs that have a CoC system-wide performance measurement process related to reducing homelessness.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1)** *Reducing the Number of Homeless Individuals and Families.* | 17 | The CoC will receive:<br><br>• Up to 5 points for demonstrating a decrease of at least 20 percent in the number of unsheltered homeless individuals and families in the 2025 PIT compared to the prior year's data.<br><br>• Up to 4 points for demonstrating decreases in the number of unsheltered homeless individuals and families between the 2023 and 2024 PIT Counts AND the 2024 |

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 197 of 256
PageID #: 2588

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix |

| | | and 2025 PIT Counts. |
| | | • Up to 3 points for demonstrating a decrease in the number of unsheltered homeless individuals and families between the 2023 and 2025 PIT Counts. |
| | | • Up to 3 points for demonstrating a 5% decrease in the number of individuals and families experiencing chronic homelessness between the 2024 and 2025 PIT Counts. |
| | | • Up to 2 points for demonstrating a decrease of at least 20 percent in the combined number of sheltered and unsheltered individuals and families in the 2025 PIT compared to the prior year's data. |
| **(2) *Reduce First Time Homelessness.*** | 1 | The CoC must:<br><br>• Demonstrate a reduction in the number of first-time homeless of at least 20% as reported in HDX;<br><br>• Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and<br><br>• Identify the |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 198 of 256
PageID #: 2589

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

| | | organization or position that is responsible for overseeing the CoC's strategy to reduce or end the number of persons experiencing homelessness for the first time. |
|---|---|---|
| **(3)** *Length of Time Homeless.* | 1 | The CoC must: <br><br>• Demonstrate a reduction in the length-of-time homeless compared to the prior year's data as reported in HDX; <br><br>• Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and <br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce the length of time individuals and families remain homeless. |
| **(4)** *Successful Permanent Housing Placement.* | 5 | The CoC must: <br><br>• Demonstrate that the rate of successful exit from ES, TH, and RRH is at least 50% (up to 2 points); <br><br>• Demonstrate that at least 20% of program participant exits from TH/RRH/PSH |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 199 of 256
PageID #: 2590

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

|  |  | collectively are to unsubsidized housing using HMIS data (up to 2 points). |
|  |  | • Indicate the strategy (including funding sources and timeframes) the CoC is taking to improve permanent housing placement and stability including how the CoC connects participants to non-subsidized housing and furthers successful transitions from CoC-funded projects to other housing options; and |
|  |  | • Identify the organization or position that is responsible for overseeing the CoC's strategy to increase the rate at which persons exit to permanent housing destinations (up to 1 point). |
| **(5) *Returns to Homelessness.*** | 7 | The CoC must:<br><br>• Demonstrate the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness over a 12- month and 24-month period as reported in HDX:<br><br>Is less than 8% over 24 months (3 points, or 1 point if less than 16% over 24 months).<br><br>Is less than 7% over 12 |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 200 of 256
PageID #: 2591

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix |

| | | |
|---|---|---|
| | | months (3 points, or 1 point if less than 11% over 12 months). |
| | | • Indicate a strategy to account for returns to homelessness that occur outside of the geographic area to the extent practicable (i.e., statewide HMIS sharing, long-term follow-up with clients.) |
| | | • Indicate the strategy that will reduce returns to homelessness over the long term. Additionally, identify the funding sources that will be used to accomplish specific tasks within the strategy and the timeframes for completing specific tasks within the strategy; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce returns to homelessness. |
| **(6) *Jobs and Income Growth.*** | 7 | The CoC must: • Demonstrate that the percentage of program participants who had an increase in income from employment (not government assistance) in the CoC was 20 percent or higher as reported in |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 201 of 256
PageID #: 2592

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | HDX (up to 3 points); |
|---|---|---|
| | | • Demonstrate that at least 25 percent of people leaving programs in the CoC had an increase in income from employment (up to 3 points); |
| | | • Identify the strategy (including funding sources and timeframes) that has been implemented to increase employment and non-employment cash sources, including through employment training; |
| | | • Identify how the CoC works with child care organizations to facilitate employment for parents experiencing homelessness; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to increase jobs and income from employment and non-employment cash sources. |
| **(7) *Timely Submission of Data.*** The CoC collected and submitted data in a timely manner. | 1 | The CoC must demonstrate it: <br><br> • Conducted a Housing Inventory (HIC) and Point-in-Time (PIT) count during the last 10 days in January 2025, |

| | | |
|---|---|---|
| | | or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD; |
| | | • Submitted both the 2025 HIC and PIT count data in HDX 2.0 by June 13, 2025, 8:00 PM EDT, or an alternate date approved by HUD; |
| | | • Submitted their Longitudinal System Analysis (LSA) data in HDX 2.0 by the submission deadline of January 9, 2025, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files; and |
| | | • Submitted FY 2024 System Performance Measures data in HDX 2.0 by the submission deadline of 8:00 PM EDT on April 11, 2025, or an alternate date approved by HUD. |
| **(8) HMIS and Comparable Database Participation** | 1 | The CoC must demonstrate at least 85 percent of the beds in their CoC's geographic area are covered in HMIS and comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons |

DOJ-HUD-AR01215

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 203 of 256
PageID #: 2594

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

|  |  | experiencing homelessness in the geographic area covered by the CoC. |

**c.** ***CoC Coordination and Engagement.*** HUD will award up to 81 points to CoCs that demonstrate coordination with other systems of care that serve homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1)** ***Accountable Structure and Participation.*** | | |
| **(a)** has a membership of a variety of stakeholders within the geographic area and considers the needs of all relevant subpopulations; | 0.5 | The CoC must demonstrate it has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area: Relevant organizations include nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies including CCBHCs and CMHCs, hospitals, universities, affordable housing developers, law enforcement, and organizations that serve veterans and homeless and formerly homeless individuals. |
| **(b)** has a governance board representative of the community | 4 | The CoC must demonstrate it has a decision-making governance board that includes: <br>• at least 1 person with a former experience of |

DOJ-HUD-AR01216

| | | |
|---|---|---|
| | | homelessness; <br><br> • at least 3 elected public officials; <br><br> • at least 1 representative of the business community; <br><br> • at least 2 representatives of law enforcement. |
| **(c)** has an invitation process for new members to join; | 0.5 | The CoC must demonstrate it has a transparent process (e.g., communicated in a public manner such as on the CoC's website) in place to invite new members to join and the invitation process is publicly available within the CoC's geographic area at least annually. |
| **(d)** solicits and considers opinions from knowledgeable individuals and organizations; and | 0.5 | The CoC must demonstrate a transparent process (e.g., communicated in a public manner such as on the CoC's website) is in place to solicit and consider opinions regarding the CoC's general performance, strategies, and priority setting process from individuals and organizations with knowledge of homelessness in the geographic area or an interest in preventing or ending homelessness in the geographic area. |
| **(e)** accepts and considers proposals from organizations that have not previously received CoC Program funding. | 0.5 | The CoC must demonstrate it has a transparent process is in place to accept and consider proposals from organizations that have not previously received CoC |

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 205 of 256
PageID #: 2596

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

| | | Program funding including faith-based organizations. |
|---|---|---|
| **(2)** *Availability of Treatment and Recovery Services.* | 16 | The CoC must demonstrate:<br><br>• Substance use treatment is available on-site for at least 30% of projects (attach agreements or letters of commitment);<br><br>• The creation or current existence of projects with the purpose of providing substance abuse treatment services for people experiencing homelessness in which program participants are required to take part in such services as a condition of continued participation in the program (attach contracts or occupancy agreements);<br><br>Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment.<br><br>-For geographic areas with a population greater than 2,500,000, demonstrate at least 500 beds.<br><br>-For geographic areas with a population between 1,000,000 and |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 206 of 256
PageID #: 2597

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

2,499,999, demonstrate at least 250 beds.

-For geographic areas with a population between 500,000 and 999,999, demonstrate at least 100 beds.

-For geographic areas with a population between 100,000 and 499,999, demonstrates at least 50 beds.

-For geographic areas with less than 100,000, demonstrate 25 beds.

The bed count described above may include CoC-funded per diem beds located outside the geographic area of the CoC. Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment.

- There is 24/7 access to detox or inpatient treatment within the geographic area of the CoC;

- Formal partnership with a Certified Community Behavioral Health Clinic (CCBHC) or Community Mental Health Center (CMHC) or a similar facility if no CCBHCs or CMHCs

| | | |
|---|---|---|
| | | are located in the geographic area; |
| | | • The availability or proposed creation of sober housing for people in recovery in accordance with 24 CFR 578.93(b)(5); and |
| | | • They are investing adequately in supportive services by showing either: |
| | |     o through proposed CoC funding, leveraging, match, and other formal partnerships, the CoC is providing supportive services with a value of 50% of the CoC's Annual Renewal Demand; or |
| | |     o 30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand. |
| **(3) *Participation Requirements for Supportive Services.*** | 10 | The CoC must demonstrate that projects require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by attaching supportive service |

DOJ-HUD-AR01220

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 208 of 256
PageID #: 2599

| | | agreements (contract, occupancy agreement, lease, or equivalent).<br><br>• 100% of CoC projects have participation requirements (10 points).<br><br>• 50% of CoC projects have participation requirements (5 of the 10 points). |
|---|---|---|
| **(4) *Reduce encampments.*** | 10 | The CoC must demonstrate a reduction in the number of encampments or the number of people residing in encampments by at least 20%. |
| **(5) *Coordination with Federal, State, Local, Private, and Other Organizations.*** | 2 | The CoC must:<br><br>• Demonstrate coordination with other federal, state, local, private, and other organizations in the planning and operation of projects; and<br><br>• Describe how they have and plan to continue to consult with ESG recipients in the planning and allocation of ESG funds; and Describe how they have or will share PIT, HIC, HMIS, and System Performance data with state and local government as permitted by law. |
| **(6) *Discharge Planning.*** | 2 | The CoC must coordinate with state or local planning efforts |

DOJ-HUD-AR01221

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 209 of 256
PageID #: 2600

I. Basic Information    II. Eligibility    III. Program Description    IV. Application Contents and Format    V. Application Review Information    VI. Submission Requirements and Deadlines    VII. Post-Award Requirements and Administration    VIII. Contact and Support    Appendix

|  |  | to prevent homelessness among people transitioning from public systems (prisons, jails, health care facilities, residential care facilities, and foster care.) |
|---|---|---|
| **(7) *Collaboration Related to Children and Youth.*** | 2 | The CoC must:<br><br>• Indicate written agreements are in place between their CoC or its HUD-funded projects and educational supports and services for children ages 0-5, such as Public Pre-K, Head Start, Child Care (including Child Care and Development Fund), or home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV);<br><br>• Identify formal partnerships the CoC has with youth education providers, local educational authorities, or school districts; and<br><br>• Show policies and procedures that have been adopted to inform individuals and families who become homeless of their eligibility for educational services. |
| **(8) *Coordination with Veteran Organizations.*** | 6 | The CoC must indicate that they partner with the Department of Veterans Affairs or other Veteran |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 210 of 256
PageID #: 2604

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

|  |  | Serving Organizations to do the following:<br><br>• Refer veterans identified by the CoC to VA or other Veteran Serving Organizations for assistance;<br><br>• Coordinate the provision of emergency shelter, supportive services, and housing; and<br><br>• Identify and fill service gaps for veterans. |
|---|---|---|
| **(9) *Addressing the Needs of Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking*** | 2 | The CoC must partner with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers or other organizations who help provide shelter, housing, and services to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking. |
| **(10) *Street Outreach.*** | 6 | The CoC must show that:<br><br>• An increasing number of people exit street outreach to a positive destination; and<br><br>• Street Outreach projects cooperate with first responders and law enforcement to increase positive interaction in order to increase housing and |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 211 of 256
PageID #: 2602

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Review
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

| | | |
|---|---|---|
| | | service engagement and promote use of CoC services. |
| **(11)** *Partnering with Public Housing Agencies.* | 2 | The CoC must:<br>• Show they have an agreement in place with one or more of their public housing agencies to enable participants to transition from Transitional Housing, Rapid Re-Housing, and Permanent Supportive Housing to HUD assisted housing; and<br>• Describe the strategy for helping participants who are able to live independently move from homelessness assistance to permanent housing taking into account employment and economic stability. |
| **(12)** *Leveraging housing and healthcare resources.* These points are available for CoCs that apply for at least one new TH, PSH or RRH project that that utilizes housing and healthcare resources not funded through the CoC or ESG Programs. Examples of housing and healthcare resources include those provided by:<br>• Private organizations<br>• State or local government sources | 4 | • The CoC must demonstrate that:<br>    ○ In the case of housing subsidies for PSH or TH projects, the leveraged resources provide at least 25 percent of the units included in the project;<br>    ○ In the case of housing subsidies for a |

DOJ-HUD-AR01224

Case 1:25-cv-00636-MSM-AEM     Document 59-4     Filed 12/31/25     Page 212 of 256
PageID #: 2603

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix |

| | | RRH project, the leveraged resources serve at least 25 percent of the program participants included in the project. |
|---|---|---|
| • Public housing agencies<br><br>• Faith-based organizations | | • The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate the commitment. CoCs can receive less than full points for demonstrating commitments less than the threshold above.<br><br>• The CoC must demonstrate that:<br><br>    ○ In the case of an organization that provides substance use disorder treatment or recovery services, the leveraged resource provides access to all participants who qualify for those services; or<br><br>    ○ In the case of healthcare or behavioral health resources, the value of assistance being |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 213 of 256
PageID #: 2604

| | | |
|---|---|---|
| | | provided is at least an amount that is equivalent to 25 percent of the funding being requested by the project. |
| | | The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate that commitment. CoCs can receive less than full points for demonstrating commitments less than the thresholds described above. |
| **(13) Protecting Public Safety.**<br><br>HUD encourages the most effective use of funding for efforts to end homelessness, quickly rehouse individuals, and minimize trauma (42 U.S.C 11381). Law enforcement and public safety protections play a critical role in accomplishing these purposes. | 13 | CoCs must conduct assessments of their geographic area to determine the effect of location on success in attaining the program goals:<br><br>• Demonstrate, by providing evidence, that the CoC's entire geographic area (up to 4 points):<br><br>    ○ Quickly clears tents and encampments on public property and connects individuals who are camping in public with appropriate services. In your response, describe how the CoC cooperates with law enforcement to |

| | | |
|---|---|---|
| | | achieve this and the current status of tents and encampments in the geographic area. |
| | | ○ Does not tolerate the public use of illicit drugs and quickly connects individuals who are using illicit drug in public with appropriate services and/or law enforcement. In your response, describe how the CoC cooperates with law enforcement to achieve this and the current status of overdoses and illicit drug use in public spaces in the geographic area. |
| | | • Demonstrate utilization of standards that address individuals experiencing homelessness who are a danger to themselves or others including involuntary commitment; (up to 3 points point) |
| | | • Indicate that the state is substantially compliant |

DOJ-HUD-AR01227

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 215 of 256
PageID #: 2606

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix



| | | with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); (up to 3 points) |
| | | • Indicate (up to 3 points) that the CoC: |
| | | ○ When asked by law enforcement, assists in adequately mapping and checking the location of homeless sex offenders; and |
| | | Cooperates, assists, and does not interfere or impede with law enforcement or co-response to connect violators of public camping or drug use laws with services. |

**d.** ***CoC Merger Bonus Points.*** As stated in section 2.b.(2) in the Appendix of this NOFO, HUD will award up to a possible 15 bonus points to CoCs that merged after the FY 2024 CoC Program Registration deadline. To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were considered completely separate CoCs in prior CoC Program competitions.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Merged CoCs after the FY 2024 CoC Program Registration CoC Program Registration deadline.** | 15 | Merged CoCs - all CoCs that merged will receive this minimum number of points. |

## 2. Policy Initiative Preference Points

Preference points are added to your overall application score. You do not need to address the policy initiatives in this section to receive an award. If you choose to address a policy initiative in your application, you must adhere to the information with any award.

This NOFO supports the following policy initiatives, for which a maximum of fourteen (14) preference points may be awarded.

**a. Opportunity Zones**
You may receive up to four (4) points if your proposed activities are within an Opportunity Zone. To receive points, you must complete and submit form HUD-2996, Certification for Opportunity Zone Preference Points. If you expect to use less than 50% of the award in Opportunity Zones, you won't receive preference points.

**b. Prohibiting Illicit Drug Enablement**
Apart from the required selection criteria, you may receive up to ten (10) points if you can indicate that all housing projects submitted by the CoC will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of "harm reduction."

## 3. Other Factors

### a. Budget

The panel will review but not approve the budget. The panel will assess whether the budget aligns with planned program activities and objectives. Panel members will consider whether the budget and the requested performance period are fully justified and reasonable in relation to the proposed project.

The budget information will be reviewed to ensure:

- The requested costs are eligible under the CoC Program and this NOFO.

- The total amount of funding is within the amount of funding available to the CoC as described in Section I.A.2 of this NOFO.

- If funds are requested for project administrative costs, the amount requested is no more than 10 of the total funding requested.

### b. Certification of Consistency with the Consolidated Plan

You must make sure your application activities are consistent with your local Consolidated Plan.

All project applications submitted and listed on the CoC Priority Listing by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.A.1 for more information.

## C. Risk Review

Before making an award, HUD will evaluate each applicant's likelihood of successfully implementing an award based on the following criteria.

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 217 of 256
PageID #: 2608

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

- OMB-designated repositories of governmentwide data, as noted in [2 CFR 200.206(a)](#)

- Other public sources such as newspapers, Inspector General or Government Accountability Office reports or findings, or other complaints that have been proven to have merit

- Financial stability

- Quality of management systems and ability to meet the management standards prescribed in 2 CFR part 200

- Reports and findings from audits performed under 2 CFR part 200, subpart F—Audit Requirements or the reports and findings of any other available audits

- The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities

- Capacity of the applicant, including staffing structures and capabilities

- History of timely completion of activities and receipt and expenditure of promised matching or leveraged funds

- Ability to promote self-sufficiency and economic independence

- Ability to produce positive outcomes and results

- History of subsidizing or facilitating activities that impede law enforcement related to vagrancy, drug use, or other illicit activities that conflict with the purposes of this NOFO.

- History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards. HUD will not penalize a renewal applicant who sufficiently complied with the terms and conditions FY2024 NOFO that are in direct conflict with those contained herein.

HUD may use the results of the risk review to make funding decisions and to apply award conditions.

This assessment helps identify risks that may affect the advancement toward or the achievement of a project's goals and objectives. 2 C.F.R. 200.206(b)(1).

## D. Selection Process

When making funding decisions, HUD will consider:

- Eligibility requirements, including threshold review results.

- Merit review results.

- Risk review results.

To the extent allowed by law, HUD may:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case: 1:25-cv-00636-MSM-AEM Document 59-4 Filed 12/31/25 Page 218 of 256 PageID #: 2609

- Fund applications in whole or in part.

- Fund applications at a lower amount than requested.

- Choose to fund no applications under this NOFO.

- Adjust funding for an application, to ensure funding or geographic dispersion, and alignment with program or administrative priorities.

- Withdraw an award offer and make an offer of funding to another eligible application, if terms and conditions are not finalized or met.

- Use additional funds made available after NOFO publication to either fully fund an application or fund additional applications.

- Correct HUD review and selection errors. If HUD commits an error that causes an applicant not to be selected, HUD may make an award to that applicant when and if funding is available.

- Release another NOFO, if funding is available and if HUD does not receive applications of merit.

## 1. Threshold Review.

HUD will conduct a project eligibility and project quality threshold review on all project applicants.

HUD will review new project applications to determine whether applicants meet the applicant eligibility in section V.A.1, and whether the project applications meet the project eligibility and project quality thresholds detailed in sections V.A.4.a and V.A.4.b of this NOFO. HUD will review renewal projects to determine if project applicants and subrecipients meet the renewal project threshold requirements detailed in section V.A.4.c of this NOFO. If HUD determines these standards are not met, HUD will reject the project application, unless otherwise provided in this NOFO.

If a new project application passes the project eligibility threshold review in section V.A.4.a and receives enough points to pass the project quality threshold review in section V.A.4.b of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

## 2. Conditional Selection and Adjustments to Funding.

HUD Headquarters will conditionally select project applications for funding using the following process:

**a. _HUD Funding Process._** All project applications, including YHDP renewal and replacement projects, must be competitively ranked, except for CoC Planning and, if applicable, UFA Costs Applications. All new Permanent Housing projects must be separately ranked in their own, Extended Track Priority Listing. If a CoC is applying for one new Permanent Housing project, it must still be listed on the Extended Track Priority

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 219 of 256
PageID #: 2610

Listing. HUD will not consider new Permanent Housing projects if submitted in Normal Track. CoCs should ensure that their projects submitted in Normal Track and Extended Track do not, when combined, exceed their maximum award amount.

HUD will select Normal Track projects in the following order in an amount up to $2,655,600,000:

> (1) HUD will select all CoC Planning and UFA Costs applications that meet project quality threshold requirements. Only one CoC Planning and one UFA Costs (if applicable) project application can be submitted per CoC.

> (3) HUD will then select all projects in Tier 1 that pass project quality and project eligibility thresholds as described in section V.D.3.a below.

> (4) HUD will then select projects that meet project quality and project eligibility thresholds that are ranked in Tier 2 in the order of project score as described in Section V.D.3.b below:

>> (a) If at any point, HUD selects Permanent Housing renewal projects in an amount more than 30 percent of a CoC's Annual Renewal Demand (ARD), HUD will remove all remaining unselected Permanent Housing renewal projects from that CoC's priority listing, recalculate their Tier 2 project score, and continue selection.

>> (b) HUD will not consider new Permanent Housing projects in Normal Track. New Permanent Housing projects must be submitted in a separate Extended Track Priority Listing.

HUD will select Extended Track projects in the following order in an amount up to $1,262,400,000:

> (1) HUD will select all new Permanent Housing projects that meet project quality and project eligibility thresholds that are ranked in the Extended Track Priority Listing in the order of project score using the Tier 2 100-point score scale described in Section V.D.3.b below.

>> **(a)** In selecting projects, HUD will not exceed a CoC's maximum award amount. CoCs should ensure that their projects submitted in Normal Track and Extended Track do not, when combined, exceed their maximum award amount. HUD will use a CoC's Priority Listings for Normal Track and Extended Track to determine if and when a CoC exceeds their maximum award amount. CoCs may not submit Priority Listings that, when combined, exceed their maximum award amount.

HUD will then review DV Bonus projects already selected for funding through the above process and determine whether $52,000,000 has been awarded to DV Bonus projects:

>> (a) If at least $52,000,000 has been selected for conditional award no further action is needed.

>> (b) If $52,000,000 has not been selected for conditional award – continue down the list and fund additional DV Bonus projects by project-level score until at least $52 million has been selected.

DOJ-HUD-AR01232

**b.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

**c.** If an ineligible renewal project submitted under this NOFO is used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2025 CoC and YHDP Funding Process, a project must have an expiration date in Calendar Year (CY) 2026 (between January 1, 2026, and December 31, 2026).

## 3. HUD Funding Process.

CoCs and applicants should ensure there is a thorough understanding of the information provided in this NOFO. HUD has a two-tier funding selection process for FY 2025 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated DV Bonus amounts on HUD's website.

The maximum amount a CoC may apply for (Normal Track and Extended Track combined) is the sum of the CoC's ARD, eligible CoC Bonus amounts, eligible DV Bonus amounts, eligible CoC planning amounts and if applicable, eligible UFA costs amounts.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs.

Note that for FY 2025, DV Bonus and YHDP projects will be selected using the Tier 1 and Tier 2 selection process.

**a.** *Tier 1.* Tier 1 is equal to 30 percent of the CoC's Annual Renewal Demand (ARD). HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass both project eligibility and project quality threshold review, and if applicable, project renewal threshold.

Any competitively ranked project may be placed in Tier 1 according to the CoC's local rating and ranking process and based on local needs and priorities.

**b.** *Tier 2.* Tier 2 is the difference between Tier 1 and the sum of each CoC's ARD, CoC Bonus, and DV Bonus.

HUD will evaluate project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the CoC project ranking.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 221 of 256
PageID #: 2612

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

point value from the highest scoring project application to the lowest:

> **(1)** *CoC Score.* Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 65 out of 130 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

> **(2)** *CoC Project Ranking.* Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC.

> **(3)** *Service Participation.* Up to 10 points for projects that have or will incorporate supportive service participation requirements in their program design, based on individual need and evidenced by direct language from an occupancy agreement or equivalent document. Supportive Service Only (SSO) projects will automatically receive 10 points in this category.

**c.** *Projects Straddling Tiers.* If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using selection criteria in section V.D.3.b above, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**d.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).* This NOFO provides approximately $52 million for "rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." In this NOFO, Transitional Housing is an eligible activity determined critical to assist survivors of domestic violence, dating violence, sexual assault, or stalking.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit to the number of TH projects and PH-RRH projects CoCs may apply for, provided each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section IV.D.1.j.(4) of this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 222 of 256
PageID #: 2613

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number as well. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the existing renewal project for funding.

## 4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.

Consultants and technical experts who assist HUD in evaluating applications for funding under published CoC Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for CoC Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in reviewing CoC Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a CoC Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

## 5. Adjustments to Projects.

HUD may adjust the selection of competitive projects as follows:

**a.** *CoC Maximum Award and FMR Adjustments.* The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). 24 CFR 578.51(f) requires that HUD will determine the award amount for Rental Assistance projects by multiplying the number and size of units proposed by the FMR of each unit on the date the application is submitted to HUD.

HUD will make these adjustments as follows:

**(1)** Funds awarded for rental assistance will be adjusted in one of two ways:

**(a)** Funds awarded for rental assistance requesting the FMR will be adjusted by applying the FMR in effect at the time applications are due, including instances where the FMR for a specific area has decreased from the project award year.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contracts and Support | Appendix

Case 1:25-cv-00636-MSM-AEM Document 59-4 Filed 12/31/25 Page 223 of 256 PageID #: 2614

**(b)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (section IV.D.2.h), will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area had a net decrease from the project award year, the award will not exceed the FMR after adjustment. If the FMR for the project applicant's entire area decreased from the project award year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**(2)** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

**b.** *Cost of Living Adjustment Factor.* HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor: Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm.

## 6. Geographic Diversity.

HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

## 7. Funding Diversity.

HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

## 8. Approval from HUD Headquarters is required before a grant awarded under this NOFO may be transferred.

Under this NOFO, HUD will treat the change of project applicant as a curable deficiency. This occurs when a Recipient of an expiring grant awarded under a prior FY CoC or YHDP competition NOFO applies to renew their award under this NOFO and during the period between applying for FY 2025 funds and before HUD announces FY 2025 awards, HUD executes a grant agreement amendment to transfer the expiring grant to a New Recipient.

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 224 of 256
PageID #: 2615

I. Basic Information   II. Eligibility   III. Program Description   IV. Application Contents and Format   V. Application Review Information   VI. Submission Requirements and Deadlines   VII. Post-Award Requirements and Administration   VIII. Contacts and Support   Appendix

This grant transfer results in a FY 2025 CoC renewal application that does not reflect the New Recipient as the applicant. In this type of situation, HUD will treat the change of project applicant as a curable deficiency.

**9. Use of unawarded funds.**

In the case that funding remains available under this NOFO after HUD follows the selection process described in V.D.2 and V.D.3 above and any subsequent appeals process as described in VII.D below, HUD reserves the right to issue a supplemental NOFO.

## E. Award Notices

If you are successful, HUD will email an award notice to the authorized official representative from the SF-424. HUD will also notify unsuccessful applicants.

The award notice communicates the amount of the award, important dates, and the terms and conditions you need to follow. HUD may impose specific conditions on an award as provided under 2 CFR 200.208.

You agree to the award terms and conditions by either drawing funds from HUD's payment system or signing the agreement with HUD. If you do not agree to the award terms and conditions, HUD may select another eligible applicant.

Under 2 CFR 200.458 pre-award costs are allowable with written approval from HUD if such costs: a) are consistent with 2 CFR 200.458; and b) would be allowable as a post-award cost; and c) do not exceed 10 percent of the total funds obligated to this award. However, HUD will not consider eligibility for pre-award costs until after the date of the HUD selection notice. Additionally, the incurrence of pre-award costs in anticipation of an award imposes no obligation on HUD either to make the award, or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

For selected projects, HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

If the award includes funds for acquisition, HUD may allow recipients to draw down acquisition funds before recording the Declaration of Restrictive Covenant if the HUD Field Office confirms that the escrow agent has received the Declaration of Restrictive Covenant and the recording instructions. The recipient or subrecipient may not draw down any funds other than acquisition funds until HUD Field Counsel has confirmed the Declaration of Restrictive Covenants has been recorded.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 225 of 256 PageID #: 2808

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

VI. Submissions Requirements and Deadlines

A. Deadlines

B. Submission Methods

C. Other Submissions

D. False Statements

TABLE OF CONTENTS

DOJ-HUD-AR01238

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 226 of 256
PageID #: 2555

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

You must apply electronically. See <u>Find the Application Package</u> to make sure you have everything you need to apply online. See <u>Application Waiver</u> if you qualify to submit a paper application.

Make sure you are current with <u>SAM.gov</u> and UEI requirements before applying for the award. See the <u>Before You Begin</u> section of this NOFO.

## A. Deadlines

### 1. Application submission deadline:

The application deadline is 8 PM Eastern time on:

02/25/2025

HUD must receive your application by the deadline. Applications received after the deadline are late. Late applications are not eligible for HUD funding.

If HUD receives more than one application from you, HUD will review only the last submission.

HUD may extend an application due date based on emergency situations such as Presidentially-declared natural disasters. Improper or expired registration and password issues are not causes to allow HUD to accept applications after the deadline date.

Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. The deadline to submit applications for FY 2025 funding is 8:00 PM EST on January 28, 2026 for Normal Track applications and February 25, 2026 for Extended Track applications.

24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD. As part of this collaborative process, CoCs must implement internal deadlines to ensure transparency and fairness at the local level. CoCs may operate separate collaborative processes and establish separate deadlines for Normal Track and Extended Track applications. The implementation of deadlines that meet the standards outlined below for FY 2025 CoC Program project applications are part of the scoring criteria as detailed in section V.B.1.a of this NOFO.

  **a. *Project Application.*** All project applications must be submitted to the CoC before HUD's CoC Program application submission deadline.

  **b. *CoC Notification to Project Applicants.*** The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the FY 2025 CoC Program application submission deadline.

  Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.1.a.(2) of this NOFO.

Case 1:25-cv-00636-MSM-AEM Document 59-4 Filed 12/31/25 Page 227 of 256 PageID #: 2525

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

## 2. Major Disaster Areas.

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact the submission of the CoC Priority Listing and FY 2025 project applications, the CoC's Collaborative Applicant must send written notification to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);

**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disaster.

## B. Submission Methods

### 1. Electronic Submission

The official documents HUD uses to solicit applications for this NOFO are posted on Grants.gov; however, you must register and submit your application through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

### 1. Electronic Submission

Applicants must register and submit project applications through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

**a. *CoC Registration.*** Collaborative Applicants that Registered their CoCs in FY 2024 were not required to register again for FY 2025 funding. HUD moved all FY 2024 CoC Program Registrations forward for FY 2025 on behalf of all existing Collaborative Applicants in accordance with Notice CPD-22-02: Continuum of Care Program Registration. Collaborative Applicants that were designated by HUD as UFAs during the FY 2024 Registration were not required to reapply during the FY 2025 funding year.

**b. *CoC Review of Project Applications Prior to Submission to HUD.*** HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD for the FY 2025 CoC Program Competition. HUD's experience is that many project applications contain information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 228 of 256
PageID #: 2536

HUD rejecting projects, and delays accessing project funds to house and assist individuals and families experiencing homelessness. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**(1)** all proposed program participants will be eligible for the program component type selected;

**(2)** the information provided in the project application and proposed activities are:

**(a)** eligible and consistent with program requirements in the Rule;
**(b)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections IV.D.1.d, and IV.D.1.e, and I.D.1.f of this NOFO; or
**(c)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections IV.D.1.h and IV.D.1.i of this NOFO;

**(3)** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**(4)** the data provided in various parts of the project application are consistent; and

**(5)** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between November 1, 2024 and February 25, 2026.

**c.** ***Collaborative Applicant Submission Requirements.*** Collaborative Applicants must submit the FY 2025 Consolidated application by the FY 2025 application submission deadline. HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2025 CoC Application, the FY 2025 CoC Priority Listing, and all FY 2025 project applications on behalf of the CoC.

If a CoC is submitting new Permanent Housing project applications, the CoC must submit a separate, Extended Track Priority Listing by the Extended Track deadline of February 25, 2026. HUD will not fund CoCs beyond their maximum award amount. CoCs should ensure that their Fy 2025 Priority Listing and Extended Track Priority Listing do not exceed their maximum award amount.

The FY 2025 CoC Application and the FY 2025 CoC Priority Listing and Extended Track Priority Listing are separate submissions in e-snaps. Collaborative Applicants must ensure both the CoC Application and the CoC Normal Track Priority Listing, that includes project applications either approved and ranked or rejected, are submitted in e-snaps prior to the Normal Track CoC Program application submission deadline. The Extended Track Priority Listing must be submitted by the Extended Track application submission deadline.

The "Submit" button will not be available on the Submission Summary of the FY 2025 CoC Application and FY 2025 CoC Priority Listing until all required sections of the application and all parts of the listings have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

Collaborative Applicants should export a PDF copy of the Submission Summary form from

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 229 of 256 PageID #: 2526

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

the FY 2025 CoC Application and the FY 2025 CoC Priority Listing and Extended Track Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2025 application deadline.

The CoC Consolidated Application includes the following:

**(1) FY 2025 CoC Application which includes the following:**

**(a) CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**(b) CoC Public Notice.** A screenshot(s) from the CoC's, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning and UFA costs), approved and ranked or rejected.

**(c) CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**(d) Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**(e) Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**(f) PHA Administrative Plan.** If the CoC is seeking points under section V.B.1.c.(11) of this NOFO, a copy or the relevant excerpt from the local PHA(s) administrative planning document(s), or other written policy developed between the CoC and the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness. Instead of a relevant excerpt from the written plan, a letter from the PHA(s) that describes the PHA(s) preference for persons

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 230 of 256
PageID #: 2356

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

experiencing homelessness may be attached.

**(g) Leveraging Housing and Healthcare Resources.** If the CoC is seeking points under section V.B.1.c.(12) and (13) written commitment(s), contract(s), or other formal written documents that demonstrate the number of housing subsidies, housing units, and healthcare resources that will be provided.

**(h) Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**(i) The FY 2025 HDX Competition Report.** The FY 2025 HDX Competition Report contains data submitted to HUD via HUD's Homelessness Data Exchange (HDX), including HIC, PIT count, and system performance data.

**(2) FY 2025 Project Application(s), including for each project application:**

**(a) Charts, narrative responses, and attachments.**

**(b) Documentation of Applicant and subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**(c) HUD required forms.** The following HUD required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application (see section IV.F.A of this NOFO).

**(3) FY 2025 CoC Priority Listing, including.** The CoC Priority Listing in e-snaps must include the following completed forms, certifications and attachments:

**(a) Project Reallocation Form.** The Reallocation form allows CoCs to indicate which eligible new projects, if any, will be reduced or eliminated through the reallocation process.

**(b) CoC and YHDP Project Listings.** The CoC project listing forms require the following project applications to be ranked, with unique rank numbers, in order of priority. Any project not ranked with a unique rank number must be rejected. The forms under this requirement include:

**i.** CoC New Projects (including CoC Bonus and CoC Reallocation projects;
**ii.** CoC Renewal Projects (including DV Renewal and Special NOFO Renewal projects);
**iii.** DV Bonus Projects;
**iv.** DV Reallocation Projects;

**v.** YHDP Renewal Projects;

**vi.** YHDP Replacement Projects (including YHDP Reallocation projects).

**(c)** CoC Planning and UFA Costs Project Application Listings. These project listing forms include the following non-ranked project applications:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 231 of 256 PageID #: 2532

**i.** CoC Planning Project Listing; and

**ii.** UFA Costs Project Listing, if applicable.

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated UFA, one UFA Costs project application.

**(d)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(e)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

**(4) Extended Track Priority Listing.** For CoCs that are applying for new Permanent Housing projects, the Extended Track Priority Listing in e-snaps must include project applications that are ranked, with unique rank numbers, in order of priority. If a CoC is only applying for one new Permanent Housing project, it must still submit a Extended Track Priority Listing. The Extended Track Priority Listing must also include:

**(a)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(b)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

## d. Project Application Submissions.

Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Project applicants must also provide documentation of applicant and subrecipient eligibility. All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds.

Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

For more information on project applications, see section IV.D of this NOFO.

## e. Timely Submissions.

HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 232 of 256    PageID #: 2532

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

**f. Resolving Technical Difficulties.**

CoC and project applicants experiencing technical difficulty with any part of the Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

CoCs that are submitting new and renewal applications for FY 2025 CoC and YHDP funding should print the Submission Summary form for the FY 2025 CoC Priority Listing for proof of compliance with the FY 2025 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2025 CoC Priority Listing is determined to be late and the Collaborative Applicant is unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadline date and time.

HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13, that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

**Need Help?** See the Contact and Support section of this NOFO.

## 2. Electronic Submission Application Waiver

You may request a waiver from the requirement to submit your application electronically. The request must show good cause and detail why you are technologically unable to submit electronically. An example of good cause may include: a valid power or internet service disruption in the area of your business office. Lack of SAM.gov registration is not good cause.

Use the information in the Contact and Support section of this NOFO to submit a written request to HUD. You must **submit your waiver request at least 15 calendar days before the application deadline**.

The regulatory framework of HUD's electronic submission requirement is the final rule established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. If a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 233 of 256
PageID #: 2536

I. Basic       II. Eligibility    III. Program    IV. Application    V. Application    VI. Submission    VII. Post-Award    VIII. Contracts and    Appendix
Information                      Description      Contents and      Information        Requirements and  Requirements and    Support
                                                 Format                              Deadlines          Administration

established deadline.

## C. Other Submissions

### 1. Intergovernmental Review

This NOFO is not subject to Executive Order 12372. No action is needed.

### 2. Technical Application Errors

HUD may contact you to fix a technical error with your timely application after the due date. Technical errors that you may fix are not submitted to satisfy merit review criteria. And you may not fix technical errors related to threshold review except eligibility entity documentation. Examples of technical errors include: inconsistencies in funding requests; improper signature on a form; a missing or incomplete form; and nonprofit status documentation.

HUD will send notice to the authorized organization representative from the SF-424 to fix a technical error.

Your application is not eligible for funding, if you fail to fix the error to HUD's satisfaction and by the due date in HUD's notice. HUD will not review information submitted after the application due date in HUD's notice.

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section V.D.7 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project.

### a. Fix Errors in Electronic Applications

To fix an error in response to a HUD notice, you must email the corrections to HUD at CoCNOFO@hud.gov.

HUD allows 7 calendar days from the date of the HUD notice to fix an error. If the due date to fix an error falls on a Saturday, Sunday, Federal holiday, or on a day when HUD's Headquarters office in Washington, DC is closed, then the due date is the next business day.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 234 of 256    PageID #: 25211

## b. Fix Errors in Paper Applications

You must fix an error in your paper application, in accordance with HUD's notice. If your paper application includes an incorrect UEI, HUD will request you supply the correct UEI.

## D. False Statements

By submitting an application, you acknowledge your understanding that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil or administrative sanctions, including but not limited to: fines, restitution, and/or imprisonment under 18 USC 1001, 18 USC 1012, 18 USC 1010, 18 USC 1014, or 18 USC 287; treble damages and civil penalties under the False Claims Act, 31 USC 3729 et seq.; double damages and civil penalties under the Administrative False Claims Act, 31 USC Sections 3801-3812; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, FAR Part 9.4 or 2 CFR Part 180; and other remedies including termination of active HUD award.

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 235 of 256 PageID #: 2626

# VII. POST - AWARD REQUIREMENTS AND ADMINISTRATION

VII. Post-Award Requirements and Administration

A.   Administrative, National and Departmental Policy Requirements and General Terms and Conditions

B.   Environmental Requirements

C.   Remedies for Noncompliance

D.   Reporting

TABLE OF CONTENTS

DOJ-HUD-AR01248

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 236 of 256
PageID #: 2627

I. Basic | II. Eligibility | III. Program | IV. Application | V. Application | VI. Submission | VII. Post-Award | VIII. Contract and | Appendix
Information | | Description | Contents and | Information | Requirements and | Requirements and | Support
| | | Format | | Deadlines | Administration |

# VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION

## A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions

You must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2025. You must comply with these applicable provisions:

1. The Fair Housing Act (42 USC 3601-3619) and Civil Rights laws which encompass the Fair Housing Act and related authorities (24 CFR 5.105(a))

2. Affirmatively Furthering Fair Housing (AFFH) requirements, (42 USC § 3608(e)(5)) and implementing regulations at 24 CFR 5.150 et seq.as amended by 90 FR 11020.

3. Economic Opportunities for Low-and Very Low-income Persons (12 USC 1701u) requirements, including those listed at 24 CFR part 75

4. Compliance with Immigration Requirements (8 U.S.C. 1601-1646; Executive Order 14218)

5. Accessible Technology requirements, (29 USC § 794d, 29 USC 794, 42 USC 12131-12165) and implementing regulations at 36 CFR part 1194 (Section 508 regulations),24 CFR § 8.6 (Section 504 effective communication regulations), 28 CFR part 35, subpart H (DOJ Web Access Rule), and 28 CFR part 35, subpart E (DOJ's Title II communications regulations)

6. Ensuring, when possible, small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms receive consideration consistent with 2 CFR 200.321

7. Equal Participation of Faith-based Organizations in HUD Programs and Activities consistent with 42 U.S.C. 2000bb et seq.; 42 U.S.C. 2000d et seq.; 24 CFR 5.109; and Executive Orders 14202, *Eradicating Anti-Christian Bias* and EO 14205, *Establishment of the White House Faith Office.*

8. Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 USC § 4601 et seq.) (URA) requirements, 49 CFR part 24, and applicable program regulations

9. Participation in HUD-Sponsored Program Evaluation (12 USC 1701z-1; 12 USC 1702z-2; 24 CFR part 60; and FR-6278-N-01)

10. OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200)

11. Drug-Free Workplace requirements (2 CFR part 2429)

12. HUD requirements related to safeguarding resident/client files (e.g., 2 CFR 200.303(e))

13. The Federal Funding Accountability and Transparency Act of 2006 (2 CFR part 170) (FFATA), as amended

15. Accessibility for Persons with Disabilities requirements (29 USC § 794) and implementing

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application and Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case: 1:25-cv-00636-MSM-AEM  Document 59-4  Filed 12/31/25  Page 237 of 256 PageID #: 2628

regulations at 24 CFR parts 8 and 100; 28 CFR part 35

16. Applicable Violence Against Women Act requirements in the Housing Chapter of VAWA (34 USC § 12491-12496) 24 CFR part 5, subpart L, and program-specific regulations.

17. Conducting Business in Accordance with Ethical Standards/Code of Conduct, including 2 CFR 200.317, 2 CFR 200.318(c) and other applicable conflicts of interest requirements

18. Build America, Buy America (BABA) Act procurement purchase requirements

20. Environmental requirements that apply in accordance with 24 CFR part 50 or part 58

22. Unless prohibited by law and to the extent permitted under the Freedom of Information Act (FOIA), your application and post-award content may be released to the public in response to FOIA requests, except to the extent that certain information may be withheld under a FOIA exemption (5 USC § 552(b); 24 CFR 15.107(b)). HUD may also share your information within HUD or with other Federal agencies if HUD determines that sharing is relevant to the respective program's objectives.

23. Waste, Fraud, Abuse, and Whistleblower Protections. 41 USC § 4712, which includes informing your employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a contractor, subcontractor, grantee, subgrantee, and personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant. (See Federal Contractor or Grantee Protections | Office of Inspector General, Department of Housing and Urban Development (hudoig.gov))

24. Implementing Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction: Executive Order (EO) 14219 (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); 14218 (Ending Taxpayer Subsidization of Open Borders); guidance resulting from the White House Task Force established by 14202 (Eradicating Anti-Christian Bias) and the Senior Advisor to the White House Faith Office assigned by 14205 (Establishment of the White House Faith Office); 14182 (Enforcing the Hyde Amendment); 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing); and 14148 (Initial Rescissions of Harmful Executive Orders and Actions)

In addition:

1. Awards made under this NOFO will not be used to conduct activities that subsidize or facilitate illegal racial preferences or other forms of illegal discrimination, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; 14332 (Improving Oversight of Federal Grantmaking).

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 238 of 256    PageID #: 2629

2. Awards made under this NOFO will not be distributed in a way that violates or otherwise is used to interfere with constitutional protections guaranteed for speech and religious beliefs and the free exercise of religion.

3. Awards made under this NOFO will not be used to fund, promote, encourage, subsidize or facilitate the use of illicit drugs.

4. Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates illegal drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856..

5. All agreements or contracts made with subrecipients under this NOFO must contain the identical terms and conditions as those in the grant agreement issued by HUD. Any additional or conflicting terms and conditions must be approved by HUD.

6. If any part or provision of the grant Agreement or terms of this Notice are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice. In the event the enjoinment of such provisions is stayed, dissolved or reversed, the full terms of the grant agreement and Notice, including such provisions, will automatically become effective. This clause is self-executing and will become effective, binding, and enforceable automatically upon issuance of this Notice.

## B. Environmental Requirements

### 1. Environmental Review

You must follow these environmental review requirements, including regulations at:

24 CFR part 50

24 CFR part 58

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58 or by HUD under 24 CFR part 50.

**a.** All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in 24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

DOJ-HUD-AR01251

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 239 of 256
PageID #: 2630

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**b.** For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

**c.** Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient must supply all available, relevant information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

**d.** The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

## 2. NOFO Impact Determination Related to the Environment

This NOFO has no significant impact related to the environment. HUD has made a Finding of No Significant Impact (FONSI) as required by HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 USC § 4332(2)(c)). To learn more about this FONSI, go to HUD's Funding Opportunities web page.

## 3. Lead-Based Paint Requirements

You must follow the lead-based paint rules below if you fund any work on pre-1978 housing. This includes buying, leasing, support services, operating, or work that disturbs painted surfaces.

- HUD's rules (Lead Disclosure Rule; and Lead Safe Housing Rule).

- EPA's rules (Renovation, Repair and Painting Rule, and Lead Abatement, Inspection and Risk Assessment Rule).

You must discuss the Lead Disclosure Rule if you fund education or counseling on buying or renting housing that may have been built before 1978. You must also discuss the Lead Safe Housing Rule if the education or counseling focuses on buying or renting HUD-assisted pre-1978 housing.

## C. Remedies for Noncompliance

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 240 of 256
PageID #: 2634

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

HUD may terminate all or a part of your award as described under 2 CFR 200.340 through 200.343 pursuant to the terms and conditions of your award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. HUD may also impose specific conditions on your award or take other remedies as described by 2 CFR 200.339 through 200.343, if you do not comply with your award terms and conditions.

For more information on CoC Program sanctions and remedies for noncompliance see 24 CFR 578.107.

## D. Reporting

HUD requires recipients to submit the performance, financial, and program reports as outlined below. You must comply with these reporting requirements to remain eligible for HUD funding. See Section VII.C. of this NOFO.

HUD is implementing new grants management and reporting tools, which will be rolled out for your use in the near term. As a grantee, you will be required to report on grant performance and financial activities (including vendor and cash disbursement supporting details for yourself and your sub-recipients) using these new tools when they are released. HUD will work with you to support your transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include requiring 100% review or stopping future disbursements altogether if reporting is not timely submitted.

| Report | Description | When |
|---|---|---|
| Federal Funding Accountability and Transparency Act (FFATA) | • Awards equal to or greater than $30,000<br><br>• Data on executive compensation and first-tier subawards<br><br>• See Public Law 109-282 and 2 CFR part 170<br><br>• HUD reports initial prime recipient data to usaspending.gov<br><br>• Submit via SAM.gov | See 2 CFR Appendix A to Part 170(a)(2)(ii) |
| Reporting on Recipient Integrity and Performance Matters | • Total value of all current Federal awards exceed $10,000,000 for any period of time during the period of | See 2 CFR Appendix-XII to Part 200 I.(d) |

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 241 of 256
PageID #: 2632

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | performance of this Federal award<br><br>• See Appendix XII to 2 CFR 200<br><br>• Submit via SAM.gov | |
| Annual Performance Report (APR) | • Collect and report data use of funds annually.<br><br>• Projects receiving funds for acquisition, new construction, or rehabilitation must submit APRs for 15 years from the date of initial occupancy or the date of initial service provision. | See 24 CFR 578.103(e) |
| Federal Financial Report, SF-425 | • Summary of key financial data<br><br>• See 2 CFR 200.328 | See 2 CFR 200.328 or award terms |
| Race, Ethnicity, and Other Data Reporting | Recipients that provide HUD-funded program benefits to individuals or families, report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households funded by this program. | Annually through the Homeless Data Exchange submission. |
| Audited financial statement | Recipient's organizational structure, any sub-grantees or sub-recipients, and how each disbursement of grant funds was applied to an eligible cost throughout the life of the grant to receive disbursements of Federal funds. | No less than annually. |

**1. Program Specific Reporting Requirements.**

   **a.** In accordance with program regulations at 24 CFR 578.103, project recipients must

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 242 of 256 PageID #: 2633

maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $750,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2 CFR part 200, subpart F.

**b. Section 3 Reporting Regulations.** Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**e.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

## 2. Administrative and Other Program Requirements.

Federal agencies are required to measure the performance of their programs. HUD captures this information from monitoring visits and APRs

# VIII. CONTACT AND SUPPORT

VIII. Contact and Support

A. Agency Contact

B. Grants.gov

C. Sam.gov

D. Debriefing

E. Applicant Experience Survey

F. Other Online Resources

TABLE OF CONTENTS

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 244 of 256
PageID #: 2635

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# VIII. CONTACT AND SUPPORT

Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission.

## A. Agency Contact

### 1. Program and Application Requirements

Name: HUD Office of Community Planning and Development

Phone: 800-347-3735

Email: CoCNOFO@hud.gov

Note: HUD's assistance is limited by the standards at 24 CFR 4.26.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in e-snaps.

**a. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**b. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in e-snaps or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/hud-partners/community-coc.

**c. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM EST on January 14, 2026. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

### 2. Paper Application Waiver Request

Name: HUD Office of Community Planning and Development

Email: CoCNOFO@hud.gov

Phone: (202) 708-4300

HUD Organization: Community Planning and Development

Street: 451 7th Street SW

City: Washington

DC DISTRICT OF COLUMBIA

DOJ-HUD-AR01257

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 245 of 256
PageID #: 2636

20410

**HUD Reform Act.** HUD is prohibited from disclosing covered selection information during the selection process. The selection process includes NOFO development and publication, and concludes with the announcement of selected recipients of financial assistance. HUD will not assist you with completing your application.

HUD will only return calls related to paper application requests. All other calls will not be returned.

All other requests or questions regarding this NOFO must be sent via email to CoCNOFO@hud.gov

## B. esnaps.hud.gov

CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions

## C. SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

## D. Debriefing and Appeals

1. After public announcement of awards, HUD will debrief the Collaborative Applicant upon your written request. Submit your written request to the agency contact for program and application requirements in this NOFO. HUD may limit the information provided to protect the integrity of the competition.

2. You may appeal an application decision or a HUD funding decision. Email your appeal to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VIII.D.4 of this NOFO for additional information about the

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 246 of 256
PageID #: 263

Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to snapsappeals@hud.gov.

### 3. Types of Appeals.

The provision at 24 CFR part 578 sets forth the following types of appeals:

**a. *Solo Applicants.*** A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.

**b. *Denied or Decreased Funding.*** A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.

**c. *Consolidated Plan Certification.*** A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).

**d. *Competing CoCs*.** A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process provided by 24 CFR 578.35(d).

### 4. Solo Applicant.

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 427, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary."

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in e-snaps by the application submission deadline of January 14, 2026 at 8:00 PM EST. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

**a. *Written Notice of Intent to Appeal.*** The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

**b.** No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to

DOJ-HUD-AR01259

snapsappeals@hud.gov.

**c.** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**d.** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**e.** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s).

## 5. Denied or Decreased Funding.

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**a.** *Denied Funding*. To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VIII.D.6 of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**(1)** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**(a)** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**(b)** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**(c)** HUD did not have sufficient funding to fund all eligible projects ranked within

DOJ-HUD-AR01260

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 248 of 256 PageID #: 2639

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the CoC's maximum award amount.

**(2)** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO, which resulted in the project not being funded.

**(3)** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**(d)** the evidence in section VI.B.1.b of this NOFO as well as evidence for decreased funding in section VIII.D.5.b of this NOFO.

**(4)** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the Coc Application or project application score.

**b. _Decreased Funding._** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VIII.D.2 of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant. Documentation submitted by the applicant must include evidence of the HUD error the applicant believes was made.

occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 249 of 256   PageID #: 2640

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

the denial or decrease.

## 6. Written Appeal.

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VIII.D of this NOFO. The written appeal must include the following information:

**a.** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**b.** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**c.** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

The appeal may include additional information the applicant believes supports its appeal, including:

**(1)** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

**(2)** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**d.** *Jurisdiction Response.* The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**(1)** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

**(2)** written rebuttal to any claims made by the applicant in the written appeal.

**e.** *HUD Decision and Notification of Decision.*

**(1)** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 250 of 256   PageID #: 2644

jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**(2)** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**(3)** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**(4)** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## E. Applicant Experience Survey

You are encouraged to provide feedback on your application experience by completing our Applicant Experience Survey. Your feedback is optional; you are not required to provide personal information. HUD may use your feedback to improve future NOFOs. Your feedback has no impact on funding decisions.

## F. Other Online Resources

You are encouraged to review the online resources for context on some of the NOFO requirements.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 251 of 256 PageID #: 2642

# **APPENDIX**

Appendix

Appendix I Definitions

TABLE OF CONTENTS

DOJ-HUD-AR01264

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 252 of 256
PageID #: 2643

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# APPENDIX

## Appendix I. Definitions

### 1. Standard Definitions

For standard definitions not listed below, refer to 2 CFR 200.1.

**Affirmatively Furthering Fair Housing (AFFH)** - statutory obligation to affirmatively further the purposes and policies of the Fair Housing Act (see also 24 CFR 5.151, as amended by 90 FR 11020).

**Authorized Organization Representative (AOR)** is the official within your organization with the legal authority to: give assurances, make commitments, submit your application to HUD, enter into agreements, and execute such documents on behalf of your organization. The AOR is not necessarily the Project Director. The AOR has defined privileges within Grants.gov.

**Consolidated Plan** has the same meaning as defined at 24 CFR part 91.

**Eligibility requirements** are mandatory requirements for an application to be considered for funding.

**Opportunity Zone (OZs)** are defined in 26 U.S.C. 1400Z-1. In general, OZs are census tracts located in low-income communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

**Primary Point of Contact (PPOC)** is the person HUD may contact with questions about the application submitted. The PPOC is listed in item 8F on the SF-424.

**System for Award Management (SAM)** has the same meaning as 2 CFR 25.100(b).

**Threshold Requirements** are eligibility requirements you must meet before HUD advances to a merit review of your application.

**Unique Entity Identifier (UEI)** has the same meaning as 2 CFR 25.100(a).

### 2. Program Definitions.

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO.

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to operate projects under this NOFO.

  **a. *The following terms are defined in 24 CFR 578.*** Applicants must refer to the Rule for the definitions contained in this section.

  **(1)** Annual Renewal Amount (ARA)
  **(2)** Applicant
  **(3)** Centralized or Coordinated Assessment System
  **(4)** Chronically Homeless

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application and Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 253 of 256 PageID #: 2644

**(5)** Collaborative Applicant
**(6)** Continuum of Care
**(7)** Consolidated Plan
**(8)** Establishing and Operating the CoC. -24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.
**(9)** Final Pro Rata Need (FPRN)
**(10)** High Performing Community (HPC)
**(11)** Homeless Management Information System (HMIS)
**(12)** HMIS Lead
**(13)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced,
**(14)** Permanent Housing
**(15)** Permanent Supportive Housing
**(16)** Preliminary Pro Rata Need (PPRN)
**(17)** Private Nonprofit Organization
**(18)** Program Participant
**(19)** Project
**(20)** Rapid Rehousing (RRH).
**(21)** Recipient
**(22)** Subrecipient
**(23)** Transitional Housing
**(24)** Unified Funding Agency
**(25)** Victim Service Provider

b. *CoC Program NOFO Terms*. The following terms may be used during the administration of CoC Program grants. The definitions and specific concepts pertaining to these terms are further explained below:

**(1) Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).** The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

**(a)** renewal projects approved and ranked on the Renewal Project Listing;
**(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Project Listing;
**(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and
**(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is eligible for YHDP Renewal.

DOJ-HUD-AR01266

Case 1:25-cv-00636-MSM-AEM   Document 59-4   Filed 12/31/25   Page 254 of 256
PageID #: 2645

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**(2) CoC Merger.** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic area of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process. To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award 5 bonus points to the FY 2025 CoC Application Score for CoCs that registered as a merged after the FY 2024 CoC Program Registration deadline.

**(3) Formula Area**. Defined in the Indian Housing Block Grant Program at [24 CFR 1000.302](#).

**(4) CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**(5) Homelessness and Human Trafficking.** HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraphs (1) and (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(6) Host Home and Kinship Care.** Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(7) Housing Inventory Count (HIC).** A complete listing of the CoC's HUD and non-HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

DOJ-HUD-AR01267

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 255 of 256 PageID #: 2646

**(8) Reservation and Trust Land.** For purposes of this Notice, Reservations and Trust Land are types of formula areas as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(9) Rural Area.** For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or

**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which Emergency Solutions Grants program funds are made available.

**(10) Shared Housing.** YHDP Renewal, YHDP Replacement and YHDP Reallocation grants may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in sharing a housing unit with a roommate unrelated to the program participant.

**(11) Special NOFO.** A competition administered under the Continuum of Care Supplemental to Address Unsheltered and Rural Homelessness designed to target efforts to reduce unsheltered homelessness in communities with very high levels of unsheltered homelessness and homelessness in rural areas. Funding through this Competition was awarded through either the Unsheltered Set Aside or the Rural Set Aside.

DOJ-HUD-AR01268

Case 1:25-cv-00636-MSM-AEM    Document 59-4    Filed 12/31/25    Page 256 of 256
PageID #: 2647

**(12) YHDP Replacement Process, including YHDP Reallocation.** The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections IV.D.1.i of this NOFO.

Appendix 2: Funding Opportunity Goals

1. Improving Outcomes

2. Restoring Balance to the Continuum of Care

3. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency

4. Promoting Economic Self-Sufficiency

5. Creating Competition to Improve Innovation and Accountability

6. Ending the Crisis of Homelessness on Our Streets

7. Advancing Public Safety for All

8. Minimizing Trauma for Vulnerable Populations

9. Expanding Access Based on Merit, not Ideology

DOJ-HUD-AR01269