## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS, <br><br> NATIONAL LOW INCOME HOUSING COALITION, <br><br> CROSSROADS RHODE ISLAND, <br><br> YOUTH PRIDE, INC., <br><br> CITY OF BOSTON, <br><br> CITY OF CAMBRIDGE, <br><br> MARTIN LUTHER KING, JR. COUNTY, <br><br> METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, <br><br> COUNTY OF SANTA CLARA, <br><br> CITY AND COUNTY OF SAN FRANCISCO, and <br><br> CITY OF TUCSON, <br><br>     *Plaintiffs*, <br> *v.* <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, and <br><br> SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development, <br>     *Defendants*. | Case No. 25-cv-636-MSM-AEM <br><br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     The Continuum of Care (CoC) program, administered by Defendant U.S. Department of Housing and Urban Development (HUD), is Congress's primary response to homelessness, supporting housing and other essential services for hundreds of thousands of formerly unhoused people, including many disabled and older individuals, veterans, and families. The backbone of the CoC Program is funding permanent housing and, along with it, supporting long-term community stability. It promotes this housing stability by prioritizing the renewals of local, effective projects and guarding against dramatic funding fluctuations for each community from year to year. This approach provides stability for the individuals and families it serves, promotes safer communities, and reduces burdens on local law enforcement, hospital, and emergency shelter resources.

2.     Across five presidential administrations, the CoC Program has employed strategies proven effective to reduce homelessness. For years that has meant an approach that emphasizes stable, permanent housing.

3.     To provide for even greater stability and efficiency for the program and its participants, Congress in 2024 authorized a two-year funding cycle for the CoC Program. This allowed HUD to solicit and review applications once and use the results of that competition to make awards both for fiscal year 2024 and, once funds were appropriated, for fiscal year 2025. HUD conducted that two-year competition, and successful applicants, including Plaintiffs— national membership associations and their members, nonprofit service providers, and local governments—planned accordingly.

4.     But on November 13—mere weeks before FY 2025 awards would have gone out—HUD reversed course. It rescinded the two-year notice of funding opportunity (NOFO) and replaced it with a new one (the November NOFO), initiating a new competition for FY 2025

1

awards. This decision delayed essential funding for housing, as HUD said it would not make any awards until May 2026 at the earliest. But programs across the country have grants expiring as soon as January—and would be left without funding for months, forcing them to shutter or significantly scale back their programs and placing the formerly homeless individuals and families that rely on those programs at risk of homelessness once again.

5.      Plaintiffs brought this suit challenging the belated rescission of the two-year FY24-25 NOFO as well as the terms of the November NOFO. In response, Defendants withdrew the November NOFO on December 8, 2025, hours before a scheduled hearing on Plaintiffs' motion for a temporary restraining order, "in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." (ECF No. 39.) HUD stated its intent to make unspecified "revisions" and to again issue a revised FY25 NOFO, at an unknown time, "instead of processing renewals" of the FY 2024 awards. (ECF No. 39-2.)

6.      Just minutes before midnight on December 19, 2025, Defendants issued a third NOFO to cover FY 2025 (the December NOFO). HUD characterized the December NOFO as a corrective or superseding action. In substance, however, the December NOFO preserves the same core funding reallocations, eligibility restrictions, scoring criteria, and policy conditions that rendered the November NOFO unlawful. The December NOFO did not reinstate renewal protections for existing permanent housing projects and did not eliminate the unlawful criteria and preferences challenged in this action. And it exacerbated the harms to Plaintiffs arising from the late-breaking changes to HUD's administration of the CoC Program. As a result, if the December NOFO becomes operative, Plaintiffs and their members remain subject to the same imminent funding losses, coerced program redesign conflicting with the statute and Congress's intent, and irreparable harm that prompted this Court's preliminary injunction.

7.     The late-stage decision to rescind and replace the original two-year NOFO is unlawful, even without considering the unlawful terms of the November NOFO and December NOFO (collectively, the FY25 NOFOs). If HUD wanted to launch a new competition, it had a statutory deadline to do so—and that deadline came and went in June 2025. Beyond that, HUD has failed to explain its untimely action or to account for the serious disruption, and serious harm, the late-stage rescission and replacement causes. Worse, the belated decision has upended the network of CoC-funded projects, disrupted their operations, and forced them to recreate their long-time programming under an unworkable deadline. The rescission and replacement of the original two-year NOFO must be set aside for those reasons alone.

8.     The FY25 NOFOs are also unlawful even apart from their too-late issuance. The new NOFOs dramatically slash the CoC Program's funding for permanent housing, contrary to Congressional direction, throwing more than 170,000 formerly homeless people into immediate housing instability. Both FY25 NOFOs shift funding to disruptive and punitive models that are contrary to well-established and proven strategies that reduce homelessness. These unlawful changes will have devastating impacts for Plaintiffs, and will force vulnerable children, adults, and families back into homelessness, beginning in winter.

9.     At the same time, the FY25 NOFOs exclude long-time grantees who adhered to prior HUD regulations and guidance, like Plaintiffs and their members and constituents, from even being considered for an award if they do not meet the Administration's new, unlawful criteria, conditions, and certifications, through which HUD is continuing its campaign to advance the President's agenda contrary to congressional mandates—on issues ranging from gender, diversity, and immigration, to "harm reduction," and more.

10.     In HUD's own words, the changes are "[m]onumental" and make "the most

significant policy reforms and changes in the program's history." HUD, *HUD Sec. Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund* (Nov. 13, 2025), https://perma.cc/334N-5AWQ. Yet HUD seeks to make such monumental changes on a compressed timeline, without congressional authorization, contrary to relevant statutes and regulations, without satisfactory reasoning, by turning away from a decade of prioritizing evidence-based approaches that reduce homelessness, and away from communities, providers, and, most importantly, individuals reliant on the housing it will defund.

11.     These actions will cause devastating and irreparable harms to Plaintiffs and the Plaintiff associations' members and to the people who rely on them for housing and services. Stripping housing and other critical support from the people who rely on it will pave way for the collapse of many service providers, result in mass layoffs, and create an oncoming wave of homelessness across the country. And, if the December NOFO stands, Plaintiffs will be deprived of the opportunities to compete for funds on lawful terms, to qualify for funding without betraying their missions and the clients they already serve, and to obtain the funding they need to support critical programs.

12.     The rescission and replacement of the FY24-25 NOFO and the new FY25 NOFOs violate the Administrative Procedure Act (APA) and the Constitution and must be set aside.

## JURISDICTION AND VENUE

13.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the U.S. Constitution and the APA, 5 U.S.C. § 551 *et seq.*, and because Defendants are a United States agency and official, 28 U.S.C. § 1346(a)(2).

14.     This Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent statutory and injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA,

5 U.S.C. §§ 705-706; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

15.    Venue properly lies within the District of Rhode Island pursuant to 28 U.S.C. § 1391(e)(1) because this is an action against an officer or employee of the United States in his official capacity and an agency of the United States, and Plaintiffs Crossroads Rhode Island and Youth Pride, Inc. reside in this judicial district.

## PARTIES

16.    **Plaintiff National Alliance to End Homelessness** (Alliance) is a nonprofit, nonpartisan membership organization that works to end homelessness in the United States and prevent its continued growth. The Alliance seeks to ensure that no American is homeless by mobilizing all sectors of American society in an alliance to end homelessness. The Alliance is located in Washington, D.C. and has members in all 50 states. The Alliance brings this lawsuit on behalf of its members, a robust coalition that works to end homelessness through collaborative action and proven solutions. Alliance members include more than 10,000 nonprofit organizations, service providers, practitioners, local researchers, local and state government entities, and people with the lived experience of homelessness. Many Alliance members receive grants from HUD's CoC Program and intend to reapply for these grants.

17.    **Plaintiff National Low Income Housing Coalition** (NLIHC) is a nonprofit organization headquartered in Washington, D.C. It is dedicated to achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes that are accessible and affordable in communities of their choice. NLIHC's over 1,000 dues-paying members include state and local housing coalitions, residents of public and assisted housing and other impacted people, nonprofit housing providers, homeless service providers, fair housing organizations, public housing agencies, private developers and property owners, local and state

government agencies, faith-based organizations, researchers, and concerned citizens. NLIHC's members include dozens of entities across the United States that receive CoC funding or are CoC-funded housing providers. NLIHC supports its members with research, policy counseling, advocacy tools, and information sharing to deliver benefits for extremely low-income people who receive or need federal housing assistance, including people experiencing and at risk of homelessness.

18.    **Plaintiff Crossroads Rhode Island** (Crossroads) is a nonprofit organization that has grown and evolved since 1894 to become the largest provider of homeless services in the state of Rhode Island. With headquarters in Providence, Rhode Island, Crossroads provides services statewide with a mission to help those experiencing homelessness secure stable homes. Crossroads offers a range of services to people experiencing homelessness, including housing, basic needs, emergency shelter, case management, referrals, and education and employment services. Crossroads has received competitive grants from the CoC Program since approximately 2012 and, prior to that, grants from the Supportive Housing Program since the early 1990s. Crossroads currently has four direct CoC grants for FY 2024, totaling over $2.1 million. Additionally, Crossroads receives a CoC FY 2024 subgrant in the amount of $417,200 through Rhode Island Housing. Crossroads is a member of the Alliance.

19.    **Plaintiff Youth Pride, Inc.** (YPI or Youth Pride) is a nonprofit organization headquartered in Providence, Rhode Island. Youth Pride's mission is to meet the unique, ongoing needs of LGBTQ+ youth and young adults in Rhode Island through direct services, support, advocacy, and education. Youth Pride has received and is currently receiving federal funding through HUD's Youth Homelessness Demonstration Program to provide housing assistance for LGBTQ+ youth, and any other youth, ages 18-24, who come to YPI and are

experiencing housing instability. Currently, YPI receives a direct CoC grant for FY 2024 for $183,260, which it uses to assist youth and young adults who are housing insecure, unstably housed, homeless, or in danger of losing housing.

20.     **Plaintiff City of Boston** (Boston) is a municipal corporation organized under the laws of the Commonwealth of Massachusetts. Boston was awarded a FY 2024 CoC grant and relies on nearly $48 million annually in CoC grant funds to house and stabilize residents exiting homelessness. Approximately 90% of that funding supports permanent housing for over 1,600 households which include people with disabilities, children, and veterans.

21.     **Plaintiff City of Cambridge** (Cambridge) is a municipal corporation organized under the laws of the Commonwealth of Massachusetts. The Cambridge Continuum of Care was awarded more than $6.3 million in FY 2024 and relies on these funds to provide housing and case management services to over 200 people with disabling conditions and provide rapid rehousing for survivors of domestic violence, among other services.

22.     **Plaintiff Martin Luther King, Jr. County** (MLK County) is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. MLK County is part of the Seattle–King County Continuum of Care. The Seattle-King County Continuum was awarded $67 million for FY 2024, and MLK County was the direct recipient of $38.85 million of those funds. MLK County relies on these funds to serve its homeless residents, who numbered almost 17,000 during a recent count.

23.     **Plaintiff Metropolitan Government of Nashville & Davidson County** (Nashville) is a combined municipal corporation and county government organized and existing under the laws of the State of Tennessee. The Nashville-Davidson County Continuum of Care was awarded approximately $11.8 million in CoC FY 2024 funding, which it relies on to address

homelessness in the community, including housing for people with chronic disabling conditions.

24.     **Plaintiff County of Santa Clara** (Santa Clara County) is a charter county and political subdivision of the State of California. Santa Clara County serves as the lead agency and collaborative applicant for the Santa Clara County Continuum of Care. The Santa Clara County Continuum of Care was awarded approximately $48 million in CoC funding for FY 2024, of which $33 million went directly to Santa Clara County. Santa Clara County relies on CoC funding to provide—through subcontracts with community-based organizations—rental assistance, case management, and supportive services to help individuals and families exit homelessness and maintain stable housing.

25.     **Plaintiff City and County of San Francisco** (San Francisco) is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county. The San Francisco Continuum of Care was awarded approximately $56 million in CoC funding for FY 2024. Approximately 91% of that funding supports permanent housing projects in 42 housing projects with 1,900 program participants, including children, seniors, veterans, and persons with serious physical, developmental, and mental disabilities.

26.     **Plaintiff City of Tucson** (Tucson) is a home rule charter city organized and existing under the constitution and laws of the State of Arizona. The Tucson/Pima County Continuum of Care was collectively awarded approximately $14.5 million in CoC FY 2024 funding, of which Tucson received approximately $6.1 million. Tucson relies on this funding to provide housing and outreach as part of its homelessness response.

27.     **Defendant United States Department of Housing and Urban Development** is an executive department of the United States federal government headquartered in Washington,

D.C. 42 U.S.C. § 3532(a). HUD is an "agency" within the meaning of the APA. 5 U.S.C.

§ 551(1).

28.    **Defendant Scott Turner** is the Secretary of HUD, the highest-ranking official in

HUD, and responsible for the decisions of HUD and for administering the CoC Program. He is

sued in his official capacity.

**FACTUAL ALLEGATIONS**

I.    **The HUD Continuum of Care Program Supports Individuals and Families Experiencing Homelessness**

29.    Congress enacted what became the McKinney-Vento Homeless Assistance Act

(the Homeless Assistance Act) in 1987 "to meet the critically urgent needs of the homeless of the

Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped

persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b). In

enacting the law, Congress recognized that "the Federal Government has a clear responsibility

and an existing capacity to fulfill a more effective and responsible role to meet the basic human

needs and to engender respect for the human dignity of the homeless." *Id.* § 11301(a)(6).

30.    For 20 years following the passage of the Homeless Assistance Act, HUD

administered three separate programs that "focuse[d] on the longer-term housing and services

needs of homeless individuals and families." Libby Perl, Cong. Rsch. Serv., RL33764, *The HUD

Homeless Assistance Grants: Programs Authorized by the HEARTH Act* at 10 (updated Aug. 30,

2017), https://perma.cc/K6X2-RJEX.

31.    In 2009, Congress passed the Homeless Emergency Assistance and Rapid

Transition to Housing (HEARTH) Act, which amended the Homeless Assistance Act to

consolidate these three programs under the umbrella of the CoC Program, which is designed to

support local communities in responding to homelessness at the local level. 42 U.S.C. §§ 11381–

9

11389.

32.    The HEARTH Act does this by recognizing local or regional "Continuums of Care" or "Continuums," bodies responsible for coordinating funding from the CoC Program and other available resources for homelessness response within a geographic area. Continuums are composed of representatives of organizations that may include "nonprofit homeless providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, law enforcement, [and] organizations that serve homeless and formerly homeless veterans," as well as "homeless and formerly homeless persons." 24 C.F.R. § 578.3.

33.    The primary goal of a Continuum is to end homelessness in a specific geographic area through a comprehensive plan.

34.    The CoC Program funds critical homelessness services administered by grant recipients either directly or through subgrantees. The CoC Program funds a variety of programs that support homeless individuals and families, including through providing permanent or transitional housing through construction, acquisition, rehabilitation, or rental assistance, providing rehousing support, and providing supportive services, which include, but are not limited to, childcare, job training, healthcare, mental health services, trauma counseling, and life skills training. *See* 42 U.S.C. §§ 11360(29), 11383.

**II.    Congress Designed the CoC Program to Prioritize Permanent Housing, Consistency in Funding, and Respect for Local Decisionmaking**

35.    In codifying the CoC Program, Congress "establish[ed] a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." Prevent Mortgage Foreclosures and Enhance Mortgage Credit Availability, Pub. L. No.

111-22, § 1002, 123 Stat. 1632, 1664 (2009), *codified at* 42 U.S.C. § 11301 Note. It also sought, among other things, to "promote community-wide commitment to the goal of ending homelessness," to help rehouse people "while minimizing the trauma and dislocation" that homelessness causes, and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

36.     Three key aspects of the CoC Program contribute to its ability to meet these statutory requirements. The program (1) prioritizes the funding of permanent housing; (2) encourages stability by prioritizing the renewal of funding where such funding is needed and has previously been used effectively; and (3) gives local communities a central role in determining how best to eradicate homelessness in their areas.

### A.  Permanent Housing

37.     On the first aspect, permanent housing, Congress specifically identified only two "activities that have been proven to be effective at reducing homelessness"—and both are permanent housing strategies. 42 U.S.C. § 11386b(d)(1), (2)(A), (B). The first proven-effective strategy that Congress identified is "permanent supportive housing for chronically homeless individuals and families." *Id.* at § 11386b(d)(2)(A). And the second is "rapid rehousing" paired with services to help improve stability and incomes. *Id.* § 11386b(d)(2) (B).[1] Congress directed HUD to support such strategies. In particular, the statute provides that HUD "shall provide bonuses or other incentives" for using funding on those strategies (permanent supportive housing and rapid rehousing) that have proven effective. 42 U.S.C. § 11386b(d)(1).

38.     The statute also requires HUD, when awarding grants, to evaluate "the extent to

---

[1] Rapid rehousing is a type of permanent housing. 24 C.F.R. § 578.3 (defining "permanent housing" to include rapid rehousing).

which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," including the strategies "proven to be effective at reducing homelessness," like "permanent supportive housing" and "rapid rehousing." 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2).

39.    Notably, the HEARTH Act allows HUD to identify additional proven strategies "based on research and after notice and comment to the public." *Id.* § 11386b(d)(2)(C). To date, HUD has not identified any such additional proven strategies using this statutory process.

40.    The HEARTH Act also sets bare minimum amounts that HUD must allocate to permanent housing for certain communities. First, it requires HUD to allocate at least 30 percent of the funds appropriated for the CoC program and another program, other than funds used for renewals, to permanent supportive housing for "homeless individuals with disabilities" or certain families that include such an individual. 42 U.S.C. § 11386b(a)(1)-(2). And it also requires that at least 10 percent of funds appropriated for the program in any given year be "used to provide or secure permanent housing for homeless families with children." *Id.* § 11386b(b).

41.    Congress has reiterated this commitment to permanent housing in recent appropriations bills. In the FY 2024 appropriations act, Congress mandated that HUD "provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II., 138 Stat. 25, 363 (2024). Congress carried those instructions forward in the continuing resolution appropriating CoC funds for FY 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(12), 1105, 139 Stat. 9, 12 (2025) (appropriating funds pursuant to the same "requirements, authorities, conditions, limitations, and other provisions of the" fiscal year 2024 appropriations act).

## B. Project Renewal

42.    On the second aspect—encouraging stability by prioritizing renewals—Congress explicitly prioritized renewals for permanent housing.

43.    In particular, the HEARTH Act states that appropriated funds "shall be available for the renewal of contracts" for "rental assistance and housing operation costs associated with permanent housing projects funded under this part." 42 U.S.C. § 11386c(b). In Section 11386c(b), the statute identifies two—and only two—factors that HUD must consider when determining whether to renew a permanent housing award: (1) whether "there is a demonstrated need for the project" and (2) whether it "complies with program requirements and appropriate standards of housing quality and habitability, as determined by [HUD]." *Id.* The applicant for the geographic area submits a "certification" that these factors are met, and HUD then makes a renewal determination "on the basis of" that certification. *Id.*

44.    Congress made clear that this provision governing HUD's consideration of renewals is not meant to be a limitation on when projects can be renewed: The statute specifies that nothing in Section 11386c(c) "shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth" elsewhere in the statute. *Id.* § 11386c(c).

45.    The HEARTH Act also takes steps to ensure that, to the extent sufficient funding was appropriated, it would be available to fund renewal projects. The statute requires HUD to consider "the need within the geographic area for homeless services" in making awards. *Id.* § 11386a(b)(2). That need amount is determined by a regulatory formula that looks to factors related to population size and poverty. *Id.*; *see also* 24 C.F.R. § 578.17(a)(3). But the statute also requires HUD to "increase the estimated need amount" for a particular geographic area as "necessary to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for that

area. 42 U.S.C. § 11386a(b)(2)(B)(iii); *see also id.* § 11386a(c) (authorizing HUD to adjust the geographic need formula "as necessary[] to ensure that each [CoC] has sufficient funding to renew all qualified projects for at least one year" and also "to ensure that collaborative applicants are not discouraged from replacing renewal projects with new projects that the [CoC] determines will better be able to meet the purposes of this chapter.").

46.     Congress also limited when funding could be used for new projects as opposed to renewals. In particular, in the relevant appropriations act, Congress provided that no CoC funds could be used for "new projects, except for projects created through reallocation, unless the Secretary determines that the continuum of care has demonstrated that projects are evaluated and ranked based on the degree to which they improve the continuum of care's system performance." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 363 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(12), 1102, 1105, 139 Stat. 9, 12 (2025) (carrying that provision forward for fiscal year 2025 funding).

47.     Congress has also taken steps to ensure that renewal projects could provide the same level of service despite rising costs. The statute requires HUD, "[w]hen providing renewal funding for leasing, operating costs, or rental assistance for permanent housing," to "make adjustments proportional to increases in the fair market rents in the geographic area." *Id.* § 11382(f). In addition, in recent appropriations bills, Congress separately specifically authorized HUD to "make reasonable adjustments to renewal amounts to enable renewal projects to operate at substantially the same levels." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 363 (2024). Congress carried that forward in the continuing resolution appropriating CoC funds for fiscal year 2025. *See* Full-Year Continuing Appropriations and

Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(12), 1102, 1105, 139 Stat. 9, 12 (2025).

### C.  Local Decisionmaking

48.     Finally, on the third aspect—the respect for local communities' central role—Congress recognized that the local "continuum of care program process" was an "integral local function" that is "necessary to generate the local strategies for ending homelessness." Prevent Mortgage Foreclosures and Enhance Mortgage Credit Availability, Pub. L. No. 111-22, § 1002, 123 Stat. 1632, 1664 (2009), *codified at* 42 U.S.C. § 11301 Note. It accordingly codified that process in federal law. *Id.*

49.     Under the statute, a local Continuum established at the community level coordinates the process of applying for CoC program funds for that community. 42 U.S.C. § 11360a(a).

50.     Each local CoC designates a "collaborative applicant" (which can be the Continuum itself or another organization eligible for CoC funds) that is responsible for applying for funding on behalf of entities within the CoC's geographic area. 42 U.S.C. § 11360a(a). Each CoC must run a local competition to determine what projects and service providers will be part of its federal application, and how it will rank them. 42 U.S.C. § 11382; 24 C.F.R. § 578.9. It then submits an application on behalf of the CoC and all project applicants in that area. 42 U.S.C. § 11360a; 24 C.F.R. § 578.15. These CoC-designated collaborative applicants play a central role in determining the projects for which it should seek funding—and the statute permits an individual entity to apply on its own only if it "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner." 42 U.S.C. § 11382(i).

51.     In evaluating applications and making selections, HUD looks not only at the characteristics of individual projects but also at the "methodology" the CoC "used to determine the priority for funding local projects." *Id.* § 11386a(b)(1)(C). HUD must also consider "the need

within the geographic area for homeless services" in making awards. *Id.* § 11386a(b)(2).

52.     Further recognizing the importance of respecting local communities' roles in addressing homelessness in their areas, Congress took steps to ensure that HUD does not unduly interfere in state and local policymaking. In particular, 42 U.S.C. § 12711 bars HUD from "establish[ing] any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law" so long as the jurisdiction had authority to adopt, continue, or discontinue it and it does not violate federal law. That provision applies to any "funds made available under programs administered by the Secretary" of HUD. *Id.* § 12711.

### III.    Statutes and Regulations Govern HUD's Administration of the CoC Program

#### A.  Governing Statutes

53.     The HEARTH Act sets forth various requirements for HUD's administration of the CoC Program. In addition to the requirements described above, the statute establishes timing requirements, eligibility and selection criteria, and conditions to which grantees must agree, as well as other mandates.

54.     For one, the statute establishes timing requirements to ensure that funds are awarded promptly to the communities that need them. It provides that "the Secretary shall release a notification of funding availability"—also known as a "notice of funding opportunity" or "NOFO"—for CoC grants "for a fiscal year not later than 3 months after" Congress has enacted the relevant appropriations statute. 42 U.S.C. §11382(b). It then must announce conditional awards "within 5 months" after the NOFO application deadline. *Id.* § 11382(c)(2)(A). And once a recipient meets all relevant requirements for a final award (such as obtaining matching funds and passing environmental review), HUD must "obligate the funds for the grant involved" within 45 days. *Id.* § 11382(d)(2).

55.     The statute also identifies what activities are eligible for funding. 42 U.S.C.

§ 11383.

56.     The statute also sets forth comprehensive criteria to govern HUD's selection of

awardees. *Id.* § 11386a. Those statutory criteria include the "previous performance of the

recipient regarding homelessness" (as measured by criteria that HUD announces and that must

include certain statutorily defined metrics); the recipient's plan to serve homeless individuals and

families; the recipient's methodology for prioritizing CoC funds for local projects; and the

recipient's ability to coordinate and supplement CoC funds with other federal, state, and local

resources and entities. *Id.* § 11386a(b). The statute vests the Secretary with authority to define

additional criteria, but only as "appropriate to carry out" the program "in an effective and

efficient manner." *Id.* § 11386a(b)(1)(G).

57.     The statute also specifies the "[r]equired agreements" that grant recipients must

make to receive funds under the program. *Id.* § 11386(b). For instance, recipients must agree to

operate funded projects in accordance with statutory requirements, to involve individuals

experiencing homelessness in project operations where practicable, and to certify that children in

family programs are enrolled in school and connected to services such as Head Start and

Individuals with Disabilities Education Act programs. *Id.* HUD may also establish "other terms

and conditions," but only "to carry out this part in an effective and efficient manner." *Id.*

§ 11386(b)(8).

58.     The statute requires HUD to award a minimum amount of funding for permanent

supportive housing programs that serve "homeless individuals with disabilities." 42 U.S.C. §

11386b(a)(1). The HEARTH Act defines "'homeless individual with a disability'" to include

individuals with "physical, mental, or emotional impairment, including an impairment caused by

alcohol or drug abuse, post traumatic stress disorder, or brain injury." 42 U.S.C.

§ 11360(10)(A)(i)(IV). Similarly, the regulations define "permanent supportive housing" to be

"permanent housing in which supportive services are provided to assist homeless persons with a

disability to live independently," and the definition of such persons "with a disability" is

consistent with the HEARTH Act and makes no distinction between physical or mental health

disabilities. *See* 24 C.F.R. § 578.3.

### B. Governing Regulations

59.    The Homeless Assistance Act requires the Secretary to promulgate regulations to

carry out the CoC Program pursuant to specified procedures. 42 U.S.C. § 11387. The governing

HUD regulations for the CoC Program, generally track the statutory language. *See generally* 24

C.F.R. §§ 578.1–578.109.

60.    Separately, HUD regulations require HUD to proceed by notice-and-comment

rulemaking for "matters that relate to . . . grants," "even though such matters would not

otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. § 10.1, *see also id.*

§§ 10.2, 10.7-10.10.

61.    Among other things, HUD regulations include nondiscrimination requirements

that recipients of CoC funds must follow. For instance, HUD's Equal Access Rule applies to

CoC-funded programs and protects transgender and other gender-expansive individuals from

discrimination. That rule requires, among other things, that grantees provide individuals equal

access to programs, shelters, benefits, services, and accommodations "in accordance with the

individual's gender identity"; "place[], serve[], and accommodate[]" individuals "in accordance

with the[ir] gender identity"; "not subject[]" individuals "to intrusive questioning" or ask them to

provide evidence of their gender identity; and place individuals in "facilities with shared sleeping

quarters or [] bathing facilities" according to their gender identity. 24 C.F.R. § 5.106(b).

62.     HUD regulations also prohibit discrimination on the basis of disability. The regulations provide that "[n]o qualified individual with handicaps shall, solely on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance from the Department." 24 C.F.R. § 8.4(a). The "individuals with handicaps" protected by this regulation include those with both physical and mental impairments, including "drug addiction and alcoholism." *Id.* § 8.3.

## IV.    HUD Has Long Structured the CoC Program to Prioritize Permanent Housing, Long-Term Stability, and Respect for Local Decisionmaking

63.     Consistent with Congress's goals, HUD's award and application process for the CoC Program has long prioritized permanent housing, protected renewal of effective projects with demonstrated need, and ensured that geographic areas would not experience significant fluctuations in funding levels.

64.     For one, HUD has never set a cap on the amount it would award for permanent housing programs—the only programs Congress has identified as proven effective at reducing homelessness. *See* 42 U.S.C. § 11386b(d)(2).

65.     In addition, it has long run the CoC competition in a way that prioritizes stability and local decisionmaking, while still maintaining a competitive process.

66.     Following statutory directives, HUD's regulations specify that after "enactment of the annual appropriations act" each year, HUD will calculate for each Continuum the sum of "all projects within the Continuum eligible to apply for renewal in that fiscal year's competition." 24 C.F.R. § 578.17(a)-(b)(2). This amount is known as the annual renewal demand (ARD) and is the "maximum award amount," other than bonus or set aside funds, for that geographic area (unless

their formula-based need amount is higher, which is rare).[2] 24 C.F.R. § 578.17(b).

67.    CoCs conduct a local competition based on the CoC program's requirements and goals and its own local needs. Both CoCs and HUD have long used a two-tier system for new and renewal project applications. Tier 1 projects are those a CoC has identified as most critical to meeting community needs, and HUD will typically fund all the Tier 1 projects so long as the project passes threshold eligibility and quality review. CoCs often choose to list renewal projects in Tier 1 to ensure stability in their local communities. But they do not have to. If a project is no longer needed or is performing poorly, the CoC can reallocate the money to create a new project that better meets local needs. Because Tier 1 funding is more assured, CoCs can make these types of decisions without undue risk and instability to the whole system. The protection of Tier 1 funding also ensures that CoCs will have relatively stable funding levels for their communities, even when the funded projects change.

68.    Tier 2 projects are subject to a national competition, and HUD awards the funding available for Tier 2 projects to the projects that score highest under the competition's criteria.

69.    As HUD explained in its 2013-14 CoC Notice of Funding: "The purpose of this two-tiered approach is for CoCs to clearly indicate to HUD which projects are prioritized for funding in the event that the national total Annual Renewal Demand (ARD) exceeds [the annual appropriation for this program]." HUD, *Notice of Funding Availability (NOFA) for the Fiscal Years 2013-14 CoC Program Competition* at 6, § I(B)(1)(b) (Dec. 20, 2013), https://perma.cc/G8WJ-DEZY.

70.    Each year, HUD identifies what percentage of money will be available for Tier 1

---

[2] *See, e.g.*, HUD, *CoC Estimated Annual Renewal Demand Report – revised* (2024), https://perma.cc/NZ8X-6QCT.

projects, as a percentage of each geographic area's Annual Renewal Demand. For example, in FY 2024, Tier 1 was set at 90 percent of each CoC's Annual Renewal Demand. Practically speaking, that meant that in 2024, collaborative applicants could rank projects amounting to 90 percent of their ARD in Tier 1 and be reasonably certain those projects would be funded. "HUD's intent" has been "to continue to fund projects that are currently serving people to avoid having them experience homelessness again." HUD, *Determining the Amount of Available CoC Program Funds* at 4, https://perma.cc/M6VL-G5T4.

71.    Tier 2 covers the remainder of the funds, *i.e.*, the funds not allocated for Tier 1 projects. For example, in 2024, 10 percent of funding was available for Tier 2 because Tier 1 was set at 90 percent of renewal demand.

72.    Consistent with Congress's mandate to prioritize stability, fund proven strategies for reducing homelessness, and give communities flexibility in responding to local needs and priorities, HUD has routinely dedicated the large majority of congressionally appropriated CoC Program funds to Tier 1, with 85% representing the lowest portion HUD reserved for Tier 1 programs (in FY 2015). The consistently high allocations to Tier 1 projects ensured a stable and predictable funding scheme that enabled CoCs to make informed ranking decisions within local competitions. As a practical matter, since funding for projects ranked in Tier 1 is "protected," CoCs can reliably balance between prioritizing renewing existing projects that are critical to maintaining the *current* level of services and meeting *new* community needs when ranking projects in their local competitions.

73.    The program structure has also led to increases in awards directed towards permanent housing projects (permanent supportive housing, rapid rehousing, and joint transitional housing-rapid rehousing, all considered types of permanent housing). The amount

allocated to permanent housing projects has steadily increased from 60 percent in FY 2012 to 88 percent in FY 2024. HUD, *HUD's 2024 Continuum of Care Program Funding Awards* (2024), https://perma.cc/FX7Y-PSZ3.

74.     Consistent with the goal of housing stability, HUD has for almost a decade called on applicants to adopt strategies consistent with a "Housing First" approach—that is, policies that prioritize first providing housing to unhoused people while also offering, but not mandating, supportive services to address underlying issues such as drug use or mental health conditions—and the federal government had embraced it ever since the George W. Bush administration. *See, e.g.*, HUD, *FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants* at 17, https://perma.cc/DQ4P-U6QH (FY24-25 NOFO); HUD, *Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2016 Continuum of Care Program Competition* at 9, https://perma.cc/NMS7-5NAG; *see also* HUD, *Housing First: A Review of the Evidence* (2023), https://perma.cc/AN54-NYET. Consistent with this approach, the FY24-25 NOFO prioritized a housing first strategy as well, giving higher scores to project proposals that adhered to that approach. (*See* FY24-25 NOFO at 62, 87, 95). For instance, CoCs received points if they could "[d]emonstrate [that] at least 75 percent of all project applications that include housing activities . . . [were] using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services." (FY24-25 NOFO at 87).

75.     This emphasis on offering, but not mandating, services is consistent with other federal laws. Under the Violence Against Women Act (VAWA) and Family Violence Prevention and Service Act (FVPSA)—two laws that, among other things, fund housing support for survivors of domestic violence and sexual assault who cannot safely remain at home—it is illegal

for a provider to require participants to take part in supportive services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA grants for transitional housing assistance); 42 U.S.C. § 10408(d)(2) (FVPSA grants for emergency shelter).

**V.    Congress Authorizes a Two-Year Competition to Promote Efficiency and Stability for the CoC Program**

76.    Congress has regularly appropriated funds for the CoC Program since the program's inception.

77.    In 2024, to provide for greater stability and efficiency, Congress authorized HUD to run a single competition to cover awards for both fiscal year 2024 and 2025. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, § 242. This two-year competition and funding cycle has received strong bipartisan support.

78.    In July 2024, HUD issued a two-year NOFO for CoC grants and related renewal and replacement grants under the Youth Homeless Demonstration Program (FY24-25 NOFO). Under that two-year NOFO, a Continuum needed to submit only one application that would cover both fiscal year 2024 and fiscal year 2025 funds. This two-year NOFO was intended to enable HUD to award fiscal year 2025 funds to those awarded CoC grants in fiscal year 2024, once available, without going through a new application process. This two-year process was designed to reduce the burden on communities and provide greater predictability of funding.

79.    Consistent with HUD's practices for nearly a decade, the FY24-25 NOFO prioritized permanent housing solutions to homelessness.

80.    Communities undertook their local processes and applied to the FY24-25 NOFO. HUD made fiscal year 2024 awards in January 2025.

81.    Funding became available for fiscal year 2025 awards in March 2025. In

particular, on March 15, Congress enacted a continuing resolution appropriating $3.544 billion for the Continuum of Care program and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12).

82.    Because HUD had issued a two-year NOFO, no new FY 2025 NOFO was required.

83.    If, however, HUD wanted to issue a new NOFO for awarding those FY 2025 funds, it was required to do so within three months of the appropriation, that is, by June 15, 2025. *See* 42 U.S.C. § 11382(b).

### VI.    Defendants Abruptly Rescind the FY24-25 NOFO and Replace it with a New NOFO

84.    HUD did not issue a new NOFO by June 15, 2025.

85.    On July 3, 2025, HUD announced that it "intend[ed] to publish" a new NOFO for FY 2025 CoC awards. But HUD provided few details beyond stating that the NOFO would "seek to provide opportunities for new types of projects including street outreach and transitional housing programs" and inviting applicants to "prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants."

86.    HUD did not actually rescind the FY24-25 NOFO until November—long after the three-month window in which the statute would have permitted HUD to release a replacement NOFO.

87.    On November 13, 2025—eight months after Congress appropriated FY 2025 funds for the CoC Program—HUD issued a new fiscal year 2025 NOFO (the November NOFO).

88.    In one sentence of the 128-page November NOFO, HUD rescinded the FY24-25 NOFO, with no explanation, stating only that it "rescinds and supersedes any mention of awards

of FY 2025 CoC funds" in the FY24-25 NOFO. HUD, *FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO* at 15, https://perma.cc/7MSQ-5FHQ (November NOFO).

### VII.    After Plaintiffs File Suit, Defendants Abruptly Withdraw the November NOFO and Issue a New NOFO

89.    After Plaintiffs filed this lawsuit, hours before the hearing the Court set on Plaintiffs' motion for a temporary restraining order, Defendants withdrew the November NOFO on December 8, 2025, "in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." (ECF No. 39.) HUD informed CoCs that, "instead of processing renewals" under the FY24-25 NOFO, it intended to make unspecified "revisions" and to again issue a revised FY25 NOFO, at an unknown time at some point well before "the deadline for obligation of available Fiscal Year 2025 funds," i.e., before September 30, 2027. (ECF No. 39-2.)

90.    The Court set a hearing for Plaintiffs' motion for relief under 5 U.S.C. § 705 and for a preliminary injunction for December 19, 2025.

91.    At that hearing, the Court orally granted Plaintiffs' motion and enjoined Defendants from rescinding the FY24-25 NOFO and from implementing or enforcing the November NOFO or its challenged conditions.

92.    At 11:51 pm the same day, Defendants issued a third NOFO (the December NOFO). *See* HUD, *FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO*, https://perma.cc/N7D5-U2N2. The December NOFO retains the November NOFO's sentence rescinding and superseding the FY24-25 NOFO. *Id.* at 22. The December NOFO makes clear that HUD understands it to be enjoined pursuant to this Court's order. *Id.* at 5-6.

93.    On December 23, 2025, the Court issued a written order that, among other things, stayed the rescission of the FY24-25 NOFO, preliminarily enjoined Defendants from giving effect to any other NOFO, and ordered Defendants to process eligible renewals under the FY24-25 NOFO, short of obligating funding or granting any specific renewals. ECF No. 52 ¶¶ 2, 5, 6.

## VIII.    The Administration Pursues Criminalizing Homelessness, Ending "Housing First," and Leveraging Funding to Promote Ideological Goals

94.    The rescission of the FY24-25 NOFO and the FY25 NOFOs followed the Administration's efforts to leverage federal funding to advance the executive branch's own agenda without congressional authorization.

95.    First, on July 24, President Trump had issued Executive Order No. 14321, titled "Ending Crime and Disorder on America's Streets." 90 Fed. Reg. 35817 (Jul. 24, 2025) (Homelessness E.O.). The E.O. attacked unhoused people's dignity and rights, portraying homelessness as a criminal issue rather than a societal challenge requiring systemic solutions. Without citing any supporting evidence, the E.O. declares that "the overwhelming majority" of "individuals living on the streets in the United States" "are addicted to drugs, have a mental health condition, or both." *Id.* The E.O. also declares that the "Federal Government and the States have spent tens of billions of dollars on failed programs that address homelessness . . . leaving other citizens vulnerable to public safety threats." *Id.*

96.    The Homelessness E.O. calls for HUD and the Department of Health and Human Services (HHS) to "end[] support for 'housing first' policies" because, the E.O. asserts, they "deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency." Homelessness E.O. § 5.

97.    The Homelessness E.O. also takes aim at "drug injection sites" or "safe consumption" sites that aim to reduce the harm from drug use, asserting (again without evidence)

that they "only facilitate illegal drug use and its attendant harm." *E.g.*, *id.* §§ 4-5. Among other things, the E.O. directs HHS not to fund such sites, *id.* § 4(a)(i); directs the Attorney General to consider prosecuting such organizations for operating "drug-involved premises," *id.* § 5(c)(i); and directs HUD to review whether recipients that operate such harm reduction sites are in violation of the terms of their awards and to "freeze" their funding as appropriate. *Id.* § 5(c)(ii).

98.    The Homelessness E.O. also encourages the involuntary institutionalization of unhoused people by, among other things, directing the Attorney General to provide technical assistance and grants to states to adopt and implement "maximally flexible civil commitment" and related standards that facilitate commitment of individuals with mental illness or who "are living on the streets and cannot care for themselves." *Id.* § 2(a)(ii).

99.    In addition, the Homelessness E.O. issues various directives designed to pressure states and localities to adopt and implement homelessness policies at the local level that align with the Administration's views. In particular, the E.O. instructs various agencies, including HUD, to prioritize giving federal funding to grantees based on the policies of the states and municipalities in which they are located. Under the E.O., preference should go to jurisdictions that enforce prohibitions on "open illicit drug use," on "urban camping and loitering," and on "urban squatting"; that adopt and enforce standards to commit "individuals who are a danger to themselves or others" or cannot care for themselves; and that substantially implement the Sex Offender Registry Notification Act (SORNA), including by adequately tracking "homeless sex offenders." *Id.* § 3.

100.    Second, the Administration has also sought to leverage federal funding to force the public to shun transgender and other gender-expansive people and adopt the Administration's views on gender.

101.    In an early executive order on so-called "gender ideology," the President announced that it was "the policy of the United States to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality." Exec. Order No. 14168 § 2, 90 Fed. Reg. 8615 (Jan. 30, 2025) (Gender Ideology E.O.). That executive order directed federal agencies to "ensure grant funds do not promote" what the Administration deemed to be the "false" idea that a person can have a gender identity that differs from their biological sex. *Id.* § 3(g).

102.    Seven months later, in an executive order broadly addressing federal grantmaking, the President similarly commanded agencies to help ensure that grantees would not deny "the sex binary in humans" or express "the notion that sex is a chosen or mutable characteristic." Improving Oversight of Federal Grantmaking § 4(b)(ii)(B), Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 7, 2025) (Grants E.O.).

### IX.    The FY25 NOFOs Radically Alter the CoC Program

103.    Both the November NOFO and the December NOFO radically change the terms of the CoC Program with no valid justification. The FY25 NOFOs make drastic changes at every step of the process—by changing the types of projects HUD will fund, the criteria for selecting awardees, and the conditions grantees will be required to accept.

104.    First, the new FY25 NOFOs radically restructure the CoC Program by imposing an unprecedented new cap on permanent housing, categorically excluding existing projects from eligibility for 30 percent of the appropriated funding, and destabilizing the whole system by dramatically curtailing the funding that will be awarded at Tier 1 (Structural Provisions).

105.    Second, the FY25 NOFOs impose unlawful criteria at each stage of HUD's review, including the threshold, merit, and risk reviews. Threshold Criteria are prerequisites applicants must meet to even be considered for project funding and to advance to the merit

review. Merit Criteria are used to score projects and rank them, and HUD uses those rankings to select awardees. Finally, the Risk Review uses factors purportedly bearing on each applicant's "likelihood of successfully implementing an award" before making a final decision.

106.    Across the three review stages, there are several unlawful criteria (collectively, Review Criteria):

    a.   Rewarding Continuum applicants for conditioning housing on services and treatment (Service Requirements Condition);

    b.   Prioritizing projects that advantage individuals with certain qualifying disabilities, including physical and developmental disabilities (Disability Condition);

    c.   Discriminating against projects based on whether the state or local jurisdiction in which a Continuum is located advances the Administration's view that homelessness requires a law enforcement response (Geographic Discrimination Conditions);

    d.   Rewarding applicants who take steps to assist law enforcement and advance the Administration's unrelated policy priorities (Law Enforcement Conditions);

    e.   Provisions that impose on CoCs and local providers mandatory certifications, retroactive reservations, and a risk review catchall that allows HUD to exclude applicants whose current or past activities do not align with the Administration's agenda.

107.    Third, the FY25 NOFOs impose post-award conditions that require awardees to conform to the Administration's wishes on topics unrelated to the purpose of the CoC Program (Post-Award Conditions).

108.    The imposition of these unlawful Review Criteria and Post-Award Conditions,

and the Structural Provisions' stark retreat from proven practices like permanent housing and protecting renewals, will dismantle an effective program relied on for years by communities across the country. Plaintiffs refer to the FY25 NOFOs' Structural Provisions, Review Criteria, and Post-Award Conditions collectively as the "Challenged Provisions."

109.     The November NOFO set a deadline of January 14, 2026, and required CoCs to complete their local competitions by December 15 (November NOFO at 98), while the December NOFO sets out a "two track application process." December NOFO at 23. Under the December NOFO, "Normal Track" applications would be due to HUD by January 28, 2026, and "Extended Track" applications, for new permanent housing projects only, would be due February 25, 2026. December NOFO at 6, 23. The December NOFO also would require CoCs to announce decisions (rejections, reductions, acceptance, and rankings) from their local competitions at least 15 days before the HUD application deadlines (i.e., by January 13 for the Normal Track and February 10 for the Extended Track). December NOFO at 110. This effectively means that CoCs have less than 30 days to design and complete their local competitions, among other challenges.

### A. Defunding of Permanent Housing and Renewals

110.     The FY25 NOFOs make structural changes that completely revamp the CoC program and fly in the face of Congress's focus on permanent housing and the stability created by renewing effective awards (Structural Provisions).

111.     First, both FY25 NOFOs cap the amount that each CoC can receive for permanent housing projects. The November NOFO's cap precludes CoCs from receiving more than 30 percent of their annual renewal demand for *any* permanent housing project, while the December NOFO's cap precludes CoCs from receiving more than 30 percent of their annual renewal demand amount for renewals of existing permanent housing projects (Permanent Housing Caps). November NOFO at 15; December NOFO at 23. This is unprecedented. Since the program's

30

inception, HUD has never imposed a cap on permanent housing awards within the CoC Program. In a decade, the percentage of CoC funding awarded to permanent housing projects has not once been less than 80 percent.[3]

112.    Second, the December NOFO earmarks approximately $1.26 billion—30 percent of the funds appropriated for the CoC and another program—exclusively for *new* permanent housing projects for individuals and families with a disability (New Project Earmark). December NOFO at 6, 22-24. The New Project Earmark thus makes existing projects categorically ineligible for a significant portion of CoC funding.

113.    Third, both FY25 NOFOs allocate to the protected Tier 1 category only 30 percent of each CoC's ARD, i.e., 30 percent of the amount each CoC would need to fully fund all renewals (Tier 1 Allocation). November NOFO at 15; December NOFO at 23. The Tier 1 allocation percentage has been 90 percent or greater for years, and for the entire lifespan of the CoC Program, it has never dipped below 85 percent.

114.    Although they have slightly different approaches, both the November NOFO and December NOFO would require CoCs to reallocate substantial portions of their Annual Renewal Demand away from existing permanent housing—thereby forcing communities to dismantle stable, long-term housing programs that Congress expressly sought to preserve.

115.    Under the FY24-25 NOFO, 88 percent of FY24 national awards—or about $3.3 billion—supported permanent housing projects. The FY25 NOFOs would allow, at most, a fraction of those projects to continue—only 30 percent of annual renewal demand, or $1.05 billion.

---

[3] HUD, *CoC Award Summary Reports by Component and Project Type - All States, Territories, Puerto Rico, and DC*, 2014-2024, https://perma.cc/J5JX-A247.

116.    Given the housing stability imperative inherent in the CoC Program and the severe lack of affordable market-rate housing for people with very low incomes, a large portion of CoC funding has historically been directed toward permanent housing, with the expectation that funds will be renewed year after year. The FY25 NOFOs' Permanent Housing Caps and the December NOFO's New Project Earmark will therefore mean a tremendous loss of funding to existing permanent housing nationwide. In most jurisdictions, the majority of renewal funding would be lost.

**B. Threshold Criteria Retroactively Punish Lawful Conduct, Exclude CoCs that Do Not Conform with the Administration's Unrelated Political Agenda, and Unlawfully Preference Certain Disabilities Over Others**

117.    The FY25 NOFOs also include several threshold requirements that bear no relationship to the purpose of the CoC Program nor its authorizing statutes. Instead, the new requirements exclude or disadvantage CoC funding project applicants whose current—and in some instances past—activities do not align with the Administration's unrelated political agenda.

118.    These new barriers to CoC funding include: two DEI-Related Certifications, a Harm Reduction Certification, three Retroactive Reservations, and a Disability Condition.

119.    If a project applicant fails to meet any one of the threshold criteria, HUD will deem its application ineligible for funding and automatically reject it on a "pass/fail" basis. (November NOFO at 53; December NOFO at 61). If a project meets all threshold requirements, the application advances to the next stage, merit review.

120.    Both the November NOFO and the December NOFO would require applicants to certify compliance with conditions and policies not authorized by Congress, including conditions unrelated to the effectiveness or efficiency of homeless assistance programs.

121.    First, a DEI-Related Certification requires that CoC applicants "certify

affirmatively" that they "will not engage in illegal discrimination including racial preferences." (December NOFO at 62; *see also* November NOFO at 54 (requiring certification that applicant "will not engage in racial preferences or other forms of illegal discrimination").) The Certification does not define "racial preferences" or "other forms of illegal discrimination." *Id.*

122.    In addition, the FY25 NOFOs impose another general DEI-Related Certification requirement that all applicants submit Form HUD-424B, which requires applicants to certify that they "will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." HUD, *Applicant & Recipient: Assurances & Certifications* (HUD-424B) (2023), https://perma.cc/YA65-TMS9. (December NOFO at 32; November NOFO at 24.)

123.    Second, the Harm Reduction Certification requires that CoC applicants "certify affirmatively" (and without any limitation to grant-funded activities) that:

> "The project applicant will not operate drug injection sites or 'safe consumption sites' in violation of 21 u.s.c. 856 [*sic*]. This is consistent with the objectives outlined in Section III.B above and is consistent with the requirements of 2 CFR 200.300(a).'"

(December NOFO at 62; *see also* November NOFO at 54.)

124.    The FY25 NOFOs also contains Retroactive Reservations under which HUD "reserves the right to verify *past performance* and evaluate the eligibility of a project application" based on the Trump Administration's new policy priorities. (November NOFO at 55; December NOFO at 63 (emphasis added)).

125.    One of the Retroactive Reservations (the Racial Preference Reservation) partially mirrors (but goes beyond) the forward-looking certification regarding "racial preferences" by stating that HUD can reject a project application based on unspecified "evidence" that "the project has *previously* or currently conducts activities that subsidize or facilitate racial

preferences or other forms of illegal discrimination." (November NOFO at 55, 65 (emphasis added)). The December NOFO also suggests that HUD will review "past performance" regarding whether a project "conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences" and that it "reserves the right" to reject applicants where there is "evidence that the project conducts activities that subsidize or facilitate[] illegal discrimination including illegal racial preferences." (December NOFO at 63, 73-74).

126.    A second Retroactive Reservation (the Gender Identity Reservation) in the November FY25 NOFO states that HUD can reject a project application based on evidence that "the project has *previously* or currently . . . conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." (November NOFO at 55, 65 (emphasis added)). The reference to a "definition of sex other than as binary" is unclear but appears to require applicants to commit to recognizing only two immutable genders and to denying the very existence of transgender and nonbinary individuals. *Id*. While the December NOFO does not include the Gender Identity Reservation, it imposes the Administration's views on gender identity through a post-award condition, as explained further below.

127.    Notably, the FY25 NOFOs do not adequately explain their sudden departure from the FY24-25 NOFO, which encouraged as policy priorities "Racial Equity" and "Improving Assistance to LGBTQ+ Individuals." (FY24-25 NOFO at 9). Nor does the November FY25 NOFO explain how that Gender Identity Reservation can be reconciled with HUD's Equal Access Rule, which recognizes that sex is not binary by requiring grantees to serve program participants "in accordance with the[ir] gender identity," 24 C.F.R. § 5.106(b)(2). Moreover, if Plaintiffs, which have thousands of employees, were to decline to recognize "sex as other than binary" under this Reservation, they may find themselves in direct conflict with that condition by

committing another form of illegal discrimination—that is, employment discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964, as well as discrimination under the Fair Housing Act and state and local civil rights laws. *See, e.g.*, 42 U.S.C. §§ 3604(a)-(b), 2000e–2(a)(1); *see also Bostock v. Clayton County, Georgia*, 590 U.S. 644, 649-50 (2020) (concluding that Title VII protects against employment discrimination on the basis of gender identity). Although the December NOFO does not explicitly include the same Gender Identity Reservation, HUD has not disavowed its ability to re-impose this condition in the future.

128.    In addition, another Retroactive Reservation in both FY25 NOFOs (the Harm Reduction Reservation) is nearly identical to the forward-looking Harm Reduction Certification and states that HUD can reject a project application based on evidence that the project engages in conduct that is prohibited under the Harm Reduction Certification described above. (November NOFO at 55, 65; December NOFO at 63, 73-74).

129.    By judging applications based on "past performance," these reservations could exclude project applicants from CoC funding based on past activity that is disfavored by the current Administration—even where such activity is actually lawful and despite project applicants receiving no prior notice that such activity could render them ineligible for future CoC funding.

130.    The threshold criteria would also reward applicants that deprioritize individuals who have substance use disorders or mental or emotional impairments, while favoring services for those with physical and developmental disabilities (the Disability Conditions).

131.    For permanent supportive housing projects to pass threshold project quality review, they must receive 4 out of 6 available points. The November NOFO assigns projects 1 point if they are "designed to serve elderly individuals and/or individuals with a physical

disability/impairment or a developmental disability (24 C.F.R. § 582.5) not including substance

use disorder," and have units that "will prioritize these populations." (November NOFO at 61).

The December NOFO does not exclude individuals with a substance use disorder or those with

mental/emotional impairments (December NOFO at 69 and 70), but again, HUD has made no

effort to disavow its ability to impose similarly discriminatory requirements in the future.

132.    For transitional housing projects to pass project quality threshold review, they

must receive at least 7 out of 10 available points. Both the November and December NOFOs

assign 2 points to projects that provide 40 hours per week of "customized" services to each

participant. (November NOFO at 56-57; December NOFO at 65). That requirement, however,

does not apply to people with physical disabilities or developmental disabilities, but does apply

to people with substance use disorder and other types of disabilities. (*See* November NOFO at

56-57; December NOFO at 64-65).

133.    There is no statutory basis for treating people differently based on type of

disability.

### C.  New "Merit Review" Scoring System Drastically Departs from the FY24-25 NOFO

134.    The second step of HUD's selection process is to review the results of the so-

called "Merit Review." (November NOFO at 90; December NOFO at 74). The Merit Review

assigns points based on various criteria. These criteria look to the CoC's own characteristics and

activities. There are 130 points available, plus 19 bonus and preference points. (November

NOFO at 66; December NOFO at 74).

135.    The Merit Review reflects a drastic shift from the two-year FY24-25 NOFO.

HUD provided no reasonable explanation or defensible evidence, and it did not go through

public notice and comment, before it announced its drastic shift in incentives and preferences.

*Service Requirement Conditions*

136.    The FY25 NOFOs prioritize and reward mandatory treatment and services, like conditioning housing on compulsory substance use treatment (Service Requirement Conditions).

137.    These incentives and preferences appear in several parts of the Merit Review: "Availability of Treatment and Recovery Services"; "Participation Requirements for Supportive Services"; and "Objective Criteria and System Performance." (November NOFO at 66-67, 77-80; December NOFO at 74-75, 86-89).[4] A CoC gets 16 points if it requires participants to undergo substance abuse treatment (November NOFO at 77; December NOFO at 86); 3 points if at least 25% of the total points available in the CoC's local competition account for mandatory supportive services (November NOFO at 67; December NOFO at 75); and 10 points if 100% of its projects require program participants to take part in supportive services (or 5 points if 50% do) (November NOFO at 80; December NOFO at 88-89).

138.    Applicants that use the Housing First approach risk losing 29 points (out of 130 total points) at the Merit Review due to the new Service Requirement Conditions.

*Geographic Discrimination Conditions*

139.    The Merit Criteria preference applicants whose projects are in jurisdictions that have and enforce laws that are consistent with the Administration's policy priorities and that are wholly unrelated to the CoC Program's statutory purposes, including reducing homelessness. (Geographic Discrimination Conditions).

140.    In the "Protecting Public Safety" category of the Merit Review, applicants can

---

[4] In addition to the Merit Review, service requirements are included as part of the "Project Quality Threshold" review. (December NOFO at 64 (2 points for mandatory supportive services and 2 points for demonstrating at least 40 hours per week of such services for each participant for transitional housing); 69 (1 point for mandatory supportive services for permanent supportive housing); 71 (same for rapid rehousing); November NOFO at 56, 61, 62 (same requirements)).

earn thirteen total points if their proposed project will be in a jurisdiction (state, county, city) that prohibits and enforces rules against public illicit drug use and public camping and is in a state that is substantially compliant with the Sex Offender Registry and Notification Act (SORNA) (November NOFO at 86-87; December NOFO at 94-96).

*Law Enforcement Conditions*

141.    The Merit Criteria reward applicants that take steps to work with law enforcement (Law Enforcement Conditions).

142.    Applicants receive points for cooperating with law enforcement in several ways: conducting street outreach projects that "partner with first responders and law enforcement" to get people to accept services or housing (November NOFO at 83; December NOFO at 91-92);[5] assisting in mapping and checking the location of homeless sex offenders "[w]hen asked by law enforcement" (November NOFO at 87; December NOFO at 96); and "[c]ooperat[ing], assist[ing]," and not impeding "law enforcement or co-response to connect violators of public camping or drug use laws with services" (November NOFO at 87; December NOFO at 96). There is no indication Defendants considered how this could compromise relationships and trust among populations who often distrust systems of care.

143.    Under the November NOFO, applicants would also receive additional "preference points" for excluding undocumented immigrants. In particular, even though Congress specifically exempted non-profit charitable organizations from the obligation to verify participants' immigration status when providing federal public benefits, 8 U.S.C. § 1642(d), the Merit Criteria reward applicants with up to four bonus points if all CoC projects that are non-

---

[5] In addition to the Merit Review, law enforcement conditions are included as part of the "Project Quality Threshold" review for street outreach projects. (December NOFO at 66-67; November NOFO at 58-59.

profit charitable organizations "voluntarily, thoroughly, and demonstrably facilitate immigration status verification before distribution of benefits to all recipients" using a federal database, a task that is costly and burdensome for organizations and that could deter even lawfully present individuals from seeking help. (November NOFO at 88).

144.    The Merit Criteria also assign points based on activities prioritized by this Administration—even when those activities could cause trauma, reduce trust, or diminish the overall effectiveness of the program. For instance, CoCs that pursue involuntary commitment or otherwise "utiliz[e] . . . standards that address individuals experiencing homelessness who are a danger to themselves or others" receive additional points. (November NOFO at 86; December NOFO at 95).

145.    The NOFOs also establish, for the first time, a criterion titled "Reduce encampments," which awards 10 points to applicants that reduce the number of people in homeless encampments by "at least 20%." (November NOFO at 81; December NOFO at 89). This unrealistic and arbitrary benchmark, imposed on an extremely compressed timeline, leaves applicants with fewer opportunities to amass points and disadvantages their applications.

### D.  New Unauthorized "Risk Review" Criterion Allows for Inconsistent Application and Punishes Past Conduct

146.    At the next step of the process, HUD will conduct a "Risk Review" to "evaluate each applicant's likelihood of successfully implementing an award." (November NOFO at 89; December NOFO at 97).

147.    The "Risk Review" stage of the FY25 NOFOs includes a new criterion that would allow HUD to evaluate each CoC application and make funding decisions or impose additional conditions based on the applicant's history of conducting lawful activity. Under the November NOFO, HUD stated it would evaluate the applicant's "[h]istory of subsidizing or facilitating

activities that conflict with the purposes of this NOFO." (November NOFO at 89). Under the December NOFO, HUD stated it would evaluate the applicant's "[h]istory of subsidizing or facilitating activities that impede law enforcement related to vagrancy, drug use, or other illicit activities that conflict with the purposes of this NOFO." (December NOFO at 98).

148.    The November NOFO's "Risk Review" criterion disadvantages applicants that successfully carried out their CoC grants in the past because the FY25 NOFOs mark a 180-degree shift on many fronts, meaning that an applicant who successfully performed a prior grant (by following Housing First principles, for example) would be at risk of rejection now because those activities conflict with the FY25 NOFOs' new purposes. This, in turn, conflicts with the statutory goal of stability and continuity.

149.    The December NOFO's "Risk Review" criterion disadvantages applicants based on prior lawful activity. While the December NOFO suggests that "HUD will not penalize a renewal applicant who sufficiently complied with the terms and conditions [of the] FY2024 NOFO that are in direct conflict with those contained herein," (December NOFO at 98), that disclaimer does not eliminate the risk of penalization. Many CoCs and project applicants, independent of the FY24-25 NOFO, have long valued and implemented policies and practices at odds with the FY25 NOFOs, including preventing the criminalization of homelessness that HUD has suggested it would now consider to "impede law enforcement" relating to vagrancy or other laws.

150.    Throughout the FY25 NOFOs, Defendants explicitly wield the Administration's political agenda as a barrier to CoC funding. The inclusion of uncertain Risk Review criteria presents a final opportunity for the Administration to impose its unrelated priorities on Plaintiffs under the guise of a legitimate review. Without standards or metrics to function as guardrails to

these criteria, the Administration will have no trouble wielding its discretion to unfavorably evaluate and further disadvantage Plaintiffs' applications.

## E.  Unlawful Post-Award Conditions

151.    The FY25 NOFOs require successful grantees to agree to award conditions that are the same as or similar to conditions that courts have repeatedly struck down in other contexts, including prior HUD CoC grants. These award conditions (Post-Award Conditions) include:

152.    *Compliance with DEI-Related Conditions.* Awardees must comply with Executive Orders 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) and 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing). Awardees also may not use CoC funds to "subsidize or facilitate racial preferences or other forms of illegal discrimination, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation." (November NOFO at 108; December NOFO at 118). Given the language of those executive orders, awardees reasonably understand this provision to require elimination of all diversity, equity, and inclusion efforts.

153.    *Compliance with an Immigration Condition.* Awardees must comply with Executive Order 14218 (Ending Taxpayer Subsidization of Open Borders), which mandates verifying immigration status and seeks to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation," 90 Fed. Reg. 10581 (Feb. 19, 2025). (November NOFO at 108; December NOFO at 118).

154.    *Compliance with Gender Identity Conditions.* The November NOFO would prohibit awardees from using CoC funds to conduct activities that "rely on or otherwise use a definition of sex as other than binary in humans." (November NOFO at 108.) Both FY25 NOFOs

41

require awardees to comply with the Gender Ideology E.O., which rejects as "false" the notion that "males can identify as and thus become women and vice versa" and purports to require agencies to "ensure grant funds do not promote" this so-called "gender ideology." (*Id.*; December NOFO at 118).

155.    *Compliance with Anti-Abortion Condition.* Awardees must comply with Executive Order 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025) (Enforcing the Hyde Amendment), which bars grant funds from being used to fund or promote elective abortion. (November NOFO at 108; December NOFO at 118).

156.    *Compliance with Anti-Harm Reduction Condition.* Awardees are prohibited from using CoC funds "to fund, promote, encourage, subsidize or facilitate the use of illicit drugs." (November NOFO at 109; December NOFO at 119). The FY25 NOFOs also provide that awards "will not be used to fund any project, *service provider, or organization* that operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'" (November NOFO at 109; December NOFO at 119 (emphasis added)). This suggests HUD is limiting awardees' ability to prevent fatal drug overdoses, including by restricting a "service provider" or "organization" from engaging in certain types of harm reduction efforts even outside the context of their CoC-funded projects.

157.    *Compliance with Anti-Housing First Condition.* Awardees must comply with Executive Order 14321, 90 Fed. Reg. 35817 (July 24, 2025) (Ending Crime and Disorder on America's Streets). That executive order directs the end of "support for 'housing first' policies," *id.* at 35818, and the requirement to "comply with" it seemingly purports to bar grantees from

using a housing first approach. *Id*.

**X.    Plaintiffs and the Communities they Serve Will Suffer Devastating Harm**

158.    HUD's belated rescission and replacement of the FY24-25 NOFO, the unprecedented changes embodied in the FY25 NOFOs, and the rapid timeline in which CoCs and their program applicants must make application decisions in response to the new NOFOs, each individually and collectively will cause devastating harm to Plaintiffs, members of the Plaintiff Associations (the Alliance and NLIHC), and the homeless and formerly homeless individuals and families they serve.

159.    The last-minute rescission and replacement of the FY24-25 NOFO threatens gaps in funding that will cause Plaintiffs harm.

160.    Under the FY24-25 NOFO, HUD would have issued awards in December or January at the latest. Under the November NOFO, HUD would not have made new awards until May 1, 2026, at the earliest; under the December NOFO, it is likely that any new awards would be even more delayed, despite HUD's promises to issue awards by March 31, 2026 (Normal Track) and April 22, 2026 (Extended Track). (December NOFO at 23.) This will leave Plaintiffs, the Plaintiff Associations' members, and participants in the Local Government Plaintiffs' CoCs—some of which have FY24 grants expiring as early as January—without funding for months.

161.    This gap in funding threatens to cause programs to shutter or scale back, as they cannot reasonably expect to find alternative funding on such short notice. And the formerly homeless people those programs serve will lose their homes.

162.    By contrast, if Defendants had retained the FY24-25 NOFO, or even issued a replacement one within the three-month statutory deadline, Plaintiffs, the Associations' members, and participants in the Local Government Plaintiffs' CoCs would not face such

significant gaps.

163.    In addition, HUD represented in the FY24-25 NOFO that projects awarded under the two-year FY24-25 NOFO would be renewed for FY 2025, depending on the appropriation of sufficient funds by Congress (which did occur). Plaintiffs accordingly planned their budgets, entered into contracts, and made staffing decisions in anticipation of those funds. For example, in reliance on the two-year NOFO, and because of obligations required under the County's fiscal year term, Plaintiff Santa Clara County already obligated approximately $1.5 million in now-threatened FY 2025 CoC funding for service provider subcontractors. Plaintiffs must now scramble to respond to HUD's abrupt change of course.

164.    Plaintiffs also face significant harm as a result of the FY25 NOFOs' significant changes, including HUD's dramatic decrease in funding for permanent housing, deprioritization of renewals that have formed the backbone of stable homelessness response systems in communities, and other substantive changes to the review process.

165.    For years, Plaintiffs have relied on CoC funding to provide housing, wrap-around services, and support to individuals and families experiencing chronic homelessness. And if Plaintiffs lose some or all of their CoC funding, they will suddenly and unexpectedly be unable to effectively subsidize housing for program participants unless Plaintiffs can redirect general funds away from other invaluable services and programs—such as public health, public safety, and social services. For the nonprofit Plaintiffs, nearly all of their funding comes through restricted grants and contracts, and they would not be able to use those funds awarded for other programs and services to make up for the loss of the CoC funds.

166.    The FY25 NOFOs' deprioritization of renewals will cause Plaintiffs and their members to lose out on funding they would otherwise receive. Currently, approximately 90

percent of CoC funding supports permanent housing. The FY25 NOFOs' 30 percent permanent housing caps will dramatically decrease the amount CoCs have available to keep their existing permanent housing projects afloat. As a result, programs will be scaled back or cut, program employees will lose their jobs, and vulnerable community members will again lose their homes, straining local temporary housing and shelter systems that are already over capacity.

167.    The abrupt departure from permanent housing also impacts Plaintiffs' current and future investment in property and housing projects. Some local government plaintiffs have made tens of millions of dollars of capital investments in permanent housing projects. Loss of access to CoC funds creates a risk that they will be unable to make loan payments potentially resulting in default and an additional loss of housing units. Similarly, some nonprofit plaintiffs own real estate with restrictions that limit their options for operating housing; as a result, without renewal funding, they will be faced with significant financial jeopardy.

168.    The rapid loss of funding and the resulting program closures will also compromise the goodwill that Plaintiffs have built with the individuals they serve and other partners, and that Local Government Plaintiffs have established with contractual and investment partners. Many permanent housing projects rely on the participation of property owners and landlords, along with other supportive service providers. Imminent default on contractual and rent obligations or uncertainty in future funding makes it difficult to recruit private investment and willing landlord partners in the future.

169.    More critically, agencies that serve individuals experiencing homelessness work hard to develop trusting relationships; severing those relationships and turning people out into the street will undermine those relationships and poison future efforts to help a marginalized population who often distrust systems of care. Compounding this harm, the FY25 NOFOs'

prescriptive requirements—such as mandating treatment or other services, encouraging criminalization of homelessness, and requiring programs to mis-gender the individuals they serve—undermine the trust that is crucial in helping people exit homelessness.

170.    The FY 2025 NOFOs' new selection criteria, certifications, and conditions also threaten Plaintiffs with enormous harm, both by placing them at a major disadvantage in the competitive process of obtaining funds and by forcing them to decide whether to forgo providing critical services in order to avoid being disqualified from the CoC funding process.

171.    The FY25 NOFOs contain unlawful threshold criteria targeting racial equity, gender inclusion, and harm reduction. CoCs and nonprofit providers—including Plaintiffs—face the prospect of being denied funds altogether simply because they have complied with HUD regulations and requirements in the past. This uncertainty imperils the stability of a funding stream that communities have relied on for years.

172.    Even assuming that HUD does not arbitrarily disqualify them, Plaintiffs are faced with an urgent yet untenable choice: either accede to the unlawful and capricious certifications and other conditions of the NOFO, or forgo (collectively) hundreds of millions of dollars in CoC funding for critical permanent housing and connected services, among other programs, that were almost certain to be fully funded for federal FY 2025 under the two-year FY24-25 NOFO and the governing appropriations statute.

173.    The FY25 NOFOs' Merit Review further penalizes many of Plaintiffs' longstanding projects serving persons with substance use disorders and victims of sexual assault and domestic violence, making applicants that operate these programs less competitive.

174.    For example, projects that receive grants under the Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA), including Plaintiff

Crossroads and two projects in Plaintiff Nashville's CoC, cannot require beneficiaries to participate in support services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). Thus, under the FY25 NOFO's Service Requirement Conditions, organizations serving survivors face great disadvantage because they cannot receive the 29 points (of the 130 points available) that are granted to programs that mandate participation in supportive services.

175.     As another example, the FY25 NOFOs penalize projects that serve individuals with mental health disabilities including substance use disorders. Local government-led CoCs face an impossible choice as well: if they include lower-scoring projects in their application, they risk disadvantaging their application and reducing the size of their award, but omitting these projects would exclude critical services from the continuum. And if service providers agree to prioritize services on the basis of type of disability, in order to have a competitive advantage under the FY25 NOFO, they could face potential claims under local, state and federal disability civil rights laws, including HUD's own Section 504 regulations.

176.     Finally, the compressed timeline for responding to the FY25 NOFOs further exacerbates Plaintiffs' impending injury.

177.     Many local government Plaintiffs and members of the Plaintiff Associations are responsible for conducting the local competitions for CoC funding. These competitions normally require months of preparation. But due to the unexpected rescission of the FY24-25 NOFO and issuance of new NOFOs, they face a Herculean task: they must divert resources to conduct competitive review processes on a compressed timeline (in the absence of the court's injunction) and while preparing for and providing emergency cold weather services. Further, they must implement dramatically changed criteria that will wholly reshape the nature of the services the

CoCs provide, and that will disqualify or dissuade experienced partners from applying, and under wholly unrealistic timeframes. The CoCs will lose the benefit of those partnerships, and the stability of the services they offer will be compromised.

178.    For example, Plaintiff Crossroads, the largest homeless service provider in the state of Rhode Island, would face an imminent deadline to submit an application for funds that its organization and clients desperately need.[6] However, this new NOFO presents Crossroads with an impossible choice: to either (1) attempt to comply with the new requirements and preferences and betray its mission, abandon the clients it serves, jeopardize compliance with professional ethical standards, and face enormous risks of litigation and government inquiry under the False Claims Act and state and federal civil rights laws, or (2) forgo applying for or accepting HUD CoC awards and face devastating consequences by cutting off supportive services and rental assistance to hundreds of households across the state. Without the renewal funds, financially insecure residents who are now stably housed will be responsible for paying 100% of the rental cost, which is not feasible, and will result in returns to homelessness.

179.    As another example, Plaintiff Youth Pride provides housing assistance with CoC funds specifically designed to meet the unique needs of LGBTQ+ youth ages 18-24, many of whom have been rejected by their families, face discrimination in accessing mainstream services, and need affirming support to heal from trauma. Youth Pride had been anticipating its grant would be renewed, but now would have to apply by an imminent deadline. If Youth Pride were to apply for and accept funding under these new conditions, it could be forced to cease using

---

[6] HUD acknowledges that the December NOFO, including the deadlines set therein, are currently stayed and their enforcement enjoined pending further order of this Court. *See* (December NOFO at 5-6). HUD anticipates "provid[ing] further notice as to when the application portal will open" should the NOFO be permitted to go into effect. *Id.*

preferred names and chosen pronouns, stop operating its support group for transgender and non-binary youth, and potentially terminate transgender and non-binary staff members or ask them to hide their identities to comply with the Gender Ideology E.O. incorporated into the FY25 NOFOs' Post-Award Conditions. Youth Pride could have to fundamentally change its identity, abandon its mission, and betray the vulnerable youth it serves. Yet if Youth Pride forgoes applying for CoC funds, the critical housing assistance that Youth Pride provides would end, leaving some of Rhode Island's most vulnerable youth homeless without support.

**CLAIMS FOR RELIEF**

**Count 1:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Contrary to Law and In Excess of Statutory Authority**
**Rescission and Replacement of FY24-25 NOFO**

180.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

181.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

182.    An agency action is reviewable under the APA if it is a final agency action. *Id.* § 704.

183.    The rescission and replacement of the FY24-25 NOFO is a final agency action subject to review under the APA.

184.    By statute, HUD "shall release" a NOFO for grants for a particular fiscal year "not later than 3 months" after the enactment of the act making the appropriation. 42 U.S.C. § 11382(b). Thus, once HUD has lawfully issued a NOFO for a fiscal year's funding, it cannot rescind and replace that NOFO more than three months after Congress appropriates the relevant

funding.

185.    Defendants did not issue the FY25 NOFOs replacing the FY24-25 NOFO for fiscal year 2025 funds until November 13, 2025, and December 19, 2025—eight and nine months, respectively, after Congress appropriated the relevant funding.

186.    The rescission and replacement of the FY24-25 NOFO must be declared unlawful and set aside as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

### Count 2:
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious
### Rescission and Replacement of FY24-25 NOFO

187.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

188.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

189.    The rescission and replacement of the FY24-25 NOFO was arbitrary and capricious.

190.    Defendants provided no reasoned explanation for their decision to rescind and replace the FY24-25 NOFO at such a late date.

191.    Defendants failed to consider important aspects of the problem, including the delay in awarding appropriated funds, the inefficiencies and administrative burdens rescission and reissuance create, and the gaps in funding—and resulting disruption in services for individuals and families experiencing homelessness—that the belated rescission and replacement will cause.

192.    Defendants failed to consider applicants' reasonable reliance on the FY24-25 NOFO and the reliance interests of the communities that grantees serve.

193.    The rescission and replacement of the FY24-25 NOFO must be declared unlawful and set aside as "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

**Count 3:**
**Administrative Procedure Act, 5 U.S.C. § 706(1)**
**Agency Action Unlawfully Withheld and Unreasonably Delayed**

194.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

195.    The APA provides that a court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

196.    By statute, Defendants "shall award grants" under the CoC Program. 42 U.S.C. § 11382(a); *see also id.* § 11386a(a) (providing that HUD "shall award funds to recipients through a national competition between geographic areas").

197.    The statute provides timelines for HUD to accomplish this.

198.    Those timelines include a requirement that Defendants "shall release a notification of funding availability" for CoC program grants for a given fiscal year "not later than 3 months after the date of the enactment" of the act appropriating funds for HUD for that fiscal year. 42 U.S.C. § 11382(b).

199.    The statute also includes a requirement that HUD "shall announce … the grants conditionally awarded" for a fiscal year "within 5 months after the last date for the submission of applications" for that fiscal year. 42 U.S.C. § 11382(c)(2)(A).

200.    HUD issued a NOFO for Fiscal Years 2024 and 2025 in July 2024. As explained in Counts 1 and 2 above, that NOFO can be the only valid NOFO for FY 2025 because it is too late for HUD to issue a replacement NOFO. HUD is therefore required by statute to make FY 2025 awards under the FY24-25 NOFO.

201.    The FY24-25 NOFO established August 29, 2025, as the last date for the

submission of applications for FY 2025.

202.   By statute, then, HUD must announce conditional awards by January 29, 2026.

203.   HUD has made clear that, absent an order by a court, it does not intend to announce conditional awards under the FY24-25 NOFO by that deadline, or ever. It has likewise made clear that, absent a court order, it does not intend to make final awards under the FY24-25 NOFO. HUD has also failed to provide applicants a means by which to submit applications by the August 29, 2025 deadline, where necessary. While applicants who received FY 2024 awards need not submit another application to renew those same awards in FY 2025, applicants would need to submit another application for other awards.

204.   Defendants have nondiscretionary duties to make awards under the FY24-25 NOFO, including by accepting applications, making conditional awards, and following further steps to finalize awards in accordance with the statute, 42 U.S.C. § 11382.

205.   Defendants have violated their nondiscretionary duty to accept applications by the August 29, 2025, deadline and to make conditional awards by January 29, 2026. They therefore have unlawfully withheld agency action.

206.   Defendants have also unreasonably delayed the award of funding by failing to take the necessary steps, including allowing applicants to submit applications (where necessary), processing renewals where no application is needed, and announcing conditional awards.

207.   The Court should thus compel Defendants to award FY 2025 funding for the CoC Program expeditiously pursuant to the FY24-25 NOFO.

**Count 4:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**In Excess of Statutory Authority**
**FY25 NOFOs**

208.   Plaintiffs re-allege and incorporate the above as if set forth fully herein.

209. The APA provides that a court "shall" "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

210. The issuance of the FY25 NOFOs is final agency action subject to review under the APA.

211. Defendants lack statutory authority to impose the FY25 NOFOs' Permanent Housing Caps, New Project Earmark, Review Criteria, or Post-Award Conditions. Neither HUD's organic statute nor the statutes authorizing the CoC program allow the agency to impose these requirements.

212. Defendants also lack authority to adopt the Retroactive Reservations for the additional reason that an agency may not retroactively attach new consequences to past conduct without authorization by Congress, and Congress has not granted any such authorization.

213. The FY25 NOFOs must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**Count 5:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Contrary to Law**
**FY25 NOFOs**

214. Plaintiffs re-allege and incorporate the above as if set forth fully herein.

215. The APA provides that a court "shall" "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2).

216. The FY25 NOFOs are contrary to various statutes and regulations.

217. ***Defunding and Destabilization of Permanent Housing***. The Permanent Housing Caps and New Project Earmark—which defund and destabilize permanent housing—are contrary to the Homeless Assistance Act, as amended by the HEARTH Act, including but not limited to

the following provisions:

    a.   42 U.S.C. § 11386b(d), which permits HUD to provide incentives only for activities proven effective at combatting homelessness, because the NOFOs effectively defund the types of projects Congress has determined are proven effective strategies for addressing homelessness, while incentivizing other, unproven projects that HUD lacks authority to incentivize;

    b.   42 U.S.C. § 11386c(b), which (1) provides that funds appropriated for the CoC program "shall be available for the renewal of contracts" for permanent housing, because the NOFOs ensure that a large portion of funding will not be available for the renewal of permanent housing contracts, and (2) requires HUD to decide whether to renew permanent housing awards based on two enumerated factors, because the NOFOs ensure that HUD will make the decision whether to renew permanent housing projects based on other, unpermitted factors; and

    c.   For the November NOFO's Permanent Housing Cap, 42 U.S.C. § 11386b(a)(1) and (b)'s statutory minimum funding levels for certain types of permanent housing because it makes it virtually impossible that HUD would be able to meet the statutory minimums.

218. ***Service Requirements Conditions***. The Service Requirements that advantage projects that mandate treatment are contrary to the Homeless Assistance Act's instruction to provide services and treatment where appropriate as complement to housing placement, not a precondition to housing. *See* 42 U.S.C. § 11385(a); 42 U.S.C. § 11386a(b)(1)(F).

219. ***Disability Condition***. The Disability Condition, which rewards applicants that deprioritize individuals with substance use disorders and mental and emotional impairments (in

the November FY25 NOFO) and forces service providers to treat people differently on the basis of disability in transitional housing (in both FY25 NOFOs), contradicts the broad and inclusive definitions of disability in the Homeless Assistance Act and HUD regulations. 42 U.S.C. § 11360(10)(A)(i)(IV) (including mental/emotional impairments and substance use disorders in definition of "homeless individual with a disability"); 24 C.F.R. § 578.3. Likewise, these disability preferences are contrary to the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, 12181–12189, Rehabilitation Act of 1973, Pub. L. No. 93-112, § 504, 87 Stat. 355, 361 (Sept. 26, 1973), 29 U.S.C. § 794, and HUD's Section 504 regulations, 24 C.F.R. § 8.4(b) (federally-assisted activities), 24 C.F.R. § 9.130(b)(1)(ii) (federally-conducted activities) (prohibiting discrimination and unequal access on the basis of disability).

220.    ***Geographic Discrimination Conditions***. The Geographic Discrimination Conditions are contrary to 42 U.S.C. § 12711, which prohibits HUD from "establish[ing] any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law," so long as the policy or law was within the jurisdiction's authority and does not violate federal law.

221.    ***Gender Identity Reservation and Conditions***. The Gender Identity Reservation (in the November NOFO) and Conditions (in both FY25 NOFOs) also violate HUD's own Equal Access regulation as well as Title VII and other laws barring discrimination on the basis of gender identity.

222.    The FY25 NOFOs must be declared unlawful and set aside as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

**Count 6:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Arbitrary & Capricious**
**FY25 NOFOs**

223.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

224.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

225.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

226.    HUD has provided no reasonable explanation for imposing the Challenged Provisions.

227.    HUD has also entirely failed to consider important aspects of the problem when adopting these provisions. Among its many errors, it failed to consider how the decision to defund Permanent Housing, and especially renewals of existing permanent housing projects, would lead to a catastrophic increase in homelessness. It also failed to consider how the other provisions would exclude or deter people experiencing homelessness from accessing housing.

228.    HUD failed to provide a rational explanation for its departure from the proven strategies that reduce homelessness to the punitive and untested practices in the Challenged

Provisions that do not advance the CoC Program's statutory purposes.

229.    HUD also failed to account for the consequences of increased homelessness and associated human suffering and increased urgent demand for social services caused by the FY25 NOFOs and the Challenged Provisions on impacted communities, including Plaintiff local governments.

230.    HUD also failed to consider or explain how the Challenged Provisions are consistent with the purposes of the CoC Program authorized by Congress. For example, it failed to explain the decision to impose unrelated Administration policy preferences related to DEI, gender ideology, and immigration, on a program designed to reduce homelessness.

231.    HUD failed to consider or explain its decision to adopt provisions that punish applicants for past compliance with policies that it previously required or encouraged.

232.    HUD failed to articulate a rational justification for, or consider the impact of, its abandonment of proven policies like supporting stable, permanent housing without conditions, or for imposing new restrictions on grantees, like forgoing all "harm reduction" activities.

233.    Numerous Challenged Provisions violate or are in tension with HUD regulations or other binding requirements, such as the Equal Access Rule, other prohibitions on gender identity discrimination, the prohibition on discrimination based on disability, and provisions of the Violence Against Women Act and Family Violence Prevention Services Act barring grantees from imposing service requirements as a condition of providing housing.

234.    HUD similarly did not consider how the Law Enforcement Conditions and points for rapid encampment reduction undermined the CoC Program's purpose of "minimizing the trauma and dislocation" when rehousing homeless individuals. *See* 24 C.F.R. § 578.1(b)(2).

235.    And HUD ignored entirely the substantial reliance interests of CoC applicants,

including Plaintiffs and their members, and the communities they serve in departing from the FY24-25 NOFO's anticipated two-year award cycle, reliance interests in the expectation of renewal of ongoing permanent housing programs, the reliance interests of people living in permanent housing whose homes will be lost, the reliance interests of programs organized to provide services to their communities through a Housing First model, and the reliance interests of people in those communities that have benefited from CoC services, but will now be excluded or deterred.

236. The FY25 NOFOs must be declared unlawful and set aside as "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

**Count 7:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Not in Observance of Procedure Required by Law**
**FY25 NOFOs**

237. Plaintiffs re-allege and incorporate the above as if set forth fully herein.

238. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

239. The requirement to observe procedure "required by law" includes not just procedures required by governing statutes, but also procedures required by the agency's own regulations. *Id.*

240. The FY25 NOFOs' dramatic restructuring of the CoC Program constitutes a substantive rule, but Defendants did not comply with the notice-and-comment requirements set forth in HUD's own regulations, and thus failed to observe procedures required by law, 24 C.F.R. § 10.1. Defendants also did not comply with the requirement to engage in notice and comment before identifying new activities—other than the types of permanent housing Congress identified—that HUD could incentivize.

241.    Congress empowered Defendants to provide bonuses or other incentives for using CoC funding for activities that have been proven to be effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals for families with children and youth. 42 U.S.C. § 11386b(d); *see also id.* § 11386a(b)(1)(F). Congress identified two specific permanent housing strategies as activities that have been proven effective and that therefore could be covered by bonuses or incentives. *Id.* § 11386b(d)(2). Congress also authorized Defendants to provide bonuses for other activities, but only if Defendants made a determination—"based on research and after notice and comment to the public"—that any such activity had been proven effective. *Id.* § 11386b(d)(2)(C). But Defendants have not done so.

242.    The FY25 NOFOs provide bonuses and incentives for various activities— including by providing points for mandating that participants take part in supportive services, for partnering with first responders and law enforcement, for being based in a jurisdiction that has adopted and enforces the Administration's preferred homelessness policies and that substantially implements SORNA, for supporting involuntary commitment and similar strategies, and for verifying participants' immigration status. But Defendants never determined that those activities were effective based on research and after notice and comment to the public. Defendants therefore failed to follow required procedures in providing bonuses and incentives without making such a determination or undertaking notice and comment.

243.    The FY25 NOFOs must be declared unlawful and set aside as "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

**Count 8:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Contrary to the Constitution**
**FY25 NOFOs**

244.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

245.    Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

246.    As described in counts 9-11, the FY25 NOFOs violates bedrock constitutional provisions and principles, including the separation of powers between the President and Congress, the Spending Clause, and the First Amendment.

247.    The FY25 NOFOs must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B).

**Count 9:**
**Violation of Separation of Powers**
**FY25 NOFOs**

248.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

249.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution, including the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

250.    The Constitution vests Congress—not the Executive—with legislative powers, U.S. Const. art. 1, § 1, the spending power, U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

251.    The Constitution exclusively grants the power of the purse to Congress, not the President.

252.     Neither the President nor an executive agency can enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998); *see* U.S. Const. art. I, § 7, cl. 2.

253.     Congress has not authorized Defendants to impose the Permanent Housing Caps, New Project Earmark, Review Criteria, or Post-Award Conditions.

254.     By imposing these conditions on grant recipients, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

255.     For these reasons, the FY25 NOFOs violate the separation of powers doctrine.

## Count 10:
### Violation of Spending Clause
### FY25 NOFOs

256.     Plaintiffs re-allege and incorporate the above as if set forth fully herein.

257.     The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

258.     As described above, the FY25 NOFOs violate the separation of powers because the Permanent Housing Caps, New Project Earmark, Review Criteria, and Post-Award Conditions are neither expressly nor impliedly authorized by Congress. For the same reasons, the FY25 NOFOs violate the Spending Clause.

259.     The Spending Clause also requires recipients to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

260.     Moreover, funding restrictions may only impose conditions that are reasonably

related to the federal interest in the project and the project's objectives. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

261.    Even if Congress had delegated authority to the Executive and HUD to adopt the Challenged Provisions, such exercise of authority would violate the Spending Clause by:

> a.  imposing conditions that are ambiguous, including conditions that refer to "Gender Ideology," engaging in "illegal discrimination," engaging in "harm reduction" by the "project" or "project applicant"; that look to whether localities have and enforce ill-defined policies; and that purport to require grantees to comply with executive orders directed to federal agencies;

> b.  imposing conditions that are not germane to the stated purpose of grant program funds; and

> c.  with respect to the Gender Identity Conditions and Reservation, imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex.

### Count 11:
### First Amendment – Free Speech Clause
### FY25 NOFOs Gender Identity Conditions and Reservation

262.    Plaintiffs re-allege and incorporate the above as if set forth fully herein. This count is asserted on behalf of Plaintiffs the Alliance, NLIHC, Crossroads, Youth Pride, and Plaintiff Associations' members.

263.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491 n.2.

264.    The First Amendment to the United States Constitution provides that the

government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

265.    While the government may in some circumstances attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). The government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). In addition, even in providing what recipients may do with government funding, "the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). And where the government imposes a funding condition "not relevant to the objectives of the program," that can violate the First Amendment. *See All. for Open Soc'y*, 570 U.S. at 214.

266.    The Gender Identity Conditions and Reservation in the November NOFO, and the Gender Identity Condition in the December NOFO, run afoul of those limits.

267.    The Gender Identity Conditions and Reservation disadvantage applicants based on viewpoint by threatening to reject any applicant that has used or uses "a definition of sex other than as binary in humans"—that is, applicants who express a viewpoint that the Administration disfavors. This curtails applicants' speech outside the scope of the federally funded program and punishes applicants based on that speech.

268.    Even when grantees are performing a funded project, the Gender Identity Conditions and Reservation restrict speech outside the scope of the funded program because they require grantees to adopt the government's view because there is no way to avoid the topic during day-to-day interactions with people.

269.    The Gender Identity Conditions and Reservation are designed to suppress ideas

that the Administration deems dangerous—namely, that sex is not "binary in humans." The censorious purpose of these funding criteria render them unconstitutional in violation of the First Amendment.

270.    The Gender Identity Conditions and Reservation also have no relevance to the CoC program's purposes of addressing homelessness, but rather aim at the suppression of an idea with which the Administration disagrees. That censorious purpose and lack of relation to the objectives of the CoC program additionally render it unconstitutional under the First Amendment.

271.    No compelling government interest justifies Defendants' viewpoint-based targeting of speech, and the Gender Identity Conditions and Reservation are not the least restrictive means available to advance whatever interest the criteria serve.

272.    The Gender Identity Conditions and Reservation violate the First Amendment rights of the nonprofit Plaintiffs, including the Association Plaintiffs and their members, and Defendants must be enjoined from enforcing or implementing them.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A. Declare unlawful, vacate, and set aside the rescission and replacement of the FY24-25 NOFO;

B. Declare unlawful, vacate, and set aside both FY25 NOFOs;

C. Stay the rescission and replacement of the FY24-25 NOFO pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the proceedings;

D. Enter a preliminary injunction requiring Defendants, their agents, and all persons acting

in concert or participation with Defendants to expeditiously take the steps necessary to process eligible renewals for FY 2025 funding under the FY24-25 NOFO in preparation for ultimate awards;

E.  Enter an order requiring Defendants to make FY 2025 awards pursuant to the FY24-25 NOFO;

F.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing or implementing the FY25 NOFOs' Challenged Provisions, or any substantively similar criteria or conditions, on any future HUD CoC competitions or awards in any manner, including by requiring applicants to meet the criteria to be considered for an award or to receive an award, by considering those criteria in selecting awardees, or by requiring grantees to comply with such criteria or conditions upon obtaining an award;

G.  Preliminarily and permanently enjoin Defendants from retaliating against any Plaintiff or member of the Plaintiff associations for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or Plaintiff's member; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; and refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment;

H.  Award Plaintiffs reasonable costs and attorneys' fees; and

I.  Grant any other relief that the Court deems fit and proper.

January 14, 2026

Respectfully submitted,

AMY R. ROMERO
  (RI Bar No. 8262)
KEVIN LOVE HUBBARD +
  (MA Bar No. 704772)
DELUCA, WEIZENBAUM,
  BARRY & REVENS, LTD.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
  Lawyers' Committee for RI

*Counsel for All Plaintiffs*


TONY LOPRESTI +
  (CA Bar No. 289269)
COUNTY COUNSEL
KAVITA NARAYAN +
  (CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
  (CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
STEFANIE WILSON +
  (CA Bar No. 314899)
DEPUTY COUNTY COUNSEL
LEILY ARZY +
  (CA Bar No. 364187)
LITIGATION FELLOW
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of
Santa Clara*

/s/ Aleshadye Getachew
ALESHADYE GETACHEW +
  (DC Bar No. 1007161)
MADELINE H. GITOMER +
  (DC Bar No. 1023447)
KRISTIN BATEMAN +
  (DC Bar No. 90037068)
AMAN T. GEORGE +
  (DC Bar No. 1028446)
SIMON C. BREWER +
  (CT Bar No. 441889)*
CHRISTINE L. COOGLE +
  (DC Bar No. 1738913)
YENISEY RODRÍGUEZ +
  (DC Bar No. 1600574)
CARRIE Y. FLAXMAN +
  (DC Bar No. 458681)
ROBIN THURSTON +
  (DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
agetachew@democracyforward.org
mgitomer@democracyforward.org
kbateman@democracyforward.org
ageorge@democracyforward.org
sbrewer@democracyforward.org
ccoogle@democracyforward.org
yenisey.rodriguez@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and Youth
Pride, Inc.*

DAVID CHIU +
  (CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
  (CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
  (CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY
SARA J. EISENBERG +
  (CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE
  LITIGATION
RONALD H. LEE +
  (CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND
  AFFIRMATIVE LITIGATION
MICHAEL LEVIN GESUNDHEIT +
  (CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org

*Counsel for Plaintiff City and County
of San Francisco*


WALLACE W. DIETZ +
  (TN BPR No. 009949)
DIRECTOR OF LAW
JOHN K. WHITAKER +
  (TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
  (TN BPR No. 041470)
ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219


LYNETTE LABINGER +
  (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
  ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and Youth
Pride, Inc.*


ANTONIA K. FASANELLI +
  (DC Bar No. 481856)
KATHRYN M. SCOTT +
  (WA Bar No. 38978)*
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

*Counsel for Plaintiffs National Alliance to
End Homelessness and National Low Income
Housing Coalition*


TOBY MERRILL +
  (MA Bar No. 601071)
CASSANDRA CRAWFORD +
  (NC Bar No. 45396)
GRAHAM PROVOST +
  (DC Bar No. 1780222)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org

(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

DAVID J. HACKETT +
  (WA Bar No. 21236)
GENERAL COUNSEL TO KING COUNTY
  EXECUTIVE AND SPECIAL DEPUTY
  PROSECUTOR
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

+ Admitted pro hac vice
^ Not admitted in the District of Columbia. Practice supervised by members of the DC bar.