# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*, <br><br>    *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*, <br><br>    *Defendants*. | Case No. 1:25-cv-636-MSM-AEM |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.    Legal Background .................................................................................................... 3

    A.    The Continuum of Care Program ................................................................. 3

        1.    Statutory priorities of the CoC program ......................................... 4

        2.    Statutory and regulatory provisions governing the CoC program ............ 8

    B.    HUD's Administration of the CoC Program Consistent with Statutory Priorities and Evidence-Based Strategies ......................................... 10

    C.    Two-Year NOFO for FY 2024 and FY 2025 ........................................... 14

II.    Defendants' Rescission and Replacement of the FY24-25 NOFO ...................... 15

III.    The FY25 NOFOs and the Challenged Provisions ............................................. 16

    A.    Structural Provisions ................................................................................. 17

    B.    Review Criteria ......................................................................................... 18

    C.    Post-Award Conditions ............................................................................. 23

IV.    Plaintiffs Suffer Harm Due to Defendants' Unlawful Actions ........................... 25

V.    Procedural History ............................................................................................... 28

LEGAL STANDARD ...................................................................................................... 29

ARGUMENT ................................................................................................................... 29

I.    The Rescission of the FY24-25 NOFO Violates the APA ................................. 29

    A.    The Rescission Must Be Set Aside Under Section 706(2) of the APA ............. 29

        1.    The rescission is final agency action ............................................. 30

        2.    The rescission is not committed to agency discretion by law ................... 31

        3.    The rescission is contrary to law and exceeds Defendants' authority ........................................................................................ 33

        4.    The rescission is arbitrary and capricious ..................................... 35

    B.    The Court Should Compel Defendants Under Section 706(1) of the APA to Award FY 2025 Funding Under the FY24-25 NOFO ...................................... 38

    C.    The Proper Remedies Are Vacatur of the Rescission and An Order Compelling Defendants to Make Awards Promptly ............................................. 44

        1.    The Court should set aside the rescission of the FY24-25 NOFO under 5 U.S.C. § 706(2) ................................................................. 44

        2.    The Court should compel Defendants to make FY 2025 awards promptly under the FY24-25 NOFO under 5 U.S.C. § 706(1) ................ 45

II.    The FY25 NOFOs Are Unlawful ....................................................................... 48

A.     The FY25 NOFOs Violate the APA ............................................................. 49

    1.     The FY25 NOFOs exceed Defendants' authority...................................... 49

    2.     The Challenged Provisions are contrary to law ....................................... 51

          a.     Destabilization of Permanent Housing ........................................... 51

          b.     Disability Conditions ..................................................................... 53

          c.     Geographic Discrimination Conditions .......................................... 53

          d.     Gender Identity Reservation and Conditions................................. 54

    3.     The FY25 NOFOs are arbitrary and capricious......................................... 55

          a.     Destabilization of Permanent Housing ........................................... 56

          b.     Review Criteria ............................................................................... 58

          c.     Post-Award Conditions ................................................................... 68

    4.     The FY25 NOFOs were unlawfully issued without notice and comment...................................................................................................... 71

B.     The FY25 NOFOs Are Unconstitutional .................................................. 72

    1.     The Gender Identity Conditions and Reservation violate the First Amendment............................................................................................... 72

    2.     The FY25 NOFOs violate the separation of powers and the Spending Clause...................................................................................... 74

C.     The Proper Remedies Are Vacatur of the FY25 NOFOs and An Injunction Against the Challenged Provisions ......................................................... 75

    1.     The Court should set aside the FY25 NOFOs .......................................... 75

    2.     The Court should grant injunctive relief to bar Defendants from reimposing the unlawful Challenged Provisions in any FY 2025 NOFO....................................................................................................... 75

CONCLUSION...................................................................................................... 78

# TABLE OF AUTHORITIES

*Cases*

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) .................................................................................. 72, 73

*Ahadian v. Rubio*,
   12168, No. 24-cv-12168, 2025 WL 1617224 (D. Mass. June 6, 2025) .......................... 39

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ........................................................................ 40

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   594 U.S. 758 (2021) ...................................................................................... 77

*Am. Acad. of Pediatrics v. FDA*,
   330 F. Supp. 3d 657 (D. Mass. 2018) ................................................................. 42

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003) ...................................................................................... 34

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................... 30

*Biden v. Texas*,
   597 U.S. 785 (2022) ...................................................................................... 55

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016) ............................................................................. 29

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) ................................................................................. 54, 70

*Boston Chapter, NAACP, Inc. v. Beecher*,
   371 F. Supp. 507 (D. Mass. 1974) ..................................................................... 77

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ...................................................................................... 51

*California v. U.S. DOT*,
   No. 25-cv-208-JJM-PAS, 2025 WL 3072541 (D.R.I. Nov. 4, 2025) ...................... 44, 75

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024), *cert. dismissed*, 2025 WL 3120404 (U.S. Aug.
   12, 2025) .................................................................................................... 77

*Castaneda v. Souza,*
    810 F.3d 15 (1st Cir. 2015) ................................................................ 34

*Chamber of Com. of U.S.A. v. CFPB,*
    691 F. Supp. 3d 730 (E.D. Tex. 2023), *appeal dismissed*, 2025 WL 1304573
    (5th Cir. May 1, 2025) ...................................................................... 76

*City & Cnty. of San Francisco v. Trump,*
    No. 25-cv-01350-WHO, 2025 WL 2426858, (N.D. Cal. Aug. 22, 2025) ...................... 69

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) .......................................................................... 49

*City of Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020) ......................................................... 44, 74

*City of Providence v. Barr,*
    954 F.3d 23 (1st Cir. 2020) ................................................................ 49

*Comm. For Fairness v. Kemp,*
    791 F. Supp. 888 (D.D.C. 1992) ............................................................ 71

*Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.,*
    603 U.S. 799 (2024) .......................................................................... 44

*County of Santa Clara v. Noem,*
    2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ................................................ 67

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) .......................................................................... 31

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ............................................................... 37, 55, 71

*Dolan v. United States,*
    560 U.S. 605 (2010) .......................................................................... 33

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) .......................................................................... 77

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) .......................................................................... 57

*FBI v. Fikre,*
    601 U.S. 234 (2024) .......................................................................... 49

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................ 35

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................................................ 59

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
   112 F.4th 507 (8th Cir. 2024) ............................................................................. 76

*Forest Guardians v. Babbitt*,
   174 F.3d 1178 (10th Cir. 1999) ............................................................... 39, 40, 42

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ............................................................................................ 72

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ............................................................................ 55

*Harrington v. Chao*,
   280 F.3d 50 (1st Cir. 2002) ................................................................................. 44

*Keystone-Conemaugh Projects LLC v. U.S. EPA*,
   100 F.4th 434 (3d Cir. 2024) .............................................................................. 48

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................................ 32

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ............................................................................................ 33

*Martin Luther King, Jr. County v. Turner*,
   785 F. Supp. 3d 863 (W.D. Wash. 2025) .................................................. 35, 50, 68

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................................ 76

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*,
   554 U.S. 527 (2008) ............................................................................................ 45

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................................... *passim*

*Multnomah Cnty. v. Azar*,
   340 F. Supp. 3d 1046 (D. Or. 2018) .................................................................... 31

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) ............................................................................ 41

*NEA v. Finley*,
    524 U.S. 569 (1998) ..................................................................................... 72

*New York v. Trump*,
    133 F.4th 51 (1st Cir. 2025) .......................................................................... 30

*Nielsen v. Preap*,
    586 U.S. 392 (2019) ..................................................................................... 33

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................... 77

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) .................................................................................. 39, 41

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023) ......................................................................... 77

*Ohio v. EPA*,
    603 U.S. 279 (2024) ................................................................................ 35, 55

*Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*,
    734 F.3d 28 (1st Cir. 2013) ........................................................................... 77

*Pennhurst State School and Hosp. v. Halderman*,
    451 U.S. 1, 17 (1981) .................................................................................... 74

*Planned Parenthood of NYC, Inc. v. HHS*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) ........................................................... 31

*R.I. Coal. Against Domestic Violence v. Bondi*,
    794 F. Supp. 3d 58 (D.R.I. 2025) ................................................................. 63

*R.I. Coal. Against Domestic Violence v. Kennedy*,
    2025 No. 25-cv-342-MRD-PAS, 2025 WL 2988705
    (D.R.I. Oct. 23, 2025) .............................................................................. 68, 72

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
    800 F. Supp. 3d 351, 373 (D.R.I. 2025), *appeal filed*, No. 25-2113 (1st Cir.
    Nov. 17, 2025) ............................................................................................. 63

*Ramirez v. ICE*,
    471 F. Supp. 3d 88 (D.D.C. 2020) ................................................................ 39

*Rhode Island v. Trump*,
    No. 1:25-cv-128, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) ......................... 40

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ........................................................................... 73

*S.F. AIDS Found. v. Trump*,
    786 F. Supp. 3d 1184 (N.D. Cal. 2025) ................................... 72, 73 73

*Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*,
    977 F.3d 69 (1st Cir. 2020) ............................................................... 29

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ....................................................... 32, 78

*South Carolina v. United States*,
    907 F.3d 742 (4th Cir. 2018) ....................................................... 42, 45

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ....................................................................... 74, 75

*Telecommunications Research and Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ....................................................... 42, 43

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmty. Project, Inc.*,
    576 U.S. 519 (2015) ........................................................................... 54

*Texas v. Cardona*,
    743 F. Supp. 3d 824 (N.D. Tex. 2024) ............................................ 76

*Towns of Wellesley, Concord & Norwood, Mass. v. FERC*,
    829 F.2d 275 (1st Cir. 1987) ............................................................. 42

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ............................................................................. 34

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ....................................................... 44

*Viscito v. Nat'l Plan. Corp.*,
    34 F.4th 78 (1st Cir. 2022) ............................................................... 29

*Webster v. Doe*,
    486 U.S. 592 (1988) ..................................................................... 31, 32

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ........................................................................... 49

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    778 F. Supp. 3d 440 (D.R.I. 2025).............................................................. 35, 63

**Federal Statutes**

5 U.S.C.
    § 553 .......................................................................................................... 71, 72
    § 701 .............................................................................................................. 32
    § 703 .............................................................................................................. 75
    § 706 .................................................................................................... *passim*

24 U.S.C.
    § 578.17(b) ...................................................................................................... 7
    § 11313(a)(12) .............................................................................................. 65

28 U.S.C.
    § 794 .............................................................................................................. 53

34 U.S.C.
    § 12351(b)(3) ............................................................................................ 13, 61

42 U.S.C.
    § 2000e–2(a)(1) ............................................................................................ 54
    § 3604(a) ...................................................................................................... 54
    § 10408(d)(2) ............................................................................................ 13, 61
    § 11301 .......................................................................................................... 4
    § 11360 ........................................................................................ 4, 8, 10, 53
    § 11382 .................................................... 6, 8, 15, 32, 33, 39, 40, 40, 46, 48
    § 11383 .......................................................................................................... 4
    § 11386 ........................................................................................ 32, 50, 52
    § 11386a .................................................................................... 7, 8, 50
    § 11386b ................................................................ 5, 6, 10, 17, 50, 52, 53
    § 11386c ................................................................................ 6, 51, 52
    § 12131-12134 ............................................................................................ 53
    § 12711 .................................................................................................... 9, 54

Consolidated Appropriations Act 2024,
    Pub. L. No. 118-42, 138 Stat. 25 (2024) ........................................ 5, 6, 14, 40

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 (2025) .............................................. 5, 7, 33, 40

Further Consolidated Appropriations Act, 2024
    Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) .................................... 24

Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act.
    Pub. L. No. 111-22, §§ 1301-1306, 123 Stat. 1632 (2009) ........................ 4

McKinney-Vento Homeless Assistance Act
    Pub. L. No. 100-77, 101 Stat. 482 (1987) ............................................................................ 4

Prevent Mortgage Foreclosures and Enhance Mortgage Credit,
    Pub. L. No. 111-22, § 1002, 123 Stat. 1632 (2009) ...................................................... 4, 7

*Federal Regulations*

24 C.F.R.
    § 5.106 ................................................................................................................. 10, 54, 70
    § 8.3 .......................................................................................................................... 10, 53
    § 8.4(b)(1)(ii) .................................................................................................................. 53
    § 10.1 ....................................................................................................................... 10, 71
    § 578.1 ............................................................................................................................ 53
    § 578.3 ................................................................................................................. 5, 10, 53
    § 578.7 .............................................................................................................................. 7
    § 578.9 ............................................................................................................................. 8
    § 578.17(a)(3) ................................................................................................................... 7

*State Statutes*

California
Cal. Gov't Code § 12955(a) ..................................................................................................... 70

*State Regulations*

Cal. Welf. & Inst. Code § 8256 .............................................................................................. 61

Cal. Welf. & Inst. Code § 5150 .............................................................................................. 66

*Other Authorities*

Exec. Order 14173, Ending Illegal Discrimination and Restoring Merit-Based
Opportunity, 90 Fed Reg. 8633 (Jan. 21, 2025) .............................................................. 21, 23

Exec. Order 14151, Ending Radical and Wasteful Government DEI Programs and
Preferencing 90 Fed. Reg. 8339 (Jan. 29, 2025) ............................................................. 21, 23

Exec. Order 14168, Defending Women From Gender Ideology Extremism and
Restoring Biological Truth to the Federal Government
    90 Fed. Reg. 8615 (Jan. 30, 2025) ................................................................................ 24

Exec. Order 14218, Ending Taxpayer Subsidization of Open Borders
    90 Fed. Reg. 1058 (Feb. 25, 2025) ............................................................................... 23

Exec. Order 14321, Ending Crime and Disorder on America's Streets
90 Fed. Reg. 35817(July 24, 2025)..................................................................................... 25

## INTRODUCTION

Congress created the Continuum of Care (CoC) program to be the federal government's primary response to homelessness. It provides housing and essential services to 750,000 formerly and currently unhoused people, including many disabled and older individuals, veterans, and other individuals and families at risk of experiencing homelessness. The CoC program has improved long-term stability for communities and people exiting homelessness through its funding of permanent housing, prioritization of effective renewal projects selected through competitive national and local competitions, and a framework guarding against dramatic fluctuations in funding from year to year.

To support even greater stability, in 2024, Congress authorized Defendant U.S. Department of Housing and Urban Development (HUD) to issue a two-year Notice of Funding Opportunity (NOFO) for the CoC program that covered fiscal years 2024 and 2025. This allowed HUD to run one competition, including reviewing and scoring applications, and generally to use the results of that competition to make awards both for fiscal year 2024 and, once funds were appropriated, for fiscal year 2025. HUD conducted that two-year competition and selected awardees. Under the two-year NOFO, renewal awards for FY 2025 were expected by January 2026 at the latest.

HUD has upended that process. In mid-November 2025—mere weeks before FY 2025 awards would have gone out under the two-year NOFO—HUD abruptly rescinded that NOFO and replaced it with a new one for FY 2025. With this late-breaking switch, awards could no longer go out by January. But grants began to expire in January, meaning that programs would be left without funding for months and would be forced to shutter or scale back their programs, displacing the thousands of formerly homeless individuals and families that rely on those programs for housing. The new November NOFO, moreover, made radical, wholesale changes to

the CoC program with a litany of novel provisions that violate statutory and regulatory commands and are unsupported by reasoned decision making.

Plaintiffs brought this suit to challenge HUD's actions and promptly moved for emergency relief. Just hours before this Court's scheduled hearing, HUD changed course yet again. It withdrew the November NOFO—only to reissue another new NOFO with the unlawful provisions largely unchanged the next week, on December 19.

This bait-and-switch must end. HUD's delays, shifting guidance, and the uncertainty caused by its actions are already destabilizing the CoC program, with many providers across the country halting intake of prospective tenants, struggling to cobble together scarce funding to bridge anticipated gaps, and beginning to counsel tenants about their imminent loss of housing. If HUD does not promptly begin processing renewals and making awards, CoC grantees will be unable to provide the services on which their communities and beneficiaries rely, returning thousands of individuals and families to homelessness—contrary to Congress's express goal of ending homelessness.

The extremely late-in-the-game rescission of the original two-year NOFO is unlawful, even without considering the new NOFOs' unlawful terms. HUD blew past a statutory deadline that required it to issue any new NOFO by June. In addition, HUD provided no explanation for its untimely rescission and failed to consider the serious harm and disruption its action would cause. Worse, the belated decision to rescind and replace the two-year NOFO has upended the network of CoC-funded projects, disrupting Plaintiffs' operations and forcing them to drastically reconfigure their long-time programming, if they can, to seek funding under new terms. For these reasons alone, the rescission is unlawful and the Court should vacate that rescission and compel the agency to make the now-overdue awards under the two-year NOFO, as the statute requires.

The Court need go no further. But if it does, the new NOFOs are also themselves unlawful for multiple independent reasons even apart from their too-late issuance. They fundamentally restructure the CoC program by severely limiting funding for existing permanent housing—the only strategy Congress has found proven effective at reducing homelessness—and stripping local communities of control over which existing projects will be prioritized for renewal. In addition, the new NOFOs impose new unlawful criteria that would effectively disqualify most current program participants while preferencing those in favor of the Administration's unsupported agenda of ending the proven Housing First approach, criminalizing homelessness, and advancing other unrelated policy goals related to gender, disability, immigration, and race. These dramatic changes exceed HUD's statutory authority, conflict with statutory and regulatory commands, are arbitrary and capricious, were issued without proper procedure, and violate multiple constitutional provisions. If the Court does not vacate the rescission of the two-year NOFO and order Defendants to make awards under that NOFO, it should vacate the new NOFOs, declare their challenged provisions unlawful, and enjoin Defendants from imposing these provisions in any new NOFO for FY 2025 funding.

As this Court recognized in granting preliminary relief, prompt action is necessary to prevent the devastating effects that HUD's unlawful, unreasonable decisions will have across the country. Plaintiffs therefore respectfully request that the Court enter summary judgment in their favor as soon as possible.

## BACKGROUND

### I.  Legal Background

#### A.  The Continuum of Care Program

Congress enacted what became known as the McKinney-Vento Homeless Assistance Act (Homeless Assistance Act) in 1987 to establish a coordinated federal response to homelessness,

including by providing funds for programs to assist homeless individuals and families. Pub. L. No. 100-77, § 102, 101 Stat. 482, 484-85 (1987), *codified at* 42 U.S.C. § 11301. In 2009, Congress consolidated HUD's existing homelessness programs into the Continuum of Care (CoC) program through passage of the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act. Pub. L. No. 111-22, §§ 1301-1306, 123 Stat. 1632, 1680–96 (2009), *codified at* 42 U.S.C. § 11381–11388.

With the CoC program, Congress aimed to "promote community-wide commitment to the goal of ending homelessness," to help rehouse people "while minimizing the trauma and dislocation" that homelessness causes, and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381. It also "establish[ed] a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days." Prevent Mortgage Foreclosures and Enhance Mortgage Credit, Pub. L. No. 111-22, § 1002, 123 Stat. 1632, 1664 (2009), *codified at* 42 U.S.C. § 11301 Note. The CoC program funds a variety of projects that support homeless individuals and families, including providing housing through construction, acquisition, rehabilitation, operating, leasing, or rental assistance; helping individuals and families secure housing; and providing supportive services such as childcare, job training, healthcare, mental health services, trauma counseling, and life skills training. 42 U.S.C. §§ 11360(29), 11383. Today, the CoC program is the largest federal grant program for homeless services and housing.[1]

### 1.    Statutory priorities of the CoC program

Three key aspects of the CoC program contribute to its ability to meet Congress's

---

[1] U.S. Dep't of Hous. and Urb. Dev., *Biden-Harris Administration Awards nearly $3.6 Billion in Homelessness Assistance Funding to Communities Nationwide*, News, (Jan. 17, 2025), https://perma.cc/7FS7-GZLQ (last visited Jan. 13, 2026).

statutory goals. Congress designed the program to (1) prioritize funding for permanent housing, (2) encourage stability by prioritizing the renewal of funding where such funding is needed and has previously been used effectively, and (3) give local communities a central role in determining how best to eradicate homelessness in their areas.

 **Focus on permanent housing**. Congress made clear that permanent housing should be prioritized. For instance, the HEARTH Act requires HUD to "provide bonuses or other incentives" for activities "that have been proven to be effective at reducing homelessness," and to consider "the extent to which the recipient will . . . incorporate" such activities when awarding grants. 42 U.S.C. §§ 11386b(d)(1)-(2), 11386a(b)(1)(B)(iv)-(II). Congress identified two—and only two—such "proven" strategies, and both are permanent housing strategies: "permanent supportive housing for chronically homeless individuals and families" and, for families, "rapid rehousing"[2] paired with services to help improve stability and incomes. *Id.* § 11386b(d)(2)(A),(B). Congress authorized HUD to identify other proven effective strategies "based on research and after notice and comment to the public," *id.* § 11386b(d)(2)(C), but HUD has never used this statutory process to identify additional strategies. Recent appropriations acts further prioritize permanent housing by requiring HUD to "provide incentives to create projects" that coordinate with certain entities "to provide permanent supportive housing and rapid re-housing services." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 363 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12); § 1105, 139 Stat. 9, 12 (2025) (carrying those instructions forward for FY 2025).

 The HEARTH Act also sets minimum amounts that HUD must allocate to permanent

---

[2] Rapid rehousing is a type of permanent housing. 24 C.F.R. § 578.3.

housing for certain communities: For any given fiscal year, at least 30 percent of the funds used for new awards (*i.e.*, non-renewals) must go to permanent supportive housing for "homeless individuals with disabilities" or their families, and at least 10 percent of appropriated funds must be used for "permanent housing for homeless families with children." 42 U.S.C. § 11386b(a)(1), (b).

**Stability through renewals**. The HEARTH Act explicitly prioritizes renewals for permanent housing. In particular, the statute specifies that appropriated funds "shall be available for the renewal of contracts" for certain costs "associated with permanent housing projects." 42 U.S.C. § 11386c(b). The statute identifies two—and only two—factors that HUD must consider when determining whether to renew a permanent housing award: (1) whether "there is a demonstrated need for the project" and (2) whether it "complies with program requirements and appropriate standards of housing quality and habitability, as determined by [HUD]." *Id.* Congress made clear that this is not meant to be a *limitation* on when projects can be renewed: the statute specifies that nothing in this section "shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth" elsewhere in the statute. *Id.* § 11386c(c). Congress further ensured that renewal funding could keep pace with rising costs by requiring HUD to adjust renewal awards for permanent housing based on "increases in the fair market rents." 42 U.S.C. § 11382(f).

Congress also has restricted when funding can be used for new projects as opposed to renewals. The relevant appropriations act provides that funds can be used for "new projects" only in two circumstances: (1) if the CoC chooses to reallocate funding from an existing project or (2) if the CoC chooses new projects "based on the degree to which they improve the continuum of care's system performance." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 364 (2024); *see also* Full-Year Continuing

Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12); § 1105, 139 Stat 9, 12 (2025) (carrying that provision forward for FY 2025).

Congress also took other steps to ensure that appropriated funding would be available to fund renewal projects. The statute requires HUD to consider "the need within [each CoC's] geographic area" when making awards and prescribes how to calculate that need, which the statute treats as an "estimated grant amount." 42 U.S.C. § 11386a(b)(2). That need amount is determined by a regulatory formula that looks to factors related to population size and poverty. *Id.*; *see also* 24 C.F.R. § 578.17(a)(3). But if that is not enough "to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for that area, HUD must "increase the estimated need amount" to provide sufficient funding to renew those existing grants. 42 U.S.C. § 11386a(b)(2)(B)(iii). That amount becomes the "maximum award amount" for that geographic area, apart from bonus funding, unless the CoC's formula-based need amount is higher, which is now rare. 24 U.S.C. § 578.17(b). This ensures that funding is fairly distributed across geographic areas because, with certain exceptions, no one area can be awarded more than their need or what is necessary to maintain stable funding.

**Respect for local decisionmaking**. Finally, Congress also designed the program to respect local communities' central role in addressing homelessness in their regions. *See* Pub. L. No. 111-22, div. B, § 1002(2), 123 Stat. 1632, 1664 (2009), *codified at* 42 U.S.C. § 11301 note (recognizing the CoC process as an "integral local function" that is "necessary to generate the local strategies for ending homelessness"). The statute recognizes that local continuums of care are responsible for coordinating the response to homelessness within their geographic areas. 42 U.S.C. § 11360a; *see also* 24 C.F.R. § 578.7.

Most relevant here, each CoC is responsible for applying for CoC program funds on behalf of its community—and the statute gives CoCs a significant role in determining which

projects will receive funding. *See* 42 U.S.C. § 11360a(a), (f). A CoC designates a "collaborative applicant" (which can be the CoC itself or another organization eligible for CoC funds) that is responsible for applying for funding on behalf of entities within the CoC's geographic area. *Id.*; *see also* 24 C.F.R. § 578.9. Each CoC must run a local competition to determine what projects and service providers will be part of its federal application, and how it will rank them. 42 U.S.C. § 11360a(f); *see also* 24 C.F.R. § 578.9. It then submits an application on behalf of the CoC and the selected project applicants in that area. 42 U.S.C. § 11360a(f)(1); *see also* 24 C.F.R. § 578.15. All projects generally must go through this locally run competitive CoC process. An individual entity can apply on its own only if it "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner." 42 U.S.C. § 11382(i).

HUD's selection process looks to characteristics not only of individual projects, but also of the CoCs themselves. For instance, in evaluating applications and making selections, HUD considers the "methodology" the CoC "used to determine the priority for funding local projects" and "the need" for services within the CoC's geographic area. *Id.* §§ 11386a(b)(1)(C), (b)(2).

### 2. Statutory and regulatory provisions governing the CoC program

The statute sets forth further requirements for HUD's administration of the CoC program. In addition to the requirements described above, the statute establishes timing requirements, eligibility and selection criteria, and conditions to which grantees must agree, as well as other mandates.

**Timing requirements**. For one, the statute establishes timing requirements to ensure that funds are awarded promptly to the communities that need them. It provides that "the Secretary shall release a notification of funding availability"—also known as a "notice of funding opportunity" or "NOFO"—for CoC grants "for a fiscal year not later than 3 months after" Congress has appropriated funding. *Id.* § 11382(b). It then must announce conditional awards

"within 5 months" after the application deadline. *Id.* § 11382(c)(2)(A). Once a recipient meets all
requirements for a final award (such as obtaining matching funds and passing environmental
review), HUD must "obligate the funds for the grant" within 45 days. *Id.* § 11382(d)(2).

 **Selection criteria**. The statute also sets forth comprehensive criteria to govern HUD's
selection of awardees. *Id.* § 11386a. Those statutory criteria include the CoC's "previous
performance . . . regarding homelessness" as measured by various metrics, its plan, its
methodology for prioritizing CoC funds for local projects, and its ability to coordinate with other
entities and to supplement CoC program funds. *Id.* § 11386a(b). The statute vests the Secretary
with authority to define additional criteria, but only as "appropriate to carry out" the program "in
an effective and efficient manner." *Id.* § 11386a(b)(1)(G).

 In addition, Congress has made clear that HUD cannot adopt criteria that would unduly
interfere in state and local policymaking. In particular, 42 U.S.C. § 12711 bars HUD from
"establish[ing] any criteria for allocating or denying funds . . . based on the adoption,
continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law" so long
as the jurisdiction had authority to adopt, continue, or discontinue it, and it does not violate
federal law.

 **Grant conditions**. The statute also specifies the "[r]equired agreements" that grant
recipients must execute to receive funds under the program. *Id.* § 11386(b). For instance,
recipients must agree to operate funded projects in accordance with statutory requirements, to
involve individuals experiencing homelessness in project operations where practicable, and to
certify that children in family programs are enrolled in school and connected to relevant
educational services. *Id.* HUD may also establish "other terms and conditions," but only "to
carry out this part in an effective and efficient manner." *Id.* § 11386(b)(8).

 **Additional statutory and regulatory requirements**. Statutes and regulations prohibit

9

discrimination on the basis of disability in CoC programs. The statute requires that permanent supportive housing funding be made available for "homeless individuals with disabilities." 42 U.S.C. § 11386b(a)(1); *see also id.* § 11360(10)(A)(IV) (defining "homeless individual with a disability" to include individuals with "physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse, post traumatic stress disorder, or brain injury"); *accord* 24 C.F.R. § 578.3. In addition, regulations provide that "[n]o qualified individual with handicaps," which includes individuals with physical and/or mental disabilities, including substance use disorder, "shall, solely on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance from the Department." 24 C.F.R. §§ 8.3, 8.4(a).

HUD regulations also bar discrimination on the basis of gender identity. HUD's Equal Access Rule requires, among other things, that grantees "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity." 24 C.F.R. § 5.106(b)(2).

Finally, HUD has adopted regulations requiring it to proceed by notice-and-comment rulemaking including for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking." 24 C.F.R. §§ 10.1, 10.2, 10.7–10.10.

## B. HUD's Administration of the CoC Program Consistent with Statutory Priorities and Evidence-Based Strategies

Consistent with the statute and Congress's goals, HUD has long prioritized stable funding and respect for local decisionmaking, as well as investment in permanent housing strategies that have proven effective.

To that end, HUD has long used a two-tier system for applications that promotes stability and respects a CoC's role in assessing the needs of its own local community. *See* Libby Perl, Cong. Rsch. Serv., RL33764, *The HUD Homeless Assistance Grants: Programs Authorized by*

the *Hearth Act* at 22 (updated Aug. 30, 2017), https://perma.cc/48U2-PWTN. Under this system, HUD allocates available funding across two tiers, expressed as a percentage of each geographic area's "annual renewal demand," i.e., the amount necessary to fund all eligible renewals. *Id.* at 21.[3] For instance, in the most recent fiscal year, HUD allocated 90 percent of each CoC's annual renewal demand to Tier 1 and 10 percent to Tier 2. Administrative Record (AR)[4] 31, 56.

Funding for Tier 1 projects is more predictable, and CoCs can be reasonably certain that the projects they designate within Tier 1 will be funded. Declaration of Ann Marie Oliva (NAEH) ¶¶ 55, 79–80, Dkt. No. 7-1; *see also* Cong. Rsch. Serv., RL33764, at 23. Tier 1 projects compete locally but not nationally. Cong. Rsch. Serv., RL33764, at 23; Oliva (NAEH) ¶¶ 55, 79, Dkt. No. 7-1. The regional CoCs conduct local competitions based on the CoC program's requirements and goals and select the projects to list in Tier 1. Oliva (NAEH) ¶ 55, Dkt. No. 7-1. HUD then funds those projects so long as they meet baseline requirements. Cong. Rsch. Serv., RL33764, at 20. CoCs more often than not choose to list renewal projects in Tier 1 so that they can ensure consistent services in their local communities. Oliva (NAEH) ¶¶ 79–80, Dkt. No. 7-1; Declaration of Ann Chanecka (Tucson) ¶ 16, Dkt. No. 7-11. But they do not need to. If a project is no longer needed or is performing poorly, the CoC can reallocate the money from that project to a new project that better meets local needs.

Tier 2 projects are subject to a nationwide competition based on the score received by the CoC, and HUD selects the projects that score the highest based on a full merit review. *See* Oliva (NAEH) ¶ 79, Dkt. No. 7-1.

---

[3] The statute also requires funding to be distributed geographically in accordance with a formula based on community need. *See* Cong. Rsch. Serv., RL33764, at 17.

[4] The continuously paginated Administrative Record is contained on the Docket. *See* Dkt. Nos. 44, 56, 59. Relevant excerpts are included in Plaintiffs' Excerpts of Administrative Record filed with this motion.

To implement Congress's priorities, including stability and permanent housing, HUD has historically allocated a large percentage of funding to Tier 1, with the lowest percentage since HUD implemented the tier system being 85 percent of annual renewal demand. Oliva (NAEH) ¶ 81, Dkt. 7-1. As a practical matter, this has meant that, where there is still a need for them, successful projects have received renewal funding. Cong. Rsch. Serv., RL33764, at CRS-26 (showing that, from 2012 to 2016, 84 percent of awards were for renewal projects). This has ensured continuity in permanent housing projects, which made up 88 percent of awards last year, as in previous years. AR 288.

Consistent with congressional direction, HUD's longstanding focus on permanent housing is supported by extensive evidence that permanent housing is effective in addressing homelessness. Oliva (NAEH) ¶¶ 33–43, 45, Dkt. No. 7-1; Declaration of Kathryn J. Kaminski (Santa Clara), Ex. 2, Dkt. No. 7-9 at 34 (HUD study found permanent supportive housing had "striking impacts" in reducing subsequent shelter stays for families, compared to transitional housing and service-requirement programs); *see also* Declaration of April Calvin (Nashville) ¶ 9, Dkt. No. 7-8 (seven encampments closed as residents moved into permanent housing).  Rapid rehousing, a type of permanent housing, has also proven effective. Oliva (NAEH) ¶ 34, Dkt. No. 7-1 (discussing success of rapid rehousing in helping people exit homelessness and maintain housing after exiting rapid rehousing). As a result, for years, HUD has prioritized permanent housing in making CoC awards. AR 288 (vast majority of CoC funds have gone to permanent housing for years).

Additionally, for over a decade, HUD prioritized evidence-based strategies, like the Housing First approach—i.e., offering housing and supportive services without requiring treatment, service participation, or sobriety as a condition of accessing housing. *See* U.S. Dep't of Hous. and Urb. Dev., *Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and*

12

*2014 Continuum of Care Program Competition* [Docket No. FR-5700-N-31B], 9 (Dec. 20, 2013) ("FY 2013 NOFO"), https://perma.cc/SK7R-YAL8; *see also* AR 57, 114-15, 122. "Housing First" evolved as a response to the inefficacy of "treatment first" programs that imposed such requirements. *See* Kaminski (Santa Clara) Ex. 2, Dkt. No. 7-9 at 28-29. A HUD issue brief published in 2023 explains that "[t]he George W. Bush administration embraced Housing First principles, which contributed to a 30 percent reduction in homelessness rates in the United States between 2005 and 2007." *Id.* Housing First principles also guided the creation, in 2010, of the first national strategic plan to end homelessness (which was also required by the HEARTH Act), and those principles "have been guiding federal homeless response programs" ever since. *Id.* at 29.

HUD's emphasis on offering but not mandating services is consistent with other federal laws governing federal housing assistance. Under the Violence Against Women Act (VAWA) and Family Violence Prevention and Service Act (FVPSA)—two laws that, among other things, fund housing support for survivors of domestic violence and sexual assault who cannot safely remain at home—it is illegal for a provider to require participants to take part in supportive services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA grants for transitional housing assistance); 42 U.S.C. § 10408(d)(2) (FVPSA grants for emergency shelter).

Relatedly, HUD has historically deprioritized transitional housing that lacks a connection to permanent housing, recognizing that transitional housing has value for crisis housing but that little evidence suggests that transitional housing programs are effective in reducing homelessness overall. Oliva (NAEH) ¶¶ 39, 86, Dkt. No. 7-1; Kaminski (Santa Clara) ¶ 12, Dkt. No. 7-9; *see also, e.g.*, FY 2013 NOFO at 10 (noting research showing that transitional housing is generally "more expensive" and "under-utilized because homeless households cannot overcome the

barriers to entry").

### C.  Two-Year NOFO for FY 2024 and FY 2025

In 2024, to provide for greater stability and efficiency in the CoC program, Congress authorized HUD to run a single competition that would cover both FY 2024 and FY 2025. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, § 242. This two-year funding cycle has enjoyed strong bipartisan support. *See, e.g.*, Letter from Members of Cong. to Sec'y Turner (Oct. 28, 2025), https://perma.cc/S2S9-XZ6V.

In July 2024, HUD issued a two-year NOFO for grants for the CoC program (FY24-25 NOFO).[5] AR 27-155. Consistent with statutory priorities and HUD's practices for nearly a decade, the FY24-25 NOFO prioritized permanent housing and stability. AR 34-35. Under that two-year NOFO, a CoC could submit a single application that would cover both FY 2024 and FY 2025 funds (though it would have an opportunity to submit an additional application for FY 2025 if it sought funding for a project not covered in its original application). AR 31, 98. HUD could then review applications once and use the results of that competition to make awards both for FY 2024 and, once funds were appropriated, for FY 2025. AR 31. This two-year process was designed to reduce the burden on communities, Oliva (NAEH) ¶ 62, Dkt. No. 7-1, and to provide greater predictability of funding. HUD made FY 2024 awards in January 2025. *Id.* ¶ 67.

Funding became available for FY 2025 awards in March 2025. In particular, on March 15, Congress enacted a continuing resolution appropriating $3.544 billion for the CoC program and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12). Because HUD had issued a two-year NOFO, no new NOFO for FY 2025

---

[5] The FY24-25 NOFO covers funding for the CoC program and related Youth Homeless Demonstration Program grants. AR 30, 54. For simplicity, this brief refers to all funding covered by this NOFO as CoC funding.

was required. If HUD wanted to issue a new NOFO for awarding those FY 2025 funds, however, it was required to do so within three months, or by June 15, 2025. 42 U.S.C. § 11382(b) (providing that HUD "shall release" a NOFO for CoC grants "not later than 3 months after the date of the enactment of the appropriate Act making appropriations" for that fiscal year).

## II. Defendants' Rescission and Replacement of the FY24-25 NOFO

HUD did not issue a new NOFO by June 15. Instead, on July 3, 2025, HUD announced by email that it "intend[ed] to publish" a new NOFO for FY 2025 CoC awards. AR 18. But HUD provided no meaningful details about its plan or anticipated timeline. The email stated only that the NOFO would "seek to provide opportunities for new types of projects including street outreach and transitional housing programs" and instructed applicants to "prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants." *Id.*

HUD waited several months before it actually rescinded the NOFO—long after the three-month window in which the statute would have permitted HUD to issue a replacement. On November 13, 2025—eight months after Congress appropriated FY 2025 funds for the CoC program—HUD issued a new NOFO for the FY25 competition (November NOFO). AR 156-283. In one sentence of the 128-page November NOFO, HUD rescinded the FY24-25 NOFO, with no explanation, stating only that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds" in the FY24-25 NOFO. AR 170.

The November NOFO stated that HUD would make awards in May 2026. AR 160. But renewal projects funded under the two-year NOFO would run out of funds beginning in January 2026, Declaration of Shireen McSpadden (San Francisco) ¶ 12, Dkt. No. 7-10; Declaration of Joyce Tavon (MHSA) ¶ 22, Dkt. No. 7-15; Declaration of Andrew Freeman (Safe Haven) ¶¶ 5, 10, Dkt. No. 7-13; First Supplemental Declaration of Ann Marie Oliva (NAEH) ¶ 27, Dkt. No.

49-1, and under the FY24-25 NOFO, awards should have gone out in January at the latest. Oliva (NAEH) ¶¶ 57, 73, Dkt. No. 7-1.

About a month later—a week after Plaintiffs filed this case, and just hours before the Court was scheduled to hear argument on Plaintiffs' motion for preliminary relief—Defendants withdrew the November NOFO. *See* Dkt. No. 39. They did not undo the rescission of the FY24-25 NOFO, however. Defendants stated that they still intended to "fashion a revised NOFO" after "assess[ing] the issues raised by Plaintiffs in their suits." *Id.* at 1. And on December 19, the same day this Court preliminarily enjoined the rescission of the two-year NOFO in an oral order,[6] HUD in fact issued another FY25 NOFO (December NOFO) to replace the two-year FY24-25 NOFO. AR 1133-1269. The December NOFO explicitly continued the rescission of the FY24-25 NOFO, while acknowledging that this Court's Order enjoined the December NOFO. AR 1154, 1137-1138.

## III. The FY25 NOFOs and the Challenged Provisions

The November and December NOFOs (together, "FY25 NOFOs") contain similar (and in many cases substantively identical) provisions and are both unlawful. The FY25 NOFOs (a) radically restructure and destabilize the CoC program by stripping funding from proven permanent housing strategies and existing programs; (b) include various new review criteria that on their own and collectively disqualify or disadvantage applicants based on impermissible factors; and (c) impose post-award conditions that unlawfully require awardees to conform to the Administration's views on topics unrelated to the purpose of the CoC program. These unlawful provisions (collectively, "Challenged Provisions") are comprehensively listed in the Appendix attached to this brief.

---

[6] The Court memorialized its oral order in a written order entered on December 23, 2025. *See* Dkt. No. 52.

### A. Structural Provisions

*Permanent Housing Caps*. The December NOFO caps the amount that each CoC can receive for existing permanent housing projects at 30 percent of the CoC's annual renewal demand, while the November NOFO imposed a 30 percent cap for all permanent housing projects (both new and existing) (Permanent Housing Caps). Appendix at 1; AR 1155, 170. This is unprecedented and marks a major structural shift. HUD has never imposed a cap on permanent housing awards within the CoC program. Oliva (NAEH) ¶¶ 76-77, 98, Dkt. No. 7-1. Over the past decade, the percentage of CoC funding awarded to permanent housing projects—the only type of activity that Congress has designated as proven effective, *see* 42 U.S.C. § 11386b(d)(2)—has not once been less than 85 percent.[7] If the Permanent Housing Caps go into effect, many permanent housing projects will categorically be excluded from eligibility and lose their CoC funds. Oliva (NAEH) ¶ 99, Dkt. No. 7-1 (loss of $2.5 billion for permanent housing projects); *see also id.* ¶¶ 102-106 (describing defunding of CoCs' permanent housing programs due to cap).

*New Project Earmark*. The December NOFO earmarks approximately $1.26 billion—30 percent of the funds available for the CoC and another program—exclusively for new permanent housing projects for individuals and families with a disability (New Project Earmark). Appendix at 1; AR 1138, 1154-56. The NOFO establishes two "tracks" for applying for funds—an "extended track" to apply for the $1.26 billion in earmarked funds for new permanent housing projects and a "normal track" to apply for the remaining $2.65 billion allocated for all other project types, including existing permanent housing. AR 1155. Because the New Project

---

[7] U.S. Dep't of Hous. and Urb. Dev., *CoC Award Summary Reports by Component and Project Type*, HUD Exchange, https://perma.cc/J4DX-ZKZX (last visited Jan. 13, 2026). To access data, search by year and calculate permanent housing (including rapid re-housing) national percentages.

Earmark sets aside funding for *new* projects only, it makes existing projects categorically ineligible for a significant portion of CoC funding.

*Tier 1 Allocation*. The FY25 NOFOs set the Tier 1 amount at only 30 percent of each CoC's annual renewal demand, i.e., 30 percent of the amount each CoC would need to fully fund all renewals (Tier 1 Allocation).[8] Appendix at 1; AR 1155, 170. This dramatically departs from past practice, under which Tier 1 has typically been set at 90 percent or greater and has never dipped below 85 percent. Oliva (NAEH) ¶¶ 81-82, Dkt. No. 7-1. It also will cause massive instability—both for individual projects that CoCs would otherwise put forward for renewal and for CoCs' entire regions. *See, e.g.*, Declaration of Sheila A. Dillon (Boston) ¶¶ 24-25, Dkt. No. 7-5; Declaration of Sunaree Marshall (MLK County) ¶¶ 16-21, Dkt. No. 7-7; Chanecka (Tucson) ¶ 24, Dkt. No. 7-11; Declaration of Elizabeth Mengers Magargee (Cambridge) ¶ 23, Dkt. No. 7-6. With the Tier 1 Allocation, 70 percent of funding will be allocated to Tier 2—and those projects designated Tier 2 will need to compete nationally for funding. But given the new, drastically different review criteria discussed below, many existing projects likely will not be renewed due to their inevitably lower ranking. *See, e.g.*, Declaration of Michelle M. Wilcox (Crossroads) ¶¶ 34-58, Dkt. No. 7-3; Declaration of Rush Frazier (YPI) ¶¶ 32-57, Dkt. No. 7-4; Declaration of Renee M. Willis (NLIHC) ¶¶ 52-56, 76-78, Dkt. No. 7-2; Tavon (MHSA) ¶¶ 29-30, Dkt. No. 7-15; Chanecka (Tucson) ¶ 26, Dkt. No. 7-11; Kaminski (Santa Clara) ¶ 37, Dkt. No. 7-9.

## B.  Review Criteria

The FY25 NOFOs impose a host of new criteria across three stages of review—"threshold" review for compliance with criteria that applicants must satisfy to even be eligible

---

[8] In the December NOFO, the Tier 1 Allocation applies only to the "normal track" applications. AR 1232.

for consideration; "merit" review in which projects receive points based on various criteria that look to the project itself as well as the CoC, with awards going to the highest-scoring projects; and "risk" review under which HUD assesses factors purportedly bearing on each applicant's "likelihood of successfully implementing an award" before it makes a final decision. AR 1191-1231, 206-44. New criteria appear across all three stages.

*Service Requirements*. In a complete reversal from past practice, the FY25 NOFOs reward applicants for requiring participants to participate in services and treatment as a condition of receiving housing (Service Requirements). These requirements are reflected in several threshold and merit review categories. *See* Appendix at 2-3 (listing Service Requirements); AR 1196-97, 1200-01, 1202-03, 1206-07, 1218-19, 1220-21, 210-12, 215-16, 217, 221-22, 232-33, 235. For example, during the merit review, applicants can receive up to 16 points (out of a total 130) by demonstrating that "program participants are required to take part in such services [including substance use treatment] as a condition" of program participation. AR 1218-19, 232-33.

*Disability Conditions*. The FY25 NOFOs incentivize applicants to treat people differently based on disability type (Disability Condition). Appendix at 4. For transitional housing projects, the FY25 NOFOs penalize projects that do not provide 40 hours of services to program participants. Projects that serve individuals with physical or developmental disabilities, however, are not subject to this 40-hour requirement, while projects that serve individuals with other types of disabilities, including substance use disorder, are. AR 1196-97, 211-12. In addition, the November NOFO rewarded permanent supportive housing applicants that served individuals with physical or developmental disabilities, but not those with other disabilities like substance use disorder. AR 216.

*Geographic Discrimination Conditions*. The FY25 NOFOs discriminate against projects

based on whether the jurisdiction in which a CoC is located advances the Administration's view that homelessness requires criminalization and a law enforcement response—factors entirely outside the CoCs' control (Geographic Discrimination Conditions). Appendix at 5. Applicants gain points if the state in which they are located substantially complies with the Sex Offender Registry and Notification Act (SORNA). AR 1227-28, 241-42. Additional points are assigned to applicants who can demonstrate that the "entire geographic area" "quickly clears tents and encampments on public property" and "does not tolerate the public use of illicit drugs." AR 1226-27; *see also* AR 241-42 (similar conditions in November NOFO).

*Law Enforcement Conditions*. The FY25 NOFOs also reward applicants that advance the Administration's law enforcement priorities (Law Enforcement Conditions). Appendix at 6-7. CoCs receive a higher score if they can demonstrate that they work with law enforcement. Specifically, points are assigned for: conducting street outreach in partnership with "first responders and law enforcement"; helping to map and identify the location of homeless sex offenders when law enforcement asks; "[c]ooperat[ing] . . . with law enforcement" to "enforce local laws such as public camping and public drug use laws" or "to connect violators of public camping or drug use laws with services"; and pursuing "involuntary commitment." AR 1198-99, 1227-28, 241-42. The FY25 NOFOs further reward applicants (10 points) if they reduce the number of homeless encampments by "at least 20 percent" (AR 1221, 236)—a metric that, when coupled with points for aggressively reducing the unsheltered population by 20 percent (AR 1209-10, 224-25), incentivizes local communities to arrest or ticket those in encampments. In addition, the November NOFO awarded preference points to projects that assist with federal immigration enforcement by "voluntarily, thoroughly, and demonstrably facilitat[ing] immigration status verification before distribution of benefits to all recipients" using a government database. AR 243.

*"Risk Review" Criterion*. The FY25 NOFOs adopt a "Risk Review" Criterion under which HUD could reject applicants based on a "history" of clashing with the current Administration's favored policies. Appendix at 7. The December NOFO states it will consider an applicant's "history" of "imped[ing] law enforcement related to vagrancy, drug use, or other illicit activities that conflict with the purposes of this NOFO," AR 1229-30, while the November NOFO refers even more broadly to a "history of subsidizing or facilitating activities that conflict with the purposes of this NOFO." AR 244.

*DEI-Related Certifications*. The FY25 NOFOs include two certifications related to race and diversity, equity, and inclusion (DEI-Related Certifications). Appendix at 8. First, all applicants must certify that they "will not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." Applicant and Recipient Assurances and Certification, HUD, OMB No. 2501-0044 (Feb. 2023), https://perma.cc/N5DW-RF5G; *see also* AR 1164, 179. Second, all applicants must "certify affirmatively" that they "will not engage in illegal discrimination including illegal racial preferences." AR 1194; *see also* AR 209 (similar). These DEI Certifications do not define key terms including "DEI," "racial preferences," "illegal racial preferences," or "other forms of illegal discrimination." But given the Administration's multiple Executive Orders aimed at eliminating DEI, e.g., EO 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity), EO 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing), applicants reasonably understand these certifications as intended to require the elimination of all diversity, equity, and inclusion efforts. *See* Wilcox (Crossroads) ¶ 49, Dkt. No. 7-3; Frazier (YPI) ¶ 27, Dkt. No. 7-4.

*Harm Reduction Certification*. The FY25 NOFOs require project applicants to make a certification related to harm reduction strategies (Harm Reduction Certification). Appendix at 8.

21

The November NOFO required project applicants to affirm that they "will not operate drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" AR 209. The December NOFO requires that the "project applicant will not operate drug injection sites or 'safe consumption sites' in violation of 21 u.s.c. [*sic*] 856." AR 1194.

*Retroactive Reservations*. The FY25 NOFOs include three reservations that would allow HUD to reduce or reject projects based on applicants' past conduct related to gender, race, and harm reduction (Retroactive Reservations). Appendix at 9-10.

The Gender Identity Reservation in the November NOFO threatens to reject applicants based on whether they previously or currently "conduct[] activities that rely on or otherwise use a definition of sex other than as binary in humans." AR 210, 220.

The Racial Preference Reservation threatens to reject applicants based on whether they previously or currently "conduct[] activities that subsidize or facilitate[] illegal discrimination including illegal racial preferences." AR 1195, 1205-06; *see also* AR 210, 220 (similar).

The Harm Reduction Reservation in the November NOFO evaluates "past performance" and threatens to reject applicants if the project "operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'" AR 209, 220. The December NOFO threatens to reject projects that "operate[] illegal drug injection sites or 'safe consumption sites,' in violation of 21 U.S.C. § 856," including their "past performance" in that regard. AR 1195, 1205-06.

### C. Post-Award Conditions

The FY25 NOFOs impose post-award conditions designed to force CoC applicants and grantees to adhere to the Administration's policy positions that are wholly unrelated to the CoC program and the purpose of ending homelessness, often by requiring grantees to "comply with" specified executive orders. Appendix at 11-12. While it is far from clear what it means to "comply with" executive orders—which typically issue instructions to executive branch agencies, not the public—these conditions appear to require compliance with the policies set forth in those orders.

*DEI-Related Conditions.* The FY25 NOFOs require compliance with Executive Orders 14173 ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity") and 14151 ("Ending Radical and Wasteful Government DEI Programs and Preferencing"). Appendix at 11; AR 1250, 263. Those executive orders set forth a view that diversity, equity, and inclusion initiatives are generally "illegal" and forbidden. *See* Exec. Order 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025); Exec. Order 14173, 90 Fed Reg. 8633, 8633 (Jan. 21, 2025). The FY25 NOFOs also prohibit using awards to "conduct activities that subsidize or facilitate illegal racial preferences or other forms of illegal discrimination"—another means of deterring lawful diversity, equity, and inclusion activities that the Administration now contends are unlawful. AR 1250; *see also* AR 263-64 (similar).

*Immigration Condition.* The FY25 NOFOs require compliance with Executive Order 14218 ("Ending Taxpayer Subsidization of Open Borders"). Appendix at 11; AR 1250, 263. Executive Order 14218 directs agencies to withhold federal funding from states and local governments with so-called "'sanctuary' policies" and to "enhance eligibility verification systems" to exclude undocumented immigrants from services. 90 Fed. Reg. 10581, 10581 (Feb. 25, 2025). Secretary Turner previously explained that this requirement to comply with Executive

Order 14218 is meant "to ensure that Federal resources are not used to support 'sanctuary' policies of State and local jurisdictions."[9]

*Gender Identity Conditions*. The FY25 NOFOs require compliance with Executive Order 14168 ("Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"). Appendix at 12; AR 1250, 263. That Executive Order announces that "the policy of the United States" is "to recognize two sexes, male and female," that are "not changeable and are grounded in fundamental and incontrovertible reality," 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025), and the requirement to "comply with" that EO seems to require grantees to implement that view. The November NOFO further expressly barred grantees from using awards to "conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." AR 263.

*Anti-Abortion Condition.* The FY25 NOFOs require compliance with Executive Order 14182 ("Enforcing the Hyde Amendment"), which aims to block "use of Federal taxpayer dollars to fund or promote elective abortion," 90 Fed. Reg. 8751, 8751 (Jan. 24, 2025). Appendix at 12; AR 1250, 263. This apparent bar on "promot[ing]" abortion could block grantees from providing abortion information or referrals to participants seeking help.[10]

*Anti-Harm Reduction Condition.* The Post-Award Conditions also include an Anti-Harm Reduction Condition that mirrors the Harm Reduction Certifications described above. Appendix

---

[9] Letter from Sec'y Turner to All HUD Grantees and Stakeholders (April 4, 2025), https://perma.cc/MQL4-XWBR.

[10] While the EO purports to implement the Hyde Amendment, it does not. The Hyde amendment is an appropriations rider that limits the use of appropriated funds for abortions, but the rider applies only to funds appropriated to HHS. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, §§ 506, 507, 138 Stat. 460, 703 (Mar. 23, 2024). Other statutes impose similar restrictions on other appropriations for certain other agencies, but Congress has imposed no such restriction on HUD's funding.

at 12; AR 1251, 264.

*Anti-Housing First Condition*. The FY25 NOFOs require compliance with Executive Order 14321 ("Ending Crime and Disorder on America's Streets"). Appendix at 12; AR 1250, 263. Among other things, that EO directs HUD to "end[] support for 'housing first' policies," 90 Fed. Reg. 35817, 35818 (July 24, 2025), so the requirement to "comply with" that EO would potentially bar grantees from using a Housing First approach.

## IV. Plaintiffs Suffer Harm Due to Defendants' Unlawful Actions

Plaintiffs are local governments and nonprofits that receive CoC grants, including two national membership associations whose members receive CoC grants. These grantees were awarded CoC funds under the original FY24-25 NOFO and expected their awards to be renewed for FY 2025 under that NOFO. Oliva (NAEH) ¶ 67, Dkt. No. 7-1; Willis (NLIHC) ¶¶ 18, 49, 67, Dkt. No. 7-2; Dillon (Boston) ¶ 12, Dkt. No. 7-5; Magargee (Cambridge) ¶ 11, Dkt. No. 7-6; Marshall (MLK County) ¶ 12, Dkt. No. 7-7; Calvin (Nashville) ¶ 7, Dkt. No. 7-8; McSpadden (San Francisco) ¶ 10, Dkt. No. 7-10; Chanecka (Tucson) ¶¶ 19-20, Dkt. No. 7-11; Kaminski (Santa Clara) ¶¶ 17-18, Dkt. No. 7-9; Wilcox (Crossroads) ¶ 7, Dkt. No. 7-3; Frazier (YPI) ¶ 8, Dkt. No. 7-4; Tavon (MHSA) ¶ 9, Dkt. No. 7-15.

The rescission of the FY24-25 NOFO has created tremendous uncertainty—and resulting harm—for Plaintiffs and the communities they serve. Plaintiffs are struggling to adapt to the uncertainty and delays in the processing of renewals of their existing awards. Because many CoCs have grants expiring in the coming months (including some this month), even if they are ultimately eligible for CoC funding on HUD's new criteria, they face the prospect of months-long gaps in funding that many cannot cover. *See* Second Supplemental Declaration of Ann Marie Oliva (NAEH) ¶ 7; *see also*, *e.g.*, Freeman (Safe Haven) ¶¶ 5, 10, Dkt. No. 7-13 (inability to find replacement funding by January 31, 2026, to keep families housed); Marshall (MLK

County) ¶ 15, Dkt. No. 7-7; Calvin (Nashville) ¶ 25, Dkt. No. 7-8; Chanecka (Tuscon) ¶ 22, Dkt. No. 7-11; Dillon (Boston) ¶ 19, Dkt. No. 7-5; McSpadden (San Francisco) ¶¶ 12, 13, Dkt. No. 7-10.

NAEH's members, for example, are the recipients of 271 grants under the FY24-25 NOFO that are set to expire during the first quarter of this year, with another 500 set to expire during Q2 of 2026. Oliva (NAEH) 2nd Suppl. Decl. ¶ 7. These grants collectively support housing for over 31,000 individuals. *Id.* Across the country, NAEH's members are doing their best to try to find supplemental funding that might allow them to keep tenants housed while awaiting FY25 renewals, but some of these resource-constrained programs have already begun informing tenants of the impending loss of funding for their housing. *Id.* ("[T]he CoC has been unable to find alternative [funding] arrangements [for grants expiring in January, February, and March of 2026] and has had to inform over 100 families that they may not have housing anymore as these grants expire.").

Because the funding landscape is so uncertain, many CoCs and service providers fear they will have to evict people from housing supported by the CoC program, and many have already ceased accepting new referrals and applications for housing. *See, e.g.*, Oliva (NAEH) 1st Suppl. Decl. ¶¶ 24-29, Dkt. No. 49-1; Willis (NLIHC) ¶¶ 50, 78, Dkt. No. 7-2; Tavon (MHSA) ¶ 48, Dkt. No. 7-15; Frazier (YPI) ¶ 64, Dkt. No. 7-4; Chanecka (Tucson) ¶ 34, Dkt. No. 7-11; Dillon (Boston) ¶ 18, Dkt. No. 7-5; Oliva (NAEH) 2nd Suppl. Decl. ¶ 7. The FY25 NOFOs also seek to impose radical changes to the CoC program that would jeopardize Plaintiffs' abilities to continue serving most of the individuals in their communities as they would be unable to wholly re-structure their programs to pursue Defendants' new objectives and unlawful criteria.

Plaintiffs have spent extensive time and resources developing stable permanent housing offerings for their tenants through the CoC program. *See, e.g.*, Oliva (NAEH) ¶¶ 24, 33, 37, 77-

78, 86, 128, Dkt. No. 7-1; Wilcox (Crossroads) ¶¶ 18-21, Dkt. No. 7-3; Marshall (MLK County) ¶ 18, Dkt. No. 7-7; Chanecka (Tucson) ¶ 5, Dkt. No. 7-11; Dillon (Boston) ¶ 5, Dkt. No. 7-5; Magargee (Cambridge) ¶¶ 16-17, Dkt. No. 7-6. The vast majority of Plaintiffs' work under the CoC program involves providing permanent housing to tenants. *See, e.g.*, Willis (NLIHC) ¶ 47 (89%), Dkt. No. 7-2; Tavon (MHSA) ¶¶ 40 (96%), 46 (84%), Dkt. No. 7-15; Dillon (Boston) ¶ 23 (90%), Dkt. No. 7-5; Magargee (Cambridge) ¶ 14 (86%), Dkt. No. 7-6; Marshall (MLK County) ¶ 16 (92%), Dkt. No. 7-7; Calvin (Nashville) ¶ 7 (87%), Dkt. No. 7-8; McSpadden (San Francisco) ¶ 9 (91%), Dkt. No. 7-10; Chanecka (Tucson) ¶ 15 (83%), Dkt. No. 7-11; Oliva (NAEH) ¶ 99, Dkt. No. 7-1 (roughly 87 percent of all CoC program funds nationally support permanent housing and many Alliance members spend more than 90 percent of their CoC grants on permanent housing for seniors, veterans, families with children, and people with physical and mental disabilities). Many of the individuals that Plaintiffs serve through their permanent housing programs face insurmountable barriers to finding stable housing without government assistance, for example, advanced age or a variety of disabilities that make workforce participation impossible. *See* Calvin (Nashville) ¶ 27, Dkt. No. 7-8; Chanecka (Tucson) ¶ 34, Dkt. No. 7-11; Dillon (Boston) ¶ 40, Dkt. No. 7-5; Marshall (MLK County) ¶ 20, Dkt. No. 7-7; Willis (NLIHC) ¶¶ 51-52, 79-81, Dkt. No. 7-2. The FY25 NOFOs would effectively defund permanent housing, rendering Plaintiffs unable to serve their vulnerable community members, who would in turn lose their housing and become homeless once more.

Many of the individuals Plaintiffs serve also live with mental health or substance use disabilities and are at risk of losing access to housing due to HUD's attempts to limit CoCs' abilities to serve them or to make serving them substantially more burdensome or resource intensive. Dillon (Boston) ¶¶ 33-34, Dkt. No. 7-5; Kaminski (Santa Clara) ¶¶ 11, 38, Dkt. No. 7-9; Wilcox (Crossroads) ¶¶ 50-51, Dkt. No. 7-3 (excluding mental health and substance abuse

disabilities "will prohibit some of the people most in need of these services from receiving them"); Willis (NLIHC) ¶ 77, Dkt. No. 7-2 (requiring on-site substance abuse treatment is an "unfunded requirement" that would "necessitate drastic changes to [a provider's] model and staff deployment," including more crisis response staff and more behavioral health staff "of which there already exists a significant national shortage").

## V. Procedural History

On December 1, 2025, Plaintiffs filed suit against HUD and Secretary Scott Turner to challenge the rescission of the FY24-25 NOFO and its replacement with the November NOFO.[11] Dkt. No. 1. That same day, Plaintiffs moved for preliminary relief, Dkt. No. 5, and the Court scheduled a hearing for December 8.

On December 8, Defendants abruptly rescinded the November NOFO and indicated they would issue another new NOFO for FY 2025. Dkt. No. 39. Given these developments, the parties proceeded with briefing, and the Court held a hearing on December 19. Defendants issued a new December NOFO that same day, after the hearing. Dkt. No. 51.

The Court orally granted the motion for preliminary relief at the hearing, Dec. 19, 2025, Hr'g Tr. 70:14-15, and issued a written order a few days later. Dkt. No. 52. Among other things, the Court's Order stayed the rescission of the FY24-25 NOFO and preliminarily enjoined Defendants from giving effect to any other NOFO. *Id.* ¶¶ 2, 5. It also ordered Defendants to process eligible renewals under the FY24-25 NOFO, short of obligating funding or granting any specific renewals. *Id.* ¶ 6. In compliance with the Court's Order, Defendants have begun that process and have stated that they will select (but not grant) FY 2025 awards using the FY24-25 NOFO by March 31, 2026. Dkt. No. 62-1 at 1, 2. Defendants notified CoCs and stakeholders that

---

[11] A coalition of states also filed a case challenging the same agency actions a few days earlier. *State of Washington, et al., v. HUD, et al.*, No. 1:25-cv-626-MSM-AEM (D.R.I.).

if the Court's order is "no longer in effect," they will implement the December NOFO instead. Dkt. No. 61-1.

## LEGAL STANDARD

Summary judgment "is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (cleaned up). "On cross-motions for summary judgment, each motion is reviewed separately, drawing facts and inferences in favor of the non-moving party." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020). For APA claims, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action" violates the APA. *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

## ARGUMENT

Defendants acted unlawfully in rescinding the FY24-25 NOFO so late, well after the statutory deadline for doing so and just weeks before FY 2025 awards should have gone out and existing grants would begin expiring. Plaintiffs are entitled to relief on the basis of the unlawful rescission alone. But, even apart from their too-late issuance, the FY25 NOFOs are also unlawful for a host of additional reasons and can be set aside on those grounds as well.

## I.    The Rescission of the FY24-25 NOFO Violates the APA

### A.  The Rescission Must Be Set Aside Under Section 706(2) of the APA

The rescission of the FY24-25 NOFO is unlawful and must be set aside under section 706(2) of the APA. No threshold barriers preclude review of the rescission—the rescission is final agency action and is not committed to agency discretion by law. And it must be set aside both because it is contrary to law and in excess of Defendants' statutory authority and because it

29

is arbitrary and capricious.

### 1. The rescission is final agency action

The rescission of the FY24-25 NOFO is a reviewable final agency action. For APA review to be available, a plaintiff must challenge a (1) "discrete" agency action that is "final" in the sense that it (2) "mark[s] the consummation of the agency's decisionmaking process," and (3) determines "rights or obligations" or produces "legal consequences." *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (cleaned up) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The rescission of the FY24-25 NOFO satisfies all three criteria.

First, the rescission is a "discrete" agency action. On November 13, Defendants issued the November NOFO, which "rescind[ed] and supersede[d] any mention of" FY 2025 awards in the FY24-25 NOFO. AR 170. This reflects a specific "decision[]" that Defendants made and that Plaintiffs seek to have set aside. *New York*, 133 F.4th at 67. It does not matter that a "series of events" led up to the rescission. *See* Defs.' PI Mem. at 32, Dkt. No. 45. The fact that Defendants foreshadowed that they would rescind the FY24-25 NOFO—by announcing their intent in July—does not make the rescission itself any less discrete or actionable. Indeed, if that were enough to render an action insufficiently discrete, agencies could regularly insulate their actions from review just by previewing them first.

Second, the rescission is final, as it "marks the consummation of the agency's decisionmaking process." *New York*, 133 F.4th at 67 (cleaned up). Defendants made, and announced, a final decision to rescind the FY24-25 NOFO through the publication of the November NOFO. And while Defendants later withdrew the November NOFO, they made very clear that they were not thereby undoing the rescission of the FY24-25 NOFO, as the December NOFO confirmed. *See* AR 1154.

Third, the rescission determines rights or obligations and produces legal consequences.

As courts have repeatedly held, actions that establish eligibility criteria for federal funding are final agency actions reviewable under the APA. *See, e.g.*, *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056–59 (D. Or. 2018) (collecting cases); *Planned Parenthood of NYC, Inc. v. HHS*, 337 F. Supp. 3d 308, 328–29 (S.D.N.Y. 2018) (same). By the same token, an action that eliminates existing eligibility criteria—and thereby changes the terms on which funds will be awarded—is necessarily a final agency action as well. *Cf. FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action.").

The rescission produced other legal consequences as well—both by newly requiring applicants to reapply for funding and by eliminating the expectation of renewal funding based on the FY24-25 competition. In the FY24-25 NOFO, HUD "reserve[d] the right" to change the NOFO, but it provided that, absent further action, projects awarded funds in FY 2024 were "not required to apply for renewal for FY 2025 funds." AR 31; *see also* Oliva (NAEH) 1st Suppl. Decl. ¶¶ 44–47, Dkt. 49-1 (explaining that HUD took steps to process FY25 renewals in January and June 2025 consistent with the FY24-25 NOFO). That set the terms for awarding FY25 funding—terms that HUD discarded when it rescinded the NOFO, thus resulting in legal consequences.

### 2.    The rescission is not committed to agency discretion by law

The rescission of the FY24-25 NOFO is not insulated from APA review under the exception for agency actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that . . . the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 599–600 (1988); *see Dep't of Com. v. New York*, 588 U.S. 752, 771–72 (2019) (explaining that this exception to the strong

"presumption of judicial review" is read "quite narrowly") (cleaned up). Only in those "rare instances" in which there is "no law to apply" is it appropriate to deem an action "committed to agency discretion" and therefore unreviewable. *Webster*, 486 U.S. at 599.

This case presents no such rare instance. The statute governing the CoC program sets forth standards that cabin HUD's discretion in awarding grants—including by establishing criteria that HUD must consider and the conditions it must impose, 42 U.S.C. §§ 11386(b), 11386a(b)(1); limiting the additional criteria and conditions HUD can adopt, *id.* § 11386a(b)(1)(G); and establishing timelines for releasing notices of funding opportunity and for making awards, *id.* § 11382(b), (d). These detailed statutory provisions supply "meaningful standard[s]" for evaluating HUD's rescission of the FY24-25 NOFO. *See Webster*, 486 U.S. at 600.

Further, the rescission is not the type of decision "that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (quoting 5 U.S.C. § 701(a)(2)). Those traditional categories include a "decision not to institute enforcement proceedings," an intelligence agency's decision "to terminate an employee in the interests of national security," and "[t]he allocation of funds from a lump-sum appropriation" where Congress has not "statutorily restrict[ed] what can be done with those funds." *Id.* Defendants' decision to rescind the FY24-25 NOFO—against the statutory backdrop prescribing criteria and conditions and setting timelines for CoC awards—bears no resemblance to those traditional categories of decisions committed to agency discretion. *Cf. Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021) (holding that agency funding decisions were reviewable where Congress "circumscribed agency discretion to allocate resources by putting restrictions in the operative statute") (cleaned up).

### 3.    The rescission is contrary to law and exceeds Defendants' authority

The rescission of the FY24-25 NOFO is "not in accordance with law" and is "in excess of [Defendants'] statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). By statute, HUD "shall release" a NOFO for grants for a particular fiscal year "not later than 3 months" after the enactment of the act making the appropriation. 42 U.S.C. § 11382(b). Congress appropriated funds for FY 2025 CoC awards on March 15, 2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12), 139 Stat. 9, 12 (2025). If HUD wanted to rescind and replace the two-year NOFO already covering both FY 2024 and FY 2025, the statute required HUD to release the new NOFO for FY 2025 CoC funds "not later than" three months after the enactment of the relevant appropriations—i.e., by June 15, 2025.

But HUD did no such thing. In fact, HUD did not rescind and replace the FY24-25 NOFO until November 13—*eight months* after Congress appropriated the relevant funding. HUD did not have authority to rescind the lawful NOFO that was already in place, contrary to the timing mandate of section 11382(b). *Cf. Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[U]nless and until Congress confers power upon" them, agencies have "literally . . . no power to act."). The rescission must be set aside for this reason alone.

The principle that an agency may in many instances lawfully take an action after missing the deadline is inapposite here. *Contra* Defs.' PI Mem. at 39–41. Whether an agency can still take action after a deadline has passed is a question of congressional intent. *Dolan v. United States*, 560 U.S. 605, 610 (2010) (looking to "statutory language" and "context" and the "purposes that a time limit is designed to serve" to determine "the consequences of [a] missed deadline"). Most often, where Congress directs an agency to take an action by a particular time, it does not thereby intend to "preclude action later." *Nielsen v. Preap*, 586 U.S. 392, 411 (2019) (cleaned up). That is because "an official's crucial duties are better carried out late than never."

33

*Id.* Limiting the agency's ability to act after the deadline would be "counterintuitive," so if Congress had meant to set such a limit, "it would have said" so. *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 163 (2003).

The same logic does not apply where, as here, the agency has *already* taken the required action—*i.e.*, HUD had already taken the required action for FY 2025 when it issued the FY24-25 NOFO. In such circumstances, barring the agency from acting after the deadline would not "strip the government of authority to get the job done." *Castaneda v. Souza*, 810 F.3d 15, 40 (1st Cir. 2015) (Barron, J., for equally divided en banc court) (cleaned up) (concluding that agency lacked authority to take action after the time limit there). There is nothing "counterintuitive," *Barnhart*, 537 U.S. at 163, about limiting the agency's authority in such circumstances—as there is no tension between the mandate that the agency take action and the mandate that the agency do so by a particular deadline. Both mandates can be honored. Indeed, limiting the agency's authority to take a new, untimely action where it has already taken the required action is the only way to avoid rendering the deadline provision meaningless. If an agency could take a required action (by the deadline or even after) and then rescind it and take a new action at any time it wanted, the statutory time limit would be "void or insignificant," contrary to "a cardinal principle of statutory construction." *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up).

In addition, it does not matter that, in the FY24-25 NOFO, HUD "reserve[d] the right to modify [that] NOFO or issue a supplemental FY 2025 . . . NOFO if necessary (e.g., to accommodate a new CoC or YHDP priority or new funding source)." AR 31-32. That reservation of right did not and could not alter the statutory deadline—which HUD failed to meet. *Contra* Defs.' PI Mem. at 41–42, Dkt. No. 45.

Accordingly, Defendants' rescission of the FY24-25 NOFO on November 13 was contrary to law and in excess of statutory authority.

### 4. The rescission is arbitrary and capricious

Defendants' rescission of the FY24-25 NOFO is quintessentially arbitrary and capricious. Courts must hold unlawful any agency action that is "not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). An agency must offer "a satisfactory explanation for its action" and can neither "rel[y] on factors which Congress has not intended it to consider" nor ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although agencies are free to change their existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *Fox Television Stations*, 556 U.S. at 515. This is equally true for a new administration, which may "come into office with policy preferences and ideas" but still must engage in "[r]easoned decisionmaking under the [APA]." *Dep't of Commerce*, 588 U.S. at 783, 785; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 471 (D.R.I. 2025) ("[F]urthering the President's wishes cannot be a blank check for the Agencies to do as they please." (cleaned up)), *appeal filed*, No. 25-1428 (1st Cir. May 1, 2025). Here, Defendants have failed at every turn.

To begin, the decision to rescind the FY24-25 NOFO, and to do so at such a late date, has largely "not been explained at all." *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 887 (W.D. Wash. 2025) (finding that the adoption of new funding conditions, without any explanation, was arbitrary and capricious), *appeal pending*, No. 25-3664. The paltry administrative record underscores the lack of reasoned foundation for the decision: the bulk of the record comprises the NOFOs themselves, and the remaining 26 pages merely include emails and letters to CoCs and members of Congress. *See* AR 1-283. Those communications hardly refer to the rescission at all, much less reasonably explain this action. *See, e.g.*, AR 18 (July 3

email announcing intent to publish new FY 2025 NOFO without explaining reasons for abandoning FY24-25 NOFO). Nowhere does the record explain why HUD was rescinding an existing NOFO just before awards should have gone out, or why the agency could not wait until a new funding cycle to make any lawful changes on a timely basis.

The administrative record also makes clear that Defendants failed to consider multiple "important aspects of the problem." *State Farm*, 463 U.S. at 43. Most significantly, it was inevitable that the timing of the rescission would lead to funding gaps. *See* Calvin (Nashville) ¶ 25, Dkt. No. 7-8; Chanecka (Tucson) ¶ 22, Dkt. No. 7-11; Freeman (Safe Haven) ¶¶ 5, 10, Dkt. No. 7-13; Dillon (Boston) ¶ 19; Marshall (MLK County) ¶ 15, Dkt. No. 7-7; Tavon (MHSA) ¶¶ 22–24, Dkt. No. 7-15; Willis (NLIHC) ¶¶ 36–48, 70–76, Dkt. No. 7-2. Some providers' existing grants already expired in January or are set to expire within days. McSpadden (San Francisco) ¶ 12, Dkt. No. 7-10; Tavon (MHSA) ¶ 22, Dkt. No. 7-15.

Under the FY24-25 NOFO, continuums and service providers expected FY 2025 awards on the normal timeline around December 2025 or January 2026—before their existing one-year FY 2024 grant agreements began to expire in January. *See* Oliva (NAEH) ¶¶ 67–68, 73, 135–36, Dkt. No. 7-1; *see also* Kaminski (Santa Clara) ¶¶ 20, 30, Dkt. No. 7-9; Marshall (MLK County) ¶ 15, Dkt. No. 7-7; McSpadden (San Francisco) ¶ 12, Dkt. No. 7-10. With the late-stage rescission, funds will not be awarded until months later, leaving lengthy funding gaps that will force formerly homeless individuals and families out of their housing and back onto the streets, resulting in the loss of gains made in health and mental health treatment and substance use stability, and placing them at risk of violence, exploitation, and severe trauma. *See, e.g.*, Oliva (NAEH) ¶¶ 132–37, Dkt. No. 7-1; Wilcox (Crossroads) ¶ 74, Dkt. No. 7-3; Frazier (YPI) ¶ 64, Dkt. No. 7-4. The administrative record, which nowhere even acknowledges the effects of the rescission and its timing, confirms that HUD did not consider these impacts, much less articulate

a satisfactory explanation for the action.

Moreover, Defendants failed to consider the reliance interests of CoCs, service providers, and the individuals and the communities they serve. Before it acts, an agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). These reliance interests are significant—they include the fact that the ultimate beneficiaries of the programs awarded funds under the FY24-25 NOFO depend on those funds for their housing and that recipients planned their budgets and made subcontract commitments in reliance on the renewal of grant awards for FY 2025. *See, e.g.*, Oliva (NAEH) 1st Suppl. Decl. ¶¶ 23, 26, 29, Dkt. No. 49-1; McSpadden (San Francisco) ¶¶ 7, 10-13, Dkt. No. 7-10; Tavon (MHSA) ¶¶ 32-34, 44, 48, Dkt. No. 7-15; Frazier (YPI) ¶ 64, Dkt. No. 7-4; Chanecka (Tucson) ¶¶ 24, 31, 34, Dkt. No. 7-11; Dillon (Boston) ¶¶ 17-19, Dkt. No. 7-5; Oliva (NAEH) 2nd Suppl. Decl. ¶ 7. And CoCs and their beneficiaries reasonably held these reliance interests, which are based on not only the two-year NOFO but also the statute itself. Congress designed the CoC program specifically to provide for funding stability and permanent housing, and the agency's longstanding practice in administering CoC awards has been consistent with those objectives. *See supra* Background Section I.A-B; *see also* Kaminski (Santa Clara) ¶ 23, Dkt. No. 7-9. HUD did not consider these effects of its late-stage abandonment of statutory objectives and longstanding agency practice, let alone articulate a "satisfactory" explanation for choosing that course. *State Farm*, 463 U.S. at 43.

Though less harmful than the life-or-death consequences that the ultimate beneficiaries of projects selected under the FY24-25 NOFO will suffer, HUD likewise did not consider the administrative burdens the rescission and replacement would cause. Congress authorized a two-year NOFO to streamline the CoC application process. Rescinding that NOFO (especially so

late) has the opposite effect—yet HUD did not consider this or explain why it took that course. Redoing the competition for FY 2025 funds, starting with the now-withdrawn November NOFO, already resulted in untold hours of work by CoCs that were forced to run new local competitions on a compressed timeframe and by service providers that had to prepare new project applications. Oliva (NAEH) 1st Suppl. Decl. ¶¶ 18-21, Dkt. No. 49-1. The potential of reverting to the December NOFO, and starting the process anew, only exacerbates those harms and wasted resources.

If Defendants wanted to make lawful changes to CoC program policies, they could have attempted to do so much earlier, when the changes would not have been so disruptive. If they could not make their desired changes in a timely manner, there was an obvious alternative path: to wait to take the desired action until the following year, and to do so in a timely manner. Defendants simply have no reasonable explanation for their untimely rescission of the FY24-25 NOFO, mere weeks before renewal awards would otherwise have gone out, rather than waiting until the next year to issue a new NOFO for FY 2026 reflecting their policy priorities.

Defendants cannot cure these myriad problems with better reasoning because, by the time they rescinded the FY24-25 NOFO in November, it was already far too late for any rescission of the FY24-25 NOFO to be reasonable. To effectuate any such rescission, Defendants would have to account for and justify the funding delays and the associated human suffering that would result. That is not possible at this late date and in the particular circumstances here.

### B. The Court Should Compel Defendants Under Section 706(1) of the APA to Award FY 2025 Funding Under the FY24-25 NOFO

Section 706(1) of the APA separately entitles Plaintiffs to an order compelling Defendants to expeditiously award FY 2025 funding for the CoC program pursuant to the FY24-25 NOFO—action that Defendants have unlawfully withheld and unreasonably delayed. *See*

*Ramirez v. ICE*, 471 F. Supp. 3d 88, 94, 191 (D.D.C. 2020) (allowing plaintiffs to bring two counts, under 5 U.S.C. § 706(1) and (2), that "focus[ed] on the same conduct"). Under section 706(1), a court must "compel agency action unlawfully withheld or unreasonably delayed" where an agency was "required to take" a "discrete agency action" but has not. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). Where "Congress imposed a date-certain deadline" that the agency missed, an agency has "unlawfully withheld" agency action. *See Ahadian v. Rubio*, No. 24-cv-12168, 2025 WL 1617224, at *4 n.4 (D. Mass. June 6, 2025) (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999)). And an agency may have "unreasonably delayed" action even if it did not miss a "concrete deadline." *See id.* (quoting *Forest Guardians*, 174 F.3d at 1190). Relief under section 706(1) is warranted here because awarding FY 2025 funding under the FY24-25 NOFO is a discrete agency action that Defendants are required to take, and Defendants have both unlawfully withheld and unreasonably delayed that action.

**1.** To begin, awarding the FY 2025 CoC program funds under the FY24-25 NOFO is a "discrete" and "required" agency action. *See Norton*, 542 U.S. at 63, 64. Unlawfully withheld or unreasonably delayed "discrete" agency actions include, for example, "the failure to promulgate a rule or take some decision." *Id.* at 63. Here, HUD has failed to "take [a] decision," *id.*—namely, to award FY 2025 funds under the FY24-25 NOFO.

Further, there is no reasonable ground to dispute that HUD is required to award the FY 2025 CoC funds that Congress appropriated. The HEARTH Act provides that Defendants "shall award grants" under the CoC program. 42 U.S.C. § 11382(a); *see also id.* § 11386a(a) (providing that HUD "shall award funds to recipients through a national competition between geographic areas"). Moreover, it is well established that the executive branch "does not have unilateral authority to refuse to spend the funds" that are "appropriated by Congress for a particular …

39

program." *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also, e.g.*, *Rhode Island v. Trump*, No. 1:25-cv-128, 2025 WL 3251113, at *13 (D.R.I. Nov. 21, 2025). Congress appropriated over $3.5 billion for the CoC program for FY 2025. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II., 138 Stat. 25, 362-63 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12); § 1105, 139 Stat. 9, 12 (2025) (carrying forward FY 2024 funding levels). The law thus requires HUD to award that funding.

Because, as explained above, it is too late for HUD to issue any other NOFO to govern the award of FY 2025 funds, Defendants are, at this point, required to award that funding *pursuant to the FY24-25 NOFO*. *See supra* Sections I.A.3-4.

**2.** Defendants have unlawfully withheld this action by "fail[ing] to meet a concrete statutory deadline." *Forest Guardians*, 174 F.3d at 1191. The statute prescribes a specific timeline according to which Defendants must carry out their duty to award CoC grants. It specifies that HUD "shall release a notification of funding availability" for CoC program grants for a given fiscal year "not later than 3 months after the date of the enactment" of the act appropriating funds for HUD for that fiscal year. 42 U.S.C. § 11382(b). Next, HUD "shall announce . . . the grants conditionally awarded" for a fiscal year "within 5 months after the last date for the submission of applications" for that fiscal year. *Id.* § 11382(c)(2)(A). Once a recipient or project sponsor for a conditional award "meet[s] all requirements for the obligation" of conditionally awarded funds, HUD "shall" within "45 days . . . obligate the funds for the grant involved" by making the final award. *Id.* § 11382(d)(1)(A), (d)(2).

HUD has made clear that it will not meet the statutory deadline for making conditional awards. As explained above, *supra* Sections I.A.3-4, the FY24-25 NOFO is, and must be, the operative NOFO for FY 2025 because it is too late for HUD to issue a modified or replacement

NOFO. Under the FY24-25 NOFO, August 29, 2025, is the "last date for the submission of applications" for FY 2025, 42 U.S.C. § 11382(c)(2)(A). *See* AR 31.[12] As a result, Defendants were required by law to announce conditional awards no later than January 29, 2026. *See* 42 U.S.C. § 11382(c)(2)(A); *see also generally Norton*, 542 U.S. at 65 ("discrete agency action that is . . . demanded by law . . . includes, of course, agency regulations that have the force of law"); *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations." (cleaned up)).

There is no dispute that Defendants will miss that January 29 deadline. HUD did not provide applicants any means by which to submit relevant applications by the August 29 deadline. Defs.' PI Mem. at 33, Dkt. No. 45. And Defendants have made clear that, absent a court order, they have no intention of announcing conditional FY 2025 awards under the FY24-25 NOFO at any point, let alone by January 29. Dkt. No. 61-1 at 2. Without taking that step, Defendants cannot fulfill their mandatory duty to make final awards under that NOFO either.

Defendants' belated attempt to award the FY 2025 funds pursuant to the new FY25 NOFOs does not cure the problem. As explained above, it is simply too late for HUD to issue a replacement NOFO for the award of FY 2025 funds. Its duty, therefore, is to award funding under the FY24-25 NOFO—an action that it has unlawfully withheld.

The Court should therefore issue an order compelling Defendants to carry out their duty to conditionally award FY 2025 funding under the FY24-25 NOFO. Where, as here, Congress "sets a specific deadline for agency action, neither the agency nor any court has discretion. The

---

[12] CoCs would not need to submit a new application by this deadline for the vast majority of projects—namely, those that received awards under the FY24-25 NOFO in FY 2024 and that the CoC wanted to renew. Oliva (NAEH) 2nd Suppl. Decl. ¶¶ 10-12. But the FY24-25 NOFO gives CoCs an opportunity to submit an additional application for FY 2025 if they want to seek funding for new projects or renew an award that was not granted in FY 2024 but in an earlier fiscal year. AR 31.

agency must act by the deadline." *Forest Guardians*, 174 F.3d at 1190. And where, as here, the agency "withholds such timely action, a reviewing court must compel the action unlawfully withheld." *Id.*; *accord South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018); *Am. Acad. of Pediatrics v. FDA*, 330 F. Supp. 3d 657, 664 (D. Mass. 2018).

**3.** In addition to unlawfully withholding the award of FY 2025 funds by missing the deadline to announce conditional awards, Defendants have also unreasonably delayed awarding FY 2025 funds under the FY24-25 NOFO. Defendants' delay in satisfying their nondiscretionary duty to award FY 2025 funding under the FY24-25 NOFO is manifestly unreasonable and has already created funding gaps.

To evaluate whether agency action is unreasonably delayed, courts in this circuit look to the guidelines provided in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*"). *See Towns of Wellesley, Concord & Norwood, Mass. v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987). Those guidelines include six, nonexclusive considerations:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC*, 750 F.2d at 80 (cleaned up). These considerations uniformly point towards unreasonable delay here.

As to the first consideration, Defendants have not claimed any "rule of reason" that would justify their delay; instead, they have wrongly disclaimed any obligation to award funding

under the FY24-25 NOFO at all. Besides, as to the second consideration, the statute expressly provides an appropriate rule of reason: As just explained, the statute, in conjunction with the FY24-25 NOFO, requires HUD to issue conditional awards no later than January 29, 2026—a deadline HUD will not meet (and a duty HUD will not satisfy at all unless required by court order).

Further, as to the third consideration, a several-month delay is intolerable in this context, where "human health and welfare are at stake"—as the delay causes severe funding gaps for CoC projects that will lead to formerly unhoused individuals losing their homes. *TRAC*, 750 F.2d at 80; *see also* Oliva (NAEH) 2nd Suppl. Decl. ¶¶ 6-8; Oliva (NAEH) 1st Suppl. Decl. ¶¶ 23-30, Dkt. No. 49-1; Freeman (Safe Haven) ¶¶ 5, 10, Dkt. No. 7-13; Marshall (MLK County) ¶¶ 14, 15, Dkt. No. 7-7; Calvin (Nashville) ¶¶ 24-26, Dkt. No. 7-8; Chanecka (Tucson) ¶¶ 22, 31, Dkt. No. 7-11; Dillon (Boston) ¶ 19, Dkt. No. 7-5. For the same reasons, as to the fifth consideration, the "interests prejudiced by delay" are, for many of those who benefit from the services that Plaintiffs and their members provide, a matter of life and death. *TRAC*, 750 F.2d at 80; *see* Oliva (NAEH) ¶¶ 133–37, Dkt. No. 7-1; Wilcox (Crossroads) ¶ 74, Dkt. No. 7-3; Frazier (YPI) ¶¶ 64-66, Dkt. No. 7-4. And, as to the fourth consideration, Defendants do not—and indeed cannot—point to any competing priority that might lessen the unreasonableness of the delay in processing awards for this nearly four-billion-dollar statutory program.

Finally, as the *TRAC* court explained with respect to the sixth consideration, it is irrelevant whether any "impropriety lurk[s] behind [HUD's] lassitude" here. *TRAC*, 750 F.2d at 80. The delay is profoundly unreasonable, full stop.

The Court should therefore grant summary judgment on Plaintiffs' claim under section 706(1) and compel Defendants to award FY 2025 funding for the CoC program under the FY24-25 NOFO, including by expeditiously making conditional awards and then promptly making

final awards upon satisfaction of any required conditions, as set forth more fully below.

### C. The Proper Remedies Are Vacatur of the Rescission and An Order Compelling Defendants to Make Awards Promptly

To address Defendants' unlawful rescission of the FY24-25 NOFO—and their resulting failure to make awards under that NOFO as required by law—the Court should vacate the rescission and compel Defendants to promptly make awards under the FY24-25 NOFO. If the Court enters this relief, then it need not reach Plaintiffs' claims regarding the FY25 NOFOs.

### 1. The Court should set aside the rescission of the FY24-25 NOFO under 5 U.S.C. § 706(2)

The Court should vacate the rescission of the FY24-25 NOFO pursuant to 5 U.S.C. § 706(2). Vacatur is the ordinary remedy when a court determines that an agency action violates the APA. *See, e.g.*, *California v. U.S. DOT*, No. 25-cv-208-JJM-PAS, 2025 WL 3072541, at *11 (D.R.I. Nov. 4, 2025) (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 826–27 (2024) (Kavanaugh, J., concurring); *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002)). Because vacatur "acts directly" on the agency action under review, *Corner Post*, 603 U.S. at 829 (Kavanaugh, J., concurring), it is not a party-specific remedy. And, indeed, a party-specific remedy would not even be workable in this case, where all CoCs compete for the funding from the same, limited pot of money. *Cf. Chicago v. Barr*, 961 F.3d 882, 921 (7th Cir. 2020).

The result of that vacatur will be that the FY24-25 NOFO would again become the operative NOFO for all applicants. But "[t]o avoid any confusion," the Court also should "order" HUD "to reinstate" the FY24-25 NOFO upon entry of final judgment. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). That will ensure that HUD and all applicants have clear and unequivocal public notice about the terms of the CoC grants for FY 2025.

Moreover, remand to HUD is neither required nor appropriate. Where an agency can take only one action lawfully, remand for further consideration "would be an idle and useless formality." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 544 (2008) (cleaned up). Here, the only option lawfully available to HUD is to carry out the FY24-25 NOFO and make awards pursuant to its terms for FY 2025. The statutory deadline for a new FY25 NOFO has long passed and replacing it is no longer consistent with reasoned decisionmaking, *see supra* Section I.A.3-4, and there is no legal path for HUD to issue another new NOFO at this late juncture.

### 2. The Court should compel Defendants to make FY 2025 awards promptly under the FY24-25 NOFO under 5 U.S.C. § 706(1)

The Court should also enter an order compelling Defendants to promptly make FY 2025 CoC awards pursuant to the terms of the FY24-25 NOFO. The remedy for an unlawfully withheld or unreasonably delayed agency action is an order "compel[ling]" that action. 5 U.S.C. § 706(1); *see also South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018) ("[I]f a party has successfully demonstrated an unlawfully withheld agency action under § 706(1), the court must enter an appropriate order and secure the agency's compliance with the law."). Plaintiffs are entitled to such an order under 5 U.S.C. § 706(1) regardless of the equitable factors that traditionally govern injunctions. *See South Carolina*, 907 F.3d at 761 (concluding that "the general rules for injunctive relief, derived from equity, do not control relief under § 706(1)"). And in any event, the equitable factors overwhelmingly favor Plaintiffs, as Plaintiffs and their members and constituents face devastating gaps in funding, and an inability to maintain housing and other critical services for homeless and formerly homeless individuals and families absent relief. *See, e.g.*, *supra* Background Section IV; Oliva (NAEH) 2nd Suppl. Decl. ¶¶ 5-7; Oliva (NAEH) 1st Suppl. Decl. ¶¶ 23-30, Dkt. No. 49-1; Oliva (NAEH) ¶¶ 133–37, Dkt. No. 7-1;

Wilcox (Crossroads) ¶ 74, Dkt. No. 7-3; Frazier (YPI) ¶¶ 64-66, Dkt. No. 7-4.

The Court's order should compel Defendants to promptly make awards in accordance with the FY24-25 NOFO. In particular, the order should compel Defendants, by specific deadlines, to take the two steps the statute identifies for making awards: (1) announcing conditional awards and (2) obligating the funds by making final awards once the recipient meets all applicable requirements. 42 U.S.C. § 11382(c)(2)(A), (d)(2).

For the first step, by statute, Defendants should have announced conditional awards by January 29, 2026—"5 months after the last date for the submission of applications" for the fiscal year, which the FY24-25 NOFO had set as August 29, 2025. 42 U.S.C. § 11382(c)(2)(A); AR 31 (setting August 29 application deadline). Because that date will have already passed and CoCs and their communities face mounting harms the longer the delay persists, the Court should order Defendants to announce conditional awards as quickly as possible and by one of two specific deadlines, depending on the type of award. In particular, there are two categories of FY 2025 awards, each of which requires a different level of processing under the FY24-25 NOFO: (1) renewal awards for projects that received FY 2024 funding under the FY24-25 NOFO, for which no new application and only minimal additional review[13] is required (No-Application Renewals) and (2) renewal and new awards that did not receive FY 2024 awards under the FY24-25 NOFO and for which a new application and full review is accordingly required (New-Application

---

[13] Plaintiffs and Defendants disagree on precisely what review is required for No-Application Renewals under the FY24-25 NOFO but agree that the review is not onerous and can be completed quickly. Plaintiffs do not currently seek court intervention as to what review Defendants may undertake in implementing the FY24-25 NOFO but reserve the right to do so if Defendants' undertaking of unnecessary review steps causes undue delay or otherwise causes Plaintiffs harm.

Awards).[14] The Court should order Defendants to announce No-Application Renewals by March 2 and New-Application Awards by March 31, or one week after the Court's order, whichever is later for each category.

These deadlines are reasonable. The Court's order granting preliminary relief required Defendants to begin processing renewal awards to minimize the delay in actually making awards if and when the Court entered final judgment requiring them to do so. *See* Dkt. No. 52 ¶ 6. Pursuant to that order, Defendants have begun the process and stated they can complete selections for both categories of awards by "no later than late March 2026." Dkt. No. 61-1 at 2. Plaintiffs' requested March 31 deadline for New-Application Awards is therefore reasonable and achievable by Defendants' own admission.

The earlier, March 2 deadline for conditionally awarding No-Application Renewals is also reasonable and warranted. Defendants' preferred late March announcement would be too late, as many grantees' existing awards will have already expired by then. Oliva (NAEH) 1st Suppl. Decl. ¶¶ 15, 23, 27, 29, Dkt. No. 49-1. Every day of additional delay causes more harm as grantees prepare to evict residents and turn away others needing housing. *See* Oliva (NAEH) 2nd Suppl. Decl. ¶¶ 5-7; Oliva (NAEH) 1st Suppl. Decl. ¶¶ 24-29, 30, 34, Dkt. No. 49-1; Willis (NLIHC) ¶¶ 50, 78, Dkt. No. 7-2; Tavon (MHSA) ¶ 48, Dkt. No. 7-15; Frazier (YPI) ¶ 64, Dkt. No. 7-4; Chanecka (Tucson) ¶ 34, Dkt. No. 7-11. There is no need to wait until HUD completes the more extensive process for selecting New-Application Awards before it announces the No-Application Renewals to which a far more streamlined process applies. And Defendants concede they can expedite the processing and announcement of certain awards when needed. AR 297

---

[14] Approximately $3.34 billion in funding would be eligible for renewal as a No-Application Renewal. Oliva (NAEH) 2nd Suppl. Decl. ¶ 14. The New-Application Awards consist of renewals of awards made in years before FY 2024 and awards for new projects that CoCs create primarily by reallocating or replacing existing projects. AR 31.

(Defendants propose issuing awards that require less review more quickly than others under the December NOFO). March 2 is more than one month after the last permissible date for making awards under the statute, more than one month after grants began expiring, over two months after this Court ordered Defendants to begin processing those renewals, and over seven weeks after HUD began that processing. *See* 42 U.S.C. § 11382(c)(2)(A); Oliva (NAEH) ¶¶ 134-136, Dkt. No. 7-1 (grants began expiring in January); Dkt. No. 52 ¶ 6 (order entered December 23, 2025, requiring Defendants to begin processing); ECF No. 61-1 (notice kicking off FY 2025 award process sent on January 8, 2026).

For the second step, the Court should order Defendants to obligate funding by making final awards within 30 days after the recipient meets the applicable requirements, 42 U.S.C. § 11382(d)(1), (2). While the statute ordinarily gives HUD 45 days to make final awards, *id.* § 11382(d)(2), truncating that period is appropriate given that awards are already behind schedule as a result of the unlawful and unreasonable delay Defendants have caused.[15]

## II.  The FY25 NOFOs Are Unlawful

The FY25 NOFOs are also unlawful for a host of independent reasons: they exceed Defendants' statutory authority, conflict with controlling statutes and regulations, are arbitrary and capricious, were adopted without following required procedure, and violate multiple

---

[15] If the Court does not grant relief under section 706(1) but concludes Plaintiffs are entitled to relief under section 706(2), then it should direct HUD to file within 7 days a compliance plan setting forth the steps HUD will take to effectuate the vacatur of the rescission and the corresponding reinstatement of the FY24-25 NOFO. That plan should include the timeline on which HUD will make conditional and final awards. For the reasons given above, in Plaintiffs' view, that plan should provide for conditional awards for No-Application Renewals to be announced by March 2 and New-Application Awards by March 31, and for HUD to make final awards within 30 days of recipients satisfying the applicable requirements. Such an order is necessary to prevent irreparable harm to Plaintiffs and their members from HUD's rescission of the FY24-25 NOFO, and to restore the status quo ante as best as possible. *Cf. Keystone-Conemaugh Projects LLC v. U.S. EPA*, 100 F.4th 434, 446 (3d Cir. 2024) ("When a court vacates an agency's rule, it restores the status quo before the invalid rule took effect . . . .").

constitutional commands. The Court need not reach these claims if it grants Plaintiffs the relief they request for the rescission claims as described above, but, if it does, it should set those FY25 NOFOs aside and enjoin Defendants from including the same unlawful provisions in any new FY 2025 NOFO.

### A. The FY25 NOFOs Violate the APA[16]

#### 1. The FY25 NOFOs exceed Defendants' authority

For agencies charged with administering statutes, "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority . . . violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (cleaned up). Defendants lack authority to impose the Permanent Housing Caps, New Project Earmark, Review Criteria, and Post-Award Conditions.[17]

To begin, no statute authorizes Defendants to impose a 30 percent cap—or any cap—on permanent housing or permanent housing renewals, or to render existing projects categorically ineligible for a significant portion of funding by earmarking funds for new projects. The statute

---

[16] The FY25 NOFOs are final agency action reviewable under the APA. They unquestionably mark Defendants' final decision to impose new conditions and criteria to select recipients for FY25 CoC funds, and they affect rights and obligations and produce legal consequences by affecting applicants' eligibility for funds. *See supra* Section I.A.1 (discussing cases holding that actions establishing eligibility criteria for funding are final agency action).

[17] Plaintiffs challenge both the November and December NOFOs. Importantly, Defendants' abrupt withdrawal and replacement of the November NOFO during this litigation does not moot claims about that NOFO. The voluntary-cessation doctrine requires HUD to meet a "formidable burden" to "show that the practice cannot reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up). Despite withdrawing the November NOFO, HUD has provided no "assurance" that it will not reimpose that NOFO's Challenged Provisions in the future. *Id.* at 243. Because "the Government nowhere suggests that if this litigation is resolved in its favor it will not reimpose" the November NOFO's Challenged Provisions, the controversy regarding those provisions "remains justiciable." *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (cleaned up).

requires HUD to award funds "based on criteria" that HUD establishes pursuant to the statute. 42 U.S.C. § 11386a(a). It does not permit HUD to categorically limit certain kinds of projects regardless of how they would rank under the criteria—and it certainly does not permit HUD to impose a cap on the very activities Congress expressly determined to have been proven effective at combatting homelessness. *Id.* § 11386b(d)(2).

Nor does the statute authorize HUD to impose the host of new Review Criteria and Post-Award Conditions that the FY25 NOFOs impose. The statute prescribes a detailed list of "[r]equired criteria" HUD must consider when awarding grants—including things like the applicant's "previous performance . . . regarding homelessness," its plan for reducing the existence and duration of homelessness, its coordination with other entities, and its ability to obtain supplemental funding. 42 U.S.C. § 11386a(b)(1). And the statute identifies the conditions to which grantees must agree—things like involving unhoused individuals in project operations and ensuring children are enrolled in school. *Id.* § 11386(b). HUD may also establish additional criteria and conditions to carry out the program "in an effective and efficient manner," *id.* §§ 11386a(b)(1)(G), 11386(b)(8), but the challenged Review Criteria and Post-Award Conditions do nothing to serve efficacy and efficiency goals. Indeed, in many instances, they advance wholly unrelated ideological and policy goals on topics like race, gender identity, abortion, or "harm reduction" activities the grantee conducts outside the scope of the funded program. *See, e.g.*, AR 1164, 1195, 1205-06, 1250-51. Such criteria and conditions are not even "of the same kind" as the ones the statute specifies—all of which involve ways to effectively address homelessness—and the statute cannot be read to authorize conditions that are different in kind from the ones the statute imposes. *Cf. King, Cnty.*, 785 F. Supp. 3d at 886 (concluding that similar grant of authority in CoC statute could not authorize conditions not "of the same kind" as those in the statute).

The FY25 NOFOs' Retroactive Reservations also exceed Defendants' statutory authority for the additional reason that they operate retroactively by potentially disqualifying applicants based on their past conduct. AR 1195, 1205-06; *see also* AR 210, 220. As the Supreme Court has made clear, an agency lacks the "power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Congress has conveyed no such power here.

### 2.    The Challenged Provisions are contrary to law

Agency action that is "not in accordance with law" must be set aside. 5 U.S.C. § 706(2)(A). The FY25 NOFOs' destabilization of permanent housing, as well as a range of other unlawful review criteria, render the FY25 NOFOs contrary to law.

### a.    Destabilization of Permanent Housing

The FY25 NOFOs redirect funding away from stable permanent housing and instead to transitional housing and "supportive services" projects with no housing component.[18] AR 288. They do so by, among other things, imposing Permanent Housing Caps that limit funding for permanent housing renewals (or, for the November NOFO, all permanent housing) at 30 percent of each CoC's annual renewal demand (i.e., 30 percent of the amount needed to renew all existing projects) and by adopting a New Project Earmark that categorially excludes existing permanent housing projects from eligibility for over $1.26 billion in funding. These provisions contravene the statute in multiple ways.

First, they conflict with 42 U.S.C. § 11386c(b) twice over. For one, under that provision, "[t]he sums" appropriated for the program "shall be available for the renewal of contracts" for

---

[18] *See* U.S. Dep't of Hous. and Urb. Dev., *HUD Secretary Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund*, News, https://perma.cc/334N-5AWQ (last visited Jan. 13, 2026).

"permanent housing." 42 U.S.C. § 11386c(a)-(b). The Permanent Housing Caps and New Project Earmark conflict with this direction by limiting the amounts that can be awarded for existing permanent housing—and thereby ensuring that "[t]he sums" appropriated will not in fact "be available" to renew permanent housing contracts. In addition, the provision mandates that HUD "determine whether to renew" such projects "on the basis of" the CoC's certification as to two (and only two) things: that "there is a demonstrated need" and that "the project complies with program requirements and appropriate standards of housing quality and habitability." 42 U.S.C. § 11386c(b). The Permanent Housing Caps and New Project Earmark mean that HUD will impermissibly make the decision on whether to renew a permanent housing project based not on the two statutorily identified factors but based on whether a CoC had already hit the baseless 30 percent cap on funding for permanent housing or whether the limited funding HUD has made available for existing projects has been exhausted.

Second, the Permanent Housing Caps conflict with the statute's requirement that HUD provide "incentives" for specified permanent housing activities that Congress determined have proven effective in combatting homelessness (or other proven strategies that HUD identifies after notice and comment, of which there are none). *See* 42 U.S.C. § 11386b(d). By dramatically restricting the pool of funding available for existing permanent housing projects, Defendants incentivize CoCs and applicants to seek funding for other types of projects whose funding pools are not so limited. This restriction violates the statutory requirement that only specified permanent housing projects be incentivized.[19]

---

[19] The Permanent Housing Cap in the November NOFO also violates 42 U.S.C. § 11386(a)(1)'s and (b)'s statutory mandates to provide minimum amounts of funding to certain types of permanent housing projects because it would make it virtually impossible that HUD could meet the statutory minimums.

### b. Disability Conditions

The FY25 NOFOs' Disability Conditions conflict with federal statutes and regulations that prohibit discrimination on the basis of disability. Both FY25 NOFOs award points for imposing service requirements on participants, but not participants with physical or developmental disabilities. AR 1196-97; AR 211-12. The conditions thus push service providers to treat people disparately based on type of disability. This violates the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, 12181-89 and the Rehabilitation Act of 1973, 28 U.S.C. § 794, both of which prohibit unequal access on the basis of disability. It also violates HUD's own regulation, 24 C.F.R. § 8.4(b)(1)(ii), which bars grantees from "afford[ing] a qualified individual with handicaps an opportunity to participate in" the grant-funded service "that is not equal to that afforded to others." The disabilities protected by this regulation include those with physical and mental impairments, including substance use disorders. *Id.* § 8.3. Applicants would be in violation of these laws if they imposed certain requirements based on type of disability to meet these conditions in the FY25 NOFOs.

In addition, the November NOFO rewarded applicants that served individuals with certain disabilities, not including mental or emotional impairments or "substance use disorder," AR 216, in direct conflict with Congress' unmistakable directive that permanent supportive housing must serve all homeless individuals with disabilities, including people with mental health and substance use disabilities. *See* 42 U.S.C. § 11386b(a)(1); 42 U.S.C. § 11360(10)(A); *see also* 24 C.F.R. § 578.3; 24 C.F.R. § 578.1. By incentivizing different treatment based on disability for permanent housing, Defendants violate the statutory mandate to make permanent supportive housing available to all homeless individuals with disabilities.

### c. Geographic Discrimination Conditions

The FY25 NOFOs preference applicants whose projects are located in jurisdictions that

53

implement public policies favored by the Administration. Applicants are awarded points, for example, if they are in a jurisdiction that is substantially compliant with the Sex Offender Registry and Notification Act (SORNA)[20] and if their jurisdiction clears encampments and enforces laws against public illicit drug use. AR 1227-28; AR 241-42.

But Congress has been clear that this kind of interference into local decision-making is prohibited: HUD cannot "establish any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law," so long as the policy or law was within the jurisdiction's authority and does not violate federal law. 42 U.S.C. § 12711. The Geographic Discrimination Conditions straightforwardly conflict with this provision.

### d. Gender Identity Reservation and Conditions

The Gender Identity Reservation (in the November NOFO) and Gender Identity Conditions (in both FY25 NOFOs) conflict with myriad laws. In particular, the Fair Housing Act and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, which includes gender identity. 42 U.S.C. §§ 3604(a)-(b), 2000e–2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see also Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmty. Project, Inc.*, 576 U.S. 519 (2015) (likening Fair Housing Act's sex discrimination provisions to those of Title VII). And binding HUD regulations require that, in CoC programs, individuals be treated in accordance with their gender identity. 24 C.F.R. § 5.106.

Yet the Gender Identity Reservation and Conditions would require grantees to commit to

---

[20] SORNA "does not require" states to implement its standards, so the extent to which a state complies is a matter of state law and policy. 73 Fed. Reg. 38030, 38047 (July 2, 2008).

treating sex as binary[21]—which would apparently preclude them from acknowledging transgender individuals' gender identity or treating them in accordance with that identity. Thus, complying with these provisions would require organizations to violate the Fair Housing Act, Title VII, and/or HUD's nondiscrimination regulations.

### 3. The FY25 NOFOs are arbitrary and capricious

Foundational principles of administrative law forbid agencies from making "arbitrary" or "capricious" decisions. 5 U.S.C. § 706(2). To survive judicial review, agency action must be both "reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 807 (2022). The reviewing court must ensure, among other things, that the agency has offered "'a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Ohio*, 603 U.S. at 292 (cleaned up) (quoting *State Farm*, 463 U.S. at 43). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. An agency must genuinely consider relevant evidence and factors; merely "stating that a factor was considered—or found—is not a substitute for considering or finding it." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (cleaned up). And when an agency changes policy, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30 (cleaned up). The FY25 NOFOs repeatedly flunk these basic standards, and they and their Challenged Provisions must be set aside as arbitrary and capricious.

---

[21]*See* AR 210, 220, 263; Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025); AR 1250 (requiring grantees to comply with E.O. 14168).

### a. Destabilization of Permanent Housing

When issuing the FY25 NOFOs, HUD failed to consider the predictable and devastating consequence of people losing their homes. The Permanent Housing Caps and Tier 1 Allocation would force many permanent housing programs to shutter, pushing hundreds of thousands of people into homelessness. *See, e.g.*, Oliva (NAEH) ¶¶ 7-8, 100, 109, 117-19, Dkt. No. 7-1; Dillon (Boston) ¶¶ 23-25, Dkt. No. 7-5; Marshall (MLK County) ¶¶ 16-17, Dkt. No. 7-7; Chanecka (Tucson) ¶ 24, Dkt. No. 7-11; Magargee (Cambridge) ¶¶ 13, 23-26, Dkt. No. 7-6. The first time around, when HUD issued the November NOFO, it said nothing about this devastating real-world impact.[22]

HUD's second attempt, with the December NOFO, fares no better. It pairs its Permanent Housing Cap and Tier 1 Allocation with a New Project Earmark that sets aside around one-third of available funding for *new* permanent housing projects only—thereby categorically disqualifying existing projects from even competing for that funding. The same day HUD issued the December NOFO, in response to this litigation, it finalized a memorandum documenting the "Recommendation for Revised FY25 CoC NOFO." AR 286-99 (December 19 McKenney Memo). Even in this memorandum, HUD did not claim it considered the plight of the people who would be forced to return to homelessness. *See* AR 293 (listing the pros and cons of issuing a new FY25 NOFO and undertaking a new competition).

The administrative record then makes fleeting reference to forthcoming "guidance" about how program participants (i.e., people) *might* be able to transition from permanent housing to transitional housing. AR 295. And HUD further claims—without any support or reasoning—that "all program participants may be eligible for assistance in another project in the CoC or for other

---

[22] *See supra* note 18 (HUD's November NOFO announcement).

homelessness assistance outside the CoC," and that "local communities have immense discretion and flexibility to ensure that they are serving their citizens best." AR 298. But these blanket assertions fall short. They fail to address important aspects of the problem: for one, statutory and regulatory requirements would not allow such transitions. *See* Oliva (NAEH) ¶ 101, Dkt. No. 7-1 (explaining that statutory and regulatory definitions of homelessness would not allow people currently housed in permanent housing to switch to transitional housing programs); Magargee (Cambridge) ¶ 23, Dkt. No. 7-6; Willis (NLIHC) ¶¶ 76-77, Dkt. No. 7-2. In addition, communities do not have sufficient resources, like emergency shelters, or other housing options, to serve everyone who will be thrust out of permanent housing and into homelessness once again. Willis (NLIHC) ¶¶ 48-49, 76-78, Dkt. No. 7-2; Kaminski (Santa Clara) ¶¶ 43-44, Dkt. No. 7-9; Declaration of Amy M. Davidson (San Mateo) ¶ 23, Dkt. No. 7-12; Dillon (Boston) ¶ 40, Dkt. No. 7-5; Marshall (MLK County) ¶ 19, Dkt. No. 7-7. Such resources and flexibility are not so readily available to local communities as Defendants suggest without any basis.

Likewise, HUD did not sufficiently account for the "serious reliance interests" of providers. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (cleaned up). Plaintiffs, and their members and constituents, along with countless providers around the country, developed supportive housing systems, invested significantly in building permanent housing—all in reliance on the longstanding and consistent directives from HUD. *See, e.g.*, Oliva (NAEH) ¶¶ 24, 33, 37, 77-78, 86, 128, Dkt. No. 7-1; Wilcox (Crossroads) ¶¶ 18-21, Dkt. No. 7-3; Marshall (MLK County) ¶ 18, Dkt. No. 7-7; Chanecka (Tucson) ¶ 5, Dkt. No. 7-11; Dillon (Boston) ¶ 5, Dkt. No. 7-5; Magargee (Cambridge) ¶¶ 16-17, Dkt. No. 7-6. In addition, organizations and governments have invested significant resources of their own into these projects, pursuant to CoC programs' funding match requirements, among other investments. *See,*

*e.g.*, Kaminski (Santa Clara) ¶ 34, Dkt. No. 7-9; Magargee (Cambridge) ¶ 17, Dkt. No. 7-6; Marshall (MLK County) ¶ 21, Dkt. No. 7-7.

In addition, in upending stability by drastically reducing the Tier 1 Allocation from 90 percent to 30 percent, Defendants offered the sole reason that "competition" needs to be restored to "drive[] outcomes, effectiveness, innovation, and accountability." AR 290; *see also* AR 297. But nothing in the administrative records demonstrates that prior Tier 1 projects, i.e., programs currently providing housing and services to communities, lack merit, or are otherwise ineffective. And again, Defendants miss the point that a loss of renewal funding will lead to loss of housing for thousands. Defendants' faulty and unsupported reasoning does not hold up as reasoned or reasonable agency decision-making.

By destabilizing and defunding permanent housing, Defendants aim to restore "balance" and shift CoC funding to "Transitional Housing and Supportive Services Only projects." AR 288. The record, however, does not address the research showing the inefficacy of transitional housing. *See, e.g.*, FY 2013 NOFO at 10 (noting research showing that transitional housing is generally "more expensive" and "under-utilized because homeless households cannot overcome the barriers to entry"); Oliva (NAEH) ¶¶ 39, 86, Dkt. No. 7-1; Kaminski (Santa Clara) ¶ 12, Dkt. No. 7-9. Moreover, Defendants offer no reasonable explanation for why they are adopting an unproven strategy, over a strategy that Congress has deemed effective, i.e., permanent housing. *See also supra* Background Section I.B (summarizing research showing effectiveness of permanent housing).

### b. Review Criteria

The FY25 NOFOs also imposes a host of new Review Criteria that Defendants have not supported with reasoned decisionmaking.

*Service Requirements*. Defendants' imposition of Service Requirements, i.e.,

conditioning housing on mandatory services, is unsupported by evidence, lacks rational reasoning, and ignores serious reliance interests.

Defendants' explanations for abandoning evidence-based strategies are neither "reasonable" nor "reasonabl[y] explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants broadly group the FY25 NOFOs' Service Requirements as part of HUD's decision to shift away from Housing First strategies, including voluntary services. As one justification, Defendants contend that homelessness has increased, especially in recent years, despite longstanding support for Housing First strategies. *See* AR 287. But Defendants make no effort to explain how Housing First strategies have caused or contributed to increases in homelessness. Indeed, in the record, the 2024 Annual Homelessness Assessment Report (AHAR) to Congress explains that increases in homelessness, particularly in recent years, were driven by factors like the worsening national affordable housing crisis, inflation and wage stagnation, the end of pandemic-era eviction bans and other supports, and natural disasters that displaced people from their homes—not the absence of service requirements to obtain housing. AR 585, 597. Homelessness is a systemic, multifaceted issue, AR 574, and multiple strategies, including those associated with Housing First, have had success.

Defendants likewise failed to consider the significant evidence that contradicts their basis for shifting resources away from voluntary services to mandatory Service Requirements. Defendants utterly fail to acknowledge the significant evidence showing the effectiveness of Housing First and voluntary services. Wilcox (Crossroads) ¶ 37, Dkt. No. 7-3 (data shows that 93 percent of those placed in Crossroads' housing, offering services with a Housing First model, never returned to homelessness); Oliva (NAEH) ¶¶ 33-43 & nn. 5-7, 9, Dkt. No. 7-1; *see also id.* ¶ 45 (describing consistent reduction in homelessness between 2010 and 2020, including 50 percent reduction in veteran homelessness and 16 percent reduction in chronic homelessness).

HUD itself, in 2023, highlighted a series of studies that found Housing First programs to be more effective than treatment first programs. *See* Kaminski (Santa Clara) Ex. 2, Dkt. No. 7-9 at 26-42. Those studies, among other findings, showed Housing First programs resulted in "quicker exits from homelessness and greater housing stability," (*id.* at 31); reduced costs (by shortening stays in hospitals, prisons, and elsewhere) (*id.* at 32); and helped to "successfully house people with intersecting vulnerabilities," such as veterans and "individuals experiencing substance use or mental health issues." (*id.* at 38). HUD also did not consider research (that it previously endorsed) indicating that requiring treatment, like the Service Requirements, "produces inferior housing stability outcomes" and can counterproductively cause individuals experiencing homelessness to "disengage[] from critical services." *Id.* at 30; *see also* Oliva (NAEH) ¶¶ 90-91, Dkt. No. 7-1.

Here too, Defendants ignore the serious reliance interests of providers and the communities they serve. It would be virtually impossible for providers to flip to imposing Service Requirements. *See, e.g.*, Willis (NLIHC) ¶¶ 74, 77, Dkt. No. 7-2; McSpadden (San Francisco) ¶ 31, Dkt. No. 7-10. These Service Requirements are coercive and erode client trust and choice, key ingredients to keeping people housed and fulfilling Plaintiffs' missions. Wilcox (Crossroads) ¶¶ 35, 37, Dkt. No. 7-3. Providers face a lose-lose situation. If providers implement these Service Requirements to remain competitive and secure CoC funds, many people will refuse services and Plaintiffs will be forced to exit those individuals, Wilcox (Crossroads) ¶¶ 36, 37, Dkt. No. 7-3, resulting in more unhoused people—not less.  But if providers continue to make services voluntary, they risk a lower ranking and the loss of their CoC grants. Wilcox (Crossroads) ¶¶ 37-39, Dkt. No. 7-3.

Defendants' imposition of Service Requirements also fails to account for the impact on Plaintiffs and other service providers who must comply with conflicting federal laws. The CoC

program is a vital source of funding to entities that provide housing to survivors of domestic violence and sexual assault. Dillon (Boston) ¶ 36, Dkt. No. 7-5; Declaration of Mary Katherine Rand (Mary Parrish Center) ¶¶ 3-5, Dkt. No. 7-14. But those entities' programs frequently also rely on funding under the Violence Against Women Act and the Family Violence Prevention Service Act—and those laws outright prohibit grantees from requiring beneficiaries to participate in support services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2); *see also* Freeman (Safe Haven) ¶ 8, Dkt. No. 7-13; Rand (Mary Parrish Center) ¶ 6, Dkt. No. 7-14. Defendants failed to consider how the Service Requirements would systematically disadvantage those providers in the FY25 CoC competition and lead to closure of vital programs for survivors. *See, e.g.*, Dillon (Boston) ¶¶ 36-38, Dkt. No. 7-5; Freeman (Safe Haven) ¶¶ 7-9, Dkt. No. 7-13; Rand (Mary Parrish Center) ¶¶ 9-11, Dkt. No. 7-14; Wilcox (Crossroads) ¶ 38, Dkt. No. 7-3.

Defendants similarly did not consider the problem the Service Requirements would create for providers whose HUD-funded projects are also funded by states, such as California, that have codified Housing First by prohibiting service or program compliance as a condition of housing. *See* Cal. Welf. & Inst. Code § 8256. These entities, too, would face an undue burden in restructuring their programs and determining if and how they can meet both the FY25 NOFOs' Service Requirements and the state funding requirements—another consequence Defendants failed to consider. *See* McSpadden (San Francisco) ¶¶ 28-31, Dkt. No. 7-10.

*Disability Condition.* Incentivizing applicants to treat participants differently on the basis of disability is arbitrary and capricious for lack of a reasoned explanation.

The only possible recorded explanation for imposing service requirements on people with substance use and mental health disabilities is HUD's stated intention "to help able-bodied people move to self-sufficiency." AR 1147. HUD then goes on to contrast, "[i]ndividuals who

are likely to never be able to return to the workforce – over 62 years old, physically disabled, developmentally disabled" with other individuals who have "certain disabilities, such as impairment due to substance abuse, [and] are able to recover and regain self-sufficiency." AR 1147. Those assertions are unsupported by any citation or record evidence. Instead, HUD appears to rely exclusively on stereotypes of individuals with physical and developmental disabilities as being unable to move to "self-sufficiency" and people with other types of disabilities as being "able-bodied" and "able to recover."

Such stereotypes are not legitimate factors for HUD to consider in implementing the CoC program. Congress has enacted multiple statutes—including the Fair Housing Amendments Act and the Americans with Disabilities Act—to combat discrimination in housing and employment against certain stigmatized groups, including those with mental illness. These statutes specifically rejected generalized perceptions about disabilities and unfounded speculations as grounds to justify exclusion of persons with disabilities from the American mainstream. *See, e.g.*, Legislative History, H.R. Rep. No. 100-711, 100th Cong., 2d Sess. 13, *reprinted in* 1988 U.S. Code Cong. & Admin. News 2173, 2179 (Fair Housing Amendments Act); *see also* Legislative History, H.R. Rep. No. 101-485, pt. 3 at 45 (1990), *reprinted in* 1990 U.S. Code Cong. & Admin. News 445, 468 (Americans with Disabilities Act). HUD offers no justification for why such stereotypes would be appropriate to consider in the CoC program.

The only other reference to the differing standards for people with mental health and substance use disorders can be found in the December 19 McKenney Memo. It states that "people experiencing homelessness self-report high rates of substance use disorder and mental illness – especially the unsheltered population." AR 289. Secretary Turner has expressed a similar belief that mental health disorders and substance use are "root causes" of homelessness. AR 309. Both statements are plainly contradicted by HUD's own findings regarding the principal

factors contributing to high rates of homelessness. AR 585. These threadbare assertions do not rationally connect the high rates of substance use disorders and mental illness among those experiencing homelessness nor do they explain how imposing treatment on these individuals would reduce homelessness.

Defendants also neglected to consider important aspects of the problem. The administrative record lacks any indication of how grantees could comply with this condition while also complying with HUD's own disability regulations, as well as local, state, and federal laws that prohibit unequal treatment on the basis of disability. Nor is there any evidence that Defendants considered the impact that this condition would have on programs' effectiveness and the difficulty that grantees would have in implementing the differing service requirements (e.g., how to treat someone who has both physical and substance use disabilities).

*Geographic Discrimination Conditions.* The Geographic Discrimination Conditions are also arbitrary and capricious because HUD considered impermissible factors and relied on information Congress deemed irrelevant. *See State Farm*, 463 U.S. at 43.

The December 19 McKenney Memo attempts to justify these conditions by relying on an executive order directing HUD to impose them. AR 287. But "an agency cannot avert the 'arbitrary and capricious' analysis by simply deferring to the relevant EO." *Woonasquatucket River*, 778 F. Supp. 3d at 471; *accord R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 373 (D.R.I. 2025), *appeal filed*, No. 25-2113 (1st Cir. Nov. 17, 2025); *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 70 (D.R.I. 2025).

Aside from reference to the executive order, Defendants' stated reasons for imposing these conditions lack rational support in the record. The December 19 McKenney Memo cites a May 2025 article from the Cicero Institute to support that SORNA compliance is "indicative of ability to minimize trauma and protect the safety of individuals experiencing homelessness." AR

292. But Defendants fail to make any reasonable connection between preferencing projects in states that comply, which is entirely out of the CoC's control, and ending homelessness, or the asserted goal of "minimizing trauma and protecting the safety of individuals experiencing homelessness," especially when registered sex offenders disproportionately experience homelessness themselves. AR 292.

The record also fails to articulate a rational explanation for preferencing applicants in jurisdictions that aggressively address public drug use and camping. The December 19 McKenney Memo cites a report asserting that there is "strong bipartisan support for public camping bans and stricter enforcement of drug laws," AR 291, but says nothing about the CoC program. It also cites the "challenges" that law enforcement faces in "trying to serve and protect the homeless population in jurisdictions where their 'hands are tied.'" AR 296. But HUD did not articulate how disadvantaging projects in those jurisdictions would address those challenges, nor is there any indication that HUD weighed contrary evidence and considered alternatives.

Nor does HUD appear to have considered the detrimental impact of the Geographic Discrimination Conditions on the communities served by the grantees, or the applicants' reasonable reliance on the opportunity to compete for the funds or the reliance interests of the communities served by the grantees. *See, e.g.*, Wilcox (Crossroads) ¶ 54, Dkt. No. 7-3 (Crossroads will be penalized because of state and city laws). As for SORNA, the Department of Justice determined that, at present, 32 states, the District of Columbia, and 12 tribes have not substantially implemented SORNA, and thus would be disadvantaged under this preferencing provision. *See* U.S. Dep't of Justice, *SORNA Implementation Status*, https://perma.cc/N7VY-64V4 (last visited Jan. 13, 2026). Defendants failed to explain why it is reasonable to penalize CoCs for their respective states' implementation of SORNA and did not consider the effect of disadvantaging so many jurisdictions in the funding process.

64

*Law Enforcement Conditions.* The Law Enforcement Conditions are also arbitrary and capricious. The FY25 NOFOs now reward the aggressive deployment of law enforcement to confront unsheltered individuals, regardless of whether law enforcement involvement is appropriate. These provisions reflect a policy preference for criminalizing homelessness that is unsupported by evidence and inconsistent with congressional objectives. *See* 24 U.S.C. § 11313(a)(12) (requiring advisory body to "develop constructive alternatives to criminalizing homelessness").

Defendants also failed to engage in reasoned decisionmaking in adopting these conditions. For one, these Law Enforcement Conditions push for the clearing of encampments, AR 1221, 1226-27. But the administrative record lends no support to HUD's assumption that aggressively clearing encampments, alone, effectively transitions unsheltered individuals into housing. HUD cites purported evidence that vigorous public camping enforcement reduced the number of unsheltered individuals in Austin, AR 1150, but the article HUD relies on actually shows that, while a downtown district recorded a drop in homelessness, the unsheltered population in Austin continued to *increase* as unsheltered individuals simply spread farther from the city center. AR 1103. The record confirms that HUD must address the lack of shelter rather than its singular focus on clearing encampments. *See* AR 1118 (explaining that the "'dramatic increase' in homeless street encampments" is caused by "the lack of temporary shelter").[23] To the extent that HUD also seeks to remove homeless encampments from high-profile public places so that others can "enjoy public spaces safely," AR 1149, there is no indication that

---

[23] Defendants also rely on an amicus brief from the Cicero Institute (AR 1109-1131) to demonstrate the success of a public camping ban in Colorado Springs. *See* AR 291. That brief cites to the Cicero Institute's own "issue brief," which in turn provides no citation for the purported reduction in unsheltered homelessness. AR 1119, 1129 (citing "*Public Camping Bans: Guiding the Homeless into Shelter*, Cicero Inst. (Dec. 28, 2023), perma.cc/8TLFC76A" to support Colardo Springs example).

Congress deemed such a consideration relevant to administering the CoC program.

Similarly, HUD fails to explain how broad-based criminal enforcement against public illicit drug use (which incidentally is not limited to those who are unsheltered) has the effect of reducing homelessness. And more generally, HUD also entirely fails to acknowledge or consider the impacts of exposing more people to criminal legal system interactions for nonviolent offenses.

The FY25 NOFOs also award points to CoCs that utilize involuntary commitment, AR 1227, but the administrative record fails to explain the connection between involuntary commitment and reducing homelessness or to account for differences in applicable law that limit the authority of CoCs to assess an individual's mental health condition or pursue involuntary commitment. *See, e.g.*, Cal. Welfare & Institutes Code § 5150 (limiting involuntary commitment to 72 hours).

Provisions that award points to CoCs that assist law enforcement with checking the location of homeless sex offenders and that cooperate with law enforcement or co-responders to connect violators of public camping or drug use laws with services, AR 1228, are arbitrary and capricious for the same reasons that the parallel Geographic Discrimination Conditions are.

HUD also failed to consider increased costs the Law Enforcement Conditions impose on state and local governments. By favoring the involvement of law enforcement to clear encampments and by rewarding the arrest, incarceration, and even involuntary commitment of unsheltered individuals, state and local governments would have to bring additional law enforcement and healthcare resources to bear, straining municipal budgets and drawing attention away from other law enforcement priorities. HUD did not consider these impacts or explain why these cost burdens are warranted. Nor did HUD consider how service providers would be disadvantaged if their local jurisdictions did not engage in the type of law enforcement the

NOFO supports.

*The Certifications, Retroactive Reservations, and Risk Review Criterion*

Other Review Criteria are arbitrary and capricious as well.

The FY25 NOFOs aim to deter diversity, equity, and inclusion initiatives by threatening to reject applications if HUD believes the project "facilitates illegal discrimination including racial preferences" and requiring applicants to certify that they will not engage in such conduct and "[w]ill not use Federal funding to promote diversity, equity, and inclusion (DEI) mandates, policies, programs, or activities that violate any applicable Federal antidiscrimination laws." AR 1164, 1194, 1205-1206; *see also* HUD, OMB No. 2501-0044 (Feb. 2023), https://perma.cc/N5DW-RF5G. These expansive certifications are intended to align the 2025 NOFOs with executive orders "removing diversity, equity, inclusion (DEI)." U.S. Dep't of Hous. and Urb. Dev., *HUD Delivers Mission-Minded Results in Trump Administration's First 100 Days*, News, https://perma.cc/BH8N-P97R (last visited Jan. 13, 2026). And while DEI is not illegal, the Administration has asserted that it is—and has threatened to aggressively enforce its expansive (and mistaken) view.[24] The record does not acknowledge the chilling effect that this will have on lawful diversity efforts, nor does it offer any reasonable explanation for deterring diversity activities in this way. The chilling effect is significant because marginalized people experience homelessness disproportionately. AR 611 (Black, Native, and Indigenous people account for 69% of people experiencing homelessness).  These DEI-related certifications,

_____

[24] *See, e.g.*, Exec. Order 14151, 90 Fed. Reg. at 8339 (calling "DEI" "policies" "dangerous, demeaning, and immoral race- and sex-based preferences"); *County of Santa Clara v. Noem*, 2025 WL 3251660, at *19 (N.D. Cal. Nov. 21, 2025) (the Administration's EOs express the view that "DEI and DEIA programs violate anti-discrimination laws and cannot be supported or utilized by federal, state, or local governments."); U.S. Dep't of Hous. and Urb. Dev., *HUD Cancels $4 Million in DEI Contracts*, News, https://perma.cc/LKZ8-SETD (last visited Jan. 13, 2026) ("DEI is dead at HUD.").

reservations, and conditions will impact how providers can serve marginalized groups and tackle any disparities. The record likewise fails to reasonably explain why HUD has reversed its prior focus on addressing racial disparities in access to housing programs. *See, e.g.*, AR 36-37, 64-65, 118, 124 (emphasizing racial equity as a policy priority in the FY24-25 NOFO).

HUD also requires project applicants to certify that they "will not operate illegal drug injection sites or 'safe consumption sites' in violation of 21 u.s.c. [*sic*] 856." AR 1194; *see also* AR 1205-1206. As additional context, HUD explains that the NOFO "prohibits recipients from distributing drug paraphernalia [like needles, pipes, and foil] or permitting the use and distribution of fatal, illicit drugs on their properties" because it enables "deadly" addictions. AR 1148. But the administrative record is devoid of any consideration of how this certification could dissuade legal harm reduction efforts, and HUD cites no evidence that harm reduction efforts increase deadly overdoses.

### c. Post-Award Conditions

The Post-Award Conditions impermissibly leverage federal funding to advance the Administration's ideological preferences related to gender, immigration enforcement, DEI programs, harm reduction, and abortion. Notably, many Post-Award Conditions are indistinguishable from conditions that courts, including this one, have held likely to be arbitrary and capricious.[25] Here, as in those cases, HUD has provided no reasoned explanation, failed to consider important aspects of the problem, relied on improper factors, and ignored significant reliance interests.

For one, many Post-Award Conditions require compliance with executive orders, but

---

[25] *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342-MRD-PAS, 2025 WL 2988705, at *1, 7–9 (D.R.I. Oct. 23, 2025); *Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863, 888–89 (W.D. Wash. 2025), *appeal filed*, No. 25-3664 (9th Cir. June 10, 2025). Local government Plaintiffs are also plaintiffs in *King County v. Turner*.

HUD fails to consider that it will be difficult for grantees to understand what this requires of them. Executive orders typically provide instructions to federal agencies, not the public—so grantees will be left to guess what they must do to comply with the executive orders' policies.

HUD also provides no rational explanation—because there is none—for suddenly requiring that CoC applicants commit resources to federal immigration enforcement, deny the existence of non-binary and transgender persons, restrict speech relating to abortion, and abandon DEI, housing first, and harm-reduction policies.

HUD has also relied on improper factors and failed to address obvious issues with implementation of the Post-Award Conditions. For example, nothing in the statute indicates that Congress intended HUD to consider local jurisdictions' relationship to federal immigration enforcement as part of the CoC funding competition. HUD cannot lawfully impose "immigration-related conditions upon grants that share no nexus with immigration enforcement." *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO, 2025 WL 2426858, at *8 (N.D. Cal. Aug. 22, 2025).[26] Additionally, the administrative record shows that HUD has apparently not considered important aspects of the problem, such as the fact that other federal housing statutes already limit noncitizen eligibility for certain programs, and there are existing processes for verification of client eligibility based on immigration status.[27] The unexplained Immigration Condition now creates confusion as to whether or how HUD is changing those requirements.

Similarly, with respect to the Gender Identity and Anti-Abortion Conditions, HUD relied

---

[26] Many of the local government Plaintiffs are also plaintiffs in this case, which challenges implementations of the President's directives to terminate all federal funding for so-called "sanctuary jurisdictions."

[27] *See* Cong. Rsch. Serv., R46462, *Noncitizen Eligibility for Federal Housing Programs* (Jan. 23, 2023), *available at* https://www.congress.gov/crs-product/R46462.

on improper factors because Congress did not intend for HUD to consider CoC recipients' views on abortion or gender identity as a basis for awarding funding. Defendants also failed to recognize or consider that the Gender Identity Condition conflicts with federal and state statutes and regulations protecting transgender individuals from discrimination.[28]

The same is true for the DEI-Related Conditions. AR 1249–50. Like the DEI-related Certifications and the Racial Preference Reservation discussed above, these conditions arbitrarily and capriciously chill lawful conduct without any legitimate justification.

Finally, HUD failed to consider legitimate reliance interests. HUD had longstanding policies requiring CoCs to address racial disparities in homelessness, to ensure equal access to services and shelter regardless of gender identity, and to promote recovery and self-reliance through housing stability (i.e., "Housing First").[29] It also had a longstanding practice not to impose policy conditions unrelated to ending homelessness—such as a requirement to assist in federal immigration enforcement actions—on receipt of CoC funds. These practices engendered significant reliance interests. The Anti-Housing First Condition ignores that entire supportive housing systems have been built upon Housing First principles. *See, e.g.*, McSpadden (San Francisco) ¶ 7, ECF No. 7-10. And the Gender Identity Conditions ignore that individuals and households who receive CoC-funded housing assistance have significant reliance interests in

---

[28] *See, e.g., Bostock v. Clayton County*, 590 U.S. 644 (2020) (holding that Title VII of the Civil Rights Act of 1964 protects employees against discrimination on the basis of gender identity); *see also* 24 C.F.R. § 5.106 (HUD's Equal Access Rule requiring that grantees "place[], serve[], and accommodate[]" individuals "in accordance with the[ir] gender identity"); Cal. Gov't Code § 12955(a) (prohibiting housing discrimination on the basis of gender identity and expression); R.I. Gen. Law § 34-37-2.3 (prohibiting housing discrimination on the basis of gender identity or expression).

[29] *See, e.g.*, AR 36–37, 64–65, 118–119, 124 (emphasizing racial equity as a policy priority in the FY24-25 NOFO); 24 C.F.R. § 5.106 (HUD's Equal Access Rule); *supra* Background Section I.B. (discussing HUD's longstanding support for Housing First approach).

being served by local supportive housing systems in a manner appropriate for their gender identity. *See* Frazier (YPI) ¶ 10, ECF No. 7-4 (LGBTQ youth are disproportionately homeless, and many of them would lose access to housing assistance and supportive services from denial of CoC funding to the organizations that serve them)). Nothing in the administrative record reveals any consideration of these or other potential reliance interests. That failure is fatal. *See Regents*, 591 U.S. at 33.

### 4.    The FY25 NOFOs were unlawfully issued without notice and comment

Agency action taken "without observance of procedure required by law" must be set aside. 5 U.S.C. § 706(2)(D). Defendants failed to follow required procedures when making the sweeping changes to the CoC program through the FY25 NOFOs. Before taking action that qualifies as a legislative rule under the APA, government agencies must provide notice and an opportunity to comment. 5 U.S.C. § 553(b), (c). Although the APA exempts matters relating to grants, 5 U.S.C. § 553(a)(2), HUD's regulations have long required the agency to undertake notice and comment even in rulemakings involving grants—despite that exemption. 24 C.F.R. § 10.1.

The FY25 NOFOs fundamentally overhaul the CoC program. They sharply limit funding for permanent housing and undermine the stable funding streams on which communities have come to rely, in addition to imposing a host of new criteria and conditions that alter what the CoC program will fund. If HUD wants to try to make those sorts of substantive changes to the program, its own binding regulations require it to undertake notice and comment first. *See id.*; *cf. also Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (HUD's changed methods for calculating subsidies for public housing authorities were substantive rules subject to notice and comment). That process would allow HUD to understand and account for the real-world impacts of its proposed changes—something it has to date entirely failed to consider.

### B.  The FY25 NOFOs Are Unconstitutional

The Challenged Provisions of the FY25 NOFOs also violate multiple constitutional provisions and therefore must be set aside under the APA. *See* 5 U.S.C. § 706(2)(B).[30] The Challenged Provisions violate the First Amendment, the separation of powers, and the Spending Clause, and this Court should set aside and enjoin those provisions.

### 1.  The Gender Identity Conditions and Reservation violate the First Amendment

The Gender Identity Conditions and Reservation in the November NOFO, and the Gender Identity Condition in the December NOFO, violate the First Amendment. The Gender Identity Conditions and Reservation disadvantage applicants that express a disfavored viewpoint that sex is nonbinary or distinct from gender identity.

While the government may, in some circumstances, attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," it can only do so within constitutional limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). The Gender Identity Conditions and Reservation transgress those limits several times over, whether they are understood to limit any speech by the applicant or only speech within the scope of the funded program. Indeed, multiple courts have held that similar agency actions barring grantees from using grant funds to "promote gender ideology" likely violate the First Amendment. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2988705, at *7–8, 12; *see also S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1218 (N.D. Cal. 2025).

For one, the government may not leverage government funding to "aim at the suppression of dangerous ideas." *NEA v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). But the Gender

---

[30] Even if APA review were somehow unavailable, Plaintiffs would still be able to bring claims "directly under the Constitution." *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

Identity Conditions and Reservation are designed to suppress ideas that the Administration disfavors.

Second, the government can also violate the First Amendment by imposing a funding condition "not relevant to the objectives of the program." *Agency for Int'l Dev.*, 570 U.S. at 214. The Gender Identity Conditions and Reservation are "entirely untethered to any 'legitimate objective[s]'" of the program. *S.F. AIDS Found.*, 786 F. Supp. 3d at 1218. Instead, they are "directed . . . towards disfavored speech." *Id.* at 1219. If the Gender Identity Conditions and Reservation apply, a grantee apparently could not "refer to the clients they serve . . . by any pronoun" or preferred name that matches their gender identity as opposed to their sex assigned at birth. *Id.* But that "is pure speech that has no relation to," *id.*, the grant program's purpose of providing permanent supportive housing to help people overcome homelessness.

Finally, the government may not restrict "protected [speech] outside the scope of the federally funded program." *Agency for Int'l Dev.*, 570 U.S. at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). The Gender Identity Conditions and Reservation overstep that limit too—even if they were interpreted to restrict only the use of federal funds to engage in such speech. As the Supreme Court has explained, a funding condition "by its very nature affects 'protected conduct outside the scope of the federal funded program'" when it "demand[s] that a funding recipient[] adopt—as their own—the Government's view on an issue of public concern." *Id.* at 218 (quoting *Rust*, 500 U.S. at 197). The Gender Identity Conditions and Reservation do just that. Under those provisions, a grantee risks noncompliance if it says anything recognizing someone's gender identity, such as by using a non-binary or transgender person's preferred pronouns.

2.    **The FY25 NOFOs violate the separation of powers and the Spending Clause**

The Challenged Provisions violate the separation of powers. Imposing "extra-statutory conditions on federal grant awards as a tool to obtain compliance with [the executive's] policy objectives strikes at the heart of . . . the separation of powers." *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020). Defendants have done precisely that here. As explained above, *supra* Section II.A.1, Congress has not imposed the Permanent Housing Caps, New Project Earmark, Review Criteria, or Post-Award Conditions. Nor has Congress delegated to Defendants the authority to attach these conditions unilaterally. In doing so anyway, Defendants have exceeded their constitutional authority and encroached on Congress's power to control federal spending, in violation of foundational separation-of-powers principles.

The Challenged Provisions of the FY25 NOFOs also violate the Spending Clause. *See* U.S. Const. art. I, § 8, cl. 1. The Constitution empowers Congress to "condition[] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives," but conditions on receipt of funds must be "unambiguous[]." *South Dakota v. Dole*, 483 U.S. 203, 206-7 (1987) (cleaned up). In addition, the conditions must be "[]related to the federal interest in particular national projects or programs" such that they are "reasonably calculated" to advance "a purpose for which the funds are expended." *Id.* at 207, 209.

The Challenged Provisions transgress these limits. First, the Challenged Provisions are far from unambiguous and otherwise do not allow recipients to "exercise their choice knowingly." *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). It is not clear, for example, what it means to comply with various executive orders that announce policies but impose no explicit requirements on the public. *See* AR 1250, 263.

Second, at least some of the Challenged Provisions are "unrelated to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (cleaned up). For example, an applicant's views on gender are not even loosely tied to the goal of creating new permanent supportive housing to combat homelessness. *Cf. California v. U.S. DOT*, 2025 WL 3072541, at *11 (concluding that condition on transportation grants requiring cooperation with federal immigration enforcement "blatantly violates the Spending Clause" because it "bears no reasonable relationship to the" grant programs).

### C. The Proper Remedies Are Vacatur of the FY25 NOFOs and An Injunction Against the Challenged Provisions

If the Court reaches Plaintiffs' claims regarding the FY25 NOFOs (Counts 4-11), the Court should set aside those NOFOs and enjoin Defendants from imposing the same or substantially similar Challenged Provisions.

#### 1. The Court should set aside the FY25 NOFOs

Vacating the FY25 NOFOs pursuant to 5 U.S.C. § 706(2) is the appropriate remedy for the FY25 NOFOs' myriad violations of the APA for the same reasons that vacating the rescission is the appropriate remedy. Vacatur is the ordinary remedy for APA violations and acts directly on the challenged agency action, rather than being party-specific. *See supra* Section I.C.1. Indeed, a party-specific remedy would not even be workable here. *See id.*

#### 2. The Court should grant injunctive relief to bar Defendants from reimposing the unlawful Challenged Provisions in any FY 2025 NOFO

In addition to vacating the FY25 NOFOs, the Court should also enter a permanent injunction barring Defendants from imposing the FY25 NOFOs' Challenged Provisions or substantially similar provisions in any new FY 2025 NOFO.

The APA contemplates that a court may issue "writs of prohibitory or mandatory injunction" in an appropriate case. 5 U.S.C. § 703. Although an injunction is not necessary where

it would "not have any meaningful practical effect independent of" vacatur of the challenged agency action, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "an injunction may be warranted if vacatur does not sufficiently redress the plaintiff's injury," *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024) (discussing *Monsanto*, 561 U.S. at 165-66). So, for example, an injunction is warranted where the agency could attempt to take similar action again "as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024). In such circumstances, injunctive relief can appropriately "restrain agency officials from . . . conduct based on the disputed agency [action]." *Chamber of Com. of U.S.A. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023), *appeal dismissed*, No. 23-40650, 2025 WL 1304573 (5th Cir. May 1, 2025); *see also Cardona*, 743 F. Supp. 3d at 898 (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs). Injunctive relief is warranted here for several reasons.

First, vacatur standing alone would not fully protect Plaintiffs from injury. If, despite the late date and the chaos that Defendants' conduct has already wrought, Defendants attempted to issue yet another NOFO for FY 2025, vacatur alone would not necessarily prevent Defendants from including the Challenged Provisions or substantially similar provisions. If HUD did so, Plaintiffs would be needlessly forced to return to this Court to obtain another order prohibiting HUD from enforcing the unlawful conditions, which could result in further delays in awarding FY 2025 CoC funds. That is of particular concern given HUD's recent withdrawal of a NOFO just as this Court was set to review it. An injunction is warranted to ensure that HUD does not attempt to take any other actions that would evade judicial oversight of a future NOFO with the same Challenged Provisions.

The equitable factors pertinent to injunctive relief uniformly favor the entry of a

permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 40 (1st Cir. 2013). Plaintiffs prevail on the merits; an injunction will prevent irreparable harm to Plaintiffs, for which there are no remedies available at law; and the balance of the equities and the public interest favor an injunction preventing illegal agency action. *See id.*

First, Plaintiffs prevail on the merits of their APA and constitutional claims for the reasons discussed above. Defendants' actions lack statutory authorization and violate foundational constitutional principles; they are also manifestly arbitrary and capricious.

Second, an injunction will prevent irreparable harm to Plaintiffs. The illegal provisions in the FY25 NOFOs will cause Plaintiffs to lose the "opportunity to compete" for the funds on fair and lawful terms. *Boston Chapter, NAACP, Inc. v. Beecher*, 371 F. Supp. 507, 520 (D. Mass. 1974). That constitutes irreparable harm because the federal government's sovereign immunity precludes them from recovering damages for that loss in an action at law. *See Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023). Similarly, being forced to prepare applications and compete for funds based on the illegal provisions in the FY25 NOFOs would impose unrecoverable compliance costs on Plaintiffs, which will adversely affect the amount and quality of services they are able to provide to homeless individuals. Such costs are likewise irreparable. *See, e.g.*, *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024), *cert. dismissed*, 2025 WL 3120404 (U.S. Aug. 12, 2025).

Finally, the balance of the equities and the public interest favor an injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (concluding that harms to the government and the public interest "merge"). Our constitutional system "does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021). As a result, "there is generally no public interest in the perpetuation of unlawful

agency action." *Shawnee Tribe*, 984 F.3d at 102 (cleaned up). If Defendants believe the CoC program could be more effective if administered differently, they must obtain authorization from Congress to make those changes and then implement them in a reasoned manner consistent with the APA's procedural requirements.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs.

January 14, 2026

Respectfully submitted,

<div style="display:flex">
<div>

AMY R. ROMERO
  (RI Bar No. 8262)
KEVIN LOVE HUBBARD +
  (MA Bar No. 704772)
DELUCA, WEIZENBAUM,
  BARRY & REVENS, LTD.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
  Lawyers' Committee for RI

*Counsel for All Plaintiffs*

TONY LOPRESTI +
  (CA Bar No. 289269)
COUNTY COUNSEL
KAVITA NARAYAN +
  (CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
  (CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
STEFANIE WILSON +
  (CA Bar No. 314899)
DEPUTY COUNTY COUNSEL
LEILY ARZY +

</div>
<div>

/s/ Aleshadye Getachew
ALESHADYE GETACHEW +
  (DC Bar No. 1007161)
MADELINE H. GITOMER +
  (DC Bar No. 1023447)
KRISTIN BATEMAN +
  (DC Bar No. 90037068)
AMAN T. GEORGE +
  (DC Bar No. 1028446)
SIMON C. BREWER +
  (CT Bar No. 441889)*
CHRISTINE L. COOGLE +
  (DC Bar No. 1738913)
YENISEY RODRÍGUEZ +
  (DC Bar No. 1600574)
CARRIE Y. FLAXMAN +
  (DC Bar No. 458681)
ROBIN THURSTON +
  (DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
agetachew@democracyforward.org
mgitomer@democracyforward.org
kbateman@democracyforward.org
ageorge@democracyforward.org

</div>
</div>

(CA Bar No. 364187)
LITIGATION FELLOW
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of
Santa Clara*

DAVID CHIU +
 (CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
 (CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
 (CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY
SARA J. EISENBERG +
 (CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE
 LITIGATION
RONALD H. LEE +
 (CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND
 AFFIRMATIVE LITIGATION
MICHAEL LEVIN GESUNDHEIT +
 (CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org

*Counsel for Plaintiff City and County
of San Francisco*

sbrewer@democracyforward.org
ccoogle@democracyforward.org
yenisey.rodriguez@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and Youth
Pride, Inc.*

LYNETTE LABINGER
 (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
 ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and Youth
Pride, Inc.*

ANTONIA K. FASANELLI +
 (DC Bar No. 481856)
KATHRYN M. SCOTT +
 (WA Bar No. 38978)*
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

*Counsel for Plaintiffs National Alliance to
End Homelessness and National Low Income
Housing Coalition*

TOBY MERRILL +
 (MA Bar No. 601071)

WALLACE W. DIETZ +
  (TN BPR No. 009949)
DIRECTOR OF LAW
JOHN K. WHITAKER +
  (TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
  (TN BPR No. 041470)
ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

CASSANDRA CRAWFORD +
  (NC Bar No. 45396)
GRAHAM PROVOST +
  (DC Bar No. 1780222)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

DAVID J. HACKETT +
  (WA Bar No. 21236)
GENERAL COUNSEL TO KING COUNTY
  EXECUTIVE AND SPECIAL DEPUTY
  PROSECUTOR
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

+ Admitted *pro hac vice*
* Not admitted in the District of Columbia; practicing under the supervision of members of the D.C. Bar