

The U.S. Department of
Housing and Urban Development
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

# The 2024 Annual Homelessness Assessment Report (AHAR) to Congress



## PART 1: POINT-IN-TIME ESTIMATES OF HOMELESSNESS
### DECEMBER 2024

DOJ-HUD-AR00581

# Acknowledgements

**Authors:**

Tanya de Sousa and Meghan Henry, *Abt Global*

**Principal Investigator:**

Jill Khadduri, *Abt Global*

**Data Collection Managers:**

Tanya de Sousa and Giuliana Sciuto, *Abt Global*

**Data Collectors and Reviewers:**

Alyssa Andrichik, Samantha Bolden, Antonio Calbo-Jackson, Jill Cusick, RJ de la Cruz, Tanya de Sousa, Meghan Henry, Makiyah Holder, Charlene Kwan, Victoria Lopez, Andrew McFadden, Sonya Phillips, Hannah Pico, Ed Prestera, Katherine Rush, Giuliana Sciuto, Erica Sewell, Meghan Shea, Melissa Stevenson, and Shantae White, *Abt Global*

**Programmers/Analysts:**

Meghan Shea and Pearl Zheng, *Abt Global* and Jon-Paul Oliva, *GIS and Data Quality Consultant*

**Contributors and Reviewers:**

William Snow, *U.S. Department of Housing and Urban Development*

Robyn Andrews, *Senior Program Manager, CSH; HUD Persons with Lived Experience and Expertise Team*

Emma Beers, *Homebase, HUD Persons with Lived Experience and Expertise Team*

John Harrison, *HUD Persons with Lived Experience and Expertise Team*

Rashema Melson, *CEO and Founder, Pain Into PURPOSE; Lead of HUD Persons with Lived Experience and Expertise Team*

Dr. Rajni Shankar-Brown, MA, M-MA, MBA, PhD, *Past Board President and Racial Equity and Education Chair of the National Coalition for the Homeless; Co-Lead of U.S. Department of Housing and Urban Development (HUD) Equity Team; Member of the HUD People with Lived/Living Experience and Expertise Team; Professor and Chair of Social Justice Education at Stetson University*

Donald Whitehead, Executive Director, *National Coalition for the Homeless*

Dana Woolfolk, *HUD Persons with Lived Experiences and Expertise Team*

Rhie Azzam Morris, *Founder, Rhie Azzam Morris, LLC; HUD Persons with Lived Experiences and Expertise Team*

Additional people with lived experience and expertise of homelessness that remain unnamed also reviewed this report.

**Design and Production:**

David Dupree, *Abt Global*

# Table of Contents

Acknowledgements .............................................................................................................ii

Table of Contents...............................................................................................................iii

Key Findings .......................................................................................................................v

Definition of Terms ..........................................................................................................viii

About this Report................................................................................................................xi

**1.    Estimates of All People Experiencing Homelessness in the United States ..............1**
   1.1    National Estimates of Homelessness in the United States .......................................1
   1.2    State-Level Estimates of People Experiencing Homelessness................................8
   1.3    Estimates of All People Experiencing Homelessness by CoC...............................11

**2.    Estimates of Individuals Experiencing Homelessness............................................14**
   2.1    National Estimates of Individuals Experiencing Homelessness............................14
   2.2    State-Level Estimates of Individuals Experiencing Homelessness.......................20
   2.3    CoC-Level Estimates of Individuals Experiencing Homelessness........................23

**3.    Estimates of Families with Children Experiencing Homelessness in the
United States ....................................................................................................................25**
   3.1    National Estimates of Families with Children Experiencing Homelessness in
       the United States .................................................................................................25
   3.2    Estimates of Homelessness by State....................................................................32
   3.3    Estimates of People in Families with Children Experiencing Homelessness by
       CoC ....................................................................................................................35

**4.    Estimates of Unaccompanied Youth Experiencing Homelessness........................37**
   4.1    National Estimates of Unaccompanied Youth Experiencing Homelessness..........37
   4.2    State-Level Estimates of Unaccompanied Youth Experiencing Homelessness.....43
   4.3    CoC-Level Estimates of Unaccompanied Youth Experiencing Homelessness ......46

**5.    Estimates of Veterans Experiencing Homelessness in the United States .............48**
   5.1    National Estimates of Veterans Experiencing Homelessness in the United
       States ..................................................................................................................48
   5.2    Estimates of the Number of Veterans Experiencing Homelessness by State........54
   5.3    Estimates of Veterans Experiencing Homelessness by CoC.................................57

**6.    Estimates of Individuals Experiencing Chronic Patterns of Homelessness ..........59**
   6.1    National Estimates of Individuals Experiencing Chronic Patterns of
       Homelessness .....................................................................................................59
   6.2    State-Level Estimates of Individuals Experiencing Chronic Patterns of
       Homelessness .....................................................................................................62
   6.3    CoC-Level Estimates of Individuals Experiencing Chronic Patterns of
       Homelessness .....................................................................................................65

**7.    National Inventory of Beds for People Currently Experiencing Homelessness
and People Transitioning Out of Homelessness ..................................................................67**
   7.1    Types of Programs in the National Inventory .........................................................67

DOJ-HUD-AR00583

7.2    Beds by CoC Category, 2024 ...............................................................................74

**Appendix A: State-Level Data ...............................................................................76**

**Appendix B: Additional Data on People Experiencing Homelessness in 2024 ..................80**

Changes to the 2024 PIT Demographic Reporting Options. ...........................................80

B-1: Additional Data on All People Experiencing Homelessness ....................................82

B-2: Additional Data on Individuals Experiencing Homelessness....................................86

B-3: Additional Data on People in Families with Children Experiencing Homelessness.......................................................................................................90

B-4: Additional Data on Unaccompanied Youth Experiencing Homelessness................94

B-5: Additional Data on Veterans Experiencing Homelessness .....................................98

B-6: Additional Data on Individuals with Chronic Patterns of Homelessness ...............102

DOJ-HUD-AR00584

# Key Findings

**The number of people experiencing homelessness on a single night in 2024 was the highest ever recorded.** A total of 771,480 people – or about 23 of every 10,000 people in the United States – experienced homelessness in an emergency shelter, safe haven, transitional housing program, or in unsheltered locations across the country. Several factors likely contributed to this historically high number. Our worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, and the persisting effects of systemic racism have stretched homelessness services systems to their limits. Additional public health crises, natural disasters that displaced people from their homes, rising numbers of people immigrating to the U.S., and the end to homelessness prevention programs put in place during the COVID-19 pandemic, including the end of the expanded child tax credit, have exacerbated this already stressed system.

**Nearly all populations reached record levels.** Homelessness among people in families with children, individuals, individuals with chronic patterns of homelessness, people staying in unsheltered locations, people staying in sheltered locations, and unaccompanied youth all reached the highest recorded numbers in 2024.

**People in families with children had the largest single year increase in homelessness.** Between 2023 and 2024, 39 percent more people in families with children experienced homelessness. Overall, the number of people experiencing homelessness increased by 18 percent.

**Nearly 150,000 children experienced homelessness on a single night in 2024,** reflecting a 33 percent increase (or 32,618 more children) over 2023. Between 2023 and 2024, children (under the age of 18) were the age group that experienced the largest increase in homelessness.

**Veterans were the only population to report continued declines in homelessness.** Between 2023 and 2024, the number of veterans experiencing homelessness declined by eight percent, or 2,692 fewer veterans. The number of veterans experiencing homelessness has declined by 55 percent since data collection about veteran homelessness began in 2009. The declines in sheltered and unsheltered experiences of homelessness were similar, (56% and 54%). These declines are the result of targeted and sustained funding to reduce veteran homelessness.

**About one in every five people experiencing homelessness on a single night in 2024 was age 55 or older.** More than 104,000 people experiencing homelessness were aged 55 to 64, and just over 42,150 people were over age 64. Nearly half of adults aged 55 or older (46%) were experiencing unsheltered homelessness in places not meant for human habitation.

**People who identify as Black, African American, or African continue to be overrepresented among the population experiencing homelessness.** People who identify as Black made up just 12 percent of the total U.S. population and 21 percent of the U.S. population living in poverty but were 32 percent of all people experiencing homelessness. **However, the share of people experiencing homelessness who identify as Black (of any ethnicity) decreased from 37 percent of all people experiencing homelessness in 2023.**[1]

---

[1] This change could partially be due to changes in the way race and ethnicity was reported this year and the inclusion of additional reporting categories. However, in recent years, many Communities of Care (CoCs) have engaged in additional technical assistance to correct for bias in the allocation of housing and prevention resources. This decline could also reflect the effects of those and other local efforts to more fairly distribute resources.

DOJ-HUD-AR00585

**One in every three individuals experiencing homelessness reported having experienced chronic patterns of homelessness, or 152,585 people.** This is the highest number of individuals experiencing chronic patterns of homelessness counted in the PIT. Individuals experiencing chronic patterns of homelessness have increased by 27 percent since data was first collected in 2007. Sixty-five percent of all individuals experiencing chronic patterns of homelessness, or more than 99,500 people, were counted in unsheltered locations. This is also the highest number recorded since data collection began.

**Exhibit A-1: Change in the Number of People Experiencing Homelessness**

|  | 2023-2024 | 2007-2024 |
|---|---|---|
| All People | +18.1% | +19.2% |
| Sheltered | +25.4% | +27.0 |
| Unsheltered | +6.9% | +7.2 |
| Individuals | +9.6% | +24.1% |
| People in Families | +39.4% | +10.6% |
| Unaccompanied Youth* | +10.0% | +3.4% |
| Veterans* | -7.6% | -55.2% |
| Chronic Patterns of Homelessness | +6.6% | +27.4% |

*Baseline comparison year for veterans is 2009; baseline for unaccompanied youth is 2017

**The national inventory of beds for people currently experiencing homelessness increased by 13 percent between 2023 and 2024.** This increase was driven by increases in emergency shelter beds, which increased by 18 percent between 2023 and 2024 and have doubled since 2007. Transitional housing, meanwhile, has steadily decreased over time – declining by 4 percent between 2023 and 2024 and by 60 percent since 2007. However, this reduction since 2007 does not necessarily mean that transitional housing beds were completely removed from the national inventory. Often transitional housing programs realize they function more like emergency shelter and convert their project type to align better with the way they actually function. In other cases, transitional housing programs converted to permanent housing projects, including transition-in-place and rapid rehousing.

**Nearly 60 percent of the national inventory of beds is for people formerly experiencing homelessness.** Rapid rehousing (RRH), permanent supportive housing (PSH), and other permanent housing (OPH) programs make up 57 percent of all beds reported in the housing inventory count (HIC)—people in these programs are not counted as experiencing homelessness in the PIT count data. Between 2023 and 2024 total inventory for these programs increased by 3 percent, with the largest increase among OPH programs (14,735 more beds). This reflects significant investments into OPH through the Emergency Housing Voucher program. PSH makes up the largest share of all inventory for people formerly experiencing homelessness (at 58%). While nationally the supply of PSH beds has more than doubled since 2007, there are still areas where the need for permanent housing has outpaced the supply.

DOJ-HUD-AR00586

**Exhibit A-2: Share of Inventory that is Dedicated to Emergency Housing (ES/TH/SH) vs. Permanent
Housing (RRH/PSH/OPH), 2007-2024**



KEY: Permanent Housing (PH) = Rapid Rehousing, Permanent Supportive Housing, and Other Permanent Housing; Emergency
Housing (EH) = Emergency Shelter (ES), Save Haven (SH), and Transitional Housing (TH).

DOJ-HUD-AR00587

# Definition of Terms

**Please note:** Key terms are used for AHAR reporting purposes and accurately reflect the data used in this report. Definitions of these terms may differ in some ways from the definitions found in the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act and in HUD regulations.

**Adults** refers to people age 18 or older.

**Children** refers to people under the age of 18.

**Continuums of Care (CoC)** are local planning bodies responsible for coordinating the full range of homelessness services in a geographic area, which may cover a city, county, metropolitan area, or an entire state.

**Disability** refers to an individual with one or more of the following conditions: (A) A physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse, post-traumatic stress disorder, or brain injury that: (1) Is expected to be long-continuing or of indefinite duration; (2) Substantially impedes the individual's ability to live independently; and (3) Could be improved by the provision of more suitable housing conditions; (B) A developmental disability, as defined in section 102 of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (42 U.S.C. 15002); or (C) The disease of Acquired Immunodeficiency Syndrome (AIDS) or any condition arising from the etiologic agency (infectious agent) for Acquired Immunodeficiency Syndrome.

**Emergency Shelter (ES)** is a facility with the primary purpose of providing temporary shelter for people experiencing homelessness.

**Experiencing Homelessness** describes a person who lacks a fixed, regular, and adequate nighttime residence.

**Eviction moratorium** refers to the federal (or state or local) ban on evicting certain tenants from a residential rental property because of non-payment of rent.

**Families Experiencing Chronic Homelessness** refers to people in families with children in which the head of household has a disability and has either been continuously experienced homelessness for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time experiencing homelessness on those occasions is at least 12 months.

**Family Households** refers to households made up of at least one adult age 18 or older and one child age under 18 that were experiencing homelessness together on the night of the point-in-time count.

**HMIS** stands for homelessness management information system. CoCs use an HMIS to collect data on people who are experiencing sheltered homelessness in their area, including information about their characteristics and service-use patterns over time.

**Housing Inventory Count (HIC)** is produced by each CoC and provides an annual inventory of beds that provide assistance to people in the CoC who are experiencing homelessness or transitioning out of their experience of homelessness.

**Individual** refers to a person who is not part of a family with children during an experience of homelessness (i.e., the person is not experiencing homelessness in a household with at least one adult and at least one child under age 18). Individuals may be single adults, unaccompanied children, or in multiple-adult or multiple-child households.

DOJ-HUD-AR00588

**Individual Experiencing Chronic Homelessness** refers to an individual with a disability who has been continuously experiencing homelessness for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time experiencing homelessness on those occasions is at least 12 months.

**Multiple Races or Multi-Racial** refers to people who self-identify as more than one race (i.e., a person who selects more than one race category from a "select all that apply" option).

**Other Permanent Housing** is housing with or without services that is specifically for people who formerly experienced homelessness but does not require people to have a disability.

**Parenting Children** are people under age 18 who are the parents of one or more children (under age 18) who are present or sleeping in the same place as the child and without anyone over the age of 18.

**Parenting Child Household** is a household with at least one parenting child and the child or children for whom the parenting child is the parent.

**Parenting Youth** are people under age 25 who are the parents or legal guardians of one or more children (under age 18) who are present with or sleeping in the same place as that youth parent, where there is no person over age 24 in the household.

**Parenting Youth Household** is a household with at least one parenting youth and the child or children for whom the parenting youth is the parent or legal guardian.

**People in Families with Children** are people who are experiencing homelessness as part of a household that has at least one adult (age 18 or older) and one child (under age 18).

**Point-in-Time (PIT) Counts** are unduplicated one-night estimates of both sheltered and unsheltered people experiencing homelessness. The one-night counts are conducted by CoCs nationwide and occur during the last week in January of each year.[2]

**Permanent Supportive Housing (PSH)** is a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who were experiencing homelessness when they entered the program and are now considered to have formerly experienced homelessness. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability for eligibility.

**Rapid Re-Housing (RRH)** is a housing model designed to provide temporary housing assistance to people experiencing homelessness, moving them quickly out of their experience of homelessness and into permanent housing in which they may be able to remain after the assistance ends.

**Safe Havens (SH)** are projects that provide private or semi-private temporary shelter and services to people experiencing severe mental illness and are limited to serving no more than 25 people within a facility.

**Sheltered Homelessness** refers to people who are staying in emergency shelters, transitional housing programs, or safe havens.

---

[2] While CoCs are only required to conduct an unsheltered and sheltered PIT count biennially per 24 CFR 578.7(c)(2), most CoCs conduct a PIT count annually.

DOJ-HUD-AR00589

**Transitional Housing Programs (TH)** provide people experiencing homelessness a place to stay combined with supportive services for up to 24 months.

**Unaccompanied Youth/Children (under 18)** are people in households with only children under the age of 18 who are not part of a family with children or accompanied by their parent or guardian during their experience of homelessness.

**Unaccompanied Youth (18-24)** are young adults in households without children who are not part of a family with children or accompanied by their parent or guardian during their episode of homelessness.

**Unsheltered Homelessness** refers to people whose primary nighttime location is a public or private place not designated for, or ordinarily used as, a regular sleeping accommodation for people (for example a car, public park, abandoned building, bus or train station, airport, or camping ground).

**Veteran** refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

DOJ-HUD-AR00590

# About this Report

The US Department of Housing and Urban Development (HUD) releases the Annual Homelessness Assessment Report to Congress (AHAR) in two parts. Part 1 provides Point-in-Time (PIT) estimates, offering a snapshot of experiences of homelessness—both sheltered and unsheltered—on a single night. The PIT counts also provide an estimate of the number of people experiencing homelessness within particular populations such as veterans and individuals experiencing chronic patterns of homelessness. To be included in the PIT count, a person needs to meet the definition of experiencing homelessness used by HUD—which differs from the definition used by other agencies. HUD defines experiences of homelessness as lacking a fixed, regular, and adequate nighttime residence, meaning:

- An individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings such as a car, public park, abandoned building, bus or train station, airport, or camping ground; or
- An individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including congregate shelters, transitional housing, and hotels and motels paid for by charitable organizations or by federal, State, or local government programs for low-income individuals).[3]

People staying in the following locations on the night of the PIT count *are not* included in the sheltered or unsheltered PIT count:

- People living in housing provided by permanent supportive housing (PSH) programs, including people using HUD Veterans Affairs Supportive Housing (VASH) vouchers.
- People living in other permanent housing (OPH), including housing supported by the Veteran Affairs Grant and Per Diem Transition in Place (TIP) program and people living in housing supported by the Emergency Housing Voucher program and not considered PSH.
- People living in permanent housing supported by rental assistance from a rapid re-housing (RRH) program.
- People in any housing not listed on the housing inventory count (HIC) because the housing is not dedicated for people experiencing homelessness.
- People temporarily staying with family or friends—sometimes referred to as being "doubled-up" or "couch surfing"—even if their stay may be unstable.

The one-night PIT counts are typically conducted each year during the last 10 days of January. In 2024, just four CoCs conducted counts in February instead of the last 10 days of January.

To understand our nation's capacity to serve people who are currently or formerly experiencing homelessness, this report also has a chapter focusing on the inventory of shelters and housing for people currently experiencing homelessness or transitioning out of their experience of homelessness. Counts of emergency shelters, transitional housing programs, safe havens, rapid rehousing programs, permanent supportive housing programs, and other permanent housing are based on reports by CoCs in the Housing Inventory Count (HIC).

---

[3] For the PIT Count, CoCs must count all individuals or families who meet the criteria in paragraphs (1)(i) and (1)(ii) of the homeless definition in 24 CFR 578.3.

DOJ-HUD-AR00591

In 2024, the PIT estimates of people experiencing homelessness in sheltered and unsheltered locations, as well as the number of beds available to serve them, were reported by 385 Continuums of Care (CoC) nationwide. These 385 CoCs covered virtually the entire United States.[4]

To better understand how experiences of homelessness differ by geography, the AHAR study team categorizes CoCs into four groups[5]:

1) Major city CoCs
2) Other largely urban CoCs
3) Largely suburban CoCs
4) Largely rural CoCs

A CoC with a plurality of its population living in rural areas (i.e., more people living in rural areas than in any other defined area) is classified as a "largely rural CoC." That does not mean, however, that all people experiencing homelessness in the largely rural CoC were counted in rural areas. CoCs span large territories (even an entire state in some cases) and may comprise a mixture of urban, suburban, and rural areas. Because PIT estimates are reported for an entire CoC, each person experiencing homelessness in the CoC cannot be classified as staying in an urban, suburban, or rural area. Rather, all people experiencing homelessness in the CoC are classified as staying in a CoC that is largely urban, suburban, or rural.

HUD has technical standards for conducting the PIT counts, and CoCs use a variety of approved methods to produce the counts. The guide for PIT methodologies (i.e., approved approaches for conducting the PIT count) can be found here: https://www.hudexchange.info/resource/4036/point-in-time-count-methodology-guide. While standards exist, each CoC makes choices among the approved methods, so there is no universal method used to collect PIT count data. This results in variations in how CoCs conduct their PIT counts, often reflecting the size and type of the CoC. For example, some CoCs conduct a full census, attempting to capture data on all people experiencing homelessness. Others, often those with large geographic areas, use a sampling approach to count a smaller group of people experiencing homelessness and use that sample to estimate the number and characteristics for the entire population of people experiencing homelessness within their community.

HUD also sets several standards for what types of situations qualify as experiences of unsheltered homelessness. All situations that qualify as experiences of unsheltered homelessness are considered places not meant for human habitation. However, the level of connection to services and resources varies. For example, an experience of unsheltered homelessness can be a situation where a person is sleeping in a public space with no covering or connection to resources. It can also be in an encampment that has water

---

[4] The CoCs that did not participate in the 2024 PIT count were American Samoa and the Northern Mariana Islands.

[5] First, CoCs representing the 50 most populous cities in the United States, based on U.S. Census data, were assigned to the major city CoC category. Next, the study team used geographic data published in the 2021 U.S. Department of Education's National Center for Education Statistics (NCES) data to determine the urbanicity of the remaining CoCs. NCES defines 12 geographic locales, which were collapsed into three distinct categories: urban (mapping to the three NCES "City" locales), suburban (mapping to the three NCES "Suburban" locales, as well as the "Town – Fringe" locale), and rural (mapping to the three NCES "Rural" locales, as well as the "Town – Distant" and "Town – Remote" locales). Using the percentage of each CoC's total population living in urban, suburban, and rural areas, based on the NCES geographic data, CoCs were classified into categories according to their largest percentage among the three. The study team used population counts from the Census Bureau's 2020 block-level data. Census blocks are the smallest geographic unit for which the Census reports population counts, and they are the ideal unit for this CoC analysis. Block-level population data are only available in the decennial census reports.

DOJ-HUD-AR00592

or bathroom facilities and is visited by outreach workers who provide connections to supportive services. Experiences of unsheltered homelessness also include people sleeping in cars, trucks, and recreational vehicles when it appears to the people conducting the PIT count that the purpose is not recreational but instead exists because the occupants do not have another place to sleep. Some communities have established "safe parking" programs that have services similar to those found in shelters. They are also considered unsheltered locations.

When collecting demographic data on people experiencing homelessness, the people conducting the PIT count use pre-established categories to collect data on race, ethnicity, and gender. These data are collected from previously administered intake surveys (e.g., for people experiencing sheltered homelessness) or from surveys administered for purposes of the PIT count (e.g., for people experiencing unsheltered homelessness). The demographic categories used in the 2024 PIT count are based on current reporting standards, which are defined in the fiscal year 2024 Homeless Management Information System (HMIS) Data Standards. Those race, ethnicity, and gender response categories were updated for the 2022 PIT count and changed again for the 2024 PIT count to better reflect the ways in which people identify themselves. HUD consulted with advocates, providers, researchers, and people with lived experience of homelessness to arrive at the updated gender and race/ethnicity categories. HUD also took guidance from the White House's *Recommendations on the Best Practices for the Collection of Sexual Orientation and Gender Identity Data on Federal Statistical Surveys* the National Academic of Sciences, Engineering, and Medicine March 2022 report *Measuring Sex, Gender Identity, and Sexual Orientation*.

Beginning in 2023, communities were asked to collect additional information on the ages of people experiencing homelessness. Instead of a single category representing all people over the age of 24, five additional categories were used to provide more detail on the ages of people experiencing homelessness. These categories were 25-34, 35-44, 45-54, 55-64, and 65 or older. As 2023 was the first year these data were reported, comparisons to prior years for the new age categories are not available.

For the AHAR reporting, if a CoC does not conduct an unsheltered count for the reporting year, their prior year's unsheltered data is carried forward to avoid misleading changes in the data. In 2023, 22 CoCs conducted a sheltered-only count, and the 2022 unsheltered count data was carried forward for these CoCs.[6]

In 2024, 22 CoCs conducted a sheltered-only count and the 2023 unsheltered count data was carried forward for these CoCs.[7]

---

[6] To be able to report the age distribution of people over age 24 for these CoCs, the age category breakouts were estimated. To do this estimation, the total number of people aged 24 and older from the reported 2022 unsheltered data was extrapolated (estimated) using the age distribution of comparable CoCs' unsheltered populations in 2023. For example, if 20 percent of people in the 2023 count of unsheltered people over 24 in the comparison CoC(s) fell into the 25-34 age category, 20 percent of the 2022 unsheltered population over age 24 was used to estimate the 25-34 unsheltered population for the CoC. For the 15 California CoCs that did a sheltered-only count, the combined age distribution of all other California CoCs that conducted an unsheltered count in 2023 was used. For other CoCs that did not complete an unsheltered count in 2023, the remainder of CoCs in the same state and geographic category or CoCs from the same geographic category and a similar state were used to impute (estimate) the age distributions. The 22 CoCs that did not conduct an unsheltered count in 2023 included 15 CoCs from California, two CoCs from Georgia, one CoC from Illinois, two CoCs from Michigan, one CoC from Puerto Rico, and one CoC from Washington.

[7] To be able to report the race and ethnicity distribution for these CoCs, the combined race and ethnicity category breakouts were estimated. To do this estimation, we distributed the total reported population in each race category from the reported 2023 unsheltered data by each race and Hispanic/Latina/e/o category in 2024 using the race and Hispanic/Latina/e/o distribution of each CoCs' sheltered populations in 2024. For example, if 20 percent of the total American Indian, Alaska Native, or Indigenous people in the 2024 count of sheltered persons in families in the given CoC were reported as American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o, 20 percent of the 2023 unsheltered population of American Indian,

DOJ-HUD-AR00593

The HIC and PIT count are based on data from January 2024. By the time of the 2023 and 2024 HIC and PIT counts, most shelters had resumed operating at full capacity—that is, they no longer practiced the social distancing that had reduced their bed capacity by up to 50 percent in 2021 and 2022—nearly all COVID-era protections such as city, county, or state level eviction moratoriums, had ended; and many communities reported an increased ability to conduct unsheltered counts. However, the COVID-19 pandemic had lasting impacts on levels of experiences of homelessness and characteristics of people experiencing homelessness. Some one-time investments made during the pandemic were coming to an end. Few communities were still spending down the remains of COVID-era funding to support additional shelter and rapid rehousing programming. Most of these funds were exhausted by the time of the 2024 count (see Section 7 for more information). Significant investments in prevention assistance, including through the Emergency Rental Assistance Program that provided rental assistance payments to prevent evictions and entries into homelessness, were also running down. However, some communities were able to expand the amount of other permanent housing (OPH) available in their communities through the use of Emergency Housing Vouchers which provide funding to support OPH for people at-risk of or currently experiencing homelessness or who have a high risk of housing instability. Furthermore, by 2024, the effects of high inflation rates over the past few years, the ending of the expanded child tax credit, alongside with the continued lack of affordable housing across most of the country continued to have a significant impact on rates of homelessness.

In 2024, many of the CoCs that reported the largest increases in sheltered homelessness, reported that they experienced an increase from people who were displaced from natural disasters or due to immigration. For example, in Hawaii, over 5,000 people were in disaster emergency shelter due to the Maui Fire. Another 13 CoCs indicated an increase due to an increase in immigrants or refugees seeking asylum.

In an effort to meaningfully include people with lived experiences and expertise (PLEE) with homelessness as a part of the AHAR process, HUD invited technical assistance (TA) providers with lived experiences to provide a review of the AHAR chapters. This review continued a collaboration between HUD and PLEE that began with the 2020 AHAR Part 2 report. The AHAR is an important source of data used to inform policies, programmatic decisions, and funding. HUD will continue collaboration with PLEE in development of the report as it will strengthen and improve the usefulness of the AHAR. The contents of this report do not necessarily represent the views or opinions of the PLEE.

---

Alaska Native, or Indigenous persons in families was used to estimate the American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o unsheltered persons in families population for the CoC. We assumed the remainder of the reported 2023 unsheltered population of American Indian, Alaska Native, or Indigenous persons in families were non-Hispanic/Latina/e/o. The 22 CoCs that did not conduct an unsheltered count in 2024 included seven CoCs from California, five CoCs from Oregon, two CoCs from Arkansas, two CoCs from Maryland, and one CoC each from Alabama, Colorado, Florida, New Jersey, Texas, and the Virgin Islands.

DOJ-HUD-AR00594

# 1.   Estimates of All People Experiencing Homelessness in the United States

## 1.1   National Estimates of Homelessness in the United States

The estimates presented in this section reflect national data collected on the number of people experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness on a single night. Sheltered homelessness includes people who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH), or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of people experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of people experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

**All People Experiencing Homelessness** includes all people who lack a fixed, regular, and adequate nighttime residence. It includes people staying in emergency shelters, safe havens, and transitional housing programs. It also includes people who were experiencing unsheltered homelessness in places not meant for human habitation such as on the streets, in abandoned buildings, bus stations, or in their cars.

DOJ-HUD-AR00595

**Exhibit 1-1: PIT Estimates of People Experiencing Homelessness by Sheltered Status, 2007-2024**



Note: The exhibit does not display the total count of people experiencing homelessness in 2021 or the count of all people experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Estimates of the number of people experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

**Exhibit 1-2: Experiences of Homelessness by Household Type and Sheltered Status, 2024**



On a single night in January 2024, 771,480 people experienced homelessness in the United States, the largest number since data collection began and an overall increase of 19 percent since 2007. Compared

DOJ-HUD-AR00596

with 2007, 124,222 more people experienced homelessness in 2024. Between 2023 and 2024, the increase of 118,376 people was largely driven by an increase in the sheltered population, which rose by 25 percent (100,762 more people). The number of people experiencing sheltered homelessness in 2024 was larger than the pre-pandemic sheltered population.

Two-thirds of all people experiencing homelessness in 2024 were in households without children (i.e., individuals). For further detail on people experiencing homelessness by household type, see Chapters 2 and 3.

**Exhibit 1-3: Change in Number of People Experiencing Homelessness Over Time by Sheltered Status, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Change 2020–2024 | | Change 2023–2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All People Experiencing Homelessness** | 124,222 | 19.2% | 134,403 | 21.1% | 191,014 | 32.9% | 118,376 | 18.1% |
| **Sheltered People** | 105,855 | 27.0% | 93,713 | 23.2% | 142,870 | 40.3% | 100,762 | 25.4% |
| **Unsheltered People** | 18,367 | 7.2% | 40,690 | 17.4% | 48,144 | 21.3% | 17,614 | 6.9% |

> [OUR STATE] IS 21,000 HOUSING UNITS SHORT OF PROPERTIES THAT WOULD BE CONSIDERED AFFORDABLE TO EXTREMELY LOW-INCOME RENTERS—THUS WE EXPECT HOMELESSNESS POPULATIONS TO CONTINUE TO INCREASE. PROGRAMS HAVE ALSO HAD INCREASED BED UTILIZATION RATES AS THEY HAVE ROLLED BACK COVID-19 RESTRICTIONS, MAKING MORE BEDS AVAILABLE FOR PEOPLE WHO WOULD OTHERWISE BE UNSHELTERED.
>
> CoC in the Mid-Atlantic

Communities reported that increases in the sheltered population reflected: increased shelter capacity, the ending of eviction moratoria (bans) and other programs designed to prevent experiences of homelessness during the pandemic, a shortage of affordable housing, natural disasters that displaced people from their homes, and rising numbers of people immigrating to the U.S. Increases in the unsheltered population also were connected to a lack of affordable housing and the end of pandemic era protections but also to lack of shelter capacity in some communities.

### Demographic Characteristics

In 2024, HUD made significant changes to the way the Point-in-Time count collected data on gender and data on race and ethnicity. People were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latina/e/o identity, historically collected separately, is now listed among the race categories. Given these changes, numerical comparisons to prior

DOJ-HUD-AR00597

years (i.e., changes in the number of people experiencing homelessness) for gender and race are not included in the report.

The demographic characteristics of people experiencing homelessness vary considerably by household type and shelter status and reflect the large percentage of individuals among the total population of people experiencing homelessness. Detailed characteristics are shown separately for individuals in Section 2 of this report and for families with children in Section 3.

*Age*

**Exhibit 1-4: Age Distribution of People Experiencing Homelessness, 2024**



In 2024, more than one of every four people experiencing homelessness was a child under the age of 18 (19%) or a young adult between the ages of 18 and 24 (8%). Demographics differ depending on the type of homelessness experienced, with few children experiencing unsheltered homelessness and more middle aged adults making up the unsheltered population. People between the ages of 35 and 54 make up almost half of the total number of people experiencing unsheltered homelessness.

While all populations saw increases in the number of people experiencing homelessness between 2023 and 2024, the largest percentage increases were among children (under the age of 18), which increased by 32 percent, followed by young adults aged 25 to 34 which increased by 24 percent (see Appendix B).

DOJ-HUD-AR00598

## *Gender*

Six of every 10 people experiencing homelessness in 2024 were men or boys. This share is even higher in the unsheltered population, where men and boys make up nearly 70 percent of people experiencing unsheltered homelessness.

**Exhibit 1-5: Gender of People Experiencing Homelessness, 2024**

| | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Woman (girl) | 302,660 | 39.2% | 218,628 | 44.0% | 84,032 | 30.6% |
| Man (boy) | 459,568 | 59.6% | 274,680 | 55.2% | 184,888 | 67.4% |
| Transgender | 2,561 | 0.3% | 1,501 | 0.3% | 1,060 | 0.4% |
| Gender Questioning | 383 | <0.1% | 74 | <0.1% | 309 | 0.1% |
| Culturally Specific Identity | 324 | <0.1% | 71 | <0.1% | 253 | 0.1% |
| Different Identity | 720 | 0.1% | 174 | <0.1% | 546 | 0.2% |
| Non Binary | 1,977 | 0.3% | 1,001 | 0.2% | 976 | 0.4% |
| More Than One Gender | 3,287 | 0.4% | 1,127 | 0.2% | 2,160 | 0.8% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

The shelter status of people experiencing homelessness varied considerably within gender categories. People experiencing homelessness identifying as women or girls had the highest sheltered rate (72%), while those identifying as gender questioning – though the number was small – had the highest unsheltered rate (81%).[8]

**Exhibit 1-6: Shelter Status within Gender Identities, 2024**



| | Sheltered | Unsheltered |
|---|---|---|
| Woman | 72.2% | 27.8% |
| Man | 59.8% | 40.2% |
| Transgender | 58.6% | 41.4% |
| Gender Questioning | 19.3% | 80.7% |
| Culturally Specific Identity | 21.9% | 78.1% |
| Different Identity | 24.2% | 75.8% |
| Non Binary | 50.6% | 49.4% |
| More Than One Gender | 34.3% | 65.7% |

[8] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than man or woman.

DOJ-HUD-AR00599

## *Race and Ethnicity*

**Exhibit 1-7: Race/Ethnicity of People Experiencing Homelessness, 2024**

| Race | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All People Experiencing Homelessness** | 771,480 | 100% | 497,256 | 100% | 274,224 | 100% |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o | 4,272 | 0.6% | 2,758 | 0.6% | 1,514 | 0.6% |
| American Indian, Alaska Native, or Indigenous Only | 16,894 | 2.2% | 8,074 | 1.6% | 8,820 | 3.2% |
| Total American Indian, Alaska Native, or Indigenous, any ethnicity | 21,166 | 2.7% | 10,832 | 2.2% | 10,334 | 3.8% |
| Asian or Asian American and Hispanic/Latina/e/o | 793 | 0.1% | 409 | 0.1% | 384 | 0.1% |
| Asian or Asian American Only | 10,401 | 1.3% | 6,315 | 1.3% | 4,086 | 1.5% |
| Total Asian or Asian American, any ethnicity | 11,194 | 1.5% | 6,724 | 1.4% | 4,470 | 1.6% |
| Black, African American, or African and Hispanic/Latina/e/o | 15,967 | 2.1% | 13,680 | 2.8% | 2,287 | 0.8% |
| Black, African American, or African Only | 227,769 | 29.5% | 168,206 | 33.8% | 59,563 | 21.7% |
| Total Black, African American, or African, any ethnicity | 243,736 | 31.6% | 181,886 | 36.6% | 61,850 | 22.6% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 499 | 0.1% | 402 | 0.1% | 97 | <0.1% |
| Middle Eastern or North African Only | 1,513 | 0.2% | 881 | 0.2% | 632 | 0.2% |
| Total Middle Eastern or North Africa, any ethnicity | 2,012 | 0.3% | 1,283 | 0.3% | 729 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 1,071 | 0.1% | 703 | 0.1% | 368 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 10,312 | 1.3% | 5,865 | 1.2% | 4,447 | 1.6% |
| Total Native Hawaiian or Pacific Islander, any ethnicity | 11,383 | 1.5% | 6,568 | 1.3% | 4,815 | 1.8% |
| White and Hispanic/Latina/e/o | 51,376 | 6.7% | 40,487 | 8.1% | 10,889 | 4.0% |
| White Only | 244,280 | 31.7% | 125,971 | 25.3% | 118,309 | 43.1% |
| Total White, any ethnicity | 295,656 | 38.3% | 166,458 | 33.5% | 129,198 | 47.1% |
| Multi-Racial and Hispanic/Latina/e/o | 6,841 | 0.9% | 3,991 | 0.8% | 2,850 | 1.0% |
| Multi-Racial All Other | 24,346 | 3.2% | 13,088 | 2.6% | 11,258 | 4.1% |
| Total Multi-Racial, any ethnicity | 31,187 | 4.0% | 17,079 | 3.4% | 14,108 | 5.1% |
| Hispanic/Latina/e/o Only | 155,146 | 20.1% | 106,426 | 21.4% | 48,720 | 17.8% |
| Total Hispanic/Latina/e/o, Any Race | 235,965 | 30.6% | 168,856 | 34.0% | 67,109 | 24.5% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

Across all people experiencing homelessness, about three in 10 identified as singularly White and 31 percent as Hispanic/Latina/e/o (any race). This reflects a considerable reduction in the number of people experiencing homelessness that identified as white, both by number and percent. It is likely that several people who identified as white in prior years identified as singularly Hispanic/Latina/e/o in 2024.

Close to 32 percent of people experiencing homelessness identified as Black, African American, or African, including just over two percent who identified as Black and Hispanic. The multiracial category is

now greater than 4 percent and is likely to grow as more people choose that identity from among the available categories.

Year to year, there are generally only slight changes in the numbers of people experiencing homelessness by race. However, in 2024, the updates in the race and ethnicity reporting options resulted in the inclusion of three new race/ethnicity categories: Middle Eastern or North African Only, Middle Eastern or North African and Hispanic/Latina/e/o, and Hispanic/Latina/e/o (only). In 2024, 157,158 people (20% of all people experiencing homelessness) reported as one of these new race/ethnicity categories. Along with these changes, the share of people experiencing homelessness who identify as Black (of any ethnicity) decreased from 37 percent of all people experiencing homelessness in 2023 to 32 percent in 2024.[9]

**Exhibit 1-8: Shelter Status within Race and Ethnic Identities, 2024**



Sheltered rates also varied considerably across the racial and ethnic identities of people experiencing homelessness. People who identified as Black, African American, or African and Hispanic/Latina/e/o had the highest sheltered rates at 86 percent. People who identified as American Indian or Alaska Native had the lowest sheltered rates at 48 percent.

---

[9] This change could partially be due to changes in the way race and ethnicity was reported this year and the inclusion of additional reporting categories. However, in recent years, many Communities of Care (CoCs) have engaged in additional technical assistance to correct for bias in the allocation of housing and prevention resources. This decline could also reflect the effects of those and other local efforts to more fairly distribute resources.

DOJ-HUD-AR00601

## 1.2 State-Level Estimates of People Experiencing Homelessness

**Exhibit 1-9: Estimates of People Experiencing Homelessness by State, 2024**



States with the highest number of people experiencing homelessness in 2024 were California and New York. These states also have rates of homelessness higher than the national rate of 23 people experiencing homelessness per 10,000 (48 per 10,000 in CA and 81 per 10,000 in NY).

**Exhibit 1-10: Percentages of People Experiencing Homelessness Who Are Unsheltered by State, 2024**



The point-in-time counts are completed during the coldest time of year in the Unites States. States with the highest rates of unsheltered homelessness during the PIT count tend to be in warmer climates (e.g.,

DOJ-HUD-AR00602

California, Alabama, and Georgia). Other factors impacted the number of people who experienced unsheltered homelessness in a state, include but are not limited to policies related to access to shelter, shelter capacity, and local housing markets.

**Exhibit 1-11: Changes in Number of People Experiencing Homelessness by State, 2023-2024**



Between 2023 and 2024, 43 states and the District of Columbia reported increases in the number of people experiencing homelessness. In many of these states, the increases were driven by increases in the sheltered population.

For information on how rates of homelessness have changed by state since 2007 please see Appendix A.

DOJ-HUD-AR00603

## *Understanding Changes in the Number of People Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles three states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *New York (NY)*

New York is composed of 24 CoCs. Twelve (50%) of the CoCs are suburban, 11 (46%) are rural, and one CoC is a major city (New York City). Between 2023 and 2024, New York saw a 53 percent increase in homelessness. Several CoCs in the state again pointed to increased evictions as cities worked through backlogs in evictions that built up during the eviction moratorium, lack of affordable housing, and increased rents as key drivers to this increase, as well as loss of rapid re-housing supported by ESG-CV and other COVID-related funding. These factors led to an increase in shelter stays as people searched for affordable housing. Other drivers that increased the total homelessness count in New York were increased availability of warming shelters in some locations and increased or improved PIT count training. Finally, one CoC, New York City, noted that it continued to experience a significant influx of asylum seekers in 2024. The CoC noted that these households, who were in emergency shelters, accounted for almost 88 percent of the increase in sheltered homelessness in New York City.

### *Hawaii (HI)*

Hawaii is composed of two CoCs, one suburban CoC covering Oahu, and one rural CoC covering the rest of the state. Between 2023 and 2024, Hawaii had an 87 percent increase in total homelessness. These CoCs attributed this increase in the number of people needing emergency shelter due to the Maui wildfires, which displaced thousands of people from their homes. This added over 5,000 people to Maui's sheltered PIT count as these families were housed in temporary disaster-related emergency shelter housing. Unsheltered homelessness also increased across the state, which the CoCs attributed to the lack of affordable housing, the inability to pay rent, and other financial constraints for households.

### *Illinois (IL)*

Illinois has 19 CoCs, one major city (Chicago), three other largely urban CoCs, ten suburban CoCs, and five largely rural CoCs. Between 2023 and 2024, Illinois had a 116 percent increase in the number of people experiencing homelessness (13,885 more people). Ninety-one percent of this increase was in Chicago. The Chicago CoC reported that an influx of new arrivals accounted for most of this observed increase. According to the CoC, new arrivals (which included migrant and asylum-seeking families, including those bused or flown to Chicago from other states) accounted for more than 13,600 people in emergency shelters in 2024. While the CoC indicated that new arrivals accounted for most of Chicago's increase in estimated homelessness, the same cannot be said for the 16 other CoCs in Illinois that experienced increases. Many attributed their rises to increased shelter capacity, extreme cold that brought people into shelter, a higher cost of living combined with a rollback of pandemic-related financial supports, and a lack of affordable housing.

DOJ-HUD-AR00604

## 1.3  Estimates of All People Experiencing Homelessness by CoC

*Continuums of Care (CoC) were Divided into Four Geographic Categories*

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 1-12: Share of All People Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

More than half of people experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 24 percent. There is some variation by shelter status, where major cities account for a slightly larger share of the sheltered population and rural areas a slightly larger share of the unsheltered population.

DOJ-HUD-AR00605

**Exhibit 1-13: Number of People Experiencing Homelessness by Geographic Category and Sheltered Status, 2024**

|  | # CoCs | All People | Sheltered | Unsheltered |
|---|---|---|---|---|
| **Total** | **385** | **771,480** | **497,256** | **274,224** |
| Major Cities | 48 | 418,339 | 282,874 | 135,465 |
| Other Urban CoCs | 61 | 45,579 | 29,976 | 15,603 |
| Suburban CoCs | 165 | 181,274 | 114,646 | 66,628 |
| Rural CoCs | 111 | 126,288 | 69,760 | 56,528 |

**Exhibit 1-14: Distribution by Household Type and Sheltered Status by Geography, 2024**









Note: Prior years data did not include U.S. territories

Families with children were most likely to be experiencing unsheltered homelessness in largely rural CoCs, with 6 percent of all people experiencing homelessness in largely rural CoCs being unsheltered families. In all other geographic areas, this share was 2 percent or less. Individuals made up a larger share of people

DOJ-HUD-AR00606

experiencing homelessness in other largely urban CoCs (78%) compared to major cities (63%), especially among sheltered individuals (45% vs. 32%).

**Exhibit 1-15: Change in the Number of People Experiencing Homelessness by Sheltered Status and CoC Category, 2023-2024**

|  | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | **118,376** | **18.1%** | **100,762** | **25.4%** | **17,614** | **6.9%** |
| Major Cities | 76,528 | 22.4% | 78,167 | 38.2% | -1,639 | -1.2% |
| Other Largely Urban CoCs | 1,568 | 3.6% | 1,545 | 5.4% | 23 | 0.1% |
| Largely Suburban CoCs | 26,467 | 17.1% | 15,783 | 16.0% | 10,684 | 19.1% |
| Largely Rural CoCs | 13,813 | 12.3% | 5,267 | 8.2% | 8,546 | 17.8% |

Note: Prior years data did not include U.S. territories

While overall the number of people experiencing homelessness increased by 18 percent across the country, CoCs that contained one of the nation's largest cities and those that were composed mostly of suburban areas experienced large increases. Other largely urban areas saw the least increases among people experiencing either sheltered or unsheltered homelessness. Major cities were the only area to report a decrease in unsheltered homelessness between 2023 and 2024.

For more information on people experiencing homelessness at the CoC and geographic level, please see Appendix B.

DOJ-HUD-AR00607

## 2.  Estimates of Individuals Experiencing Homelessness

### *2.1  National Estimates of Individuals Experiencing Homelessness*

The estimates presented in this section reflect national data collected on the number of individuals experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness on a single night. Sheltered homelessness includes people who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH), or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of people experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of people experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

**Individuals Experiencing Homelessness** refers to a people who are not part of a family with children during an experience of homelessness (i.e., the person is not experiencing homelessness in a household with at least one adult and at least one child under age 18). Individuals may be single adults, unaccompanied children, or in multiple-adult or multiple-child households.

DOJ-HUD-AR00608

**INDIVIDUALS**

In January of 2024, 512,007 people in households without children—i.e., individuals—experienced homelessness in the United States. This is the largest number of individuals experiencing homelessness since data collection began. About 50 percent of individuals stayed in sheltered locations and 50 percent in unsheltered locations. This section provides information on individuals experiencing homelessness at a single point in time. See Appendix B for detailed tables supporting the exhibits in this chapter.

**Exhibit 2-1: PIT Estimates of Individuals Experiencing Homelessness, 2007-2024**



Note: The exhibit does not display the total count of individuals experiencing homelessness in 2021 or the count of individuals experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Estimates of the number of individuals experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

DOJ-HUD-AR00609

The number of individuals experiencing homelessness has increased steadily over the last decade after decreasing for several years between 2007 and 2015. Between 2007 and 2024, the number of individuals experiencing homelessness increased by 24 percent.

The 10 percent increase between 2023 and 2024 was observed across both sheltered populations (a 13% increase) and unsheltered populations (a 7% increase).

### Demographic Characteristics

In 2024, HUD made significant changes in the way data on gender and data on race and ethnicity were collected. Individuals were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latina/e/o status, historically

**Exhibit 2-2: Percent Change in Individuals Experiencing Homelessness Over Time, 2007-2024**

|  | Percent change from 2023 to 2024 | Percent change from 2007 to 2024 |
|---|---|---|
| Total Individuals | 9.6% | 24.1% |
| Sheltered Individuals | 12.5% | 20.3% |
| Unsheltered Individuals | 6.9% | 28.1% |

collected separately, is now listed among the race categories. Given these changes, comparisons to prior years for gender and race are not included in the report.

### Age

Most individuals experiencing homelessness were between the ages of 25 and 64 (84%). The groups most likely to be in shelter rather than observed in unsheltered locations were unaccompanied children (that is, children not experiencing homelessness with a parent or legal guardian age 18 or older), youth, and individuals 55 and older.

The number of individuals experiencing homelessness increased across nearly all age groups and shelter statuses between 2023 and 2024. The only populations to decrease during this period were people in child-only households and unsheltered unaccompanied youth (see Appendix B).



**Exhibit 2-3: Age Distribution of Individuals Experiencing Homelessness, 2024**

### Gender

In 2024, more than two-thirds of individuals experiencing homelessness identified as men and 30 percent as women. Two percent identified as a gender other than singularly woman or man. A somewhat higher share of unsheltered individuals identified as men and as more than one gender.

DOJ-HUD-AR00610

The shelter status of individuals varied considerably within gender categories. Individuals experiencing homelessness identifying as transgender had the highest sheltered rate (58%) while those identifying as a having a culturally specific gender identity – though the number was small – had the highest unsheltered rate (88%). [10]

### Race and Ethnicity

Individuals of color, particularly Black, African American, or African and American Indian, Alaska Native, and Indigenous populations are considerably overrepresented among individuals experiencing homelessness (accounting for 69% of individuals experiencing homelessness).

In 2024, 78,780 people (or 15%) identified as only Hispanic or Latina/e/o, however an additional 9 percent of people identified as Hispanic and some other race.

Black, African, or African American accounted for a higher share of the sheltered population than the unsheltered population (37% vs. 25%). Most other groups comprised a higher share of the unsheltered population than they did the sheltered population. See Appendix B for additional detail.

**Exhibit 2-4: Gender Identity of Individuals Experiencing Homelessness, 2024**

|  | All People | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
|  | # | % | # | # | % | # |
| **Woman** | 153,477 | 30.0% | 79,589 | 31.0% | 73,888 | 28.9% |
| **Man** | 350,056 | 68.4% | 173,376 | 67.6% | 176,680 | 69.1% |
| **Transgender** | 2,449 | 0.5% | 1,411 | 0.6% | 1,038 | 0.4% |
| **Gender Questioning** | 356 | 0.1% | 60 | <0.1% | 296 | 0.1% |
| **Culturally Specific Identity** | 280 | 0.1% | 34 | <0.1% | 246 | 0.1% |
| **Different Identity** | 640 | 0.1% | 107 | <0.1% | 533 | 0.2% |
| **Non-Binary** | 1,766 | 0.3% | 824 | 0.3% | 942 | 0.4% |
| **More Than One Gender** | 2,983 | 0.6% | 939 | 0.4% | 2,044 | 0.8% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

**Exhibit 2-5: Shelter Status within Gender Identities of Individuals Experiencing Homelessness**



---

[10] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than man or woman.

DOJ-HUD-AR00611

**Exhibit 2-6: Race and Ethnicity of Individuals Experiencing Homelessness, 2024**

| | Total Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All Individuals Experiencing Homelessness** | 512,007 | 100.0% | 256,340 | 100.0% | 255,667 | 100.0% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 3,007 | 0.6% | 1,575 | 0.6% | 1,432 | 0.6% |
| **American Indian, Alaska Native, or Indigenous Only** | 13,708 | 2.7% | 5,388 | 2.1% | 8,320 | 3.3% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 16,715 | 3.3% | 6,963 | 2.7% | 9,752 | 3.9% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 610 | 0.1% | 233 | 0.1% | 377 | 0.1% |
| **Asian or Asian American Only** | 7,652 | 1.5% | 3,765 | 1.5% | 3,887 | 1.5% |
| **Total Asian or Asian American, any ethnicity** | 8,262 | 1.6% | 3,998 | 1.6% | 4,264 | 1.6% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 6,160 | 1.2% | 4,147 | 1.6% | 2,013 | 0.8% |
| **Black, African American, or African Only** | 140,174 | 27.4% | 85,562 | 33.4% | 54,612 | 21.4% |
| **Total Black, African American, or African, any ethnicity** | 146,334 | 28.6% | 89,709 | 35.0% | 56,625 | 22.2% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 418 | 0.1% | 321 | 0.1% | 97 | <0.1% |
| **Middle Eastern or North African Only** | 1,151 | 0.2% | 566 | 0.2% | 585 | 0.2% |
| **Total Middle Eastern or North Africa, any ethnicity** | 1,569 | 0.3% | 887 | 0.3% | 682 | 0.2% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 738 | 0.1% | 389 | 0.2% | 349 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 5,393 | 1.1% | 2,154 | 0.8% | 3,239 | 1.3% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 6,131 | 1.2% | 2,543 | 1.0% | 3,588 | 1.4% |
| **White and Hispanic/Latina/e/o** | 28,912 | 5.6% | 18,885 | 7.4% | 10,027 | 3.9% |
| **White Only** | 204,446 | 39.9% | 92,268 | 36.0% | 112,178 | 43.9% |
| **Total White, any ethnicity** | 233,358 | 45.5% | 111,153 | 43.4% | 122,205 | 47.8% |
| **Multi-Racial and Hispanic/Latina/e/o** | 4,102 | 0.8% | 1,637 | 0.6% | 2,465 | 1.0% |
| **Multi-Racial All Other** | 16,796 | 3.3% | 6,414 | 2.5% | 10,382 | 4.1% |
| **Total Multi-Racial, any ethnicity** | 20,898 | 4.1% | 8,051 | 3.1% | 12,847 | 5.1% |
| **Hispanic/Latina/e/o Only** | 78,740 | 15.4% | 33,036 | 12.9% | 45,704 | 17.9% |
| **Total Hispanic/Latina/e/o, Any Race** | 122,687 | 24.0% | 60,223 | 23.5% | 62,464 | 24.4% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

DOJ-HUD-AR00612

> "THE RISE IN UNSHELTERED NUMBERS … CAN BE ATTRIBUTED TO SEVERAL PIVOTAL
> DEVELOPMENTS. THE END OF THE EVICTION MORATORIUM PLAYED A SIGNIFICANT
> ROLE, AS MANY INDIVIDUALS WHO HAD BEEN PROTECTED UNDER PANDEMIC-ERA
> POLICIES SUDDENLY FACED EVICTION PROCEEDINGS. WITH THE LEGAL SYSTEM
> RESUMING OPERATIONS, THOSE WHO WERE DELAYED IN COURT PROCESSES FOUND
> THEMSELVES WITHOUT HOUSING. ECONOMIC PRESSURES HAVE ALSO ESCALATED THE
> SITUATION, PARTICULARLY THE UNPRECEDENTED SPIKES IN RENTAL PRICES, WHICH
> SAW NEARLY A 23% INCREASE FROM 2020 TO LATE 2023. THIS SURGE IN HOUSING
> COSTS HAS PUSHED MANY OUT OF AFFORDABILITY, LEADING TO HIGHER RATES OF
> HOMELESSNESS."
>
> CoC in the Southeast

Sheltered status varied considerably by racial groups. Asian, Indigenous, Pacific Islander, and multi-racial populations had the highest rates of individuals experiencing unsheltered homelessness in 2024, all with rates above 60 percent. Individuals identifying as Middle Eastern and Hispanic or Latina/e/o had the highest rate of individuals experiencing sheltered homelessness at 77 percent.

**Exhibit 2-7: Sheltered Status of Individuals Experiencing Homelessness within Racial Groups, 2024**



| Racial Group | Sheltered | Unsheltered |
|---|---|---|
| American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o | 52.4% | 47.6% |
| American Indian Alaska Native or Indigenous Only | 39.3% | 60.7% |
| Asian or Asian American and Hispanic/Latina/e/o | 38.2% | 61.8% |
| Asian or Asian American Only | 49.2% | 50.8% |
| Black African American or African and Hispanic/Latina/e/o | 67.3% | 32.7% |
| Black African American or African Only | 61.0% | 39.0% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 76.8% | 23.2% |
| Middle Eastern or North African Only | 49.2% | 50.8% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 52.7% | 47.3% |
| Native Hawaiian or Pacific Islander Only | 39.9% | 60.1% |
| White and Hispanic/Latina/e/o | 65.3% | 34.7% |
| White Only | 45.1% | 54.9% |
| Multi-Racial and Hispanic/Latina/e/o | 39.9% | 60.1% |
| Multi-Racial All Other | 38.2% | 61.8% |
| Hispanic/Latina/e/o Only | 42.0% | 58.0% |

DOJ-HUD-AR00613

## 2.2    State-Level Estimates of Individuals Experiencing Homelessness

In West Virginia, 89 percent of all people experiencing homelessness at a point-in-time were individuals – the highest rate in the country. California is second, with 86 percent. See Appendix A for more detailed, state-level information.

**Exhibit 2-8: Estimates of Individuals Experiencing Homelessness by State, 2024**



The point-in-time counts are conducted during the coldest time of year in the Unites States. Most of the states with the highest rates of individuals experiencing homelessness in unsheltered locations during the PIT count are in warmer climates (e.g., California, Georgia, and Florida). However, other factors, such as policies related to local housing markets, access to shelter, and shelter capacity also affect the share of people who experience unsheltered homelessness.

DOJ-HUD-AR00614

**Exhibit 2-9: Percentages of Individuals Experiencing Homelessness Who Are Unsheltered, 2024**



Between 2023 and 2024, 42 states and the District of Columbia experienced increases in the number of individuals experiencing homelessness. More states experienced increases in unsheltered individuals (43 states and DC) than sheltered individuals (36 states and DC experienced increases).

**Exhibit 2-10: Largest Changes in the Number of Individuals Experiencing Homelessness by State, 2023-2024**



DOJ-HUD-AR00615

## *Understanding Changes in the Number of People Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *New Jersey (NJ)*

New Jersey is composed of 16 largely suburban CoCs. Between 2023 and 2024, the state experienced a 31% rise in homelessness among individuals. Increases in sheltered individuals slightly outpaced increases in unsheltered individuals (33% vs. 23%) in the state. Nearly all communities noted the continued (and in some CoCs, delayed) impact of the expiration of state-level homelessness prevention resources—particularly the eviction moratorium that continued after the federal moratorium expired and ended in 2022. A large number of people in NJ were staying in hotels and motels after being evicted. In addition, the housing market has continued to tighten and become increasingly unaffordable. One community noted the impact of remote work, "Since the landlords were not receiving much of the income they used to receive through rents, the option of asking for higher rents [from people with jobs in NYC]…was preferable to them. The result was that the rents…went far beyond what any available voucher or program might have allowed for our clients trying to move out of the facility [a shelter] for others to move in."

### *North Carolina (NC)*

North Carolina is composed of 12 CoCs, 7 urban, 2 rural, and 3 suburban. Between 2023 and 2024, the number of individuals experiencing homelessness increased by 17%. Increases in unsheltered individuals outpaced increases in sheltered individuals (25% vs. 10%). While housing affordability was noted in some CoCs, most CoCs described the increased use of coordinated entry as both a reason for improved identification and increases in the population. As one CoC put it, "By expanding Coordinated Entry Access Points and enhancing outreach efforts, we identified and assessed more individuals experiencing homelessness. This proactive approach ensured they were connected with shelters or agencies utilizing hotel funds [non-congregate shelters using motels or hotels], thereby increasing shelter capacity during the PIT count." In addition, North Carolina CoCs noted increased capacity for conducting PIT counts, which contributed to more comprehensive counting. "…there has been growth in the number of community partners participating in the…PIT count. These organizations include Peer Support Recovery Programs, Schools, Faith-Based Organizations, the Department of Social Services, Mental Health/Substance Use Providers, Food Pantries, Veterans Organizations, Homeless Coalitions, Law Enforcement, Libraries, Health Departments, Federally Qualified Health Centers, and the Regional Housing Authorities."

DOJ-HUD-AR00616

## 2.3 CoC-Level Estimates of Individuals Experiencing Homelessness

*Continuums of Care (CoC) were Divided into Four Geographic Categories*

- **(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.
- **(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.
- **(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.
- **(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

More than half of individuals experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 24 percent. Rural areas and suburban areas had somewhat larger shares of unsheltered individuals, while major cities had a larger share of sheltered individuals.

**Exhibit 2-11: Share of All Individuals Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

DOJ-HUD-AR00617

**Exhibit 2-12: Number of Individuals Experiencing Homelessness by Geography Category and Shelter Status, 2024**

|  | # CoCs | Total Individuals | Sheltered Individuals | Unsheltered Individuals |
|---|---|---|---|---|
| *Total* | *385* | *512,007* | *256,340* | *255,667* |
| Major Cities | 48 | 263,999 | 134,690 | 129,309 |
| Other Urban CoCs | 61 | 35,350 | 20,620 | 14,730 |
| Suburban CoCs | 165 | 121,315 | 58,320 | 62,995 |
| Rural CoCs | 111 | 91,343 | 42,710 | 48,633 |

Note: Prior years data did not include U.S. territories.

Overall, increases occurred across geographic categories. Between 2023 and 2024, major cities experienced a large increase in sheltered individuals (18%) and a small drop in the number of unsheltered individuals. Meanwhile, largely suburban and largely rural CoCs experienced considerable increases in the number of unsheltered individuals during the same period.

**Exhibit 2-13: Change in Individuals Experiencing Homelessness by Sheltered Status and CoC Category, 2023-2024**

|  | Change in Total Individuals | | Change in Sheltered Individuals | | Change in Unsheltered Individuals | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| *Total* | *44,987* | *9.6%* | *28,545* | *12.5%* | *16,442* | *6.9%* |
| Major Cities | 20,025 | 8.2% | 20,253 | 17.7% | -228 | -0.2% |
| Other Urban CoCs | 554 | 1.6% | 629 | 3.1% | -75 | -0.5% |
| Suburban CoCs | 14,937 | 14.0% | 4,645 | 8.7% | 10,292 | 19.5% |
| Rural CoCs | 9,471 | 11.6% | 3,018 | 7.6% | 6,453 | 15.3% |

Note: Prior years data did not include U.S. territories.

DOJ-HUD-AR00618

# 3.   Estimates of Families with Children Experiencing Homelessness in the United States

## 3.1   National Estimates of Families with Children Experiencing Homelessness in the United States

The estimates presented in this section reflect national data collected on the number of people in families with children experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness on a single night. Sheltered family homelessness consists of people in families with children who were staying in emergency shelters (ES) or transitional housing (TH) programs on the night of the count. It does not include people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive (PH) housing, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also provides information on the number of people in families with children experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) defines unsheltered homelessness as staying in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. However, some experiences of unsheltered family homelessness may be difficult to identify, as family members may take turns sleeping in backyards or in vehicles that are also used for transportation. In addition, the strength of the unsheltered count may differ from community to community. For these reasons, the actual number of people experiencing unsheltered family homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflects a return to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

**Families with Children Experiencing Homelessness** refers to people in households made up of at least one adult age 18 or older and one child age under 18 that were experiencing homelessness together on the night of the point-in-time count.

DOJ-HUD-AR00619

**Exhibit 3-1: PIT Estimates of People in Families with Children Experiencing Homelessness by Sheltered Status, 2007-2024**



Note: The exhibit does not display the total count of people in families with children experiencing homelessness in 2021 or the count of all people in families with children experiencing unsheltered homelessness because of pandemic-related disruptions to PIT counts. Estimates of the number of people in families with children experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

On a single night in January 2024, 259,473 people in families with children were experiencing homelessness in the United States, the largest number since data collection began. Nine in ten people experiencing homelessness as families were sheltered.

IN RESPONSE TO COVID-19, [OUR] COC SAW AN INFLUX OF RAPID REHOUSING AND PREVENTION RESOURCES, AS WELL AS AN EFFECTIVE STATEWIDE EVICTION MORATORIUM. THESE EFFORTS WERE EFFECTIVE IN KEEPING HOUSEHOLDS FROM ENTERING INTO HOMELESS AND MOVING HOUSEHOLDS OUT OF HOMELESSNESS QUICKLY. SINCE THE SUNSETTING OF THESE RESOURCES AND THE ENDING OF THE [EVICTION] MORATORIUM, [OUR] COC HAS SEEN A LARGE INFLUX OF NEW FAMILIES AND INDIVIDUALS SEEKING EMERGENCY SHELTER ASSISTANCE. THIS INCLUDES A LARGE NUMBER OF FIRST TIME HOMELESS HOUSEHOLDS UNFAMILIAR TO THE SYSTEM, AS WELL AS A NUMBER OF UNDOCUMENTED HOUSEHOLDS SEEKING ASSISTANCE.

Suburban CoC in the Northeast

DOJ-HUD-AR00620

**Exhibit 3-2: Changes in the Number of People in Families with Children Experiencing Homelessness Over Time by Sheltered Status, 2007-2024**

The progress made towards reducing experiences of family homelessness between 2014 and 2021 has reversed in recent years.

The number of people in families with children experiencing homelessness increased by 39 percent between 2023 and 2024. This increase was largely driven by increases in the sheltered population, which rose by 43 percent (72,217 more people).

Overall, the number of people experiencing homelessness as part of a family with children has



| | Percent Change from 2023 to 2024 | Percent Change from 2007 to 2024 |
|---|---|---|
| All People in Families Experiencing Homelessness | 39.40% | 10.60% |
| Sheltered People in Families | 42.80% | 35.10% |
| Unsheltered People in Families | 6.70% | -67.00% |

increased by 51 percent since its low in 2020—prior to the start of the COVID-19 pandemic.

Parenting youth are also included in the population of families with children experiencing homelessness. About half of 18- to 24-year-olds in families with children experiencing homelessness were parents (49% or 9,053 total parenting youth). Children of parenting youth make up seven percent of all children in families experiencing homelessness (9,911 children).

**Exhibit 3-3: Number of People in Parenting Youth Households, 2024**

| | Parents in Households | Children in Households | Total People in Households |
|---|---|---|---|
| **Parenting Youth (Under 18)** | 125 | 135 | 260 |
| **Parenting Youth (18 to 24)** | 9,052 | 10,211 | 19,263 |
| **Total Parenting Youth** | 9,177 | 10,346 | 19,523 |

DOJ-HUD-AR00621

### Demographic Characteristics

In 2024, HUD made significant changes to the way the Point-in-Time count collects data on gender and data on race and ethnicity. People were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latine/a/o identity, historically collected separately, is now listed among the race categories. Given these changes, numerical comparisons to prior years (i.e., changes in the number of people experiencing homelessness) for gender and race are not included in this report.

### Age

In 2024, over half of all people in families with children experiencing homelessness were children under the age of 18 (56%). About one of every five was an adult between the ages of 25 to 34. Families with children experiencing unsheltered



**Exhibit 3-4: Age Distribution of People in Families with Children Experiencing Homelessness, 2024**

homelessness were more likely to have an adult aged 45 or older in the household compared with families in shelter.

While all age groups saw increases in the number of people in families with children experiencing homelessness between 2023 and 2024, the largest percentage increases were among adults ages 25 to 34, which saw a 52 percent increase, followed closely by adults ages 35 to 55 which saw a 48 percent increase (see Appendix B).

DOJ-HUD-AR00622

**Exhibit 3-5: Gender Identity of People in Families with Children
Experiencing Homelessness, 2024**

*Gender*

Women and girls make up 58 percent of all people in families with children experiencing homelessness. This share is slightly lower among families experiencing unsheltered homelessness (55%).

| | All People in Families with Children | | Sheltered | | Unsheltered | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Woman (girl) | 149,183 | 57.5% | 139,039 | 57.7% | 10,144 | 54.7% |
| Man (boy) | 109,512 | 42.2% | 101,304 | 42.0% | 8,208 | 44.2% |
| Transgender | 112 | <0.1% | 90 | <0.1% | 22 | 0.1% |
| Gender Questioning | 27 | <0.1% | 14 | <0.1% | 13 | 0.1% |
| Culturally Specific Identity | 44 | <0.1% | 37 | <0.1% | 7 | <0.1% |
| Different Identity | 80 | <0.1% | 67 | <0.1% | 13 | 0.1% |
| Non Binary | 211 | 0.1% | 177 | 0.1% | 34 | 0.2% |
| More Than One Gender | 304 | 0.1% | 188 | 0.1% | 116 | 0.6% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

**Exhibit 3-6: Shelter Status of People in Families with Children
Experiencing Homelessness, within Gender Identities,
2024**

The shelter status of people experiencing homelessness as part of a family with children varied within gender categories. People identifying as men (boys) or women (girls) both had the highest sheltered rates (93%), while those identifying as questioning – though the number was small – had the lowest rate (52%).[11]



---

[11] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than a man or woman.

DOJ-HUD-AR00623

*Race and Ethnicity*

**Exhibit 3-7: Race/Ethnicity of People in Families with Children Experiencing Homelessness, 2024**

| | All People Experiencing Homelessness as Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All People in Families with Children Experiencing Homelessness** | 259,473 | 100% | 240,916 | 100% | 18,557 | 100% |
| American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o | 1,265 | 0.5% | 1,183 | 0.5% | 82 | 0.4% |
| American Indian, Alaska Native, or Indigenous Only | 3,186 | 1.2% | 2,686 | 1.1% | 500 | 2.7% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 4,451 | 1.7% | 3,869 | 1.6% | 582 | 3.1% |
| Asian or Asian American and Hispanic/Latina/e/o | 183 | 0.1% | 176 | 0.1% | 7 | <0.01% |
| Asian or Asian American Only | 2,749 | 1.1% | 2,550 | 1.1% | 199 | 1.1% |
| **Total Asian or Asian American, any ethnicity** | 2,932 | 1.1% | 2,726 | 1.1% | 206 | 1.1% |
| Black, African American, or African and Hispanic/Latina/e/o | 9,807 | 3.8% | 9,533 | 4.0% | 274 | 1.5% |
| Black, African American, or African Only | 87,595 | 33.8% | 82,644 | 34.3% | 4,951 | 26.7% |
| **Total Black, African American, or African, any ethnicity** | 97,402 | 37.5% | 92,177 | 38.3% | 5,225 | 28.2% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 81 | <0.01% | 81 | <0.01% | 0 | 0.0% |
| Middle Eastern or North African Only | 362 | 0.1% | 315 | 0.1% | 47 | 0.3% |
| **Total Middle Eastern or North Africa, any ethnicity** | 443 | 0.2% | 396 | 0.2% | 47 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 333 | 0.1% | 314 | 0.1% | 19 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 4,919 | 1.9% | 3,711 | 1.5% | 1,208 | 6.5% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 5,252 | 2.0% | 4,025 | 1.7% | 1,227 | 6.6% |
| White and Hispanic/Latina/e/o | 22,464 | 8.7% | 21,602 | 9.0% | 862 | 4.6% |
| **White Only** | 39,834 | 15.4% | 33,703 | 14.0% | 6,131 | 33.0% |
| **Total White, any ethnicity** | 62,298 | 24.0% | 55,305 | 23.0% | 6,993 | 37.7% |
| Multi-Racial and Hispanic/Latina/e/o | 2,739 | 1.1% | 2,354 | 1.0% | 385 | 2.1% |
| Multi-Racial All Other | 7,550 | 2.9% | 6,674 | 2.8% | 876 | 4.7% |
| **Total Multi-Racial, any ethnicity** | 10,289 | 4.0% | 9,028 | 3.7% | 1,261 | 6.8% |
| Hispanic/Latina/e/o Only | 76,406 | 29.4% | 73,390 | 30.5% | 3,016 | 16.3% |
| Total Hispanic/Latina/e/o, Any Race | 113,278 | 43.7% | 108,633 | 45.1% | 4,645 | 25.0% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail.

DOJ-HUD-AR00624

Across all people experiencing homelessness as part of a family with children, about 38 percent identified as Black, African American, or African, including four percent that identified as Black and Hispanic. More than four in every 10 people in families experiencing homelessness identified as Hispanic/Latina/e/o (any race). Three in ten identified as Hispanic only (and no other race). About one quarter of people experiencing homelessness in families with children identified as White (any ethnicity).

The race and ethnicity of people experiencing homelessness in families with children has changed considerably from last year. It is likely that the updates in the race and ethnicity reporting options—which resulted in the inclusion of three new race/ethnicity categories—affected how people identified. In 2024, 76,849 people (30%) identified as one of the newly available racial/ethnic categories.

**Exhibit 3-8: Shelter Status of People in Families with Children Experiencing Homelessness within Racial Groups, 2024**



Sheltered rates also varied considerably across the racial and ethnic identities of people in families with children experiencing homelessness. People who identified as Native Hawaiian or Pacific Islander (only) had the highest unsheltered rates at 25 percent. People who identified as Hispanic or Latina/e/o, regardless of race, tended to have higher sheltered rates than those who identified as non-Hispanic.

[OUR CITY] IS ONE OF THE MOST BURDEN[ED] COMMUNITIES WHEN IT COMES TO COST OF LIVING AND COST FOR RENT. IN ORDER TO MEET THE INCREASING DEMAND OF PEOPLE EXPERIENCING HOMELESSNESS WE PURCHASED ADDITIONAL EMERGENCY SHELTER BEDS TO ADD SYSTEM CAPACITY FOR CRISIS HOUSING. WE ADDED ADDITIONAL HOTEL VENDORS TO MEET DEMAND OF FAMILY PLACEMENTS WHEN EMERGENCY SHELTER IS AT CAPACITY.

Largely Urban CoC in the Southeast

DOJ-HUD-AR00625

## 3.2    Estimates of Homelessness by State

**Exhibit 3-9: State Estimates of People in Families with Children Experiencing Homelessness by State, 2024**



States with the highest number of people in families with children experiencing homelessness in 2024 were New York (95,457 people) and California (25,639 people). However, the states that had the highest share of families with children experiencing homelessness among all people experiencing homelessness were Massachusetts (76%), New York (60%), and Illinois (52%).

**Exhibit 3-10: Percentages of People in Families with Children Experiencing Homelessness Who Are Unsheltered, 2024**



DOJ-HUD-AR00626

Across the nation, four states have more than 25 percent of people in families with children experiencing homelessness in places not meant for human habitation: Oregon (56%), Idaho (54%), Alabama (48%), and Tennessee (32%).

**Exhibit 3-11: Changes in the Number of People in Families with Children Experiencing Homelessness by State, 2023-2024**



Between 2023 and 2024, 39 states and the District of Columbia reported increases in the number of people in families with children experiencing homelessness. Four states saw the number of people in families experiencing homelessness more than double: Illinois (234% increase), Wyoming (219% increase), Hawaii (187% increase), and Colorado (134% increase). In many states, the increases were driven by increases in the sheltered population.

For information on how rates of families experiencing homelessness have changed by state since 2007 please see Appendix B.

DOJ-HUD-AR00627

## *Understanding Changes in the Number of People Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *Massachusetts (MA)*

Massachusetts is composed of 11 CoCs. It has one major city (Boston) and one other largely urban CoC (Cambridge); the remaining nine CoCs are largely suburban. Three of every four people experiencing homelessness in Massachusetts (76%) were doing so in families with children, the highest share in the country. Between 2023 and 2024, Massachusetts had a 74 percent increase in family homelessness (9,512 more people). Many of these CoCs attributed this increase to the state's right to shelter law and its application to hundreds of recently arrived migrant families, refugees, and asylum-seekers who did not yet have living arrangements coming to the state. In August 2023, the Governor of Massachusetts declared a state of emergency regarding newly arriving migrant families, unlocking additional shelter beds and other resources to help place these families in emergency shelters. Other factors contributing to the increase related to overall expanded shelter capacity, a high cost of living, inflation, increases in rents, and a lack of affordable housing.

### *Arizona (AZ)*

Arizona is composed of three CoCs. Two of the CoCs are major cities (Tucson and Phoenix) and the other, geographically large, CoC is largely rural. Twenty-one percent of all people experiencing homelessness in Arizona were families with children. Between 2023, and 2024, the number of people in families experiencing homelessness increased by 15 percent (411 more people). All three CoCs reported increases in family homelessness between 2023 and 2024. These increases were driven by: increased PIT count coordination that allowed for expanded surveying in rural parts of the state where more families experiencing unsheltered homelessness were living; an increase in shelter capacity in one major city that allowed programs to serve more families experiencing homelessness; and an undersupply of emergency shelter capacity for families experiencing homelessness in the other major city that resulted in an increase in unsheltered family homelessness.

DOJ-HUD-AR00628

### 3.3 Estimates of People in Families with Children Experiencing Homelessness by CoC

**Continuums of Care (CoC) were Divided into Four Geographic Categories**

(1) Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

(2) Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

(3) Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

(4) Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 3-12: Share of All People in Families Experiencing Homelessness in Each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

Six of every ten people in families with children experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, at 23 percent. There is some variation by shelter status, with major cities accounting for a larger share of the sheltered population and rural areas a larger share of the unsheltered population. Four in ten families experiencing unsheltered homelessness are in rural CoCs.

DOJ-HUD-AR00629

FAMILIES WITH CHILDREN

**Exhibit 3-13: Number of People in Families with Children Experiencing Homelessness by Geographic Category and Sheltered Status, 2024**

| | # CoCs | All People in Families Experiencing Homelessness | Sheltered People in Families | Unsheltered People in Families |
|---|---|---|---|---|
| **Total** | **385** | **259,473** | **240,916** | **18,557** |
| Major Cities | 48 | 154,340 | 148,184 | 6,156 |
| Other Urban CoCs | 61 | 10,229 | 9,356 | 873 |
| Suburban CoCs | 165 | 59,959 | 56,326 | 3,633 |
| Rural CoCs | 111 | 34,945 | 27,050 | 7,895 |

Note: Prior years data did not include U.S. territories.

**Exhibit 3-14: Change in Experiences of Family Homelessness by Sheltered Status and CoC Category, 2023-2024**

While overall the number of people in families with children experiencing homelessness increased by 39 percent across the country, CoCs that contained one of the nation's 50 largest cities experienced the greatest increases. This was entirely driven by increases in the sheltered population, which increased by 64 percent. In major cities, unsheltered family

| | All People in Families Experiencing Homelessness | | Sheltered Families | | Unsheltered Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | **73,389** | **39.4%** | **72,217** | **42.8%** | **1,172** | **6.7%** |
| Major Cities | 56,503 | 57.8% | 57,914 | 64.2% | -1,411 | -18.6% |
| Other Largely Urban CoCs | 1,014 | 11.0% | 916 | 10.9% | 98 | 12.6% |
| Largely Suburban CoCs | 11,530 | 23.8% | 11,138 | 24.6% | 392 | 12.1% |
| Largely Rural CoCs | 4,342 | 14.2% | 2,249 | 9.1% | 2,093 | 36.1% |

Note: Prior years data did not include U.S. territories.

homelessness declined by 19 percent, the only region to see declines in unsheltered family homelessness. Largely rural CoCs reported a 36 percent increase in unsheltered family homelessness—the largest increase among all geographies.

DOJ-HUD-AR00630

## 4.  Estimates of Unaccompanied Youth Experiencing Homelessness

### 4.1  National Estimates of Unaccompanied Youth Experiencing Homelessness

The estimates presented in this section reflect national data collected on the number of individuals under the age of 25 (unaccompanied youth) experiencing homelessness during a single point-in-time (PIT) that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of unaccompanied youth experiencing sheltered and unsheltered homelessness without a parent or guardian or a child of their own. Sheltered unaccompanied youth consists of people staying in emergency shelters (ES), safe haven (SH), or transitional housing (TH) programs on the night of the count. It does not include young people living in housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH) programs, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7). In addition, these data do not reflect unaccompanied youth living with friends or family on a temporary basis. Doubling up and couch surfing are more common for youth than for other populations.

The PIT count also includes the number of unaccompanied youth experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of unaccompanied youth experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflects a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

> **A Note About Doubling Up and Couch Surfing**
>
> HUD's definition on homelessness does not include situations where people are "doubling up" or temporarily staying with others due to a loss of housing or other hardships. HUD's definition of homelessness also does not include instances of "couch surfing" or staying on someone's couch, floor, or in an extra space in someone else's home due to housing instability or because there are no housing options available to them. This form of housing instability may be more common among youth (ages 18-24). More information on this and other types of housing instability can be found in the AHAR Part 2.

> **Unaccompanied Youth Experiencing Homelessness** are children (under the age of 18) and young adults (ages 18-24) who are not part of a family with children or accompanied by their parent or guardian during their experience of homelessness.

DOJ-HUD-AR00631

**Exhibit 4-1: PIT Estimates of Unaccompanied Youth Experiencing Homelessness, 2017-2024**



Note: The exhibit does not display the total count of unaccompanied youth experiencing homelessness in 2021 or the count of all unaccompanied youth experiencing unsheltered homelessness because of pandemic-related disruptions to PIT counts. Estimates of the number of unaccompanied youth experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

In January of 2024, 38,170 unaccompanied youth experienced homelessness on a single night in the United States.

After decreasing steadily between 2017 (the first year the data were reported) and 2020, the number of unaccompanied youth experiencing homelessness has risen post-pandemic. Between 2022 and 2023, the number of unaccompanied youth in the U.S. increased by 15 percent. The number increased again between 2023 and 2024, by 10 percent.[12]

**Exhibit 4-2: Percent Change in the Number of Unaccompanied Youth Experiencing Homelessness, 2007-2024**



|  | Percent change from 2023 to 2024 | Percent change from 2017 to 2024 |
|---|---|---|
| Unaccompanied youth | 10.0% | -0.3% |
| Sheltered unaccompanied youth | 24.0% | 37.2% |
| Unsheltered unaccompanied youth | -10.3% | -35.6% |

---

[12] Beginning in 2017, HUD began issuing funding to CoCs through the Youth Homelessness Demonstration Program (YHDP). The goal of YHDP is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness.

DOJ-HUD-AR00632

UNACCOMPANIED YOUTH

*Demographic Characteristics*

In 2024, HUD made significant changes in the way data on gender and data on race and ethnicity were collected. Individuals were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latine/a/o status, historically collected separately, is now listed among the race categories. Given these changes, comparisons to prior years for gender and race are not included in the report.

### Age

Nearly all unaccompanied youth were between the ages of 18 and 24. Unaccompanied children (under 18), made up a larger share of the unsheltered population than the sheltered population for all unaccompanied youth experiencing homelessness (8% vs. 6%).

The overall increase in the number of unaccompanied youths experiencing homelessness was driven by increases in youth over the age of 18. Unaccompanied youth under the age of 18 decreased across shelter statuses between 2023 and 2024. (see Appendix B).[13]

### Gender

In 2024, six of every ten unaccompanied youth identified as men or boys (60%) and 36 percent identified as women or girls. Compared to all individuals, unaccompanied youth were more likely to identify as a gender outside of singularly "men" or "women" (4% vs. 2%).

**Exhibit 4-3: Gender Identity of Unaccompanied Youth Experiencing Homelessness, 2024**

| Gender Identity | Total Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| Woman or Girl | 13,607 | 35.6% | 9,266 | 36.4% | 4,341 | 34.1% |
| Man or Boy | 22,852 | 59.9% | 15,089 | 59.3% | 7,763 | 61.0% |
| Transgender | 551 | 1.4% | 382 | 1.5% | 169 | 1.3% |
| Gender Questioning | 82 | 0.2% | 35 | 0.1% | 47 | 0.4% |
| Culturally Specific Identity | 50 | 0.1% | 10 | <0.01% | 40 | 0.3% |
| Different Identity | 80 | 0.2% | 41 | 0.2% | 39 | 0.3% |
| Non-Binary | 530 | 1.4% | 362 | 1.4% | 168 | 1.3% |
| More Than One Gender | 418 | 1.1% | 261 | 1.0% | 157 | 1.2% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

---

[13] This could be due to the greater vulnerability of the youth population, difficulty reaching these populations, increased fear around accessing shelter programs, or difficulty in finding shelter programs specifically for youth.

DOJ-HUD-AR00633

The shelter status of unaccompanied youth varied considerably within gender categories. Unaccompanied youth experiencing homelessness identifying as transgender had the highest sheltered rate (69%), followed closely by those identifying as a women (68%), while those identifying as a having a culturally specific gender identity – though the number was small – had the highest unsheltered rate (80%).[14]

**Exhibit 4-4: Shelter Status within Gender Identities**



Youth of color who are under the age of 25 are considerably overrepresented among individuals experiencing homelessness. Black, African American, or African youth accounted for a higher share of the sheltered population than the unsheltered population (36% vs. 25%). Most other racial groups made up a higher share of the unsheltered population than they did the sheltered population.

### Race and Ethnicity

---

[14] People self-identify their gender when accessing shelter or when participating the unsheltered count. Some individuals may identify their gender differently or not respond to this question due to shelter requirements or perceived biases, resulting in underreporting of people identifying as a gender other than a man or woman.

DOJ-HUD-AR00634

**Exhibit 4-5: Race and Ethnicity of Unaccompanied Youth Experiencing Homelessness, 2024**

| | Total Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Unaccompanied Youth Experiencing Homelessness** | 38,170 | 100% | 25,446 | 100% | 12,724 | 100% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 304 | 0.8% | 169 | 0.7% | 135 | 1.1% |
| **American Indian, Alaska Native, or Indigenous Only** | 968 | 2.5% | 479 | 1.9% | 489 | 3.8% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 1,272 | 3.3% | 648 | 2.6% | 624 | 4.9% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 48 | 0.1% | 22 | 0.1% | 26 | 0.2% |
| **Asian or Asian American Only** | 605 | 1.6% | 270 | 1.1% | 335 | 2.6% |
| **Total Asian or Asian American, any ethnicity** | 653 | 1.7% | 292 | 1.2% | 361 | 2.8% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 651 | 1.7% | 493 | 1.9% | 158 | 1.2% |
| **Black, African American, or African Only** | 11,762 | 30.8% | 8,730 | 34.3% | 3,032 | 23.8% |
| **Total Black, African American, or African, any ethnicity** | 12,413 | 32.5% | 9,223 | 36.2% | 3,190 | 25.0% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 11 | <0.01% | 2 | <0.01% | 9 | 0.1% |
| **Middle Eastern or North African Only** | 243 | 0.6% | 196 | 0.8% | 47 | 0.4% |
| **Total Middle Eastern or North Africa, any ethnicity** | 254 | 0.6% | 198 | 0.8% | 56 | 0.5% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 71 | 0.2% | 35 | 0.1% | 36 | 0.3% |
| **Native Hawaiian or Pacific Islander Only** | 312 | 0.8% | 167 | 0.7% | 145 | 1.1% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 383 | 1.0% | 202 | 0.8% | 181 | 1.4% |
| **White and Hispanic/Latina/e/o** | 2,674 | 7.0% | 2,002 | 7.9% | 672 | 5.3% |
| **White Only** | 10,330 | 27.1% | 5,744 | 22.6% | 4,586 | 36.0% |
| **Total White, any ethnicity** | 13,004 | 34.1% | 7,746 | 30.5% | 5,258 | 41.3% |
| **Multi-Racial and Hispanic/Latina/e/o** | 438 | 1.1% | 242 | 1.0% | 196 | 1.5% |
| **Multi-Racial All Other** | 1,482 | 3.9% | 845 | 3.3% | 637 | 5.0% |
| **Total Multi-Racial, any ethnicity** | 1,920 | 5.0% | 1,087 | 4.3% | 833 | 6.5% |
| **Hispanic/Latina/e/o Only** | 8,271 | 21.7% | 6,050 | 23.8% | 2,221 | 17.5% |
| **Total Hispanic/Latina/e/o, Any Race** | 12,468 | 32.6% | 9,015 | 35.5% | 3,453 | 27.2% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

Sheltered status of unaccompanied youth varied considerably across race and ethnicity. Several groups had unsheltered rates that were higher than the overall unaccompanied youth rate of 33 percent. Unaccompanied youth identifying as Asian, Indigenous, or Native Hawaiian (either alone or also Latina/e/o) had rates that exceeded the national rate. People identifying as Hispanic or Latina/e/o generally had lower rates of unsheltered homelessness.

DOJ-HUD-AR00635

**Exhibit 4-6. Sheltered Status of Unaccompanied Youth by Race, 2024**



> WHEN [THE YOUTH HOMELESSNESS DEMONSTRATION PROGRAM
> (YHDP)] GOT MORE INVOLVED, IT LED TO MORE VOLUNTEERS FROM
> DIFFERENT COUNTIES JOINING IN. WITH MORE VOLUNTEERS, WE WERE ABLE TO
> COVER MORE AREAS AND COUNT MORE ACCURATELY. SO, THE CHANGE IN HOW
> PARTNERS AND PROGRAMS PARTICIPATED, ESPECIALLY WITH YHDP, BROUGHT
> IN MORE VOLUNTEERS FROM MORE COUNTIES, WHICH HELPED MAKE THE
> COUNT BETTER THIS YEAR.
>
> CoC in the Southeast

DOJ-HUD-AR00636

## 4.2  State-Level Estimates of Unaccompanied Youth Experiencing Homelessness

States with the largest number of unaccompanied youth experiencing homelessness in 2024 were California and New York. In Wyoming, 20 percent of all individuals experiencing homelessness at a point-in-time were unaccompanied youth – the highest rate in the country. Illinois and Minnesota were second, with 16 percent. See Appendix A for more detailed, state-level information.

**Exhibit 4-7: Estimates of Unaccompanied Youth Experiencing Homelessness by State, 2024**



The point-in-time counts are completed during the coldest time of year in the Unites States. Most of the states with the highest rates of unsheltered youth homelessness are in warmer climates. In 2024, Arkansas had the highest rate of unsheltered unaccompanied youth (66%) on a single night in January followed by California and Oregon (60%).

DOJ-HUD-AR00637

**Exhibit 4-8: Percentages of Unaccompanied Youth Experiencing Homelessness Who Are Unsheltered, 2024**



Between 2023 and 2024, 33 states and the District of Columbia experienced increases in the number of unaccompanied youth experiencing homelessness. More states experienced increases in sheltered unaccompanied youth (34 states and DC) than unsheltered unaccompanied youth (28 states and DC).

**Exhibit 4-9: Largest Changes in Unaccompanied Youth Experiencing Homelessness by State, 2023-2024**



DOJ-HUD-AR00638

## *Understanding Changes in the Number of Unaccompanied Youth Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

### *Illinois (IL)*

Illinois has 19 CoCs, one major city (Chicago), three other largely urban CoCs, ten suburban CoCs, and five largely rural CoCs. Between 2023 and 2024, Illinois had a 95 percent increase in the number of unaccompanied youth experiencing homelessness (949 more unaccompanied youth). Ninety percent of this increase was in Chicago. The Chicago CoC reported that an influx of new arrivals accounted for most of this observed increase. According to the CoC, new arrivals (which included migrant and asylum-seeking families) accounted for more than 1,050 sheltered unaccompanied youth in 2024 compared to just over 300 in 2023. All other CoCs in the state reported increases or decreases of less than 20 unaccompanied youth experiencing homelessness.

### *West Virginia (WV)*

West Virginia is composed of 4 CoCs – one largely urban CoC, two rural CoCs, and one largely suburban CoC. Between 2023 and 2024, West Virginia had a 29 percent decrease in the number of unaccompanied youth experiencing homelessness (43 fewer youth). While each CoC experienced a decrease in the number of unaccompanied youth, the largest CoC in the state -- WV Balance of State -- experienced the largest decrease. They noted that there were several new Youth Homelessness Demonstration Program (YHDP) grantees in the state. YHDP grants provide communities resources to develop a coordinated approach to ending youth homelessness, including connection to and provision of permanent housing.

DOJ-HUD-AR00639

### 4.3 CoC-Level Estimates of Unaccompanied Youth Experiencing Homelessness

**Continuums of Care (CoC) were Divided into Four Geographic Categories**

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

More than half of unaccompanied youth experiencing homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 21 percent. There is some variation by shelter status, with rural areas and suburban areas accounting for larger shares of unsheltered unaccompanied youth and major cities accounting for a larger share of sheltered unaccompanied youth.[15]

**Exhibit 4-10: Share of Unaccompanied Youth Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

---

[15] The number of unaccompanied youth experiencing homelessness in rural areas may be higher than reported due to challenges in completing the unsheltered PIT count in rural communities, especially rural Tribal nations.

DOJ-HUD-AR00640

**Exhibit 4-11: Number of Unaccompanied Youth Experiencing Homelessness by Geography Type, 2024**

| | # CoCs | Total Individuals | Sheltered Individuals | Unsheltered Individuals |
|---|---|---|---|---|
| *Total* | *385* | *38,170* | *25,446* | *12,724* |
| Major Cities | 48 | 20,758 | 14,636 | 6,122 |
| Other Urban CoCs | 61 | 2,334 | 1,534 | 800 |
| Suburban CoCs | 165 | 8,083 | 5,027 | 3,056 |
| Rural CoCs | 111 | 6,995 | 4,249 | 2,746 |

Note: Prior years data did not include U.S. territories.

The overall increase in unaccompanied youth experiencing homelessness was largely driven by increases in sheltered youth in major cities. All areas except for suburban areas experienced decreases in unsheltered unaccompanied youth. In suburban areas the number increased by 15 percent.

**Exhibit 4-12: Changes in the Number of Unaccompanied Youth Experiencing Homelessness, 2023-2024**

| | Change in Total Unaccompanied Youth | | Change in Sheltered Unaccompanied Youth | | Change in Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| *Total* | 3,467 | 10.0% | 4,923 | 24.0% | -1,456 | -10.3% |
| Major Cities | 2,609 | 14.4% | 4,012 | 37.8% | -1,403 | -18.6% |
| Other Urban CoCs | -169 | -6.8% | 14 | 0.9% | -183 | -18.6% |
| Suburban CoCs | 781 | 10.7% | 391 | 8.4% | 390 | 14.6% |
| Rural CoCs | 246 | 3.6% | 506 | 13.5% | -260 | -8.6% |

Note: Prior years data did not include U.S. territories.

DOJ-HUD-AR00641

# 5.   Estimates of Veterans Experiencing Homelessness in the United States

## 5.1   National Estimates of Veterans Experiencing Homelessness in the United States

The estimates presented in this section reflect national data collected on the number of veterans experiencing homelessness during a point-in-time (PIT) count that occurred during the last 10 days of January 2024. The PIT count offers a snapshot of the number of veterans experiencing sheltered and unsheltered homelessness on a single night. Sheltered veteran homelessness includes veterans who were staying in emergency shelters (ES), transitional housing (TH) programs, or safe havens (SH) on the night of the count. It does not include veterans living in housing supported by rapid rehousing (RRH) programs, veterans living in permanent supportive (PH) housing, and veterans in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of veterans experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as staying in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of veterans experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

Communities began reporting PIT data on veterans experiencing homelessness in 2009, and this report uses 2009 as the baseline (starting) measure of veterans experiencing homelessness in the United States.

**Veteran** refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

DOJ-HUD-AR00642

**Exhibit 5-1: PIT Estimates of Veterans Experiencing Homelessness by Sheltered Status, 2009-2024**



Note: The data for 2021 does not display the total count of veterans experiencing homelessness or the count of all veterans experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Also, estimates of the number of veterans experiencing sheltered homelessness at a point in time in 2021 should be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

On a single night in January 2024, 32,882 veterans were experiencing homelessness. About six in every ten veterans experiencing homelessness were sheltered, and the other four in ten were unsheltered.

Veterans made up five percent of all adults experiencing homelessness in the United States. The share was the same across sheltered status.

**Exhibit 5-2: Proportion of Adults Experiencing Homelessness Who are Veterans by Sheltered Status, 2024**

| Sheltered Status | All Veterans Experiencing Homelessness | All Adults Experiencing Homelessness | Percent of Adults Experiencing Homelessness Who Are Veterans |
|---|---|---|---|
| **Total People** | 32,882 | 623,242 | 5.3% |
| Sheltered | 19,031 | 360,097 | 5.3% |
| Unsheltered | 13,851 | 263,145 | 5.3% |

DOJ-HUD-AR00643



**Exhibit 5-3: Changes in the Number of Veterans Experiencing Homelessness Over Time by Sheltered Status, 2009-2024**

Overall, the number of veterans experiencing homelessness decreased by 8 percent between 2023 and 2024. This decrease in the number of veterans experiencing homelessness was the same for the sheltered and unsheltered populations, however, the percentage decline for veterans experiencing unsheltered homelessness was larger, at 11 percent.

### Demographic Characteristics

In 2024, HUD made significant changes to the way the Point-in-Time count collected data on gender and

> "CHANGE IN PERMANENT SUPPORTIVE HOUSING (PSH) CAPACITY, THE INTRODUCTION OF NEW PSH INITIATIVES, INCLUDING PROGRAMS TARGETED AT VETERANS, CONTRIBUTED TO A 34% INCREASE IN THE NUMBER OF PEOPLE HOUSED COMPARED TO 2022 [FOR OUR COC]. WHILE THESE PROGRAMS DID NOT DIRECTLY AFFECT THE UNSHELTERED COUNT, THEIR IMPACT ON REDUCING … HOMELESSNESS AMONG VETERANS SUGGESTS A BROADER POSITIVE TREND IN ADDRESSING HOMELESSNESS WITHIN THE COMMUNITY."

CoC in the West

data on race and ethnicity. People were able to identify both their gender and their race more inclusively, by selecting more than a single gender or race. Hispanic/Latine/a/o identity, historically collected separately, is now listed among the race categories. Given these changes, numerical comparisons to prior years (i.e., changes in the number of people experiencing homelessness) for gender and race are not included in the report.

DOJ-HUD-AR00644

## *Gender*

Almost nine in every ten veterans experiencing homelessness were men (89%). Veterans who identified as women made up a slightly higher share of veterans experiencing unsheltered homelessness than of veterans experiencing sheltered homelessness (12% vs 9%).

**Exhibit 5-4: Gender Identity of Veterans Experiencing Homelessness, 2024**

| | All Veterans Experiencing Homelessness | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Woman** | 3,329 | 10.1% | 1,661 | 8.7% | 1,668 | 12.0% |
| **Man** | 29,189 | 88.8% | 17,252 | 90.7% | 11,937 | 86.2% |
| **Transgender** | 110 | 0.3% | 51 | 0.3% | 59 | 0.4% |
| **Gender Questioning** | 12 | <0.1% | 2 | <0.1% | 10 | 0.1% |
| **Culturally Specific Identity** | 26 | 0.1% | 6 | <0.1% | 20 | 0.1% |
| **Different Identity** | 13 | <0.1% | 1 | <0.1% | 12 | 0.1% |
| **Non-Binary** | 105 | 0.3% | 27 | 0.1% | 78 | 0.6% |
| **More Than One Gender** | 98 | 0.3% | 31 | 0.2% | 67 | 0.5% |

Note: In 2024, HUD changed the way data on gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for definitions of gender categories.

The shelter status of veterans experiencing homelessness varied within gender categories. Veterans identifying as a gender other than woman or man were less likely to be sheltered.[16]

**Exhibit 5-5: Shelter Status within Gender Identities, 2024**



---

[16] This trend could be due to an increased vulnerability of this population. It is also possible that shelter requirements around gender affect responses, resulting in underreporting of people identifying as other than a man or woman.

DOJ-HUD-AR00645

## *Race and Ethnicity*
**Exhibit 5-6: Race/Ethnicity of Veterans Experiencing Homelessness, 2024**

| Race | All Veterans Experiencing Homelessness | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **All Veterans Experiencing Homelessness** | 32,882 | 100% | 19,031 | 100% | 13,851 | 100% |
| **American Indian, Alaska Native, or Indigenous and Hispanic/Latina/e/o** | 139 | 0.4% | 59 | 0.3% | 80 | 0.6% |
| **American Indian, Alaska Native, or Indigenous Only** | 898 | 2.7% | 376 | 2.0% | 522 | 3.8% |
| **Total American Indian, Alaska Native, or Indigenous, any ethnicity** | 1,037 | 3.1% | 435 | 2.3% | 602 | 4.4% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 14 | <0.1% | 5 | <0.1% | 9 | 0.1% |
| **Asian or Asian American Only** | 376 | 1.1% | 152 | 0.8% | 224 | 1.6% |
| **Total Asian or Asian American, any ethnicity** | 390 | 1.1% | 157 | 0.8% | 233 | 1.7% |
| **Black, African American, or African and Hispanic/Latina/e/o** | 298 | 0.9% | 187 | 1.0% | 111 | 0.8% |
| **Black, African American, or African Only** | 9,890 | 30.1% | 6,746 | 35.4% | 3,144 | 22.7% |
| **Total Black, African American, or African, any ethnicity** | 10,188 | 31.0% | 6,933 | 36.4% | 3,255 | 23.5% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 4 | <0.1% | 0 | <0.1% | 4 | <0.1% |
| **Middle Eastern or North African Only** | 53 | 0.2% | 9 | <0.1% | 44 | 0.3% |
| **Total Middle Eastern or North Africa, any ethnicity** | 57 | 0.2% | 9 | <0.1% | 48 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 32 | 0.1% | 21 | 0.1% | 11 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 308 | 0.9% | 120 | 0.6% | 188 | 1.4% |
| **Total Native Hawaiian or Pacific Islander, any ethnicity** | 340 | 1.0% | 141 | 0.7% | 199 | 1.5% |
| **White and Hispanic/Latina/e/o** | 1,094 | 3.3% | 775 | 4.1% | 319 | 2.3% |
| **White Only** | 16,034 | 48.8% | 9,465 | 49.7% | 6,569 | 47.4% |
| **Total White, any ethnicity** | 17,128 | 52.1% | 10,240 | 53.8% | 6,888 | 49.7% |
| **Multi-Racial and Hispanic/Latina/e/o** | 248 | 0.8% | 94 | 0.5% | 154 | 1.1% |
| **Multi-Racial All Other** | 1,291 | 3.9% | 485 | 2.5% | 806 | 5.8% |
| **Total Multi-Racial, any ethnicity** | 1,539 | 4.7% | 579 | 3.0% | 960 | 6.9% |
| **Hispanic/Latina/e/o Only** | 2,203 | 6.7% | 537 | 2.8% | 1,666 | 12.0% |
| **Total Hispanic/Latina/e/o, Any Race** | 4,032 | 12.3% | 1,678 | 8.8% | 2,354 | 17.0% |

Note: In 2024, HUD changed the way data on race and ethnicity were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. See Appendix B for more detail on the race and ethnicity of people experiencing homelessness.

DOJ-HUD-AR00646

Across all veterans experiencing homelessness, about 49 percent identified as White (only), and 30 percent identified as Black, African American, or African (only). People who identified as Hispanic/Latina/e/o, of any race, were more likely to be experiencing unsheltered homelessness, making up 17 percent of unsheltered veterans compared to nine percent of sheltered veterans.

Based on the new categories, the race and ethnicity of veterans experiencing homelessness changed slightly between 2023 and 2024, showing a reduction in the number of veterans who identified as White (any ethnicity). This may reflect the addition of three new race/ethnicity categories: Middle Eastern or North African Only, Middle Eastern or North African and Hispanic/Latina/e/o, and Hispanic/Latina/e/o (only). In 2024, 2,260 veterans (7%) identified as one of the newly available racial/ethnic categories.

**Exhibit 5-7: Shelter Status within Race and Ethnic Identities, 2024**



Sheltered rates also varied considerably across the racial and ethnic identities of veterans experiencing homelessness. Veterans who identified as White and Hispanic/Latina/e/o had the highest sheltered rate at 71 percent.

DOJ-HUD-AR00647

## 5.2    Estimates of the Number of Veterans Experiencing Homelessness by State

**Exhibit 5-8: Percentage of All Veterans Experiencing Homelessness by State, 2024**



California accounted for 28 percent of all veterans experiencing homelessness in the United States. Florida and Texas had the next largest numbers of veterans experiencing homelessness.

**Exhibit 5-9: Percentages of Veterans Experiencing Homelessness Who Are Unsheltered, 2024**



DOJ-HUD-AR00648

In five states, more than half of all veterans experiencing homelessness were sleeping in places not meant for human habitation. These are California (69%), New Mexico (60%), Washington (59%), Oregon (55%), and Hawaii (51%).

**Exhibit 5-10: Changes in the Number of Veterans Experiencing Homelessness by State, 2023-2024**



Between 2023 and 2024, 28 states and the District of Columbia experienced decreases in the number of veterans experiencing homelessness. The largest percentage decline was in Wyoming (59% fewer veterans experiencing homelessness) and the largest numeric decline was in California (1,279 fewer veterans experiencing homelessness).

For information on how rates of homelessness have changed by state since 2009, please see Appendix B.

DOJ-HUD-AR00649

**VETERANS**

*Understanding Changes in the Number of Veterans Experiencing Homelessness*

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles two states with large changes in their PIT counts and the reasons for those changes reported by the CoCs.

*Tennessee (TN)*

Tennessee is composed of ten CoCs. Two are major city CoCs (Memphis and Nashville), one is in another largely urban area, one is a largely suburban area, and the remaining six are largely rural. Between 2023, and 2024, the number of veterans experiencing homelessness decreased by 25 percent across the state (129 fewer veterans). Much of this decline was driven by one CoC, Chattanooga, which experienced a 75 percent decline in veteran homelessness (110 fewer veterans). This CoC attributed the decline to increased collaboration with the Department of Veterans Affairs. Through this collaboration they were able to conduct case conferencing specifically for veterans experiencing homelessness to expedite referrals to permanent housing.

*Texas (TX)*

Texas is composed of 11 CoCs. It has six major city CoCs (Austin, Dallas, El Paso, Fort Worth and Arlington, Houston, and San Antonio), two other largely urban CoCs, and three largely rural CoCs. Six percent of all veterans experiencing homelessness in the United States were in Texas. Between 2023 and 2024, Texas reported a 10 percent decrease in veteran homelessness (199 fewer veterans). Many of the CoCs attributed this decrease to the Department of Veterans Affairs' programs that place veterans into permanent housing through the Veteran Affairs Supportive Housing (HUD-VASH) and Supportive Services for Veteran Families (SSVF) programs. Some Texas CoCs have added other resources to the efforts to prevent veterans from entering homelessness or to resolve their homelessness quickly.

DOJ-HUD-AR00650

**VETERANS**

## 5.3    *Estimates of Veterans Experiencing Homelessness by CoC*

### *Continuums of Care (CoC) were Divided into Four Geographic Categories*

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

Forty-seven percent of all veterans experiencing homelessness were in one of the nation's 50 largest cities. Suburban areas accounted for the next largest share, with 26 percent of all veterans experiencing homelessness.

There is some variation by shelter status. Major cities accounted for a larger share of the unsheltered veteran population, while suburban and other largely urban areas comprised a larger share of the sheltered population.

**Exhibit 5-11: Share of All Veterans Experiencing Homelessness in each CoC Category by Sheltered Status, 2024**



**Exhibit 5-12: Number of Veterans Experiencing Homelessness by Geographic Category and Sheltered Status, 2024**

|  | #<br>CoCs | All Veterans<br>Experiencing<br>Homelessness | Sheltered<br>Veterans | Unsheltered<br>Veterans |
|---|---|---|---|---|
| **Total** | **385** | **32,882** | **19,031** | **13,851** |
| Major Cities | 48 | 15,361 | 8,351 | 7,010 |
| Other Urban CoCs | 61 | 2,962 | 2,098 | 864 |
| Suburban CoCs | 165 | 8,509 | 5,206 | 3,303 |
| Rural CoCs | 111 | 6,050 | 3,376 | 2,674 |

DOJ-HUD-AR00651

VETERANS

Within the different geographies, largely rural CoCs have the largest share of veterans experiencing unsheltered homelessness, with 44 percent of all veterans experiencing homelessness in rural areas being unsheltered.

Between 2023 and 2024, CoCs that contained one of the nation's largest cities experienced the largest numerical (i.e., change in the overall number) and percentage decrease in veteran homelessness (1,678 fewer veterans or a decline of 10%). This overall decline was driven by reductions in unsheltered veteran homelessness, which declined by 17 percent. Largely suburban CoCs were the only geographic area to experience an increase in unsheltered veteran homelessness, with an increase of four percent between 2023 and 2024.

**Exhibit 5-13: Change in Homelessness by Sheltered Status and CoC Category, 2023-2024**

| | All Veterans Experiencing Homelessness | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | **-2,692** | **-7.6%** | **-1,036** | **-5.2%** | **-1,656** | **-10.7%** |
| Major Cities | -1,678 | -9.8% | -279 | -3.2% | -1,399 | -16.6% |
| Other Largely Urban CoCs | -208 | -6.6% | -95 | -4.3% | -113 | -11.6% |
| Largely Suburban CoCs | -282 | -3.2% | -406 | -7.2% | 124 | 3.9% |
| Largely Rural CoCs | -524 | -8.0% | -256 | -7.0% | -268 | -9.1% |

Note: Prior years data did not include U.S. territories.

DOJ-HUD-AR00652

# 6.    Estimates of Individuals Experiencing Chronic Patterns of Homelessness

## 6.1    National Estimates of Individuals Experiencing Chronic Patterns of Homelessness

The estimates presented in this section reflect national data collected on the number of individuals experiencing chronic patterns of homelessness, experiencing homelessness during a single point-in-time (PIT) count that occurred during the last 10 days in January 2024. The PIT count offers a snapshot of the number of people experiencing sheltered and unsheltered homelessness. Sheltered chronic homelessness consists of individuals staying in emergency shelters (ES) or safe havens (SH) on the night of the count. It does not include people living in transitional housing (TH), housing supported by rapid rehousing (RRH) programs, people in permanent supportive housing (PSH) programs, or people in other permanent housing programs (OPH). (For more information on these programs, see Section 7).

The PIT count also includes the number of people experiencing unsheltered homelessness. The Department of Housing and Urban Development (HUD) guidance defines unsheltered homelessness as sleeping in places not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods. Because of the difficulty of locating people in some of these situations and differences in local capacity to conduct the unsheltered count, the actual number of people experiencing unsheltered homelessness could be larger than reported.

The United States announced an end to the COVID-19 (Coronavirus) public health emergency in May 2023, and the 2024 national PIT counts reflect a returning to post-pandemic shelter use. Many shelters that had reduced shelter capacity through de-concentration (social distancing) efforts had gone back to full capacity by the time of the 2024 count. The strengthening of safety net programs, income protections, and eviction moratoria (bans) in-place during the pandemic, which helped to prevent some people from entering into homelessness, had also expired. For all these reasons, comparisons to the pandemic years should be made with caution.

In January of 2024, 152,585 individuals who experienced chronic patterns of homelessness, experienced homelessness on a single night in the United States. This represents the largest number of individuals who experienced chronic homelessness since data collection began. About two-thirds stayed in unsheltered locations and one-third in sheltered locations. This section provides information on individuals who experienced chronic homelessness at a single point in time. See Appendix B for detailed tables supporting the exhibits in this chapter.

**Individual Experiencing Chronic Homelessness** refers to an individual with a disability who has been continuously experiencing homelessness for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time experiencing homelessness on those occasions is at least 12 months.

DOJ-HUD-AR00653

**Exhibit 6-1: PIT Estimates of Individuals Experiencing Chronic Patterns of Homelessness**



Note: The exhibit does not display the total count of individuals experiencing chronic patterns of homelessness in 2021 or the count of unsheltered individuals experiencing chronic patterns of homelessness because of pandemic-related disruptions to counts. Estimates of the number of sheltered individuals experiencing chronic patterns of homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

**Exhibit 6-2. Share of Individuals Experiencing Chronic Patterns of Homelessness, 2007-2024**

In 2024, 30 percent of all individuals who experienced homelessness had chronic patterns of homelessness. The share of all individuals experiencing homelessness with chronic patterns has varied between 2007 and 2024, hitting a low



DOJ-HUD-AR00654

# CHRONIC PATTERNS OF HOMELESSNESS

of 22 percent in 2018 and a high of 31 percent in 2023.

The number of individuals experiencing homelessness who have experienced chronic patterns of homelessness has increased steadily over the last several years. Increases in individuals experiencing chronic patterns of homelessness persisted through the pandemic, while other populations declined. The number of individuals experiencing chronic homelessness in 2024 was 27 percent higher than in 2007.



**Exhibit 6-3: Change in the Number of Individuals Experiencing Chronic Patterns of Homelessness, 2007-2024**

The most recent change, between 2023 and 2024, was a 7 percent increase in the number of individuals experiencing chronic homelessness across the country. Similar increases were observed across both sheltered populations (a 6% increase) and unsheltered populations (a 7% increase).

Compared to 2020 – just before the start of the Covid-19 pandemic – experiences of chronic homelessness have increased by 38 percent.

> [OUR COMMUNITY'S] COMMITMENT TO HOUSING FIRST RESULTED IN THE CREATION OF SIGNIFICANT NEW PSH FOR THE HIGHEST-NEEDS CLIENTS IN [OUR AREA], INCLUDING PSH FOR FAMILIES WITH CHILDREN, RESULTING IN A DECREASE IN CHRONIC AND FAMILY HOMELESSNESS. [OUR COMMUNITY] ALSO USES THE BY-NAME LIST METHOD TO FIND TARGETED HOUSING SOLUTIONS AND DECREASE OUR TOTAL NUMBER OF HOMELESS VETERANS, FAMILIES, TRANSITION AGE YOUTH, AND [PEOPLE WITH] CHRONIC [PATTERNS OF HOMELESSNESS].
>
> CoC in the South

DOJ-HUD-AR00655

## 6.2 State-Level Estimates of Individuals Experiencing Chronic Patterns of Homelessness

States with the largest number of individuals experiencing chronic patterns of homelessness in 2024 were California and Washington. California alone accounted for 44 percent of all individuals who experienced chronic homelessness in the country. In Washinton, 49 percent of all individuals had experienced chronic patterns of homelessness – the highest rate in the country. Rhode Island is second, with 48 percent. See Appendix A for more detailed, state-level information.

**Exhibit 6-4: Estimates of Individuals Experiencing Chronic Patterns of Homelessness by State, 2024**



The point-in-time counts are conducted during the coldest time of year in the Unites States. Most of the states with the highest rates of unsheltered homelessness on a single night in January are in warmer climates (e.g., Mississippi, Hawaii, New Mexico, Alabama, and California). Other factors, such as policies related to access to shelter, shelter capacity, and strength of coordinated entry (CE) in Continuums of Care (CoCs) across the state may affect the unsheltered rate.

DOJ-HUD-AR00656

**CHRONIC PATTERNS OF HOMELESSNESS**

**Exhibit 6-5: Percentages of Individuals Experiencing Chronic Patterns of Homelessness Who Were Unsheltered, 2024**



Between 2023 and 2024, 35 states and the District of Columbia experienced increases in the number of individuals who experienced chronic patterns of homelessness. The largest numeric increase occurred in Washington (4,295) while the largest percentage increase was observed in Vermont (190%).

**Exhibit 6-6: Changes in the Number of Individuals Experiencing Chronic Patterns of Homelessness by State, 2023-2024**



DOJ-HUD-AR00657

### Understanding Changes in the Number of People Who Experienced Chronic Patterns of Homelessness

As a part of the PIT data submission and data quality review process, Continuums of Care (CoCs) provided details on changes in homelessness locally. To help provide context for the findings from the 2024 PIT count, the authors of this report reviewed these details. This revealed that while experiences of homelessness are increasing nationwide, there are distinct factors that impact local changes. This section profiles one state with large changes in their PIT count and the reasons for those changes reported by the CoCs.

### Washington (WA)

Washington is composed of six CoCs, one major city (Seattle), one other largely urban CoC, three largely suburban CoCs, and one geographically large, rural CoC. Between 2023 and 2024, Washington reported a 56 percent increase in the number of individuals experiencing chronic patterns of homelessness (4,295 more individuals). CoCs that saw large increases in the number of people experiencing chronic patterns of homelessness attributed the increase to a lack of affordable housing. CoCs noted that housing costs continue to rise across Washington, leading to higher rates of homelessness overall. Another factor that increased the count was associated with outreach efforts to identify people in encampments and move them into temporary shelter. This resulted in identifying more people staying in encampments as having chronic patterns of homelessness.

DOJ-HUD-AR00658

### 6.3 CoC-Level Estimates of Individuals Experiencing Chronic Patterns of Homelessness

*Continuums of Care (CoC) were Divided into Four Geographic Categories*

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

Just over 56 percent of individuals experiencing chronic patterns of homelessness were counted in one of the nation's 50 largest cities. Suburban areas account for the next largest share, with 22 percent. There is some variation by shelter status, with major cities and rural areas accounting for larger shares of unsheltered individuals.

**Exhibit 6-7. Share of Individuals Experiencing Chronic Patterns of Homelessness in each CoC Category by Sheltered Status, 2024**



Note: Prior years data did not include U.S. territories.

Nationally, 30 percent of all individuals experiencing homelessness experienced chronic patterns of homelessness. Urban areas – including both major cities and other urban areas – had higher rates of individuals experiencing chronic homelessness than either rural or suburban CoCs.

DOJ-HUD-AR00659

**Exhibit 6-8: Percent of Individuals Experiencing Chronic Patterns of Homelessness by Geographic Category, 2024**

|  | Total Individuals Experiencing Homelessness | Percent of Individuals Who Experienced Chronic Patterns of Homelessness |
|---|---|---|
| **Total** | **152,585** | **29.8%** |
| Major Cities | 85,787 | 32.5% |
| Other Urban CoCs | 11,019 | 31.2% |
| Suburban CoCs | 34,003 | 28.0% |
| Rural CoCs | 21,776 | 23.8% |

Note: Prior years data did not include U.S. territories.

While overall chronic homelessness increased by 7 percent across the country, largely suburban CoCs and largely rural CoCs experienced large increases in both the numbers and the percentages of individuals who experienced chronic patterns of homelessness. These increases were largely among people experiencing unsheltered homelessness. In contrast, major cities experienced the largest increases in sheltered individuals experiencing chronic patterns of homelessness.

**Exhibit 6-9: Changes in Individuals Experiencing Chronic Patterns of Homelessness by Geographic Category, 2023-2024**

|  | Change in Total Number of Individuals Experiencing Chronic Patterns of Homelessness | | Change in Sheltered Individuals Experiencing Chronic Patterns of Homelessness | | Change in Unsheltered Individuals Experiencing Chronic Patterns of Homelessness | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| *Total* | 9,480 | 6.6% | 2,883 | 5.8% | 6,597 | 7.1% |
| Major Cities | 3,509 | 4.3% | 1,982 | 7.6% | 1,527 | 2.7% |
| Other Urban CoCs | 161 | 1.5% | 119 | 2.4% | 42 | 0.7% |
| Suburban CoCs | 3,354 | 10.9% | 958 | 8.2% | 2,396 | 12.7% |
| Rural CoCs | 2,456 | 12.7% | -176 | -2.5% | 2,632 | 21.6% |

Note: Prior years data did not include U.S. territories.

DOJ-HUD-AR00660

# 7.  National Inventory of Beds for People Currently Experiencing Homelessness and People Transitioning Out of Homelessness

**Exhibit 7-1: Project Types for People Currently Experiencing Homelessness and People Transitioning Out of Homelessness**

| Shelter for People Experiencing Homelessness | Permanent Housing for People Transitioning Out of Homelessness |
|---|---|
| •**Emergency Shelter (ES):** provides temporary or nightly shelter beds to people experiencing homelessness<br>•**Transitional Housing (TH):** provides people experiencing homelessness a place to stay combined with supportive services for up to 24 months<br>•**Safe Havens (SH):** provides private or semi-private temporary shelter and services to people with severe mental illness and are limited to serving no more than 25 people within a facility | •**Rapid Rehousing (RRH):** a housing model designed to provide temporary housing assistance to people experiencing homelessness, moving them quickly out of homelessness and into permanent housing<br>•**Permanent Supportive Housing (PSH):** a housing model designed to provide housing assistance (project- and tenant-based) and supportive services on a long-term basis to people who were experiencing homelessness when they entered the program and are now considered as having formerly experienced homelessness. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability to be eligible.<br>•**Other Permanent Housing (OPH):** a housing model with or without services that is designed specifically for people who formerly experienced homelessness. OPH does not have a disability requirement. |

## 7.1    Types of Programs in the National Inventory

Communities across the country submit data each year on their residential programs for people experiencing homelessness and their programs that help people end their experiences of homelessness and move into housing. The two basic types of programs are shelter programs for people experiencing homelessness and housing programs for people who formerly experienced homelessness. Communities report the number of beds that are available for both types of programs at the same time each January when they conduct Point-in-Time (PIT) counts. The national inventory is the total number of beds in all communities, as reported through the housing inventory count (HIC).

1) **Shelter** is intended to serve people currently experiencing homelessness and is made up of two main types of programs, emergency shelters (ES) and transitional housing programs (TH). By design, ES is shorter-term and provides less intensive services than

TH.[17] Shelter also includes a small number of programs, called safe havens (SH), for individuals who have been identified as having higher needs such as severe mental illness. The sheltered data only reports on beds that are available during the entire year. While the HIC includes information on beds available during severe weather events (storms, fires, extreme cold), during seasonal timeframes (open only during specific weeks or months), and beds made available when the number of people seeking shelter exceeds capacity (overflow beds), the focus of this analysis is on the year-round inventory. This information reflects the planned capacity communities rely on to meet the current needs of people experiencing homelessness.

2) **Permanent housing** is intended to serve people who were experiencing homelessness at the time they were enrolled in a permanent housing program. Once the program helps a household (an individual or family) find a housing unit, that housing is considered permanent in the sense that the household has a lease (or similar agreement) and may be able to stay in the same housing unit long-term. This category includes rapid rehousing (RRH), a short-term subsidy in a housing unit in which the individual or family may be able to remain after the subsidy ends; permanent supportive housing (PSH), housing with a long-term subsidy and supportive services for people with disabilities; and other permanent housing (OPH), which also is intended for people transitioning out of experiencing homelessness but is not restricted to people with disabilities. The information on permanent housing shows the planned capacity of communities to use these programs to help people no longer experience homelessness. Only programs considered by the Continuum of Care (CoC) to be part of the homelessness services system are included in the HIC as OPH. Communities may use other programs to help people transition out of experiencing homelessness.[18]

> **Data on People Living in Permanent Housing**
>
> People living in permanent housing programs are not included in the PIT count. However, information on the number of people served in rapid rehousing and permanent supportive housing programs over the course of a year can be found in the AHAR Part 2.

---

[17] Some transitional housing programs provide housing in which the individual or family may be able to stay after the transitional period with intensive services ending (sometimes called "transition-in-place"), and some emergency shelters have intensive services. Communities decide how to categorize their programs when reporting data to HUD.

[18] Additional programs or housing supports may house people experiencing homelessness or transitioning out of homelessness. However, to be included on the HIC, the beds and units must be dedicated to serving persons experiencing homelessness, or for permanent housing projects, dedicated for persons who were experiencing homelessness at entry. Beds in institutional settings not specifically dedicated for persons who are experiencing homelessness, including detox facilities, emergency rooms, jails, and acute crisis or treatment centers are not included in the HIC.

DOJ-HUD-AR00662

**Exhibit 7-2: Distribution of the National Bed Inventory by Program Type, 2024**

A total of 1,190,565 year-round beds in communities across the nation were dedicated to serving people who are currently experiencing homelessness (43% of inventory) or transitioning out of homelessness (57% of inventory).



Note: A small percentage of safe haven beds (0.2%) are in the national inventory but are not included in the exhibit.

DOJ-HUD-AR00663

**Exhibit 7-3: Inventory of Beds in Shelters and Permanent Housing, 2007-2024**



Note: The small share of Safe Haven beds (0.2%) is not included in this exhibit.

DOJ-HUD-AR00664

The COVID-19 pandemic resulted in significant changes to the national inventory. At the time of the 2021 HIC, precautions taken to reduce the spread of the COVID-19 virus resulted in considerable changes to the capacity of homelessness service providers. Shortly after the onset of the pandemic, Congress appropriated significant funding to support additional inventory (see the box at the end of this chapter for more information).

**Exhibit 7-4: Changes in the Inventory of Beds in Shelters and Permanent Housing, 2007-2024**



The total national inventory for people experiencing homelessness (i.e., the emergency shelter, transitional housing, and safe havens inventory) has increased by about 87,000 beds since 2007. This change was driven by increases in the number of emergency shelter beds (210,522 more beds) that exceeded declines in transitional housing beds (125,720 fewer beds) over the same time period.

Between 2020—the last pre-pandemic housing inventory count—and 2024, the number of available beds for people experiencing homelessness increased by 29 percent (113,561 more beds).

> "EVEN IF ALL OF THE OPH, PSH, ES, AND TH BEDS WERE FULL ON THE NIGHT OF THE COUNT, THERE WOULD BE MORE PEOPLE EXPERIENCING HOMELESSNESS THEN BEDS AVAILABLE TO HOST EVERYONE EXPERIENCING HOMELESSNESS. DUE TO THE ECONOMIC IMPACTS OF INFLATION IN COMBINATION WITH THE LACK OF AFFORDABLE HOUSING, THERE HAS BEEN AN INCREASE IN FOLKS EXPERIENCING HOMELESSNESS, AND THAT HAS RESULTED IN SEEING AN INCREASE IN FOLKS EXPERIENCING UNSHELTERED HOMELESSNESS AS WELL"

CoC in the Midwest

DOJ-HUD-AR00665

*Beds Dedicated to Veterans, Youth, and People Experiencing Chronic Patterns of Homelessness*

**Exhibit 7-5: Inventory of Year-Round Beds for Special Populations, 2024**

| Bed Type | Total Beds | Beds for People Experiencing Chronic Patterns of Homelessness | | Beds for Veterans | | Beds for Youth | |
|---|---|---|---|---|---|---|---|
| | # | # | % | # | % | # | % |
| Emergency Shelter | 421,973 | | | 3,863 | 0.9% | 7,524 | 1.8% |
| Transitional Housing | 85,485 | N/A | | 11,037 | 12.9% | 9,976 | 11.7% |
| Safe Haven | 2,252 | | | 1,343 | 59.6% | 10 | 0.4% |
| Rapid Rehousing | 146,652 | | | 22,828 | 15.6% | 8,228 | 5.6% |
| Permanent Supportive Housing | 397,241 | 160,475 | 40.4% | 109,891 | 27.7% | 4,971 | 1.3% |
| Other Permanent Housing | 136,962 | N/A | | 3,681 | 2.7% | 3,170 | 2.3% |
| Total Beds | 1,190,565 | 160,475 | 13.5% | 152,643 | 12.8% | 33,879 | 2.8% |

Note: Only PSH programs funded by HUD can report dedicated beds for people experiencing chronic patterns of homelessness on the HIC. According to the Fiscal Year 2024 HMIS data standards, "a dedicated bed is a bed that must be filled by a person in the subpopulation category (or a member of their household) unless there are no persons from the subpopulation who qualify for the project located within the geographic area." Beds can be dedicated to more than one population, for example, a bed may be dedicated to veterans experiencing chronic homelessness. For more information, see pages 40-41 of the HMIS Data Standards Manual: https://files.hudexchange.info/resources/documents/HMIS-Data-Standards-Manual-2024.pdf

Thirteen percent of all beds in the national inventory (152,643 beds) were dedicated to veterans experiencing homelessness and their family members. Housing types with the most beds dedicated to veterans experiencing homelessness were safe havens (60% of all safe haven beds) followed by PSH (28% of all PSH beds).

DOJ-HUD-AR00666

**Exhibit 7-6: Inventory of PSH Beds for People Experiencing Chronic Homelessness, 2007-2024**

| Year | Number of Beds |
|------|----------------|
| 2007 | 37,807 |
| 2008 | 42,298 |
| 2009 | 50,602 |
| 2010 | 55,256 |
| 2011 | 67,964 |
| 2012 | 74,693 |
| 2013 | 81,666 |
| 2014 | 94,282 |
| 2015 | 95,066 |
| 2016 | 111,390 |
| 2017 | 149,005 |
| 2018 | 168,503 |
| 2019 | 181,505 |
| 2020 | 179,569 |
| 2021 | 173,457 |
| 2022 | 178,545 |
| 2023 | 178,681 |
| 2024 | 160,475 |

| | Change 2023-2024 | | Change 2007–2024 | |
|---|---|---|---|---|
| | # | % | # | % |
| **PSH Beds for People Experiencing Chronic Homelessness** | -18,206 | -10.1% | 122,668 | 324.5% |

CoCs reported a slight decline in the number of PSH beds for people who experience chronic patterns of homelessness between 2023 and 2024 (a decline of 18,206 beds). Despite this, the PSH inventory has increased over three-fold (325%) since 2007.

DOJ-HUD-AR00667

## 7.2    Beds by CoC Category, 2024

*Continuums of Care (CoC) were divided into four geographic categories*

**(1)** Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

**(2)** Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

**(3)** Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

**(4)** Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 7-7: Inventory of Year-Round Beds by Program Type and CoC Category, 2024\***



*Excludes safe haven inventory, which accounts for between 0.1% and 0.3% of beds across the four CoC categories.

In rural CoCs, the split of inventory for people currently experiencing homelessness and people transitioning out of homelessness is roughly even (49% vs 51%). Other largely urban CoCs have significantly more bed inventory for people transitioning out of homelessness than for people currently experiencing homelessness (63% vs 37%).

DOJ-HUD-AR00668

**Context for Changes in the National Inventory, 2021-2024**

In response to the COVID-19 pandemic, the U.S. Government passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) in March 2020. As part of the CARES Act, Congress appropriated $4 billion to the Emergency Solutions Grants - Coronavirus (ESG-CV) program to help communities support additional homeless assistance and prevention activities. ESG recipients could use ESG-CV funds for additional sponsor-based rental assistance, hotel or motel costs for people experiencing homelessness, and temporary emergency shelters. HUD required that at least 50 percent of funds be drawn by June 2022 and all ESG-CV funds be fully spent by the end of 2023 (with the exception of reallocated funds, which could be spent through June 2024). As such, the impact of ESG-CV funds on bed inventory was greatest in 2021 and 2022. The share of the total inventory for people currently experiencing homelessness that was funded using ESG-CV funds increased from 14 percent in 2021 to 19 percent in 2022 but declined to 8 percent in 2023 and just 3 percent in 2024 as ESG recipients spent down remaining ESG-CV funds in anticipation of the spending deadline. ESG-CV funds were also used to support an increase in the rapid re-housing inventory. In 2021, 10 percent of all rapid re-housing was funded using ESG-CV funds, and by 2022 this had peaked at 34 percent. However, by 2023, the share of rapid rehousing funded by ESG-CV went back down to 10 percent, and by 2024 it was just 1 percent.

In March 2021, Congress passed the American Rescue Plan Act (ARPA) which included $1.1 billion in funding to support Emergency Housing Vouchers (EHV). EHVs are used to provide housing support to people experiencing homelessness or at risk of homelessness. The HIC captures data on OPH and PSH that was supported using EHV funds. CoCs mainly recorded EHV in the HIC as additional OPH inventory. At the time of the 2022 HIC, 34 percent of all OPH and one percent of PSH inventory was supported by EHV funding. In 2023 and 2024, this reached 44 percent for OPH and declined to under one percent for PSH, in accordance with HUD guidance on how to record EHV in the HIC.

**Exhibit 7-8: Inventory of Beds Funded by Coronavirus Relief-Related Funding, 2021-2023**

| | 2021 | | 2022 | | | 2023 | | | 2024 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bed Inventory (#) | ESG-CV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) |
| Emergency Shelter, Safe Haven, and Transitional Housing Inventory | 396,466 | 14% | 418,642 | 19% | | 449,567 | 8% | | 509,710 | 3% | |
| RRH Inventory | 137,206 | 10% | 149,866 | 34% | | 144,765 | 10% | | 146,652 | 1% | |
| OPH Inventory | 53,856 | | 90,098 | | 34% | 122,227 | | 44% | 136,962 | | 44% |
| PSH Inventory | 376,709 | | 387,305 | | 1% | 395,986 | | 0.5% | 397,241 | | 0.8% |

Note: ESG-CV funding is only available for ES and RRH inventory and was in use by the time of the 2021 HIC. EHV funding can be used to support OPH and PSH housing and was in use by the time of the 2022 HIC. Inventory included is limited to year-round, current inventory.

DOJ-HUD-AR00669

## Appendix A: State-Level Data

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 4,601 | 39.3% | -15.6% | 2,698 | 58.6% | 1,903 | 41.4% | 9 | 3,430 | 1,171 | 182 | 291 | 533 |
| Alaska | 2,686 | 2.8% | 63.6% | 479 | 17.8% | 2,207 | 82.2% | 37 | 2,019 | 667 | 197 | 106 | 781 |
| Arizona | 14,737 | 3.5% | 0.6% | 7,291 | 49.5% | 7,446 | 50.5% | 20 | 11,640 | 3,097 | 821 | 994 | 774 |
| Arkansas | 2,783 | 6.7% | -27.5% | 1,334 | 47.9% | 1,449 | 52.1% | 9 | 2,035 | 748 | 125 | 226 | 3,497 |
| California | 187,084 | 3.1% | 34.6% | 123,974 | 66.3% | 63,110 | 33.7% | 48 | 161,445 | 25,639 | 9,052 | 9,310 | 66,548 |
| Colorado | 18,715 | 29.6% | 31.6% | 4,791 | 25.6% | 13,924 | 74.4% | 32 | 10,196 | 8,519 | 591 | 978 | 4,059 |
| Connecticut | 3,410 | 13.1% | -23.9% | 574 | 16.8% | 2,836 | 83.2% | 9 | 2,302 | 1,108 | 174 | 174 | 81 |
| Delaware | 1,358 | 9.1% | 28.0% | 238 | 17.5% | 1,120 | 82.5% | 13 | 803 | 555 | 29 | 89 | 1,386 |
| District of Columbia | 5,616 | 14.1% | 5.6% | 900 | 16.0% | 4,716 | 84.0% | 83 | 3,960 | 1,656 | 420 | 213 | 224 |
| Florida | 31,362 | 2.0% | -34.8% | 16,868 | 53.8% | 14,494 | 46.2% | 14 | 23,799 | 7,563 | 1,367 | 2,333 | 6,100 |
| Georgia | 12,290 | 0.0% | -37.4% | 6,673 | 54.3% | 5,617 | 45.7% | 11 | 9,562 | 2,728 | 578 | 646 | 1,633 |
| Hawaii | 11,637 | 87.0% | 91.7% | 4,042 | 34.7% | 7,595 | 65.3% | 81 | 7,145 | 4,492 | 351 | 283 | 1,567 |
| Idaho | 2,750 | 19.7% | 57.2% | 1,374 | 50.0% | 1,376 | 50.0% | 14 | 1,631 | 1,119 | 88 | 209 | 531 |
| Illinois | 25,832 | 116.2% | 66.8% | 2,664 | 10.3% | 23,168 | 89.7% | 21 | 12,310 | 13,522 | 1,947 | 559 | 381 |

DOJ-HUD-AR00670

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indiana | 6,285 | 4.5% | -14.6% | 1,477 | 23.5% | 4,808 | 76.5% | 9 | 4,584 | 1,701 | 273 | 422 | 1,884 |
| Iowa | 2,631 | -0.8% | -3.8% | 464 | 17.6% | 2,167 | 82.4% | 8 | 1,903 | 728 | 137 | 135 | 598 |
| Kansas | 2,793 | 6.0% | 32.3% | 904 | 32.4% | 1,889 | 67.6% | 9 | 2,109 | 684 | 156 | 211 | 764 |
| Kentucky | 5,231 | 9.8% | -35.1% | 1,716 | 32.8% | 3,515 | 67.2% | 12 | 4,105 | 1,126 | 290 | 391 | 987 |
| Louisiana | 3,469 | 9.5% | -36.9% | 1,558 | 44.9% | 1,911 | 55.1% | 8 | 2,861 | 608 | 205 | 223 | 446 |
| Maine | 2,702 | -36.5% | 2.4% | 273 | 10.1% | 2,429 | 89.9% | 19 | 1,548 | 1,154 | 181 | 115 | 1,984 |
| Maryland | 6,069 | 3.5% | -37.0% | 1,036 | 17.1% | 5,033 | 82.9% | 10 | 4,126 | 1,943 | 254 | 312 | 789 |
| Massachusetts | 29,360 | 53.4% | 94.1% | 1,635 | 5.6% | 27,725 | 94.4% | 42 | 6,966 | 22,394 | 564 | 550 | 459 |
| Michigan | 9,739 | 8.2% | -65.6% | 1,623 | 16.7% | 8,116 | 83.3% | 10 | 5,882 | 3,857 | 565 | 456 | 976 |
| Minnesota | 9,201 | 9.6% | 25.6% | 2,084 | 22.6% | 7,117 | 77.4% | 16 | 5,013 | 4,188 | 782 | 299 | 1,707 |
| Mississippi | 1,041 | 6.0% | -24.4% | 486 | 46.7% | 555 | 53.3% | 4 | 874 | 167 | 44 | 40 | 1,534 |
| Missouri | 7,312 | 9.0% | 17.0% | 2,384 | 32.6% | 4,928 | 67.4% | 12 | 5,162 | 2,150 | 501 | 513 | 84 |
| Montana | 2,008 | -7.8% | 74.6% | 576 | 28.7% | 1,432 | 71.3% | 18 | 1,466 | 542 | 122 | 168 | 423 |
| Nebraska | 2,720 | 10.5% | -23.0% | 301 | 11.1% | 2,419 | 88.9% | 14 | 2,020 | 700 | 154 | 129 | 1,824 |
| Nevada | 10,106 | 16.6% | 16.9% | 4,914 | 48.6% | 5,192 | 51.4% | 32 | 8,404 | 1,702 | 545 | 644 | 102 |

DOJ-HUD-AR00671

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Hampshire | 2,245 | -8.0% | -0.1% | 579 | 25.8% | 1,666 | 74.2% | 16 | 1,516 | 729 | 118 | 128 | 645 |
| New Jersey | 12,762 | 24.3% | -26.3% | 1,767 | 13.8% | 10,995 | 86.2% | 14 | 8,194 | 4,568 | 515 | 521 | 575 |
| New Mexico | 4,631 | 20.5% | 53.6% | 2,242 | 48.4% | 2,389 | 51.6% | 22 | 3,744 | 887 | 207 | 298 | 1,846 |
| New York | 158,019 | 53.1% | 152.4% | 5,638 | 3.6% | 152,381 | 96.4% | 81 | 62,562 | 95,457 | 7,671 | 1,180 | 1,700 |
| North Carolina | 11,626 | 19.2% | -1.5% | 4,523 | 38.9% | 7,103 | 61.1% | 11 | 8,396 | 3,230 | 524 | 688 | 3,093 |
| North Dakota | 865 | 10.3% | 36.0% | 190 | 22.0% | 675 | 78.0% | 11 | 646 | 219 | 83 | 44 | 5,077 |
| Ohio | 11,759 | 3.3% | 4.4% | 2,379 | 20.2% | 9,380 | 79.8% | 10 | 8,402 | 3,357 | 815 | 589 | 1,429 |
| Oklahoma | 5,467 | 17.6% | 29.5% | 2,216 | 40.5% | 3,251 | 59.5% | 13 | 4,407 | 1,060 | 450 | 304 | 1,344 |
| Oregon | 22,875 | 13.6% | 30.0% | 14,191 | 62.0% | 8,684 | 38.0% | 54 | 18,923 | 3,952 | 1,315 | 1,407 | 7,707 |
| Pennsylvania | 14,088 | 12.2% | -13.1% | 2,635 | 18.7% | 11,453 | 81.3% | 11 | 9,524 | 4,564 | 690 | 719 | 2,140 |
| Rhode Island | 2,442 | 34.9% | 78.0% | 534 | 21.9% | 1,908 | 78.1% | 22 | 1,565 | 877 | 73 | 130 | 756 |
| South Carolina | 4,593 | 13.3% | -18.9% | 1,846 | 40.2% | 2,747 | 59.8% | 9 | 3,703 | 890 | 269 | 388 | 894 |
| South Dakota | 1,338 | 4.4% | 131.1% | 227 | 17.0% | 1,111 | 83.0% | 15 | 1,044 | 294 | 147 | 42 | 151 |
| Tennessee | 8,280 | -10.1% | -26.1% | 4,348 | 52.5% | 3,932 | 47.5% | 12 | 6,640 | 1,640 | 399 | 570 | 1,577 |
| Texas | 27,987 | 2.2% | -29.7% | 12,339 | 44.1% | 15,648 | 55.9% | 9 | 21,648 | 6,339 | 1,355 | 1,837 | 5,028 |

DOJ-HUD-AR00672

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utah | 3,869 | 4.9% | 28.5% | 1,008 | 26.1% | 2,861 | 73.9% | 11 | 2,923 | 946 | 240 | 121 | 869 |
| Vermont | 3,458 | 4.9% | 234.1% | 167 | 4.8% | 3,291 | 95.2% | 53 | 2,153 | 1,305 | 131 | 108 | 918 |
| Virginia | 7,141 | 5.6% | -26.7% | 1,581 | 22.1% | 5,560 | 77.9% | 8 | 4,665 | 2,476 | 309 | 389 | 640 |
| Washington | 31,554 | 12.5% | 35.0% | 16,222 | 51.4% | 15,332 | 48.6% | 40 | 24,320 | 7,234 | 1,723 | 1,780 | 11,986 |
| West Virginia | 1,779 | 25.6% | -26.2% | 788 | 44.3% | 991 | 55.7% | 10 | 1,592 | 187 | 108 | 132 | 603 |
| Wisconsin | 5,049 | 3.9% | -10.6% | 510 | 10.1% | 4,539 | 89.9% | 9 | 3,136 | 1,913 | 216 | 351 | 357 |
| Wyoming | 501 | -5.8% | -6.7% | 89 | 17.8% | 412 | 82.2% | 9 | 399 | 102 | 80 | 37 | 94 |

DOJ-HUD-AR00673

# Appendix B: Additional Data on People Experiencing Homelessness in 2024

## *Changes to the 2024 PIT Demographic Reporting Options.*

In 2024, HUD changed the way data on race, ethnicity, and gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. These updates in reporting options aligned with updates made to the FY2024 HMIS Data Standards.

### *Updates to Race and Ethnicity Reporting:*

HUD combined the race and ethnicity options into a single element that allowed people to select one or more race and ethnic identities from the list below.

1) American Indian, Alaska Native, or Indigenous
2) Asian or Asian American
3) Black, African American, or African
4) Hispanic/Latina/e/o
5) Middle Eastern or North African
6) Native Hawaiian or Pacific Islander
7) White

When reporting race and ethnicity for the PIT Count, CoCs were required to report race and ethnicity using the following categories. Under these categories, people were only included in a single race/ethnicity if the person identified with only one race/ethnicity identity (e.g., Black, African American, or African). Selecting the multi-racial reporting option indicates that the person identified with more than one race.

1) American Indian, Alaska Native, or Indigenous
2) American Indian, Alaska Native, or Indigenous & Hispanic/Latina/e/o
3) Asian or Asian American
4) Asian or Asian American & Hispanic/Latina/e/o
5) Black, African American, or African
6) Black, African American, or African & Hispanic/Latina/e/o
7) Hispanic/Latina/e/o
8) Middle Eastern or North African
9) Middle Eastern or North African & Hispanic/Latina/e/o
10) Native Hawaiian or Pacific Islander
11) Native Hawaiian or Pacific Islander & Hispanic/Latina/e/o
12) White
13) White & Hispanic/Latina/e/o
14) Multi-Racial & Hispanic/Latina/e/o
15) Multi-Racial (not Hispanic/Latina/e/o)

### *Updates to Gender Reporting*

Following the updates made to the FY2024 HMIS Data Standards, the gender response options were also updated to allow for the following response options:

1) Woman (Girl if child)
2) Man (Boy if child)

DOJ-HUD-AR00674

3) Culturally Specific Identity (e.g., Two-Spirit)
4) Transgender
5) Non-Binary
6) Questioning
7) Different Identity

When reporting gender for the PIT Count, people could select as many response options as applied to their gender identity. When reporting for the PIT count, CoCs were required to report genders based on the following categories. Under these categories, people were only included in a single gender if the person identified with only one gender identity (e.g., Transgender). More than one gender means that the person identified with more than one gender.

1) Woman (Girl if child)
2) Man (Boy if child)
3) Culturally Specific Identity (e.g., Two-Spirit)
4) Transgender
5) Non-Binary
6) Questioning
7) Different Identity
8) More Than One Gender

DOJ-HUD-AR00675

## B-1: Additional Data on All People Experiencing Homelessness

**Exhibit B1-1: Demographic Characteristics of People Experiencing Homelessness, 2024**

| | All People Experiencing Homelessness | | Sheltered People Experiencing Homelessness | | Unsheltered People Experiencing Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 771,480 | 100% | 497,256 | 100% | 274,224 | 100% |
| **Age** | | | | | | |
| Under 18 | 148,238 | 19.2% | 137,159 | 27.6% | 11,079 | 4.0% |
| 18 to 24 | 57,640 | 7.5% | 43,232 | 8.7% | 14,408 | 5.3% |
| 25-34 | 146,859 | 19.0% | 95,216 | 19.1% | 51,643 | 18.8% |
| 35-44 | 153,849 | 19.9% | 84,122 | 16.9% | 69,727 | 25.4% |
| 45-54 | 118,740 | 15.4% | 58,215 | 11.7% | 60,525 | 22.1% |
| 55-64 | 104,007 | 13.5% | 54,989 | 11.1% | 49,018 | 17.9% |
| 65 and over | 42,147 | 5.5% | 24,323 | 4.9% | 17,824 | 6.5% |
| **Gender** | | | | | | |
| Woman (girl) | 302,660 | 39.2% | 218,628 | 44.0% | 84,032 | 30.6% |
| Man (boy) | 459,568 | 59.6% | 274,680 | 55.2% | 184,888 | 67.4% |
| Transgender | 2,561 | 0.3% | 1,501 | 0.3% | 1,060 | 0.4% |
| Gender Questioning | 383 | 0.0% | 74 | 0.0% | 309 | 0.1% |
| Culturally Specific Identity | 324 | 0.0% | 71 | 0.0% | 253 | 0.1% |
| Different Identity | 720 | 0.1% | 174 | 0.0% | 546 | 0.2% |
| Non Binary | 1,977 | 0.3% | 1,001 | 0.2% | 976 | 0.4% |
| More Than One Gender | 3,287 | 0.4% | 1,127 | 0.2% | 2,160 | 0.8% |
| **Race/Ethnicity** | | | | | | |
| American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o | 4,272 | 0.6% | 2,758 | 0.6% | 1,514 | 0.6% |
| American Indian Alaska Native or Indigenous Only | 16,894 | 2.2% | 8,074 | 1.6% | 8,820 | 3.2% |
| Asian or Asian American and Hispanic/Latina/e/o | 793 | 0.1% | 409 | 0.1% | 384 | 0.1% |
| Asian or Asian American Only | 10,401 | 1.3% | 6,315 | 1.3% | 4,086 | 1.5% |
| Black African American or African and Hispanic/Latina/e/o | 15,967 | 2.1% | 13,680 | 2.8% | 2,287 | 0.8% |
| Black African American or African Only | 227,769 | 29.5% | 168,206 | 33.8% | 59,563 | 21.7% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 499 | 0.1% | 402 | 0.1% | 97 | 0.0% |
| Middle Eastern or North African Only | 1,513 | 0.2% | 881 | 0.2% | 632 | 0.2% |

DOJ-HUD-AR00676

| | All People Experiencing Homelessness | | Sheltered People Experiencing Homelessness | | Unsheltered People Experiencing Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 1,071 | 0.1% | 703 | 0.1% | 368 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 10,312 | 1.3% | 5,865 | 1.2% | 4,447 | 1.6% |
| White and Hispanic/Latina/e/o | 51,376 | 6.7% | 40,487 | 8.1% | 10,889 | 4.0% |
| White Only | 244,280 | 31.7% | 125,971 | 25.3% | 118,309 | 43.1% |
| Multi-Racial and Hispanic/Latina/e/o | 6,841 | 0.9% | 3,991 | 0.8% | 2,850 | 1.0% |
| Multi-Racial All Other | 24,346 | 3.2% | 13,088 | 2.6% | 11,258 | 4.1% |
| Hispanic/Latina/e/o Only | 155,146 | 20.1% | 106,426 | 21.4% | 48,720 | 17.8% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all people experiencing homelessness and people experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00677

**Exhibit B1-2: Changes in the Demographic Characteristics of People Experiencing Homelessness, 2023-2024**

| | Change in All People | | Change in Sheltered People | | Change in Unsheltered People | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 118,376 | 18.1% | 100,762 | 25.4% | 17,614 | 6.9% |
| **Age** | | | | | | |
| **Under 18** | 36,618 | 32.8% | 36,087 | 35.7% | 531 | 5.0% |
| **18 to 24** | 10,204 | 21.5% | 10,570 | 32.4% | -366 | -2.5% |
| **25-34** | 27,977 | 23.5% | 25,081 | 35.8% | 2,896 | 5.9% |
| **35-44** | 23,462 | 18.0% | 17,587 | 26.4% | 5,875 | 9.2% |
| **45-54** | 12,050 | 11.3% | 6,590 | 12.8% | 5,460 | 9.9% |
| **55-64** | 5,614 | 5.7% | 2,936 | 5.6% | 2,678 | 5.8% |
| **65 and over** | 2,451 | 6.2% | 1,911 | 8.5% | 540 | 3.1% |
| **Gender** | | | | | | |
| **Woman (girl)** | 52,651 | 21.1% | 45,773 | 26.5% | 6,878 | 8.9% |
| **Man (boy)** | 64,408 | 16.3% | 54,410 | 24.7% | 9,998 | 5.7% |
| **Transgender** | -1,526 | -37.3% | -394 | -20.8% | -1,132 | -51.6% |
| **Gender Questioning** | -376 | -49.5% | -189 | -71.9% | -187 | -37.7% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -1,112 | -36.0% | -210 | -17.3% | -902 | -48.0% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 56,629 | 31.6% | 56,418 | 50.2% | 211 | 0.3% |
| **Not Hispanic/Latina/e/o** | 61,747 | 13.0% | 44,344 | 15.6% | 17,403 | 9.2% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -1,950 | -8.4% | 358 | 3.4% | -2,308 | -18.3% |
| **Asian or Asian American** | -380 | -3.3% | 2,276 | 51.2% | -2,656 | -37.3% |
| **Black African American or African** | 112 | 0.0% | 5,561 | 3.2% | -5,449 | -8.1% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | 671 | 6.3% | 2,054 | 45.5% | -1,383 | -22.3% |
| **White** | -29,198 | -9.0% | -12,324 | -6.9% | -16,874 | -11.6% |
| **Multi-Racial** | -8,037 | -20.5% | -4,872 | -22.2% | -3,165 | -18.3% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as

DOJ-HUD-AR00678

Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B1-3: Largest Changes in People Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| **Largest Increases** | | | | | |
| New York | 54,819 | 53.1% | New York | 95,418 | 152.4% |
| Illinois | 13,885 | 116.2% | California | 48,098 | 34.6% |
| Massachusetts | 10,219 | 53.4% | Massachusetts | 14,233 | 94.1% |
| California | 5,685 | 3.1% | Illinois | 10,345 | 66.8% |
| Hawaii | 5,414 | 87.0% | Washington | 8,175 | 35.0% |
| **Largest Decreases** | | | | | |
| Maine | -1,556 | -36.5% | Florida | -16,707 | -34.8% |
| Tennessee | -935 | -10.1% | Texas | -11,801 | -29.7% |
| New Hampshire | -196 | -8.0% | Georgia | -7,349 | -37.4% |
| Montana | -170 | -7.8% | New Jersey | -4,552 | -26.3% |
| Wyoming | -31 | -5.8% | Maryland | -3,559 | -37.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B1-4: Percent of All People Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00679

## B-2: Additional Data on Individuals Experiencing Homelessness

**Exhibit B2-1: Changes in Numbers of Individuals Experiencing Homelessness Over Time, 2007–2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| All Individuals | 99,307 | 24.1% | 116,867 | 29.6% | 103,116 | 25.2% | 44,987 | 9.6% |
| Sheltered Individuals | 43,267 | 20.3% | 44,122 | 20.8% | 56,862 | 28.5% | 28,545 | 12.5% |
| Unsheltered Individuals | 56,040 | 28.1% | 72,745 | 39.8% | 46,254 | 22.1% | 16,442 | 6.9% |

**Exhibit B2-2: Demographic Characteristics of Individuals Experiencing Homelessness, 2024**

|  | All Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| Total | 512,007 | 100% | 256,340 | 100% | 255,667 | 100% |
| **Age** | | | | | | |
| Under 18 | 2,823 | 0.6% | 1,709 | 0.7% | 1,114 | 0.4% |
| 18 to 24 | 39,267 | 7.7% | 25,957 | 10.1% | 13,310 | 5.2% |
| 25-34 | 98,052 | 19.2% | 49,192 | 19.2% | 48,860 | 19.1% |
| 35-44 | 120,646 | 23.6% | 53,565 | 20.9% | 67,081 | 26.2% |
| 45-54 | 108,668 | 21.2% | 49,491 | 19.3% | 59,177 | 23.1% |
| 55-64 | 101,259 | 19.8% | 52,763 | 20.6% | 48,496 | 19.0% |
| 65 and over | 41,292 | 8.1% | 23,663 | 9.2% | 17,629 | 6.9% |
| **Gender** | | | | | | |
| Woman (girl) | 153,477 | 30.0% | 79,589 | 31.0% | 73,888 | 28.9% |
| Man (boy) | 350,056 | 68.4% | 173,376 | 67.6% | 176,680 | 69.1% |
| Transgender | 2,449 | 0.5% | 1,411 | 0.6% | 1,038 | 0.4% |
| Gender Questioning | 356 | 0.1% | 60 | 0.0% | 296 | 0.1% |
| Culturally Specific Identity | 280 | 0.1% | 34 | 0.0% | 246 | 0.1% |
| Different Identity | 640 | 0.1% | 107 | 0.0% | 533 | 0.2% |
| Non Binary | 1,766 | 0.3% | 824 | 0.3% | 942 | 0.4% |
| More Than One Gender | 2,983 | 0.6% | 939 | 0.4% | 2,044 | 0.8% |
| **Race/Ethnicity** | | | | | | |

DOJ-HUD-AR00680

| | All Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o | 3,007 | 0.6% | 1,575 | 0.6% | 1,432 | 0.6% |
| American Indian Alaska Native or Indigenous Only | 13,708 | 2.7% | 5,388 | 2.1% | 8,320 | 3.3% |
| Asian or Asian American and Hispanic/Latina/e/o | 610 | 0.1% | 233 | 0.1% | 377 | 0.1% |
| Asian or Asian American Only | 7,652 | 1.5% | 3,765 | 1.5% | 3,887 | 1.5% |
| Black African American or African and Hispanic/Latina/e/o | 6,160 | 1.2% | 4,147 | 1.6% | 2,013 | 0.8% |
| Black African American or African Only | 140,174 | 27.4% | 85,562 | 33.4% | 54,612 | 21.4% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 418 | 0.1% | 321 | 0.1% | 97 | 0.0% |
| Middle Eastern or North African Only | 1,151 | 0.2% | 566 | 0.2% | 585 | 0.2% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 738 | 0.1% | 389 | 0.2% | 349 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 5,393 | 1.1% | 2,154 | 0.8% | 3,239 | 1.3% |
| White and Hispanic/Latina/e/o | 28,912 | 5.6% | 18,885 | 7.4% | 10,027 | 3.9% |
| White Only | 204,446 | 39.9% | 92,268 | 36.0% | 112,178 | 43.9% |
| Multi-Racial and Hispanic/Latina/e/o | 4,102 | 0.8% | 1,637 | 0.6% | 2,465 | 1.0% |
| Multi-Racial All Other | 16,796 | 3.3% | 6,414 | 2.5% | 10,382 | 4.1% |
| Hispanic/Latina/e/o Only | 78,740 | 15.4% | 33,036 | 12.9% | 45,704 | 17.9% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00681

**Exhibit B2-3: Changes in the Demographic Characteristics of Individuals Experiencing Homelessness, 2023-2024**

| | Change in All Individuals | | Change in Sheltered Individuals | | Change in Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 44,987 | 9.6% | 28,545 | 12.5% | 16,442 | 6.9% |
| **Age** | | | | | | |
| **Under 18** | -607 | -17.7% | -145 | -7.8% | -462 | -29.3% |
| **18 to 24** | 5,120 | 15.0% | 5,365 | 26.1% | -245 | -1.8% |
| **25-34** | 11,255 | 13.0% | 8,398 | 20.6% | 2,857 | 6.2% |
| **35-44** | 12,731 | 11.8% | 6,960 | 14.9% | 5,771 | 9.4% |
| **45-54** | 9,185 | 9.2% | 3,923 | 8.6% | 5,262 | 9.8% |
| **55-64** | 5,044 | 5.2% | 2,338 | 4.6% | 2,706 | 5.9% |
| **65 and over** | 2,259 | 5.8% | 1,706 | 7.8% | 553 | 3.2% |
| **Gender** | | | | | | |
| **Woman (girl)** | 13,146 | 9.4% | 7,083 | 9.8% | 6,063 | 8.9% |
| **Man (boy)** | 30,780 | 9.6% | 21,103 | 13.9% | 9,677 | 5.8% |
| **Transgender** | -1,435 | -36.9% | -336 | -19.2% | -1,099 | -51.4% |
| **Gender Questioning** | -315 | -46.9% | -146 | -70.9% | -169 | -36.3% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -1,092 | -38.2% | -239 | -22.5% | -853 | -47.5% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 11,911 | 10.8% | 11,717 | 24.2% | 194 | 0.3% |
| **Not Hispanic/Latina/e/o** | 33,076 | 9.3% | 16,828 | 9.4% | 16,248 | 9.2% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -1,636 | -8.9% | 309 | 4.6% | -1,945 | -16.6% |
| **Asian or Asian American** | -1,802 | -17.9% | 869 | 27.8% | -2,671 | -38.5% |
| **Black African American or African** | -4,255 | -2.8% | 1,800 | 2.0% | -6,055 | -9.7% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -914 | -13.0% | 666 | 35.5% | -1,580 | -30.6% |
| **White** | -22,516 | -8.8% | -7,709 | -6.5% | -14,807 | -10.8% |
| **Multi-Racial** | -4,199 | -16.7% | -1,313 | -14.0% | -2,886 | -18.3% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in

DOJ-HUD-AR00682

this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B2-4: Largest Changes in Individuals Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| **State** | **#** | **%** | **State** | **#** | **%** |
| **Largest Increases** | | | | | |
| New York | 13,057 | 26.4% | California | 50,493 | 45.5% |
| California | 5,529 | 3.5% | New York | 34,506 | 123.0% |
| Illinois | 4,408 | 55.8% | Washington | 11,031 | 83.0% |
| Washington | 3,420 | 16.4% | Oregon | 9,052 | 91.7% |
| Oregon | 2,681 | 16.5% | Hawaii | 3,810 | 114.2% |
| **Largest Decreases** | | | | | |
| Tennessee | -975 | -12.8% | Florida | -9,241 | -28.0% |
| Colorado | -602 | -5.6% | Texas | -4,658 | -17.7% |
| Maine | -410 | -20.9% | Georgia | -2,959 | -23.6% |
| Montana | -218 | -12.9% | Tennessee | -1,822 | -21.5% |
| New Hampshire | -132 | -8.0% | Massachusetts | -1,326 | -16.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B2-5: Percent of Individuals Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00683

## B-3: Additional Data on People in Families with Children Experiencing Homelessness

**Exhibit B3-1: Changes in Numbers of People in Families with Children Experiencing Homelessness Over Time, 2007-2024**

| | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| All People in Families | 24,915 | 10.6% | 17,536 | 7.2% | 87,898 | 51.2% | 73,389 | 39.4% |
| Sheltered People in Families | 62,588 | 35.1% | 49,591 | 25.9% | 86,008 | 55.5% | 72,217 | 42.8% |
| Unsheltered People in Families | -37,673 | -67.0% | -32,055 | -63.3% | 1,890 | 11.3% | 1,172 | 6.7% |

**Exhibit B3-2: Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2024**

| | All People in Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | 259,473 | 100% | 240,916 | 100% | 18,557 | 100% |
| Age | | | | | | |
| Under 18 | 145,415 | 56.0% | 135,450 | 56.2% | 9,965 | 53.7% |
| 18 to 24 | 18,373 | 7.1% | 17,275 | 7.2% | 1,098 | 5.9% |
| 25-34 | 48,807 | 18.8% | 46,024 | 19.1% | 2,783 | 15.0% |
| 35-44 | 33,203 | 12.8% | 30,557 | 12.7% | 2,646 | 14.3% |
| 45-54 | 10,072 | 3.9% | 8,724 | 3.6% | 1,348 | 7.3% |
| 55-64 | 2,748 | 1.1% | 2,226 | 0.9% | 522 | 2.8% |
| 65 and over | 855 | 0.3% | 660 | 0.3% | 195 | 1.1% |
| Gender | | | | | | |
| Woman (girl) | 149,183 | 57.5% | 139,039 | 57.7% | 10,144 | 54.7% |
| Man (boy) | 109,512 | 42.2% | 101,304 | 42.0% | 8,208 | 44.2% |
| Transgender | 112 | 0.0% | 90 | 0.0% | 22 | 0.1% |
| Gender Questioning | 27 | 0.0% | 14 | 0.0% | 13 | 0.1% |
| Culturally Specific Identity | 44 | 0.0% | 37 | 0.0% | 7 | 0.0% |
| Different Identity | 80 | 0.0% | 67 | 0.0% | 13 | 0.1% |
| Non Binary | 211 | 0.1% | 177 | 0.1% | 34 | 0.2% |
| More Than One Gender | 304 | 0.1% | 188 | 0.1% | 116 | 0.6% |
| Race/Ethnicity | | | | | | |

DOJ-HUD-AR00684

| | All People in Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o | 1,265 | 0.5% | 1,183 | 0.5% | 82 | 0.4% |
| American Indian Alaska Native or Indigenous Only | 3,186 | 1.2% | 2,686 | 1.1% | 500 | 2.7% |
| Asian or Asian American and Hispanic/Latina/e/o | 183 | 0.1% | 176 | 0.1% | 7 | 0.0% |
| Asian or Asian American Only | 2,749 | 1.1% | 2,550 | 1.1% | 199 | 1.1% |
| Black African American or African and Hispanic/Latina/e/o | 9,807 | 3.8% | 9,533 | 4.0% | 274 | 1.5% |
| Black African American or African Only | 87,595 | 33.8% | 82,644 | 34.3% | 4,951 | 26.7% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 81 | 0.0% | 81 | 0.0% | 0 | 0.0% |
| Middle Eastern or North African Only | 362 | 0.1% | 315 | 0.1% | 47 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 333 | 0.1% | 314 | 0.1% | 19 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 4,919 | 1.9% | 3,711 | 1.5% | 1,208 | 6.5% |
| White and Hispanic/Latina/e/o | 22,464 | 8.7% | 21,602 | 9.0% | 862 | 4.6% |
| White Only | 39,834 | 15.4% | 33,703 | 14.0% | 6,131 | 33.0% |
| Multi-Racial and Hispanic/Latina/e/o | 2,739 | 1.1% | 2,354 | 1.0% | 385 | 2.1% |
| Multi-Racial All Other | 7,550 | 2.9% | 6,674 | 2.8% | 876 | 4.7% |
| Hispanic/Latina/e/o Only | 76,406 | 29.4% | 73,390 | 30.5% | 3,016 | 16.3% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00685

**Exhibit B3-3: Changes in the Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2023-2024**

| | Change in All People in Families | | Change in Sheltered People in Families | | Change in Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 73,389 | 39.4% | 72,217 | 42.8% | 1,172 | 6.7% |
| **Age** | | | | | | |
| **Under 18** | 37,225 | 34.4% | 36,232 | 36.5% | 993 | 11.1% |
| **18 to 24** | 5,084 | 38.3% | 5,205 | 43.1% | -121 | -9.9% |
| **25-34** | 16,722 | 52.1% | 16,683 | 56.9% | 39 | 1.4% |
| **35-44** | 10,731 | 47.8% | 10,627 | 53.3% | 104 | 4.1% |
| **45-54** | 2,865 | 39.8% | 2,667 | 44.0% | 198 | 17.2% |
| **55-64** | 570 | 26.2% | 598 | 36.7% | -28 | -5.1% |
| **65 and over** | 192 | 29.0% | 205 | 45.1% | -13 | -6.3% |
| **Gender** | | | | | | |
| **Woman (girl)** | 39,505 | 36.0% | 38,690 | 38.6% | 815 | 8.7% |
| **Man (boy)** | 33,628 | 44.3% | 33,307 | 49.0% | 321 | 4.1% |
| **Transgender** | -91 | -44.8% | -58 | -39.2% | -33 | -60.0% |
| **Gender Questioning** | -61 | -69.3% | -43 | -75.4% | -18 | -58.1% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -20 | -8.7% | 29 | 19.6% | -49 | -59.0% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 44,718 | 65.2% | 44,701 | 69.9% | 17 | 0.4% |
| **Not Hispanic/Latina/e/o** | 28,671 | 24.4% | 27,516 | 26.3% | 1,155 | 9.1% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -314 | -6.6% | 49 | 1.3% | -363 | -38.4% |
| **Asian or Asian American** | 1,422 | 94.2% | 1,407 | 106.7% | 15 | 7.9% |
| **Black African American or African** | 4,367 | 4.7% | 3,761 | 4.3% | 606 | 13.1% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | 1,585 | 43.2% | 1,388 | 52.6% | 197 | 19.1% |
| **White** | -6,682 | -9.7% | -4,615 | -7.7% | -2,067 | -22.8% |
| **Multi-Racial** | -3,838 | -27.2% | -3,559 | -28.3% | -279 | -18.1% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as

DOJ-HUD-AR00686

Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B3-4: Largest Changes in People in Families with Children Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| **Largest Increases** | | | | | |
| New York | 41,762 | 77.8% | New York | 60,912 | 176.3% |
| Massachusetts | 9,512 | 73.8% | Massachusetts | 15,559 | 227.6% |
| Illinois | 9,477 | 234.3% | Illinois | 6,688 | 97.9% |
| Colorado | 4,878 | 134.0% | Hawaii | 1,757 | 64.2% |
| Hawaii | 2,927 | 187.0% | Vermont | 869 | 199.3% |
| **Largest Decreases** | | | | | |
| Maine | -1,146 | -49.8% | Florida | -7,466 | -49.7% |
| Georgia | -784 | -22.3% | Texas | -7,143 | -53.0% |
| Florida | -268 | -3.4% | Georgia | -4,390 | -61.7% |
| New Mexico | -144 | -14.0% | New Jersey | -3,774 | -45.2% |
| Indiana | -133 | -7.3% | Oregon | -3,767 | -48.8% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B3-5: Percent of People in Families with Children Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00687

## B-4: Additional Data on Unaccompanied Youth Experiencing Homelessness

**Exhibit B4-1: Changes in Numbers of Unaccompanied Youth Experiencing Homelessness Over Time, 2017-2024**

|  | Total Change 2017-2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **All Unaccompanied Youth** | -133 | -0.3% | 3,960 | 11.6% | 3,467 | 10.0% |
| **Sheltered Unaccompanied Youth** | 6,904 | 37.2% | 8,175 | 47.3% | 4,923 | 24.0% |
| **Unsheltered Unaccompanied Youth** | -7,037 | -35.6% | -4,215 | -24.9% | -1,456 | -10.3% |

**Exhibit B4-2: Demographic Characteristics of Unaccompanied Youth Experiencing Homelessness, 2024**

|  | All Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 38,170 | 100% | 25,446 | 100% | 12,724 | 100% |
| **Age** | | | | | | |
| **Under 18** | 2,698 | 7.1% | 1,627 | 6.4% | 1,071 | 8.4% |
| **18 to 24** | 35,472 | 92.9% | 23,819 | 93.6% | 11,653 | 91.6% |
| **Gender** | | | | | | |
| **Woman (girl)** | 13,607 | 35.6% | 9,266 | 36.4% | 4,341 | 34.1% |
| **Man (boy)** | 22,852 | 59.9% | 15,089 | 59.3% | 7,763 | 61.0% |
| **Transgender** | 551 | 1.4% | 382 | 1.5% | 169 | 1.3% |
| **Gender Questioning** | 82 | 0.2% | 35 | 0.1% | 47 | 0.4% |
| **Culturally Specific Identity** | 50 | 0.1% | 10 | 0.0% | 40 | 0.3% |
| **Different Identity** | 80 | 0.2% | 41 | 0.2% | 39 | 0.3% |
| **Non Binary** | 530 | 1.4% | 362 | 1.4% | 168 | 1.3% |
| **More Than One Gender** | 418 | 1.1% | 261 | 1.0% | 157 | 1.2% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 304 | 0.8% | 169 | 0.7% | 135 | 1.1% |
| **American Indian Alaska Native or Indigenous Only** | 968 | 2.5% | 479 | 1.9% | 489 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 48 | 0.1% | 22 | 0.1% | 26 | 0.2% |

DOJ-HUD-AR00688

| | All Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Asian or Asian American Only | 605 | 1.6% | 270 | 1.1% | 335 | 2.6% |
| Black African American or African and Hispanic/Latina/e/o | 651 | 1.7% | 493 | 1.9% | 158 | 1.2% |
| Black African American or African Only | 11,762 | 30.8% | 8,730 | 34.3% | 3,032 | 23.8% |
| Middle Eastern or North African and Hispanic/Latina/e/o | 11 | 0.0% | 2 | 0.0% | 9 | 0.1% |
| Middle Eastern or North African Only | 243 | 0.6% | 196 | 0.8% | 47 | 0.4% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 71 | 0.2% | 35 | 0.1% | 36 | 0.3% |
| Native Hawaiian or Pacific Islander Only | 312 | 0.8% | 167 | 0.7% | 145 | 1.1% |
| White and Hispanic/Latina/e/o | 2,674 | 7.0% | 2,002 | 7.9% | 672 | 5.3% |
| White Only | 10,330 | 27.1% | 5,744 | 22.6% | 4,586 | 36.0% |
| Multi-Racial and Hispanic/Latina/e/o | 438 | 1.1% | 242 | 1.0% | 196 | 1.5% |
| Multi-Racial All Other | 1,482 | 3.9% | 845 | 3.3% | 637 | 5.0% |
| Hispanic/Latina/e/o Only | 8,271 | 21.7% | 6,050 | 23.8% | 2,221 | 17.5% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00689

**Exhibit B4-3: Changes in the Demographic Characteristics of Unaccompanied Youth Experiencing Homelessness, 2023-2024**

| | Change in All Unaccompanied Youth | | Change in Sheltered Unaccompanied Youth | | Change in Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 3,467 | 10.0% | 4,923 | 24.0% | -1,456 | -10.3% |
| **Age** | | | | | | |
| **Under 18** | -542 | -16.7% | -105 | -6.1% | -437 | -29.0% |
| **18-24** | 4,009 | 12.7% | 5,028 | 26.8% | -1,019 | -8.0% |
| **Gender** | | | | | | |
| **Woman (girl)** | 431 | 3.3% | 1,051 | 12.8% | -620 | -12.5% |
| **Man (boy)** | 2,977 | 15.0% | 3,789 | 33.5% | -812 | -9.5% |
| **Transgender** | -168 | -23.4% | -84 | -18.0% | -84 | -33.2% |
| **Gender Questioning** | -75 | -47.8% | -34 | -49.3% | -41 | -46.6% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -246 | -31.7% | -111 | -23.5% | -135 | -44.6% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 1,972 | 18.8% | 3,001 | 49.9% | -1,029 | -23.0% |
| **Not Hispanic/Latina/e/o** | 1,456 | 6.0% | 1,883 | 13.0% | -427 | -4.4% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -449 | -26.1% | -111 | -14.6% | -338 | -35.1% |
| **Asian or Asian American** | 5 | 0.8% | 22 | 8.1% | -17 | -4.5% |
| **Black African American or African** | -28 | -0.2% | 242 | 2.7% | -270 | -7.8% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -96 | -20.0% | 20 | 11.0% | -116 | -39.1% |
| **White** | -4,008 | -23.6% | -1,384 | -15.2% | -2,624 | -33.3% |
| **Multi-Racial** | -482 | -20.1% | -114 | -9.5% | -368 | -30.6% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

DOJ-HUD-AR00690

**Exhibit B4-4: Largest Changes in Unaccompanied Youth Experiencing Homelessness by State, 2017-2024**

| Change 2023-2024 | | | Change 2017-2024 | | |
|---|---|---|---|---|---|
| **State** | **#** | **%** | **State** | **#** | **%** |
| **Largest Increases** | | | | | |
| New York | 3,203 | 71.7% | New York | 4,842 | 171.2% |
| Illinois | 949 | 95.1% | Illinois | 1,217 | 166.7% |
| Hawaii | 175 | 99.4% | Arizona | 243 | 42.0% |
| Florida | 154 | 12.7% | District of Columbia | 192 | 84.2% |
| Nevada | 116 | 27.0% | Ohio | 120 | 17.3% |
| **Largest Decreases** | | | | | |
| California | -1,121 | -11.0% | California | -3,910 | -30.2% |
| Washington | -303 | -15.0% | Nevada | -1,621 | -74.8% |
| Tennessee | -160 | -28.6% | Florida | -652 | -32.3% |
| Oregon | -109 | -7.7% | Washington | -412 | -19.3% |
| Montana | -61 | -33.3% | Colorado | -172 | -22.5% |

**Exhibit B4-5: Percent of Unaccompanied Youth Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00691

## B-5: Additional Data on Veterans Experiencing Homelessness

**Exhibit B5-1: Changes in Numbers of Veterans Experiencing Homelessness Over Time, 2009-2024**

|  | Total Change 2009-2024 | | Total Change 2010-2024 | | Total Change 2020-2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All Veterans** | -40,485 | -55.2% | -41,205 | -55.6% | -4,370 | -11.7% | -2,692 | -7.6% |
| **Sheltered Veterans** | -24,378 | -56.2% | -24,406 | -56.2% | -3,017 | -13.7% | -1,036 | -5.2% |
| **Unsheltered Veterans** | -16,107 | -53.8% | -16,799 | -54.8% | -1,353 | -8.9% | -1,656 | -10.7% |

**Exhibit B5-2: Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2024**

|  | All Veterans | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 32,882 | 100% | 19,031 | 100% | 13,851 | 100% |
| **Gender** | | | | | | |
| **Woman (girl)** | 3,329 | 10.1% | 1,661 | 8.7% | 1,668 | 12.0% |
| **Man (boy)** | 29,189 | 88.8% | 17,252 | 90.7% | 11,937 | 86.2% |
| **Transgender** | 110 | 0.1% | 51 | 0.0% | 59 | 0.1% |
| **Gender Questioning** | 12 | 0.0% | 2 | 0.0% | 10 | 0.1% |
| **Culturally Specific Identity** | 26 | 0.3% | 6 | 0.1% | 20 | 0.6% |
| **Different Identity** | 13 | 0.3% | 1 | 0.3% | 12 | 0.4% |
| **Non Binary** | 105 | 0.0% | 27 | 0.0% | 78 | 0.1% |
| **More Than One Gender** | 98 | 0.3% | 31 | 0.2% | 67 | 0.5% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 139 | 0.4% | 59 | 0.3% | 80 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 898 | 2.7% | 376 | 2.0% | 522 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 14 | 0.0% | 5 | 0.0% | 9 | 0.1% |
| **Asian or Asian American Only** | 376 | 1.1% | 152 | 0.8% | 224 | 1.6% |
| **Black African American or African and Hispanic/Latina/e/o** | 298 | 0.9% | 187 | 1.0% | 111 | 0.8% |
| **Black African American or African Only** | 9,890 | 30.1% | 6,746 | 35.4% | 3,144 | 22.7% |

DOJ-HUD-AR00692

| | All Veterans | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Middle Eastern or North African and Hispanic/Latina/e/o | 4 | 0.0% | 0 | 0.0% | 4 | 0.0% |
| Middle Eastern or North African Only | 53 | 0.2% | 9 | 0.0% | 44 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 32 | 0.1% | 21 | 0.1% | 11 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 308 | 0.9% | 120 | 0.6% | 188 | 1.4% |
| White and Hispanic/Latina/e/o | 1,094 | 3.3% | 775 | 4.1% | 319 | 2.3% |
| White Only | 16,034 | 48.8% | 9,465 | 49.7% | 6,569 | 47.4% |
| Multi-Racial and Hispanic/Latina/e/o | 248 | 0.8% | 94 | 0.5% | 154 | 1.1% |
| Multi-Racial All Other | 1,291 | 3.9% | 485 | 2.5% | 806 | 5.8% |
| Hispanic/Latina/e/o Only | 2,203 | 6.7% | 537 | 2.8% | 1,666 | 12.0% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

**Exhibit B5-3: Changes in the Demographic Characteristics of Veterans Experiencing Homelessness, 2023-2024**

| | Change in All Veterans | | Change in Sheltered Veterans | | Change in Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | -2,692 | -7.6% | -1,036 | -5.2% | -1,656 | -10.7% |
| Gender | | | | | | |
| Woman (girl) | -651 | -16.4% | -154 | -8.5% | -497 | -23.0% |
| Man (boy) | -2,042 | -6.5% | -896 | -4.9% | -1,146 | -8.8% |
| Transgender | -63 | -36.4% | -23 | -31.1% | -40 | -40.4% |
| Gender Questioning | -17 | -58.6% | -7 | -77.8% | -10 | -50.0% |
| Culturally Specific Identity | N/A | N/A | N/A | N/A | N/A | N/A |
| Different Identity | N/A | N/A | N/A | N/A | N/A | N/A |
| Non Binary | -56 | -34.8% | 6 | 28.6% | -62 | -44.3% |
| More Than One Gender | N/A | N/A | N/A | N/A | N/A | N/A |
| Ethnicity | | | | | | |
| Hispanic/Latina/e/o | -657 | -14.0% | -154 | -8.4% | -503 | -17.6% |
| Not Hispanic/Latina/e/o | -2,035 | -6.6% | -882 | -4.8% | -1,153 | -9.1% |
| Race (any ethnicity) | | | | | | |
| American Indian Alaska Native or Indigenous | -232 | -18.3% | -26 | -5.6% | -206 | -25.5% |

DOJ-HUD-AR00693

| | Change in All Veterans | | Change in Sheltered Veterans | | Change in Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Asian or Asian American | -218 | -35.9% | -26 | -14.2% | -192 | -45.2% |
| Black African American or African | -948 | -8.5% | -270 | -3.7% | -678 | -17.2% |
| Middle Eastern or North African | N/A | N/A | N/A | N/A | N/A | N/A |
| Native Hawaiian or Pacific Islander | -87 | -20.4% | -28 | -16.6% | -59 | -22.9% |
| White | -3,159 | -15.6% | -1,103 | -9.7% | -2,056 | -23.0% |
| Multi-Racial | -308 | -16.7% | -129 | -18.2% | -179 | -15.7% |
| Hispanic/Latina/e/o Only | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B5–4: Largest Changes in Veterans Experiencing Homelessness by State, 2009-2024**

| Change 2023-2024 | | | Change 2009-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| Largest Increases | | | | | |
| Washington | 96 | 5.7% | Oregon | 130 | 10.2% |
| New York | 82 | 7.5% | Vermont | 47 | 76.5% |
| New Jersey | 67 | 14.8% | Rhode Island | 10 | 8.3% |
| Arizona | 62 | 6.7% | N/A | -- | -- |
| New Mexico | 42 | 16.4% | N/A | -- | -- |
| Largest Decreases | | | | | |
| California | -1,279 | -12.1% | California | -8,663 | -48.2% |
| Nevada | -450 | -41.1% | Florida | -4,802 | -67.3% |
| Florida | -225 | -8.8% | New York | -4,699 | -79.9% |
| Texas | -199 | -9.8% | Texas | -3,654 | -66.5% |
| Tennessee | -189 | -24.9% | Georgia | -2,114 | -76.6% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2009 and 2024.

DOJ-HUD-AR00694

**Exhibit B5-5: Percent of Veterans Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00695

## B-6: Additional Data on Individuals with Chronic Patterns of Homelessness

**Exhibit B6-1: Changes in Numbers of Individuals with Chronic Patterns of Homelessness Over Time, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All Individuals with Chronic Patterns of Homelessness** | 32,772 | 27.4% | 46,523 | 43.9% | 42,057 | 38.1% | 9,480 | 6.6% |
| **Sheltered Individuals with Chronic Patterns of Homelessness** | 11,252 | 26.9% | 9,691 | 22.4% | 15,909 | 42.9% | 2,883 | 5.8% |
| **Unsheltered Individuals with Chronic Patterns of Homelessness** | 21,520 | 27.6% | 36,832 | 58.7% | 26,148 | 35.6% | 6,597 | 7.1% |

**Exhibit B6-2: Largest Changes in Individuals with Chronic Patterns of Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| **State** | # | % | **State** | # | % |
| **Largest Increases** | | | | | |
| Washington | 4,295 | 55.8% | California | 26,207 | 65.0% |
| Oregon | 1,423 | 22.6% | Washington | 9,383 | 360.5% |
| Nevada | 715 | 30.1% | Oregon | 4,878 | 172.4% |
| Florida | 700 | 13.0% | Nevada | 2,222 | 255.1% |
| Illinois | 577 | 44.1% | New Mexico | 989 | 139.1% |
| **Largest Decreases** | | | | | |
| California | -962 | -1.4% | Texas | -2,903 | -36.6% |
| New York | -597 | -10.5% | New York | -1,399 | -21.6% |
| Tennessee | -280 | -15.1% | Florida | -1,363 | -18.3% |
| Alaska | -171 | -24.3% | Tennessee | -1,190 | -43.0% |
| Montana | -117 | -21.7% | Virginia | -1,045 | -53.2% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

DOJ-HUD-AR00696

**Exhibit B6-3: Percent of Individuals with Chronic Patterns of Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00697

12/22/25, 1:14 PM
Austin's homeless population dispersing after 2 years of camping ban enforcement
Case 1:25-cv-00636-MSM-AEM    Document 67-5    Filed 01/14/26    Page 118 of 283
PageID #: 3288

 

Become an InCIder  ›

Trending now

| | | | | |
|---|---|---|---|---|
| **Nearly 5 years after Uri, ERCOT says Texas power grid will ...** | **6 dining updates from across the Austin metro** | **6 events Dec. 19-21 in the Austin area: caroling, holiday painting ...** | **New retail, homes and ACC enrollment figures: 6 trending Austin area ...** | **Austin sees 46% drop in pedestrian crashes after le safety pilot** |



LEARN MORE
CASTLE HILL FITNESS
MEMBERSHIP DISCOUNTS & FREE PAUSES
HOLIDAY SPECIAL · UNTIL DECEMBER 31

[AUSTIN](#) / [SOUTH CENTRAL AUSTIN](#) / [CITY & COUNTY](#)

## Austin's homeless population dispersing after 2 years of camping ban enforcement

 

By [Katy McAfee](#), [Ben Thompson](#) | 4:57 PM May 25, 2023 CDT
Updated 4:57 PM May 25, 2023 CDT



*Volunteers collect information during the January survey of Austin's homeless population. (Katy McAfee/Community Impact)*

Austin's unsheltered homeless population is growing, spreading out farther from the city center and living in more secluded areas, a trend that's likely a result of the city's [2-year-old ban](#) on public camping.

**The big picture**

The Ending Community Homelessness Coalition, a nonprofit leading the regional homelessness strategy, identified new trends in Austin's homeless community based on a [January point-in-time count](#) of unsheltered residents. The count marked the first in-person survey conducted since the COVID-19 pandemic.

Point-in-time counts are [federally mandated](#) efforts used to get a snapshot of an area's homeless

DOJ-HUD-AR01103

population on any given night.

**By the numbers**

- 2,374 total people experiencing homelessness counted
- 1,266 people counted as unsheltered, or living on the streets and in temporary places such as tents or cars
- 1,108 people counted in shelters or transitional housing



*2023's point-in-time count of the local homeless population identified nearly 2,400 people. (Courtesy Ending Community Homelessness Coalition)*



**Key findings**

- Men and boys had higher rates of homelessness at about 63% of the population counted.
- Black people were <u>overrepresented</u> in the homeless population at about 33% despite making up 7.25% of Austin's total population, according to the 2020 U.S. census.
- Those 35 to 44 years old were the largest age group identified and were mostly unsheltered.
- Veterans made up 9.5% of those counted.
- The shares of Hispanic, Asian and Native American people experiencing homelessness in 2023 all rose since 2020.

**Put in perspective**

ECHO volunteers counted fewer people in the January survey than in 2020 but about 100 more than the count in 2019. However, ECHO representatives cautioned the totals may be undercounted and don't offer a full picture of the local homeless population.

Complicating factors include rainy weather on the night of the count and the broad geographic distribution of unsheltered residents, especially in parks and wooded areas. The survey also didn't account for most or all of the 699 homeless people booked in Travis County Jail on Jan. 28, according to the county sheriff's office.

ECHO also maintains a <u>dashboard</u> with monthly estimates of the regional homeless population that's based on the number of people who seek out services or housing. That data, which ECHO staff said may offer a more accurate systemwide view of homelessness, shows a gradually increasing unsheltered population that passed 4,500 people this spring.

DOJ-HUD-AR01104



Based on that information, around 5,400 people are now experiencing sheltered or unsheltered homelessness in the Austin area.

**Austin-Travis County homeless population**
The number of people experiencing homelessness in Austin and Travis County has increased in recent years.



Source: Ending Community Homelessness Coalition/Community Impact

Made with Flourish • Create a chart

## The impact

An increased homeless presence has been tracked toward the city's edges and in less visible places since Austinites voted in May 2021 to reinstate a public camping ban. Analysts and service providers at that time had predicted such a distribution would take place, likely making it harder to find homeless residents and connect them with supportive services and shelter or housing.

The number of people experiencing homelessness in city parks and green spaces rose from 5.2% as of early 2020 to 13.6% in 2023, the January point-in-time count found.

"What we're seeing though is a significant increase in the number of folks who are ending up in our parks, nature preserves and green belts," ECHO Executive Director Matt Mollica said during a May 24 presentation. "And that just makes sense, right? Out of the way, more hidden, less likely to be encountered by the police."

DOJ-HUD-AR01105



*Austin's homeless population remains concentrated around downtown but is spreading out. (Courtesy Ending Community Homelessness Coalition)*



In Austin, City Council District 9, which includes downtown, still claims the highest share of those experiencing homelessness. However, the count in the area dropped by more than a third since 2020.

Conversely, the areas farther from downtown—particularly South Austin's District 5, Northwest Austin's District 6 and Northeast Austin's District 1—saw notable jumps in the number of unsheltered residents over the same time.

By **Katy McAfee** 
**Government Reporter**

Katy joined Community Impact in 2022 and covers transportation and government for Travis County, Rollingwood and West Lake Hills. Prior to CI, Katy graduated from the University of Cincinnati with a bachelor's degree in journalism and a certificate in deaf studies as well as serving as the features editor for her school's student newspaper, The News Record. When she's not writing, Katy enjoys watching movies and spending time outdoors.

By **Ben Thompson** ✉
**Government Reporter**

Ben joined Community Impact in January 2019 after graduating with a degree in journalism from Northeastern University in Boston. He spent more than two years reporting on Montgomery County and The Woodlands area before moving to Austin in 2021 to cover City Hall and other news throughout the city. Contact Ben with questions, tips or feedback at bthompson@communityimpact.com, and follow him on X, formerly known as Twitter, @BThompson_CI.



## Thanks for reading!

Daily news about your community is *free*, and your support is *invaluable*. Give $10 now towards CI's journalistic mission across Texas.

Become an InCIder

DOJ-HUD-AR01106



## More stories from South Central Austin



**DINING**
Italian restaurant Poeta relocating to East Austin …



**GOVERNMENT**
Austin details planned social service cuts under …



**GOVERNMENT**
Supreme Court declines to hear Austin's petition …



**TRANSPORTATION**
Austin sees 46% drop in pedestrian crashes …



## More stories from Austin Metro



**BUSINESS**
Bricks & Minifigs to open Round Rock …



**BUSINESS**
Cinemark Stone Hill Town Center upgrade coming …



**DINING**
Ike's Love & Sandwiches coming to Pflugerville



**BUSINESS**
Check out these new and coming soon …

Emergencies happen anytime, anywhere —
**know where to go.**

**24/7 ER care**

Ascension
Seton

DOJ-HUD-AR01107

**Austin Metro**

Austin Metro Home

Bastrop | Cedar Creek

Cedar Park | Far Northwest Austin

Georgetown

Lake Travis | Westlake

Leander | Liberty Hill

North Central Austin

Northwest Austin

Pflugerville | Hutto

Round Rock

San Marcos | Buda | Kyle

South Central Austin

Southwest Austin | Dripping Springs

**Houston Metro**

Houston Metro Home

Bay Area

Bellaire | Meyerland | West University

Conroe | Montgomery

Cy-Fair | Jersey Village

Cypress

Heights | River Oaks | Montrose

Katy | Fulshear

Lake Houston | Humble | Kingwood

New Caney | Porter

Pearland | Friendswood | Manvel

Spring | Klein

Sugar Land | Missouri City

The Woodlands

Tomball | Magnolia

**Dallas | Fort Worth Metro**

Dallas | Fort Worth Metro Home

Denton

Flower Mound | Highland Village | Argyle

Frisco

Grapevine | Colleyville | Southlake

Keller | Roanoke | Northeast Fort Worth

McKinney

Plano North

Plano South

Prosper | Celina

Richardson

**San Antonio Metro**

San Antonio Metro Home

Boerne | Fair Oaks Ranch

New Braunfels

North San Antonio

Northeast San Antonio Metrocom

f  X  ⓘ  in  ▶

(512) 989-6808

TERMS OF SERVICE | PRIVACY POLICY | COOKIE PREFERENCES

© 2005-2025 Community Impact Newspaper Co. All rights reserved.

DOJ-HUD-AR01108

No. 23-175

IN THE

# Supreme Court of the United States

CITY OF GRANTS PASS, OREGON,

*Petitioner,*

*v.*

GLORIA JOHNSON, ET AL., ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARLY SITUATED,

*Respondents.*

ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

## BRIEF OF *AMICUS CURIAE*
## CICERO INSTITUTE
## IN SUPPORT OF PETITIONER

Ryan Vassar
CICERO INSTITUTE
2112 Rio Grande St.
Austin, TX 78705
(512) 815-2028

Jeffrey M. Harris
  *Counsel of Record*
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

March 4, 2024

*Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................ii

INTEREST OF *AMICUS CURIAE* ........................... 1

INTRODUCTION AND SUMMARY OF
THE ARGUMENT .................................................... 2

ARGUMENT ............................................................. 4

I.    Homelessness is worse today than at any point
      in recent history and public street camps only
      exacerbate the problem. ...................................... 4

II.   States and localities must have the flexibility
      to address the homelessness crisis with crea-
      tive solutions that work. ................................... 12

CONCLUSION ....................................................... 15

DOJ-HUD-AR01110

ii

## TABLE OF AUTHORITIES

**Cases**

*Martin v. City of Boise,*
  902 F.3d 1031 (9th Cir. 2018)................................10

*Martin v. City of Boise,*
  920 F.3d 584 (9th Cir. 2019)........................2, 12, 13

*Metropolitan Life Ins. Co. v. Massachusetts,*
  471 U.S. 724 (1985)..................................................2

**Statutes**

Grants Pass Municipal Code §5.61.010(B)................2

Grants Pass Municipal Code §5.61.020(A)................2

Grants Pass Municipal Code §5.61.030....................2

Grants Pass Municipal Code §6.46.090....................2

**Other Authorities**

*Addressing Homelessness in the States*, Cicero
  Inst. Fact Sheet................................................4, 5

Jeff Amy, *Georgia Lawmakers: Localities
  Must Apply Homeless Camp Bans*, AP
  (Mar. 27, 2023)....................................................14

DOJ-HUD-AR01111

iii

Michael Corkery, *Fighting for Anthony: The Struggle to Save Portland, Oregon*, N.Y. Times (July 29, 2023).........................................................12

Thomas Fuller, *Death on the Streets*, N.Y. Times (Apr. 25, 2022).........................................................11

Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, The Atlantic (Mar. 8, 2019) ...................................12

Robert B. Hawkins, Jr., Foreword, in Richard W. White, Jr., Rude Awakenings: What the Homeless Crisis Tells Us (1992)..............................5

Christal Hayes, *'The World Doesn't Care': Homeless Deaths Spiked During Pandemic, Not from COVID. From Drugs.*, USA Today (May 28, 2022)...............................................11, 12

Cassandra Hemenway, *Confirmed: School Bus Gunshot Came from Encampment Country Club Road Shelter Opens Nov. 15*, The Bridge (Nov. 1, 2023) ....................................................8, 9

Meghan Henry, et al., *The 2016 Annual Homeless Assessment Report (AHAR) to Congress*, Dept. of Hous. & Urban Dev. (Nov. 2016).............................4

DOJ-HUD-AR01112

iv

Margot Kushel, MD, et al., *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness*, UCSF Benioff Homelessness & Housing Initiative (June 2023) .................................. 5, 6, 7, 8

Paul J. Larkin, *Camping and the Constitution*, Georgetown J. of L. & Pol'y (forthcoming; last visited Feb. 22, 2024) ............................................. 5

Eric Leonard, *LAPD Concerned About Increase in Sexual Violence Against Women Experiencing Homelessness*, NBC4 (Feb. 27, 2020) .................. 12

C. Y. Liu, et al., *Communicable Disease Among People Experiencing Homelessness in California*, Epidemiology & Infection (Mar. 20, 2020) ............. 9

Joe Lonsdale, Cicero Institute July 2022 Update (July 12, 2022) ......................................................... 1

Katy McAfee & Ben Thompson, *Austin's Homeless Population Dispersing After 2 Years of Camping Ban Enforcement*, Community Impact (May 25, 2023) .................................................................... 14

Jennifer Medina, *Los Angeles Fire Started in Homeless Encampment*, Officials Say, N.Y. Times (Dec. 12, 2017) .................................... 12

v

Andrew Noh, *New Data Reveals Link Between
Homelessness and Crime Wave in California*,
600 KOGO (Mar. 29, 2022) ......................................8

Natalie O'Neill, *Blazes That Begin in Homeless
Camps Now Account for Nearly Half the Fires in
Portland*, Willamette Week (Nov. 2, 2022) ...........12

*Public Camping Bans: Guiding the
Homeless into Shelter*, Cicero Inst.
(Dec. 28, 2023) ......................................4, 8-10, 13-15

Sam Quinones, *Skid Row Nation: How L.A.'s
Homelessness Crisis Response Spread Across
the Country*, L.A. Mag. (Oct. 6, 2022) ...............3, 11

*Recent Killings in Los Angeles and New York
Spark Anger, Raise Risk for Homeless People*,
KTLA (Jan. 28, 2022) ............................................12

Laurie Roberts, *It's Time for Phoenix to Clean Up
the Humanitarian Disaster Area Known as 'The
Zone'*, The Arizona Republic (Mar. 28, 2023) .........9

*Sanctioned Camping: A Safer Solution*,
Cicero Inst. (Dec. 28, 2023) ........................3, 6, 7, 10

SOH: State and CoC Dashboard (California),
Nat'l All. to End Homelessness (last accessed
Feb. 28, 2024) ......................................................6, 7

SOH: State and CoC Dashboard (Oregon), Nat'l
All. to End Homelessness (last accessed Feb. 28,
2024) ........................................................................7

DOJ-HUD-AR01114

vi

SOH: State and CoC Dashboard (Washington),
    Nat'l All. to End Homelessness (last accessed
    Feb. 28, 2024) ........................................................ 6

Tanya de Sousa et al., *The 2023 Annual
    Homelessness Assessment Report (AHAR) to
    Congress*, U.S. Dept. of Hous. & Urban Dev.
    (Dec. 2023) ............................................................. 4

Steff Danielle Thomas, *Homelessness in US Surges
    to Highest-Recorded Level*, The Hill (Dec. 12,
    2023) ...................................................................... 4

Steve Twist & Seth Leibsohn, *Phoenix Neglects the
    Homeless, Ignores Rampant Crime in Drug-
    Riddled 'Zone'*, The Arizona Republic (Nov. 17,
    2022) ...................................................................... 9

DOJ-HUD-AR01115

1

## INTEREST OF *AMICUS CURIAE*[1]

The Cicero Institute is a nonpartisan public policy organization with deep experience in government, legislation and the law, technology, and entrepreneurship. It promotes innovative public policies that harness the strengths of free-market competition and government accountability. And it helps elected leaders fix urgent issues in public systems—fostering prosperity, competent government, and safeguarding American liberty for future generations.

The Institute has been at the forefront of homelessness reform, helping twenty states craft and pass legislation to compassionately and effectively address homelessness. The Institute's model legislation has been enacted in Missouri, Tennessee, Texas and Utah, among others. *See* Joe Lonsdale, Cicero Institute July 2022 Update (July 12, 2022), perma.cc/888X-BC8A. The Institute thus has an important interest in this case.

---

[1] Pursuant to this Court's Rule 37.6, counsel for *amicus curiae* certify that this brief was not authored in whole or in part by counsel for any party and that no person or entity other than *amicus curiae* or its counsel has made a monetary contribution to the preparation or submission of this brief.

2

## INTRODUCTION AND SUMMARY
## OF THE ARGUMENT

Like many other cities, Grants Pass seeks to protect its citizens' health, welfare, and safety by regulating homeless individuals' ability to camp or sleep overnight on its sidewalks or in its parks. *See* Grants Pass Municipal Code §§5.61.020(A), 5.61.010(B), 5.61.030, 6.46.090. It enforces these regulations through civil citations. But for the second time in five years, the Ninth Circuit has allowed federal judges to serve as the nation's "homelessness policy czars" and invalidate these common-sense policies as "cruel and unusual punishment" within the meaning of the Eighth Amendment. App. 156a (opinion of M. Smith, J.). If upheld, that decision will have "dire practical consequences" for thousands of local governments and millions of people across the country. *Martin v. City of Boise*, 920 F.3d 584, 594 (9th Cir. 2019) (M. Smith, J., dissenting from denial of rehearing en banc).

*Amicus* agrees with Petitioner that the Ninth Circuit's decision has "no basis in the Eighth Amendment's text, history, or tradition." Pet'n Br. at 4. And regulating public health and safety falls within the heartland of state police power. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (cleaned up). *Amicus* writes separately, however, to highlight the scope of the homelessness problem and explain why states need the flexibility to craft tailored and workable solutions to it.

3

Not only does enforcing laws regulating camping on public property not constitute "cruel and unusual punishment" under the Eighth Amendment, but doing so is imperative to addressing the homelessness crisis. Homelessness is worse today than at any point in recent history. It is a complex issue that stems from a "mix of economic, mental-health, and substance-abuse factors." App. 140a-143a (opinion of M. Smith, J.). And it has no one-size-fits-all solution. As a result of the lack of temporary shelter, American cities have seen a "dramatic increase" in homeless street encampments. *Sanctioned Camping: A Safer Solution*, Cicero Inst. (Dec. 28, 2023), perma.cc/4GGY-DSED.

But public street camps only exacerbate the problem, and judicial decisions barring state and local governments from addressing these camps are profoundly counterproductive. Crime, mental illness, and substance abuse plague these camps. And they "surround[] the homeless in criminality and predation, not to mention fires, filth, disease, and [fentanyl and meth.]" Sam Quinones, *Skid Row Nation: How L.A.'s Homelessness Crisis Response Spread Across the Country*, L.A. Mag. 131 (Oct. 6, 2022), bit.ly/48FoAfO. Because homelessness "resist[s] any easy solution," App. 140a (M. Smith, J.), states and localities need the flexibility to address its root causes, offer creative solutions, and focus on accountability and outcomes.

Put simply, judicial decisions invalidating prohibitions on public camping have failed those in the homeless encampments as well as residents of surrounding areas. And those decisions have "paralyz[ed] local communities from addressing the pressing issue of homelessness" in their communities. App. 117a

DOJ-HUD-AR01118

4

(O'Scannlain, J., respecting the denial of rehearing en banc). The Court should reverse the decision below.

## ARGUMENT

### I.   Homelessness is worse today than at any point in recent history and public street camps only exacerbate the problem.

Homelessness in America is at an all-time high. *See Public Camping Bans: Guiding the Homeless into Shelter*, Cicero Inst. (Dec. 28, 2023), perma.cc/8TLF-C76A; *see also* Steff Danielle Thomas, *Homelessness in US Surges to Highest-Recorded Level*, The Hill (Dec. 12, 2023), perma.cc/6MA2-DA4Q. In 2023, roughly 20 out of every 10,000 people experienced homelessness. *See* Tanya de Sousa et al., *The 2023 Annual Homelessness Assessment Report (AHAR) to Congress*, U.S. Dept. of Hous. & Urban Dev. 2 (Dec. 2023), perma.cc/L7D7-X5Y8. And four in ten individuals identified as homeless experienced "unsheltered homelessness"—i.e., residing in places "not meant for human habitation such as sidewalks, abandoned buildings, bus stations, and vehicles parked for long periods." *Id.* at 2, 24.

According to the Department of Housing and Urban Development, 256,610 individuals experienced unsheltered homelessness in 2023, up from 176,357 in 2016. *Compare id.* at 13 with Meghan Henry, et al., *The 2016 Annual Homeless Assessment Report (AHAR) to Congress*, Dept. of Hous. & Urban Dev. 8-9 (Nov. 2016), perma.cc/Y8HU-B2VX. Those numbers represent a "30 percent [increase] in less than ten years." *Addressing Homelessness in the States*, Cicero Inst. Fact Sheet. This crisis "has left America's once

5

great urban centers dangerous shells of what they once were." *Id.*

Federal, state, and local governments and their non-profit partners often "insist[] that homelessness can be solved by simply building and giving away enough free housing for every homeless individual." *Id.* But those conventional "housing first" approaches to homelessness do not address the root causes of the crisis. "Most of the homeless are not simply without homes, as many of their advocates would have us believe." Robert B. Hawkins, Jr., Foreword, in Richard W. White, Jr., Rude Awakenings: What the Homeless Crisis Tells Us ix (1992). In fact, "[t]he majority suffer from severe problems that are difficult to treat under optimal conditions—problems such as substance abuse, serious mental illness, and family breakdowns." *Id.*; *see* Paul J. Larkin, *Camping and the Constitution*, Georgetown J. of L. & Pol'y, at 15-16 (forthcoming; last visited Feb. 22, 2024) (collecting sources), perma.cc/88JC-6UL5.

The largest representative study of American homelessness reported that "more than 80 percent of homeless individuals suffered from mental illness, and only four percent cited housing costs as the primary reason they became homeless." *Addressing Homelessness in the States, supra*; *see* Margot Kushel, MD, et al., *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness*, UCSF Benioff Homelessness & Housing Initiative (June 2023), perma.cc/B7VF-2PE2. The study also found that "two-thirds of homeless people admitted to regularly using hard narcotics like

6

methamphetamine, crack cocaine, and opiates, with less than half reporting ever receiving treatment." *Id.*

Because most federal resources "prioritize[] longer-term permanent housing programs" at the expense of temporary shelter, shelter resources across the country are "misaligned." *Sanctioned Camping, supra.* While the number of unsheltered homeless individuals has increased, "there has not been a significant increase in the number of temporary shelter beds to accommodate these people." *Id.* Indeed, "[t]en times more federal funding is available for permanent housing options than for temporary shelters." *Id.* But temporary shelter options are an important tool to help connect the unsheltered population to critical resources and to move them off the streets. Yet there are often "zero empty beds" for these individuals in major U.S. cities. *Id.*

This misalignment of resources has only exacerbated the homelessness problem. *Id.* Indeed, "[m]any U.S. cities have seen a spike in unsheltered homeless without an increase in temporary housing." *Id.* Take three major American cities that fall within the Ninth Circuit—Seattle, San Francisco, and Portland. Since 2007, Seattle has faced a 246 percent increase in the number of unsheltered homeless individuals. *Id.*; SOH: State and CoC Dashboard (Washington), Nat'l All. to End Homelessness (last accessed Feb. 28, 2024), bit.ly/3IgDYEL. Only 44 percent of those individuals "have a shelter bed available to them." *Sanctioned Camping, supra.* San Francisco's unsheltered homeless population increased by 58 percent during that same timeframe. *Id.*; SOH: State and CoC Dashboard (California), Nat'l All. to End Homelessness (last

7

accessed Feb. 28, 2024), bit.ly/3Iht7uk. Yet only 24 percent of those individuals have a bed available to them. *Sanctioned Camping*, *supra*. And in Portland, the number of unsheltered homeless individuals grew by 20 percent. *Id.*; SOH: State and CoC Dashboard (Oregon), Nat'l All. to End Homelessness (last accessed Feb. 28, 2024), bit.ly/3IdZPN4. Yet only 57 percent have a bed available to them. *Sanctioned Camping*, *supra*.

Cities that lack temporary shelter beds have other options available to them that do not require allowing *unregulated* street camping. *See id.* For example, regulated camp sites typically offer potable water, health and recovery services, and security. They also serve as a way to introduce unsheltered homeless individuals to other types of shelter and services. Such camps exist in Austin, Texas, Denver, Colorado, and Madison, Wisconsin. *Id.*

Even in cities that have sufficient temporary shelter for the unsheltered homeless population, street camping is a higher-risk alternative. The limited enforcement of prohibitions on street camping has caused a "dramatic increase" in homeless street encampments. *Id.* Mental illness and substance abuse plague these camps. According to one study, two-thirds of homeless individuals reported "regularly using hard narcotics like methamphetamine, crack cocaine, and opiates," and less than half of those individuals reported having ever received treatment. *Id.*; Kushel, et al., *supra*. More than 80 percent of homelessness individuals reported severe mental health conditions. *Sanctioned Camping*, *supra*. And nearly a quarter had been hospitalized for those issues. *Id.*

8

These public camps are hotbeds of crime too. According to the San Diego County District Attorney's crime data, homeless individuals were "514 times more likely to commit crimes" than the average citizen. Andrew Noh, *New Data Reveals Link Between Homelessness and Crime Wave in California*, 600 KOGO (Mar. 29, 2022), perma.cc/G257-29W4. Homeless offenders also reoffended in 98 percent of cases. *Id.* And "[r]oughly half" of homeless individuals in shelters have served time in prison, "with one in five having been released within the preceding three years." *Public Camping Bans*, *supra*; *see also* Kushel, et al., *supra* (finding that nearly one in three homeless people in California had been to prison or a long-term jail stay in the six months prior to their becoming homeless).

Homeless individuals are also primary *victims* of these crimes. Last year in Los Angeles, nearly 25 percent of homicides and 15 percent of all violent crimes "involved homeless individuals as either perpetrators or victims, or both." *Public Camping Bans*, *supra*.

Public street camps have wreaked havoc on American cities from coast to coast. Just four months ago, one Vermont city cleared a homeless encampment and confiscated eight guns after someone in the encampment shot out the windshield of a school bus full of children. Cassandra Hemenway, *Confirmed: School Bus Gunshot Came from Encampment Country Club Road Shelter Opens Nov. 15*, The Bridge (Nov. 1, 2023), perma.cc/PF4E-SWGL. Nearby residents and business owners had noticed that "incidents were escalating" at the encampment, and noted that

DOJ-HUD-AR01123

9

occupants had been breaking windows and yelling at passersby. *Id.*

Across the country, Phoenix recently cleared a 1,000-person encampment called "The Zone" after a "humanitarian crisis" forced the area to be shut down. Laurie Roberts, *It's Time for Phoenix to Clean Up the Humanitarian Disaster Area Known as 'The Zone'*, The Arizona Republic (Mar. 28, 2023), perma.cc/6E3B-TTDH. The area was riddled with drug crimes, violence, and disease. *Public Camping Bans, supra*; Steve Twist & Seth Leibsohn, *Phoenix Neglects the Homeless, Ignores Rampant Crime in Drug-Riddled 'Zone'*, The Arizona Republic (Nov. 17, 2022), perma.cc/658B-55LT. Last year, a "burned, deceased newborn baby" was tragically found "lying in the street." Roberts, *supra*.

Street camps also pose innumerable health risks to the individuals who are living there. Homeless individuals are already at a "higher risk of communicable diseases due to the circumstances of their living conditions." *Public Camping Bans, supra.* Their "increased exposure[]" to disease, unchecked drug and alcohol use, and mental illness all make them more vulnerable. C. Y. Liu, et al., *Communicable Disease Among People Experiencing Homelessness in California*, Epidemiology & Infection 148 (Mar. 20, 2020), perma.cc/LW4Q-FHRX. As does their "lack of access to hygiene and healthcare facilities." *Id.*

The consequences can be deadly for homeless individuals. The National Institute of Health found that "unsheltered homeless have a nearly three-fold increase in mortality compared to sheltered homeless." *Public Camping Bans, supra*. That is in large part due

DOJ-HUD-AR01124

10

to factors like "drug-induced poisonings and infections." *Id.* Tuberculosis, for example, has run rampant in homeless camps. The NIH reported that "the prevalence of tuberculosis among homeless individuals is 20 times higher than that of the general population." *Id.* In 2013, Los Angeles faced "a wave of tuberculosis" on "Skid Row." *Id.* Health workers verified sixty cases among the homeless individuals and identified an additional 5,000 individuals "who were likely exposed." *Id.* Over a two-year period starting in 2016, the San Diego homeless suffered one of the largest outbreaks of Hepatitis A ever, resulting in 465 hospitalizations and 21 deaths. *Id.* "Of those who contracted Hepatitis A," 72%" had "also reported using drugs." *Id.* More recently, King County, Washington, faced a shigella outbreak—an intestinal infection spread by fecal matter. *Id.* Seventy-seven percent of cases were homeless individuals. *Id.*

Despite these serious and well-documented problems, localities have not done enough "to push unsheltered homeless individuals out of dangerous street encampments and into available shelter space and other services." *Id.* For western states, that is in no small part due to the Ninth Circuit's ruling in *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018). That decision held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Id.* at 1048.

In practice, *Martin* meant that cities across the western United States that lacked sufficient shelter or shelter alternatives could not "enforce their rules against street camping." *Sanctioned Camping, supra.*

DOJ-HUD-AR01125

11

And ones that tried were promptly sued. *See* Pet. 8 (noting that "[t]hree days after the Ninth Circuit's initial September 2018 ruling, a plaintiff filed a follow-on suit against Portland" and "[o]ver the ensuing months, more plaintiffs pursued *Martin* theories").

At bottom, the "status quo" under *Martin* has profoundly failed both those in the homeless encampments and the residents of surrounding communities. *See* App. 139a (M. Smith, J.). Indeed, it has "paralyz[ed] local communities from addressing the pressing issue of homelessness." App. 117a (O'Scannlain, J.). Purportedly brought "in the name of compassion and decriminalizing homelessness[,]" these lawsuits "had the effect of surrounding the homeless in criminality and predation, not to mention fires, filth, disease, and the two most dangerous drugs we've known"—fentanyl and meth. Quinones, *supra.*

As Petitioners explain, "the results have been tragic, if predictable: skyrocketing rates of fatal drug overdoses; increasingly volatile behavior on the streets for those who live near encampments; a shocking rise in homicides and sexual assaults committed against the homeless; a resurgence of medieval diseases (such as typhus and tuberculosis) in encampments; a series of fires in major cities, some of which burned out of control for days; and massive amounts of debris, such as needles and excrement, polluting the environment." Pet. 34 (cleaned up); Pet'n Br. at 46-47; *see also* Thomas Fuller, *Death on the Streets*, N.Y. Times (Apr. 25, 2022), nyti.ms/3ThW5QW; Christal Hayes, *'The World Doesn't Care': Homeless Deaths Spiked During Pandemic, Not from COVID. From Drugs.*, USA Today (May 28, 2022), perma.cc/6KY4-

12

Q8HY; Michael Corkery, *Fighting for Anthony: The Struggle to Save Portland, Oregon*, N.Y. Times (July 29, 2023), nyti.ms/49OgqDa; *Recent Killings in Los Angeles and New York Spark Anger, Raise Risk for Homeless People*, KTLA (Jan. 28, 2022), perma.cc/2SD9-QSDL; Eric Leonard, *LAPD Concerned About Increase in Sexual Violence Against Women Experiencing Homelessness*, NBC4 (Feb. 27, 2020), perma.cc/GA5G-YU6G; Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, The Atlantic (Mar. 8, 2019), perma.cc/AWP6-84DG; Natalie O'Neill, *Blazes That Begin in Homeless Camps Now Account for Nearly Half the Fires in Portland*, Willamette Week (Nov. 2, 2022), perma.cc/6CJD-ACBD; Jennifer Medina, *Los Angeles Fire Started in Homeless Encampment*, Officials Say, N.Y. Times (Dec. 12, 2017), nyti.ms/3ThWcMm. The decision below doubled down on *Martin* and will only make things worse.

## II. States and localities must have the flexibility to address the homelessness crisis with creative solutions that work.

For the second time in five years, the Ninth Circuit has allowed federal judges to serve as the nation's "homelessness policy czars." App. 156a (opinion of M. Smith, J.). If upheld, that decision will have "dire practical consequences" for thousands of local governments and millions of people across the country. *Martin*, 920 F.3d at 594 (M. Smith, J., dissenting from denial of rehearing en banc). As discussed, homelessness is a complex issue that stems from a "mix of economic, mental-health, and substance-abuse factors." App. 140a-143a (M. Smith, J.). And it "appears to resist any

DOJ-HUD-AR01127

13

easy solution." *Id.* States and localities thus need the flexibility to address its root causes, offer creative solutions that will protect homeless individuals and surrounding communities alike, and focus on accountability and outcomes. And they should not face an inevitable new lawsuit each time they try to tackle these complex issues.

Localities on the front lines must have "the ability to make tough policy choices unobstructed by court-created mandates that lack any sound basis in law" and have "add[ed] enormous and unjustified complication to an already extremely complicated set of circumstances." App. 163a (Bress, J., dissenting from denial of rehearing en banc). This Court should return this issue to "the people and their representatives." Pet'n Br. at 19 (citation omitted).

Respondents contend that common-sense regulations prohibiting public encampments are "punishing people for universal biological necessities like sleeping and using a blanket to survive cold temperatures when they have no choice but to be outside." BIO 2. But that argument is unavailing as a matter of constitutional law and harmful and counterproductive as a matter of public policy. Enforcing public camping bans is "a compassionate way to redirect unsheltered homeless to existing shelters that are safer and provide resources such as substance abuse treatment or job placement in addition to hygiene facilities and food." *Public Camping Bans, supra.* Indeed, this "contributes to better outcomes for homeless individuals and safer communities for all." *Id.*

Several jurisdictions have made great progress by enforcing public camping bans. Indeed, "when tied to

14

fines or temporary jail time for unlawful camping on public lands," these bans have been "an effective means to addressing the growing homelessness crisis." *Id.* And there is no reason to think that civil citations will fare worse. In July 2018, for example, Colorado Springs "banned camping within 100 feet of creeks and other waterways." *Id.* Thirty-three percent of the city's homeless population was unsheltered that year, but by 2022, "that number had dropped to 19 percent." *Id.* That success is due in large part to the "ability to relocate unsheltered homeless individuals to shelters that provide various resources like vocational training, food, and hygiene necessities." *Id.*

The unsheltered homeless population in downtown Austin fell by one-third after voters reinstated the city's camping ban in 2021. *Id.*; *see* Katy McAfee & Ben Thompson, *Austin's Homeless Population Dispersing After 2 Years of Camping Ban Enforcement*, Community Impact (May 25, 2023), perma.cc/B3XW-VD49. As a result, federal data show that "the current homeless population in Austin has declined by five percent compared to 2020, consisting of 19 percent more people seeking formal shelter and 20 percent fewer unsheltered individuals." *Public Camping Bans*, *supra.* And clearing "the Zone" in Phoenix was another positive outcome. After the city cleared "the Zone," "80% of residents … found more stable shelter." *Id.*

In 2023, Georgia and Utah also passed laws requiring cities and counties to enforce camping bans. *See* Jeff Amy, *Georgia Lawmakers: Localities Must Apply Homeless Camp Bans*, AP (Mar. 27, 2023), bit.ly/4bTwTYx; *Public Camping Bans*, *supra.* As for Georgia, "the state's 5,245 unsheltered households

15

will be directed to the 7,302 vacant shelter beds that are currently available, as well as additional temporary options like sanctioned camping facilities." *Public Camping Bans, supra.* And in Utah, the state's "780 unsheltered homeless households will be directed to the approximately 2,977 available emergency shelter and transitional housing beds are currently open and available." *Id.* Missouri and Tennessee have also recently enacted legislation prohibiting public camping, but those laws are yet to be evaluated. *Id.*

As these examples show, "[r]emoving homeless individuals from unsanctioned camps and placing them in shelters offers them the services they need while reducing crime." *Id.* This Court should ensure that states and localities retain flexibility to address homelessness in ways that work for them. It is the responsibility and duty of elected leaders, not federal courts, to evaluate and balance the complex factors causing this crisis, and to implement the best public policies in response to each area's unique needs and circumstances.

## CONCLUSION

For these reasons, the Court should reverse the decision below.

16

Respectfully submitted,

Ryan Vassar                    Jeffrey M. Harris
CICERO INSTITUTE                  *Counsel of Record*
2112 Rio Grande St.            Tiffany H. Bates
Austin, TX 78705               CONSOVOY MCCARTHY PLLC
(512) 815-2028                 1600 Wilson Boulevard
                               Suite 700
                               Arlington, VA 22209
                               (703) 243-9423
                               jeff@consovoymccarthy.com

March 4, 2024                  *Counsel for Amicus Curiae*



U.S. Department of Housing
and Urban Development

# FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO

FR-6901-N-25

Community Planning and Development

DOJ-HUD-AR01133

# TABLE OF CONTENTS

I. BASIC INFORMATION...........................................5
A. Summary..............................................................5
B. Agency Contact(s) ...............................................7
II. ELIGIBILITY.......................................................10
A. Eligible Applicants..............................................10
B. Cost Sharing or Matching ...................................11
III. PROGRAM DESCRIPTION ...............................13
A. Purpose..............................................................13
B. Goals and Objectives..........................................13
C. Authority............................................................21
D. Unallowable Costs .............................................21
E. Indirect Costs .....................................................21
F. Program History .................................................22
G. Other Information................................................24
IV. APPLICATION CONTENTS AND FORMAT.....32
A. Standard Forms, Assurances, and Certifications32
B. Budget................................................................34
C. Narratives and Other Attachments ....................42
D. Other Application Content ..................................42
V. APPLICATION REVIEW INFORMATION ..........59
A. Threshold Review ..............................................59
B. Merit Review ......................................................74
C. Risk Review .......................................................97
D. Selection Process ..............................................98
E. Award Notices..................................................105
VI. SUBMISSION REQUIREMENTS AND

DEADLINES.........................................................107
A. Deadlines .........................................................107
B. Submission Methods ........................................108
C. Other Submissions ..........................................114
D. False Statements.............................................115
VII. POST-AWARD REQUIREMENTS AND
ADMINISTRATION ..............................................117
A. Administrative, National and Departmental Policy
    Requirements, and General Terms and Conditions
    ..........................................................................117
B. Environmental Requirements ...........................119
C. Remedies for Noncompliance ..........................120
D. Reporting .........................................................121
VIII. CONTACT AND SUPPORT ..........................125
A. Agency Contact ...............................................125
B. esnaps.hud.gov ...............................................126
C. SAM.gov ..........................................................126
D. Debriefing and Appeals ...................................126
E. Applicant Experience Survey ...........................131
F. Other Online Resources...................................131
APPENDIX ...........................................................133
Appendix I. Definitions ..........................................133

# BEFORE YOU BEGIN

If you believe you are a good candidate for this funding opportunity, register in the appropriate systems now and review the application package. If you are already registered, make sure your registration is active and up-to-date.

**SAM.gov Registration**

You must have an active and up-to-date account with SAM.gov, at the time of application and throughout the life of any award.

To register, go to SAM.gov Entity Registration and click Get Started. From the same page, you can also click on the Entity Registration Checklist for the information you will need to register.

It can take several weeks to register in SAM.gov, so please get started now if you are planning to apply. SAM.gov also provides each organization with a unique entity identifier (UEI). A valid UEI is required to apply for funding.

**esnaps.hud.gov Registration**

You must have an active esnaps.hud.gov account to submit your application. See step-by-step instructions at the CoC Registration and Competition home page.

See Section VI.B. Submission Methods.

**Find the Application Package**

Use the Grants Search at Grants.gov and search for opportunity number FR-6901-N-25 . The application package has all the online forms you need to apply. You also need to access the Download Instructions link and review the content before you apply.

If you have other technical difficulties using Grants.gov, access the Support Center on Grants.gov for assistance.

To get updates on changes to this notice of funding opportunity (NOFO), click Subscribe from the View Grant Opportunity page for this NOFO on Grants.gov.

---

**Application Deadline**

See Section VI.A. of this NOFO.

**HUD Listserv**
If you are interested in email notices about upcoming funding opportunities, subscribe to HUD's Funding Opportunities listserv.
**Note**: To help you find what you need, this NOFO uses internal links. In Adobe Reader, you can go back to where you were by pressing Alt + Left Arrow (Windows) or Command + Left Arrow (Mac) on your keyboard.

---

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application and Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 150 of 283   PageID #: 3320

# I. BASIC INFORMATION

I.  Basic Information

   A.  Summary

B.  Agency Contact(s)

TABLE OF CONTENTS

DOJ-HUD-AR01136

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 151 of 283
PageID #: 3321

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Post-Award Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

# I. BASIC INFORMATION

See [Contact and Support](#) section of this NOFO.

## A. Summary

**Federal Agency Name:**

United States Department of Housing and Urban Development (HUD)

**HUD Program Office:**

Community Planning and Development

**Announcement Type:**

Initial

**Program Type:**

Discretionary

**Paperwork Reduction Act Information:**

2501-0044

**Due Date for Intergovernmental Review:**

See [Section VI.C.1.](#)

<table>
<tr><td>

**Key Facts**

**Opportunity Name:**
FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO

**Opportunity Number:**
FR-6901-N-25

**Federal Assistance Listing:**
14.267

</td><td>

**Key Dates**

**Application Due Date: 8PM Eastern Time on**:
02/25/2025

**Anticipated Award Date:**
03/31/2026

**Estimated Performance Period Start Date:**
03/31/2026

**Estimated Performance Period End Date:**
12/31/2027

</td></tr>
</table>

### 1. NOFO Summary

==The Department of Housing and Urban Development (HUD) is issuing this Notice of Funding Opportunity (NOFO) for the 2025 Fiscal Year for public review. HUD understands this NOFO to be enjoined pursuant to a preliminary injunction entered in *State of Washington, et al. v. HUD*, No. 1:25-cv-00626-MSM-AEM (District of Rhode Island), and *National Alliance to End Homelessness, et al. v. HUD*, No. 1:25-cv-00636-==

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 152 of 283
PageID #: 3322

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**MSM-AEM (District of Rhode Island). HUD will not implement or enforce this NOFO pending further court order. HUD will issue further clarification on the status of this or any other future Fiscal Year 2025 NOFO as necessary. HUD will provide further notice as to when the application portal will open.**

The Continuum of Care (CoC) Program is a competitive and results oriented program designed to:

- promote a community-wide commitment to the goal of ending homelessness;

- provide funding for efforts by nonprofit providers, States, Indian Tribes or Tribally Designated Housing Entities [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)], and local governments to quickly rehouse individuals and families experiencing homelessness, persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, and youth experiencing homelessness while minimizing the trauma and dislocation caused by homelessness;

- promote access to, and effective utilization of, mainstream programs and programs funded with State or local resources; and

- optimize self-sufficiency among individuals and families experiencing homelessness.

This does not alter all applicable protections and obligations under the original Violence Against Women Act of 1994 (Pub.L. 103-322), codified mainly in 42 U.S.C. 13925 et seq., appearing in 108 Stat. 1796; as well as the Violence Against Women Reauthorization Act of 2022, Pub. L. 117-103) 34 (e.g., 34 U.S.C. 12491 (VAWA).

The goal of the Youth Homelessness Demonstration Program (YHDP) is to support the development and implementation of a coordinated community approach to preventing and ending youth homelessness and sharing that experience with and mobilizing communities around the country toward the same end. The population to be served by the demonstration program is youth ages 24 and younger who are experiencing homelessness, including unaccompanied and pregnant or parenting youth.

**This NOFO establishes two deadlines for submitting applications to HUD.**
   **Application Due Date: 8PM Eastern Time on**:
      Normal Track: 01/28/2026 for $2,655,600.
      Extended Track: 02/25/2026 for $1,262,400 in funding for new Permanent Housing projects for individuals and families with a disability.
   **Anticipated Award Date:**
      Normal Track: 03/31/26
      Extended Track: 04/28/26

## 2. Funding Details

**Type of Funding Instrument**

G (Grant)

**Available Funds**

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 153 of 283
PageID #: 3323

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Application Review Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

Funding of approximately **$3,918,000,000** is available through this NOFO.

Additional funds may become available for award. Use of these funds is subject to statutory constraints. All awards are subject to the selection process contained in this NOFO.

On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Public Law 118-42, approved March 9, 2024). Pursuant to the Full-Year Continuing Appropriations and Extensions Act, 2025, HUD will repurpose $100,000,000 in funds previously outlined in paragraph (5) of the Consolidated Appropriations Act, 2024, under the heading 'Department of Housing and Urban Development—Community Planning and Development—Homeless Assistance Grants', to supplement the FY 2025 CoC Program Competition. Approximately $294,000,000 in amounts available pursuant to section 231 of the Further Consolidated Appropriations Act, 2020 (Public Law 116-94, division H, title II, section 231; 42 U.S.C. 11364a) is also being made available as part of this Notice.

Of the $3,918,000,000 HUD is making available:

- Approximately $52,000,000 in funding is available for Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus) projects, described in sections IV.D.1.e and IV.D.1.f of this NOFO.

- Approximately $129,000,000 for the renewal of projects originally awarded as part of the Unsheltered and Rural Homelessness Supplemental NOFO.

- Approximately $228,000,000 for the competitive renewal and replacement of expiring YHDP grants.

All requirements in the FY 2025 application process, including requirements for the entire CoC Consolidated Application, and the total amount of funds available are included in this NOFO.

**Number of Awards**
HUD expects to make approximately 7000 awards from the funds available under this NOFO.

**Length of Performance Period:**

12-month project period and budget period

18-month project period and budget period

24-month project period and budget period

36-month project period and budget period

42-month project period and budget period

48-month project period and budget period

60-month project period and budget period

Length of Periods Explanation:

# B. Agency Contact(s)

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 154 of 283
Page ID #: 3324

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

See [Contact and Support](#) section of this NOFO.

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 155 of 283 PageID #: 3325

# II. ELIGIBILITY

II. Eligibility

A. Eligible Applicants

B. Cost Sharing or Matching

TABLE OF CONTENTS

DOJ-HUD-AR01141

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 156 of 283
PageID #: 3326

I. Basic       II. Eligibility    III. Program    IV. Application    V. Application    VI. Submission    VII. Award    VIII. Post-Award    IX. Contract and    Appendix
Information                       Description      Contents and      Information        Requirements and    Requirements and    Support
                                                   Format                               Deadlines          Administration

# II. ELIGIBILITY

You are invited to apply if your organization is an eligible entity type and meets the funding conditions included in the NOFO. HUD will review applications from eligible applicants using the criteria in Section V. of this NOFO.

## A. Eligible Applicants

### 1. Eligible Entity Types:

00 (State governments)

01 (County governments)

02 (City or township governments)

04 (Special district governments)

06 (Public and State controlled institutions of higher education)

07 (Native American tribal governments (Federally recognized))

08 (Public housing authorities/Indian housing authorities)

11 (Native American tribal organizations (other than Federally recognized tribal governments))

12 (Nonprofits having a 501(c)(3) status with the IRS, other than institutions of higher education)

20 (Private institutions of higher education)

25 (Others (see text field entitled "Additional Information on Eligibility" for clarification))

Additional Information on Eligibility

Faith-based organizations may apply on the same basis as any other organization. HUD does not engage in any unlawful and improper conduct, policies, or practices that target faith-based organizations.

Individuals are ineligible applicants.

a. Faith-based organizations may apply for this award on the same basis as any other organization, as set forth at 24 CFR 5.109, and subject to the protections and requirements of 42 U.S.C. § 2000bb et seq. HUD will not, in the selection of recipients, discriminate against an organization based on the organization's religious character, affiliation, or exercise.

b. A faith-based organization that participates in this program will retain its independence and may continue to carry out its mission consistent with religious freedom and conscience protections in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution, 42 U.S.C. § 2000bb et seq., 42 U.S.C. § 238n, 42 U.S.C. § 18113, 42 U.S.C. §§ 2000e-1(a) and 2000e-2(e), 42 U.S.C. § 12113(d), and the Weldon Amendment, among others. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws. A religious organization's exemption from the Federal prohibition on employment discrimination of the basis of religion, set forth in section 702(a) of the Civil Rights Act of 1964(442 U.S.C. 2000e-1) is not forfeited when the

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 157 of 283
PageID #: 3327

I. Basic    II. Eligibility    III. Program    IV. Application    V. Application    VI. Submission    VII. Post-Award    VIII. Contact and    Appendix
Information                    Description      Contents and     Review          Requirements and   Requirements and   Support
                                               Format           Information      Deadlines         Administration

organization participates in a HUD program. See 24 C.F.R. 5.109(i).

c. Religious accommodations may also be sought under many of these religious freedom and conscience protection laws. Nothing in this Notice shall interfere with rights of such Eligible Applicants, as provided under the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488, codified at 42 U.S.C. § 2000bb through 42 U.S.C. § 2, nor the processes and guarantees provided in HUD regulations regarding applicants' activities and assessments (see 24 CFR 578.93(b)(2) and 24 CFR 578.93(d)(2) and 24 CFR 5.110 and their right to apply as a qualified solo applicant as provided in Section VIII.D.4 of this NOFO (24. CFR 578.35(b).

To be eligible for funding under the FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO, project applicants must meet all statutory and regulatory requirements in the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act) and the CoC Program Rule found in 24 CFR part 578 (the Rule). For more information on Applicant eligibility see Section V.A.1 of this NOFO.

## 2. Restrictions

### a. Statutory and Regulatory Requirements Affecting Eligibility

You must comply with the current General Statutory and Regulatory Requirements Affecting Eligibility for HUD's Competitive Programs. HUD will review your eligibility before issuing an award. As part of this review, HUD uses SAM.gov and Department of Treasury data.

Project applicants can obtain a copy of the Act and the Rule on HUD's website or by contacting the NOFO Information Center at 1-800-483-8929. Individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities may visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs for more information on how to make an accessible telephone call to HUD.

### b. Application Eligibility

Your application is considered for funding if it satisfies the application review requirements in Section V. of this NOFO.

For-profit entities are not eligible to apply for grants or to be subrecipients of grant funds.

## B. Cost Sharing or Matching

This Program requires cost sharing or matching, as described below.

24 CFR 578.73 of the Rule requires that recipients must match all grant funds, except for leasing funds, with no less than 25 percent of funds or in-kind contributions from other sources. 24 CFR 578.73.

Project applicants that intend to use program income as a match must provide an estimate of how much program income will be used for the match. HUD will not require YHDP Renewal or replacement projects to meet the 25 percent match requirement if the applicant is able to demonstrate it has taken reasonable steps to maximize resources available for youth experiencing homelessness.

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 158 of 283 PageID#: 3328

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# III. PROGRAM DESCRIPTION

III. Program Description

A. Purpose

B. Goals and Objectives

C. Authority

D. Unallowable Costs

E. Indirect Costs

F. Program History

G. Other Information

TABLE OF CONTENTS

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 159 of 283 PageID #: 3329

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

# III. PROGRAM DESCRIPTION

## A. Purpose

The Continuum of Care (CoC) Program (24 CFR part 578) is a competitive and results oriented program designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, local governments and Indian Tribes or tribally designated housing entities (as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)) to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs and programs funded with State or local resources; and to optimize self-sufficiency among those experiencing homelessness.

As described in detail below, a "Housing First" approach to homelessness has failed to deliver on the CoC Program's primary goal: to end homelessness.

The FY 2025 CoC Program NOFO funds the renewal of existing CoC grants, including DV Renewal projects and projects originally funded under the Special NOFO to Address Unsheltered and Rural Homelessness, and the competitive renewal or replacement of existing YHDP grants that are expiring in Calendar Year 2026. This NOFO also provides funding for new projects, including those created with DV Bonus, CoC Bonus, and the reallocation of existing renewal projects.

For FY 2025, HUD requires Collaborative Applicants to rank all project applications, except for CoC Planning, and if applicable, UFA Costs project applications.

## B. Goals and Objectives

This section provides context to help applicants better understand how the merit criteria found in section V.B of this NOFO advance HUD's implementation of the Continuum of Care program's goal of ending homelessness.

"Housing First" has been a profound failure by any measure. Far from ending homelessness as promised, chronic homelessness has increased by 75% in just a decade. And that is despite artificially lowered numbers and nearly triple the amount of Permanent Housing since 2007. HUD is returning the CoC program to its original goals of solving homelessness by improving outcomes, expanding competition, and prioritizing treatment, economic independence, and law and order to address the diverse root causes of homelessness.

More than a decade ago, advocates of "Housing First" argued that the approach would end all types of homelessness in 10 years.[1] By focusing on permanently subsidized housing with no conditions, the Obama Administration said it would end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[2]

In 2025, it is evident that those promises have profoundly failed. Last year, homelessness in the U.S. reached the highest number ever recorded at the highest rate of increase ever recorded.[3] Unsheltered homelessness has increased every year since 2015.[4] Between 2023 and 2024, only six states reported a decrease in homelessness.[5]

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 160 of 283
PageID#: 3330

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

Chronic homelessness, which Permanent Supportive Housing was intended to address, has increased by 74.5% since 2015 to the highest number on record. This is despite a 24.7% increase nationwide in Permanent Supportive Housing beds during the same time. In California alone, chronic homelessness increased 128.1% since 2015 despite a 55.2% increase in Permanent Supportive Housing.[6]

According to the McKinney-Vento Act, HUD considers individuals and families living in Transitional Housing, but not Permanent Housing, to be experiencing homelessness. Although Transitional Housing and Rapid Rehousing are both housing limited to 24-months, HUD chose to consider Rapid Rehousing to be Permanent Housing. The effect of this counting method is artificially lower numbers of people experiencing homelessness, and a system that incentivized the speed at which individuals could receive subsidized housing rather than the quality of services individuals could receive in order to reach self-sufficiency and independent living.[7]

There are more people today than ever before who are dependent on indefinitely subsidized housing for homelessness — Permanent Housing. The nation's supply of Permanent Supportive Housing has increased by 111% (more than double) since 2007. When Rapid Rehousing is included, the supply of Permanent Housing (Permanent Supportive Housing and Rapid Rehousing) has increased by 188%. During the same time period, the nation's supply of Transitional Housing has decreased by 59.5% (more than half).

**1. Improving Outcomes.**

One of the main objectives for the CoC program, as set out in the McKinney-Vento Act, 42 U.S.C. § 11381(4), is to optimize self-sufficiency among individuals and families experiencing homelessness. CoCs should review all projects eligible for renewal under this NOFO to determine their effectiveness in reducing homelessness and increasing self-sufficiency. CoCs should prioritize projects that promote self-sufficiency, increase employment income over government assistance, and promote treatment and recovery.

This NOFO includes several options to help CoCs improve their effectiveness, including reallocation, expansion, and transition grants, and CoC's should take advantage of these options to expand the pool of successful providers, including faith-based providers, and improve the overall performance of the CoC. This NOFO also makes a significant investment in Transitional Housing and Supportive Service Only projects to ensure that those who can recover and achieve self-sufficiency have the support to do so.

**2. Restoring Balance to the Continuum of Care**

From 2007 to 2009 there was a nearly equal distribution of Emergency Shelter beds, Transitional Housing beds, and Permanent Supportive Housing beds.[1] During this time, the number of people experiencing homelessness was decreasing consistently. Beginning in 2010, and reinforced by HUD's 2013 NOFO, the distribution of homelessness assistance grew dramatically and became imbalanced.

The numbers cited above, and the graph from HUD's Annual Homelessness Assessment Report, reference nationwide bed counts. The trend and disparities between Permanent Housing and Transitional Housing is even more apparent when narrowed to CoC-funded housing in particular. Last year, 88% of the CoC national award went to Permanent Housing,

and only 1% supported transitional housing projects.[2]

Instead of a balanced continuum of assistance, the CoC Program has become a "one size fits all" response to homelessness that restricts the spectrum of eligible program components to one component, excluding a wide array of community providers in the process. By investing in Transitional Housing and Supportive Service Only projects, HUD intends to restore the "continuum" to the Continuum of Care Program to help able-bodied people move to self-sufficiency. Individuals who are likely to never be able to return to the workforce—over 62 years old, physically disabled, developmentally disabled—should be prioritized for Permanent Supportive Housing. Instead, many Permanent Supportive Housing units prioritize certain disabilities over others at the cost of serving the most vulnerable. Many individuals and families that have these certain disabilities, such as impairment due to substance abuse, are able to recover and regain self-sufficiency and deserve every opportunity to receive treatment and services to help them do so.

To the extent permitted by law, HUD is shifting its focus from awarding nearly 90% of CoC funding to Permanent Housing to expand opportunities for other components of the CoC Program, and it is also prioritizing Permanent Housing that has robust services with participation requirements.

### 3. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency.

According to a nationwide study, 75% of a survey sample of 64,000 people experiencing unsheltered homelessness reported a substance use disorder and 78% reported a mental health condition. The study found that substance use disorder contributed to the loss of housing for 50% of the unsheltered population, and mental health conditions contributed to loss of housing for 51% of the population.[3] Another study found that two-thirds of people experiencing homelessness self-reported regular use of hard drugs like methamphetamine, cocaine, and opiates. Of those, 29% reported wanting treatment and being unable to receive it.[4] Based on HUD's 2024 Point-In-Time Count data, which asks individuals if they wish to self-report substance abuse, 24.7% of individuals experiencing unsheltered homelessness select to self-report substance abuse. The results of ignoring the prevalence of substance use disorder among people experiencing homelessness is deadly.

According to a 2022 study from JAMA, "deaths among people experiencing homelessness in San Francisco more than doubled to 331 deaths during the first year of the COVID-19 pandemic, driven by a large increase in overdose deaths."[5] The risk of fatal overdose inside Permanent Supportive Housing is noteworthy, and tragic. The City of Seattle reported a 282% increase in overdose deaths in King County's Permanent Supportive Housing (and other subsidized housing) between 2020 and 2023.[6] According to HUD's own data, 19.5% of exits from Permanent Supportive Housing among adults living alone are due to death. Between 2019 and 2022, the share of adults living alone who died in Permanent Supportive Housing increased from 13% of exits to 20%, and the *number* of adults who died increased by 31%.[7]

A National Academies of Sciences, Engineering, and Medicine review of studies on Permanent Supportive Housing concluded that "there is no substantial published evidence as yet to demonstrate that Permanent Supportive Housing improves health outcomes or reduces healthcare costs" and that "the studies reviewed did not demonstrate improvements in

psychiatric symptomatology or substance use behavior."[8] This review was published in 2018, just prior to the explosion of Fentanyl use in the U.S..

Despite the tragic realities of substance abuse and fatal overdose among people experiencing homelessness or living in Permanent Supportive Housing, there are recipients of CoC funding who reportedly, under the misnomer of "harm reduction", permit, and even encourage, the use and distribution of illicit drugs on their property including by distributing drug paraphernalia like needles, pipes, and foil. This NOFO provides communities opportunities to invest in treatment services and recovery housing, and prohibits recipients from distributing drug paraphernalia or permitting the use and distribution of fatal, illicit drugs on their properties.

CoCs should prioritize projects that provide the treatment and services people need to recover and regain self-sufficiency including on-site behavioral health treatment, robust wraparound supportive services, and participation requirements. This NOFO devotes resources to Transitional Housing programs and Supportive Service Only projects with the goal of improving health and long-term economic independence for individuals and families experiencing homelessness. HUD encourages CoCs to utilize the full array of mainstream programs and local and private resources to provide housing and healthcare needed to maintain safe and stable housing.

### 4. Promoting Economic Self-Sufficiency.

One of the primary purposes of the CoC Program, as outlined in 42 U.S.C. § 11381, is to optimize self-sufficiency. In fact, self-sufficiency is one of only four purposes Congress provided for the CoC Program. CoCs should partner with workforce development centers, employers, childcare, and other supportive service providers to increase employment and employment income for program participants. CoCs should prioritize projects that help lead to long-term economic independence for individuals and families to exit homelessness to unsubsidized housing and prevent future returns to homelessness.

Although a chief goal of the program is self-sufficiency, HUD's data reveals low rates of increased employment income and exits to unsubsidized housing. As of 2023, a median of only 6% of individuals in CoC-funded housing across the nation increased their earned, employment income during that reporting period. In comparison, 33% of individuals in CoC-funded housing increased their benefits and welfare income.[9] Nationwide, 76.1% of Permanent Supportive Housing residents are under age 65, with a significant 17.4% under age 18.[10] Yet in Permanent Supportive Housing, only 13.2% of all households exited their housing. Of that percentage, only 12.9%, or 1.7% of participating households, exited to unsubsidized housing. Nearly twice as many exits were due to death.[11]

One way to advance both recovery and self-sufficiency is through supportive service participation requirements. Service participation requirements have been successfully employed in most federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996. For example, PELL Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment insurance benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF) requires beneficiaries to work or advance their education.

Case 1:25-cv-00636-MSN-AEM   Document 67-6   Filed 01/14/26   Page 163 of 283
PageID#: 3333

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

According to a national poll in 2024, there is strong bipartisan support for supportive service participation requirements, with 69% of respondents in favor of "requiring participation in programs for housing benefits."[12]

In accordance with 24 CFR 578.75(h), HUD encourages supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals set forth in 42 U.S.C. 11386a(b)(1)(F).

## 5. Creating Competition to Improve Innovation and Accountability.

The Continuum of Care Program was intended to be a "national competition between geographic areas" (42 U.S.C § 11386a), which is also consistent with Office of Management and Budget requirements that federal grants be awarded on a competitive, objective basis, even for renewals. 2 CFR 200.205, 200.309. Last year, 90% of every CoC's Annual Renewal Demand was conditionally awarded without any connection to CoC score or project merit.[13] This means that only about 10% of CoC awards were competed on the basis of merit between geographic areas. In fact, since 2013, the most competitive CoC competition required only 15% competition on the basis of merit, and the least competitive required merely 5% competition.

Competition drives outcomes, effectiveness, innovation, and accountability which is why HUD is competing 70% of Annual Renewal Demand on the basis of merit between geographic areas. Increased competition brings the CoC Program back to its original intent as a competitive program, not an entitlement program or block grant. Competition ensures that CoCs consistently evaluate the effectiveness of their projects and invest in new projects that deliver the best results at reducing homelessness and optimizing self-sufficiency. The historic lack of competition has meant that the same projects are awarded every year regardless of their impact on homelessness.

## 6. Ending the Crisis of Homelessness on Our Streets.

The number of people experiencing unsheltered homelessness is at an all-time high.[14] People living on the streets and in encampments have high rates of substance use disorder and mental illness.[15] HUD intends to focus increasingly on reductions in unsheltered homelessness and movement through Transitional Housing and out of Permanent Housing to self-sufficiency.

CoCs should direct resources towards outreach, intervention, and assistance that helps people move out of unsheltered homelessness and regain self-sufficiency. By expanding opportunities for new providers and historically disincentivized program components, HUD is assisting community-wide efforts to address homelessness with the most effective solutions.

## 7. Advancing Public Safety for All.

Safety and security for all members of the public, especially those living unsheltered, is essential to promoting a community-wide commitment to the goal of ending homelessness. CoCs should cooperate with law enforcement to advance public safety for the entire community impacted by homelessness. No one should sleep outside on the street or in dangerous encampments, and everyone should be able to enjoy public spaces safely. HUD encourages CoCs to assist in preventing and minimizing the trauma associated with living on

the streets or in encampments, especially for women and youth that are the victims of sexual assault and trafficking. Unchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness.

Respecting the rule of law is critical to community-wide efforts to address homelessness and protect all residents. According to one report, as unsheltered homelessness increased in King County, gun crimes tied to homeless encampments increased by 122% in just the first six months of 2022. Between 2017 and 2020, 50% of all arrests in Portland, Oregon were of individuals experiencing homelessness despite the homelessness population comprising only 2% of the total population. According to the same report, drug overdoses were the most common cause of death among individuals experiencing homelessness in New York City between 2018 and 2021. The number of deaths doubled during that short time period.[16] One recent study indicates that in some states, as many as half of unsheltered individuals experiencing homelessness are registered sex offenders.[17]

None of the realities above suggest that the entire population experiencing homelessness is engaged in criminal or illicit activity despite significant disproportionality. Data also indicates that people experiencing homelessness are the victims of crime at higher rates than the general public.[18] Gun violence in encampments, fatal drug overdoses on the streets, and sexual assault in encampments all perpetuate harm and trauma to individuals experiencing homelessness. It is common sense to acknowledge the close relationship between unchecked homelessness and illicit activity with its many victims. Enforcing the rule of law is critical to protecting the safety of everyone regardless of their housing status, which in turn promotes one of the core purposes of McKinney-Vento, "community-wide commitment to the goal of ending homelessness." 42 U.S.C. § 11381(1).

In 2024, The City of Seattle reported that 76% of residents surveyed in a downtown neighborhood disagreed or strongly disagreed with the statement "I feel safe in my neighborhood." The respondents included residents of three Permanent Supportive Housing buildings in the neighborhood. The city described a downtown environment that creates "opportunities for illegal street markets, drug markets, and unsanctioned tent encampments to form."[19]

The public is supportive of policies that advance public safety related to homelessness. According to national polling in 2024, there is string bipartisan support for public camping bans and stricter enforcement of drug laws, with 72% of voters in favor of "moving individuals into shelters over allowing camping" and 60% of voters in favor of "stricter drug enforcement near service, providers, including penalties for facilities permitting drug activity."[20]

Advancing public safety policies has been shown to decrease homelessness. Two years after the City of Austin reinstated a ban on public camping, unsheltered homelessness decreased by one-third.[21] Several years after Colorado Springs restricted public camping near creeks and waterways, unsheltered homelessness decreased by 14%.[22]

First responders are critical partners in engaging people into treatment and services and protecting public order and vulnerable individuals experiencing homelessness. In *Grants Pass v. Johnson,* the Supreme Court of the United States upheld the authority of local governments to prohibit public camping.

First responders and law enforcement are often the first to encounter our most vulnerable

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 165 of 283
PageID #: 3335

I. Basic       II. Eligibility   III. Program   IV. Application   V. Application   VI. Submission   VII. Post-Award   VIII. Contractual   Appendix
Information                      Description      Contents and    Information      Requirements and  Requirements and   Support
                                                  Format                           Deadlines        Administration

members of society and should be aware of the available services to triage individuals into safe and appropriate services, ideally alongside non-law enforcement service providers in the Continuum of Care. Executive Order 14321 reflects the need for cooperation. CoCs should work with law enforcement, first responders, and their state and local governments to reduce encampments, public camping, and public drug use in order to address barriers to maintaining housing and increasing self-sufficiency.

### 8. Minimizing Trauma for Vulnerable Populations.

One of the purposes of the CoC program is to minimize the trauma associated with homelessness 42 U.S.C. § 11381(2). CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking. Women experiencing homelessness or domestic violence should have access to safe, single-sex spaces and other considerations for personal privacy (24 CFR 578.93(b).

### 9. Expanding Access Based on Merit, not Ideology.

HUD is committed to providing an equal opportunity to every applicant, recipient, and program participant free from discrimination. Part of this commitment is recognizing that faith-based providers deserve a level playing field to compete for CoC funding and participate in the community-wide efforts of their local CoCs. Faith-based organizations first served the nation's homelessness population long before the Federal government was ever involved.[23]

To the fullest extent permitted by law, HUD will ensure that faith-based organizations can participate in the CoC program and operate consistent with their sincerely held religious beliefs, recognizing all relevant protections provided by subsection c of HUD's Equal Participation Rule, 24 CFR § 5.109, the Religious Freedom Restoration Act, and the First Amendment. Promoting equal access for faith-based organizations directly advances the goals of the CoC program by increasing the number and diversity of program providers and increasing overall competition for CoC funds.

Likewise, HUD is committed to promoting equal access to CoC programs for homeless individuals and program participants regardless of their race or other protected status. The prior administration wrongly and illegally pressured or required providers to discriminate against participants based on their race, sex, or other protected status. In *Students for Fair Admissions (SFFA) v Harvard*, 600 U.S. 181 (2023), the Supreme Court ruled Harvard's race-conscious admissions violated the Fourteenth Amendment's Equal Protection Clause, effectively ending affirmative action as previously practiced by using race as a "plus" factor for diversity, finding it led to racial stereotyping, lacked a logical endpoint, and failed strict scrutiny by not being narrowly tailored to serve a compelling government interest. HUD believes that these harmful and illegal practices promoted division and waste and wants to increase access to homelessness relief for *all* individuals and families.

[1]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[2]CoC_AwardComp_NatlTerrDC_2024.pdf

[3]Health Conditions Among Unsheltered Adults in the US

[4]CASPEH_Report_62023.pdf

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 166 of 283 PageID #: 3336

[5] Mortality Among People Experiencing Homelessness in San Francisco During the COVID-19 Pandemic | Public Health | JAMA Network Open | JAMA Network

[6]Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[7]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[8]Evidence of Effect of Permanent Supportive Housing on Health - Permanent Supportive Housing - NCBI Bookshelf

[9]System-Performance-Measures-Data.xlsx

[10]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[11]2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States

[12]2024 National Public Safety and Homelessness Poll | Cicero Institute

[13] Tier 1 of FY24-25 CoC NOFO

[14]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[15]Health Conditions Among Unsheltered Adults in the US

[16]How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

[17]Sex Offenders: An Overlooked but Significant Subpopulation of the Homeless | Cicero Institute

[18]Homeless Data and Plan News Release FINAL 3-21-22.pdf

[19]Addressing Places in Seattle Where Overdoses and Crime are Concentrated: An Evidence-Based Approach

[20]2024 National Public Safety and Homelessness Poll | Cicero Institute

[21]Austin's homeless population dispersing after 2 years of camping ban enforcement | Community Impact

[22]20240304161555229_23-175 Amicus BOM Cicero PDFA.pdf

[23]History of The Salvation Army

[1]Are Cities' Pledges to End Homelessness Working?

[2]USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness - HUD Exchange

[3]The 2024 Annual Homelessness Assessment Report (AHAR to Congress) Part 1: Point-In-Time Estimates of Homelessness, December 2024

[4] Ibid.

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 167 of 283
PageID#: 333

I. Basic        II. Eligibility    III. Program    IV. Application   V. Application    VI. Submission    VII. Award       VII. Post-Award   VIII Contractors   Appendix
Information                        Description     Contents and      Information        Requirements and  Requirements and  Support
                                                   Format                               Deadlines         Administration

[5] Ibid.

[6]The Future of Housing for the Homeless

[7]How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf

## C. Authority

The CoC Program is authorized by subtitle C of title IV of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11381–11389) (the Act), and the CoC Program rule found in 24 CFR part 578 (the Rule). Pursuant to 42 U.S.C 11386a(a) and 42 U.S.C. 11386a(b)(1)(G), the Secretary can establish criteria for the awarding of funds including factors deemed appropriate to carry out the CoC Program in an effective and efficient manner.

FY 2025 funding for CoC Program Competition NOFO, including the competitive or noncompetitive renewal or replacements of YHDP grants under the CoC program, is authorized by the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025). Under this NOFO, HUD will competitively renew or replace YHDP grants under the CoC Program.

HUD is including up to $294,000,000 in funding under Section 231(a)(1) and 231(a)(3) of the 2020 Consolidated Appropriations Act.

HUD is also utilizing authority under the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025) to enable HUD to repurpose $100 million made available for Permanent Supportive Housing to fund CoC projects under this NOFO.

## D. Unallowable Costs

HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## E. Indirect Costs

If you expect to charge indirect costs to the award, submit the Indirect Cost Rate Certification form (HUD-426) with your application.

The HUD-426 form is built into the *e-snaps* Project Applicant Profile where you will complete the information if requesting indirect costs, and you will also see the information transferred within your project application.

Indirect cost rules under 2 CFR part 200, as may be amended from time to time, apply. Project applicants that intend to charge indirect costs to the award must clearly state in the project application(s) the rate and distribution base the recipient intends to use, and if applicable, the rate and distribution base to be used by any subrecipient(s). If the rate is a Federally negotiated indirect cost rate, the project application must include the corresponding negotiated indirect cost rate agreement signed by the cognizant agency. A government department or agency unit that receives no more than $35 million in direct federal funding per year and has developed and maintains an indirect cost rate proposal and supporting documentation in accordance with 2 CFR part 200, appendix VII, may use the rate and distribution base specified in that indirect cost rate proposal. These governmental departments or agencies are not required to submit their proposals unless they are

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contracts and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 168 of 283 PageID #: 3338

specifically requested to do so by an awarding Federal agency. The Federal agency's review should be limited to ensuring the proposal is consistent with the principles of this part.

For each applicant or intended subrecipient that meets the conditions for using the de minimis rate under 2 CFR 200.414(f) and will use that rate to charge indirect costs, the project application must clearly state the intended use of the de minimis rate. As described in 2 CFR 200.403, costs must be consistently charged as either indirect or direct costs but must not be double charged or inconsistently charged as both. Once an organization elects to use the de minimis rate, the organization must apply this methodology consistently for all Federal awards until the organization chooses to negotiate for a rate, which the organization may apply to do at any time. Documentation of the decision to use the de minimis rate must be retained on file for audit.

## F. Program History

FY 2025 CoC awards will be made through this NOFO. This NOFO rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024, and includes several changes.

**1. Investment in New Permanent Housing with Robust Supportive Services for Individuals and Families with a Disability.**

This NOFO provides a set-aside of 30% of all ESG and COC funds,[1] as contained in 42 U.S.C. § 11386b, for new permanent housing projects for homeless individuals and families with disabilities, including PH-PSH and PH-RRH. As outlined in the Threshold Criteria in V.A.4, new PH-PSH and PH-RRH projects must serve individuals and families with disabilities.

This NOFO aligns with the program statutory requirements to fund new permanent housing. CoCs have discretion to determine if or how much of their Annual Renewal Demand (ARD) will be used for the creation of new Permanent Housing projects.

For CoCs applying for new Permanent Housing projects, those projects:

- Must be submitted by the Extended Track deadline.

- Must be ranked by the CoC in an Extended Track Priority Listing.

- Must not be included in the Normal Track FY25 CoC Priority Listing.

- May be CoC Bonus projects.

- May be DV Bonus projects, if it meets DV and new project criteria.

- May be the expansion portion of an expanding renewal project.

- May be Transition Grant projects.

- Will not be considered if they exceed the CoC's maximum award based on the CoC's combined Priority listings. In other words, these projects should not, in combination with the Normal Track FY25 CoC Priority Listing, exceed the CoC's maximum award

Case 1:25-cv-00636-MSN-AEM   Document 67-6   Filed 01/14/26   Page 169 of 283
PageID#: 3339

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix |

amount.

## 2. Two-Track Application Process for Increased Flexibility.

In order to provide time and flexibility for CoCs to solicit new Permanent Housing project applications, HUD is creating a separate deadline for new Permanent Housing projects.

Normal Track: $2,655,600,000 in funding, January 28, 2026 deadline and March 31, 2026 estimated award date. HUD reserves the right to award projects in Tier 1 of CoC Priority Listings prior to the rest of awards.

Extended Track: $1,262,400,000 in funding, February 25, 2026 deadline and April, 22, 2026 estimated award date. For new Permanent Housing projects only.

## 3. FY 2025 CoC Consolidated Application.

All CoCs must complete and submit the FY 2025 CoC Consolidated Application that includes the CoC Application and CoC Priority Lising with all submitted projects ranked or rejected based on the criteria set forth in this NOFO. CoCs applying for new Permanent Housing projects on the Extended Track timeline must submit a separate Extended Track Priority Listing of new Permanent Housing projects. CoCs should not submit projects in Normal Track and Extended Track that, when combined, exceed their maximum award amount.

## 4. Increase in Competition and Expedited Awards.

The Continuum of Care program is a national competition (42 U.S.C. 11386a). Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD). HUD reserves the right to award projects in Tier 1 of CoC Priority Listings prior to the rest of awards.

## 5. Investment in Transitional Housing and Supportive Service Only Projects.

In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of existing Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects.

## 6. Program Components that are eligible under this NOFO.

Provisions at 24 CFR 578.37 provide that CoC funds may be used for projects under five program components: transitional housing, supportive services only, HMIS, permanent housing (including rapid re-housing and permanent supportive housing), and in some cases, homelessness prevention. This NOFO is differant than prior years in that applicants may apply for Transitional Housing (TH) and Supportive Services Only (SSO) projects including street outreach. Only designated High Performing Communities (HPC), may carry out homelessness prevention activities through the CoC program and there are currently no HPCs. Therefore, the four components that will be funded through this CoC Program Competition are: (a). Transitional Housing; (b). Supportive Services Only; (c). Permanent Housing; and (d). HMIS. Additionally:

**a.** HUD will allow renewal project applications for Joint T/PH-RRH component projects, which combine two existing program components in a single project (see section III.G.4of this NOFO for more information). No new Joint TH/PH-RRH component project applications will be allowed.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSN-AEM Document 67-6 Filed 01/14/26 Page 170 of 283 PageID#: 3340

**b.** Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. These projects must meet the project quality threshold criteria in section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in section V.A.4.b.(5)(b) of this NOFO.

The components are fully described at 24 CFR 578.37.

## 7. Special CoC NOFO grants.

Grants originally awarded funding under the Special NOFO to Address Unsheltered and Rural Homelessness, that are expiring in Calendar year 2026 are eligible to renew under this NOFO.

## 8. Reallocation.

CoCs may reallocate funding from any eligible renewal grant, including grants that have not previously renewed under the CoC Program, so long as the project has an executed grant agreement with an expiration date in Calendar Year 2026. For more information on Reallocation requirements see section III.G.3 of this NOFO.

## 9. Competitive Renewal or Replacement of YHDP Grants.

HUD will competitively renew or replace YHDP projects. Additionally, YHDP projects may be reallocated by CoCs to create new YHDP grants. If significant changes to a renewing YHDP project are needed the YHDP project may replace its current project with a new YHDP Replacement project, that may wholly or in part include activities ineligible under the CoC Program as outlined in section IV.D.1.h of this NOFO.

[1] HUD estimates that this amount is $1,262,400,000.

## G. Other Information

## 1. CoC Program NOFO Requirements.

All requirements for submitting the entire CoC Consolidated Application, including applications for projects eligible for FY 2025 CoC and YHDP funding and the total amount of funds available, are contained in this NOFO. Applicants should read this information carefully and respond to all submission requirements and deadlines as described.

**a.** CoCs should consider the Goals and Objects established in Section III.B of this NOFO in conjunction with local priorities to determine the ranking of new and renewal project application requests.

**b.** Collaborative Applicants that are designated Unified Funding Agencies (UFAs) or High Performing Communities (HPCs) by HUD during the FY 2024 CoC Program Registration process will maintain their UFA and/or HPC designation for the FY 2025 CoC Program Competition.

**c.** HUD will conduct threshold reviews of project applicants, and project applications for all CoC Consolidated Applications that are submitted by the application submission deadline as described in section V.A.4.

Case 1:25-cv-00636-MSN-AEM   Document 67-6   Filed 01/14/26   Page 171 of 283
PageID#: 3341

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix |

**d.** HUD may issue more than one conditional funding announcement, including for instances where a CoC has been affected by a disaster and for which HUD has extended the deadline for application submission.

**e.** HUD will score the FY 2025 CoC Application portion of the Consolidated Application in accordance with the criteria set forth in section V.B of this NOFO.

**f.** With the exception of CoC Planning and, if applicable, UFA Cost applications, CoCs must rank all project applications. This includes CoC Bonus, DV Bonus, CoC Renewal (including DV Renewal projects), New CoC Reallocation, New DV Reallocation, and YHDP Renewal and YHDP Reallocation projects. CoC Planning and, if applicable, UFA Costs project applications are not ranked and will be selected provided they pass project eligibility and project quality threshold review.

## 2. Eligible Renewal Project.

YHDP and CoC projects originally funded in FY 2024 or earlier, including projects originally funded under the Special NOFO or DV Bonus are eligible to renew under this NOFO, provided the projects have an expiration date in CY 2026 (between January 1, 2026, and December 31, 2026). Renewal project applications must be submitted by the recipient currently under grant agreement to operate the project. See section IV.D.2 for more information on renewal project requirements.

In cases where an expiring grant agreement is amended to have a new recipient after a renewal application is submitted, the new recipient will be eligible to receive the renewal award (Section V.D.8).

## 3. Reallocation.

Reallocation is a process CoCs use to shift funds in whole or in part from existing eligible CoC renewal projects to create one or more new projects without decreasing the CoC's ARD. CoCs may only reallocate eligible renewal projects so long as the renewal project being reduced or eliminated has a current grant agreement with an expiration date in CY 2026. Additionally, new projects created through reallocation must meet the project eligibility and project quality thresholds established in sections V.A.4.a and V.A.4.b of this NOFO. For more information on the requirements for projects created through reallocation, see sections IV.D.1.e and IV.D.1.f (DV Reallocation), IV.D.1.g (CoC Reallocation), and IV.D.1.i (YHDP Reallocation) of this NOFO.

To create a Transition Grant through the reallocation process, the CoC must wholly eliminate one or more projects and use those funds to create the single, new transition grant [see section IV.D.1.l of this NOFO].

## 4. Joint TH/PH-RRH Component Project.

The Joint TH/PH-RRH component project combines two existing program components – Transitional Housing and Permanent Housing-Rapid Rehousing – in a single project to serve individuals and families experiencing homelessness.

If funded, HUD will limit eligible costs as follows, in addition to other limitations found in the Rule:

Case 1:25-cv-00636-MSN-AEM Document 67-6 Filed 01/14/26 Page 172 of 283 PageID#: 3342

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission and Deadlines | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractual Support | Appendix

**a.** leasing of a structure or units, and operating costs to provide transitional housing;

**b.** short- and medium-term tenant-based rental assistance on behalf of program participants to pay for the RRH portion of the project;

**c.** supportive services;

**d.** costs of contributing data to the HMIS; and

**e.** project administrative costs.

Renewal project applicants must include details in the project description of how TH and PH-RRH assistance will be provided. Additionally, if CoC Program funds are not being requested for both TH and PH-RRH units, the renewal project application must describe and include the number of the project's TH units and PH-RRH units that will be paid for from another funding source. Applicants may only use CoC Program Leasing funds or non-CoC Program Funds to pay for the cost of housing program participants enrolled in the TH portion of the project.

When a program participant is enrolled in a Joint TH/PH-RRH component project, the recipient or subrecipient must be able to provide both components, including the units supported by the TH component and the tenant-based rental assistance and services provided through the PH-RRH component, to all participants. A program participant may choose to receive only the assistance provided through the TH portion of the project or the assistance provided through the PH-RRH component, but the recipient or subrecipient must make both types of assistance available.

### 5. Supportive Services Only (SSO) projects not dedicated to Coordinated Entry.

Project applicants may apply for SSO projects consistent with 24 CFR 578.37 and 578.53, including projects with the outreach service activity described at 24 CFR 578.53(e)(13) to individuals and families primarily residing in places not meant for human habitation. Projects that are primarily providing these outreach services and identify themselves as such in the project application, must meet the project quality threshold criteria in Section V.A.4.b.(5)(c) of this NOFO. All other SSO projects, except those dedicated to coordinated entry, must meet the threshold criteria in Section V.A.4.b.(5)(b) of this NOFO.

### 6. Centralized or Coordinated Assessment System (Coordinated Entry).

In general, 24 CFR 578.23(c)(9) and (11) requires all CoC program recipients and subrecipients to use the centralized or coordinated assessment system established by CoCs. The definition of Centralized or Coordinated Assessment (also known as Coordinated Entry) is found at 24 CFR 578.3. 24 CFR 578.7(a)(8) details the responsibilities of the CoC to establish and operate this required system. In addition to the definition and responsibilities established in the Rule, HUD posted on its website, *CPD-17-01: Notice Establishing Additional Requirements for a Continuum of Care Centralized or Coordinated Assessment System*, establishing additional requirements related to the development and use of a centralized or coordinated entry assessment system. These systems help communities assess the needs of program participants and effectively match individuals and families experiencing homelessness with the most appropriate resources available to address their supportive service and housing needs. CoCs may use planning costs to design and plan for the implementation of a Coordinated Entry system; however, once the system is established and operating, the costs of operating it are not eligible planning costs. CoCs must operate the

Case 1:25-cv-00636-MSN-AEM Document 67-6 Filed 01/14/26 Page 173 of 283 PageID#: 3343

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

system with CoC Program funds, other funds, or a combination of the two. Section 578.23(c)(9) of the CoC Program Rule exempts victim service providers from using the CoC's coordinated entry process if victim service providers use a coordinated entry process that otherwise meets HUD's requirements.

## 7. Non-Dedicated Permanent Supportive Housing Beds.

A Permanent Supportive Housing bed within a CoC's geographic area that is not currently classified as dedicated for use by chronically homeless individuals and families or as DedicatedPLUS.

## 8. Beds Dedicated to Chronically Homeless Individuals and Families.

A Permanent Supportive Housing bed that is dedicated specifically for use by individuals and families experiencing chronic homelessness [see 24 CFR 578.3 definition of Chronically Homeless] within a CoC's geographic area, as reported in the CoC's housing inventory count (HIC) and permanent housing (PH) project applications.

## 9. DedicatedPLUS Project.

**a.** A PSH project where 100 percent of the beds are dedicated to serve individuals, households with children, and unaccompanied youth (including pregnant and parenting youth) that at intake meet one of the following categories:

**(1)** experiencing chronic homelessness, meaning they qualify as "chronically homeless" as defined in 24 CFR 578.3;

**(2)** residing in a TH project that will be eliminated and meets the definition of chronically homeless in effect at the time in which the individual or family entered the TH project;

**(3)** residing in a place not meant for human habitation, emergency shelter, or Safe Haven and had been admitted and enrolled in a PH project within the last year but were unable to maintain a housing placement and met the definition of chronically homeless as defined by 24 CFR 578.3 prior to entering the project;

**(4)** residing in transitional housing funded by a Joint TH/PH-RRH component project and who were experiencing chronic homelessness as defined by 24 CFR 578.3;

**(5)** residing and has resided in a place not meant for human habitation, Safe Haven, or emergency shelter for at least 12 months in the last three years, but has not done so on four separate occasions and the individual or head of household meet the definition of 'homeless individual with a disability; or

**(6)** receiving assistance through a Department of Veterans Affairs (VA)-funded homeless assistance program and met one of the above criteria at initial intake to the VA's homeless assistance system.

**b.** A renewal project where 100 percent of the beds were dedicated to individuals and families experiencing chronic homelessness may either be reallocated to create a DedicatedPLUS project or may continue as a renewal project dedicating 100 percent of its beds to individuals and families experiencing chronic homelessness. If the project is reallocated as a DedicatedPLUS project, the project must adhere to all fair housing

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

Case 1:25-cv-00636-MSN-AEM Document 67-6 Filed 01/14/26 Page 174 of 283 PageID#: 3344

requirements at 24 CFR 578.9.

**c.** Projects HUD awarded as DedicatedPLUS in a previous CoC Program Competition must continue to include households with children to qualify as a DedicatedPLUS project in the FY 2025 CoC Program Competition.

### 10. Participant Eligibility.

Projects funded through this NOFO must have the following eligibility criteria for program participants. All references to paragraphs of the definition of homeless that are found throughout this NOFO refer to the paragraphs listed under the definition of "homeless" in 24 CFR 578.3 and include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All specific references to the definition of "homeless" under paragraph (4) of 24 CFR 578.3 that are found throughout this NOFO also include the definition of "homeless" under section 103(b) of the McKinney-Vento Homeless Assistance Act, even if section 103(b) is not explicitly referenced. All projects must participate in coordinated entry, and the selection of program participants must be consistent with the CoC's coordinated entry process. As provided by the Consolidated Appropriations Act, 2025, youth aged 24 and under must not be required to provide third-party documentation that they meet the homeless definition in 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act as a condition for receiving services funded under this NOFO. Additionally, any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under or families headed by youth aged 24 and under who are living in unsafe situations. HUD interprets "youth-serving provider" as a private nonprofit organization whose primary mission is to provide services to youth aged 24 and under and families headed by youth aged 24 and under. HUD interprets "living in unsafe situations" as having an unsafe primary nighttime residence and no safe alternative to that residence. These youth-related requirements supersede any conflicting requirements under this NOFO or the Rule.

Participants eligible to be served by projects funded under this NOFO, are as follows:

**a.** PH-PSH projects awarded CoC funds must serve one of the following:

**(1)** persons eligible to be served by DedicatedPLUS projects as described in section III.G.9 of this NOFO in which case all units funded by the project must be used to serve program participants who meet the qualifications for DedicatedPLUS;

(2) persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act; or

**(3)** for renewal projects, the same population of individuals and families indicated in the expiring grant agreement (e.g., PSH projects originally awarded under the Special NOFO Competition projects through the Unsheltered Set Aside must serve individuals and families who qualify under paragraph (1) or (4) of the definition of homeless).

**b.** TH, PH-RRH, Joint TH/PH-RRH, SSO projects awarded CoC funds must serve persons who qualify as homeless under paragraphs (1), (2), or (4) of 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act with the following exception:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Application Review Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

Case 1:25-cv-00636-MSN-AEM Document 67-6 Filed 01/14/26 Page 175 of 283 PageID#: 3345

PH-RRH, TH, Joint TH/PH-RRH, SSO- may serve persons who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**c.** DV Bonus, DV Renewal and DV Reallocation projects must serve individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking and who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 with the following exception:

PH-RRH, Joint TH/PH-RRH, SSO- projects may serve individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking who qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

**d.** YHDP Renewal and Replacement projects including YHDP projects created through reallocation must serve youth aged 24 or younger, including unaccompanied and pregnant or parenting youth who:

**(1)** qualify as homeless under paragraphs (1), (2), or (4) of the homeless definition in 24 CFR 578.3 or Section 103(b) of the McKinney-Vento Homeless Assistance Act;

**(2)** have an unsafe primary night-time residence and no safe alternative to that residence; or

**(3)** qualify as homeless under paragraph (3) of 24 CFR 578.3 if the CoC is approved to serve persons in paragraph (3).

## 11. Performance-Based Decisions.

**a.** The CoC must review each project application submitted to the CoC for inclusion on the FY 2025 CoC Priority Listing as part of the CoC Consolidated Application and either approve and rank or reject project application submissions. All project applications approved by the CoC must be listed on the CoC Priority Listing in rank order.

Higher ranked projects will be assigned to Tier 1 and lower ranked projects will be assigned to Tier 2 as described in sections V.D.3.a and V.D.3.b of this NOFO. This two-tiered approach for CoCs notifies HUD which projects are prioritized for funding based on project performance, local needs, and gaps.

**b.** Consistent with the requirements of the Consolidated Appropriations Act, 2024:

**(1)** Requests for new CoC project applications are allowed if the CoC evaluates and competitively ranks projects based on how they improve the CoC's system performance as outlined in section V.B.1.a.(1) of this NOFO; and

**(2)** HUD will prioritize funding for CoCs that have demonstrated the capacity to reallocate funding from lower to higher performing projects.

## 12. Coordination with Housing and Healthcare.

The Consolidated Appropriations Act, 2024 directs HUD to provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid rehousing services. In the 2025 CoC Program

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 176 of 283
PageID #: 3346

Competition, CoCs may receive up to 4 points on the CoC Application if the FY 2025 CoC Priority Listing includes new TH, PH-PSH or PH-RRH project applications created through reallocation or CoC Bonus that utilizes housing resources and healthcare provided through an array of healthcare services and housing providers. See section V.B.1.c of this NOFO for additional details.

Case 1:25-cv-00636-MSN-WEF    Document 67-6    Filed 01/14/26    Page 177 of 283 PageID#: 3347

# IV. APPLICATION CONTENTS AND FORMAT

IV.   Application Contents and Forms

A. Standard Forms, Assurances, and Certifications

B. Budget

C. Narratives and Non-Form Attachments

D.  Other Application Content

TABLE OF CONTENTS

DOJ-HUD-AR01163

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 178 of 283
PageID #: 3348

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# IV. APPLICATION CONTENTS AND FORMAT

Applications must include three main elements: a) standard forms, assurances, and certifications; b) budget; and c) narratives and other attachments. The content, forms, and format for each element are included in this section.

You may use this section as a checklist to ensure you submit a complete application.

If you don't provide the required documents in the correct format, your application is incomplete.

Do not submit password protected or encrypted files.

While the CoC Program NOFO is officially posted on Grants.gov, the standard forms, assurances, certifications, budgets, narrative responses, and the ability to include attachments are built into e-snaps, an electronic application system.

HUD does not accept faxed applications or supportive documents.

There are two types of applications under this NOFO that are part of the CoC Consolidated Application;

- CoC Application that includes the CoC responses to the rating factors in Section V.B of this NOFO; and

- Project applications that must be approved by CoCs to be included as part of the CoC Consolidated Application. See Sections IV.D.1 and V.A.4 of this NOFO for information on eligible project applications and submission requirements.

_____ pages is the total maximum length of all narratives.

## A. Standard Forms, Assurances, and Certifications

You must properly complete and submit with your application the standard forms, assurances, and certifications identified below. You can find all forms in the application package or review them and their instructions at Grants.gov Forms. You can also read more about standard forms on HUD's Funding Opportunities page.

The identified forms below are included in the project applicant profile in e-snaps and must be completed by the project applicant before gaining access to the application.

| Forms/Assurances/Certifications | Submission Requirement |
|---|---|
| Application for Federal Assistance (SF-424) | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| Applicant and Recipient Assurances and Certifications (HUD-424B) | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| Applicant/Recipient Disclosure/Update | Required with the application and completed |

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 179 of 283
PageID #: 3349

I. Basic | II. Eligibility | III. Program | IV. Application | V. Application | VI. Submission | VII. Post-Award | VIII. Contact and | Appendix
Information | | Description | Contents and | Information | Requirements and | Requirements and | Support
| | | Format | | Deadlines | Administration |

| Report (HUD-2880) | in e-snaps via the information from the Project Applicant Profile. |
|---|---|
| **Certification Regarding Lobbying** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Disclosure of Lobbying Activities (SF-LLL)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification for a Drug-Free Workplace (HUD-50070)** | Required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Assurances for Construction Programs (SF-424D)** | If applicable, required with the application and completed in e-snaps via the information from the Project Applicant Profile. |
| **Certification of Need and Compliance with Housing Quality and Habitability Standards.** | If applicable, required with the application and included in e-snaps.<br><br>Collaborative Applicants must certify there is a demonstrated need for all PH renewal projects included in the Renewal Project Listing. Additionally, Collaborative Applicants must certify these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing. |
| **Certification for Opportunity Zone Preference Points (HUD 2996)** | If applicable. The HUD-2996 form is not built into e-snaps and must be submitted as an attachment to the CoC application in e-snaps on the Attachment screen if the CoC is requesting Opportunity Zone Preference Points. |
| **Indirect Cost Rate Certification (HUD-426)** | If applicable, required with the application and included in e-snaps. |

Attachment of the forms that are built into e-snaps, as indicated above, is not required. These forms must be completed before you will have access to the e-snaps application screens.

**The following forms are not built into e-snaps but are required to be submitted by Collaborative applicants with the CoC Priority listing:**

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 180 of 283
PageID #: 3350

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**1. Certification of Consistency with the Consolidated Plan Form HUD-2991.**

The standard form, Certification of Consistency with the Consolidated Plan (form HUD-2991), in which a state or local official certifies that the proposed activities or projects are consistent with the jurisdiction's Consolidated Plan and, if the project applicant is a state or unit of local government, that the jurisdiction is following its Consolidated Plan per the requirement of 24 CFR part 91. Collaborative Applicants must download a new HUD-2991 and complete it for all project applications submitted and listed on the CoC Project Listings either by submitting one correctly signed and dated HUD-2991 form from the appropriate jurisdiction(s) that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction.

The FY 2025 Form HUD-2991 must be completed and dated between November 1, 2024 and February 25, 2026 and attached to the FY 2025 CoC Priority Listing.

**2. Tribal Resolution for Projects on Trust Land or Reservations, if applicable.**

Any applicant that is not a Tribe or TDHE proposing to site a project on a reservation or trust land must include a Tribal resolution or a letter from an official or principal of the Indian Tribe or TDHE, who is authorized to act on behalf of the Indian Tribe or TDHE. Tribes do not need to include a Tribal resolution to site a project on their own reservation or trust land. A Tribal resolution is the formal manner in which the Tribal government expresses its legislative will in accordance with its organic documents. In the absence of such organic documents, a written expression adopted pursuant to Tribal practices is acceptable.

A CoC that is not a Tribe or TDHE that proposes to locate a new project on a reservation or trust land that is not currently included in the CoC's approved geographic service areas, identified during the CoC Registration process, are required to obtain a Tribal Resolution from the Tribe or TDHE and attach it to the CoC Priority Listing.

## B. Budget

You must submit a budget with your application to support your project narrative.

At a minimum, your budget must indicate direct and any indirect costs.

You must also submit form HUD-426, based on the requirements in Section III.E. of this NOFO.

The project application in e-snaps includes the budget forms available under this NOFO. Project applicants will select the appropriate budget form(s) based on the requested activities and must be completed for the proposed project. Additionally, there is a section to capture indirect cost rate and the HUD-426 form, if applicable.

**Eligible Costs.**

Except as otherwise stated below, 24 CFR 578.37 through 578.63 identifies the eligible costs that applicants may request under the CoC Program.

**1. YHDP Costs.**

Eligible costs for YHDP projects originally funded under the YHDP Competition are also eligible YHDP Renewal project costs under this NOFO (see section IV.D.1.h of this NOFO).

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 181 of 283 PageID #: 3354

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contract and Support | Appendix

Additionally, YHDP Renewal projects may include the YHDP Special Activities described in IV.B.2 below, subject to Renewal project requirements in sections IV.D.2 including IV.D.2.f.(2) of this NOFO. YHDP Replacement including YHDP Reallocation project applications under this NOFO may include requests for eligible CoC Program Costs, the YHDP activities described in section IV.D.1.i and the YHDP Special Activities in section IV.B.2 below. HUD will reject any requests for ineligible costs, except as otherwise provided in this NOFO.

## 2. Special YHDP Activities.

YHDP Renewal and YHDP Replacement including YHDP Reallocation projects may submit applications that include the following special YHDP activities, which are ineligible under the CoC Program, subject to the conditions specified in this section:

**a.** Recipients may carry out the activities below with written notice to the Director of HUD's Office of Special Needs Assistance Programs (SNAPS), subject to the requirements governing grant agreement amendments at 24 CFR 578.105. HUD will consider the inclusion of these activities in the project application as notification to the Director of SNAPS.

**(1)** Housing projects may have leases for a minimum term of 1 month plus 1 day under rental assistance budget line items.

**(2)** Projects may use leasing, sponsor-based rental assistance, and project-based rental assistance in RRH projects.

**(3)** In addition to the eligible costs listed in 24 CFR 578.59(a), recipients may use project administration funds to support costs of involving youth with lived experience in project implementation, execution, and improvement.

**(4)** Recipient may use project administrative funds to attend conferences and trainings that are not HUD-sponsored or HUD-approved, provided that the subject matter is relevant to youth homelessness.

**(5)** Projects may employ youth who are receiving services, or housing assistance, from the recipient organization. Recipients that use this special YHDP activity must maintain documentation that discloses the nature of work that the youth performs, and that the youth is not in a position that creates a conflict of interest.

**(6)** Projects may use habitability standards in 24 CFR 576.403(c) rather than the housing standards in 24 CFR 578.75 for short- or medium-term (up to 24 months) housing assistance. Recipients implementing this special YHDP activity must keep documentation of which standards they apply to the units and proof that the units complied with standards before assistance is provided for every unit funded.

**(7)** Recipients may provide moving expenses to a program participant more than once.

**(8)** Recipients may provide payments of up to $500 per month for families that provide housing under a host home and kinship care model to offset the increased costs associated with having youth housed in the unit.

**(9)** YHDP recipients may continue providing supportive services to program participants for up to 12 months after the program participant exits homelessness, transitional housing or after the end of housing assistance.

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 182 of 283
PageID# 3352

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**(10)** Projects using grant leasing funds may pay above the Fair Market Rent (FMR) for individual units as long as the amount paid is consistent with the reasonable rent standards at 24 CFR 578.51(g).

**(11)** Recipients may use grant funds for the following if they are necessary to assist program participants to obtain and maintain housing. Recipients and subrecipients must maintain records establishing how it was determined that paying the costs was necessary for the program participant to obtain and retain housing and must also conduct an annual assessment of the needs of the program participants and adjust costs accordingly:

**(a)** Security deposits for units in an amount not to exceed 2 months of rent.

**(b)** The costs to pay for any damage to housing due to the action of program participants, which may be paid while the youth continues to reside in the unit. The total costs paid for damage per program participant may not exceed the cost of 2 months' rent.

**(c)** The costs of providing household cleaning supplies to program participants.

**(d)** Housing start-up expenses for program participants, including furniture, pots and pans, linens, toiletries, and other household goods, not to exceed $300 in value per program participant.

**(e)** The one-time cost of purchasing a cellular phone and service for program participant use, provided access to a cellular phone is necessary to obtain or maintain housing and the costs of the phone and services are reasonable per 2 CFR 200.404.

**(f)** The cost of internet in program participants' units if the costs of the service is reasonable per 2 CFR 200.404.

**(g)** Payment of rental arrears consisting of a one-time payment for up to 6 months of rent in arrears, including any late fees on those arrears.

**(h)** Payment of utility arrears of up to 6 months per utility.

**(i)** Up to 3 months of utilities for a program participant, based on the utility costs schedule for the unit size and location.

**(j)** In addition to transportation costs eligible in 24 CFR 578.53(e)(15), recipients may pay gas and mileage costs for a program participant's personal vehicle for trips to and from medical care, employment, childcare, or other services eligible under this section.

**(k)** Legal fees, including court fees, bail bonds, and required courses and equipment.

**(l)** Program participant's past driving fines and fees that are blocking a young person from being able to obtain or renew a driver's license and impacting their ability to obtain or maintain housing. Additionally, recipients may pay for program participants' costs for insurance and registration for personal vehicles, if the personal vehicle is necessary to reach medical care, employment, childcare, or

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Other Information | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 183 of 283 PageID #: 3353

other services eligible under this section.

**(12)** Recipients of housing projects (RRH, TH, TH-RRH, and PSH) may use YHDP funds to pay for owner incentive and retention payments before occupancy of the unit, or at any point thereafter, provided that the overall amount paid with program funds per unit occupied by the program participant does not exceed three times the rent charged for the unit. These payments may include signing bonuses (a payment offered to an owner as an incentive for leasing a unit to be occupied by a program participant), repairs to bring the unit into compliance with program requirements, or holding fees to reserve a unit for an individual or family experiencing homelessness.

**b. *YHDP Exceptions.*** Under the conditions specified below, recipients may make use of the following built-in exceptions to this NOFO's requirements, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. To expedite grant agreement processing, applicants should include as much information as possible as part of their project application to demonstrate they meet the conditions specified below.

**(1)** Projects may provide up to 36 months of RRH rental assistance to program participants if the recipient demonstrates: (1) the method it will use to determine which youth need rental assistance beyond 24 months and (2) the services and resources that will be offered to ensure youth are able to sustain their housing at the end of the 36 months of assistance.

**(2)** Projects may continue providing supportive services to program participants for up to 24 months after a program participant exits homelessness, transitional housing or after housing assistance ends if the recipient demonstrates: (1) the proposed length of extended services to be provided; (2) the method it will use to determine whether services are still necessary; and (3) how those services will result in self-sufficiency and ensure stable housing for program participants.

**(3)** Projects may continue providing supportive services to program participants for up to 36 months after program participants exit homelessness, if the services are in connection with housing assistance, such as the Foster Youth to Independence initiative, or if the recipient can demonstrate that extended supportive services ensures continuity of caseworkers for program participants.

**(4)** Rental assistance may be combined with leasing or operating funds in the same unit, provided that the recipient submits a project plan that includes safeguards to ensure that no part of the project would receive a double subsidy.

**(5)** Projects may provide payments of up to $1,000 per month for families that provide housing under a host home and kinship care model, provided that the recipient can show that the additional cost is necessary to recruit hosts to the program.

**(6)** YHDP recipients may pay for short-term (up to three months) emergency lodging in motels or shelters as the transitional housing component in a Joint transitional housing-rapid rehousing (TH-RRH) project, provided that the recipient can demonstrate that use of the hotel or motel room is accessible to supportive services.

**c. *Innovative Activities***. In addition to the specific activities authorized above or in 24

CFR part 578, other innovative activities to reduce youth homelessness may be carried out in a YHDP project, subject to approval by the Director of SNAPS and requirements governing grant agreement amendments at 24 CFR 578.105. Requests to carry out YHDP innovative activities are permitted to be requested in any YHDP application. YHDP Replacement applicant must demonstrate to HUD that the activity meets the following criteria; and to expedite grant agreement processing, must include as much information as possible as part of their project application.

YHDP Renewal or YHDP Replacement applications requesting to carry out Innovative Special YHDP Activities must demonstrate the following:

**(1)** The activity is approved by both the Youth Action Board (YAB) and the CoC, as evidenced by letters of support from each organization. For purposes of this section, a YAB is defined as a group of at least 4 youth – aged 24 or younger - with voting power on policy decisions of the CoC (particularly on policies that relate to preventing and ending youth homelessness, and where at least two-thirds of the members have lived experience/expertise of homelessness. The YAB must be a formal committee of the CoC. The YAB should be representative of the youth and young adult population experiencing homelessness in the community;

**(2)** That activity will be testing or likely to achieve a positive outcome in at least one of the four core outcomes for youth experiencing homelessness (stable housing, permanent connections, education/employment, and well-being);

**(3)** The activity is cost-effective; and

**(4)** The activity is not in conflict with fair housing, civil rights, or environmental regulations.

## 3. Rural Costs for Projects Originally Awarded Under the Rural Set Aside of the Special CoC NOFO Competition.

Projects originally awarded under the Rural Set Aside through the Special CoC NOFO Competition may submit applications that include the following costs (Note: CoC Projects not originally funded under the Rural Set Aside of the Special NOFO Competition are not permitted to request funding under this cost category):

**a.** Rent or utility assistance after 2 months of nonpayment of rent or utilities to prevent eviction or loss of utility service. Funds may be used to pay rent or utility arrear payments up to 6 months on behalf of program participants residing in permanent housing.

**b.** Repairs, (such as insulation, window repair, door repair, roof repair, and repairs) that are necessary to make housing habitable to be used for transitional or permanent housing by people experiencing homelessness. The total cost of repairs may not exceed $10,000 per structure.

**c.** *Capacity building activities.* Capacity building activities are those activities that maintain or improve the skills of recipients. Eligible capacity building activities include employee education, job training, staff retention activities such as financial incentives to staff, paying for continuing education opportunities, cross-training within an organization, staff training and professional licensing or certification, and other professional

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Other Information | IX. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 185 of 283 PageID #: 3355

development activities. An applicant may apply for up to 20% of funds requested as part of the project, including project administrative costs, for capacity building activities.

**d. *Emergency food and clothing assistance.*** The cost of providing meals or groceries and clothing to program participants are eligible costs.

**e.** Costs associated with making use of Federal Inventory property programs to house individuals and families experiencing homelessness. Federal Inventory property programs means the Use of Federal Real Property to Assist the Homeless program authorized in title V of the Act, and implemented by 24 CFR part 581, and the Single Family Property Disposition Program authorized by section 204(g) of the National Housing Act (12. U.S.C. 1710(g)) and implemented at 24 CFR part 291 Eligible costs are: preparing and submitting applications to obtain ownership of the real property; transfer taxes; recording fees; closing costs; building permit and zoning fees; attorney's fees; rehabilitation of buildings and structures on the property necessary to bring them into compliance with local building codes and to convert them to the intended homeless assistance use; water, sanitation, sewer and utility hook-up fees and deposits and bringing lines to the property; wells; septic systems; and improving access to the real property from public roads.

## 4. VAWA Costs Information.

Section 605(a)(2) of VAWA 2022 amended section 423(a) of the McKinney-Vento Homeless Assistance Act to add the following eligible activity to the CoC program: "Facilitating and coordinating activities to ensure compliance with the emergency transfer plan requirement in [34 U.S.C. 12491(e)] and monitoring compliance with the confidentiality protections in [34 U.S.C. 12491(c)(4)]."

HUD has determined that eligible activities paid for under the VAWA costs category are not subject to the CoC program's spending caps on administrative costs under section 423(a)(10), (11), and (12). This activity may be included in new project applications, added to eligible renewal projects through expansion or added to eligible renewal projects by shifting up to 10 percent of funds from one eligible activity to the VAWA costs line item.

**a.** Examples of eligible costs for emergency transfer facilitation include the costs of assessing, coordinating, approving, denying and implementing a survivor's emergency transfer which includes:

**(1)** Assistance with moving costs. Reasonable moving costs to move survivors for an emergency transfer.

**(2)** Assistance with travel costs. Reasonable travel costs for survivors and their families to travel for an emergency transfer.

**(3)** Security Deposits. Grant funds can be used to pay for security deposits of the safe units the survivor is transferring to via an emergency transfer.

**(4)** Utilities. Grant funds can be used to pay for costs of establishing utility assistance in the safe unit the survivor is transferring to.

**(5)** Housing Fees. Fees associated with getting survivors into a safe unit via emergency transfer, includes but not limited to application fees, broker fees, holding fees, trash fees, pet fees where the person believes they need their pet to be safe, etc.

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 186 of 283
PageID #: 3356

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

**(6)** Case management. Grant funds can be used to pay staff time necessary to assess, coordinate and implement emergency transfers.

**(7)** Housing navigation. Grant funds can be used to pay staff time necessary to identify safe units and facilitate moves into housing for survivors through emergency transfers.

**(8)** Technology to make an available unit safe. Grant funds can be used to pay for technology that the individual believes is needed to make the unit safe, including but not limited to doorbell cameras, security systems, phone and internet service when necessary to support security systems for the unit, etc.

**b.** Examples of eligible costs for monitoring compliance with the VAWA confidentiality requirements include the costs of ensuring compliance with the VAWA confidentiality requirements which includes:

**(1)** Monitoring and evaluating compliance with VAWA confidentiality requirements.

**(2)** Developing and implementing strategies for corrective actions and remedies.

**(3)** Program evaluation of confidentiality policies, practices and procedures.

**(4)** Training on compliance with VAWA confidentiality requirements.

**(5)** Reporting to Collaborative Applicant, HUD and other interested parties on compliance with VAWA confidentiality requirements.

**(6)** Costs for establishing methodology to protect survivor information.

**(7)** Staff time associated with maintaining adherence to confidentiality requirements.

## 5. Rural Costs Information.

Section 5707 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (PL 117-263, December 23, 2022, 136 Stat 2395) amended section 423(a) of the McKinney-Vento Homeless Assistance Act to allow projects in rural areas [as defined in section 2.b.(9) of the Appendix] to use program funds to pay for the following eligible activities:

**a.** Payment of short-term emergency lodging, including in motels or shelters, directly or through vouchers.

**b.** Repairs to units in which individuals and families experiencing homelessness will be housed; or are currently not fit for human habitation.

**c.** Staff training, professional development, skill development, and staff retention activities.

HUD has determined that eligible activities paid for under the rural costs category may be included in new project applications or added to eligible renewal projects through expansion. This rural cost category does not apply to projects originally awarded under the Rural Set Aside through the Special NOFO.

HUD published a list of CoCs located in rural areas on the CoC Program page on the HUD.gov website.

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 187 of 283
PageID #: 3357

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br>File name: HUD-424CB<br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424-CBW) | Required with the application | Page limit: Not applicable<br>File name: HUD-424CBW<br>Form location: download instructions |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable<br>File name: ICR Doc.<br>Form location: download instructions |

| Budget Form/Document | Submission Requirement | Notes/Description |
|---|---|---|
| Budget Information for Non-Construction Programs (SF-424A) | If applicable with the application | Page limit: Not Applicable<br>File name: SF-424A |
| Budget Information for Construction Programs (SF-424C) | If applicable, required with the application | Page limit: Not applicable<br>File name: SF-424C |
| Grant Application Derailed Budget (HUD-424-CB) | Required with the application | Page limit: Not applicable<br>File name: HUD-424CB<br>Form location: download instruction |
| Grant Application Detailed Budget Worksheet (HUD-424- | Required with the application | Page limit: Not applicable |

DOJ-HUD-AR01173

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 188 of 283
PageID #: 3358

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

| CBW) | | File name: HUD-424CBW<br><br>Form location: download instructions |
| Indirect Cost Information Certification (HUD-426) | If applicable, this document is required with the application and after award | Page limit: Not applicable<br>File name: ICR Doc.<br><br>Form location: download instructions |

## C. Narratives and Other Attachments

If applicable, you must upload narrative and non-form attachments in e-snaps.hud.gov. When adding the attachments to the form, you can upload PDF, Word or Excel formats.

Collaborative Applicants will provide narrative responses about the CoC planning body, governance structure, overall performance, and the strategic planning processes in esnaps. The CoC Application describes the CoC's plan for ending homelessness and increasing self-sufficiency and recovery, its system-level performance, and addresses the merit criteria specified in section V.B of this NOFO. HUD scores this part of the application with all charts and narratives completed (as applicable) and all required attachments to determine the order in which competitively ranked CoC projects are funded.

Project applicants will provide narrative responses to questions in e-snaps that demonstrate their ability to meet project eligibility and project quality threshold requirements.

## D. Other Application Content

**1. Eligible Project Applications.**

The following types of project applications will be eligible for completion and submission under this NOFO.

**a. *CoC Planning projects.*** All Collaborative Applicants are eligible and encouraged to apply for CoC Planning funds which they may use according to 24 CFR 578.39. CoC Planning project applications must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. Planning projects will not affect a CoC's available amount for new and renewal project applications because it is not included in the CoC's ARD calculation.

**b. *UFA Costs projects.*** Only those CoC-designated Collaborative Applicants approved for UFA designation by HUD are eligible to apply for UFA Costs project funds as described in 24 CFR 578.41. UFA Costs project application must be submitted by the CoC-designated Collaborative Applicant and the Collaborative Applicant organization must match the organization listed as the Collaborative Applicant in the CoC Applicant Profile in e-snaps. UFA Costs projects will not affect a CoC's available amount for new and renewal project applications as it is not included in the CoC's ARD calculation.

**c. *CoC Bonus Project.*** The CoC Bonus allows CoCs to use up to 20 percent of their Final Pro Rata Need (FPRN) to create one or more new project applications. New projects

Case: 1:25-cv-00636-MSM-AEM Document 67-6 Filed 01/14/26 Page 189 of 283 PageID #: 3359

created through the CoC Bonus must meet the project eligibility and project quality threshold requirements established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. To be eligible to receive a CoC Bonus project, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**d. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Renewal Projects (DV Renewal Projects).*** Are eligible renewal projects that were previously funded, in whole or in part, with DV Bonus funding or were at some point expanded using DV Bonus funding to continue serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. This incorporates by reference all applicable protections and obligations under VAWA as provided for in Section I.A.

**e. *Domestic Violence, Dating Violence, Sexual Assault, and Stalking New Projects (DV Bonus and DV Reallocation Projects).*** A new project that is dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under the paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. As described in section 2.b.(5) of the Appendix , survivors of human trafficking may also qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act because they are often also victims of domestic violence, dating violence, sexual assault, or stalking, however a DV Bonus project may not exclusively serve people fleeing or attempting to flee human trafficking. CoCs may apply for DV Bonus projects where the total amount for one year of funding for all DV Bonus applications is up to 10 percent of its Preliminary Pro Rata Need (PPRN); however, this amount is limited to:

- A minimum of $50,000 if 10 percent of the CoC's PPRN is less than $50,000; or
- A maximum of $5 million if 10 percent of the CoC's PPRN is more than $5 million.

See sections V.A.4.b and V.D.3.d of this NOFO for project application requirements and how DV Bonus projects will be reviewed and selected.

**(1)** To be eligible to receive DV Bonus projects, the Collaborative Applicant must demonstrate its CoC evaluates and ranks projects based on how they improve system performance as outlined in section V.B.1.a.(1) of this NOFO.

**(2)** CoCs may reallocate eligible DV Renewal to create new DV Reallocation projects that are dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraphs (1) or (4) of the definition of homelessness act. DV Bonus funding and funding made available from the reallocation of expiring DV Renewal projects may be used for "new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence,

DOJ-HUD-AR01175

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 190 of 283
PageID #: 3360

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

sexual assault, or stalking."

**(3)** New projects or expansion projects created with DV Bonus or DV Reallocation funding, must meet DV Bonus and DV Reallocation project requirements. Additionally, the sum of all DV Reallocation applications must be for the same amount of funding made available from the DV Renewal funding being reallocated. If a CoC reallocates funding from a DV Renewal grant and does not use those funds for new project(s) that are 100 percent dedicated to the eligible population established in this section, HUD may condition the project applications to ensure the projects are serving the required subpopulation. If an applicant does not resolve the condition placed on the project, HUD may withdraw the award. To avoid any potential delays in funding or a loss in ARD, CoCs should review the FY 2025 GIW provided by HUD to determine which renewal projects were originally awarded DV Bonus or DV Reallocation funds, including CoC projects that were expanded with DV Bonus or DV Reallocation funding in a prior year competition.

The following restrictions apply to the DV Reallocation process:

**(a)** DV Renewal projects that have a SSO-CE component cannot be reallocated.

**(b)** Reallocated DV Renewal funding cannot be used to expand a CoC or YHDP Renewal grant.

**(c)** DV Renewal projects cannot be reallocated to create new non-DV CoC projects. If HUD determines that a project applicant incorrectly classified one or more new projects as a DV Reallocation, HUD may reclassify the project(s). For example, if the proposed project is not dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking, HUD may condition the project to ensure the required population is served.

**(d)** If a project does not have enough funding available from reallocation sources, HUD will reduce the project to the amount available, if any, and determine if the project is feasible at the reduced rate.

**f.** *New Projects Created Through DV Bonus or DV Reallocation Processes.*

**(1)** DV Bonus and DV Reallocation may only be used to create new SSO-Coordinated Entry, Rapid Re-housing (PH-RRH), and Transitional Housing (TH) projects.

**(2)** For PH-RRH and TH projects, the application must demonstrate:

**(a)** The project applicant's experience serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking, and their ability to house survivors and meet safety outcomes.

**(b)** The project's inclusion of victim-centered practices.

**(c)** Demonstration of plan to include survivors with lived expertise.

**(3)** Supportive Services Only Coordinated Entry (SSO-CE) must be designed to implement policies, procedures, and practices that equip the CoC's coordinated entry

Case 1:25-cv-00636-MSN-AEM   Document 67-6   Filed 01/14/26   Page 191 of 283 PageID#: 3361

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix |

to better meet the needs of people experiencing homelessness who are experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking (e.g., to implement policies and procedures that are trauma-informed, client-centered or to better coordinate referrals between the CoC's coordinated entry and the victim service providers coordinated entry system where they are different). SSO-CE project applications created with DV Bonus and DV Reallocation funding must also demonstrate its plan to involve survivors in policy and program development throughout the project's operation.

**g.** *New Projects Created with CoC Bonus or Through the CoC Reallocation process.* CoCs may apply for the following types of new CoC projects through the CoC Bonus or CoC Reallocation processes:

**(1)** SSO projects.

**(2)** TH projects.

**(3)** PH-PSH projects.

**(4)** PH-RRH projects.

**(5)** Dedicated HMIS project for the costs at 24 CFR 578.37(a)(4) that may only be carried out by the HMIS Lead, which is the recipient or subrecipient of an HMIS grant and is listed on the HMIS Lead form in the CoC Applicant Profile in e-snaps. Additionally, if the CoC has organizations within its geographic area that are victim service providers, the HMIS Lead, or subrecipient, may request HMIS funds for a comparable database. Victim service providers may also request HMIS funds in their project application budgets to enter data into a comparable database.

**(6)** SSO-CE project to develop or operate a Coordinated Entry system.

Prior to completing a new project application created using CoC Bonus funds or through the reallocation process, project applicants should consult with the CoC to determine which of these options is available to be locally selected as part of the CoC.

If HUD determines that a CoC Bonus or CoC Reallocation project applicant or a Collaborative Applicant incorrectly classified one or more new projects as reallocation or CoC Bonus, HUD may reclassify the project(s) as either reallocation or CoC Bonus if the CoC exceeded either its reallocation or CoC Bonus amounts. For example, if a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, and there are CoC Bonus funds available, HUD may reclassify the new project application as CoC Bonus during its review. If a project applicant uses both reallocation and CoC Bonus amounts to create a single new project but did not have enough available from either source, HUD will reduce the project to the amount available, if any.

If a project applicant or the Collaborative Applicant classified a new project application as reallocation but did not reallocate funds in whole or part from an eligible renewal project, HUD may reduce the funding amount or reject the new project application during its review.

For new projects created through the CoC Bonus process, HUD must determine the CoC

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 192 of 283
PageID #: 3362

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

has demonstrated that the projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**h.** *Youth Homeless Demonstration Program (YHDP).* Consistent with the requirements of the Consolidated Appropriations Act, 2024, funding for the CoC Program may be used to competitively or non-competitively renew or replace grants for YHDP projects.

In order to ensure the best use of federal dollars, HUD will competitively award all YHDP projects, including renewal and replacement YHDP projects. CoCs seeking to reallocate YHDP projects may only reallocate to other youth projects. See section IV.D.1.i below of this NOFO for additional information.

While YHDP projects can use the replacement process to consolidate projects as outlined in section IV.D.1.i and IV.D.1.k below, these projects cannot consolidate with non-YHDP projects. YHDP Renewal projects may apply to expand its current project through the YHDP Replacement process. Unified Funding Agencies (UFAs) are prohibited from moving funds out of or into YHDP-funded projects and mixing funding from any other non-YHDP funded project. UFAs may replace eligible YHDP renewal projects.

All YHDP Renewal and YHDP Replacement projects, including YHDP reallocation, are subject to the following provisions of the Rule, as may be amended from time to time, except where they conflict with the NOFO requirements, with the Special YHDP Activities identified in section IV.B.2 of this NOFO, or the requirement that grant funds may only be used to serve homeless youth, age 24 and younger: 24 CFR 578.3, 578.15, 578.23, 578.25, 578.27, 578.29, 578.37, 578.43, 578.45, 578.47, 578.49, 578.51, 578.53, 578.55, 578.57, 578.59, 578.61, 578.63, 578.73, 578.75, 578.77, 578.79, 578.81, 578.83, 578.85, 578.87, 578.89, 578.91, 578.93 except in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located, 578.95, 578.97, 578.99, 578.103(a)(3) - (18) and (b) – (e), 578.105, 578.107 and 578.109. The requirements of 2 CFR 200.306, as may be amended from time to time, with the exception of 200.306(b)(5) apply. All YHDP Renewal, YHDP Replacement and new YHDP Reallocation projects must comply with 24 CFR 578.93, except that in 578.93(c)(2), recipients must provide such information to the jurisdiction in which the project is located. Federal fair housing and nondiscrimination requirements cannot be waived.

**i.** *New YHDP Projects Created through YHDP Replacement processes.* CoCs may replace renewing YHDP project(s) to create one or more new YHDP Replacement projects, including YHDP Reallocation (see section 2.b.(12) of the Appendix for more information).

> **(1)** YHDP Renewal project applicants may submit renewal applications for minor changes to a project, including adding or modifying select Special YHDP Activities under section IV.B.2; however, if a renewing YHDP project applicant chooses to modify the current project in a way that does not meet the definition of renewal project found at IV.D.2 of this NOFO, it must submit a YHDP Replacement project application.

> **(2)** A YHDP Renewal project applicant may apply to expand its current project through the YHDP Replacement process. See section IV.D.1.j.(3) for more information.

> **(3)** A YHDP Replacement project application must:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Other Information | Appendix

Case 1:25-cv-00636-MSN-WBP   Document 67-6   Filed 01/14/26   Page 193 of 283 PageID#: 3363

**(a)** demonstrate that the project is consistent with the CoC's most recent Coordinated Community Plan; and

**(b)** For YHDP replacement projects that are not reallocations, include the grant number from the YHDP Renewal project(s) being replaced with the YHDP Replacement project application. The CoC's Collaborative Applicant is responsible for ensuring that only a renewal YHDP or replacement YHDP project application is submitted through the CoC Project Priority Listing. If the Collaborative Applicant submits both a renewal and replacement YHDP project application for the same project, HUD will only select the renewal YHDP project application;

**(4)** HUD will only fund new YHDP Reallocation projects through the YHDP Replacement process as described below and in sections IV.D.1.h and IV.B.2 of this NOFO:

**(a)** TH or Crisis Residential Transitional Housing which is a form of transitional housing that is short-term, low-barrier, using a congregate living setting, and provides access to the following supportive services in particular: family engagement and unification, case management, emergency triage services and other supportive services whose purpose is to move youth rapidly into stable housing.

**(b)** SSO, including, but not limited to, housing search and placement services, case management, or street outreach.

**(c)** SSO-CE.

**(d)** SSO - Host Home and Kinship Care. A model in which a family agrees to permit a youth to reside with them. Recognizing that the addition of another person in the home may increase costs to the family, HUD will entertain applications that propose to house youth with families and to subsidize the additional costs attributable to housing the youth. The residence is in a community-based setting. The family could be related to the youth and the length of stay may be time-limited or without time limits. YHDP funds may be used to subsidize the increased costs to the family that are attributable to housing the youth. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination by the recipient for HUD review upon request.

**(e)** HMIS.

**(5)** HUD will review new YHDP Reallocation and YHDP Replacement project applications to ensure the activities requested are eligible and the amounts requested do not exceed the amounts available for YHDP reallocation or, in the case of YHDP Replacements, the ARA of the renewal project(s) being replaced. HUD will not reject YHDP project applications; however, HUD may require YHDP grant recipients to correct or revise information submitted after the final award announcement, prior to executing the grant agreement.

**j. *Expansion Project.*** The process used by eligible renewal project applicants to add

funds to an existing CoC Renewal, DV Renewal or YHDP Renewal project to expand its current operations either through reallocation, DV Bonus or a CoC Bonus project application. The new funding being added to the existing renewal must be submitted as a new project in e-snaps. This portion of the project is known as new expansion project. Expansion projects for permanent housing should be included in the Extended Track Priority Listing.

HUD will allow project applicants to apply for new expansion projects to expand existing projects to increase the number of units, persons served, services provided to existing program participants, or to add additional activities to HMIS and SSO-CE projects.

The new expansion project applications must meet the project eligibility and project quality thresholds in V.A.4.a and V.A.4.b of this NOFO and must be for the same component as the project being expanded. Additionally, the renewal project being expanded must have an expiration date in CY 2026.

In the case of YHDP Replacement applications to expand existing YHDP Renewal projects, applicants must submit a YHDP Replacement and a YHDP Reallocation application separately and each project must be included in the CoC's Priority Listing.

If a project application does not meet the following requirements, or if the renewal project the new project application is proposing to expand is not selected for award, HUD will review the new expansion project and will consider it as a standalone project during the selection process provided that the project is feasible on its own with its requested funding and provided it passes project eligibility and project quality threshold requirements.

If both the new expansion project and the renewal project it expands are conditionally selected for funding, one grant agreement incorporating both approved project applications will be executed.

**(1)** The following limitations apply to expansion grant applications:

**(a)** If the new expansion project exceeds the amount of funding available to the CoC under the reallocation or Bonus processes, HUD will reduce the funding request for the new expansion project to the available amount, which could affect the activities of the new expansion project.

**(b)** HUD will not fund expansion applications that include requests for capital costs (i.e., new constructions, rehabilitation, or acquisition) and will only allow 1-year funding requests.

**(c)** Recipients cannot apply to expand a project included in a grant consolidation during the same funding year. If an applicant applies to expand a project included in a grant consolidation, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(d)** CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding cannot be used to expand a YHDP renewal project.

**(e)** If CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation funding is used to expand a DV Renewal project, the entire expanded project must be 100 percent dedicated to serving individuals and families who are fleeing or attempting to flee

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractual Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 195 of 283
PageID #: 3365

domestic violence, dating violence, sexual assault, or stalking and who qualify under paragraph (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and the project must meet all the DV project requirements in sections IV.D.1.e and IV.D.1.f of this NOFO.

**(f)** New YHDP projects created with reallocated YHDP funding may be used to expand an existing YHDP renewal project through the YHDP Replacement process. The expansion YHDP project must meet the requirements of a new YHDP Replacement application.

**(2)** Project applicants expanding an eligible CoC Renewal or DV Renewal project must:

**(a)** submit a separate renewal project application and the new project application with expansion information (both projects must be ranked by the CoC with unique rank numbers);

**(b)** in the new project application, enter the grant number of the eligible renewal project proposed for expansion;

**(c)** indicate how the new project application will expand units, beds, services, persons served, or services provided to existing program participants, or in the case of HMIS or SSO-CE projects, how the current activities will be expanded for the CoC's geographic area; and

**(d)** ensure the funding request for the expansion grant is within the funding parameters allowed under CoC Bonus, CoC Reallocation, DV Bonus, or DV Reallocation amounts available.

**(3)** Project applicants expanding an eligible YHDP Renewal project through the YHDP Replacement process must:

**(a)** submit a new YHDP Reallocation project application with the expansion information through the YHDP Replacement process, including the grant number of the YHDP Renewal project being expanded.

**(b)** indicate how the expansion project application will expand units, beds, services, persons served, or services provided to existing program participants.

**(c)** ensure the funding request for the YHDP Reallocation application to expand the YHDP Renewal project is within the funding parameters allowed under the YHDP Reallocation amount available.

**(d)** ensure the YHDP Renewal and YHDP Reallocation project applications meet the requirements in sections IV.D.1.h and IV.D.1.i of this NOFO.

**(4)** DV Bonus and DV Reallocation Expansion Applications.

**(a)** DV Bonus and DV Reallocation funds can only be used for an application to expand an existing renewal project if the new expansion project is dedicated to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 196 of 283
PageID#: 3366

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(b)** Project applicants may use DV Bonus funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population; however, only the new project application for the expansion will be considered for DV Bonus funds.

**(c)** If an applicant proposes to use DV Reallocation funds to expand an existing renewal project that is not currently dedicated to serving individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking to dedicate additional beds, units, persons served, or services provided to existing program participants of this population, the entire project, including the renewal project being expanded, must serve 100 percent individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act. In the case of DV Reallocation Projects, HUD will use the Tier 1 and Tier 2 selection process described in sections V.D.3.a, V.D.3.b and V.D.3.c of this NOFO.

**k. *Consolidation Project.*** Applicants intending to use the consolidation process to combine two or more, but no more than 10, eligible renewal projects (including renewing YHDP projects and renewal Special CoC NOFO Competition projects), may do so through the renewal project application. The projects being combined during a grant consolidation will continue uninterrupted. To be eligible for consolidation, the projects must have the same recipient and be for the same component.

**(1)** The period of performance and budget period of the expiring grants must have end dates in CY 2026. Applicants intending to use the consolidation process must ensure:

**(a)** Budget Line Items (BLIs) for the consolidated project application submitted, exactly match the sum of the BLIs for each of the individual projects as they appear on the grant agreement, or the grant agreement as amended;

**(b)** inclusion of the expiring grant numbers with period of performance and budget period start and end dates for the projects that are consolidating;

**(c)** are in good standing with HUD, meaning none of the projects have:

> i. outstanding audit or monitoring findings,
> ii. outstanding obligation to HUD that is in arrears,
> iii. unresolved construction delays,
> iv. a history of poor financial management/drawdown issues,
> v. history of low occupancy levels, or lack experience in administering the project type, or
> vi. other capacity issues.

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 197 of 283
PageID #: 3367

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

**(d)** the projects have the same recipient and are for the same component.

**(2)** YHDP Renewal projects that wish to consolidate may establish a single YHDP Replacement grant to replace multiple YHDP Renewal grants.

**(3)** The following projects cannot be consolidated and if a project application meeting these characteristics attempts to consolidate, HUD will not consider the consolidation, but rather select the projects individually provided they pass project eligibility and project quality threshold requirements:

**(a)** a DV Renewal project cannot consolidate with a CoC Renewal project (a project not dedicated to serving individuals and families who meet the eligibility criteria in Section III.G.10.(c) of this NOFO, including a project originally funded under the Special NOFO Competition, and a YHDP Renewal project), or a project originally funded under the Special CoC NOFO Competition;

**(b)** a YHDP Renewal project cannot consolidate with a CoC Renewal project (including those projects originally funded **under the Special CoC NOFO Competition) or a DV Renewal project**;

**(c)** a project originally funded under the Special CoC NOFO Competition through the Rural Set Aside cannot consolidate with any other type of project (e.g., a project originally funded with DV Bonus or a project originally funded through the Unsheltered Set Aside in the Special NOFO Competition) except another project originally funded through the Rural Set Aside. This means, a project originally funded under the Special NOFO through the Rural Set Aside can only consolidate with another Special CoC NOFO Competition project originally funded through the Rural Set Aside;

**(d)** a TH and a PH project cannot consolidate to form a Joint TH/PH-RRH component project;

**(e)** transition grants cannot consolidate with any other project; and

**(f)** recipients cannot apply to consolidate projects and apply to expand the consolidated project during the same funding year. If an applicant applies to expand projects that are involved in a consolidation of grants, HUD may consider the expansion project for funding if it meets all the requirements of a new standalone project.

**(4)** To request the consolidation of eligible renewal projects, project applicants must submit renewal projects for the individual projects to be included in the consolidation and each project application must identify the grant number that will survive which must be the grant number with the earliest start date CY 2026. Project applications for the grants that are proposed to be part of the consolidation must be ranked with a unique rank number for each project, and if all those grants are selected, HUD will conditionally award the single surviving grant based on its ranked position to include the amount of funding of all grants included in the consolidation. All other project applications included in the surviving grant will be removed from the CoC's ranking resulting in project applications below to slide up one ranked position. Project applicants must not submit a consolidated project application that contains two

different components (e.g., PH and TH).

**(5)** The start date for the consolidated grant, if conditionally awarded, will be the day after the expiration date of the eligible renewal project with the earliest expiration date. HUD will calculate the expiration date for the consolidated grant by averaging the expiration dates for all expiring grants included in the consolidated grant weighted by the size of each expiring grant. If that date falls on the first through the fifteenth of a month, then the expiration date will be the last day of the previous month. If the date falls on the sixteenth through the end of the month, then the expiration date will be the last day of the month.

**(6)** HUD will calculate the expiration date for the consolidated grant as follows: It will be 'X' months after the end of the 12th month after the start date for the consolidated grant with 'X' determined by calculating the sum for all grants of the total award times the number of months after the expiration of the first expiring grant that the grant expires and dividing that sum by the total award for the consolidated grant. If the calculation of 'X' results in a partial month, if it is less than 0.5, then the consolidated grant will expire on the last day of the previous month, and if it is 0.5 or more, then the consolidated grant will expire on the last day of the calculated month.

**(7)** Collaborative Applicants designated by HUD as UFAs have more flexibility in how they manage their CoC Program-funded projects, making the consolidation of projects during the CoC Program competition unnecessary. A Collaborative Applicant with UFA designation can consolidate projects during the grant term, so long as the consolidations are not combining different component types and the projects are funded under the same grant (e.g., projects are currently funded under the same renewal grant). If a UFA-designated Collaborative Applicant consolidates projects during the grant term, it can apply to renew them during the CoC Program Competition as consolidated projects.

**I.** *Transition Grant.* A Transition grant is an application to fund a new CoC project through the reallocation process to transition an eligible CoC renewal project (including a Special NOFO project or DV Renewal project) from one program component to another eligible component over a 1-year period. The renewal project transitioning to a new component must be fully eliminated through reallocation. Transition grant applications awarded FY 2025 funds must fully transition to the new component by the end of the 1-year grant term and may only apply for renewal in the next CoC Program Competition under the component to which it transitioned.

**(1)** Renewal Grants expiring in CY 2026 may submit a FY 2025 transition grant application to request a component type change. The transition grant's operating start date will be the day after the end of the previous grant term for the expiring component. For transition grants reallocated from more than one project, the operating start date of the transition grant will be the day after the end of the earliest expiring grant term. The grant term may be extended consistent with 2 CFR 200.308 and 2 CFR 200.309.

**(2)** Applicants wishing to apply for a transition grant must have the consent of its Continuum of Care; and the new project application must meet project eligibility and

DOJ-HUD-AR01184

project quality thresholds established by HUD in sections V.A.4.a and V.A.4.b of this NOFO. If the project application identifies the project as a transition grant and the CoC accepts the new transition grant project on the New Project Application Project Listing in the CoC Priority Listing, HUD will consider this as CoC consent.

**(3)** For a new project to be considered a transition grant, the new project applicant must be the recipient listed on the current grant agreement for the eligible renewal grant(s) being eliminated and must include the grant number(s) of the project(s) being eliminated to create the new project and attach a copy of the most recently awarded project application. For example, expiring FY 2024 grants applying to transition to a new component during the FY 2025 funding process will attach a copy of the FY 2024 CoC Program Competition project application.

**(4)** Transition Grant Restrictions: YHDP Renewal grants are not eligible to use the transition grant process. YHDP Renewal grants must submit a YHDP Replacement application to change component types.

If HUD determines a new project submitted as a transition grant does not qualify, but meets all other new project requirements, HUD may award the project as a new non-transition grant project. If this occurs, the new project operating start date will be reflected in the grant agreement.

## 2. Renewal Project Requirements.

As set forth in 24 CFR 578.33, projects may renew under the CoC Program NOFO to continue ongoing leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs.

Awards HUD made under the CoC Program (including projects awarded 1-year of funding under the FY 2024 CoC Program funding opportunity), projects originally awarded under the Special NOFO, and YHDP projects are eligible for renewal with FY 2025 CoC Program funds if they are currently operating and have an expiration date in CY 2026 (the period from January 1, 2026, through December 31, 2026).

**a.** Renewal project applications must be submitted by the same recipient that signed the executed grant agreement for the grant being renewed, or entity that became the recipient through a grant agreement transfer amendment. To be eligible as a renewal project, the application must (1) be for the same amount of funding before any adjustments described in this NOFO (e.g. FMR adjustments), or the amount reduced due to reallocation ; (2) be for the same program component; and (3) in the case of DV Renewal projects and YHDP Renewal projects, must continue to serve the same subpopulation.

**b.** If HUD conditionally selects a renewal grant for funding that does not have an expiration date that meets the renewal eligibility requirements prescribed by this NOFO, HUD will withdraw any funds conditionally selected for award.

**c.** Projects that were eligible under predecessor programs, specifically Safe Haven projects, will continue to be eligible under the CoC Program and will continue to be eligible for renewal of leasing, operating, supportive services, rental assistance, HMIS, and project administrative costs under 24 CFR 578.33(d)(1) so long as the project continues to serve the same population and the same number of program participants or units in the

DOJ-HUD-AR01185

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 200 of 283
PageID #: 3370

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

same type of housing as identified in their most recent grant agreement, amended grant agreement, signed before August 31, 2012. No new Safe Haven projects will be funded; however, existing Safe Haven projects may be renewed to continue to carry out activities that are eligible costs under Subpart D of the Rule.

**d.** The total request for each renewing project, including YHDP Renewal and YHDP Replacement projects, is limited to a project's ARA. Additionally, where two or more eligible projects are being consolidated through the project application, the total ARA of the consolidation project must be equal to or less than the sum of the original ARA of the renewal projects before consolidation. Because funds for acquisition, new construction, and rehabilitation are not renewable, grants being renewed whose original expiring award included acquisition, new construction, and rehabilitation funds may only renew leasing, supportive services, rental assistance, operating, and HMIS costs and must not exceed 10 percent in administrative costs.

**e.** HUD will recapture grant funds remaining unspent at the end of the previous grant period when it renews a grant.

**f.** HUD encourages the consolidation of eligible renewal grants as provided in Section IV.D.1.k of this NOFO. This does not apply to CoCs that HUD designates as UFAs, because UFAs enter into a single renewal grant agreement with HUD for the CoC's entire geographic area. If applicable, HUD issues a separate UFA grant agreement that only includes YHDP grants.

**g.** Subject to HUD approval and the terms of the NOFO, the following requests may be included in a renewal application:

**(1)** CoC renewal project applications (including DV Renewal projects and projects originally funded under the Special NOFO) may include non-significant changes including shifting up to 10 percent of funds from one approved eligible activity to another.

**(2)** YHDP Renewal project applications from any round may include non-significant changes including adding select Special YHDP Activities in section IV.B.2 and shifting up to 10 percent of funds from one approved eligible activity to another.

**(3)** Renewal applications that include requests to shift more than 10 percent of funds from one approved eligible activity to another and other significant changes as defined at 24 CFR 578.105 will not be considered during the CoC Program Competition by HUD. If an application includes a budget shift that exceeds 10 percent, HUD will correct the project budget to reflect the previously awarded budget amounts. Applicants seeking to make significant changes to their grant, such as shifting more than 10 percent of funds from an approved eligible activity, should contact their Field Office and request a grant agreement amendment.

**(4)** CoC renewal project applicants may also apply to transition an eligible renewal project from one program component to another eligible new component through reallocation and use those funds to create a single, new transition grant (see section IV.D.1.l of this NOFO). YHDP Renewal project applicants are not permitted to utilize the transition grant application process. YHDP applicants must submit a YHDP

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contracts and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 201 of 283 PageID #: 3374

Replacement application to change program components.

**(5)** YHDP Replacement projects cannot request capital costs (i.e., new construction, acquisition, or rehabilitation).

**h. *Actual Per Unit Cost – Renewal Grants.*** Applicants requesting renewal of grants for rental assistance may request a per-unit amount less than the Fair Market Rent (FMR) if the actual rent per unit under lease is less than the FMR. This will help reduce the number of projects receiving rental assistance that have large balances of unspent funds remaining at the end of the operating year. Renewal project applicants must ensure the amount requested will be sufficient to cover all eligible costs as HUD cannot provide funds beyond the amount awarded through the FY 2025 CoC Program funding process. Project applications for rental assistance cannot request more than 100 percent of the published FMR. New project applications must adhere to 24 CFR 578.51(f) and must request the full FMR amount per unit. See section V.D.5.a of this NOFO for additional information regarding FMR adjustments for projects receiving funds for rental assistance.

**i. *Renewal Project Grant Terms.*** Renewal project applications are limited to a 1-year grant term with 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309.

Any renewal PH project that receives project-based rental assistance or operating costs may request up to a 15-year grant term; however, project applicants may only request 1 year of funding. HUD may extend the grant term consistent with 2 CFR 200.308 and 2 CFR 200.309. Project applicants must apply for the additional funds as a renewal project application prior to the anniversary of the first expenditure of grant funds by which date grant funds should have been expended; or, if HUD extends the date that funds must be expended, the date the extension expires. HUD does not guarantee CoC Program funds past the 1 year of renewal funding.

**j. *Compliance and re-evaluation.*** To maintain the competitive and objective nature of the CoC Program under the McKinney Vento Act and comply with 2 CFR 200.309 and 200.205, which together require renewals for federal grants to be issued based on objective and merit-based criteria, all renewals will be re-evaluated each year. Further, HUD may condition renewal on compliance with audits for large grant recipients (over $1,000,000) as required by 2 CFR 200.501.

## 3. New Project Requirements.

CoCs are encouraged to submit new projects created through CoC Bonus, DV Bonus, CoC Reallocation, DV Reallocation or YHDP Replacement including YHDP Reallocation. A CoC designated Collaborative Applicant may submit a new CoC Planning project application, and if applicable, a UFA Costs project application in FY 2025.

To expend funds within statutorily required deadlines, applicants funded for sponsor-based and project-based rental assistance must execute the grant agreement and begin providing rental assistance within 2 years. However, HUD strongly encourages all rental assistance to begin within 12 months of award. Applicants that are unable to begin rental assistance within the 12-month period should consult with the local HUD CPD field office.

**a.** HUD will review project subrecipient eligibility as part of the project quality threshold

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 202 of 283
PageID #: 3372

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

review process. Project applicants must submit documentation of the subrecipient's eligibility with the project application.

**b.** Any youth-serving provider funded under this NOFO may serve unaccompanied youth aged 24 and under (or families headed by youth aged 24 and under, including pregnant or parenting youth) who have an unsafe primary nighttime residence and no safe alternative to that residence.

**c.** Per the Consolidated Appropriations Act, 2024, to receive funding for a new CoC project, except those created through reallocation, HUD must determine the CoC has demonstrated that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance (See more information on System Performance in sections III.B.6 and V.B.1.a.(1) of this NOFO).

**d.** *New Project Grant Terms.* The initial grant term for new project applications may be 1-year, 2-years, 3-years, 4-years, 5-years, or 15-years. HUD may extend the grant consistent with 2 CFR 200.308 and 2 CFR 200.309. The following exceptions apply:

**(1)** HUD will allow new projects to request 1 year of funding with a longer initial grant term not to exceed 18 months. HUD has determined that most new projects requesting 1 year of funding normally take approximately 3 to 6 months to begin fully operating the new project (e.g., hiring staff, developing partnerships with landowners if leasing or renting). Therefore, a new project requesting 1 year of funding may request a grant term of 12 months to 18 months that will allow for the additional start-up process. Any new projects requesting capital costs (i.e., new construction, acquisition, or rehabilitation) are not eligible for 1-year funding requests. See (7) below for more information on new projects requesting capital costs. Transition grant applications cannot request 18-month grant terms.

**(2)** Any new expansion project submitted to expand an eligible renewal CoC Program-funded project may only request a 1-year grant term, regardless of the project type.

**(3)** Any new project that requests tenant-based rental assistance may request a 1-year, 2-year, 3-year, 4-year, or 5-year grant term.

**(4)** Any new project that requests leasing costs - either leasing costs only or leasing costs plus other costs (e.g., supportive services, HMIS) - may request up to a 3-year grant term.

**(5)** The first year of funding for YHDP Replacement projects will be based on the 1-year renewal amount of the current YHDP project being replaced. The YHDP Replacement project's operating start date will be the day after the end of the previous grant term for the project being replaced.

**(6)** Any new project that requests project-based rental assistance or sponsor-based rental assistance, or operating costs may request up to a 15-year grant term; however, the project applicant may only request up to 5 years of funds. Funding for the remainder of the term is subject to availability. Applicants must apply for additional funds through a renewal project application in the competition held in the calendar year prior to the anniversary of the first expenditure of grant funds, or if HUD has extended the grant term, the date the extension expires. HUD does not guarantee

Case 1:25-cv-00636-MSN-AEM    Document 67-6    Filed 01/14/26    Page 203 of 283
PageID# 3373

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

CoC Program funds past the initial 5-year grant term, if conditionally awarded.

**(7)** Any new project that requests operating costs, supportive services only, HMIS, and project administrative costs may request 1-year, 2-year, 3-year, 4-year, or 5-year grant terms with funding for the same number of years.

**(8)** Any new project conditionally selected by HUD that requests new construction, acquisition, or rehabilitation costs (capital costs) must request a minimum of a 3-year grant term and may request up to a 5-year grant term. Any new projects requesting capital costs are not eligible for 1-year funding requests. If a new project requests 1 year of funding with capital costs, HUD will increase the grant term to 3-years and the new project must spend the funds requested over a 3-year period.

If an applicant requests funds for new construction, acquisition, or rehabilitation in addition to requesting funds for operating, supportive services, or HMIS, the funding will be for the 3-years to 5-years requested, and the grant term will be 3-years to 5-years plus the time necessary to acquire the property, complete construction, and begin operating the project. HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

**(9)** All new CoC Planning or UFA Costs project applications are limited to 1-year grant terms and 1 year of funding.

   **(a)** The maximum amount for one year of funding to spend on administrative costs associated with the CoC planning activities listed at 24 CFR 578.39 is 5 percent of FPRN, up to a maximum of $1,500,000, or $50,000 whichever is greater.

   **(b)** The maximum amount for one year of funding to spend on administrative costs associated with the UFA costs described at 42 USC 11360(g) is up to 3 percent of FPRN or $1,250,000 per fiscal year; whichever is less.

   **(c)** CoC Planning and UFA Costs grants are not renewable.

**(10)** Any new project that is requesting consideration under the DV Bonus or DV Reallocation process may only request 1 year of funding, but may request a longer initial grant term not to exceed 18 months regardless of project application component type.

# V. APPLICATION REVIEW INFORMATION

V. Application Review Information

    A. Threshold Review

      B. Merit Review

      C. Risk Review

    D. Selection Process

      E. Award Notices

TABLE OF CONTENTS

DOJ-HUD-AR01190

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 205 of 283
PageID #: 3375

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix |

# V. APPLICATION REVIEW INFORMATION

## A. Threshold Review

HUD reviews each application to make sure it meets the following threshold requirements. If you meet all threshold requirements, your application will advance to a merit review. If you fail to meet one or more threshold requirements, your application is not eligible for HUD funding.

### 1. Eligible Applicant

You must meet the applicant eligibility criteria in this NOFO. Applications from ineligible applicants are not rated or ranked and will not receive HUD funding.

**a. *Eligible Project Applicants (McKinney-Vento Act, 24 CFR 578.15, 24 CFR 5.100).*** Eligible project applicants for the CoC Program Competition are found at 24 CFR 578.15 and in the Act and include nonprofit organizations, states, local governments, instrumentalities of state and local governments, Indian Tribes and TDHE [as defined in section 4 of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. 4103) (TDHEs)]. Public housing agencies, as such term is defined in 24 CFR 5.100, are eligible without limitation or exclusion. For-profit entities are ineligible to apply for grants and are prohibited from being subrecipients of CoC Program grant funds.

**b. *Collaborative Applicants.*** Only CoCs with a valid FY 2025 e-snaps registration will have access to the FY 2025 CoC Program and YHDP Funding Opportunity in e-snaps, which includes the Consolidated Application (i.e., the CoC Application, the CoC Priority Listing and the project application(s). CoCs should not attempt to change Collaborative Applicants during the FY 2025 CoC Program and YHDP Funding Opportunity without prior HUD approval unless HUD replaces the CoC's designated Collaborative Applicant under the authority of Section 402(c) of the Act. HUD will approve Collaborative Applicant changes outside the annual CoC Program Registration process under the following circumstances:

  • the Collaborative Applicant made an error when entering the Collaborative Applicant name in the CoC Applicant Profile;
  • the CoC-designated Collaborative Applicant is no longer in business;
  • the CoC designates a new Collaborative Applicant; or
  • HUD designated a new Collaborative Applicant as a remedial action under Section 402(c) of the Act.

In cases where the CoC changes its designated Collaborative Applicant during the CoC Program Registration process, the CoC must notify the local HUD CPD field office, in writing, stating the reason for the Collaborative Applicant change. The notice to HUD must provide documentation of the CoC's approval of the change (e.g., a copy of the meeting minutes to include the date and attendees).

**c. *Indian Tribes and Tribally Designated Housing Entities (TDHE).*** The Consolidated Appropriations Act, 2021 (Public Law 116-260, approved December 27, 2020) amended Title IV to add Section 435 of the Act to allow Indian Tribes and Tribally Designated Housing Entities (TDHE) to be Collaborative Applicants, eligible entities, or subrecipients of the CoC Program in addition to amending Title IV Section 401 to add the terms

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 206 of 283
PageID #: 3376

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

"Formula Area" and "Indian Tribe." These amendments mean that not only may Tribes and TDHEs apply for grants through other CoCs, but that formula areas, as that term is defined in the Indian Housing Block Grant program at 24 CFR 1000.302, are eligible to be added to the geographic areas of existing CoCs or may be included in newly formed CoCs through the CoC registration process (see Notice CPD-22-02).

Indian Tribes and TDHEs may:

**(1)** create a CoC;
**(2)** be a Collaborative Applicant;
**(3)** be an eligible project applicant; or
**(4)** receive grant amounts from another entity that receives a grant directly from HUD (i.e. be a CoC grant subrecipient).

However, under 42 U.S.C. 11383(g) only States, Units of General Local Government, nonprofit organizations, and Public Housing Agencies may administer permanent housing rental assistance.

**d. *Solo Applicants.*** Eligible project applicants that attempted to participate in the CoC planning process in the geographic area in which they operate that believe they were denied the right to participate in a reasonable manner, may submit a solo project application to HUD by following the procedure found in 24 CFR 578.35. If HUD finds in favor of the solo applicant, HUD may award grant funds. Solo applicants requesting FY 2025 funding must submit their solo project application in e-snaps to HUD by 8:00 PM EST, on January 14, 2026. See section VIII.D.4 of this NOFO for additional information regarding the Solo Applicant appeal process.

## 2. Resolution of Civil Rights Matters

Applicants with outstanding, unresolved judgments against them for violations of civil rights laws must resolve those judgments before the application submission deadline or the applicant will be deemed ineligible.

a. An applicant is ineligible for funding if the applicant has received notice of a judgment imposed against them for violations of:

1. the Fair Housing Act or a substantially equivalent state or local fair housing law for discrimination because of race, color, religion, sex, national origin, disability or familial status; or

2. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, the Americans with Disabilities Act, or the Violence Against Women Act or substantially equivalent state or local laws.

b. HUD will determine if actions to resolve the judgment taken before the application deadline date will resolve the matter. Examples of actions that may be sufficient to resolve the matter include, but are not limited to:

1. Current compliance with a voluntary compliance agreement signed by all the parties;

2. Current compliance with a HUD-approved conciliation agreement signed by all the parties;

3. Current compliance with a conciliation agreement signed by all the parties and approved by the state governmental or local administrative agency with jurisdiction over the matter;

4. Current compliance with a consent order or consent decree; or

5. Current compliance with a final judicial ruling or administrative ruling or decision.

## 3. Timely Submission of Applications

Late applications are not eligible for funding. See deadlines in Section VI of this NOFO.

Applicants should review and follow the steps outlined below to ensure applications are complete and submitted by the deadlines established in this NOFO. Documents referenced in this section can be found on the CoC Program page of HUD's website: https://www.hud.gov/program_offices/comm_planning/coc.

4. Threshold Criteria.

Applicants who fail to meet the following threshold eligibility requirements are ineligible.

**a. *Project Eligibility Threshold.*** HUD will review all projects to determine if they meet the following project eligibility threshold requirements on a pass/fail standard. If HUD determines the applicable standards are not met for a project, HUD will reject the project. HUD will consider any project requesting renewal funding as having met these requirements through its previously approved grant application unless HUD receives information to the contrary (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient routinely does not draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions). Approval of new and renewal projects is not a determination by HUD that a recipient is compliant with applicable fair housing and civil rights requirements.

**(1)** Project applicants and potential subrecipients must meet the eligibility requirements of the CoC Program as described in the Act and the Rule and provide evidence of eligibility required in the application (e.g., nonprofit documentation).

**(2)** Project applicants and subrecipients must demonstrate the financial and management capacity and experience to carry out the project as detailed in the project application and the capacity to administer federal funds. Demonstrating capacity may include a description of the applicant and subrecipient experience with similar projects and with successful administration of SHP, S+C, or CoC Program funds or other federal, state, local, or private resources.

**(3)** Project applicants must submit the required certifications specified in this NOFO.

**(4)** The population to be served must meet program eligibility requirements as described in the Act, the Rule, and section III.G.10 of this NOFO.

**(5)** Project applicants, except Collaborative Applicants that only receive awards for CoC Planning costs and, if applicable, UFA Costs, must agree to participate in a local HMIS system. However, in accordance with Section 407 of the Act, any victim service provider that is a recipient or subrecipient must not disclose, for purposes of HMIS, any personally identifying information about any client. Victim service providers must

use a comparable database that meets the needs of the local HMIS.

**(6)** Project applicants must certify affirmatively to the following:

| | |
|---|---|
| The project applicant will not engage in illegal discrimination including illegal racial preferences This is consistent with the objectives outlined in Section III.B.10 above and is consistent with the requirements of 2 CFR 200.300(a). | |
| The project applicant will not operate illegal drug injection sites or "safe consumption sites" in violation of 21 u.s.c. 856. This is consistent with the objectives outlined in Section III.B above and is consistent with the requirements of 2 CFR 200.300(a). | |

**b. *Project Quality Threshold.*** HUD will review all new project applications to determine if they meet the following project quality threshold requirements HUD will not award funds to a new project unless the project was created through reallocation, or the CoC has demonstrated to HUD's satisfaction that projects are evaluated and ranked based on the degree to which they improve the CoC's system performance.

**(1)** HUD will consider any project requesting renewal funding, including renewing YHDP and renewing Special NOFO projects, as having met project quality threshold requirements through its previously approved grant application unless HUD receives information to the contrary or if the renewal project has compliance issues which results in the project not operating in accordance with the Rule.

**(2)** HUD will consider YHDP Replacement project applications including applications for new YHDP projects created through YHDP reallocation as having met project quality threshold requirements if the project application activities and costs are eligible under this NOFO. If a YHDP Replacement (including YHDP Reallocation) project application is not for activities and costs that are eligible under this NOFO, HUD will not reject the project under this project quality threshold, but HUD will require the project applicant to correct or revise information submitted after the final CoC Program award announcement but before executing the grant agreement.

**(3)** HUD will review the UFA Costs submitted by the UFA designated Collaborative Applicant to ensure appropriate match and eligibility of costs requested.

**(4)** HUD will assess all new project applications for the following minimum project eligibility, capacity, timeliness, and performance standards.

**(a)** project applicants must have satisfactory capacity, drawdowns, and performance for existing grant(s) funded under the CoC Program, as evidenced by timely reimbursement of subrecipients, regular drawdowns, and timely resolution of any monitoring findings; however, this does not apply to project applicants who

Case 1:25-cv-00636-MSM-AEM    Document 87-6    Filed 01/14/26    Page 209 of 283
PageID #: 3379

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

have never received a CoC Program funded project;

**(b)** for expansion project applications, project applicants must describe the part of the project that is being expanded and demonstrate the project is not replacing other funding sources; and

**(c)** project applicants must demonstrate their ability to meet all timeliness standards per 24 CFR 578.85. HUD reserves the right to deny a funding request for a new project, if the request is made by an existing recipient that HUD finds to have significant issues related to capacity, performance, unresolved audit, or monitoring findings related to one or more existing grants; or does not routinely draw down funds from eLOCCS at least once per quarter. HUD also reserves the right to withdraw funds if no APR is submitted on the prior grant.

**(5)** HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons:

**(a)** evidence that the project conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences.

**(b)** evidence that the project operates illegal drug injection sites or "safe consumption sites," in violation of 21 U.S.C. § 856

**(6)** Additionally, for HUD to consider new projects as meeting project quality threshold, each new project must meet the following criteria as applicable. If awarded, a recipient must meet all the criteria listed in the criteria column for its component.

| (a) Transitional Housing (TH) | | |
|---|---|---|
| **New Project Application Rating Factors** | **Points Available** | **Criteria** |
| New Transitional Housing projects must receive at least 7 out of 10 points available for this project type. New TH projects that do not receive at least 7 points will be rejected. | 2 | Demonstrate that the project will provide and/or partner with other organizations to provide eligible supportive services that are necessary to assist program participants to obtain and maintain housing. |
| | 1 | The applicant has prior experience operating transitional housing or other projects that have successfully helped homeless individuals and families exit homelessness within 24 |

Case 1:25-cv-00636-MSM-AEM    Document 87-6    Filed 01/14/26    Page 210 of 283
PageID #: 3380

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | months. |
|---|---|---|
| | 1 | The applicant has previously operated or currently operates transitional housing or another homelessness project, or has a plan in place to ensure, that at least 50 percent of participants exit to permanent housing within 24 months and at least 50 percent of participants exit with employment income as reflected in HMIS or another data system used by the applicant. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment, etc) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 2 | Demonstrate that the proposed project will provide 40 hours per week of customized services for each participant (e.g. case |

Case 1:25-cv-00636-MSM-AEM    Document 87-6    Filed 01/14/26    Page 211 of 283
PageID #: 3384

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | management, employment training, substance use treatment, etc.). |
| | | The 40 hours per week may be reduced proportionately for participants who are employed. |
| | | The 40 hours per week does not apply to participants over age 62 or who have a physical disability/impairment or a developmental disability as defined under 24 CFR 582.5 |
| | 1 | Demonstrate the average cost per household served for the project is reasonable, consistent with 2 CFR 200.404. |

**b) Supportive Services Only (SSO) Standalone (24 C.F.R. 578.37(a)(3) and 578.53)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO – Standalone project applications must receive at least 4 out of the 5 points available for this project type. New SSO standalone projects that do not receive at least 4 points will be rejected. | 1 | The Supportive Services project is necessary to assist people in exiting homelessness and increasing self-sufficiency and the Recipient will conduct an annual assessment of the service needs of the program participants. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 212 of 283
PageID #: 3382

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
|---|---|---|
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

**(c) Supportive Services Only (SSO) Street Outreach**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO project applications that focus on street outreach and indicate so in their project application must receive at least 5 out of the 6 points available for this project type. Projects that do not receive at least 5 points will be rejected. | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |
| | 2 | The proposed project has a strategy for providing supportive services to eligible program participants including those with histories of unsheltered homelessness and those who do not traditionally engage with supportive services. |
| | 1 | Demonstrate that the applicant has a history of partnering with first responders and law enforcement to engage people living in places not meant for human habitation to access emergency shelter, treatment |

| | | programs, reunification with family, transitional housing or independent living. The applicant must cooperate, assist, and not interfere or impede with law enforcement to enforce local laws such as public camping and public drug use laws. |
| | 1 | The applicant has experience providing outreach services consistent with the activity description at 24 CFR 578.53(e)(13) and has demonstrated effectiveness at helping people successfully exit from places not meant for human habitation to emergency shelter, treatment programs, transitional housing or permanent housing programs. |
| | 1 | The services provided are cost-effective consistent with 2 CFR 200.404. |

### (d) SSO-Coordinated Entry (SSO-CE)

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New SSO-CE project applications (also known as centralized or coordinated assessment) must receive at least 3 out of the 4 points available for this project type. New SSO-CE projects that do not receive at least 3 points will be rejected. | 1 | The Coordinated Entry system is easily available and reachable for all persons within the CoC's geographic area who are seeking homelessness assistance. The system must also be accessible for persons with disabilities within the CoC's geographic area. |
| | 1 | There is a strategy for |

DOJ-HUD-AR01199

Case 1:25-cv-00636-MSM-AEM    Document 57-6    Filed 01/14/26    Page 214 of 283
PageID #: 3384

I. Basic        II. Eligibility   III. Program   IV. Application   V. Application   VI. Submission   VII. Post-Award   VIII. Corrections   Appendix
Information                       Description     Contents and      Review           Requirements and  Requirements and  and Support
                                                  Format            Information       Deadlines         Administration

|  |  | advertising that is designed specifically to reach households experiencing homelessness with the highest needs. |
|  | 1 | There is a standardized assessment process. |
|  | 1 | The project will ensure program participants are directed to appropriate housing and services that fit their needs. |

**(e) Permanent Housing: Permanent Supportive Housing (PH-PSH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 4 out of the 6 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The type of housing proposed, including the number and configuration of units, will fit the needs of the program participants. |
|  | 1 | The type of supportive services and assistance that will be offered to program participants will ensure that the participant is able to successfully obtain and retain permanent housing and in a manner that fits their needs (e.g. transportation, safety planning, enhanced case management). If the applicant is proposing to expand an existing PH project, it must demonstrate how they are expanding supportive services to program participants, including where appropriate, on-site supportive services. |

| | | |
|---|---|---|
| | 1 | The project will serve homeless individuals or families with a disability. The services offered must be designed to serve any type of disability covered under 42 U.S.C. 11360(10), which includes disabled elderly individuals and/or individuals with a physical disability/impairment or a developmental disability (24 CFR 582.5) and not to the exclusion or priority of any one disability over another. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, life skills, substance use treatment) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such |

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 216 of 283
PageID #: 3386

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

| | | as Medicare, Medicaid, SSI, and SNAP. |
|---|---|---|

**(e) Permanent Housing: Rapid Rehousing (PH-RRH)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New Permanent Housing projects must receive at least 6 out of the 8 points available for this project type. New Permanent Housing projects that do not receive at least 4 points will be rejected. | 1 | The provision of tenant-based rental assistance will help individuals and families achieve self-sufficiency within 3 months or up to 24 months. |
| | 2 | The type of supportive services and assistance that will be offered to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance) will ensure that the participant is able to successfully obtain self-sufficiency and exit homelessness. |
| | 1 | The applicant has previously operated homelessness projects where outcomes for employment income were improved compared to the average project in the CoC, or has a plan in place to ensure this. |
| | 1 | The project will serve homeless individuals or families with a disability. The services offered must be designed to serve any type of disability covered under 42 U.S.C. 11360(10) and not to the preference or exclusion of one protected disability over |

DOJ-HUD-AR01202

| | | |
|---|---|---|
| | | another. |
| | 1 | Demonstrate that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment) in line with 24 CFR 578.75(h) by providing direct language from a supportive service agreement (contract, occupancy agreement, lease, or equivalent). |
| | 1 | The average cost per household served is reasonable, consistent with 2 CFR 200.404, meaning that the costs for housing and services provided by the project are consistent with the population the project plans to serve. |
| | 1 | The project will be supplemented with resources from other public or private sources, that may include mainstream health, social, and employment programs such as Medicare, Medicaid, SSI, and SNAP. |

**(g) Homeless Management Information System (HMIS)**

| New Project Application Rating Factors | Points Available | Criteria |
|---|---|---|
| New HMIS project applications must receive at least 3 out of the 4 points available for this project type. New HMIS projects that do not | 1 | How the HMIS funds will be expended in a way that furthers the CoC's HMIS implementation and ability to use HMIS as a proactive case |

DOJ-HUD-AR01203

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 218 of 283
PageID #: 3388

I. Basic          II. Eligibility   III. Program   IV. Application   **V. Application**   VI. Submission   VII. Post-Award   VIII. Contacts and   Appendix
Information                         Description    Contents and      **Review**         Requirements and  Requirements and   Support
                                                  Format            **Information**     Deadlines        Administration

| receive at least 3 points will be rejected. | | management tool to promote treatment and recovery. |
| --- | --- | --- |
| | 1 | The HMIS collects all Universal Data Elements as set forth in the HMIS Data Standards. |
| | 1 | The ability of the HMIS to un-duplicate client records. |
| | 1 | The HMIS produces all HUD-required reports and provides data as needed for HUD reporting (e.g., APR, quarterly reports, data for CAPER/ESG reporting) and other reports required by other federal partners. |

**(h) CoC Planning – Collaborative Applicants Only**

| New Project Application Rating Factors | Points Available | Criteria |
| --- | --- | --- |
| New CoC Planning projects, submitted only by the CoC's designated Collaborative Applicant, must receive at least 3 out of the 5 points available for this project type. CoC Planning projects that do not receive at least 3 points will be rejected. | 1 | Governance and Operations-The CoC conducts meetings of the entire CoC membership that are inclusive and open to members and demonstrates the CoC has a written governance charter in place that includes CoC policies. |
| | 1 | CoC Committees-The CoC has CoC-wide planning committees, subcommittees, or workgroups to address the needs of persons experiencing homelessness in the CoC's geographic area that recommends and sets policy priorities for the CoC. |
| | 2 | The proposed planning project |

| | | that will be carried out by the CoC with Planning grant funds are compliant with the provisions of 24 CFR 578.7. |
| | 1 | The funds requested will improve the CoC's ability to evaluate the outcome of both CoC Program-funded and ESG-funded projects. |

**c. *Project Renewal Threshold.*** CoCs must consider the need to continue funding for projects expiring in CY 2026 (January 1, 2026 to December 31, 2026) when applying for FY 2025 CoC and YHDP funding. Renewal projects must meet the minimum project eligibility, capacity, timeliness, and performance standards identified in this NOFO or they will be rejected from consideration for funding:

**(1)** When considering renewal projects for award; HUD will review information in eLOCCS, APRs, and information provided from the local HUD CPD field office; including monitoring reports and audit reports as applicable, and performance standards on prior grants, and will assess projects using the following criteria on a pass/fail basis:

**(a)** whether the project applicant's performance met the plans and goals established in the initial application, or grant as amended;

**(b)** whether the project applicant demonstrated all timeliness standards for grants being renewed have been met, including those standards for the expenditure of grant funds;

**(c)** the project applicant's performance in assisting program participants to achieve and maintain self-sufficiency and independent living and records of success, except dedicated HMIS projects are not required to meet this standard; and

**(d)** evidence of unwillingness of project applicants to accept technical assistance, a history of inadequate financial accounting practices, indications of project mismanagement, a drastic reduction in the population served, program changes have been made without prior HUD approval, or the loss of project site control.

**(2)** HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons:

**(a)** outstanding obligation to HUD that is in arrears or for which a payment schedule has not been agreed upon;

**(b)** audit finding(s) for which a response is overdue or unsatisfactory;

**(c)** history of inadequate financial management accounting practices;

**(d)** evidence of untimely expenditures on prior award;

**(e)** history of other major capacity issues that have significantly affected the

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 220 of 283
PageID #: 3390

I. Basic       II. Eligibility    III. Program    IV. Application    V. Application    VI. Submission    VII. Post-Award    VIII. Contractual    Appendix
Information                       Description     Contents and       Review            Requirements and   Requirements and   Support
                                                  Format             Information        Deadlines          Administration

operation of the project and its performance;

**(f)** history of not reimbursing subrecipients for eligible costs in a timely manner, or at least quarterly; and

**(g)** history of serving ineligible program participants, expending funds on ineligible costs, or failing to expend funds within statutorily established timeframes.

**(h)** evidence that the project conducts activities that subsidize or facilitates illegal discrimination including illegal racial preferences.

**(i)** evidence that the project operates illegal drug injection sites or "safe consumption sites," in violation of 21 U.S.C. § 856.

## B. Merit Review

HUD expects to evaluate and score your application using the following merit criteria and process. Merit reviewers evaluate and score all applications that pass the threshold review. Merit reviewers may include Federal and non-Federal persons. Reviewers receive a copy of your application to evaluate and score each application separately.

**Merit Review Summary**

| Merit Review Summary | |
|---|---|
| **Criterion** | **Maximum number of points = 130** |
| **a. Project Capacity, Review, and Ranking.** | 9 |
| **b. System Performance.** | 40 |
| **c. CoC Coordination and Engagement.** | 81 |
| **Bonus Points** | |
| CoC Merger Bonus (V.B.1.e) | 15 |
| Policy Initiative Preference Points (V.B.2) | 4 |

### 1. Rating Factors

Your application must include a response to the following criteria.

HUD will use all of the factors outlined in this section to establish the CoC's score for the FY 2025 CoC Program Competition.

**Rating Factors Details**

**a. *Project Capacity, Review, and Ranking.*** HUD will award up to 9 points to CoCs that demonstrate the existence of a coordinated, inclusive, and outcome-oriented community process for the solicitation, objective review, ranking, and selection of project applications.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1) *Objective Criteria and System Performance.*** | 6 | The CoC must attach the written process or tool it used to review, rate, and rank project applications for this |

| | | NOFO. This written process or tool must: |
|---|---|---|
| | | Demonstrate it used objective criteria (e.g., cost-effectiveness, performance data, type of population served) to review, rate, and rank project applications and that these factors account for at least 50% of the total available points (up to 1 point). |
| | | Demonstrate that at least 25% of the total points available for housing projects (TH, PH-PSH, PH-RRH) account for the following: |
| | | • Returns to homelessness performance measure (up to 1 point); |
| | | • Employment income performance measure (up to 1 point); and |
| | | • Supportive service participation requirements (up to 3 points). |
| **(2) Ranking and Selection Process.** | 2 | The CoC must: |
| | | • Invite new proposals from entities that have not previously received funding; |
| | | • Prior to the application deadline, post on their website all parts of the Consolidated Application, and notify community members and key stakeholders. CoCs that do not have |

DOJ-HUD-AR01207

| | | |
|---|---|---|
| | | a website must post this information to a partner website within the CoC (e.g., a city or county website); |
| | | • Attach a listing of all projects submitted to HUD from their CoC's local competition that includes all projects their CoC considered during their local competition: (1) the final score, (2) project rank, (3) accepted or rejected status, (4) funding amounts, (5) reallocated funds added to or subtracted from projects listed; and |
| | | • Notify project applicants, in writing outside of *e-snaps*, who submitted their project applications to the CoC by the CoC-established deadline, whether their project application(s) will be accepted and ranked, rejected, or reduced on the CoC Priority Listing no later than 15 days before the NOFO application submission deadline, and where a project application is being rejected or reduced, the CoC must indicate the reason(s) for the rejection or reduction. |
| **(3)** *Reallocation.* | 1 | The CoC must show: |

DOJ-HUD-AR01208

| | | • Their CoC actively reviews the performance of existing CoC Program funded projects and have a standard process for reallocating funding from lower performing projects to create new high performing projects; |
|---|---|---|
| | | OR |
| | | • They have cumulatively reallocated at least 20 percent of their CoC's ARD between the FY 2021 and the FY 2025 CoC Program Competitions. |

   **b.** *System Performance.* HUD will award up to 40 points to CoCs that have a CoC system-wide performance measurement process related to reducing homelessness.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1)** *Reducing the Number of Homeless Individuals and Families.* | 17 | The CoC will receive:<br><br>• Up to 5 points for demonstrating a decrease of at least 20 percent in the number of unsheltered homeless individuals and families in the 2025 PIT compared to the prior year's data.<br><br>• Up to 4 points for demonstrating decreases in the number of unsheltered homeless individuals and families between the 2023 and 2024 PIT Counts AND the 2024 |

DOJ-HUD-AR01209

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 224 of 283
PageID #: 3394

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractans Support | Appendix

| | | |
|---|---|---|
| | | and 2025 PIT Counts. |
| | | • Up to 3 points for demonstrating a decrease in the number of unsheltered homeless individuals and families between the 2023 and 2025 PIT Counts. |
| | | • Up to 3 points for demonstrating a 5% decrease in the number of individuals and families experiencing chronic homelessness between the 2024 and 2025 PIT Counts. |
| | | • Up to 2 points for demonstrating a decrease of at least 20 percent in the combined number of sheltered and unsheltered individuals and families in the 2025 PIT compared to the prior year's data. |
| **(2) *Reduce First Time Homelessness.*** | 1 | The CoC must:<br><br>• Demonstrate a reduction in the number of first-time homeless of at least 20% as reported in HDX;<br><br>• Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and<br><br>• Identify the |

| | | organization or position that is responsible for overseeing the CoC's strategy to reduce or end the number of persons experiencing homelessness for the first time. |
|---|---|---|
| **(3) *Length of Time Homeless.*** | 1 | The CoC must:<br><br>• Demonstrate a reduction in the length-of-time homeless compared to the prior year's data as reported in HDX;<br><br>• Identify the strategies (including funding sources and timeframes) in place to address individuals and families at risk of becoming homeless; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce the length of time individuals and families remain homeless. |
| **(4) *Successful Permanent Housing Placement.*** | 5 | The CoC must:<br><br>• Demonstrate that the rate of successful exit from ES, TH, and RRH is at least 50% (up to 2 points);<br><br>• Demonstrate that at least 20% of program participant exits from TH/RRH/PSH |

Case 1:25-cv-00636-MSM-AEM    Document 87-6    Filed 01/14/26    Page 226 of 283
PageID #: 3396

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

| | | collectively are to unsubsidized housing using HMIS data (up to 2 points). |
| | | • Indicate the strategy (including funding sources and timeframes) the CoC is taking to improve permanent housing placement and stability including how the CoC connects participants to non-subsidized housing and furthers successful transitions from CoC-funded projects to other housing options; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to increase the rate at which persons exit to permanent housing destinations (up to 1 point). |
| **(5) *Returns to Homelessness.*** | 7 | The CoC must: <br> • Demonstrate the rate at which persons who exited to permanent housing destinations experienced additional spells of homelessness over a 12- month and 24-month period as reported in HDX: <br> Is less than 8% over 24 months (3 points, or 1 point if less than 16% over 24 months). <br> Is less than 7% over 12 |

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 227 of 283
PageID #: 3397

| | | |
|---|---|---|
| | | months (3 points, or 1 point if less than 11% over 12 months).<br><br>• Indicate a strategy to account for returns to homelessness that occur outside of the geographic area to the extent practicable (i.e., statewide HMIS sharing, long-term follow-up with clients.)<br><br>• Indicate the strategy that will reduce returns to homelessness over the long term. Additionally, identify the funding sources that will be used to accomplish specific tasks within the strategy and the timeframes for completing specific tasks within the strategy; and<br><br>• Identify the organization or position that is responsible for overseeing the CoC's strategy to reduce returns to homelessness. |
| **(6) *Jobs and Income Growth.*** | 7 | The CoC must:<br><br>• Demonstrate that the percentage of program participants who had an increase in income from employment (not government assistance) in the CoC was 20 percent or higher as reported in |

DOJ-HUD-AR01213

| | | HDX (up to 3 points); |
|---|---|---|
| | | • Demonstrate that at least 25 percent of people leaving programs in the CoC had an increase in income from employment (up to 3 points); |
| | | • Identify the strategy (including funding sources and timeframes) that has been implemented to increase employment and non-employment cash sources, including through employment training; |
| | | • Identify how the CoC works with child care organizations to facilitate employment for parents experiencing homelessness; and |
| | | • Identify the organization or position that is responsible for overseeing the CoC's strategy to increase jobs and income from employment and non-employment cash sources. |
| **(7) *Timely Submission of Data.*** The CoC collected and submitted data in a timely manner. | 1 | The CoC must demonstrate it: • Conducted a Housing Inventory (HIC) and Point-in-Time (PIT) count during the last 10 days in January 2025, |

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 229 of 283
PageID #: 3399

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

| | | |
|---|---|---|
| | | or if an exception was provided by HUD, during the time period agreed upon by the CoC and HUD;<br><br>• Submitted both the 2025 HIC and PIT count data in HDX 2.0 by June 13, 2025, 8:00 PM EDT, or an alternate date approved by HUD;<br><br>• Submitted their Longitudinal System Analysis (LSA) data in HDX 2.0 by the submission deadline of January 9, 2025, 11:59 PM EST, or an alternate date approved by HUD; and HUD determined that there were at least 2 usable files; and<br><br>• Submitted FY 2024 System Performance Measures data in HDX 2.0 by the submission deadline of 8:00 PM EDT on April 11, 2025, or an alternate date approved by HUD. |
| **(8) HMIS and Comparable Database Participation** | 1 | The CoC must demonstrate at least 85 percent of the beds in their CoC's geographic area are covered in HMIS and comparable databases. The bed coverage rate is the number of HMIS and comparable database participating beds divided by the number of year-round beds dedicated to persons |

| | | experiencing homelessness in the geographic area covered by the CoC. |
|---|---|---|

**c.** ***CoC Coordination and Engagement.*** HUD will award up to 81 points to CoCs that demonstrate coordination with other systems of care that serve homeless individuals and families.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **(1)** ***Accountable Structure and Participation.*** | | |
| **(a)** has a membership of a variety of stakeholders within the geographic area and considers the needs of all relevant subpopulations; | 0.5 | The CoC must demonstrate it has participation from a broad array of stakeholders, not limited to organizations listed in 24 CFR 578.5(a), within the geographic area: Relevant organizations include nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies including CCBHCs and CMHCs, hospitals, universities, affordable housing developers, law enforcement, and organizations that serve veterans and homeless and formerly homeless individuals. |
| **(b)** has a governance board representative of the community | 4 | The CoC must demonstrate it has a decision-making governance board that includes: • at least 1 person with a former experience of |

| | | |
|---|---|---|
| | | homelessness; <br><br> • at least 3 elected public officials; <br><br> • at least 1 representative of the business community; <br><br> • at least 2 representatives of law enforcement. |
| **(c)** has an invitation process for new members to join; | 0.5 | The CoC must demonstrate it has a transparent process (e.g., communicated in a public manner such as on the CoC's website) in place to invite new members to join and the invitation process is publicly available within the CoC's geographic area at least annually. |
| **(d)** solicits and considers opinions from knowledgeable individuals and organizations; and | 0.5 | The CoC must demonstrate a transparent process (e.g., communicated in a public manner such as on the CoC's website) is in place to solicit and consider opinions regarding the CoC's general performance, strategies, and priority setting process from individuals and organizations with knowledge of homelessness in the geographic area or an interest in preventing or ending homelessness in the geographic area. |
| **(e)** accepts and considers proposals from organizations that have not previously received CoC Program funding. | 0.5 | The CoC must demonstrate it has a transparent process is in place to accept and consider proposals from organizations that have not previously received CoC |

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 232 of 283
PageID #: 3402

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix |

| | | Program funding including faith-based organizations. |
|---|---|---|
| **(2) *Availability of Treatment and Recovery Services.*** | | The CoC must demonstrate: |
| | | • Substance use treatment is available on-site for at least 30% of projects (attach agreements or letters of commitment); |
| | | • The creation or current existence of projects with the purpose of providing substance abuse treatment services for people experiencing homelessness in which program participants are required to take part in such services as a condition of continued participation in the program (attach contracts or occupancy agreements); |
| | 16 | Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment. |
| | | -For geographic areas with a population greater than 2,500,000, demonstrate at least 500 beds. |
| | | -For geographic areas with a population between 1,000,000 and |

2,499,999, demonstrate at least 250 beds.

-For geographic areas with a population between 500,000 and 999,999, demonstrate at least 100 beds.

-For geographic areas with a population between 100,000 and 499,999, demonstrates at least 50 beds.

-For geographic areas with less than 100,000, demonstrate 25 beds.

The bed count described above may include CoC-funded per diem beds located outside the geographic area of the CoC. Provide a list of the beds/projects and occupancy agreements demonstrating the purpose of the project and the requirement for participation in substance abuse treatment.

- There is 24/7 access to detox or inpatient treatment within the geographic area of the CoC;

- Formal partnership with a Certified Community Behavioral Health Clinic (CCBHC) or Community Mental Health Center (CMHC) or a similar facility if no CCBHCs or CMHCs

Case 1:25-cv-00636-MSM-AEM   Document 87-6   Filed 01/14/26   Page 234 of 283
PageID #: 3404

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix |

| | | are located in the geographic area; |
|---|---|---|
| | | • The availability or proposed creation of sober housing for people in recovery in accordance with 24 CFR 578.93(b)(5); and |
| | | • They are investing adequately in supportive services by showing either: |
| | |     ○ through proposed CoC funding, leveraging, match, and other formal partnerships, the CoC is providing supportive services with a value of 50% of the CoC's Annual Renewal Demand; or |
| | |     ○ 30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand. |
| **(3) *Participation Requirements for Supportive Services.*** | 10 | The CoC must demonstrate that projects require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by attaching supportive service |

| | | |
|---|---|---|
| | | agreements (contract, occupancy agreement, lease, or equivalent).<br><br>• 100% of CoC projects have participation requirements (10 points).<br><br>• 50% of CoC projects have participation requirements (5 of the 10 points). |
| **(4) Reduce encampments.** | 10 | The CoC must demonstrate a reduction in the number of encampments or the number of people residing in encampments by at least 20%. |
| **(5) Coordination with Federal, State, Local, Private, and Other Organizations.** | 2 | The CoC must:<br><br>• Demonstrate coordination with other federal, state, local, private, and other organizations in the planning and operation of projects; and<br><br>• Describe how they have and plan to continue to consult with ESG recipients in the planning and allocation of ESG funds; and Describe how they have or will share PIT, HIC, HMIS, and System Performance data with state and local government as permitted by law. |
| **(6) Discharge Planning.** | 2 | The CoC must coordinate with state or local planning efforts |

Case 1:25-cv-00636-MSM-AEM    Document 87-6    Filed 01/14/26    Page 236 of 283
PageID #: 3406

I. Basic | II. Eligibility | III. Program | IV. Application | V. Application | VI. Submission | VII. Post-Award | VIII. Contact and | Appendix
Information | | Description | Contents and | Review | Requirements and | Requirements and | Support
| | | Format | Information | Deadlines | Administration

| | | to prevent homelessness among people transitioning from public systems (prisons, jails, health care facilities, residential care facilities, and foster care.) |
|---|---|---|
| **(7)** *Collaboration Related to Children and Youth.* | 2 | The CoC must:<br><br>• Indicate written agreements are in place between their CoC or its HUD-funded projects and educational supports and services for children ages 0-5, such as Public Pre-K, Head Start, Child Care (including Child Care and Development Fund), or home visiting (including Maternal, Infant and Early Childhood Home and Visiting or MIECHV);<br><br>• Identify formal partnerships the CoC has with youth education providers, local educational authorities, or school districts; and<br><br>• Show policies and procedures that have been adopted to inform individuals and families who become homeless of their eligibility for educational services. |
| **(8)** *Coordination with Veteran Organizations.* | 6 | The CoC must indicate that they partner with the Department of Veterans Affairs or other Veteran |

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 237 of 283
PageID #: 3407

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix |

| | | Serving Organizations to do the following: |
|---|---|---|
| | | • Refer veterans identified by the CoC to VA or other Veteran Serving Organizations for assistance; |
| | | • Coordinate the provision of emergency shelter, supportive services, and housing; and |
| | | • Identify and fill service gaps for veterans. |
| **(9) _Addressing the Needs of Survivors of Domestic Violence, Dating Violence, Sexual Assault, and Stalking_** | 2 | The CoC must partner with victim service providers, state domestic violence coalitions, state sexual assault coalitions, anti-trafficking service providers or other organizations who help provide shelter, housing, and services to individuals and families of persons experiencing trauma or a lack of safety related to fleeing or attempting to flee domestic violence, dating violence, sexual assault, and stalking. |
| **(10) _Street Outreach._** | 6 | The CoC must show that: • An increasing number of people exit street outreach to a positive destination; and • Street Outreach projects cooperate with first responders and law enforcement to increase positive interaction in order to increase housing and |

| | | |
|---|---|---|
| | | service engagement and promote use of CoC services. |
| **(11)** *Partnering with Public Housing Agencies.* | 2 | The CoC must: <br>• Show they have an agreement in place with one or more of their public housing agencies to enable participants to transition from Transitional Housing, Rapid Re-Housing, and Permanent Supportive Housing to HUD assisted housing; and <br>• Describe the strategy for helping participants who are able to live independently move from homelessness assistance to permanent housing taking into account employment and economic stability. |
| **(12)** *Leveraging housing and healthcare resources.* These points are available for CoCs that apply for at least one new TH, PSH or RRH project that that utilizes housing and healthcare resources not funded through the CoC or ESG Programs. Examples of housing and healthcare resources include those provided by: <br>• Private organizations <br>• State or local government sources | 4 | • The CoC must demonstrate that: <br>  ○ In the case of housing subsidies for PSH or TH projects, the leveraged resources provide at least 25 percent of the units included in the project; <br>  ○ In the case of housing subsidies for a |

DOJ-HUD-AR01224

| | | |
|---|---|---|
| • Public housing agencies<br><br>• Faith-based organizations | | RRH project, the leveraged resources serve at least 25 percent of the program participants included in the project.<br><br>• The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate the commitment. CoCs can receive less than full points for demonstrating commitments less than the threshold above.<br><br>• The CoC must demonstrate that:<br><br>    o In the case of an organization that provides substance use disorder treatment or recovery services, the leveraged resource provides access to all participants who qualify for those services; or<br><br>    o In the case of healthcare or behavioral health resources, the value of assistance being |

DOJ-HUD-AR01225

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 240 of 283
PageID #: 3410

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

| | | |
|---|---|---|
| | | provided is at least an amount that is equivalent to 25 percent of the funding being requested by the project.<br><br>The CoC must attach letters of commitment, contracts, or other formal documents that demonstrate that commitment. CoCs can receive less than full points for demonstrating commitments less than the thresholds described above. |
| **(13) Protecting Public Safety.**<br><br>HUD encourages the most effective use of funding for efforts to end homelessness, quickly rehouse individuals, and minimize trauma (42 U.S.C 11381). Law enforcement and public safety protections play a critical role in accomplishing these purposes. | 13 | CoCs must conduct assessments of their geographic area to determine the effect of location on success in attaining the program goals:<br><br>• Demonstrate, by providing evidence, that the CoC's entire geographic area (up to 4 points):<br><br>    ○ Quickly clears tents and encampments on public property and connects individuals who are camping in public with appropriate services. In your response, describe how the CoC cooperates with law enforcement to |

|  |  | achieve this and the current status of tents and encampments in the geographic area. |
| --- | --- | --- |
|  |  | o Does not tolerate the public use of illicit drugs and quickly connects individuals who are using illicit drug in public with appropriate services and/or law enforcement. In your response, describe how the CoC cooperates with law enforcement to achieve this and the current status of overdoses and illicit drug use in public spaces in the geographic area. |
|  |  | • Demonstrate utilization of standards that address individuals experiencing homelessness who are a danger to themselves or others including involuntary commitment; (up to 3 points point) |
|  |  | • Indicate that the state is substantially compliant |

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 242 of 283
PageID #: 3412

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contacts and Support | Appendix

| | | with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); (up to 3 points) |
| | | • Indicate (up to 3 points) that the CoC: |
| | |     o When asked by law enforcement, assists in adequately mapping and checking the location of homeless sex offenders; and |
| | | Cooperates, assists, and does not interfere or impede with law enforcement or co-response to connect violators of public camping or drug use laws with services. |

**d. *CoC Merger Bonus Points.*** As stated in section 2.b.(2) in the Appendix of this NOFO, HUD will award up to a possible 15 bonus points to CoCs that merged after the FY 2024 CoC Program Registration deadline. To receive consideration as a merged CoC, new CoCs must contain all the geographic area of at least two CoCs that were considered completely separate CoCs in prior CoC Program competitions.

| Rating Factor | Maximum Points | To Receive Maximum Points |
|---|---|---|
| **Merged CoCs after the FY 2024 CoC Program Registration CoC Program Registration deadline.** | 15 | Merged CoCs - all CoCs that merged will receive this minimum number of points. |

## 2. Policy Initiative Preference Points

Preference points are added to your overall application score. You do not need to address the policy initiatives in this section to receive an award. If you choose to address a policy initiative in your application, you must adhere to the information with any award.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM Document 87-6 Filed 01/14/26 Page 243 of 283 PageID #: 3413

This NOFO supports the following policy initiatives, for which a maximum of fourteen (14) preference points may be awarded.

**a. Opportunity Zones**

You may receive up to four (4) points if your proposed activities are within an Opportunity Zone. To receive points, you must complete and submit form HUD-2996, Certification for Opportunity Zone Preference Points. If you expect to use less than 50% of the award in Opportunity Zones, you won't receive preference points.

**b. Prohibiting Illicit Drug Enablement**

Apart from the required selection criteria, you may receive up to ten (10) points if you can indicate that all housing projects submitted by the CoC will not operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of "harm reduction."

## 3. Other Factors

### a. Budget

The panel will review but not approve the budget. The panel will assess whether the budget aligns with planned program activities and objectives. Panel members will consider whether the budget and the requested performance period are fully justified and reasonable in relation to the proposed project.

The budget information will be reviewed to ensure:

- The requested costs are eligible under the CoC Program and this NOFO.

- The total amount of funding is within the amount of funding available to the CoC as described in Section I.A.2 of this NOFO.

- If funds are requested for project administrative costs, the amount requested is no more than 10 of the total funding requested.

### b. Certification of Consistency with the Consolidated Plan

You must make sure your application activities are consistent with your local Consolidated Plan.

All project applications submitted and listed on the CoC Priority Listing by Collaborative Applicants must be included in the certification either by submitting one correctly signed and dated HUD-2991 from the appropriate jurisdiction that includes an attachment listing of all submitted project applications, or a single signed and dated HUD-2991 for each individual project application from the appropriate jurisdiction. See section IV.A.1 for more information.

## C. Risk Review

Before making an award, HUD will evaluate each applicant's likelihood of successfully implementing an award based on the following criteria.

I. Basic Information  II. Eligibility  III. Program Description  IV. Application Contents and Format  V. Application Review Information  VI. Submission Requirements and Deadlines  VII. Post-Award Requirements and Administration  VIII. Contact and Support  Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 244 of 283
PageID #: 3414

- OMB-designated repositories of governmentwide data, as noted in 2 CFR 200.206(a)

- Other public sources such as newspapers, Inspector General or Government Accountability Office reports or findings, or other complaints that have been proven to have merit

- Financial stability

- Quality of management systems and ability to meet the management standards prescribed in 2 CFR part 200

- Reports and findings from audits performed under 2 CFR part 200, subpart F—Audit Requirements or the reports and findings of any other available audits

- The applicant's ability to effectively implement statutory, regulatory, or other requirements imposed on non-Federal entities

- Capacity of the applicant, including staffing structures and capabilities

- History of timely completion of activities and receipt and expenditure of promised matching or leveraged funds

- Ability to promote self-sufficiency and economic independence

- Ability to produce positive outcomes and results

- History of subsidizing or facilitating activities that impede law enforcement related to vagrancy, drug use, or other illicit activities that conflict with the purposes of this NOFO.

- History of performance. The applicant's record in managing Federal awards, if it is a prior recipient of Federal awards, including timeliness of compliance with applicable reporting requirements, failing to make significant progress in a timely manner, failing to meet planned activities in a timely manner, conformance to the terms and conditions of previous Federal awards, and, if applicable, the extent to which any previously awarded amounts will be expended prior to future awards. HUD will not penalize a renewal applicant who sufficiently complied with the terms and conditions FY2024 NOFO that are in direct conflict with those contained herein.

HUD may use the results of the risk review to make funding decisions and to apply award conditions.

This assessment helps identify risks that may affect the advancement toward or the achievement of a project's goals and objectives. 2 C.F.R. 200.206(b)(1).

## D. Selection Process

When making funding decisions, HUD will consider:

- Eligibility requirements, including threshold review results.

- Merit review results.

- Risk review results.

To the extent allowed by law, HUD may:

- Fund applications in whole or in part.

- Fund applications at a lower amount than requested.

- Choose to fund no applications under this NOFO.

- Adjust funding for an application, to ensure funding or geographic dispersion, and alignment with program or administrative priorities.

- Withdraw an award offer and make an offer of funding to another eligible application, if terms and conditions are not finalized or met.

- Use additional funds made available after NOFO publication to either fully fund an application or fund additional applications.

- Correct HUD review and selection errors. If HUD commits an error that causes an applicant not to be selected, HUD may make an award to that applicant when and if funding is available.

- Release another NOFO, if funding is available and if HUD does not receive applications of merit.

## 1. Threshold Review.

HUD will conduct a project eligibility and project quality threshold review on all project applicants.

HUD will review new project applications to determine whether applicants meet the applicant eligibility in section V.A.1, and whether the project applications meet the project eligibility and project quality thresholds detailed in sections V.A.4.a and V.A.4.b of this NOFO. HUD will review renewal projects to determine if project applicants and subrecipients meet the renewal project threshold requirements detailed in section V.A.4.c of this NOFO. If HUD determines these standards are not met, HUD will reject the project application, unless otherwise provided in this NOFO.

If a new project application passes the project eligibility threshold review in section V.A.4.a and receives enough points to pass the project quality threshold review in section V.A.4.b of this NOFO but does not receive all the points available for its project type, HUD may place conditions on the grant award that must be satisfied before HUD will execute a grant agreement with the applicant for the project. If an applicant is unable to satisfy the condition(s) within the timeframe specified by HUD, HUD reserves the right to withdraw the conditionally awarded funds.

## 2. Conditional Selection and Adjustments to Funding.

HUD Headquarters will conditionally select project applications for funding using the following process:

**a. *HUD Funding Process.*** All project applications, including YHDP renewal and replacement projects, must be competitively ranked, except for CoC Planning and, if applicable, UFA Costs Applications. All new Permanent Housing projects must be separately ranked in their own, Extended Track Priority Listing. If a CoC is applying for one new Permanent Housing project, it must still be listed on the Extended Track Priority

Case 1:25-cv-00636-MSM-AEM Document 67-6 Filed 01/14/26 Page 246 of 283 PageID #: 3416

Listing. HUD will not consider new Permanent Housing projects if submitted in Normal Track. CoCs should ensure that their projects submitted in Normal Track and Extended Track do not, when combined, exceed their maximum award amount.

HUD will select Normal Track projects in the following order in an amount up to $2,655,600,000:

(1) HUD will select all CoC Planning and UFA Costs applications that meet project quality threshold requirements. Only one CoC Planning and one UFA Costs (if applicable) project application can be submitted per CoC.

(3) HUD will then select all projects in Tier 1 that pass project quality and project eligibility thresholds as described in section V.D.3.a below.

(4) HUD will then select projects that meet project quality and project eligibility thresholds that are ranked in Tier 2 in the order of project score as described in Section V.D.3.b below:

(a) If at any point, HUD selects Permanent Housing renewal projects in an amount more than 30 percent of a CoC's Annual Renewal Demand (ARD), HUD will remove all remaining unselected Permanent Housing renewal projects from that CoC's priority listing, recalculate their Tier 2 project score, and continue selection.

(b) HUD will not consider new Permanent Housing projects in Normal Track. New Permanent Housing projects must be submitted in a separate Extended Track Priority Listing.

HUD will select Extended Track projects in the following order in an amount up to $1,262,400,000:

(1) HUD will select all new Permanent Housing projects that meet project quality and project eligibility thresholds that are ranked in the Extended Track Priority Listing in the order of project score using the Tier 2 100-point score scale described in Section V.D.3.b below.

**(a)** In selecting projects, HUD will not exceed a CoC's maximum award amount. CoCs should ensure that their projects submitted in Normal Track and Extended Track do not, when combined, exceed their maximum award amount. HUD will use a CoC's Priority Listings for Normal Track and Extended Track to determine if and when a CoC exceeds their maximum award amount. CoCs may not submit Priority Listings that, when combined, exceed their maximum award amount.

HUD will then review DV Bonus projects already selected for funding through the above process and determine whether $52,000,000 has been awarded to DV Bonus projects:

(a) If at least $52,000,000 has been selected for conditional award no further action is needed.

(b) If $52,000,000 has not been selected for conditional award – continue down the list and fund additional DV Bonus projects by project-level score until at least $52 million has been selected.

DOJ-HUD-AR01232

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 247 of 283
PageID #: 3417

**b.** As authorized under the Consolidated Appropriations Act, 2017 (Public Law 115-31; 131 Stat. 135) for fiscal year 2017 and hereafter, HUD will conditionally select a renewal grant that exceeds $10 million that was originally awarded pursuant to the matter under the heading "Department of Housing and Urban Development–Permanent Supportive Housing" in chapter 6 of title III of the Supplemental Appropriations Act, 2008 (Public Law 110-252; 122 Stat. 2351).

**c.** If an ineligible renewal project submitted under this NOFO is used in the reallocation process; or an ineligible YHDP Renewal or YHDP Replacement project is submitted, HUD will remove the ineligible project when calculating the final ARD amount for the CoC. To be eligible for renewal, reallocation, or replacement in the FY 2025 CoC and YHDP Funding Process, a project must have an expiration date in Calendar Year (CY) 2026 (between January 1, 2026, and December 31, 2026).

## 3. HUD Funding Process.

CoCs and applicants should ensure there is a thorough understanding of the information provided in this NOFO. HUD has a two-tier funding selection process for FY 2025 funding. HUD will establish Tier 1 and Tier 2 amounts for each CoC, based on each CoC's Annual Renewal Demand. HUD will post a report that lists the available amounts for each CoC's PPRN, estimated ARD, Tier 1, CoC Planning, estimated CoC Bonus amounts, and estimated DV Bonus amounts on HUD's website.

The maximum amount a CoC may apply for (Normal Track and Extended Track combined) is the sum of the CoC's ARD, eligible CoC Bonus amounts, eligible DV Bonus amounts, eligible CoC planning amounts and if applicable, eligible UFA costs amounts.

The selection process described in this section of the NOFO will also be used for CoC Collaborative Applicants designated as UFAs.

Note that for FY 2025, DV Bonus and YHDP projects will be selected using the Tier 1 and Tier 2 selection process.

**a.** *Tier 1.* Tier 1 is equal to 30 percent of the CoC's Annual Renewal Demand (ARD). HUD will conditionally select project applications in Tier 1 from the highest scoring CoC application to the lowest scoring CoC application and according to the rank assigned by the CoC on the CoC Priority listing, provided the project applications pass both project eligibility and project quality threshold review, and if applicable, project renewal threshold.

Any competitively ranked project may be placed in Tier 1 according to the CoC's local rating and ranking process and based on local needs and priorities.

**b.** *Tier 2.* Tier 2 is the difference between Tier 1 and the sum of each CoC's ARD, CoC Bonus, and DV Bonus.

HUD will evaluate project applications placed in Tier 2 for project eligibility and project quality threshold requirements and project renewal threshold requirements, if applicable; and HUD will determine funding using the CoC Application score as well as the CoC project ranking.

HUD will award a point value to each ranked new and renewal project application that is in Tier 2 using a 100-point scale, and conditionally select applications in Tier 2 using this

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 248 of 283
PageID #: 3418

point value from the highest scoring project application to the lowest:

**(1)** *CoC Score.* Up to 50 points in direct proportion to the score received on the CoC Application, e.g., if a CoC received 65 out of 130 points on the CoC Application, the project application would receive 25 out of 50 points for this criterion.

**(2)** *CoC Project Ranking.* Up to 40 points for the CoC's ranking of the project application(s). To consider the CoCs ranking of projects, HUD will assign point values directly related to the CoCs' ranking of project applications. The calculation of point values will be 40 times the quantity (1-x) where x is the ratio of the cumulative funding requests for all projects or portions of projects ranked higher by the CoC in Tier 2 plus one half of the funding of the project of interest to the total amount of funding available in Tier 2 for the CoC.

**(3)** *Service Participation.* Up to 10 points for projects that have or will incorporate supportive service participation requirements in their program design, based on individual need and evidenced by direct language from an occupancy agreement or equivalent document. Supportive Service Only (SSO) projects will automatically receive 10 points in this category.

**c.** *Projects Straddling Tiers.* If a project application straddles the Tier 1 and Tier 2 funding line, HUD will conditionally select the project up to the amount of funding that falls within Tier 1. Using selection criteria in section V.D.3.b above, HUD may fund the Tier 2 portion of the project. If HUD does not fund the Tier 2 portion of the project, HUD may award the project at the reduced amount based on the amount of funding that falls within Tier 1, provided the project is still feasible with the reduced funding (e.g., is able to continue serving homeless program participants effectively).

**d.** *Domestic Violence, Dating Violence, Sexual Assault, and Stalking Bonus (DV Bonus).* This NOFO provides approximately $52 million for "rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." In this NOFO, Transitional Housing is an eligible activity determined critical to assist survivors of domestic violence, dating violence, sexual assault, or stalking.

Each CoC may only submit one new SSO-CE DV Bonus project; however, there is no limit to the number of TH projects and PH-RRH projects CoCs may apply for, provided each application is for at least $50,000. A project applicant may also apply to expand an existing renewal project, including one that was previously awarded with DV Bonus funding, in accordance with section IV.D.1.j.(4) of this NOFO; however, only the new project application for the expansion will be considered for DV Bonus funds through this process. DV Bonus funding may be used to expand an existing renewal project that is not dedicated to serving individuals and families who are fleeing or attempting to flee domestic violence, dating violence, sexual assault, or stalking who qualify as homeless under paragraphs (1) or (4) of the definition of homeless at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act so long as the DV Bonus funds for expansion are solely for additional units, beds, or services dedicated to persons eligible to be served with DV Bonus funding.

DOJ-HUD-AR01234

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 249 of 283
PageID #: 3419

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractant Support | Appendix

CoCs must rank all new DV Bonus project applications on the New Project Listing of the CoC Priority Listing with a unique number ranking and when the project is part of an expansion, the corresponding renewal project application must be on the Renewal Project Listing with a unique rank number as well. HUD will only select a new DV Bonus project that expands an existing renewal project if HUD conditionally selects the existing renewal project for funding.

### 4. Conflict of Interest of Consultants or Technical Experts Assisting HUD.

Consultants and technical experts who assist HUD in evaluating applications for funding under published CoC Program NOFOs are subject to 18 U.S.C. 208, the Federal criminal conflict-of-interest statute, and the Standards of Ethical Conduct for Employees of the Executive Branch regulation published at 5 CFR 2635. Therefore, consultants and technical experts who have assisted or plan to assist applicants with preparing applications for CoC Program NOFOs are prohibited from serving on a selection panel or serving as a technical advisor to HUD. Anyone involved in reviewing CoC Program NOFO applications, including departmental staff, experts, and consultants, must avoid conflicts of interest or the appearance of such conflicts. These individuals must also disclose to HUD's Office of General Counsel Ethics Law Division the following information, if applicable:

**a.** How the selection or non-selection of any applicant under a CoC Program NOFO will affect the individual's financial interests, as provided in 18 U.S.C. 208, or

**b.** How the application process involves a party with whom the individual has a covered relationship under 5 CFR 2635.502.

The consultant or technical expert assisting HUD must disclose this information before participating in any matter regarding a program NOFO. Applicants with questions regarding these provisions or concerning a conflict of interest should call the Office of General Counsel Ethics Law Division, at (202)708-3815 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

### 5. Adjustments to Projects.

HUD may adjust the selection of competitive projects as follows:

**a. *CoC Maximum Award and FMR Adjustments.*** The process for determining a CoC's maximum award amount is detailed in 24 CFR 578.17(b). HUD must adjust awards for leasing, operating, and rental assistance BLIs based on changes to the Fair Market Rents (FMR). 24 CFR 578.51(f) requires that HUD will determine the award amount for Rental Assistance projects by multiplying the number and size of units proposed by the FMR of each unit on the date the application is submitted to HUD.

HUD will make these adjustments as follows:

**(1)** Funds awarded for rental assistance will be adjusted in one of two ways:

**(a)** Funds awarded for rental assistance requesting the FMR will be adjusted by applying the FMR in effect at the time applications are due, including instances where the FMR for a specific area has decreased from the project award year.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 250 of 283    PageID #: 3420

**(b)** Funds awarded for rental assistance for renewal projects that request less than FMR, that is, a per-unit amount based on the actual rent costs per unit (section IV.D.2.h), will be increased based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. If the FMR for a specific area had a net decrease from the project award year, the award will not exceed the FMR after adjustment. If the FMR for the project applicant's entire area decreased from the project award year, the project will be awarded the lesser amount of the per-unit amount requested by the project applicant, based on the actual rent costs per unit, or the FMR after adjustment.

**(2)** HUD will increase funds awarded for operating and leasing in PH projects based on the average increase in FMR amounts within the CoC's geographic area, weighted for population density. Because leasing and operating costs do not decrease relative to rent amounts for specific units (e.g., operating costs for 10 units that have rents of $500 are likely the same as for 10 units that have rents that are $450) HUD will not decrease leasing and operating BLIs if FMRs decrease in the geographic area. The operating and leasing BLIs in these projects will remain the same as in the most recent grant agreement or grant agreement amendment.

**b.** ***Cost of Living Adjustment Factor.*** HUD will adjust amounts for the supportive services and HMIS Costs budget lines for renewing projects by the following factor: Most recent three-year average of changes in State Quarterly Census of Employment and Wages (QCEW) for the category Social Assistance (NAICS 624). Data can be found at: https://www.bls.gov/cew/data.htm.

## 6. Geographic Diversity.

HUD has determined that geographic diversity is an appropriate consideration in selecting homeless assistance projects in the CoC Program Competition. HUD believes that geographic diversity can be achieved best by awarding grants to as many CoCs as possible. To this end, in instances where any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Northern Mariana Islands, the Virgin Islands, and American Samoa do not have at least one funded CoC, HUD reserves the right to fund eligible project(s) with the highest total score in the CoC.

## 7. Funding Diversity.

HUD reserves the right to reduce the amount of a grant, if necessary, to ensure that no more than 10 percent of assistance made available under this NOFO will be awarded for projects located within any one unit of general local government or within the geographic area covered by any one CoC.

## 8. Approval from HUD Headquarters is required before a grant awarded under this NOFO may be transferred.

Under this NOFO, HUD will treat the change of project applicant as a curable deficiency. This occurs when a Recipient of an expiring grant awarded under a prior FY CoC or YHDP competition NOFO applies to renew their award under this NOFO and during the period between applying for FY 2025 funds and before HUD announces FY 2025 awards, HUD executes a grant agreement amendment to transfer the expiring grant to a New Recipient.

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 251 of 283
PageID #: 3421

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

This grant transfer results in a FY 2025 CoC renewal application that does not reflect the New Recipient as the applicant. In this type of situation, HUD will treat the change of project applicant as a curable deficiency.

**9. Use of unawarded funds.**

In the case that funding remains available under this NOFO after HUD follows the selection process described in V.D.2 and V.D.3 above and any subsequent appeals process as described in VII.D below, HUD reserves the right to issue a supplemental NOFO.

## E. Award Notices

If you are successful, HUD will email an award notice to the authorized official representative from the SF-424. HUD will also notify unsuccessful applicants.

The award notice communicates the amount of the award, important dates, and the terms and conditions you need to follow. HUD may impose specific conditions on an award as provided under 2 CFR 200.208.

You agree to the award terms and conditions by either drawing funds from HUD's payment system or signing the agreement with HUD. If you do not agree to the award terms and conditions, HUD may select another eligible applicant.

Under 2 CFR 200.458 pre-award costs are allowable with written approval from HUD if such costs: a) are consistent with 2 CFR 200.458; and b) would be allowable as a post-award cost; and c) do not exceed 10 percent of the total funds obligated to this award. However, HUD will not consider eligibility for pre-award costs until after the date of the HUD selection notice. Additionally, the incurrence of pre-award costs in anticipation of an award imposes no obligation on HUD either to make the award, or to increase the amount of the approved budget, if the award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred.

For selected projects, HUD will require recordation of a HUD-approved use and repayment covenant before funds can be drawn down (the form can be obtained from the local HUD CPD field office) for all grants of funds for new construction, acquisition, and rehabilitation. (24 CFR 578.81) HUD Field Office Counsel must approve the use and repayment covenants in advance of their being recorded, and proof of recording must be submitted to HUD Field Office Counsel before HUD will release grant funds, other than acquisition funds.

If the award includes funds for acquisition, HUD may allow recipients to draw down acquisition funds before recording the Declaration of Restrictive Covenant if the HUD Field Office confirms that the escrow agent has received the Declaration of Restrictive Covenant and the recording instructions. The recipient or subrecipient may not draw down any funds other than acquisition funds until HUD Field Counsel has confirmed the Declaration of Restrictive Covenants has been recorded.

Case 1:25-cv-00636-MSM-AEM    Document 67-5    Filed 01/14/26    Page 252 of 283
PageID #: 1829

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

VI. Submissions Requirements and Deadlines

A.  Deadlines

B.  Submission Methods

C.  Other Submissions

D.  False Statements

TABLE OF CONTENTS

DOJ-HUD-AR01238

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 04/14/26    Page 253 of 283
PageID #: 3252

I. Basic | II. Eligibility | III. Program | IV. Application | V. Application | VI. Submission | VII. Post-Award | VIII. Contractants | Appendix
Information | | Description | Contents and | Review | Requirements and | Requirements and | Support |
| | | Format | Information | Deadlines | Administration |

# VI. SUBMISSION REQUIREMENTS AND DEADLINES

You must apply electronically. See <u>Find the Application Package</u> to make sure you have everything you need to apply online. See <u>Application Waiver</u> if you qualify to submit a paper application.

Make sure you are current with <u>SAM.gov</u> and UEI requirements before applying for the award. See the <u>Before You Begin</u> section of this NOFO.

## A. Deadlines

### 1. Application submission deadline:

The application deadline is 8 PM Eastern time on:

02/25/2025

HUD must receive your application by the deadline. Applications received after the deadline are late. Late applications are not eligible for HUD funding.

If HUD receives more than one application from you, HUD will review only the last submission.

HUD may extend an application due date based on emergency situations such as Presidentially-declared natural disasters. Improper or expired registration and password issues are not causes to allow HUD to accept applications after the deadline date.

Applicants must complete and submit their applications in *e-snaps* at **https://esnaps.hud.gov/**. The deadline to submit applications for FY 2025 funding is 8:00 PM EST on January 28, 2026 for Normal Track applications and February 25, 2026 for Extended Track applications.

24 CFR 578.9 requires CoCs to design, operate, and follow a collaborative process for the development of an application in response to a NOFO issued by HUD. As part of this collaborative process, CoCs must implement internal deadlines to ensure transparency and fairness at the local level. CoCs may operate separate collaborative processes and establish separate deadlines for Normal Track and Extended Track applications. The implementation of deadlines that meet the standards outlined below for FY 2025 CoC Program project applications are part of the scoring criteria as detailed in section V.B.1.a of this NOFO.

**a. *Project Application.*** All project applications must be submitted to the CoC before HUD's CoC Program application submission deadline.

**b. *CoC Notification to Project Applicants.*** The CoC is required to notify, in writing outside of e-snaps, all project applicants who submitted their project applications to the CoC by the local CoC-established deadline whether their project application(s) will be accepted and ranked on the CoC Priority Listing, rejected, or reduced by the CoC no later than 15 days of the FY 2025 CoC Program application submission deadline.

Where a project application is being rejected or reduced, the CoC must provide the project applicant with the reason(s) for the rejection or reduction. CoCs failing to provide this information to a project applicant that submits its project application by the local competition deadline will receive 0 points under section V.B.1.a.(2) of this NOFO.

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 04/14/26   Page 254 of 283
PageID #: 3___

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

2. Major Disaster Areas.

If a major disaster impacts a CoC's geographic area, as declared by the President under the Stafford Act, during the CoC Program application process that will impact the submission of the CoC Priority Listing and FY 2025 project applications, the CoC's Collaborative Applicant must send written notification to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCDisaster@hud.gov. The email must include:

**a.** the nature of the disaster, date(s) the major disaster occurred, how the major disaster affected the Collaborative Applicant, the CoC, or its project(s);

**b.** the duration, and the impact on the Collaborative Applicant, the project applicants, or the CoC to meet the local competition deadline; and

**c.** the anticipated amount of time the CoC is requesting for an extension (e.g., number of days, weeks, or months). This does not mean HUD will allow the full amount of time requested.

Based on the timing and the extent of the major disaster, HUD may extend the application deadline for the affected CoC(s). All requests received will be confirmed via the Federal Emergency Management Agency (FEMA) website, https://www.fema.gov/disaster.

## B. Submission Methods

### 1. Electronic Submission

The official documents HUD uses to solicit applications for this NOFO are posted on Grants.gov; however, you must register and submit your application through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

### 1. Electronic Submission

Applicants must register and submit project applications through esnaps.hud.gov. HUD does not accept applications or supportive documents via fax.

**a.** ***CoC Registration.*** Collaborative Applicants that Registered their CoCs in FY 2024 were not required to register again for FY 2025 funding. HUD moved all FY 2024 CoC Program Registrations forward for FY 2025 on behalf of all existing Collaborative Applicants in accordance with Notice CPD-22-02: Continuum of Care Program Registration. Collaborative Applicants that were designated by HUD as UFAs during the FY 2024 Registration were not required to reapply during the FY 2025 funding year.

**b.** ***CoC Review of Project Applications Prior to Submission to HUD.*** HUD expects CoCs to implement a thorough review and oversight process at the local level for both new and renewal project applications to be submitted to HUD for the FY 2025 CoC Program Competition. HUD's experience is that many project applications contain information resulting in conditions on the grant; or for more serious infractions, HUD rejecting a project application. Deficient project applications prolong HUD's review process, which results in delayed funding announcements, lost funding for CoCs due to

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 04/14/26   Page 255 of 283 PageID #: 3962

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractual Support | Appendix

HUD rejecting projects, and delays accessing project funds to house and assist individuals and families experiencing homelessness. HUD expects CoCs to closely review the information provided in each project application, including Renewal, Replacement, or Reallocation projects, to ensure:

**(1)** all proposed program participants will be eligible for the program component type selected;

**(2)** the information provided in the project application and proposed activities are:

**(a)** eligible and consistent with program requirements in the Rule;
**(b)** eligible and consistent with DV Renewal, DV Reallocation and DV Bonus requirements in sections IV.D.1.d, and IV.D.1.e, and I.D.1.f of this NOFO; or
**(c)** eligible and consistent with YHDP Renewal and YHDP Replacement project requirements which includes YHDP Reallocation provided in sections IV.D.1.h and IV.D.1.i of this NOFO;

**(3)** each project narrative is fully responsive to the question being asked and that it meets all the criteria for that question as required by this NOFO;

**(4)** the data provided in various parts of the project application are consistent; and

**(5)** all required attachments correspond to the list of attachments in e-snaps, must contain accurate and complete information and must be dated between November 1, 2024 and February 25, 2026.

**c.** *Collaborative Applicant Submission Requirements.* Collaborative Applicants must submit the FY 2025 Consolidated application by the FY 2025 application submission deadline. HUD will consider the CoC Consolidated Application properly submitted for review when the Collaborative Applicant submits the FY 2025 CoC Application, the FY 2025 CoC Priority Listing, and all FY 2025 project applications on behalf of the CoC.

If a CoC is submitting new Permanent Housing project applications, the CoC must submit a separate, Extended Track Priority Listing by the Extended Track deadline of February 25, 2026. HUD will not fund CoCs beyond their maximum award amount. CoCs should ensure that their Fy 2025 Priority Listing and Extended Track Priority Listing do not exceed their maximum award amount.

The FY 2025 CoC Application and the FY 2025 CoC Priority Listing and Extended Track Priority Listing are separate submissions in e-snaps. Collaborative Applicants must ensure both the CoC Application and the CoC Normal Track Priority Listing, that includes project applications either approved and ranked or rejected, are submitted in e-snaps prior to the Normal Track CoC Program application submission deadline. The Extended Track Priority Listing must be submitted by the Extended Track application submission deadline.

The "Submit" button will not be available on the Submission Summary of the FY 2025 CoC Application and FY 2025 CoC Priority Listing until all required sections of the application and all parts of the listings have been completed. Collaborative Applicants should review the Submission Summary form carefully to ensure no sections state "Please Complete."

Collaborative Applicants should export a PDF copy of the Submission Summary form from

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 256 of 283
PageID #: 3...

I. Basic Information   II. Eligibility   III. Program Description   IV. Application Contents and Format   V. Application Information   VI. Submission Requirements and Deadlines   VII. Post-Award Requirements and Administration   VIII. Contractand Support   Appendix

the FY 2025 CoC Application and the FY 2025 CoC Priority Listing and Extended Track Priority Listing after they have been submitted to HUD and before closing their internet browser. This is the Collaborative Applicant's receipt of submission and proof of compliance with the FY 2025 application deadline.

The CoC Consolidated Application includes the following:

**(1) FY 2025 CoC Application which includes the following:**

**(a) CoC Review, Score, and Ranking Procedures.** The CoC's written procedures that are publicly posted for all interested stakeholders and applicants that clearly describe the project-level review and ranking process that is used by the CoC to determine how CoC Program project applications submitted to the CoC are reviewed, scored, and ranked.

**(b) CoC Public Notice.** A screenshot(s) from the CoC's, or a partner website, that includes the date the CoC notified the public of its local competition process, the due date for project applications, and the full CoC Application and CoC Priority Listing that includes all Project Listings of project applications submitted to HUD as accepted (in the case of non-competitive CoC Planning and UFA costs), approved and ranked or rejected.

**(c) CoC Review and Ranking Process.** Documents the process used by the CoC in the local competition to review, assess, and score new and renewal project applications, a copy of one scored project application form used by most renewal project applicants that includes the objective criteria and system performance criteria and their respective maximum point values and the actual points your CoC awarded to the project applicant; and the local competition selection results for new and renewal project applications.

**(d) Notification to Project Applicants of projects rejected or reduced.** The notification of the action (rejection or reduction) that must be sent to the project applicant at least 15-days prior to the HUD application submission deadline, if a new or renewal project application was submitted to the CoC in the local competition and the CoC rejected it or reduced its funding request as part of the CoC's local process.

**(e) Public Notification of Ranked Project Applications.** The notification of action that all project applicants who submitted new and renewal project applications in the local CoC competition are notified at least 15-days prior to the HUD application submission deadline of the CoC's acceptance that includes the ranked position of the project applications. This notification may be posted publicly or sent via email to individual project applicants.

**(f) PHA Administrative Plan.** If the CoC is seeking points under section V.B.1.c.(11) of this NOFO, a copy or the relevant excerpt from the local PHA(s) administrative planning document(s), or other written policy developed between the CoC and the PHA(s) that describes the PHA(s) preference for persons experiencing homelessness. Instead of a relevant excerpt from the written plan, a letter from the PHA(s) that describes the PHA(s) preference for persons

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 04/14/26    Page 257 of 283 PageID #: 3458

I. Basic Information  II. Eligibility  III. Program Description  IV. Application Contents and Format  V. Application Review Information  VI. Submission Requirements and Deadlines  VII. Post-Award Requirements and Administration  VIII. Contracts and Support  Appendix

experiencing homelessness may be attached.

**(g) Leveraging Housing and Healthcare Resources.** If the CoC is seeking points under section V.B.1.c.(12) and (13) written commitment(s), contract(s), or other formal written documents that demonstrate the number of housing subsidies, housing units, and healthcare resources that will be provided.

**(h) Projects to Serve Persons Defined as Homeless under paragraph (3) of 24 CFR 578.3.** If the CoC is seeking to serve persons defined as homeless under paragraph (3) of the homeless definition, a list of projects that will serve persons defined as homeless under paragraph (3) of the homeless definition.

**(i) The FY 2025 HDX Competition Report.** The FY 2025 HDX Competition Report contains data submitted to HUD via HUD's Homelessness Data Exchange (HDX), including HIC, PIT count, and system performance data.

**(2) FY 2025 Project Application(s), including for each project application:**

**(a) Charts, narrative responses, and attachments.**

**(b) Documentation of Applicant and subrecipient Eligibility.** All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

**(c) HUD required forms.** The following HUD required forms are built into e-snaps and must be fully completed and electronically signed before project applicants have access to the project application (see section IV.F.A of this NOFO).

**(3) FY 2025 CoC Priority Listing, including.** The CoC Priority Listing in e-snaps must include the following completed forms, certifications and attachments:

**(a) Project Reallocation Form.** The Reallocation form allows CoCs to indicate which eligible new projects, if any, will be reduced or eliminated through the reallocation process.

**(b) CoC and YHDP Project Listings.** The CoC project listing forms require the following project applications to be ranked, with unique rank numbers, in order of priority. Any project not ranked with a unique rank number must be rejected. The forms under this requirement include:

**i.** CoC New Projects (including CoC Bonus and CoC Reallocation projects;
**ii.** CoC Renewal Projects (including DV Renewal and Special NOFO Renewal projects);
**iii.** DV Bonus Projects;
**iv.** DV Reallocation Projects;

**v.** YHDP Renewal Projects;

**vi.** YHDP Replacement Projects (including YHDP Reallocation projects).

**(c)** CoC Planning and UFA Costs Project Application Listings. These project listing forms include the following non-ranked project applications:

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Review Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Other Information | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 04/14/26   Page 258 of 283 PageID #: 3402

**i.** CoC Planning Project Listing; and

**ii.** UFA Costs Project Listing, if applicable.

Collaborative Applicants must ensure the CoC only submits one project application for CoC Planning, and if the CoC's Collaborative Applicant is a HUD-designated UFA, one UFA Costs project application.

**(d)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(e)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

**(4) Extended Track Priority Listing.** For CoCs that are applying for new Permanent Housing projects, the Extended Track Priority Listing in e-snaps must include project applications that are ranked, with unique rank numbers, in order of priority. If a CoC is only applying for one new Permanent Housing project, it must still submit a Extended Track Priority Listing. The Extended Track Priority Listing must also include:

**(a)** Form HUD-2991, Certification of Consistency with the Consolidated Plan (See section IV.A.1 of this NOFO).

**(b)** Tribal Resolution, if applicable (See section IV.1.2 of this NOFO).

## d. Project Application Submissions.

Project applications must include the population(s) and subpopulation(s) they will serve, the type of housing and services they will provide, and the budget activities they are requesting. Project applicants must also provide documentation of applicant and subrecipient eligibility. All nonprofit project applicants must attach eligibility documentation to the Project Applicant Profile. If nonprofit subrecipients are included in a project application, subrecipient eligibility documentation must be attached to the project application.

Collaborative Applicants applying for CoC Planning and UFA Costs (if designated as a UFA by HUD) must provide a description of the activities that will be carried out with CoC Program grant funds.

Additionally, all project applicants must ensure their organization has a Code of Conduct that complies with the requirements of 2 CFR part 200, as may be amended from time to time, and is included on HUD's website. If the organization's Code of Conduct does not appear on HUD's website, the project applicant must attach its Code of Conduct that includes all required information to its Project Applicant Profile in e-snaps.

For more information on project applications, see section IV.D of this NOFO.

## e. Timely Submissions.

HUD will not fund applications that are not received on time. Also, failure to submit a complete CoC Consolidated Application may result in HUD finding that the CoC does not meet the requirements of the Act or its implementing regulations under 24 CFR 578.13. If the Secretary makes that finding, HUD may take remedial action to ensure fair distribution of grant funds to eligible entities within the CoC's geographic area, which includes the possibility that HUD will designate another eligible applicant to be the Collaborative Applicant for the CoC. In addition to the remedial actions listed in 24 CFR 578.13(a), HUD may also impose

I. Basic Information    II. Eligibility    III. Program Description    IV. Application Contents and Format    V. Application Information    VI. Submission Requirements and Deadlines    VII. Post-Award Requirements and Administration    VIII. Contacts and Support    Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 259 of 283 PageID #: 3453

another remedial action, such as requiring the CoC to create new policies and procedures to ensure that the Collaborative Applicant performs its duties.

**f. Resolving Technical Difficulties.**

CoC and project applicants experiencing technical difficulty with any part of the Application should notify HUD immediately for assistance and document all attempts to obtain assistance. Notification of technical difficulties are to be sent to CoCNOFO@hud.gov. HUD will not provide assistance directly related to content, only to troubleshoot submission issues.

CoCs that are submitting new and renewal applications for FY 2025 CoC and YHDP funding should print the Submission Summary form for the FY 2025 CoC Priority Listing for proof of compliance with the FY 2025 application deadline. HUD will not give funding consideration to any Collaborative Applicant whose FY 2025 CoC Priority Listing is determined to be late and the Collaborative Applicant is unable to provide HUD with a record of submission that verifies the CoC Consolidated Application was submitted prior to the application deadline date and time.

HUD strongly suggests that applicants use the "Export to PDF" functionality in e-snaps to save a hard copy of all submission documents for their records. This can be completed prior to or after submission.

If after notice and reasonable opportunity to be heard, HUD finds pursuant to 24 CFR 578.13, that one or more CoCs have failed to comply with the requirements of the Act and the Rule, HUD may, solely at its discretion and only if sufficient funds become available by recapture, publish a new NOFO for eligible applicants in CoCs that HUD determined do not meet the requirements of the Act and program regulations.

**Need Help?** See the Contact and Support section of this NOFO.

## 2. Electronic Submission Application Waiver

You may request a waiver from the requirement to submit your application electronically. The request must show good cause and detail why you are technologically unable to submit electronically. An example of good cause may include: a valid power or internet service disruption in the area of your business office. Lack of SAM.gov registration is not good cause.

Use the information in the Contact and Support section of this NOFO to submit a written request to HUD. You must **submit your waiver request at least 15 calendar days before the application deadline**.

The regulatory framework of HUD's electronic submission requirement is the final rule established in 24 CFR 5.1005. CoCs seeking a waiver of the electronic submission requirement must request a waiver in accordance with 24 CFR 5.1005. If a Collaborative Applicant finds it cannot submit its application electronically and must seek a waiver of the electronic grant submission requirement, its request must be postmarked no later than 60 days after the publication date of this NOFO. To expedite the receipt and review of each request, Collaborative Applicants may email their written requests to Norm Suchar, Director, Office of Special Needs Assistance Program (SNAPS) at CoCNOFO@hud.gov. If HUD does not have sufficient time to process the waiver request, HUD will not grant a waiver. HUD will not consider paper applications received without a prior approved waiver or after the

DOJ-HUD-AR01245

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case: 1:25-cv-00636-MSM-AEM Document 67-6 Filed 01/14/26 Page 260 of 283 PageID #: 32?

established deadline.

## C. Other Submissions

### 1. Intergovernmental Review

This NOFO is not subject to Executive Order 12372. No action is needed.

### 2. Technical Application Errors

HUD may contact you to fix a technical error with your timely application after the due date. Technical errors that you may fix are not submitted to satisfy merit review criteria. And you may not fix technical errors related to threshold review except eligibility entity documentation. Examples of technical errors include: inconsistencies in funding requests; improper signature on a form; a missing or incomplete form; and nonprofit status documentation.

HUD will send notice to the authorized organization representative from the SF-424 to fix a technical error.

Your application is not eligible for funding, if you fail to fix the error to HUD's satisfaction and by the due date in HUD's notice. HUD will not review information submitted after the application due date in HUD's notice.

Applicants should compare their application submission with the requirements in the CoC Program NOFO. The FY 2025 Continuum of Care and Youth Homeless Demonstration Program Grants NOFO located on Grants.gov is HUD's official NOFO. If a discrepancy in the CoC Program NOFO posted on Grants.gov or other information provided in any other version or supporting documentation is found, please notify HUD immediately as indicated in section VIII of this NOFO. HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.

HUD will post any corrections or amendments to a CoC Program NOFO on Grants.gov.

For projects conditionally selected for award, HUD verifies that your organization has an active SAM registration prior to release of awarded funds and will withhold processing funds if your organization's SAM registration has expired or isn't consistent with the information provided on the SAM.gov website. A UEI discrepancy may also occur if HUD approves a grant to be amended to a new recipient (see section V.D.7 of this NOFO).

UEI discrepancies are a curable deficiency that may be corrected by the applicant with timely action. If a UEI discrepancy isn't resolved within the timeframe prescribed by the Notification of Curable Deficiency the applicant receives from HUD, HUD may reject the project.

### a. Fix Errors in Electronic Applications

To fix an error in response to a HUD notice, you must email the corrections to HUD at CoCNOFO@hud.gov.

HUD allows 7 calendar days from the date of the HUD notice to fix an error. If the due date to fix an error falls on a Saturday, Sunday, Federal holiday, or on a day when HUD's Headquarters office in Washington, DC is closed, then the due date is the next business day.

DOJ-HUD-AR01246

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 04/14/26   Page 261 of 283 PageID #: 3592

## b. Fix Errors in Paper Applications

You must fix an error in your paper application, in accordance with HUD's notice. If your paper application includes an incorrect UEI, HUD will request you supply the correct UEI.

## D. False Statements

By submitting an application, you acknowledge your understanding that providing false or misleading information during any part of the application, award, or performance phase of an award may result in criminal, civil or administrative sanctions, including but not limited to: fines, restitution, and/or imprisonment under 18 USC 1001, 18 USC 1012, 18 USC 1010, 18 USC 1014, or 18 USC 287; treble damages and civil penalties under the False Claims Act, 31 USC 3729 et seq.; double damages and civil penalties under the Administrative False Claims Act, 31 USC Sections 3801-3812; civil recovery of award funds; suspension and/or debarment from all federal procurement and non-procurement transactions, FAR Part 9.4 or 2 CFR Part 180; and other remedies including termination of active HUD award.

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/21/26    Page 262 of 283    PageID #: 3432

# VII. POST - AWARD REQUIREMENTS AND ADMINISTRATION

VII. Post-Award Requirements and Administration

A. Administrative, National and Departmental Policy Requirements and General Terms and Conditions

B. Environmental Requirements

C. Remedies for Noncompliance

D. Reporting

TABLE OF CONTENTS

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 263 of 283 PageID #: 3433

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# VII. POST-AWARD REQUIREMENTS AND ADMINISTRATION

## A. Administrative, National and Departmental Policy Requirements, and General Terms and Conditions

You must follow the applicable provisions in the Administrative, National & Departmental Policy Requirements and Terms for HUD Financial Assistance – 2025. You must comply with these applicable provisions:

1. The Fair Housing Act (42 USC 3601-3619) and Civil Rights laws which encompass the Fair Housing Act and related authorities (24 CFR 5.105(a))

2. Affirmatively Furthering Fair Housing (AFFH) requirements, (42 USC § 3608(e)(5)) and implementing regulations at 24 CFR 5.150 et seq.as amended by 90 FR 11020.

3. Economic Opportunities for Low-and Very Low-income Persons (12 USC 1701u) requirements, including those listed at 24 CFR part 75

4. Compliance with Immigration Requirements (8 U.S.C. 1601-1646; Executive Order 14218)

5. Accessible Technology requirements, (29 USC § 794d, 29 USC 794, 42 USC 12131-12165) and implementing regulations at 36 CFR part 1194 (Section 508 regulations),24 CFR § 8.6 (Section 504 effective communication regulations), 28 CFR part 35, subpart H (DOJ Web Access Rule), and 28 CFR part 35, subpart E (DOJ's Title II communications regulations)

6. Ensuring, when possible, small businesses, minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms receive consideration consistent with 2 CFR 200.321

7. Equal Participation of Faith-based Organizations in HUD Programs and Activities consistent with 42 U.S.C. 2000bb et seq.; 42 U.S.C. 2000d et seq.; 24 CFR 5.109; and Executive Orders 14202, *Eradicating Anti-Christian Bias* and EO 14205, *Establishment of the White House Faith Office.*

8. Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 USC § 4601 et seq.) (URA) requirements, 49 CFR part 24, and applicable program regulations

9. Participation in HUD-Sponsored Program Evaluation (12 USC 1701z-1; 12 USC 1702z-2; 24 CFR part 60; and FR-6278-N-01)

10. OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR part 200)

11. Drug-Free Workplace requirements (2 CFR part 2429)

12. HUD requirements related to safeguarding resident/client files (e.g., 2 CFR 200.303(e))

13. The Federal Funding Accountability and Transparency Act of 2006 (2 CFR part 170) (FFATA), as amended

15. Accessibility for Persons with Disabilities requirements (29 USC § 794) and implementing

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 264 of 283 PageID #: 3434

I. Basic Information   II. Eligibility   III. Program Description   IV. Application Contents and Format   V. Application Information   VI. Submission Requirements and Deadlines   VII. Post-Award Requirements and Administration   VIII. Contractans Support   Appendix

regulations at 24 CFR parts 8 and 100; 28 CFR part 35

16. Applicable Violence Against Women Act requirements in the Housing Chapter of VAWA (34 USC § 12491-12496) 24 CFR part 5, subpart L, and program-specific regulations.

17. Conducting Business in Accordance with Ethical Standards/Code of Conduct, including 2 CFR 200.317, 2 CFR 200.318(c) and other applicable conflicts of interest requirements

18. Build America, Buy America (BABA) Act procurement purchase requirements

20. Environmental requirements that apply in accordance with 24 CFR part 50 or part 58

22. Unless prohibited by law and to the extent permitted under the Freedom of Information Act (FOIA), your application and post-award content may be released to the public in response to FOIA requests, except to the extent that certain information may be withheld under a FOIA exemption (5 USC § 552(b); 24 CFR 15.107(b)). HUD may also share your information within HUD or with other Federal agencies if HUD determines that sharing is relevant to the respective program's objectives.

23. Waste, Fraud, Abuse, and Whistleblower Protections. 41 USC § 4712, which includes informing your employees in writing of their rights and remedies, in the predominant native language of the workforce. Under 41 U.S.C. § 4712, employees of a contractor, subcontractor, grantee, subgrantee, and personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant. (See Federal Contractor or Grantee Protections | Office of Inspector General, Department of Housing and Urban Development (hudoig.gov))

24. Implementing Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction: Executive Order (EO) 14219 (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative); 14218 (Ending Taxpayer Subsidization of Open Borders); guidance resulting from the White House Task Force established by 14202 (Eradicating Anti-Christian Bias) and the Senior Advisor to the White House Faith Office assigned by 14205 (Establishment of the White House Faith Office); 14182 (Enforcing the Hyde Amendment); 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity); 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing); and 14148 (Initial Rescissions of Harmful Executive Orders and Actions)

In addition:

1. Awards made under this NOFO will not be used to conduct activities that subsidize or facilitate illegal racial preferences or other forms of illegal discrimination, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; 14332 (Improving Oversight of Federal Grantmaking).

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 265 of 283
PageID #: 3435

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractual and Support | Appendix

2. Awards made under this NOFO will not be distributed in a way that violates or otherwise is used to interfere with constitutional protections guaranteed for speech and religious beliefs and the free exercise of religion.

3. Awards made under this NOFO will not be used to fund, promote, encourage, subsidize or facilitate the use of illicit drugs.

4. Awards made under this NOFO will not be used to fund any project, service provider, or organization that operates illegal drug injection sites or "safe consumption sites" in violation of 21 U.S.C. § 856..

5. All agreements or contracts made with subrecipients under this NOFO must contain the identical terms and conditions as those in the grant agreement issued by HUD. Any additional or conflicting terms and conditions must be approved by HUD.

6. If any part or provision of the grant Agreement or terms of this Notice are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice. In the event the enjoinment of such provisions is stayed, dissolved or reversed, the full terms of the grant agreement and Notice, including such provisions, will automatically become effective. This clause is self-executing and will become effective, binding, and enforceable automatically upon issuance of this Notice.

## B. Environmental Requirements

### 1. Environmental Review

You must follow these environmental review requirements, including regulations at:

24 CFR part 50

24 CFR part 58

Notwithstanding 24 CFR 578.31 and 24 CFR 578.99(a) of the Rule, and in accordance with Section 100261(3) of MAP-21 (Pub. L. 112-141, 126 Stat. 405), activities under this NOFO are subject to environmental review by a responsible entity under HUD regulations at 24 CFR part 58 or by HUD under 24 CFR part 50.

a. All HUD assisted activities, even projects that only involve exempt activities, require some level of environmental review. Two types of projects are Categorically Excluded from review under the National Environmental Policy Act (NEPA) and not subject to compliance with the laws and authorities listed under 24 CFR 58.5 (CENST): All scattered-site projects where program participants choose their own unit and are not restricted to units within a pre-determined specific project site or sites are categorized in 24 CFR 58.35(b)(1) as CENST. This includes both tenant-based rental assistance and tenant-based leasing projects where program participants choose their own unit and do not involve any physical work or impacts beyond routine maintenance as defined by Notice CPD-16-02: Guidance for Categorizing an Activity as Maintenance for Compliance with HUD Environmental Regulations. The Exempt/CENST environmental review form is only required for each project, not every unit.

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 266 of 283 PageID #: 3436

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contractand Support | Appendix

**b.** For activities under a grant to a recipient other than a state or unit of general local government that generally would be subject to review under 24 CFR part 58, HUD may make a finding in accordance with 24 CFR 58.11(d) and may itself perform the environmental review under the provisions of 24 CFR part 50 if the recipient objects in writing to the responsible entity's performing the review under part 24 CFR part 58.

**c.** Irrespective of whether the responsible entity in accordance with 24 CFR part 58 (or HUD in accordance with 24 CFR part 50) performs the environmental review, the recipient must supply all available, relevant information necessary for the responsible entity (or HUD, if applicable) to perform for each property any required environmental review. The recipient also must carry out mitigating measures required by the responsible entity (or HUD, if applicable) or select alternative property.

**d.** The recipient, its project partners, and their contractors may not acquire, rehabilitate, convert, lease, repair, dispose of, demolish, or construct property for a project under this NOFO, or commit or expend HUD or non-HUD funds for such eligible activities under this NOFO, until the responsible entity (as defined by 24 CFR 58.2(a)(7)) has completed the environmental review procedures required by 24 CFR part 58 and the environmental certification and Request for Release of Funds (RROF) have been approved or HUD has performed an environmental review under 24 CFR part 50 and the recipient has received HUD approval of the project. HUD will not release grant funds if the recipient or any other party commits grant funds (i.e., incurs any costs or expenditures to be paid or reimbursed with such funds) before the recipient submits and HUD approves its RROF (where such submission is required).

## 2. NOFO Impact Determination Related to the Environment

This NOFO has no significant impact related to the environment. HUD has made a Finding of No Significant Impact (FONSI) as required by HUD regulations at 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969 (42 USC § 4332(2)(c)). To learn more about this FONSI, go to HUD's Funding Opportunities web page.

## 3. Lead-Based Paint Requirements

You must follow the lead-based paint rules below if you fund any work on pre-1978 housing. This includes buying, leasing, support services, operating, or work that disturbs painted surfaces.

- HUD's rules (Lead Disclosure Rule; and Lead Safe Housing Rule).
- EPA's rules (Renovation, Repair and Painting Rule, and Lead Abatement, Inspection and Risk Assessment Rule).

You must discuss the Lead Disclosure Rule if you fund education or counseling on buying or renting housing that may have been built before 1978. You must also discuss the Lead Safe Housing Rule if the education or counseling focuses on buying or renting HUD-assisted pre-1978 housing.

## C. Remedies for Noncompliance

HUD may terminate all or a part of your award as described under 2 CFR 200.340 through 200.343 pursuant to the terms and conditions of your award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. HUD may also impose specific conditions on your award or take other remedies as described by 2 CFR 200.339 through 200.343, if you do not comply with your award terms and conditions.

For more information on CoC Program sanctions and remedies for noncompliance see 24 CFR 578.107.

## D. Reporting

HUD requires recipients to submit the performance, financial, and program reports as outlined below. You must comply with these reporting requirements to remain eligible for HUD funding. See Section VII.C. of this NOFO.

HUD is implementing new grants management and reporting tools, which will be rolled out for your use in the near term. As a grantee, you will be required to report on grant performance and financial activities (including vendor and cash disbursement supporting details for yourself and your sub-recipients) using these new tools when they are released. HUD will work with you to support your transition to this new reporting environment. Once implemented, timely reporting in this new environment will be mandatory. HUD reserves the right to exercise all available rights and remedies for any noncompliance with these grants management and financial reporting requirements, to include requiring 100% review or stopping future disbursements altogether if reporting is not timely submitted.

| Report | Description | When |
|---|---|---|
| Federal Funding Accountability and Transparency Act (FFATA) | • Awards equal to or greater than $30,000<br>• Data on executive compensation and first-tier subawards<br>• See Public Law 109-282 and 2 CFR part 170<br>• HUD reports initial prime recipient data to usaspending.gov<br>• Submit via SAM.gov | See 2 CFR Appendix A to Part 170(a)(2)(ii) |
| Reporting on Recipient Integrity and Performance Matters | • Total value of all current Federal awards exceed $10,000,000 for any period of time during the period of | See 2 CFR Appendix-XII to Part 200 I.(d) |

| | performance of this Federal award<br><br>• See Appendix XII to 2 CFR 200<br><br>• Submit via SAM.gov | |
|---|---|---|
| Annual Performance Report (APR) | • Collect and report data use of funds annually.<br><br>• Projects receiving funds for acquisition, new construction, or rehabilitation must submit APRs for 15 years from the date of initial occupancy or the date of initial service provision. | See 24 CFR 578.103(e) |
| Federal Financial Report, SF-425 | • Summary of key financial data<br><br>• See 2 CFR 200.328 | See 2 CFR 200.328 or award terms |
| Race, Ethnicity, and Other Data Reporting | Recipients that provide HUD-funded program benefits to individuals or families, report data on the race, color, religion, sex, national origin, age, disability, and family characteristics of persons and households funded by this program. | Annually through the Homeless Data Exchange submission. |
| Audited financial statement | Recipient's organizational structure, any sub-grantees or sub-recipients, and how each disbursement of grant funds was applied to an eligible cost throughout the life of the grant to receive disbursements of Federal funds. | No less than annually. |

**1. Program Specific Reporting Requirements.**

    **a.** In accordance with program regulations at 24 CFR 578.103, project recipients must

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM Document 67-6 Filed 01/14/26 Page 269 of 283 PageID #: 3439

maintain records within the timeframe required and make any reports that HUD may require. Project recipients may report the data as part of their APR submission to HUD. Also, project recipients who expend $750,000 or more in 1 year in federal awards must have a single or program-specific audit for that year in accordance with the provisions of 2 CFR part 200, subpart F.

**b. Section 3 Reporting Regulations.** Recipients are required to report their Section 3 activities per 24 CFR 75.25 if funds were awarded for housing rehabilitation, housing construction, and other public constructions. See HUD's Section 3 website for additional information including annual reporting requirements.

**c.** Award notices may also include requirements for sub-award reporting in compliance with the requirements of the Federal Financial Assistance Accountability and Transparency Act of 2006 (Pub. L. 109-282) (FFATA) and Section 872 of the Duncan Hunter National Defense Authorization Act for Fiscal Year 2009 (Pub. L. 110-417), referred to as "Section 872." See the General Section for further information.

**e.** An estimate of the reporting and recordkeeping burden of the CoC Program can be found in the Federal Register Publication of the Rule.

## 2. Administrative and Other Program Requirements.

Federal agencies are required to measure the performance of their programs. HUD captures this information from monitoring visits and APRs

# VIII. CONTACT AND SUPPORT

VIII. Contact and Support

A. Agency Contact

B. Grants.gov

C. Sam.gov

D. Debriefing

E. Applicant Experience Survey

F. Other Online Resources

TABLE OF CONTENTS

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 271 of 283 PageID #: 3441

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

# VIII. CONTACT AND SUPPORT

Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call, visit the webpage for the Federal Communications Commission.

## A. Agency Contact

### 1. Program and Application Requirements

Name: HUD Office of Community Planning and Development

Phone: 800-347-3735

Email: CoCNOFO@hud.gov

Note: HUD's assistance is limited by the standards at 24 CFR 4.26.

HUD staff will be available to provide general clarification on the content of this NOFO; however, HUD staff are prohibited from assisting any applicant in preparing the application(s) in e-snaps.

**a. Local HUD Community Planning Development (CPD) Office.** Questions regarding specific program requirements should be directed to the local HUD CPD field office, a directory of which can be found at https://www.hud.gov/program_offices/field_policy_mgt/localoffices.

**b. Training and Resources.** Collaborative Applicants and project applicants that need assistance completing the applications in e-snaps or understanding the program requirements under the CoC Program may access the Rule, training materials, and program resources via https://www.hud.gov/hud-partners/community-coc.

**c. Questions.** CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions up to the deadline of 8:00 PM EST on January 14, 2026. Applicants experiencing technical difficulty should contact CoCNOFO@hud.gov immediately for assistance and document their attempts to obtain assistance.

### 2. Paper Application Waiver Request

Name: HUD Office of Community Planning and Development

Email: CoCNOFO@hud.gov

Phone: (202) 708-4300

HUD Organization: Community Planning and Development

Street: 451 7th Street SW

City: Washington

DC DISTRICT OF COLUMBIA

20410

**HUD Reform Act.** HUD is prohibited from disclosing covered selection information during the selection process. The selection process includes NOFO development and publication, and concludes with the announcement of selected recipients of financial assistance. HUD will not assist you with completing your application.

HUD will only return calls related to paper application requests. All other calls will not be returned.

All other requests or questions regarding this NOFO must be sent via email to CoCNOFO@hud.gov

## B. esnaps.hud.gov

CoCs, Collaborative Applicants, and project applicants that require information and technical support concerning this NOFO and the application in e-snaps may submit an inquiry to CoCNOFO@hud.gov. Starting 2 days prior to the application deadline, this email address will respond only to emergency technical support questions

## C. SAM.gov

If you need help, you can call 866-606-8220 or live chat with the Federal Service Desk.

## D. Debriefing and Appeals

1. After public announcement of awards, HUD will debrief the Collaborative Applicant upon your written request. Submit your written request to the agency contact for program and application requirements in this NOFO. HUD may limit the information provided to protect the integrity of the competition.

2. You may appeal an application decision or a HUD funding decision. Email your appeal to snapsappeals@hud.gov. The subject line of your email must include the CoC Number, "Appeal Notice," and type of appeal, i.e., Participation, HUD Error, or Consolidated Plan Certification. A sample email Subject Line is, Subject: XX-500 – Appeal Notice–Consolidated Plan Certification.

24 CFR 578.35 provides the appeal process options. Sections 578.35(b)(3), (b)(4), (c)(1), and (d)(2) authorize HUD to establish requirements for the form and manner of submissions for appeals by Solo Applicants, applicants with denied or decreased funding, and from competing CoCs. For HUD to consider an appeal under 24 CFR 578.35(b) or (c), the solo project applicant must follow the applicable application process set forth in this NOFO. This NOFO also provides guidance to CoCs and applicants regarding appeals of a jurisdiction's refusal to sign the Consolidated Plan certification for a project under 24 CFR 578.35(c).

Additionally, HUD is clarifying the impact that Solo Applicant appeals will have on HUD signing grant agreements for funds awarded under this NOFO. If HUD receives one or more Solo Applicant appeals from a CoC, HUD will determine the amount of funding the Solo Applicant(s) have requested which may delay signing grant agreements for the awarded project(s) listed at the bottom of the CoC's Priority Listing that has requested funding under this NOFO equal to double the amount requested by the Solo Applicant(s). Refer to the Solo Applicant appeal process in section VIII.D.4 of this NOFO for additional information about the

Solo Application appeal process.

Finally, for the purposes of the appeals identified in this NOFO where 24 CFR 578.35 requires that all evidence be sent to the CoC and that the CoC respond to evidence, this means that correspondence to the CoC should be addressed to the CoC-designated Collaborative Applicant and all correspondence to HUD from the CoC should be addressed from the CoC's designated Collaborative Applicant. If the CoC has authorized another entity other than the Collaborative Applicant to respond to the appeals identified in this NOFO on its behalf, it should notify HUD by sending an email to snapsappeals@hud.gov.

### 3. Types of Appeals.

The provision at 24 CFR part 578 sets forth the following types of appeals:

**a. *Solo Applicants.*** A process for eligible project applicants that attempted to participate in their CoC planning process and believe they were denied the right to participate in a reasonable manner.

**b. *Denied or Decreased Funding.*** A process for eligible applicants that are denied funds by HUD or that requested more funds than HUD awarded to them.

**c. *Consolidated Plan Certification.*** A process for eligible applicants whose jurisdiction refused to provide a Certification of Consistency with the Consolidated Plan (form HUD-2990).

**d. *Competing CoCs.*** A process when more than one CoC selects the same geographic area, for eligible applicants of lower-scoring CoCs, to appeal to HUD's decision to fund the competing CoC. Should two or more CoCs select the same geographic codes associated with formula areas during the CoC Program Registration process, HUD will use the competing CoC process provided by 24 CFR 578.35(d).

### 4. Solo Applicant.

Per the Act, "A solo applicant may submit an application to the Secretary for a grant under subsection (a) and be awarded such grant on the same basis as such grants are awarded to other applicants based on the criteria described in section 427, but only if the Secretary determines that the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner. The Secretary may award such grants directly to such applicants in a manner determined to be appropriate by the Secretary."

To apply as a solo applicant, the project applicant must submit a Solo Applicant Project Application in e-snaps by the application submission deadline of January 14, 2026 at 8:00 PM EST. Additionally, the solo applicant, Collaborative Applicant, and HUD must take the following steps (See 24 CFR 578.35 for more information):

**a. *Written Notice of Intent to Appeal.*** The solo applicant must submit a written notice of intent to appeal, with a copy to the CoC, with their funding application.

**b.** No later than 30 days after the date that HUD announces the awards, the solo applicant shall submit in writing, with a copy to the Collaborative Applicant, all relevant evidence supporting its claim. The submission shall be emailed to

DOJ-HUD-AR01259

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM Document 67-6 Filed 01/14/26 Page 274 of 283 PageID #: 3444

snapsappeals@hud.gov.

**c.** The CoC has 30 days from the date of its receipt of the solo applicant's evidence to respond to HUD in writing, with a copy to the solo applicant. The submission must be emailed to snapsappeals@hud.gov.

**d.** HUD will notify the solo applicant and the CoC of its decision within 60 days of receipt of the CoC's response.

**e.** If HUD finds that the solo applicant was not permitted to participate in the Continuum of Care planning process in a reasonable manner, then HUD may award a grant to the solo applicant when funds next become available and may direct the Continuum of Care to take remedial steps to ensure reasonable participation in the future. HUD may also reduce the award to the Continuum's applicant(s).

## 5. Denied or Decreased Funding.

Eligible applicants, including project applicants and Collaborative Applicants, that submitted an application to HUD in response to this NOFO, that were either not awarded funds by HUD, or that requested more funds than HUD awarded, may appeal HUD's decision within 45 days after the final funding announcement. HUD will only consider for funding or additional funding applicants the CoC ranked within the CoC's maximum amount available. Collaborative Applicants that submitted CoC planning, and if applicable, UFA Costs project applications can appeal decreased funding if they can demonstrate HUD decreased the submitted project application's funding request to less than 5 percent of the CoC's FPRN or $1,250,000; whichever is less. To appeal HUD's decision, the applicant must submit a written appeal to HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant. The written appeal must include evidence demonstrating HUD error and follow the instructions in this section.

The applicant must submit its written appeal by email to snapsappeals@hud.gov, from the organization's email address on the organization's letterhead and signed by the authorized representative–electronic signatures are acceptable.

**a.** *Denied Funding.* To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in Section VIII.D.6 of this NOFO within 45 days of the date of the funding announcement of the conditional awards from HUD, with a copy to the authorized representative from the CoC's designated Collaborative Applicant.

**(1)** Projects, including projects for CoC Planning funds and Unified Funding Agency (UFA) costs, could have been rejected by HUD because:

**(a)** the individual project application failed to meet project eligibility, project quality, and project renewal thresholds set forth in this NOFO;

**(b)** the individual project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO, but was ranked in a position where a portion of the grant funds was outside the CoC's maximum award amount, and after HUD reduced its funding to fit within the CoC's maximum award amount, HUD determined that the project was no longer feasible; or

**(c)** HUD did not have sufficient funding to fund all eligible projects ranked within

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 275 of 283
PageID #: 3445

the CoC's maximum award amount.

**(2)** For applicants that were fully denied funding for a grant, the applicant must provide evidence that demonstrates HUD error in not awarding the grant. Documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility, project quality, and project renewal thresholds set forth in this NOFO; and

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO, which resulted in the project not being funded.

**(3)** For applicants that were denied funding due to the individual project's funding being decreased to such a level that the project was no longer feasible, documentation submitted by the applicant must include:

**(a)** documentation that the project was ranked within the maximum award amount available to the CoC;

**(b)** evidence from the project application supporting the applicant's claim that the project application met project eligibility and project quality thresholds set forth in this NOFO;

**(c)** evidence that the applicant believes HUD failed to follow its selection threshold criteria set forth in this NOFO which resulted in the project not being funded (e.g., selecting a lower-scored project within the CoC or a similar project from another CoC); and

**(d)** the evidence in section VI.B.1.b of this NOFO as well as evidence for decreased funding in section VIII.D.5.b of this NOFO.

**(4)** For CoCs that were denied funding due to the score of the CoC Application or the score of the project application not being high enough to result in the funding of project(s) within the CoC, and the lower score for one or both application types was the result of HUD error, the CoC may appeal the CoC or project application score and request funding for affected projects. Documentation submitted by the Collaborative Applicant on behalf of the CoC must include evidence of HUD error when calculating the Coc Application or project application score.

**b. *Decreased Funding.*** To appeal HUD's decision, the applicant must submit a written appeal to HUD using the process outlined in section VIII.D.2 of this NOFO within 45 days of the date of the final funding announcement of the conditional awards from HUD, with a copy to the authorized representative of the CoC's designated Collaborative Applicant. Documentation submitted by the applicant must include evidence of the HUD error the applicant believes was made.

occurred, and the applicant should have been awarded additional funding, HUD will provide funding from the next available funds and make necessary adjustments by amending the award. HUD will reverse a decision only when the applicant can show that HUD error caused

the denial or decrease.

## 6. Written Appeal.

An applicant may appeal to HUD a jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan. The appeals process is as follows:

With the project application that is submitted by the application deadline, the applicant must submit a written appeal. Project applicants may submit its appeal in e-snaps with its project application. When submitted with the project application in e-snaps, the applicant must also email a copy of this appeal to the jurisdiction that denied the Certification of Consistency with the Consolidated Plan and should send a copy to the authorized representative from the CoC's designated Collaborative Applicant, unless it is the Collaborative Applicant that is filing the appeal. Otherwise, the project applicant or Collaborative Applicant may submit the appeal to HUD using one of the methods in section VIII.D of this NOFO. The written appeal must include the following information:

**a.** a copy of the applicant's request to the jurisdiction for the Certification of Consistency with the Consolidated Plan;

**b.** a copy of the jurisdiction's response stating the reasons for denial, including the reasons the proposed project is not consistent with the jurisdiction's Consolidated Plan in accordance with 24 CFR 91.510(c); and

**c.** a statement of the reasons why the applicant believes its project is consistent with the jurisdiction's Consolidated Plan.

The appeal may include additional information the applicant believes supports its appeal, including:

**(1)** any additional communication between the applicant and the jurisdiction regarding the request for certification of consistency; and

**(2)** documentation that identifies to whom within the jurisdiction the evidence was sent and the date on which it was sent.

**d.** *Jurisdiction Response.* The jurisdiction will have 10 days after the receipt of the applicant's written appeal to submit a written response to HUD. The response must be sent by email to snapsappeals@hud.gov on the organization's letterhead, with a copy to the project applicant and the authorized representative of the CoC's designated Collaborative Applicant. The response must include the following information:

**(1)** an explanation of the reasons originally given for refusing to provide the Certification of Consistency with the Consolidated Plan; and

**(2)** written rebuttal to any claims made by the applicant in the written appeal.

**e.** *HUD Decision and Notification of Decision.*

**(1)** HUD will review the submissions and will provide written notification, by email, of its decision to the applicant and the jurisdiction, with a copy to the authorized representative from the CoC's designated Collaborative Applicant within 45 days of the date of the receipt of the jurisdiction's response. In making its decision, HUD will consider whether the applicant submitted the request to the appropriate certifying

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 277 of 283 PageID #: 344

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

jurisdiction and the reasonableness of the jurisdiction's refusal to provide the certificate.

**(2)** If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was reasonable, then HUD will automatically reject the project application. If HUD finds that the certifying jurisdiction's refusal to provide a certification of consistency with the Consolidated Plan was not reasonable, then HUD will consider the project application for funding in the respective FY CoC Program Competition in accordance with the review standards set forth in this NOFO.

**(3)** If the jurisdiction failed to provide written reasons for refusal, including the reasons why the project is not consistent with the jurisdiction's Consolidated Plan in its initial response to the applicant's request for a certification, HUD will find for the applicant without further inquiry or response from the political jurisdiction.

**(4)** HUD will provide written notification of its decision within 45 days of the date of HUD's receipt of the jurisdiction's response. Where the jurisdiction failed to provide a written response, HUD will provide written notification of its decision within 55 days of the date of HUD's receipt of the project applicant's response.

## E. Applicant Experience Survey

You are encouraged to provide feedback on your application experience by completing our Applicant Experience Survey. Your feedback is optional; you are not required to provide personal information. HUD may use your feedback to improve future NOFOs. Your feedback has no impact on funding decisions.

## F. Other Online Resources

You are encouraged to review the online resources for context on some of the NOFO requirements.

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM   Document 67-6   Filed 01/14/26   Page 278 of 283 PageID #: 3448

# APPENDIX

Appendix

Appendix I Definitions

TABLE OF CONTENTS

DOJ-HUD-AR01264

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Submission Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 279 of 283 PageID #: 3449

# APPENDIX

## Appendix I. Definitions

### 1. Standard Definitions

For standard definitions not listed below, refer to 2 CFR 200.1.

**Affirmatively Furthering Fair Housing (AFFH)** - statutory obligation to affirmatively further the purposes and policies of the Fair Housing Act (see also 24 CFR 5.151, as amended by 90 FR 11020).

**Authorized Organization Representative (AOR)** is the official within your organization with the legal authority to: give assurances, make commitments, submit your application to HUD, enter into agreements, and execute such documents on behalf of your organization. The AOR is not necessarily the Project Director. The AOR has defined privileges within Grants.gov.

**Consolidated Plan** has the same meaning as defined at 24 CFR part 91.

**Eligibility requirements** are mandatory requirements for an application to be considered for funding.

**Opportunity Zone (OZs)** are defined in 26 U.S.C. 1400Z-1. In general, OZs are census tracts located in low-income communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

**Primary Point of Contact (PPOC)** is the person HUD may contact with questions about the application submitted. The PPOC is listed in item 8F on the SF-424.

**System for Award Management (SAM)** has the same meaning as 2 CFR 25.100(b).

**Threshold Requirements** are eligibility requirements you must meet before HUD advances to a merit review of your application.

**Unique Entity Identifier (UEI)** has the same meaning as 2 CFR 25.100(a).

### 2. Program Definitions.

Regulatory citations are provided below so applicants can refer to specific areas of the Rule. Projects awarded CoC Program funds are subject to the program regulations as they may be amended from time to time. However, YHDP Renewal and YHDP Replacement projects and awards are subject to CoC Program regulations except as otherwise provided in this NOFO.

The definitions and concepts contained in this section include terms that are important for all applicants to understand in order to operate projects under this NOFO.

   **a. *The following terms are defined in 24 CFR 578.*** Applicants must refer to the Rule for the definitions contained in this section.

   **(1)** Annual Renewal Amount (ARA)
   **(2)** Applicant
   **(3)** Centralized or Coordinated Assessment System
   **(4)** Chronically Homeless

I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Other Support | Appendix

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 280 of 283 PageID #: 3450

**(5)** Collaborative Applicant
**(6)** Continuum of Care
**(7)** Consolidated Plan
**(8)** Establishing and Operating the CoC. -24 CFR 578.5 and 24 CFR 578.7 detail the requirements for the establishment of a CoC and its responsibilities.
**(9)** Final Pro Rata Need (FPRN)
**(10)** High Performing Community (HPC)
**(11)** Homeless Management Information System (HMIS)
**(12)** HMIS Lead
**(13)** Homeless. - Although not reflected in the regulation, section 605 of Violence Against Women Act Reauthorization Act of 2022 amended Section 103(b) of the Act and requires HUD to consider certain individuals and families as homeless. This amendment took effect on October 1, 2022. Notwithstanding anything to the contrary contained elsewhere in this NOFO, where 578.3 paragraph (4) is referenced,
**(14)** Permanent Housing
**(15)** Permanent Supportive Housing
**(16)** Preliminary Pro Rata Need (PPRN)
**(17)** Private Nonprofit Organization
**(18)** Program Participant
**(19)** Project
**(20)** Rapid Rehousing (RRH).
**(21)** Recipient
**(22)** Subrecipient
**(23)** Transitional Housing
**(24)** Unified Funding Agency
**(25)** Victim Service Provider

**b.** *CoC Program NOFO Terms*. The following terms may be used during the administration of CoC Program grants. The definitions and specific concepts pertaining to these terms are further explained below:

**(1) Annual Renewal Demand (ARD) (24 CFR 578.17(b)(2)).** The total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items (BLIs) based on FMR changes. HUD will calculate the ARD by combining the total amount of funds requested by eligible renewal projects in each FY funding opportunity, including:

**(a)** renewal projects approved and ranked on the Renewal Project Listing;
**(b)** renewal project amount(s) that were reallocated as recorded on the reduced or eliminated reallocation forms of the CoC Project Listing;
**(c)** YHDP renewal projects on the YHDP Renewal Project Listing; and
**(d)** YHDP Replacement projects, including YHDP Reallocation projects, on the YHDP Reallocation and Replacement Project Listing. YHDP Replacement projects are eligible for funding through the replacement of YHDP Renewal projects. The YHDP Replacement application must request the same amount of funding that is eligible for YHDP Renewal.

DOJ-HUD-AR01266

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 281 of 283
PageID #: 3451

I. Basic
Information | II. Eligibility | III. Program
Description | IV. Application
Contents and
Format | V. Application
Information | VI. Submission
Requirements and
Deadlines | VII. Post-Award
Requirements and
Administration | VIII. Contact and
Support | Appendix

**(2) CoC Merger.** The CoC merger is a process where two or more CoCs voluntarily agree to merge the entire geographic area of all CoCs into one larger CoC. HUD strongly encourages CoCs that struggle with capacity to merge with a neighboring CoC or Balance of State CoC during each fiscal year's CoC Program Registration process. To encourage CoC mergers and mitigate the potential adverse scoring implications that may occur when a high performing CoC merges with one or more lower-performing CoC(s), HUD will award 5 bonus points to the FY 2025 CoC Application Score for CoCs that registered as a merged after the FY 2024 CoC Program Registration deadline.

**(3) Formula Area**. Defined in the Indian Housing Block Grant Program at 24 CFR 1000.302.

**(4) CoC Geographic Area.** 24 CFR 578.5 requires representatives from relevant organizations within a geographic area to establish a CoC to carry out the duties within the geographic area. The boundaries of identified CoC geographic areas cannot overlap, and any overlapping geographies are considered Competing CoCs. HUD follows the process at 24 CFR 578.35(d) to determine which CoC HUD will fund in the case of CoC geographic areas that overlap.

**(5) Homelessness and Human Trafficking.** HUD is clarifying that persons who are fleeing or attempting to flee human trafficking may qualify as homeless under paragraph (4) of the homeless definition at 24 CFR 578.3 or section 103(b) of the McKinney-Vento Homeless Assistance Act and may be eligible for certain forms of homeless assistance under the CoC Program, subject to other restrictions that may apply. HUD considers human trafficking, including sex trafficking, to be "other dangerous or life-threatening conditions that relate to violence against the individual or family member" under paragraphs (1) and (4) of the definition of homeless at 24 CFR 578.3 and "other dangerous, traumatic, or life-threatening conditions related to the violence against the individual or a family member in the individual's or family's current housing situation" under section 103(b) of the McKinney-Vento Homeless Assistance Act.

**(6) Host Home and Kinship Care.** Host Home and Kinship Care is limited to YHDP Renewal and replacement grants. This is a model of housing where a family agrees to permit a youth program participant to reside with them. Recognizing the addition of another person in the home may increase costs to the family, HUD will consider YHDP Replacement project applications that propose to house youth with families and subsidize the additional costs attributable to housing the youth, including recruitment of hosts. An example of eligible costs would be additional food or transportation costs, which are eligible supportive services under 24 CFR 578.53(e)(7) or 24 CFR 578.53(e)(15). Recipients must keep records related to this determination for HUD review upon request. The residence is in a community-based setting and the family may be related to youth program participants with a time-limited or unlimited length of stay.

**(7) Housing Inventory Count (HIC).** A complete listing of the CoC's HUD and non-HUD funded beds dedicated to individuals and families experiencing homelessness in the CoC's geographic area.

DOJ-HUD-AR01267

**(8) Reservation and Trust Land.** For purposes of this Notice, Reservations and Trust Land are types of formula areas as specifically delineated under HUD's IHBG program at 24 CFR 1000.302.

**(9) Rural Area.** For this competition a rural area is a county which:

**(a)** has no part of it within an area designated as a standard metropolitan statistical area by the Office of Management and Budget;

**(b)** is within an area designated as a metropolitan statistical area or considered as part of a metropolitan statistical area and at least 75 percent of its population is local on U.S. Census blocks classified as non-urban; or

**(c)** is located in a state that has a population density of less than 30 persons per square mile (as reported in the most recent decennial census), and of which at least 1.25 percent of the total acreage of such State is under Federal jurisdiction, provided that no metropolitan city in such State is the sole beneficiary of the grant amounts awarded under this NOFO. A metropolitan city means a city that was classified as a metropolitan city under section 102(a) of the Housing and Community Development Act of 1974 (42. U.S.C. 5302(a)) for the fiscal year immediately preceding the fiscal year for which Emergency Solutions Grants program funds are made available.

**(10) Shared Housing.** YHDP Renewal, YHDP Replacement and YHDP Reallocation grants may provide rental assistance for shared housing where youth may reside with family or another unrelated person. The youth leases from the property owner and shares the unit with the family or unrelated person. The unit may be a house or an apartment.

**(a)** YHDP rental assistance cannot be provided to a youth to reside in a unit occupied by an immediate family member. For this NOFO "immediate family member" includes parents, grandparents, and legal guardians.

**(b)** YHDP rental assistance cannot be provided to a youth in a shared housing unit if the landlord is an immediate family member of the youth.

**(c)** YHDP rental assistance may only be provided to a youth if the youth can enter into a valid, binding, and enforceable lease under applicable state or local law. This includes a legally appointed guardian executing a lease on behalf of a youth or an emancipated youth entering into a lease.

**(d)** YHDP Renewal and replacement grants may provide a shared housing option for youth program participants who are not part of a household but are interested in sharing a housing unit with a roommate unrelated to the program participant.

**(11) Special NOFO.** A competition administered under the Continuum of Care Supplemental to Address Unsheltered and Rural Homelessness designed to target efforts to reduce unsheltered homelessness in communities with very high levels of unsheltered homelessness and homelessness in rural areas. Funding through this Competition was awarded through either the Unsheltered Set Aside or the Rural Set Aside.

DOJ-HUD-AR01268

Case 1:25-cv-00636-MSM-AEM    Document 67-6    Filed 01/14/26    Page 283 of 283
PageID #: 3453

| I. Basic Information | II. Eligibility | III. Program Description | IV. Application Contents and Format | V. Application Information | VI. Submission Requirements and Deadlines | VII. Post-Award Requirements and Administration | VIII. Contact and Support | Appendix |

**(12) YHDP Replacement Process, including YHDP Reallocation.** The YHDP Replacement process occurs when: (1) a CoC reallocates a YHDP Renewal project to create one or more new YHDP project(s) that has the same recipient referred to as YHDP Replacement in this NOFO; (2) a CoC is reallocating a YHDP Renewal project to create one or more new projects with a new recipient referred to as YHDP Reallocation in this NOFO; or (3) a CoC is reallocating YHDP Renewal project(s) to create YHDP Expansion applications through the YHDP Replacement process. For more information on YHDP Reallocation, see sections IV.D.1.i of this NOFO.

Appendix 2: Funding Opportunity Goals

1. Improving Outcomes

2. Restoring Balance to the Continuum of Care

3. Prioritizing Treatment and Recovery as a Means to Self-Sufficiency

4. Promoting Economic Self-Sufficiency

5. Creating Competition to Improve Innovation and Accountability

6. Ending the Crisis of Homelessness on Our Streets

7. Advancing Public Safety for All

8. Minimizing Trauma for Vulnerable Populations

9. Expanding Access Based on Merit, not Ideology

DOJ-HUD-AR01269