**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-636-MSM-AEM |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 4

I.    The Rescission of the FY24-25 NOFO and Failure to Make Awards Under it Is Unlawful ......................................................................................... 4

    A.    The Rescission Is Unlawful ........................................................... 4

        1.    The rescission exceeds Defendants' statutory authority and is contrary to law ............................................................................. 4

        2.    The rescission is arbitrary and capricious ........................................ 7

    B.    Defendants Have Unlawfully Withheld and Unreasonably Delayed Making Awards Under the FY24-25 NOFO ....................................... 11

        1.    Defendants unlawfully withheld making awards under the FY24-25 NOFO ......................................................................... 12

        2.    Defendants unreasonably delayed making awards under the FY24-25 NOFO ............................................................................. 14

    C.    The Court Should Set Aside the Rescission and Order Defendants to Promptly Make Awards Under the FY24-25 NOFO .............................. 16

        1.    The Court should set aside the rescission and reinstate the FY25-25 NOFO under Section 706(2) ............................................. 16

        2.    The Court should compel Defendants to promptly make awards under Section 706(1) ................................................................... 18

II.   The FY25 NOFOs Are Unlawful ................................................................ 21

    A.    The Challenges to the November NOFO's Provisions Are Not Moot ................. 21

    B.    The FY25 NOFOs Violate the APA ................................................ 24

        1.    The FY25 NOFOs exceed Defendants' statutory authority .................... 24

        2.    Multiple Challenged Provisions are contrary to law ......................... 26

            a.    Permanent Housing Caps and New Project Earmark ...................... 26

            b.    Disability Conditions ................................................... 28

            c.    Geographic Discrimination Conditions .................................. 29

          d.    Gender Identity Reservation and Conditions ..................................... 30

    3.   The FY25 NOFOs are arbitrary and capricious ................................. 32

          a.    Destabilization of Permanent Housing ................................. 33

          b.    Review Criteria ....................................................................... 38

          c.    Post-Award Conditions ..................................................... 44

    4.   Key provisions of the FY25 NOFOs were unlawfully issued without notice and comment ..................................................................... 44

C.    The FY25 NOFOs Are Unconstitutional .............................................. 46

    1.   The Gender Identity Conditions and Reservation violate the First Amendment ..................................................................................... 46

    2.   The FY25 NOFOs violate the separation of powers and the Spending Clause ............................................................................................... 47

D.    In Addition to Vacating the FY25 NOFOs, the Court Can and Should Enjoin Defendants from Re-Imposing the Challenged Provisions in Any New FY25 NOFO .................................................................................. 48

CONCLUSION ............................................................................................................. 50

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954)..........................................................................45

*Am. Hosp. Ass'n v. Kennedy*, No. 25-2236, 2026 WL 49499 (1st Cir. Jan. 7, 2026)..................37

*Am. Pub. Health Assoc. v. NIH*, 145 F.4th 39 (1st Cir. 2025) ......................................................39

*Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981) ......................................................9

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ....................................................34

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) ................31

*Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3 (1st Cir. 2021)..........................................................22, 23

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ............................................................25

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) .......................32

*Brock v. Pierce Cnty.*, 476 U.S. 253 (1986) ..............................................................................5, 6

*Butte Cnty., Cal. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)..........................................................32

*Chamber of Com. v. U.S. Dep't of Labor*, 174 F.3d 206 (D.C. Cir. 1999)...................................46

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ....................................................31

*City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025) ...................................................................................................................................31

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019)........................................................48

*City of Providence v. Barr*, 385 F. Supp. 3d 160 (D.R.I. 2019) ..................................................18

*Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020) ......................................................31

*County of Westchester v. HUD*, 802 F.3d 413 (2d Cir. 2015) ......................................................29

*Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017) ..................................18

*Dalton v. Specter*, 511 U.S. 462 (1994)..................................................................................47, 48

*Dep't of Comm. v. New York*, 588 U.S. 752 (2019)...............................................................25, 32

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020).... 9, 10, 11, 34, 37

*Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144 (1st Cir. 2015) ..................................... 5

*Dolan v. United States*, 560 U.S. 605 (2010)............................................................... 5

*FBI v. Fikre*, 601 U.S. 234 (2024) .............................................................................. 22

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).................................... 33, 39

*Furtado v. Oberg*, 949 F.3d 56 (1st Cir. 2020)..................................................... 25, 26

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) ........................................................ 37

*Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025) ................................................... 23

*Kennedy v. Allera*, 612 F.3d 261 (4th Cir. 2010) ...................................................... 30

*Lowe v. Gagné-Holmes*, 126 F.4th 747 (1st Cir. 2025) ......................................... 22, 23

*Motor Vehicle Mfrs. Assoc. of the U.S. v. State Farm Mutual Automobile Ins. Co.*,
    463 U.S. 29 (1983) ........................................... 10, 32, 36, 39, 40, 41, 42, 44

*N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018).............................................. 45

*Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022)................................ 50

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) ................................ 46

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) .............................................. 18

*R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2988705
    (D.R.I. Oct. 23, 2025) ....................................................................................... 47

*R.I. Latino Arts v. NEA*, 800 F. Supp. 3d 351 (D.R.I. 2025) ...................................... 47

*Rhode Island v. Trump*, 781 F. Supp. 3d 25 (D.R.I. 2025)......................................... 34

*Smith v. Berryhill*, 587 U.S. 471 (2019) .................................................................... 49

*Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247 (D.C. Cir. 2021) .................... 34

*Telecomms. Rsch. and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)............... 15, 16

*Thakur v. Trump*, No. 25-4249, 2025 WL 3760650 (9th Cir. Dec. 23, 2025)............... 43

*Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) ...................................................... 31

*United States v. Johnson*, 632 F.3d 912 (5th Cir. 2011) ............................................................... 30

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........................................................................... 22, 23

*Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994) ..................................... 45

## FEDERAL STATUTES

5 U.S.C.
    § 553 ................................................................................................................................ 44
    § 701 .................................................................................................................................. 4
    § 706 ................................................................................................................................ 46

21 U.S.C.
    § 856 ................................................................................................................................ 43

34 U.S.C.
    § 20927 ............................................................................................................................ 30

42 U.S.C.
    § 11313 ............................................................................................................................ 42
    § 11381 ............................................................................................................................ 35
    § 11382 ............................................................................. 4, 5, 6, 12, 14, 15, 17, 19
    § 11385 ............................................................................................................................ 38
    § 11386 ............................................................................................................................ 25
    § 11386a ........................................................................................................................... 24
    § 11386b ........................................................................................... 24, 27, 28, 36
    § 11386c ................................................................................................................. 26, 27
    § 12711 ..................................................................................................................... 29, 30

## FEDERAL REGULATIONS

24 C.F.R.
    § 10.1 ............................................................................................................................... 45
    § 578.3 ............................................................................................................................. 36
    § 578.75 ........................................................................................................................... 38

## INTRODUCTION

In mid-November, mere weeks before awards for FY 2025 funds should have gone out, Defendant the Department of Housing and Urban Development (HUD) plunged the Continuum of Care (CoC) program into crisis. It rescinded the two-year FY24-25 notice of funding opportunity (NOFO) that had been slated to govern FY 2025 awards and replaced it with a new NOFO that radically restructured the CoC program, the nation's nearly $4 billion program to address homelessness. This late-state changeup predictably led to funding gaps and crippling uncertainty for providers that rely on CoC funding to provide housing, as well as for the tens of thousands of formerly homeless people and families who rely on that housing and who will be forced back into homelessness if Defendants' actions are permitted to stand.

Defendants' attempts to defend HUD's unlawful and unreasonable actions fall far short. At bottom, Defendants claim that the CoC program's prior approach had failed to effectively address homelessness and that their new approach would do better. But this does not come close to justifying the changes Defendants made or get around their illegality.

As an initial matter, Defendants' views about their policy choice cannot fix the fact that HUD simply waited too late to make any changes for FY 2025. For one, HUD blew the statutory deadline to make changes—which is reason enough alone to reject HUD's belated rescission and replacement of the FY24-25 NOFO. Defendants claim that they could disregard the deadline with impunity, but that is not the law. If Defendants had their way, HUD could evade the statutory deadline whenever it wanted by simply issuing a placeholder NOFO by the deadline and then replacing it at any time, deadline notwithstanding. The deadline is not such a dead letter.

Even apart from the binding deadline, Defendants' end-of-year rescission and replacement of the FY24-25 NOFO is invalid because it fails basic Administrative Procedure Act

(APA) requirements for reasoned decisionmaking. Defendants did not consider or justify the harmful effects that the extremely late-in-the-game change in course would cause. Although Defendants attempt to justify their decision to revamp the CoC program's policy approach, those attempts do nothing to justify the *timing* of the decision. Defendants never explain, for example, why they needed to make their radical changes at the end of the year, right before awards should have gone out, forcing communities to scramble to deal with the resulting gaps in funding needed for life-saving services. Defendants likewise fail to explain why HUD could not wait until the next funding cycle to try to make changes when it would not cause so much chaos.

As a result of their unlawful and unreasonable rescission of the FY24-25 NOFO, Defendants have now missed *another* statutory deadline, one that required them to announce conditional awards by January 29, 2026. Defendants protest that they nullified that deadline by rescinding the NOFO, but the rescission was unlawful—and Defendants cannot eliminate a deadline through unlawful action. Nor can Defendants credibly deny that, even apart from that deadline, they have also unreasonably delayed making FY 2025 awards. On this, Defendants' main response is that "only" $362 million worth of awards will expire by March 31, so the delays Defendants caused are no big deal. But they are a big deal to the hundreds of grantees whose funding is expiring in that window—and, more importantly, a big deal to the people who rely on that funding for housing. Because Defendants have unlawfully withheld and unreasonably delayed making awards under the FY24-25 NOFO—the only NOFO that, at this point, HUD can lawfully use to make FY 2025 awards—Plaintiffs are entitled to an order compelling Defendants to make those awards expeditiously.

If the Court grants that relief, it need go no further—that would address Plaintiffs' harm. But if it does go further, the FY25 NOFOs are also unlawful for a whole host of independent

reasons. Defendants fail to effectively rebut Plaintiffs' claims that the FY25 NOFOs' Challenged Provisions exceed Defendants' statutory authority, are in many cases contrary to law, and are arbitrary and capricious, that HUD improperly used the NOFOs to make major structural changes without undergoing required notice and comment, and that many provisions violate the Constitution to boot. Defendants claim they needed to transform the program to better address homelessness, but they offer little beyond their own *ipse dixit* to support their claim that the FY25 NOFOs' radical changes in policy will produce the better results they seek. And they ultimately offer no justification for unlawfully and arbitrarily stripping funding from permanent housing—even while permanent housing solutions are the only strategies Congress has ever deemed effective at addressing homelessness. If the Court reaches the substance of the FY25 NOFOs, it should set them aside and enjoin Defendants from reimposing the unlawful Challenged Provisions or substantially similar ones in any future NOFO for FY 2025.

Plaintiffs respectfully request relief as soon as possible to mitigate the significant ongoing harms that they and the Plaintiff associations' members are already facing. In accordance with this Court's preliminary injunction, Defendants have begun the necessary process to make awards under the FY24-25 NOFO and will be ready to announce all awards by March 31 if the Court orders them to do so. HUD, FY24-25 CoC NOFO Implementation Plan at 1, Dkt. No. 62-1. Because many awards expire before then, Plaintiffs respectfully request that the Court order Defendants to move more quickly on the subset of awards that require no new application and only minimal review, and to announce those by March 2 (or within 7 days of the Court's order if that date is later), while announcing the balance by March 31.

## ARGUMENT

**I.    The Rescission of the FY24-25 NOFO and Failure to Make Awards Under it Is Unlawful**

Defendant's belated rescission and replacement of the FY24-25 NOFO is unlawful because it violated the statutory timing requirement and because it was arbitrary and capricious. As a result of the unlawful rescission, Defendants have unlawfully withheld and unreasonably delayed making awards under the FY24-25 NOFO. To remedy these violations, the Court should set aside the rescission and compel Defendants to promptly make the now-overdue awards under the FY24-25 NOFO.

### A.  The Rescission Is Unlawful

#### 1.    The rescission exceeds Defendants' statutory authority and is contrary to law

Defendants' rescission of the FY24-25 NOFO exceeded Defendants' statutory authority and was contrary to law because it violated 42 U.S.C. § 11382(b). That provision requires HUD to release a NOFO for a fiscal year "not later than 3 months after" the enactment of the relevant appropriations bill for that fiscal year. 42 U.S.C. § 11382(b). Defendants do not dispute (1) that, for FY 2025, this deadline was June 15, 2025, and (2) that Defendants did not rescind the FY24-25 NOFO or issue a replacement by that deadline. They also concede that rescinding the FY 24-25 NOFO would be unlawful if a statutory provision "prohibit[s] HUD from taking that specific action." Defs.' Combined Cross-Mot. for S.J. and Opp. to Pls.' Mot. for S.J. (Defs.' Mem.) at 19, Dkt. No. 68. The only dispute is over whether § 11382(b) in fact prohibits HUD from rescinding an existing NOFO and issuing a replacement after the three-month deadline has passed.[1]

---

[1] Defendants also assert in passing (at 17) that the rescission "was committed to HUD's discretion" by law, which would make the rescission unreviewable under the APA. *See* 5 U.S.C.

It does. *See* Pls.' Mem. i.s.o. Mot. S.J. (Pls.' Mem.) at 33-34, Dkt. No. 67-1. Where HUD has *already* issued a NOFO, it would "defeat the basic purpose" of the deadline provision to allow HUD to rescind it and issue a new one any time it wanted. *See Dolan v. United States*, 560 U.S. 605, 615 (2010). Defendants offer no response to this key point. And the arguments they do offer lack merit.

First, Defendants object (at 19) that the statute only sets a three-month deadline for HUD "to issue a NOFO" and does not expressly bar HUD from rescinding it or replacing it later. But that is irrelevant, as the Supreme Court has made clear that a statutory deadline can "bar later action" even if that consequence is not "stated explicitly in the statute." *Brock v. Pierce Cnty.*, 476 U.S. 253, 262 n.9 (1986); *accord, e.g., Dolan v. United States*, 560 U.S. 605, 610 (2010) (explaining that, where "statute does not specify" consequences of missing a deadline, courts must look to the "statutory language," "context," and "purposes"). It is likewise irrelevant that the appropriations act authorizing the two-year NOFO "contained no provision limiting whether HUD could rescind or otherwise modify" that NOFO. Defs.' Mem. at 20. Plaintiffs do not suggest that the appropriations act barred HUD from replacing the two-year NOFO for FY 2025. The limit on its authority comes from § 11382(b), not from the appropriations act. And HUD could have replaced the two-year NOFO at any time before § 11382's three-month deadline passed (subject, of course, to ordinary APA constraints). But HUD did not.

Second, Defendants contend (at 20) that it would be "structurally inconsistent" to interpret the statute as preventing HUD from revisiting an earlier NOFO because "new funding"

---

§ 701(a)(2). But Defendants do not actually explain this argument, and "[i]t is black letter law that [courts] deem waived" such arguments "adverted to in a cursory fashion, unaccompanied by developed argument." *Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 149 (1st Cir. 2015). Any such argument would be baseless in any event for the reasons explained in Plaintiffs' opening brief. Pls.' Mem. at 31-32.

could become available or there could be "insufficient funding" to fully fund all selected grants. It is unclear what Defendants mean. To the extent Defendants suggest that HUD should have a chance to revise a two-year NOFO if Congress appropriates more or less funding in the second year, nothing stops it from doing so within § 11382's three-month timeframe. If HUD misses that deadline, it is unclear why it would be "structurally inconsistent" to read the statute as barring HUD from rescinding the existing NOFO and belatedly issuing a replacement. The two-year NOFO anticipated and addressed both scenarios that Defendants posit: It explains that if "new competitive funding becomes available," the two-year NOFO's "[a]pplication and score may be used" to award it, and, conversely, if inadequate funds are available in the second year, grant amounts could be "reduced proportionately." AR 31.

Third, Defendants contend (at 34-35) that enforcing the deadline would undermine "the public interest" because "HUD determined" that the FY24-25 NOFO would not effectively reduce homelessness. But even putting aside the fundamental flaws with that determination, there is no statutory exception for when the agency determines its untimely action would better serve the public interest. *Congress* decides what is in the public interest—and, here, Congress determined it was in the public interest for a notice of funding opportunity to be released within three months of funding becoming available. *See* 42 U.S.C. § 11382(b). Defendants rely on a case in which the Supreme Court looked to the "public interests" in concluding that a statutory deadline did not preclude the agency from acting after the deadline—but, there, Congress directed the agency to take action in the public interest, the agency had not acted yet, and so barring action after the deadline would mean the agency could not take the action at all. *See Brock v. Pierce Cnty.*, 476 U.S. 253, 261 (1986) (holding that agency could recover misused grant funds after statutory deadline because precluding action after the deadline "would prejudice

the rights of the taxpaying public"). Defendants cite no case allowing an agency to disregard a statutory deadline when it has already taken the public-serving action Congress prescribed—here, issuing the NOFO to start the process for getting funding out expeditiously.

Finally, Defendants contend (at 35) that they do not lose the power to act after the deadline because "there are less drastic remedies available"—namely, "to order HUD to issue a NOFO." But that remedy is decidedly *not* available where HUD already issued a NOFO—a court could not compel the agency to take an action it has already taken. In those circumstances, the only remedy available for HUD's failure to follow the deadline is to invalidate the untimely action.

For all these reasons, the rescission of the FY24-25 NOFO after the June 15 deadline exceeded Defendants' statutory authority and was contrary to law.

### 2. The rescission is arbitrary and capricious

As Plaintiffs explained (at 35-37), the rescission of the FY24-25 NOFO was arbitrary and capricious because HUD did not adequately consider or explain why it was necessary to rescind and replace the existing NOFO so late in the CoC funding cycle, why the agency could not wait until a new funding cycle to effectuate changes to the program, or how its late-stage changeup would impede the reliance interests of CoC grantees and beneficiaries. The result was a careless and harmful decision that would predictably lead to unnecessary uncertainty and lengthy funding gaps and force formerly homeless individuals and families out of their housing and back onto the streets. In response, Defendants point to nothing in the administrative record showing that HUD considered these factors. Instead, their brief largely rehashes Defendants' policy disagreements with the FY 24-25 NOFO. But those policy disagreements do not justify Defendants' decision to make their changes so late or justify the harms wrought by their carelessness.

*a.* Start with Defendants' failure to consider or explain the timing of their rescission and

replacement of the FY24-25 NOFO. Defendants emphasize (at 22) that HUD disagrees with aspects of existing CoC program policy, but disagreeing with program policy does not explain why HUD's policy goals had to be effectuated via a late-stage rug-pull of the CoC program—or why it could not instead take a more deliberate approach that would better protect continuity of funding and stability for the people the CoC program serves. The record in this case lays bare Defendants' single-minded focus on achieving their policy objectives at the expense of careful implementation and stability for formerly homeless individuals and families.

In arguing that the rescission was not arbitrary and capricious, Defendants cite only two documents—a July 3, 2025, email previewing HUD's plans to issue a new NOFO for FY 2025 and a memo (December Memo) from Policy Advisor Caitlyn McKenney dated December 19, 2025—well after Defendants rescinded the FY24-25 NOFO and after this case was filed. *See* Defs.' Mem. at 21-24. Neither supports the decision to rescind the FY24-25 NOFO and replace it in November 2025, or to impose transformative new CoC conditions for FY25 so late in the year rather than wait for a new funding cycle, using that time to prepare CoCs for the changes to the program.

Defendants argue (at 22) that the July 3 email explained why HUD felt a need to "revise the policies that had previously been in place." But their desire to "change the status quo," *id.*, does not justify the harmful and chaotic approach that HUD chose in making the changes so late. And nothing in the July 3 email explained what the actual changes would be, grappled with how those changes (and the timing of their rollout) would ultimately throw the CoC program into crisis, or explained why that was justified. *See* AR 18.

Defendants also rely on the December Memo—issued *after* the rescission (and, indeed, dated the same day this Court issued its preliminary injunction in this case) purporting to

retroactively summarize HUD's decision-making process about the recission of the FY24-25 NOFO. *See* Defs.' Mem. at 22-23 (citing AR 286-295). But it is black-letter administrative law that arbitrary-and-capricious review looks to "the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020) (cleaned up). An agency cannot rely on "*post hoc* rationalizations." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). Where, as here, an agency offers an after-the-fact explanation of its reasons, that explanation "must be viewed critically" to ensure it reflects the agency's "original reasons," not a "*post hoc* rationalization." *Regents*, 591 U.S. at 21 (cleaned up).

The December Memo flunks that test. Defendants argue the December Memo shows that Defendants considered how they were selecting "the most burdensome workload option for CoCs," that their approach would "reduce the quality of applications," and that the change would "reduce funding for existing renewal projects." Defs.' Mem. at 23 (quoting AR 293). But these considerations "bear[] little relationship" to any earlier-stated reasons and are "nowhere to be found" in the original record of decision, so should be rejected outright as *post hoc* rationalization irrelevant to arbitrary and capricious review. *See Regents*, 591 U.S. at 21-22 (rejecting memorandum as *post hoc*).

At any rate, even if it were not *post hoc*, the December Memo does not salvage Defendants' decisionmaking. Defendants do not point to anything in the memo recognizing one of the core harms that implementing the administration's policy priorities on this timeline would cause—creating substantial funding gaps for CoCs, service providers, and the individuals they serve, even for renewal projects and even for projects that could adapt to HUD's new priorities. Whatever Defendants' substantive policy preferences, implementing those changes in November

2025—just weeks before funding should have gone out—was unjustifiable. If HUD could not get its replacement NOFO out much earlier, it could have simply waited for FY 2026 to implement its new agenda. In ignoring the funding gaps that their chosen course would create, Defendants "entirely failed to consider an important aspect of the problem," a hallmark of arbitrary and capricious decision-making. *Motor Vehicle Mfrs. Assoc. of the U.S. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

*b.* Defendants also failed to consider reliance interests in rescinding the FY24-25 NOFO at the late stage it did. Plaintiffs explained in their opening brief (at 37) the ways that CoCs and programs planned their budgets and operations in expectation of the continued stability of the CoC program. Those expectations, coupled with the inherent difficulties of fundamentally restructuring longstanding programs on a few weeks' notice to pursue brand new objectives, made it predictable that Defendants' approach would lead to tremendous human costs. *See* Pls.' Mem. at 37-38.

Had Defendants seriously considered these reliance interests, they may have used the "considerable flexibility" they have in overseeing the CoC program to roll their desired changes out in a way that minimized disruption to the hundreds of thousands of people the program serves. *Regents*, 591 U.S. at 32. Defendants could have chosen a different course altogether; they could have allowed more time for the CoC ecosystem to prepare for potential changes; or they could have designed the shift in priorities to phase in gradually over multiple years rather than all at once. *See id.* (describing the regulatory flexibility that an agency appropriately cognizant of reliance interests might undertake).

Defendants point to a single sentence in the July 3 email as evidence that they "explicitly considered" reliance interests: "We recognize this is a new application process for 2025 funding

and are committed to providing CoCs the resources needed to serve their communities." Defs.' Mem. at 24 (citing AR 18). This single sentence does not acknowledge the reliance of CoCs and communities on the stable funding streams to address homelessness—and falls far short of satisfying the agency's obligation to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Simply recognizing the existence of a new application process also says nothing about whether HUD considered the chaos it would cause by rolling the new application out so late in the CoC funding cycle, nor does it evince an understanding of the reliance interests that would be affected by the dramatic substantive changes to the CoC funding model.

Defendants argue (at 24) that Plaintiffs could not have had "adequate reliance interests" because renewed funding for FY 2025 was not guaranteed. But that ignores the structure of the two-year cycle, Congress's intent to ensure stable funding for permanent housing, and the agency's longstanding practice in managing the program, all of which are relevant to assessing Plaintiffs' reliance interests. *See* Pls.' Mem. at 37. Even the December Memo concedes that renewing FY 2024 grants without rescinding the NOFO and forcing CoC applicants to re-apply for funds would have been the approach that "satisfies the intent of the 2-year process from the 2024 NOFO," AR 293, an intent that was equally clear to CoC applicants who planned for their FY 2025 funding to follow that process. *See, e.g.*, Oliva (NAEH) Decl. ¶¶ 62-68, Dkt. No. 7-1. Defendants cannot dismiss that reliance out of hand.

### B. Defendants Have Unlawfully Withheld and Unreasonably Delayed Making Awards Under the FY24-25 NOFO

Because the rescission was unlawful and because it is far too late for HUD to issue any replacement NOFO to govern the award of FY 2025 funds, Defendants are, at this point, required to award those funds pursuant to the FY24-25 NOFO. They have unlawfully withheld and

unreasonably delayed awarding those funds, so Plaintiffs are entitled to an order under Section 706(1) of the APA compelling Defendants to take that action. To resist this claim, Defendants principally attack straw men, insisting (at 24, 33) that the "rescission of the [FY24-25 NOFO] was not unreasonably delayed" and that any claim that the "issuance of the December 2025 NOFO was unlawfully or unreasonably withheld is moot." But Plaintiffs do not seek an order compelling *those actions* as unlawfully withheld or unreasonably delayed. Rather, Plaintiffs claim that Defendants have unlawfully withheld and unreasonably delayed *making awards* under the FY24-25 NOFO. That agency action—making awards under the FY24-25 NOFO—was unlawfully withheld and unreasonably delayed, and Defendants fail to show otherwise.

### 1. Defendants unlawfully withheld making awards under the FY24-25 NOFO

As Plaintiffs explained, Defendants have unlawfully withheld making awards by failing to meet a concrete deadline. Pls.' Mem. at 40. By statute, HUD must "announce … the grants conditionally awarded" for a fiscal year "within 5 months after the last date for the submission of applications" for that fiscal year. 42 U.S.C. § 11382(c)(2)(A). The FY24-25 NOFO—which, again, at this point must be the operative NOFO for FY 2025 because HUD waited too long to rescind and replace it—established August 29, 2025 as "the last date for the submission of applications," making the statutory deadline for announcing conditional awards January 29, 2026. There is no dispute that Defendants missed this deadline.

Defendants' sole defense (at 25) is that January 29, 2026, is not a real deadline because it is keyed off the FY24-25 NOFO's application date—which, in Defendants' view, they properly changed. The problem, however, is that Defendants did not *lawfully* change that deadline because they did not lawfully rescind the NOFO. HUD cannot circumvent a statutory deadline by taking unlawful action.

Contrary to Defendants' contention (at 25), it does not matter that HUD "publicly nullified" the application date before it occurred by announcing in July that HUD "intend[ed]" to rescind the two-year NOFO and publish a new one for FY 2025. That announcement did not make the rescission any more lawful. Indeed, even if that announcement itself effectuated the rescission,[2] it came too late to be lawful. HUD did not have authority to rescind and replace the FY24-25 NOFO when it made that announcement on July 3 either—so, even if the rescission occurred on July 3, it violated the June 15 statutory deadline. *See supra* Section I.A.1. It was also arbitrary and capricious to rescind the FY24-25 NOFO at that point for all the same reasons it was arbitrary and capricious to rescind it later. *See supra* Section I.A.2. Given that HUD would not be ready to issue a replacement NOFO until late 2025, the rescission had all the same devastating effects even if occurred in July. And HUD did not consider those devastating effects that rescinding the NOFO would have on communities facing funding gaps as a result, particularly given that HUD would not be ready to issue a replacement NOFO until late 2025. Indeed, nothing in the administrative record shows that HUD had considered the impacts of a rescission and late-stage change at all when it made this announcement in July.

Defendants also mistakenly contend (at 84) that the January 29 deadline cannot be binding because (1) HUD did not have to issue a two-year NOFO at all and (2) HUD generally has discretion on when to set an application deadline. While both statements might be true, Defendants' conclusion does not follow. HUD chose to issue a two-year NOFO and to set the FY 2025 application deadline as August 29, 2025; the fact that HUD could have initially made a

---

[2] Defendants on the one hand suggest that they rescinded the FY24-25 NOFO in July, before the NOFO's application date, but on the other hand suggest that they rescinded the NOFO later, after they had considered various factors. *Compare* Defs.' Mem. at 25, *with id.* at 22-23. Defendants cannot have it both ways. In any event, regardless of whether HUD rescinded the FY24-25 NOFO in July or in November, the decision was unlawful.

different choice does not matter. And while HUD could have made changes at some point, it waited too long to do so.

Defendants posit two alternative deadlines for awards, neither of which supersedes the January 29 one. At one point, Defendants suggest (at 27-28) that they need only make awards by September 30, 2027, when the funds appropriated for FY 2025 awards expire. But this ignores that the statute sets earlier deadlines for making conditional, and then final, awards. *See* 42 U.S.C. § 11382(c)(2)(A), (d)(2). At another point, Defendants suggest (at 28) that the deadline to announce conditional awards should be five months after *the December NOFO*'s January 28, 2026 application date. This ignores that the December NOFO cannot be controlling because it was unlawful for HUD to rescind the FY24-25 NOFO and to issue the December NOFO instead.

Defendants waited too long to rescind and replace the FY24-25 NOFO. That NOFO's application date therefore remains the operative date on which the statute's five-month deadline for announcing conditional awards must be based. Defendants have unlawfully withheld making the awards by the date Congress required.

> **2. Defendants unreasonably delayed making awards under the FY24-25 NOFO**

Defendants have also unreasonably delayed making FY 2025 awards. Even if Defendants had not missed a concrete deadline, the Court could and should compel them to make awards under the FY24-25 NOFO because they have unreasonably delayed taking that action. As Plaintiffs explained in their opening brief, the so-called *TRAC* factors that this Court considers in assessing unreasonable delay all show Defendants have unreasonably delayed making these awards. Defendants' arguments to the contrary are unavailing.

Start with the first and second *TRAC* factors, which explain that (1) the time an agency takes "must be governed by a rule of reason" and (2) that a "statutory scheme may supply

content for this rule of reason" where the statute "provide[s] a timetable or other indication of the speed with which [Congress] expects the agency to proceed." *Telecomms. Rsch. and Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC") (cleaned up). On this, Defendants again contend that the statutory timetable—requiring Defendants to make conditional awards within five months of the application date, 42 U.S.C. § 11382(c)(2)(A)—is irrelevant because HUD nullified the FY24-25 application date. But, again, that unlawful action does not strip the statutory timelines of their force. *See supra* Section I.B.1.

Defendants also contend (at 26-27) that they did not "unreasonably delay" rescinding the FY24-25 NOFO. But that scrambles the issues. The "unreasonably delayed" action that Plaintiffs seek to compel is the making of awards under the FY24-25 NOFO, not the rescission of the NOFO. The "unreasonably delayed" standard therefore has no relevance to the rescission of the FY24-25 NOFO. *See TRAC*, 750 F.2d at 79-80 (describing standard for determining whether "delay is so egregious as to warrant" order "compel[ling] agency action"). The rescission is instead evaluated for whether it complies with the statute and withstands arbitrary-and-capricious review—which it does not. *See supra* Section I.A.1-2.

On the third *TRAC* factor—which advises that delays are "less tolerable when human health and welfare are at stake," *TRAC*, 750 F.2d at 80—Defendants note (at 29) that "only 10 percent" of grant dollars will have expired by the end of March 2026. But human health and welfare are at stake even though "only" around $362 million in funding will expire in the next few months—that represents housing for thousands of individuals. *See* Oliva (NAEH) 2nd Suppl. Decl. ¶¶ 6-7, Dkt. No. 67-3. Defendants also claim (at 29) that CoCs have previously been able to navigate gaps caused by funding delays, and so should be able to keep protecting human health and welfare while they wait for funding. That is wildly out of touch. This year's delay is

nothing like previous years'—when CoCs could bridge funding gaps because HUD's stable administration of the program meant they were reasonably assured to get renewed funding. Oliva (NAEH) 1st Suppl. Decl. ¶ 35, Dkt. No. 49-1. Project sponsors cannot so readily bridge those gaps now, in the face of HUD's attempts to defund a large portion of existing programs.

On the fourth *TRAC* factor—which looks to "the effect of expediting delayed action on agency activities of a higher or competing priority," *TRAC*, 750 F.2d at 80—Defendants again confuse the issues. Defendants insist (at 30) that it is a "high[er] priority" to revamp the CoC program and run an entirely new competition. But that is not an argument against "expediting" the making of awards under the FY24-25 NOFO, but rather an argument that Defendants should not have to take that action at all—and that argument fails for the reasons already explained. *See supra* Section I.A.1-2. Defendants point to no competing activities that will suffer if the Court compels Defendants to make awards under the FY24-25 NOFO now, as opposed to waiting until later.

Defendants' delay in making FY 2025 awards under the FY24-25 NOFO is unreasonable, and Plaintiffs are entitled to relief under Section 706(1).

### C. The Court Should Set Aside the Rescission and Order Defendants to Promptly Make Awards Under the FY24-25 NOFO

#### 1. The Court should set aside the rescission and reinstate the FY25-25 NOFO under Section 706(2)

If Plaintiffs prevail on either or both of their APA Section 706(2) claims—that the rescission exceeded HUD's authority and was contrary to law and was arbitrary and capricious—the Court should vacate the rescission and reinstate the FY24-25 NOFO. There is little dispute on this point. Defendants appear to agree that vacating the rescission would be appropriate if the Court found those claims meritorious. *See* Defs.' Mem. at 78-83. They also do not dispute (1) that the effect of that vacatur would be that the FY24-25 NOFO would again be in place, and

(2) that the Court should order HUD to reinstate the NOFO to avoid any confusion. *Compare* Pls.' Mem. at 44 (making that point), *with* Defs.' Mem. at 78-83 (not refuting that point).

Although it is not entirely clear, Defendants at most appear to dispute whether, based on Plaintiffs' Section 706(2) claims, the Court can enjoin Defendants from rescinding the FY24-25 NOFO again and correspondingly require them to make awards under that NOFO. It can. Defendants concede (at 81) that the Court can "permanently prevent HUD from taking any action rescinding" the FY24-25 NOFO again so long as it "clearly identif[ies] the nature of the error leading it to order such relief." Here, two separate errors warrant such relief: Under § 11382(b)'s timing requirement, it is too late to rescind and replace the FY24-25 NOFO, and, given the serious harms that would occur, it is arbitrary and capricious to make a change for FY 2025 at this late date. Defendants disagree (at 82), but their arguments go to the merits, not to the propriety of the requested relief, and fail for the reasons discussed above. *See supra* Section I.A.

As for an injunction requiring Defendants to make awards under the FY24-25 NOFO, the Court need not reach that requested relief if the Court rules for Plaintiffs on their Section 706(1) claim. The straightforward remedy for that claim—an order compelling Defendants to make the unlawfully withheld and unreasonably delayed awards—would resolve the issue. But if the Court does reach Plaintiffs' alternative request for an injunction based on their Section 706(2) claim, it should grant it. Defendants concede that an injunction is available for Section 706(2) claims "where there is only one rational course for the Agency to follow … after vacatur." Defs.' Mem. at 81 (quotations and citation omitted). For the same reasons that Defendants may not re-rescind the FY24-25 NOFO, the "only rational course" for HUD to follow after vacatur of the rescission is to implement the FY24-25 NOFO by making awards under it. An injunction requiring them to do so is therefore appropriate.

## 2. The Court should compel Defendants to promptly make awards under Section 706(1)

The proper remedy for Defendants' unlawful withholding and unreasonable delay of making awards under the FY24-25 NOFO is an order compelling them to take that action. Defendants do not appear to dispute that this relief is warranted if the Court agrees that Defendants have unlawfully withheld or unreasonably delayed awards.[3] Instead, Defendants rehash the merits, object to relief Plaintiffs do not actually seek, and fight about the details of just how quickly they should be ordered to act. All their arguments are unavailing.

*a.* Defendants contend (at 84) that they have no obligation to award funds by January 29, 2026, or at any other point before most of the funding expires in September 2027. That contention fails for the same reasons explained above. *See supra* Sections I.B.1-2. Defendants relatedly contend (at 85) that they can, at most, be compelled to make awards expeditiously, which (they claim) they could do under the December NOFO. But they cannot because, as explained above, it was illegal for HUD to rescind and replace the FY24-25 NOFO so late. As a result, the FY24-25 NOFO must govern the FY 2025 awards. And beyond that, awards cannot go out expeditiously under the December NOFO because that NOFO is separately unlawful for a whole host of reasons explained below. *See infra* Section II.B-C.

---

[3] Defendants object in passing (at 86) that an order granting this relief would improperly prescribe HUD's "general mode of operations, not any discrete agency action." Not so. Plaintiffs seek an order compelling HUD to make awards under the FY24-25 NOFO. That is a discrete agency action and a far cry from the type of impermissible "programmatic" relief to which Defendants nod. *Compare, e.g.*, *City of Providence v. Barr*, 385 F. Supp. 3d 160, 165 (D.R.I. 2019) (compelling agency to "disburse … award funding"), *with, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65-67 (2004) (declining to compel agency to comply with "broad statutory mandate" to "'continue to manage'" certain areas "'in a manner so as not to impair [their] suitability … for preservation as wilderness'"); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 27 (D.D.C. 2017) (holding that court could not compel agency to fulfill "programmatic" duty to "'continue to review'" agency procedures and "'revise them as necessary'").

*b.* Defendants protest (at 84) that the Court cannot order them to make "specific project renewals" or "award funding to specific applicants." Plaintiffs do not ask for that. Instead, Plaintiffs seek an order compelling Defendants to make awards pursuant to the FY24-25 NOFO. That will result in most projects that were awarded funds in FY 2024 receiving awards again in FY 2025—because, under the NOFO's terms, projects awarded funds in FY 2024 need not re-compete and will receive FY 2025 awards so long as they pass minimal additional review. *See* AR 31, 80, 86. But the relief Plaintiffs seek is an order compelling Defendants to make awards pursuant to the FY24-25 NOFO.

*c.* Defendants argue about just how quickly they should be ordered to make awards under the FY24-25 NOFO. As Plaintiffs' opening brief explains, this Court should set deadlines for two critical steps the statute identifies for making awards: (1) announcing conditional awards and (2) making final awards once the recipients meet applicable requirements. Pls.' Mem. at 46-48 (citing 42 U.S.C. § 11382(c)(2)(A), (d)(2)). For the conditional awards—which Defendants should have made by January 29, 2026—Plaintiffs seek an order setting two separate deadlines—(1) March 2 for No-Application Renewals (i.e., renewal awards for projects that received FY 2024 funding under the FY24-25 NOFO, for which no new application and only minimal additional review is required), and (2) March 31 for New Application Awards (i.e., awards that did not receive FY 2024 funding under the FY24-25 NOFO and for which a new application and full review is required).[4] *Id.* Defendants do not object to Plaintiffs' proposed deadlines for making final awards or the March 31 proposed deadline for conditional awards. The only dispute is over the March 2 deadline for No-Application Renewals.

---

[4] For both categories of awards, Plaintiffs propose that the deadline be one week after the Court's order, if one week after the Court's order is later than March 2 or March 31, respectively. Pls.' Mem. at 47.

As explained, that earlier deadline for announcing No-Application Renewals is warranted because many grantees' existing awards have already expired and will continue to expire by Defendants' preferred March 31 announcement—causing irreparable and ongoing harm to those grantees and the communities they serve. Pls.' Mem. at 47. Defendants make three objections to the March 2 deadline, and all are baseless.

First, Defendants assert (at 85-86) that this earlier deadline is not "necessary" because "only 10 percent of grant dollars will expire by March 31." But the projects with those 10 percent of funds need relief before their projects expire on March 31. As the supplemental declaration that Defendants submit on this point shows, 626 grants totaling over $362 million expire by the end of March, including 343 grants totaling nearly $190 million that expire by the end of February. Declaration of Caitlyn J. McKenney, Dkt. No. 68-1, Ex. A. For those grantees and the people they serve, the difference between March 2 and March 31 matters—it can mean not just weeks of funding, but also whether people keep their place to live. Oliva (NAEH) 2nd Suppl. Decl. ¶¶ 7-8.

Second, Defendants assert (at 86) that they cannot "possibly process" No-Application Renewals by March 2. Defendants offer no explanation for this, let alone any evidence. The supplemental declaration they submit is conspicuously silent on why HUD could not make conditional awards by March 2. There is no apparent reason they could not—particularly given that, by definition, the No-Application Renewals to which the March 2 deadline would apply do not require a new application, re-scoring, or anything more than what Defendants acknowledge is a minimal review.

Third, Defendants claim (at 86) that a "bifurcated" announcement of awards is impermissible under "the terms of the [FY24-25] NOFO." That is false. The FY24-25 NOFO

specifically says that "HUD may issue more than one conditional funding announcement." AR 50. Indeed, for last year's awards, HUD did just that. *See* HUD, Continuum of Care Program, https://perma.cc/43WJ-62NL (noting "additional awards" of FY 2024 funding). Defendants posit (at 86) that, if they issue some awards first, they will not be able to "make funding adjustments" that the NOFO contemplates if "later awardees" have projects deemed ineligible. This is nonsensical. The ineligibility of a project considered at the later stage would not affect the eligibility of a project that HUD already deemed eligible and issued an award at the earlier stage. Indeed, the December NOFO contemplates the same funding adjustments (AR 1233), yet Defendants have proposed, within a single track, bifurcating the announcement of awards under that NOFO. AR 297 (proposing announcing awards requiring "less review" before announcing others). Contrary to Defendants' handwaving (at 86), there is no way that announcing awards in multiple stages would "frustrate" the funding adjustments the NOFO contemplates.

## II.    The FY25 NOFOs Are Unlawful

Although the Court need not reach the issue if it grants Plaintiffs the relief they request for the rescission claims as described above, the FY25 NOFOs are also unlawful for a host of independent reasons even apart from their too-late issuance.

### A.  The Challenges to the November NOFO's Provisions Are Not Moot

Defendants do not defend the merits of the Challenged Provisions in the November NOFO that "ha[ve] no counterpart" (Defs.' Mem. at 30) in the December NOFO, and instead just claim (at 30-32) that Plaintiffs' challenges to them are moot.[5] They are not. A case does not

---

[5] Those Provisions that have no direct counterpart in the December NOFO are the Disability Condition that excludes people with substance use disorder (AR 216), the Law Enforcement Condition that assigns points for immigration-related verification (AR 243), and the Gender Identity Reservations and Condition that bar grantees from "us[ing] a definition of sex as other

automatically become moot when, as here, the defendant voluntarily ceases the challenged conduct during the course of the litigation. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 719-20 (2022). The voluntary-cessation doctrine prevents "a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture." *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) (cleaned up). Like every other defendant, the government bears "a formidable burden" to demonstrate "no reasonable expectation remains that it will return to its old ways." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up).

HUD starts off on the wrong foot by suggesting (at 31) that Plaintiffs have not met their burden to furnish evidence that HUD will re-impose the Challenged Provisions. "The burden here is on the *defendant* to establish that it cannot reasonably be expected to resume its challenged conduct." *Fikre*, 601 U.S. at 235 (emphasis altered); *accord Lowe v. Gagné-Holmes*, 126 F.4th 747, 756 (1st Cir. 2025). And notably absent from Defendants' argument (or from their declaration) is any representation that HUD will not re-impose these Challenged Provisions. The closest HUD comes is to say (at 32) that it "is standing on the December 2025 NOFO," but presumably HUD also "st[ood] on" the November NOFO, until it didn't. HUD's statement falls far short of unequivocally representing that it "will not reimpose" the Challenged Provisions from the November NOFO. *West Virginia*, 597 U.S. at 720 (cleaned up). Without that kind of "assurance," HUD fails to carry its burden. *Fikre*, 601 U.S. at 243.

Defendants simply ignore *Fikre* and *West Virginia*, the relevant Supreme Court precedent on mootness. That omission is particularly striking with respect to *West Virginia*, which held that

---

than binary" (AR 210, 220, 263-64). *See* Appendix, FY25 NOFOs: Challenged Provisions at 4, 7, 9, 12, Dkt. No. 67-2.

a challenge to a rule did not become moot merely because the federal agency "decided to promulgate" a replacement. 597 U.S. at 719. Even if taking a replacement agency action can in some circumstances moot a case, *see* Defs.' Mem. at 31, that is not enough to demonstrate mootness standing alone.

The cases on which Defendants principally rely—*Boston Bit Labs* and *Lowe*—are inapposite. Both concerned challenges to emergency restrictions imposed during the COVID-19 pandemic and later rescinded, and the court of appeals explained that these controversies were moot for two reasons, neither of which applies here: (1) the state defendants had not changed the policies in response to the litigation, but in response to evolving public-health conditions, and (2) the challenged public-health restrictions could not reasonably be expected to recur given that the once-in-a-generation pandemic had subsided. *See Lowe*, 126 F.4th at 756-59; *Bos. Bit Labs*, 11 F.4th at 10-12. By contrast, HUD's abrupt about-face here was plainly driven by the litigation: HUD withdrew the November NOFO just before a scheduled hearing on Plaintiffs' motion for preliminary relief—conduct that, at a minimum, raises concerns that HUD is attempting to "manipulat[e] [the] court's jurisdiction." *Illinois v. FEMA*, 801 F. Supp. 3d 75, 86 (D.R.I. 2025). And, here, no changed circumstances make it unlikely HUD would reimpose the November NOFO's challenged provisions if it could. Particularly given that HUD already abruptly reversed course once, the voluntary-cessation doctrine precludes dismissal of these claims as moot. *See West Virginia*, 597 U.S. at 720. And because Defendants have forfeited any defense of them on the merits, the Court need not conduct any further analysis to declare them unlawful.

23

### B.  The FY25 NOFOs Violate the APA

#### 1.    The FY25 NOFOs exceed Defendants' statutory authority

As Plaintiffs explained in their opening brief, Defendants lack authority to impose the Permanent Housing Caps, New Project Earmark, Review Criteria, and Post-Award Conditions. Defendants' responses are unavailing.

To begin, Defendants mistakenly suggest (at 37) that the New Project Earmark is not only authorized but effectively required by 42 U.S.C. § 11386b(a). That provision requires HUD to use "not less than 30 percent" of funds appropriated for CoC and another program for permanent housing for individuals and families with disabilities. 42 U.S.C. § 11386b(a)(1). But Defendants ignore a key proviso: "In calculating the portion" of funds used for such permanent housing, HUD "shall not count funds made available to renew contracts for existing projects." 42 U.S.C. § 11386b(a)(2). In other words, this provision addresses only the funding used for *new* projects: Of the funding used for new projects, 30 percent must go toward new permanent housing for this population. The statute does not require 30 percent of *all* funding to go to new permanent housing for individuals and families with disabilities—and HUD therefore cannot claim that the New Project Earmark is statutorily required. (In fact, it is prohibited for the reasons explained below. *See infra* Section II.B.2.a.)

Defendants otherwise seek authority in 42 U.S.C. § 11386a—which provides that the criteria for awarding CoC grants can include "such other factors as the Secretary determines to be appropriate to carry out [the CoC program] in an effective and efficient manner." *See* 42 U.S.C. § 11386a(b)(1)(G). But that provision does not grant HUD the needed authority.

As an initial matter, this provision, by its terms, only authorizes the Secretary to establish "criteria" for awarding grants. It therefore does not authorize the Permanent Housing Caps or the

New Project Earmark. Those are not criteria for making awards, but rather provisions that categorically limit the funding available for certain projects.[6]

Beyond that, § 11386a(b)(1)(G) authorizes only those provisions that "carry out [the CoC program] in an effective and efficient manner," and the Challenged Provisions do not meet that requirement. To the extent Defendants even determined that the Challenged Provisions serve effectiveness and efficiency goals, those determinations are arbitrary and capricious for all the reasons explained below. *See infra* Section II.B.3. And if Defendants mean to suggest (at 36) that whether the provisions serve effectiveness and efficiency goals is unreviewable because the statute refers to criteria that "the Secretary determines" serves those goals, they are mistaken. The Supreme Court has held that agency action pursuant to similar authority is reviewable. *See Dep't of Comm. v. New York*, 588 U.S. 752, 771-73 (2019) (holding that Court could review agency's decision to add question to census pursuant to statutory provision authorizing it to take census "'in such form and content as [the Secretary] may determine'").

Finally, § 11386a(b)(1)(G) cannot authorize the Retroactive Reservations because an agency cannot impose conditions that retroactively disqualify applicants based on past conduct "unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Defendants entirely fail to respond to this point in Plaintiffs' motion (Pls.' Mem. at 51) and therefore have effectively conceded the point. *See Furtado v.*

---

[6] That provision also does not authorize the post-award conditions, as those are not "criteria" either. But a separate provision—42 U.S.C. § 11386(b)(8)—authorizes HUD to establish "terms and conditions … to carry out this part in an effective and efficient manner." HUD does not cite this provision so forfeits any reliance on it. At any rate, this provision does not provide HUD the needed authority for the same reason that § 11386a(b)(1)(G)'s similar authorization for additional "criteria" does not.

*Oberg*, 949 F.3d 56, 59 (1st Cir. 2020) (holding that courts may treat a party's failure "to respond to a properly raised argument for summary judgment as waiver").

>    2.    **Multiple Challenged Provisions are contrary to law**

>        a.    **Permanent Housing Caps and New Project Earmark**

As Plaintiffs' opening brief explained (at 51-52), the Permanent Housing Caps and New Project Earmark conflict with the statute. Defendants entirely fail to respond to Plaintiffs' arguments that the New Project Earmark is contrary to law and thus have waived any defense to that claim. *See Furtado*, 949 F.3d at 59. Defendants also fail to effectively rebut Plaintiffs' actual arguments on the NOFOs' Permanent Housing Caps.

To begin, Defendants entirely ignore Plaintiffs' argument (at 51-52) that the Permanent Housing Caps (and New Project Earmark) conflict with 42 U.S.C. § 11386c(b)'s command that appropriated funds "shall be available for the renewal" of permanent housing projects. Contrary to that mandate that all appropriated funds "be available" for permanent housing renewals, the Permanent Housing Caps (and New Project Earmark) make some funding categorically unavailable for such renewals. Defendants spend pages (at 40-43) arguing that this provision does not "entitle project sponsors" to renewals. But NAEH Plaintiffs do not suggest it does. Rather, NAEH Plaintiffs' point is that, by requiring that all funds "be available" for permanent housing renewals, § 11386c(b) mandates that existing permanent housing projects be *eligible* for all of the funding. The Permanent Housing Caps (and New Project Earmark) make such projects categorically *ineligible* for certain funds—a point Defendants entirely ignore.

Defendants also fail to respond to Plaintiffs' argument (Pls.' Mem. at 52) that the Permanent Housing Caps also violate § 11386c(b) for the separate reason that they (as well as the New Project Earmark) introduce impermissible factors into the decision whether to renew permanent housing projects. That provision mandates that HUD "determine whether to renew"

permanent housing projects "on the basis of" two specified factors—but the Permanent Housing Caps would have HUD make that determination based on whether the CoC had already hit the baseless 30 percent cap on funding for such renewals.[7] In responding to a separate argument (that NAEH Plaintiffs do not make), Defendants contend (at 42) that § 11386c(b) does not actually "limit[]" HUD to considering only the two statutorily identified factors because a neighboring subsection says that the provision shall not "be construed as prohibiting [HUD] from renewing contracts … in accordance with criteria set forth" elsewhere in the statute. 42 U.S.C. § 11386c(c). But, consistent with the statute's prioritization of stability and renewals for permanent housing, this provision clarifies only that HUD is permitted to "*renew*[]" awards if warranted by other established criteria. It does not permit HUD to *decline to renew* awards based on factors other than those that § 11386c(b) identifies.

Defendants also miss the mark in responding to Plaintiffs' argument that the Permanent Housing Caps violate the statutory command that HUD provide "incentives" for specified permanent housing activities that Congress determined have proven effective in combatting homelessness, 42 U.S.C. § 11386b(d). *See* Pls.' Mem. at 52. Defendants contend (at 39) that Congress instructed HUD to provide that incentive by dedicating 30 percent of funding to permanent housing for certain populations, as § 11386b(a) requires. Not so. The requirement to allocate 30 percent of new-project funding (not 30 percent of all funding, *see supra* Section II.B.1) to permanent housing for certain populations is separate and distinct from the requirement that HUD provide "incentives" for proven activities. *See* 42 U.S.C. § 11386b(a), (d). Indeed, the 30 percent allocation and the required "incentives" do not even cover the same types of projects.

---

[7] The New Project Earmark likewise violates this mandate because it would have HUD determine whether to renew a project based on whether the limited funding HUD has made available for renewals has been exhausted.

*Compare* 42 U.S.C. § 11386b(a) (allocation for "permanent housing for homeless individuals with disabilities" and their families), *with id.* § 11386b(d) (incentives for "permanent supportive housing for chronically homeless individuals and families" and for specified rapid rehousing services "for homeless families").

Defendants' further contention (at 39) that the December NOFO actually *does* provide incentives for permanent housing is demonstrably false. While Defendants claim that the December NOFO provides "merit points" for permanent housing activities, the NOFO sections that Defendants cite actually just establish the minimum threshold criteria that permanent housing projects must satisfy to be eligible for consideration. *See* AR 1200-1203 (establishing the minimum points that "new permanent housing projects" must receive to pass threshold review); *see also* AR 1191 (explaining that these "threshold requirements" determine whether an applicant can "advance to a merit review"). That is not an incentive.

### b. Disability Conditions

As Plaintiffs explained (at 53), Defendants violate various antidiscrimination laws by imposing the Disability Condition that exempts individuals "who have a physical disability/impairment or a developmental disability"—but not individuals with other types of disabilities—from required services for which applicants can earn points, AR 1197, 212. To defend this Condition, Defendants claim (at 45) HUD was actually "likely required by law" to "include an exception for disabled individuals unable to work." But that is not what the Condition does. It does not exempt individuals who are unable to participate due to disability, but rather implements stereotypes about what types of disabilities are deserving of an exemption. As a result, any grantee who followed the NOFO—imposing service requirements for some

individuals with disabilities but not others—would violate numerous laws and regulations. *See* Pls.' Mem. at 53 (listing applicable laws).[8]

### c. Geographic Discrimination Conditions

The FY25 NOFOs' Geographic Discrimination Conditions also violate 42 U.S.C. § 12711's prohibition on "establish[ing] any criteria … based on" a state or local jurisdiction's adoption of any "public policy, regulation, or law." Pls.' Mem. at 53-54. To defend against this claim (at 46-47), Defendants first contend that they "do not actually award points merely for demonstrating a state's compliance with the Administration's favored policies," but rather look to "how the CoC cooperates" with local officials to achieve certain goals. That mischaracterizes the Conditions. By their terms, the Conditions award points based on whether "the CoC's entire geographic area" does things like "quickly clear[ing]" encampments and "not tolerat[ing]" public illicit drug use. AR 1226-27. While the Conditions *also* look to what the CoC itself does, that does not change the fact that they impermissibly look to the local jurisdictions' public policies on encampments and public illicit drug use as well. This case is therefore unlike the case Defendants cite (at 46), where the court concluded that HUD did not violate § 12711 by requiring a funding applicant to "assess and analyze" whether certain local laws impeded fair housing and to "identify a plan to overcome the effects of such impediments." *County of Westchester v. HUD*, 802 F.3d 413, 433 (2d Cir. 2015). Here, unlike there, HUD's criteria are based on what policies the local jurisdictions actually implement.

---

[8] Defendants also point out (at 45-46) that this and another provision of the December NOFO establish that services must "serve any type of disability." *See* AR 1201, 1202-03. That has no bearing on Plaintiffs' challenge to the December NOFO's Disability Condition. That shows only that the December NOFO does not repeat the November NOFO's separate problem of unlawfully prioritizing projects that serve people with physical and development disabilities over people with substance use disorder. *See* AR 212, 216.

Next, Defendants contend (at 47) that the condition awarding points based on whether the CoC's state "is substantially compliant" with SORNA does not turn on the state's laws or public policies, but rather on their compliance with "federal law." That is mistaken. Consistent with constitutional limits on Congress's authority, "SORNA does not require the States to comply with its directives." *United States v. Johnson*, 632 F.3d 912, 920 (5th Cir. 2011) (emphasis omitted); *accord, e.g.*, *Kennedy v. Allera*, 612 F.3d 261, 269 (4th Cir. 2010). Rather, under federal law, states can choose either to substantially implement SORNA or to lose a portion of certain criminal justice funding. 34 U.S.C. § 20927(a). Thus, whether a state substantially implements SORNA is a matter of the state's own law and public policy—and the criterion looking to those laws and policies violates § 12711.

### d. Gender Identity Reservation and Conditions

As Plaintiffs' opening brief explained (at 54-55), the December NOFO's requirement that grantees comply with the "Gender Ideology" Executive Order would violate various laws and regulations barring discrimination based on gender identity. Defendants do not dispute that forcing grantees to comply with the "Gender Ideology" Executive Order's decree that sex is binary and immutable would violate those laws. Instead, Defendants claim (at 48-49) that (1) the Condition actually "has *no* effect" because it imposes no obligations on grantees and (2) necessarily could not violate the law anyway because it states that grantees need not comply if "otherwise restricted by law." Both arguments fail.

Defendants' first point strains credulity. The FY25 NOFOs direct grantees, "You must comply with" the "Gender Ideology" Order—a direction that makes no sense if HUD did not intend for grantees to at least *think* they needed to comply. AR 1249-50, 262-63. HUD clearly included this Condition to constrain grantees' behavior—even if it does so by misleading them to

think they are required to implement the Executive Order's views on gender to keep their grants. After all, there would be no other reason to tell grantees they "must comply."[9]

The Condition's savings clause requiring compliance with the "Gender Ideology" E.O. "unless otherwise restricted by law" (AR 1250) also does not "magically ensure" that the condition is lawful. *City of Fresno v. Turner*, No. 25-cv-7070, 2025 WL 2721390, at *10 (N.D. Cal. Sept. 23, 2025), *appeal pending*, No. 25-7378 (holding that savings clause such as "to the maximum extent permitted by law" did not "magically ensure that the conditions incorporating that language only operate" lawfully); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1238–1240 (9th Cir. 2018) (holding that a requirement to take action "to the extent consistent with law" did not mean the requirement was necessarily lawful). While Defendants claim (at 48) that "a directive with a permitted-by-law qualifier" necessarily "cannot violate the law," the cases they rely on are inapposite. One did not address the lawfulness of the directive at all because the challenge was not ripe. *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020). And the other two involve a directive that *could* be implemented lawfully. *See Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,* 295 F.3d 28, 33 (D.C. Cir. 2002) (addressing a "policy that … is above suspicion in the ordinary course of administration"); *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (Sotomayor, J., concurring) (noting that district court would consider whether plans implementing executive order with savings clause "can and will be carried out consistent with the constraints of law"). That is wholly different than the Condition at

---

[9] Indeed, Defendants have separately warned grantees that they must comply with the policies in executive orders or else lose their funding. *See* Pls.' Mem. at 67 (Secretary Turner stating that CoC funds will be restricted from recipients that "enforce 'gender ideology'" or engage in other activity targeted by executive orders such as "promot[ing] DEI" or "support[ing] abortion"); *id.* 23 & n.9 (Secretary Turner statement that, pursuant to an executive order, HUD will withhold funding from "sanctuary" jurisdictions).

issue here, which appears to require grantees to deny transgender individuals' identity and thus cannot be implemented lawfully.

### 3. The FY25 NOFOs are arbitrary and capricious

For all the reasons Plaintiffs explained, the FY25 NOFOs are also arbitrary and capricious. *See* Pls.' Mem. at 55-71. In attempting to defend the reasonableness of their decision to adopt the latest NOFO, Defendants rely heavily on Policy Advisor McKenney's December 19 Memo (December Memo). But that memo fails to address "important aspect[s] of the problem" and fails to provide "a satisfactory explanation for [HUD's] action" that includes a "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (cleaned up). It fails to offer "genuine justifications for important decisions." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). At bottom, its determinations fail because conclusory statements will not do; an "agency's statement must be one of '*reasoning.*'" *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (emphasis added)).

Defendants argue (at 50) that the December Memo makes two "framing determinations" that underpin the FY25 NOFOs and from which "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286, (1974). First, HUD determined that the CoC program's prior focus on permanent housing had "failed to deliver." Defs.' Mem. at 50. Second, the agency decided to "'return the CoC program to its original goals of solving homelessness' by promoting individual self-sufficiency, promoting treatment and recovery, and—at bottom—reducing homelessness." *Id*. These determinations provide no such reasonably discernable "path" and suffer from four fatal flaws. They are conclusory and provide no "rational connection between the facts found and the choice made" in the FY25 NOFOs. *State Farm*, 463 U.S. at 43 (cleaned up). They ignore "important aspect[s] of the problem." *Id.* They fail to consider Congress's directives regarding the effective methods of

meeting the CoC programs' statutory goals. And they fail to sufficiently consider the "serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). These flaws pervade the FY25 NOFOs and the myriad Challenged Provisions.

### a.  Destabilization of Permanent Housing

Defendants' explanations for destabilizing permanent housing—through the Permanent Housing Caps, the New Project Earmark, and the Tier 1 Allocation—fail on all four fronts.

Instead of examining the evidence and facts before the agency and taking actions supported by those facts, in issuing the FY25 NOFOs, HUD "had a clear goal from the start"— "the Administration's approach to homelessness would be different than what HUD had done in the past." AR 286. In attempting to justify this predetermined outcome, Defendants make numerous unsupported determinations. For example, HUD alleges, with no citations or evidence, that the Tier 1 Allocation "fail[ed] to deliver on the purposes it was designed to serve." AR 286.

That "determination" fails to provide any explanation, let alone a "rational connection" between Defendants' findings and their decision to institute a Permanent Housing Caps, a New Project Earmark, and the Tier 1 Allocation. That is particularly problematic because "a more detailed justification" than usual is required given that HUD's "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, (2009).

Neither the December Memo nor any other part of the Administrative Record addresses the volumes of prior factual findings underpinning the CoC Program's longstanding focus on permanent housing.[10] Instead, the Memo sets forth conclusory statements about renewals of

---

[10] Many prior NOFOs emphasize the importance of and evidence supporting permanent housing. *See* States' Mot. for S.J. (States' Mem.) at 10 n.5, *Washington v. HUD*, No. 1:25-cv-626 (D.R.I.), Dkt. No. 81; *see also* HUD, *Fiscal Year 2022–2026 Strategic Plan* (Mar. 28, 2022),

grants causing "more harm than good" and permanent housing "failing to deliver." AR 286. But

"conclusory statements will not do; an agency's statement must be one of *reasoning.*" *Amerijet*

*Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up); *see also, e.g.*, *Rhode*

*Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025).

The Memo *does* present evidence that homelessness has increased in the past decade, and

during that time, the CoC program has invested in permanent housing strategies. AR 287-288.

But what is missing is what the APA requires—a "rational connection" between the two.[11]

Defendants have failed to provide any evidence of connection between the increase in

homelessness and the investment in permanent housing; in fact, the available evidence shows

that Defendants' inferences are unreasonable. *See* States' Mem. at 47-57; Pls.' Mem. at 12-13.

Defendants' inclusion of the New Project Earmark in the December 2025 NOFO is

further arbitrary and capricious because it fails to "consider responsible alternatives to its chosen

policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines,*

*Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021); *accord, e.g.*, *Dep't of Homeland*

*Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32-33 (2020). The December Memo states

"HUD chose to increase competition by setting aside funds for new projects instead of renewal

projects." AR 298. But HUD never explains why allowing *all* projects to compete—including

existing ones—would not even more effectively increase competition. Defendants also suggest

---

https://perma.cc/35YM-YEV4; HUD, *Office of Community Planning and Development Homeless Assistance Grants*, https://perma.cc/7E6K-LG8C.

[11] Further frustrating Defendants' efforts to find a connection where none exists is recent evidence that homelessness decreased last year, reversing the trend on which HUD heavily relies. *See* Jason DeParle, *Homelessness Appears to Decline, Reversing a Yearslong Trend*, N.Y. Times (Jan. 28, 2026), https://perma.cc/K2WB-5LM3 (reporting that sample of local homelessness counts suggests homeless population shrank by tens of thousands of people last year, and noting that, "[w]hile the count is usually announced in December," HUD "declined to say when it would be made public").

(at 54) that the New Project Earmark is required by statute, but that is wrong for the reasons explained above. *See supra* Section II.B.1. The December Memo states "HUD chose to increase competition by setting aside funds for new projects instead of renewal projects." AR 298. But HUD never explains why opening this Earmark to all permanent housing projects, and allowing existing projects to compete for such funds, would not similarly increase competition.

Defendants' actions are also inconsistent with Congress's directives. Defendants argue that its actions are "reasonable" because the agency simply decided to "return the CoC program to its original goals of solving homelessness" by promoting individual self-sufficiency, promoting treatment and recovery, and—at bottom—reducing homelessness. Defs.' Mem. at 50; AR 288. Defendants provide no cite to support their assertion that its chosen approaches will effectively "solv[e] homelessness." And they are flat out wrong when they contend that their chosen approaches were approved by Congress.

First, the statutory purposes of the CoC Program do not include "expanding competition,"[12] "prioritizing treatment, or "law and order," as HUD implies in the December Memo, AR 288. *See* 42 U.S.C. § 11381. The purposes *do* include "quickly rehous[ing] homeless individuals and families while minimizing … trauma and dislocation." 42 U.S.C. § 11381. The FY25 NOFOs' destabilization of permanent housing, through the Permanent Housing Caps, Tier 1 Allocation, and New Project Earmark, will result in trauma and dislocation. *See* Declaration of Sunaree Marshall (MLK County) ¶ 19, Dkt. No. 7-7; Declaration of Kathryn J. Kaminski (Santa

---

[12] Congress did intend for the CoC program to be competitive (not formula-based), but the CoC program has long satisfied that goal. Permanent housing projects and renewals compete too. And even when the Tier 1 Allocation is high, CoCs must run a local competition to decide what projects to slot in Tier 1, ensuring all awards—even renewals—are competitive.

Clara) ¶¶ 38, 42-43, Dkt. No. 7-9; Declaration of Amy M. Davidson (San Mateo) ¶ 23, Dkt. No. 7-12. Defendants fail to consider Congress's directive in instituting such measures.

Second, Defendants are wrong that its actions "rebalance" the CoC program in the way Congress intended. *See* Defs.' Mem. at 52. Congress prioritized permanent housing. *See* 42 U.S.C. § 11386b(a), (b), (d). There is absolutely no support for Defendants' contention that Congress intended that only 30 percent of funding go to permanent housing projects. Defendants continue to misread the statute as Plaintiffs describe above. *See supra* Section II.B.1. Defendants hide behind their misunderstanding of this provision to defend against the significant evidence demonstrating that Congress intended for the program to focus on and prioritize permanent housing.

To that end, Congress identified in statute two—and only two—activities that "have been proven to be effective at reducing homelessness"—permanent supportive housing for those who are chronically homeless, and rapid rehousing with associated services (a type of permanent housing, *see* 24 C.F.R. § 578.3) for homeless families. 42 U.S.C. §§ 11386b(d)(1)-(2). Yet, by destabilizing permanent housing, the FY25 NOFOs strip funding from those two congressionally prioritized activities, along with all other permanent housing projects. Defendants fail to grapple with their actions' contradictions with the statutory findings—and thus fail to address an important aspect of the problem. *State Farm*, 463 U.S. at 43.

Defendants also offer no valid response on their failure to consider the "significant reliance interests" of individuals and communities on the CoC programs' longstanding support for stable permanent housing. Defendants emphasize (at 51) that HUD "provided a process" for grantees to transition to new types of funding. But documenting after-the-fact implementation of a pre-determined decision does not fulfill the requirement to "assess whether there were reliance

interests" and "weigh any such interests against competing policy concerns" when deciding *whether* to make the policy change in the first place. *Regents*, 591 U.S. at 33 (cleaned up). Defendants conducted no such assessment. The serious reliance interests at issue barely get a nod in the administrative record. The December Memo fails entirely to consider the 170,000 individuals that may lose housing as a result of the destabilization of permanent housing.[13] *See* Pls.' Mem. at 56. As Plaintiffs point out (at 57), HUD failed to consider that statutory and regulatory requirements would not permit many of the individuals relying on permanent housing to transition to other housing. Similarly, HUD failed to consider the significant reliance interests of CoCs and service providers, including landlords. *Id.*; Declaration of Joyce Tavon (MHSA) ¶ 18, Dkt. No. 7-15. Instead, Defendants argue (at 52) that HUD determined "it would do all it could [do] to ameliorate the transition to transitional-housing grants as much as possible." Indeed, while Defendants assert in their brief (at 51) that HUD considered the effects and reliance interests and determined that "the negative effects … were outweighed by the benefits," Defendants notably point to nothing in the administrative record supporting that bare assertion. *See, e.g., Am. Hosp. Ass'n v. Kennedy*, No. 25-2236, 2026 WL 49499, at *3 (1st Cir. Jan. 7, 2026) (concluding the record "does not contain any evidence showing that the federal government considered the hospitals' reliance interests"). Instead, Defendants argue that the "determination was squarely within HUD's discretion." *Id.* But under the APA, "[n]odding to concerns … only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated on other grounds*, 142 S. Ct. 1665 (2022).

---

[13] Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants*, N.Y. Times (Nov. 12, 2025), https://perma.cc/388A-9BP3.

### b. Review Criteria

Defendants' arguments as to why each Review Criteria is a result of reasoned decisionmaking likewise all fail.

### i. Service Requirements

Defendants' attempt to defend the Service Requirements—criteria prioritizing projects that offer housing only if the beneficiaries participate in treatment or other services—falls short. *See* Defs.' Mem. at 55-56. Defendants first suggest that this advances statutory and regulatory goals, but the statutory and regulatory provisions they rely on require supportive services to be *available* to clients of CoC-funded housing programs, not that those services be mandatory. *Id.* (citing 42 U.S.C. § 11385(a); 24 C.F.R. § 578.75). HUD has long satisfied these requirements by allowing CoC-funded programs to offer supportive services to clients on a voluntary basis, consistent with Housing First principles and the HEARTH Act. *See* Pls.' Mem. at 12-13, 59-60. The statute and regulations provide no support for the sea change the Service Requirements produce. Indeed, the Service Requirements are inconsistent with the Violence Against Women Act and the Family Violence Prevention and Service Act, which prohibit providers from mandating services for victims of domestic violence. Pls.' Mem. at 61. Defendants never address this point—and apparently failed to consider how the Service Requirements would therefore systematically disadvantage projects that serve such victims.

HUD also failed to consider other key consequences of the Service Requirements, including that affected CoCs would have to change a significant portion of their programs' requirements; that programs would need to terminate clients from housing who did not participate in services, resulting in more homelessness; or that mandatory services requirements would lead unhoused individuals to decline shelter, resulting in underutilized services. *See* Declaration of Ann Marie Oliva (NAEH) ¶¶ 90-92, Dkt. No. 7-1; Declaration of Rush Frazier

(YPI) ¶ 34, Dkt. No. 7-4; Declaration of Ann Chanecka (Tucson) ¶ 25, Dkt. No. 7-11; *see also* Tavon (MHSA) ¶ 29, Dkt. No. 7-15; Declaration of Mary Katherine Rand (MPC) ¶¶ 6-11, Dkt. No. 7-14. Defendants' failure to consider these "important aspect[s] of the problem" render the Service Requirements arbitrary and capricious. *State Farm*, 463 U.S. at 43.

The Service Requirements are also arbitrary and capricious because Defendants provide no "reasonable explanation" for the change in policy. Defendants claim (at 56-57) that they reasonably adopted the Service Requirements to promote "recovery and self-sufficiency," *id.,* but the administrative record provides no support for that assertion, let alone the "more detailed justification" that is required when an agency's new policy "rests upon factual findings that contradict those which underlay its prior policy." *Am. Pub. Health Assoc. v. NIH*, 145 F.4th 39, 53 (1st Cir. 2025) (quoting *FCC*, 556 U.S. at 515) (cleaned up). Defendants claim (at 57) that "participation requirements have been successfully employed in other social service programs," but the evidence they cite does not actually support that assertion.[14] One source that Defendants cite (at 57) says only that some chronically unhoused individuals living with severe disabilities or substance use disorder may require higher levels of care than can be provided in permanent supportive housing. AR 706. Another source that Defendants cite (at 57) reports that people experiencing homelessness—i.e., people *not* enrolled in publicly assisted housing—had trouble accessing substance use treatment. AR 838-39. And the final source that Defendants cite (at 57) says that 90 percent of all households living in permanent supportive housing "did not use other

---

[14] Defendants rely on one paper that makes passing reference to Pell Grants and Temporary Assistance for Needy Families (TANF), which require recipients to do things like go to class or job search, as its sole source of evidence that social service requirements work in the housing context. *See* AR 727. This paper offers zero analysis as to whether these requirements actually made Pell Grants or TANF more or less successful, let alone any insight as to how these two programs inform housing practices and translate into solving homelessness *See id.*

parts of the homelessness services system during the year"—meaning that they did not use shelters or other subsidy programs, *not* that they did not access services. AR 1024-25.

Defendants' explanation, moreover, ignores entirely the significant evidence to the contrary, including HUD's *own* facts and findings that underlay its prior policy: that supportive services are most effective when offered to clients who are stably housed, while requiring clients to participate in treatment or services as an upfront condition of receiving housing does not lead to better housing outcomes and drives up costs for front-line institutions like hospitals and jails. *See* Pls.' Mem. at 12-13. Defendants' brief otherwise cites to various studies included in the administrative record, but none of these studies supports the propositions that Defendants cite them for, nor provide a "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (cleaned up). For these reasons, the Service Requirements are arbitrary and capricious.

### ii.  *Disability Conditions*

As explained above and in Plaintiffs' opening brief, the Disability Conditions implement a stereotype-based assumption about which *types* of disabilities should be entitled to an exemption from a project's service requirements. *See supra* Section II.B.2.b; Pls.' Mem. at 62. Defendants offer no reasonable basis for adopting these Conditions. They claim (at 58) that CoCs "will face no penalty or receive no benefit" for using their "discretion to decide whether and how to provide services to people with disabilities," but that is flat wrong. Plaintiffs will lose out on merit review points if they do not impose service requirements on individuals with mental health disabilities or substance use disorders, but will not lose out on those points for failing to impose those requirements on individuals with other types of disabilities.

Notably, Defendants fail to point to anything in the record to support their decision-making regarding this specific condition, and fail to respond at all to Plaintiffs' arguments (Pls.'

Mem. at 62) regarding impermissible stereotypes. Instead, Defendants suggest that the Condition's exemption for participants with certain types of disabilities is "likely" required by law. That is incorrect for the reasons explained above. *See supra* Section II.B.2.b.

### iii. Geographic Discrimination Conditions

At bottom, each of the Geographic Discrimination Conditions is plainly arbitrary and capricious because Defendants failed to consider an important aspect of the problem—namely, that the ability to meet these conditions, which require adoption of certain state and local laws and/or policies, is out of the control of the applicants being assessed. Defendants cite no evidence to support their bare conclusion that "many CoCs are responsible for administering such policies," nor do they explain how CoCs could administer policies at odds with state and local laws. *See* Defs.' Mem. at 61 (cleaned up). And Defendants again ignore that the merit review points are based on the CoC's "entire geographic area" and not just the CoC's own policies. *See supra* Section II.B.2.c. In failing to consider this "important aspect of the problem," and thus failing to make any "rational connection" between areas' enacting and enforcing laws—which is out of the control of applicants—and the scores those applicants receive, each Geographic Discrimination Condition is arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

Defendants' reasoning is arbitrary and capricious for other reasons as well. To justify the SORNA Geographic Discrimination Condition, for example, Defendants claim (at 59-60) that a state substantially implementing SORNA "ensur[es] that there are mechanisms to identify sex offenders," which in turn protects participants' safety. But Defendants fail to acknowledge that there are other ways to identify sex offenders as well and do not justify the decision to penalize CoCs based on the policies of the states where they are located. Similarly, Defendants claim (at 60-61) that the Geographic Discrimination Conditions that look to whether the geographic area clears encampments and does not tolerate public illicit drug use help connect individuals to

"appropriate services." But Defendants cite no evidence showing that clearing encampments alone or punishing public drug use actually improve service connections.[15] To the contrary, providers and CoCs can and do offer those service connections whether or not the "entire geographic area" in which they are located follows those policies. *See, e.g.*, Declaration of Elizabeth Mengers Magargee (Cambridge) ¶ 29, Dkt. No. 7-6 (describing stakeholder collaboration).

### iv.  Law Enforcement Conditions

Defendants fail to effectively address Plaintiffs' multiple arguments that Defendants acted arbitrarily and capriciously in imposing the Law Enforcement Conditions. *See* Pls.' Mem. at 65-67. They do not address Plaintiffs' point that Defendants failed to consider Congress's intent to develop "alternatives to criminalizing homelessness," 42 U.S.C. § 11313(a)(12), in adopting conditions that promote that congressionally disfavored approach. They also do not address Plaintiffs' point that Defendants failed to consider the increased criminal justice and public health costs that the Law Enforcement Conditions would impose on state and local governments. Pls.' Mem. at 65-66. Defendants baldly assert (at 61) that "HUD sufficiently considered the costs and benefits," but offer no record support. And Defendants do not address Plaintiffs' challenge to the involuntary commitment-related Law Enforcement Condition at all. Pls.' Mem. at 66.

In addition, Defendants fail to make any "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (cleaned up). They say (at 60-61) they seek to

---

[15]  The December Memo on which Defendants rely does not even reference "quickly clearing encampments," and instead only addresses *bans* on public camping, including a reference to a news article showing (contrary to the statement in the Memorandum) that an Austin ban made it *harder* to connect individuals with supportive services. *See* States' Mem. at 56-57 (citing AR 291, 1105).

protect safety for homeless individuals and the public generally, but they fail to offer any evidence that the Law Enforcement Conditions will serve those goals. Nor did they consider that the Conditions would actually be counterproductive by undermining providers' ability to gain the trust of those they are meant to serve.

### v. Certifications, Retroactive Reservations, and Risk Review Criterion

Defendants defend the Certifications, Retroactive Reservations, and Risk Review Criterion by asserting (at 62) that they simply ensure that grants are not "used to fund unlawful activities." But Defendants completely ignore Plaintiffs' key point (Pls.' Mem. at 67-68)—that the conditions will chill providers from engaging in entirely lawful activity. For example, Defendants have self-evidently added the various provisions barring "illegal discrimination" specifically including "DEI" activities and "racial preferences" as part of the Administration's orchestrated campaign to end activities promoting diversity, equity, and inclusion that have long been considered lawful. *Id.*; *see also, e.g.*, *Thakur v. Trump*, No. 25-4249, 2025 WL 3760650, at *5 (9th Cir. Dec. 23, 2025) (noting that "record suggest[ed] that the government aimed at the suppression of speech that views DEI . . . favorably"). This will chill providers from engaging in lawful activity honoring diversity. Yet Defendants do not show they considered this predictable consequence, much less explain how it is justified.

Nor do Defendants consider how the conditions barring grantees from violating a prohibition on maintaining "drug-involved premises," 21 U.S.C. § 856, will deter grantees from operating (lawful) safe-injection and other harm reduction sites. The December Memo notes that HUD believes harm reduction policies are "addiction enablement," but provides no record support for that belief. AR 296. Indeed, deterring those lawful activities may well be the point of these criteria. But in failing to acknowledge those consequences, or explain why the conditions

are nonetheless warranted, Defendants have arbitrarily and capriciously failed to "consider an important aspect of the problem" or to offer a "satisfactory explanation" for their choice. *See State Farm*, 463 U.S. at 43.

### c. Post-Award Conditions

Defendants offer no explanation for their decision to impose the Post-Award Conditions—and thus necessarily fail to provide the reasoned decisionmaking that the APA demands. Instead, Defendants assert that the conditions only "require compliance with applicable law" or, in the case of the Conditions requiring compliance with executive orders, do not actually impose any obligations on grantees. As noted above, *supra* Section II.B.2.d, this argument neither insulates the Conditions from judicial review nor excuses Defendants from the requirement to supply a reasoned justification for these changes under the APA. It also strains credulity. On the one hand, there is no reasoned explanation for including requirements that are not applicable to the grantees; this will cause confusion and improperly chill grantees from engaging in lawful conduct inconsistent with the executive orders' announced policies. On the other, this administration has announced it will apply these requirements expansively; these provisions are clearly meant to scare grantees into avoiding even lawful conduct. Defendants do not show that they considered these important consequences of the Post-Award Conditions, much less explain why they are nonetheless justified. Nor did Defendants acknowledge that this Court and others have already found similar funding conditions unlawful. *See* Pls.' Mem. at 68 & n.25.

### 4. Key provisions of the FY25 NOFOs were unlawfully issued without notice and comment

Plaintiffs' opening brief explains (at 71) that the FY25 NOFOs were unlawfully issued without notice and comment, in violation of the APA and HUD's own regulations. *See* 5 U.S.C.

44

§ 553(b)-(c); 24 C.F.R. § 10.1 (requiring notice-and-comment rulemaking for matters involving grants). The NOFOs radically overhaul the CoC program by imposing Permanent Housing Caps and the New Project Earmark that categorically limit funding for permanent housing projects. But HUD did not follow the necessary process to make these kinds of dramatic changes to the program.

Defendants' response (at 64-67) rests on a fundamental misunderstanding of Plaintiffs' claim. Plaintiffs do not contend that every NOFO must undergo notice and comment, and Plaintiffs agree with the uncontroversial proposition that general statements of policy are exempt from notice-and-comment procedures. *Contra* Defs.' Mem. at 64. But substantive (or "legislative") rules must undergo notice and comment, as Defendants appear to concede. *See* Defs.' Mem. at 66.[16]

The FY25 NOFOs' Permanent Housing Caps and New Project Earmarks are substantive rules requiring notice and comment. *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (explaining that a "legislative rule . . . creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself" (cleaned up)). Each of those provisions would result in drastic cuts to existing housing projects—either by directly capping funding for existing permanent housing or making such projects categorically ineligible for the earmarked funds. These provisions "announce[d] a new policy out of whole cloth." *N.H. Hosp.*, 887 F.3d at 72. Such categorical denial of funding is a binding effect—the hallmark of a

---

[16] To the extent Defendants do not concede this and suggest that they are not bound by the regulation requiring notice and comment, that contention is meritless. *See Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954) (holding that agencies must follow their own regulations); *see also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) ("Section 10.1 [24 C.F.R. § 10.1] requires HUD to proceed by notice and comment rulemaking whenever it promulgates a substantive rule.").

legislative rule rather than a "general statement of policy," as HUD characterizes these policies (at 64-65). A general statement of policy "does not impose any requirements," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014), and "leaves agency decisionmakers free to exercise their informed discretion in individual cases," *Chamber of Com. v. U.S. Dep't of Labor*, 174 F.3d 206, 212 (D.C. Cir. 1999). The Permanent Housing Caps and the New Project Earmark flunk those standards. They leave HUD no discretion to award funding to projects that exceed the cap or fall outside the earmark.

As a result, these policies should have undergone notice and comment, and for good reason.[17] Had HUD undertaken that process, it would have had an opportunity to understand and account for the real-world impacts on ongoing permanent housing projects. HUD's failure to engage in the notice-and-comment process required by law and regulation is fatal. The Court should set aside the FY2025 NOFOs as issued without appropriate process. 5 U.S.C. § 706(2)(D).

### C. The FY25 NOFOs Are Unconstitutional

#### 1. The Gender Identity Conditions and Reservation violate the First Amendment

Defendants do not defend the November NOFO's Gender Identity Conditions and Reservation, and their sole response to Plaintiffs' First Amendment claims is that the December 2025 NOFO's Gender Identity Condition—which requires grantees to comply with the "Gender Ideology" Executive Order—does not actually require grantees to do anything. Defs.' Mem. at 77. This argument lacks merit for the same reasons explained above in Section II.B.2.d.

---

[17] Defendants' argument (at 65-66) that a public comment process is inconsistent with timely publication of NOFOs misses the mark. HUD can undertake notice and comment to change substantive standards and then incorporate them in the next NOFO.

Defendants must understand this provision to do something, as they deemed it sufficiently important to include in the December NOFO. On that understanding, it violates the First Amendment because it requires grantees to adopt the Defendants' views on gender or penalizes them for refusing to do so. Indeed, two judges of this Court have already concluded that materially indistinguishable conditions violate the First Amendment. *R.I. Latino Arts v. NEA*, 800 F. Supp. 3d 351, 368 (D.R.I. 2025) (Smith, J.), *appeal pending*, No. 25-2113; *R.I. Coal. Against Domestic Violence v. Kennedy*, 2025 WL 2988705, at *8 (D.R.I. Oct. 23, 2025) (DuBose, J.). Defendants make no attempt to distinguish those cases or to provide any other explanation for why the Gender Identity Condition would not violate the First Amendment.

### 2. The FY25 NOFOs violate the separation of powers and the Spending Clause

As Plaintiffs explained in their opening brief (at 74-75), the FY25 NOFOs' Challenged Provisions violate the separation of powers and the Spending Clause. Rather than faithfully implementing the criteria established by Congress, Defendants imposed the Challenged Provisions to obtain compliance with the Administration's policy objectives.

Defendants' principal response (at 68-69) is that these separation-of-powers claims are foreclosed by *Dalton v. Specter*, 511 U.S. 462, 472 (1994), which holds that executive actions that exceed statutory authority are not "*ipso facto* in violation of the Constitution." But *Dalton* also recognizes that it violates the Constitution for the executive to act based on "the President's inherent constitutional power as the Executive" when it in fact has no such power. *See Dalton*, 511 U.S. at 473. To the extent that Defendants have imposed the Provisions to comply with executive orders, they apparently rely on some claimed executive power to take those actions, notwithstanding the dictates of the statute. The executive branch has no such power, and its attempt to impose the Challenged Provisions contrary to congressional directives violates the

separation of powers. And *Dalton* has nothing to do with Plaintiffs' Spending Clause claim, which is based on Defendants' improper use of the spending power to impose conditions, not any theory that Defendants' actions outside the scope of their statutory authority are also "*ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472.

Defendants' other arguments (at 69-70) regarding Plaintiffs' Spending Clause claim fare no better. They submit that the Spending Clause is only implicated when Congress imposes a spending or funding condition. Defs.' Mem. at 69-70. That is not the law. *See, e.g.*, *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019) (concluding that the Spending Clause "appl[ies] to agency-drawn conditions on grants").

On the merits, the Challenged Provisions violate the Spending Clause because (1) they are unconstitutionally ambiguous, and (2) some of the Challenged Provisions, like the Gender Identity Condition, are unrelated to any federal interest. Defendants do not respond to Plaintiffs' ambiguity argument at all, thereby forfeiting the issue. Defendants similarly make no attempt to explain how the conditions like the Gender Identity Condition are at all related to the federal interest in the CoC grant program. Given that, the arguments Defendants do make (at 70-73) regarding whether various provisions "comport" with statutory requirements are not responsive to Plaintiffs' claims here.

### D. In Addition to Vacating the FY25 NOFOs, the Court Can and Should Enjoin Defendants from Re-Imposing the Challenged Provisions in Any New FY25 NOFO

Plaintiffs' opening brief (at 75-78) explained that, if the Court reaches the claims regarding the Challenged Provisions in the FY25 NOFOs, it should vacate the NOFOs and enjoin Defendants from imposing those Provisions or substantially similar ones in any new FY25 NOFO. Defendants acknowledge (at 82-83) that vacatur is proper, and they have abandoned their earlier argument that a court may not enter injunctive relief based on an APA claim under

Section 706(2). *See* Defs.' Mem. at 81 (conceding that the APA authorizes "injunctions").[18] Defendants also take no issue with Plaintiffs' explanation that the traditional equitable factors uniformly favor injunctive relief. *See* Pls.' Mem. at 76-78.

Instead, Defendants principally object to Plaintiffs request to enjoin "substantially similar" provisions, contending (at 81) that such an injunction is not appropriate because HUD could pursue "innumerable" different conditions in a future NOFO that are similar to the Challenged Provisions. Rather than advancing Defendants' position, that merely illustrates the problem. If Defendants are permitted to pursue countless iterations of these illegal conditions, then Plaintiffs will be needlessly forced to return to court time and again to vindicate their rights. Defendants protest (at 81) that Plaintiffs have provided no "basis to prevent HUD from implementing 'substantially similar' conditions" in the future, but they have: The Challenged Provisions are in excess of Defendants' authority, contrary to law, and/or unconstitutional, and no additional "justifications" (Defs.' Mem. at 81) that HUD provides could make the provisions any more lawful. *Cf. Smith v. Berryhill*, 587 U.S. 471, 488 n.21 (2019) (observing that remand is unnecessary where it "would serve no meaningful purpose"). Enjoining HUD from implementing patently illegal conditions in no way impairs HUD's legitimate discretion in administering the CoC Program. *Contra* Defs.' Mem. at 81.

Finally, Defendants suggest that any remedy should be limited to invalidating the portions of the FY25 NOFOs that the Court concludes are unlawful. Defs.' Mem. at 82-83. The entire argument rests on HUD's inclusion of a generic severability clause in the NOFOs, which

---

[18] This concession makes it difficult to understand Defendants' assertion (at 79-80) that the APA does not authorize "specific relief." The Court can and should take Defendants at their word that "Plaintiffs correctly explain that Section 703 contemplates the issuance of structural injunctions to correct statutory violations." Defs.' Mem. at 81 (cleaned up).

is insufficient to demonstrate severability. *See, e.g.*, *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022) ("[T]he ultimate determination of severability will rarely turn on the presence or absence of a severability clause." (cleaned up)). Defendants make no effort to explain how the FY25 NOFOs could "function sensibly," *id.* at 1144, if, for example, the Permanent Housing Caps or New Project Earmark were held invalid. Nor do they explain how CoCs could understand how to apply for a program governed by a NOFO with a mishmash of valid and invalid provisions. In such circumstances, the better course is to vacate the agency action in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs and deny Defendants' cross-motion for summary judgment.

January 30, 2026

AMY R. ROMERO
  (RI Bar No. 8262)
KEVIN LOVE HUBBARD +
  (MA Bar No. 704772)
DELUCA, WEIZENBAUM,
  BARRY & REVENS, LTD.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
  Lawyers' Committee for RI

*Counsel for All Plaintiffs*

TONY LOPRESTI +
  (CA Bar No. 289269)
COUNTY COUNSEL

Respectfully submitted,

/s/ Kristin Bateman
KRISTIN BATEMAN +
  (DC Bar No. 90037068)
MADELINE H. GITOMER +
  (DC Bar No. 1023447)
ALESHADYE GETACHEW +
  (DC Bar No. 1007161)
AMAN T. GEORGE +
  (DC Bar No. 1028446)
SIMON C. BREWER +
  (DC Bar No. 90042403)
CHRISTINE L. COOGLE +
  (DC Bar No. 1738913)
YENISEY RODRÍGUEZ +
  (DC Bar No. 1600574)
CARRIE Y. FLAXMAN +
  (DC Bar No. 458681)

KAVITA NARAYAN +
  (CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
  (CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
STEFANIE WILSON +
  (CA Bar No. 314899)
DEPUTY COUNTY COUNSEL
LEILY ARZY +
  (CA Bar No. 364187)
LITIGATION FELLOW
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

DAVID CHIU +
  (CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
  (CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
  (CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY
SARA J. EISENBERG +
  (CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE
  LITIGATION
RONALD H. LEE +
  (CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND
  AFFIRMATIVE LITIGATION
MICHAEL LEVIN GESUNDHEIT +
  (CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza

ROBIN THURSTON +
  (DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
agetachew@democracyforward.org
ageorge@democracyforward.org
sbrewer@democracyforward.org
ccoogle@democracyforward.org
yenisey.rodriguez@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

LYNETTE LABINGER
  (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
  ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

ANTONIA K. FASANELLI +
  (DC Bar No. 481856)
KATHRYN M. SCOTT +
  (WA Bar No. 38978)*
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036

1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org

*Counsel for Plaintiff City and County
of San Francisco*

WALLACE W. DIETZ +
 (TN BPR No. 009949)
DIRECTOR OF LAW
JOHN K. WHITAKER +
 (TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
 (TN BPR No. 041470)
ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan
Government of Nashville and Davidson
County*

(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

*Counsel for Plaintiffs National Alliance to
End Homelessness and National Low Income
Housing Coalition*

TOBY MERRILL +
 (MA Bar No. 601071)
CASSANDRA CRAWFORD +
 (NC Bar No. 45396)
GRAHAM PROVOST +
 (DC Bar No. 1780222)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of
Cambridge, Martin Luther King, Jr. County,
Metropolitan Government of Nashville and
Davidson County, City of Tucson*

DAVID J. HACKETT +
 (WA Bar No. 21236)
GENERAL COUNSEL TO KING COUNTY
 EXECUTIVE AND SPECIAL DEPUTY
 PROSECUTOR
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
david.hackett@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr.
County*

+ Admitted *pro hac vice*
* Not admitted in the District of Columbia;
practicing under the supervision of members
of the D.C. Bar

52

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2026, I electronically filed the within document, and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

/s/ *Kristin Bateman*
Kristin Bateman