# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS, *et al.*,

     *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT *et al.*,

     *Defendants*.

Case No. 1:25-cv-00636-MSM-AEM

## PLAINTIFFS' SUPPLEMENTAL EXCERPTS OF ADMINISTRATIVE RECORD

## INDEX

| Doc. | File | Beginning BATES | Ending BATES |
|---|---|---|---|
| 1 | The Future of Housing for the Homeless | DOJ-HUD-AR00698 | DOJ-HUD-AR00710 |
| 2 | How-Congress-Can-Reform-Governments-Misguided-Homelessness-Policies-20221011.pdf | DOJ-HUD-AR00711 | DOJ-HUD-AR00740 |
| 3 | CASPEH_Report_62023.pdf | DOJ-HUD-AR00752 | DOJ-HUD-AR00847 |
| 4 | 2022 Annual Homelessness Assessment Report (AHAR) to Congress, Part 2: Annual Estimates of Sheltered Homelessness in the United States | DOJ-HUD-AR00922 | DOJ-HUD-AR01030 |

12/22/25, 1:36 PM    Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 3 of 250 PageID
#: 3622
The Future of Housing for the Homeless

**GOVERNANCE**
Homelessness, Housing

June 26th, 2025
**Report** by Stephen Eide

# The Future of Housing for the Homeless

## Executive Summary

Permanent supportive housing (PSH) has become a central part of the government's response to homelessness. PSH, which provides rental assistance coupled with social services, is prioritized for "chronic" cases: those with a disability and a long-term experience of homelessness.

There are around 400,000 PSH units nationwide, up 25% over the last decade. That increase reflects policymakers' embrace of the Housing First philosophy, which emphasizes permanent housing as the solution to homelessness. Proponents of these policies claimed that they would dramatically reduce, or perhaps even end, homelessness. But homelessness reached a record high last year, exceeding the record high of the previous year.[1] Chronic homelessness, too, is at a record high.[2]

The Trump administration has indicated that, given these failures, it will reassess the place of PSH in federal homelessness policy.

That reassessment is appropriate, especially because the PSH model will face even more challenges in the coming years. Problems inherent in PSH that were ignored during its rapid growth will become more acute and hinder further expansion:

1. PSH budgets will have to divert more resources to maintain old units, thus reducing resources for adding new units.

2. PSH's emphasis on community integration creates community opposition, which slows the rate at which new units can be brought online. Community opposition will increase in coming years.

3. PSH is hard to scale, and its effect on homelessness, which is limited to begin with, fades over time. That will weaken public support for the model.

4. Some PSH tenants need a higher level of care than the model can deliver.

Reassessment is not the same as replacement. PSH will continue to play an important role in government's response to homelessness. To strengthen current PSH programs, this report concludes with the following recommendations:

1. Decouple PSH and Housing First by giving PSH providers more flexibility.

2. Invest in temporary housing.

3. Create treatment courts for housing.

4. Shift more responsibility for the most difficult PSH tenants to other behavioral health systems.



DOJ-HUD-AR00698

**Introduction**

In some places, such as California, homelessness has consistently ranked among top public concerns since the 2010s.[3] In response, policymakers have prioritized investment in permanent supportive housing (PSH), or service-enhanced housing for the homeless.

At the end of the Biden administration, federal outlays on homelessness had reached historical highs.[4] There has also been an impressive increase in state and local commitments to housing for the homeless.[5] In total, Los Angeles's HHH program (2016), New York City's NYC 15/15 initiative (2015), and New York State's Empire State Supportive Housing Initiative (2015) will build more than 40,000 units of PSH. The nation's PSH stock has increased 25% since 2014 (**Figure 1**).

But the case for even more spending on PSH has weakened recently because, despite historical investment in the model, rates of homelessness have risen to record-high levels. Some of that surge has been driven by the recent increase in migrants, many of whom were placed in shelters.[6] But the number of unsheltered and chronically homeless people—who are a priority for PSH placement due to disability and long-term homelessness—is also at a historical high. Independent of the migrant surge, New York and California have long been grappling with homelessness crises, despite their investments in PSH (**Figures 2–3** and **Table 1**).

Figure 1

## PSH Units, 2007–24



DOJ-HUD-AR00699

**Figure 2**

## Chronically Homeless, 2007–24



DOJ-HUD-AR00700

**Figure 3**

## Street Homeless, 2007–24



Source for Figs. 1, 2, and 3: U.S. Dept. of Housing and Urban Development (HUD), "The 2024 Annual Homelessness Assessment Report (AHAR) to Congress," December 2024; HUD Exchange, "CoC Homeless Populations and Subpopulations Reports," December 2025, exhibits 7-3, 1-1, 6-1

**Table 1**

## PSH Expansion vs. Change in Homelessness, 2007–24

|  | # Change, 2015–24 | % Change, 2015–24 |
|---|---|---|
| **Nationwide** |  |  |
| PSH Units | 78,568 | 24.7% |
| Street Homeless | 100,956 | 58.3% |
| Chronically Homeless | 69,415 | 83.5% |
| **California** |  |  |
| PSH Units | 27,998 | 55.2% |
| Street Homeless | 50,275 | 68.2% |
| Chronically Homeless | 37,370 | 128.1% |
| **New York** |  |  |
| PSH Units | 12,491 | 31.3% |

DOJ-HUD-AR00701

| | | |
|---|---|---|
| Street Homeless | 1,616 | 40.2% |
| Chronically Homeless | 750 | 17.3% |

Source: Author analysis of HUD data

PSH expansions have been guided by a theory known as Housing First, which holds that permanent housing benefits must be granted without requiring participation in services, sobriety, or any other behavioral change. In Housing First–style PSH, social services are provided on a purely voluntary basis. Some PSH programs began before the development of Housing First.[7] However, at present, Housing First and PSH are functionally indistinguishable.

## Problems That Will Hinder Further PSH Expansion

Over the last two decades, Housing First has gained influence among major government funders of homelessness programs, such as the U.S. Department of Housing and Urban Development's Continuum of Care program and the California state government. Policymakers—and, to an extent, the broader public—believed advocates who claimed that Housing First could end homelessness. But because the jurisdictions that most thoroughly implemented Housing First have seen large increases in homelessness, skepticism about the policy is growing. With national homelessness trends now so unfavorable, a reassessment of Housing First is unavoidable. In its FY26 budget request, the Trump administration called for restructuring homelessness assistance grants as mainly temporary housing.[8] While the final results of the budget process are uncertain, the proposal is evidence of the administration's intent to redirect homelessness policy away from Housing First. [9]

A thorough reassessment of homelessness policy should also examine the PSH model—including its inherent problems, which were ignored as the model expanded and are likely to worsen in coming years. Faced with such an assessment, even the policymakers most ideologically committed to PSH and Housing First would have to accept the fact that expansion will be even harder than in the past.

### Expansion vs. maintenance

PSH exists in two forms: tenant-based, in which the subsidy is given to the individual who uses it to rent a unit on the private market; and site-based, in which the subsidy is connected to a unit. Most PSH stock is tenant-based, especially outside New York and California (**Table 2**).[10]

## Table 2

## Tenant-Based vs. Site-Based PSH, 2024

| | | |
|---|---|---|
| **Total PSH Nationwide** | **412,623** | |
| Tenant-Based PSH, Nationwide | 248,241 | 60.2% |
| Site-Based PSH, Nationwide | 164,382 | 39.8% |

DOJ-HUD-AR00702

| | | |
|---|---|---|
| **Total PSH, California and New York** | **135,209** | |
| Tenant-Based PSH, New York and California | 53,078 | 39.3% |
| Site-Based PSH, New York and California | 82,131 | 60.7% |
| **Total PSH, Outside California and New York** | **277,414** | |
| Tenant-Based PSH, Outside California and New York | 195,163 | 70.4% |
| Site-Based PSH, Outside California and New York | 82,251 | 29.6% |

Source: Author analysis of HUD, "2024 Housing Inventory Count (Raw File)"

Some homeless advocates favor tenant-based PSH because it provides the homeless with ordinary housing: a normal rental unit like one that any other household might use, integrated into buildings and neighborhoods inhabited by the non-homeless.[11] Orthodox Housing First doctrine holds that "consumer choice" is paramount and that, given the choice, homeless Americans would prefer to "live in a place of their own rather than in congregate specialized housing with treatment services onsite."[12] The dominance of tenant-based PSH is also in line with broader norms in affordable housing, which have, over the years, shifted toward voucher-style approaches.[13]

However, tenant-based PSH has certain practical disadvantages. Expanding tenant-based PSH, at scale, requires getting more landlords to enter the business of housing the formerly homeless. NYC 15/15 was initially projected to create 7,500 units of site-based PSH and 7,500 tenant-based units. But with too few landlords willing to participate, the city recently announced that most of the tenant-based units would be converted to site-based.[14] The problem is especially acute in hot housing markets, which pose the greatest risk of homelessness for low-income individuals but which also offer landlords the widest choice of tenants. As a result, tenant-based PSH is particularly hard to scale in places where it is seen as most needed.

Relying on landlords also subjects PSH tenants to greater risk of eviction. Formerly homeless people are more likely to engage in behaviors that can lead to eviction, including nonpayment of rent,[15] hoarding,[16] setting fires, flooding, noise, harassing other tenants, assaulting other tenants, and "unit takeovers," ceding control of a unit to a drug dealer or someone else interested in using it for criminal purposes.[17] Some studies of tenant-based PSH programs show extraordinarily high rates of housing instability.[18] While eviction may sometimes benefit other tenants, it is easier to control in the case of site-based PSH.

But site-based PSH also faces practical difficulties. Like mainstream affordable housing programs, site-based PSH developments rely on multiple funding sources, such as the Low-Income Housing Tax Credit (a block grant–style federal program available to states),[19] own-source state and local housing programs, and population-specific resources such as for veterans and tenants with AIDS. However, the extremely low incomes of PSH tenants and the need for service funding make financing these projects especially expensive and complex.[20]

In 2023, the Los Angeles–based Skid Row Housing Trust, a major site-based PSH provider, fell into receivership. [21] Beginning in the late 1980s, the organization built a strong reputation by acquiring derelict for-profit hotels in Skid Row and renovating them into nonprofit PSH. Over the years, Skid Row Housing Trust grew its portfolio by tapping into various new funding streams—but it also failed to maintain its older properties. By 2022, a quarter of its 2,000 units were vacant, often due to severe damage, triggering a vicious cycle of declining

DOJ-HUD-AR00703

rent revenues and further deterioration.[22] Because each property relied on different funding streams, money
dedicated to viable properties could not be used to repair damaged units. The severity of the situation was not
evident before receivership because the trust's financial statements reported the condition of the organization
as a whole, not individual properties. Its portfolio of 29 buildings was sold off to new owners whose goal is to
maintain all units as PSH, but finances remain precarious.[23]

The downfall of Skid Row Housing Trust reflects a classic pathology of American government: prioritizing
expansion over maintenance. Faced with a homelessness emergency, the city of Los Angeles rushed to bring new
housing units online. The city's voters approved historical levels of investment in PSH, including via the $1.2
billion HHH program in 2016, in which the trust participated.[24] Policymakers devoted less attention and
resources to maintain existing programs.

The Skid Row Housing Trust began around 1990, when many other PSH programs were launching.[25]
Examples of other once-admired supportive housing providers now facing financial problems are the San
Francisco-based Tenants and Owners Development Corporation and the Chicago-based Heartland Alliance. In
NYC, some older PSH projects currently have more than 100 building violations,[26] while more than 2,000
PSH units are currently offline because they are too damaged to rent.[27]

All landlords rely on rents to fund upkeep, which is especially challenging for PSH. Low-income households not
only pay less in rent than working-class and middle-income Americans, but their payments are also more
erratic.[28] Rent delinquency is a major concern for many PSH providers.[29] Meanwhile, as PSH building
stock continues to age, so do the tenants,[30] which will require expensive accessibility-related maintenance.

### Community integration vs. community opposition

To promote community integration, PSH is meant to resemble normal community living, not institutional
living. Residents can come and go as they please, without being subject to any more requirements than a typical
tenant. Best-practice manuals, such as a 2010 report published by the federal Substance Abuse and Mental
Health Services Administration, advise against "clustering" PSH tenants.[31] The pursuit of integration,
however, often provokes community opposition, which critics term "NIMBYism" (Not in My Backyard-ism).

PSH prioritizes those who have experienced long-term homelessness, without imposing any expectation of
behavioral change. Thus, asking a neighborhood to accept PSH is a different proposition from, for example,
asking it to accept a family shelter, affordable housing project, or market-rate apartment building. Individuals
whose behavior in tent encampments provoked community outrage do not necessarily become ideal neighbors
after they are placed in housing.[32]

Working-class and low-income neighborhoods[33]—which often welcome forms of development that wealthy
areas reject, such as affordable housing—are less receptive to programs like PSH, single-adult shelters,
methadone clinics, and safe consumption sites. Residents of these areas feel that they are already
"saturated."[34]

Over the past two decades, cities such as Los Angeles, San Francisco, and New York have expanded not only PSH
but also a broader array of programs serving those with addiction, seriously mental illness, and criminal

DOJ-HUD-AR00704

records. As a result, more neighborhoods can now credibly claim to be saturated than when PSH expansion started.

Even when funding is available, community opposition slows down the pace at which government can bring units online. If opposition remains high, inflows into homelessness are likely to outpace the number of people housed in PSH.

### Scale and fadeout

PSH is hard to scale. The peer-reviewed literature on PSH/Housing First largely examines rates of residential stability among formerly homeless people placed in PSH. In these studies, residential stability rates typically hover around 80% over the course of the study—usually less than five years.[35] However, these findings reflect outcomes of individual programs, not the effects of Housing First implemented at a community-wide scale. One 2017 study found that reducing homelessness by a single person may require building as many as 10 PSH units. [36]

A major PSH expansion will absorb a certain portion of a community's homeless population. But after all those units are leased, what happens to new people who fall into homelessness? Over a period longer than a few years, many homeless people who do not get PSH will exit homelessness, and some homeless people who do receive PSH will wind up homeless again.[37] Thus, the effect of PSH, over and against other interventions, fades over time.

Scale- and fadeout-related problems mean that even dramatic investments in PSH might not yield noticeable and sustainable improvement in street conditions. That has certainly been the experience in California, where public support for PSH has weakened.[38] Advocates can still argue that expanding PSH is the right thing to do —but they can't argue that members of the public will notice a change in their quality of life.

### Health vs. housing

PSH differs from mainstream affordable housing most distinctly in its promise of supportive services. But those services can be expensive: per unit estimates of annual PSH costs range from less than $20,000 to over $50,000. [39] Some providers argue that they have been underfunded.[40]

These requests for more money may reflect unreasonably low funding rates for old programs and how, in recent years, government required PSH providers to accept tenants with increased behavioral and health problems, who are more expensive to handle.[41] It's also possible that funding rates were consciously set too low, in order to build political support for PSH and the idea that it was the most cost-effective solution to homelessness.[42]

PSH is prioritized for the chronically homeless, whose needs are among the most acute within the homeless population generally—which itself has some of the highest needs among all low-income groups. Meeting these needs might require an array of nurses, case managers, professionals who specialize in supported employment (via social enterprise or corporate responsibility programs), staff for art and music programs, fitness and nutrition specialists, mental-health professionals (psychiatrists, clinical social workers), and substance-abuse

DOJ-HUD-AR00705

professionals (detox, medication-assisted treatment, peer support). Whether, or to what degree, investment in these services is appropriate depends on whether PSH is appropriately defined as a health or housing program.

The argument for increased spending on supportive services is, to some extent, similar to that for greater investment in maintenance of existing units. But spending on basic maintenance does not raise questions about the ultimate goal of PSH. If residential stability is the only standard of success in homelessness policy, only a modest level of supportive services is appropriate.

Residential stability can also be achieved by simply not evicting tenants for behavior that would normally merit that course of action. In the case of some tenant-based PSH programs, supportive services functionally serve the landlord,[43] who expects to have someone to call when friction arises. Supportive-services personnel intercede with, and on behalf of, landlords and find new housing situations when existing ones become untenable. Supporting landlords is an important goal.[44] But it is different from improving the health of formerly homeless tenants. If PSH "service" funds serve only to manage friction with landlords, it is not obvious why these funds should qualify for Medicaid reimbursement.[45]

Some proponents of PSH obscure questions about the program's purpose by equating investment in housing with investment in health care. But the Housing First literature reveals high rates of social isolation and mortality,[46] as well as poor health outcomes,[47] among participants. These outcomes suggest a deeper problem: PSH programs are effectively warehousing those with complex needs in environments that cannot provide adequate care.[48] Several journalistic accounts have detailed how PSH can become gruesome for tenants who need more care than the programs provide.[49] While some argue that establishing and maintaining housing is in itself therapeutic—or at least helps to socialize—that is less true when tenancy requires fewer expectations.

Perhaps more spending on supportive services would improve health outcomes for some PSH tenants. But for tenants with the most acute, unmet needs, the focus should be instead on finding a program that provides a higher level of care than PSH—for their own benefit, as well as that of other tenants and the host neighborhood.

## Recommendations

The recent rapid expansion of PSH was premised on a flawed assumption: that homelessness was immune from normal dilemmas encountered in other fields of social policy. The problems facing PSH—expansion vs. maintenance, scale and fadeout, NIMBYism, community opposition, and the failure to distinguish between health and social needs[50]—are familiar. Infrastructure and public housing struggle with maintenance; alternatives to incarceration and charter schools confront scaling problems; pre-K programs face fadeout; and addiction services regularly provoke NIMBY backlash. The belief that homelessness was somehow exceptional in its avoidance of normal policymaking pitfalls fed an even more flawed assumption: that homelessness could be ended.

Funding for federal homelessness programs is unlikely to rise dramatically in the near-term. At the state and local levels, homelessness-related ballot initiatives have recently been passing by slimmer margins than they did

DOJ-HUD-AR00706

during the 2010s.[51] Increased fiscal restraint, combined with the challenges facing PSH, means that even policymakers who are philosophically committed to Housing First will have to consider alternatives in the coming years.

The growth of Housing First was driven, in part, by exaggerated claims about its effectiveness[52] but also by a legitimate desire for permanent housing solutions to homelessness on the part of many American communities. This need can be exaggerated, but it is real. What communities want is not an end to PSH but the freedom to operate it as best they see fit.

Reassessing PSH should, above all, be focused on consolidating and improving current programs. Here are some recommendations about how to relieve pressure on PSH providers:

### Decouple PSH and Housing First by giving PSH providers more flexibility

Provider flexibility could be expanded by loosening requirements in the "Notice of Funding Opportunity" for HUD's Continuum of Care program or by block-granting the Continuum of Care program.[53]

With more flexibility, PSH providers would be able to:

- Require that tenants take their medication (as happened in some PSH programs before the advent of Housing First),[54] pass drug tests, or show up for social- and health-services appointments
- Use probationary housing—i.e., require that tenants stay in their unit for a few months before they acquire standard tenant protections
- Impose stricter rules on some tenants
- Pursue more integration with behavioral health programs that use incentives and coercion, such as assisted outpatient treatment or contingency management
- Use homelessness funds on sober-living or recovery housing programs

A program that imposed behavior rules, provided housing on a probationary basis, and asked more of some clients than others could still be meaningfully considered service-enhanced or supportive housing. The goal would be to create housing for the homeless that expected recovery and personal transformation, as opposed to just allowing for that possibility.

Greater rule enforcement will help reduce community opposition. A program that imposes behavioral requirements on tenants will provoke less backlash than one that asks nothing. It may also help to lower capital needs, as tenants with unaddressed behavioral health disorders will do more damage to units than stabler tenants.[55]

PSH programs should also have more flexibility over tenant selection. In the current "Coordinated Entry" approach, governments allocate PSH units based on who has been homeless longer and struggles the most with mental illness and addiction. This approach has three problems. First, it rewards drug addiction;[56] it is overly bureaucratic, leading to long waits to fill vacancies, which, in turn, lead to disruptions in rent revenues; and it has burdened providers with tenants who are too difficult to manage.[57] Coordinated entry was adopted

DOJ-HUD-AR00707

partly to prevent providers from cherry-picking or "creaming" their tenants. But any well-designed social-services system gives the provider some degree of selectivity over its clients.[58]

More flexibility is imperative in an era of flat funding. One of the most misleading arguments for Housing First to gain traction was that housing without rules is cheaper than the alternative. Some advocates say that rules will reduce the uptake of services because conforming to rules will be a deal-breaker for many members of the street population. But regulated housing programs tend to be safer—which always ranks as a top priority in surveys of the unsheltered—and, when there's more demand for PSH than supply, which is normally the case, providers have leverage. Rules-oriented PSH will not lack for takers.

Changes to federal homelessness policy will affect different communities differently. Wealthy, big-spending jurisdictions, such as New York and California, will be the least affected. The typical U.S. community devotes very little own-source revenues to homelessness-specific programs. But all would appreciate more flexibility. The end of Housing First need not, and should not, mean the end of PSH.

**Invest in temporary housing**

Since 2007, PSH and other permanent housing programs have grown 260%, whereas shelter and other temporary housing programs have increased only 20%.[59]

An unrealistic belief that government can solve homelessness through permanent housing has left many homeless individuals without access to any kind of housing. PSH as currently structured is highly perfectionist. It attempts to end homelessness by providing housing in units that cost as much as $800,000 and require a years-long wait on the street to secure.[60] Those living on the streets should not be encouraged to hold out for perfection.

Shelter is less of an all-or-nothing proposition than PSH. It is much easier to bring shelter beds online quickly than PSH units. If it is true that "housing is health care," that is just as true for temporary as for permanent housing. Shelter takes someone off the streets, provides food and a place to sleep and store belongings, and offers connection to other services. Shelter is much safer than the streets.[61] Studies of homeless mortality have found disproportionately high mortality rates among the unsheltered population.[62] The rate of sexual assault and trauma for homeless women, especially the 84,000 unsheltered among them,[63] is very high. Building more shelters is by far the most efficient way to protect them.[64] The most truly pragmatic, "greatest good for greatest number" approach to homelessness would be shelter-oriented, not PSH-oriented. When someone does access PSH, he'll be able to benefit more from it—and place less pressure on the program—if he has spent the previous months in a shelter instead of on the streets deteriorating.

Homelessness policymaking requires managing flows. Every day, some Americans fall into homelessness and others move out. But people don't fall into chronic homelessness so much as transition into it from episodic homelessness. Not investing in temporary housing, because all the funding is tied up in PSH, risks undermining these individuals' motivation, thus leading more non-chronic cases to become chronic ones.

**Create treatment courts for housing**

DOJ-HUD-AR00708

Courts are commonly used to effect behavioral change. Examples include problem-solving criminal courts and family court.[65] Setting up a similar program within housing court would allow providers to use the eviction threat as leverage—something they already do—but through a more formal process. A housing court–based treatment program would begin eviction proceedings, and then divert tenants into a drug or mental-health program to avoid eviction. The goal would be to replicate the success that sober living and contingency housing programs have had in promoting behavioral health, but within the PSH context. Behavioral health resources would be required to divert tenants into these programs, which will be more robust in some communities than in others.

### Shift more responsibility for the most difficult PSH tenants to other behavioral health systems

The health needs of some formerly homeless PSH tenants cannot be met by current programs. Those needs should be dealt with by transferring responsibility for them to mental-health or addiction-services authorities, rather than adding more social- and health-services enhancements to current PSH programs.

The best argument for Housing First is that it is hard to repair broken lives, and, for those who are homeless, not much seems to work other than housing.[66] However, outside the homelessness context, there are evidence-based programs for rebuilding broken lives. Examples include supported employment and other vocational services,[67] full-service partnerships,[68] clubhouses,[69] first-episode psychosis interventions,[70] special court programs (problem-solving courts like mental-health courts[71] and HOPE-style desistance mandates[72] ), reentry programs,[73] sober-living housing programs,[74] 12-step addiction programs,[75] contingency management,[76] and assisted outpatient treatment.[77] At homelessness conferences and in strategic planning documents, these programs tend to be eclipsed by interest in the technical details about how to fund and build more PSH. These programs are operated by other agencies—criminal justice, addiction, mental health—outside homeless services and thus are evaluated based on a different standard from residential stability. While PSH's goal of residential stability might be appropriate for some cases, other tenants would benefit from being placed in a program with different goals. In those cases, the resources should follow the tenant. In the debate about "criminalization of mental illness," there is broad agreement that the criminal-justice system is the wrong place for many mentally ill people. This idea of a "category error"[78] also applies to homeless services.

### Conclusion

We are entering an era of consolidation for PSH. To a greater extent than in the last two decades, governments will now have to focus on the quality of current programs as much as the raw quantity of units. Expansion can no longer be the only priority.

To promote a reassessment of PSH and Housing First, the federal government must adopt a more deferential role in homelessness policymaking. In contrast to other policy areas, such as higher education, federally directed homelessness reform will not require using funding as leverage to force change at the state and local levels. Homelessness represents a case in which recipients of federal funding deserve more programmatic flexibility than they have recently experienced.

DOJ-HUD-AR00709

**Acknowledgments**

The author would like to thank the Moynihan Center at The City College of New York, and, for their comments on the draft, Dan Kent, Paul Webster, and Judge Glock.

**Endnotes**

Please see Endnotes in PDF

Photo: Robert Gauthier/Los Angeles Times via Getty Images

 **Download PDF**

## / **Donate**

Are you interested in supporting the Manhattan Institute's public-interest research and journalism? As a 501(c)(3) nonprofit, donations in support of MI and its scholars' work are fully tax-deductible as provided by law (EIN #13-2912529).

DOJ-HUD-AR00710



# DISCOVERY
## INSTITUTE

## How Congress Can Reform Government's Misguided Homelessness Policies

Real Solutions for Mental Illness, Drug Addiction, and Crime Cannot be Found in Housing Subsidies Alone



THE *Center* ON
WEALTH & POVERTY

DOJ-HUD-AR00711





**3**    **Executive Summary**

**7**    **Homelessness: A Growing Crisis in American Communities**

**13**    **"Housing First" Is Not Working**

**21**    **The Time Has Come for Real Reform**

**24**    **Glossary**

**27**    **Endnotes**

fixhomelessness.org

DOJ-HUD-AR00712

# Executive Summary



America is suffering a complicated homelessness tragedy in myriad cities and rural areas. Huge sums of government money have been thrown at the problem, most notably in housing programs, but also indirectly in the criminal justice system (police, courts, and jails) and hospital emergency rooms. The homelessness epidemic also drains private charitable resources and suppresses economic growth and development in many communities. Lax enforcement of borders is allowing deadly drugs into the country, worsening the conditions found in homeless encampments.

Any efforts to address this web of interlocking crises are doomed to failure if they begin with an inadequate diagnosis of the causes. Though lack of housing is a major factor in what we call homelessness, it is erroneous to view homelessness as *primarily*— let alone solely—a housing problem that can be solved through a "Housing First" approach that ignores untreated mental illness, and with "harm reduction" projects that enable addicts to continue devastating drug habits.

Data from the Department of Housing and Urban Development (HUD) confirm dramatic nationwide increases in homelessness, as illustrated in the charts in the full report (see below). The total number of individuals experiencing homelessness within all five HUD homelessness categories is approaching 1.2 million, and unsheltered homelessness increased 20.5% over the five pre-COVID years – a dramatic shift from the drop of 31.4% between 2007-2014, before Housing First was officially adopted by the federal government.

Children are hit especially hard. The total number of children experiencing homelessness increased from 679,724 in the 2006-2007 school year to 1,508,265 in the 2017-2018 school year, a pre-COVID increase of 122%. The number of children

> **With Housing First, the Obama Administration said it could end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020. Additionally, advocates argued that the Housing First approach would end all types of homelessness by 2023.**

DOJ-HUD-AR00713

in unsheltered situations (on the street and in vehicles) more than doubled between the 2016-2017 and 2017-2018 school years.

The federal government has attempted to mask the magnitude of the crisis in at least two ways. First, citing the COVID pandemic, HUD stopped collecting relevant data on unsheltered homelessness in 2020. More disingenuously, HUD resorted to an accounting gimmick to reclassify over 100,000 individuals from transitional programs (considered to be experiencing homelessness) to Rapid Rehousing programs (deemed no longer experiencing homelessness). This, even though the individuals were mostly in the same rooms, in the same buildings, being housed by the same agencies, for the same period of time.

The federal policy of Housing First is at the heart of America's deteriorating homelessness problem. Supported by powerful and self-serving interests, this approach is embraced by many state and local jurisdictions, as well as the White House and Congress. Housing (to repeat) should be part of any homelessness program. But, by insisting that subsidized housing be provided to people experiencing homelessness without time limits or any requirements that individuals participate in wraparound services (such as mental illness clinical services and treatment, substance use disorder treatment, job training, and job retention programs), this approach has become a "housing only" solution in practice. **In essence, we have created an enormous federal homelessness assistance program which is functionally equivalent to HUD Section 8 Housing — but with no rules.**

The results have been disastrous. The dramatic shift in the trajectory of homelessness numbers mentioned above correlate with the federal adoption of Housing First. Namely, unsheltered street homelessness rose by more than 20% even as subsidized housing vouchers went up more than 40%.

California provides an alarming example of the failures of Housing First. In 2016, California enacted a law that required that every state dollar spent on homelessness be spent on Housing First programs. **From 2015 (the year before the new state policy) to 2019, unsheltered street-level homelessness in California rose 47.1%** in just four years. California now boasts almost half of America's unsheltered street-level homeless population and nearly one in four of America's overall homeless population, even though it contains only 12% of the U.S. population. Only this year did the state pass a "Care Court" program that may—in a year or two—make it easier to get help for people with serious mental illness. Also, a recent settlement announcement by the LA Alliance for Human Rights commits LA County to more mental health and addiction treatment outreach and beds, not just housing.

Results within other jurisdictions also illustrate the folly of Housing First. In Seattle/King County the number of unsheltered people experiencing homelessness rose to more than 5,500, and gun crimes tied to homelessness encampments jumped 122% during the first half of 2022. In Portland, Oregon, people experiencing homelessness comprised 50% of all arrests between 2017 and 2020, even though their share of the population was less than 2%. In New York City, the number of deaths of people experiencing homelessness more than doubled in a three-year period from 2018 to 2021, up to 640 deaths, with the most frequent cause of death being drug overdose.

## "Housing First" Is Not Working

**Advocates had claimed that shifting to a Housing First approach, with its massive increases in subsidized housing vouchers, would end homelessness in ten years (i.e. by 2023).** The failure of their prediction is rooted in flawed assumptions about the nature of the crisis, especially the prevalence of untreated mental illness and drug use disorders within the homelessness community. In their 2019 ground-

breaking study, the California Policy Lab, a non-partisan research institute based at the University of California, found that 78% of the unsheltered homelessness population reported having mental health conditions and 50% reported that their mental health conditions contributed to their loss of housing. Additionally, 75% of the unsheltered population reported substance abuse conditions, and 51% reported that the use of drugs or alcohol contributed to their loss of housing.

Because of the funding restrictions dictating how homelessness assistance dollars are to be spent, the intensive treatment and clinical services most needed by so many people living on the street have become an afterthought. Consequently, the federal Housing First approach has led to the following adverse effects to individuals and families (which are explained more fully in the full report):

1. Elimination of service participation requirements has removed incentives for individuals to participate in effective programs and therapies.

2. Elimination of federal funding for intensive wraparound services has undercut services needed for treatment and recovery (e.g. for mental illness and substance use disorders).

3. The chance to develop customized treatment approaches has been diminished by a one-size-fits-all housing approach.

4. Concurrent defunding of emergency services has led to increased negative outcomes, including death.

5. Program focus has been lost by changing the policy goal from self-sufficiency to increased inputs in the form of housing vouchers.

6. The expansion of this federal Housing First policy to state and local governments has dramatically increased homelessness.

Of course, the deemphasis on treatment of the seriously (and often dangerously) mentally ill did not begin with Housing First. Deinstitutionalization of psychiatric patients is a policy now six decades

in effect, dramatically illustrated by the fact that the U.S. has only 5% as many psychiatric beds as it had fifty years ago. One of the most glaring examples of unintended consequence in American health history, the federal policy has led to untold suffering and death by consigning hundreds of thousands of seriously mentally ill people to the streets, homelessness encampments, jails and prisons, instead of to effective treatment.

## The Time Has Come for Real Reform

Immediate policy changes are necessary to reverse the growing homelessness crisis. **Homelessness should be addressed primarily as a mental and behavioral health issue, rather than simply a housing issue.** Increasingly, American citizens demand reform – polling indicates homelessness is now the number one or number two local issue among voters in twenty of the highest populated cities in America, and homelessness continues to be the top statewide issue in many states.

Congress is encouraged to take the following actions to address the crisis, with a goal of helping to move as many people as possible out of homelessness and toward recovery and self-sufficiency. More detailed descriptions and justifications are provided in the full report.

1. Pass legislation directing HUD to eliminate Housing First as the primary approach to address homelessness, including in Notices of Funding Availability (NOFAs), policies, rule-making, guidance, technical assistance, and in federal communications.

2. Pass the Housing PLUS Act to prohibit HUD from restricting or limiting Continuum of Care (CoC) funds (see CoC definition in glossary below) going to providers that require the provision of supportive services (such as addiction treatment or job counseling) or program participation requirements, or to faith-based organizations. The Act also requires that no less than 30% of CoC funding shall be used by recipients that provide or offer access to wraparound services.



DOJ-HUD-AR00715

3. Prioritize economic "self-sufficiency" as the primary measurement of effectiveness of all federal homelessness assistance programs rather than the number of housing vouchers distributed.

4. Prioritize trauma-informed wraparound services in all federal homelessness assistance programs by requiring that a minimum of 40% of CoC funding be used for direct trauma-informed wraparound services (such as mental illness clinical services and treatment, substance use disorder therapy and treatment, job training, and job retention) and limiting housing vouchers to 60% of funding.

5. Require participation in treatment and training activities when enrolled in federally funded homelessness assistance programs, similar to PELL Grants, unemployment assistance, and Temporary Assistance for Needy Families (TANF).

6. Restore funding for emergency programs, which are an important steppingstone on the path to self-sufficiency.

7. Replace the Continuum of Care (CoC) system with a state block grant system to ensure more efficient delivery of services, eliminate conflicts of interest, increase accountability, and improve outcomes. Alternatively, Congress should reform the governance structures of CoCs to eliminate conflicts of interest and expand membership to include state and local elected officials as well as general public stakeholders for greater accountability.

8. Eliminate the Institutions for Mental Diseases Exclusion ("IMD Exclusion") in Medicaid to increase federal reimbursements for inpatient mental illness and substance use disorder treatment. The exclusion currently prevents many mentally ill people from receiving the treatment they need to avoid landing up on the streets or in emergency rooms or jails.

9. Review the budget of the National Institute of Mental Health to ensure its priorities reflect the actual problems of neglect seen in the day-to-day care of the mentally ill, especially those who are homeless.

10. Incentivize local governments to reduce or eliminate building fees and burdensome regulations to enable affordable housing construction.

DOJ-HUD-AR00716



# Homelessness:
## A Growing Crisis in American Communities

omelessness has skyrocketed in the United States over the last decade and has reached crisis levels in many American cities. This is a tragedy for those caught up in the heartbreaking cycle of homelessness that plagues communities. Attendant issues include overwhelmed emergency rooms, drug overdoses, damage to public spaces, urban decay, overcrowded jails, decreased public safety, and intimidating chaos on many streets. Small businesses are especially hurt, since patrons are reluctant to journey into areas with high levels of homelessness. Fixing the homelessness problem will cost money. But not fixing it is already costing plenty — and letting the problem fester will cost even more.

### HUD Documenting Dramatic Rise in Adult Homelessness

The graphs below, based on data from the U.S. Department of Housing and Urban Development (HUD) *Annual Homeless Assessment Reports* (AHARs) and the U.S. Department of Education (ED) *Annual Federal Data Summary School Years – Education for Homeless Children and Youth*, illustrate the magnitude of the homelessness crisis in the U.S. over the last decade.

The federal government has two different formal definitions of homelessness, as well as methodologies and metrics to measure the number of people experiencing homelessness.

DOJ-HUD-AR00717

HUD primarily tracks adults, while ED tracks child and youth homelessness per the McKinney-Vento Homeless Assistance Act of 1987. While each agency's data is explored separately below, both federal cabinet departments report that homelessness is increasing across all populations, regardless of the differences in how homelessness is defined.

HUD aggregates data from 400 regional Continuums of Care (CoC) that conduct annual "Point-in-Time Counts" (PITCs). Additional data is stored in each CoC's Homelessness Management Information System (HMIS), which reports a variety of demographic and statistical information to HUD for its annual reports. HUD's general definition of a person experiencing homelessness is one who "lacks a fixed, regular, and adequate nighttime residence."[1]

Per HUD's *Annual Homeless Assessment Reports* (AHARs) and PITCs, individuals experiencing homelessness are grouped into five sub-categories based on what type of housing they are living in:

1. **Unsheltered** (also known as street-level homelessness),
2. **Emergency Shelters** (e.g. Citygate rescue missions and Salvation Army centers),
3. **Transitional Housing** (subsidized apartments with wraparound services for up to two years),
4. **Rapid Rehousing** (the most radical form of subsidized "Housing First" units that have no participation requirements), and
5. **Permanent Supportive Housing** (subsidized lease-based housing units, typically supported by vouchers).

Figure 1 illustrates the dramatic nationwide increases in homelessness. The stacked colored bars illustrate those living unsheltered, in emergency shelters, in transitional housing, in rapid rehousing, and in permanent supportive housing (unsheltered number for 2021 is estimated — HUD did not provide data). When totaled together, these latter five cohorts reflect the aggregated year-round homelessness count in the United States. The vertical dotted line is the inflection point when HUD formally shifted federal homelessness policies and funding to a "Housing First" philosophy per the 2013 HUD Notice of Funding Availability (NOFA).



Figure 1: National HUD Data (Adults)

8    CENTER ON WEALTH AND POVERTY



## Key Takeaways:

- The total number of individuals experiencing homelessness within all five HUD categories is approaching 1.2 million individuals, not the half a million number that is frequently incorrectly cited by media sources.

- HUD artificially counts those participating in permanent supportive housing and rapid re-housing programs as "not experiencing homelessness" while those in transitional housing programs are counted as "experiencing homelessness."    This gimmick artificially lowers the number of people considered to be experiencing homelessness.  Sound policy decisions require objective and accurate data.

- Even though federal funding of the homelessness assistance system has significantly expanded after the policy shift to the Housing First approach, unsheltered homelessness rose dramatically between 2014 to 2020.  The total number of unsheltered individuals experiencing homelessness increased 20.5% over the five pre-COVID years after HUDs adoption of Housing First.[2]

- In 2022, the Biden Administration did not report the national unsheltered count for 2021.  This omission was likely made to hide the dramatic increases in unsheltered homelessness since the onset of the Housing First approach.

- Prior to the implementation of Housing First, the total number of unsheltered individuals had dropped 31.4% between 2007-2014, when intensive wraparound services for participants were required for most homelessness assistance program participants.    The downward trend ended with HUD's adoption of the Housing First approach.

- The programmatic changes required by the 2013 HUD NOFA (Notice of Funding Availability) penalized service agencies and programs that included service participation requirements and incentivized those that included no such service participation requirements.    Furthermore, funding guidelines and system performance measures prioritized speed-of-placement rather than quality of placement, resulting in replacing high-quality recovery and rehabilitative programs with subsidized housing absent of participation requirements in treatment programs.  **In essence, we have created a federal homelessness assistance program which is functionally equivalent to Section 8 housing with no rules, no treatment programs, and no participation requirements.**

DOJ-HUD-AR00719

## HUD Documents an Even Higher Homelessness Rise of Adults in California

Figure 2 below focuses solely on the State of California. As with Figure 1, the stacked colored bars illustrate those living unsheltered, in emergency shelters, in transitional housing, in rapid rehousing, and in permanent supportive housing (unsheltered number for 2021 is estimated — HUD did not provide data).

California state data is revealing because California requires 100% of state funding to go to Housing First programs. Consequently, 100% of federal and state homeless assistance funds go solely to Housing First programs.

Additionally, the State of California encourages local governments and CoCs to restrict their funding to the Housing First approach. Consequently, almost all local judications within the state—including the City of Los Angeles and Los Angeles County—require government funding of all types (national, state, and local) to fund Housing First programs. The State of California, therefore, provides a statistically controlled study of the outcomes of this one-size-fits-all policy. The results of going "all in" on Housing First have been devastating and have increased human suffering.

### Figure 2: HUD Data for California (Adults)



- Unsheltered
- Transitional Housing Beds
- Permanent Supportive Housing Beds
- Emergency Shelter Beds
- Rapid Rehousing Beds

### Key Takeaways:

- California communities have experienced worse outcomes than other parts of the country.
- California rates of unsheltered homelessness jumped after the 2013 federal implementation of Housing First. Rates jumped again after California mandated that all state funding for homelessness assistance be restricted to Housing First programs.
- Homelessness in California has been increasing at a faster rate than the rest of the U.S. **From 2015 to 2019 (starting the year before passage of the law mandating that all state funding be used for Housing First programs), unsheltered homelessness rose 47.1%.** This increase occurred prior to the COVID pandemic in 2020.[3]
- From 2015 to 2019, following the passage of the law mandating that all state funding go to Housing First programs, overall homelessness in California rose 33.8% (again all before the COVID pandemic).

**Department of Education Reports Dramatic Increase in Number of Children Experiencing Homelessness**

The U.S. Department of Education *Annual Federal Data Summary School Years – Education for Homeless Children and Youth* aggregates data provided by local and state school administrators for each Pre-K-12 school student who experiences homelessness.[4] ED's definition of homelessness within Section 725 of the McKinney-Vento Act defines children and youth experiencing homelessness as children who lack a fixed, regular, and adequate nighttime residence at least once over a school year.[5]

The annual report groups children experiencing homelessness into five cohorts based on where they are living:

1. **Unsheltered,**
2. **Motels and Hotels,**
3. **Shelters and Transitional Housing,**
4. **Staying with Others, and**
5. **Location Not Reported.**

Figure 3 illustrates the dramatic increases in nationwide child and youth homelessness. The stacked colored bars illustrate unsheltered, motels and hotels, shelters and transitional housing, staying with others, and those whose location is not reported.

Children often start by staying with others and then move into motels, shelters, or the street, once they overstay their welcome with friends and family. In accordance with ED's codifying guidelines, the first type of homelessness a child experiences categorizes the child's status throughout the year, which does not necessarily reflect the current type of homelessness that child is experiencing. Since most children start experiencing homelessness in the "living with others" category, it is always overrepresented in the data, while those unsheltered and staying in shelters are underrepresented.

### Figure 3: National Department of Education Data (Families with Children)



**Key Takeaways:**

- The number of children experiencing homelessness continues to rise.

- The total number of children experiencing homelessness increased from 679,724 in the 2006-2007 school year to 1,508,265 in the 2017-2018 school year, a pre-COVID increase of 122%.

- The total number of children living in shelters, transitional housing, motels, and in unsheltered situations increased from 283,137 in the 2012-2013 school year to 390,760 in the 2017-2018 school year – a 38.1% pre-COVID increase.

- The number of children in unsheltered situations (on the street and in vehicles) more than doubled between the 2016-2017 and 2017-2018 school years – a 104% increase.

- A sizeable percentage of adults experiencing homelessness first experienced homelessness as a child. For example, HUD's point-in-time count survey reports that 20% of adults experiencing homelessness in Los Angeles first experienced homelessness as children. In Seattle and Santa Cruz, the number is 18%, while San Francisco's rate is 15%.



## Homelessness is Increasing Despite Dramatic Increases in Federal Funding

The substantial increases in the number of people experiencing homelessness indicated by the HUD and ED data presented above have occurred even as federal funding for programs intended to address homelessness has dramatically increased. In 2022, Congress appropriated more than $7.9 billion for targeted homelessness assistance programs – President Biden has asked for an additional $8.7 billion in the FY 2023 federal budget.[6] This represents more than a three-fold increase from the $2.8 billion spent in 2008.

These amounts do not include the more than $4 billion in directly dedicated homelessness assistance and the more than $64.9 billion in indirect homelessness assistance allocated in the CARES Act and American Rescue Plan COVID-19 relief packages.[7,8] See Figure 4 for an illustration of the year-over-year spending since 2009.



**Figure 4: Federal Homelessness Spending**

DOJ-HUD-AR00722

# "Housing First" Is Not Working



## Federal Government Formally Embraces Housing First in 2013

The 2013 Housing and Urban Development Notice of Funding Availability (HUD NOFA) formally shifted federal policies and funding to a "Housing First" philosophy, which offers government-subsidized homelessness housing vouchers to individuals with no participation and treatment requirements (such as attending life-skills classes or seeing a drug addiction counselor).[9] **Disconnecting housing subsidies from any participation requirement for rehabilitation and treatment is the most radically negative single change to federal homelessness assistance policy in decades.**

In addition to formally prioritizing the Housing First approach over all other homelessness assistance strategies, the 2013 HUD NOFA also, for the first time, formally funded rapid rehousing subsidies while simultaneously phasing out funding for transitional housing. These changes fundamentally altered the way homelessness assistance is allocated by the federal government.

HUD's implementation of Housing First led to changes in federal regulations, grant application scoring factors, and program guidance to local communities. Taken together, local governments and Continuums-of-Care (CoCs) were heavily pressured to adopt Housing First policies to continue to receive federal funding. Local agencies that did not conform to these guidelines were de-funded. These changes impacted the programs and organizations that make up most of the direct front-line homelessness service providers, including faith-based and transitional housing providers. Housing First has essentially become Section 8 federally subsidized housing vouchers without any rules.

## Disastrous Results

The results of the shift to Housing First have been disastrous. Shortly after the policy shift away from requiring service participation when receiving homelessness assistance, HUD measured unsheltered homelessness rose from 175,399 in 2014 to 211,293 in 2019, a 20.5% increase in five

DOJ-HUD-AR00723

years (all pre-COVID).[10] During the same period, the number of individuals receiving subsidized Rapid Rehousing and Permanent Supportive Housing vouchers rose from 338,065 to 482,254, a 42.7% increase. **In short, even though the number of housing vouchers increased more than 40%, unsheltered street homelessness increased more than 20%. If the Housing First approach were working to reduce overall homelessness, unsheltered street level homelessness should have dropped dramatically. Instead, the opposite occurred.**

The increase in homelessness has occurred even as permanent supportive "Housing First" units have doubled, Rapid Rehousing units have increased sixfold, and federal spending on homelessness has more than tripled.

The negative impacts of skyrocketing homelessness on communities are manifold, including increased demand on local government resources, including, most notably, the criminal justice system (e.g. police, courts, and jails) and emergency rooms. The growing crisis of homelessness drains non-profit resources, increases drug overdoses, exacerbates urban decay, and suppresses economic growth and development.

### Communities Are in Crisis

Beyond the bleak national numbers, the data demonstrate especially dramatic rises in the hundreds of cities (and states) that have aggressively embraced the flawed Housing First philosophy — such as Los Angeles, San Francisco, Sacramento, Portland, Seattle, and New York City.

California provides an especially alarming example of the failure of Housing First. As discussed above, the California legislature passed a bill in 2016 that required every state dollar spent on homelessness must be spent on Housing First programs. **Consequently, unsheltered street-level homelessness in California rose 47.1%**

**in just four years and overall homelessness increased 30.7% (pre-COVID).**

California now boasts almost half of America's unsheltered street-level homeless population and nearly one in four of America's overall homeless population (all five HUD AHAR categories), even though it contains only 12% of the United States population.[11] **If Housing First worked as promised by advocates, California should have the lowest rates of homelessness in the U.S., not the highest.**

Some progress was made this year in California where a law recommended by the governor was passed creating Care Courts that at least offer the prospect that—in a year or two—people with severe mental illness who are experiencing homelessness can be required to get treatment. Fought by the ACLU from a misguided fear of civil liberties abuse, the fact that the law was passed overwhelmingly in the legislature is a sign of increasing public desire for reform. Likewise, a successful lawsuit by the LA Alliance for Human Rights commits LA County to increase mental health and substance abuse outreach and treatment as part of its vast housing expenditures. But California still has a long way to go and is moving slowly.

The experiences of other jurisdictions also illustrate the folly of Housing First. In Seattle/King County the number of unsheltered people experiencing homelessness rose to more than 5,500, and the Seattle Police Department reports that gun crimes tied to homelessness encampments jumped 122% during the first half of 2022.[12] In Portland, Oregon, people experiencing homelessness comprised 50% of all arrests between 2017 and 2020, even though the population of people experiencing homelessness was less than 2%.[13] In New York City, the number of deaths of people experiencing homelessness more than doubled in a three-year period from 2018 to 2021, up to 640 deaths, with the most frequent cause of death being drug overdose.[14]

Exacerbating the negative effects of federal and state Housing First polices are poorly conceived local policies that significantly raise housing construction costs to make housing unaffordable for many, especially low-income Americans. Chief among them are onerous regulations and exorbitant local construction permitting fees that inflate housing construction costs. Not limited to California, excessive fees and regulations have made housing unaffordable in many parts of the country, especially in communities where the cost of living is the highest.

**Attempts to Mask the Problem**

The federal government has attempted to mask the magnitude of the crisis in at least two ways. First, due to the COVID pandemic, HUD stopped collecting relevant data on homelessness in 2020. More disingenuously, HUD resorted to an accounting gimmick that reclassified assistance programs to produce an artificial, short-term public relations success. After the 2013 HUD NOFA, changes to annual HUD NOFA deprioritized transitional housing in favor of Rapid Rehousing. Consequently, 101,746 individuals were "reclassified" from transitional programs (which are considered to be still experiencing homelessness) to Rapid Rehousing programs (which are deemed no longer experiencing homelessness).

This definitional sleight-of-hand was based on the fact that, though both programs have the same HUD regulatory 24-month limit, HUD considers people living in rapid rehousing programs as no longer experiencing homelessness. This is because they are housed through a "lease" and, therefore, are covered under the Fair Housing Act.[15] On the other hand, people living in transitional housing are still considered by HUD to be experiencing homelessness because those programs often provide housing through a "participation contract" rather than a lease. In short, under current federal policy, Rapid Rehousing participants are considered tenants while transitional housing participants are considered people experiencing

homelessness. It is bureaucratic nonsense meant to bolster the claims of Housing First advocates.

It is important to note that the 101,746 reclassified individuals were mostly in the same rooms, in the same buildings, being housed by the same agencies — yet deemed no longer to be experiencing homelessness. These types of short-term accounting gimmicks fail to seriously address the problem of increasing homelessness.

Despite the attempts to hide the true magnitude of the homelessness crisis, the data clearly proves the Housing First advocates wrong.

**Why has Housing First Failed to End Homelessness as Promised?**

More than a decade ago, **progressive Senators and House Members and other advocates of Housing First argued that the approach would end all types of homelessness by 2023.[16] With Housing First, the Obama Administration said it could end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[17]**

Unfortunately however, as documented above, even though federal spending has nearly tripled, homelessness has not ended, but has increased dramatically, even before COVID.

How could advocates have been so wrong about Housing First ending homelessness by 2023? In short, the Housing First approach is fatally flawed. By focusing on rapidly placing individuals into housing regardless of whether the placement is clinically appropriate, the approach works against the achievement of long-term outcomes, such as graduating out of homelessness or attaining lasting housing self-sufficiency. **By ignoring the root causes of homelessness – such as untreated mental illness combined with substance use disorders – Housing First is at best an expensive short-term band-aid that only addresses the symptom of an individual's living on the street.**

DOJ-HUD-AR00725

These flawed theoretical assumptions allowed subsidized housing vouchers to be used as substitutes for mental illness treatment and substance use disorder therapy. In addition, Washington-based policy advocates who had little or no front-line experience providing direct services did not realize how prevalent untreated mental illness and co-presenting substance use disorders were within the community of homelessness. For example, in 2014, the President and CEO of the National Alliance to End Homelessness claimed that only 20% percent of the people experiencing homelessness have a mental illness or a substance abuse problem.

Yet the California Policy Lab, a non-partisan research institute based at the University of California, found in their 2019 ground-breaking study of 64,000 people experiencing homelessness that **78% of the unsheltered homelessness population reported having mental health conditions, and 50% reported that their mental health conditions contributed to their loss of housing.** Additionally, **75% of the unsheltered population reported having substance abuse conditions, and 51% reported that the use of drugs or alcohol contributed to their loss of housing.**[18]

Unfortunately, because of the expense of creating permanent supportive housing, and the funding restrictions dictating how homelessness assistance dollars are to be spent, the intensive treatment and clinical services so many people living on the street need have become an afterthought.

Housing vouchers are subsidies and do not have the ability to treat mental illness, nor do they address substance use disorders. The failure of Housing First is graphically illustrated by the many individuals isolated in apartments in terrible living conditions with no treatment for mental illnesses nor therapy for substance use disorders, whose stories often end in tragedy. For example, a study

of Boston's chronically homeless unsheltered population shows low housing retention and nearly half of the studied cohort (45%) died while housed. The study concludes "Housing stability for this vulnerable population likely requires more robust and flexible and long-term medical and social supports."[19] Similar poor outcomes have occurred in Los Angeles with Project Room Key.

Subsidized housing and converted motels are highly inadequate substitutes for treatment. Housing First warehouses people, without care, into isolated living arrangements in which drug use and untreated mental illness tend to proliferate. The Los Angeles Times reports that the deaths that occurred in Project Room Key units increased the number of deaths due to the unabated presence of methamphetamine and fentanyl.[20] Meth and fentanyl were directly responsible for the increase in overdose deaths and also contributed to other causes of death such as heart failure, suicide due to drug-induced psychosis, and brain hemorrhage.[21]

**Housing First is based on a faulty premise that homelessness is simply a housing issue which can be solved with subsidized housing. In fact, the root cause of most homelessness in the United States is untreated mental illness, often combined with co-presenting substance use disorders (SUDs).** Policies that fail to address these root causes, when combined with policies that make housing unaffordable, only exacerbate the crisis.

### Housing First is Impeding Effective Help

Not only has Housing First led to increases in homelessness, the approach has also harmed families and individuals by impeding service providers from deploying treatments that effectively address the root causes of their predicament.

Specifically, we note the following adverse effects of the federal Housing First approach:

DOJ-HUD-AR00726

 **The elimination of service participation requirements has removed incentives for individuals to participate in effective programs and therapies.**

The elimination of service participation requirements — such as robust case management and treatment for substance use disorders — has adversely impacted many service providers (including many faith-based organizations) by stripping them of their best intervention tools. These organizations had used these requirements successfully for years as an incentive to improve the mental and physical health of program participants and to promote self-sufficiency.

**Service participation requirements have been successfully employed in most other federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996.** For example, Pell Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF), which provides benefits to families in poverty, requires beneficiaries to work or advance their education.

Many Housing First proponents argue that participation requirements are barriers to shelter and housing. They claim that people experiencing homelessness refuse to accept offers of shelter and housing because they do not want to or cannot participate. The growth of homeless encampments shows that refusal of shelter and services exists even with "low barrier" policies. **The real barrier to recovery is the lack of participation in robust treatment services, especially for mental health and substance use disorder issues.**

Participation requirements are the key element to improved health and increased self-sufficiency that leads to reduced numbers of people experiencing homelessness.

 **The elimination of federal funding for intensive wraparound services has pulled the plug on the critical services needed for treatment and recovery (e.g. for treatment of mental illness and substance use disorders).**

For most, homelessness is a medical and clinical issue rooted in untreated mental illness, often combined with substance use disorders. Consequently, the best intervention is robust trauma-informed care along with wraparound services such as mental health treatment, substance use disorder interventions, medical provisions, life-skill classes, and job training and retention.

However, because of the shift in federal policy and funding, many local and county governments have reduced or eliminated treatment services needed to address mental illness and addiction head on. Instead, they often take the short-sighted, least-resistance route of short-term spending on (federally subsidized) housing vouchers rather than providing the long-term treatment and recovery services needed to address the underlying causes of homelessness.

Making matters worse, the few locations where voluntary services are offered are often poorly funded and understaffed. And absent participation requirements, programs like addiction services, workforce training, and life-skills classes are frequently avoided by individuals who might benefit.

**Housing First's prohibition against participation requirements and its myopic emphasis on funding housing subsidies has practically stopped funding treatment programs of any clinical benefit within homelessness programs.** After stopping participation requirements and stopping funding of treatment, it is no wonder why homelessness is skyrocketing.

DOJ-HUD-AR00727



**The movement away from customized treatment approaches to a one-size-fits-all housing approach has limited treatment approaches.**

Moving an unsheltered individual to housing provides a number of health and emotional benefits. However, housing alone does not lead to sustained mental health nor recovery from addictions. **A housing voucher does not kick a drug habit, address chemical instability, nor teach one how to write a job resume.** Yet Housing First advocates argue housing vouchers will end all types of homelessness. This is akin to providing the same medical treatment to a person with an infection, a broken leg, or experiencing a stroke.

To be clear, Housing First vouchers are a one-size-fits-all approach, with no room for variations in treatment or alternative interventions. Housing *First* has become housing *Only*.

The Institute for Children, Poverty & Homelessness (ICPH), points out that the one-size-fits-all approach does not work for all populations nor in all locations. Specifically, ICPH did a study of New York City's Housing First program, which has been practiced on a large scale for an extended period of time.[22] Though Housing First advocates had promised the recidivism rate would drop, the ICPH found that after "Rapidly Rehousing" 33,000 families from 2005 to 2011, the recidivism back to shelter rate actually increased. ICPH posits that Rapid Rehousing is analogous to a steroid shot — the pain temporarily goes away but comes back quickly, since the underlying issues have not been addressed. ICPH goes on to say that there is a lack of evidence showing long-term success of Rapid Rehousing and Housing First.

Tragically, a one-size-fits-all approach can actually harm individuals experiencing homelessness who need and benefit from customized, trauma-informed wraparound services. When the only

intervention is "housing," little or no treatment is provided and few clinical outcomes are achieved. We will fail if Housing First is the only tool in the toolbox.



**The defunding of emergency services has led to increased negative outcomes, including death.**

**De-funding of emergency services, like emergency sheltering and mental health services, has reduced critical front-line life-saving services for individuals living on the street.** Before the 2013 HUD NOFA was implemented, funding for the homelessness Continuum of Cares were evenly balanced — funding about one-third each for emergency services, transitional housing, and long-term housing.

After the changes implemented by the 2013 HUD NOVA, the federal government terminated funding of homelessness emergency services and began to phase out funding of transitional housing in favor of funding Housing First vouchers. This destabilized the balance between the three equally important and critical phases of Continuum of Cares described above.

As a result, emergency services have been replaced with housing outreach workers with little expertise and few resources to help those in need. Their objective is limited to recruiting people experiencing homelessness into Housing First programs, along with a bottle of water and words of comfort. Replacing emergency services with housing outreach workers tragically accepts the viewpoint that homelessness is a housing problem rather than a broader humanitarian crisis that can only be addressed through a wholistic program focusing on the treatment of underlying causes.

The de-funding of critical emergency services has particularly restrained the ability of faith-based and non-profit agencies to help individuals in need.

DOJ-HUD-AR00728



**In changing the ultimate goal from self-sufficiency to maximizing the number of vouchers distributed, Housing First has led to a loss of program focus.**

The federal government currently measures success in addressing homelessness by how many, and how quickly, taxpayer-subsidized housing vouchers are distributed — regardless of whether the vouchers actually help pull people out of homelessness. **The government should instead gauge success by measuring self-sufficiency: the number of people who exit from homelessness over a sustained period.**

Federal programs instruct Continuums of Cares to avoid objective, performance-oriented metrics. In fact, instead of measuring "outcomes," HUD's performance system measures "outputs" based on process-related performance of CoCs in providing housing. Even HUD's metrics of income increases are belied by equating earned income from a job with government subsidies from various government programs. This represents yet another example of measuring the wrong thing.

**The fatal flaw of Housing First should be obvious — the federal government is not measuring how many individuals attain self-sufficiency every year (i.e. no longer needing government-subsidized housing vouchers). Instead, they measure failure — the number of people dependent on government handouts.**

Unfortunately, many Housing First advocates have aggressively resisted efforts to have meaningful and truthful measurements because this would spotlight how Housing First has failed to truly reduce the number of people experiencing homelessness.



**The expansion of Housing First to state and local governments has dramatically increased homelessness.**

Housing First grants have induced state and local governments to adopt the Housing First model, despite its failures. Contrary to the promises of Housing First advocates, the approach has not ended homelessness where it has been implemented. On the contrary, in many locales such as Los Angeles and San Francisco, as well as California as a whole, **adoption of the Housing First experiment has substantially increased the number of people experiencing homelessness.**

According to a recent survey, most citizens blame local mayors and city councilmembers for increases in homelessness.[23] But it is appropriate to lay much of the blame at the feet of the federal government. Since HUD exclusively promotes and funds Housing First throughout the U.S., many municipalities are limited in their responses to homelessness. Knowing that Housing First has not worked at a national level, why would we want to push this flawed policy onto local governments?

**The issue of untreated mental illness is an inescapable and neglected part of the homelessness puzzle.**

Starting in the Depression years of the 1930s and accelerating over the decades, the long-term neglect of mental hospital care by state governments became an embarrassment and even, in some cases, scandalous. Instead of improving care, policy makers de-institutionalized state mental health hospitals. The 1965 Medicaid bill, which provided support for funding of

DOJ-HUD-AR00729

state facilities that serve lower income people, specifically left out individuals in the age categories between 21 and 65, who often present with significant and serious mental illnesses and conditions. It was thought that this "Institutions of Mental Disease ("IMD") Exclusion would hold down costs, take advantage of new medications, protect civil liberties and somehow enable people with mental illness or substance abuse issues to get good local community-based care.

In practice, however, it succeeded mainly in justifying states' increasing failures to provide their own adequate funding for professional psychiatric care in state hospitals, while the patients released to home care and local clinics most often received ineffective or insufficient treatment. Among other things, small community clinics seldom can afford on-site professional psychiatric personnel that meet the needs of the seriously mentally ill. This meant that people treated at home or at smaller mental health clinics often wound up on the streets or in jail due to a lack of settings that could appropriately respond to crises, stabilize, and in many cases, provide residences for those experiencing serious mental illness.

There are now only five percent as many psychiatric beds in state hospitals as we had a half century ago. Indeed, **there are more people in psychiatric care in prisons than in hospital care making jails, prisons, and homeless encampments modern-day asylums.**

As Dr. Thomas Insel, recent Director of the National Institute of Mental Health, notes in his book *Healing*, "We so overcorrected the problematic state of institutions in the 1960's that we effectively created an enormous deficit in funded psychiatric beds." Federal funding for mental illness, meanwhile, tends to go to programs that assist persons with tractable neuroses, rather than resistant psychoses. Even middle-class and wealthy Americans in many communities find hospital care and long-term adult residences for mental illness hard to acquire, which is a largely unreported calamity for thousands of families in America and is reflected, among other things, in rising suicide rates. But the impact on homelessness is especially acute.

DOJ-HUD-AR00730

# The Time Has Come for Real Reform



As described in this report, Housing First has been an abject failure in addressing the growing crisis of homelessness. The approach is built on a false premise—that homelessness is primarily a housing issue rather than a mental illness issue with co-presenting substance use disorders.

A reverse course is needed. **Rather than seeking to increase the number of taxpayer-subsidized housing vouchers, our goal should be to help move as many people as possible into recovery and stability, and then toward self-sufficiency with supported long-term sobriety.**

To that end, the two most important tools to end homelessness are: 1) the promotion and funding of trauma-informed mental and behavioral health treatment, integrated and directly tied to the provision of affordable housing; and 2) the development of truly affordable housing construction through the elimination of local building fees and excessive regulatory requirements.

Citizens in communities around the country are increasingly exasperated by the results of misguided government policies. Polling indicates homelessness is now the number one or number two local issue among voters in twenty of the highest populated cities in America, and homelessness continues to be the top statewide issue in almost all polls in California.[24]

Congress is encouraged to take the following specific actions as soon as possible to begin to address the national homelessness crisis:

DOJ-HUD-AR00731

1. **Pass legislation directing HUD to eliminate Housing First as the primary approach to address homelessness.** Housing First prioritization should be eliminated in NOFAs, policies, rule-making, guidance, technical assistance, and in federal communications. Additionally, appropriations should specifically eliminate government funding for any program or regulation that only provides housing vouchers (i.e. has no service participation requirements).

2. **Pass the Housing PLUS Act.** Sponsored by Rep. Andy Barr (KY-6), H.R. 6018, the Housing PLUS Act, would prohibit the HUD Secretary from restricting or limiting Continuum of Care (CoC) funds going to providers that require the provision of supportive services (such as addiction treatment or job counseling) or program participation requirements, or to faith-based organizations. By requiring that no less than 30% of CoC funding be used by recipients that provide or offer access to wraparound services, the bill will provide much needed flexibility to allow local communities to customize their efforts to individual needs. However, the 30% provision within H.R. 6018 should be amended to no less than 40%.

3. **Prioritize economic "self-sufficiency" as the primary measurement of effectiveness of all federal homelessness assistance programs.** In order to receive federal funding, all tribal, state, regional, and local governments, as well as CoCs should also prioritize "self-sufficiency" as the number one measurement of homelessness assistance program effectiveness.

4. **Prioritize trauma-informed wraparound services.** The CoC program should require a minimum of 40% of all federal homelessness assistance funding to be used for direct trauma-informed wraparound services, such as mental illness clinical services and treatment, substance use disorder treatment, job training, and job retention (i.e. funding for housing vouchers should be limited to 60% of funding across all homelessness assistance programs).

5. **Require program participation in all federally funded homelessness assistance programs.** To receive federal housing support, participants should be required to participate in self-sufficiency, health, life skills, behavioral health services and treatment plans, similar to what is done for Pell Grants, TANF, and unemployment insurance benefits.

6. **Restore funding for emergency programs.** As phase one in the Continuum of Care, 25% to 33% of all federal homelessness assistance funding should be allocated to emergency services. The other 67% to 75% of the funding would go to the second and third phases of the CoC, for transitional housing and longer-term housing, respectively. Additionally, rules and regulations that impede faith-based organizations, and other non-profits, from helping people experiencing homelessness should be eliminated.

7. **Replace the Continuum of Care (CoC) funding system with a state block grant system. If moving to a state block grant system is not feasible, then reform the existing CoC governance model.** State block grants, built on the premise that states have a better understanding of local conditions than the federal government, provide a more efficient means of funding CoCs. If a state block program is not feasible, then Congress should reform the governance structures of Continuums of Cares by restricting any type of CoC membership of agencies that receive CoC funds (e.g. stop self-dealing conflicts of interest). Additionally, CoC board membership should be expanded to include state and local elected officials, as well as general public stakeholders, to increase accountability.

8. **Eliminate the Institutions for Mental Diseases Exclusion ("IMD Exclusion") in Medicaid** to increase federal reimbursements for inpatient mental illness treatment. Due to the IMD Exclusion, many mentally ill people do not receive treatment, or are prematurely terminated from treatment. Consequently, they land up on the streets or in jail or prisons. Follow-up clinical services should also be reimbursed in order to allow discharged hospital patients to receive ongoing treatment to continue to improve and get well.

9. **Review the budget of the National Institute of Mental Health** to ensure its priorities reflect the actual problems of neglect seen in the day-to-day care of the mentally ill, especially those who are homeless.

10. **Incentivize local governments to eliminate local building fees for affordable housing construction.** Local governments should be incentivized to streamline building codes and eliminate unnecessary regulations that unnecessarily inflate the cost of housing.

# Produced by Discovery Institute's Center on Wealth and Poverty

### Dr. Robert G. Marbut Jr.

Lead Writer, Project Coordinator, and Discovery Institute Senior Fellow. Dr. Marbut worked in three different U.S. Presidential Administrations, including being selected as a White House Fellow to President George H.W. Bush and serving as the Executive Director of the U.S. Interagency Council on Homelessness from 2019 to 2021. He was a San Antonio City Councilperson/Mayor-Pro-Tem, and was the Founding President & CEO of *Haven for Hope Transformational Campus*.

### Steven J. Buri

Contributor and Discovery Institute President. Mr. Buri has served in various capacities in government at the local, state and federal levels. He served as Deputy Mayor then as Mayor of the City of Newcastle, Washington. He was selected by the American Council of Young Political Leaders to participate as part of a bi-partisan political delegation to Nepal to share policy lessons from the United States and to promote the adoption of a new Nepalese constitution.

### Erik L. Nutley

Editor and Discovery Institute Program Director. Mr. Nutley retired from the U.S. Air Force in 2008, after a career as a squadron commander, instructor pilot, engineer, and Assistant Professor of aeronautical engineering at the U.S. Air Force Academy. As a Department of Defense civilian in the Pentagon, he conducted program oversight of multi-billion-dollar Air Force and Navy aircraft procurement programs.

### Ambassador Bruce Chapman

Contributor and Discovery Institute Chairman of the Board. Ambassador Chapman was appointed by President Ronald Reagan to the position of Director of the United States Census Bureau and served as the United States Ambassador to the United Nations International Organizations in Vienna. He was also the Director of the White House Office of Planning and Evaluation, which worked on many poverty issues.

### Paul Webster

Contributor, Editor and Discovery Institute Researcher. Mr. Webster is the Founder and Director of Hope Street Coalition. He has an extensive background in legislation, public policy, administration, and program delivery. He served as a senior policy advisor in the U.S. Department of Housing and Urban Development and was the Vice President of a homelessness services provider.

### For more information

Visit www.FixHomelessness.org or email info@discovery.org.

Contact Dr. Robert G. Marbut Jr. at 210-260-9696.

CENTER ON WEALTH AND POVERTY   23

# Glossary

**Affordable Housing –** Taxpayer-subsidized housing for people at or below a region's median income. According to HUD, affordable housing is intended for people paying no more than thirty percent of their gross income for housing costs, including utilities.

**American Rescue Plan –** An Act of Congress, passed in 2021, which provided $1.9 trillion in economic stimulus. The American Rescue Plan provided $4 billion in direct support to state and local programs for people experiencing or at risk of homelessness, as well as $51.6 million in indirect homelessness assistance.

**Annual Homelessness Assessment Report (AHAR) –** An annual report requiring HUD to provide to Congress nationwide counts of homelessness compiled from regional Point-in-Time Counts, Housing Inventory, and HMIS data reporting from CoCs. The number of people experiencing homelessness is reported in five major categories based on type of housing: Unsheltered, Emergency Shelters, Transitional Housing, Rapid Rehousing, and Permanent Supportive Housing.

**Barriers to Housing –** Barriers are challenges that act to prevent individuals and families from getting and maintaining housing. Examples of barriers are lack of income, unemployment, criminal convictions, lack of identification, mental illness, and substance use disorders.

Behavioral Health – Refers to how behaviors impact an individual's well-being, distinct from mental illnesses. Substance use disorders, alcoholism, and gambling fall under the general umbrella of behavioral health.

**CARES Act –** Congressional legislation (The Coronavirus Aid, Relief, and Economic Security Act of 2020, and the Coronavirus Responses and Consolidated Appropriations Act of 2021), which provided economic assistance to individuals, families, businesses, and tribal, state, and local governments impacted by the Covid-19 pandemic. Both Acts provided expedited funding and regulatory changes to governments to address the impacts of the COVID-19 virus, including homelessness.

**Case Management –** A service provided by homelessness assistance providers that coordinates overall treatment for people experiencing homelessness.

**Continuum of Care (CoC) –** A CoC is a self-appointed regional or local planning body, organized to fulfill the responsibilities prescribed in the CoC Program Interim Rule for a defined geographic area, that coordinates housing and services funding for families and individuals experiencing homelessness. CoCs determine local funding allocations, with many of the member agencies receiving federal funds themselves.

**Chronic Homelessness –** The state of experiencing homelessness – living in a place not meant for human habitation – for at least twelve months or four separate occasions in the last three years and eligible for Social Security disability payments due to a disability.

**Disability –** The physical, intellectual, and developmental inability to do any substantial gainful activity, which can be expected to result in death, or which has lasted for a continuous period of twelve months or more. Chronic homelessness and a diagnosis of substance use disorder are considered disabilities and qualify people experiencing homelessness for Social Security Disability Income.

**Encampments –** Locations where two or more people experiencing homelessness live in an

DOJ-HUD-AR00724

unsheltered area. Encampments are typically made up of tents and improvised structures and can be in either urban or rural settings.

**Emergency Shelter** – A facility that provides temporary shelter for people experiencing homelessness.

**Housing Unit** – A house, apartment, group of rooms, or single room occupied or intended for occupancy as separate living quarters.

**Housing First** – An approach that centers on solving homelessness by providing taxpayer funded housing vouchers free of charge to people experiencing homelessness. Per HUD and the Housing First philosophy, participation in treatment services are not allowed to be mandatory.

**Housing Management Information System (HMIS)** – HMIS is a local information technology system used to collect client-level data and data on the provision of housing and services to individuals and families experiencing homelessness and persons at risk of homelessness. Each Continuum of Care (CoC) is responsible for selecting an HMIS software solution that complies with HUD's data collection, management, and reporting standards.

**HUD** – U.S. Department of Housing and Urban Development is the lead funding agency on most federal programs to address homelessness.

**Intensive Case Management** – A program for people with severe and persistent mental health issues that severely impact their ability to meet basic needs, maintain medication compliance, managing symptoms, attending and scheduling appointments, life skill classes, employment training, and connecting to specialized services.

**McKinney-Vento Act** – The federal law that provides regulations and funding of many homelessness assistance programs. The Act originally created fifteen programs providing a spectrum of services to people experiencing homelessness, including Supportive Housing Program, Shelter Plus Care

Program, and Emergency Shelter Grant Program. It also established the United States Interagency Council on Homelessness. Later, the HEARTH Act of 2009 consolidated many of these programs, established the federal definition of chronic homelessness, and authorized the Continuum of Care Program as the means to distribute federal grants to communities for homelessness assistance.

**Mental Health / Mental Illness** – Mental illness refers to "conditions that affect a person's thinking, feeling, mood, or behavior." These can include but are not limited to depression, anxiety, bipolar disorder, or schizophrenia. Mental health reflects "our emotional, psychological, and social well-being."

**Notice of Funding Availability / Notice of Funding Opportunity (NOFA/NOFO)** – The public notice by the federal government of grants and other funding available to address specific needs or issues. NOFAs / NOFOs define what eligible activities qualify for funding, how to apply for funds, and what specific information should be included in proposals to describe projects and justify funding awards.

**Outcomes vs. Outputs** – Outcomes are the desired end-game goals to be accomplished (e.g. how many people exit homelessness). Outputs are sub-step actions that contribute towards accomplishing outcomes (e.g. how many hygiene kits are given out).

**Outreach Services** – Services that attempt to engage and persuade people experiencing homelessness to go into a trauma-informed treatment program or to accept housing.

**Overhead Construction Costs** – Overhead construction costs include cost of permitting fees, utility hook-ups, and germane and non-germane building codes, as well as the impact of regulations such as parking ratios, environmental reviews, and financing. California has some of the highest building fees and regulatory costs due to laws like the California Environmental Quality Act

DOJ-HUD-AR00735

(CEQA). In California, it is common to have more than $100,000 overhead construction costs per housing unit.

**Participation Requirements** – See Service Participation Requirements below.

**Permanent Supportive Housing** – Leased-based taxpayer subsidized housing for people experiencing homelessness. Per HUD, participation treatment requirements and services are not allowed to be mandatory.

**Point-in-Time Count (PITC)** – The Point-in-Time Count is a count of people experiencing homelessness (both unsheltered and sheltered) on a single night in January. A PITC is required by HUD for communities that receive federal homelessness assistance funds and is one of the responsibilities of the local Continuum of Care.

**Preconditions** – Preconditions, distinct from service participation requirements, are pre-qualifying conditions for individuals to participate in a program based on screening requirements. Preconditions and screening requirements could include sobriety, absence of a serious mental illness, or ability to work.

**Rapid Re-Housing (RRH)** – An intervention that provides short-term (up to three months) and medium-term (4-24 months) tenant-based rental assistance and supportive services to households experiencing homelessness. The practice of quickly moving people experiencing homelessness into taxpayer subsidized lease-based housing for a maximum of 24 months. Per HUD and the Housing First philosophy, participation treatment requirements and services are not allowed to be mandatory.

**Services** – A wide array of assistance activities provided by service agencies for people experiencing homelessness. Services include, but are not limited to, trauma-informed care, case management, job skills training, life skill classes, laundry, hygiene care, substance use disorder treatment, treatment for mental illness, dental care, and health care.

**Service Participation Requirements** – As with Pell Grant and Temporary Assistance for Needy Families (TANF), these are required activities persons must participate in to continue in a program and receive taxpayer funded assistance. Activities can include attending meetings with case managers or job training and life skill classes, and participation in substance use disorder treatment. Per HUD and the Housing First philosophy, participation treatment requirements and services are not allowed to be mandatory.

**Serious Mental Illness (SMI)** – A mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities of daily living.

**Substance Use Disorder (SUD)** – Clinically significant impairment, including health problems, disability, and failure to accomplish responsibilities at work, school, or home caused by the recurrent use of alcohol and/or drugs.

**Transitional Housing (TH)** – Transitional Housing provides temporary housing with supportive services to individuals and families experiencing homelessness, with the goal of interim stability and longer-term goal of successfully moving into permanent housing. Transitional Housing programs cover the costs for both housing and accompanying supportive services for program participants for up to 24 months.

**Trauma Informed Care** – A customized approach of care that addresses an individual's underlying history of trauma.
Wrap Around Services / Robust Services – A wraparound approach customizes treatment services based on the individual needs of people experiencing homelessness.

# Endnotes

1. US Department of Housing and Urban Development, HUD Exchange, "Category 1 Literally Homeless," accessed August 31, 2022, https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/category-1/.

2. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

3. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

4. US Department of Education, National Center on Homeless Education, "Data and Statistics on Homelessness," accessed August 31, 2022, https://nche.ed.gov/data-and-stats/.

5. National Archives, Federal Register, "McKinney-Vento Education for Homeless Children and Youths Program," accessed August 31, 2022, https://www.federalregister.gov/documents/2016/03/17/2016-06073/mckinney-vento-education-for-homeless-children-and-youths-program

6. United States Interagency Council on Homelessness, "FY 2023 Proposed Federal Budget for Homelessness," accessed August 31, 2020, https://www.usich.gov/tools-for-action/fy-2023-proposed-federal-budget-for-homelessness.

7. National Low Income Housing Coalition, "Coronavirus Response Packages, Updated May 12, 2020," accessed August 2022, https://nlihc.org/sites/default/files/Coronavirus-Budget-Chart.pdf.

8. United States Interagency Council on Homelessness, "Making the Most of the American Rescue Plan: A Guide to the Funding That Impacts People Experiencing Homelessness," accessed August 31, 2022, https://www.usich.gov/resources/uploads/asset_library/USICH_American_Rescue_Plan_Guide.pdf.

9. US Department of Housing and Urban Development, Docket No. FR-5700-N-31B, Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and 2014 Continuum of Care Program Competition.

10. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

DOJ-HUD-AR00737

11.US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

12.Tammy Mutasa, "Growing crime rate at Seattle's homeless camps prompts anxiety, demands for solutions," May 20, 2022, KOMO News, accessed August 31, 2022, https://komonews.com/news/operation-crime-justice/crime-at-seattles-homeless-camps-prompts-anxiety-demands-for-city-crackdown.

13.Piper McDaniel, "Homeless people are more likely to be victims of violence than housed people," July 13, 2022, Street Roots, accessed August 31, 2020, https://www.streetroots.org/news/2022/07/13/violence-conflated.

14.Kevin Duggan, "Lost and Forgotten: Record Number of Homeless Died in New York Last Year, Report Finds," AMNY Newsletter, March, 22, 2022, accessed August 31, 2022, https://www.amny.com/news/record-homeless-died-new-york-last-year-report/.

15.24 CFR 578.3 Definitions: Permanent housing means community-based housing without a designated length of stay, and includes both permanent supportive housing and rapid rehousing. To be permanent housing, the program participant must be the tenant on a lease for a term of at least one year, which is renewable for terms that are a minimum of one month long and is terminable only for cause.

16.Tina Trenkner, "Are Cities' Pledges to End Homelessness Working?" March 26, 2012, Governing, accessed August 31, 2022, https://www.governing.com/archive/gov-homelessness-rising-decade-after-pledges-to-end-it.html.

17.US Department of Housing and Urban Development, HUD Exchange, "USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness," June 2015, accessed 31 August 2022, https://hudexchange.info/resource/1237/usich-opening-doors-federal-strategic-plan-end-homelessness/#:~:text=The%20Plan%20is%20focused%20on,ending%20all%20types%20of%20homelessness.

18.Janey Rountree, Nathan Hess, and Austin Lyke, "Health Conditions Among Unsheltered Adults in the U.S." October 2019, California Policy Lab Policy Brief, accessed 31 August 2022, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

19.Jill Roncarati, Henning Temeier, Rebecca Tachick, Tyler VanderWeele, and James J O'Connell, "Housing Boston's Chronically Homeless Unsheltered Population: 14 Years Later." Medical Care 59, Suppl 2 (2021): 170-174, accessed September 13, 2022, https://pubmed.ncbi.nlm.nih.gov/33710091/.

20.Ananya Roy and Chloe Rosenstock, "We Do Not Forget: Stolen Lives of LA's Unhoused During the COVID-19 Pandemic," UCLA Luskin Institute on Inequality and Democracy, December 1, 2021, accessed September 13, 2022, https://escholarship.org/uc/item/9104j943.

21. Emily Alpert Reyes, Benjamin Oreskes, and Doug Smith, "Why did so many homeless people die while staying at one hotel using Project Roomkey?" Los Angeles Times, June 28, 2021, accessed September 13, 2022, https://www.latimes.com/homeless-housing/story/2021-06-28/la-homeless-people-died-after-entering-covid-hotel-why.

DOJ-HUD-AR00739



# How Congress Can Reform Government's Misguided Homelessness Policies



fixhomelessness.org

DOJ-HUD-AR00740

# Toward a New Understanding

The California Statewide Study
of People Experiencing Homelessness

June 2023



Benioff Homelessness
and Housing Initiative

University of California
San Francisco



DOJ-HUD-AR00752



**Toward a New Understanding** The California Statewide Study of People Experiencing Homelessness

DOJ-HUD-AR00753

**AUTHORS:**

Margot Kushel, MD and Tiana Moore, PhD


With *(listed in alphabetical order):*

Jennafer Birkmeyer, MPH

Zena Dhatt, BS

Michael Duke, PhD

Kelly Ray Knight, PhD

Kara Young Ponder, PhD


**STATISTICS:**

Jennafer Birkmeyer, MPH; Sara Colom, PhD; Dave Graham-Squire, PhD; Kim Nguyen, ScD; Eve Perry, MPP; Margo Pottebaum, BA; Mai See Yang, PhD; and Statistics Team Project Manager: Regina Sakoda, BS

**QUALITATIVE RESEARCH:**

Dallas Augustine, PhD; Zena Dhatt, BS; Michael Duke, PhD; Anita Hargrave, MD; Tianna Jacques, BA; Kelly Ray Knight, PhD; Grace Taylor, BA; Kara Young Ponder, PhD

**EPIDEMIOLOGY:**

Meghan Morris, PhD; Paul Wesson, PhD

**BHHI CORE FIELD RESEARCH TEAM:**

Operations Manager: Layan Kaileh, MSW. *RDS Manager:* Angelica DeGaetano, LLM. *Qual Managers:* Zena Dhatt, BS and Michael Duke PhD. Diana Flores, MPH; Tremone Fucles, MPH; Norma Guzman, BA; Tianna Jacques, BA; Amy Lara, MPH; Corbin Platamone, MPH; Abraham Renteria-Ramirez, BA; Madison Rodriguez, BS; Regina Sakoda, BS; Ivan Smith, AS; Elana Straus, BA; Grace Taylor, BA

**Suggested citation:**

Kushel, M., Moore, T., et al. (2023). Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness. UCSF Benioff Homelessness and Housing Initiative.

Photos cover and opposite page: Sam Comen/unhousedca.org

homelessness.ucsf.edu

# Table of Contents

04 **Executive Summary**

11 **Introduction**

12 **Study Overview and Methods**

12 Study Population and Eligibility

14 Venue-Based and Respondent Driven Sampling Methods

14 Administered Questionnaires

16 In-Depth Interview Sub-Studies

17 Community Engaged Practices

17 **About the Report**

19 **Chapter 1: Who Experiences Homelessness in California?**

19 **Overview**

20 **Who Experiences Homelessness in California?**

20 Family Structure

21 Age

21 Adults with Minor Children

22 Current Marital or Partner Status

22 Race

23 Birthplace and Where Participants Lived Prior to Homelessness

23 Gender

23 Sexuality

24 Education

24 Veteran Status

24 Prior Experiences of Homelessness and Length of Current Episode

24 Chronic Homelessness

25 **The Disproportionate Burden of Homelessness**

25 **Experiences Over the Life Course**

25 Discrimination, Exposure to Violence, and Incarceration

26 Mental Health Over the Life Course

27 Substance Use Over the Life Course

29 **Summary**

29 **Key Takeaways**

31 **Chapter 2: Pathways to Homelessness**

32 **Housing Costs and Household Income**

32 **Homelessness Entrances from a Non-Leaseholding Arrangement**

33 **Homelessness Entrances from a Leaseholding Arrangement**

35 **Homelessness Entrances from Institutional Settings**

36 **Reasons for Leaving Last Housing**

37 Economic Reasons

39 Social Reasons

41 Health-Related Reasons

44 Other Reasons

44 **Primary Reason for Leaving Last Housing**

46 **Homelessness Prevention**

49 **Summary**

49 **Key Takeaways**

51 **Chapter 3: Experiences During Homelessness**

51 **Where Did People Stay?**

53 Shelter Access and Suitability

53 Vehicular Homelessness

53 Use of Domestic Violence Shelters by Survivors of IPV

**53 Physical Health and Use of Healthcare Services**

54 Physical Health Status

56 Pregnancy

56 Access to Healthcare

58 Acute Health Care Utilization

**59 Behavioral Health**

59 Mental Health

61 Substance Use

**64 Criminal Justice Involvement**

**65 Confiscations and Forced Displacements**

**66 Experiences of Violence**

**66 Income**

**66 Work and Employment**

**68 Benefits**

**69 Discrimination**

**71 Summary**

**71 Key Takeaways**

**73 Chapter 4: Barriers and Facilitators of Returns to Housing**

**73 Interest in Obtaining Permanent Housing**

**73 Challenges to Accessing Housing**

74 Housing Costs

74 Trade-offs to Make Housing Affordable

75 The Role of Rental Subsidies

76 Lack of Case Management and Housing Navigation Assistance

77 Wait Times and Hopelessness

77 Logistical and Technological Barriers to Receiving Housing

78 Family Status

79 Discrimination and Prior History as Barriers

79 Challenges Associated with Physical and Behavioral Health

**80 What Would Help Individuals End Their Homelessness?**

**81 Key Takeaways**

**83 Chapter 5: Policy Recommendations**

**83 Increase Affordable Housing Options Available to Extremely Low-Income Households**

**84 Increase Homelessness Prevention**

**85 Facilitate Swift Exits from Homelessness**

**85 Increase Access to Services to Match Clients' Physical and Behavioral Health Needs**

**87 Address the Criminal Justice to Homelessness Cycle**

**87 Increase Opportunities for Earned Income and Benefits Utilization**

**88 Support Those Impacted by Domestic Violence**

**88 Increase Outreach to Those Experiencing Unsheltered Homelessness**

**88 Center Racial Equity**

**90 ACKNOWLEDGMENTS**

**92 REFERENCES**

# Executive Summary

IN CALIFORNIA, more than 171,000 people experience homelessness daily. California is home to 12% of the nation's population, 30% of the nation's homeless population, and half the nation's unsheltered population. While homelessness is a major issue for California, there are many conflicting ideas about what to do about it. To design effective programs and policies to address homelessness, we need to understand who is experiencing it, how they became homeless, what their experiences are, and what is preventing them from exiting homelessness.

To answer these questions, the University of California, San Francisco (UCSF) Benioff Homelessness and Housing Initiative conducted the California Statewide Study of People Experiencing Homelessness (CASPEH), the largest representative study of homelessness since the mid-1990s and the first large-scale representative study to use mixed methods (surveys and in-depth interviews). Guided by advisory boards composed of people with lived experience of homelessness and those who work on homelessness programs and policies, we selected eight counties that represent the state's diversity and recruited a representative sample of adults 18 and older experiencing homelessness throughout California. The investigators conducted the research between October 2021 and November 2022. We administered questionnaires to nearly 3,200 participants, selected intentionally to provide a representative sample, and weighted data to provide statewide estimates. To augment survey responses, we recruited 365 participants to participate in in-depth interviews. With this context, CASPEH provides evidence to shape programs and policy responses to the homelessness crisis.

## WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA

First, we explore the life experiences of study participants. Individuals with certain vulnerabilities, those with a history of trauma, and/or those from racially minoritized groups, are at higher risk of experiencing homelessness. People who experience homelessness have higher rates of mental health conditions and substance use than the general population. For many, these problems predated their first episode of homelessness.

⬛ **The homeless population is aging, and minoritized groups are overrepresented.** The median age of participants was 47 (range 18-89). Participants who report a Black (26%) or Native American or Indigenous identity (12%) were overrepresented compared to the overall California population. Thirty-five percent of participants identified as Latino/x.

⬛ **People experiencing homelessness in California are Californians.** Nine out of ten participants lost their last housing in California; 75% of participants lived in the same county as their last housing.

⬛ **Participants have been homeless for prolonged periods.** Thirty-nine percent of participants were in their first episode of homelessness. The median length of homelessness was 22 months. More than one third (36%) met federal criteria for chronic homelessness.

⬛ **Participants reported how stress and trauma over the life course preceded their experience with homelessness.** Participants reported experiences of discrimination, exposure to violence, incarceration, and other traumas prior to homelessness. These experiences interacted and compounded to increase vulnerability to homelessness.

⬛ **Physical and sexual victimization throughout the life course was common.** Nearly three quarters (72%) experienced physical violence in their lifetime; 24% experienced sexual violence. Sexual violence was more common among ciswomen (43%) and transgender or nonbinary individuals (74%).

⬛ **Participants reported high lifetime rates of mental health and substance use challenges.** The majority (82%) reported a period in their life where they experienced a serious mental health condition. More than one quarter (27%) had been hospitalized for a mental health condition; 56% of these hospitalizations occurred prior to the first instance of homelessness. Nearly two thirds (65%) reported having had a period in their life in which they regularly used illicit drugs. Almost two thirds (62%) reported having had a period in their life with heavy drinking (defined as drinking at least three times a week to get drunk, or heavy intermittent drinking). More than half (57%) who ever had regular use of illicit drugs or regular heavy alcohol use had ever received treatment.

## PATHWAYS TO HOMELESSNESS

Second, we sought to understand the context of participants' lives prior to their most recent episode of homelessness. High housing costs and low income left participants vulnerable to homelessness.

In the six months prior to homelessness, the median monthly household income was $960. A high proportion had been rent burdened. Approximately one in five participants (19%) entered homelessness from an institution (such as a prison or prolonged jail stay); 49% from a housing situation in which participants didn't have their name on a lease or mortgage (non-leaseholder), and 32% from a housing situation where they had their name on a lease or mortgage (leaseholder).

DOJ-HUD-AR00758

**⚑ Participants exiting housing to homelessness reported having minimal notice.** Leaseholders reported a median of 10 days notice that they were going to lose their housing, while non-leaseholders reported a median of one day.

**⚑ Non-leaseholders reported lower incomes and housing costs than leaseholders.** In the six months prior to homelessness, the median monthly household income for non-leaseholders was $950. Of non-leaseholders, 43% were not paying any rent; among those who reported paying anything, the median monthly rent was $450. Among non-leaseholders who paid rent, 57% were rent burdened (paying more than 30% of household income for rent). Many non-leaseholders previously had been in leaseholding arrangements, but were able to forestall homelessness by moving in with family or friends. Not only did participants lack legal rights, but they often were living in substandard and overcrowded conditions. These arrangements tended to be highly stressful, leading to conflicts.

**⚑ Leaseholders had higher incomes, but higher housing costs.** The median monthly household income for leaseholders in the six months prior to homelessness was $1400. The median housing costs were $700. While 10% of participants whose names were on the lease didn't pay for housing, among those who paid rent, 66% met criteria for rent burden. Sixteen percent of leaseholders had received a rental subsidy in their last housing. Those who became homeless immediately after leaving a leaseholding situation were similar in many ways to the non-leaseholders but lacked options to move to after losing their housing.

**⚑ The most common reason for leaving last housing was economic for leaseholders and social for non-leaseholders.** Twenty-one percent of leaseholders cited a loss of income as the main reason that they lost their last housing. Among non-leaseholders, 13% noted a conflict within the household and 11% noted not wanting to impose. For leaseholders, economic considerations interacted frequently with social and health crises. For example, participants' (or household members') health crises led them to lose their job.

**⚑ Participants who entered homelessness from institutional settings reported not having received transition services.** Nineteen percent of participants entered homelessness from an institutional setting, such as prolonged jail and prison stays. Few reported having received services prior to having exited.

**⚑ A low proportion of those who entered homelessness from housing situations had sought or received homelessness prevention services.** Many participants were unaware of these services. Overall, 36% of participants had sought help to prevent homelessness, but most sought help from friends or family, rather than non-profits or government agencies.

**⚑ Even if the cause of homelessness was multifactorial, participants believed financial support could have prevented it.** Seventy percent believed that a monthly rental subsidy of $300-$500 would have prevented their homelessness for a sustained period; 82% believed receiving a one-time payment of $5,000-$10,000 would have prevented their homelessness; 90% believed that receiving a Housing Choice Voucher or similar option would have done so.

© Sam Comen

 

DOJ-HUD-AR00759

## EXPERIENCES DURING HOMELESSNESS

**Next, we examined participants' experiences of homelessness. Homelessness is devastating to health and well-being.** Participants' experiences were difficult and marked by significant health challenges, high use of drugs and alcohol, frequent victimization, and interactions with the criminal justice system. For the most part, participants were disconnected from the job market and services.

**◼ Most participants were unsheltered.** More than three quarters (78%) noted that they had spent the most time while homeless in the prior six months in unsheltered settings (21% in a vehicle, 57% without a vehicle). Over the prior six months, 90% reported at least one night in an unsheltered setting. Participants who stayed in shelters reported general satisfaction with them; many who didn't expressed concerns about curfews, the need to vacate during the day, health risks, and rules. Forty-one percent of participants noted a time during this homelessness episode where they wanted shelter but were unable to access it.

**◼ Participants reported poor health and many health challenges.** Forty-five percent of all participants reported their health as poor or fair; 60% reported a chronic disease. More than one third of all participants (34%) reported a limitation in an activity of daily living, and 22% reported a mobility limitation.

**◼ Among women of reproductive age, pregnancy was common.** One quarter (26%) of those assigned female at birth age 18-44 years had been pregnant during this episode of homelessness; 8% reported a current pregnancy.

**◼ Despite these health challenges, participants had poor access to healthcare.** While 83% of participants reported having health insurance (primarily Medicaid); half (52%) reported a regular non-emergency department (ED) source of care. Half (49%) had seen a health care provider outside the ED in the prior six months. Almost one quarter (23%) reported an inability to get needed healthcare in the prior six months.

**◼ Participants had high rates of acute and emergent health service utilization.** In the prior six months, 38% reported an ED visit that didn't result in a hospitalization; 21% reported a hospitalization for a physical health concern and 5% for a mental health issue.

**◼ Many participants had symptoms of mental health conditions; few had access to treatment.** Participants noted how the stresses of homelessness exacerbated their mental health symptoms. Two thirds (66%) noted symptoms of mental health conditions currently, including serious depression (48%), anxiety (51%), trouble concentrating or remembering (37%), and hallucinations (12%). Only 18% had received non-emergent mental health treatment recently; 9% had received any mental health counseling and 14% any medications for mental health conditions.



DOJ-HUD-AR00760

⬤ **Substance use, particularly methamphetamine use, was common; few received treatment.** Many participants reported using drugs and alcohol to help them cope with the circumstances of homelessness. Almost one third (31%) reported regular use of methamphetamines, 3% cocaine, and 11% non-prescribed opioids. Sixteen percent reported heavy episodic drinking. Nearly one quarter (24%) noted that substance use currently caused them health, legal, or financial problems. Approximately equal proportions reported that their use of drugs had decreased, stayed the same, or increased during this homelessness episode. Six percent of participants reported receiving any current drug or alcohol treatment. Twenty percent of those who report current regular use of illicit drugs or heavy episodic alcohol use reported that they wanted treatment, but were unable to receive it.

⬤ **Criminal justice involvement and experiences of violence were common.** Nearly one third (30%) of participants reported a jail stay during this episode of homelessness. Participants reported that homelessness left them more vulnerable to violence. More than one third of all participants (38%) experienced either physical (36%) or sexual (10%) violence during this episode of homelessness. Ciswomen (16%) and transgender or non-binary individuals (35%) were more likely to experience sexual violence.

⬤ **Participants noted substantial disconnection from labor markets, but many were looking for work.** Some of the disconnection may have been related to the lack of job opportunities during the pandemic, although participants did report that their age, disability, lack of transportation, and lack of housing interfered with their ability to work. Only 18% reported income from jobs (8% reported any income from formal employment and 11% from informal employment). Seventy percent reported at least a two-year gap since working 20 hours or more weekly. Of all participants, 44% were looking for employment; among those younger than 62 and without a disability, 55% were.

## BARRIERS AND FACILITATORS OF RETURNS TO HOUSING

**Next, we examined what prevented participants from re-entering housing.** While participants faced many barriers to returning to housing, the primary one was cost. Participants overwhelmingly wanted permanent housing, but they had conflicting feelings about emergency shelter.

⬤ **Nearly all participants expressed an interest in obtaining housing, but faced barriers.** Nearly 9 in 10 (89%) participants noted housing costs as a barrier to re-entering permanent housing. Other barriers included lack of necessary documentation, discrimination, prior evictions, poor credit history, challenges associated with physical or behavioral health conditions, and family considerations (such as having enough space for their children).

© Sam Comen



DOJ-HUD-AR00761

**■** Participants were not receiving regular assistance, such as housing navigation, to help them exit homelessness. Fewer than half (46%) had received any formal assistance to re-enter housing during their episode of homelessness. Only 26% received assistance monthly or more frequently in the prior six months. Two thirds of participants believed that their lacking assistance was a barrier in their re-entering housing.

**■** Participants believed that financial assistance would help them obtain housing and exit homelessness. Eighty-six percent thought that a monthly subsidy of $300-$500 a month would help them re-enter housing. Ninety-five percent thought a lump-sum payment of $5,000-$10,000 would help them. Ninety-six percent thought that a Housing Choice Voucher (or similar rental subsidy) would help them re-enter housing.

## POLICY RECOMMENDATIONS

Based on these findings, we offer policy recommendations. The full report presents more detailed recommendations; we list our top six here:

**1** Increase access to housing affordable to extremely low income households (those making less than 30% of the Area Median Income) through (1) supporting production of housing (e.g., Low Income Housing Tax Credits, leveraging land use tools), (2) expanding availability of rental subsidies (e.g., Housing Choice Vouchers), and (3) supporting their use on the rental market (e.g., increase housing navigation services, create and enforce anti-discrimination laws).

**2** Expand targeted homelessness prevention (e.g., financial support, legal assistance) at service settings (e.g., social service agencies, healthcare settings, domestic violence services, community organizations) for both leaseholders and non-lease holders. Expand prevention and transition services at institutional exits (jails, prisons). Expand and strengthen eviction protections.

**3** Provide robust supports to match the behavioral health needs of the population by (1) increasing access to low barrier mental health, substance use, and harm reduction services during episodes of homelessness (including unsheltered settings) and (2) appropriately staffing permanent supportive housing with evidence-based models (e.g., pathways to housing, assertive community treatment, and intensive case management) that meet the needs of the population.

**4** Increase household incomes through evidence-based employment supports (e.g., training, transportation) and affirmative outreach to support increasing receipt of benefits.

**5** Increase outreach and service delivery to people experiencing homelessness, including a focus on unsheltered settings.

**6** Embed a racial equity approach in all aspects of homeless system service delivery. Ensure that prevention activities and coordinated entry prioritization schemes address racial inequities; and that service delivery is conducted in a way that support racial equity.



DOJ-HUD-AR00762



© Sam Comen

DOJ-HUD-AR00763

## INTRODUCTION

**California is home to the largest population of people experiencing homelessness in the United States.**

More than 171,000 people experience homelessness daily in California, two times more than the next highest state. While 12% of the overall United States population lives in California, 30% of the nation's homeless population and half the nation's unsheltered population (those living outside, in vehicles, or in places not meant for human habitation) reside here. There are many conflicting ideas about how homelessness became a crisis in California and what to do about it. To determine effective policies, we need to understand who is experiencing homelessness, how they came to be homeless, what their experiences are while homeless, and what is preventing them from returning to housing.

The University of California, San Francisco (UCSF) Benioff Homelessness and Housing Initiative (BHHI) conducted the California Statewide Study of People Experiencing Homelessness (CASPEH). The CASPEH is the largest representative study of homelessness conducted in California and the largest representative study of homelessness in the United States since the mid-1990s. The study examined the characteristics and experiences of adults experiencing homelessness, the precipitants of homelessness, the barriers and facilitators to exiting homelessness, the impact of the COVID-19 pandemic on homelessness, and the opportunities to better prevent and end homelessness in California. By recruiting a representative sample of all California adults experiencing homelessness and by using a combination of questionnaires and in-depth interviews, we provide an accurate picture of the homelessness crisis and its impact on the adults who experience it. We intend for this work to help the public understand the myriad causes and consequences of homelessness and to shape policy conversations about potential solutions.

DOJ-HUD-AR00764

## STUDY OVERVIEW AND METHODS

The research team used best practices to recruit a representative sample of all adults experiencing homelessness in California, whether they be young or old, in family units with children or single, sheltered or unsheltered, and using services or not. Thus, the sample accurately represents all adults experiencing homelessness regardless of service use, living situation, family structure, or language spoken. The study used questionnaires to determine accurate data on the proportions of people who report certain experiences. In addition, the study used in-depth interviews to understand how and why participants experienced what they did.

To guide our work, we convened community advisory boards consisting of those with lived experiences of homelessness and those involved in policy and practice. These boards played a critical role at every stage of the process. Designed to be representative of all adults 18 years and older experiencing homelessness in California,[1] the study includes nearly 3,200 administered questionnaires and 365 in-depth interviews with adults experiencing homelessness in counties representing eight regions (Figure 1). In partnership with a wide array of community stakeholders, the UCSF BHHI team collected data between October 2021 and November 2022.

The study received approval from the UCSF Institutional Review Board. All study staff underwent extensive training in research methods and received certification in ethical conduct of research. The study was funded by the UCSF Benioff Homelessness and Housing Initiative, the California Healthcare Foundation (CHCF), and Blue Shield of California Foundation (BSCF). UCSF conducted the study at the request of the California Health and Human Services Agency Secretary Mark Ghaly. The study did not receive funding from the State of California. UCSF BHHI takes responsibility for the findings. Neither CHCF, BSCF, nor the State of California had a role in analyzing the data or interpreting the findings.

### Study Population and Eligibility

The California Statewide Study sought to understand the experiences of all adults experiencing homelessness in California. Eligible participants were at least 18 years old and homeless, as defined by the Homeless Emergency Assistance and Rapid Transitions to Housing (HEARTH) Act.[2] All participants provided informed consent prior to study participation.

> Representative of all adults 18 years and older experiencing homelessness in California, the study includes nearly 3,200 administered questionnaires and 365 in-depth interviews with adults experiencing homelessness in eight counties representing eight distinct regions.

DOJ-HUD-AR00765

**FIGURE 1** Map of the Eight Study Regions



- Northern California
- Inland California
- Northern Central Valley
- Outer Bay Area
- Inner Bay Area
- Southern Central Valley
- Central Coast and Southern California
- Los Angeles

DOJ-HUD-AR00766

INTRODUCTION

## Venue-Based and Respondent-Driven Sampling Methods

To provide a representative sample, we divided California into eight regions (Figure 1). Using a variety of data inputs to choose counties within a region that would allow us to draw conclusions about all adults experiencing homelessness in California, we chose one county in each region (Figure 1). With these methods, the counties together stand in for every county across California.

To ensure representativeness within each county, we used venue-based sampling supplemented by respondent-driven sampling (RDS) to recruit participants. In venue-based sampling, we developed a list of places where people experiencing homelessness may be found (encampments, shelters, free and low-cost food programs, showers, and community centers) and selected a random sample of these places. Within each venue, we selected a random sample of people to interview based on the number of people who were present at the time of our visit.[3]

Respondent-driven sampling seeks to recruit people from populations who are likely to be missed during venue-based sampling. Our Advisory Boards recommended we use RDS to find young adults, LGBTQ adults, farmworkers, and residents at domestic violence shelters. With the help of community members who have connections to these groups, we recruited study participants, administered the survey to them, and then asked them to help us recruit other people in their networks. This process continued with participants referring us to members of their communities who then referred us to others.

Using information on all who were eligible and all who participated, we weighted responses to generate statewide estimates.[4]



Photo: Barbara Ries

## Administered Questionnaires

Trained research staff administered questionnaires to 3,198 participants, covering topics including demographics, prior and current living situation, employment, income, precipitants of homelessness, barriers to re-entering housing, physical and mental health, work, criminal justice involvement, experiences of violence, experiences of discrimination, and service utilization (e.g., health, mental health, homelessness, benefits, etc.) (Table 1). We designed the questionnaire to understand who was homeless, how participants came to be homeless, what happened to them when homeless, and what was preventing them from exiting homelessness.

Study staff administered questionnaires in person using internet-enabled tablets. For select participants staying in domestic violence shelters, staff conducted surveys via telephone to protect privacy. We conducted interviews in English (95%) and Spanish (5%). For a few interviews (<1%), staff conducted interviews with trained interpreters (American Sign Language and Russian). Interviews lasted 45-60 minutes.

> We designed the questionnaire to understand who was homeless, how participants came to be homeless, what happened to them when homeless, and what was preventing them from exiting homelessness.

DOJ-HUD-AR00767

**TABLE 1** Overview of Questionnaire Domains and Location(s) in Report

| Questionnaire Domain | Content Summary | Chapter(s) |
|---|---|---|
| Demographics | Race, gender identity, sexual orientation, education, relationship status, place of birth, chronic homelessness, household status, size | 1 |
| Housing Trajectories | Qualities of last housing prior to homelessness, including where they lived, tenure, when they left, and institutional entries and exits | 2 |
| Precursors and Precipitants to Homelessness | Qualities of last housing: owned/rent, leaseholder status, housing costs, rental assistance, circumstances of exiting last housing (e.g., notice prior to leaving, reasons for leaving) | 2 |
| Homelessness Prevention | Help sought and/or received prior to homelessness, scenarios that might have prevented homelessness | 2 |
| History of Homelessness | Previous experiences of homelessness, age when first experienced homelessness | 1 |
| Returns to Housing | Barriers and resources that would help exit homelessness | 4 |
| Housing Services | Instrumental support during this episode of homelessness | 4 |
| Living Situation | Sheltered and unsheltered locations during this episode (limited to past six months) | 3 |
| Income, Employment, and Benefits | Income before and during homelessness, employment changes prior to homelessness, current employment and employment barriers, receipt of social safety net benefits | 3 |
| Healthcare Access and Utilization | Health insurance, regular place for healthcare, ambulatory care, emergency department use, hospitalization, unmet needs for healthcare | 3 |
| Physical Health | Health status, chronic disease, disability, functional status, COVID-19 | 3 |
| Pregnancy and Children | Pregnancy history, minor children, custody | 1, 2, 3 |
| Carceral System | Involvement with the criminal justice system (lifetime, prior to homelessness, during homelessness), re-entry support, interactions with police | 1, 2, 3 |
| Mental Health | Mental health symptoms (lifetime, prior to homelessness, current). Receipt of mental health treatment (ambulatory and hospitalization) prior to and during episode | 1, 2, 3 |
| Substance Use | Substance use (tobacco, alcohol, cocaine, methamphetamine, opioids) before and during homelessness, unmet treatment needs, changes in use with homelessness, treatment | 1, 2, 3 |
| Interpersonal Violence | Physical, emotional, or sexual violence (lifetime, prior to, and during homelessness) | 1, 2, 3 |
| Discrimination | Discrimination before and during homelessness | 1, 2, 3 |

DOJ-HUD-AR00768

**INTRODUCTION**

**TABLE 2** In-Depth Interview Sub-Studies, Objectives, and Number of Participants

| In-Depth Interview Topic | Objective | Number of Participants |
|---|---|---|
| **Barriers to Returns to Housing** | To understand the challenges that participants face in returning to permanent housing | 65 |
| **Behavioral Health Among People Experiencing Homelessness** | To understand the impact of behavioral health issues on participants' experience of homelessness and the deleterious effects of homelessness on behavioral health | 58 |
| **Precipitants of Homelessness** | To understand the precursors of homelessness and identify opportunities for homelessness prevention | 66 |
| **Black Experiences of Homelessness** | To understand Black Californians' experiences of homelessness, with an emphasis on the effects of anti-Black racism | 50 |
| **Latino/x[6] Experiences of Homelessness** | To understand Latino/x populations' experiences of homelessness | 35 |
| **Incarceration and Homelessness** | To understand the interconnectedness between experiences of incarceration and/or other criminal legal contact and homelessness | 41 |
| **Intimate Partner Violence (IPV) and Homelessness** | To understand the relationship between intimate partner violence and homelessness | 50 |



Photo: Barbara Ries

## IN-DEPTH INTERVIEW SUB-STUDIES

To understand the full context of participants' experiences, we conducted 365 in-depth interviews in seven sub-studies. In these in-depth interviews, we asked a series of open-ended questions, which allowed participants to share their experiences. The research team selected participants for in-depth interviews based on their questionnaire responses and the researcher's assessment that the participant would be able to discuss the interview topic at length. Staff audio-recorded all in-depth interviews and trained transcriptionists created written transcripts. We coded and analyzed all of the in-depth interviews. See Table 2 for more details on the interviews.

DOJ-HUD-AR00769

## COMMUNITY-ENGAGED PRACTICES

Our team committed to community-engaged practices throughout the study. We relied on the expertise of three advisory boards: the Lived Expertise Advisory Board (a group of individuals with lived experiences of homelessness); the Learning Collaborative Advisory Board (a group of leaders from each of the representative regions); and the Policy and Practice Advisory Board (a group of local, state, and national government partners, service providers, and members of advocacy groups). These boards provided feedback on questionnaires and qualitative interview guides, provided region-specific expertise during study implementation, interpreted findings, and partnered with us to disseminate findings.

To collect data, we partnered with community workers with lived experience of homelessness and knowledge of homelessness in their communities to help with study administration. Supporting outreach and recruitment efforts, they served as integral members of the study staff team.

## ABOUT THE REPORT

This report summarizes our main findings, organized by the pathways that lead to homelessness to highlight that homelessness is an experience people have—not an indicator of their character. Chapter 1 provides an overview of who experiences homelessness in California. Chapter 2 discusses our findings on how people became homeless, with a focus on what was happening prior to their current episode of homelessness and opportunities for prevention. Chapter 3 describes the experience of homelessness, with attention to the health and safety of those experiencing homelessness. Chapter 4 focuses on individuals' interactions with the homelessness system and the barriers they faced to regaining housing. Finally, in Chapter 5, we present policy recommendations.

Throughout this report, we use vignettes, drawn from our in-depth interviews, to help readers understand the experience of study participants. A widely-used approach for illustrating themes in qualitative research, such vignettes draw on a composite of several participants' common experiences. We created composite experiences to protect privacy and to elucidate the range of experiences shared by multiple participants.

> We partnered with community workers with lived experience of homelessness and knowledge of homelessness in their communities to help with study administration. Supporting outreach and recruitment efforts, they served as integral members of the study staff team.

### A NOTE ON TERMINOLOGY

We use several terms to describe our participants and their housing status. These terms include: people experiencing homelessness (or PEH), homeless, unhoused, and unsheltered.

We define these terms as follows:

- **People Experiencing Homelessness:** A human-centered alternative to the term homeless, people experiencing homelessness centers the person and their experience with housing.

- **Homeless:** Refers to the circumstances of not having a permanent indoor place to sleep.

- **Unhoused:** Refers to not having a permanent indoor place to sleep.

- **Unsheltered:** Refers to living in an area not meant for human habitation such as a sidewalk, a park, or a car.

DOJ-HUD-AR00770



© Sam Comen

DOJ-HUD-AR00771

## CHAPTER 1

# WHO Experiences Homelessness in California?

## Overview

In their book, *Helping America's Homeless: Emergency Shelter or Affordable Housing*,[6] Martha Burt and Laudan Aron note that homelessness arises because of an interaction between structural factors (such as the availability of affordable housing or income inequality), individual factors that increase a person's risk of becoming homeless (such as substance use, mental health challenges, or childhood adversity), and the presence or absence of a social safety net (unemployment income, publicly funded healthcare).



*I've met some really good people [out here]… Everybody out there in the real world is one paycheck away from being homeless.*

— CASPEH participant

When structural conditions are favorable and there is a strong safety net, fewer people become homeless, and those that do tend to be only those with many individual risk factors. When structural conditions are unfavorable and there isn't a strong safety net, those with fewer individual vulnerabilities become homeless as well. In the United States, structural conditions are unfavorable. Income inequality is the widest it has been in decades.[7] There is an enormous wealth gap by race (the median white family had $184,000 in wealth in 2019 compared to just $38,000 and $23,000 for the median Hispanic and Black families, respectively).[8] Only 33 units of housing are affordable and available for every 100 extremely low-income households (those who make less than 30% of the area median income) in the United States; in California, there are only 24.[9] Our safety net is frayed, with only one in four households who qualify for rental housing subsidies nationwide receiving them, time-limited unemployment benefits, and other gaps. Thus, in the United States in 2023, many who become homeless do not have significant individual vulnerabilities, but those with individual vulnerabilities are at an even higher risk.

When someone asks "Who experiences homelessness?" it is easy to conflate two different questions. As they explain in their book, *In the Midst of Plenty: Homelessness and What to Do About It*,[10] Marybeth Shinn and Jill Khadduri note that you will get different answers depending on which question you ask: "Why do some people become homeless?" or "Why do so many people become homeless?" The former question will lead to answers about individual characteristics, and the latter will lead to answers about structural conditions. Sometimes, people confuse these and answer one (why are so many people homeless) with an answer better suited for the other. In their book, *Homelessness is a Housing Problem*,[11] Gregg Colburn and Clayton Page Aldern help us understand this distinction by using the analogy of musical chairs, reminding us that the game starts with an equal number of chairs and players who walk around those chairs. At some point, someone pulls away a chair and stops the music, and the players scramble for the remaining chairs. Imagine a game where one player had sprained their ankle the night before, and played walking with crutches they don't know how to use. In this analogy, players are people in an area, chairs are housing, and the player with the sprained ankle is someone with an

DOJ-HUD-AR00772

individual vulnerability. If you had to guess who would be standing when the music stops, you would guess it would be the person on crutches. That helps answer the question: Why is this person standing? But, if you ask a different question: Why is there someone standing? They are standing because there are only 9 chairs. If there had been 10 chairs, everyone would be sitting. If no one had sprained their ankle and yet you only had 9 chairs, either two people would be sitting on one another, or *someone* would be standing. As we will explain, the reason California has so much homelessness is that we don't have enough "chairs"—in this case, housing affordable to the lowest income households. But, when we ask who is homeless, we find that those with certain individual vulnerabilities to homelessness—either because of a health condition or exposure to structural racism—are at increased risk of homelessness.

In this chapter, to answer the question "Who is experiencing homelessness in California?" we examine the demographic characteristics of CASPEH participants including age, family structure, partner status, race and ethnicity, place of origin, gender, and sexual orientation. To set the stage for later chapters, we explore where study participants were living, for how long they had been homeless, and their experiences of trauma, mental health conditions, and substance use throughout their lives.

Due to the ongoing impact of structural racism, homelessness disproportionately impacts racially marginalized communities, including Black and Indigenous people. We report on the very high rates of prior trauma in those who experience homelessness. We describe the high proportion of people who have experienced mental health and substance use challenges. We recognize that many characteristics that increase one's risk for homelessness are intertwined. For example, experiencing trauma, such as sexual or physical violence, increases one's risk for having substance use and mental health problems. Those who face structural vulnerabilities, having less access to resources throughout their lives, are at higher risk of developing health problems. In calling out these issues, we point out how they interact with one another. In noting them, we are not saying

that these experiences are responsible for someone becoming homeless, nor are we answering the question: "why are there so many people experiencing homelessness?" Rather, we are recognizing that in a state with far too few "chairs," it is important to know who has been left standing.

## WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA?

### Family Structure

One way that policymakers and researchers categorize people experiencing homelessness is through family structure. In alignment with the federal definitions of homeless adults, we classified people as belonging to one of three family structures: single homeless adults (adults 25 and older who are not living with minor children); adults in homeless families (adults living with minor children); and transition age young adults (TAY; young adults aged 18-24 not living with minor children). Ninety percent of our sample were single adults, 7% were adults in families, and 3% were TAY. Throughout the report, when appropriate, we will present data by family structure, as these groups have different needs and experiences.

Children and youth younger than 18 are an important contingent of people experiencing homelessness. However, our study did not attempt to capture the experience of children and youth younger than 18. This leads to several key differences with the Point in Time Count (PIT), which presents data on "people in homeless families," including both adults and minor children. Because our study included adults only, it has a lower proportion of people in families than the PIT. Further, when the PIT and others discuss TAY, they typically include those 12-24 experiencing homelessness without a caregiving adult. For our purposes, we included only those aged 18-24 and call them transition age young adults. Prior research suggests that aging out of institutions (such as the child welfare system ["foster care"] and juvenile detention), complex family situations, and holding a gender or sexual minority identity increase risk for homelessness among TAY.

DOJ-HUD-AR00773

## Older Adults

California's homeless population is aging, with the proportion of older adults (defined as adults older than 50) in the state's homeless population increasing. Among single homeless adults, 48% were 50 and older. Among single adults 50 and older, 41% became homeless for the first time at age 50 or older.

**FIGURE 2** Age Distribution of CASPEH Participants



- 18-24 years
- 25-39 years
- 40-49 years
- 50-64 years
- 65+ years

7%  4%

29%

37%

24%

Cumulative percentage does not equal 100% due to rounding.

## Age

The CASPEH sought to understand the experiences of homeless adults (18 years and older). Participants ranged from 18 to 89 years of age. The median age of participants was 47 years, with an interquartile range[12] (IQR) of 37 to 56 years. The median age of single adults was 49 (IQR 38 - 57), 36 (IQR 29-42) for adults in families, and 22 (IQR 21-23) for TAY. Overall, 4% of participants were between 18 and 24 and 44% were 50 and older. Figure 2 presents the age distribution of participants.

## Adults with Minor Children

Seven percent of participants met the federal definition of being adults in homeless families. Adults living in homeless families had a median of 1 child living with them (range 1-6). The median age of children living in homeless families was 7 (IQR 2-12). Twenty-six percent of children living in homeless families were aged two or younger. In keeping with the federal definition, we included only adults with minor children (younger than 18) currently living with them as adults in homeless families.

Many adults experiencing homelessness have minor children, but those children aren't staying with them. We found that an additional 27% of participants had children (younger than 18) who were not currently living with them (30% of single adults and 8% of TAY). There are many reasons why parents who experience homelessness may not be living with their children. Among all participants, 18% reported having ever lost custody of a child to Child Protective Services (CPS); 11% reported they currently did not have custody of a minor child due to their child being removed by CPS. Homelessness can increase the chance that CPS removes a child from a parent's custody. In addition, parents may make the difficult decision to temporarily give up custody of their children due to struggles with housing—either because they cannot find a place where both they and their children can stay, or because they have a place where their child can stay, but not themselves. Faced with the difficult decision to remain with one's child or have the child not be homeless, some parents make the decision to separate from their child. We found that 11% of all participants (24% of all women) had voluntarily given up primary caretaking responsibilities due to housing instability or homelessness at some point in their lives. Currently, 8% of all participants (10% of those younger than 60) reported that they had given up custody of their minor children temporarily because they were homeless. This was more common in women than men (19% of women younger than 60 and 6% of men younger than 60).

DOJ-HUD-AR00774

Although some participants had lost custody of their children to CPS, others asked relatives to care for their children so that they would not be exposed to the challenges of being homeless. For example, after describing how she had lost her housing due to a substantial rent increase, a participant added: "So, I wound up homeless. My son had to go stay with his dad. And it wasn't fair to my son." Many of these parents maintained contact with their children and put aside money to purchase small gifts for when they visited them. These parents expressed a determination to improve their housing situation so that they could live with their children.

### Current Marital or Partner Status

More than half of participants (57%) were currently single and never married, while 23% were either married or partnered. Twenty-one percent of participants were divorced, separated, or widowed (18% divorced or separated and 3% widowed).

### Race

We asked participants to share their racial identities (Figure 3). Unlike the PIT, which asks one question about racial identity and a separate question about Hispanic origin, we constructed one race measure. Our race measure treats Latino/x participants as a racial group rather than an ethnicity and includes expanded racial categories. Along with allowing participants to choose all that apply, we include the category "multiracial." These differences mean that our race data cannot be compared to the PIT or general population estimates. For the purpose of description, in this section we provide a breakdown of racial groups in two ways: the percentage of our sample who identified a racial group as their sole racial identity and the percentage of our sample who identified a racial group as one of their racial identities. Separately, we constructed categories around those who chose: (1) white only, (2) Black only or Black and another racial group,[13] (3) Latino/x only, (4) more than one racial group or the multiracial category, (5) Native American/Indigenous or Indigenous to Mexico, Central or South America, (6) Asian American or Pacific Islander[14] (Figure 3).

Across our sample, 27% of participants identified as white and 26% as Black or African American (20% selected Black as their sole racial identity and 6%

selected Black as one of their racial identities). Thirty-five percent of participants identified as Latino/x (26% identified Latino/x as their sole racial identity and 9% as one of their racial identities). Twelve percent of our study participants identified Native American, Alaskan Native, or Indigenous to Mexico, Central or South America as one of their racial identities (3% selected Native American/Alaskan Native only; 0.15% selected Indigenous to Mexico, Central or South America only; 8% selected Native American and some other racial group; 1% selected Indigenous to Mexico, Central or South America and some other racial group). Asian or Pacific Islanders made up 3% of our sample (2% selected Asian or Pacific Islander as their sole identity and 1% as one of their identities.). Twenty-two percent of all participants identified as either more than one race or multiracial. The most common answers for those who marked more than one racial group were: Native American/Indigenous and White; Latino/x and White; and Latino/x and Native American/ Indigenous.



**FIGURE 3** Racial Identities of CASPEH Participants

● White   ● Black   ● Latino/x   ● Multiracial
● Native American/Indigenous   ● AAPI   ● Other

27%
<1%
2%
3%
15%
26%
26%

Twenty percent identified Black as their sole racial identity; 6% as one of their racial identities.

DOJ-HUD-AR00775

### UNDERSTANDING RACE AND ETHNICITY IN THE CASPEH

In order to measure the lived experience of race for CASPEH participants, our team decided to include a race and ethnicity measure that differs from the race and ethnicity domains on the Point-in-Time Demographic Survey. The Point-In-Time Demographic Survey follows the United States Census in asking two separate questions about race and Hispanic origin: a five-category measure of race ([1] White, [2] Black or African American, [3] American Indian or Alaska Native, [4] Asian, and [5] Native Hawaiian or Other Pacific Islander) and a two-category measure of Hispanic origin ([1] Hispanic or [2] Non-Hispanic.) There is a debate about whether this is the best way to categorize race and ethnicity in the United States. Scholars point out that the socially constructed five-category measure of race is an imperfect reflection of the way that people live race in their daily lives, flattening and concealing in-group variation and inequality. With regard to the Hispanic origin measure, scholars note that Latino/Latina/Latinx, Hispanic, or Latin American are ways that people racially identify and differentiate themselves from other racial groups.[15]

In our quest to represent people's lived experiences of race as accurately as possible, our team made the decision to use a single nine-measure race domain that treats those who identify as Latino/x or Hispanic as a racial group and includes expanded racial categories. These categories are: Black, African-American, African; White, Caucasian, or European-American; Native American or Alaskan Native; Pacific Islander, Samoan, or Hawaiian; Asian or Asian-American; Latino/Latina/Latinx, Hispanic, or Latin American'; Indigenous from Mexico/Central/South America; 'Mixed/Multiracial'; or 'Other.'

While these changes make it difficult to compare our race data one-to-one with the Point-In-Time Count, we believe it reflects the daily lived experience of race in California and elsewhere more accurately.

Black Californians were overrepresented among older homeless adults compared to those in younger age brackets. One in three (31%) adults aged 50 and older identified as Black compared to 23% of participants younger than 50 years.

### Birthplace and Where Participants Lived Prior to Homelessness

Despite conjecture that people move to California once homeless, our data did not support this. In fact, most participants did not move far from where they last were housed. Ninety percent of participants became homeless in California, having been last housed in the state. People who experience homelessness in California *are* Californians. Three-quarters (75%) of participants lived in the same county where they were last housed; 3% were homeless in a nearby county within the same census region. Eleven percent stayed within California, but lived in a different census region from where they lost their housing.

Most participants (87%) were born in the United States. One-quarter (28%) of Latino/x, 60% of AAPI, and 52% of "other" respondents were born outside of the United States. Two-thirds (66%) were born in California.

### Gender

Sixty-nine percent of all participants identified as cisgender men; 30% identified as cisgender women; and 1% identified as non-binary, transgender, or gender non-conforming (Figure 4).[16] The proportion of non-binary, transgender, or gender non-conforming participants was higher among TAY (6%). While adults in homeless families are thought to be primarily women, we found that 34% of participants experiencing homelessness with their minor children were cisgender men.

### Sexuality

Nine percent of participants identified as lesbian, gay, bisexual, pansexual, queer, or another non-heterosexual sexual identity. Transition age young adults were more likely to identify with these identities. While a similar proportion of single adults (9%) and adults in families (9%) did, one in five (19%) of TAY did.

DOJ-HUD-AR00776



**FIGURE 4** Gender Identities of CASPEH Participants by Family Structure

● Cisgender men   ● Cisgender women   ● Transgender/non-binary/gender non-conforming

| | Cisgender men | Cisgender women | Transgender/non-binary/gender non-conforming |
|---|---|---|---|
| All | 69% | 30% | 1% |
| Single adults | 72% | 27% | 1% |
| Adults in families | 34% | 66% | 0% |
| TAY | 64% | 30% | 6% |

### Education

Two-thirds of all participants (63%) had at least a high school diploma or equivalent. Twenty-nine percent held a high school diploma or GED, 24% had some college-level education (but did not obtain a degree), and 10% held a college degree (Associates or Bachelors). Single adults reported education beyond high school (26% some college and 11% a college degree) more frequently than adults in homeless families or TAY.

### Veteran Status

There has been substantial progress preventing and ending homelessness among United States Veterans in the last decade. Still, 6% of participants report having served in the military (active duty). An additional 0.4% reported serving in the reserves or National Guard (and not active duty).

### Prior Experiences of Homelessness and Length of Current Episode

Participants reported recurrent and lengthy episodes of homelessness. Less than half of participants were in their first episode of homelessness. Thirty-nine percent of participants indicated their current episode of homelessness was their first episode. Adults in families (54%) were more likely to report that this is their first episode of homelessness than single adults (38%) and TAY (35%).

The median length of the current episode of homelessness was 22 months. Those in their first episode had been homeless longer than those with prior episodes. For those who experienced homelessness

before, the median length of their current episode was 16 months, compared to 34 months for those in their first episode.

Participants first became homeless as an adult at the median age of 33 (IQR 21-45). Those who had a prior episode of homelessness reported first experiencing homelessness at the median age of 28 (IQR 18 - 39). For those in their first episode of homelessness, the median age when they first became homeless was 41 (IQR 33-52). Among single adults 50 and older, 41% had their first episode after age 50.

A small proportion (4%) reported having experienced childhood homelessness along with their caregivers (before the age of 18). This was more common among TAY (13%) than adults in homeless families (4%) and single homeless adults (4%).

### Chronic Homelessness

Chronic homelessness is defined as both (1) experiencing homelessness for at least 12 months or having four or more episodes of homelessness in the prior three years that together total more than 12 months and (2) having a disabling condition. More than one third (36%) of participants met criteria for chronic homelessness. Single adults were more likely to experience chronic homelessness (37%) compared to adults in families (26%) and TAY (23%). Were chronic homelessness defined only based on the time period (rather than requiring having a disabling condition), more would qualify: 75% of single adults, 62% of adults in families, and 74% of TAY.

DOJ-HUD-AR00777

## THE DISPROPORTIONATE BURDEN OF HOMELESSNESS

People who are members of populations marginalized by racism and colonization face economic and structural disadvantages. These structural disadvantages lower the threshold for people who face them to become homeless and prolong episodes by creating barriers to exiting homelessness. Racially marginalized populations are at higher risk for experiencing homelessness due to historical and ongoing structural racism and discrimination. We found that Black and Indigenous participants were overrepresented compared to their representation in the general population in California. Because there are different methodologies for measuring race, it is difficult to make direct comparisons between CASPEH participants and California's overall population. With that said, 26% of participants reported Black as one of their racial identities; among Californians of all ages, 7% did. Twelve percent of participants identified Native American/Alaskan Native as one of their racial identities; among Californians of all ages, 3% did.[17][18] The 2022 PIT count found that homelessness in the Latino/x community is increasing. We defined Latino/x differently than the Census or the PIT count, making comparisons difficult. In our study, 35% of study participants identified as Latino/x (26% as the sole identity and 9% as Latino/x and another identity).[19]

## EXPERIENCES OVER THE LIFE COURSE

Homelessness does not happen in a vacuum. It occurs in conjunction with structural conditions that produce and reproduce inequalities. These conditions include high housing costs, low wages that do not keep pace with inflation, the steady disappearance of jobs from low-income neighborhoods, the consequences of mass incarceration on families, and the ongoing effects of classism, racism, sexism, homophobia, and transphobia on people's life chances. Individual vulnerabilities—like substance use and mental health conditions—interact with these structural conditions. At the beginning of the chapter, we reviewed how homelessness is an interaction between structural conditions, individual conditions, and the presence or absence of a safety net. When structural conditions are worse and

there isn't a safety net, people with fewer individual vulnerabilities become susceptible to homelessness. However, the relationship between structural conditions, individual experiences, and homelessness is complex—as unequal structural conditions not only create the overall risk for homelessness, but they also increase the risk of having, and severity of, individual vulnerabilities. To understand CASPEH participants' experiences of homelessness, we have to understand their experiences of trauma, stress, mental health, substance use, and incarceration over the life course. In this section, we share some key common experiences that participants had over the life course, including exposure to trauma, incarceration, mental health challenges, and substance use. We reflect on how these experiences amplify and reinforce one another and leave participants at higher risk of experiencing homelessness.

### Discrimination, Exposure to Violence, and Incarceration

In in-depth interviews, participants shared stories of discrimination and exploitation that impacted their daily lives and abilities to thrive throughout their lives. Participants faced repeated barriers to meeting their basic needs and bureaucratic hurdles to receiving help. Living in communities with few employment options, they reported experiencing exploitation and discrimination on the job market and in other aspects of their lives. Because of their constrained choices, they faced numerous impediments to thriving.

Our survey data revealed that participants experienced high rates of interpersonal violence (Figure 5). Nearly three quarters (72%) of participants reported a lifetime experience of physical violence; 24% reported experiencing sexual violence. Physical violence was common among both cisgender men (70%), cisgender women (75%), and transgender/non-binary individuals (87%). Experiences of sexual violence were more common among cisgender women (43%) and trans/non-binary (74%) participants than cisgender men. Nearly half (49%) of all participants experienced physical or sexual violence before age 18; 45% reported experiencing physical violence and 15% sexual violence.

DOJ-HUD-AR00778

More than three quarters (79%) of participants had been incarcerated in jail or prison during their lifetime. More than one third (37%) spent time in prison, and 77% were incarcerated in jail.

Research shows that cumulative trauma exposure is linked to poor self-rated mental health as well as substance use disorders. It is not surprising that CASPEH participants had high levels of depression, anxiety, suicidal ideation, and substance use.

## Mental Health Over the Life Course

Because one can only receive a mental health diagnosis if one had access to healthcare, we asked about experiences of mental health symptoms over the lifecourse; using standard language, we described the conditions we asked about in addition to naming them. Because we wanted to focus on conditions that led to impairments in function, we asked about "serious symptoms" that lasted over a "significant period of time." We asked whether participants had ever experienced a "significant period in your life where you experienced" serious depression (sadness, hopelessness, loss of interest, difficulty with daily functioning); serious anxiety (uptight, unreasonably worried, inability to feel relaxed); hallucinations



© Sam Comen

(saw things, heard voices that others didn't hear or see); or trouble understanding, concentrating, or remembering (Figure 6).[20] Eighty-two percent of participants experienced one of these in their lifetime; depression (69%) and anxiety (69%) were the most common, but 23% reported having experienced hallucinations. Separately, we asked whether they had ever received a diagnosis of post traumatic stress disorder; one quarter (25%) said that they had.

To assess whether participants ever had a severe enough mental health crisis to lead to a hospitalization, we asked whether they had ever experienced a hospitalization for a mental health problem; 27% had. More than half (56%) reported that their first hospitalization had occurred prior to their first episode of homelessness. Fifteen percent of adults in families reported a mental health-related hospitalization, while 28% of single adults and 32% of TAY did.

One in three participants (31%) attempted suicide at some point in their lifetime. Twenty-one percent of adults in families reported a suicide attempt, while 32% of single adults and 32% of TAY did. Many factors are associated with the risk of suicide attempts—including individual factors (e.g., prior trauma, mental health, and substance use challenges); criminal legal involvement; relationship factors (e.g., social isolation or loss of relationships); and community factors (discrimination and poor access to healthcare).[21] Many of these are heightened among people experiencing homelessness. The high rates of attempted suicide reflect the many overlapping traumas that people who are homeless have experienced.



**FIGURE 5** Lifetime Experiences of Physical and Sexual Violence by Gender

● All  ● Cisgender men  ● Cisgender women
● Transgender/non-binary/gender non-conforming

Physical violence
72%
70%
75%
87%

Sexual violence
24%
15%
43%
74%

DOJ-HUD-AR00779



**FIGURE 6** Self-Reported Mental Health Conditions at Any Point in Participants' Lifetime by Family Structure

● Any mental health condition  ● Anxiety  ● Depression
● Trouble remembering, concentrating, or understanding  ● Hallucinations

**All**
| | |
|---|---|
| Any mental health condition | 82% |
| Anxiety | 69% |
| Depression | 69% |
| Trouble remembering | 49% |
| Hallucinations | 23% |

**Adults in families**
| | |
|---|---|
| Any mental health condition | 81% |
| Anxiety | 65% |
| Depression | 63% |
| Trouble remembering | 36% |
| Hallucinations | 8% |

**Single adults**
| | |
|---|---|
| Any mental health condition | 82% |
| Anxiety | 69% |
| Depression | 70% |
| Trouble remembering | 50% |
| Hallucinations | 24% |

**TAY**
| | |
|---|---|
| Any mental health condition | 77% |
| Anxiety | 68% |
| Depression | 68% |
| Trouble remembering | 51% |
| Hallucinations | 21% |

## Substance Use Over the Life Course

People who have experienced trauma (including violence and childhood adversity) and those with mental health problems are at higher risk of having substance use disorders. We asked participants to report their lifetime use of three classes of drugs (non-prescribed amphetamines [like methamphetamine], cocaine, and non-prescribed opioids) and to describe patterns of use (Figure 7). We asked participants if they ever used any of these substances three times a week or more frequently. Nearly two-thirds (65%) of participants reported ever using either amphetamines, cocaine, or non-prescribed opioids regularly (at least three times a week). More than half (56%) reported having had a period where they used amphetamines regularly, one third (33%) reported lifetime regular cocaine use, and one in five (22%) reported regular non-prescribed opioid use in their life. Among those who reported ever using any of these substances regularly, 64% reported having started to do so prior to their first episode of homelessness. We asked participants if they had ever used injection drugs; 26% had.

> Homelessness does not happen in a vacuum. It occurs in conjunction with structural conditions that produce and reproduce inequalities. Individual vulnerabilities—like substance use and mental health conditions—interact with these structural conditions.

DOJ-HUD-AR00780

To understand participants' experiences with alcohol, we asked participants if there was ever a time where they drank alcohol three or more times per week to the point where they felt buzzed or drunk, or drank less frequently but more heavily for short periods (like getting drunk on the weekends). By this measure, 62% reported this. Of these participants, 79% reported doing so prior to their first episode of homelessness.

We asked participants if they had ever had a non-fatal overdose, asking about episodes of overdose that required immediate medical attention, naloxone, or a visit to the emergency department. One in five (20%) participants indicated that they experienced an overdose during their lifetime. To assess whether drug or alcohol use had caused problems with function, we asked whether drug or alcohol use led to financial, health, social, or legal problems at some point in their lifetime. Half (47%) of participants indicated that it had.

To understand whether participants had ever received treatment for a drug or alcohol problem, we asked about receiving any type of treatment, including 12-step groups (such as Alcoholics Anonymous [AA] or Narcotics Anonymous [NA] groups), residential treatment, counseling, medications, or any other treatment to help with drug or alcohol problems. Among those who ever had regular use of any drugs or regular heavy alcohol use, 57% reported having ever received treatment. Finally, we asked whether they had ever wanted treatment but had been unable to access it, to understand whether they had encountered any barriers to treatment. Among those who ever had regular drug use or regular heavy alcohol use, 29% reported having ever wanted treatment for drugs or alcohol and had been unable to receive it.



**FIGURE 7** Proportion of Participants Who Reported Regular Substance Use Ever in Their Lives by Family Structure

● Any substance 3+ times a week  ● Amphetamines 3+ times a week
● Opioids 3+ times a week  ● Cocaine 3+ times a week

**All**
- 65%
- 56%
- 22%
- 33%

**Adults in families**
- 38%
- 35%
- 6%
- 15%

**Single adults**
- 68%
- 58%
- 23%
- 35%

**TAY**
- 57%
- 48%
- 35%
- 25%

DOJ-HUD-AR00781

## SUMMARY

In this chapter, we learned about who experiences homelessness in California. We found that the vast majority of adults who experience homelessness in California are single homeless adults, meaning those 25 and older living without minor children. However, we learned that many more had minor children but were living separately from them. The single adult homeless population in California is aging, with nearly half age 50 and older, 41% of whom had their first ever episode of homelessness after age 50. Adults in homeless families and TAY shared many similarities with single homeless adults, but had some key differences, including a much higher proportion of TAY young adults identifying as members of gender and sexual minority communities. Due to the ongoing impacts of structural racism, Black and Indigenous individuals are overrepresented in the adult homeless population. Due to different ways to assess racial and ethnic identity, we cannot make easy comparisons to census data for Latino/x adults.

Despite myths surrounding the homeless population, adults experiencing homelessness in California are Californian, with deep roots in the community. Most are experiencing homelessness in the same county as where they were last housed. Participants reported significant sources of trauma in their lives, much of it predating their homelessness, including experiences with physical and sexual violence and incarceration. Like many with these experiences, they reported high levels of both mental health distress and substance use. A high proportion reported episodes in their life with serious mental health symptoms, hospitalizations, and suicide attempts; a significant proportion reported periods of regular substance use and almost half reported that their substance use had caused them social, legal, or health problems. These findings give us a sense of who is experiencing homelessness in California.

### KEY TAKEAWAYS

- Single homeless adults comprise the vast majority of adults experiencing homelessness in California.

- Single homeless adults are aging, with nearly half age 50 and older.

- People experiencing homelessness in California are Californians. Ninety percent of our sample last lost their housing in California. Seventy-five percent of participants lost their housing in the same county in which they experienced homelessness.

- Once homeless, adults remain homeless for extended times. The median length of homelessness was nearly two years.

- One-third of adults met criteria for chronic homelessness.

- Ongoing impacts of structural racism place communities of color at increased risk for homelessness. Black and Indigenous communities are disproportionately impacted.

- Participants' lives were marked by multiple forms of stress and trauma, including violence and incarceration. Nearly three in four experienced physical violence, one in four experienced sexual violence, and three in four were incarcerated at some point in their lifetime.

- Substance use and mental health conditions were common. Many of these predated homelessness. One in five reported a history of a non-fatal overdose. Almost one third reported a lifetime history of a suicide attempt, reflecting the deep vulnerability of this population.

DOJ-HUD-AR00782



© Sam Comen

DOJ-HUD-AR00783

CHAPTER 2

# PATHWAYS to Homelessness

Understanding the context of people's lives prior to becoming homeless is necessary for designing policies to prevent and end homelessness. Homelessness is an experience that people have, not a statement of who they are. In this chapter, we seek to understand how people came to be homeless.

In the survey, we asked participants to report on experiences during the six months prior to their becoming homeless. The months before people become homeless are marked by tremendous stress. Challenges with health, mental health, and substance use can contribute to the descent into homelessness, but can also be caused by the stress of housing instability. We present findings on these aspects of the participants' life in the six months prior to homelessness (including their health, mental health, and use of substances) recognizing the complex interactions between these experiences and the subsequent loss of housing. Through our in-depth interviews, we learned how these experiences acted—as a cause of housing loss or an effect of stress of losing housing, or both.

We asked where participants were living, whether they had tenancy rights or other legal protections, the costs of their housing, and their income immediately prior to this episode of homelessness. We asked about the last place they stayed for at least a month right before their current episode of homelessness. For this analysis, we considered the last place individuals lived as the last non-institutional setting where they stayed for one month or more, or the last institutional setting where they stayed for three months.[22] We determined whether the non-institutional settings were places where they held a lease or mortgage[23] ("leaseholders") or not, such as a doubled-up situation ("non-leaseholders").

> **"**
>
> *The rent's so high in this town, it's unbelievable... If you had a minimum wage job you cannot pay your rent, and no one would let you in on a minimum wage job. You couldn't get a place. There's no way.*
>
> — CASPEH participant

We asked participants to report what they believed caused their most recent episode of homelessness, acknowledging that multiple precipitants are often intertwined. Thus, we allowed participants to name more than one cause. Then we asked participants to name which, among the causes they reported, contributed the most. We asked them to report on what assistance they sought and what they received. Finally, we asked participants to reflect on what could have prevented their homelessness.

We used in-depth interviews to untangle how multiple stressors interacted and the sequence in which they occurred. For example, job loss may lead participants to fall behind in rent, which may lead the household to be evicted. After eviction, household members may move in with family members without a lease. Overcrowded conditions can cause tempers to flare, leading to conflict. Understanding how these factors are connected can lead to a clearer and more actionable picture of how homelessness begins.

DOJ-HUD-AR00784

## HOUSING COSTS AND HOUSEHOLD INCOME

High housing costs combined with low incomes left participants vulnerable to homelessness. The median monthly household income of participants' in the six months prior to homelessness was $960 (IQR $220-$2100) (Table 3). Overall, the median monthly housing costs were $375 (IQR $0–$800). However, this statistic obscures an important point. Many participants were already living with family or friends ("doubled up") or living in informal arrangements without leases; others entered from a leaseholder arrangement and still others entered homelessness from institutional settings where they didn't have housing costs. Overall, 49% entered homelessness from a non-leaseholder, non-institutional housing situation, [24] 32% entered from a leaseholder arrangement, and 19% entered from an institutional setting.

Participants entering from non-leaseholder arrangements tended to have relatively low housing costs, but were staying in suboptimal—and impermanent—places, without legal protections. Many, if not most, had left formal leaseholding arrangements at some point before doubling up, but had forestalled homelessness through one or more non-leaseholding arrangements. Earlier, they had faced experiences similar to those who had left leaseholding arrangements. After losing that housing, they experienced a more gradual descent into homelessness, exhausting other options before entering homelessness. Those

who came from leaseholding situations had higher housing costs and when they lost that housing had no other options but homelessness. Next, we describe the experiences of those who entered homelessness from non-leaseholders situations, leaseholder arrangements, and institutional settings.

## HOMELESSNESS ENTRANCES FROM A NON-LEASEHOLDING ARRANGEMENT

Among those who entered homelessness from a non-institutional setting, 60% were in non-leaseholder arrangements. Some contributed rent while others stayed for free. The median monthly housing costs for these non-leaseholders was $200, (IQR: $0 to $500). Almost half (43%) reported paying nothing for rent. Among non-leaseholders who reported paying anything for housing, the median monthly rent was $450.

The median monthly income for all non-leaseholders in the six months prior to homelessness was $950 (IQR: $221-$2000). For those who paid no rent, their median monthly household income was $500 (IQR: $0-$1200). For non-leaseholders who did pay rent, their median household income was $1200 (IQR: $500-$2400). Among non-leaseholders who paid rent, 57% were rent burdened (paying more than 30% of their income in rent) and 41% were severely rent burdened (paying more than 50% of their household income in rent).

**TABLE 3** Median Monthly Income, Housing Costs, Housing Tenure, and Advance Notice Before Homelessness for Leaseholders and Non-Leaseholders

| Participant Type | Monthly Income Prior to Homelessness (IQR) | Monthly Cost of Last Housing (IQR) | Housing Tenure | Warning Before Losing Housing |
|---|---|---|---|---|
| All Participants | $960 ($220-$2,100) | $375 ($0-$800) | 1 year | 5 days |
| Non-leaseholders | $950 ($221-$2,000) | $200 ($0-$500) | 1 year | 1 day |
| Leaseholders | $1,400 ($700-$2,600) | $700 ($350-$1,100) | 3 years | 10 days |

DOJ-HUD-AR00785

**CARLOS' STORY**

Carlos experienced a spinal injury when he fell off a ladder at work. Unable to continue working and ineligible to receive workers' compensation since he was paid in cash, Carlos could no longer afford the rent for his apartment. As the leaseholder, he decided to vacate the apartment to avoid having an eviction on his record. He then rented a room in a two-bedroom apartment, but left after several months due to conflicts with his roommates. Carlos hoped that moving in with his sister's family would provide a long-term solution to his housing situation, but her family was facing COVID-related job loss and a shortage of space. Wanting to avoid being a burden to his family and without other options, Carlos became homeless, living in his truck. After receiving multiple parking tickets, his truck was towed. He now lives in an encampment in a park near City Hall.

Participants described using limited financial or social network resources to secure suboptimal housing, by living temporarily with friends or relatives. These arrangements were often strained by the hosts' financial stress and/or overcrowding. The conditions became untenable, sometimes falling apart due to interpersonal conflict brought on by difficult circumstances. Others reported losing their housing in non-leaseholding situations when the primary tenants faced eviction.

For those whose last housing was a non-leaseholding arrangement, the median warning time that they would lose their housing was one day, reflecting the volatility of these circumstances. Participants who entered homelessness from a non-leaseholding arrangement reported having spent a median of one year at their last (non-leaseholding) housing. Of non-leaseholders, 42% reported that this was their first episode of homelessness.

## HOMELESSNESS ENTRANCES FROM A LEASEHOLDING ARRANGEMENT

Among all participants, 32% entered from a stable living situation in which they were on a lease, mortgage, or other written agreement, although most were on a lease (rather than a mortgage).[25] Among those who entered from a non-institutional setting, 40% entered directly from holding a lease (36%) or mortgage (4%). These individuals described rapid descents precipitated by discrete events, such as a threatened (or actual) eviction, domestic violence, a family health crisis that required immediate full time caretaking, an incarceration, or wildfire. By the time they became homeless,

many had navigated through a series of less stable and lower quality housing. These included moving from being a primary leaseholder to renting a room in a shared house, having multiple roommates, or renting low-quality housing.

Those who left leaseholder situations described little forewarning prior to being forced to leave, with no chance to make alternative arrangements, or no alternatives remaining. Participants who left leaseholder arrangements reported having a median of 10 days of warning before losing their housing.

For those who had a lease agreement, the median monthly housing costs were $700, with an interquartile range of $350 to $1100. Leaseholders' median monthly income was $1400 (IQR: $700-$2600). Some (10%) of those on leases contributed nothing for rent; for instance, some participants were listed on a family member's lease but didn't contribute to the rent. Among those who paid rent in leaseholder arrangements, 66% met the criteria for rent burden (spending at least 30% of income on rent) and 42% met criteria for severe rent burden (spending at least 50% of income on rent). Across the eight counties, leaseholders' median income ranged from $1100 to $1800 and median housing costs from $500 to $800. Comparing median rent to median income, we found that median cost burdens ranged from 33% to 55%. A small proportion (6%) of participants reported receiving a rental subsidy in their last housing; 16% of all leaseholders did.

DOJ-HUD-AR00786

CHAPTER 2: PATHWAYS TO HOMELESSNESS

**SPOTLIGHT ON EVICTION**

An eviction occurs when someone is forcibly removed from their home, often (but not always) for falling behind on rent or mortgage payments. Those whose names appear on the lease receive a notice to vacate the property. Once a leaseholder is evicted, the eviction appears on their housing record making it more difficult to find a new place to live. It can also trigger a move into worse housing, housing with others, or directly into homelessness. For those living doubled up or in housing without a lease, we don't use the term eviction. However, a leaseholder may ask non-leaseholders to leave a property. While this doesn't leave a legal trail, it has similar effects in displacing the non-leaseholder—either to a different housing option (often less favorable) or into homelessness.

*" We lost our home in January. Our landlord had received the full amount or some substantial amount of the emergency rent assistance…about $6,000.00, and two months later he pretty much nailed us with a 90-day notice to quit. We were paid up on rent and everything, and he didn't give us any option of helping us stay in a hotel or anything while he fixed the little crack that was in our bathroom that he said that was the whole foundation being unstable. But he moved two people in like two weeks after we got our stuff out in March… we've been homeless ever since. "*

Participants who entered homelessness from a leaseholding situation reported having spent a median of three years in their last housing. Almost half (47%) reported that this was their first ever episode of homelessness.

Participants discussed their experience with eviction or threatened eviction.[26] Many reported evictions due to falling behind in rent. Participants reported a variety of reasons for being behind in rent including job loss, personal health crises, accumulation of financial struggles, and the loss of contributing household members due to ill-health, death, or other reasons. Those who lost their housing due to evictions for non-payment of rent reported receiving "pay or quit" orders. Unable to pay the rent and fearing the impact of an eviction on their credit record, they left their housing suddenly without adequate time to make alternative arrangements. Some participants reported other non-financial reasons for eviction, including lease violations, or conflict with property owners and other household members. Others reported receiving eviction notices due to the need for property repairs. Participants regarded these eviction notices as a response to their complaints about poor housing conditions. In some cases, participants faced eviction due to the owner or a family member moving in or the owners selling the property. Several survivors of interpersonal violence described facing eviction as a result of conflict-related property damage, noise disturbances, or "causing a scene" including 911 calls to the home. Others reported losing housing due to climate emergencies, such as wildfires.

Leaseholders in California have rights that grant either 3-, 30-, 60-, or 90-day notice prior to eviction. The 10 day median notice leaseholders reported may reflect a high proportion of people who were behind on their rent and received a 3-day notice to pay or quit. The three day warning is allowable only for non-payment of rent. The short notice participants reported may reflect that many evictions were for non-payment of rent or that tenants had limited access to legal protections to enforce eviction orders. The absence of adequate notice presents a challenge to homelessness prevention efforts, which depend on recognizing that someone is at risk of losing their housing in time to intervene.

DOJ-HUD-AR00787

## HOMELESSNESS ENTRANCES FROM INSTITUTIONAL SETTINGS

Nineteen percent of all participants entered homelessness directly from an institutional setting; 8% entered from a prolonged jail stay and 6% from a prison stay.[27] Of those who entered from institutional settings, 67% had been homeless when they entered that setting.

A larger proportion of participants had institutional stays in the six months prior to homelessness than entered directly from those institutions, suggesting that some who became homeless had short housing stays between their institutional stay and homelessness. In the six months prior to homelessness, 20% of participants spent time in jail, 9% spent time on probation, 10% were released from prison, and 4% served parole.

People leaving institutional stays reported facing different but related challenges compared with those who entered from housing. In addition to struggling to identify and pay for housing, their social networks had been depleted, they faced barriers to employment, and in many cases, they did not receive assistance from service providers. Participants who were incarcerated in a different county than they were living prior to conviction reported not having the resources to travel back to their home county post-release. Those under community supervision faced barriers to living with friends or relatives living in different parts of the state from where they were serving community supervision. Some who left drug treatment facilities noted that they left after relapsing and had limited options. Like those coming from non-institutional settings, they faced the prospect of finding new housing in high-cost housing markets with low incomes.



**FIGURE 8** Proportion of Participants Exiting Jail or Prison Who Received Support Signing Up for Benefits, Health Care Services, or Finding Housing

● Jail  ● Prison

**Benefits**
19%
18%

**Healthcare**
17%
14%

**Housing**
17%
14%

Jail re-entry support is only reported for individuals who reported jail stays of 30 days or more.

In survey data, participants who had been incarcerated reported receiving minimal support upon exiting prisons or jails. In fact, most who exited the carceral system reported receiving no support at all (Figure 8).

In-depth interviews highlighted the dearth of integrated discharge support. When asked to describe what being released from jail was like, one participant shared: "[They said] 'Thank you,' cut your bracelet off, and off you go. There's nothing. They don't know if you're going to go out and going to be homeless, if you're going back to being homeless, they don't—they don't ask any of that."

**❝** *It's a rough road and then people treat you as though you're nothing because you have been incarcerated. Nevertheless, I feel like I've served my time… and if I'm striving to get jobs and find avenues and find housing, then those opportunities should be more readily available for me...* **❞**

DOJ-HUD-AR00788

## REASONS FOR LEAVING LAST HOUSING

We asked participants to report on the circumstances that led them to leave their last housing.[28] They could choose as many causes as they felt described their situation. We grouped these reasons into general categories (economic, social, health, and other) and stratified by leaseholder status, to see whether patterns differed between leaseholder and non-leaseholders. While the patterns are useful, within each category there are diverse reasons which call for different solutions. We present these data in broad categories (Figure 9), then separately by

specific reason. Finally, we asked participants to name which reason was the most important. We detail specific economic, health, social, and other reasons in Table 4.

Separately, we asked participants to report on experiences that they may have had in the six months prior to becoming homeless—recognizing that these experiences may have contributed to their housing loss, or been a result of the stress or difficulty that they were under. Through in-depth interviews, we explored how these factors played out and interacted with one another.

**TABLE 4** Economic, Social, Health, and Other Reasons for Leaving Last Housing

| Economic | Social | Health | Other |
|---|---|---|---|
| Exchanged work for housing, and work ended | Breakup between residents | COVID-19 health and safety concerns | Left the area for a job, family, etc. |
| Lost or reduced income | An issue with the rules | Became sick or disabled | Went into an institution |
| Lost rental assistance | Conflict among residents | Participant or partner became pregnant | Poor housing conditions |
| Non-housing costs increased | Conflict with property owner | Participant's substance use | Program ended |
| Building sold or foreclosed; owner/primary leaseholder change | Conflict with your neighbors or concerns about neighborhood safety | Someone else became sick, disabled, or died | Fire or natural disaster |
| Housing costs were too high | Didn't want to impose/ wanted own space | Other health reason | |
| Housing costs increased | Discrimination (race or other identity) | | |
| Someone else stopped paying rent | Others needed more space | | |
| Stolen from or was victim of scam | Substance use by others in the household | | |
| Other economic reason | Violence or abuse in the household | | |
| | Other social reason | | |

## ECONOMIC REASONS

We included anyone who reported any economic reason to have an economic reason for housing loss; participants could indicate multiple reasons (Figure 10) along with social, health, or other reasons. Participants whose last housing was as a leaseholder cited at least one economic reason (58%) more commonly than non-leaseholders (40%).

The most frequently reported economic reason was loss of income. Participants living on the economic margin, with high housing costs, low incomes, and little savings, had little margin for error. Loss of income or decrease in work propelled many living on the economic margins into homelessness. Twenty-two percent reported that lost or reduced income was a reason for losing their last housing. Leaseholders reported this reason more frequently than non-leaseholders (35% of leaseholders, 15% of non-leaseholders). Many participants reported other economic reasons related to low income and high housing costs. Twelve percent noted that while neither the cost of their housing nor their income had changed, they could not keep up with housing costs. One in ten (10%) noted that they had been stolen from or the victim of a scam, and 10% noted that non-housing costs (such as healthcare, food costs, and unexpected expenses) had increased, leaving them unable to pay their rent. Eight percent each noted that their rent had increased, someone else in their household stopped contributing to rent, or their building had been foreclosed on or the primary leaseholders lost their lease.

Leaseholders were more likely to report various economic reasons than non-leaseholders (Figure 11). The economic reasons all point to the fact that, for most, the rent was too high for their income.

In addition to asking about reasons for losing housing, we asked about life events in the six months prior to homelessness. During this time period, 28% of participants had a decrease in work-related income (through job loss, decrease in hours, or decrease in pay). Eleven percent reported having been laid off, 10% reported having had their income reduced, 8% reported having been furloughed or had hours reduced, 5% reported having been fired, and 1% reported having retired. In the months prior to becoming homeless, 2% reported losing a rental subsidy. Some (22%) reported loss of their own, or a member of their household's, income due to the COVID-19 pandemic, either through job loss or a decrease in hours.

Participants discussed experiences of job loss resulting from the COVID-19 pandemic, seasonal employment, and others. As one participant shared: "The virus (COVID) screwed everything up. If the virus, if that wouldn't have never happened, I'd still have my job. And a place. I would have both of them." In many cases, economic and health reasons were intertwined. Participants reported job loss due to injuries (both work and non-work related), illness (their own or family members), the need to provide caregiving to family members, or deaths of household members. Some participants described losing jobs after contracting COVID, due to not having job protections when they missed work due to prolonged illnesses or the need to isolate or quarantine.



**FIGURE 9** Proportion of Participants Who Reported at Least One Economic, Social, or Health-Related Reason for Leaving Last Housing by Leaseholder Status

● Economic reasons   ● Health reasons
● Social reasons

All
47%
32%
63%

Non-leaseholder
40%
31%
70%

Leaseholder
58%
33%
53%

DOJ-HUD-AR00790



**FIGURE 10** Economic Reasons for Leaving Last Housing, All Participants

Lost or reduced income
22%

Housing costs were too high
12%

Stolen from or was victim of scam
10%

Non-housing costs increased
10%

Building sold or foreclosed; owner/primary leaseholder change
8%

Housing costs increased
8%

Someone else stopped paying rent
8%

Exchanged work for housing, and work ended
3%

Lost rental assistance
2%

Other economic reason
<1%

**FIGURE 11** Economic Reasons for Leaving Last Housing by Leaseholder Status

● Non-leaseholder  ● Leaseholder

Lost or reduced income
15%    35%

Housing costs were too high
12%    12%

Stolen from or was victim of scam
9%    13%

Non-housing costs increased
7%    14%

Building sold or foreclosed; owner/primary leaseholder change
9%    8%

Housing costs increased
4%    14%

Someone else stopped paying
7%    10%

Exchanged work for housing, and work ended
5%    2%

Lost rental assistance
1%    3%

Other economic reason
<1%    <1%

DOJ-HUD-AR00791

Some participants experienced housing precarity and eventual homelessness due to macro-level economic crises. One interview participant shared the lasting impact of the last economic recession: "We applied for a mortgage and financed a condo. That was in 2006 and in 2010 we had to leave the place because of the lack of money when the entire country went through an economic crisis. We were not able to make the $3,500 to pay the mortgage, so we had to leave the place. Since then, we have been homeless. We got divorced, and since then I have lived in my car." Participants who worked as farm workers and day laborers described challenges finding or keeping work during the off-season, which was particularly challenging during the pandemic as farmers were hiring fewer farm workers than they had in previous seasons.

In talking with non-leaseholders, we found that many had experienced an economic shock earlier that led to their entering a non-leaseholder housing situation. Their non-leaseholding housing situations were stressful and overcrowded. When the stress of these situations became too much, the participants exited into homelessness. When we asked for causes, they noted social causes, such as conflict with their hosts. However, an earlier economic shock underlay their downward trajectory.

## SOCIAL REASONS

Sixty-three percent of all participants noted at least one social reason for losing housing. As with economic and health reasons, there was substantial overlap between reasons. Due to the diversity of these experiences, we report them separately in Figure 12.

We know that people who have difficulty paying for housing costs—whether with or without leases—face overcrowded, suboptimal conditions. We see the impact of these throughout the social reasons for leaving. One third of participants noted that conflict between people staying in the house was a reason they left their last housing. When people struggle to make rent and housing is overcrowded, conflict may arise. In these situations, particularly for those without a lease, people can feel like they are imposing or in others' space. Almost a quarter noted that not wanting to impose and/or wanting their own

space contributed to why they left. Similarly, 16% noted that others in the household wanted more space and thus asked or encouraged the participant to move. Almost one in five (19%) reported a conflict with a property owner, which could reflect economic considerations. Other factors contributing to the decision to leave included violence in the household (13%), an issue with rules (12%), and substance use of others in the household (9%). Experiences of discrimination due to their race or other aspect of their identity contributed to 9% of participants leaving their last household. A similar proportion (8%) reported concerns about neighborhood safety or conflict with neighbors.

Non-leaseholders more frequently reported a social reason than leaseholders (Figure 13). Non-leaseholders were much more likely to report that their not wanting to impose (or wanting their own space) drove them to leave than did leaseholders (33% vs. 10%). Non-leaseholders were more likely to report an issue with rules (15% vs. 7%), reflecting the lack of agency that non-leaseholders have.

### Interpersonal Precursors

In in-depth interviews, participants discussed how interpersonal conflicts precipitated homelessness. As with other categories, there was overlap. For example, conflicts over money could lead to interpersonal conflict, as could disagreement about things like substance use. For people living under the constraints of poverty or struggling with health issues, tensions ran high. Conflicts could revolve around finances, rules, responsibilities, or expectations. Participants reported informal arrangements around splitting the cost of rent, utilities, and other household expenses with people they were living with, with resultant conflicts when their expectations were not met.

### Violence

Regardless of whether people reported violence or abuse as a reason for leaving, violence was common in participants' lives. In the six months prior to homelessness, one quarter (25%) of all participants experienced physical violence (27% cis-women, 24% cis-men) and 6% (8% cis-women, 5% cis-men) experienced sexual violence. Violence or abuse was a reason for leaving their last housing for 13% of participants (20% of all cis-women, 9% of cis-men).

DOJ-HUD-AR00792

**CHAPTER 2: PATHWAYS TO HOMELESSNESS**



**FIGURE 12** Social Reasons for Leaving Last Housing, All Participants

Conflict among residents
33%

Didn't want to impose/wanted own space
23%

Conflict with property owner
19%

Others needed more space
16%

Violence or abuse in the household
13%

Issue with rules
12%

Discrimination (race or identity)
9%

Substance use by others in the household
9%

Conflict with neighbors/concerns about neighborhood safety
8%

Other social reason
2%

**FIGURE 13** Social Reasons for Leaving Last Housing by Leaseholder Status

● Non-leaseholder ● Leaseholder

Conflict among residents
38%    27%

Didn't want to impose/wanted own space
33%    10%

Conflict with property owner
20%    18%

Others needed more space
21%    10%

Violence or abuse in the household
14%    12%

Issue with rules
15%    7%

Discrimination (race or identity)
8%    9%

Substance use by others in the household
10%    7%

Conflict with neighbors/concerns about neighborhood safety
6%    10%

Other social reason
1%    3%

DOJ-HUD-AR00793

Participants who left due to violence spoke of leaving as a strategy to survive. Leaving due to interpersonal violence (IPV) affected those in both non-leaseholder and leaseholder housing, with a similar proportion reporting it as a reason for leaving. For some, IPV led to their leaving behind a housing subsidy. One participant stated: "I told my brother, 'Stay in the house, and don't let [my husband] come back... Because if he gets in the house, then he's not going to leave. And it's going to mess up my Section 8.'...my husband got out of jail and went there. And he wouldn't leave the house, and [my brother] couldn't get him out. Because it's his address, too. And so, they had an inspection, but I wasn't there to do the inspection. So, I lost my housing. If I came back there, he would've – he's almost killed me twice already." Some participants noted that pandemic-related conditions (including stay-at-home orders and related job loss) led to more time and stress (and thus more violence) with partners/perpetrators.

### Discrimination

Participants shared stories of discrimination that led to their housing loss either directly or circuitously. They experienced discrimination in the labor market based on disability, race, immigration status, and language. People encountered discrimination when trying to find work and experienced discrimination at work that led to reduced hours, reduced wages, lower pay than promised, being targeted for harsher and more frequent evaluations, or exclusion from raises and promotions. This made it harder for participants to find any work or work that paid a living wage, and contributed to their inability to pay for housing. One participant who used a wheelchair told us: "[I] do feel discriminated [against] because of…race, because of the disability I walk in a store and say, 'Are you hiring?' 'No, we're not hiring. Apply online.' You know? I get that a lot. Everywhere I go, I ask. I mean I've been all over with employment. It's difficult, especially with the disability and wheelchair. You know, I can fix and dress myself up nice. But, once they see the [wheelchair]– you know?"

Discrimination on the housing market can lead to homelessness. A participant shared that he had been renting a room in an apartment with a friend, who was the primary leaseholder. Their landlord was "not friendly to Black people" and one day told him to "get out now,' instead of giving me my 30 days. He's like a violent type, so he'll go against the law and not give me my 30 days." With no savings and minimal notice, he had no option but to check into a shelter as he searched for another room to rent. He shared that he searched for housing online and on social media, but people did not want to rent to him once they knew he was Black. Reflecting on searching for housing on social media, he shared: "[Social media] is hard…cause you gotta show your face. I would get a lot of 'no's' or like, 'we're busy' or like 'we're not renting it yet', even though it says 'renting out now.' So, yeah. They didn't respond to me after I showed them a picture—after they asked for a picture of me, they didn't respond."

## HEALTH-RELATED REASONS

In both survey data and in-depth interviews, participants reported health problems—theirs and their family members—as a reason for entering homelessness. There were myriad types of health problems—physical health, mental health, substance use, COVID-19, pregnancy, and the need to become a caregiver. Like with economic and social issues, these problems interacted with others to increase the risk for homelessness. Health problems could lead to economic issues (through job loss or excessive non-housing costs) or social issues (for instance, a participant's substance use could cause conflict with others). Pregnancy and the post-partum period are known risk periods for homelessness. Of participants who were assigned female at birth and 18 to 44 years old , 11% were pregnant during the six months prior to homelessness (representing 2% of all participants). Overall, nearly one third of participants indicated at least one health-related reason as a cause of their homelessness.

Thirteen percent of participants noted that their use of substances was a factor in their leaving their last housing (Figure 14). Nearly as many (11%) noted that someone else's illness or death contributed to their becoming homeless, and 9% noted that their own health crisis was a reason for their housing loss.

DOJ-HUD-AR00794

Concerns about their—or others—health or safety related to COVID contributed to 5% leaving. A small percentage noted pregnancy as a reason.

Unlike economic and social reasons, we did not find much variation between leaseholders and non-leaseholders for health-related reasons (Figure 15).

### Physical Health

In many cases, physical health problems and housing loss were linked through employment. Participants reported that health crises (theirs or a household member's) led to job loss and then the loss of income caused them to lose housing. A participant described the impact of an injury and the COVID pandemic on his ability to work as a driver: "I got hurt…That's kind of making it bad for me because I really can't

do too much. They have me as disabled because of my back and my leg, so I really can't do all the things I used to do…I got hurt at work just before COVID. And when COVID came, it just messed up everything. That's how I became homeless." Another participant described how her pregnancy led to job loss, which led to homelessness: "I lost my job because I got pregnant, I got fired after working there for one year. I was not feeling well one day, and the supervisor didn't let me go home, so I left. The next day he told me that there was no longer work for me. So, the owner of the house gave me one month while I found another job, but it is not easy since I was pregnant. I found work for one or two days, so I couldn't make the money to pay the rent."



**FIGURE 14** Health-Related Reasons for Leaving Last Housing, All Participants

Participant's substance use
13%

Someone else became sick, disabled, or died
11%

Participant became sick or disabled
9%

COVID-19 health and safety concerns
5%

Participant or partner became pregnant
<1%

Other health reason
<1%



**FIGURE 15** Health-Related Reasons for Leaving Last Housing by Leaseholder Status

● Non-leaseholder  ● Leaseholder

Participant's substance use
14%    11%

Someone else became sick, disabled, or died
10%    14%

Participant became sick or disabled
8%    10%

COVID-19 health and safety concerns
5%    4%

Participant or partner became pregnant
<1%    <1%

Other health reason
<1%    <1%

DOJ-HUD-AR00795

## Mental Health Conditions

The period prior to homelessness is frequently marked by multiple forms of stress. Decreased household income, difficulty paying for rent, physical health problems, conflict with others, and concerns about losing one's housing can precipitate or worsen mental health challenges. Similarly, having mental health challenges can make it difficult to maintain work and relationships and can contribute to housing loss. Mental health hospitalizations are known to be associated with future homelessness. In the six months prior to homelessness, 7% of all participants reported a mental health hospitalization. A higher proportion reported significant mental health challenges that did not require hospitalization: half of participants (50%) experienced significant depression, half experienced significant anxiety (51%), 13% experienced hallucinations, and a third (32%) experienced trouble understanding, concentrating, or remembering. Only a small proportion received formal help for these symptoms: 14% received outpatient treatment or counseling, and 20% were prescribed medication for mental health issues.

## Substance Use

Substance use disorders can increase vulnerability to homelessness. Thirteen percent of participants noted that their substance use was a reason for leaving their last housing. In the six months before homelessness, 29% used amphetamines, cocaine, or non-prescribed opioids regularly (at least three times a week). Nearly one quarter (24%) reported heavy regular drinking. One quarter (25%) of all participants reported that their substance use led to health, social, or legal problems in the six months prior to homelessness. One in eight (12%) received treatment or counseling for alcohol or substance use; however, 9% indicated that they wanted treatment but could not access it during this period.

In some instances, employment challenges, substance use, and mental health problems worked in synchrony to increase risk for homelessness. Participants described how these three factors contributed to their becoming homeless: "I was laid off. Went to unemployment and then as things progressed my depression set in more. It was just almost like a relationship that I lost through depression and drugs... these are the cycles that I go through."

Substance use and incarceration can interact to increase risk for homelessness. One participant shared: "In a broader sense maybe it was more of the addiction that led to the homelessness, that also led to the arrest... But being homeless definitely did put you out in the public to where you can be arrested."

Substance use can increase the precarity of already fragile housing situations, as was the case for those actively using substances and those who were seeking support to reduce or stop their substance use. Participants discussed how their substance use was a source of conflict within their household and contributed to their loss of housing or inability to stay with friends or family. In in-depth interviews, participants reported how infractions while in residential treatment programs resulted in housing loss. One participant reported: "I went into residential rehab for six months... And then I moved into their sober living environment when I graduated from the program. And then I relapsed after a couple months and they kicked me out. And I've been homeless ever since." Residential programs may decide to terminate residents for these infractions, leaving individuals at risk of homelessness.

## Caretaking and Health of Others

In addition to personal health crises, some reported that other's health crises contributed to their homelessness. Some participants described moving in with family members to serve as a caregiver (paid or unpaid) for a family member—and then losing their housing upon the hospitalization or death of their loved one. When participants were paid caregivers, they risked losing both their employment income and their housing when their family member died. In other cases, a household member's illness led to the household member's job loss and inability to contribute to housing costs, leading the entire household to be displaced. In other cases, the death of a household member led to housing loss—either because the decedent was the only one with their name on the lease, or because the loss of their income led to the household being unable to make rent. Still others spoke about complicated grief from the death of a loved one interfering with their ability to work.

DOJ-HUD-AR00796

Participants explained how the health or death of loved ones could lead them to homelessness. One participant noted: "I took care of my mom before that so—after she passed away, I had nothing. I became homeless after that, because there was no income for me, nothing after that. The job gets cut off, and she was on housing and the day she died is the day they closed the house and threw me out."

## OTHER REASONS

Some participants discussed reasons for leaving their last housing that we did not classify as economic, social, or health-related. These reasons included leaving an area for a job, relationship, or for family, living in deteriorating housing conditions, having a program (such as a substance use treatment program) end, entering an institution, or being impacted by a fire or natural disaster (Figure 16). We found that 9% of people left the area for a job or relationship, 6% left because conditions were poor, and 6% left because a program they were in which supplied housing ended. Two percent each reported leaving to enter an institution (such as a jail, prison, or hospital) or due to a fire or other natural disaster.

A participant explained how a move to a new area could not work out: "My dad had been trying to talk me into moving with him [to Florida] anyway, so I decided to take him up on that offer… and it ended up being the worst thing I could have ever done for myself. And so we ended up moving back... it took everything we had… all of our money, took everything. And then when we got here we had nothing."

### Climate-Related Housing Loss

Some participants discussed losing housing due to climate emergencies, such as wildfires. Overall, 1% of all participants noted this as a reason, but responses were concentrated in certain regions. A participant shared: "I was staying with my sister and my niece, and then their house went up in flames while I was in the hospital. Then I ended up in a care home for a little bit, and then [I had] no place to go."



**FIGURE 16** Other Reasons for Leaving Last Housing

Left the area for a job, family, etc.
9%

Poor housing conditions
6%

Program ended
6%

Went into an institution
2%

Fire or natural disaster
2%

Other reason
2%

### Housing Conditions

Sometimes people left housing because the conditions deteriorated to the point that the home was no longer habitable. Among all participants, 6% noted this as a reason for leaving their last housing. One participant share: "Nothing worked—the trash compactor and the disposal was clogged, my bathroom, this pipe was leaking—broken, the toilet kept overflowing. It's just very hard to live in that house."

## PRIMARY REASON FOR LEAVING LAST HOUSING

In this section, we discuss the primary reason that participants identified as contributing to their housing loss.

Overall, participants reported that loss of income was the most important for them to leave their last housing: 12% of all participants did (Figure 17). Nine percent noted a conflict with residents of their household was the primary reason.

DOJ-HUD-AR00797

**Figure 17** Primary Reasons for Leaving Last Housing, All Participants

Lost or reduced income
12%

Conflict among residents
9%

Didn't want to impose/wanted own space
7%

Conflict with property owner
7%

Someone else became sick, disabled, or died
6%

Building was sold or foreclosed
6%

Violence or abuse in the household
5%

Breakup between residents
4%

Participant's substance use
4%

Other needed more space
4%

**Figure 18** Primary Reasons for Leaving Last Housing, Non-leaseholders

Conflict among residents
13%

Didn't want to impose/wanted own space
11%

Conflict with property owner
7%

Building sold or foreclosed; owner/primary leaseholder change
7%

Someone else became sick, disabled, or died
7%

Lost or reduced income
7%

Others needed more space
6%

Participant's substance use
5%

Violence or abuse in the household
5%

Housing costs were too high
4%

**Figure 19** Primary Reasons for Leaving Last Housing, Leaseholders

Lost or reduced income
21%

Conflict with property owner
7%

Someone else became sick, disabled, or died
6%

Violence or abuse in the household
6%

Breakup between residents
6%

Building sold or foreclosed; owner/primary leaseholder change
5%

Conflict among residents
4%

Left area for a job, family, etc.
4%

Program ended
4%

Housing costs increased
4%

DOJ-HUD-AR00798

However, when we look at reasons separately for non-leaseholders and leaseholders, a different pattern emerges: non-leaseholders were more likely to report social reasons and leaseholders economic ones. A similar proportion of all participants (5%), non-leaseholders (5%) and leaseholders (6%) left due to violence in the home.

In examining the most important reason for non-leaseholders to leave their last housing, the most common reasons were ones we classified as social: conflict between residents (13%) and not wanting to impose on others/wanting more space (11%) (Figure 18). These reasons reflect the stress of living with others, often in overcrowded situations, with limited money or space. After these two leading reasons, there were multiple others with similar proportions. Seven percent reported conflict with the property owner, which could reflect non-leaseholders not being allowed to stay in properties without their names on leases. A similar proportion (6%) reported that their building was sold or foreclosed upon, there was a change in ownership, or the primary leaseholder lost their housing (reflecting that when one is a non-leaseholder, if the leaseholder has to vacate, others living with them do as well). Others included a household member becoming sick, disabled, or dying, or a loss of household income.

Among leaseholders, economic reasons predominated. Figure 19 presents the 10 reasons leaseholders reported most frequently. One in five (21%) leaseholders noted reductions in income as the most important reason they entered homelessness. Leaseholders noted this as the primary reason at least three times more frequently than any other reason.

## HOMELESSNESS PREVENTION
### Limited Support Before Becoming Homeless

Homelessness prevention programs, when targeted appropriately, can prevent homelessness effectively at a reasonable cost. What complicates the design of prevention programs is that among a large group of people who seem to be at risk of becoming homeless, only a small proportion do. Because our study, by design, included only those who became homeless, it is possible that those who received effective homelessness prevention never entered our sample. Thus,

perhaps it is not a surprise that few in our study received homelessness prevention services—because it is possible those who did never became homeless.

To understand the experiences of those who did become homeless, we asked participants whether they sought and received help from any source (e.g., family, friends, government agencies, community based organizations, legal services, etc.) prior to homelessness. We included a broad definition of what we considered support, including advice from friends and family who experienced a similar situation before, information about housing resources, and transportation support to search for alternate housing. Participants could choose more than one source of support if applicable.

In the survey, few reported seeking or receiving any support. One in three participants (36%) reported seeking help from any source before their homelessness began. Seeking support was more common for adults in homeless families, where 61% sought assistance. The most common sources of support sought across all participants were friends and family (22%); community-based organizations, religious organizations, or domestic violence services (16%); and government agencies (8%) (Figure 20). Adults in families sought help from any source more frequently than single adults and TAY.

Twenty-three percent of all participants received help. Adults in homeless families were more likely to receive help; nearly half (48%) of adults in families received help of any kind (compared to 21% of single adults and 24% of TAY). The most common reported types of support received were from friends and family, community-based organizations, and government agencies. Adults in families received help from any source more frequently than single adults and transition age young adults.

No matter the cause of the housing loss, in in-depth interviews, few reported awareness of eviction or homelessness prevention resources prior to their becoming homeless. As one participant said, "I didn't know about services or organizations that were available at the time when I was searching that could help me." With the minimal amount of warning that participants received prior to becoming homeless (i.e., median of 5 days among all participants), participants may have found seeking help to be unrealistic.

## Financial Support Would Have Prevented Homelessness

To understand what participants believed may have prevented their homelessness, we asked them to engage in a thought experiment about the likelihood that their homelessness could have been prevented had they received financial intervention. We provided all participants with three different scenarios and asked them whether each intervention would have prevented their becoming homeless for at least two years.[29] The interventions were: (1) a monthly rental subsidy worth $300-$500; (2) a one-time payment of $5,000 to $10,000; or, (3) a voucher that limits rent contribution to 30% of their income (such as a Housing Choice Voucher).

We asked participants whether, with financial intervention, they would have been able to stay in the same housing or have to move to a different location.[30] Even with financial help, 72% of participants from non-institutional settings reported that they would have needed to move to a different housing situation (81% of non-leaseholders and 59% of leaseholders).

However, many of these participants believed the intervention would have allowed them to obtain alternate housing. Seventy percent of all participants believed that a shallow subsidy of $300-$500 a month would have allowed them to avoid homelessness for at least two years (Figure 21). Eighty-two percent of participants believed that a one-time lump sum payment between $5,000-$10,000 would have kept them housed for at least two years. The highest proportion of participants (90%) reported that an ongoing subsidy that capped their housing costs at 30% of their income (such as a Housing Choice Voucher) would have prevented their homelessness.

Among those who entered homelessness from an institutional setting, 71% believed a shallow monthly subsidy would have prevented their homelessness, 83% reported a lump-sum payment would have done so, and 93% believed that a permanent subsidy would have.



**FIGURE 20** Sources of Homelessness Prevention Help Sought Prior to Homelessness by Family Structure

DOJ-HUD-AR00800



**FIGURE 21** Participant Report of Effect of Hypothetical Homelessness Prevention Interventions by Family Structure

● $300-$500/month shallow subsidy   ● $5,000-$10,000 one-time payment   ● Housing voucher

**All**
70%
82%
90%

**Adults in families**
56%
73%
94%

**Single adults**
71%
83%
90%

**TAY**
76%
81%
85%

Participants may have been overly optimistic in their assessments. However, the high proportion of all participants who thought that these interventions could have prevented their homelessness highlights the role that high housing costs play in homelessness and may suggest an untapped potential for prevention. Even those who had substantial substance use or mental health conditions, had experienced an interpersonal conflict that immediately precipitated homelessness, or had exited institutional settings, believed that having financial resources to pay for housing would have meaningfully prevented their homelessness.



© Sam Comen

> The high proportion of all participants who thought that these interventions could have prevented their homelessness highlights the role that high housing costs play in homelessness and may suggest an untapped potential for prevention.

DOJ-HUD-AR00801

## SUMMARY

In this chapter, we learned that those who became homeless did so after losing tenuous holds on housing. One in five came from institutional settings. Among those who came from housing situations, more than half came from non-leaseholder settings where they held few legal rights. Many had entered non-leaseholder situations after a series of losses; they entered suboptimal housing situations in a fruitless effort to stay out of homelessness. When the stress of living in overcrowded housing became too much, these housing options fell apart with little warning. Those who came from leaseholder arrangements lived in places they could barely afford and had no cushion to protect them if something went wrong. Despite legal protections, they had little warning before entering homelessness.

Few who lost housing had asked for help prior to exiting their housing, and even fewer received it. In-depth interviews revealed that many participants were not aware help existed and didn't know where to turn. Those who were aware did not receive the assistance they needed to prevent homelessness. Those who entered from institutional settings had little assistance before exiting into homelessness. It is possible that those who received this assistance never entered homelessness. Participants were able to tell us what they thought would have prevented their homelessness. The vast majority believed that receiving help paying the rent—either through shallow subsidies, deep subsidies (like Housing Choice Vouchers) or one-time payments—would have made an enormous difference.

### KEY TAKEAWAYS

- Homelessness is inextricably linked to deep poverty. The median monthly household income preceding homelessness was $960 ($1400 for leaseholders and $950 for non-leaseholders).

- One in five participants entered homelessness from an institutional setting.

- Precarious living situations often precede homelessness; 60% of participants in non-institutional settings prior to homelessness were not on a lease agreement.

- Participants reported minimal notice before losing their housing. Leaseholders received a median of 10 days notice, while non-leaseholders reported a single day.

- Trajectories to homelessness differ. Some participants reported a rapid transition to homelessness, while others reported using limited financial resources and social networks to slow their descent into homelessness.

- Leaseholders reported that an economic reason contributed to their homelessness more often than non-leaseholders. Non-leaseholders were more likely to report a social reason. However, participants spoke to structural conditions (e.g., high housing costs, crowded housing, low-income, etc.) that preceded the social reasons.

- Most participants believed that interventions that provided financial assistance could have prevented their homelessness. Participants overwhelmingly believed that shallow monthly subsidies, a lump-sum payment, or rental assistance that reduced rental burdens would have been effective.

DOJ-HUD-AR00802



© Sam Comen

DOJ-HUD-AR00803

CHAPTER 3

# EXPERIENCES During Homelessness

In this chapter, we review the experiences of study participants during homelessness. We begin with an overview of where people stayed while homeless, recognizing that these environmental contexts shape the experience of homelessness. We then discuss participants' physical health, mental health, use of substances, experiences of violence, and interactions with the police.

We conducted interviews between October 2021 and November 2022, when the COVID pandemic altered many facets of life. Due to the public health emergency, there were many changes to services and benefits. During the pandemic, many congregate shelters decreased their capacity, or changed their rules. At the time of our data collection, many shelters were still operating on limited capacity, or closing new admissions due to outbreaks of COVID. Participants might have changed decision-making about whether to stay in shelters based on concerns about infection or may not have been able to access them due to limitations. Many communities were operating enhanced non-congregate shelters, such as those from Project RoomKey,[31] providing opportunities for non-congregate shelter that had not existed prior to the pandemic.

## Where Did People Stay?

People experiencing homelessness stay in a variety of settings: in unsheltered settings (with or without vehicles), in emergency shelters, couch surfing with family and friends, and in short-term institutional settings (including jails and hospitals). Although people experiencing homelessness view staying in a vehicle as distinct from being unsheltered without a vehicle, the Federal Government considers both to count as unsheltered. Because those who experience homelessness view staying in vehicles differently than in unsheltered settings without one, we present these

> *Most of the time we're running around, trying to figure out where we're going to sleep at night or how we're going to be housed, or it's about to start raining soon. And we worry about that. We're not worried about going to the doctors or going to see somebody or going to get help with our mental state.*
>
> — CASPEH participant

data separately. Experiences of homelessness are not static; people move between settings. Thus, we present the locations where people stayed in three ways: where they stayed the prior night; where they stayed most often in the last six months during this episode of homelessness; and every place they stayed while homeless (within the last six months). More than three-quarters of participants (76%) stayed in unsheltered settings the night prior to their interview; 20% stayed in a vehicle, and 56% without a vehicle. Nineteen percent stayed in an emergency shelter, 0.3% stayed in a domestic violence shelter, 2% stayed in a motel, hotel, or trailer paid for by the government or an organization (e.g., as part of a COVID program), 0.1% stayed in a motel or hotel paid for by self or family, 1% stayed with family or friends, and 0.5% stayed in institutional settings, such as hospitals or jails.

DOJ-HUD-AR00804

Among those who spent the prior night in a vehicle, 51% spent the night in a car, van or truck and 49% in an oversized vehicle (such as an RV or converted commercial vehicle). A minority (13%) of those who stayed in vehicles stayed in a safe parking site or authorized place for people who live in vehicles. The rest were either on a public street (77%), on private property (10%), or at a public rest stop (1%).

We asked where people spent the most time during the past six months of this episode of homelessness. If people had been homeless for less than six months, we asked where they had spent the most time during their episode of homelessness. The responses were similar to where participants had been the previous night: 78% were in unsheltered settings (21% in a vehicle, 57% unsheltered settings without a vehicle). Fifteen percent reported that they spent the most time in an emergency shelter, 0.3% in a domestic violence shelter, 2% in a motel, hotel, or

trailer paid for by the government or organization, 2% in a motel or hotel paid for by self or family, 0.5% in a substance use treatment program, and 2% with friends and family.

Where people stayed differed by family structure. Adults in families were most likely to spend most of their nights homeless in a sheltered setting; 59% reported that they were primarily sheltered (compared to 19% of single adults and 26% of TAY). Adults in families and single adults reported living in vehicles more frequently than TAY (22% of adults in families, 21% of single adults, 12% of TAY).

Looking at every place participants spent time while homeless in the prior six months (or since they became homeless, if their current episode was less than 6 months) presents a different picture (Figure 22). By asking this way, we see that people have multiple experiences, although almost all had spent time unsheltered. Many more report staying with family



**FIGURE 22** All Places Participants Slept For At Least One Night in the Last 6 Months, by Family Structure

● Outdoors  ● Vehicle  ● Motel/hotel paid for by you/family/friend
● Motel/hotel paid for by government or organization  ● Shelter  ● Other

**All**

| | |
|---|---|
| Outdoors | 76% |
| Vehicle | 46% |
| Motel/hotel paid for by you/family/friend | 38% |
| Motel/hotel paid for by government or organization | 12% |
| Shelter | 16% |
| Other | 19% |

**Adults in families**

| | |
|---|---|
| Outdoors | 43% |
| Vehicle | 48% |
| Motel/hotel paid for by you/family/friend | 50% |
| Motel/hotel paid for by government or organization | 28% |
| Shelter | 37% |
| Other | 22% |

**Single adults**

| | |
|---|---|
| Outdoors | 79% |
| Vehicle | 45% |
| Motel/hotel paid for by you/family/friend | 37% |
| Motel/hotel paid for by government or organization | 11% |
| Shelter | 14% |
| Other | 18% |

**TAY**

| | |
|---|---|
| Outdoors | 79% |
| Vehicle | 59% |
| Motel/hotel paid for by you/family/friend | 52% |
| Motel/hotel paid for by government or organization | 7% |
| Shelter | 18% |
| Other | 26% |

DOJ-HUD-AR00805

or friends or institutional settings at least once than reported these as where they stayed the last night or the most. Ninety percent of participants spent at least one night in an unsheltered setting in the prior six months; almost half (46%) spent at least one night in a vehicle; and three-quarters (76%) at least one night unsheltered without a vehicle. Thirty percent stayed in an emergency shelter at least one night in the prior six months, 2% stayed in a domestic violence shelter, 12% in a motel, hotel or trailer paid for by the government or an organization. Thirty-eight percent stayed in a motel/hotel paid for by self or family, 31% spent at least one night staying temporarily with family or friends; and 7% spent at least one night in a substance use treatment program.

### Shelter Access and Suitability

Forty-one percent of participants noted that, during this episode of homelessness, there was a time that they wanted shelter but could not access it, showing unmet need (and desire) for shelter. Those who didn't report this included both those who received shelter when they wanted it and those who did not want it.

Participants residing in congregate shelters reported being satisfied, generally, with their living arrangements. They appreciated having access to a place to bathe, hot food, and case management services. In contrast, some living in encampments held negative views of congregate shelters. They reported concerns about COVID and other health risks of sleeping in close quarters. They noted burdensome rules about securing a bed, curfews, and the need to vacate during the day as disincentives to shelter stays. Those living in unsheltered settings perceived the case management services offered in shelters to be ineffective for securing permanent housing.

### Vehicular Homelessness

Many participants reported living in their vehicles when they first became homeless. Although some managed to reside in their vehicles for an extended period, many lost this option. They did not give up their vehicles by choice. Vehicle residents reported needing to be vigilant to avoid having their vehicles ticketed and towed. Instead, participants reported that their vehicle became inoperable or that, after multiple tickets, their vehicle was towed. Participants noted preferring their vehicles to other unshel-

tered settings or congregate shelters; having their own vehicle allowed them to secure their belongings and feel more safe than when they slept outside, while allowing them to live without the restrictions of congregate settings.

### Use of Domestic Violence Shelters by Survivors of IPV

In in-depth interviews, some survivors of intimate partner violence discussed facing barriers to entering domestic violence shelters. They described being turned away because either all available beds were full or because there were beds available only for women with children. Others described difficulty accessing domestic violence shelters because they didn't know how to. Participants who entered domestic violence shelters mentioned varied experiences receiving adequate support and access to services; some described positive and helpful interactions and others reported limited support. A participant described the challenge of trying to access services while dealing with her own trauma: "It seems like you have to stay on top of the people that are supposed to be helping you to get the help that you're supposed to need, and like that's really hard. When you're going through trauma, it's hard to even get up sometimes, like you feel really low. I feel like your advocates that are supposed to be helping you, [they] should be reaching out to you to make sure that you're okay because you're already in a bad place."

## PHYSICAL HEALTH AND USE OF HEALTHCARE SERVICES

Homelessness takes a toll on health. Health problems—including physical and mental health conditions and substance use—can increase the chance that someone becomes homeless. All can interfere with the ability to function— including interfering with work and social relationships—and make it harder to compete in a difficult housing market. People who become homeless are more likely than those who don't to have health problems. Being homeless has deleterious impacts on health, worsening these problems and furthering the disparities between those with and without housing. The experience of being homeless brings with it stress, exposure to violence and harsh environmental

DOJ-HUD-AR00806

conditions, lack of access to food and ways to pre-pare it, inability to sleep and other challenges. The experience of homelessness can be all-consuming, leading people to engage in unhealthy behaviors such as using cigarettes, alcohol, or illicit drugs to stay awake (or go to sleep), lessen hunger pains, or manage untreated mental health conditions. These, in turn, worsen health.

People who are homeless lack money, transportation, telephones, and addresses to receive mail or access to the internet—all of which interfere with the ability to get preventive and longitudinal healthcare or to receive treatment for substance use. While homeless, people lack time, energy, and focus. The constant need to manage day-to-day issues that people with housing are protected from—threats of violence, exposure to cold (or heat, or rain), finding an electrical outlet, ensuring that belongings don't get stolen, and trying to find food and a place to sleep or just rest—is exhausting. In the face of this exhaustion, people who experience homelessness may find it difficult to think about addressing health problems, taking medications, or receiving treatment for, reducing or quitting smoking, alcohol, or substance use. As a result, people who become homeless are more likely to have health problems than people who don't become homeless, and once homeless, they are more likely to have their health problems worsen and less likely to be able to seek the care that would address these problems.

## Physical Health Status

Nearly half (45%) of study participants reported having fair or poor health (as opposed to good, very good, or excellent) (Figure 23). Self-reported fair or poor health is a simple but important measure of health; those who report it have a higher likeli-hood of being hospitalized or dying in the coming years. In the general population, rates of fair or poor health are elevated in older adults. Our finding is significantly higher than would be expected in older adults in the general population. Among the general non-institutionalized population age 65 and older in the United States, 22% report fair or poor health. Despite the median age of 47, twice the proportion of participants in this study reported fair or poor health than those 65 and older in the general popu-lation. We found the highest reports of fair or poor



**FIGURE 23** Self-Reported Fair or Poor Health Status by Age

**All**
45%

**18-24 years**
28%

**25-49 years**
40%

**50+ years**
53%

health among the oldest participants. More than half (53%) of those 50 and older reported that their health was fair or poor (compared with 28% of those 18-24).

People experiencing homelessness are more likely to underreport chronic health conditions, because they have poor access to healthcare. People who don't receive healthcare are less likely to know that they have chronic health problems such as diabetes or high blood pressure. Nevertheless, participants reported high prevalence of chronic diseases. Sixty percent of participants reported having at least one chronic health condition and 28% at least two.[32] Hypertension (30%) and asthma or chronic obstructive pulmonary disease (COPD) (25%) were the most prevalent conditions, while 15% of participants noted having a heart condition or having had a stroke, 11% had diabetes, and 11% liver disease. As in the general population, the likelihood of having a chronic health condition increased with age, but all age groups reported higher proportions than would be expected. Forty-one percent of young adults reported a chronic health condition, slightly over half (55%) of those 25-49, and almost two-thirds (68%) of adults 50 and older did. In Figure 24, we outline the prevalence of chronic diseases by age.

Function, meaning the ability to engage in activi-ties of daily living (ADL: dressing, bathing, eating, transferring [out of a bed or chair], and toileting) is an important component of health. Having difficulty with any ADLs places people at risk of requiring

DOJ-HUD-AR00807



**FIGURE 24** Self-Reported Chronic Health Conditions by Age

● Asthma, chronic bronchitis, emphysema or COPD  ● Cancer  ● Diabetes  ● Heart problems or stroke
● High blood pressure  ● HIV/AIDS  ● Liver disease  ● Weak kidneys or chronic kidney disease

**All**
- 25%
- 7%
- 11%
- 15%
- 30%
- 3%
- 11%
- 6%

**25-49 years**
- 27%
- 5%
- 8%
- 12%
- 21%
- 3%
- 8%
- 6%

**18-24 years**
- 29%
- 4%
- 9%
- 6%
- 9%
- <1%
- 4%
- 3%

**50+ years**
- 23%
- 10%
- 15%
- 18%
- 42%
- 3%
- 15%
- 7%

future nursing home placement, with the highest risk for those having difficulty with three or more ADLs. Thirty-four percent of participants indicated that they had difficulty performing at least one ADL; 23% reported difficulty with at least two. Among participants 50 and older, approximately 43% reported difficulty with at least one ADL, and 31% reported difficulty with at least two. Almost a quarter (22%) of participants reported difficulty with mobility, which was more common in those 50 and older (32%). One in five (20%) reported using a mobility aide, such as a cane, crutches, walker, or wheelchair; such use was more common in those 50 and older (33%).

Participants reported that their mobility challenges negatively impacted their lives. Their mobility aids were in poor repair and their mobility challenges hindered visits to prospective housing units. They found that many congregate shelters and permanent housing were inaccessible. As one participant reported: "I was trying to rent a room; the doors are not wide enough for the wheelchair that I had. They're not wheelchair accessible. I'd have to put myself in a place that I really probably wouldn't like if I found one that specifically catered to wheelchairs."

DOJ-HUD-AR00808

## Pregnancy

Pregnancy was common. Among those assigned female at birth aged 18-44, 26% reported having been pregnant at some point during this episode of homelessness. Among those aged 18-24, 40% reported a pregnancy during this episode of homelessness; among those 25-34, 22% did; 35-44, 26% did (Figure 25). We asked participants to report if they were currently pregnant. At the time of the interview, 8% of those aged 18-44 were pregnant.

Participants described the experience of pregnancy while homeless. As one participant said: "It's uncomfortable. Got to use the bathroom 2:00, 3:00 in the morning,... [my friend] has an apartment. I park in her parking lot so she [leaves] her door open, I use their bathroom and I come back out. But it's uncomfortable. My damn back hurt, and I'm four months pregnant."



FIGURE 25 Proportion of Adults Age 18-44 Assigned Female at Birth Who Were Pregnant at Any Time During Their Current Episode of Homelessness by Age

All — 26%

18-24 years — 40%

25-34 years — 22%

35-44 years — 26%

## Access to Healthcare

To assess access to healthcare, we asked participants whether they had health insurance (and which kind), whether they had a regular source of healthcare other than the emergency department (ED), and if so, if they had an identified primary care provider. Having insurance is an important precursor for medical care, but obtaining insurance is not the only barrier that people experiencing homelessness face. Other barriers, including lacking phones, time, transportation, knowledge of where to go, concerns about leaving belongings unattended or of facing stigma in health settings may be more important. Having a non-ED regular place for care and a primary care provider suggests that one has some engagement with longitudinal healthcare and a place to call when they need care. However, it doesn't ensure one will receive care. To assess non-emergent care, another measure of access, we asked when was the last time participants saw a healthcare provider outside of the ED. The frequency with which one should see a healthcare provider (outside the ED) is related to several factors, including age and underlying health conditions. However, due to the high prevalence of health problems in this population, we considered not having seen a provider outside the ED in longer than a year a marker of poor access. To assess whether they had unmet need for healthcare, we asked (separately) whether they had a need for

healthcare and had been unable to receive it, and whether they had been prescribed medication and unable to obtain it. Medicaid (known as Medi-Cal in California) relaxed rules on needing to re-enroll, due to the pandemic during the period of our study allowing more people to remain insured than otherwise might have. Some health services had switched to telehealth, providing both opportunities and barriers for people experiencing homelessness. People may have accessed care more, due to having COVID, or less, due to fears about acquiring COVID. Our results should be understood in the context of the disruptions of the pandemic.

With Medicaid expansion in California, at the time of the study most participants would have been eligible for Medicaid[33] based on their low incomes. Eighty-three percent of participants reported having health insurance, most frequently Medicaid (Figure 26).[34] Young adults were less likely to have coverage (65% of adults aged 18-24 compared to 82% of adults aged 25-49, and 86% of adults 50 and older).

Approximately half of participants (52%) reported having a regular source of healthcare other than the ED. Having a regular source of care was more common among those who were sheltered (64%) versus unsheltered (48%).[35] Fewer (39%) reported having a primary care provider. Six in ten (61%) reported

DOJ-HUD-AR00809

having seen a healthcare provider outside of the ED in the past year; 49% reported having done so in the prior six months (Figure 27). Almost one-quarter of participants (23%) reported having an unmet need for care in the past six months. The same proportion (23%) indicated an inability to get needed medication in the past six months.

Participants described challenges they faced trying to enroll in Medicaid. They noted that enrollment processes were time consuming and confusing. Even if insured, participants reported having difficulty finding healthcare providers who accepted Medicaid. Participants reported that their difficulty maintaining a phone—keeping one safe (from being lost or stolen), charged, and paid for—limited their ability to schedule and attend appointments and receive communications from their healthcare providers. Transportation was a significant barrier, particularly in areas where clinics were far away and public transportation was limited. When providers substituted telehealth appointments for in-person visits due to the pandemic, participants reported being unable to access care due to their not having access to a reliable smartphone and power source.

Participants described a range of experiences with healthcare. Some distrusted the healthcare system, resulting from prior negative experiences. Some noted that treatment had improved their quality of life or saved their lives. Others reported feeling that they received substandard treatment. Participants, particularly those who identified as Black and/or Latino/x, reported experiencing discrimination and stigma when they sought healthcare, creating additional barriers. These participants reported facing longer wait times for appointments than others, experiencing microaggressions from administrative staff regarding their names or the way they looked, and that their clinicians hadn't taken their medical concerns seriously. One participant explained: "When I went to the gastro doctor… From my name, they can't tell my race, okay? So, when I showed up with locks, dressed very eccentric for my race, you know; he's like, 'Oh, I didn't know.' I said, 'Didn't know what? What, did I scare you?' He's like, 'No, on the phone you sound so proper.' I said, 'Oh, you didn't know I was Black.'"



**FIGURE 26** Health Insurance Coverage Type by Age

● Medicaid and Medicare   ● Medicaid only   ● Medicare only   ● Other health insurance   ● No health insurance

**All**
- 4%
- 71%
- 5%
- 4%
- 17%

**25-49 years**
- 1%
- 78%
- 1%
- 2%
- 18%

**18-24 years**
- <1%
- 54%
- 3%
- 9%
- 35%

**50+ years**
- 7%
- 64%
- 10%
- 6%
- 14%

DOJ-HUD-AR00810



FIGURE 27 Time Since Last Visit with a Health Care Provider by Age

● Six months or less  ● More than 6 months to 1 year  ● More than 1 year to 5 years
● More than 5 years  ● Never

**All**
49%
12%
23%
14%
2%

**25-49 years**
45%
13%
26%
14%
1%

**18-24 years**
51%
12%
24%
10%
2%

**50+ years**
54%
10%
19%
14%
3%

Participants connected their challenges accessing care to worsening of their health. Throughout the study, we heard a common theme: if participants were housed, they would be more able to prioritize their healthcare and face fewer barriers to care, leading to improved health. As one participant said: "(If I had housing) I would start hitting [AA/NA] meetings. I would go to an outpatient behavioral health drug treatment program. It's a volunteer basis. And I would do that. I would be working. Services I would be accessing, definitely behavioral health. I would get a primary doctor and get my health in order. I would probably join a club or two, like photography? You know? Something fun… It would change everything."

## Acute Health Care Utilization

In the past six months, 38% of participants reported a visit to the ED that did not result in a hospitalization (Figure 28). For comparison, in 2019, approximately 22% of Americans aged 18 and older had visited the ED at least once in the prior year.[36] As in most reports, a small group of people made the majority of the visits by using the ED repeatedly. In our study, 9% visited the ED at least three times in the last six months.

In the prior six months, 21% reported an inpatient hospitalization for a physical health reason (Figure 29). Adults aged 50 and older (25%) and young adults aged 18-24 (29%) reported a higher rate of hospitalizations. These rates are substantially higher than similarly aged adults in the general population.

The high proportion of people reporting ED visits and inpatient hospitalizations reflect several factors, including the overall poor health of those who are homeless, the deleterious impacts of homelessness on health, the lack of access to non-emergency healthcare, and the limited options to treat people who are ill as outpatients (lowered admission thresholds).

Participants reported few options for places to recover from illnesses when they didn't feel well. They reported the inability to get adequate sleep or rest while in unsheltered settings and noted that

DOJ-HUD-AR00811



**FIGURE 28** Emergency Department Visits in the Last Six Months by Age

● 1 visit   ● 2 visits   ● 3+ visits

All — 38%

18-24 years — 37%

25-49 years — 40%

50+ years — 37%



**FIGURE 29** Physical Health Hospitalizations in the Last Six Months by Age

● 1 visit   ● 2 visits   ● 3+ visits

All — 21%

18-24 years — 29%

25-49 years — 18%

50+ years — 25%

many shelters required guests to leave during the day. Those who were hospitalized noted the lack of adequate post-hospitalization care (e.g., recuperative care/medical respite). Participants described hardships they experienced when discharged from inpatient stays to unsheltered situations. Those who lived in vehicles noted that while they were hospitalized, they risked their vehicles being ticketed or towed. Some participants noted that they had access to recuperative care following hospitalizations: "It's a good thing and it's a bad thing being in this situation. It's a good thing, because of my medical condition...I have shelter. The bad thing is because I have a heart condition. That's a bad thing for me to get housing in this situation. I wish I didn't have my health condition and still have housing."

## BEHAVIORAL HEALTH

### Mental Health

Many who experience homelessness have had past trauma. The experience of homelessness is highly stressful—exposing participants to worry, poor sleep, violence, and hopelessness. Mental health problems can increase one's risk for homelessness and be exacerbated by homelessness. It is not surprising that many participants reported mental health symptoms. To receive a diagnosis of a mental health condition, one needs to have accessed mental

health treatment. Because access to treatment can be limited, we asked about specific symptoms rather than diagnoses.

To determine current symptomatology, we asked participants to report on mental health symptoms in the prior 30 days. We asked whether participants experienced serious depression (symptoms of sadness, hopelessness, loss of interest, difficulty with daily functioning) or serious anxiety (uptightness, unreasonably worried, unable to relax). We asked if they had ever experienced hallucinations (saw things or heard things that weren't there) or had difficulty concentrating or remembering things.

Current mental health symptoms were common (Figure 30). Two-thirds (66%) of participants reported experiencing symptoms of either depression, anxiety, trouble concentrating or remembering, or hallucinations in the past 30 days. Many experienced more than one type of symptom. Half (51%) experienced anxiety, half (48%) experienced depression, one-third (37%) reported trouble concentrating or remembering, and 12% reported hallucinations.

We asked participants about their access to and receipt of treatment for mental health concerns. We asked all participants if they had received outpatient mental health counseling or treatment in the prior 30 days. Similarly, we asked whether they had been

DOJ-HUD-AR00812

**CHAPTER 3: EXPERIENCES DURING HOMELESSNESS**



**FIGURE 30** Current Self-Reported Mental Health Conditions by Family Structure

● Any mental health condition  ● Anxiety  ● Depression
● Trouble remembering, concentrating, or understanding  ● Hallucinations

**All**

66%
51%
48%
37%
12%

**Adults in families**

59%
43%
39%
27%
5%

**Single adults**

67%
51%
49%
38%
13%

**TAY**

62%
48%
45%
36%
13%

prescribed medication for a mental health concern as an outpatient in the prior 30 days. Finally, we asked about whether they had ever had a mental health hospitalization, and if so, if they had in the prior six months.

> ❝ *I just want to get in a place. This pain that I'm feeling, emotional and physical pain, you know. If I can just get beyond that, most of it be solved by getting in a place. I'd be so happy to be in my own place.* ❞

Despite two-thirds (66%) of participants reporting current mental health symptoms, only 18% of all participants had received either mental health counseling or medications in the prior 30 days; 9% had received mental health counseling and 14%

medications for mental health conditions. Among those who reported current mental health conditions, 24% reported receiving either counseling or a prescription for a medication currently. Five percent reported a hospitalization for a mental health problem in the prior six months.

Participants discussed daily stress, anxiety, and feelings of hopelessness associated with homelessness, as well as symptoms of severe depression, mania, psychosis, and panic attacks that occurred while homeless. They described how homelessness worsened their mental health symptoms through a variety of mechanisms, including inability to maintain medications that had kept them stable, lack of sleep, experiences of violence, and experiences of shame and stigma associated with homelessness. Participants reported numerous barriers to accessing mental health treatment, such as the inability to obtain counseling due to challenges with navigating mental health services or not having a phone to make appointments. Without access to services, participants noted deploying other strategies to

DOJ-HUD-AR00813

manage symptoms, including self-segregating from other individuals to decrease exposure to loud noises or difficult interactions and self-medicating with drugs or alcohol. Participants discussed difficulty accessing medications or losing their existing medications. As one participant reported: "But day to day, I have social anxiety, physical anxiety, and hopelessness. Those are more to do with mental health. I haven't had my meds… a couple weeks ago when I had to leave a different place, all my things were taken. So, I haven't had meds in a couple weeks, and I'm on a few of them. So, definitely depression has been a lot worse, and it's a bad time to have all this because I'm trying to get into a new place, get a job, whatever."

## Substance Use

Substance use patterns change over time; it is common for people to fluctuate between periods of heavy use and cessation. People increase and decrease their use of substances for a myriad of reasons (e.g., response to trauma, to self-medicate mental health challenges, concerns about health or legality). We asked about current use (including whether they used, what substances, and the frequency), including non-fatal overdose experiences during this episode

of homelessness and availability of naloxone. We asked similar questions about alcohol use. We asked participants how their use changed during this episode of homelessness, whether they had sought and received help, whether they had had difficulty accessing treatment that they wanted, and whether they felt that their substance use was causing them social or legal problems. To help us understand why people used, didn't use, changed their use patterns, or engaged (or didn't engage) in treatment, and the consequences of those decisions, we used in-depth interviews.

We describe current regular use of cocaine, amphetamines, and non-prescribed opioids as use three times a week or more. By this definition, one third (35%) of participants reported currently using cocaine, amphetamines, or non-prescription opioids regularly (Figure 31). Thirty-one percent of participants report current regular use of methamphetamines; 3% cocaine, and 11% non-prescribed opioids. In the prior six months, 13% of all participants report using injection drugs. During this episode of homelessness, 11% of participants reported experiencing an overdose; one-quarter (26%) reported having access to naloxone.



**FIGURE 31** Current, Regular Substance Use by Family Structure

- Any substance 3+ a week
- Amphetamines 3+ times a week
- Cocaine 3+ times a week
- Opioids 3+ times a week

**All**
- 35%
- 31%
- 3%
- 11%

**Adults in families**
- 13%
- 13%
- <1%
- 1%

**Single adults**
- 36%
- 33%
- 3%
- 11%

**TAY**
- 40%
- 18%
- 18%
- 29%

DOJ-HUD-AR00814



**FIGURE 32** Self-reported Changes in Substance Use Since Homelessness (of Participants Who Ever Used Substances) by Family Structure

● Increased a lot ● Increased a little ● Stayed about the same ● Decreased a little ● Decreased a lot

**All**
- 20%
- 8%
- 38%
- 7%
- 28%

**Adults in families**
- 10%
- 5%
- 33%
- 6%
- 46%

**Single adults**
- 20%
- 8%
- 38%
- 7%
- 27%

**TAY**
- 43%
- 11%
- 21%
- 11%
- 13%

To assess current alcohol use, we asked standardized questions to assess regular drinking and heavy episodic drinking (drinking 6 or more drinks in one sitting). Using standard definitions, we defined regular drinking as drinking three or more times a week until buzzed or drunk or drinking less frequently but more heavily, like getting drunk regularly on weekends. We assessed current unhealthy alcohol use using commonly accepted definitions of heavy alcohol consumption.[37] We defined unhealthy alcohol use as either heavy use[38] or heavy episodic use (consuming 6 or more drinks in a single sitting monthly or more often). Sixteen percent reported heavy episodic drinking at least monthly and 9% report heavy episodic drinking at least weekly. Eleven percent of women and 21% of men reported either unhealthy drinking or heavy episodic drinking at least monthly.

One measure of substance use is the frequency and amount people use. Another is the consequences of that use. To assess that, we asked whether participants believed that their use was currently causing them health, legal, social, or financial problems; 24% reported that it did. Single adults were more likely (26%) than TAY (17%) or adults in families (9%) to report this. Looking only at those with current regular use of drugs or alcohol, 46% reported that it was currently leading to health, legal, social, or financial problems.

We were interested in knowing how participants' drug use changed during this episode of homelessness (Figure 32). Of those who reported substance use at some point in their lives, 28% noted that their drug use increased either a little (8%) or a lot (20%) during this episode of homelessness, 38% noted that it didn't change, and 35% reported that it decreased either a little (7%) or a lot (28%). These statistics differed by family category. Transition-aged young adults were much more likely to note an increase (a little or a lot) during this episode (54%); adults in families were more likely to note a decrease during this episode (52%); and single adults were equally as likely to report increases as decreases.

DOJ-HUD-AR00815

### JOHN'S STORY

John is living in an encampment with about 20 other people on a riverbed—a spot that is well known to the local police. Early morning raids mean that he often must quickly gather his things and leave, or he might be searched and arrested. He has started using methamphetamine to stay up all night. He used to drink, but when he passed out in the encampment his things would get stolen and he would miss the others' signals that the police had arrived. Methamphetamine makes him feel antsy and wired. Sometimes he isn't able to sleep for several days in a row, which makes him feel worse. But right now, he doesn't see a way to be sober given where he is living.

Combining these measures gives us one indicator of drug or alcohol use severity. Of all participants, 45% currently used either methamphetamines, cocaine, or non-prescribed opioids three or more times weekly or engaged in heavy episodic drinking (6 drinks) at least once a month. Single adults (47%) and TAY (48%) were more likely than adults in families (16%) to report this.

Homelessness can limit access to substance use treatment. Currently, 6% of all participants (8% of those who reported ever using drugs or alcohol regularly) were receiving any substance use treatment. The most common forms of substance use treatment that participants received included 12-step programs (such as AA or NA), outpatient or one-on-one counseling, or opioid replacement therapy (such as buprenorphine or methadone). Eleven percent of all participants indicated that they currently wanted substance use treatment but were unable to receive it. Among those who report current regular use of methamphetamine, cocaine, opioids, or heavy episodic alcohol use, 20% indicated that they currently wanted substance use treatment but were unable to receive it; 4% of those who do not report current regular use reported that they did.

Participants who reported spending most of their time unsheltered were more likely to report current regular use of drugs or heavy episodic drinking than those who were primarily sheltered (52% vs. 19%). There are several explanations for this difference. Many shelters do not admit guests who are intoxicated or showing other signs of substance use. The rules may vary from allowing all, to allowing individuals so long as they don't use during the time that they are in shelter, to not allowing anyone who uses at all. Some shelters don't allow use on site but don't allow individuals to leave during their stay, making it difficult for those who use to stay there. Individuals who use may have had behaviors that led them to be asked to leave or may have found the rules difficult. Those who do not have access to shelter may have used to help cope with the challenges of being unsheltered.

Participants explained that their substance use had caused them problems (with their health, the law, relationships, work), but had also played important roles for them (helping them cope with trauma, pain or depression; helping keep them alert; or numbing them to their circumstances). In-depth interview participants who used drugs and alcohol discussed how drug use or heavy alcohol use contributed to losing their homes or custody of their children. They described how illicit substance use had exposed them to criminal charges, probation or parole violations, and produced negative impacts on their health and well-being. But, people who use drugs or alcohol tend to recognize ways in which this use benefits them (even if they recognize the overall pattern is detrimental). Participants who used drugs and alcohol described how substance use helped them form social relationships, which enhanced safety and security. Those using methamphetamine described the benefits of staying awake to protect themselves from assault or theft and having energy to engage in recycling and other ways to gain income. Participants reported using substances to cope with depression, anxiety, and the routine trauma of experiencing homelessness. In many cases, the same participant described the ways that substances not only caused them harm but also helped them cope. As one participant noted: "For the most part, the drugs that I do, I stay up, I stay focused, and it keeps

DOJ-HUD-AR00816

me with a numb attitude. It keeps me out of reality. And when you're sober, you come back to reality and that hurts. You feel it more when you're sober."

Participants reported engaging in efforts to decrease the harm that drugs and alcohol caused them. Some participants noted that they substituted alcohol for illicit drugs to reduce the risk of targeting by police. Others reported reducing alcohol use in order to stay more alert, or remaining abstinent from opioids to prevent overdose.

Participants described how homelessness complicated efforts to reduce their use or maintain sobriety. They discussed how using substances built a community that they were reluctant to leave—by stopping use, they would lose relationships they had developed. Participants reported that having few choices of where to stay limited their ability to avoid being around others who used substances, making it difficult to reduce or stop using. Without access to medications to manage withdrawal symptoms, participants found it difficult to stop use. Participants discussed numerous barriers to receiving treatment or other help to reduce use or enter recovery. They reported times where they were ready to engage with treatment services but they were unavailable, either because there weren't openings at local treatment facilities and wait times were long, or the staff were unresponsive to their needs, or the treatment was far away. Some participants discussed their concern that by seeking help for substance use, they could risk losing custody of their children.

Substance use, for many participants, was related to their homelessness. Some reported increased use as a way to cope with the challenges of homelessness. Others reported decreasing their use as a coping strategy, because they felt doing so would keep them safer or allow them to exit homelessness earlier. Some reported that obtaining housing would eliminate their need to use substances, noting that they would likely quit once they were housed. A participant shared: "Well, if I found housing, I'd probably wouldn't even get high at all... Like there's stuff that I do [that's] out of character, I probably wouldn't do it otherwise. But as long as I'm out here, I have to do it. It's like a survival tactic." Participants explained that if they were housed they would be better situated to address their substance use. For some, housing



**FIGURE 33** Proportion of Participants Who Experienced a Jail Stay During Current Episode of Homelessness, by Family Structure

All
30%

Single adults
32%

Adult in families
12%

TAY
33%

would make going through symptoms of withdrawal less challenging. Others noted that housing would allow them to access medication assisted treatment for their substance use more easily and safely. Others noted that housing would give them the sense of safety and security that they needed to reduce or stop their use.

## Tobacco Use

Compared to approximately 10% of adults in California, 70% of study participants smoked cigarettes currently. More than half, 54%, smoked daily. Daily smoking was less common among adults in families (33%) and TAY (47%) compared with single adults (56%).

## Criminal Justice Involvement

In previous chapters, we described how many participants were incarcerated during their lifetime, how exiting prison or a prolonged jail stay led a large proportion to homelessness, and how few who had entered homelessness from carceral settings had received transition resources. Here, we examine a different issue—that of jail stays during the current episode of homelessness.[32] At the time of the interview, 13% of participants were under community

DOJ-HUD-AR00817

supervision, either parole (from prison) or probation (from jail). Nearly a third (30%) of participants reported a jail stay during their current episode of homelessness (Figure 33). In accordance with the federal definition of homelessness, we counted any jail stay that lasted more than three months as starting a new episode of homelessness (as opposed to the current episode), so this proportion underestimates the true toll of arrests and incarcerations. The frequency of short-term jail stays reflects the revolving door between jail and homelessness: jail stays increase the risk of homelessness and homelessness increases the risk of jail stays.

Incarceration wasn't the only interaction with the criminal justice system for participants. In in-depth interviews, participants noted frequent interactions with police—particularly in encampments, participants felt that they were being surveilled. They described interactions with police that included being checked for outstanding warrants, probation violations, and having themselves or their belongings searched to assess for possession of illicit substances. Participants noted that minor drug offenses propelled them back into the carceral system. One participant shared: "On probation [the police] would just show up and, man, there they are tapping on my shoulder, and they'd want to search me. And they'd find drugs on me or something, and off to jail we went."

> ❝ *The numero uno is housing... [If I had housing I would] have to see people that use all the time, but I don't have to live with them. I can go home and shut my door and say, 'no.' Okay? You have to have some will power to do this. And I know how to do it. [While I am homeless] there's nowhere to hide here. There's nowhere to go.* ❞

To quantify negative interactions with the police, we asked all participants whether they had been roughed up by the police or felt that the police were harassing them when they were experiencing homelessness.[50] Forty-seven percent said that they had.

## Confiscations and Forced Displacements

Participants spoke about the impact of forced displacements on their lives. Forced displacements, or sweeps, occur when municipal officials (e.g., police officers, sanitation workers) resolve a homeless encampment by confiscating or disposing of all belongings that individuals living in the encampment do not, or cannot, remove themselves. Individuals are then requested or required to physically relocate from the area. Sometimes individuals targeted for sweeps are given referrals to services or access to temporary shelter beds, but often, services are not provided. Forced displacements occur with varied frequency. In the survey, we asked participants if they had their belongings taken away by authorities (such as police or other government workers) in the prior six months (if they had been homeless for shorter than six months, we asked about the time that they had been homeless). A significant proportion of participants had this experience: 36% noted that it had happened at least once in the prior six months. Among all participants, 11% had had this happen once, 10% 2-3 times, and 15% more than 3 times. Those who had spent most of their time unsheltered were more likely to have had this happen at least once (42%) than those who had spent most of their time in sheltered locations (15%).

Participants spoke about the impact of forced displacements and confiscation on their lives. Participants described how forced displacements resulted in their losing critical materials and supplies, including medications and cell phones. They discussed how displacement resulted in the loss or destruction of personal documents that they needed to apply for housing and other services, including birth certificates and state-issued IDs. Some expressed concern that they could lose their pets if the displacement occurred while they were away from their encampment.

DOJ-HUD-AR00818

## Experiences of Violence

In previous chapters, we reviewed the prevalence of physical abuse or violence and examined how often violence contributed to or precipitated homelessness. In this chapter, we examine violence that occurred during the current episode of homelessness. We asked about both physical and sexual violence and asked participants to report on their relationships (or lack thereof) to perpetrators. In in-depth interviews, we explored the experience of violence and how it intersected with participants' homelessness. While past experiences of violence increase the risk of homelessness, homelessness increases the risk of violence.

More than a third (38%) experienced either physical or sexual violence during this episode of homelessness. Those who spent most of their time unsheltered without a vehicle reported similar rates of violence (42%) to those who were in vehicles (39%) but higher than those who spent most of their time in sheltered locations (26%).

More than one-third (36%) of all participants experienced physical violence during their current episode of homelessness. Of those who experienced physical violence, half (49%) reported that the violence was committed by a stranger and 21% by an intimate partner. Women were more likely than men to report that their perpetrator of physical violence was an intimate partner: 39% of cis-women did, versus 23% of non-binary, transgender, or participants with other gender identities and 13% of cis-men.

Ten percent of participants experienced sexual violence during their current episode of homelessness. Cis-women (16%) and non-binary, transgender, or other gender participants (35%) experienced sexual violence more frequently than cis-men (7%). As with physical violence experienced during homelessness, approximately half (54%) who experienced sexual violence reported the perpetrator was a stranger. One in five (22%) indicated that an intimate partner perpetrated this violence. Cis-women (21%) and cis-men (21%) reported similar proportions, but nearly half (46%) of non-binary, transgender, or participants with other gender identities who reported sexual violence reported that it was perpetrated by an intimate partner.

Participants explained that homelessness left them more vulnerable to violence. Without the protection of home, participants had less protection against violence perpetrated by strangers. Participants reported frequent harassment by members of the housed community, which they connected to the stigma of homelessness. Some participants experienced physical violence as a result of personal conflict with other encampment or shelter residents, acquaintances' gang involvement, or in the course of being robbed of their belongings. Others reported being physically harassed by law enforcement officers.

Participants noted that being homeless decreased their protection from intimate partner violence, as being homeless could facilitate the ability of perpetrators to locate them. Participants noted that, at times, they remained in abusive situations due to their need for shelter, stability, safety, and material resources. With choices constrained, they had less ability to exit abusive relationships. Alcohol and substance use could exacerbate experiences of intimate partner violence. Some described experiencing more physical abuse when their partner was under the influence, intoxicated, or going through withdrawal; others reported self-medicating to address the trauma of abuse.

## Income

Participants reported low total household incomes (including income from work (formal and informal) and income benefits). In the previous month, the median income in individuals' personal households (all those with whom they currently shared income and expenses) was $400 (IQR $100-1000).[41] Approximately 16% reported no current income; of those who reported any income, the median monthly income was $600 (IQR $221-1060).

## Work and Employment

The pandemic may have changed employment patterns. For many, employment opportunities decreased due to pandemic-related economic disruptions. One quarter (24%) of participants reported COVID-related health and safety concerns as a barrier to work. Six percent of all participants (8% of those under 62 without a disability) reported working at least 20 hours for pay in the week prior

DOJ-HUD-AR00819



FIGURE 34 Sources of Income in the Last 30 Days by Family Structure

● A job  ● A pension  ● Benefits  ● Did not receive any income in the last 30 days
● Money shared by someone familiar  ● Panhandling or asking people for money
● Recycling/selling used goods or other odd job  ● Other

Participants could have reported more than one source of income.

to the interview. Overall, 18% reported income from a job in the month; 11% from informal employment or gig work and 8% from formal employment. More than a third (40%) reported income from recycling or odd jobs. Two percent of participants had income from a pension or retirement fund. When we restricted the data set to those younger than 62 and without a physical or mental health disability, 13% reported income from informal employment or gig work and 12% from formal employment. Figure 34 presents participants' income sources in the past month.

Participants faced extended disconnections from the formal labor market. Seventy percent reported that it had been longer than two years since they last worked a paying job for 20 hours a week or more. Sixty-two percent of those younger than 62 without a physical or mental disability reported the same. Nonetheless, participants were interested in finding a job. Of all participants, 44% reported they were looking for employment. Among those younger than 62 and without a disability, 55% were looking for work.

DOJ-HUD-AR00820

**❝** *Being homeless is a full time job.* **❞**

Participants noted numerous barriers to engaging in paid work. The conditions of homelessness required time and energy that reduced participants' ability to earn income. Just as the lack of well-paid work had interfered with participants' ability to maintain housing, their homelessness restricted their ability to engage in paid work. While homeless, they reported spending their time accessing services, searching for housing, safeguarding belongings, and meeting basic needs. As one participant summarized it: "Being homeless is a full time job."

In the survey, we asked all participants to report what interfered with their ability to engage in paid work. Participants reported multiple barriers. Half (52%) of participants indicated that they were unable to work due to problems related to their older age, health, or disability. Half of participants (50%) indicated that transportation to or from the workplace hindered their ability to work. One in five (20%) participants reported that having a record of arrests or prior convictions, and being on community supervision following incarceration posed challenges to employment. Eight percent of all participants reported that caretaking responsibilities interfered with work, but 51% of adults in families did.

Participants described the complex interplay between their work, their homelessness, and their health, noting that health conditions interfered with work, and work could produce health problems. One participant described how staff at a shelter helped him secure a job, but he then got hurt on the job: "I got a job in [retail store] by staying at that shelter... I worked there for a long time till I fell down and got hurt there, and then I couldn't work for a year because my back and my hip." Participants recognized that their inability to work served as a major barrier to housing. As one participant said, in response to what was keeping him from regaining housing: "Being able to work. Right now, that is preventing me from paying rent. Because I can't move my arm…And the stroke I got."

## Benefits

Benefits are a critical source of income for those experiencing homelessness. During the COVID-19 pandemic, many social safety net programs eased eligibility and certification requirements for benefits, reducing some administrative barriers to accessing income support. Since we conducted research during this period, our findings reflect the result of pandemic-related increased access.

### Nutrition Benefits

#### CalFresh

CalFresh, California's Supplemental Nutrition Assistance Program (SNAP), is a federally-funded, county-administered benefits program that helps low-income individuals purchase groceries and other food items. At the start of the pandemic, CalFresh increased its monthly benefit amount to eligible individuals. California's Department of Social Services requested federal waivers to ease initial application and re-certification requirements (such as eliminating face-to-face interview requirements) for the program. These actions expanded the program's reach. Seventy percent of participants received CalFresh; 68% of single adults; 90% of adults in families; and half (52%) of TAY.[52]

### Income Benefits

#### Social Security

A federally-funded entitlement program, Social Security provides income to retirement-aged individuals. Those who are at least 62 years of age and have paid Social Security taxes for a federally determined time period are eligible to receive benefits; surviving spouses of beneficiaries do as well. Overall, 8% of participants received social security benefits; 36% of participants age 62 or older did.

#### Supplemental Security Income

Supplemental Security Income (SSI) is a federal program which provides monthly payments to adults with limited income who are 65 or older, or individuals of any age who have a disabling condition. While administered by the Social Security Administration, SSI is distinct from Social Security benefits, and those who receive Social Security are not precluded from SSI receipt. Overall, 12% received SSI; 35% of participants age 65 and older; and 17% of participants with a disability did.

DOJ-HUD-AR00821

### Social Security Disability Insurance

Social Security Disability Insurance (SSDI) provides monthly benefits to people with severe disabilities, as defined by the Social Security Administration, who are unable to work due to their disabling condition. In general, a recipient of SSDI must prove that they are unable to work due to their disability for at least a year; however, exemptions exist (for example, compassionate allowances for individuals with certain medical conditions). Overall, 8% of participants received SSDI; 11% of participants who reported having a disabling condition did. The criteria for SSDI eligibility determination is likely more strict than the one we used to determine having a disabling condition.

### Veterans Administration Income Benefits

The Veterans Administration (VA) offers benefits to both active-duty veterans and National Guard and Reserves members; however, eligibility for some benefits may differ based on length of service and duty status. Overall, 2% received VA income benefits. Six percent of participants had completed military service (either active duty or served in the National Guard or Reserves). Of those participants, 19% reported receiving VA benefits.

### CalWORKs

CalWORKs, California's Temporary Assistance for Needy Families (TANF) program, is a federally-funded, locally-administered program that provides monthly assistance to unemployed or underemployed families with minor children. Overall, 5% received CalWORKs; 36% of adults in families did.

### General Relief and General Assistance

The General Assistance and General Relief (GA/GR) program is designed to provide financial assistance to adults who have not received other income benefits.[43] Thus, only those who did not receive Social Security, SSI, SSDI, VA income benefits, or CalWORKs would be eligible. In California, counties determine both eligibility criteria and the amount of aid offered through GA/GR. Many people who receive GA/GR are able to receive nutrition benefits, such as SNAP (CalFresh). One quarter (28%) of participants received GA or GR. Among those who did not receive any of the other income benefits, 34% received GA/GR.

Participants described their challenges obtaining benefits. They reported being frustrated by challenges completing online benefit forms without the aid of a case manager, because they found the online navigation and interface confusing. These participants used computer terminals in libraries and other public locales, which delete session-specific information once the user logs off. As a result, some participants reported being unable to retrieve passwords and other identifying information the next time they logged on. Participants noted the lack of mobile phones as a barrier to two-factor authentication. Additionally, participants described bureaucratic impediments that resulted in their being turned down for services or remaining on waiting lists for an extended period.

## Discrimination

To assess experiences of discrimination,[44] we administered the Everyday Discrimination Scale (EDS).[45] The EDS is a widely used measure of subjective experiences of discrimination.[46] We asked participants to assess how often in their day-to-day life they were treated with less courtesy or respect than other people, they received poorer service than other people at restaurants or stores, they were treated as if they were not smart, people acted as if they were afraid of them, or they were threatened or harassed. We asked participants why they believe people discriminated against them from a list of 13 commonly marginalized statuses including housing/homelessness status.[47] Acknowledging that people experiencing homelessness often embody multiple marginalized statuses such as homelessness, race/ethnicity, gender, sexual orientation, and disabilities, participants could indicate multiple reasons. We then asked participants what they believed to be the main reason that people discriminated against them.

Discrimination has been linked to a wide range of adverse health outcomes. A stressor that negatively impacts physical, mental, and behavioral health, discrimination can trigger physiological and psychological responses, such as increased cortisol and adrenaline levels, as well as emotional distress. Most (83%) participants reported experiencing discrimination in their daily lives. Nearly half (47%) of participants indicated that they were treated with less courtesy or respect than other people almost

DOJ-HUD-AR00822



© Sam Comen

every day or at least once a week. Forty percent of participants report being treated as if they are not smart almost every day or at least once a week. Of those who reported any discrimination, 32% of participants believed that their homelessness was the main reason people discriminated against them. Those who were unsheltered were more likely to report their homelessness as the main reason (35%) compared to those living in sheltered locations (20%). Participants specified physical appearance and race as main reasons as well. A smaller proportion 21% shared that their physical appearance was the main reason and 9% indicated that race was the main reason.

Participants described the stigma that they faced due to being unhoused. One participant shared: "Do you know how many people are so close to being homeless? Like one paycheck, and they're going to be homeless…There's some people that are homeless because they're mentally messed up or they're on drugs or whatever… But they just stereotype [everyone] and put them in that category."

Participants highlighted the intersectional nature of discrimination, emphasizing the importance of understanding the complex and interrelated reality of these experiences. Discrimination can occur based on more than one embodied status at a time. One participant shared his experience attempting to apply for an apartment as a Latino/x man with tattoos. He shared: "[Leasing agents are] discriminating because I've got tattoos everywhere. So, if I walk in, they'll give me an application, but that's not going to make it into the records or whatever. So, I just don't waste my time on it… [And] my race plays a big factor out here. They look and they see a brown guy with a bald head and tattoos. What are they going to say? 'He's out here stealing stuff.' It's stressful."

DOJ-HUD-AR00823

## SUMMARY

The experience of homelessness is highly stressful: participants spent much of their time trying to survive and find shelter, food, safety. They reported that these efforts consumed much of their energy, leaving them less able to seek healthcare (including treatment for physical and mental health challenges and substance use) and employment. They reported frequent exposure to violence (often perpetuated by strangers), surveillance by the criminal justice system, and discrimination in multiple arenas. When they had the energy to seek help, they found many doors closed, encountering barriers wherever they turned. These barriers caused their health and economic conditions, which were already poor when they entered homelessness, to worsen. They reported that what they most needed—housing—remained elusive.

### KEY TAKEAWAYS

- Most participants experienced unsheltered homelessness. Nine out of ten participants slept in an unsheltered location at least one night during their current episode of homelessness.

- Participants' health status is far worse than their housed, non-institutionalized counterparts. Nearly half of participants self-reported fair or poor health; 34% had difficulty performing at least one activity of daily living; nearly two-thirds had at least one chronic health condition. The high proportion of participants who were age 50 and over faced even greater health challenges.

- Homelessness presents barriers to physical and behavioral health treatment and care needs. Half reported having a regular place for care. A quarter of participants reported an inability to access prescription medications for physical health conditions; a quarter experienced a time where they needed health care, but were unable to get it. Of those who reported current regular substance use, one in five wanted treatment, but were unable to receive it.

- Pregnancy is common during homelessness. One in four of those assigned female at birth aged 18-44 experienced a pregnancy at some point during their current episode of homelessness. Eight percent were pregnant at the time of interview.

- Stress and feelings of hopelessness characterized many participants' experiences of homelessness.

- Two-thirds of participants reported current mental health symptoms, with serious depression and anxiety symptoms being reported most commonly. Approximately half reported symptoms of either depression or anxiety; 12% reported experiencing hallucinations.

- Participants noted frequent interactions with police. One in three were incarcerated for at least one night during their current episode of homelessness.

- Participants spoke about the adverse impact of forced displacements on their lives; over a third reported losing belongings to confiscations in the prior six months. Participants noted that important documents and medication had been confiscated.

- More than a third of participants experienced physical or sexual violence during this episode of homelessness. The perpetrators of this violence were commonly strangers.

- Although benefits were a key source of income, many who may have been eligible for income benefits didn't receive them.

- Eight out of ten participants reported experiencing discrimination in their daily lives. Housing or homelessness status was most frequently identified as the main reason for discrimination.

DOJ-HUD-AR00824



© Sam Comen

DOJ-HUD-AR00825

CHAPTER 4

# BARRIERS & FACILITATORS
## of Returns to Housing

After exploring who experiences homelessness, what life events led to homelessness, and what happens to people while they are homeless, we turn to a different question: what factors interfere with exits from homelessness.

We know that for individuals, housing solves homelessness; if people were housed, they would no longer be homeless. In this chapter, we ask what is getting in the way of people returning to housing, and what would help them do so. Through in-depth interviews, we asked participants about their experiences trying to return to housing: what hopes they had, what challenges they faced, what things would help them.

We heard time and again about participants' eagerness to return to permanent housing—and the seemingly insurmountable barriers they faced. While participants faced many barriers, the primary barrier for all was the high cost of housing.

> "
> *There's just not enough resources out there for people who want to get out of being unhoused... You kind of just seem like you're stuck there. Even if you're trying to get a job, like you have to have an address. And, if you don't have an address, you can't get a job. If you can't get a job, you can't stop being unhoused.*
>
> — CASPEH participant

## INTEREST IN OBTAINING PERMANENT HOUSING

In in-depth interviews, participants expressed an eagerness to obtain permanent housing, because they felt permanent housing would offer needed stability to seek employment and address physical and behavioral health issues. They explained that permanent housing would provide personal safety, security for belongings, access to meal preparation, and protection from the elements. The few participants who expressed concern about permanent housing noted that mental health issues (including PTSD) could make living in housing feel constraining.

## CHALLENGES TO ACCESSING HOUSING

Despite the high level of interest in obtaining housing, study participants faced multiple challenges to doing so. Participants described barriers, including the scarcity and high cost of housing, the lack of rental subsidies, the absence of information about how to access housing services, the lack of assistance in identifying housing, and concerns about whether romantic partners, close friends, or pets would be eligible to stay with them.

In the survey, we sought to understand the barriers that participants faced obtaining housing. To do so, we asked participants about a number of potential barriers to housing and asked them to note how much each interfered with housing returns: not at

DOJ-HUD-AR00826

all, a little, a lot, or don't know. We asked questions about costs; formal assistance (housing navigators or case managers); logistical and technical difficulties; family structure and pets; health problems; past history (credit, criminal justice); and discrimination. Through in-depth interviews, participants helped us understand how these problems played out in their lives.

### Housing Costs

Nearly 9 in 10 participants (89%) noted that housing costs negatively affected their ability to re-enter permanent housing; 76% noted that housing costs impacted their ability to re-enter housing a lot. Participants discussed the cost-related barriers to re-entering permanent housing, including their having insufficient income to cover monthly rental costs and lack of cash reserves to cover the security deposit, first and last months' rent. As one participant told us, "I've tried to look for apartments on my own, but I wanted to make sure that I could afford them. And most of them, they want three times the rent, you know. And just for, like, studios or one bedrooms out here, it's, like, $1100, $1200 just for that alone. I'm like, 'whoa', you know? So that means I'm going to have to make $3300, you know. And I wasn't making that. And I'm not going to be making that anytime soon."

### Trade-offs to Make Housing Affordable

Affordability can be a tradeoff. In theory, there might have been housing that a participant could afford, but other barriers, such as being too far away interfered with it being a viable option. More than half (57%) of participants reported that housing they could afford was either too far away or unsafe: 40% noted that this barrier impacted them a lot (Figure 35). Participants discussed these trade-offs in interviews, noting the many challenges of moving elsewhere for lower cost housing. Those who were able to identify housing that fit their budget found the housing was located in neighborhoods the participant considered unsafe, not well-served by public transportation, or too far away from their place of employment or medical care. Participants discussed the need to find housing in the same city or town to remain in proximity of children, family,



**FIGURE 35** Proportion of Participants Who Reported Affordability-Related Housing Barriers

Impacts ability to obtain housing ● A little ● A lot

**I can't afford housing**

89%

**Housing I can afford is far or unsafe**

57%

and others in their social network. As one participant described their reasoning for not considering moving to a lower cost area: "No, I wouldn't [move there], mainly because my doctors are here. And that's a big concern for me. You know, [to] have the same doctors, they know what's going on, they have all my records, and I know them, too."

In in-depth interviews, we presented participants with a set of hypothetical trade-offs for obtaining housing (e.g., you would need to double up with people you do not know, your place would be inaccessible to public transportation or in another town or city). While participants' responses varied, nearly all expressed being willing to compromise in order to obtain permanent housing. There were common themes to the criteria that participants had in order to accept a housing offer. Participants noted that they would accept a permanent place to live, provided that: (a) the unit was accessible to public transportation, employment, medical care, and/or their social networks; (b) the property owner would accept pets, romantic partners, and/or friends and family members as roommates; and (c) the regulations were no more restrictive than those found in the general housing market (i.e., they were not asked to accept restrictions that people who are not homeless agree to accept).

DOJ-HUD-AR00827

> **❝** *There's not much out there for people with low income. I live below poverty. SSI, I get $900.00 a month. You can't live on that. You can't rent a place with that because you need first month's rent, security deposit, plus you need to make three times that amount of rent. I don't make that much. If I pay rent, even if I pay $500.00 a month rent and I have to have a storage unit, I have to pay for food. I can't do it.* **❞**

Because of interest in shared housing as a means to decrease housing costs, we asked interview participants about this possibility. Some participants stated that they would be willing to share housing with someone they did not know if (a) they would live with just one other person, (b) they would have their own separate bedroom, or (c) they had the opportunity to get to know the person they would be living with before moving in together.

Although participants were, for the most part, willing to accept housing with others (rather than by themselves or with members of their personal household), they were reluctant to accept housing with people they did not know and hadn't chosen. They expressed concern about being forced to live with someone who might be untrustworthy or irresponsible, unwilling to share the same standard for cleanliness, or would steal their belongings. Others explained that their reluctance to share housing with people unknown to them resulted from their past experiences of physical or sexual violence. The ongoing trauma of these experiences led them to be reluctant to accept housing with someone they didn't know. Some participants expressed reluctance to double up with someone with mental health issues or who is actively engaged in substance use. For some, this was because they felt that it would complicate their efforts to maintain their own sobriety or manage their own mental health issues.

## The Role of Rental Subsidies

Rental subsidies, such as Housing Choice Vouchers, allow individuals to pay only 30% of their household income on housing, with the rest paid for by the subsidy. However, there are long wait lists for vouchers and most who qualify don't receive them. Nationally, only one in four households who meet the criteria for Housing Choice Vouchers receive them. In high cost regions with housing shortages like California, even those who receive vouchers may have difficulty using them. We asked participants about rental subsidies: whether they had heard of them, were on wait lists for them, or had one that they couldn't use. Since we interviewed only those who remained homeless, we did not speak to anyone who was currently using a voucher.

The availability of housing vouchers varied greatly by region. In some regions, we spoke to participants who had never heard of them or never heard of anyone having received them. Other participants described being on waiting lists for them. One described his situation this way: "Finding the help and actually believing that I'm not on a hamster wheel with the people I'm working with. I feel like that's what the Section 8 list is, for sure. I feel like that never goes through. It never goes anywhere. You just stay on that waiting list forever and ever and ever. I mean, I stayed on it one time. My ex was on it. We both were on it, but she actually ended up getting picked for the voucher, but they never told her. And then they couldn't find her on the list. After she got selected, she went to go meet with them, and they couldn't find her on the list anymore. You lose hope after a certain point in time." In one or two regions, we met participants who had vouchers or knew others that did. Participants described vouchers as highly valued and rare, with one participant referring to them as "a golden ticket." Those without vouchers described the voucher distribution process as opaque. The lack of transparency led some participants to suspect that favoritism played a role in voucher determinations. These participants speculated that case managers provided vouchers to clients who were members of their own racial or ethnic group.

DOJ-HUD-AR00828

Participants identified numerous obstacles to obtaining housing, even for those with a Housing Choice Voucher. Some participants with vouchers reported that available housing was outside of the allowable price range for the voucher and that their ability to use them was limited by discrimination against voucher holders by property owners.

## Lack of Case Management and Housing Navigation Assistance

Participants expressed enthusiasm about receiving assistance to re-enter housing, but described substantial barriers to receiving it. Unsheltered participants, particularly in rural areas, discussed lack of knowledge about providers that could help participants regain permanent housing. When we asked what formal assistance they received to help them exit homelessness, some were unfamiliar that such services existed. It is possible that the disruptions of the pandemic decreased interactions with case managers and housing navigators.

When (in surveys) we asked about barriers to regaining housing, two-thirds (63%) of participants endorsed that not having someone from an agency to help them interfered with their finding housing; 46% said that this negatively impacted them a lot. When asked whether they had received formal assistance in finding housing, fewer than half (46%) reported receiving help from a case manager, housing navigator, or someone else from an agency or community organization during this episode of homelessness. Even among those who received help, almost half had not received help more than once or twice in the prior six months, if at all. Among the 46% who had received help, 15% reported monthly contact in the prior six months, 29% weekly, and 12% daily or almost daily. Thus, overall, only one quarter (26%) of all participants received help (from a provider) finding housing monthly or more frequently in the prior six months. Sheltered participants were more likely to have received help in the prior six months (44%) than unsheltered participants (20%).

In in-depth interviews, participants residing in shelters (congregate or non-congregate) reported more consistent case management service access, including housing navigation. Some noted that shelters required interaction with case managers. Unsheltered participants reported that outreach workers from social service agencies occasionally offered housing navigation assistance, but rarely returned to provide follow-up information. Participants reported difficulties remaining in contact with case managers/housing navigators, due to lack of access to a reliable telephone. Some participants reported missing out on housing opportunities due to the inability to stay connected. Participants remarked that their phones were either broken, misplaced, stolen, or confiscated during forced displacements, or "sweeps." Given sporadic access to electricity, unsheltered participants with working phones struggled to keep them charged. Participants explained how this led to hopelessness.

As one participant explained, "If you called the [resource hotline] or they give you all these resources and other numbers to call. There is none. They put you back in the link of calls and they send you here, they send you there. But nobody has the right information for the right guidance of where you need [to go] – who is the person you need to speak to and how can I get the help... It was ridiculous to a point you give up. You give up."

Whether sheltered or unsheltered, participants reported that housing navigation services varied in quality. Some participants praised their case managers for facilitating efforts to obtain permanent housing, assisting them with paperwork, helping them to collect the necessary documents, and offering other assistance. Others felt that the assistance they received was inadequate. Participants described receiving out-of-date lists, so when they called about a housing unit, it was no longer available. Participants reported that providers gave them information about housing that was market rate, and thus, outside their price range. Some participants believed these negative experiences could reflect service provider caseloads being too large, frequent staff turnover in service organizations due to low pay or labor shortages, and the lack of existing affordable housing to which case managers/housing navigators could refer.

DOJ-HUD-AR00829

## Wait Times and Hopelessness

Almost half of participants (46%) reported that their having "given up or (not having) the time or energy" to look for housing options negatively impacted their ability to re-enter housing; 30% noted this impacted them a lot. Over half (52%) noted being negatively impacted by extended waits on waitlists; 42% noted this impacted them a lot.

As one participant said, "They tell us, "You're on the waiting list," and all this. It's been three years. How long can the waiting list be? We should be priority according to what the news says all the time. We should be priority to get us off the streets, and they don't. Some of these guys have been out here 20 years... I understand you get the elderly and those out of the way, health conditions. But they tell us the same thing all the time. "You're next. You're next."... It's just stressful."

> **❝** *The most stressful thing I could think of is not having secure or stable housing... I know how to survive, but I don't really know how to live. And then the older I get, the higher [more expensive] stuff is starting to become. So once I think that I'm at a manageable level, I'm noticing that I have to make either three times more than I'm already making or four times more... Previously, I had two jobs, but even still having two jobs wasn't enough.* **❞**

## Logistical and Technological Barriers to Receiving Housing

Participants described lacking necessary documentation to re-enter housing. During their homelessness, they had lost track of documents that they needed to regain housing. They discussed having lost birth certificates, government-issued IDs, and other documents due to theft and loss. A common theme was the role that forced displacements played in



© Sam Comen

documents becoming damaged or misplaced. During these forced displacements, authorities would dispose of belongings or leave them unattended and thus exposed to theft or the elements. Participants reported that COVID-related government closures created an additional barrier to obtaining necessary documents, since government agencies responsible for providing this documentation remained closed for an extended time. Participants noted the toll of their recurring exposure to the elements, with documents destroyed due to rain or lost to wind. In the survey, more than half of participants (53%) noted a lack of documents as a barrier to finding permanent housing; 37% of all participants indicated this impacted them a lot.

DOJ-HUD-AR00830

CHAPTER 4: BARRIERS & FACILITATORS OF RETURNS TO HOUSING



**FIGURE 36** Proportion of Participants Who Reported Family Status Housing Barriers by Family Structure



**FIGURE 37** Proportion of Participants Who Report Discrimination and Prior History as a Barrier

## Family Status

Families and friends can be a source of housing support for many individuals, providing places for individuals to live. But many participants noted that their family or friends were not able to provide a place to stay (Figure 36). Half (51%) of all participants noted that their family and friends were unable to accommodate them, with 39% noting it as a barrier that impacted them a lot. This issue was more frequently identified as a barrier among transition age young adults (70%, with 53% indicating it impacted them a lot) and adults in families (65%, with 57% indicating it impacted them a lot) than single adults (49%, with 37% indicating it impacted them a lot). This finding could be because family or friends do not have space or resources for the participant to live with them, or because rental agreements

DOJ-HUD-AR00831

for market-rate or subsidized housing may limit the number of residents permitted to reside in a unit, or the length of time a guest is allowed to stay there.

Among all participants, 10% noted that they were impeded in finding housing because they needed to find housing for themselves and their children; 6% noted that this impacted them a lot. This issue was more common among adults in homeless families, where half (50%) noted it; 35% reported that it impacted them a lot. While having children presented a barrier for housing (either because property owners discriminated against children or because participants could not find affordable spaces with room for their children), housing was critical for those with children to maintain or regain custody.

We asked participants whether having pets was an impediment to their finding housing. Eighteen percent of participants reported this served as a barrier, with 10% noting it impeded them a lot. Participants discussed the challenges of finding housing that allows pets. These participants considered their pets to be part of their family, and would not consider housing that wouldn't allow their pets, despite encountering barriers associated with having a pet.

### Discrimination and Prior History as Barriers

We examined the role that identity-based discrimination and histories of eviction, poor credit history, or a criminal record played in creating barriers to re-entering housing. We defined discrimination broadly to encompass any perceived disparate treatment based on participants' characteristics. Forty-three percent of participants reported that they had experienced discrimination when trying to rent, with one quarter (25%) indicating this barrier impacts them a lot (Figure 37). One in three (36%) participants indicated their carceral record as a barrier, with 21% of participants noting that this negatively impacted their ability to find housing a lot. Nearly half of participants (49%) noted that either problems with their credit history or prior evictions negatively impacted their ability to find housing, with 30% noting it did a lot.

Participants described instances where property owners discriminated against those with rental subsidies/vouchers, those with little or no rental history, and those with a history of incarceration. Participants discussed being discriminated against in the housing market on account of their race or ethnicity. Because of these challenges, participants reported needing to apply for several units, leading to cost-prohibitive application fees that stalled their housing search. One participant shared: "There's so many times of just applying and not even hearing a phone call back to even say that you're not even accepted... If they don't want to have me there, why have me fill out the application and all that?... they were charging like $35.00 credit checks and stuff each time, each application... After so many times of trying, you just give up because that money is just going to them for nothing when they know their answer already."

### Challenges Associated with Physical and Behavioral Health

Some participants encountered challenges due to physical and behavioral health conditions. A quarter (24%) of participants noted they could not find housing that meets their needs due to a physical disability; 14% indicated that this impacted their ability to find housing a lot. More than a quarter (29%) of participants indicated that their mental health or substance use impeded their ability to obtain housing, with 19% noting it impacted their ability to find housing a lot.

Some participants discussed how behavioral health conditions caused them to feel overwhelmed by the bureaucratic hurdles necessary to secure housing. When asked how their mental health impacted their ability to find housing one participant shared: "My mental health, bipolar disorder, because of my mania I don't think more than a day ahead. It's day by day. I try to focus on the day. When I try to think about next week, I get too much anxiety and I freak out and I panic."

DOJ-HUD-AR00832

## WHAT WOULD HELP INDIVIDUALS END THEIR HOMELESSNESS?

Similar to the prevention program thought experiment (Chapter 2), we asked all participants (in the survey) about several hypothetical interventions that could help them re-enter housing right now. We asked participants what they believed would help them obtain housing: (a) a monthly subsidy of $300-$500 dollars, (b) a lump-sum payment of $5,000-$10,000 dollars, (c) a subsidy or voucher that limited their rent to 30% of their income (similar to a Housing Choice Voucher), or (d) a housing navigator (Figure 38). We asked about each hypothetical intervention separately and asked, for each, for participants to rate whether the intervention would help them a lot, a little, not at all, or not sure. Eighty-six percent thought that a monthly subsidy of $300-$500 would help; 65% thought it would help a lot. Ninety-five percent indicated a lump-sum payment of $5,000 to $10,000 (that could help with security deposit, first, and last month's rent) would help, 85% indicated it would help a lot. Ninety-six percent of participants indicated a rental subsidy that would limit their rent to 30% of their income would help; 89% thought it would help a lot. Finally, 94% indicated that a housing navigator would help; 80% thought it would help a lot.



**FIGURE 38** Participant Report of Effect of Hypothetical Interventions to Support Returns to Housing

● Help a little  ● Help a lot

$300-$500 dollars/month shallow subsidy
86%

$5,000-$10,000 one-time payment
95%

Housing voucher
96%

Housing navigation
94%

> **"** *You be cold and freezing in the tent sometimes. You've got plenty blankets, gloves, hoodie, jackets. But it really makes you appreciate being inside. You can bathe when you want to. You can flush the toilet when you want to. I was going to flush the toilet when I get in my apartment, just so I can hear it. You don't realize how important it is to be inside... I know now that I would cut all my limbs off, if that's what it took to pay my rent for the rest of my life. And I would never have to be outside again. That's what I would do... Having a place, a stable place over your head, is the most honorable thing you can give yourself. Because you can eat, you can sleep, come and go. Yeah, see your grandkids. They come to see you because you have somewhere for them to come to. It's the most beautiful thing.* **"**

DOJ-HUD-AR00833

> Participants wanted housing desperately. And while they suffered immensely, they held out hope for a better future–one in which they could, once more, know the safety and security of home.

## PARTICIPANTS WANTED HOUSING, BUT FACED MANY BARRIERS.

Participants wanted to exit homelessness. They wanted to have a permanent home, knowing that it would provide them a pathway toward health, reunification with their children, employment, safety, and stability. While many had lost hope, they yearned for home. Everywhere they turned, they came up against barriers: they had poor credit, no savings, no phone to receive calls, no documents, transportation, or money for rental applications. Many did not have anyone to help find housing. Those who did considered themselves lucky, but their luck would run out when the person helping them left their job, or they lost their phone. If they were one of the few to get a rental subsidy, they still had to overcome a host of obstacles: discrimination against voucher holders, racial discrimination, no internet, no transportation. The biggest obstacle they faced was costs: they could not make enough money every month to pay the rent. Participants believed, overwhelmingly, that money—a monthly subsidy or one-time payment-- would help them end their homelessness. Participants wanted housing desperately. And while they suffered immensely, they held out hope for a better future–one in which they could, once more, know the safety and security of home.

### KEY TAKEAWAYS

- Nearly all participants expressed interest in obtaining housing. However, significant barriers impacted their ability to do so.
- Housing costs posed the most significant barrier to regaining housing.
- Participants are willing to make trade-offs to access permanent housing.
- Participants noted additional obstacles, including logistical barriers (no phone, transportation, documents); lack of housing navigation support; family considerations; identity-based discrimination; and prior histories of criminal justice involvement, eviction, and poor credit.
- Fewer than half of participants received help from a case manager, housing navigator, or someone else from an agency. Only one quarter of participants received any help finding housing monthly or more frequently in the prior six months.
- Participants overwhelmingly believed that additional money would end their homelessness, whether through shallow subsidies, one-time lump-sum payments, or deep rental subsidies.

DOJ-HUD-AR00834



© Sam Comen

DOJ-HUD-AR00835

CHAPTER 5

# Policy Recommendations

In this chapter, we discuss policy recommendations for local, state, and federal policymakers. Our recommendations include increasing affordable housing, homelessness prevention, appropriate services and supports, and income, and centering racial equity. We highlight where programs or policymakers could leverage or expand existing funding mechanisms to implement these recommendations. For example, the California Advancing and Innovating Medi-Cal (CalAIM) program, California's transformation of their state Medicaid plan (known as Medi-Cal), offers several opportunities to bring key recommendations to scale. We intend for these recommendations to start a conversation, rather than to be comprehensive. Ending the homelessness crisis will take time and demand resources and coordination between local, state, and federal entities.

## INCREASE AFFORDABLE HOUSING OPTIONS AVAILABLE TO EXTREMELY LOW-INCOME HOUSEHOLDS

The median monthly household income in the six months prior to homelessness across all CASPEH participants was $960. Almost all participants met criteria to be considered "extremely low-income" or making less than 30% of the Area Median Income. Participants' inability to afford housing was both the underlying cause of homelessness and the primary barrier to their returning to housing. This finding was true throughout California, not only in the high-cost coastal regions.

Any solution to homelessness must address the lack of affordable housing for extremely low-income households. In 2023, California had only 24 units of housing available and affordable for every 100 extremely low-income households.[48] Shrinking this housing deficit will require investments at every level of government. But, it is essential to end the homelessness crisis. We recommend the following:

■ **Expand deep rental assistance programs (such as Housing Choice Vouchers).** Funded by the federal government and administered by local housing authorities, Housing Choice Vouchers limit a household's rent to 30% of income. Only one in four households nationwide who qualify for Housing

Choice Vouchers receive them. While most Housing Choice Vouchers are tenant-based, some housing authorities use project-based vouchers. Expanding rental assistance programs could provide housing stability for many extremely low-income households.

In addition to advocating for the federal government to support additional vouchers, local jurisdictions could expand locally operated rental subsidy programs with funding from local, state, and federal programs.

■ **Support usability of existing subsidies.** Expansion of Housing Choice Vouchers (or similar rental subsidies) is necessary, but not sufficient. In certain regions, participants reported having a voucher and not being able to use it. Providing increased housing navigation support, funding for non-rent housing costs (e.g., housing search, security deposits, and move-in costs), incentivizing property owners' acceptance of vouchers, and enforcing anti-discrimination laws could increase use of vouchers in tight rental markets.

■ **Incentivize production of deeply affordable housing through existing mechanisms, such as the Low Income Housing Tax Credit (LIHTC) program.** California is one million units short of available and affordable housing for extremely low income renters.[49] There is a need to leverage

DOJ-HUD-AR00836

land use tools to achieve affordability by removing local permitting barriers to affordable housing. By incentivizing public-private partnerships in support of development, LIHTC has helped finance nearly all affordable housing in California. Other examples include programs such as Homekey, which provided funding for local governments to purchase pre-existing housing or convert commercial properties to interim or permanent housing.

🚩 **Pilot shared housing; to make them tenable, give clients agency in choosing with whom they live, privacy, and support.** While there is a clear and critical need for housing production, closing the housing gap will take time. Shared housing (an option in which two or more unrelated people live together in a housing unit and share expenses) offers an opportunity to maximize use of limited existing housing. Previous Housing and Urban Development (HUD) programs allowed for shared housing (e.g., two households could split rent). In our in-depth interviews, we engaged participants in a thought experiment about trade-offs they would make in order to obtain permanent housing. While many participants expressed concerns about shared housing, some participants were open to the idea under the condition that they shared with only one other person, had their own bedroom, and had a chance to get to know any potential housemates prior to moving in together. Participants noted that they would not accept shared housing with a housemate whom they didn't have a choice in selecting.

Effective models of shared housing give agency to residents. Shared housing programs should allow for clients to choose whom they live with and provide private bedrooms within the space. Allowing individuals to live with whom they are most compatible with, while providing all residents in the unit their own space, could mitigate conflict among residents. Additionally, shared housing models should integrate mediation services to help residents navigate issues that may arise while living together. Piloting shared housing programs that promote client choice and provide support may be a strategy to increase use of existing housing units.

🚩 **Pilot providing monetary support to facilitate shared housing with family members/friends.** More people entered homelessness from non-leaseholder agreements than from traditional leases. One quarter of individuals in non-leaseholder agreements paid no rent. The second most common reason for leaving housing among non-leaseholders was "not wanting to impose." Pilot programs could explore the ability of rental stipends to facilitate extremely low-income individuals to remain with or move in with members of their social network (family or friends).

## INCREASE HOMELESSNESS PREVENTION

Participants received minimal warning before losing their housing; few knew about or accessed prevention services. Leaseholders' median notice before losing housing was 10 days, while non-leaseholders had a single day. While few reported access to prevention services, many participants engaged with other mainstream systems. We recommend the following:

🚩 **Pilot shallow monthly subsidy or lump-sum payment programs.** Many CASPEH participants believed that a one-time payment of $5000-$10,000 or a shallow monthly subsidy of $300-$500 would have prevented their current episode of homelessness. These interventions can help renters catch up on late rent and avoid pay or quit eviction, help others pay security deposits and moving costs, or make up the difference between income and rent. This recommendation is in line with research on homelessness prevention, which shows that if targeted appropriately, homelessness prevention can reduce episodes of homelessness (and the attendant downstream consequences) at a reasonable cost.

🚩 **Incentivize property owner and tenant mediation processes as a means for eviction diversion.** Incentivizing property owner participation in mediation processes prior to eviction proceedings could allow tenants and property owners to come to a resolution that averts eviction. If they cannot reach agreement, the mediation process could offer tenants additional time to find alternate housing arrangements. Currently, property owner–tenant

DOJ-HUD-AR00837

mediation in California is voluntary. However, dedicated efforts to incentivize landlords to participate in the process could increase its reach.

Nearly half (47%) of participants indicated that eviction or credit history were key barriers to exiting homelessness. Mediation offers a critical pathway to housing stability and avoids a record of eviction. Mediation should be paired with legal support for tenants to navigate the process.

**⚑ Increase homelessness prevention in institutional settings.** One in five participants entered homelessness directly from an institutional setting (jail, prison); few had received prevention services. Embedding robust homelessness prevention in institutional settings (carceral settings, drug treatment, hospitals) could reduce inflows into homelessness.

**⚑ Embed homelessness prevention in mainstream systems where low-income individuals receive services.** Few participants had sought or received prevention services. Embedding screening and prevention services where at-risk individuals seek services (healthcare, social service, domestic violence services, educational settings) could increase awareness and use of prevention services.

## FACILITATE SWIFT EXITS FROM HOMELESSNESS

The median duration of current homelessness episodes was 22 months. Participants spoke about numerous barriers that made re-entering permanent housing difficult. While almost 9 in 10 reported that the cost of housing was the main barrier to re-entering housing, they noted other barriers as well. Participants described the lack of support received for finding housing, difficulty identifying available affordable housing, and challenges with documents. To quicken exits from homelessness, we recommend:

**⚑ Increase housing navigation, with targeted outreach to those in unsheltered settings.**
Housing navigation can help clients with searching for housing, negotiating with property owners, and gathering necessary documents. Implementing comprehensive housing navigation services could help people experiencing homelessness overcome barriers to returning to housing.

**⚑ Ease barriers to identifying affordable housing options.** Participants described challenges identifying available affordable housing, complicating their housing search. Tools that make the search for deeply affordable housing easier could ease barriers.

**⚑ Lower barriers for accessing State-issued identification cards and other needed documentation.** Half (52%) of participants noted a lack of documents, such as State-issued identification cards and birth certificates, as a barrier to finding housing. Participants could not afford to replace these, nor did they have access to transportation or other resources to start the replacement process. Improving outreach to assist with document replacement, waiving replacement fees, and providing safe storage would reduce barriers to employment and housing.

## INCREASE ACCESS TO SERVICES TO MATCH CLIENTS' PHYSICAL AND BEHAVIORAL HEALTH NEEDS

Study participants had poor health and poor access to appropriate services. They reported barriers to receipt of routine healthcare, substance use services, and mental health treatment. The aging of the population, poor functional status, high prevalence of chronic illnesses, high rate of pregnancy, and high prevalence of behavioral health needs call for additional services and support—both while people experience homelessness and to support them in housing. Because of the extraordinarily high rate of trauma—before and during homelessness—these services must be offered in a way that adheres to trauma-informed principles.

### Substance Use

**⚑ Increase access to substance use treatment.** Twenty percent of participants who reported current regular substance use indicated that they wanted treatment, but were unable to receive it. Evidence shows that substance use treatment is most effective among those who choose to engage with it. A higher proportion of individuals who used substances regularly live in unsheltered environments. There is a need for increased access for those who want it, particularly those in unsheltered settings. Promising models for low-barrier, outreach-focused services (including medication treatment) should be expanded.

DOJ-HUD-AR00838

**▶ Increase outreach with harm reduction services (naloxone, needles, drug testing).** Participants report a high rate of substance use, injection drug use, and drug poisoning (overdose). There is a need to increase access to harm reduction services, including those aimed at preventing overdose (naloxone), skin and soft tissue infections, and infectious diseases, particularly in unsheltered settings.

**▶ Prioritize investments in promising treatments for stimulants.** Participants report high rates of methamphetamine use. There is a need to invest in promising treatments, such as contingency management for those with stimulant use disorders.

**▶ Increase linkage to harm reduction and substance use treatment through emergency departments.** As with other studies, we found high rates of emergency department (ED) use among those experiencing homelessness and low use of non-ED ambulatory care. To meet the needs of those with substance use disorders, increase ED's capacity to provide and link to substance use treatment and harm reduction services. This capacity could include initiation and linkage to medication treatment for opioid and alcohol use disorders, linkage to residential treatment and distribution of naloxone.

## Provide Appropriate Services to Match Client Needs in Housing

**▶ Increase availability of permanent supportive housing for those with complex behavioral health needs.** Permanent supportive housing should be aligned with Housing First principles and use evidence-based models of care (e.g., Assertive Community Treatment, Intensive Case Management, Pathways to Housing) that meet the needs of those who have significant behavioral health needs. There is a need for funding to pay for appropriate service provision. For those who are not able to thrive in permanent supportive housing with high levels of support, we recommend expanding availability of behavioral health focused residential care facilities.

**▶ Create permanent supportive housing responsive to the needs of older adults.** Nearly half of adults experiencing homelessness are 50 or older. By the age of 50, people experiencing homelessness have

health and function similar to adults in their 70s and 80s in the general community, with high prevalence of functional and cognitive impairments. Many have co-occurring behavioral health problems. To avoid preventable institutional care, there is a need for housing options that support independence for those with functional and cognitive impairments. Medicaid Home and Community Based Services can fund supports and services, but traditional consumer model in-home supportive services may not meet the needs of this population. There is a need for models of care for older adults that take into account the co-occurrence of behavioral health needs with significant functional and cognitive impairments, narrow social networks, and history of trauma. There is a need for expanded permanent supportive housing with robust services and supports for those with chronic illness and functional or cognitive impairments; using the Home and Community Based Alternatives Waiver offers a promising opportunity. Other potential models (such as integration of the Program of All-Inclusive Care for the Elderly [PACE] programs with permanent supportive housing) and expanded use of the contract mode of in-home supportive services should be considered.

## Physical and Mental Health Services

**▶ Increase street medicine outreach.** *Street medicine* is the practice of providing critical health care services to those experiencing unsheltered homelessness. Despite relatively high levels of insurance coverage, only half (51%) of participants noted having a regular place for care. Meeting people where they are to provide care lowers barriers to care among a population with high need.

**▶ Increase access to full scope reproductive services, prevention, and housing resources for pregnant people.** More than one quarter (26%) of participants assigned female at birth who were aged 18-44 experienced a pregnancy during their current episode of homelessness; 8% were currently pregnant. Increasing access to comprehensive reproductive health services and facilitating connections to housing resources is crucial to the health of pregnant people experiencing homelessness and children.

DOJ-HUD-AR00839

🚩 **Increase access to mental health care in all settings.** Despite a high prevalence of mental health needs, participants reported limited engagement with mental health services. Increasing access to mental health care in both unsheltered and sheltered settings offers a critical opportunity to increase parity between needs and availability of services.

🚩 **Increase availability of recuperative care/medical respite.** More than one third (38%) of all participants visited the emergency department and one in five (21%) were hospitalized for a physical health condition in the prior six months. Participants spoke of their experiences being discharged from hospitalizations to unsheltered settings, or shelters that did not have the resources they needed for recovery. Recuperative care combines shelter with health services for people exiting hospitals who no longer meet criteria for the hospital but are too ill for sheltered or unsheltered settings. These programs may help decrease length of hospital stay and readmissions and improve health outcomes. With an aging homeless population, the need for recuperative care will increase.

## ADDRESS THE CRIMINAL JUSTICE SYSTEM TO HOMELESSNESS CYCLE

Nearly one in five participants (19%) entered homelessness from an institutional setting, including jail and prison. Thirty-seven percent spent time in prison and 77% spent time in jail at some point in their lifetimes. While experiencing homelessness, 30% of all participants had a jail stay during their current episode.

Participants reported their prior criminal justice records were a barrier to employment and housing. They reported frequent interactions with law enforcement agencies while homeless. We recommend the following:

🚩 **Lower housing barriers for those with criminal justice system records.** Consider prohibiting consideration of criminal justice records in the tenant review processes and taking a more individualized approach to reviewing applicants with criminal justice records.

🚩 **Improve re-entry support for those exiting carceral settings.** Few participants exiting prison or prolonged jail stays reported that they had received re-entry support. Improving re-entry supports, including meaningful connections to permanent housing, healthcare, and employment could result in reductions in homelessness and returns to carceral settings.

🚩 **Reduce carceral responses to homelessness.** Criminal justice responses to survival behaviors, such as sleeping or living in public spaces are associated with increased rate of incarceration and prolongation of homelessness. Using non–law enforcement responses to behavioral health crises increases trust and supports connection to ongoing care. Ticketing and towing of vehicles leads to loss of a resource that can provide safety and security for individuals (as well as transportation to employment and healthcare). Following encampment resolution best practices, including supporting access to low barrier housing, can reduce trauma, loss of documents, and support better health outcomes.

## INCREASE OPPORTUNITIES FOR EARNED INCOME AND BENEFITS UTILIZATION

One in five leaseholders cited reduced or lost income as the biggest reason for leaving their last housing. Many participants have extended disconnections from the labor market. While benefits are a critical source of income for people experiencing homelessness, we found relatively low rates of utilization of many benefits. We recommend the following:

🚩 **Increase evidence-based employment supports.** Given lengthy disconnections from the workforce and the relatively high rate of people actively looking for work, increasing evidence-based employment supports for people living in affordable or supportive housing, those with histories of homelessness, and with behavioral health needs could increase opportunities for earned income. Many participants reported transportation barriers to employment; this should be considered as part of employment support.

DOJ-HUD-AR00840

CHAPTER 5: POLICY RECOMMENDATIONS

**▶ Increase enrollment in income-eligible benefits.** We found low rates of utilization of income-eligible benefits, such as SSI/SSDI. Streamlining processes, removing recertification barriers, increasing affirmative outreach to those experiencing unsheltered homelessness, and connecting participants to benefits when participants interact with other systems could provide crucial income support.

## SUPPORT THOSE IMPACTED BY DOMESTIC VIOLENCE

Fifteen percent of all participants noted that violence or abuse in the household was a reason for leaving their last housing arrangement. In the six months prior to homelessness, 25% of participants experienced physical violence and 6% experienced sexual violence. We recommend the following:

**▶ Increase availability of emergency shelters and permanent housing options for those impacted by domestic violence.** Increased shelter availability could better meet the needs of those impacted by domestic violence. Expanded availability should be coupled with enhanced training of shelter staff to ensure consistent connection of those impacted by domestic violence with coordinated entry systems. While emergency shelters play an important role in allowing those impacted by domestic violence to exit situations swiftly, there is a need for permanent housing to promote exits from shelter settings.

## INCREASE OUTREACH TO THOSE EXPERIENCING UNSHELTERED HOMELESSNESS

Nearly 8 in 10 participants (78%) reported that they spent most of their prior six months in unsheltered settings. Many who started in vehicles lost their vehicles. Those in unsheltered settings had less access to services and higher rates of behavioral health challenges. We recommend the following:

**▶ Invest in sustained outreach into unsheltered communities.** We recommend increasing outreach related to physical health, behavioral health, benefits, and housing navigation services to those living in vehicles, encampments, and other unsheltered places. Increase opportunities for individuals to retain their vehicles, which provided a form of shelter and transportation. Some communities in California have safe parking programs, which often provide access to restrooms, running water, and secure parking to support those experiencing vehicular homelessness.

## CENTER RACIAL EQUITY

Minoritized racial groups are disproportionately represented in homeless populations. Because they have experienced multiple forms of discrimination throughout their lives, services must be aligned with best practices to build trust and reduce harm. Participants experienced discrimination at multiple points across their life course.

**▶ Strengthen anti-discrimination policies and enforcement mechanisms.** Given that participants experienced discrimination on the housing market, there is a need to strengthen anti-discrimination housing policies (such as HUD's Fair Housing Act and California's Fair Employment and Housing Act). These strengthened policies should be coupled with adequate enforcement mechanisms to ensure more equitable housing outcomes.

**▶ Prioritize equity in local coordinated entry systems.** Some coordinated entry processes and assessment tools have perpetuated racial inequities. Coordinated entry should embed racial equity at all steps—from assessments and prioritization to ensuring non-discriminatory practices in housing placement. To accomplish this goal, coordinated entry systems should regularly review data to ensure equitable pathways to permanent housing.

**▶ Lower housing barriers for those with criminal justice system records.** Given the disproportionate impact of incarceration on people of color, lowering barriers for justice-impacted individuals is critical to advancing racial equity.

DOJ-HUD-AR00841

DOJ-HUD-AR00842

## ACKNOWLEDGMENTS

The California Statewide Study of People Experiencing Homelessness (CASPEH) reflects the hard work and dedication of many people. Completing a project of this size, in a state as large and diverse as California, in the midst of a pandemic, could not have happened without their commitment, brilliance, and devotion.

We are endlessly grateful to core BHHI field researchers who spent much of a year traveling throughout the state, honoring the stories of the people experiencing homelessness whom they met. They were indefatigable and brilliant in all that they did. Layan Kaileh (who managed overall operations) brought us all together, and led her team with compassion and wisdom. In addition to doing advance work in each county, she supervised the team, community ambassadors, and county field staff, scouted locations, served as troubleshooter, and kept morale high through long days that were alternatingly too hot, too cold, too wet or too dry. We thank Angelica DeGaetano (who managed our respondent-driven sampling project), Zena Dhatt and Michael Duke (who managed the qualitative interviews), Diana Flores (who got the field team started) for their leadership and commitment. We are grateful to our core team members: Tremone Fucles, Norma Guzman, Tianna Jacques, Amy Lara, Corbin Platamone, Abraham Renteria-Ramirez, Madison Rodriguez, Regina Sakoda, Ivan Smith, Elana Straus, and Grace Taylor. You all brought wisdom, energy, and compassion to the work (and yes, we are at "End Survey"!). We thank BHHI senior staff members Pamela Olsen, Tiana Moore, Kara Young Ponder, Alice Fishman and Tamar Schnepp, who, whenever we needed it, traveled with the team to provide additional leadership, training, support, and organization whenever and however. Their leadership in and out of the field was essential to what we did. We thank BHHI staffers Celeste Enriquez, Cheyenne Garcia, and Karen Valle who stepped out of their usual roles and went into the field when we needed additional help.

We thank Dallas Augustine and Lucy Zhang who joined us in multiple counties to conduct qualitative interviews for those with criminal justice histories and Graham Pruss for joining in multiple counties to conduct qualitative interviews. We thank Jay Bindman, Georgia Bright, Lucy Zhang, Chikwado Akpunonu, Jose Alvarez, Bianca Armenta, Lila Avendano, Dalliana Banuelos, Lydia Barrett, Andrew Cheung, Karla Garcia, Valeria Gomez, Kristofer Hernandez, Andi Ismail, Maryanne Jacoby, Kimberly Lara, Marcus Lou, Jennifer Ly, Sureena Mann, Kimberly Merene, Kim Merida, Raquel Morales Flores, Nneoma Ogele, Charlene Rodriguez, Steve Singleton, Alexis Umoye, and Sophia Yonkers-Talz who served as field researchers in large counties and brought their understanding, sense of humor, willingness to learn, and commitment to the project.

We thank our community ambassadors throughout California who walked besides us, introduced us to each community and setting we entered, and served as our local experts and guides. Your kindness, thoughtfulness, and brilliance made this project what it is. To maintain confidentiality of the counties, we are not naming you here, but we are endlessly grateful for your work and your partnership. We know that we couldn't have done this without you.

We thank our partners in the eight counties we worked in. Coordinating on the ground in eight counties took a village. While we cannot acknowledge people by name, we want to thank the dozens of outreach workers, Point-In-Time-Count leaders, community organizations, university professors and staff, government agency staff, emergency shelter and SIP hotel staff, homeless service response system providers and individuals running street medicine programs for helping us build our venue and encampment databases; set up and randomize at venues, and ensure that we were connected to the right people to make this project a success. We couldn't have done this project without you.

We were supported by an incredible BHHI team who managed the logistics and provided support. We are grateful to Dante Skidmore for somehow keeping track of all the logistics, including innumerable supplies, car and hotel reservations, and whatever else needed to happen and to Alma Yates who worked alongside him. Thanks to Gato Gourley, Alice Fishman, Binh Tran, Sonja Simmons, and Usma Khan for holding us together in many ways and to all our BHHI colleagues who kept everything else running while we were preoccupied with this study.

Our incredible statistics and data science team Jenna Birkmeyer, Sara Colom, Dave Graham-Squire, Kim Nguyen, Eve Perry, Margo Pottebaum, and Mai See Yang and their project manager Regina Sakoda oversaw every number and figure you see. We are grateful to Dave's overall leadership of the team and his wisdom in study design, Gina's incredible organization and project management, and Jenna, Sara, Kim, Eve, Margo and Mai See's continuous work to ensure that our findings are accurate, clear, and comprehensive.

Michael Duke and Kelly Knight served as lead investigators on our qualitative team. They were aided by sub-study co-investigators Dallas Augustine (Incarceration and Homelessness), Kara Young Ponder (Black Experiences of Homelessness in California) and Anita Hargrave (Intimate Partner Violence and Homelessness). Zena Dhatt served as qualitative team project manager with aplomb. Tianna Jacques and Grace Taylor were fabulous core members of the qualitative team. They were aided by numerous field researchers who conducted interviews, and Lucy Zhang, Corbin Platamone, Kweku Djan, Mukund Raghuram, Norma Rodriguez and others who played important roles coding reams of qualitative data. We are so grateful to the qualitative team's commitment to treating the participants and their stories with compassion, rigor, and understanding and making sure that others heard the participants' truth.

DOJ-HUD-AR00843

In designing the questionnaire, we were lucky to have the expertise of Meghan Morris and Cheyenne Garcia who brought their wisdom and energy to leading the effort. Many others, including Shannon Smith-Bernardin, Christine Ma, Monica McLemore, Dallas Augustine and Anita Hargrave helped identify appropriate questions on specific topics and answered our questions. We are grateful to Paul Wesson who was an incredible thought partner in designing the sampling plans, helped us think through complicated weighting plans and guided us through many difficult decisions. We thank Kenny Perez for bringing his energy, brilliance and way too many late nights to guide our programming of the survey instrument and ensure its accuracy.

Kara Young Ponder played too many roles to count, including guiding our wonderful community advisory boards, running the Black Experiences of Homelessness qualitative research project, and supporting our team through difficult days.

Erin Hartman and Robin Craig on the BHHI communications team played key roles in editing and conveying our findings. We are grateful to Elizabeth Weaver and Ranit Schmelzer at Woodside Park Strategies for their communications guidance.

We are grateful to Aaron Schrank for his audio journalism and Sam Comen for his photography for CASPEH's companion documentary project, Unhoused. Many of Sam's incredible photos are featured in this report, alongside the compelling photographs of Barbara Ries. We thank Ellen Sherrod for her layout and design and willingness to work on a tight deadline.

This study depended on the insight, honesty, and brilliance of our three Community Advisory Boards. Our board members were critical partners at all phases of the study. We extend our appreciation to members of our Lived Expertise Advisory Board (Ludmilla Bade, Jesica Giannola, DeForest Hancock, Sage Johnson, Dontae Lartigue, Dez Martinez, Priest Martinez, Robynne Rose-Haymer, Claudine Sipili), our Policy and Practice Advisory Board (Ali Sutton, Bobby Watts, Brenda Grealish, Corrin Buchanan, Cynthia Nagendra, Jamie Almanza, Janey Rountree, Jennifer Loving, Joy Moses, Maria Rodriguez-Lopez, Nan Roman, Nicole Sager, Omar Passons, Patti Prunhuber, Richard Cho, VaLecia Adams Kellum, William Snow), and our Learning Collaborative Advisory Board. To maintain anonymity of the counties, we are not naming our Learning Collaborative Board members here, but we are endlessly grateful for all of your assistance and partnership.

At various times, we called on outside researchers for advice. We are grateful to their willingness to answer our questions. We thank Dennis Culhane, Tianna Paschel, Anita Raj, Ryan Finnigan, Evan White, Sara Kimberlin, Johanna Lacoe, Jill Khadduri, Janey Rountree, Dean Obermark, Ben Henwood, Beth Shinn, and Randall Kuhn.

The project was funded by the Benioff Homelessness and Housing Initiative, California Health Care Foundation and Blue Shield Foundation of California. Our partners at CHCF (Lisa Aliferis, Eric Antebi, Dalma Diaz, Michelle Schneidermann) and BSFC (Karen Ben-Moshe, Courtnee Hamity, Krysten Massa, Rachel Wick) stood by us throughout the process and were true colleagues. We are grateful for their partnership. We are grateful to Marc and Lynne Benioff whose generous donation has provided essential support to the BHHI.

Throughout the process, we had help from colleagues at the California Health and Human Services Department who provided insights and advice. We thank Corrin Buchanan for her wisdom, willingness to answer questions and provide guidance throughout the process. We are grateful to Marta Galan and Irene Farnsworth for their insights and assistance.

Jenna Birkmeyer knew the questionnaire inside and out and worked with the other incredible statistics team members to make sense of (and convey) our findings. We are grateful for her (and the statistics team's) calmness, knowledge, and willingness to go the extra mile. Michael Duke, Zena Dhatt, and Kelly Knight drafted sections that originated from the qualitative research and made sure that they were true to the qualitative data. They brought the experiences of our participants to life and made sure that CASPEH honored their experiences. Kara Young Ponder drafted numerous sections, brought her deep knowledge of race and racism to our work, and made sure that we incorporated the deep wisdom of our advisory boards.

Tiana Moore led the writing effort with brilliance, fearlessness, a deep commitment to find the truth, and a willingness to work hours that no one should work. We are endlessly grateful to her leadership, analytical, organization, and writing skills; her deep knowledge of policy; and her unyielding devotion to this project. None of this could have happened without her.

To those whom we neglected to name, know that we are so appreciative of all of your contributions. While this was, truly, a group effort, the authors take responsibility for any errors that may have slipped through.

Most of all, we thank the 3,200 study participants who answered our questions with vulnerability and honesty. We hope that we have honored what you told us and we commit to work toward a future where you, once again, enjoy the safety and security of home.



**Margot Kushel, MD**

*Director, UCSF Benioff Homelessness and Housing Initiative*

*CASPEH Principal Investigator*

DOJ-HUD-AR00844

# REFERENCES

**1** Our study focuses on adults only. We include all adults, including those in homeless families (those living with minor children while homeless) and transition age young adults (aged 18-24). The experience of children living in homeless families and homeless youth (under age 18) is outside the scope of this project.

**2** The Homeless Emergency Assistance and Rapid Transition (HEARTH) to Housing Act of 2009 is the definition of homelessness used by the Federal Government. It defines homeless individuals and families as those who lack a fixed, regular, and adequate nighttime residence; those who will lose their primary nighttime residence imminently (i.e., within 14 days); or who are fleeing domestic violence, dating violence, stalking, or similar threatening situations.

**3** Our random samples were determined based on the number of people at a given site and the number of people we needed to interview. Our staff kept track of which people we approached for an interview and who we skipped over so that we could accurately determine the percentage of people at each site that we interviewed.

**4** Weighting is a statistical technique in which researchers adjust data to allow them to represent the population studied.

**5** We use the term Latino/x to refer to our participants who indicated Latino/a/x, Hispanic, or Latin American on the CASPEH race measure. We use this term to recognize both those who prefer to use the terms Latino or Latina and those who prefer to use the term Latinx to describe their ethnic and/or racial identity.

**6** Aron, L. & Burt, M. (2001). *Helping America's Homeless: Emergency Shelter or Affordable Housing*. Urban Institute.

**7** Semega, J & Kollar, M. (2022, September 13). Increase in Income Inequality Driven by Real Declines in Income at the Bottom. *Census.gov*. Retrieved from: https://www.census.gov/library/stories/2022/09/income-inequality-increased.html

**8** Harris, B. & Werz, S.S. (2022, September 15). Racial Differences in Economic Security: The Racial Wealth Gap. *U.S. Department of the Treasury*. Retrieved from: https://home.treasury.gov/news/featured-stories/racial-differences-economic-security-racial-wealth-gap

**9** The National Low Income Housing Coalition. (2023). *THE GAP: A Shortage of Affordable Homes*. https://nlihc.org/sites/default/files/gap/Gap-Report_2023.pdf

**10** Shinn, M. & Khadduri, J. (2020). *In the Midst of Plenty: Homelessness and What to Do About It*. Hoboken, New Jersey: Wiley Blackwell Publishers.

**11** Aldern, C.P. & Colburn, G. (2022). *Homelessness is a Housing Problem: How Structural Factors Explain U.S. Patterns*. Berkeley, California: UC Press.

**12** Interquartile range is a measure of the spread of numeric data. The lower value represents the 25th percentile of the data and the upper value represents the 75th percentile. These values provide context to how responses may have differed across participants.

**13** In the United States, Blackness is treated as a racial category at the bottom of a racial hierarchy. This means that those who are perceived as Black, even if they are multiracial, are treated as Black. Scholarship in public health has shown that due to structural, institutional, and interpersonal racism, people with any Black racial identity have similar health outcomes to one another than to other racial groups. Therefore, in our report, we define the category 'Black' as those who identify Black as their sole racial identity and those who identify Black as one of their racial identities.

**14** Race in the United States is extremely complex. We relied on current scholarship about race to inform how we reported race. We recognize that our categories may conceal unique experiences within groups and plan to conduct further analysis on race in the CASPEH at a later time.

**15** For more on the history of racial measures on the census see Mora,G.C. (2014). *Making Hispanics: How Activists, Bureaucrats, and Media Constructed a New America*. Chicago, Illinois: University of Chicago Press.

**16** While we aggregated participants who identified as transgender, gender non-conforming, or other gender identities into a single category because of the size of the sample, we recognize experiences differ across these identities. Our sample included transgender men, transgender women, non-binary, gender-queer, or gender non-conforming individuals, and individuals who indicated another or unknown gender identity.

**17** We did not interview on tribal lands throughout California in order to match the PIT methodology, which, by mandate from HUD, does not count individuals on tribal lands. However, we consulted with Tribal partners throughout the course of the study to ensure that we surveyed Native Americans living in the counties surveyed.

**18** To make these comparisons, we use the U.S. Census in two ways. First, California population estimates were taken from calculations on "Race alone or in combination with one or more other races" in the 2021 American Community Survey 1-Year Estimates (See U.S. Census Bureau. (2021). American Community Survey 1-Year Estimates. Retrieved from: https://data.census.gov/table?q=race+by+age&g=040XX00US-06&y=2021&tid=ACSDP1Y2021.DP05). Additionally, in line with the guidelines provided by the U.S. Census and the U.S. Office of Management and Budget (OMB), we combined those who identified as Native American/Alaskan Native with those who identified as Indigenous to Mexico, Central or South America into one category. (See U.S. Census Bureau. (2022, March 1). About the Topic of Race. Retrieved from: https://www.census.gov/topics/population/race/about.html)

DOJ-HUD-AR00845

**19** In the Census and PIT, individuals select a racial identity and separately mark whether their ethnicity is Hispanic/Latino/x. Because we asked the question differently, and asked people to mark a racial identity only (including Latino/x), our findings are not comparable to either the general population or the PIT.

**20** Problems understanding or remembering can be a symptom of a variety of health conditions, including cognitive impairment, depression, anxiety, schizophrenia, or developmental delay.

**21** Centers for Disease Control and Prevention. (2022, November 6). Suicide Prevention: Risk and Protective Factors. Retrieved from: https://www.cdc.gov/suicide/factors/index.html

**22** If a person experiencing homelessness spends 3 or more months in an institutional setting, they are considered to start a new episode of homelessness if they are homeless upon release.

**23** If a person was named on the lease or mortgage, we considered them leaseholders.

**24** We include those whose personal household didn't include a leaseholder as non-leaseholders. This could include people doubled-up with family or friends, or staying in informal arrangements without the protection of a lease.

**25** We will use the term "leaseholder" for those who either held a rental lease or a mortgage.

**26** Many report leaving prior to a formal eviction to avoid having an eviction on their record. In this report, we will use the term eviction for either–formal eviction, or, more commonly–leaving under the threat of eviction.

**27** While 19% entered homelessness directly from an institution, an additional 4% either had left their last stable housing arrangement to enter an institution for a short time or exited the institution for a short stay in housing. When we include these, jail stays increase to 10% and drug treatment to 3% of those entering homelessness.

**28** We did not ask those exiting prisons, jails, or hospitals for these responses.

**29** We chose two years because we were not interested in brief delays in homelessness, but also wanted to choose a duration for which participants could project.

**30** For those entering from an institutional setting, we assumed that they would have needed to find new housing.

**31** California Department of Social Services. Project Roomkey/ Housing and Homelessness COVID Response. Retrieved from: https://www.cdss.ca.gov/inforesources/cdss-programs/housing-programs/project-roomkey

**32** Self-reported chronic diseases included diabetes, cancer (excluding non-melanoma skin cancer), HIV/AIDS, chronic kidney disease, hypertension, heart problems or stroke, liver disease, asthma or COPD.

**33** Most individuals who were undocumented or recent immigrants were not eligible during the study period.

**34** Pandemic-related changes, including reductions in barriers to remaining enrolled, may have increased enrollment.

**35** We used where participants reported spending the most time in the prior six months to determine shelter status and considered those in vehicles to be unsheltered, consistent with HUD definitions.

**36** Clarke T.C., Schiller J.S. (2020). Early Release of Selected Estimates Based on Data From the January–June 2019 National Health Interview Survey. *National Center for Health Statistics.* https://www.cdc.gov/nchs/data/nhis/earlyrelease/earlyrelease_202009-508.pdf

**37** Volpicelli, J.R., & Menzies, P. (2022). Rethinking Unhealthy Alcohol Use in the United States: A Structured Review. *Substance Abuse: Research and Treatment* 16, 1-12

**38** We defined heavy alcohol use for women as consuming 5 or more drinks at a time, twice a week; 3 or more drinks at a time, 4 or more times a week; or 6 or more drinks at a time weekly or more often. For men, heavy use was defined as consuming 5 or more drinks at a time, two or more times a week; or 6 drinks at a time weekly or more often.

**39** If an individual who is homeless enters an institutional setting and stays for more than three months–their homelessness episode is "reset"--meaning–when they exit, they are considered to be in a new episode of homelessness.

**40** For this question, we asked about any episode of homelessness, not focused solely on this episode.

**41** To calculate income, we asked participants to include income from work (formal or informal) and benefits. We asked participants to not include money from Supplemental Nutrition Assistance Program (SNAP)/CalFresh.

**42** We did not count these towards participants' income.

**43** California Department of Social Services. (n.d.). Benefits and Services. General Assistance. https://www.cdss.ca.gov/general-assistance

**44** Discrimination is defined as the process in which members of a socially defined group are treated differently, often unfairly, due to their membership in that group.

**45** Sternthal, M., Slopen, N., & Williams, D.R. (2011). Racial Disparities in Health: How Much Does Stress Really Matter? *Du Bois Review*, 8(1), 95-113.

**46** We used the Everyday Discrimination Scale – Short version. We modified this scale by combining the first two questions for brevity and adding housing status to the list of identities that can be discriminated against.

**47** Possible answers include: ancestry or national origin; gender; race; age; housing/homelessness status; religion; sexual orientation; criminal record; physical disability; physical appearance; the shade of your skin color; education or income level; other.

**48** National Low Income Housing Coalition. (2023). The GAP: A Shortage of Affordable Housing. https://nlihc.org/sites/default/files/gap/Gap-Report_2023.pdf

**49** Ibid.

DOJ-HUD-AR00846

Benioff Homelessness
and Housing Initiative



University of California
San Francisco

TWITTER **@ucsfbhhi**
WEBSITE **homelessness.ucsf.edu**
EMAIL **homelessness@ucsf.edu**

DOJ-HUD-AR00847

The U.S. Department of
Housing and Urban Development
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

**PART 2:** Annual Estimates of Sheltered Homelessness in the United States    **MAY 2024**

# 2022 Annual Homelessness Assessment Report (AHAR) to Congress



DOJ-HUD-AR00922

# Summary of Contents

Acknowledgements..........................................................................................iii
Message from the Secretary..............................................................................iv

## Section A: About this Report

Key Terms..................................................................................................A-2
About This Report.........................................................................................A-4
Interpretation and Key Findings......................................................................A-6

## Section B: Broader Perspectives on Housing Instability and Homelessness

Broader Perspectives on People Experiencing Homelessness and Housing Instability................. B-2
People who are At-Risk of Homelessness............................................................ B-2
Renters with Very-Low and Extremely Low Incomes in Precarious Housing Situations
(HUD 2023 Worst Case Needs Report)............................................................... B-2
The Census Household Pulse Survey on Housing Insecurity.......................................... B-6
Housing Insecurity During the COVID-19 Pandemic by Household Type.......................... B-6
Housing Insecurity During the COVID-19 Pandemic by Race........................................ B-6
Education Data on Children and Youth.............................................................. B-7
Doubled up and Other Homeless Situations of Children and Youth
(Data from State Educational Agencies)............................................................ B-7
Survivors of Domestic Violence...................................................................... B-9
Domestic Violence Survivors Who Use Shelters...................................................... B-9
Unsheltered Homelessness............................................................................ B-10

## Section 1: Estimates of Homelessness

Overview of Estimates of Sheltered Homelessness in the United States..............................1-2
How Did Estimates of Households Experiencing Sheltered Homelessness Compare to the U.S. Total
and Poverty Populations?............................................................................1-2
Characteristics of All People Experiencing Sheltered Homelessness................................1-3
What Were the Demographic Characteristics of Sheltered Households?..............................1-3
How Do the Demographic Characteristics of the Sheltered Population Compare to the U.S. Total
and U.S. Poverty Populations?...................................................................... 1-4
Where Did Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?..... 1-6
Additional Characteristics of Heads of Households and Other Adults............................... 1-6
What Were the Other Characteristics of all Households Experiencing Sheltered Homelessness?...... 1-6
How Have the Additional Characteristics of Households Experiencing Sheltered Homelessness
Changed over Time?..................................................................................1-7
Engagement of Sheltered Households with the Homelessness Services System ...................... 1-8
Where Did Households Stay Prior to Entering Shelters?............................................ 1-8
What Percentage of Households Exited the Homelessness Service System During the Reporting Period?.1-9

## Section 2: Estimates of Sheltered People in Adult-Only Households

Overview of Estimates of Adult-Only Sheltered Homelessness in the United States.................. 2-2
How Did Estimates of Adult-Only Households Experiencing Sheltered Homelessness Compare to the
U.S. Total and Poverty Populations?................................................................ 2-2
Characteristics of People in Adult-only Households Experiencing Sheltered Homelessness .......... 2-3
What Were the Demographic Characteristics of Sheltered Adult-Only Households in 2022?........... 2-3
How Did the Demographic Characteristics of the Sheltered Adult-only Population Compare to the
U.S. Total and U.S. Poverty Populations?.......................................................... 2-4
How Have the Characteristics of Adult-only Households Changed over Time?........................ 2-5
Where Did Adult-only Households Access Emergency Shelter, Transitional Housing, or Safe Haven
Programs?............................................................................................ 2-6
How Did the Location of Shelter Use for Adult-Only Households Change over Time?................. 2-6
Additional Characteristics of Heads of Households and Other Adults .............................. 2-6
What Were the Other Characteristics of Adult-Only Households Experiencing Sheltered
Homelessness?........................................................................................ 2-6
How Have the Additional Characteristics of Adult-only Households Experiencing Sheltered
Homelessness Changed over Time?.................................................................... 2-7
Engagement of Adult-only Households with the Homelessness Services System ..................... 2-8
How Did Adult-Only Households Engage with the Shelter System in 2022?........................... 2-8

Where Did Adult-Only Households Stay Prior to Entering Shelters?................................. 2-9
How Did System Engagement Change over Time?....................................................2-10
How Long Did Adult-Only Households Stay in Shelter?............................................2-11
How Has Length of Time in Shelter Programs Changed over Time?.................................2-11
What Were the Exit Destinations of Households Leaving Shelter Programs?........................2-12
How Did the Destinations at the Time of Exit Change for Sheltered Households?..................2-12

## Section 3: Estimates of Sheltered People in Families with Children

Overview of Estimates of Sheltered Family Homelessness in the United States ..................... 3-2
How Did Estimates of Family Households Experiencing Homelessness Compare with the U.S. Total
and U.S. Poverty Populations?...................................................................... 3-2
Characteristics of People in Family Households Experiencing Homelessness ....................... 3-3
What Were the Demographic Characteristics of Sheltered Family Households in 2022? .............. 3-3
How Do the Demographic Characteristics of the Sheltered Family Population Compare with the
U.S. Total and U.S. Poverty Populations?.......................................................... 3-4
How Have the Characteristics of Family Households Experiencing Sheltered Homelessness Changed
over Time?.......................................................................................... 3-5
How Did the Household Size and Composition of Sheltered Families Compare with the U.S. Total and
U.S. Poverty Populations?.......................................................................... 3-6
Where Did Families with Children Access Emergency Shelter or Transitional Housing? .............. 3-6
What Were the Other Characteristics of Families with Children Experiencing Sheltered Homelessness?. 3-7
How Did the Additional Characteristics of Families with Children Experiencing Homelessness Change
over Time?.......................................................................................... 3-7
Engagement of Family Households with the Homelessness Services System .......................... 3-8
How Did Family Households Engage with the Shelter System in 2022?.............................. 3-8
Where Did Family Households Stay Prior to Entering Shelters?..................................... 3-9
How Did System Engagement Change for Family Households?........................................ 3-10
How Long did Family Households Stay in Shelter?.................................................3-11
How Has Length of Time in Shelter Programs Changed for Family Households? ...................3-11
What Were the Exit Destinations of Family Households Leaving Shelter Programs? ...............3-11
How Did the Destination at the Time of Exit Change for Family Households?......................3-12

## Section 4: Unaccompanied Homeless Youth

Overview of Estimates of Youth who Experienced Sheltered Homelessness........................... 4-2
How Did Estimates of Unaccompanied Youth Households Experiencing Homelessness Compare
with the U.S. Total and Poverty Population?....................................................... 4-2
Characteristics of Sheltered Unaccompanied Youth ................................................ 4-2
What Were the Demographic Characteristics of Sheltered Unaccompanied Youth Households in 2022?. 4-2
How Did the Demographic Characteristics of the Sheltered Unaccompanied Youth Population
Compare with the U.S. Total and U.S. Poverty Populations?....................................... 4-4
How Have the Characteristics of Unaccompanied Youth Households Changed over Time? .............. 4-5
Where Did Unaccompanied Youth Households Access Emergency Shelter, Transitional Housing,
or Safe Haven Programs?............................................................................ 4-6
How Did the Location of Shelter Use for Unaccompanied Youth Households Change over Time?....... 4-6
What Were the other Characteristics of Unaccompanied Youth Households Experiencing Sheltered
Homelessness?....................................................................................... 4-7
How Have the Additional Characteristics of Unaccompanied Youth Households Experiencing
Sheltered Homelessness Changed over Time?........................................................ 4-7
Engagement of Unaccompanied Youth Households with the Homelessness Services System............. 4-8
Where Did Unaccompanied Youth Households Stay Prior to Entering Shelters?....................... 4-8
How Long Did Unaccompanied Youth Households Stay in Shelter? ................................... 4-9
How Did System Engagement Change Over Time?...................................................... 4-9

## Section 5: Estimates of Homeless Veterans

Overview of Estimates of Veterans Experiencing Homelessness in the United States................. 5-2
How Did Estimates of Sheltered Veterans Compare to All U.S. Veterans and Veterans in Poverty?....... 5-2
Characteristics of Veterans in Adult-only Households Experiencing Sheltered Homelessness in 2022.... 5-3
What Were the Demographic Characteristics of Veterans in Adult-Only Households Experiencing

DOJ-HUD-AR00923

Sheltered Homelessness in 2022?................................................................ 5-3
How Did the Demographic Characteristics of Veterans in Adult-Only Households Compare with the
Equivalent U.S. Total and U.S. Poverty Populations? ........................................... 5-4
How Have the Demographic Characteristics of Sheltered Veterans in Adult-Only Households Changed
over Time?.................................................................................... 5-5
Where Did Adult-only Veteran Households Access Emergency Shelter, Transitional Housing, or
Safe Haven Programs?......................................................................... 5-5
What Were the other characteristics of Veterans in Adult-Only Households Experiencing Sheltered
Homelessness?................................................................................ 5-6
How Have the Additional Characteristics of Adult-only Households Experiencing Sheltered
Homelessness Changed over Time? ............................................................. 5-6
Engagement of Veteran Adult-only Households with the Homelessness services system ............... 5-7
Where Did Veterans in Adult-Only Households Stay Prior to Enrolling in Emergency Shelter,
Transitional Housing, or Safe Havens? .......................................................... 5-7
How Did the Prior Living Situation of Veteran Households Change over Time?........................ 5-7
How Long did Veteran Adult-Only Households Stay in Shelter? ..................................... 5-8
How Has Length of Time in Shelter Programs Changed over Time?.................................. 5-8

## Section 6: People with Chronic Patterns of Homelessness

Overview of Estimates of Chronic Homelessness in the United States................................. 6-2
Characteristics of People in Adult-Only Households with Chronic Patterns of Homelessness .......... 6-3
What Were the Demographic Characteristics of Sheltered Adult-Only Households with Chronic
Patterns of Homelessness in 2022?.............................................................. 6-3
How Have the Characteristics of Adult-only Households with Chronic Patterns of Homelessness
Changed over Time? ........................................................................... 6-4
Where Did Adult-only Households Experiencing Chronic Patterns of Homelessness Access Emergency
Shelter, Transitional Housing, or Safe Haven Programs? .......................................... 6-5
How Did the Location of Shelter Stays for Adult-Only Households Experiencing Chronic Patterns of
Homelessness Change over Time?............................................................... 6-6
Additional Characteristics of Heads of Households and Other Adults ............................... 6-6
What Were the Other Characteristics of Adult-Only Households Experiencing Chronic Patterns of
Homelessness?................................................................................ 6-6
How Have the Additional Characteristics of Adult-only Households Experiencing Chronic Patterns of
Homelessness Changed over Time? ............................................................. 6-7
Engagement of Adult-only Households Experiencing Chronic Patterns of Homelessness with the
Homelessness Services System.................................................................. 6-8
Where Did Adult-Only Households with Chronic Patterns of Homelessness Stay Prior to
Entering Shelters?............................................................................. 6-8
How Did System Engagement Change over Time? ................................................ 6-9
How Long did Adult-Only Households Experiencing Chronic Patterns of Homelessness Stay in Shelter? . 6-9
How Has Length of Time in Shelter Programs Changed over Time?................................. 6-10

## Section 7: People Using Rapid Re-Housing Programs

Overview of Estimates of People and Households Using Rapid Rehousing Subsidies................... 7-2
Characteristics of People Living in Housing Supported by Rapid Rehousing Programs ............... 7-3
What Were the Demographic Characteristics of Households Using RRH Subsidies?................... 7-3
How Did the Demographic Characteristics Change over Time? ..................................... 7-4
Where Did Households Using RRH Subsidies Live? ............................................... 7-4
What Were the Other Characteristics of Housings Using RRH Subsidies in 2022?.................... 7-5
How Did the Other Characteristics Change over Time? ........................................... 7-5
Engagement of Households Using RRH .......................................................... 7-6
How Did Length of RRH Subsidy Use Change over Time?......................................... 7-7
What Was the Exit Location of Households after RRH Assistance Ended? ........................... 7-7
How Did the Location after RRH Assistance Ended Change over Time?.............................. 7-8
Supportive Services for Veterans and their Families (SSVF)....................................... 7-10

## Section 8: People Living in Permanent Supportive Housing

Overview of Estimates of People in Permanent Supportive Housing ................................ 8-2
How many People Lived in PSH During 2022? .................................................... 8-2
How Did Estimates of People Living in PSH Change over Time?.................................... 8-2
Characteristics of People Living in PSH in 2022 .................................................. 8-3
What Were the Demographic Characteristics of Households in PSH in 2022?......................... 8-3
How Have the Demographic Characteristics of Households in PSH Changed over Time? .............. 8-4
Where Did Households in PSH Live?............................................................. 8-4
How Did the Location of PSH Households Change over Time?..................................... 8-4
What are the Other Characteristics of Households in PSH? ........................................ 8-5
How Have Additional Characteristics of Households Living in PSH Changed over Time?.............. 8-5
Engagement of Households with the Homelessness services system ............................... 8-5
How Long Do Households Live in PSH?.......................................................... 8-6
How Has Length of Time in Shelter Programs Changed over Time?................................ 8-6
Where Do Households Go after Leaving PSH? ................................................... 8-7
How Did Exit Status and Destination of Exit Change over Time?................................... 8-7
Veterans Using PSH Provided by the HUD-VASH Programs ...................................... 8-9
HOMES data and HMIS data .................................................................. 8-9

DOJ-HUD-AR00924

## Acknowledgements

AUTHORED BY:
Dr. Meghan Henry, Dr. Adam Travis, Victoria Lopez, and Colette Tano, *Abt Global*

PRINCIPAL INVESTIGATOR:
Dr. Jill Khadduri, *Abt Global*

DATA MANAGERS:
Ciara Collins and RJ de la Cruz, *Abt Global*

DATA COLLECTORS AND REVIEWERS:
Alyssa Andrichik, Gaby Antonova, Katie Ciaffone, Marissa Cuellar, Jill Cusick, RJ de la Cruz, Tanya de Sousa, Lola Jacquin, Jesse Jorstad, Jazmine Kirkland, Victoria Lopez, Andrew McFadden, Sean Morris, Dusty Olson, Ed Prestera, Caroline Roddey, Katherine Rush, Giuliana Sciuto, Adam Travis, Meghan Shea, Simonne Vincent

DATA ANALYSTS:
Victoria Lopez, Tom McCall and Marci Schalk, *Abt Global*

REVIEWERS:
William Snow and Norman Suchar, *The U.S. Department of Housing and Urban Development*
Dr. Larry Buron, *Abt Global*
**People with Lived Experiences and Expertise:**
John Harrison, National Coalition for the Homeless
Rashema Melson, *Pain into PURPOSE, HUD Persons with Lived Experiences and Expertise Team Lead*
Dr. Rajni Shankar-Brown, Ph.D, *President of the National Coalition for the Homeless, Professor and Chair of Social Justice Education at Stetson University, and Co-Lead of HUD Equity Team*
Dana Woolfolk, HUD Persons with Lived Experiences and Expertise Core Team
Donald Whitehead, *Executive Director, National Coalition for the Homeless,*
Additional persons with lived experience and expertise of homelessness that prefer to remain unnamed

RESEARCH ADVISORY GROUP:
Chair – Dr. Dennis Culhane, *University of Pennsylvania*
Dr. Melissa Chinchilla, *University of California, Los Angeles*
Dr. Earl Edwards, *Boston College*
Dr. Ryan Finnigan, *University of California, Davis*
Dr. Margot Kushel, *University of California, San Francisco*
Dr. Joy Moses, Research Director, *National Alliance to End Homelessness*
Dr. MaryBeth Shinn, *Vanderbilt University*

DESIGN AND PRODUCTION:
David Dupree, *Abt Global*

DOJ-HUD-AR00925

# Message from the Secretary



I am pleased to submit the U.S. Department of Housing and Urban Development's (HUD) 2022 Annual Homelessness Assessment Report (AHAR) Part 2. This is the second of a two-part series that provides estimates of the scale of sheltered and unsheltered homelessness in the U.S. The 2022 Part 1 report, also known as the Point-in-Time Estimates of Homelessness, was published in December 2022 and provided a single-night estimate of people experiencing homelessness in both sheltered and unsheltered settings at the state, local, and national levels. This Part 2 report draws from local administrative data collected by homeless services and reported to HUD to provide a national estimate of people who utilized shelter programs at some point during the Federal fiscal year, October 1, 2021 through September 30, 2022.

During the time period covered in this report, 1,388,000 people experienced homelessness in sheltered settings, representing a 14 percent increase compared with the prior federal fiscal year. Two-thirds of people experiencing homelessness were in households with only adults present (923,000 people), and 33 percent were people in families with children (453,000 people). The number of families with children who used shelters increased by almost 20 percent in the last year. Despite these increases, the number of people experiencing sheltered homelessness over the course of the year remains 5 percent lower than prior to the pandemic.

In addition to providing overall numbers, this report also provides important data regarding the characteristics of people experiencing homelessness. We see a disturbing increase in the number of older adults experiencing homelessness and the ongoing racial and ethnic disparities that persist. Nearly 20,000 more people over the age of 64 experienced sheltered homelessness in 2022 than did in 2019. About 10,000 older adults were added to the sheltered population in the last year alone. The number of older adults who are chronically homeless—which refers to people who have a disability and who have been homeless for long periods of time—increased by 83% since 2019. While Black or African Americans represent only 13 percent of the overall U.S. population, they represent 39 percent of people experiencing sheltered homelessness. Hispanic or Latino/a/e

households who experience homelessness also continued to rise, shifting the population from historically being underrepresented among the sheltered population to overrepresented in an extremely short time period.

The report's findings are consistent with the trends observed in the 2023 AHAR Part 1, which reported a 12% increase in homelessness on a single night from January 2022 to January 2023 even while homelessness levels remained relatively stable between January 2020 and January 2022. Both the increases in the January 2023 Point-in-Time estimates and sheltered homelessness during federal fiscal year 2022 reflect the expiration and depletion of pandemic-era protections and programs that prevented people from housing loss and homelessness in the prior year. Taken together, these reports show that when our nation provides large-scale investments in programs that prevent housing loss and that support the re-housing of people experiencing homelessness, we can attenuate the number of people experiencing homelessness even amidst worsening housing needs. They also show what happens when we stop investing in these interventions: homelessness rises. I hope this report inspires greater action to continue to invest in and implement solutions that can help more Americans avoid having to experience the tragedy and indignity of homelessness.

Adrianne R. Todman
Acting Secretary
U.S. Department of Housing and Urban Development

DOJ-HUD-AR00926

# About This Report

Key Terms ...................................................................................................A-2

About This Report...........................................................................................A-4

Interpretation and Key Findings ....................................................................A-6

DOJ-HUD-AR00927

# Key Terms

**Adults** are people age 18 or older.

**Adult-Only Household** refers to a household composed of only adults and without children.

**Child-only Households** refers to a household composed only of children.

**Children** are people under the age of 18.

**Chronically Homeless Individual** refers to an individual with a disability who has experienced homelessness continuously for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time homeless on those occasions is at least 12 months.

**Chronically Homeless People in Families** refers to people in families with children in which the head of household has a disability and has either experienced homelessness continuously for one year or more or has experienced at least four episodes of homelessness in the last three years where the combined length of time homeless on those occasions is at least 12 months.

**Continuously Homeless** An adult-only, child-only, or adult with children household that was enrolled in a continuum emergency shelter, safe haven, transitional housing, rapid rehousing, or permanent supportive housing project served during the reporting period that was also reported in a continuum project on the night prior to the reporting period.

**Continuums of Care (CoC)** are local planning bodies responsible for coordinating the full range of homelessness services in a geographic area, which may cover a city, county, metropolitan area, or an entire state.

**Domestic Violence Shelters** are shelter programs for people who are experiencing homelessness and are survivors of domestic violence.

**Emergency Shelter** is a facility with the primary purpose of providing temporary shelter for people experiencing homelessness.

**Extrapolate** is a statistical procedure that uses known data to predict values for unknown data.

**Family with Children** refers to a household that has at least one adult (age 18 or older) and one child (under age 18). Families do not include households composed only of adults or only children.

**First Time Homeless** An adult-only, child-only, or adult with children household that entered a continuum emergency shelter, safe haven, transitional housing, rapid rehousing, or permanent supportive housing project during the report period and was not enrolled in such projects at any point in the two years prior to entry.

**Head of Household** is the member of the family or household to whom all other members of the household are associated in the Homeless Management Information System (HMIS). For families and adult-only households, the head of household must be an adult. In a child-only household, the parent of another child is designated as the head of household; otherwise, each child in a household without adults is designated as a head of household.

**Homeless Management Information System (HMIS)** is a software application designed to record and store client-level information on the characteristics and service needs of people experiencing homelessness. Each CoC maintains its own HMIS, which can be tailored to meet local needs but must also conform to Federal HMIS Data and Technical Standards.

**HMIS Data** provide an unduplicated count of people who are experiencing sheltered homelessness and information about their characteristics and service-use patterns over a one-year period. These data are entered into each CoC's HMIS at the client level but are submitted in aggregate form for the AHAR.

**Homelessness** describes the experience of lacking a fixed, regular, and adequate nighttime residence.

**Household Type** refers to the composition of a household upon entering a shelter program. People enter shelter as unaccompanied youth, single adults, or as part of a family with children but can be served as both adults in adult-only households and as members of a family with children during the AHAR reporting year. Additionally, people aged 17 at the start of the reporting period can be served in both child-only households and adult-only households during the year. The estimates reported in the AHAR adjust for these overlaps and thus provide an unduplicated count of homeless people.

**Housing Inventory Count (HIC)** is produced by each CoC and provides an annual inventory of beds that assist people in the CoC who are experiencing homelessness or leaving homelessness.

**HUD-Veterans Affairs Supportive Housing (HUD-VASH) program** is a program for formerly homeless veterans that combines Housing Choice Voucher (HCV) rental assistance provided by HUD with case management and clinical services provided by the Department of Veterans Affairs (VA) through VA medical centers (VAMCs) and community-based outreach clinics.

**Multiple Races** refers to people who self-identify as more than one race.

**Parenting Children** are people under age 18 who are the parents or legal guardians of one or more children (under age 18) who are present with or sleeping in the same place as the child parent and there is no person over the age of 18 in the household.

DOJ-HUD-AR00928

**Parenting Child Household** is a household with at least one parenting child and the child or children for whom the parenting child is the parent or legal guardian.

**Parenting Youth** are people under age 25 who are the parents or legal guardians of one or more children (under age 18) and who are present with or sleeping in the same place as that youth parent and there is no person over 24 in the household.

**Parenting Youth Household** is a household with at least one parenting youth and the child or children for whom the parenting youth is the parent or legal guardian.

**People with Chronic Patterns of Homelessness**[6] are individuals with a disability who have experienced homelessness continuously for one year or more or has experienced at least four episodes of homelessness in the last three years with a combined length of time homeless of least 12 months.

**Permanent Supportive Housing (PSH)** is a program designed to provide housing assistance (project-or tenant-based) and supportive services on a long-term basis to people who formerly experienced homelessness. HUD's Continuum of Care program, authorized by the McKinney-Vento Act, funds PSH and requires that the client have a disability for program eligibility.

**Rapid Re-Housing (RRH)** is a housing model designed to provide temporary housing assistance to people experiencing homelessness, moving them quickly out of homelessness and into permanent housing.

**Return to Homelessness** An adult-only, child-only, or adult with children household that entered a continuum ES, SH, TH, RRH, or PSH project during the report period and has a record of a previous exit to a permanent destination from a continuum emergency shelter, safe haven, transitional housing, rapid rehousing, or permanent supportive housing project in the 15-730 days prior to enrollment.

**Safe Havens** are projects that provide private or semi-private long-term housing for people with severe mental illness and are limited to serving no more than 25 people within a facility.

**Sheltered Homelessness** refers to people who are staying in emergency shelters, safe havens, or transitional housing programs.

**Shelter Programs** include emergency shelter programs, safe havens, and transitional housing programs.

**Total U.S. Population** refers to people who are housed (including those in group quarters) in the United States, as reported in the American Community Survey (ACS) by the U.S. Census Bureau.

**Transitional Housing Programs** provide people experiencing homelessness a place to stay combined with supportive services for up to 24 months.

**Unaccompanied Children** are people who are not part of a family with children or accompanied by their parent or guardian during their experience of homelessness, and who are under the age of 18.

**Unaccompanied Youth (18 to 24)** are people who are not part of a family with children or accompanied by their parent or guardian during their experience of homelessness and who are between the ages of 18 and 24.

**Unduplicated Count of Sheltered Homelessness** is an estimate of people who stayed in emergency shelters, safe havens, or transitional housing programs that counts each person only once, even if the person enters and exits the shelter system multiple times throughout the year within a CoC.

**U.S. Population Living in Poverty** refers to people who are housed in the United States in households with incomes that fall below the federal poverty level.

**Veteran** refers to any person who served on active duty in the armed forces of the United States. This includes Reserves and National Guard members who were called up to active duty.

**Victim Service Provider** refers to private nonprofit organizations whose primary mission is to provide services to survivors of domestic violence, dating violence, sexual assault, or stalking. This term includes rape crisis centers, domestic violence programs (shelters and non-residential), domestic violence transitional housing programs, and other related advocacy and supportive services programs.

DOJ-HUD-AR00929

# About This Report

In 2001, the U.S. Congress required that the Department of Housing and Urban Development (HUD) fund communities to implement information systems to track the use of homelessness services, with the understanding that ending homelessness requires knowledge about the size of the problem and the way in which it affects different population groups. Three main HUD efforts supported the development of these data systems. The first was the provision of technical assistance to communities on conducting the Point-in-Time (PIT) count. The assistance with PIT counts continues today. The second effort established a set of standardized data that communities collect about people who use emergency shelters and other components of a community's homelessness services systems. This effort also established system parameters for how the information is stored and secured locally in Homelessness Management Information Systems (HMIS). The third effort established standards and procedures for how HMIS and PIT count data are aggregated and reported to HUD. Both the data standards and the reporting platforms have evolved over time as communities gained more capacity to collect and report data and both national and community policymakers gained a deeper understanding of the nature of homelessness. As a part of this ongoing work, technical assistance is provided to communities to assist them in reporting and improving the quality of their data each year.

In February 2007, HUD released estimates of people experiencing homelessness in the U.S. based on one-night PIT counts and one-year HMIS data in the first Annual Homelessness Assessment Report (AHAR). AHARs have been submitted to the U.S. Congress every year since then.

This report is the second part of a two-part series. The first part of the *2022 Annual Homelessness Assessment Report (AHAR) to Congress: Point-in-Time Estimates of Homelessness* was published in December 2022. The Part 1 report provides estimates of people experiencing homelessness on a single night, based on PIT data gathered by communities throughout the country in late January.

This report, Part 2 of the 2022 AHAR, expands on the Part 1 report by presenting estimates of people experiencing sheltered homelessness, used rapid rehousing (RRH) subsidies, or resided in permanent supportive housing (PSH) at any point over the course of one year. These HMIS-based estimates provide information on demographics and patterns of emergency housing and residential service use of people who experience or who have experienced homelessness.

This report is intended for several audiences: Members of Congress, staff at local service providers, community members, CoCs, researchers, policymakers, and advocates. Each of these audiences can use this report to understand the scope of the problem and the context for the nation's efforts to prevent, reduce, and end homelessness. Stakeholders can also identify which household types and subpopulations require more attention in this effort. This report can address many questions that may be of interest across all audiences:

How many people experience sheltered homelessness in the U.S. in any given year?

1. How many people experience sheltered homelessness in households with only adults, and how many are

2. in families with children?

3. How many children and youth experience sheltered homelessness in the U.S.?

4. What are the characteristics of people who use shelter programs in the U.S.?

5. How many people use rapid re-housing assistance, and what are their characteristics?

6. How many people live in permanent supportive housing, and what are their characteristics?

7. How do people enter the homelessness assistance system and where do they go when they leave it?

### Sample

Though participation continues to be optional, HUD encouraged all CoCs to submit HMIS data for the Longitudinal Systems Analysis (LSA). In 2022, 386 CoCs submitted HMIS data for the LSA, the data platform now used for the Part 2 reports. Because of unresolved data quality issues, some CoCs were excluded from the final sample. Among the CoCs that did submit high-quality data for the LSA, their data only describe people served in projects that participate in the CoC's local HMIS. The final LSA sample for data on sheltered homelessness consists of 3,356 participating shelter projects in 244 CoCs for 2022. The final sample for data on RRH consists of 2,808 participating RRH projects in 255 CoCs. The final sample for data on PSH consists of 2,899 participating PSH projects in 237 CoCs.

The national estimates in this report are weighted to extrapolate from this sample of participating projects to the entire country. The extrapolation accounts for both sources of non-participating projects: all projects in CoCs that did not participate in the LSA (or attempted to but were precluded by data quality issues) and projects in CoCs that did participate in the LSA, but a particular project did not participate in the CoC's HMIS. The sample of participating CoCs and projects was not selected randomly, but the data were weighted to improve the sample's representativeness

DOJ-HUD-AR00930

of the full population. **For detailed information about the methodology used to produce the estimates, see the 2022 AHAR Methodology Report.**

### Additional Data Sources

This report uses two other data sources: Housing Inventory Count (HIC) data and the U.S. Census Bureau's American Community Survey (ACS) data. The HIC data provide an inventory of beds dedicated to serving people who are (or were) experiencing homelessness[4] and thus describe the nation's capacity to house such people. The HIC data are compiled by CoCs and represent the inventory of beds in various programs within the homelessness services system that are available during a particular year, including programs from all funding sources. These data were used in developing the weights to extrapolate from the LSA sample of participating homeless projects to all projects in the nation.

This report uses ACS data to provide a profile of the total U.S. population and U.S. households living in poverty. The AHAR uses ACS data on gender, age, ethnicity, race, household size, disability status, and type of geographic location to serve as a comparison to the national estimates of people experiencing homelessness from the LSA. The ACS data come in several forms. This report uses the 1-year Public Use Microdata Sample (PUMS) that corresponds most closely to the LSA data for any given year.

In collaboration with the U.S. Department of Veteran Affairs (VA), this 2022 report includes data on veterans using the Supportive Services for Veteran Families (SSVF) program's rapid re-housing services. The 2022 AHAR supplements the HMIS data on veterans in permanent supportive housing with administrative data on HUD-VASH from the VA's Homeless Operations Management Evaluation System (HOMES).

### How to Use this Report

**The body of this report is divided into eight main chapters:**

1. All people experiencing sheltered homelessness
2. Adult-only households experiencing sheltered homelessness
3. Families with children experiencing sheltered homelessness
4. Unaccompanied youth experiencing sheltered homelessness
5. Veterans experiencing sheltered homelessness
6. People with chronic patterns of homelessness
7. Formerly homeless people in rapid re-housing
8. Formerly homeless people in permanent supportive housing

Chapters 1-6 present LSA data on people who were experiencing sheltered homelessness at some time during the reporting year. These one-year estimates include information on gender, age, ethnicity, race, household size, disability status, chronic homelessness, veteran status, and domestic violence survivor status. Chapters 7 and 8 are based on LSA data on formerly homeless residents of RRH and PSH programs. Each chapter includes an examination of the system use patterns of people experiencing homelessness. These data are based on the LSA data reported by communities.

DOJ-HUD-AR00931

# Interpretation and Key Findings

Each year, HUD reports to Congress on the number of people who experience homelessness in the United States. Preventing and ending homelessness requires accurate information on the size and nature of homelessness in the country, both at a point-in-time and on an annual basis. This report provides the one-year estimates of sheltered homelessness in 2022. These data are critical to measuring progress toward federal, state, and local goals to end homelessness among families with children, people in adult-only households, unaccompanied youth, veterans, and people with chronic patterns of homelessness.

## Interpretation

Data presented in this report include information on the estimated 1.39 million people served by emergency shelters, transitional housing programs, and safe havens between October 1, 2021 and September 30, 2022. While the impact of the COVID-19 pandemic continues to be felt, homelessness services systems largely returned to pre-pandemic operations during this period. As will be discussed in more detail below and across sections of this report, the expiration of pandemic-era economic and housing supports and homelessness prevention resources resulted in increases in the number of people experiencing homelessness and seeking emergency shelter.

It is important to note that some people experiencing homelessness are not included in this report. People who experienced homelessness only in unsheltered locations during the year are not included, nor are people who only used shelters operated by designated victim service providers (VSP).

### Growth in the Number of Older Americans Experiencing Homelessness Continues

Across the homelessness services system, the percentage of people aged 65 and older who sought residential services –emergency or permanent – continued to rise. These changes reflect the increasing vulnerability and housing instability among low-income elderly households. According to the Department of Housing and Urban Development's (HUD) Worst Case Housing Needs Report, there were 2.35 million very low-income older households with severe housing problems in 2021. This was an increase of more than 100,000 households compared with 2019. Households with worst case housing needs are vulnerable to the experience of homelessness. It is therefore not surprising that in 2022 -- the following year – nearly 20,000 more people over the age of 64 accessed emergency shelter, transitional housing, or safe havens than in 2019, a 36 percent rise. Much of this increase consisted of people in adult-only households, particularly people with chronic patterns of homelessness. Increases in elderly homelessness occurred despite the overall number of people experiencing sheltered homelessness being about 68,000 people or five percent *lower* in 2022 than it was in 2019.

**EXHIBIT A.1: Percentage of People Experiencing (or Formerly Experienced) Sheltered Homelessness who are Aged 65 and Older**



DOJ-HUD-AR00932

The number of people over the age of 64 who previously experienced homelessness and used rapid rehousing (RRH) subsidies or lived in permanent supportive housing (PSH) also increased steadily, reflecting the aging sheltered population. In 2022, nearly double the number of people aged 65 and older used RRH subsidies (about 7,000 more people) than in 2019. The number of people aged 65 and older living in PSH increased by nearly 20,000 people, a 63 percent rise, while the overall number of people living in PSH decreased by three percent.

### Growth in Hispanic/Latino/a/x Population Experiencing Sheltered Homelessness

Historically, Hispanic/Latino/a/x populations have been underrepresented among people experiencing homelessness compared to their share of people with incomes below the poverty line. Factors theorized to be responsible for this underrepresentation included extended family and social networks that serve as a protective factor during a housing crisis and a reluctance to seek assistance from people outside those networks, particularly from formal systems.[1] In 2019, 19 percent of heads of households were Hispanic/Latino/a/x compared to 16 percent of all heads of sheltered households. By 2022, the share of sheltered head of households who were Hispanic/Latino/a/x increased to 23 percent, while the percentage of heads households in poverty remained the same. These increases are also reflected in the sheltered and unsheltered point-in-time counts reported in Part 1 of the Annual Homelessness Assessment Report.

Several factors likely contributed to the growth in Hispanic/Latino/a/x households staying in shelter programs, many of which pre-dated the pandemic. This

population is affected by the general causes of homelessness such as limited affordable housing and low wage jobs, but other barriers are likely to exacerbate these factors. Inaccessible information on social safety net programs such as housing assistance or economic supports, immigration status that complicates accessing these supports, and language barriers across social services systems likely make it even harder for Hispanic/Latino/a/x households to avoid the experience of homelessness.[2] While other populations experienced decreases in the number of households experiencing sheltered homelessness during the COVID-19 pandemic, homelessness among Hispanic/Latino/a/x households continued to rise.

### EXHIBIT A.3: Percentage of Heads of Households in Poverty that Experienced Sheltered Homelessness by Race and Ethnicity



### Black, Indigenous, and People of Color Continue to be Overrepresented

The primary causes of homelessness are deep poverty, a lack of affordable housing, and the structural and systemic racism that exists across our systems. Black, indigenous, and people of color (BIPOC) continue to disproportionately experience sheltered homelessness in this country. People who experience sheltered homelessness are a subset of all people experiencing poverty. Controlling for the role of poverty in the experience of homelessness, people of color are still overrepresented. Of all heads of households in poverty in the country, three percent experienced sheltered homelessness at some point during the year. By comparison, 10 percent of Black heads of households and 14 percent of Native American or American Indian heads of households in poverty experienced sheltered homelessness. This highlights how systemic racism can affect access to and the strength of the social safety net in the U.S.

### EXHIBIT A.2: Share of Heads of Households Experiencing Sheltered Homelessness who are Hispanic/Latino/a/x compared to Heads of Households in Poverty
2019-2022



1 http://www.evidenceonhomelessness.com/wp-content/uploads/2018/03/HOW-DO-HISPANIC-FAMILIES-EX-PERIENCE-HOMELESSNESS.pdf

2 https://endhomelessness.org/wp-content/uploads/2023/01/Latino-Homelessness_ResearchBrief_01242023_FINAL.pdf

DOJ-HUD-AR00933

### Data Show a Reversal of Many Pandemic-era Trends

During the pandemic, the number of people using shelter programs dropped considerably as programs closed or drastically reduced capacity. Data in this report show a reversal of these trends in 2022.

**Restoration of Capacity:** During the pandemic, many emergency shelter, transitional housing, and safe haven providers reduced the number of beds available for occupancy, in some places by 50 percent or more, to accommodate federal social distancing guidelines. During the 2022 reporting period, shelter programs largely returned to pre-pandemic capacity. The number of people accessing shelter programs rose between 2021 and 2022, as did occupancy rates, reversing the declines experienced between 2019 and 2021.

**Expiration of Resources:** In response to the COVID-19 pandemic, the American Rescue Plan and the CARES Act provided billions in funding to prevent the experience of homelessness and to prevent the spread of COVID-19 among people already experiencing homelessness. The CARES Act provided funding to deconcentrate emergency shelters using hotels and motels, to help communities acquire or renovate facilities, and to expand rapid re-housing programs. It also established a federal eviction moratorium, which stemmed the number of people needing and subsequently entering shelter. The American Rescue Plan (ARP) also provided considerable resources to prevent homelessness through emergency rental assistance (ERA) and Emergency Housing Vouchers (EHV). However, the federal eviction moratorium expired just before the start of the 2022 reporting period. As a likely result, the number of households experiencing sheltered homelessness for the first time rose by 21 percent (or about 120,000 households) between 2021 and 2022. Many of the funding sources aimed at preventing homelessness also expired or were expended either immediately before the start of or during the 2022 reporting period (October 2021). The share of households leaving sheltered situations to permanent housing with a subsidy increased between 2019 and 2021 but decreased to pre-pandemic levels in 2022, reflecting the loss of some of these additional resources.

### Use of Rapid Rehousing Subsidies by Adult-Only Households Continues to Grow

Since 2019, the use of rapid rehousing by people in households without children has increased considerably. While historically used primarily by family households, adult-only households accounted for 71 percent RRH subsidy users in 2022 compared to 61 percent in 2019, the first year these data were available through the Longitudinal Systems Analysis (LSA). There are several possible reasons for the shift in RRH use. Some of this increase may have to do with pandemic-era increases in funding. The CARES Act provided considerable funding for communities to expand RRH programs. Family homelessness dropped sharply during the pandemic, – in part reflecting homelessness prevention resources targeted to

families with children. Thus, adult-only households remaining in shelter made up a larger share of the population eligible for RRH. In addition, in recent years communities have increasingly relied on coordinated entry systems to identify people most in need of services. Given shortages of permanent supportive housing (PSH) for high needs individuals, coordinated entry systems may have instead linked them to RRH. Finally, there is a widespread shortage of affordable housing in the United States. RRH and other housing subsidies that rely on the private housing market may have a harder time finding units large enough for families. Adult-only households, especially one-person households, may have more flexibility in their housing options, including shared housing and single room occupancy housing, as well as the one-bedroom units that are common in multifamily rental housing.

Summarized below are highlights from each chapter in the report, expanding on this overall interpretation of key findings. The highlights cover the populations that are the focus of the first several chapters and then summarize the findings on programs that help people leave homelessness: rapid-housing and permanent supportive housing.

## Key Findings

### All Households Experiencing Sheltered Homelessness

- An estimated 1,388,425 million people in 1,066,514 households stayed in an emergency shelter, safe haven, or transitional housing program at some point between October 1, 2021 and September 30, 2022. This represents one of every 240 people in the U.S. and one in every 130 households.
- Two-thirds of people accessing emergency shelter, transitional housing, or safe haven programs in 2022 were in adult-only households, and one-third were in households with children. Only one percent were people in households composed of only children.
- The number of people accessing shelters increased by 14 percent between 2021 and 2022. This likely reflects a combination of increases in the number of beds available after the COVID-era restrictions were lifted and the expiration of eviction moratoria and programs providing additional income support during the pandemic.
- The share of the sheltered population that was elderly (65 or older) was five percent in 2022, and the share of the sheltered population that was near (55-64) elderly was 13 percent.
- Heads of sheltered households who identified as Hispanic or Latino/a/x of any race comprised 23 percent of the total population experiencing homelessness. This was a considerable increase over 2019, when 16 percent of heads of households identified as Hispanic/Latino/a/x.
- Households headed by someone identifying as Black, African, or African American were considerably overrepresented among people experiencing homelessness in 2022. Black household heads account for 13 percent of the

entire U.S. population and 21 percent of heads of households living in poverty. At the same time, they account for 37 percent of the sheltered population.

- The percent of sheltered heads of households who identified as Native American, American Indian, or Alaska Native was three times their share of the U.S poverty and total U.S. population (3% vs. 1%). About 12 percent of Native American households in poverty experienced sheltered homelessness during 2021, compared with 3 percent of all households.

### Adult-only Households Experiencing Sheltered Homelessness

- In 2022, 923,241 people in 907,858 adult-only households spent some time in a shelter program. The number of adult-only households who stayed in shelters at some time over the course of a year was 13 percent higher than it was in 2021, the year when the effects of the pandemic were fully felt but still about 2 percent lower than in 2019, the pre-pandemic comparison year.

- Eight percent of people in adult-only households were aged 65 or older. The number increased by 37 percent between 2019 and 2022. No other age group experienced an increase of more than three percent during this period.

- More than one in five (21%) sheltered, adult-only household heads identified as Hispanic or Latino/a/x. Between 2019 and 2022, the number of adult-only household heads identifying as Hispanic or Latino/a/x staying in shelters increased by 46 percent, while the number of Non-Hispanic/Non-Latino/a/x heads of households declined by 10 percent.

- People identifying as Black or African American are considerably overrepresented among sheltered adult-only households. Black people accounted for 35 percent of heads of sheltered adult-only households in 2022 while comprising only 19 percent of heads of adult-only households living in poverty and 12 percent of all U.S. heads of adult-only households.

- Native American heads of adult-only households using shelter programs were overrepresented compared to their share of all U.S. households (3% vs 1%) and adult-only households in poverty (1%).

- In 2022, more than six of every ten adult-only households experiencing sheltered homelessness (65%) were experiencing homelessness for the first time, not having accessed any homeless service system program in at least two years prior to the reporting period.

- Nearly six of every ten adult-only households (56%) that entered shelter programs at some point in 2022 reported that they had been experiencing homelessness the previous night, either in an unsheltered location or in a different shelter. A majority (36%) were staying in unsheltered situations prior to entering a shelter.

- Of adult-only households that transitioned out of shelter programs during the reporting period, a smaller percentage of households went to a permanent housing situation in 2022 than did in 2019. In 2019, 25 percent of households exited the shelter system to permanent housing with or without a subsidy or

to live with family or friends on a permanent basis compared to 19 percent of households in 2022.

### Family Households Experiencing Sheltered Homelessness

- In 2022, 453,016 people in 141,609 family households accessed a shelter program during the year. This represents a 10 percent decrease in the number of family households in shelters compared with the pre-pandemic comparison year of 2019 but a 19 percent increase between 2021 and 2022.

- While half of heads of family households that experienced sheltered homelessness in 2022 identified as Black, African, or African American, 24 percent of heads of family households living in poverty and 13 percent of heads of all family households in the U.S. were Black.

- Between 2019 and 2022, the share of heads of family households who identified as Hispanic or Latino/a/x increased from 24 percent to 31 percent. The *number* of Hispanic heads of family households experiencing sheltered homelessness increased by 14 percent. During the same time period, the share of Hispanic heads of families in poverty and all U.S. families remained constant.

- Seven of every ten sheltered families (71%) were headed by a single adult (most often a parent or guardian). More than one-third (34%) of sheltered families with children were very small, composed of just one parent with one child.

- Almost 4 in 10 family households (39%) were staying in a housed situation prior to entering a shelter program; 29 percent were staying with family or friends, seven percent were staying in rented housing without a subsidy, and two percent were staying in rented housing with a subsidy (which could include short- term rapid rehousing assistance).

- The share of family households accessing shelter from another homeless situation increased each year between 2019 and 2022. Prior to the pandemic, 37 percent of families with children enrolled in an emergency shelter or transitional housing program from another homeless situation. In 2021, 45 percent of families did so, and in 2022 the share increased again to 47 percent.

- Forty-two percent of family households that exited the homeless services system during the reporting period went from sheltered homelessness directly to permanent housing in 2022. Most (25%) transitioned to rental housing with housing assistance.

### Unaccompanied Youth Households Experiencing Sheltered Homelessness

- In 2022, 114,413 unaccompanied youth in 112,838 unaccompanied youth households stayed in shelter programs at some time during the year. Fifteen percent were under the age of 18, 46 percent were 18-21, and 39 percent were 22-24.

- The number of unaccompanied youth accessing shelter programs increased by 24 percent between 2021 and 2022, possibly reflecting an increase in funding and capacity once pandemic-era restrictions were eased.

- In 2022, sheltered unaccompanied youth were far more likely to identify as Hispanic or Latino/a/x than either unaccompanied youth in the U.S. population or the population of youth with incomes below the poverty line (32% vs. 14% and 15%).
- Transgender people (2%), people identifying as a gender not singularly 'female' or 'male' (2%), and people identifying as gender questioning (0.1%) together comprised nearly four percent of unaccompanied youth. This is four times the share of adult-only households that identified as a gender other than men or women alone (1%).[3]
- Unaccompanied youth identifying as Black or African American are considerably overrepresented among the sheltered youth population. Black youth accounted for 36 percent of heads of sheltered youth households in 2022 while comprising only 13 percent of unaccompanied youth living in poverty and 14 percent of all U.S. heads of unaccompanied youth households.
- Native American heads of youth households using shelter programs were overrepresented compared to their share of all U.S. households (4% vs 1%) and youth households in poverty (1%). More than one-quarter of Native American youth households living in poverty (27%) experienced sheltered homelessness in 2022.
- Just over 47 percent of unaccompanied youth households were already experiencing homelessness before accessing shelter programs in 2022. About 25 percent of unaccompanied youth were unsheltered prior to entering a shelter program.
- Nearly one-third of unaccompanied youth households entered a shelter program after staying with friends or family (32%). This is nearly double the 17 percent of adult-only households that were staying with friends or family immediately before entering shelter.

### Veteran Households Experiencing Sheltered Homelessness

- During the 2022 reporting year, 85,234 veterans in 85,628 households stayed in shelters, safe havens, or transitional housing programs. This represents one out of every 152 veterans in the United States.
- Between 2019, the pre-pandemic comparison year, and 2022, the number of veterans experiencing sheltered homelessness dropped by 15 percent. This decline among veterans represents a continuation of the decline in experiences of homelessness by veterans that predated the pandemic.
- More than half (56%) of veterans experiencing sheltered homelessness were either near elderly, 55 – 64, or elderly, 65 and older. Very few (2%) were youth aged 18-24, a smaller percentage than all people in adult-only households experiencing homelessness, 11 percent.
- In 2022, 13 percent of veterans living in poverty and identifying as Black

3 Gender data in 2022 reflects the categories included in the data standards prior to 2024. These categories have been updated and will be reflected in future reports.

experienced sheltered homelessness. By comparison, five percent of White veterans with poverty level incomes experienced sheltered homelessness during this time.

- Native American/American Indian and Alaska Native veterans in adult-only households experiencing sheltered homelessness accounted for a higher share than they did veterans in poverty or all U.S. veterans (3% vs. 1%). Of all Native American veterans living in poverty, fourteen percent stayed in an emergency shelter, transitional housing, or safe haven project at some point during 2022 – the highest rate of veteran poverty of any racial group.
- Fifty-seven percent of veteran adult-only households were already experiencing homelessness prior to their first engagement with a shelter program during the reporting period. Thirty six percent of veteran adult-only households were in unsheltered locations prior to entering a shelter program.
- Fifteen percent of veterans in adult-only households accessed shelter from an institutional setting. Most came from medical facilities (11%).

### Households Experiencing Chronic Patterns of Homelessness

- In 2022, 218,754 people in adult-only households who stayed in an emergency shelter, safe haven, or transitional housing program had chronic patterns of homelessness, roughly a quarter of people in adult-only households (24%).
- The number of people in adult-only households with chronic patterns of homelessness increased by 26 percent between 2019 and 2022, reflecting the general increase in the vulnerability of the population served during the pandemic.
- Adults who were elderly or near elderly (55 or older) made up a larger share of the population of adult-only households with chronic patterns of homelessness compared to their share among all sheltered people in adult-only households (36% versus 27%).
- Five percent of adult-only households with chronic patterns of homelessness were Native American or Alaska Native. One-third (34%) of all Native American heads of sheltered adult-only households had chronic patterns of homelessness, higher than the share of all people in sheltered adult-only households (24%).
- Nearly one-quarter of Black heads of adult-only households (23%) had chronic patterns of homelessness in 2022.
- Almost eight of every ten adult-only households experiencing chronic homelessness in 2022 (77%) had been experiencing homelessness directly before entering shelter programs. Fifty-three percent had been staying in unsheltered situations prior to entering a shelter, and 24 percent had been staying in an emergency shelter, transitional housing, or safe haven program.

### Households Using Rapid Rehousing Subsidies

- An estimated 256,653 people in 147,468 households used RRH rent subsidies at some time during the year. More than half, 56 percent, of people who used RRH

in 2022 were in families with children. Forty-four percent were people in adult-only households. The *share* of adult-only households in the RRH program rose from 32 percent in 2019 to 44 percent in 2022.

- The number of households using RRH rent subsidies increased by 16 percent between 2019, the year just prior to the onset of the pandemic, and 2022. Much of this increase occurred between 2021 and 2022, a year that saw a 14 percent rise in households using RRH.
- Compared with the sheltered population, more heads of households using RRH to subsidize their permanent housing in 2022 were women (51% compared to 39%).
- A smaller share of households using RRH subsidies were Hispanic/Latino/a/x (15%) than the share of people staying in sheltered locations (23%) in 2022.
- The share of Black, African or African American heads of households using RRH rent subsidies in 2022 was slightly higher (42%) than their share of households using shelters (37%).
- A larger share of RRH households were in rural areas than sheltered households. In 2022, 10 percent of RRH households were in rural areas compared to seven percent of sheltered households.
- As RRH serves households leaving homelessness, nearly all enrolled in the program directly from the experience of homelessness. Of those, 46 percent enrolled from an unsheltered situation.
- In 2022, 70 percent of all households that rented housing using RRH subsidies did not use other parts of the homeless service system during the year. This differed considerably by household type. Two-thirds of adult-only households used only RRH subsidies during the year compared with 81 percent of family households.
- Nearly all households that left the RRH program remained in permanent housing immediately after leaving the program (81% of adult-only households and 88% of family households).
- A small percentage of households that left RRH went directly to a homeless situation– four percent of adult-only households and two percent of family households.

### Households Living in Permanent Supportive Housing

- An estimated 387,694 people in 292,501 households lived in PSH at some point during 2022. More than two-thirds of all people living in PSH were people in adult-only households (70%). Just under one-third of PSH residents were people in families with children (30%).
- Between 2019 and 2022, the number of people living in PSH decreased by three percent. The decline in the number of households between 2019 and 2021 may reflect shortages of staff during the COVID-19 era for referring people to PSH developments and providing housing navigation for scattered-site PSH. The lack of growth in the number of households in PSH during the entire three-

year period may reflect increases in rents that meant PSH could serve fewer households with the same resources.

- The share of PSH residents who were elderly or near elderly (aged 55 and older) was much higher than the share of people experiencing sheltered homelessness (40% vs. 18%). The number of people living in PSH aged 65 and older increased by 62 percent (or about 20,000 people) over this period between 2019 and 2022.
- Approximately 44 percent of heads of PSH households identified as Black, African, or African American. This is higher than the share of heads of households using shelter programs who were Black in 2022 (37%).
- Thirty percent of PSH households included a veteran in 2022. This reflects the large share of PSH made available to veterans through the HUD-Veterans Administration supportive housing program.
- More than two in five PSH households transitioned from PSH to another permanent housing destination (41%). For the most part, families left to go to their own housing either with a subsidy (30%) or without a subsidy (22%). Adult-only households were less likely to transition to another permanent housing situation, 16 percent to housing with a subsidy and 13 percent to housing without a subsidy.
- One in five heads of adult-only households who were not active on the last day of the 2022 reporting period had died at some point during the year.

DOJ-HUD-AR00937

# Broader Perspectives on People Experiencing Homelessness and Housing Instability

**Broader Perspectives on People Experiencing Homelessness and Housing Instability** ................................................................. **B-2**

**People who are At-Risk of Homelessness** ............................................. **B-2**

Renters with Very-Low and Extremely Low Incomes in Precarious Housing Situations (HUD 2023 Worst Case Needs Report) ............................... B-2

**The Census Household Pulse Survey on Housing Insecurity** ................ **B-6**

Housing Insecurity During the COVID-19 Pandemic by Household Type ....... B-6

Housing Insecurity During the COVID-19 Pandemic by Race ........................ B-6

**Education Data on Children and Youth** ............................................... **B-7**

Doubled up and Other Homeless Situations of Children and Youth (Data from State Educational Agencies) .................................................. B-7

**Survivors of Domestic Violence** ......................................................... **B-9**

Domestic Violence Survivors Who Use Shelters ........................................... B-9

**Unsheltered Homelessness** ............................................................... **B-10**

DOJ-HUD-AR00938

# Broader Perspectives on People Experiencing Homelessness and Housing Instability

Federal agencies and their state and local partners use data on people experiencing homelessness to inform a broad set of policy solutions across many different programs to meet goals the nation has set for preventing and ending homelessness. Experiencing homelessness is a crisis that results in many people dying on the streets every year. Ending homelessness cannot rely solely on programs that are targeted to people experiencing homelessness. Homelessness is closely linked to housing affordability, livable income and employment, health (including physical, behavioral, and mental disabilities), and education. The mainstream programs that address these needs have a substantial role in preventing and ending experiences of homelessness.

This section provides a broader perspective on people experiencing housing instability and homelessness and includes information on people who are precariously housed because they are doubled up, couch surfing, or paying unsustainable shares of their income for rent. The section also provides additional information on specific groups of people who are in unstable situations: school children, survivors of domestic violence, and people staying in unsheltered locations.

Following are discussions of:

- People who are at risk of experiencing homelessness because of cost burdens or unsafe housing or who are having trouble paying their rent.
  - In 2021, 8.53 million renter households had worst case needs, a 10 percent increase over 2019. This is the highest number of renters with worst case housing needs that has ever been reported.
  - The rental housing stock that was affordable was rarest for the lowest income renters. Nationally, for every 100 renters with extremely low incomes (incomes 30 percent or less of area median income (AMI)), only 61 rental units were affordable, a loss of 9 units per 100 renters since 2019.
- Other data on children and youth experiencing homelessness or doubled up:
  - During the 2021-22 school year (SY), 1,205,292 students were identified as having experienced homelessness or housing instability at some point during the year, representing a 10 percent increase from the prior school year.
  - Students of color were overrepresented among those identified as experiencing homelessness or in doubled up situations. Students identifying as Hispanic or Latino/a/x comprised the largest share of students experiencing homelessness and housing instability (39%). These students were considerably overrepresented compared to their share of all students (29%). Black or African American students accounted for 25 percent of students experiencing homelessness, a much higher share than their 15 percent of all students.

- Survivors of domestic violence (DV):
  - Each year, more than 7 million women and men in the U.S. experience physical violence, sexual assault, and/or stalking by an intimate partner that leads to them fearing for their safety and needing services. Of these, approximately 500,000 identify housing services as a need that results from this violence.
  - In 2022, 11 percent of the emergency shelter, safe haven, and transitional housing beds available for survivors of domestic violence currently experiencing homelessness.
- Unsheltered homelessness:
  - On a single night in 2022, 234,000 people experienced unsheltered homelessness.
  - Of the approximately 1.1 million households experiencing sheltered homelessness over the course of the year, one-third accessed shelter programs directly from unsheltered locations and at least 12 percent exited programs to an unsheltered situation.

## People who are At-Risk of Experiencing Homelessness

### Renters with Very-Low and Extremely Low Incomes in Precarious Housing Situations (HUD 2023 Worst Case Needs Report)

HUD submits reports to Congress every other year on renter households with severe needs for affordable housing or housing assistance. Prepared by HUD's Office of Policy Development and Research (PD&R), the Worst Case Needs reports are based



**EXHIBIT B.1: Growth in Worst Case Housing Needs (in millions)**
2001-2021

Source: HUD-PD&R tabulations of American Housing Survey data

on detailed tabulations of data in the American Housing Survey (AHS). The analysis focuses on the availability, quality, and costs of rental housing units relative to the incomes of the housing's occupants. Households with worst case needs are defined as renters with incomes below 50 percent of area median income (very low incomes or VLI) who do not have housing assistance and are living in severely inadequate housing, paying more than half of their income for rent, or both.

The *Worst Case Housing Needs 2023 Report to Congress* analyzes data on renters in 2021, reflecting early economic impacts of the COVID-19 pandemic. In 2021, 8.53 million renter households had worst case needs, a 10 percent increase over the 7.7 million in 2019.[1] This is the highest number of renters with worst case housing needs that has ever been reported. The share of renters with worst case housing needs increased as well, with 44 percent of renters with very low incomes (VLI) experiencing such hardship in 2021 compared with 42 percent in 2019. Almost all households with worst case needs (98%) pay more than half their income for rent. Worst case needs are most prevalent among households with extremely low incomes (ELI), the households with the greatest risk of experiencing homelessness based on their poverty-level incomes. Almost half (49%) of ELI renters have worst case needs, as do 73 percent of ELI renters who are not protected by housing assistance.[2]

The increase in worst case needs between 2019 and 2021 was associated with several factors that, taken together, increased the population of renters extremely vulnerable to being at risk and/or experiencing homelessness.

- The first factor identified was simply an increase in the number of households participating in the rental market. This includes primarily new households formed as population rises.
- The second factor was the increase in the number of renters with very low incomes.
- The third factor was a reduction in the share of VLI renters with housing assistance, as the slight increase in housing assistance between 2019 and 2021 did not keep pace with the increase in VLI renters.
- The fourth factor was competition for affordable units, reducing the number of units available and affordable for households with very low incomes.

Measuring worst case housing needs is one way to identify the risk of experiencing homelessness among different types of households. In 2021, 2.6 million households or 44 percent of families with children that lived in rented housing units and had incomes below 50 percent of their area median income (VLI) had worst case housing needs, as did 66 percent of renter families with children and extremely low incomes (ELI) or more than 2.5 million households. A slightly smaller share of

1 The 2021 American Housing Survey did not include one-time income transfers provided during the COVID-19 Pandemic. Thus, they are not included in the calculations of severe rent burdens in 2021 that are part of the definition of worst case needs.

2 Worst Case Housing Needs 2023 Report to Congress, Exhibit A-3.

## EXHIBIT B.2: Worst Case Needs by Household Type and Race/Ethnicity
2021

| | Very low-income renter households (thousands) | Worst case needs (thousands) | Percentage with worst case needs |
|---|---|---|---|
| **Total** | 19,338 | 8,526 | 44.1 |
| **Household Type** | | | |
| Families with Children | 5,923 | 2,629 | 44.4 |
| Older Adult Households | 5,858 | 2,349 | 40.1 |
| Other Family Households | 1,837 | 918 | 50.0 |
| Other Nonfamily Households | 5,719 | 2,629 | 46.0 |
| **Race and Ethnicity** | | | |
| Asian or Asian American | 888 | 467 | 52.6 |
| Black, non-Hispanic/non-Latino/a/x* | 4,888 | 1,923 | 39.3 |
| Hispanic/Latino/a/x | 4,573 | 2,168 | 47.4 |
| Native American or Alaska Native | 250 | 91 | 36.4 |
| Native Hawaiian or Pacific Islander | 89 | 37 | 41.6 |
| Other Race/Ethnicity | 376 | 193 | 51.3 |
| White, non-Hispanic/non-Latino/a/x | 8,273 | 3,646 | 44.1 |

Source: American Housing Survey data, 2021. The exhibit is based on exhibits in the U.S. Department of Housing and Urban Development, *Worst Case Housing Needs: 2023 Report to Congress* Research: https://www.huduser.gov/portal/taxonomy/term/43

## EXHIBIT B.3: Shares of Renter Households, Very Low-Income Renters, and Worst Case Needs Renters by Race
2021



■ Share of All Renters    ■ Share of Very Low Income Renters    ■ Share of Households with WCN

Source: Worst Case Housing Needs, 2021 ; U.S. Census Bureau, 2021 American Community Survey 1-Year Estimates

DOJ-HUD-AR00940

## EXHIBIT B.4: Affordable, Available, and Adequate Rental Units by Income of Renters
2021

| Income Category | Affordable | Affordable and Available | Affordable, Available, and Adequate |
|---|---|---|---|
| Extremely low-income renter households (0–30% AMI) | 60.9 | 35.4 | 31.7 |
| Very low-income renter households (0–50% AMI) | 87.2 | 56.7 | 49.7 |
| Low-income renter households (0–80% AMI) | 127.8 | 93.2 | 83.0 |

Source: American Housing Survey data, 2021. The exhibit is produced from data presented in the U.S. Department of Housing and Urban Development, *Worst Case Housing Needs: 2023 Report to Congress*. Office of Policy Development and Research: https://www.huduser.gov/portal/sites/default/files/pdf/Worst-Case-Housing-Needs-2021.pdf

Note: AMI=Area Median Income

renter households composed of older adults had worst case needs, 40 percent of elderly renters with VLI and 61 percent of those with ELI.[3] The 2023 Worst Case Needs report notes that the aging baby boomers are "likely to continue be a key demographic group facing housing problems in the years to come."

Households composed of non-elderly adults and no children (including single adults, unmarried couples, and roommates) had an even higher rate of worst case needs among VLI renters. In 2021, 46 percent of these non-family, very low-income households had worst case needs, as did 64 percent of those with ELI, a total of 2.2 million households. Non-family households can be thought of as similar to the "adult-only" households that make up a large percentage of people experiencing homelessness.[4]

Worst case housing needs were present across all races and ethnicities. Data presented in exhibit B.2 show numbers and shares of renter households with very low incomes and severe rent burden. White, non-Hispanic/non-Latino/a/x households comprised the largest numbers of renters with worst case needs., 3.6 million households or 44 percent of White VLI renter households. Asian or Asian American households, a relatively small group of renters with very low incomes had the highest *rates* of worst case needs by race, with 53 percent of Asian or Asian American VLI renter households experiencing worst case housing needs. Asian renters with VLI have a relatively low rate of receipt of housing assistance, 21 percent compared with 26 percent of VLI renters of all races and ethnicities.[5] Nearly half of very low-income Hispanic or Latino/a/x renter households had worst case

3  Worst Case Housing Needs: 2023 Report to Congress, Exhibit A6-3.

4  Worst Case Housing Needs: 2023 Report to Congress, Exhibit A6-3. The worst case needs analysis also distinguishes "other family households," adults living with spouses or other adult family members but not with children under 18. This group also has a high prevalence of worst case needs.

5  Worst Case Housing Needs: 2023 Report to Congress, Exhibits A-9 and A-1A.

## EXHIBIT B.5: Rental Housing Stock Was Insufficient for Extremely Low-Income Renters Across All Regions
2021

| Income Category | Housing Units per 100 Renters | | |
|---|---|---|---|
| | Affordable | Affordable and Available | Affordable, Available, and Adequate |
| **Northeast** | | | |
| Extremely low-income renter households (0–30% AMI) | 62.7 | 41.0 | 35.4 |
| Very low-income renter households (0–50% AMI) | 87.6 | 60.9 | 53.0 |
| Low-income renter households (0–80% AMI) | 122.0 | 92.2 | 81.0 |
| **Midwest** | | | |
| Extremely low-income renter households (0–30% AMI) | 68.4 | 41.0 | 37.2 |
| Very low-income renter households (0–50% AMI) | 116.0 | 71.9 | 64.1 |
| Low-income renter households (0–80% AMI) | 144.9 | 102.9 | 93.3 |
| **South** | | | |
| Extremely low-income renter households (0–30% AMI) | 59.3 | 35.7 | 30.9 |
| Very low-income renter households (0–50% AMI) | 82.8 | 54.7 | 47.5 |
| Low-income renter households (0–80% AMI) | 131.5 | 95.2 | 83.8 |
| **West** | | | |
| Extremely low-income renter households (0–30% AMI) | 55.6 | 29.6 | 25.3 |
| Very low-income renter households (0–50% AMI) | 68.7 | 43.3 | 37.9 |
| Low-income renter households (0–80% AMI) | 113.3 | 83.2 | 75.1 |

Source: American Housing Survey data, 2021. The exhibit is produced from data presented in the U.S. Department of Housing and Urban Development, *Worst Case Housing Needs: 2023 Report to Congress*. Office of Policy Development and Research: https://www.huduser.gov/portal//portal/sites/default/files/pdf/Worst-Case-Housing-Needs-2023.pdf

needs (47% or 2.2 million households).

Overcrowding is a risk factor for experiencing homelessness but is not part of the definition of worst case needs. The 2023 worst case needs report includes separate estimates of overcrowding, defined as more than one person per room. The occurrence of overcrowding is greatest among households with VLI identifying as Hispanic—11.3 percent compared with 4.9 percent for VLI renters of all races and ethnicities.

Just under 40 percent of VLI renter households identifying as Black and not Hispanic had worst case needs in 2021 (or 1.9 million households). Black VLI renters have a relatively high rate of receiving housing assistance, 36 percent—reflecting in part the historic distribution of housing assistance across regions. Just over a third of VLI Native American or Alaska Native renter households, 36 percent, had worst case needs. This relatively low rate may be related to the definition of worst case housing needs, which does not include overcrowding and does include severe rent

**EXHIBIT B.6: Worst Case Needs by Prevalence of Housing Assistance in 2021**



Percent of very low-income renters with worst case needs

Source: American Housing Survey data, 2019. The exhibit is reproduced from data presented in the U.S. Department of Housing and Urban Development, Worst Case Housing Needs: 2021 Report to Congress. Office of Policy Development and Research, https://www.huduser.gov/portal/sites/default/files/pdf/Worst-Case-Housing-Needs-2021.pdf

Note: The size of each bubble corresponds to the size of the worst case needs population. Bubbles in the top left reflect areas with higher percentages of households receiving housing assistance and lower percentages of households with worst case needs. Bubbles in the bottom right reflect areas with lower percentages of households receiving housing assistance and higher percentages of households with worst case needs.

burdens, which are more common in urban areas.

White, non-Hispanic/non-Latino/a/x households accounted for about 43 percent of all households with worst case needs, about the same as their share of renters with very low incomes. Hispanic or Latino/a/x households accounted for 24 percent of renter households with very low incomes and 25 percent of those with worst case needs. Black households accounted for 25 percent of VLI renters and a slightly smaller share of renters with worst case needs, 23 percent.

As in previous years, the 2023 report describes shortage of units available to those renters with incomes below 50 percent and 30 percent of AMI. The report measures this mismatch by looking at whether units are affordable, available, and adequate:

- *Affordability* measures the extent to which rental housing units have rents for which a household at a certain income level would pay no more than 30 percent of its income.
- *Availability* measures the extent to which rental housing units are not just affordable but also available to households in a certain income range, meaning that a household within that range occupies the unit or that the unit is vacant.
- *Adequacy* identifies whether a unit that is affordable and available is also physically adequate based on the condition of the housing unit and its plumbing, heating, and electrical systems.

The rental housing stock that was affordable was rarest for the lowest income renters. Nationally, for every 100 renters with extremely low incomes (incomes 30 percent or less of AMI), only 61 rental units were affordable, a loss of 9 units per 100 renters since 2019. Many of the rental units that appeared affordable were occupied by households with relatively higher incomes, leaving only 35 units both affordable and available, and only 32 units affordable, available, and adequate for every 100 renters with extremely low incomes.

The mismatch between the number of affordable units and the number of extremely low-income renters is most severe in the West, where there were 25 rental units affordable, available, and adequate for every 100 ELI renters in 2021. In the South, the number of units affordable to extremely low-income households and also available and adequate was 31 for every 100 ELI renters. In the Northeast, there were 35 units, and in the Midwest 37.

The West also had the highest percentage of renters with worst case needs. The prevalence of low-income renters with worst case needs tends to be higher in areas where housing assistance is more limited, as shown in Exhibit B.6. The analysis shown in that exhibit shows four types of geography: non-metropolitan areas, central cities within metropolitan areas, metropolitan suburbs that are largely urban, and metropolitan suburbs that are largely rural. The downward slope of the bubbles shows that, overall, the percentage of renters with worst case needs grows as the percentage with housing assistance declines. The exhibit also shows an exception to high prevalence of worst case needs in the West. The highest shares of VLI renters with worst case needs are in urban suburbs in the South, a type of geography with a very low share of VLI renters who have housing assistance.

DOJ-HUD-AR00942

## The Census Household Pulse Survey on Housing Insecurity by Household Type

The Census Household Pulse Survey (HPS) is an experimental, longitudinal survey designed to quickly capture information about household social and economic experiences during the COVID-19 pandemic.[14] It is designed to be a short-turnaround survey instrument that can be used to *quickly* examine social, economic, and health information to aid COVID-19 pandemic recovery.[15] First fielded in April 2020, the HPS collects important information about housing circumstances and the associated impacts of the ongoing housing crisis. The HPS data can provide insight into the decline in sheltered homelessness seen in 2020, 2021, and 2022 by examining households reporting being behind on rental payments by household type.

### Housing Insecurity During the COVID-19 Pandemic by Household Type

The HPS asks respondents the following question: "*Is this household currently caught up on rent payments? Select only one answer.*" There are two options: "Yes and "No". This question is only asked to respondents who answered the following question "*Is your house or apartment…?*" with the "rented" response option. The data analysis included in this section used the HPS data to examine one key outcome: behind on rental payments.

According to the HPS, families with children had higher rates of being behind on rent payments compared to single adults or other households without children. HPS results from the 2022 AHAR reporting period show that the percentage of families behind on rental payments was higher than the percentage of individuals. Single

parent households were particularly at risk at being behind on rental payments, with rates ranging from 23 to 27 percent during the reporting period.

### Housing Insecurity During the COVID-19 Pandemic by Race

In addition to household type, the HPS collects data on people behind on rental payments by race, and those that fear imminent eviction due to rent arrears.

### EXHIBIT B.7: Percentage of U.S. Renter Households Behind on Rental Payments, by Household Type, Census Household Pulse Survey
August 2020 to December 2022

| Data Collection Period | Renters | One Adult with Children | Two or More Adults with Children | Elderly Retired | Young, Single Adult | Single, Middle-Aged Adult | Two Adults, No Children |
|---|---|---|---|---|---|---|---|
| Aug 19 – Oct 26 (2020) | 15.3 | 25.7 | 21.8 | 7.2 | 9.2 | 12.1 | 11.4 |
| Oct 28 – Jan 18 (2020-2021) | 18.1 | 29.9 | 26.0 | 8.4 | 12.6 | 14.6 | 13.1 |
| Jan 20 – Mar 29 (2021) | 16.5 | 27.3 | 23.9 | 8.0 | 10.2 | 13.8 | 12.0 |
| Apr 12 – Jun 21 (2021) | 14.1 | 22.5 | 19.2 | 6.1 | 7.1 | 12.3 | 11.3 |
| Jun 23 – Aug 30 (2021) | 15.0 | 28.1 | 19.5 | 8.4 | 8.9 | 12.6 | 11.6 |
| Sep 1 -Dec 13 (2021) | 14.8 | 24.2 | 21.7 | 7.5 | 7.8 | 12.1 | 11.5 |
| December 29 -April 11 (2021-2022) | 14.5 | 26.6 | 20.1 | 8.6 | 6.0 | 12.3 | 11.2 |
| Apr 27 – Aug 8 (2022) | 14.3 | 23.3 | 20.9 | 6.6 | 7.4 | 11.6 | 11.2 |
| Sep 14- Dec 19 (2022) | 12.5 | 22.9 | 17.8 | 6.6 | 8.7 | 11.2 | 9.7 |

### EXHIBIT B.8: Weighted Percentage of U.S. Renters (Person-Level) Behind on Rental Payments, by Race and Ethnicity, Census Household Pulse Survey
August 2020 to December 2022

| | | Race | | | | Ethnicity | |
|---|---|---|---|---|---|---|---|
| Data Collection Period | Renters | White, Alone | Black, Alone | Asian, Alone | Other | Not Hispanic | Hispanic |
| Aug 19 - Oct 26 (2020) | 16.0 | 12.8 | 24.4 | 20.9 | 19.6 | 14.9 | 19.6 |
| Oct 28 – Jan 18 (2020-2021) | 18.9 | 14.7 | 31.4 | 18.8 | 25.9 | 17.8 | 22.9 |
| Jan 20 - Mar 29 (2021) | 17.2 | 13.7 | 27.8 | 20.0 | 21.4 | 16.1 | 20.8 |
| Apr 12 - Jun 21 (2021) | 14.8 | 11.2 | 24.7 | 19.9 | 20.1 | 13.9 | 18.2 |
| Jun 23 – Aug 30 (2021) | 15.2 | 12.0 | 24.8 | 19.7 | 18.7 | 14.3 | 18.4 |
| Sep 1 -Dec 13 (2021) | 15.7 | 12.2 | 26.3 | 19.6 | 19.6 | 14.8 | 19.3 |
| December 29 -April 11 (2021-2022) | 15.1 | 11.9 | 24.1 | 20.3 | 20.0 | 14.3 | 17.8 |
| Apr 27 – Aug 8 (2022) | 15.3 | 11.6 | 27.3 | 16.5 | 18.8 | 14.5 | 17.8 |
| Sep 14- Dec 19 (2022) | 13.3 | 10.3 | 22.3 | 16.9 | 17.4 | 12.7 | 15.4 |

### EXHIBIT B.9: Weighted Percentage of U.S. Renters (Person-Level) Fearful of Imminent Eviction, by Race and Ethnicity, Census Household Pulse Survey
August 2020 to December 2022

| | | Race | | | | Ethnicity | |
|---|---|---|---|---|---|---|---|
| Data Collection Period | Renters | White, Alone | Black, Alone | Asian, Alone | Other | Not Hispanic | Hispanic |
| Aug 19 - Oct 26 (2020) | 7.1 | 5.7 | 11.4 | 5.0 | 9.9 | 6.5 | 9.0 |
| Oct 28 – Jan 18 (2020-2021) | 9.1 | 6.9 | 16.0 | 6.0 | 13.8 | 8.8 | 10.2 |
| Jan 20 - Mar 29 (2021) | 7.8 | 6.0 | 14.2 | 4.5 | 10.4 | 7.5 | 8.6 |
| Apr 12 - Jun 21 (2021) | 6.6 | 5.0 | 11.7 | 4.7 | 9.9 | 6.3 | 7.6 |
| Jun 23 - Aug 30 (2021) | 7.1 | 5.2 | 13.7 | 5.0 | 9.4 | 6.7 | 8.2 |
| Sep 1 -Dec 13 (2021) | 6.5 | 5.1 | 11.2 | 4.1 | 9.9 | 6.1 | 8.0 |
| December 29 -April 11 (2021-2022) | 6.3 | 5.2 | 11.3 | 3.4 | 8.3 | 6.1 | 7.1 |
| Apr 27 – Aug 8 (2022) | 7.1 | 5.1 | 14.8 | 3.1 | 8.2 | 6.7 | 8.3 |
| Sep 14- Dec 19 (2022) | 5.4 | 4.1 | 10.2 | 3.2 | 8.2 | 4.9 | 7.2 |

DOJ-HUD-AR00943

These data do show an increased vulnerability among renters of color. People who identified as Black or African American had much higher rates of both being behind on rental payments (high of 27%) and fearing eviction (high of 15%) than people who identified as White (high of 12% and 5%). Asian or Asian Americans as well as people identifying as Hispanic or Latino/a/x also had much higher rates, with 20 percent and 19 percent of renters behind on payments. A high of five percent of Asian Americans feared imminent eviction during the reporting period as did eight percent of Hispanic or Latino/a/x renters behind on rental payments.

It is important to note that the estimates of households behind on rental payments are likely much higher than reported here. The Pulse survey suffers from an overall low response rate, which has led some researchers to voice concerns about nonresponse bias. An examination of responses found likely nonresponse bias, and response patterns did differ by sociodemographic characteristics. Second, limited sample size can produce unstable estimates, especially when sub-setting outcomes data by demographic information (for example, race and ethnicity). By pooling multiple weeks of data, estimates become more stable; however, researchers lose more nuanced estimates over time. Lastly, when using Census-provided household-level weights, analyses suggest there are approximately 33 million U.S. renter households. However, the 2019 American Housing Survey shows the true estimate was approximately 44.7 million renter households.16 To alleviate this discrepancy, HUD reweights all household-level estimates using 2019 AHS renter estimates as control totals when developing estimated weighted frequencies.

## Education Data on Children and Youth

### Doubled up and Other Homeless Situations of Children and Youth (Data from State Educational Agencies)

Each year, the U.S. Department of Education requires school districts to identify and report the number of students experiencing homelessness and housing instability. Children and youth who experience homelessness are more likely than housed children to have high rates of acute and chronic health problems and exposure to violence. Their academic performance is also at risk, as unstable housing often contributes to frequent school mobility and chronic absenteeism.

The U.S. Department of Education's (ED) Education for Homeless Children and Youth (EHCY) program17 provides grants to State Educational Agencies (SEAs) to ensure that children and youth experiencing homelessness have equal access to the same free, appropriate public education, including a public preschool education, that is provided to other children and youth. Grantee activities include efforts to improve enrollment and retention in, and successful completion of, early childhood, elementary, and secondary education for children who experience homelessness, as well as to support transitions to postsecondary education. The information presented below on homeless education data collected by U.S. public schools

## EXHIBIT B.10: Number of Enrolled Students in Homeless Situations by Primary Nighttime Residence

School Years 2017-18 through 2021-22[a]

| | 2017-18[d] | 2018-19[e] | 2019-20[f] | 2020-21 | 2021-22 | Year over Year Change: 2020-21 to 2021-22 | Pre to Post Pandemic Change: 2018-19 to 2021-22 |
|---|---|---|---|---|---|---|---|
| **Total** | 1,507,904 | 1,379,043 | 1,279,039 | 1,099,221* | 1,205,292 | 9.6% | -12.6% |
| Shelters or transitional housing | 182,659 | 167,634 | 146,769 | 119,934 | 131,051 | 9.3% | -21.8% |
| Unsheltered | 102,527** | 55,306 | 52,307 | 49,475 | 51,483 | 4.1% | -6.9%** |
| Hotels/ Motels | 105,574 | 97,640 | 88,663 | 85,422 | 106,621 | 24.8% | 9.2% |
| Doubled Up | 1,117,144 | 1,058,463 | 991,300 | 844,245 | 915,578 | 8.4% | -13.5% |

[a]When comparing the total number of children and youth experiencing homelessness enrolled by grade level with the total number of children and youth experiencing homelessness enrolled by primary nighttime residence for any given school year, readers may note a small difference. This is because each school year, a small number of enrolled children and youth were missing a primary nighttime residence category.

[e]See Table 6, p. 14, of NCHE's *Federal Data Summary School Years 2016-17 through 2018-19*.

[f]See Table 3, p. 8, of NCHE's *Student Homelessness in America: School Years 2017-18 to 2019-20*.

*Note that in the 2019/2020 Annual Homeless Assessment Report Part 2 this number was slightly lower. The Department of Education updated their 2020-2021 figures between that report release and this current report.

**This number should be viewed with caution as it reflects the reporting of people affected by Hurricane Harvey that do not meet HUD's definition of "unsheltered."

Data source: https://nche.ed.gov/wp-content/uploads/2023/12/SY-21-22-EHCY-Data-Summary_FINAL.pdf

comes from a report by the National Center for Homeless Education (NCHE), the U.S. Department of Education's technical assistance center for the federal EHCY program.18

ED collects data from SEAs about children and youth ages 3 through grade 12 who are enrolled in U.S. public schools, including public preschool programs, whose primary nighttime residence at any time during a school year was:

1. a shelter, or transitional housing program, or awaiting foster care placement,19
2. unsheltered (e.g., cars, parks, campgrounds, temporary trailers, substandard or abandoned buildings);
3. a hotel or motel because of the lack of alternative adequate accommodations; or
4. sharing the housing of other people due to the loss of housing, economic hardship, or a similar reason (i.e., doubled-up).

ED uses these primary nighttime residence categories to identify those students who are eligible for services under the EHCY program. According to ED data,20 during the 2021-22 school year (SY), 1,205,292 students were identified – at some point during the school year – as having experienced homelessness or housing instability, representing a 10 percent increase from the prior school year.

DOJ-HUD-AR00944

In SY 2021-22, most children and youth identified as homeless by U.S. public schools (76%) were sharing the housing of other people because of housing loss or other economic hardship or similar reason; 11 percent were in shelters or transitional housing21; 9 percent were living in a hotel or motel because of the lack of alternate, adequate accommodations; and 4 percent were identified as unsheltered.

In each school year between 2017 – the year with the highest number of students experiencing homelessness on record—and 2021, the number of students identified in each primary nighttime residence category decreased. The pandemic complicated the reporting of housing status, so estimates of students experiencing homelessness show further drops across most nighttime residence categories between 2020 and 2021. For example, the number of students identified as sharing the housing of other people because of loss of housing, economic hardship, or a similar reason decreased by 14 percent between 2018-19, the last year completely unaffected by the COVID-19 pandemic, and the most recent school year for which data are available, 2021-22.

Between the 2020-21 and 2021-22 school years, identification of students experiencing homelessness increased across primary nighttime residence types. The number of students who were staying in hotels or motels increased by 25 percent over the one-year period. The number of students staying in hotels and motels was the only group that was also higher than it was just prior to the onset of the pandemic. The number of students who were identified as having a primary

nighttime residence of an unsheltered location increased by four percent. Students staying in shelters or transitional housing programs increased by nine percent. And students doubling up with friends or family for economic reasons increased by eight percent.

Students identifying as Hispanic or Latino/a/x comprised the largest share of students experiencing homelessness and housing instability (39%). These students

**State Education Agency Data, HMIS Data, and Point in Time Data**

The homeless education data reported by the U.S. Department of Education differ from the HMIS and PIT data reported to the U.S. Department of Housing and Urban Development in several ways. These different data sources can be used in combination for planning and policymaking to determine the appropriate scale and range of programs needed to best respond to populations experiencing different forms of homelessness, as defined by federal housing and education statutes.

- SEA data are reported by school and district personnel and generally verified by school district homeless education liaisons and State Coordinators for Homeless Education. HMIS data are reported by homeless service provider staff. PIT count data are reported by communities based on counts of people in shelter programs and unsheltered locations.

- SEA data cover a July 1 to June 30 period; the availability of data on school children during the summer may be limited. HMIS data used in the AHAR cover a period from October 1 through September 30. PIT count data are for a single night in January.

- SEA data include children staying in hotels or motels due to the lack of alternate, adequate accommodations. HMIS data include people staying in hotels or motels only if those accommodations are subsidized through a homeless assistance program.

- SEA data include children and youth sharing the housing of other people due to loss of housing, economic hardship, or a similar reason (often referred to as living in "doubled-up" arrangements or "couch-surfing"). The HUD definition of homeless does not include people in doubled-up or couch-surfing arrangements; as such, this population is not represented in HMIS data.

- SEA data reflects information on children and youth from age 3 through grade 12 enrolled in public school. HMIS and PIT count data include children under age 3. SEA data include some youth over the age of 18 who are still in public school. HMIS and PIT count data include all people age 18 and over in a separate category from those under age 18. The PIT count data report all youth who are ages 18 to 24 in a separate category.

**EXHIBIT B.11: Percent of enrolled students by race, SY 2021-22: Ungraded, 3- to 5-year-olds, and kindergarten to Grade 13**



| | Hispanic or Latino | Black or African American | White | Two or more races | Asian | American Indian or Alaskan Native | Native Hawaiian or other Pacific Islander |
|---|---|---|---|---|---|---|---|
| | 39.3 / 28.7 | 25.4 / 14.9 | 45 / 25 | 5.4 / 4.7 | 2.3 / 5.4 | 1.9 / 1.0 | 0.7 / 0.4 |

Note: Race and ethnicity categories based on U.S. Department of Education report. Data source: https://nche.ed.gov/wp-content/uploads/2023/12/SY-21-22-EHCY-Data-Summary_FINAL.pdf

DOJ-HUD-AR00945

**EXHIBIT B.12: Number and Percentage of Enrolled Homeless Students who are Unaccompanied Homeless Youth**

School Years 2015-16 through 2021-22

| | 2017-18[d] | 2018-19[e] | 2019-20[f] | 2020-21 | 2021-22 | Year over Year Change: 2020-21 to 2021-22 | Pre to Post Pandemic Change: 2018-19 to 2021-22 |
|---|---|---|---|---|---|---|---|
| Number of unaccompanied homeless youth enrolled | 129,370 | 125,729 | 112,822 | 94,363 | 110,664 | 17.3% | -12.0% |
| Percent of homeless students | 8.6 | 9.1 | 8.8 | 8.6 | 9.2 | | |

Sources: Federal Data Summary: School Years 2015-16 through 2017-18; Federal Data Summary: School Years 2016-17 through 2018-19; Student Homelessness in America: School Years 2017-18 to 2019-20 and Student Homelessness in America: School Years 2018-19 to 2021-22

were considerably overrepresented compared to their share of all students (29%). Black or African American students accounted for 25 percent of students experiencing homelessness, a much higher share than their 15 percent of all students. White and Asian or Asian American students were underrepresented among students experiencing homelessness or housing instability compared to their shares of all students in the U.S.

In addition to reporting data on children and youth identified as homeless under federal education statute by grade level and primary nighttime residence, U.S. public schools also report data on unaccompanied youth. The term *unaccompanied youth* is defined in federal education statute as "a homeless child or youth not in the physical custody of a parent or guardian." Unaccompanied youth as reported in the ED data represent 9 percent of the total number of homeless children and youth enrolled across all school years from 2017 to 2022. While the number of students who were unaccompanied youth identified in 2021-22 was 12 percent lower than it was just before the onset of the pandemic, the number grew over the most recent school year. During the 2021-22 school year, there were 17 percent more unaccompanied youth identified as experiencing homelessness or housing instability.

## Survivors of Domestic Violence

### Domestic Violence Survivors Who Use Shelters

Data from the National Intimate Partner and Sexual Violence Survey (NIPSVS) show that each year more than 7 million women and men in the U.S. experience physical violence, sexual assault, and/or stalking by an intimate partner that leads to them fearing for their safety or needing services. [29] Of these, approximately 500,000 identify housing services as a need that results from this violence. Emergency

shelter, safe haven, transitional housing, rapid re-housing, and permanent housing programs within the homelessness services system can provide shelter or housing for people in crisis and seeking a safe refuge.

Estimating the number of people fleeing domestic violence, dating violence, sexual assault, and stalking who use the homelessness services system can be challenging. Residential programs in the homeless service system operated by victim service providers (VSP) exclusively serving survivors of domestic violence are prohibited from entering client information into HMIS. While VSPs maintain and report data within comparable databases, those data are not included in the HMIS data presented in this report. However, residential programs in the homeless service system operated by non-VSPs exclusively serving survivors of domestic violence are required to enter client information into HMIS. Not having data from VSPs in the same way we have data from non-VSPs results in a challenge to fully

**EXHIBIT B.13: Domestic Violence Beds by Program Type, Household Type and CoC Type**

HIC 2022

| Type | DV Beds | Total Beds | % DV beds |
|---|---|---|---|
| **Total** | | | |
| Total Beds – ES, SH, TH | 46,236 | 415,992 | 11.0% |
| **Beds by Family Type** | | | |
| Individuals | 9,351 | 228,069 | 3.3% |
| Families | 36,769 | 184,668 | 19.9% |
| **Beds by CoC Type** | | | |
| Major Cities | 12,384 | 203,412 | 6.1% |
| Other Urban CoCs | 3,348 | 30,348 | 11.0% |
| Suburban CoCs | 11,190 | 103,969 | 10.8% |
| Rural CoCs | 19,372 | 80,913 | 23.9% |
| Total Beds – RRH, PSH, OPH | 17,488 | 627,259 | 2.8% |
| **Beds by Family Type** | | | |
| Individuals | 2,996 | 366,389 | 0.8% |
| Families | 14,485 | 260,731 | 5.6% |
| **Beds by CoC Type** | | | |
| Major Cities | 6,269 | 310,710 | 2.0% |
| Other Urban CoCs | 1,817 | 49,642 | 3.7% |
| Suburban CoCs | 5,039 | 176,175 | 2.9% |
| Rural CoCs | 4,363 | 90,742 | 4.8% |

Note: Total beds include year-round beds from emergency shelter (ES), safe haven (SH), and transitional housing (TH), separately from rapid re-housing (RRH), permanent supportive housing (PSH), and other permanent housing (OPH) projects. Beds funded under HUD's Rapid Re-housing Demonstration (DEM) program are included with RRH.

DOJ-HUD-AR00946

quantify the needs and services for survivors of domestic violence and presents a limited understanding of the extent of survivors among the homeless population. Programs serving a broader homeless population report information to their communities' HMIS on all their clients, some of whom may be survivors of domestic violence. The extent of housing instability and homelessness for this population can only be partly understood by examining the capacity of residential programs operated by VSPs to serve them.

In the Point-in-Time (PIT) count, the data source used to report on people in residential programs operated by victim service providers, collecting data on survivors of domestic violence is optional. HUD has made the collection of a person's domestic violence status optional because of the sensitive nature of this question and the reality that many people interviewing people experiencing homelessness on the night of the count are volunteers who are not adequately trained on how to ask this kind of information in a trauma-informed way. Communities that collect information from those programs do not do so systematically, so it is not possible to use the PIT counts to estimate the percentage of people experiencing homelessness who are domestic violence survivors.30

The Housing Inventory Count (HIC) data can provide an estimate of the extent to which the homelessness services system explicitly targets residential services to domestic violence survivors. The HIC contains information on all the projects and beds in the homelessness services system, including beds provided by VSPs. While the HIC provides a count of the beds, it cannot identify the number of unique people who were served in those beds over the course of a year, so this information is similar to a PIT count, with the caveat that the beds might not all be occupied at any particular point in time. In addition, survivors of domestic violence may use beds intended for a broader homeless population, so the HIC still offers only a limited sense of the extent to which this population uses the homelessness services system.

Based on the bed counts in the 2022 HIC, 11 percent of the emergency shelter, safe haven, and transitional housing beds available for people currently experiencing homelessness were targeted to survivors of domestic violence (DV). A higher share of beds for families (20%) was targeted to survivors of domestic violence than was the share of beds for people in households without children or people in a household with only children (individuals), four percent.

A smaller share, three percent, of all permanent housing beds (including beds in rapid re-housing, other permanent housing, and permanent supportive housing programs) were targeted to domestic violence survivors. By household type, about six percent of permanent housing beds for families were targeted to survivors of domestic violence, and less than one percent of beds for individuals were targeted as such.

Exhibit B.13 shows the number and share of year-round beds targeted to survivors

of domestic violence by household type and the geography type of the CoC. CoCs are divided into four geographic categories: major city CoCs (N=48); other largely urban CoCs (N=59); largely suburban CoCs (N=169); and largely rural CoCs (N=112). In 2022, the share of beds for people currently experiencing homelessness targeted to survivors of domestic violence was 6 percent in major city CoCs, 11 percent in other largely urban CoCs, and 11 percent in largely suburban CoCs. In rural areas, nearly one-quarter of all beds for people experiencing homelessness were targeted to survivors of domestic violence (24%). By geography, the share of *permanent housing beds* targeted to survivors of domestic violence was lowest in major cities (2%) and highest in rural areas (5%).

## Unsheltered Homelessness

Data on the number of people exclusively staying outdoors is not included in the annual estimates of sheltered homelessness in the core chapters of this report. Data on people experiencing unsheltered homelessness in the United States is collected on a single night in January each year.[6] Communities (CoCs) are responsible for collecting and reporting the number of people sleeping outdoors or in other places not meant for human habitation, such as cars, abandoned buildings, tents, or other temporary structures. Between 2007 and 2014, the number of people identified as experiencing unsheltered homelessness steadily declined. These declines reflected improvements in unsheltered data collection methodologies and increased resources targeted to housing people experiencing homelessness. However,

**EXHIBIT B.14: Unsheltered Homelessness in the United States**
2007-2022



Legend: Unsheltered–Total    Unsheltered–Individuals    Unsheltered–People in Families with Children

6 Most CoCs conduct their PIT count during the last 10 days in January.

beginning in 2014, the number of people staying outdoors began to rise. Driven by substantial increases in people experiencing homelessness without children present in the household (that is, individuals and not families with children), unsheltered homelessness increased by 33 percent between 2014 and 2022.

While Longitudinal System Analysis (LSA) data do not include households staying only in unsheltered locations (i.e., those who do not access any shelter programs during a reporting year), they do include information on whether households experienced unsheltered homelessness immediately prior to and immediately following their experience of sheltered homelessness. In 2022, about 362,000 households accessed a shelter program having spent the prior night outdoors, 34 percent of the 1.1 million households that enrolled in emergency shelter, transitional housing, or safe haven programs during the year. Of all households served in shelter programs during the year, 135,000 exited to an unsheltered situation, about 12 percent of households served during the year.

Households reporting staying in unsheltered locations immediately prior to entering a shelter program (362,000 households) → Households accessing sheltered programs in 2022 (1.1 million households) → Households who left a shelter program to an unsheltered situation (135,000 households)

The increase in unsheltered homelessness across the country includes increases in encampments of unsheltered people. Encampments are defined broadly as groups of people sleeping outside in tents, lean-tos, or other temporary structures for a sustained period. A feature of encampments is often a sense of community and social support for those staying there.[7] A recent study explored the rise of this form of unsheltered homelessness, including the reasons people were staying in these types of situations. The study found that the recent rise in these types of unsheltered communities largely reflects the same systemic issues that cause all types of homelessness: lack of affordable housing options and insufficient community resources aimed at preventing and ending homelessness. However, a few factors were identified that were specific to the rise in encampments, particularly in urban areas.

- First was the development or redevelopment of areas that had previously unbuilt, dilapidated, or abandoned buildings in which people may have stayed.
- The second was insufficient shelter capacity. In some places there were too few beds for the number of people who needed them. In others, shelter policies made accessing beds difficult. In some shelters it is not possible for families or couples

to stay together because of gender-based policies (i.e., men and women staying separately or teenaged boys having to stay separately from their parents). Other shelter policies that create barriers to entry include fees for accessing shelter beds or sobriety requirements.
- Finally, researchers found that another key reason is to the rise in encampments was the sense of autonomy offered alongside a sense of community was sometimes more desirable than local shelter programs.[8]

---

7 https://www.huduser.gov/portal/sites/default/files/pdf/Unsheltered-Homelessness-and-Homeless-Encampments.pdf

8 https://www.huduser.gov/portal/sites/default/files/pdf/Unsheltered-Homelessness-and-Homeless-Encampments.pdf

# 2022
# Estimates of Sheltered Homelessness

Overview of Estimates of Sheltered Homelessness in the United States................................................................1-2

How Did Estimates of Households Experiencing Sheltered Homelessness Compare to the U.S. Total and Poverty
Populations?.................................................................................................................................................................1-2

Characteristics of All People Experiencing Sheltered Homelessness .................................................................1-3

What Were the Demographic Characteristics of Sheltered Households?............................................................1-3

How Do the Demographic Characteristics of the Sheltered Population Compare to the U.S. Total and U.S. Poverty
Populations?.................................................................................................................................................................1-4

Where Did Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs? ........1-6

Additional Characteristics of Heads of Households and Other Adults...............................................................1-6

What Were the Other Characteristics of all Households Experiencing Sheltered Homelessness? ..............1-6

How Have the Additional Characteristics of Households Experiencing Sheltered Homelessness Changed over Time? .........1-7

Engagement of Sheltered Households with the Homelessness Services System............................................1-8

Where Did Households Stay Prior to Entering Shelters? ......................................................................................1-8

What Percentage of Households Exited the Homelessness Service System During the Reporting Period?...............................1-9

DOJ-HUD-AR00949

# Estimates of People

## EXPERIENCING SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

The number of people experiencing sheltered homelessness in the United States increased by 14 percent between 2019 and 2022.

## Overview of Estimates of Sheltered Homelessness in the United States

An estimated **1,388,425 million people in 1,066,514 households** stayed in an emergency shelter, safe haven, or transitional housing program at some point between October 1, 2021 and September 30, 2022. This represents 90 percent of all households accessing some part of the residential services component of homelessness services systems over the course of the year.

- Two-thirds of people accessing emergency shelter, transitional housing, or safe haven programs in 2022—or 923,241 people— were in adult-only households, and one-third —or 453,016 people— were in households with children. Only one percent were people in households composed of only children, or 17,385 children.

- After declining by 17 percent between 2019 and 2020, the number of people accessing shelters increased by 14 percent between 2021 and 2022. This likely reflects a combination of increases in the number of beds available after the COVID-era restrictions were lifted and the expiration of eviction moratoria and programs providing additional income support during the pandemic.

### How Did Estimates of Households Experiencing Sheltered Homelessness Compare to the U.S. Total and Poverty Populations?

- One of every 240 people in the U.S. and one in every 130 U.S. households experienced sheltered homelessness at some point during 2022.

- People staying in shelters made up approximately three percent of all people with incomes below the

### EXHIBIT 1.1: One-Year Estimates of Sheltered Homelessness
2019-2022

|  | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
|  | # | % (of all) | # | % (of all) | # | % (of all) |
| Number of Households | 1,102,272 | 100.0% | 938,576 | 100.0% | 1,066,514 | 100.0% |
| Number of People | 1,456,199 | 100.0% | 1,213,533 | 100.0% | 1,388,425 | 100.0% |
| **People by Household Type** | | | | | | |
| People in Adult-Only Households | 935,763 | 64.3% | 815,896 | 67.2% | 923,241 | 66.5% |
| People in Families with Children | 507,224 | 34.8% | 381,124 | 31.4% | 453,016 | 32.6% |
| People in Child-Only Households | 22,251 | 1.5% | 17,918 | 1.5% | 17,385 | 1.3% |

Because people have multiple stays in shelters over the course of a year and stay in different household configurations, a single person can be counted in more than one household type. Because of this overlap, the sum of people by household type may be greater than the unique count of people, and the percentages may sum over 100.

### EXHIBIT 1.2: Changes in Estimates of Homelessness, Households in Poverty, and U.S. Households
2019-2022

| Population | Change in People, 2019-2021 | | Change in Households, 2019-2022 | | Change in People, 2021-2022 | | Change in Households, 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| Staying in Sheltered Programs | -67,774 | -4.7% | -35,758 | -3.2% | 174,893 | 14.4% | 127,938 | 13.6% |
| Living in Poverty | 1,378,813 | 3.5% | 1,275,482 | 8.1% | -628,909 | -1.5% | 412,080 | 2.4% |
| In U.S. Population | 5,048,039 | 1.5% | 7,135,276 | 5.5% | 1,393,817 | 0.4% | 2,718,074 | 2.0% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data.

DOJ-HUD-AR00950

## ESTIMATES OF SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

poverty line and six percent of households in poverty. These rates do not include people who only stayed in unsheltered locations.

- Between 2021 and 2022, the rise in the number of households experiencing sheltered homelessness far outpaced the increase in households living in poverty and total U.S households. While sheltered households increased by 14 percent, U.S. and poverty households increased by two percent.

- The increase in the number of people experiencing sheltered homelessness was even more different than the changes in the numbers of people experiencing poverty and all people in the U.S. between 2021 and 2022. The number of people experiencing sheltered homelessness increased by 14 percent, while the total population remained flat, and the poverty population declined slightly (2%).

# Characteristics of All People Experiencing Sheltered Homelessness

## What Were the Demographic Characteristics of Sheltered Households?

Demographic characteristics of the sheltered population vary considerably by household type. Given their large share of the sheltered population, the overall characteristics are more reflective of adult-only households than households with children. (For the characteristics of families with children, see Chapter 3).

- In 2022, 60 percent of heads of households were men, and only 39 percent were women. This reflects a predominance of men among people experiencing homelessness in adult-only households (see Chapter 2).

- Transgender people made up less than one percent of heads of households using shelters, and a very small percent of heads of households identified as not singularly male or female (or gender non-singular) (0.3%). However, these numbers could be artificially low.

**EXHIBIT 1.3a: Demographic Characteristics of People Experiencing Sheltered Homelessness, U.S. Poverty Population, and Total U.S. Population**
By Gender and Age, 2019, 2021, and 2022

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population |
| **Gender of Heads of Households[a]** | | | | | | | | | |
| Women (or Girls) | 38.9% | 61.7% | 49.2% | 38.7% | 61.3% | 50.6% | 39.2% | 60.9% | 50.5% |
| Men (or Boys) | 60.7% | 38.3% | 50.9% | 60.6% | 38.7% | 49.4% | 60.0% | 39.1% | 49.5% |
| Gender Non-Singular[*] | 0.1% | | | 0.2% | | | 0.3% | | |
| Questioning | | | | 0.0% | | | 0.1% | | |
| Transgender | 0.3% | | | 0.6% | | | 0.5% | | |
| **Age of All People in the Household** | | | | | | | | | |
| Under age 18 | 22.7% | 30.2% | 22.2% | 20.6% | 29.6% | 22.1% | 20.7% | 28.2% | 21.7% |
| 18-24 | 9.7% | 13.3% | 9.3% | 8.8% | 12.4% | 9.1% | 9.7% | 12.9% | 9.4% |
| 25-34 | 18.8% | 13.2% | 13.9% | 18.1% | 13.0% | 13.6% | 19.3% | 12.6% | 13.6% |
| 35-44 | 16.5% | 10.7% | 12.8% | 17.5% | 11.3% | 13.2% | 17.8% | 11.2% | 13.3% |
| 45-54 | 15.6% | 9.1% | 12.4% | 15.3% | 9.1% | 12.2% | 14.0% | 8.8% | 12.1% |
| 55-64 | 12.9% | 10.9% | 12.9% | 14.7% | 11.1% | 12.9% | 13.3% | 11.3% | 12.6% |
| 65 and older | 3.6% | 12.7% | 16.5% | 5.1% | 13.6% | 16.9% | 5.1% | 15.1% | 17.4% |

Data Source: Homeless Management Information Systems (HMIS ) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.1.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

[*] Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00951

## ESTIMATES OF SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

Some people may not have felt comfortable reporting their gender as something other than male or female, particularly if shelter programs had gender-based requirements.

- The share of the sheltered population that was elderly (65 or older) was five percent in 2022, and the share of the sheltered population that was near (55-64) elderly was 13 percent.

- Nearly one-third of all people experiencing sheltered homelessness (31%) were children or youth, under the age of 25.

- Heads of sheltered households who identified as Hispanic or Latino/a/x of any race comprised 23 percent of the total population experiencing homelessness. This was a considerable increase over 2019, when 16 percent of heads of households identified as Hispanic/Latino/a/x.

- Black, African, or African American people accounted for 37 percent of heads of sheltered households.

- White heads of households not identifying as Hispanic or Latino/a/x were 23 percent of all heads of households staying in shelters, representing a considerable increase over 2019.

- Four percent of sheltered households were indigenous, either Native American/American Indian or Alaska Native (3%) or Native Hawaiian or Pacific Islander (1%).

### How Do the Demographic Characteristics of the Sheltered Population Compare to the U.S. Total and U.S. Poverty Populations?

- The gender of heads of households living in poverty and all U.S. households is different from the that of the sheltered population. More than 60 percent of heads of households living in poverty in 2022 were women (61%), and 39 percent were men. This is nearly the reverse of the distribution of men and women among sheltered population. (In the entire U.S. population, heads of households are about equally split between men and women.)

- Children comprised similar shares of the sheltered population and the entire U.S. population, (21% and 22%). However, children accounted for a higher share of

**EXHIBIT 1.3b: Demographic Characteristics of People Experiencing Sheltered Homelessness, U.S. Poverty Population, and Total U.S. Population**
By Ethnicity and Race, 2019, 2021, and 2022

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population |
| **Ethnicity of Heads of Households[b]** | | | | | | | | | |
| Hispanic/Latino/a/x | 15.8% | 19.1% | 13.6% | 19.3% | 19.4% | 14.3% | 22.6% | 19.1% | 14.5% |
| Non-Hispanic/Non-Latino/a/x | 84.2% | 80.9% | 86.4% | 80.8% | 80.6% | 85.7% | 77.4% | 80.9% | 85.5% |
| **Race of Heads of Households[b]** | | | | | | | | | |
| Asian or American | 0.7% | 4.4% | 4.9% | 1.1% | 4.5% | 5.1% | 1.0% | 4.5% | 5.2% |
| Black, African, or African American | 40.6% | 22.4% | 13.2% | 38.8% | 20.6% | 12.6% | 36.8% | 20.7% | 12.6% |
| Multiple Races | 3.5% | 2.9% | 2.3% | 3.7% | 12.1% | 9.7% | 4.0% | 11.6% | 9.6% |
| Native American/American Indian or Alaska Native | 3.0% | 1.5% | 0.8% | 3.0% | 1.3% | 0.8% | 3.2% | 1.3% | 0.8% |
| Native Hawaiian or Pacific Islander* | 0.9% | 0.2% | 0.1% | 0.9% | 0.2% | 0.2% | 1.0% | 0.2% | 0.2% |
| White, Hispanic/Latino/a/x | 10.8% | 12.3% | 9.1% | 14.1% | 3.1% | 2.5% | 17.0% | 3.3% | 2.7% |
| White, Non-Hispanic/Non-Latino/a/x | 40.8% | 51.0% | 66.0% | 38.5% | 50.4% | 63.9% | 37.1% | 50.6% | 63.5% |

Data Source: Homeless Management Information Systems (HMIS ) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.1.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00952

## ESTIMATES OF SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

people experiencing poverty (28%).

- Compared to the total U.S. and poverty populations, people aged 65 or older were underrepresented among people experiencing sheltered homelessness. Five percent of the sheltered population was elderly compared to 15 percent of the poverty population and 17 percent of the total U.S. population.
- The percentage of the sheltered population considered "near elderly" (age 55 to 64) was the same as that of the total U.S. population (13%) and slightly higher than the population living in poverty (11%).
- Households headed by someone identifying as Black, African, or African American were considerably overrepresented among people experiencing homelessness in 2022. Black household heads account for 13 percent of the entire U.S. population and 21 percent of heads of households living in poverty. At the same time, they account for 37 percent of the sheltered population.

"Households headed by someone identifying as Hispanic or Latino/a/x historically have accounted for a higher share of the poverty population than they have the sheltered population. However, recent considerable increases in the Hispanic population among the sheltered population has resulted in a reversed trend. In 2022, Hispanic or Latino/a/x heads of households accounted for 23 percent of the sheltered population and 19 percent of the poverty population."

- Historically, households headed by someone identifying as Hispanic or Latino/a/x accounted for a higher share of the poverty population than they did the sheltered population. Given recent considerable increases in the Hispanic population among the sheltered population, the trend has reversed. In 2022, Hispanic or Latino/a/x heads of households accounted for 23 percent of the sheltered population and 19 percent of the poverty population.
- The percent of sheltered heads of households who identified as Native American, American Indian, or Alaska Native was three times the U.S poverty and total U.S. population (3% vs. 1%). The share of all indigenous populations living in poverty using shelter programs at some point during the year higher than the share of all populations living in poverty that experienced sheltered homelessness. About 12 percent of Native American households in poverty experienced sheltered homelessness during 2021, compared with 3 percent of all households. Again, this does not include Native Americans who stayed only in unsheltered locations.

### EXHIBIT 1.4: Geographic Location of Sheltered Households by Household Type
2019-2022



Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.1.2.

DOJ-HUD-AR00953

ESTIMATES OF SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

## Where Did Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?

- In 2022, more than three-fourths of households using shelters (78%) did so in urban areas. This is nearly double the share of households in poverty living in urban areas (41%) and more than double the share of all U.S. households (35%). The overrepresentation of the population that experienced sheltered homelessness in urban areas is likely related to several factors, including limited affordable housing options in urban areas and the greater density of homeless services in those areas.
- While 40 percent of households in the United States lived in a suburban community, only 15 percent of people staying in shelters were in shelter programs located in suburban communities.
- In 2022, a much smaller share of households experiencing sheltered homelessness did so in rural areas (7%) compared with households with incomes below the poverty line (28%) and all households (25%). Rural areas often have fewer shelter programs, possibly driving people to stay outside, in their cars, or in abandoned buildings—that is, to experience unsheltered homelessness. In addition, other forms of housing instability such as doubling up may be more common in rural areas.
- Between 2019 and 2022, the distribution of households experiencing sheltered homelessness changed little, shifting only slightly away from rural areas and toward urban and suburban areas.

# Additional Characteristics of Heads of Households and Other Adults

## What Were the Other Characteristics of all Households Experiencing Sheltered Homelessness?

- In 2022, eight percent of adults staying in shelter programs across the United States were veterans. There was very little variation in the share of veterans among adults experiencing sheltered homelessness in urban, suburban, or rural areas.
- More than one in every five adults staying in shelter programs across the U.S. had a chronic pattern of homelessness in 2022 (21%). Suburban and urban areas reported higher rates of sheltered adults with chronic patterns of homelessness (23% and 22%) than rural areas (14%). Many people with chronic patterns of homelessness may not have accessed any shelter programs during the year, staying only in sheltered locations. This is particularly true for rural areas, which often have fewer shelter beds and other resources than their urban and suburban counterparts.

**EXHIBIT 1.5: Additional Characteristics of People Experiencing Sheltered Homelessness**
2019-2022

| | 2019 | 2021 | 2021 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| **Heads of Households and Adults with Chronic Patterns of Homelessness** | | | | | | | |
| Chronic Pattern of Homelessness[a] | 16.1% | 24.8% | 20.5% | 45,139 | 24.5% | -13,915 | -5.7% |
| **Veteran Status of Heads of Households and Adults** | | | | | | | |
| Veteran | 8.9% | 8.6% | 7.8% | -14,848 | -14.8% | 2,849 | 3.5% |
| Non-Veteran | 90.2% | 89.8% | 90.7% | -16,817 | -1.7% | 133,405 | 15.5% |
| Unknown Veteran Status | 0.9% | 1.7% | 1.5% | 6,650 | 65.0% | 1,099 | 7.0% |
| **Domestic Violence Survivor Status of Heads of Households and Adults\*** | | | | | | | |
| DV Survivors | 18.1% | 21.3% | 19.5% | -1,617 | -0.8% | -1,019 | -0.5% |
| Not DV Survivors | 81.5% | 78.1% | 80.2% | -51,038 | -6.1% | 92,332 | 13.4% |
| Client Doesn't Know/Refused | 0.5% | 0.6% | 0.4% | -636 | -13.0% | -1,407 | -24.9% |
| **Disability Status of Heads of Households and Adults\*** | | | | | | | |
| With a disability[b] | 53.1% | 59.0% | 57.5% | 7,952 | 1.5% | 30,176 | 5.9% |
| Without a disability | 46.9% | 41.0% | 42.5% | -87,292 | -14.9% | 62,300 | 14.2% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.1.3
[a] HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/
\*Percentages based on people with known domestic violence survivor status and disability status.
[b] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

DOJ-HUD-AR00954

## ESTIMATES OF SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

- In 2022, at least 24 percent of adults staying in shelters were survivors of domestic violence. It is important to note that this data represents survivors of domestic violence who accessed homeless services that were not operated by victim service providers and should not be considered the full estimate of survivorship among people experiencing sheltered homelessness but rather a minimum estimate. Given the way data are reported, it is not possible to show the percentage of adults in each geographic category who are survivors of domestic violence. However, data are available on the share of people currently fleeing domestic violence by geography. In 2022, seven percent of people in shelters who were currently fleeing unsafe situations in urban and rural areas, while six percent of all adults in shelter programs in suburban areas were currently fleeing unsafe situations.

### How Have the Additional Characteristics of Households Experiencing Sheltered Homelessness Changed over Time?

- The number of veterans experiencing sheltered homelessness declined by 15 percent overall between 2019 and 2022. The largest percentage change occurred in rural areas, which had 21 percent fewer sheltered veterans in 2022 than in 2019.
- Between 2019 and 2022, both the number and the share of adults who accessed shelter programs who had chronic patterns of homelessness increased. In 2022, 21 percent of adults had chronic patterns of homelessness compared with 16 percent in 2019. The number of people who experienced chronic homelessness increased by about 45,000 adults, or 25 percent, while the entire population staying in shelter declined by about 68,000 people. The share of adults with chronic patterns of homelessness increased across each geographic category. Increases in the number of sheltered adults with chronic patterns of homelessness were more considerable in urban and suburban areas (23% and 41%) than in rural areas (4%) during this period.
- The share of adults accessing shelter programs who were survivors of domestic violence remained mostly unchanged between 2019 and 2022. The share of adults currently fleeing domestic violence increased, however, by seven percent. In suburban areas, these increases were most prominent, with 31 percent more sheltered adults who were currently fleeing unsafe situations. Urban areas saw increases of six percent, while rural areas experienced decreases of eight percent.
- The share of adults with a disability remained steady between 2019 and 2022, increasing slightly from 47 percent to 49 percent. The number of adults living with a disability and staying in shelters increased by about 8,000 people or two percent.

### EXHIBIT 1.6: Additional Characteristics of Sheltered Households by Geography
2019-2022



Chronically Homeless Adult  |  Veterans  |  Currently Fleeing Domestic Violence

### EXHIBIT 1.7: Change in Additional Characteristics by Geographic Category
2019-2022



DOJ-HUD-AR00955

# Engagement of Sheltered Households with the Homelessness Services System

Data collected through the LSA provides information related to the experience of homelessness. This includes whether households experiencing homelessness are doing so for the first time, are continuously engaged in the homeless system from the prior year or have returned to the experience of homelessness after exiting to a permanent, temporary, or unknown situation. Information on system engagement varies considerably by household status. The following section provides an overview of some dimensions of system engagement, broadly comparing key engagement dynamics by household type. For detailed information on how adult-only households and family households engage with the homelessness service system, please reference chapters 2 and 3.

- In 2022, 65 percent of adult-only households and 68 percent of family households experienced homelessness for the first time.[1]
- Family households were more likely to experience homelessness for the first time or to be continuously engaged in the homelessness system, meaning they were experiencing homelessness on the day prior to the start of the 2022 reporting period (26% versus 21%).
- However, family households were less likely to return to the experience of sheltered homelessness after a period of at least two years than adult-only households (6% versus 14%).
- Nearly all households stayed in only shelter programs during the reporting period (meaning emergency shelters, transitional housing programs, or safe havens). Adult-only households were more likely to access just shelter programs than family households.
- One in every ten family households that used shelter programs at some point during the year also used rapid rehousing subsidies.
- A small share of households used shelter and PSH. For more detailed information on service use please reference chapter 2 and 3.

## Where Did Households Stay Prior to Entering Shelters?

- Of the approximately 1.1 million households who accessed shelter services in 2022, 55 percent were already experiencing homelessness. More than one-third were accessed shelter programs having stayed the night prior in an unsheltered location.
- Fifty-seven percent of adult-only households accessed shelter services from a different homeless situation and 47 percent of families did so. Adult-only households were more likely to enter shelter from an unsheltered situation and families were more likely to have transitioned from a different shelter program.
- One-quarter of households entered shelter programs having spent the night prior in permanent housing situation. Families were much more likely to have been housed just prior to their experience of sheltered homelessness (39%) than adult-only households (22%).

[1] HUD defines someone as homeless for the first time if they entered a temporary or permanent housing program and did not have prior entry in those projects in the last two years.



**EXHIBIT 1.8: System Engagement by Household Type**
2022

First time experiencing homelessness / Continuously engaged in homeless services system / Returned to homelessness within 2 years



**EXHIBIT 1.9: Program Use by Household Type**
2022

Stayed in Shelter Programs Only / Stayed in Shelter Programs and Used RRH Subsidies / Stayed in Shelter Programs and Lived in PSH

*0.3 percent of adult-only households and 0.2% of family households used all three program types during the reporting period.

## ESTIMATES OF SHELTERED HOMELESSNESS IN THE UNITED STATES IN 2022

### What Percentage of Households Exited the Homelessness Service System During the Reporting Period?

- More than one of every five households who accessed an emergency shelter, transitional housing, or safe haven program at some point during the year (22%) was still enrolled in a shelter program at the end of the reporting period, while 78 percent were no longer actively receiving temporary residential services when the reporting period ended.
- Adult-only households were less likely to be still active at the end of the reporting period than family households (21% compared to 29%). Chapters 2 and 3 include information on households that exited the homeless services system, specifically information on where households went after leaving shelter.

### EXHIBIT 1.10: Places Households Stayed Immediately Prior to Staying in Shelter Programs
2022

| | All Households | Adult-Only Households | Family Households |
|---|---|---|---|
| Already Homelessness | 54.8% | 56.6% | 47.0% |
| Sheltered | 20.9% | 20.3% | 25.8% |
| Unsheltered | 33.9% | 36.4% | 21.2% |
| Permanent Housing | 24.9% | 22.0% | 38.8% |
| Staying with Family or Friends | 19.0% | 16.8% | 29.1% |
| Rented housing unit without subsidy | 4.1% | 3.7% | 7.3% |
| Rented housing unit with subsidy | 1.1% | 1.0% | 1.9% |
| Owned housing unit | 0.4% | 0.4% | 0.5% |
| Permanent supportive housing (PSH) | 0.2% | 0.2% | 0.1% |
| Institutional Settings | 10.2% | 11.7% | 1.3% |
| Incarceration | 3.9% | 4.5% | 0.3% |
| Medical facility | 6.3% | 7.1% | 1.0% |
| Long-term care facility | 0.1% | 0.1% | 0.0% |
| Other Settings or Missing | 10.1% | 9.6% | 12.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.1.4

### EXHIBIT 1.11: Exit Status of Households Using Shelter Programs by Household Type
2022



Still active at the end of the report period      Exited during the report period

DOJ-HUD-AR00957

# 2022
# Estimates of Sheltered People in Adult-Only Households

Overview of Estimates of Adult-Only Sheltered Homelessness in the United States ....................................................2-2

How Did Estimates of Adult-Only Households Experiencing Sheltered Homelessness Compare to the U.S. Total and Poverty Populations?........................................................................................................................................2-2

Characteristics of People in Adult-only Households Experiencing Sheltered Homelessness ....................................2-3

What Were the Demographic Characteristics of Sheltered Adult-Only Households in 2022?..............................2-3

How Did the Demographic Characteristics of the Sheltered Adult-only Population Compare to the U.S. Total and U.S. Poverty Populations?........................................................................................................................2-4

How Have the Characteristics of Adult-only Households Changed over Time?...................................................2-5

Where Did Adult-only Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?......................2-6

How Did the Location of Shelter Use for Adult-Only Households Change over Time?........................................2-6

Additional Characteristics of Heads of Households and Other Adults...........................................................2-6

What Were the Other Characteristics of Adult-Only Households Experiencing Sheltered Homelessness? ...............2-6

How Have the Additional Characteristics of Adult-only Households Experiencing Sheltered Homelessness Changed over Time? ....................................................................................................................................2-7

Engagement of Adult-only Households with the Homelessness Services System ........................................2-8

How Did Adult-Only Households Engage with the Shelter System in 2022? ....................................................2-8

Where Did Adult-Only Households Stay Prior to Entering Shelters?...................................................................2-9

How Did System Engagement Change over Time?.........................................................................................2-10

How Long Did Adult-Only Households Stay in Shelter?..................................................................................2-11

How Has Length of Time in Shelter Programs Changed over Time? ...............................................................2-11

What Were the Exit Destinations of Households Leaving Shelter Programs?...................................................2-12

How Did the Destinations at the Time of Exit Change for Sheltered Households?............................................2-12

# Estimates of Sheltered People
## IN ADULT-ONLY HOUSEHOLDS IN 2022

The number of people in adult-only households staying in shelter at some point over the course of a year increased by 13 percent between 2019 and 2022.

## Overview of Estimates of Adult-Only Sheltered Homelessness in the United States

An estimated **923,241 people in households without a child present (adult-only households)** stayed in an emergency shelter, safe haven, or transitional housing program at some point between October 1, 2021, and September 30, 2022.[1]

- In 2022, 923,241 people in 907,858 adult-only households spent some time in a shelter program.
- The number of adult-only households who stayed in shelters at some time over the course of a year was 13 percent higher than it was in 2021, the year when the effects of the pandemic were fully felt but still about 2 percent lower than in 2019, the pre-pandemic comparison year.

### How Did Estimates of Adult-Only Households Experiencing Sheltered Homelessness Compare to the U.S. Total and Poverty Populations?

- One of every 192 people in adult-only households in the U.S. experienced sheltered homelessness at some point during 2022.
- Seven percent of people in adult-only households with poverty-level incomes experienced sheltered homelessness.
- Between 2019 and 2022, increases in sheltered adult-only households and people in those households outpaced increases in both adult-only households living in poverty and among the total U.S. population. Sheltered adult-only households increased by 13 percent compared to six percent increases in adult-only households with incomes below the poverty level and three percent increases in all adult-only households.

[1] This does not include people who were only served in rapid rehousing or permanent supportive housing programs during the reporting period. Those programs are part of the homeless services system, and information on their use is in Chapters 7 and 8 of this report.

### EXHIBIT 2.1: One-Year Estimates of Sheltered Adult-Only Homelessness
2019, 2021, and 2022

|  | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
|  | # | # | # | # | % | # | % |
| Adult-Only Households | 922,735 | 801,863 | 907,858 | -14,877 | -1.6% | 105,995 | 13.2% |
| People in Adult-Only Households | 935,763 | 815,896 | 923,241 | -12,522 | -1.3% | 107,345 | 13.2% |

Data source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 2.2: Changes in Sheltered Adult-Only Households

| Population | Change in People 2019-2022 | | Change in Households 2019-2022 | | Change in People 2021-2022 | | Change in Households 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| Staying in Shelter Programs | -12,522 | -1.3% | -14,877 | -1.6% | 107,345 | 13.2% | 105,995 | 13.2% |
| Living in Poverty | 1,769,942 | 10.1% | 1,599,430 | 14.9% | 610,545 | 3.3% | 642,302 | 5.5% |
| In U.S. Population | 5,699,116 | 3.3% | 6,062,856 | 6.5% | 2,858,328 | 1.6% | 2,627,934 | 2.7% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data

DOJ-HUD-AR00959

**ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022**

## Characteristics of People in Adult-only Households Experiencing Sheltered Homelessness

### What Were the Demographic Characteristics of Sheltered Adult-Only Households in 2022?

- More than two-thirds (67%) of heads of sheltered, adult-only households identified as men, about 32 percent as women, and one percent identified as either transgender (0.6%) or not singularly 'male' or 'female' (0.3%).

- With the exception of youth (under the age of 25) and elderly people (over the age of 64), the percentage of people in adult-only households using shelters was fairly evenly distributed by age group. About 20 percent of people in adult-only households fell into each of following age ranges: 25-34, 35-44, 45-54, and 55-64. Youth (18-24) accounted for 11 percent of all people in adult-only households, and elderly adults (65 and older) accounted for about eight percent.

- More than one in five (21%) sheltered, adult-only household heads identified as Hispanic or Latino/a/x.

- Almost 4 in 10 sheltered, adult-only household heads identified as White and not Hispanic or Latino/a/x (39%). This is nearly double the percent of White, non-Hispanic/non-Latino/a/x heads of sheltered families (21%).

- In 2022, 35 percent of sheltered, adult-only household heads identified as Black, African, or African American. This is considerably lower than the 50 percent of heads of sheltered family households who were Black.

- In 2022, three percent of sheltered, adult-only household heads identified as Native American or Alaska Native.

- One percent of sheltered, adult-only household

**EXHIBIT 2.3a: Demographic Characteristics of People in Adult-Only Households Experiencing Sheltered Homelessness, in the U.S. Poverty Population, and Total U.S. Population**
By Gender and Age, 2019, 2021, and 2022[a]

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population |
| **Gender of Heads of Households** | | | | | | | | | |
| Women | 30.5% | 56.1% | 47.5% | 31.3% | 56.0% | 49.0% | 31.9% | 56.1% | 49.2% |
| Men | 69.1% | 43.9% | 52.5% | 67.9% | 44.1% | 51.0% | 67.2% | 43.9% | 50.8% |
| Gender Non-Singular* | 0.1% | | | 0.2% | | | 0.3% | | |
| Questioning | | | | <0.1% | | | <0.1% | | |
| Transgender | 0.4% | | | 0.6% | | | 0.6% | | |
| **Age of All People in the Household** | | | | | | | | | |
| 18-24 | 11.0% | 19.6% | 11.8% | 9.6% | 18.0% | 11.7% | 11.0% | 18.5% | 12.1% |
| 25-34 | 20.6% | 12.4% | 15.1% | 19.3% | 12.5% | 15.2% | 21.0% | 11.7% | 15.1% |
| 35-44 | 20.6% | 8.1% | 8.6% | 21.2% | 8.6% | 8.8% | 21.5% | 8.2% | 8.8% |
| 45-54 | 22.6% | 12.7% | 13.7% | 21.1% | 12.2% | 13.2% | 19.4% | 11.4% | 12.9% |
| 55-64 | 19.7% | 20.9% | 21.4% | 21.3% | 20.9% | 21.3% | 19.5% | 20.5% | 20.6% |
| 65 and older | 5.5% | 26.2% | 29.4% | 7.4% | 27.8% | 30.0% | 7.6% | 29.8% | 30.6% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.2.1

[a]Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b]In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00960

Case 1:25-cv-00636-MSM-AEM   Document 69-1   Filed 01/30/26   Page 181 of 250
PageID #: 3800
Homelessness in the United States

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

heads identified as Asian or Asian American or Native Hawaiian or Pacific Islander.

## How Did the Demographic Characteristics of the Sheltered Adult-only Population Compare to the U.S. Total and U.S. Poverty Populations?

Black, Indigenous, and people of color were substantially overrepresented among the sheltered adult-only population as compared to both the U.S. total and U.S. poverty populations.

- People identifying as Black or African American are considerably overrepresented among sheltered adult-only households. Black people accounted for 35 percent of heads of sheltered adult-only households in 2022 while comprising only 19 percent of heads of adult-only households living in poverty and 12 percent of all U.S. heads of adult-only households.
- Thirteen percent of Black heads of adult-only households in poverty were in shelter at some point during 2022. This is considerably higher than the four percent of all heads of adult-only households with poverty-level incomes who experienced homelessness in 2022.
- Native American heads of adult-only households using shelter programs were overrepresented compared to their share of all U.S. households in poverty (3% vs 1%) and adult-only households in poverty (1%).
- Native Americans experiencing sheltered homelessness account for 18 percent of Native American adult-only households living in poverty. By comparison, heads of adult-only households identifying as White and staying in shelter account for five percent of all White, non-Hispanic/non-Latino adult only households with poverty level incomes.
- Sheltered adult-only households that identified as Hispanic or Latino/a/x made up a higher share of the sheltered homeless population, 21 percent, than the Hispanic share of the poverty population of adult-only households, 15 percent, and the share of the U.S. population, 12 percent.

**EXHIBIT 2.3b: Demographic Characteristics of People in Adult-Only Households Experiencing Sheltered Homelessness, in the U.S. Poverty Population, and Total U.S. Population**
By Ethnicity and Race, 2019, 2021, and 2022[a]

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population | Sheltered People | U.S. Population Living in Poverty | U.S. Population |
| **Ethnicity of Heads of Households[b]** | | | | | | | | | |
| Hispanic/Latino/a/x (all races) | 14.2% | 13.8% | 10.7% | 18.2% | 14.4% | 11.5% | 21.2% | 14.5% | 11.8% |
| Non-Hispanic/Non-Latino/a/x (all races) | 85.8% | 86.2% | 89.3% | 81.8% | 85.6% | 88.6% | 78.8% | 85.5% | 88.2% |
| **Race of Heads of Households** | | | | | | | | | |
| Asian or Asian American | 0.7% | 4.9% | 4.5% | 1.1% | 4.8% | 4.6% | 1.1% | 4.7% | 4.8% |
| Black or African American | 38.7% | 21.0% | 12.9% | 37.3% | 19.1% | 12.4% | 34.9% | 19.2% | 12.4% |
| Multiple Races | 3.3% | 2.7% | 2.1% | 3.6% | 10.1% | 8.5% | 3.9% | 10.0% | 8.5% |
| Native American/American Indian or Alaska Native | 3.2% | 1.4% | 0.8% | 2.9% | 1.1% | 0.7% | 3.3% | 1.1% | 0.7% |
| Native Hawaiian or Pacific Islander | 0.9% | 0.1% | 0.1% | 0.9% | 0.2% | 0.1% | 1.0% | 0.2% | 0.1% |
| White, Hispanic/Latino/a/x[b] | 9.8% | 8.9% | 7.3% | 13.5% | 2.4% | 2.1% | 16.3% | 2.6% | 2.3% |
| White, Non-Hispanic/Non-Latino/a/x | 43.5% | 57.3% | 69.7% | 40.6% | 56.7% | 67.6% | 39.6% | 56.7% | 67.0% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.2.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00961

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

- Households identifying as White and not Hispanic comprised 40 percent of sheltered adult-only households, a much smaller share than the 67 percent of all U.S. adult-only households and the 57 percent of adult-only households living in poverty. Only four percent of White adult-only households in poverty were in shelter at some point during 2022, lower than most other populations.
- Eight percent of Hispanic heads of adult-only households in poverty stayed in shelter at some point over the course of 2022, higher than the rates of sheltered homelessness among all people and among White heads of adult-only households in poverty (5%).
- Eleven percent of people in adult-only households in shelter were youth—that is, under the age of 25. This is smaller than the share of the poverty population that is in this age group of people in adult-only households, 18 percent but about the same as the share of the total U.S. population (12%).
- Elderly people (65 or older) in adult-only households comprise a much smaller share of people in adult-only households staying in shelters, eight percent, than the share of all people in adult-only households that are elderly (31%) or the share of people in adult-only households living in poverty that are elderly (30%). Approximately one percent of all elderly people in adult-only households living in poverty experienced sheltered homelessness over the course of 2022.
- Women heads of adult-only households accounted for a smaller share of those that experienced sheltered homelessness (32%) than women heads of adult-only households living in poverty (56%) and heads of adult-only households in the country (49%).

### How Have the Characteristics of Adult-only Households Changed over Time?

In general, demographic characteristics change very little year to year. The most notable changes in the characteristics of adult-only households occurred in the number of household heads who identified as Hispanic or Latino/a/x or as Black or African American, and in the number of people 65 and older.

- Between 2019 and 2022, the number of adult-only household heads identifying as Hispanic or Latino/a/x staying in shelters increased by 46 percent, while the number of Non-Hispanic/Non-Latino/a/x heads of households declined by 10 percent. The share of heads of adult-only households that identified as Hispanic also increased over this period. In 2019, 14 percent of heads of adult-only households identified as Hispanic/ Latin(o)(a)(x) compared with 21 percent in 2022.
- The number of adult-only household heads identifying as Black, African, or African American staying in shelters decreased by about 13 percent between 2019 and 2022. The share of heads of adult-only households that identified as Black or African American also decreased over this period. In 2019, 39 percent of heads of adult-only households identified as Black or African American, compared with 35 percent in 2022.
- The adult-only sheltered population was older in 2022 compared to 2019, the pre-pandemic comparison year. The number of people in adult-only households aged 65 or older increased by 37 percent between 2019 and 2022. No other age group experienced an increase of more

**EXHIBIT 2.4: Percent of Adult-Only Households in Poverty that Experienced Sheltered Homelessness** in 2022



Note: Data on Native Hawaiian and Pacific Islanders in poverty also experiencing sheltered homelessness were excluded because of the exclusion of Guam in ACS data-derived poverty estimates.

**EXHIBIT 2.5: Households by Geography Type** 2019-2022



Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data

DOJ-HUD-AR00962

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

than three percent during this period. The share of people in adult-only aged 65 or older also increased modestly from six percent in 2019 to over eight percent in 2022.

### Where Did Adult-only Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?

- Seventy-eight percent of adult-only households accessing shelters in 2022 did so in urban areas. This is more than double the share of all U.S. adult-only households in urban areas (35%) and nearly double that of adult-only households in poverty in urban areas (41%).

- By comparison, while 39 percent of adult-only households in the United States lived in a suburban area, as did 32 percent of adult-only households with incomes below the poverty line, only 14 percent of the sheltered population accessed shelters in suburban locations in 2022.

- Rural areas accounted for seven percent of adult-only households who stayed in shelters in 2022, while rural areas had 27 percent of adult-only households in poverty, and 26 percent of all adult-only households lived there in 2022. However, it is important to note that, because these data are based on the use of emergency shelter, transitional housing, or safe havens, many dimensions of rural homelessness may be missed. Rural areas often have fewer shelter programs, possibly driving people to stay outside, in their cars, or in abandoned buildings—that is, to experience unsheltered homelessness. In addition, other forms of housing instability such as doubling up may be more common in rural areas.

### How Did the Location of Shelter Use for Adult-Only Households Change over Time?

- There was little shift in the geographic distribution of adult-only households in shelter between 2019 and 2022. A slightly higher share of adult-only households were in rural areas prior to the pandemic (9%) than in 2021 or 2022 (7%).

# Additional Characteristics of Heads of Households and Other Adults

### What Were the Other Characteristics of Adult-Only Households Experiencing Sheltered Homelessness?

Compared with 2019, the pre-pandemic comparison year, sheltered adults in adult-only households were more vulnerable in 2022, with higher rates of chronicity, domestic violence, and disability.

### EXHIBIT 2.6: Additional Characteristics of People in Adult-Only Households Experiencing Homelessness
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| **Heads of Households and Adults with Chronic Patterns of Homelessness** | | | | | | | |
| Chronic Patterns of Homelessness[a] | 18.6% | 28.2% | 23.7% | 45,165 | 26.0% | -11,616 | -5.0% |
| **Veteran Status** | | | | | | | |
| Veteran | 10.4% | 10.0% | 9.8% | -17,044 | -17.5% | 2,645 | 3.3% |
| Non-Veteran | 88.6% | 88.5% | 88.4% | -107,904 | -13.0% | 103,748 | 14.4% |
| Unknown Veteran Status | 1.0% | 1.6% | 1.8% | 5,081 | 54.7% | 953 | 6.6% |
| **Survivors of Domestic Violence*** | | | | | | | |
| Total DV Survivors | 18.1% | 21.3% | 19.5% | 4,934 | 3.1% | 343 | 0.2% |
| Not DV Survivors | 81.5% | 78.1% | 80.2% | -40,625 | -5.7% | 74,585 | 12.6% |
| DV Status: Client doesn't know/refused | 0.5% | 0.6% | 0.4% | -814 | -20.5% | -1,462 | -31.7% |
| **Disability Status*** | | | | | | | |
| With a disability[b] | 53.1% | 59.0% | 57.5% | 10,649 | 2.2% | 30,116 | 6.5% |
| Without a disability | 46.9% | 41.0% | 42.5% | -62,151 | -14.5% | 43,038 | 13.2% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.2.3
[a] HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/
*Percentages based on people with known domestic violence survivor status and disability status.
[b] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

- In 2022, 24 percent of sheltered people in households without children had a chronic pattern of homelessness. Chronic patterns of homelessness among people in households without children were less common in rural areas (15%).
- About 20 percent of people in adult-only households staying in shelter in 2022 were survivors of domestic violence. This data includes only survivors of domestic violence who stayed in shelters that were not operated by victim service providers. Thus, this is not a complete estimate of survivorship among people not accompanied by children experiencing sheltered homelessness. Given the way data are reported, it is not possible to understand the total percentage of adults in each geographic category who are survivors of domestic violence. However, data are available on the subset of people currently fleeing domestic violence by geography. In 2022, the incidence of people currently fleeing domestic violence staying in shelters not operated by victim services providers was slightly higher in rural areas (6%) compared to suburban (5%) or urban (5%) areas.
- Nine percent of all sheltered people in adult-only households were veterans in 2022. Veterans accounted for a slightly larger share of people in adult-only households in suburban areas (11%), compared to rural areas (8%) or urban areas (9%).
- Nearly 6 in 10 adults in households without children were living with a disability (58%).

### How Have the Additional Characteristics of Adult-only Households Experiencing Sheltered Homelessness Changed over Time?

- Between 2019 and 2022, the number of people in adult-only households experiencing chronic homelessness grew more rapidly than the total number of people in adult-only households experiencing homelessness. Between 2019 and 2022, the number of people in adult-only households experiencing chronic homelessness increased by 26 percent, while the total number of people in adult-only households experiencing homelessness increased by 13 percent.
- The total number of people in adult-only households who were survivors of domestic violence increased by three percent between 2019 and 2022. The share of adult-only households that were survivors of domestic violence also increased slightly, from 18 to 20 percent.
- Between 2019 and 2022, the number of people in adult-only households with a disability increased by two percent, while the share of people in adult-only households with a disability increased from 53 percent to 58 percent.



**EXHIBIT 2.7: Additional Characteristics of Sheltered Adult-only Households by Geography**
2019, 2021, and 2022

**EXHIBIT 2.8: Type of Engagement in the Homeless System**
2019, 2021, and 2022

|  | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
|  | % | % | % | # | % | # | % |
| First-time Homeless | 64.8% | 60.7% | 64.6% | −11,813 | −2.0% | 99,913 | 20.5% |
| Continuously Engaged | 18.1% | 23.5% | 21.2% | 25,573 | 15.4% | 3,966 | 2.1% |
| Returned to homelessness within 2 years | 17.1% | 15.9% | 14.2% | −28,638 | −18.1% | 2,117 | 1.7% |
| After exiting to temporary destination | 6.0% | 6.1% | 5.9% | −1,661 | −3.0% | 4,165 | 8.5% |
| After exiting to permanent destination | 3.5% | 2.5% | 2.2% | −12,061 | −37.4% | 53 | 0.3% |
| After exiting to unknown destination | 7.7% | 7.2% | 6.2% | −14,916 | −21.1% | −2,101 | −3.6% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.2.4
Note: see Key Terms section for definitions of engagement types.

DOJ-HUD-AR00964

Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 185 of 250
PageID #: 3804
Homelessness in the United States

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

- Most veterans experience homelessness in adult-only households (See Chapter 5). The number of veterans in adult-only households experiencing homelessness dropped by 15 percent between 2019 and 2022, and the share of the adult-only household members who were veterans decreased from 10 percent to nine percent. However, more recently -- between 2021 and 2022 -- the number of adults in households without children who were veterans increased by three percent.

# Engagement of Adult-only Households with the Homelessness Services System

Data collected through the LSA provides information related to the experience of homelessness. This includes whether households experiencing homelessness are doing so for the first time, are continuously engaged in the homeless system from the prior year or have returned to homelessness after exiting to a permanent, temporary, or unknown situation. This section also provides information on where people were staying immediately prior to entering an emergency shelter, transitional housing, or safe haven program, how long they stayed in shelters, and where they went after leaving shelter.

## How Did Adult-Only Households Engage with the Shelter System in 2022?

- In 2022, more than six of every ten adult-only households experiencing sheltered homelessness (65%) were experiencing homelessness for the first time, not having accessed any homeless service system program in at least two years prior to the reporting period.[2] This is slightly lower than the share of families that were engaged with the homeless services system for the first time (68%).
- About one in five (21%) adult-only households experiencing sheltered homelessness was continuously engaged, meaning that they were also experiencing sheltered homelessness or served by a program for people leaving homelessness on the day prior to the start of the 2022 reporting period. This is lower than the share of family households experiencing sheltered homelessness that were continuously engaged in 2022 (26%). Continuous engagement does not capture the population of people experiencing unsheltered homelessness during 2022 without accessing any shelter program. Because adult-only households are much more likely than families to stay in unsheltered locations, adult-only households may

2  Returns to the experience of homelessness include households that returned to some part of the homelessness service system having not accessed any homeless services for a period of at least 14 days within a two year period.

**EXHIBIT 2.9: Places Adult-Only Households Stayed Before Entering Shelter**
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| Already Experiencing Homelessness | 50.5% | 59.3% | 56.6% | 48,014 | 10.3% | 39,028 | 8.2% |
| Sheltered | 17.5% | 16.6% | 20.3% | 22,536 | 13.9% | 51,395 | 38.7% |
| Unsheltered | 33.0% | 42.7% | 36.4% | 25,478 | 8.4% | -12,367 | -3.6% |
| Housing | 28.0% | 20.9% | 22.0% | -58,414 | -22.6% | 31,929 | 19.0% |
| Staying with Family | 11.0% | 8.0% | 8.1% | -28,638 | -28.2% | 8,656 | 13.4% |
| Staying with Friends | 10.3% | 8.3% | 8.7% | -15,990 | -16.9% | 11,789 | 17.6% |
| Rented housing unit without subsidy | 5.2% | 3.2% | 3.7% | -14,861 | -30.9% | 7,445 | 28.8% |
| Rented housing unit with subsidy | 0.7% | 0.8% | 1.0% | 3,164 | 51.0% | 2,966 | 46.3% |
| Owned housing unit | 0.6% | 0.3% | 0.4% | -1,909 | -35.1% | 812 | 29.9% |
| Permanent supportive housing (PSH) | 0.2% | 0.2% | 0.2% | -180 | -9.0% | 261 | 16.9% |
| Institutional Settings | 14.3% | 11.1% | 11.7% | -25,356 | -19.2% | 17,786 | 20.1% |
| Incarceration | 6.1% | 3.6% | 4.5% | -15,410 | -27.6% | 11,497 | 39.6% |
| Medical facility | 8.1% | 7.3% | 7.1% | -9,785 | -13.2% | 6,196 | 10.6% |
| Long-term care facility | 0.2% | 0.2% | 0.1% | -161 | -11.0% | 93 | 7.7% |
| Other Settings | 3.6% | 4.3% | 4.1% | 4,187 | 12.6% | 3,124 | 9.1% |
| Hotel or motel | 3.1% | 3.8% | 3.6% | 3,766 | 13.1% | 2,425 | 8.0% |
| Foster care | 0.2% | 0.1% | 0.1% | -359 | -22.7% | 192 | 18.7% |
| Other living arrangement | 0.3% | 0.4% | 0.4% | 780 | 27.8% | 507 | 16.5% |
| Missing | 3.6% | 4.5% | 5.5% | 16,693 | 50.0% | 14,128 | 39.3% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.2.5

DOJ-HUD-AR00965

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

have higher rates of continuous episodes of homelessness of all types, both sheltered and unsheltered, than are shown here.

- Fourteen percent of adult-only households experiencing sheltered homelessness had returned to homelessness within two years of transitioning out of a prior period of homelessness. Included in this group were adult-only households that had previously transitioned out of their experience of homelessness to a temporary destination such as doubling up with friends or family on a temporary basis or other temporary situations (6%), a permanent destination such as their own rental unit (2%), or an unknown destination (6%).

### Where Did Adult-Only Households Stay Prior to Entering Shelters?

- Nearly six of every ten adult-only households (56%) that entered shelter programs at some point in 2022 reported that they had been experiencing homelessness the previous night, either in an unsheltered location or in a different shelter. Thirty six percent of adult-only households that experienced sheltered homelessness in 2022 were staying in unsheltered situations prior to entering a shelter. Twenty percent of adult-only households that entered shelter during the 2022 reporting period came from an emergency shelter, transitional housing, or safe haven program.[3]

- In 2022, 22 percent of adult-only households were housed prior to entering a shelter program: 17 percent were doubled up with friends or family, four percent were staying in rented housing without a subsidy, and the remaining one percent were staying in subsidized or supported housing, or in an owned housing unit. This is much lower than the 39 percent of family households entering shelter programs from a housed situation.

- About 12 percent of adult-only households were staying in an institutional setting prior to accessing shelter. Most (7%) were in a medical facility, including physical health or physical rehabilitation facilities, mental health facilities, and substance use rehabilitation programs. About five percent entered shelters directly after their transition from the criminal justice system. This is much higher than the one percent of family households that entered shelter from institutional settings.

- Four percent of adult-only households were staying in hotels or motels that they paid for on their own prior to staying in shelter. This is half the rate of family households accessing shelter from hotels or motels (8%).

### EXHIBIT 2.10: Length of Stay of Sheltered Adult-Only Households
2019-2022



---

3   They may have been in a different Continuum of Care or in a shelter in the same CoC that does not report to the Homeless Management Information System.

DOJ-HUD-AR00966

Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 187 of 250
PageID #: 3806
Homelessness in the United States

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

### How Did System Engagement Change over Time?

Between 2019 and 2021, the system engagement data reflected a reduced inflow into shelters during the pandemic, either coming into shelters for the first time or returning to the shelter system after an exit. During the pandemic, adult-only households also were more likely to remain in shelters if they were already there. Changes between 2021 and 2022 should be interpreted in the context of what happened during the pandemic.

- Between 2021 and 2022, the increase in the total number of adult-only households accessing shelter programs reflects the increase in those experiencing homelessness for the first time, which increased by 21 percent. This represented a near total return to pre-pandemic levels of first-time homelessness among adult-only households. The number of adult-only households who used shelter programs for the first time was lower during the pandemic than it was in either 2019 or 2022.
- The number of adult-only households who were continuously engaged by the shelter system increased by 15 percent between 2019 and 2022. Most of this growth in continuous engagement had already occurred during the pandemic. The number of continuously engaged adult-only households continued to increase slightly between 2021 and 2022 (2%).
- Between 2019 and 2022, the number of adult-only households that returned to experiencing sheltered homelessness decreased by 18 percent. This pattern of change was driven by a sharp drop in the number of adult-only households returning to sheltered homelessness during the pandemic, likely due to a combination of the reduction in shelter capacity and pandemic-era eviction moratoria and expanded prevention resources. The number of people returning to the experience of sheltered homelessness then increased slightly between 2021 and 2022 (an increase of 2%). This was driven by those returning after transitioning to a temporary destination such as staying with friends or family on a temporary basis, which increased by nine percent.
- The number of adult-only households entering shelter from rental housing that they paid for without the use of subsidies decreased by about 15,000 households or 31 percent between 2019 and 2022.
- While representing only a small share, adult-only households accessing shelter directly from subsidized rental housing increased by about 3,000 households or 46 percent between 2021 and 2022 and is 51 percent higher than it was just prior to the onset of the pandemic. This may reflect the increasing use of short-term housing assistance such as rapid rehousing for adult-only households.
- Between 2019 and 2022, the number of adult-only households entering shelter programs who were already homeless increased by 10 percent. The number of adult-only households entering shelter programs from unsheltered locations increased by 14 percent, and the number transitioning from another shelter program increased by eight percent. Compared to the year prior (2021), the number of adult-only households accessing shelter from another sheltered situation increased by 39 percent while the number entering shelter from an unsheltered situation declined by four percent.
- The number of adult-only households coming into the shelter system directly from the



**EXHIBIT 2.11: Exit Status of Adult-Only Households Using Shelter Programs (in %)**
2019-2022

Legend:
- Still active at the end of the report period
- Exited during the report period

| | 2019 | 2021 | 2022 |
|---|---|---|---|
| Exited during the report period | 82.1 | 77.4 | 79.4 |
| Still active at the end of the report period | 17.9 | 22.6 | 20.7 |

DOJ-HUD-AR00967

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

criminal justice system dropped during the pandemic and then increased between 2021 and 2022. However, the number of adult-only households coming into the shelter system from the criminal justice system remained below pre-pandemic levels in 2022, a net decrease of about 15,400 households or 28 percent since 2019.

- The number of adult-only households experiencing sheltered homelessness that had stayed with friends or family immediately prior to entering a shelter dropped during the pandemic (a decrease of 33% between 2019 and 2021). Despite an increase of 16 percent between 2021 and 2022, the number of adult-only households coming into the shelter system from doubled up living situations remains below pre-pandemic levels: about 200,000 households in 2019 and about 150,000 in 2022.

### How Long Did Adult-Only Households Stay in Shelter?

Length of time in shelter programs reflects the aggregated amount of time households spent in any emergency shelter, transitional housing, or safe haven programs over the course of the reporting period. Households staying for short periods of time include those households transitioning to permanent housing, remaining in the experience of homelessness but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

- In 2022, just more than one of every four adult-only households stayed in shelter for seven days or less (26%)[4]. This is considerably higher than the 15 percent of family households staying in shelter for no more than a week.
- About one in five adult-only households stayed in shelter from more than one week but no more than a month (21%), and a similar share stayed between one and three months (21%). Altogether, more than two-thirds (68%) of adult-only households stayed in shelter for 90 days or less.
- Among adult-only households that accessed a shelter program during the 2022 reporting year, about nine percent had stayed in shelter for one year or longer.

### How Has Length of Time in Shelter Programs Changed over Time?

In 2022, adult-only households accessing shelter stayed for slightly longer periods of time than in 2019. Lengths of stay in shelter increased during the pandemic and decreased between 2021 and 2022. Despite this partial return to pre-pandemic lengths of stay, lengths of stay in shelter for adult-only households remain slightly longer in 2022 than in 2019.

- In 2022, the share of adult-only households staying in shelter for 7 days or less was 26 percent the same as in 2019, the pre-pandemic comparison year.
- The share of adult-only households staying in shelter for 90 days or less was 68 percent in 2022, slightly lower than the 72 percent in 2019.
- In 2022, the share of adult-only households staying in shelter for one year or longer remained

---

4  The number of households staying for short stays includes households transitioning to permanent housing, remaining in the experience of homelessness, but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

### EXHIBIT 2.12: Exit Destination for Adult-Only Households who Left Shelter Programs
2019-2022

|  | 2019 | 2021 | 2022 |
|---|---|---|---|
|  | % | % | % |
| Permanent supportive housing (PSH) | 2.0% | 2.7% | 2.0% |
| Other types of permanent housing | 25.2% | 22.1% | 19.2% |
| Permanent housing, no subsidy | 9.0% | 5.7% | 5.3% |
| Permanent housing, with subsidy | 7.3% | 10.0% | 7.8% |
| Living with friends or family (permanent) | 8.9% | 6.4% | 6.1% |
| Temporary housing | 11.6% | 10.3% | 12.1% |
| Living with friends or family (temporary) | 10.1% | 8.3% | 10.0% |
| Other temporary housing | 1.5% | 2.0% | 2.1% |
| Experience of Homelessness | 18.7% | 26.5% | 22.9% |
| Sheltered | 8.7% | 9.2% | 9.2% |
| Unsheltered | 10.0% | 17.3% | 13.8% |
| Institutional setting | 4.5% | 4.6% | 4.4% |
| Unknown destination | 37.7% | 33.5% | 38.9% |
| Deceased | 0.2% | 0.5% | 0.4% |

Data Source: Homeless Management Information Systems (HMIS) data;
Note: The high percentage of unknown exit destination reflects both people leaving shelter programs without reporting to staff where they plan to go and the data collection challenges associated with night by night shelters, which enter and exit clients daily.

DOJ-HUD-AR00968

## ESTIMATES OF SHELTERED PEOPLE IN ADULT-ONLY HOUSEHOLDS IN 2022

greater than in 2019, having risen from 5 percent in 2019 to 10 percent in 2021 and then dropping only one percentage point to about nine percent in 2022.

### What Were the Exit Destinations of Households Leaving Shelter Programs?

- Just about four of every five households who stayed in an emergency shelter, transitional housing, or safe haven program at some point during the year (79%) exited the shelter system and were no longer actively receiving residential services when the reporting period ended. The other 21 percent continued to be in a shelter program at the end of the reporting period.
- Of those adult-only households who left shelter programs at some point during 2022, two percent went to permanent supportive housing, another 19 percent went to other types of permanent housing, and 6 percent to the percent to live with family or friends on a permanent basis.
- Almost one-quarter of adult-only households who left shelter (23%) went to another homeless situation in 2022. Fourteen percent went to an unsheltered situation, and nine percent to another shelter program. (These exits from shelter to shelter include households that went to a shelter in a different Continuum of Care or to a shelter in the same community that did not participate in HMIS).

### How Did the Destinations at the Time of Exit Change for Sheltered Households?

- More adult-only households remained in a shelter program at the end of the reporting period in 2022 than in 2019 (21% in 2022 vs 18% in 2019).
- Compared to prior to the pandemic, a higher percentage of households went from their current shelter experience to another homeless experience (23% compared to 19%), with increases in exits to both unsheltered locations and other sheltered locations. However, during the pandemic (2021) the rate of households leaving for another homeless situation was higher than it was in 2022 (27%).
- A smaller percentage of households went to a permanent housing situation in 2022 than did in 2019. In 2019, 25 percent of households exited the shelter system to permanent housing with or without a subsidy or to live with family or friends on a permanent basis compared to 19 percent of households in 2022.

DOJ-HUD-AR00969

# 2022
# Estimates of Families with Children Experiencing Sheltered Homelessness

Overview of Estimates of Sheltered Family Homelessness in the United States ........................................................ 3-2

   How Did Estimates of Family Households Experiencing Homelessness Compare with the U.S. Total and U.S. Poverty
Populations? ........................................................................................................................................................ 3-2

Characteristics of People in Family Households Experiencing Homelessness ............................................. 3-3

   What Were the Demographic Characteristics of Sheltered Family Households in 2022? ........................................... 3-3

   How Do the Demographic Characteristics of the Sheltered Family Population Compare with the U.S. Total and
U.S. Poverty Populations? ..................................................................................................................................... 3-4

   How Have the Characteristics of Family Households Experiencing Sheltered Homelessness Changed over Time? ............... 3-5

   How Did the Household Size and Composition of Sheltered Families Compare with the U.S. Total and U.S. Poverty
Populations? ........................................................................................................................................................ 3-6

   Where Did Families with Children Access Emergency Shelter or Transitional Housing? .............................................. 3-6

   What Were the Other Characteristics of Families with Children Experiencing Sheltered Homelessness? ..................... 3-7

   How Did the Additional Characteristics of Families with Children Experiencing Homelessness Change over Time? ............ 3-7

Engagement of Family Households with the Homelessness Services System ............................................... 3-8

   How Did Family Households Engage with the Shelter System in 2022? ...................................................................... 3-8

   Where Did Family Households Stay Prior to Entering Shelters? ................................................................................. 3-9

   How Did System Engagement Change for Family Households? .................................................................................. 3-10

   How Long did Family Households Stay in Shelter? .................................................................................................... 3-11

   How Has Length of Time in Shelter Programs Changed for Family Households? ........................................................ 3-11

   What Were the Exit Destinations of Family Households Leaving Shelter Programs? .................................................. 3-11

   How Did the Destination at the Time of Exit Change for Family Households? ............................................................ 3-12

DOJ-HUD-AR00970

# Estimates of Families with Children

## EXPERIENCING SHELTERED HOMELESSNESS

The number of people in families with children experiencing sheltered homelessness increased by 19 percent between 2019 and 2022.

## Overview of Estimates of Sheltered Family Homelessness in the United States

An estimated **453,016 people in families with children in 141,609 households**, stayed in an emergency shelter or transitional housing program at some point between October 1, 2021 and September 30, 2022.

- In 2022, 453,016 people in 141,609 family households accessed a shelter program during the year.
- This was a 10 percent decrease in the number of family households in shelters compared with the pre-pandemic comparison year of 2019. The number of people in family households staying in a shelter program increased by 19 percent between 2021 and 2022. This increase could be attributed, in part, to the end of the federal eviction moratorium just before the start of the 2022 reporting period, as well as the sunsetting of several pandemic-era income supports and homelessness prevention programs.

### How Did Estimates of Family Households Experiencing Homelessness Compare with the U.S. Total and U.S. Poverty Populations?

- One of every 267 family households in the U.S. experienced sheltered homelessness at some point during 2022.
- People in families with children staying in shelters accounted for two percent of all people in families with incomes below the poverty line and three percent of all family households. These rates do not include the number of family households who only stayed in unsheltered locations. Family members living in poverty were less likely to stay in shelter programs in 2022 than people in households with poverty-level incomes and no children present (7% of adult-only households).
- Between 2021 and 2022, the number of sheltered families increased by 19 percent, differing considerably from trends in the number of family households living with incomes below the poverty level, which declined by four percent.

### EXHIBIT 3.1: One-Year Estimates of Families with Children who Experienced Sheltered Homelessness
2019, 2021, and 2022

|  | 2019 | 2021 | 2022 |
|---|---|---|---|
|  | # | # | # |
| Family Households | 157,827 | 119,070 | 141,609 |
| People in Family Households | 507,224 | 381,124 | 453,016 |

Data Source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 3.2: Changes in Estimates of Families Using Shelter, Households in Poverty, and U.S. Households
2019-2022

| Characteristic | Change in People in Families with Children 2019-2021 | | Change in Family Households 2019-2020 | | Change in People in Families with Children 2021-2022 | | Changes in Family Households 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| Staying in Shelter Programs | -54,208 | -10.7% | -16,218 | -10.3% | 71,892 | 18.9% | 22,539 | 18.9% |
| Living in Poverty | -392,782 | -1.8% | 318,456 | 6.4% | -1,243,312 | -5.5% | -231,738 | -4.3% |
| In U.S. Population | -609,099 | -0.4% | 1,114,267 | 3.0% | -1,436,160 | -0.9% | 121,069 | 0.3% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data.

DOJ-HUD-AR00971

ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

## Characteristics of People in Family Households Experiencing Homelessness

### What Were the Demographic Characteristics of Sheltered Family Households in 2022?

- Most heads of family households that experienced sheltered homelessness in 2022, 86 percent, identified as women. This is considerably higher than the 32 percent of heads of adult-only households experiencing sheltered homelessness who identified as women. (See Chapter 2 for more information on adult-only households experiencing homelessness.)

- Fourteen percent of heads of family households identified as men. A very small percent (less than 1%) identified as either transgender (0.1%) or a gender that is not singularly 'female' or 'male' (<0.1%).

- Children accounted for 60 percent of people in families experiencing sheltered homelessness; 28 percent were children under the age of five, and 32 percent were children ages 6 to 17.

- In 2022, heads of sheltered family households who identified as Hispanic or Latino/a/x of any race accounted for 31 percent of all family households experiencing sheltered homelessness. This is considerably higher than the share of heads of adult-only households who identified as Hispanic, 21 percent.

- Half of all heads of family households that experienced sheltered homelessness

### EXHIBIT 3.3a: Demographic Characteristics of Sheltered Families with Children
By Gender and Age, 2019, 2021, and 2022[a]

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered Families with Children | U.S. Families with Children in Poverty | Total U.S. Families with Children | Sheltered Families with Children | U.S. Families with Children in Poverty | Total U.S. Families with Children | Sheltered Families with Children | U.S. Families with Children in Poverty | Total U.S. Families with Children |
| **Gender of Heads of Households** | | | | | | | | | |
| Male | 10.7% | 26.3% | 46.6% | 11.4% | 27.1% | 45.4% | 13.5% | 27.4% | 46.1% |
| Female | 89.3% | 73.7% | 53.4% | 88.6% | 73.0% | 54.6% | 86.3% | 72.6% | 53.9% |
| Gender Non-Singular* | 0.0% | | | 0.0% | | | 0.1% | | |
| Gender Questioning | | | | 0.0% | | | 0.0% | | |
| Transgender | <0.1% | | | <0.1% | | | 0.1% | | |
| **Age of All People in the Household** | | | | | | | | | |
| 5 or under | 29.1% | 18.8% | 14.8% | 28.5% | 17.7% | 14.3% | 27.5% | 17.5% | 14.1% |
| 6-17 | 31.8% | 35.7% | 31.6% | 32.0% | 36.3% | 32.2% | 32.3% | 36.0% | 32.1% |
| 18-24 | 8.1% | 8.2% | 6.5% | 7.7% | 7.7% | 6.2% | 7.7% | 7.9% | 6.3% |
| 25-34 | 16.9% | 13.9% | 12.5% | 16.8% | 13.5% | 11.9% | 17.0% | 13.4% | 11.8% |
| 35-44 | 9.9% | 12.8% | 17.5% | 10.5% | 13.5% | 18.1% | 11.1% | 13.9% | 18.4% |
| 45-54 | 3.3% | 6.2% | 11.1% | 3.4% | 6.5% | 11.2% | 3.3% | 6.4% | 11.3% |
| 55-64 | 0.8% | 2.8% | 3.7% | 0.8% | 3.0% | 3.7% | 0.8% | 3.0% | 3.6% |
| 65 and older | 0.2% | 1.8% | 2.4% | 0.2% | 1.9% | 2.4% | 0.3% | 2.0% | 2.4% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.3.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution. Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00972

## ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

in 2022 identified as Black or African American. This is considerably higher than the share of heads of adult-only households who identified as Black, 35 percent.

- In 2022, four percent of heads of family households who experienced sheltered homelessness identified as indigenous – either Native American/American Indian or Alaska Native (2%) or Native Hawaiian or Pacific Islander (2%). Less than one percent of heads of family households identified as Asian or Asian American.

- White heads families with children not identifying as Hispanic or Latino/a/x were 21 percent of all heads of family households staying in shelters, considerably less than the share of White heads among sheltered adult-only households (40%).

### How Do the Demographic Characteristics of the Sheltered Family Population Compare with the U.S. Total and U.S. Poverty Populations?

Black, Indigenous, and people of color remained substantially overrepresented among the heads of family households that experienced sheltered homelessness in 2022, compared to both the U.S. total and U.S. poverty populations.

- While half of heads of family households that experienced sheltered homelessness in 2022 identified as Black, African, or African American, 24 percent of heads of family households living in poverty and 13 percent of heads of all family households in the U.S. were Black. Black families

### EXHIBIT 3.3b: Demographic Characteristics of Sheltered Families with Children
By Ethnicity and Race, 2019, 2021, and 2022[a]

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered Families with Children | U.S. Families with Children in Poverty | Total U.S. Families with Children | Sheltered Families with Children | U.S. Families with Children in Poverty | Total U.S. Families with Children | Sheltered Families with Children | U.S. Families with Children in Poverty | Total U.S. Families with Children |
| **Ethnicity of Heads of Households[b]** | | | | | | | | | |
| Hispanic/Latino/a/x (all races) | 24.0% | 30.4% | 21.0% | 25.8% | 30.5% | 21.5% | 30.6% | 30.3% | 21.6% |
| Non-Hispanic/Non-Latino/a/x (all races) | 76.0% | 69.7% | 79.0% | 74.2% | 69.6% | 78.5% | 69.5% | 69.7% | 78.5% |
| **Race of Heads of Households** | | | | | | | | | |
| Asian or Asian American | 0.7% | 3.4% | 6.1% | 0.6% | 3.8% | 6.3% | 0.6% | 3.9% | 6.5% |
| Black, African, or African American | 52.2% | 25.3% | 13.8% | 49.8% | 23.7% | 13.0% | 49.6% | 24.4% | 13.1% |
| Multiple Races | 4.2% | 3.2% | 2.6% | 4.3% | 16.3% | 12.8% | 4.1% | 15.7% | 12.6% |
| Native American/American Indian or Alaska Native | 1.9% | 1.8% | 0.9% | 2.8% | 1.9% | 1.1% | 2.2% | 1.8% | 1.1% |
| Native Hawaiian or Pacific Islander | 1.2% | 0.2% | 0.2% | 1.2% | 0.3% | 0.2% | 1.7% | 0.3% | 0.2% |
| White, Hispanic/Latino/a/x[b] | 15.7% | 19.5% | 13.9% | 17.4% | 4.6% | 3.6% | 20.9% | 4.8% | 3.7% |
| White, Non-Hispanic/Non-Latino/a/x | 24.2% | 37.5% | 56.6% | 23.9% | 36.5% | 54.6% | 20.9% | 36.1% | 54.2% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.3.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

[c] Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

### EXHIBIT 3.4: Percentage of Families in Poverty who Experienced Sheltered Homelessness in 2022



Black, African, or African American 5.4
Native American/American Indian or Alaska Native 3.2
Hispanic/Latino/a/x 2.8
Total 2.2
White, Non-Hispanic/Non-Latino/a/x 1.6
Multiple Races 0.7
Asian or Asian American 0.4

0%                                6%

DOJ-HUD-AR00973

## ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

with incomes below the poverty level had the highest incidence of experiencing sheltered homelessness across racial and ethnic groups (5%). This is more than double the rate of all families in poverty who experience sheltered homelessness (2%).

- The share of heads of sheltered family households identifying as Hispanic or Latino/a/x was roughly the same as the share of families in poverty (31% and 30%). This is higher than their share of all family households in the U.S. (22%). Three percent of Hispanic or Latino/a/x households with incomes below the poverty level experienced sheltered homelessness in 2022.

- Heads of family households that experienced sheltered homelessness were twice as likely to identify as Native American/American Indian or Alaska Native (2%) compared to the total population (1%) but similarly likely as heads of family households with incomes below the poverty line (2%). Three percent of Native American family households in poverty spent some time in a shelter program during 2022 – similar to the share of all family households. This is considerably lower than the 21 percent of Native American adult-only households with poverty-level incomes who accessed a shelter program in 2022.

- Women comprised a much higher share of heads of family households experiencing sheltered homelessness (86%) than they did heads family households living in poverty (73%) and of all U.S. families with children (54%). Female heads of family household living in poverty were more likely than male heads of households to experience sheltered homelessness (3% compared to 1%).

- Families with children who accessed an emergency shelter or transitional housing program in 2022 were younger than families in poverty or all U.S. families. While children five or under were 28 percent of all people in sheltered families, they were only 18 percent of people in families with incomes below the poverty level and 14 percent of all people in families in the U.S.

### How Have the Characteristics of Family Households Experiencing Sheltered Homelessness Changed over Time?

Demographic characteristics of families with children experiencing sheltered homelessness did not change much between 2019 and 2022. However, heads of family households in 2022 were slightly less likely to be women, more likely to be Hispanic or Latino/a/x, and less likely to be White and not Hispanic or Latino/a/x.

- Between 2019 and 2022, the share of heads of family households who identified as Hispanic or Latino/a/x increased from 24 percent to 31 percent. The *number* of Hispanic heads of family households experiencing sheltered homelessness increased by 14 percent. During the same time period, the share of Hispanic heads of families in poverty and all U.S. families remained relatively constant.

- The percentage of family households headed by someone who identified as White and not Hispanic or Latino/a/x declined from 24 percent to 21 percent. The *number* of White heads of households among the sheltered population also decreased, by 23 percent.

- In 2022, the number of female heads of family households experiencing sheltered homelessness declined by 13 percent. The share of heads of family households who were

**EXHIBIT 3.5: Household Size and Composition of Families Experiencing Sheltered Homelessness**
2019-2022





Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data; Raw data available in Appendix A.3.2

DOJ-HUD-AR00974

## ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

women was 86 percent compared to 89 percent in 2019. Meanwhile, shares of all U.S. families and families in poverty headed by women remained constant.

- More than one-third (34%) of sheltered families with children were composed of just a parent and a child (two people) in 2022.
- Seven of every ten sheltered families (71%) were headed by a single adult (most often a parent or guardian). Most (54%) were single adults with one or two children, and 17 percent were single adults with three or more children.
- More than one-quarter of sheltered families were large, consisting of three or more children (with one or more adults) (26%).
- In 2022, there were slightly fewer sheltered family households with three or more children (26%) compared to 2019 (28%).

### How Did the Household Size and Composition of Sheltered Families Compare with the U.S. Total and U.S. Poverty Populations?

- In 2022, sheltered families were considerably smaller than both all families in the U.S. and families living in poverty. In 2022, more than one-third of families using shelters consisted of just one adult and one child (34%), more than double the share of families in poverty (15%) and four times the share of all families in the U.S. (8%).
- Sheltered families were far more likely to be headed by a single adult (71%) than families with incomes below the poverty line (38%) and all U.S. families with children (16%).

### Where Did Families with Children Access Emergency Shelter or Transitional Housing?

In 2022, nearly three-fourths of families accessing shelters did so in urban areas (74%). This is more than double the percentage of U.S. family households living in urban areas (32%) and much higher than the percentage of families in poverty living in urban areas (41%). The high share of families accessing shelters who do so in urban areas is likely related to several factors, including density of homeless services in urban areas and limited affordable housing options.

- Families accessing shelters were underrepresented in suburban areas. While a plurality of the U.S. population resided in suburban communities in 2022, 44 percent, only 19 percent of families accessing shelters were in suburban areas in 2022.
- Rural areas, too, accounted for a much larger share of all U.S. families than they did families experiencing sheltered homelessness. Rural areas accounted for just seven percent of families who experienced homelessness in 2022 but 24 percent of all U.S. families and 27 percent of families living in poverty. Because these data are based on the use of emergency shelters and transitional housing, many dimensions of rural homelessness may be missed. Rural areas often have fewer shelter programs, possibly driving people to stay outside, in their cars, or in abandoned buildings—that is, to experience unsheltered homelessness. In addition, other forms of housing instability such as doubling up may be more common in rural areas.
- Between 2019 and 2022 there was little change in the geographic distribution of family households staying in shelters.



**EXHIBIT 3.6:** Geographic Location of Families with Children Experiencing Homelessness, Families with Children Experiencing Poverty, and All Families with Children 2019-2022

|  | URBAN 0% | SUBURBAN | RURAL 100% |
|---|---|---|---|
| **SHELTERED FAMILIES** 2019 |  | 74.7 | 18.8  6.6 |
| 2021 |  | 72.7 | 19.4  7.8 |
| 2022 |  | 74.0 | 19.2  6.8 |
| **FAMILIES LIVING IN POVERTY** 2019 | 41.4 | 30.5 | 28.1 |
| 2021 | 40.9 | 31.7 | 27.4 |
| 2022 | 40.9 | 31.7 | 27.4 |
| **TOTAL U.S. FAMILIES** 2019 | 32.2 | 43.4 | 24.4 |
| 2021 | 31.8 | 44.1 | 24.0 |
| 2022 | 31.8 | 44.1 | 24.0 |

DOJ-HUD-AR00975

Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 196 of 250
PageID #: 3815
Homelessness in the United States

## What Were the Other Characteristics of Families with Children Experiencing Sheltered Homelessness?

- In 2022, six percent of adults in sheltered families with children had chronic patterns of homelessness. Rates of chronic homelessness among sheltered family households were highest in suburban areas (10%). In both urban and rural areas, seven percent of sheltered families had chronic patterns of homelessness.
- Very few adults in family households staying in shelters were veterans (only 1%). The share of sheltered family households who were veterans was small across geographic types but rose to three percent in rural areas.
- Nearly one-quarter of adults in families staying in shelters were survivors of domestic violence. These data represent survivors of domestic violence that accessed homeless services that were not operated by victim service providers and are considered an underestimate of survivorship among sheltered families. In 2022, 18 percent of family households in urban areas were currently fleeing an unsafe situation, the highest of all geographic categories. In rural areas, 15 percent of family households were currently fleeing domestic violence, and in suburban areas the share was 14 percent.

## How Did the Additional Characteristics of Families with Children Experiencing Homelessness Change over Time?

- Among family households, the experience of chronic homelessness was less common in 2022 than it was in 2021 (by 16%) and slightly less common than it was in 2019 (by 4%). The share of family households with chronic patterns of homelessness is similar to the share just prior to the onset of the pandemic and lower than it was in 2021, at the height of the pandemic.
- Between 2019 and 2022, the number of heads of household and other adults in sheltered families that had a disability went down by seven percent. However, between 2021 and 2022, the number of households with an adult with a disability decreased by five percent. The share of households was slightly higher in 2022 than it was in 2019 (28% compared to 26%), but lower than it was in 2021 (30%).
- While the share of adult domestic violence survivors in sheltered families was about the same in 2022 as it was in 2019, the number decreased by 12 percent during that time, part of the overall drop in sheltered family homelessness since before the pandemic. In urban and rural areas, the share of family households experiencing sheltered homelessness and currently fleeing domestic violence using shelters not operated by victim service providers rose between 2019 and 2021 and then declined between 2021 and 2022. In suburban areas, these rates increased between 2019 and 2021 and continued to increase between 2021 and 2022.

**EXHIBIT 3.7: Additional Characteristics of Sheltered Families**
2019-2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| Chronic Homeless Status of Heads of Households and Other Adults in Families | | | | | | | |
| Chronic Patterns of Homelessness[a] | 6.1% | 9.2% | 6.4% | -428 | -3.6% | -2,155 | -15.6% |
| Veteran Status of Heads of Households and Other Adults in Families | | | | | | | |
| Veteran | 1.6% | 1.6% | 1.4% | -532 | -17.0% | 250 | 10.6% |
| Non-Veteran | 97.9% | 97.5% | 97.7% | -16,294 | -8.4% | 31,384 | 21.4% |
| Unknown Veteran Status | 0.5% | 0.9% | 0.9% | 630 | 66.9% | 215 | 15.8% |
| Domestic Violence Survivor Status of Heads of Households and Other Adults in Families* | | | | | | | |
| DV Survivors | 33.1% | 36.6% | 32.2% | -7,153 | -12.0% | 17 | 0.0% |
| Not DV Survivors | 66.7% | 63.2% | 67.6% | -9,961 | -8.3% | 19,468 | 21.5% |
| Doesn't Know/Refused | 0.2% | 0.2% | 0.2% | -50 | -15.5% | -68 | -19.9% |
| Disability Status of Heads of Households and Other Adults in Families[b] | | | | | | | |
| With Disabilities | 25.6% | 30.4% | 27.5% | -3,348 | -6.6% | 2,045 | 4.5% |
| Without Disabilities | 74.4% | 69.6% | 72.5% | -22,539 | -15.4% | 20,751 | 20.1% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.3.3
[a] HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/
*Percentages based on people with known domestic violence survivor status and disability status.
[b] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

DOJ-HUD-AR00976

ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

# Engagement of Family Households with the Homelessness Services System

Data collected to inform this report included information related to the experience of homelessness. This includes whether households experiencing homelessness are doing so for the first time, are continuously engaged in the homeless system from the prior year or have returned to homelessness after exiting to a permanent, temporary, or unknown situation. This section also provides information on where people were staying immediately prior to entering an emergency shelter or transitional housing, how long they stayed in shelters, and where they went after leaving shelter.

Length of time in shelter programs reflects the aggregated amount of time households spent in any emergency shelter, transitional housing, or safe haven programs over the course of the reporting period. Households staying for short periods of time includes those households transitioning to permanent housing, remaining in the experience of homelessness, but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

## How Did Family Households Engage with the Shelter System in 2022?

- More than two-thirds of family households (68%) who experienced sheltered homelessness in 2022 did so for the first time, not having accessed any program in the homeless services system for at least two years prior to the reporting period.[1]
- More than one-quarter (26%) of family households experiencing sheltered homelessness were continuously engaged, meaning that they were also enrolled in a program for people experiencing homelessness on the day prior to the start of the 2022 reporting period.
- Just about six percent of sheltered family households returned to the experience of sheltered homelessness during the 2022 reporting period, meaning that they returned to a shelter program within two years of exiting homelessness. Of those, three percent returned after having transitioned to a permanent destination such as their own rental unit. Two percent had previously left for a temporary destination such as

1 Prior living situation is based on a sheltered household's first engagement with the homelessness services system during the reporting period. Most people engaged only with emergency shelter or transitional housing during the FY22 reporting period. However, for a very small share of households who used shelter or transitional housing, it is possible the first engagement may have been in a RRH or PSH program.

## EXHIBIT 3.8: Percent of Family Households with Additional Characteristics by Geography
2019-2022



Chronically Homeless Families   Veteran Families   Currently Fleeing Domestic Violence

Note: Data are based family households which is different from the universe presented in Exhibit 3.6.

## EXHIBIT 3.9: Type of Engagement in the Homeless System
2019, 2021, and 2022

| Place Stayed | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| Sheltered Family Households | | | | -16,218 | -10.3% | 22,539 | 18.9% |
| First time experiencing homeless | 62.3% | 63.6% | 67.9% | -2,197 | -2.2% | 20,505 | 27.1% |
| Continuously Engaged | 27.1% | 29.8% | 25.9% | -6,216 | -14.5% | 1,203 | 3.4% |
| Returned to the experience of homelessness within 2 years | 10.5% | 6.7% | 6.2% | -7,806 | -47.0% | 831 | 10.4% |
|   After exiting to temporary destination | 2.0% | 2.2% | 1.9% | -534 | -16.9% | -10 | -0.4% |
|   After exiting to permanent destination | 3.7% | 3.0% | 2.6% | -2,257 | -38.2% | 87 | 2.4% |
|   After exiting to unknown destination | 4.8% | 1.5% | 1.8% | -5,015 | -66.5% | 754 | 42.6% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.3.4
Note: see Key Terms section for definitions of engagement types.

DOJ-HUD-AR00977

## ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

doubling up with friends or family on a temporary basis. Two percent returned after leaving to an unknown destination.

- Nearly 9 in 10 of family households with children (88%) that stayed in an emergency shelter or transitional housing program in 2022 only stayed in shelter programs during the year, meaning they did not also enroll in RRH or PSH. Ten percent accessed both shelter programs and RRH programs. A small share (1%) accessed PSH in addition to emergency shelter or transitional housing programs. Less than one percent accessed all three program types.

### Where Did Family Households Stay Prior to Entering Shelters?

- In 2022, almost half (47%) of family households were already experiencing homelessness the night before they entered shelter programs. Of those, 26 percent reported that they had been in a different shelter program[2], and 22 percent were staying in unsheltered situations prior to entering a shelter.

- Almost 4 in 10 family households (39%) were staying in a housed situation prior to entering a shelter program: 29 percent were staying with family or friends, seven percent were staying in rented housing without a subsidy, two percent were staying in rented housing with a subsidy (which could include short-term rapid rehousing assistance), and another one percent were either staying in an owned housing unit or in permanent supportive housing. Families were much more likely than adult-only households to be housed before entering shelters; only 22 percent of adult-only households had been in a housed situation before entering a shelter.

- In 2022, eight percent of family households had been staying in a hotel or motel that they paid for on their own prior to entering a shelter program. This is double the share of people in adult-only households that had stayed in a hotel or motel just prior to entering shelter (4%).

- One percent of family households had been staying in an institutional setting prior to accessing shelter. Most of these households (1%) were in a medical facility, including physical health or physical rehabilitation facilities, mental health facilities, and substance use rehabilitation programs. This is much smaller than the 12 percent of adult-only households having stayed in institutional settings just prior to accessing shelter programs.

### EXHIBIT 3.10: Places Family Households Stayed Before Entering Shelter
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2021 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| Already Experiencing Homelessness | 36.9% | 45.3% | 47.0% | 8,252 | 14.2% | 12,554 | 23.3% |
| Sheltered | 19.5% | 23.8% | 25.8% | 5,769 | 18.8% | 8,116 | 28.6% |
| Unsheltered | 17.4% | 21.5% | 21.2% | 2,483 | 9.0% | 4,438 | 17.4% |
| Housing | 45.3% | 41.8% | 38.8% | -16,465 | -23.0% | 5,248 | 10.6% |
| Staying with Family | 21.8% | 20.6% | 18.0% | -8,876 | -25.8% | 938 | 3.8% |
| Staying with Friends | 12.8% | 12.7% | 11.1% | -4,533 | -22.4% | 571 | 3.8% |
| Rented housing unit without subsidy | 8.9% | 6.5% | 7.3% | -3,710 | -26.5% | 2,587 | 33.6% |
| Rented housing unit with subsidy | 1.2% | 1.4% | 1.9% | 706 | 36.1% | 1,037 | 63.8% |
| Owned housing unit | 0.5% | 0.5% | 0.5% | -44 | -5.9% | 157 | 28.5% |
| Permanent supportive housing (PSH) | 0.1% | 0.2% | 0.1% | -8 | -4.4% | -42 | -19.4% |
| Institutional Settings | 2.0% | 1.7% | 1.3% | -1,229 | -40.0% | -155 | -7.8% |
| Incarceration | 0.4% | 0.3% | 0.3% | -276 | -42.0% | 33 | 9.5% |
| Medical facility | 1.5% | 1.4% | 1.0% | -892 | -38.3% | -168 | -10.5% |
| Long-term care facility | 0.1% | 0.0% | 0.0% | -61 | -69.3% | -20 | -42.6% |
| Other Settings | 5.9% | 9.2% | 7.6% | 1,443 | 15.5% | -180 | -1.6% |
| Hotel or motel* | 5.8% | 9.0% | 7.5% | 1,441 | 15.8% | -139 | -1.3% |
| Foster care | 0.1% | 0.1% | 0.0% | -27 | -35.5% | -25 | -33.8% |
| Other living arrangement | 0.1% | 0.1% | 0.1% | 29 | 22.8% | -16 | -9.3% |
| Missing | 10.0% | 2.1% | 5.3% | -8,221 | -52.2% | 5,070 | 206.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.3.5

---

2  They may have been in a different Continuum of Care of in a shelter in the same CoC that does not report to the Homeless Management Information System.

ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

## How Did System Engagement Change for Family Households?

The system engagement data for people in families with children reflects an increase in new families entering the homeless services system after a period of slowed inflow into shelters during the pandemic.

- Between 2019 and 2021, the share of family households experiencing sheltered homelessness for the first time increased from 62 percent of families to 64 percent. It increased further to 68 percent in 2022. More recently, between 2021 and 2022, the number of family households that experienced homelessness for the first time increased by 27 percent. This likely reflects a combination of the expiration of pandemic-era eviction moratoria and resources aimed at the prevention of homelessness as well as the increased difficulty in securing affordable housing in communities across the country.

- The number of family households that were continuously engaged in the homeless services system increased between 2021 and 2022, by three percent, but was 15 percent lower in 2022 than it was in 2019.

- After dropping by nearly half between 2019 and 2022 (47%), the number of family households returning to shelter within two years increased by 10 percent in the more recent time period, 2021 to 2022.

- The share of family households accessing shelter from another homeless situation increased each year between 2019 and 2022. Prior to the pandemic, 37 percent of families with children enrolled in an emergency shelter or transitional housing program from another homeless situation. In 2021, 45 percent of families did so, and in 2022 the share increased again to 47 percent. This includes families accessing shelter from unsheltered locations, which increased from 17 percent to 21 percent in 2022. The number of people in families with children accessing shelter programs having stayed in unsheltered situations the night prior increased by 9 percent between 2019 and 2022 and by 17 percent in the last year alone, between 2021 and 2022.

- While the number of families entering a shelter program directly from a housed situation was 23 percent lower in 2022 than it was in 2019, just before the onset of the pandemic, in the most recent two years, 2021 to 2022, the number increased by 11 percent (5,248 households). These recent increases were driven by increases in families coming from their own rented units, with or without a subsidy.

- Compared to 2019, the numbers of families coming from most prior living situations were lower in 2022. The only exception was the number entering shelter from subsidized rental housing, which showed a 36 percent increase over the three years (706 households). This increase may reflect households entering shelters after their rapid rehousing ended. Rapid rehousing



**EXHIBIT 3.11: Length of Stay of Sheltered Families**
2019-2022

Data source: Homeless Management Information Systems (HMIS) data



**EXHIBIT 3.12: Exit Status of Family Households (in %)**
2019-2022

Still active at the end of the report period    Exited during the report period

Data source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR00979

## ESTIMATES OF FAMILIES WITH CHILDREN EXPERIENCING SHELTERED HOMELESSNESS IN 2022

programs had been expanded during the pandemic.

- The share of families with children having stayed with friends or family just prior to staying in shelter declined from 35 percent to 29 percent.

## How Long did Family Households Stay in Shelter?

Length of time in shelter programs reflects the aggregated amount of time households spent in any emergency shelter, transitional housing, or safe haven programs over the course of the reporting period. Households staying for short periods of time include those households transitioning to permanent housing, remaining in the experience of homelessness but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

- In 2022, 15 percent of families with children accessing shelter programs stayed for one week or less. This is considerably smaller than the share of adult-only households staying for one week or less (26%)[3].
- One-third of family households (33%) stayed in shelter for less than one month, but 18 percent stayed between three and six months, and a quarter of families staying in shelters were there for more than six months.
- Just over one of every 10 people in family households (11%) experiencing sheltered homelessness had stayed in shelter for more than a year.

## How Has Length of Time in Shelter Programs Changed for Family Households?

Overall, there was little change in how long families stayed in shelter programs between 2019 and 2022, with some shifts within particular time periods.

- Between 2019 and 2022, the share of family households experiencing sheltered homelessness that stayed in shelters for one week or less increased from 12 percent to 15 percent, and the share staying for between one week and one month decreased from 24 percent to 18 percent.
- The share of family households experiencing sheltered homelessness that had stayed in shelter for more than a year increased during the height of the pandemic, from 11 percent to 15 percent, but returned to pre-pandemic levels in 2022 (11%).

## What Were the Exit Destinations of Family Households Leaving Shelter Programs?

- In 2022, 29 percent of family households who stayed in an emergency shelter or transitional housing program at some point during the year were still enrolled in a shelter program at the end of the reporting period, while 71 percent were no longer actively receiving temporary residential services when the reporting period ended.
- Forty-two percent of family households went from sheltered homelessness directly to

**EXHIBIT 3.13: Destination of Exit of Family Households**
2019-2022

| | 2019 | 2021 | 2022 |
|---|---|---|---|
| | % | % | % |
| Permanent supportive housing (PSH) | 2.1% | 2.3% | 2.1% |
| Permanent housing | 47.7% | 49.7% | 41.8% |
| Permanent housing, no subsidy | 13.2% | 10.4% | 8.8% |
| Permanent housing, with subsidy | 24.3% | 29.7% | 24.6% |
| Doubled up with friends or family (permanent) | 10.2% | 9.6% | 8.4% |
| Temporary housing | 15.0% | 15.7% | 17.1% |
| Doubled up with friends or family (temporary) | 12.6% | 12.3% | 13.6% |
| Other temporary housing | 2.3% | 3.4% | 3.5% |
| Experience of Homelessness | 8.2% | 14.2% | 11.7% |
| Sheltered homelessness | 5.6% | 11.2% | 8.3% |
| Unsheltered homelessness | 2.6% | 3.0% | 3.4% |
| Institutional setting | 0.9% | 1.1% | 0.9% |
| Unknown housing status | 26.2% | 17.0% | 26.4% |
| Deceased | 0.1% | 0.1% | 0.1% |

Data Source: Homeless Management Information Systems (HMIS) data

---

3   The number of households staying for short stays includes households transitioning to permanent housing, remaining in the experience of homelessness, but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

DOJ-HUD-AR00980

permanent housing in 2022. Most (25%) transitioned to rental housing with housing assistance. This could include long-term assistance such as Housing Choice Vouchers or short-term assistance, such as RRH. Nine percent exited to permanent housing without rental assistance, and eight percent went to live with friends or family on a permanent basis.

- In 2022, 17 percent of families left shelter for a different temporary situation, most often staying with friends or family for a short period of time.
- Twelve percent of families with children who left shelters did so to another homeless situation. Only three percent went to an unsheltered situation. Others may have gone to a shelter in a different community or to a shelter in the same CoC that does not report to the HMIS.

## How Did the Destination at the Time of Exit Change for Family Households?

- The share of families with children who remained in a shelter program at the end of the reporting period rose between 2019 and 2021 (from 26% to 31%) but declined to 29% in 2022, remaining slightly higher than pre-pandemic levels.
- A higher share of families with children left their current shelter experience for another homeless situation in 2022 than did so in 2019. In 2019, eight percent of families left shelter and stayed in another shelter program or in unsheltered locations. This rose to 14 percent in 2021 but declined slightly to 12 percent in 2022. A smaller share of families went from one shelter program to another between 2021 and 2022 (11% to 8%), but the share exiting to unsheltered situations remained the same (3%) during that time.
- Between 2019 and 2021, the share of families that transitioned to rental housing with subsidies increased from 24 percent to 30 percent. Between 2021 and 2022, however, the share exiting to subsidized permanent housing returned to the pre-pandemic level (25%). This likely reflects a combination of factors, including the expiration of pandemic-era RRH funding and other homelessness prevention programs and the increasing difficulty in finding affordable units across the country.

DOJ-HUD-AR00981

# 2022
# Estimates of Sheltered Unaccompanied Youth

Overview of Estimates of Youth who Experienced Sheltered Homelessness ...................................................... 4-2

How Did Estimates of Unaccompanied Youth Households Experiencing Homelessness Compare with the U.S. Total and Poverty Population? ................................................................................................................................ 4-2

Characteristics of Sheltered Unaccompanied Youth ......................................................................................... 4-2

What Were the Demographic Characteristics of Sheltered Unaccompanied Youth Households in 2022? .............. 4-2

How Did the Demographic Characteristics of the Sheltered Unaccompanied Youth Population Compare with the U.S. Total and U.S. Poverty Populations? ............................................................................................... 4-4

How Have the Characteristics of Unaccompanied Youth Households Changed over Time? ............................... 4-5

Where Did Unaccompanied Youth Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs? ............................................................................................................................. 4-6

How Did the Location of Shelter Use for Unaccompanied Youth Households Change over Time? ..................... 4-6

What Were the other Characteristics of Unaccompanied Youth Households Experiencing Sheltered Homelessness? .......... 4-7

How Have the Additional Characteristics of Unaccompanied Youth Households Experiencing Sheltered Homelessness Changed over Time? ........................................................................................................ 4-7

Engagement of Unaccompanied Youth Households with the Homelessness Services System ............................. 4-8

Where Did Unaccompanied Youth Households Stay Prior to Entering Shelters? .............................................. 4-8

How Long Did Unaccompanied Youth Households Stay in Shelter? ................................................................ 4-9

How Did System Engagement Change Over Time? ....................................................................................... 4-9

DOJ-HUD-AR00982

# Estimates of Sheltered Unaccompanied Youth

## Overview of Estimates of Youth who Experienced Sheltered Homelessness

Approximately **114,000 unaccompanied youth** stayed in an emergency shelter, safe haven, or transitional housing program at some point between October 1, 2021 and September 30, 2022.

Sheltered unaccompanied youth are a combination of two groups: 1) people staying in shelter programs who are between the ages of 18 and 24 in adult-only households but without a parent or guardian (74,448 people in 2022) and 2) people in shelter programs in households with only children and without a parent or guardian (17,918 people in 2022). These estimates do not include unaccompanied youth who stayed only in unsheltered locations or with friends or family (i.e. doubled up).

- In 2022, 114,413 unaccompanied youth in 112,838 unaccompanied youth households stayed in shelter programs at some time during the year.
- Unaccompanied youth accounted for 12 percent of all sheltered people in adult-only and child-only households in 2022.
- Between 2019, the year prior to the COVID-19 pandemic, and 2022, the number of sheltered unaccompanied youth dropped by about 6,500 people or 5 percent. However, the number of unaccompanied youth accessing shelter programs increased by approximately 22,000 people, or 24 percent, between 2021 and 2022, possibly reflecting an increase in capacity once pandemic-era restrictions were eased.

### How Did Estimates of Unaccompanied Youth Households Experiencing Homelessness Compare with the U.S. Total and Poverty Population?

- One of every 84 unaccompanied youth in the United States experienced sheltered homelessness at some point during 2022.
- Of unaccompanied youth with incomes below the poverty line, five percent spent at least one night in a shelter program during 2022.

## Characteristics of Sheltered Unaccompanied Youth

### What Were the Demographic Characteristics of Sheltered Unaccompanied Youth Households in 2022?

- Unaccompanied youth experiencing sheltered homelessness were more likely to be women, transgender, or people identifying as a gender that is not singularly 'male' or 'female' than people in adult-only households. Just more than half of unaccompanied youth in 2022 were men or boys (53%) compared to two-thirds of heads of adult only households (67%). Forty-four percent of unaccompanied youth identified as women or girls compared with 32 percent



**EXHIBIT 4.1: One-Year Estimates of Sheltered Homelessness Among Unaccompanied Youth (Under 25)**
2019-2022

Note: Data reported through the LSA are structured so that person served in multiple household types is reflected only once in the dataset, but each household type is captured. For example, an unaccompanied youth who is 17 at the start of the reporting period and turns 18 during the year will be counted only once. But the child-only household and the adult-only household of which they were a part will both be included in the household number. Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data.



**EXHIBIT 4.2: Changes in Estimates of Sheltered Unaccompanied Youth Households, Unaccompanied Youth in Poverty, and all Unaccompanied Youth (Under 25) in the U.S.**

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data.

Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 204 of 250
PageID #: 3823
Homelessness in the United States

## ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

**EXHIBIT 4.3a: Demographic Characteristics of Sheltered Homeless People in Unaccompanied Youth Households (Under 25)**
By Gender and Age, 2019, 2021, and 2022[a]

| | 2019 | | | 2021 | | | 2022 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sheltered Unaccompanied Youth | U.S. Unaccompanied Youth Living in Poverty | Total Unaccompanied Youth | Sheltered Unaccompanied Youth | U.S. Unaccompanied Youth Living in Poverty | Total Unaccompanied Youth | Sheltered Unaccompanied Youth | U.S. Unaccompanied Youth Living in Poverty | Total Unaccompanied Youth |
| **Gender of Heads of Households** | | | | | | | | | |
| Female | 43.0% | 52.3% | 46.6% | 43.0% | 54.5% | 48.0% | 43.7% | 53.3% | 48.9% |
| Male | 55.3% | 47.7% | 53.4% | 53.3% | 45.5% | 52.0% | 52.8% | 46.7% | 51.1% |
| Non-Singular* | 0.5% | | | 1.3% | | | 1.5% | | |
| Questioning | | | | 0.1% | | | 0.1% | | |
| Transgender | 1.3% | | | 2.4% | | | 1.9% | | |
| **Age of All People in the Household** | | | | | | | | | |
| Under 18 | 17.8% | 10.0% | 2.4% | 18.9% | 9.5% | 2.2% | 14.9% | 1.0% | 1.7% |
| 18-21 | 46.3% | 60.5% | 59.0% | 45.6% | 57.6% | 57.1% | 46.2% | 57.8% | 56.1% |
| 22-24 | 35.9% | 38.5% | 38.6% | 35.5% | 41.4% | 40.7% | 38.9% | 41.2% | 42.2% |

**EXHIBIT 4.3b: Demographic Characteristics of Sheltered Homeless People in Unaccompanied Youth Households (Under 25)**
By Ethnicity and Race, 2019, 2021, and 2022[a]

| | 2019 | | | 2021 | | | 2022 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Sheltered Unaccompanied Youth | U.S. Unaccompanied Youth Living in Poverty | Total Unaccompanied Youth | Sheltered Unaccompanied Youth | U.S. Unaccompanied Youth Living in Poverty | Total Unaccompanied Youth | Sheltered Unaccompanied Youth | U.S. Unaccompanied Youth Living in Poverty | Total Unaccompanied Youth |
| **Ethnicity of Heads of Households[b]** | | | | | | | | | |
| Hispanic/Latino/a/x | 19.1% | 12.4% | 13.6% | 22.4% | 13.0% | 13.3% | 31.6% | 14.7% | 14.3% |
| Non-Hispanic/Non-Latino/a/x | 80.9% | 87.6% | 86.5% | 77.6% | 87.1% | 86.7% | 68.4% | 85.3% | 85.7% |
| **Race of Heads of Households** | | | | | | | | | |
| Asian or Asian American | 0.8% | 8.7% | 6.9% | 1.0% | 7.5% | 6.2% | 0.9% | 7.6% | 7.2% |
| Black, African, or African American | 42.9% | 14.2% | 15.1% | 40.0% | 13.5% | 14.7% | 35.5% | 12.6% | 13.9% |
| Multiple Races | 6.2% | 4.1% | 4.3% | 6.4% | 9.9% | 9.8% | 5.9% | 9.9% | 10.0% |
| Native American/American Indian or Alaska Native | 2.6% | 1.2% | 0.8% | 3.4% | 0.8% | 0.8% | 3.5% | 1.1% | 0.8% |
| Native Hawaiian or Pacific Islander | 0.8% | 0.3% | 0.2% | 1.0% | 0.2% | 0.2% | 1.2% | 0.1% | 0.2% |
| White, Hispanic/Latino/a/x[b] | 12.8% | 8.2% | 9.2% | 15.5% | 3.5% | 3.6% | 24.8% | 4.3% | 4.5% |
| White, Non-Hispanic/Non-Latino/a/x | 33.9% | 60.6% | 60.7% | 32.2% | 60.9% | 61.0% | 28.3% | 60.0% | 59.6% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.4.1
[a]Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.
[b]In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.
Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

## ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

of people in adult only households.

- Transgender people (2%), people identifying as a gender not singularly 'female' or 'male' (2%), and people identifying as gender questioning (0.1%) together comprised nearly four percent of unaccompanied youth. This is four times the share of adult-only households that identified as a gender other than men or women alone (1%).
- Unaccompanied youth identifying as Black, African, or African American comprised 36 percent of sheltered unaccompanied youth.
- The percentage of unaccompanied youth who identified as Hispanic or Latino/a/x in 2022 was considerably higher than the share of all adult-only households using shelters (32% compared to 21%).
- In 2022, five percent of unaccompanied youth accessing shelter programs identified as Indigenous. Four percent were Native Americans, American Indians or Alaska Natives and one percent were Pacific Islander or Native Hawaiian.
- One percent of unaccompanied youth identify as Asian or Asian American. This is the same as the percentage of adult-only households that identified as Asian.
- More than one-quarter of unaccompanied youth using shelters identify as White and non-Hispanic (28%). This is considerably smaller than the share of all adult-only households identifying as White and not Hispanic in 2022 (40%).

### How Did the Demographic Characteristics of the Sheltered Unaccompanied Youth Population Compare with the U.S. Total and U.S. Poverty Populations?

- Sheltered unaccompanied youth were much more likely to be under the age of 18 (15%) than all youth in the U.S. population (2%) and U.S. poverty population (1%) living without a parent, guardian, or child of their own. Sheltered unaccompanied youth under the age of 18 accounted for 69 percent of unaccompanied youth under 18 in poverty and 11 percent of all unaccompanied youth under 18 in the U.S.
- In 2022, sheltered unaccompanied youth were far more likely to identify as Hispanic or Latino/a/x than either

**EXHIBIT 4.4: Percent of Households in Poverty Experiencing Sheltered Homelessness in 2022**



Data Source: Homeless Management Information Systems (HMIS) data

**EXHIBIT 4.5: Geographic Location of Unaccompanied Youth Households (Under 25) 2019-2022**



## ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

unaccompanied youth in the U.S. population and the population of youth with incomes below the poverty line (32% vs. 14% and 15%).

- Eighteen percent of Hispanic of unaccompanied youth in poverty stayed in shelter at some point over the course of 2022, higher than the rates of sheltered homelessness among all unaccompanied youth and among White heads of unaccompanied youth households in poverty (5% and 4%).
- Unaccompanied youth identifying as Black or African American are considerably overrepresented among the sheltered youth population. Black youth accounted for 36 percent of heads of sheltered youth households in 2022 while comprising only 13 percent of unaccompanied youth living in poverty and 14 percent of all U.S. heads of unaccompanied youth households.
- Nearly one-quarter of Black heads of unaccompanied youth households in poverty (24%) were in shelter at some point during 2022. This is considerably higher than the five percent of all unaccompanied youth households with poverty-level incomes who experienced homelessness in 2022. It is also nearly double the rate of heads of adult-only households living below the poverty level experiencing sheltered homelessness in 2022 (13%).
- Native American heads of youth households using shelter programs were overrepresented compared to their share of all U.S. households (4% vs 1%) and youth households in poverty (1%).
- More than one-quarter of Native American youth households living in poverty experienced sheltered homelessness in 2022 (27%).
- Heads of unaccompanied youth households that were women or girls accounted for 44 percent of sheltered youth households, smaller than their share of unaccompanied youth households in poverty (53%) and slightly smaller than their share of heads of all unaccompanied youth households in the U.S. (49%).

### How Have the Characteristics of Unaccompanied Youth Households Changed over Time?

Demographic characteristics generally change very little year to year. However, data show distinct changes for some youth populations in their access to shelter programs between 2019 and 2022. The most notable changes in the characteristics of unaccompanied youth households occurred in the numbers identifying as Hispanic or Latino/a/x, gender other than male or female, Black unaccompanied youth, and White unaccompanied youth.

- Compared with 2019, the sheltered population of unaccompanied youth was more likely to be identified in the HMIS data as transgender, gender non-binary, or gender questioning in 2022. Four percent of unaccompanied sheltered youth in 2022 identified as transgender, gender non-binary, or gender questioning compared with two percent in 2019.
- Unaccompanied youth identifying as Hispanic or Latino/a/x youth accounted for a much higher share of sheltered unaccompanied youth in 2022 (32%) than they did in 2019 (19%).
- The number of sheltered Black unaccompanied youth decreased by 23 percent between 2019 and 2022. The share of unaccompanied youth who were Black in 2022 was also lower than it was in 2019, decreasing from 43 percent to 36 percent.

**EXHIBIT 4.6: Change in the Geographic Location of Unaccompanied Youth Households**
2019-2022



DOJ-HUD-AR00986

## ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

- In 2022, the number of unaccompanied youth identifying as White, non-Hispanic, non-Latino/a/x was 22 percent lower than it was in 2019. The share decreased as well, from 34 to 28 percent of all unaccompanied youth identifying as White and not Hispanic or Latino/a/x.

### Where Did Unaccompanied Youth Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?

- More than three of every four unaccompanied youth using shelters did so in urban areas (78%). This is considerably higher than the 54 percent of unaccompanied youth households in poverty living in urban areas and 48 percent of all unaccompanied youth households in the country.
- Conversely, the share of sheltered unaccompanied youth living in suburban areas (14%) was lower than that of unaccompanied youth households in poverty and all unaccompanied youth households (23% and 28%).
- Rural areas accounted for eight percent of unaccompanied youth households who stayed in shelters in 2022, while rural areas had 23 percent of youth households in poverty, and 25 percent of all unaccompanied youth households lived there in 2022. However, it is important to note that, because these data are based on the use of emergency shelter, transitional housing, or safe havens, many dimensions of rural homelessness may be missed. Rural areas often have fewer shelter programs, possibly driving people to stay outside, in their cars, or in abandoned buildings—that is, to experience unsheltered homelessness. In addition, other forms of housing instability such as doubling up may be more common in rural areas.

### How Did the Location of Shelter Use for Unaccompanied Youth Households Change over Time?

- Between 2021 and 2022, the geographic distribution of unaccompanied youth accessing shelter programs remained largely the same. Compared to 2019, just prior to the onset of the pandemic, the geographic distribution shifted slightly toward urban areas and away from rural and suburban areas.
- In all geographic areas, the number of unaccompanied youth in 2022 was lower than it was in 2019, but increased between 2021 and 2022, as restrictions related to the pandemic eased. The largest increases occurred in urban areas, by 27 percent.
- Between 2019 and 2022, rural areas experienced the largest decreases, with 23 percent fewer unaccompanied youth accessing shelter in rural places in 2022 than did so in 2019.

### EXHIBIT 4.7: Additional Characteristics of Sheltered Unaccompanied Youth
2019-2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| **Chronic Homeless Status of Heads of Households and Adults** | | | | | | | |
| Chronic Patterns of Homelessness[a] | 8.2% | 12.7% | 9.5% | 940 | 9.5% | -851 | -7.3% |
| **Veteran Status** | | | | | | | |
| Veteran | 1.4% | 1.7% | 1.4% | 46 | 3.4% | 135 | 10.6% |
| Non-Veteran | 97.8% | 96.6% | 97.1% | -2,733 | -2.8% | 22,142 | 30.5% |
| Unknown Veteran Status | 0.9% | 1.7% | 1.5% | 625 | 73.3% | 170 | 13.0% |
| **Survivors of Domestic Violence** | | | | | | | |
| DV Survivors | 22.6% | 28.5% | 23.2% | -1,883 | -8.1% | -946 | -4.3% |
| Not DV Survivors | 76.6% | 70.6% | 75.7% | -9,155 | -11.6% | 14,315 | 25.9% |
| Client Doesn't Know/ Refused | 0.8% | 0.9% | 1.1% | 4,553 | 24.2% | 8,522 | 57.4% |
| **Disability Status** | | | | | | | |
| With Disabilities[b] | 34.2% | 41.3% | 37.9% | -1,785 | -4.4% | 1,634 | 4.4% |
| Without Disabilities | 65.8% | 58.7% | 62.1% | -14,444 | -18.5% | 10,753 | 20.4% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.4.2
[a] HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/
*Percentages based on people with known domestic violence survivor status and disability status.
[b] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

DOJ-HUD-AR00987

## What Were the other Characteristics of Unaccompanied Youth Households Experiencing Sheltered Homelessness?

- In 2022, one in every 10 unaccompanied youth using shelters had chronic patterns of homelessness. Unaccompanied youth households in urban areas had the highest rates (10%) and rural areas the lowest (8%).
- Almost one in four unaccompanied youth staying in shelter (23%) were survivors of domestic violence, dating violence, sexual assault, or stalking in 2022. It is important to note that these data represent survivors of domestic violence that accessed homeless services that were not operated by victim service providers and should not be considered the full estimate of survivorship among unaccompanied youth experiencing sheltered homelessness.
- Only one percent of sheltered unaccompanied youth were veterans in 2022. There was no variance in the geographic distribution of veterans among the sheltered unaccompanied youth population.
- An estimated 38 percent of all unaccompanied youth staying in shelters with known disability status had a disability in 2022.

## How Have the Additional Characteristics of Unaccompanied Youth Households Experiencing Sheltered Homelessness Changed over Time?

- While the number of sheltered unaccompanied youth declined by 5 percent between 2019 and 2022, the number of unaccompanied youth experiencing chronic homelessness increased by 10 percent over the same period. All of the increase occurred between 2019 and 2021, as the share of sheltered unaccompanied youth with chronic patterns of homelessness decreased between 2021 and 2022. Increases in the percentage of unaccompanied youth who had experienced chronic patterns of homelessness occurred in each geographic type between 2019 and 2021.
- The number of sheltered unaccompanied youth who were survivors of domestic violence decreased eight percent between 2019 and 2022 and by four percent between 2021 and 2022. The share of people currently fleeing domestic violence in 2022 was slightly higher than it was just before the pandemic. While nearly the same in urban and suburban areas, increases in the share of sheltered unaccompanied youth who were currently fleeing domestic violence was largest in rural areas, increasing from four to seven percent between 2019 and 2022.
- The share of sheltered unaccompanied youth who were living with a disability was higher in 2022 than it was in 2019 (38% compared to 34%). The number of sheltered unaccompanied youth with a disability was 4 percent lower in 2022 than it was in 2019, but four percent higher than it was in 2021.

## EXHIBIT 4.8: Additional Characteristics of Unaccompanied Youth Households by Geography
2019, 2021, and 2022

| Characteristic of Households | Urban Households | | | Suburban Households | | | Rural Households | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Chronically Homeless | 8.8% | 13.9% | 10.0% | 8.4% | 10.9% | 9.1% | 5.2% | 8.0% | 7.9% |
| Veteran | 1.2% | 1.4% | 1.3% | 0.7% | 1.4% | 1.2% | 1.5% | 0.9% | 1.1% |
| Domestic Violence Survivor | 6.3% | 8.2% | 6.8% | 4.7% | 5.7% | 5.3% | 4.0% | 9.1% | 6.8% |

DOJ-HUD-AR00988

ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

# Engagement of Unaccompanied Youth Households with the Homelessness Services System

Data collected through the LSA provides information related to the experience of homelessness. For youth, this includes information on where people were staying immediately prior to entering an emergency shelter, transitional housing, or safe haven program and how long they stayed.

Length of time in shelter programs reflects the aggregated amount of time households spent in any emergency shelter, transitional housing, or safe haven programs over the course of the reporting period. Households staying for short periods of time includes those households transitioning to permanent housing, remaining in the experience of homelessness, but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

## Where Did Unaccompanied Youth Households Stay Prior to Entering Shelters?

Compared with adult-only households experiencing sheltered homelessness, unaccompanied youth were far more likely to have entered shelter programs from a doubled-up situation and less likely to have already been homelessness at the time they entered the homelessness services system in 2022.

- Just over 47 percent of unaccompanied youth households were already experiencing homelessness before accessing shelter programs in 2022. About 25 percent of unaccompanied youth were unsheltered prior to entering an emergency shelter, transitional housing, or safe haven program. This is lower than the 57 percent of adult-only households reporting that they had stayed the night prior in another homeless situation.
- More than one-third (34%) of unaccompanied youth households were housed immediately before entering a shelter program. Nearly all of these households entered a shelter program after staying with friends or family (32%). This is nearly double the 17 percent of adult-only households that were staying with friends or family immediately before entering shelter.
- A small share of unaccompanied youth, two percent, entered shelter programs from rented housing, either with or without a subsidy.
- Nearly one in 10 unaccompanied youth households (9%) was in institutional settings prior to staying in a shelter, which does not include foster care. Four percent were in a medical facility, including physical health or physical rehabilitation facilities, mental health facilities, and substance use

**EXHIBIT 4.9: Places Unaccompanied Youth Households Stayed Before Entering Shelter (Under 25)**
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2021 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| Already Homeless | 39.6% | 44.8% | 47.3% | 6,022 | 12.7% | 12,502 | 30.6% |
| Sheltered | 16.0% | 15.7% | 22.5% | 6,281 | 32.9% | 10,999 | 76.6% |
| Unsheltered | 23.7% | 29.0% | 24.9% | -259 | -0.9% | 1,503 | 5.7% |
| Housing | 42.9% | 37.5% | 34.3% | -12,627 | -24.6% | 4,496 | 13.1% |
| Staying with Family | 25.4% | 22.1% | 20.1% | -7,737 | -25.4% | 2,541 | 12.6% |
| Staying with Friends | 14.2% | 13.2% | 11.5% | -4,051 | -23.8% | 886 | 7.3% |
| Rented housing unit without subsidy | 2.7% | 1.6% | 1.9% | -1,092 | -34.0% | 671 | 46.4% |
| Rented housing unit with subsidy | 0.3% | 0.4% | 0.5% | 194 | 50.0% | 192 | 49.2% |
| Owned housing unit | 0.2% | 0.1% | 0.2% | 50 | 22.3% | 147 | 115.7% |
| Permanent supportive housing (PSH) | 0.1% | 0.1% | 0.1% | 9 | 7.5% | 59 | 84.3% |
| Institutional Settings | 9.1% | 8.4% | 8.5% | -1,280 | -11.8% | -11,661 | -54.9% |
| Incarceration | 4.7% | 2.9% | 4.4% | -680 | -12.1% | 2,303 | 88.0% |
| Medical facility | 4.4% | 5.4% | 4.1% | -592 | -11.4% | -348 | -7.0% |
| Long-term care facility | 0.0% | 0.1% | 0.0% | -8 | -23.5% | -28 | -51.9% |
| Other Settings | 4.9% | 5.8% | 5.0% | -243 | -4.1% | 293 | 5.5% |
| Hotel or motel | 2.5% | 3.2% | 2.7% | 103 | 3.5% | 108 | 3.7% |
| Foster care | 2.1% | 2.2% | 2.0% | -243 | -9.9% | 160 | 7.8% |
| Other living arrangement | 0.4% | 0.4% | 0.3% | -103 | -21.1% | 25 | 6.9% |
| Missing | 3.5% | 3.6% | 4.9% | 1,312 | 31.6% | 2,215 | 68.1% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.4.3

DOJ-HUD-AR00989

## ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

rehabilitation programs. Four percent of unaccompanied youth entered shelters from prison or jail. Adult-only households had only slightly higher rates entering shelters from these locations.

- Three percent of unaccompanied youth households stayed in a hotel or motel and two percent were staying in foster care just prior to accessing shelter.

### How Long Did Unaccompanied Youth Households Stay in Shelter?

Unaccompanied youth households who accessed an emergency shelter, transitional housing, or safe haven program at some point during 2022 stayed for shorter periods of time than all adult-only households.

- Thirty-six percent of unaccompanied youth who stayed in shelter programs during 2022 did so for seven days or less. This is higher than the share of all adult-only households who stayed for one week or less (26%). The share of short-term stayers includes households that exited an HMIS-participating shelter for unsheltered situations, permanent housing locations, shelters that do not participate in HMIS, and unaccompanied youth that enrolled in shelter programs during the last week of the reporting period.

- Nearly six in 10 unaccompanied youth, 59 percent, used shelter for one month or less.

- Only four percent of unaccompanied youth stayed in shelter programs for one year or longer. This is half of the share of all adult-only households who stayed in shelter for one year or longer (8%).

### How Did System Engagement Change Over Time?

- The number of youth accessing shelter from other experiences of homelessness was 13 percent higher in 2022 than it was just prior to the pandemic in 2019, and 31 percent higher than it was in 2021. These increases were driven by increases in the number of unaccompanied youth entering shelter from other sheltered situations. Between 2021 and 2022, the number of youth entering shelter after experiencing unsheltered homelessness increased by six percent but was roughly the same number as did so in 2019.

- The share of unaccompanied youth households entering shelter programs from other homeless situations increased between 2019 and 2022, from 40 to 47 percent. The share accessing shelter from another sheltered location increased from 16 percent in 2019 to 23 percent in 2022 and the share accessing shelter from unsheltered locations was about the same (increasing from 24 to 25 percent).

- The number of unaccompanied youth entering shelter programs from

**EXHIBIT 4.10: Length of Stay of Sheltered Unaccompanied Youth Households** 2019-2022



DOJ-HUD-AR00990

## ESTIMATES OF SHELTERED UNACCOMPANIED YOUTH

housed situations was 25 percent lower in 2022 than it was in 2019, but 13 percent higher than it was in 2021, a year entirely affected by the pandemic and the consequent restrictions on the number of beds available to people experiencing homelessness. The *share* of unaccompanied youth accessing shelter from housed situations was lower in 2022 (34%) than it was in both 2019 (43%) and 2021 (38%). This reflects the decreases in the shares of unaccompanied youth going to shelter programs after staying with friends or family.

- Over the longer period, 2019 to 2022, the shares of unaccompanied youth households coming into the shelter system directly from the criminal justice system and foster care remained largely the same. However, after decreasing during the pandemic, the number increased between 2021 and 2022. In 2022, 88 percent more unaccompanied youth, about 2,300 more people, entered shelter directly from the criminal justice system and eight percent more youth entered shelter directly from foster care.

- Higher percentages of unaccompanied youth households stayed in shelter programs for very short periods of time in 2022 than did in 2019 or 2021. In 2022, the share staying in shelter for less than one week was 36 percent compared with 28 percent in 2021 and 32 percent in 2019. The share staying for one year or longer was similar across years, with slightly more staying for longer during the pandemic (6% in 2021 compared to 4% in other years).

DOJ-HUD-AR00991

# 2022
# Estimates of Veterans who Experienced Sheltered Homelessness

Overview of Estimates of Veterans Experiencing Homelessness in the United States ................................................. 5-2

How Did Estimates of Sheltered Veterans Compare to All U.S. Veterans and Veterans in Poverty? ........................... 5-2

Characteristics of Veterans in Adult-only Households Experiencing Sheltered Homelessness in 2022 ................................ 5-3

What Were the Demographic Characteristics of Veterans in Adult-Only Households Experiencing Sheltered Homelessness in 2022? ................................................................................................................................ 5-3

How Did the Demographic Characteristics of Veterans in Adult-Only Households Compare with the Equivalent U.S. Total and U.S. Poverty Populations? ..................................................................................................... 5-4

How Have the Demographic Characteristics of Sheltered Veterans in Adult-Only Households Changed over Time? ........... 5-5

Where Did Adult-only Veteran Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs? ..... 5-5

What Were the other characteristics of Veterans in Adult-Only Households Experiencing Sheltered Homelessness? ......... 5-6

How Have the Additional Characteristics of Adult-only Households Experiencing Sheltered Homelessness Changed over Time? ................................................................................................................................................... 5-6

Engagement of Veteran Adult-only Households with the Homelessness services system ....................................... 5-7

Where Did Veterans in Adult-Only Households Stay Prior to Enrolling in Emergency Shelter, Transitional Housing, or Safe Havens? ............................................................................................................................................... 5-7

How Did the Prior Living Situation of Veteran Households Change over Time? ....................................................... 5-7

How Long did Veteran Adult-Only Households Stay in Shelter? ................................................................................ 5-8

How Has Length of Time in Shelter Programs Changed over Time? ........................................................................ 5-8

DOJ-HUD-AR00992

# Estimates of Veterans who Experienced Sheltered Homelessness
## IN THE UNITED STATES 2022

**57% of veterans experiencing sheltered homelessness were elderly or near elderly (55 and older).**

## Overview of Estimates of Veterans Experiencing Homelessness in the United States

Approximately **85,000 veterans** stayed in an emergency shelter, safe haven, or transitional housing program at some point between October 1, 2021 and September 30, 2022.

- During the 2022 reporting year, 85,234 veterans stayed in shelters, safe havens, or transitional housing programs. Nine percent of people in adult-only sheltered households were veterans.
- Nearly all veterans experiencing homelessness were on their own or without any children present in the household (97%). The characteristics of veterans detailed in the rest of this chapter focus on veterans in adult-only households.
- Between 2019, the pre-pandemic comparison year, and 2022, the number of veterans experiencing sheltered homelessness dropped by 15 percent. This decline among veterans represents a continuation of the decline in experiences of homelessness by veterans that predated the pandemic. Veteran-specific permanent housing and other resources provided during the pandemic likely contributed to the continued decline.
- While remaining below pre-pandemic levels, the number of veterans experiencing sheltered homelessness in adult-only households increased by four percent between 2021 and 2022. This one-year rise in sheltered veterans might reflect the end of pandemic-era assistance programs.

### How Did Estimates of Sheltered Veterans Compare to All U.S. Veterans and Veterans in Poverty?

- One out of every 152 veterans in the United States spent some time in an emergency shelter, transitional housing, or safe haven program during 2022. This does not include veterans who only stayed in unsheltered locations such as outdoors, in vehicles, or in encampments.

### EXHIBIT 5.1: One-Year Estimates of Sheltered Veteran Homelessness
2019, 2021, and 2022

|  | 2019 (baseline) | 2021 (prior year) | 2022 (current year) |
|---|---|---|---|
| Number of Veteran Households | 100,571 | 82,593 | 85,628 |
| Number of Veterans | 100,082 | 82,385 | 85,234 |

| Veterans by Household Type | # | % | # | % | # | % |
|---|---|---|---|---|---|---|
| Veterans in Adult-Only Households | 97,199 | 97.1% | 80,155 | 97.3% | 82,800 | 97.1% |
| Veterans in Families with Children | 3,132 | 3.1% | 2,350 | 2.9% | 2,600 | 3.1% |

Note: Because people can have multiple stays in shelter over the course of a year and stay in different household configurations, a single veteran can be counted in more than one household type. Because of this overlap, the total number of veteran households may be inflated.

### EXHIBIT 5.2: Change in Estimates of Veteran Households
2019-2022

| Characteristic | Change in People 2019-2020 | | Change in Households 2019-2021 | | Change in People 2021-2022 | | Change in Households 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| Staying in Sheltered Programs | -14,848 | -14.8% | -14,943 | -14.9% | 2,849 | 3.5% | 3,036 | 3.7% |
| Living in Poverty | 59,735 | 6.4% | 42,640 | 6.2% | 3,432 | 0.3% | 10,630 | 1.5% |
| In U.S. Population | -1,092,732 | -7.8% | -957,604 | -9.8% | -282,378 | -2.1% | -119,519 | -1.3% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data

DOJ-HUD-AR00993

ESTIMATES OF VETERANS WHO EXPERIENCED SHELTERED HOMELESSNESS IN THE UNITED STATES 2022

- The rate of sheltered homelessness for veterans with incomes below the poverty line is much higher, one of every 12 or nine percent.
- While the number of sheltered veterans in adult only households increased by four percent between 2021 and 2022, the number of all veterans in the U.S. in adult-only households decreased by two percent. Veterans with incomes below the poverty level increased only slightly, by less than one percent.

# Characteristics of Veterans in Adult-only Households Experiencing Sheltered Homelessness in 2022

## What Were the Demographic Characteristics of Veterans in Adult-Only Households Experiencing Sheltered Homelessness in 2022?

- Men accounted for more than nine in ten heads of adult-only households who were veterans (91%). The remaining eight percent of household heads were women, a substantially lower percentage than among heads of all adult-only veteran households living in poverty, 13 percent. Very few veteran household heads identified as either transgender (0.4%) or a gender that is not singularly 'female' or 'male.' (0.1%).
- More than half (56%) of veterans experiencing sheltered homelessness were either near elderly, 55 – 64, or elderly, 65 and older. Very few (2%) were youth aged 18-24, a smaller percentage than all people in adult-only households experiencing homelessness, 11 percent.
- About half of veteran household heads experiencing sheltered homelessness (49%) identified as White and not Hispanic or Latino/a/x, a higher percentage than all heads of adult-only households, 40 percent.
- Just over a third of veteran household heads, 37 percent, identified as Black, African, or African American, slightly more than among all heads of adult-only households

**EXHIBIT 5.3a: Demographic Characteristics of Sheltered Population, U.S. Poverty Population, and Total U.S. Population of Veterans in Adult-Only Households[a]**
By Gender and Age, 2019, 2021, and 2022

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered Veterans | U.S. Veteran Population Living in Poverty | U.S. Veteran Population | Sheltered Veterans | U.S. Veteran Population Living in Poverty | U.S. Veteran Population | Sheltered Veterans | U.S. Veteran Population Living in Poverty | U.S. Veteran Population |
| **Gender of Veteran Heads of Households** | | | | | | | | | |
| Women | 6.8% | 12.7% | 6.9% | 7.7% | 13.5% | 8.0% | 8.2% | 12.8% | 8.4% |
| Men | 92.9% | 87.4% | 93.1% | 91.9% | 86.5% | 92.0% | 91.3% | 87.2% | 91.6% |
| Non-Singular* | 0.0% | | | 0.1% | | | 0.1% | | |
| Questioning | | | | 0.0% | | | 0.0% | | |
| Transgender | 0.2% | | | 0.3% | | | 0.4% | | |
| **Age of All Veterans** | | | | | | | | | |
| 18-24 | 1.4% | 2.1% | 1.1% | 1.6% | 1.9% | 1.2% | 1.7% | 2.1% | 1.2% |
| 25-34 | 10.2% | 8.5% | 4.8% | 9.9% | 8.4% | 4.8% | 9.8% | 7.3% | 4.9% |
| 35-44 | 13.1% | 8.6% | 4.4% | 14.9% | 9.8% | 4.7% | 15.2% | 8.9% | 5.0% |
| 45-54 | 21.1% | 11.7% | 10.6% | 18.7% | 11.4% | 10.6% | 17.0% | 10.6% | 10.0% |
| 55-64 | 39.1% | 25.8% | 19.6% | 35.9% | 23.1% | 20.2% | 34.6% | 22.6% | 20.0% |
| 65 and Older | 15.1% | 43.4% | 59.5% | 19.2% | 45.4% | 58.6% | 21.8% | 48.6% | 58.9% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.5.1

[a]Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b]In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00994

## ESTIMATES OF VETERANS WHO EXPERIENCED SHELTERED HOMELESSNESS IN THE UNITED STATES 2022

(35%).

- The percentages of veterans experiencing sheltered homelessness identifying as Hispanic or Latino/a/x or as White and Hispanic were somewhat lower than the percentages of all adult-only sheltered households identifying as such (9% vs. 21% for Hispanic or Latino/a/x and 6% vs 16% for White Hispanic or Latino/a/x).

- Four percent of veterans in adult-only households experiencing sheltered homelessness were Indigenous in 2022 – three percent were Native American or American Indian and one percent were Native Hawaiian or Pacific Islander.

### How Did the Demographic Characteristics of Veterans in Adult-Only Households Compare with the Equivalent U.S. Total and U.S. Poverty Populations?

- Veterans experiencing sheltered homelessness in adult-only households were younger than the equivalent U.S. Veterans and all U.S. Veterans. In 2022, 12 percent of sheltered veterans were under the age of 35 compared to nine percent of veterans in poverty and six percent of all U.S. veterans in adult-only households.

- In 2022, veterans who identified as Black, African, or African American made up 12 percent of the total U.S. veteran population and 17 percent of veterans with incomes below the poverty line. However, they accounted for more than a third of veteran heads of households experiencing sheltered homelessness (37%).

- In 2022, 13 percent of veterans living in poverty and identifying as Black experienced sheltered homelessness. By comparison, five percent of White veterans with poverty level incomes experienced sheltered homelessness during this time.

- Hispanic or Latino/a/x veteran heads of adult-

**EXHIBIT 5.3b: Demographic Characteristics of Sheltered Population, U.S. Poverty Population, and Total U.S. Population of Veterans in Adult-Only Households[a]**
By Ethnicity and Race, 2019, 2021, and 2022

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sheltered Veterans | U.S. Veteran Population Living in Poverty | U.S. Veteran Population | Sheltered Veterans | U.S. Veteran Population Living in Poverty | U.S. Veteran Population | Sheltered Veterans | U.S. Veteran Population Living in Poverty | U.S. Veteran Population |
| **Ethnicity of Heads of Veteran Households[b]** | | | | | | | | | |
| Hispanic/Latino/a/x | 8.2% | 9.3% | 5.7% | 9.9% | 9.8% | 6.7% | 8.8% | 9.8% | 6.7% |
| Non-Hispanic/Non-Latino/a/x | 91.8% | 90.7% | 94.3% | 90.1% | 90.2% | 93.4% | 91.2% | 90.2% | 93.3% |
| **Race of Heads of Veteran Households** | | | | | | | | | |
| Asian or Asian American | 0.5% | 1.9% | 1.4% | 0.6% | 1.9% | 1.4% | 0.8% | 1.8% | 1.7% |
| Black or African American | 35.3% | 21.1% | 11.2% | 34.8% | 20.1% | 11.7% | 37.2% | 17.3% | 12.1% |
| Multiple Races | 3.5% | 2.9% | 1.8% | 3.4% | 8.4% | 6.4% | 3.6% | 7.6% | 6.4% |
| Native American/American Indian or Alaska Native | 2.4% | 1.7% | 0.8% | 2.1% | 1.3% | 0.6% | 2.6% | 1.2% | 0.7% |
| Native Hawaiian or Pacific Islander | 0.6% | 0.3% | 0.2% | 0.7% | 0.4% | 0.2% | 0.7% | 0.2% | 0.1% |
| White, Hispanic/Latino/a/x[b] | 6.0% | 6.2% | 4.2% | 7.8% | 2.1% | 1.4% | 6.4% | 2.1% | 1.6% |
| White, Non-Hispanic/Non-Latino/a/x | 51.7% | 65.4% | 79.5% | 50.4% | 66.2% | 76.1% | 48.7% | 56.6% | 75.4% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.5.1

[a]Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b]In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR00995

only households accounted for similar shares of sheltered veterans as they did veterans living in poverty (9% and 10%), both slightly higher than their share of all U.S. veterans (7%).

- Native American/American Indian and Alaska Native veterans in adult-only households experiencing sheltered homelessness accounted for a higher share than they did veterans in poverty or all U.S. veterans (3% vs. 1%). Of all Native American veterans living in poverty, fourteen percent stayed in an emergency shelter, transitional housing, or safe haven project at some point during 2022 – the highest rate of veteran poverty of any racial group.
- Heads of veteran adult-only households experiencing sheltered homelessness were as likely to be women as heads of all U.S. veteran households (8%), and less likely than veteran adult-only households in poverty (13%).

### How Have the Demographic Characteristics of Sheltered Veterans in Adult-Only Households Changed over Time?

Overall, the demographic characteristics of sheltered veterans changed very little between 2019 and 2022.

- Between 2019 and 2022, the number of sheltered veterans either decreased or remained nearly unchanged for all age groups except for veterans 65 and older. The *number* of elderly veterans experiencing sheltered homelessness increased by 22 percent. The *share* of veterans experiencing sheltered homelessness who were aged 65 and older also increased from 15 percent in 2019 to 22 percent in 2022.
- In contrast, over the same time period, the number of sheltered veterans between the ages of 55 and 64 declined by 25 percent, and the number of sheltered veterans between 45 to 54 dropped by 32 percent. While this points to the successful provision of housing and income resources targeted to veterans, these resources may not be preventing people from either aging into elderly homelessness or experiencing homelessness for the first time while 65 or older.

### Where Did Adult-only Veteran Households Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?

- In 2022, nearly eight in ten adult-only veteran households experiencing sheltered homelessness accessed an emergency shelter program, transitional housing program, or safe haven in an urban area (77%). This is more than double the share of U.S. veteran adult-only households living in poverty in urban areas (34%) and the share of all U.S. veterans living there (29%).
- By comparison, 40 percent of all U.S. veterans and 33 percent of veterans with incomes below the poverty line were living in suburban areas in 2021, significantly higher than the 17 percent of veterans accessing shelter programs in those areas.
- Sheltered veterans were considerably underrepresented in rural areas. Thirty-three percent of veterans with incomes below the poverty line and 31 percent of all veterans live in rural areas compared with 6 percent of veterans accessing shelters. This underrepresentation of sheltered veterans in rural areas can likely be attributed in some part to limited shelter capacity.



**EXHIBIT 5.4: Percentage of Veterans Experiencing Poverty who also Experienced Sheltered Homelessness**
by Race and Ethnicity, 2022

Data source: Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data



**EXHIBIT 5.5: Geographic Location of Sheltered Homeless Veterans in Adult-Only Households**
2019-2022

Data source: Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data

DOJ-HUD-AR00996

## ESTIMATES OF VETERANS WHO EXPERIENCED SHELTERED HOMELESSNESS IN THE UNITED STATES 2022

- There was little change in the geographic distribution of veteran adult-only households in shelter between 2019 and 2022.

## What Were the Other Characteristics of Veterans in Adult-Only Households Experiencing Sheltered Homelessness?

- In 2022, 24 percent of veterans and other adults in veteran households had chronic patterns of homelessness. Urban areas had the highest rates of veterans in adult-only households with chronic patterns of homelessness (25%) compared to suburban areas (22%) and rural areas (16%).
- More than one of every 10 sheltered veterans in adult-only households (11%) was a survivor of domestic violence, and three percent were *currently* fleeing unsafe situations. It is important to note that these data represent survivors of domestic violence who accessed homeless services that were not operated by victim service providers and should not be considered the full estimate of survivorship among veterans experiencing sheltered homelessness. Across all geographic areas, between two and three percent of veterans in adult-only households were currently fleeing domestic violence.
- Seventy-four percent of veteran household heads had a disability in 2022.

## How Have the Additional Characteristics of Adult-only Households Experiencing Sheltered Homelessness Changed over Time?

- Between 2019 and 2022, the *number* of veterans in adult-only households with chronic patterns of homelessness dropped by three percent. The share of veterans with chronic patterns of homelessness also increased during this period, from 21 percent to 24 percent.
- There was a nine percent decrease in the number of veteran heads of households experiencing homelessness who were survivors of domestic violence between 2019 and 2022.
- Between 2019 and 2022, the number of veteran household heads who were experiencing sheltered homelessness and had a disability dropped by 11 percent. The number of households without a disability fell even more sharply during this period (a decrease of 25%).

### EXHIBIT 5.6: Additional Characteristics of Sheltered Homeless Veterans in Adult-Only Households
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Changes 2019-2021 | | Changes 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| **Chronic Homeless Status of Heads of Veteran Households and Adults** | | | | | | | |
| Chronic Patterns of Homelessness | 20.8% | 25.9% | 23.6% | -689 | -3.4% | -1,189 | -5.7% |
| **Domestic Violence Survivor Status of Heads of Veteran Households and Adults** | | | | | | | |
| DV Survivors | 10.6% | 12.7% | 11.2% | -867 | -8.9% | -905 | -9.3% |
| Not DV Survivors | 88.9% | 86.8% | 88.6% | -11,876 | -14.5% | 3,162 | 4.7% |
| Client Does Not know/Refused | 0.5% | 0.5% | 0.2% | -294 | -64.2% | -230 | -58.4% |
| **Disability Status of Heads of Veteran Households and Adults** | | | | | | | |
| With a disability | 70.8% | 73.2% | 74.1% | -7,694 | -11.4% | 2,223 | 3.8% |
| Without a disability | 29.2% | 26.8% | 25.9% | -6,956 | -24.9% | -256 | -1.2% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.5.2

[a] HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/

[b] Percentages based on people with known domestic violence survivor status and disability status.

[c] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

### EXHIBIT 5.7: Additional Characteristics of Sheltered Homeless Veterans in Adult-Only Households by Geography
2019, 2021, and 2022

| Characteristic | Urban Veterans | | | Suburban Veterans | | | Rural Veterans | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Chronic Patterns of Homelessness | 21.6% | 27.3% | 24.7% | 20.1% | 22.8% | 22.3% | 15.0% | 16.8% | 15.9% |
| Domestic Violence Survivor | 1.8% | 3.0% | 2.7% | 1.6% | 1.5% | 1.6% | 2.0% | 3.2% | 3.7% |

Data source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR00997

Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 218 of 250
PageID #: 3837
Homelessness in the United States

**ESTIMATES OF VETERANS WHO EXPERIENCED SHELTERED HOMELESSNESS IN THE UNITED STATES 2022**

# Engagement of Veteran Adult-only Households with the Homelessness services system

Data collected through the LSA provide information related to the experience of homelessness. This includes where veteran households were staying immediately prior to entering an emergency shelter, transitional housing, or safe haven program and the length of time spent in shelter programs.

## Where Did Veterans in Adult-Only Households Stay Prior to Enrolling in Emergency Shelter, Transitional Housing, or Safe Havens?

- In 2022, 57 percent of veteran adult-only households were already experiencing homelessness prior to their first engagement with a shelter program during the reporting period. Thirty six percent of veteran adult-only households were in unsheltered locations prior to entering a shelter program. Another 21 percent of veteran adult-only households were already staying in a shelter program in another CoC or in a shelter program that did not participate in HMIS.
- About one in five veterans was housed just prior to entering shelter. Thirteen percent of veteran adult-only households were staying with friends or family prior to entering a shelter program. Four percent were living in rented housing without a subsidy, and another two percent were living in rented housing with a subsidy.
- Fifteen percent of veterans in adult-only households accessed shelter from an institutional setting. Most came from medical facilities (11%).
- In general, the prior living situations of veterans in adult-only households reflect those of the broader sheltered adult-only population. The most notable difference is that veterans were somewhat more likely to access shelter from a medical setting (11% vs. 7%) and somewhat less likely to be housed prior to entering shelter (20% vs. 22%).

## How Did the Prior Living Situation of Veteran Households Change over Time?

- Because the number of sheltered veterans declined between 2019 and 2022, the number engaging with the system from most prior living situations also declined. There are a few exceptions: the number of veterans accessing shelter from rented housing with a subsidy increased by 10 percent (171 people), and the number of veterans accessing shelter from a hotel or motel setting increased by eight percent (292 people).

**EXHIBIT 5.8: Places Homeless Veterans in Adult-Only Households Stayed Before Entering Shelter**
2019, 2021, and 2022

| Place Stayed | 2019 % | 2021 % | 2022 % | Change 2019-2022 # | Change 2019-2022 % | Change 2021-2022 # | Change 2021-2022 % |
|---|---|---|---|---|---|---|---|
| **Already Homeless** | | | | | | | |
| Sheltered | 18.8% | 18.5% | 20.7% | -1,178 | -6.4% | 2,316 | 15.6% |
| Unsheltered | 33.9% | 39.7% | 35.9% | -3,240 | -9.8% | -2,103 | -6.6% |
| **Housing** | | | | | | | |
| Staying with Family | 7.3% | 6.1% | 6.0% | -2,172 | -30.5% | 31 | 0.6% |
| Staying with Friends | 6.7% | 6.0% | 6.5% | -1,147 | -17.5% | 611 | 12.7% |
| Rented housing unit without subsidy | 5.9% | 4.0% | 4.4% | -2,152 | -37.2% | 400 | 12.4% |
| Rented housing unit with subsidy | 1.8% | 2.0% | 2.3% | 171 | 9.7% | 325 | 20.2% |
| Owned housing unit | 0.8% | 0.5% | 0.7% | -235 | -29.1% | 137 | 31.4% |
| Permanent supportive housing (PSH) | 0.2% | 0.2% | 0.2% | -75 | -33.5% | 25 | 20.2% |
| **Institutional Settings** | | | | | | | |
| Incarceration | 4.2% | 3.3% | 3.1% | -1,523 | -36.9% | -71 | -2.7% |
| Medical facility | 12.4% | 11.1% | 11.1% | -2,939 | -24.2% | 268 | 3.0% |
| Long-term care facility | 0.2% | 0.3% | 0.3% | 17 | 8.9% | -6 | -2.8% |
| **Other Settings** | | | | | | | |
| Hotel or motel | 3.6% | 4.7% | 4.6% | 292 | 8.2% | 106 | 2.8% |
| Foster care | 0.0% | 0.1% | 0.0% | 22 | 200.0% | -4 | -10.8% |
| Other living arrangement | 0.4% | 0.5% | 0.5% | 27 | 7.7% | 19 | 5.3% |
| Missing | 3.6% | 3.1% | 3.8% | -331 | -9.4% | 703 | 28.3% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.5.3

DOJ-HUD-AR00998

## ESTIMATES OF VETERANS WHO EXPERIENCED SHELTERED HOMELESSNESS IN THE UNITED STATES 2022

- Between 2021 and 2022, the number of veteran adult-only households accessing shelter programs from unsheltered situations declined by seven percent, and the number entering shelter from other shelter programs increased by 16 percent.

### How Long did Veteran Adult-Only Households Stay in Shelter?

Length of time in shelter programs reflects the aggregated amount of time households spent in any emergency shelter, transitional housing, or safe haven programs over the course of the reporting period. Households staying for short periods of time include those households transitioning to permanent housing, remaining in the experience of homelessness but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

- Veterans in adult only households staying in shelter programs were less likely to leave shelter very quickly than all adult-only households. In 2022, 16 percent of sheltered veterans in adult-only households stayed in a shelter, transitional housing, or safe haven program for seven days or less compared with 26 percent of all sheltered adult-only households.
- Of veterans in adult-only households who accessed a shelter program during the 2022 reporting year, nine percent stayed in shelter for more than one year, about the same as the eight percent of all adult-only households that stayed in shelter for more than one year.

### How Has Length of Time in Shelter Programs Changed over Time?

Between 2019 and 2022, lengths of stay in shelter for veterans in adult-only households appeared to fluctuate due to the COVID-19 pandemic. Lengths of stay increased between 2019 and 2021. Lengths of stay then decreased between 2021 and 2022 but remained longer in 2022 than in 2019.

- Between 2019 and 2022, the share of veterans that stayed in shelter programs for seven days or less decreased from 18 percent to 16 percent.
- Between 2019 and 2022, the share of veterans that stayed in shelter programs for six months or less decreased from 82 percent to 76 percent.
- Conversely, between 2019 and 2022, the share of veterans that stayed in shelter programs for more than six months increased from 18 percent to 24 percent.

**EXHIBIT 5.9: Length of Stay of Sheltered Homeless Veterans in Adult-Only Households**
2019-2022



Data source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR00999

# 2022
# People in Adult-Only Households with Chronic Patterns of Homelessness

Overview of Estimates of Chronic Homelessness in the United States ..............................................................6-2

Characteristics of People in Adult-Only Households with Chronic Patterns of Homelessness ....................6-3

What Were the Demographic Characteristics of Sheltered Adult-Only Households with Chronic Patterns of Homelessness in 2022? ...............................................................................................................................6-3

How Have the Characteristics of Adult-only Households with Chronic Patterns of Homelessness Changed over Time? ......6-4

Where Did Adult-only Households Experiencing Chronic Patterns of Homelessness Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?..............................................................................................6-5

How Did the Location of Shelter Stays for Adult-Only Households Experiencing Chronic Patterns of Homelessness Change over Time?............................................................................................................................6-6

Additional Characteristics of Heads of Households and Other Adults .............................................................6-6

What Were the Other Characteristics of Adult-Only Households Experiencing Chronic Patterns of Homelessness? ...........6-6

How Have the Additional Characteristics of Adult-only Households Experiencing Chronic Patterns of Homelessness Changed over Time?...........................................................................................................................6-7

Engagement of Adult-only Households Experiencing Chronic Patterns of Homelessness with the Homelessness Services System ...........................................................................................................................6-8

Where Did Adult-Only Households with Chronic Patterns of Homelessness Stay Prior to Entering Shelters? ........6-8

How Did System Engagement Change over Time?.............................................................................................6-9

How Long did Adult-Only Households Experiencing Chronic Patterns of Homelessness Stay in Shelter?...............6-9

How Has Length of Time in Shelter Programs Changed over Time? ..................................................................6-10

DOJ-HUD-AR01000

# People in Adult-Only Households with Chronic Patterns of Homelessness
## IN 2022

The number of people with chronic patterns of homelessness increased by 26 percent between 2019 and 2022.

## Overview of Estimates of Chronic Homelessness in the United States

Across both adult-only households and families, more than **229,000 adults** who stayed in an emergency shelter, safe haven, or transitional housing program[1] at any point from October 1, 2021, through September 30, 2022, had chronic patterns of homelessness. This does not include people currently in RRH or PSH with chronic patterns of homelessness who enrolled in those programs prior to the reporting period. A chronic pattern of homelessness means the person has a disability[2] and has been homeless for at least one year within the past three years.[3] Within the population of people with patterns of chronic homelessness, nearly all (95%) were people in adult-only households. **This chapter focuses explicitly on the 218,754 people in adult-only households with chronic patterns of homelessness.** In this chapter, comparisons are made between different reporting years as well as between the adult-only chronically homeless population and the general adult-only population.

- In 2022, 218,754 people in adult-only households who stayed in an emergency shelter, safe haven, or transitional housing program at any point from October 1, 2021, through September 30, 2022, had chronic patterns of homelessness.
- Roughly a quarter of people in adult-only households had a chronic pattern of homelessness (24%).
- The number of people in adult-only households with chronic patterns of homelessness increased by 26 percent between 2019 and 2022, from 173,588 to 218,754, reflecting the general increase in the vulnerability of the population served during the pandemic.
- Between 2021 and 2022, the number of people in adult-only households with chronic patterns of homelessness decreased by five percent (or by about 12,000 people). This decrease could be attributed to increased funding during the pandemic through 2021 that focused on getting people housed quickly with needed stabilization services and possibly to easing of the housing market disruptions associated with the pandemic. However, even with this decrease in 2021, the total number of people

### EXHIBIT 6.1: One-Year Estimates of Sheltered Adult-Only Households with Chronic Patterns of Homelessness
2019, 2021, and 2022

|  | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2021 | |
|---|---|---|---|---|---|---|---|
|  | # | # | # | # | % | # | % |
| People in Adult-Only Households with Chronic Patterns of Homelessness | 173,588 | 230,370 | 218,754 | 45,165 | 26.0% | -11,616 | -5.0% |
| Households with Chronic Patterns of Homelessness | 173,179 | 228,828 | 217,604 | 44,425 | 25.7% | -11,225 | -4.9% |

Data source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 6.2: Changes in Chronic Patterns of Homelessness among Adult-Only Households
2019- 2022



■ Change in People    ■ Change in Households

---

1  The federal government defines these three program types as sheltered homelessness. People using rapid re-housing or permanent supportive housing programs have left homelessness for permanent housing.

2  Based on HUD's definition of disability, not the Social Security Administration (SSA). HUD's definition of disability is someone who has a physical or mental impairment that substantially limits one or more major life activities.

3  The criteria for at least one year of homelessness can be met either continuously or by at least four episodes of homelessness totaling a year or more. The three-year timeframe over which this length of time is evaluated varies for each person, as it begins three years prior to the person's last date active during the 2022 reporting year. Time spent in an emergency shelter, safe haven, or an unsheltered location counts towards chronic homelessness. Time spent in a transitional housing program or a permanent housing program does not count.

DOJ-HUD-AR01001

PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

in adult-only households with chronic patterns of homelessness remained well above 2019 pre-pandemic levels as of 2022.

# Characteristics of People in Adult-Only Households with Chronic Patterns of Homelessness

## What Were the Demographic Characteristics of Sheltered Adult-Only Households with Chronic Patterns of Homelessness in 2022?

- The gender characteristics of people with chronic patterns of homelessness are similar to those of all adult-only households. Just under seven in ten heads of adult-only households experiencing chronic homelessness were men (68%), and 31 percent were women. People who identified as transgender, gender non-binary, or gender questioning made up one percent of heads in adult-only households with chronic patterns of homelessness, the same as their share of all adult-only households.

- People experiencing chronic patterns of homelessness were generally older than the general population of sheltered adult-only households. Of those experiencing chronic homelessness in adult-only households, fifty-nine percent were over 44 years old compared to forty-six percent among all sheltered adult-only households. Adults who were elderly or near elderly (55 or older) made up a larger share of the population of adult-only households with chronic patterns of homelessness compared to their share among all sheltered people in adult-only households (36% versus 27%).

- Older people in sheltered adult-only households were more likely to have chronic patterns of homelessness. In 2022, almost one-third of the near-elderly population (age 55 to 64) in sheltered adult-only households had chronic patterns of homelessness (32%). Thirty percent of people 65 years of age and older in adult-only households had chronic patterns of homelessness.

- At the other end of the age spectrum for adults, the percentage of youth (between 18 and 24) among people in adult-only households with chronic patterns of homelessness was half that of all people in adult-only households using shelters (5% versus 11%). Slightly more than one of every 10 people in adult-only households had a chronic pattern of homelessness (11%).

EXHIBIT 6.3a: Demographic Characteristics of People in Adult-Only Sheltered Households with Chronic Patterns of Homelessness[a]
By Gender and Age, 2019-2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Sheltered Adults in AO Households with Chronic Patterns of Homelessness | All Sheltered Adults in AO Households | Sheltered Adults in AO Households with Chronic Patterns of Homelessness | All Sheltered Adults in AO Households | Sheltered Adults in AO Households with Chronic Patterns of Homelessness | All Sheltered Adults in AO Households |
| **Gender of Heads of Households** | | | | | | |
| Women | 28.6% | 30.5% | 31.7% | 31.3% | 30.7% | 31.9% |
| Men | 70.9% | 69.1% | 67.5% | 67.9% | 68.2% | 67.2% |
| Gender Non-Singular* | 0.1% | 0.1% | 0.2% | 0.2% | 0.3% | 0.3% |
| Gender Questioning | | | 0.0% | 0.0% | 0.1% | 0.0% |
| Transgender | 0.5% | 0.4% | 0.6% | 0.6% | 0.7% | 0.6% |
| **Age of All People in the Household** | | | | | | |
| 18-24 | 5.7% | 11.0% | 5.1% | 9.6% | 5.0% | 11.0% |
| 25-34 | 15.1% | 20.6% | 14.7% | 19.3% | 15.1% | 21.0% |
| 35-44 | 19.7% | 20.6% | 20.3% | 21.2% | 21.0% | 21.5% |
| 45-54 | 26.6% | 22.6% | 24.1% | 21.1% | 23.3% | 19.4% |
| 55-64 | 26.3% | 19.7% | 27.0% | 21.3% | 25.9% | 19.5% |
| 65 and older | 6.7% | 5.5% | 8.7% | 7.4% | 9.7% | 7.6% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.6.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01002

## PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

- In 2022, people who identified as Hispanic or Latino/a/x of any race made up 17 percent of all chronically homeless individuals in adult-only households, while they made up 21 percent the general adult-only population. Of all people in adult-only households who identified as Hispanic or Latino/a/x, 20 percent had chronic patterns of homelessness. This is the same as in 2019, just before the pandemic.
- People who identified as Black, African, or African American were slightly underrepresented among people experiencing chronic homelessness compared to the entire sheltered adult-only population (32% versus 35%). Nearly one-quarter of Black heads of adult-only households had chronic patterns of homelessness (23%).
- People identifying as belonging to more than one racial group were about 6 percent of all chronically homeless individuals in adult-only households. One-third of all heads of adult-only households (35%) who identified as belonging to more than one racial group had chronic patterns of homelessness. This is significantly higher than the rate of chronic homelessness among all adult-only households and the highest among all racial groups.
- More than one-quarter of heads of adult-only households staying in shelter identified as White, Non-Hispanic/non-Latino/a/x (26%) had chronic patterns of homelessness.
- Five percent of adult-only households with chronic patterns of homelessness were Native American or Alaska Native. One-third (34%) of all Native American heads of sheltered adult-only households had chronic patterns of homelessness, higher than the share of all people in sheltered adult-only households (24%).
- The rate of chronic homelessness among Native Hawaiians or Pacific Islanders in adult-only households was slightly lower than that of all adult-only households (22% versus 24%).
- Asian or Asian Americans accounted for a similar share of chronically homeless adult-only households as they did all adult-only households (1%). The rate of chronic homelessness among Asian and Asian Americans was 26 percent, slightly higher than that of all adult-only households (24%).

### How Have the Characteristics of Adult-only Households with Chronic Patterns of Homelessness Changed over Time?

Across demographic categories for gender, age, and race/ethnicity, rates of chronic homelessness in 2022 were higher than 2019 pre-pandemic rates but lower than rates seen in 2021.

**EXHIBIT 6.3b: Demographic Characteristics of People in Adult-Only Sheltered Households with Chronic Patterns of Homelessness[a]**
By Ethnicity and Race, 2019-2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Sheltered Adults in AO Households with Chronic Patterns of Homelessness | All Sheltered Adults in AO Households | Sheltered Adults in AO Households with Chronic Patterns of Homelessness | All Sheltered Adults in AO Households | Sheltered Adults in AO Households with Chronic Patterns of Homelessness | All Sheltered Adults in AO Households |
| **Ethnicity of Chronically Homeless Heads of Households[b]** | | | | | | |
| Hispanic/Latino/a/x | 14.8% | 14.2% | 18.2% | 18.2% | 17.2% | 21.2% |
| Non-Hispanic/Non-Latino/a/x | 85.3% | 85.8% | 81.8% | 81.8% | 82.8% | 78.8% |
| **Race of Chronically Homeless Heads of Households** | | | | | | |
| Asian or Asian American | 0.7% | 0.7% | 1.1% | 1.1% | 1.2% | 1.1% |
| Black or African American | 35.3% | 38.7% | 34.4% | 37.3% | 32.2% | 34.9% |
| Multiple Races | 4.5% | 3.3% | 4.7% | 3.6% | 5.7% | 3.9% |
| Native American/ American Indian or Alaska Native | 3.6% | 3.2% | 3.3% | 2.9% | 4.6% | 3.3% |
| Native Hawaiian or Pacific Islander | 0.8% | 0.9% | 0.7% | 0.9% | 0.8% | 1.0% |
| White, Hispanic/Latino/a/x[b] | 10.9% | 9.8% | 14.1% | 13.5% | 12.6% | 16.2% |
| White, Non-Hispanic/Non-Latino/a/x | 44.3% | 43.5% | 41.6% | 40.5% | 42.9% | 39.6% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data. Raw data available in Appendix A.6.1

[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards.

[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01003

## PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

- The share of heads of adult-only households with chronic patterns of homelessness who identified as Hispanic (inclusive of any race) increased from 15 to 17 percent between 2019 and 2022. The number of sheltered adult-only households with chronic patterns of homelessness who identified as Hispanic increased by almost 12,000 people or 47 percent.
- The share of women with chronic patterns of homelessness in the adult-only population was higher in 2022 (31%) than it was in 2019 (29%). The number of sheltered women in adult-only households with chronic patterns of homelessness increased by about 17,000 people or 35 percent.
- The elderly population (65 and older) with chronic patterns of homelessness continues to steadily grow comprising 10 percent of all persons in adult only households in 2022 compared to 9 percent in 2021 and 7 percent in 2019. The number of sheltered heads of adult-only households with chronic patterns of homelessness increased by almost 10,000 people or 83 percent.
- The share of people in sheltered adult-only households with chronic patterns of homelessness who identified as Native American, American Indian, or Alaska Native increased from four to five percent. The number of Native Americans experiencing chronic homelessness increased by 59 percent (3,600 people) during the same time period.
- The share of adult-only household heads who identified as Hispanic or Latino/a/x declined slightly between 2021 and 2022, from 18 to 17 percent. The number, too, decreased by about 4,000 people or 10 percent. Both the share and the number remain above 2019 levels.
- After remaining relatively consistent between 2019 and 2021, the share of sheltered adults with chronic patterns of homelessness who identified Native American, American Indian, or Alaska Native increased from three percent to five percent between 2021 and 2022. The number who identified as Native American increased by 30 percent or about 2,300 people.
- The share of elderly sheltered adults among those with chronic patterns of homelessness has steadily increased over time and between 2021 and 2022 increased from nine to 10 percent of all sheltered people in adult-only households experiencing chronic homelessness. The number increased by six percent.
- The share of women among the population of sheltered adult-only households with chronic patterns of homelessness decreased slightly from 2021 to 2022 – from 32 percent to 31 percent but remained above 2019 levels.

### Where Did Adult-only Households Experiencing Chronic Patterns of Homelessness Access Emergency Shelter, Transitional Housing, or Safe Haven Programs?

- Eight in ten sheltered adult-only households with chronic patterns of homelessness were in urban areas (80%), slightly higher than the share of all adult-only households experiencing sheltered homelessness (78%).
- Suburban areas accounted for approximately 15 percent of the chronically homeless population, roughly the same as for all adult-only households using shelters (14%).



**EXHIBIT 6.4: Rates of Chronic Homelessness among Adult-Only Sheltered Households by Race and Ethnicity**
2022

| | |
|---|---|
| Multiracial | 35.4 |
| Native American/American Indian or Alaska Native | 33.8 |
| White (single race), Non-Hispanic/Non-Latino/a/x | 26.4 |
| Asian or Asian American | 26.2 |
| All Adults in Adult-only Households | 23.7 |
| Black or African American | 22.5 |
| Native Hawaiian or Pacific Islander | 21.7 |
| Hispanic/Latino/a/x | 19.7 |

0%                                    40%



**EXHIBIT 6.5: Rates of Chronic Homelessness among Adult-Only Sheltered Households by Age**
2022

| | |
|---|---|
| 18-24 | 10.7 |
| 25-34 | 17.1 |
| 35-44 | 23.2 |
| 45-54 | 28.5 |
| 55-64 | 31.5 |
| 65 and Older | 30.3 |

0%                                    35%

DOJ-HUD-AR01004

## PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

- Rural areas accounted for a smaller share of adult-only households experiencing chronic homelessness compared to all sheltered adult-only households (5% versus 7%). However, because these data are based on the use of emergency shelter, transitional housing, or safe havens, many dimensions of rural homelessness, including chronic patterns, may be missed. Rural areas often have fewer shelter programs, possibly driving people to stay outside, in their cars, or in abandoned buildings—that is, to experience unsheltered homelessness. In addition, other forms of housing instability such as doubling up may be more common in rural areas.

### How Did the Location of Shelter Stays for Adult-Only Households Experiencing Chronic Patterns of Homelessness Change over Time?

- The geographic distribution of adult-only sheltered households with chronic patterns of homelessness changed only slightly between 2019 and 2022. The share of adult-only households experiencing chronic homelessness located in suburban areas increased slightly, from 13 percent in 2019, to 14 percent in 2021, and to 15 percent in 2022.
- The share in rural areas changed only slightly, from six percent in 2019 to five percent in 2022.
- Urban areas continued to account for the largest share of adult-only households experiencing chronic homelessness, remaining stable across 2019, 2021, and 2022.

# Additional Characteristics of Heads of Households and Other Adults

### What Were the Other Characteristics of Adult-Only Households Experiencing Chronic Patterns of Homelessness?

- In 2022, nine percent of chronically homeless heads of households in adult-only households were veterans. The percentage of all chronically homeless heads of households in adult-only households that were veterans ranged from eight to nine percent across urban, suburban, and rural geographic areas.
- Survivors of domestic violence made up 28 percent of sheltered heads of households in adult-only households experiencing chronic homelessness in 2022. This is considerably higher than the share of all heads of adult-only households who were survivors of domestic



**EXHIBIT 6.6: Geographic Location of Sheltered Adult-Only Households with Chronic Patterns of Homelessness**
2019-2022

| | URBAN | SUBURBAN | RURAL |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **CHRONICALLY HOMELESS ADULT-ONLY HOUSEHOLDS** 2019 | 81.2 | 13.3 | 5.5 |
| 2021 | 82.4 | 13.7 | 3.9 |
| 2022 | 80.1 | 15.4 | 4.5 |
| **ALL SHELTERED ADULT-ONLY HOUSEHOLDS** 2019 | 77.5 | 13.6 | 8.9 |
| 2021 | 79.0 | 14.4 | 6.6 |
| 2022 | 78.4 | 14.3 | 7.3 |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.6.2

ªHUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/

**EXHIBIT 6.7: Additional Characteristics of Sheltered Adult-Only Households with Chronic Patterns of Homelessness**
2019-2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | # | % | # | # | % | # | % |
| **Veteran Status of Chronically Homeless Heads of Households** | | | | | | | |
| Veteran | 11.8% | 9.1% | 9.0% | -721 | -3.6% | -1,156 | -5.6% |
| Non-Veteran | 87.8% | 90.4% | 90.4% | 44,270 | 29.3% | -9,788 | -4.8% |
| **Domestic Violence Survivor Status of Chronically Homeless Heads of Households** | | | | | | | |
| DV Survivors | 25.1% | 28.6% | 28.3% | 17,199 | 41.1% | -4,124 | -6.5% |
| Not DV Survivors | 74.7% | 71.2% | 71.4% | 24,410 | 19.6% | -8,220 | -5.2% |
| Client Doesn't Know/Refused | 0.2% | 0.2% | 0.3% | 160 | 41.7% | 3 | 0.5% |

Data source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.6.3

DOJ-HUD-AR01005

## PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

violence (18%). It is important to note that these data represents survivors of domestic violence who accessed homeless services that were not operated by victim service providers and should not be considered the full estimate of survivorship among people experiencing chronic homelessness who accessed the sheltered system.

- Given the way data were reported for the 2022 reporting year, it is not possible to understand the percentage of adults in each geographic category who are survivors of domestic violence – regardless of fleeing status. However, data are available on the share of people *currently fleeing* domestic violence by geography. Rural and urban areas had the same rate of chronically homeless people currently fleeing unsafe situations (8%) which is slightly higher than in suburban areas (7%).

### How Have the Additional Characteristics of Adult-only Households Experiencing Chronic Patterns of Homelessness Changed over Time?

- Between 2019 and 2022, the share of people in adult-only households with chronic patterns of homelessness who were veterans decreased from 12 percent to nine percent. Also, the overall number of chronically homeless adults who were veterans decreased by 721 people over the same period. This decrease could possibly be attributed to the long-term commitment to community and national-level initiatives focused on housing veterans experiencing homelessness.

- The percentage of chronically homeless adults who were veterans declined across geographic categories, with the largest drop occurring in suburban areas (13% in 2019 to 9% in 2022). There were also 1,641 fewer chronically homeless veterans in urban areas in 2022 compared to 2021.

- Compared with 2019, the year prior to the pandemic, in 2022 the number of chronically homeless individuals who were survivors of domestic violence was 41 percent higher. The *share* of heads of adult-only households with chronic patterns of homelessness that were survivors of domestic violence also increased, from 25 percent to 28 percent.

- The percentage of chronically homeless adults who were survivors of domestic violence increased across all geographic categories, with the largest increase occurring in urban areas (6% in 2019 to 8% in 2022). These percentages also remained consistent between 2021 and 2022.

### EXHIBIT 6.8: Additional Characteristics of Chronically Homeless Adult-Only Households by Geography
2019-2022

| | Urban Households | | | Suburban Households | | | Rural Households | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Veteran | 11.7% | 9.2% | 9.0% | 12.8% | 8.8% | 9.4% | 10.5% | 8.3% | 8.4% |
| Domestic Violence Survivor | 6.2% | 7.6% | 8.0% | 5.0% | 6.2% | 6.7% | 8.3% | 9.4% | 8.3% |

Data source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.6.4

### EXHIBIT 6.9: Places Chronically Homeless Households Stayed Before Entering Shelter
2019-2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| Experienced Homelessness | 73.7% | 78.9% | 77.0% | | | | |
| Sheltered | 22.5% | 20.4% | 24.1% | 13,511 | 34.7% | 5,792 | 12.4% |
| Unsheltered | 51.2% | 58.5% | 52.9% | 26,455 | 29.8% | -18,683 | -14.0% |
| Housing | 12.9% | 9.6% | 10.1% | | | | |
| Staying with Family | 4.8% | 3.3% | 3.4% | -890 | -10.8% | -208 | -2.7% |
| Staying with Friends | 5.2% | 4.1% | 4.4% | 548 | 6.0% | 155 | 1.6% |
| Rented housing unit without subsidy | 2.1% | 1.4% | 1.4% | -635 | -17.4% | -85 | -2.7% |
| Rented housing unit with subsidy | 0.4% | 0.5% | 0.6% | 662 | 94.3% | 256 | 23.1% |
| Owned housing unit | 0.2% | 0.1% | 0.1% | -84 | -22.5% | 1 | 0.3% |
| Permanent supportive housing (PSH) | 0.2% | 0.2% | 0.2% | 19 | 5.4% | -87 | -19.1% |
| Institutional Settings | 10.1% | 7.5% | 8.3% | | | | |
| Incarceration | 3.0% | 1.6% | 2.0% | -700 | -13.7% | 796 | 22.0% |
| Medical facility | 7.0% | 5.8% | 6.1% | 1,071 | 8.8% | -65 | -0.5% |
| Long-term care facility | 0.1% | 0.1% | 0.2% | 113 | 54.6% | 10 | 3.2% |
| Other Settings | 2.0% | 2.2% | 2.4% | | | | |
| Hotel or motel | 1.8% | 2.0% | 2.1% | 1,439 | 46.8% | -151 | -3.2% |
| Foster care | 0.1% | 0.0% | 0.1% | 30 | 31.3% | 75 | 147.1% |
| Other living arrangement | 0.2% | 0.2% | 0.2% | 144 | 41.0% | 145 | 41.4% |
| Missing | 1.3% | 1.8% | 2.3% | 2,743 | 124.9% | 824 | 20.0% |

Data source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.6.5

DOJ-HUD-AR01006

PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

# Engagement of Adult-only Households Experiencing Chronic Patterns of Homelessness with the Homelessness Services System

Data collected through the LSA provides information related to the experience of homelessness. This section also provides information on where people were staying immediately before entering an emergency shelter, transitional housing, or safe haven program.

Length of time in shelter programs reflects the aggregated amount of time households spent in any emergency shelter, transitional housing, or safe haven programs over the course of the reporting period. Households staying for short periods of time includes those households transitioning to permanent housing, remaining in the experience of homelessness but leaving the program for an unsheltered situation or a program that does not participate in HMIS, and those that entered the homelessness services system during the last week of the reporting period.

## Where Did Adult-Only Households with Chronic Patterns of Homelessness Stay Prior to Entering Shelters?

- Nearly eight of every ten adult-only households experiencing chronic homelessness in 2022 (77%) had been experiencing homelessness directly before entering shelter programs. This is higher than the share among all sheltered adult-only households, where 57 percent had stayed in either sheltered or unsheltered locations.
- Among all adult-only households experiencing chronic homelessness, 53 percent were staying in unsheltered situations prior to entering a shelter, and 24 percent had been staying in an emergency shelter, transitional housing, or safe haven program. Those with a prior living situation of another sheltered location include those who transitioned from a shelter program not participating in HMIS or in a shelter program located in a different CoC.
- Ten percent of adult-only households experiencing chronic homelessness were staying in a housed situation prior to entering a shelter program: eight percent were doubled up with friends or family, one percent were staying in rented housing without a subsidy, and the remaining one percent were staying in subsidized or supportive housing.
- About eight percent of adult only households with chronic patterns of homelessness stayed in an institutional setting prior to accessing shelter.



EXHIBIT 6.10: Length of Stay of Sheltered Chronically Homeless Adult-Only Households
2019-2022

Data source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01007

## PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

Within this group, most (6%) were in a medical facility, including physical health or physical rehabilitation facilities, mental health facilities, and substance use rehabilitation programs. Two percent entered shelters directly from the criminal justice system.

- Two percent of adult-only households experiencing chronic homelessness stayed in hotels or motels that they paid for on their own prior to entering shelter programs.

### How Did System Engagement Change over Time?

- The number of adult-only households with chronic patterns of homelessness that had been experiencing homelessness before entering a shelter program increased by 31 percent or almost 40,000 people between 2019 and 2022. This emphasizes the challenges of leaving homelessness both during and after the pandemic.
- More recently, between 2021 and 2022, 18,683 fewer people with chronic patterns of homelessness were unsheltered just before they entered a shelter program. In the same period, 5,792 more people entered shelter from another sheltered location.
- Perhaps the strongest indication of the concentrated efforts to engage and shelter populations highly susceptible to severe illness during the COVID-19 public health emergency is the significant increase in the number of adult-only households with chronic patterns of homelessness that entered shelter from an unsheltered situation between 2019 and 2022. During that three-year period, the number of households going from an unsheltered situation to a shelter program increased by 30 or 26,455 people.
- The number of adult-only households with chronic patterns of homelessness that entered shelter programs from medical facilities or long-term care facilities increased between 2019 and 2022, possibly reflecting use of non-congregate shelter programs to keep people safer than they would have been in institutions. Though the number of adult-only households with chronic patterns of homelessness that entered the shelter system directly from the criminal justice system was lower in 2022 than it was in 2019, there was a slight increase of 796 people when compared to 2021.
- Between 2019 and 2022, the number of adult-only households with chronic patterns of homelessness that entered the shelter system from a hotel or motel that the household paid for on their own increased by 1,439 people.

### How Long did Adult-Only Households Experiencing Chronic Patterns of Homelessness Stay in Shelter?

- In 2022, a little more than half of all adult-only households with chronic patterns of homelessness stayed in shelter for three months or less (54%).
- Compared to the general population of sheltered people in adult-only households, chronically homeless adult-only households tended to stay in shelter longer. Fifteen percent of all adult-only households with chronic patterns of homelessness stayed in shelter for six months to a year (181 to 365 days). This is higher than the share of all adult-only households (10%). Together, 30 percent of adult-only households with chronic patterns of homelessness stayed in shelter for 181 days or more compared to 19 percent of all adult-only households.
- Of people who accessed a shelter program during the 2022 reporting year, about 15 percent

DOJ-HUD-AR01008

## PEOPLE IN ADULT-ONLY HOUSEHOLDS WITH CHRONIC PATTERNS OF HOMELESSNESS IN 2022

of adult-only households experiencing chronic homelessness had stayed in shelter for one year or longer compared to the nine percent seen in the general population of sheltered people in adult-inly households.

### How Has Length of Time in Shelter Programs Changed over Time?

Between 2019 and 2022, a higher share of adult-only households experiencing chronic homelessness stayed in shelter programs for longer lengths of time. This could reflect a combination of an increased difficulty in leaving the experience of homelessness during the pandemic, the effects of the pandemic on case management staff and others that support the transition from homelessness to permanent housing, and the reduction in the number of units available and affordable to people leaving the experience of homelessness and the programs supporting them.

- In 2019, 17 percent of adult-only households experiencing chronic homelessness stayed in shelter for seven days or less. This decreased to 13 percent in 2021 but increased to 15 percent in 2022.
- When looking at long-term shelter stays, 15 percent of adult-only households experiencing chronic homelessness had stayed in shelter programs for one year or longer in 2022, compared with 14 percent in 2021 and nine percent in 2019.

DOJ-HUD-AR01009

# 2022
# Estimates of Households Using Rapid Rehousing Subsidies

Overview of Estimates of People and Households Using Rapid Rehousing Subsidies ................................................... 7-2

Characteristics of People Living in Housing Supported by Rapid Rehousing Programs .............................................. 7-3

What Were the Demographic Characteristics of Households Using RRH Subsidies?................................................. 7-3

How Did the Demographic Characteristics Change over Time? ............................................................................... 7-4

Where Did Households Using RRH Subsidies Live?................................................................................................. 7-4

What Were the Other Characteristics of Housings Using RRH Subsidies in 2022? .................................................. 7-5

How Did the Other Characteristics Change over Time? .......................................................................................... 7-5

Engagement of Households Using RRH ..................................................................................................................... 7-6

How Did Length of RRH Subsidy Use Change over Time? ...................................................................................... 7-7

What Was the Exit Location of Households after RRH Assistance Ended?............................................................... 7-7

How Did the Location after RRH Assistance Ended Change over Time? .................................................................. 7-8

Supportive Services for Veterans and their Families (SSVF)....................................................................................... 7-10

# Estimates of Households Using Rapid Rehousing Subsidies

148,000 households lived in housing supported by rapid rehousing subsidies in 2022, a 16 percent increase over 2019.

## Overview of Estimates of People and Households Using Rapid Rehousing Subsidies

Approximately **257,000 people in 148,000 households lived in housing supported by Rapid Re-housing (RRH) subsidies** at some point between October 1, 2021, and September 30, 2022. RRH programs help people leave the experience of homelessness by providing time-limited rent subsidies in permanent housing. RRH also provides case management that may continue after the household has moved into the permanent housing unit supported by the rent subsidy. Communities, and often individual programs within communities, decide the duration of the rent subsidy, how the subsidy amount is determined, and the focus of the case management. Sometimes the subsidy is only a one-time cash payment—for example, to cover move-in costs and first and last-month's rent--and sometimes it continues for many months. When the rent subsidy ends, the household may be able to stay in the housing unit and pay rent from its earnings or other resources.

Data presented in this chapter are limited to people who are living in rental housing with the assistance of rapid rehousing funding. Households that are enrolled in rapid rehousing but have not yet moved into a unit are excluded from this analysis.

- An estimated 256,653 people in 147,468 households were participating in a RRH program and using its rent subsidies at some time between October 1, 2021, and September 30, 2022.
- One out of every 119 households with incomes below the poverty line who also experienced homelessness used RRH to subsidize their housing at some point in 2022.
- More than half – 56 percent – of people that used RRH in 2022 were in families with children. Forty-four percent were people in adult-only households.
- The number of households using RRH programs increased by 16 percent between 2019 – the year just prior to the onset of the pandemic – and 2022. Much of this increase occurred between

### EXHIBIT 7.1: One-Year Estimates of People Using Rapid Re-Housing Subsidies
2019-2022

| | 2019 | | 2021 | | 2022 | | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | | # | | # | | # | % | # | % |
| Households in RRH programs | 127,058 | | 129,416 | | 147,468 | | 20,411 | 16.1% | 18,052 | 14.0% |
| People in RRH Programs | 260,718 | | 236,934 | | 256,653 | | -4,066 | -1.6% | 19,718 | 8.3% |
| **People in RRH by Household Type** | | | | | | | | | | |
| | # | % | # | % | # | % | # | % | # | % |
| People in Adult-Only Households | 83,651 | 32.1% | 94,597 | 39.9% | 112,549 | 43.9% | 28,898 | 34.6% | 17,952 | 19.0% |
| People in Family Households | 176,558 | 67.7% | 141,754 | 59.8% | 143,507 | 55.9% | -33,051 | -18.7% | 1,753 | 1.2% |

Data Source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 7.2: Change in Estimates of Homelessness, Users of Rapid Re-Housing Subsidies, Households in Poverty, and All U.S. Households
2019, 2021, and 2022

| Population | Change in People 2019-2021 | | Change in Households 2019-2021 | | Change in People 2021-2022 | | Change in Households 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| Staying in Shelter Programs | -67,774 | -4.7% | -35,758 | -3.2% | 174,893 | 14.4% | 127,938 | 13.6% |
| **Using Rapid Re-Housing** | **-4,066** | **-1.6%** | **20,411** | **16.1%** | **19,718** | **8.3%** | **18,052** | **14.0%** |
| Living in Poverty | 1,378,813 | 3.5% | 1,687,562 | 10.7% | -628,909 | -1.5% | 412,080 | 2.4% |
| In U.S. Population | 5,048,039 | 1.5% | 7,135,276 | 5.5% | 1,393,817 | 0.4% | 2,718,074 | 2.0% |

Data Source: Homeless Management Information Systems (HMIS) data; U.S. Census Bureau's American Community Survey (ACS) PUMS 1-year data.

DOJ-HUD-AR01011

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

2021 and 2022, a year that saw a 14 percent rise in households using RRH.

- The increase was driven entirely by people in adult-only households using rapid rehousing subsidies, which rose by 35 percent between 2019 and 2022 and by 19 percent between 2021 and 2022. People in families with children partially offset this rise, decreasing by 19 percent over the longer period.
- The *share* of adult-only households in the RRH program rose from 32 percent in 2019 to 44 percent in 2022.
- Consistent with the greater emphasis on adult-only households in the RRH program, while the number of households using RRH subsidies increased between 2019 and 2022, the number of *people* in households decreased slightly, by two percent, between 2019 and 2022.

# Characteristics of People Living in Housing Supported by Rapid Re-housing Programs

## What Were the Demographic Characteristics of Households Using RRH Subsidies?

- Compared with the sheltered population, more heads of households using RRH to subsidize their permanent housing in 2022 were women (51% compared to 39%).
- Reflecting the higher share of family households among those using RRH subsidies compared with people staying in shelters, a higher share of people in households using RRH were under 18 (35% vs. 21% for people in shelters).
- A smaller share of households using RRH subsidies were Hispanic/Latino/a/x (15%) than the share of people staying in sheltered locations (23%) in 2022.
- The share of Black, African or African American heads of households using RRH rent subsidies in 2022 was slightly higher (42%) than their share of households using shelters (37%).
- Despite the historically heavy use of RRH by families and the greater number of people receiving RRH rent subsidies in 2022, almost two-thirds of households using RRH (65%) consisted of just one person.
- Households with both adults and children using RRH rent subsidies were similar in composition to households with children

**EXHIBIT 7.3a: Demographic Characteristics of Households Using Rapid Re-Housing and Experiencing Sheltered Homelessness[a]**
By Gender and Age, 2019, 2021, and 2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Using Rapid Re-Housing Subsidies | Staying in Shelters | Using Rapid Re-Housing Subsidies | Staying in Shelters | Using Rapid Re-Housing Subsidies | Staying in Shelters |
| **Gender of Heads of Households** | | | | | | |
| Woman (or Girl) | 53.7% | 38.9% | 51.5% | 38.7% | 51.0% | 39.2% |
| Man (or Boy) | 45.8% | 60.7% | 47.8% | 60.6% | 48.2% | 60.0% |
| Non-Singular* | 0.1% | 0.1% | 0.2% | 0.2% | 0.3% | 0.3% |
| Questioning | | | 0.0% | 0.0% | 0.0% | 0.1% |
| Transgender | 0.4% | 0.3% | 0.5% | 0.6% | 0.5% | 0.5% |
| **Age of All People in the Household** | | | | | | |
| Less than 18 | 42.3% | 22.7% | 36.8% | 20.6% | 34.5% | 20.7% |
| 18-24 | 8.0% | 9.7% | 9.6% | 8.8% | 9.3% | 9.7% |
| 25-34 | 15.5% | 18.8% | 15.2% | 18.1% | 14.6% | 19.3% |
| 35-44 | 12.4% | 16.5% | 12.9% | 17.5% | 13.5% | 17.8% |
| 45-54 | 9.6% | 15.6% | 10.1% | 15.3% | 10.5% | 14.0% |
| 55-64 | 9.4% | 12.9% | 11.0% | 14.7% | 12.0% | 13.3% |
| 65 and Older | 2.8% | 3.6% | 4.4% | 5.1% | 5.5% | 5.1% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.7.1
[a]Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.'" This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.
Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01012

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

staying in shelter. Nearly three in four families with children either using RRH subsidies or staying in shelters were single adults with children (74% and 71%).

## How Did the Demographic Characteristics Change over Time?

In general, the characteristics of people using RRH change little year to year. However, data show some shifts.

- The 14 percent increase in adult only households using RRH resulted in a corresponding rise in one person households between 2019 and 2022, from 55 to 65 percent.
- For the same reason, the percentage of people using RRH subsidies who were children declined from 42 percent in 2019 to 35 percent in 2022.
- Between 2019 and 2022, there was also an increase in the number of people in RRH who were aged 65 or older (from 3 to 6%). This likely reflects the rise in adult-only households using RRH and possibly an increasing use of RRH to help the most vulnerable populations leave homelessness.

## Where Did Households Using RRH Subsidies Live?

- Households in the RRH program were less likely to be in urban areas and more likely to be in suburban or rural areas than households staying in shelters. In 2022, 65 percent of households using RRH were in urban areas, lower than the 78 percent of people in shelters who were in urban areas.
- A larger share of RRH households were in rural areas than sheltered households. In 2022, 10 percent of RRH households were in rural areas compared to seven percent of sheltered households.
- More than one-quarter of RRH households were in suburban areas in 2022 (26%) compared with 15 percent of households staying in shelters.
- The higher percentages of RRH households in suburban and rural areas than sheltered households likely reflects a combination of factors including limited affordable housing in urban areas and a greater use of RRH in areas with limited shelter programs. Rural areas have historically relied more heavily than other areas on rapid rehousing and other scattered site solutions as a way to avoid the high capital cost of facility-based approaches.
- Between 2019 and 2022, the percentage of households using RRH subsidies shifted somewhat from urban to suburban areas. The share of households using RRH subsidies in urban areas dropped

**EXHIBIT 7.3b: Demographic Characteristics of Households Using Rapid Re-Housing and Experiencing Sheltered Homelessness[a]**

By Ethnicity and Race, 2019, 2021, and 2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Using Rapid Re-Housing Subsidies | Staying in Shelters | Using Rapid Re-Housing Subsidies | Staying in Shelters | Using Rapid Re-Housing Subsidies | Staying in Shelters |
| **Ethnicity of Heads of Households[b]** | | | | | | |
| Hispanic/Latino/a/x | 13.5% | 15.8% | 15.0% | 19.3% | 14.8% | 22.6% |
| Non-Hispanic/Non-Latino/a/x | 86.5% | 84.2% | 85.0% | 80.8% | 85.2% | 77.4% |
| **Race of Heads of Households** | | | | | | |
| Asian or Asian American | 0.6% | 0.7% | 0.8% | 1.1% | 1.1% | 1.0% |
| Black or African American | 43.4% | 40.5% | 41.8% | 38.6% | 42.1% | 36.6% |
| Multiple Races | 4.3% | 3.5% | 4.8% | 3.7% | 4.6% | 4.0% |
| Native American/American Indian or Alaska Native | 2.3% | 3.0% | 1.9% | 3.0% | 2.5% | 3.2% |
| Native Hawaiian or Pacific Islander* | 0.7% | 0.9% | 1.1% | 0.9% | 1.1% | 1.0% |
| White, Hispanic/Latino/a/x[b] | 9.8% | 10.8% | 10.6% | 14.0% | 10.6% | 16.9% |
| White, Non-Hispanic/Non-Latino/a/x | 38.9% | 40.6% | 38.9% | 38.3% | 38.2% | 36.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.7.1
[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
[b] In 2020, the U.S. Census Bureau updated the coding methodology for ethnicity. These updates are likely reflected in the changes in white, Hispanic/Latino/a/x shares among the U.S. Poverty and U.S. Total Population between 2019 and 2021/2022. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.
Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01013

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

from 71 percent to 65 percent. The share using RRH subsidies in suburban areas increased from 18 percent in 2019 to 26 percent in 2022. Rural areas experienced little change.

### What Were the Other Characteristics of Housings Using RRH Subsidies in 2022?

- Nearly one in every five heads of households and other adults using RRH programs (19%) had a chronic pattern of homelessness before using RRH to rent permanent housing in 2022. This compares with 25 percent of adults staying in shelters.

- The rate of chronic patterns of homelessness among adults in RRH programs was highest in suburban and urban areas, where 22 and 21 percent of all adults in RRH had experienced chronic homelessness. About 13 percent of adults using RRH subsidies in rural areas had chronic patterns of homelessness. The lower rate of chronic patterns of homelessness in rural areas could reflect the reduced shelter capacity in those areas, limiting the amount of time homeless experiences are captured.

- In 2022, 17 percent of adults using RRH subsidies were veterans. This is higher than the rate of veterans among the sheltered population (9%). The high percentage of veterans in RRH programs reflects the considerable RRH resources directed to veterans through the Supportive Services for Veterans and their Families (SSVF) program. More detail on SSVF is at the end of this chapter.

- Veterans comprised a much greater share of adults using RRH subsidies in urban areas in 2022 (22%) than in suburban or rural areas (14%).

- In 2022, 28 percent of adults in RRH were survivors of domestic violence. These data represents survivors of domestic violence who accessed RRH programs that were *not* operated by victim service providers and should not be considered the full estimate of survivorship among people served in rapid rehousing programs. Given the way data are reported, it is not possible to show the percentage of adults in each geographic category who are survivors of domestic violence. However, data are available on the share of adults *currently fleeing* domestic violence by geography. In 2022, rural areas accounted for the highest share of adults in RRH who were currently fleeing unsafe situations (14%).

- Nearly six of every ten heads of households and other adults using RRH subsidies in 2022 had disabilities, 58 percent. This is slightly higher than the 52 percent of adults staying in shelters and may reflect communities' use of RRH to help the most vulnerable people leave homelessness for permanent housing.

### How Did the Other Characteristics Change over Time?

- The share of adults in RRH who were veterans decreased from 22 percent in 2019 to 17 percent in 2022. The *number* also decreased, by 17 percent. The percentage of veterans using RRH subsidies declined across geographic types.

- The percentage of adults in RRH who had chronic patterns of homelessness increased between 2019 and 2022, from 15 to 19 percent. The *number* increased by 39 percent. This may reflect the considerable efforts made by homeless service providers to engage people staying in encampments or other unsheltered settings during the pandemic. The percentage



**EXHIBIT 7.4: Household Composition of People Using Rapid Re-Housing and Staying in Shelters, (by %)**
2019, 2021, and 2022

Data source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.7.2

DOJ-HUD-AR01014

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

of adults using RRH with chronic patterns increased slightly in rural and urban areas but increased more notably in suburban areas (from 15% to 22%).

- The share of adults using RRH subsidies who were survivors of domestic violence remained the same between 2019 and 2022 (28%), while the *number* increased by 18 percent.
- The share of adults using RRH who reported disability increased from 52 percent in 2019 to 58 percent in 2022, reflecting an increased use of RRH programs for the most vulnerable households experiencing homelessness.

# Engagement of Households Using RRH

Data collected through the LSA provides information related to the experience of homelessness and use of permanent housing programs. This includes whether households using RRH rent subsidies spent time in other programs that are part of the community's homeless service system during the reporting period, how long RRH assistance lasted, and their location after the assistance ended.

- As RRH serves households experiencing homelessness, nearly all enrolled in the program having spent the night prior experiencing homelessness.[1] More than half, 54 percent, enrolled in RRH having experienced sheltered homelessness the previous night. Forty-six percent enrolled from an unsheltered situation.
- Between 2019 and 2022, the share of households enrolling in RRH from unsheltered situations has increased. The share has increased from 37 percent to 46 percent. The number of households enrolling in RRH having spent the night prior in unsheltered locations increased by 34 percent or about 14,000 households.
- In 2022, 70 percent of all households that rented housing using RRH subsidies did not use other parts of the homeless service system during the year. This differed considerably by household type. Two-thirds of adult-only households used only RRH subsidies during the year compared with 81 percent of family households.
- One-quarter of all RRH households used both RRH subsidies and a shelter program. A higher share of adult-only households did so (28%) compared with families with children (18%).
- A very small share of both household types used a combination of shelter programs, RRH subsidies, and PSH – less than one percent for families and five percent for adult-only households.
- Use of other programs by households with RRH rent subsidies did not change much between 2019 and 2022.
- Rapid Re-housing programs provide time-limited rent subsidies, rarely lasting more than two years and often for a much shorter period.[2] The length of the subsidy is locally determined. Households in the RRH program during 2022 included those who moved into a housing unit using RRH subsidies after October 1, 2021, as well as households who



**EXHIBIT 7.5: Geographic Location of Households using Rapid Re-Housing, by Percent**
2019-2022

---

1  Some programs enroll people in RRH if they are staying with friends or family on a temporary basis or are otherwise unstably housed.

2  https://www.urban.org/research/publication/rapid-re-housings-role-responding-homelessness

DOJ-HUD-AR01015

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

had started receiving the RRH rent subsidy earlier and continued to do so. Some households using RRH during 2022 would remain in the program after September 30, 2022. Some would only use a few months of assistance. Household with short lengths of time in RRH programs could also have transitioned from shelter programs to RRH during the reporting period.

Length of time reflects the aggregated amount of time households spent using RRH subsidies over the course of the reporting period. Households staying for short periods of time include households that began using RRH subsidies during the last week of the reporting period as well as households that received one-time assistance with rent or security deposits.

- Twelve percent of households that used RRH in 2022 did so for less than one week. This includes households that moved into housing using RRH assistance during the last few days of the reporting period and households that used one-time assistance such as first months' rent and a security deposit. Those households have a length of use of RRH subsidies of just one day.
- More than one-quarter of households used RRH subsidies for between six months and one year (26%).
- Twenty-three percent used RRH subsidies for more than one year, and four percent used RRH rent subsidies for two years or more.

### How Did Length of RRH Subsidy Use Change over Time?

- Between 2019 and 2022, the share of households using RRH for three months or less dropped considerably from 44 percent to 34 percent.
- The share of households that used RRH for 18 months or longer grew from less than five percent in 2019, the year before the onset of the pandemic, to over 10 percent in 2022. This could reflect communities relaxing the time limits for RRH given the disruption of housing markets and the greater difficulty transitioning to permanent housing they could afford on their own during the COVID-19 Pandemic.

### What Was the Exit Location of Households after RRH Assistance Ended?

In 2022, 58 percent of family households and 65 percent of adult-only households who used RRH assistance to subsidize their permanent housing left the RRH program during the reporting period. This means that their subsidy ended but not necessarily that they moved from the housing unit the RRH program subsidized. For most RRH households, LSA data include their housing status at the time of exit.

- Nearly all households that left the RRH program remained in permanent housing immediately after leaving the program (81% of adult-only households and 88% of family households).
- Adult only households were more likely to exit to permanent housing with a subsidy (41%) than to permanent housing without a subsidy (35%). Families, in contrast, were slightly more likely to exit to permanent housing without a subsidy (43%) than

### EXHIBIT 7.6: Additional Characteristics of People Using Rapid Re-Housing Subsidies
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | | |
| **Chronic Homeless Status of Heads of Households and Adults** | | | | | | | |
| Chronic Patterns of Homelessness[a] | 15.0% | 18.0% | 18.7% | 8,775 | 38.9% | 4,499 | 16.8% |
| **Veteran Status of Heads of Households and Other Adults** | | | | | | | |
| Veteran | 22.3% | 20.1% | 16.5% | -5,749 | -17.2% | -2,323 | -7.8% |
| Non-Veteran | 77.5% | 79.4% | 83.1% | 23,018 | 19.8% | 20,814 | 17.6% |
| Unknown Veteran Status | 0.2% | 0.5% | 0.4% | 383 | 111.6% | -66 | -8.3% |
| **Domestic Violence Survivor Status of Heads of Households and Other Adults*** | | | | | | | |
| DV Survivors | 28.2% | 27.0% | 28.4% | 7,081 | 17.8% | 7,650 | 19.6% |
| Not DV Survivors | 71.6% | 72.8% | 71.3% | 16,476 | 16.3% | 11,934 | 11.3% |
| DV Status: Client Does Not know/refused | 0.2% | 0.2% | 0.2% | 160 | 72.5% | 158 | 70.6% |
| **Disability Status of Heads of Households and Other Adults*** | | | | | | | |
| With a Disability[b] | 51.7% | 54.5% | 57.6% | 18,693 | 24.2% | 15,406 | 19.1% |
| Without a Disability | 48.3% | 45.5% | 42.4% | -1,591 | -2.2% | 3,295 | 4.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.7.3

[a] HUD defines a person experiencing chronic patterns of homelessness as one with a disability and who has experienced homelessness for at least one year or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described. A detailed definition of chronic homelessness can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/definition-of-chronic-homelessness/

*Percentages based on people with known domestic violence survivor status and disability status.
[b] HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

with one (41%).

- Very few households left RRH for permanent supportive housing (PSH), between two and three percent for each type of household.
- A small percentage of households that left RRH went directly to a homeless situation – four percent of adult-only households and two percent of family households.
- Approximately eight percent of both types of households doubled up with family or friends on either a permanent or a temporary basis, after the RRH subsidy ended.

### How Did the Location after RRH Assistance Ended Change over Time?

The share of households that were still using RRH subsidies at the end of the reporting period was higher in 2022 than it was in 2019, but lower than it was in 2021 for both family households and adult-only households. The share of households still using RRH subsidies increased from 30 percent of adult only households in 2019 to 42 percent in 2021. In 2022, the share dropped back to 35 percent. For families, the trend was similar, increasing from 39 to 51 percent of family households between 2019 and 2021 but declining to 42 percent in 2022.

- The share of family households that left RRH to permanent housing without a subsidy decreased considerably, from 60 percent of families in 2019 to 43 percent in 2022. The share that transitioned to other subsidized rental housing after RRH ended increased during the same period, from 24 percent to 41 percent.
- There was no change in the share of families leaving RRH subsidized housing for a homeless situation (2%).
- The share of adult-only households that lived in permanent housing without a subsidy immediately after RRH assistance ended decreased, from 49 percent in 2019 to 35 percent in 2022. Similar to families, the share that transitioned to other subsidized housing after RRH ended increased, from 32 to 41 percent between 2019 and 2022.
- The share of adult-only households that became homeless immediately following the end of RRH assistance increased slightly (from 3% to 4%). The share that died during the reporting period also increased slightly, from one to two percent.



**EXHIBIT 7.7: Characteristics of Rapid Re-housing Households by Geography**
2019-2022

■ Chronically Homeless Adult    ■ Veterans    ■ Currently Fleeing Domestic Violence

**EXHIBIT 7.8: Experience of Homelessness Immediately Prior to RRH Enrollment**



■ Sheltered    ■ Unsheltered

### EXHIBIT 7.9: Other Programs Used by RRH Households
2019-2022

| Program Use | 2019 All Households | 2019 Adult-Only Households | 2019 Adult-Child Households | 2021 All Households | 2021 Adult-Only Households | 2021 Adult-Child Households | 2022 All Households | 2022 Adult-Only Households | 2022 Adult-Child Households |
|---|---|---|---|---|---|---|---|---|---|
| Used RRH only during reporting year | 71.4% | 67.0% | 78.4% | 71.9% | 67.4% | 81.3% | 69.9% | 65.6% | 80.7% |
| Used shelter programs* and RRH during reporting year | 24.1% | 26.5% | 20.4% | 23.5% | 26.4% | 17.4% | 24.6% | 27.5% | 17.5% |
| Used RRH and PSH during reporting year | 3.3% | 4.7% | 1.0% | 3.4% | 4.6% | 1.1% | 4.0% | 5.0% | 1.4% |
| Used shelter programs; RRH; and PSH during reporting year | 1.2% | 1.9% | 0.2% | 1.2% | 1.6% | 0.2% | 1.5% | 1.9% | 0.4% |

Data Source: Homeless Management Information Systems (HMIS) data
*This includes emergency shelter, transitional housing, and safe haven programs.

DOJ-HUD-AR01017

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

**EXHIBIT 7.10: Length of RRH Subsidy**
2019-2022



Data Source: Homeless Management Information Systems (HMIS) data

**EXHIBIT 7.11: Exit Status of Households using RRH**
2019-2022



Data Source: Homeless Management Information Systems (HMIS) data

**EXHIBIT 7.12: Destination of Exit for Households using RRH**
2019-2022

| | Adult-Only Households | | | Family Households | | |
|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| **Housing Status for Households that Exited RRH** | | | | | | |
| Permanent supportive housing (PSH) | 3.4% | 2.6% | 2.9% | 3.3% | 2.4% | 1.7% |
| Other types of permanent housing | 86.8% | 83.7% | 80.7% | 89.7% | 89.1% | 88.0% |
| Permanent housing, no subsidy | 48.6% | 40.2% | 34.6% | 60.3% | 55.5% | 42.7% |
| Permanent housing, with subsidy | 32.2% | 37.3% | 40.8% | 24.2% | 29.2% | 40.6% |
| Doubled up with friends or family (permanent) | 6.0% | 6.2% | 5.3% | 5.2% | 4.5% | 4.8% |
| Temporary housing | 2.1% | 3.0% | 3.4% | 2.5% | 2.9% | 3.5% |
| Doubled up with friends or family (temporary) | 1.8% | 2.4% | 2.8% | 2.3% | 2.5% | 3.0% |
| Other temporary housing | 0.3% | 0.6% | 0.6% | 0.3% | 0.4% | 0.5% |
| Homeless | 2.9% | 3.6% | 3.7% | 1.6% | 1.6% | 1.8% |
| Sheltered Homeless | 1.9% | 2.0% | 1.8% | 1.2% | 1.2% | 1.2% |
| Unsheltered homeless | 1.0% | 1.6% | 1.8% | 0.4% | 0.4% | 0.6% |
| Institutional setting | 2.0% | 2.2% | 2.2% | 0.6% | 0.6% | 0.5% |
| Unknown housing status | 2.2% | 3.6% | 5.8% | 2.2% | 3.0% | 4.1% |
| Deceased | 0.6% | 1.4% | 1.5% | 0.1% | 0.3% | 0.3% |

Data Source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01018

## ESTIMATES OF HOUSEHOLDS USING RAPID REHOUSING SUBSIDIES

# Supportive Services for Veterans and their Families (SSVF)

SSVF offers RRH or homelessness prevention (HP) assistance to veteran households experiencing or at risk of experiencing homelessness. The RRH component of SSVF provides short-term subsidies in permanent rental housing to households leaving homelessness. SSVF RRH has served an increasing number of veterans each year since the program was implemented in FY 2012. The information presented in this section references the SSVF FY 2022 Annual Report, and does not use data from the Longitudinal Systems Analysis platform of HMIS data on which the rest of this chapter is based. This section provides additional information on the characteristics of the participants or veterans served by the RRH component of SSVF, and shows where veterans were staying after they stopped receiving RRH assistance.

The SSVF program primarily served RRH participants in households without children in FY 2022. Seventy-eight percent of SSVF RRH participants were in households without children, and most were living alone.

About 61 percent of the veterans served by SSVF RRH in FY 2022 had exited the program by the end of the year. Of those veterans who stopped receiving the SSVF RRH assistance, nearly two-thirds (65%) transitioned to permanent housing. This includes households that remained in the SSVF supported housing units without ongoing assistance. Of the universe of households that exited to permanent housing, a plurality (45%) exited to PSH that was funded through the HUD-VA Supportive Housing (VASH) program. More than one-quarter exited to rental housing without assistance, and 14 percent to other subsidized rental housing.

Of veterans who stopped receiving SSVF RRH assistance and did not exit to permanent housing, 23 percent returned to the experience of homelessness and eight percent exited to another destination, which includes unknown destinations and deceased.

Excluded from the percentage of veterans and their household members who exited SSVF for permanent housing are the households that received an ongoing housing support beyond the initial term of SSVF. SSVF's Shallow Subsidy service provides veterans (and their household members) two years of additional financial assistance to support stabilization in the housing unit. These veterans remain in permanent housing, but due to the ongoing assistance are not included in veterans that exited SSVF.

**EXHIBIT 7.13: Household Type and Program Exit Experience of Veterans and Household Members Served in SSVF Rapid Re-Housing Programs**
FY 2022

| Total Participants Served | 100.00% |
| --- | --- |
| **Household Type** | |
| Without children | 77.6% |
| With children | 22.4% |
| **Destination at Exit** | |
| Permanent Destination | 65.1% |
| Homeless Situation | 23.3% |
| Other Destination (including unknown) | 7.8% |
| Institutional Destination | 3.8% |
| **Ongoing Shallow Subsidy Support** | |
| Number of Veterans that Received Shallow Subsidy | 2,457 |

Source: SSVF-HMIS Repository Data for FY 2022
Note: In FY 2022, the U.S. Department of Veterans Affairs modified the methodology they used to analyze household use of SSVF RRH programs. Data presented in this section thus differs from prior reports. For details on this change, please review the SSVF FY 2022 Annual Report.

**EXHIBIT 7.14: Percent of SSVF RRH Veterans that Exited to Permanent Housing by Destination Type**



- Rental Housing without Subsidy — 28.4%
- Rental Housing with VASH (PSH) — 45.1%
- Rental Housing without Subsidy — 15.0%
- Living with Family or Friends on a Permanent Basis — 9.0%
- Other Situations — 2.5%

DOJ-HUD-AR01019

# 2022
# People Living in Permanent Supportive Housing

Overview of Estimates of People in Permanent Supportive Housing.................................................................8-2
How many People Lived in PSH During 2022?......................................................................................................8-2
How Did Estimates of People Living in PSH Change over Time?........................................................................8-2
Characteristics of People Living in PSH in 2022....................................................................................................8-3
What Were the Demographic Characteristics of Households in PSH in 2022? ................................................8-3
How Have the Demographic Characteristics of Households in PSH Changed over Time?............................8-4
Where Did Households in PSH Live?.......................................................................................................................8-4
How Did the Location of PSH Households Change over Time?..........................................................................8-4
What are the Other Characteristics of Households in PSH?................................................................................8-5
How Have Additional Characteristics of Households Living in PSH Changed over Time? .............................8-5
Engagement of Households with the Homelessness services system..............................................................8-5
How Long Do Households Live in PSH?..................................................................................................................8-6
How Has Length of Time in Shelter Programs Changed over Time? ................................................................8-6
Where Do Households Go after Leaving PSH? .....................................................................................................8-7
How Did Exit Status and Destination of Exit Change over Time? .....................................................................8-7
Veterans Using PSH Provided by the HUD-VASH Programs ..............................................................................8-9
HOMES data and HMIS data....................................................................................................................................8-9

# People Living in Permanent Supportive Housing
## IN 2022

**388,000 people lived in PSH in 2022, 3 percent fewer than did in 2019.**

## Overview of Estimates of People in Permanent Supportive Housing

Approximately **388,000 people lived in Permanent Supportive Housing (PSH)** at some point between October 1, 2021, and September 30, 2022. PSH is designed to serve people who have experienced homelessness, often for long periods of time, and who have disabilities that reduce their ability to maintain housing without additional support. PSH programs provide permanent housing combined with optional intensive supportive services to stabilize people leaving their experience of homelessness in housing they can stay in as long as they comply with the lease. While optional, providers encourage participation in supportive services. PSH has been an important HUD priority for many years, and recent years have seen substantial increased investment in the HUD Veterans Affairs Supportive Housing (VASH) program, which is PSH dedicated to serving veterans. PSH can be based in dedicated properties or in scattered-site units[1] rented in the private market.

### How many People Lived in PSH During 2022?

- An estimated 387,694 people in 292,501 households lived in PSH at some point during 2022. More than two-thirds of all people living in PSH were people in adult-only households (70% or 272,755 people).
- In 2022, just under one-third of PSH residents were people in families with children (30% or 114,016 people).

### How Did Estimates of People Living in PSH Change over Time?

- Between 2019 and 2022, the number of people living in PSH decreased by three percent. Most of this change occurred between 2019 and 2021, with the number of people living

1  Scattered site means project units located at more than one physical location.

### EXHIBIT 8.1: One-Year Estimates of People Using Permanent Supportive Housing
2019-2021

| | 2019 | | 2021 | | 2022 | | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | | # | | # | | # | % | # | % |
| Number of Households | 293,439 | | 281,984 | | 292,501 | | -938 | -0.3% | 10,517 | 3.7% |
| Number of People | 401,428 | | 378,346 | | 387,694 | | -13,734 | -3.4% | 9,349 | 2.5% |
| People by Household Type | # | % of Total | # | % of Total | # | % of Total | # | % | # | % |
| Number of PSH Residents in Adult-Only (AO) Households | 266,604 | 66.4% | 262,256 | 69.3% | 272,755 | 70.4% | 6,151 | 2.3% | 10,499 | 4.0% |
| Number of PSH Residents in Adult-Child (AC) Households | 133,407 | 33.2% | 115,011 | 30.4% | 114,016 | 29.4% | -19,391 | -14.5% | -996 | -0.9% |

Data Source: Homelessness Management Information Systems (HMIS) data
Note: percentages in AO and AC households do not sum to 100 due to households appearing in both household types during the reporting period.

### EXHIBIT 8.2: Change in People in PSH, RRH and Shelter Programs
2019, 2021, and 2022

| Population | Change in People 2019-2022 | | Change in Households 2019-2022 | | Change in People 2021-2022 | | Change in Households 2021-2022 | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| Living in Permanent Supportive Housing | -13,734 | -3.4% | -938 | -0.3% | 9,349 | 2.5% | 10,517 | 3.7% |
| Using Rapid Re-housing Subsidies | -4,066 | -1.6% | 20,411 | 16.1% | 19,718 | 8.3% | 18,052 | 14.0% |
| Staying in Shelter Programs | -67,774 | -4.7% | -35,758 | -3.2% | 174,893 | 14.4% | 127,938 | 13.6% |

DOJ-HUD-AR01021

Case 1:25-cv-00636-MSM-AEM    Document 69-1    Filed 01/30/26    Page 242 of 250
PageID #: 3861
Homelessness in the United States

ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

in PSH decreasing from 401,428 to 378,346. The number of households decreased by less than one percent between 2019 and 2021, as some of the drop in the number of people resulted from PSH serving fewer families and more single adults.

- Between 2019 and 2022, the number of people in family households living in PSH decreased by 15 percent. In contrast, the number of people in adult-only households living in PSH increased by two percent between 2019 and 2022.
- The decline in the number of households between 2019 and 2021 may reflect shortages of staff during the COVID-19 era for referring people to PSH developments and providing housing navigation for scattered-site PSH. The lack of growth in the number of households in PSH during the entire three-year period may reflect increases in rents that meant PSH could serve fewer households with the same resources.
- Between 2021 and 2022, the number of people in adult-only households living in PSH increased from 262,256 to 272,755 (a 4% increase), while the number of people in families with children living in PSH remained largely unchanged, declining by just one percent. A reason for the continued drop in households with children could be that some communities are not emphasizing the use of PSH for families based on the greater numbers of adult-only households that need intensive services as well as permanent housing.

# Characteristics of People Living in PSH in 2022

## What Were the Demographic Characteristics of Households in PSH in 2022?

- In 2022, PSH households were somewhat more likely to be headed by men (63%) compared to households in shelters (60%). This reflects the heavy use of PSH by adult-only households.
- About one percent of residents of PSH identified as transgender (0.7%), questioning (less than 0.1%), or a gender that was not singularly 'male' or 'female' (0.2%). This is similar to the gender characteristics of the sheltered population.
- The share of PSH residents who were elderly or near elderly (aged 55 and older) was much higher than the share of people experiencing sheltered homelessness (40% vs. 18%), reflecting the greater vulnerability of people to chronic health conditions (such as heart disease and diabetes) and disabilities as they age.
- In 2022, a smaller share of people living in PSH belonged to households with Hispanic or Latino/a/x heads, compared to people using shelter programs (14% vs. 23%). In 2022, a larger share of people living in PSH belonged to households

**EXHIBIT 8.3a: Demographic Characteristics of People Living in Permanent Supportive Housing and People Living in Shelters[a]**
By Gender and Age, 2019, 2021, and 2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Permanent Supportive Housing Residents | People in Shelters | Permanent Supportive Housing Residents | People in Shelters | Permanent Supportive Housing Residents | People in Shelters |
| **Gender of Heads of Households** | | | | | | |
| Woman (or girl) | 37.1% | 38.9% | 35.8% | 38.7% | 36.4% | 39.2% |
| Man (or boy) | 62.3% | 60.7% | 63.6% | 60.6% | 63.4% | 60.0% |
| Non-Singular* | 0.1% | 0.1% | 0.1% | 0.2% | 0.2% | 0.3% |
| Questioning | | | <0.1% | <0.1% | <0.1% | 0.1% |
| Transgender | 0.6% | 0.3% | 0.6% | 0.6% | 0.7% | 0.5% |
| **Age of All People in the Household** | | | | | | |
| Under age 18 | 19.4% | 22.7% | 17.7% | 20.6% | 17.4% | 20.7% |
| 18-24 | 4.8% | 9.7% | 4.8% | 8.8% | 5.0% | 9.7% |
| 25-34 | 10.0% | 18.8% | 9.0% | 18.1% | 9.2% | 19.3% |
| 35-44 | 12.4% | 16.5% | 12.6% | 17.5% | 13.4% | 17.8% |
| 45-54 | 19.0% | 15.6% | 16.7% | 15.3% | 16.4% | 14.0% |
| 55-64 | 26.4% | 12.9% | 27.5% | 14.7% | 26.6% | 13.3% |
| 65 and older | 8.0% | 3.6% | 11.8% | 5.1% | 13.6% | 5.1% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.8.1
[a] Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.
*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution. Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01022

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

with White, non-Hispanic/non-Latino/a/x heads (40%), compared to people using shelter programs (37%).

- Approximately 44 percent of heads of PSH households identified as Black, African, or African American. This is higher than the share of heads of households using shelter programs who were Black in 2022 (37%).
- A smaller share of people living in PSH belonged to households with Native American heads (2%), compared to people using shelter programs (3%).

### How Have the Demographic Characteristics of Households in PSH Changed over Time?

In general, the characteristics of people using PSH change little year to year. However, data show distinct changes for some populations in their access to PSH programs before and after the onset of the pandemic, comparing 2022 with 2019, the pre-pandemic comparison year. Between 2019 and 2022, the most notable change occurred in the number of elderly adults (people over the age of 64) living in PSH.

- Both the share and the number of people in PSH aged 65 and older increased between 2019 and 2022. The share of people living in PSH aged 65 and older grew from eight percent in 2019 to 14 percent in 2022. The number of people living in PSH aged 65 and older increased by 62 percent over this period.
- In contrast, both the share and the number of people in PSH below the age of 35 decreased between 2019 and 2022. The share of people living in PSH below the age of 35 decreased from 34 percent in 2019 to 32 percent in 2022. The number of people living in PSH below the age of 35 decreased by 12 percent.

### Where Did Households in PSH Live?

- More than three-fourths of households living in PSH did so in urban areas (79%) in 2022. This is similar to the percentage of households staying in shelters who did so in urban areas (78%) but higher than the percentage of households using RRH subsidies in urban areas (65%).
- In 2022, 17 percent of households living in PSH were in suburban areas, slightly higher than the share of households using shelters in suburban areas (15%) but lower than the share of households using RRH subsidies in suburban areas (26%).
- Only four percent of households living in PSH were in rural areas, lower than the share of households staying in shelters in rural areas (7%) and less than half the share of households using RRH subsidies who were in rural areas (10%).

### How Did the Location of PSH Households Change over Time?

- Between 2019 and 2022, the share of households living in PSH located in urban areas increased from 74 to 79 percent, while the share of people staying in shelters there remained relatively flat, and the share using RRH subsidies dropped.

**EXHIBIT 8.3b: Demographic Characteristics of People Living in Permanent Supportive Housing and People Living in Shelters[a]**
By Ethnicity and Race, 2019, 2021, and 2022

| | 2019 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Sheltered People | U.S. Population Living in Poverty | Sheltered People | U.S. Population Living in Poverty | Sheltered People | U.S. Population Living in Poverty |
| **Ethnicity of Heads of Households** | | | | | | |
| Hispanic/Latino/a/x | 11.7% | 15.8% | 11.0% | 19.3% | 13.6% | 22.6% |
| Non-Hispanic/Non-Latino/a/x | 88.3% | 84.2% | 89.0% | 80.8% | 87.1% | 77.4% |
| **Race of Heads of Households** | | | | | | |
| Asian or American | 0.8% | 0.7% | 0.7% | 1.1% | 1.1% | 1.0% |
| Black, African, or African American | 42.2% | 40.5% | 44.7% | 38.6% | 43.5% | 36.6% |
| Multiple Races | 3.4% | 3.5% | 3.0% | 3.7% | 3.6% | 4.0% |
| Native American/American Indian or Alaska Native | 1.9% | 3.0% | 1.7% | 3.0% | 2.1% | 3.2% |
| Native Hawaiian or Pacific Islander | 0.5% | 0.9% | 0.4% | 0.9% | 0.8% | 1.0% |
| White, Hispanic/Latino/a/x | 8.7% | 10.8% | 8.0% | 14.0% | 9.8% | 16.9% |
| White, Non-Hispanic/Non-Latino/a/x | 42.5% | 40.6% | 41.4% | 38.3% | 39.8% | 36.9% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.8.1
[a]Data presented on gender, race and ethnicity are based on the 2022 HMIS Data Standards in place during the 2022 reporting period. Beginning in 2023, gender, race, and ethnicity will be reported based on the more inclusive and expansive categories implemented through the 2024 HMIS Data Standards. Future AHARs will provide estimates of people experiencing homelessness by additional race and ethnicity combinations.

*Category in HMIS is listed as "a gender that is not singularly 'female' or 'male.' This represents a change in the category from 2019 and 2020 which used the category name 'gender non-conforming.' Any change in category options for any data element could affect how people identify, and comparisons should be made with caution.

Notes: Data on characteristics excludes people for whom the characteristic is missing/unknown. Data on age is based on all people in households. Gender, ethnicity, and race are based only on the heads of household.

DOJ-HUD-AR01023

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

- The share of households living in PSH located in suburban areas decreased between 2019 and 2022, from 22 percent to 17 percent.

### What Were the Other Characteristics of Households in PSH?

- Thirty percent of PSH households included a veteran in 2022. This reflects the large share of PSH made available to veterans through the HUD-VASH voucher program. HUD-VASH is discussed further at the end of this chapter.
- In 2022, more than one in every five heads of household and other adults living in PSH was a survivor of domestic violence (21%), and four percent were currently fleeing unsafe situations. It is important to note that these data represent survivors of domestic violence who lived in permanent supportive housing that was not operated by victim service providers, which do not report client information. Accordingly, estimates should not be considered the full estimate of survivorship among people served in permanent supportive housing programs. Given the way data are reported, it is not possible to show the percentage of adults in each geographic category who are survivors of domestic violence. However, data are available on the share of people *currently fleeing* domestic violence by type of geography. In 2022, rural areas had the highest share of people in PSH who were currently fleeing unsafe situations, eight percent.
- In 2022, a high percentage of adults living in PSH had a disability, 85 percent, consistent with the targeting of most PSH to people with disabilities. The percentage of adults in PSH with a disability may be less than 100 in part because this includes all adults in the household, not just the adult with the disability that qualified the household for PSH.

### How Have Additional Characteristics of Households Living in PSH Changed over Time?

In general, the share of heads of households and other adults in PSH who had a disability or were domestic violence survivors changed little between 2019 and 2022. The share and number of veterans living in PSH decreased between 2019 and 2022.

# Engagement of Households with the Homelessness services system

Data collected through the Longitudinal System Analysis (LSA) data provides information related to how people engage with the homelessness services system. For households in PSH, this includes information on how long they lived in PSH and the destination of those who exited PSH.

- In 2022, 90 percent of all households living in PSH did not use other parts



**EXHIBIT 8.4: Geographic Location of Residents of Permanent Supportive Housing, Households Using RRH Subsidies, and Households Staying in Shelters**
2019, 2021, and 2022

| | URBAN | SUBURBAN | RURAL |
|---|---|---|---|
| **HOUSEHOLDS IN PERMANENT SUPPORTIVE HOUSING** 2019 | 73.6 | 22.0 | 4.4 |
| 2021 | 79.3 | 16.3 | 4.4 |
| 2022 | 79.0 | 17.4 | 3.6 |
| **HOUSEHOLDS USING RRH SUBSIDIES** 2019 | 71.0 | 17.9 | 11.1 |
| 2021 | 70.2 | 18.8 | 11.0 |
| 2022 | 64.6 | 25.6 | 9.8 |
| **HOUSEHOLDS IN SHELTERS** 2019 | 77.1 | 14.4 | 8.5 |
| 2021 | 78.1 | 15.1 | 6.9 |
| 2022 | 77.8 | 15.0 | 7.3 |

Data Source: Homeless Management Information Systems (HMIS) data

**EXHIBIT 8.5: Additional Characteristics of People Living in Permanent Supportive Housing**
2019, 2021, and 2022

| | 2019 | 2021 | 2022 | Change 2019-2022 | | Change 2021-2022 | |
|---|---|---|---|---|---|---|---|
| | % | % | % | # | % | # | % |
| **Domestic Violence (DV) Survivor Status of Heads of Households and Adults\*** | | | | | | | |
| DV Survivors | 20.2% | 19.9% | 21.0% | -1,925 | -3.1% | 2,622 | 4.6% |
| Not DV Survivors | 77.9% | 79.2% | 78.2% | -15,316 | -6.4% | -4,803 | -2.1% |
| DV Status: Client Doesn't know/refused | 1.9% | 1.0% | 0.8% | -3,513 | -59.5% | -378 | -13.6% |
| **Disability Status of Heads of Households and Adults\*** | | | | | | | |
| With a disability[a] | 84.9% | 84.2% | 85.3% | -5,868 | -2.2% | 4,760 | 1.9% |
| Without a disability | 15.1% | 15.8% | 14.7% | -2,692 | -5.7% | -3,027 | -6.4% |

Data Source: Homeless Management Information Systems (HMIS) data; Raw data available in Appendix A.8.2
\*Percentages based on people with known domestic violence survivor status and disability status.
[a]HUD defines a disability as a physical, mental or emotional impairment, including impairment caused by alcohol or drug abuse, post-traumatic stress disorder, brain injury or a chronic physical illness. A more detailed definition can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/determining-and-documenting-disability/disability-definition/

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

of the homelessness services system during the year. This differed somewhat by household type. About 90 percent of adult-only households lived only in PSH during the year compared with 93 percent of family households.

- In 2022, six percent of PSH households used both PSH and a shelter program. A higher share of adult-only households (7%) did so than families with children (4%).
- In 2022, three percent of all households in PSH used RRH subsidies and PSH during the reporting period. Less than one percent used PSH, RRH subsidies, and shelter programs during the reporting period.
- Between 2019 and 2022, the share of households that used only PSH during the reporting period increased slightly (from 88% to 90%).

### How Long Do Households Live in PSH?

- PSH provides long-term subsidized housing. Most households who have left their experience of homelessness for PSH remain in PSH for extended periods of time. In 2022, nearly four in ten households residing in PSH had lived in PSH for five years or more (39%), and more than half (58%) had lived in PSH for more than three years.
- In 2022, only three percent of households had lived in PSH for three months or less, and 16 percent had lived there for less than a year.

### How Has Length of Time in Shelter Programs Changed over Time?

- Between 2019 and 2022, the number of households living in PSH for shorter lengths of time declined. The number

### EXHIBIT 8.6: Characteristics of Adults in Permanent Supportive Housing by Geography
2019, 2021, and 2022

| Characteristic | Urban Households | | | Suburban Households | | | Rural Households | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Veteran | 28.8% | 32.3% | 29.9% | 36.9% | 25.3% | 29.4% | 20.6% | 39.2% | 29.0% |
| Domestic Violence Survivor | 3.3% | 3.2% | 3.5% | 3.2% | 4.6% | 4.0% | 7.7% | 6.0% | 7.5% |

Data Source: Homeless Management Information Systems (HMIS) data

### EXHIBIT 8.7: Program Use by People Living in PSH
2019, 2021, and 2022

| | 2019 | | | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Households | Adult-Only Households | Adult-Child Households | All Households | Adult-Only Households | Adult-Child Households | All Households | Adult-Only Households | Adult-Child Households |
| Enrolled in PSH only during reporting year | 88.3% | 87.7% | 91.7% | 89.7% | 89.1% | 94.4% | 90.0% | 89.7% | 92.8% |
| Enrolled in both shelter programs and PSH during reporting year | 6.9% | 7.2% | 5.1% | 6.4% | 6.8% | 3.3% | 6.4% | 6.8% | 3.8% |
| Enrolled in RRH and PSH during reporting year | 3.6% | 3.7% | 2.7% | 3.0% | 3.1% | 2.0% | 2.7% | 2.6% | 2.8% |
| Enrolled in shelter programs, RRH, and PSH during reporting year | 1.3% | 1.4% | 0.6% | 0.9% | 1.0% | 0.4% | 0.9% | 0.9% | 0.6% |

Data Source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01025

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

of households living in PSH for less than three months declined by 23 percent, and the number of households in PSH for between three and six months dropped by 27 percent. This could reflect reduced PSH placements during the pandemic. More recently – between 2021 and 2022 – the number of households in PSH for less than three months *increased* by four percent, as did the number of households in PSH for between three and six months (by 7%).

■ Between 2019 and 2022, the *number* of households in PSH for five years or longer increased by 30 percent, and the *share* of households in PSH for five years or longer increased from 30 to 39 percent.

### Where Do Households Go after Leaving PSH?

In 2022, only a small share of households left PSH during the reporting period, which is expected given the long-term nature of the program. Eighty-seven percent of both adult-only and family households living in PSH at some point during 2022 were still living in PSH on the last day of the reporting period. For the 13 percent of households that exited during the 2022 reporting period, LSA data include their destination and housing status at the time of exit.

■ More than two in five PSH households transitioned from PSH to another permanent housing destination (41%).

■ One in five heads of adult-only households that were not active on the last day of the 2022 reporting period had died at some point during the year.

■ Just under two-thirds of family households exited PSH to another permanent housing destination (64%), not including PSH. For the most part, families left to go to their own housing either with a subsidy (30%) or without a subsidy (22%). About one in every five family households (19%) that left PSH was doubled-up with friends or family on either a permanent or temporary basis. A small percentage of family households that left PSH returned to experiencing homelessness (5%).

■ The share of adult-only households that left PSH and were living in another permanent housing arrangement was markedly lower than the percent of families who left PSH for another permanent housing arrangement (38% vs. 64%). Adult-only households were almost twice as likely to exit directly to homelessness (9% vs 5%). For adult-only households, exits to experiencing homelessness were distributed evenly across sheltered and unsheltered locations. In contrast, the majority of family households that exited PSH to experiencing homelessness again exited to sheltered locations.

### How Did Exit Status and Destination of Exit Change over Time?

Between 2019 and 2022, the share of households that were no longer in PSH on the last day of the reporting period declined slightly from 15 percent to 13 percent. The number of households exiting PSH decreased by 17 percent over this period.

■ Among households that exited PSH, the share of households no longer in PSH who exited to other permanent housing situations decreased for both household types between 2019 and 2022. However, between 2021 and 2022, the share of exits to other permanent housing situations increased modestly for both adult-only and family households.



**EXHIBIT 8.8: Length of Stay of Households Living in Permanent Supportive Housing**
2019-2021

Data Source: Homeless Management Information Systems (HMIS) data



**EXHIBIT 8.9: Exit Status of PSH Households**
2019-2022

Data Source: Homeless Management Information Systems (HMIS) data

DOJ-HUD-AR01026

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

- Between 2019 and 2022, the share of households exiting PSH to experiencing homelessness again increased from six to nine percent, and the *number* of households exiting PSH to experiencing homelessness increased by 10 percent. Increases in the share of PSH exits to experiencing homelessness were experienced by both adult-only households (7% to 9%) and family households (2% to 5%).

- Between 2019 and 2022, the share of heads of adult-only households who died at some point during the reporting period increased from 13 percent to 20 percent, and the *number* of heads of households that died at some point during the reporting period increased by 31 percent (or about 1,500 people). Most of the increase in PSH deaths occurred between 2019 and 2021—that is, during the height of the COVID-19 pandemic. However, deaths between 2020 and 2021 remained well above pre-pandemic levels.

### EXHIBIT 8.10: Destination for Households in Permanent Supportive Housing
2019, 2021, and 2022

| Housing Status for Households that Exited PSH | All Households | | | Adult-Only Households | | | Families with Children | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 | 2019 | 2021 | 2022 |
| Permanent supportive housing (PSH)ª | 1.7% | 7.0% | 2.4% | 1.7% | 7.1% | 2.3% | 1.7% | 6.2% | 2.9% |
| Other types of permanent housing | 51.1% | 39.1% | 40.8% | 48.4% | 36.3% | 37.6% | 68.8% | 61.5% | 64.1% |
| Permanent housing, no subsidy | 17.6% | 12.9% | 12.8% | 16.2% | 11.3% | 11.5% | 27.1% | 25.3% | 22.4% |
| Permanent housing, with subsidy | 21.5% | 15.8% | 17.5% | 20.2% | 14.5% | 15.8% | 29.8% | 25.6% | 30.0% |
| Doubled up with friends or family (permanent) | 12.0% | 10.4% | 10.5% | 12.0% | 10.4% | 10.4% | 11.9% | 10.7% | 11.7% |
| Temporary housing | 7.3% | 6.5% | 7.0% | 7.2% | 6.0% | 6.8% | 7.8% | 10.3% | 8.5% |
| Doubled up with friends or family (temporary) | 6.3% | 5.3% | 6.0% | 6.2% | 4.8% | 5.8% | 6.9% | 9.3% | 7.7% |
| Other temporary housing | 1.0% | 1.2% | 1.0% | 1.0% | 1.2% | 1.0% | 0.9% | 1.0% | 0.9% |
| Return to Experiencing Homelessness | 6.4% | 6.5% | 8.5% | 7.0% | 6.9% | 9.0% | 2.1% | 3.4% | 4.6% |
| Experiencing Sheltered Homelessness | 4.2% | 3.5% | 4.6% | 4.6% | 3.6% | 4.8% | 1.9% | 2.5% | 2.9% |
| Experiencing Unsheltered homelessness | 2.1% | 3.0% | 3.9% | 2.4% | 3.3% | 4.2% | 0.2% | 0.9% | 1.7% |
| Institutional setting | 9.9% | 9.8% | 10.3% | 10.9% | 10.7% | 11.4% | 3.6% | 3.3% | 2.6% |
| Unknown housing status | 12.4% | 12.2% | 13.5% | 12.2% | 12.5% | 13.4% | 13.3% | 9.9% | 13.9% |
| Deceased | 11.2% | 18.9% | 17.6% | 12.6% | 20.6% | 19.5% | 2.6% | 5.4% | 3.5% |

Data Source: Homelessness Management Information Systems (HMIS) data;
ªData on people leaving PSH for other PSH projects include programs that closed and transitioned clients to other PSH programs, projects that merged but administratively transitioned clients, and clients that moved from one PSH project to another for other reasons.

DOJ-HUD-AR01027

ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

# Veterans Using PSH Provided by the HUD-VASH Programs

The HUD-VASH Program for homeless veterans and their families is a PSH program that combines long-term rental assistance with case management and clinical services. HUD provides rental assistance through the Housing Choice Voucher (HCV) program, and the voucher is usually tenant-based and used in scattered-site housing in the private market. The Department of Veterans Affairs (VA) provides case management and clinical services through VA medical centers (VAMCs) and community-based outpatient clinics (CBOCs).

The VA's Homeless Operations Management and Evaluation System (HOMES) provides information about veterans who use HUD-VASH. The VAMCs and CBOCs that administer the HUD-VASH program are required to report data into HOMES, and many do not also provide information to a Homeless Management Information System (HMIS). Although data from HOMES are similar to HMIS data in some respects, the information reported in this section on the characteristics of veterans in HUD-VASH cannot be compared directly to the LSA-based information on veterans in PSH shown earlier in this chapter.

As of the end of FY 2022, 190,332 veterans had been housed through the HUD-VASH program at some point since the program underwent significant expansion in 2008. At the end of FY 2021, 80,501 HUD-VASH vouchers were currently under lease. Some are included in the veterans in PSH reported earlier in this chapter, but many are not.

## HOMES data and HMIS data

- HOMES provides data from the VA's system of care for veterans experiencing homelessness. Submission of data is mandatory for VAMCs and CBOCs. HMIS provides data from the Continuums of Care that serve a broad population of people experiencing homelessness, including veterans. Participation in HMIS is mandatory for grantees of HUD homeless assistance programs but not for all providers of PSH. PHAs that provide HUD-VASH or other housing assistance to people experiencing homelessness are not required to participate in HMIS, although some do.

- Data elements, definitions, and guidelines differ between HOMES and HMIS.

- Both HOMES and HMIS data cover veterans using programs at any time during a year.

Most veterans using HUD-VASH vouchers in 2022 were men, 87 percent.[2] In 2022, half of veterans using HUD-VASH vouchers (50%) identified themselves as White, 43 percent as Black or African American, and 5 percent as some other race. When asked about their ethnicity, eight percent identified themselves as Hispanic or Latino of any race. Veterans using HUD-VASH

2  The information is based on the veteran in the household, excluding other household members who may be in the HUD-VASH unit.

**EXHIBIT 8.11: Characteristics of Veterans Using HUD-VASH PSH**
FY 2020-2022

| Characteristic | % Veterans Vouchered in HUD-VASH | | |
|---|---|---|---|
| | 2020 | 2021 | 2022 |
| **Gender** | | | |
| Male | 87.8% | 87.5% | 87.2% |
| Female | 11.9% | 12.2% | 12.5% |
| Other Gender[a] | 0.3% | 0.3% | 0.3% |
| **Ethnicity** | | | |
| Hispanic/Latino/a/x | 8.6% | 8.8% | 8.2% |
| Non-Hispanic/Non-Latino/a/x | 87.6% | 87.2% | 85.1% |
| Unknown | 3.8% | 4.0% | 6.7% |
| **Race** | | | |
| White | 52.1% | 52.6% | 50.3% |
| Black or African American | 39.3% | 38.5% | 43.0% |
| Other one race | 5.0% | 5.1% | 4.8% |
| Unknown | 3.6% | 3.8% | 2.0% |
| **Age** | | | |
| 18 to 30 | 5.5% | 4.7% | 2.5% |
| 31 to 50 | 27.4% | 27.1% | 22.4% |
| 51 to 61 | 36.5% | 34.6% | 28.0% |
| 62 and older | 30.5% | 33.6% | 47.1% |
| **Destination at Exit[b]** | | | |
| Deceased | 8.8% | 11.9% | 14.9% |
| Homeless | 3.1% | 3.4% | 4.3% |
| Housing[c] | 65.9% | 65.2% | 61.6% |
| Institutional settings[d] | 9.1% | 8.0% | 8.2% |
| Other settings[e] | 13.1% | 11.5% | 11.1% |

Source: Homeless Operations Management Evaluation System (HOMES) data
[a] Gender categories in HOMES database differ from HMIS
[b] Destination is only calculated for veterans who left the program, which is a small proportion of the total veterans described in the other characteristics.
[c] Housing includes a number of situations, including owned and rented housing that may be subsidized or not subsidized and permanent or temporary (such as staying with family or friends) and transitional housing.
[d] Institutional Settings include psychiatric facilities, non-psychiatric hospitals, correctional facilities, and non-VA and VA residential treatment programs.
[e] For destination at exit, unknown destinations are included in "other" settings.

DOJ-HUD-AR01028

## ESTIMATES OF PEOPLE LIVING IN PERMANANT SUPPORTIVE HOUSING IN 2022

housing vouchers typically were 51 years of age or older (75%), with nearly a quarter between the ages of 31 and 50 (22%), and very few (3%) between 18 and 30.

Approximately 62% of Veterans leaving HUD-VASH programs in FY 2022 went to another housing situation (which could be either permanent or temporary), eight percent went to an institutional setting, four percent became homeless, 15 percent were reported as deceased, and 11 percent went to other or unknown settings.

DOJ-HUD-AR01029





The U.S. Department of
Housing and Urban Development
OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

DOJ-HUD-AR01030