# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*., <br><br> Defendants. <br><br> AND <br><br> NATIONAL ALLIANCE TO END HOMELESSNESS, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*., <br><br> Defendants. | Case Nos. 25-cv-626-MSM-AEM <br> 25-cv-636-MSM-AEM <br><br> District Judge Mary S. McElroy <br> Magistrate Judge Amy E. Moses <br><br> **DEFENDANTS' COMBINED REPLY IN SUPPORT OF ITS COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.      Defendants Are Entitled to Judgment on Plaintiffs' APA Claims.................................... 2

      A.      The rescission of the 2024 NOFO did not violate the APA. ................................. 2

            i.      The rescission of the 2024 NOFO was not contrary to law....................... 3

            ii.      The rescission of the 2024 NOFO was not arbitrary and capricious. ......... 6

            iii.     Defendants' rescission of the 2024 NOFO was not unreasonably delayed. ...................................................................................................... 9

      B.      Challenges to the November 2025 NOFO are moot............................................... 9

      C.      Defendants' issuance of the December 2025 NOFO complied with the APA.................................................................................................................... 12

            i.      The Court lacks authority to order renewal awards under § 706(1). ........ 12

            ii.      The December 2025 NOFO is not contrary to law. ................................. 15

                   a.      HUD has authority to impose criteria on applications under the CoC program. ........................................................................ 15

                   b.      Caps on permanent housing funding............................................ 17

                   c.      Caps on Tier 1 project renewals.................................................... 18

                   d.      Supportive-service requirements ................................................. 21

                   e.      Disability provision........................................................................ 22

                   f.      Geographic-area provisions .......................................................... 23

                   g.      Gender-identity provisions............................................................. 25

            iii.     The provisions of the December 2025 NOFO are not arbitrary and capricious. ........................................................................................ 27

                   a.      Caps on permanent housing funding and Tier 1 renewals........... 28

                   b.      Application review provisions ....................................................... 31

                   c.      Post-award conditions.................................................................... 37

i

iv.      The December 2025 NOFO did not require notice and comment. ........... 38

II.    Plaintiffs' Constitutional Claims Fail. ................................................................. 40

    A.    HUD did not violate the Spending Clause or the separation of powers. .............. 40

    B.    The December 2025 NOFO does not violate the Tenth Amendment................... 43

    C.    The December 2025 NOFO does not unconstitutionally restrict speech............. 44

    D.    Because the December 2025 NOFO does not violate the Constitution, Plaintiffs' contrary-to-constitutional-right APA claims also fail......................... 45

III.   Any Relief for Plaintiffs' APA Claims Can Go No Further than Ordering Relief that Is Legally Required............................................................................................ 45

    A.    Remand under § 706(2) would serve a meaningful purpose. ............................... 45

    B.    Because remand would serve a meaningful purpose, injunctive relief under § 703 is not warranted, and relief under § 706(1) is limited to those actions specifically required by statute. ............................................................................ 49

CONCLUSION...................................................................................................................... 51

# TABLE OF AUTHORITIES

## CASES

*A.L. Pharma, Inc. v. Shalala*,
 62 F.3d 1484 (D.C. Cir. 1995) ................................................................. 47

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
 938 F.3d 1147 (9th Cir. 2019) ................................................................. 10

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
 145 F.4th 39 (1st Cir. 2025) ..................................................................... 6

*Atieh v. Riordan*,
 797 F.3d 135 (1st Cir. 2015) ..................................................... 29, 30, 33

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
 591 U.S. 610 (2020) ................................................................... 47, 48, 49

*Batterton v. Marshall*,
 648 F.2d 694 (D.C. Cir. 1980) ................................................................. 39

*Berge v. United States*,
 949 F. Supp. 2d 36 (D.D.C. 2013) .................................................... 46, 47

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
 295 F.3d 28 (D.C. Cir. 2002) ................................................................... 36

*Bos. Bit Labs, Inc. v. Baker*,
 11 F.4th 3 (1st Cir. 2021) ................................................................... 9, 11

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
 419 U.S. 281 (1974) ................................................................... 28, 29, 33

*Brock v. Pierce County*,
 476 U.S. 253 (1986) ......................................................................... 4, 5, 13

*Burlington Truck Lines, Inc. v. United States*,
 371 U.S. 156 (1962) ................................................................................. 36

*Camp v. Pitts*,
 411 U.S. 138 (1973) ................................................................................. 46

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971), *abrogated on other grounds by*,
 *Califano v. Sanders*, 430 U.S. 99 (1977) ............................................... 27

*City of Seattle v. Trump*,
 ---F. Supp. 3d---, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025) ............ 16, 25, 26

*City of Taunton v. U.S. EPA*,
   895 F.3d 120 (1st Cir. 2018) ......................................................................... 29

*County of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*,
   802 F.3d 413 (2d Cir. 2015) ........................................................... 23, 24, 34

*Dalton v. Specter*,
   511 U.S. 462 (1994) ..................................................................................... 41

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ........................................................................................... 8

*Doe v. Noem*,
   152 F.4th 272 (1st Cir. 2025) ................................................................ 31, 33

*Dolan v. United States*,
   560 U.S. 605 (2010) ....................................................................................... 4

*FBI v. Fikre*,
   601 U.S. 234 (2024) ..................................................................................... 11

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ....................................................................................... 6

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ..................................................................................... 27

*Hicks v. Comm'r of Soc. Sec.*,
   No. 24-5946, 2025 WL 3688892 (6th Cir. Dec. 19, 2025) .......................... 47

*Hill v. Colorado*,
   530 U.S. 703 (2000) ............................................................................... 37, 43

*In re Am. Fed'n of Gov't Emps., AFL-CIO*,
   837 F.2d 503 (D.C. Cir. 1988) ..................................................................... 51

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
   559 U.S. 573 (2010) ..................................................................................... 17

*Kennedy v. Allera*,
   612 F.3d 261 (4th Cir. 2010) ........................................................................ 24

*La Casa del Convaleciente v. Sullivan*,
   965 F.2d 1175 (1st Cir. 1992) ...................................................................... 39

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................... 17, 21

iv

*Lowe v. Gagné-Holmes,*
   126 F.4th 747 (1st Cir.), *cert. denied*, 145 S. Ct. 2795 (2025) (mem.)......................................9

*Marciano v. Adams,*
   No. 22-570-cv, 2023 WL 3477119 (2d Cir. May 16, 2023)......................................9

*Martin Luther King, Jr. County v. Turner,*
   785 F. Supp. 3d 863 (W.D. Wash.), *appeal filed*, No. 25-3664 (9th Cir. 2025)......................16

*Me. Med. Ctr. v. Burwell,*
   841 F.3d 10 (1st Cir. 2016)......................................46

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.,*
   463 U.S. 29 (1983)......................................34

*N.H. Hosp. Ass'n v. Azar,*
   887 F.3d 62 (1st Cir. 2018)......................................39

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.,*
   100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025) (mem.)......................12

*Nasdaq Stock Market LLC v. Securities & Exchange Commission,*
   38 F.4th 1126 (D.C. Cir. 2022)......................................48

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*
   595 U.S. 109 (2022)......................................16

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012)......................................43

*Nat'l Urb. League v. Trump,*
   783 F. Supp. 3d 61 (D.D.C. 2025)......................................26, 38, 43

*New York v. Trump,*
   769 F. Supp. 3d 119 (D.R.I. 2025), *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025)......................10

*New York v. U.S. Dep't of Just.,*
   951 F.3d 84 (2d Cir. 2020)......................................25

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004)......................................12, 13, 49, 50

*NYC C.L.A.S.H., Inc. v. Fudge,*
   47 F.4th 757 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 1045 (2023)......................43

*O'Neil v. Canton Police Dep't,*
   116 F.4th 25 (1st Cir. 2024)......................................11, 22, 44

*Palisades Gen. Hosp. Inc. v. Leavitt,*
   426 F.3d 400 (D.C. Cir. 2005) ............................................................. 46

*Penobscot Nation v. Frey,*
   3 F.4th 484 (1st Cir. 2021) ................................................................. 33

*Pension Benefit Guar. Corp. v. LTV Corp.,*
   496 U.S. 633 (1990) .............................................................................. 8

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
   918 F.3d 151 (D.C. Cir. 2019) ............................................................... 6

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) .............................................................................. 39

*POM Wonderful LLC v. Coca-Cola Co.,*
   573 U.S. 102 (2014) ...................................................................... 17, 21

*R.R. Ave. Props., LLC v. Acadia Ins.,*
   37 F.4th 682 (1st Cir. 2022) ............................................................... 43

*Ramirez v. U.S. Immigr. & Customs Enf't,*
   568 F. Supp. 3d 10 (D.D.C. 2021) ................................................. 46, 47

*Reno v. Flores,*
   507 U.S. 292 (1993) ............................................................................ 37

*Rhode Island v. Trump,* ---F. Supp. 3d---, 2025 WL 3251113 (D.R.I. Nov. 21, 2025),
   *appeal filed,* No. 26-1070 (1st Cir. Jan. 21, 2026) ................................. 41

*River St. Donuts, LLC v. Napolitano,*
   558 F.3d 111 (1st Cir. 2009) ................................................... 28, 31, 35

*S.D. Beverage & Kup v. United States,*
   997 F. Supp. 1343 (S.D. Cal. 1998) .................................................... 40

*S.F. A.I.D.S. Found. v. Trump,*
   786 F. Supp. 3d 1184 (N.D. Cal.), *appeal filed,* No. 25-4988 (9th Cir. Aug. 7, 2025) ...... 37, 48

*Salazar ex rel. Salazar v. District of Columbia,*
   896 F.3d 489 (D.C. Cir. 2018) ............................................................ 47

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
   591 U.S. 197 (2020) ............................................................................ 48

*Smith v. Berryhill,*
   587 U.S. 471 (2019) ............................................................................ 46

*South Dakota v. Dole*,
    483 U.S. 203 (1987)...............................................................................................43

*Spell v. Edwards*,
    962 F.3d 175 (5th Cir. 2020) ...........................................................................9

*Summers v. City of Fitchburg*,
    940 F.3d 133 (1st Cir. 2019)......................................................................22, 33

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ...........................................................................................11

*U.S. Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024)..........................................................................4

*United States v. Johnson*,
    632 F.3d 912 (5th Cir. 2011) ...........................................................................24

*United States v. Salerno*,
    481 U.S. 739 (1987) ...........................................................................................37

*United States v. Salvador-Gutierrez*,
    128 F.4th 299 (1st Cir. 2025)............................................................................3

*Viking River Cruises, Inc. v. Moriana*,
    596 U.S. 639 (2022)...........................................................................................49

*West Virginia v. EPA*,
    597 U.S. 697 (2022)...........................................................................................11

*Zixiang Li v. Kerry*,
    710 F.3d 995 (9th Cir. 2013) ...........................................................................12

**STATUTES**

5 U.S.C. § 706.............................................................................................*passim*

21 U.S.C. § 856................................................................................................36

29 U.S.C. § 794................................................................................................22

34 U.S.C. § 12351............................................................................................32

34 U.S.C. § 20912.......................................................................................23, 25

42 U.S.C. § 10406............................................................................................32

42 U.S.C. § 10408............................................................................................32

42 U.S.C. § 11381 ................................................................................... *passim*

42 U.S.C. § 11382 ................................................................................... *passim*

42 U.S.C. § 11385 ............................................................................ 21, 22, 31, 32

42 U.S.C. § 11386a ................................................................................. *passim*

42 U.S.C. § 11386b ................................................................................ *passim*

42 U.S.C. § 11386c ........................................................................ 18, 19, 20, 21

42 U.S.C. § 12112 ............................................................................................ 33

42 U.S.C. § 12711 ..................................................................................... 23, 25

42 U.S.C. § 15002 ............................................................................................ 23

Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, H.R. 7148 .................................................. *passim*

## REGULATIONS

24 C.F.R. § 8.4 ................................................................................................ 22

24 C.F.R. § 10.1 ........................................................................................ 38, 40

24 C.F.R. § 582.5 ....................................................................................... 22, 23

## INTRODUCTION

At bottom, Plaintiffs in these two related lawsuits continue merely to dispute the policy choices the Department of Housing and Urban Development (HUD) implemented in revising its Continuum of Care (CoC) housing-support funding program for the 2025 fiscal year. HUD determined that years of previous housing policies—which focused on "Housing First" permanent housing policies to the exclusion of other homelessness initiatives—had failed to ameliorate a worsening homelessness crisis throughout the nation. And it determined that it would issue a new notice of funding opportunity (NOFO) for the 2025 funding year, replacing a two-year NOFO that HUD had previously issued in July 2024 ("2024 NOFO"). HUD communicated to CoC funding recipients in July 2025 that it would revoke the 2024 NOFO (which it had reserved the right to do back in 2024), issued a new CoC NOFO in November 2025 ("November 2025 NOFO"), and later issued a revised NOFO in December 2025 ("December 2025 NOFO") that would govern the distribution of CoC funding appropriated during the 2025 fiscal year. In doing so, HUD thoroughly explained its reasoning for making changes to the CoC program, exercised the discretion Congress afforded it to manage funding for the CoC program by revising and rescinding the 2024 NOFO, and ensured that each of the December 2025 NOFO's provisions complied with the McKinney-Vento Act and the Constitution. Plaintiffs have not shown otherwise.

The passage and enactment of the most recent applicable appropriations act on February 3, 2026, affirms that Congress intended HUD to have the discretion to revise NOFOs and to renew projects competitively. *See* Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, H.R. 7148 at 209–51 ("2026 THUD Appropriations Act"). As Defendants note further below, the fact that the Act contemplates the existence of a 2025 NOFO, which Congress has given HUD the discretion

to issue prior to a cascading series of renewal deadlines throughout 2026, confirms that Congress intended HUD to retain the discretion to revise and reimplement NOFOs as HUD sees fit. And, further, a relevant provision of the Act governs fiscal year (FY) 2025 renewal funding for CoCs, mandating that all CoC projects with expiration dates during the first quarter of 2026 be noncompetitively renewed for one 12-month period, with noncompetitive renewals for projects expiring in later quarters to occur if awards are not made under a 2025 NOFO by certain rolling dates. *See id.* § 244, H.R. 7148 at 250. As Defendants will explain briefly, that choice suggests that, in the normal course, Congress generally expects renewals to be *competitive*, which supports Defendants' argument that HUD has the discretion to reduce Tier 1 renewal amounts in order to increase competition.

But, more importantly, enactment of the Appropriations Act impacts the relief available to Plaintiffs in this lawsuit: any CoCs seeking renewal whose projects are expiring before the end of the first quarter of 2026 (*i.e.*, prior to April 1, 2026) will, per the Act, have their projects renewed noncompetitively under the provisions of the 2024 NOFO. *See id.* There is nothing for this Court to order for that subset of projects. Thereafter, HUD need noncompetitively renew later projects under the 2024 NOFO (for FY 2025 funding) only if it has not made awards under the December 2025 NOFO before April 1, for awards expiring in the second quarter, or July 1, 2026, for awards expiring in the third and fourth quarters. *See id.* In sum: Plaintiffs' immediate requests for relief prior to March 31, 2026, have been squarely addressed by intervening congressional action.

## ARGUMENT

### I.     Defendants Are Entitled to Judgment on Plaintiffs' APA Claims.

#### A.     The rescission of the 2024 NOFO did not violate the APA.

In their replies, Plaintiffs have not established that the rescission of the 2024 NOFO was either contrary to law or arbitrary and capricious. *See* State Pls.' Reply in Supp. of Mot. at 3–7,

*State Litigation*, ECF No. 84 ("State Pls.' Reply"); NAEH Pls.' Reply in Supp. of Mot. at 4–11, *NAEH Litigation*, ECF No. 69 ("NAEH Pls.' Reply").

       *i.*   **The rescission of the 2024 NOFO was not contrary to law.**

Plaintiffs claim that the McKinney-Vento Act's three-month deadline to issue a NOFO also serves to prohibit HUD from ever rescinding or revising the NOFO after that time period. State Pls.' Reply at 3–5; NAEH Pls.' Reply at 4–7. That interpretation cannot stand: indeed, were HUD ever to issue a NOFO that it later determined (after the fact) contained unlawful or factually inaccurate provisions, Plaintiffs' rule would prevent HUD from making necessary changes to address those errors. HUD acted well within its discretionary statutory authority when it rescinded the 2024 NOFO and replaced it with a new set of criteria for renewals of FY25 CoC funding. *See* Defs.' Combined Cross-Mot. for Summ. J. & Opp'n to Pls.' Mots. for Summ. J. at 18–20, *State Litigation*, ECF No. 83; *NAEH Litigation*, ECF No. 68 (collectively "Defs.' Br.").

To be sure, Congress requires that HUD "release a notification of funding availability for [CoC] grants . . . not later than 3 months after the date of the enactment of the appropriate Act making appropriations for [HUD] for such fiscal year." 42 U.S.C. § 11382(b). Plaintiffs, however, claim that any subsequent alteration to, modification of, or replacement of the NOFO outside that time limit is contrary to law and invalidates any HUD action to modify, rescind, or replace the NOFO under any circumstances, regardless of reason or process. *See* NAEH Pls.' Reply at 10-13; State Pls.' Reply at 11-13. This fails both as a matter of language and of precedent. Congress merely required that HUD "release *a* notification of funding availability" within three months. 42 U.S.C. § 11382(b) (emphasis added). It did not preclude the agency from modifying that NOFO again—had it done so, it would have used the definite article "the" to specify that there could be only one NOFO. *See United States v. Salvador-Gutierrez*, 128 F.4th 299, 313 (1st Cir. 2025) (holding that the use of a definite article limited interpretation of a sentencing-guidelines provision

3

to a specific defendant previously referenced and noting further that "Congress's choice between a definite and indefinite article matters when determining statutory meaning" (quoting *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 993 (D.C. Cir. 2024))).

Nor does Plaintiffs' argument that a failure to issue the operative NOFO within three months forever bars future action under the statute comport with established precedent, which holds that unless the statute expressly states that failure to satisfy a time-limit forbids the agency from subsequent action, agencies should be allowed to act in furtherance of the statute's objective and the public interest. *See Dolan v. United States*, 560 U.S. 605, 611 (2010) ("[W]here, as here, a statute does not specify a consequence for noncompliance with its timing provisions, federal courts will not in the ordinary course impose their own coercive sanction." (citation omitted)); *Brock v. Pierce County*, 476 U.S. 253, 260 (1986) (noting that the Supreme Court "would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake" and that "[w]hen, as here, there are less dramatic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act" (footnote omitted)). Congress imposed no such 'use it or lose it' penalties in § 11382. *See* 42 U.S.C. § 11382; *see also Brock*, 476 U.S. at 259 (noting that the statute at issue "nowhere specifies the consequences of a failure to make a final determination within 120 days"); *Dolan*, 560 U.S. at 611–12 (noting that, even where a statute mandates action, a lack of statutory consequence for missing the deadline to take that action does not mean courts should interpret the statute to bar the Government "from taking the action to which a missed statutory deadline refers"). The Supreme Court has refused, in the absence of statutory language to the contrary, to bar agencies from acting, even after the expiration of time limits, in order to ensure that public funds were properly safeguarded and

expended in ways directed by statute. *See Brock*, 476 U.S. at 262 ("[T]he protection of the public fisc is a matter that is of interest to every citizen, and we have no evidence that Congress wanted to permit the Secretary's inaction to harm that interest[.]").

Recent passage of the 2026 THUD Appropriations Act confirms that Congress recognizes that HUD has the discretion to rescind, revise, and reissue NOFOs, even after the McKinney-Vento Act's statutory three-month deadline has passed. The Act—which Congress enacted well after the mid-June three-month deadline and HUD's December 2025 issuance of the new NOFO— specifically contemplates that HUD might make awards for the CoC program "under *a* fiscal year 2025 notice of funding opportunity" before either April 1 or July 1, 2026 (and requires that, if HUD fails to meet those deadlines, projects expiring in the subsequent quarters be noncompetitively renewed under the 2024 NOFO). 2026 THUD Appropriations Act, § 244, H.R. 7148 at 250–51 (emphasis added). The Act did not identify a specific fiscal year 2025 NOFO under which HUD needs to make awards—just "a" NOFO. Had Congress intended to limit HUD to the 2024 NOFO, it could have—and would have—done so. Instead, Congress contemplates future awards under "a" 2025 NOFO if done before one of two sequential dates, and it only requires noncompetitive renewals under the 2024 NOFO if new 2025 awards have not yet been issued. The language in the Act confirms that Congress intends HUD to have flexibility to identify which fiscal year 2025 NOFO governs. HUD has issued exactly that NOFO: the December 2025 NOFO.

Plaintiffs further assert that permitting HUD to rescind a NOFO after the McKinney-Vento Act's three-month deadline would render that deadline meaningless. *See* NAEH Pls.' Reply at 5. Not so. Courts retain the authority under the Administrative Procedure Act (APA) to enforce the deadline by, under § 706(1), ordering HUD to issue a NOFO as quickly as possible. *See* 5 U.S.C. § 706(1). As Defendants previously argued, mere failure to meet the three-month deadline cannot

invalidate the action contemplated under the statute—after all, many recent CoC NOFOs, including the 2024 NOFO, were issued more than three months after the applicable appropriations act. *See* Defs.' Br. at 19 n.7. But that fact did not—and does not—invalidate the CoC program.

In sum, Plaintiffs can point to no provision of law—or even of the 2024 NOFO—that prohibits HUD from modifying, revising, supplementing, or replacing a NOFO. Without any such prohibition, Plaintiffs cannot show that HUD's rescission of the 2024 NOFO was contrary to law. And, indeed, Congress has, as of this week, affirmed that HUD has precisely the authority that Plaintiffs attempt to deny here.

### ii. The rescission of the 2024 NOFO was not arbitrary and capricious.

Plaintiffs' challenge to the rescission of the 2024 NOFO as arbitrary and capricious fails. As Defendants explained in their cross-motion, the record—prior to and at the time of the rescission, as well as thereafter—reflects that HUD adequately explained the rescission and properly considered all relevant aspects of the decision. *See* Defs.' Br. at 34-37.

As the First Circuit has explained, "[t]o assess reasonableness, we look to whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) (citation omitted). HUD "need not demonstrate to a court's satisfaction that the reasons for [departing from prior policies] are *better* than the reasons for [retaining them]." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). After all, "new administrations are entitled to reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019).

Plaintiffs denounce HUD's reasoning process because they disagree with its conclusions, labeling any reasoning HUD provided as merely post-hoc justification. *See* NAEH Pls.' Reply at

13–17; State Pls.' Reply at 13–15. HUD, however, made contemporaneous statements—in July 2025—that clearly articulated its key concerns about the persistent failure of the existing policy, which focused overwhelmingly on providing permanent housing, to the detriment of other approaches emphasizing transitional housing, supportive services, and returning homeless individuals to self-sufficiency. *See* AR 18.[1] It also explained why a different NOFO would be more appropriate. *See id.* For example, HUD cited statistics showing that homelessness had increased to historic heights even in the face of the long-standing emphasis on permanent housing. *See id.* And HUD reasonably concluded that such an increase signaled the need for a shift in emphasis to programs "focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants" including a consequent need for a NOFO that will therefore "seek to provide opportunities for new types of projects including street outreach and transitional housing programs." *Id.* HUD further considered the reliance interests of current grantees, acknowledging that the rescission would represent a significant change in emphasis and approach for existing CoC partners, but clearly it then clearly stated that it would work to ensure adequate funding: "We recognize this is a new application process for 2025 funding and are committed to providing CoCs the resources needed to serve their communities." *Id.*

　　HUD deepened that reasoning a few months later in November, immediately prior to the formal replacement of the 2024 NOFO, when HUD publicly acknowledged that there was a continuing worsening of the national homelessness crisis despite major taxpayer investment in permanent housing approaches and concluded that it should refocus on "positively steward[ing]

---

[1] As in Defendants' cross-motion, citations to the Administrative Record (AR) refer to the bates-labeled page numbers in the AR rather than the ECF page numbers. See Defs. Br. at 7 n.4 for the full set of docket entries comprising the AR.

. . . valuable taxpayer resources" by, among other policy shifts, "[p]romoting treatment and recovery" using "Transitional Housing and Supportive Servies projects" while "[i]ncreasing competition for grants" and "[m]easuring long-term meaningful outcomes such as increases in self-sufficiency and reduction in recidivism rates." AR 24. HUD also again explicitly recognized that a shift in program emphasis could pose a challenge to existing CoC partners, albeit one that CoCs could address, stating that "HUD encourages CoCs to expand their pool of providers . . . who can deliver outcomes in line with the priorities above and in this NOFO." *Id*.

HUD's December 19, 2025 NOFO Memorandum, *see* AR 286–99, further expounded on these same issues. That Memorandum did not provide new or different reasoned rationales than those that HUD had publicly provided before, nor did it provide any facts that varied from those that HUD publicly cited earlier in the rescission process when it explained its reasons for instituting a new NOFO. That consistency reflects well-reasoned policy determinations that HUD made throughout the late spring, summer, and fall of 2025 and that were based on discussions, meetings, and other events that occurred over the same time period. Even in the context of APA litigation, courts have been receptive to agency efforts to explain their decisions in more detail (albeit while confining themselves to explanations already given). *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (noting that, after a remand, "the agency can offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*.' " (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990))). The December Memorandum does just that, tying the entirety of its rationale to justifications HUD previously provided to support its rescission: that existing policies had failed to improve the status quo and new policies incentivizing treatment, recovery, long-term stability, and self-sufficiency would, in HUD's view, better address the worsening crisis. *See* AR 18; *see also* AR 286–99. HUD thus adequately considered and

documented various relevant justifications for backing away from an earlier policy that, in HUD's view, was "unacceptable." AR 18. At bottom, its decision to rescind the 2024 NOFO was not arbitrary and capricious.

### iii.  Defendants' rescission of the 2024 NOFO was not unreasonably delayed.

Plaintiffs' argument that the rescission of the 2024 NOFO was unreasonably delayed—or, alternatively, that Defendants unlawfully withheld or unreasonably delayed awards under the 2024 NOFO—similarly fails.

Many of Plaintiffs' arguments here concern the rescission of the 2024 NOFO, awards under the 2024 NOFO, and issuance of the December 2025 NOFO. And the arguments all attempt to construct a series of deadlines that HUD purportedly failed to meet. As explained further below, *see infra* Section I.C.i, Plaintiffs can point only to a statutory deadline to issue a NOFO within three months of the pertinent appropriations act. There are no further deadlines that HUD is statutorily mandated to meet that do not depend on HUD's own actions.

### B.    Challenges to the November 2025 NOFO are moot.

Plaintiffs continue to challenge substantive provisions included in the November 2025 NOFO that were omitted from the December 2025 NOFO. *See* State Pls.' Reply at 9–12; NAEH Pls.' Reply at 21–23. As previously explained, those challenges are moot. *See* Defs.' Br. at 30–32.

The Court "cannot enjoin what no longer exists." *Lowe v. Gagné-Holmes*, 126 F.4th 747, 755 (1st Cir.) (quoting *Marciano v. Adams*, No. 22-570-cv, 2023 WL 3477119, at *1 (2d Cir. May 16, 2023)), *cert. denied*, 145 S. Ct. 2795 (2025) (mem.). The rescinded challenged conditions in the November 2025 NOFO no longer exist. And, in such cases, the controversy is moot because the challenged provisions have "expired or been repealed." *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (quoting *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020)).

State Plaintiffs imply that Defendants' decisions to withdraw certain conditions in the face of "an inevitable injunction" somehow negates the fact that those conditions no longer have legal effect. State Pls.' Reply at 11. But that very fact weighs in favor of finding Plaintiffs' challenges are moot. The correction of potential legal errors in response to litigation should "weigh[] in favor of a finding of mootness," not against it. *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1153 (9th Cir. 2019). Nor is it accurate to say that rescission was a "litigation tactic rather than an internal rethinking about the legality of the challenged directive," State Pls.' Reply at 11 (citing *New York v. Trump*, 769 F. Supp. 3d 119, 133–34 (D.R.I. 2025), *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025)). Rather, the changes were, as Defendants have previously explained, an "internal rethinking" of the provisions in light of challenges raised here by Plaintiffs, *see* Defs.' Notice of Withdrawal of the November 2025 NOFO at 1, *State Litigation*, ECF No. 41 (explaining the recission being made "in order to assess the issues raised by Plaintiffs in their suits"); Defs.' Notice of Withdrawal of the November 2025 NOFO at 1, *NAEH Litigation*, ECF No. 39 (same); AR 287 (noting that, after the instant lawsuits were filed, HUD withdrew the November 2025 NOFO "to make revisions").

NAEH Plaintiffs claim that, because Defendants have purportedly failed to represent that they "will not re-impose" any of these conditions, such challenges remain live. NAEH Pls.' Reply at 22. That is incorrect. HUD has made clear that it intends to maintain the December 2025 NOFO, rather than return to the November 2025 NOFO: HUD withdrew the November 2025 NOFO, implemented a new NOFO, and continues to maintain that it intends to implement the new December 2025 NOFO if this Court's injunction is ultimately vacated. *See, e.g.*, Notice of Compliance with Paragraph 9 of Prelim. Inj. Order at 2, *NAEH Litigation*, ECF No. 61-1 ("If the [preliminary injunction] Order is no longer in effect, HUD intends to implement the NOFO issued

on December 19, 2025[.]"); Defs.' Br. at 45 (listing the same avowal in NOFOs, on the CoC website, and in the listserv email to applicants). Plaintiffs cannot maintain their claims on the mere argument that Defendants have the "sheer power," *Bos. Bit Labs*, 11 F.4th at 11, to reinstate any challenged conditions at any point in the future.

Moreover, to the extent that Plaintiffs' concern is that HUD may implement these conditions not in the December 2025 NOFO but in some undetermined, *future* NOFO—*i.e.*, those for the 2026 fiscal year or thereafter—such challenges are wholly hypothetical and unripe, and they cannot form the basis of a challenge now. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985). And Defendants' representation that they are "standing on the December 2025 NOFO," Defs' Br. at 32, means that, in *this* litigation, Defendants have provided more than enough evidence to show they will not simply revert to the challenged provisions (presumably by withdrawing and reissuing the NOFO *again*) for the 2025 CoC program. That evidence suffices to defeat the voluntary-cessation doctrine under any authority Plaintiffs provide. *Cf. West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (noting the Government's failure to suggest that rescinded provisions would not be imposed in the instant litigation and the Government's vigorous defense of such provisions); *FBI v. Fikre*, 601 U.S. 234, 242–43 (2024) (finding the Government's explanation unconvincing in light of its "speculation" about the plaintiff's actions and lack of "assurance" about its own actions).

The specific agency action challenged here relates to administration of the 2025 CoC program. Plaintiffs cannot defeat mootness merely by making a free-ranging request for an advisory opinion on the legality of hypothetical future provisions that Defendants have represented will not be in effect under the very program Plaintiffs challenge in this suit. *See O'Neil v. Canton Police Dep't*, 116 F.4th 25, 27 (1st Cir. 2024) ("When events have transpired to render a court

opinion merely advisory, Article III considerations require dismissal of the case." (citation omitted)). The Court should reject Plaintiffs' thinly disguised attempt at obtaining an advisory opinion.

### C.    Defendants' issuance of the December 2025 NOFO complied with the APA.

As in their opening motion, Plaintiffs have failed to show that HUD's issuance of the December 2025 NOFO violated either the substantive or procedural provisions of the APA. And, because the December 2025 NOFO squarely complies with the McKinney-Vento Act, the Court should not set aside the NOFO as contrary to law. Finally, neither the December 2025 NOFO nor any individual elements of the NOFO constitute substantive rules—at best, as Defendants explained, they represent either current policy statements or might inform future informal agency adjudications—such that HUD regulations do not require the NOFO or its provisions to go through the formal notice-and-comment process.

### i.    *The Court lacks authority to order renewal awards under § 706(1).*

Because HUD has issued a NOFO, State Plaintiffs—who continue to challenge the issuance of the December 2025 NOFO as unreasonably delayed—can receive no relief for their § 706(1) claim. The only action contemplated under the relevant statutory provision by which Plaintiffs premise their entitlement to relief, *see* Second Am. Compl. ¶ 275, *State Litigation*, ECF No. 80, is for HUD to issue a NOFO. *See* 42 U.S.C. § 11382(b). HUD has done so. State Plaintiffs can no longer receive relief on the basis that the issuance was unreasonably delayed. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67–68 (2004) (explaining that § 706(1) claims pertaining to actions that "have already been completed" are moot); *Zixiang Li v. Kerry*, 710 F.3d 995, 1002 (9th Cir. 2013) (holding that courts may not order relief under section 706(1) where the court is unable to "go back in time" to change an action); *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 16 (1st Cir. 2024) (affirming that a dispute is moot

12

if the court cannot grant effectual relief, applied in that case to a request for injunctive relief to remedy alleged past violation of a statute), *cert. denied*, 145 S. Ct. 1050 (2025) (mem.).

If the Court were to hold that any failure to meet a three-month statutory deadline to issue a NOFO results in the forfeiture of HUD's right to exercise its discretion to manage criteria for the CoC program, such a holding would contravene longstanding precedent emphasizing that agencies have the discretion to act within the statutory limits Congress sets forth. This discretion applies even where the agency fails to satisfy one of those statutory procedural requirements, like a statutory deadline. *See Brock*, 476 U.S. at 260. Again, the remedy for a § 706(1) claim is an order requiring the agency to complete the required activity. A court cannot specify *how* that activity is to be completed. *See Norton*, 542 U.S. at 64.

Plaintiffs recast their unreasonable-delay argument as a request for an order that Defendants *issue awards* under the 2024 NOFO, apparently setting aside the question of whether issuance of the December 2025 NOFO fulfills HUD's statutory duties under the McKinney-Vento Act.[2] *See* State Pls.' Reply at 8; NAEH Pls.' Reply at 18–20. The problem is the only specific deadline that the McKinney-Vento Act sets for HUD, and thus the only statutory basis for a § 706(1) claim, is for the agency to issue a NOFO within three months of an applicable appropriations act. *See* 42 U.S.C. § 11382(b). Every other deadline Plaintiffs purport applies to HUD, including the statutory five-month period to conditionally award grants, *see id.*

---

[2] State Plaintiffs claim Defendants have "confus[ed]" Plaintiffs' claims for relief. State Pls.' Reply at 8. Any confusion appears only to be on Plaintiffs' part, who request, under 5 U.S.C. § 706(1), "[r]elief" for HUD's purported "fail[ure] to take" and "unreasonabl[e] delays in taking" certain actions. *State Litigation*, ECF No. 80 ¶ 274. Per Plaintiffs, Defendants "have unreasonably delayed in undertaking" certain "required tasks," which include "issu[ing] a NOFO" and "mak[ing] funding" available for contract renewals. *Id.* ¶¶ 275–77. Perhaps any confusion stems from the failure to identify a proper basis for relief here, where, as Defendants have argued throughout, HUD has taken or is taking every action contemplated for it by the McKinney-Vento Act and, moreover, has not unreasonably delayed in doing so. *See* Defs.' Br. at 24–30, 33–35.

§ 11382(c)(2)(A), stems from the agency's *own* actions, not from any independent or external source. *See* State Pls.' Reply at 8 (arguing that § 706(1) requires HUD to issue awards under the 2024 NOFO); NAEH Pls.' Reply at 11–16, 18 (arguing the same, including that HUD is bound to deadlines stemming from issuance of the 2024 NOFO); *see also* 42 U.S.C. § 11382(c)(2)(A) (providing that HUD shall announce awards within five months "after the last date for the submission of applications," which is set by HUD); *id.* § 11382(d)(1) (explaining that recipients are bound to meet program requirements within a certain time after the "announcement referred to in subsection (c)(2)," which, again, is set by HUD). But none of those deadlines applies because HUD withdrew the 2024 NOFO before the first deadline—the due date for applications—was to occur. As Defendants argued throughout their cross-motion, Plaintiffs cannot thus construct a series of deadlines that they purport stems from the McKinney-Vento Act when, in fact, the only statutory deadline that has actually passed is the deadline to *issue the NOFO*.[3] *See* Defs.' Br. at 25, 28. Plaintiffs can receive no further relief—because the McKinney-Vento Act *requires* no further relief, beyond the issuance of a NOFO—under § 706(1).

---

[3] State Plaintiffs claim that Defendants have waived any argument against relief for unreasonable delay under § 706(1) in making CoC renewal funding available for FY 2025. *See* State Pls.' Reply at 34. Plaintiffs completely elide the fact that any claim for such a delay can only be founded on HUD's self-imposed (non-statutory, non-regulatory) program deadlines. And, as Defendants have explained in depth, Plaintiffs cannot "construct a series of additional statutory deadlines that, in their eyes, HUD did not meet" because such deadlines "flow from the non-statutory, non-regulatory original NOFO application date of August 29, 2025." Defs.' Br. at 25. That series of deadlines includes any purported deadline to make renewal funding available. And the only deadline that could lead to a basis for the relief Plaintiffs seek is the August 29, 2025, submission deadline, which never occurred. Defendants certainly never waived their argument that any subsequent deadlines might result in unreasonable delay. The only relief Plaintiffs even could seek under § 706(1) is for an order requiring HUD to issue a NOFO. And it has done so.

### ii.  The December 2025 NOFO is not contrary to law.

Because relevant law gives HUD significant discretion to set the parameters of the CoC program, and the December 2025 NOFO falls well within that discretion, that NOFO is not contrary to law. Defendants are entitled to judgment on Plaintiffs' claims otherwise.

### a.  HUD has authority to impose criteria on applications under the CoC program.

As Defendants argued in their cross-motion, the McKinney-Vento Act, as amended by the HEARTH Act, clearly contemplates that the HUD Secretary may establish criteria that will be used to award funds under the CoC program. *See* 42 U.S.C. § 11386a(a), (b)(1)(G); Defs.' Br. at 36–37. Such an express delegation of authority gives the Secretary significant discretion to use criteria he deems may be appropriate to carry out the CoC application process in an "effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G).

State Plaintiffs attempt to show that the existence of certain statutorily required conditions for administering the McKinney-Vento Act somehow implies that the HUD Secretary might be limited in *any* exercise of his discretion to impose criteria for funding applications under the program. *See* State Pls.' Reply at 12–13. But a closer look at State Plaintiffs' arguments reveals their true dispute lies not with the mere existence of the HUD Secretary's authority to set additional criteria—which, indeed, could not be squared with the existence of an express delegation of authority to the Secretary to impose such criteria, *see* 42 U.S.C. § 11386a(b)(1)(G)—but with the similarity (or alleged lack thereof) that the conditions that HUD added to the program bear to the required conditions specified in the McKinney-Vento Act, *see* State Pls.' Reply at 13. But Plaintiffs' argument fails on its own terms: the required conditions relate to homelessness topics and those that fall within the Secretary's delegation, like an assessment of recipients' past performance in administering homelessness projects; plans recipients might have for reducing homelessness and developing comprehensive strategies for such plans; and cooperation and

coordination with other federal, state, local, and private entities also serving homeless individuals—all subjects directly at issue in the challenges Plaintiffs make to HUD's December 2025 NOFO. As Defendants explain on the merits, *see infra* Section I.C.ii, each of these provisions relates directly to statutory purposes identified in the McKinney-Vento Act.[4] That Plaintiffs might disagree with the policy reasons behind these provisions is immaterial here.

NAEH Plaintiffs attempt to invoke an alleged waiver of argument against their challenge to the so-called "Retroactive Reservations," which, Plaintiffs argue, impermissibly penalize applicants based on their past conduct without express congressional authorization. *See* NAEH Pls.' Reply at 25–26. But that claim wholly fails for the simple reason that Defendants *did* address their arguments: "[b]y referencing applicable law, HUD provided clear notice to applicants of the standards they are expected to follow in administering federally funded projects." Defs.' Br. at 62; *accord id.* at 72–73 (noting that the December 2025 NOFO's review and risk provisions enable HUD to verify CoC applicants' compliance with the law). The "Retroactive Reservations" NAEH Plaintiffs identify fulfill exactly that permissible purpose—especially because funding recipients have *always* been on notice that they need to comply with applicable law. *See id.* at 62 (citing

---

[4] State Plaintiffs' reliance on out-of-circuit district court opinions, *see* State Pls.' Reply at 13–14, fails for numerous reasons, because those courts assessed "[s]ubstantive conditions," like "prohibitions on DEI initiatives" and provisions related to "elective abortion," which do not appear and are not challenged in this case. *Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863, 886 (W.D. Wash.), *appeal filed*, No. 25-3664 (9th Cir. 2025). To the contrary, Defendants have not argued they can add "whatever 'substantively distinct and extraneous objective' they want." State Pls.' Reply at 13 (quoting *City of Seattle v. Trump*, ---F. Supp. 3d---, 2025 WL 3041905, at *8 (W.D. Wash. Oct. 31, 2025)). Instead, Defendants here make the simple argument that Congress bestowed upon the Secretary the express authority to establish criteria for administering the CoC program in an effective and efficient manner. *See* Defs.' Br. at 36. That unremarkable proposition is well supported by both the McKinney-Vento Act and by binding precedent. *See* 42 U.S.C. § 11386a(b)(1)(G); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (noting that agencies possess authority "that Congress has provided").

16

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010), for the proposition that "ignorance of the law" is not an excuse).

          b.  <u>Caps on permanent housing funding</u>

      HUD's choice to reduce the amount of permanent housing funding fully complies with the McKenney-Vento Act. *See* 42 U.S.C. § 11386b(a)(1), (b); Defs.' Br. at 37–39. The amount HUD designated—30 percent of funding for new permanent housing projects and 30 percent of each CoC's Annual Renewal Demand to fund renewal of existing permanent housing projects, *see* AR 1154–55—aligns with the statutory minimum Congress set. *See* 42 U.S.C. § 11386b(a)(1), (b). And Congress's choice to set such a minimum indicates that, assuming HUD complies with the minimum, HUD has full discretion to designate funding for permanent housing at or above that minimum. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014) (applying the *expressio unius* canon); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting the "fundamental principle of appropriations law" that the "allocation of funds from a lump-sum appropriation" is "traditionally regarded as committed to agency discretion"). HUD's decision to change the proportion of funding designated for permanent housing—as long as that proportion is at or above 30 percent of available funding—is fully within its discretion.

      Plaintiffs wrongly insist that HUD's choice to set funding for permanent housing projects—for both new projects and renewals—is somehow incompatible with the McKinney-Vento Act's requirements that HUD will evaluate applications based on "required criteria" or to provide certain bonuses or incentives to geographic areas for funding activities "proven to be effective" in reducing homelessness. State Pls.' Reply at 15 (citation omitted); *accord* NAEH Pls.' Reply at 26–27. But Plaintiffs still fail entirely to explain how the permanent housing cap *necessarily conflicts*—or even conflicts *at all*—with the Act's requirements to assess applications according to the criteria the Act lays out. HUD can—and will—do both. It might reasonably

17

evaluate new permanent-housing applications by assessing, for example, the "previous performance of the recipient regarding homelessness." 42 U.S.C. § 11386a(b)(1)(A); *accord* AR 1209 (assessing, among other factors, whether the CoC can demonstrate a decrease in unsheltered homeless individuals over the prior year). By applying the required criteria, HUD has fulfilled its statutory duty under the McKinney-Vento Act. And, after completing its review of applications, it will then determine the number that will be entitled—based on a CoC's ranking of applications—to receive available funding (here, subject to the 30-percent cap). The permanent-housing cap and statutory review criteria are not irreconcilably in tension with each other. HUD can easily satisfy its statutory obligation to apply review criteria while holding to its choice to set aside a lesser amount for permanent-housing funding. And that very fact means that Plaintiffs cannot show the cap is contrary to law.[5]

c. Caps on Tier 1 project renewals

Similarly, Plaintiffs continue to fail to point to any provision of law that requires HUD to renew existing CoC contracts at any particular rate—let alone one that requires HUD to renew *all* CoC contracts. *See* State Pls.' Reply at 16–18; NAEH Pls.' Reply at 26–27. The only statutory provision Plaintiffs identify, § 11386c(a), admits that the Secretary has significant discretion in determining how to fund renewals. *See* 42 U.S.C. § 11386c(a) (outlining how renewals for contracts "may" be funded). And the only provision that limits HUD's discretion is one dictating the contract terms to be made available to certain kinds of projects, assuming those projects have been selected for renewal. *See id.* § 11386c(b). Further, the provision expressly provides that the

---

[5] Plaintiffs again seek the benefit of a waiver of arguments against the "New Project Earmark," or the 30-percent funding set-aside for new permanent housing projects, *see* AR 1154, that did not occur. *See* NAEH Pls.' Reply at 26. Defendants supported both the "New Project Earmark" and the permanent housing cap as in line with the McKinney-Vento Act's 30-percent funding minimum. *See* Defs.' Br. at 37 (noting that the December 2025 NOFO, including the 30-percent set-aside for new permanent housing projects, satisfies the Act's requirements).

Secretary has the discretion to "determine whether to renew a contract," *see id.*, and that nothing in the statute would prohibit HUD from "renewing contracts" for the CoC program "in accordance with criteria set forth in a provision" of the statutes governing the program "other than this section," *id.* § 11386c(c). The Secretary's renewal discretion is substantial—especially where, as here, he has determined that reducing the number of renewals will promote the competition that Congress required HUD to promote in administering the CoC program. *See* AR 290 (citing 42 U.S.C. § 11386a).

Nonetheless, State Plaintiffs assert that, when the McKinney-Vento Act indicates renewals "may be funded" using one of two available appropriations funds, 42 U.S.C. § 11386c(a), such a provision "surely" does not confer discretion on the HUD Secretary to decide to renew according to criteria he may establish. State Pls.' Reply at 16. They provide no support for that bald assertion—nor are Defendants aware of any.[6] *See id.* And that argument wholly ignores the explicit reservation of rights that Congress granted to HUD permitting "the Secretary" to "renew[] contracts under this part in accordance with criteria set forth in a provision of this part other than this section." 42 U.S.C. § 11386c(c). And "criteria set forth in a provision of this part other than this section," *id.*, include "such other factors as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner," *id.* § 11386a(b)(1)(G). The *only* mandate the Act makes with respect to project renewals concerns the terms on which certain contracts will be renewed, after the Secretary determines the contracts *should* be renewed in the first instance. *Id.*

---

[6] NAEH Plaintiffs make a similar argument that, while the Act apparently confers discretion on the Secretary to renew awards if "warranted by other established criteria," it somehow bars discretion to "decline to renew awards based on factors other than those that" the McKinney-Vento Act identifies. NAEH Pls.' Reply at 27 (emphasis omitted).

§ 11386c(b) (noting that tenant-based assistance renewals shall be available on successive 1-year terms and project-based assistance renewals shall be available up to successive 15-year terms).

Plaintiffs' attempts to read mandatory renewal (or the apparently distinct "eligib[ility]" for renewal, NAEH Pls.' Reply at 26) into the McKinney-Vento Act fail even under the very provision they cite. Subsection 11386c(b), which Plaintiffs argue requires HUD to make funds available for renewal solely based on an applicant's certification, provides that the Secretary has the power to determine whether to renew contracts based on a certification that "the project complies with program requirements . . . *as determined by the Secretary*." 42 U.S.C. § 11386c(b)(2) (emphasis added). Mandating renewal—or eligibility for renewal—would read out two discretionary portions of this subsection: that the Secretary has the power to "determine whether to renew" and may do so on the basis of compliance with program requirements "as determined by the Secretary." *Id.* § 11386c(b). And further underscoring the Secretary's discretion is that he may apply criteria from "other" provisions of the CoC program to make renewal determinations as well. *Id.* § 11386c(c).

Indeed, as described above, Congress confirmed HUD's view in the recent 2026 THUD Appropriations Act that renewals are not generally mandatory by imposing a limited requirement that, for the first quarter of this year only, projects with expiration dates prior to April 1, 2026 must be "non-competitively renew[ed]." 2026 THUD Appropriations Act, § 244, H.R. 7148 at 250. But Congress *expressly declined* to impose that same requirement on the remaining projects seeking FY 2025 funding *unless* HUD fails to make awards "under a fiscal year 2025 notice of funding opportunity prior to" either April 1 or July 1, 2026. *Id.* If HUD meets its obligation to make such awards, the *expressio unius* canon confirms that Congress's omission here of any future non-

competitive renewal requirement was intentional.[7] *See POM Wonderful*, 573 U.S. at 114; *Lincoln*, 508 U.S. at 192.

In sum: Congress afforded the Secretary significant discretion to (1) establish application criteria and (2) renew projects based on his assessment of projects under those criteria. *See generally* 42 U.S.C. § 11386c. The Tier 1 cap falls well within that discretion.

### d.  Supportive-service requirements

The McKenney-Vento Act contemplates that CoCs will provide supportive services to residents of CoC projects. *See* 42 U.S.C. § 11385(a); Defs.' Br. at 44. Incentivizing the provision of such services in the December 2025 NOFO fully comports with the law.

State Plaintiffs restate their general argument that HUD is not permitted to evaluate applications based on anything other than "the specific criteria set forth in 42 U.S.C. § 11386a, which relate to how quickly projects can get people housed and the extent to which they keep them housed." State Pls.' Reply at 19. That argument fails for the reasons identified above: that (1) identified among the "specific criteria" is that the Secretary may set his own criteria for assessing applications, *see* 42 U.S.C. § 11386a(b)(1)(G); and (2) Plaintiffs have failed to show how assessing recipients' ability to provide supportive services in any way conflicts with any provision of law. Importantly, State Plaintiffs fail entirely to grapple with Defendants' reliance on the McKinney-Vento Act's requirement that CoC recipients "provide supportive services for residents" and

---

[7] Further underscoring the argument that Congress's intent to impose specific program requirements under an appropriations act should be read according to the actual text of the act is the fact that the 2026 THUD Appropriations Act specifically requires, for projects seeking FY 2026 funding, that HUD shall "select projects totaling not less than *60 percent* of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. [§] 11381 et seq." 2026 THUD Appropriations Act, H.R. 7148 at 227 (emphasis added). Notably, that requirement—which is above the 30-percent renewal rate set for FY 2025 by the December 2025 NOFO but below the roughly 90-percent renewal rate Plaintiffs seek—does not apply to FY 2025 funding. *See id.*

"homeless persons" using the CoC's project. *Id.* § 11385(a); *see* State Pls.' Reply at 18–19; *see also* Defs.' Br. at 44. And the supportive-services criteria clearly and directly help HUD and CoCs fulfill that statutory requirement to provide supportive services—meaning that they cannot be contrary to law.

       e.   <u>Disability provision</u>

       Plaintiffs fail to show that a disability exception, which HUD included in the December 2025 NOFO to ensure that individuals with disabilities would continue to have access to CoC projects notwithstanding the use of an incentive for CoCs to offer "customized services" to certain groups of people, *see* AR 1196–97, is contrary to law. Indeed, such an exception is likely required by the Americans with Disabilities Act and carves out a reasonable accommodation necessary to avoid discrimination. *See Summers v. City of Fitchburg*, 940 F.3d 133, 139 (1st Cir. 2019).

       NAEH Plaintiffs assert that they have identified "numerous" laws and regulations that the disability provision here violates—even though, as Plaintiffs acknowledge, the provision carves out participants over age 62 or who have a physical disability/impairment or developmental disability, as defined under 24 C.F.R. § 582.5, from being required to participate in supportive-service programs.[8] *See* NAEH Pls.' Reply at 28–29; *see also* AR 1197. But NAEH Plaintiffs list only the Americans with Disabilities Act, which Defendants have argued *requires* this exception, *see* Defs.' Br. at 45–46; the Rehabilitation Act of 1973, which similarly requires accommodations for individuals with disabilities, *see* 29 U.S.C. § 794; and a HUD regulation, 24 C.F.R. § 8.4(b), which also prohibits disability discrimination. *See* NAEH Pls.' Mot. for Summ. J. at 53, *NAEH*

---

[8] State Plaintiffs claim that Defendants have waived any argument that the November 2025 NOFO's related provisions were lawful. *See* State Pls.' Reply at 19–20. To the contrary: Defendants argued that challenges to such provisions were moot. *See* Defs.' Br. at 45. By raising a jurisdictional defense to Plaintiffs' claims, Defendants have expressed no position on any hypothetical future provision because such a challenge would necessarily result in an impermissible advisory opinion on the matter. *See O'Neil*, 116 F.4th at 27.

*Litigation*, ECF No. 67-1. NAEH Plaintiffs provide no insight on how the exception "push[es]" service providers to treat people disparately based on type of disability," *id.* at 53, or "implements stereotypes about what types of disabilities are deserving of an exemption," NAEH Pls.' Reply at 28. And, indeed, such a provision could not incorporate impermissible stereotypes when it directly adopts the definition that HUD—and Congress—established for similar use in such programs. *See* AR 1197 (citing 24 C.F.R. § 582.5); 42 U.S.C. § 15002.

   f. <u>Geographic-area provisions</u>

   Plaintiffs also fail to show that the geographic-area provisions in the December 2025 NOFO, *see* AR 1226–28, conflict with a statutory provision prohibiting the use of any funding criteria that depend on a state or local jurisdiction's "adoption, continuation, or discontinuation" of "any public policy, regulation, or law" that (1) is properly endorsed by the "jurisdiction's duly established authority" and (2) does not violate federal law, 42 U.S.C. § 12711 ("local-authority provision"). The December 2025 NOFO's criteria do not assign points based on the adoption, continuation, or discontinuation of any public policy—instead, they seek information from CoCs about *CoCs'* policies and how those CoCs might "overcome the effects" of any impediments that local policies might have on fulfilling the goals of the CoC program. *County of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 433 (2d Cir. 2015); *see* AR 1226–28. And, of course, assessing a State's compliance with a federal law—here, the Sex Offender Registration and Notification Act (SORNA)—does not violate the local-authority provision because SORNA is not a policy, regulation, or law that States may duly refuse to implement without penalty. *See* 34 U.S.C. § 20912(a).

   Both sets of Plaintiffs contend that, because the provisions ask for information about local policies, the December 2025 NOFO impermissibly conditions funding on those local policies. *See* State Pls.' Reply at 20–21; NAEH Pls.' Reply at 29–30. The text of the NOFO forecloses those

arguments. The December 2025 NOFO asks for *CoCs'* strategies to achieve the goal of connecting individuals camping or using drugs in public with appropriate services, notwithstanding any state or local policies to the contrary. *See* AR 1226–27. The solicitation of such strategies fits directly within the kind of discretionary activity that may help HUD assess how certain "laws" of a jurisdiction's "municipalities" or other entities might "impede the overall effort" to fulfill certain statutory goals. *County of Westchester*, 802 F.3d at 434. And, because HUD seeks information on local policies to help assess whether CoCs will be able to help "promote community-wide commitment to the goal of ending homelessness," 42 U.S.C. § 11381(1), such provisions are permissible.

State Plaintiffs again revert to their same argument that any application-review factor beyond the ones Congress explicitly identified is an impermissible factor. *See* State Pls.' Reply at 21; State Pls.' Mot. for Summ. J. at 44, *State Litigation*, ECF No. 81. To that, Defendants provide the same response: the Secretary has the express authority to establish "other factors" he may determine to be appropriate. 42 U.S.C. § 11386a(b)(1)(G).

NAEH Plaintiffs' continued insistence that the December 2025 NOFO unlawfully requires compliance with SORNA is similarly misguided. NAEH Plaintiffs argue that jurisdictions may choose not to comply with SORNA, which, as an exercise of Congress's spending power, provides states the option to decline a certain amount of criminal-justice funding. NAEH Pls.' Reply at 30 (first citing *United States v. Johnson*, 632 F.3d 912, 920 (5th Cir. 2011); and then citing *Kennedy v. Allera*, 612 F.3d 261, 269 (4th Cir. 2010)). But NAEH Plaintiffs provide as support only cases that indicate that, for Tenth Amendment purposes, Congress's statutory requirement—noncompliance with which it penalizes by revoking criminal-justice funding—does not impermissibly commandeer States. *See Johnson*, 632 F.3d at 920; *Kennedy*, 612 F.3d at 269. The

ability to decline funds—framed otherwise, an ability to decline to comply with a statutory mandate in exchange for a legal penalty—does not override the fact that an independent federal legal obligation still exists. *See* 34 U.S.C. § 20912(a). And, indeed, the obligation is "mandatory" in the sense that it imposes new legal obligations that States cannot avoid: they must either (1) comply with SORNA or (2) accept the "mandatory 10% penalty for failure to comply" with SORNA. *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 107 n.22 (2d Cir. 2020). Federal law imposes an obligation above and beyond what any State may itself choose to implement. Thus, the local-authority provision does not apply to SORNA compliance.[9] *See* 42 U.S.C. § 12711.

### g. Gender-identity provisions

Plaintiffs cannot show that the gender-identity Executive Order–compliance provision in the December 2025 NOFO, *see* AR 1250, conflicts with any law because (1) the provision itself recognizes that its effect is constrained by applicable law and (2) the provision—and the Executive Order—do not impose any obligations on funding recipients.

Both sets of Plaintiffs argue, essentially, that Defendants' argument in support of the Executive Order–compliance provision in the December 2025 NOFO is improperly circular: *i.e.*, that, if the Order and the NOFO constrain their implementation to be consistent with applicable law, then it cannot be lawful for the NOFO to reference the purportedly unlawful Order. But the problem here is that, unlike in the cases they cite, Plaintiffs do not here challenge the specific Executive Order at issue. Rather, they challenge the provision in the December 2025 NOFO, which indicates the Order should be implemented "unless otherwise restricted by law or by a court of competent jurisdiction." AR 1250. And, as State Plaintiffs make clear, *see* State Pls.' Reply at 21, the Order *has* been restricted by a court of competent jurisdiction. *See City of Seattle*, 2025 WL

---

[9] Indeed, any failure to comply with SORNA further qualifies under the provision's second prong: such a failure violates federal law. *See* 42 U.S.C. § 12711.

3041905, at *6–7 (enjoining enforcement against the City of Seattle). It is not improperly circular—indeed, it's merely a truism—that HUD is permitted to rely on provisions implementing lawful Executive Orders but is not permitted to do so for Orders it is precluded from implementing. As the December 2025 NOFO makes clear, it is for *other* courts to determine whether the substantive Order is lawful. *See* AR 1250. And because Plaintiffs have constrained their relief sought to the NOFO, not to the Executive Order, *see State Litigation*, ECF No. 80 ¶¶ a–m (Prayer for Relief); NAEH Pls.' First Am. Compl. ¶¶ A–I, *NAEH Litigation*, ECF No. 66 (Prayer for Relief), this Court has no basis to say that a provision constraining its implementation to other courts' determination of the applicable law is itself unlawful. *See Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 102 (D.D.C. 2025) ("If Plaintiffs worry that this administration takes a broader view of what counts as illegal . . . , that is a concern with the interpretation of the underlying federal . . . law—which Plaintiffs do not challenge—rather than the [instant provision].").

In any event, Plaintiffs handwave away the fact that the Executive Order itself imposes no duties on recipients by arguing that "HUD clearly included this Condition to constrain grantees' behavior—even if it does so by misleading them to think they are required to implement the Executive Order's views on gender to keep their grants." NAEH Pls.' Reply at 30–31. But the provision does not say that recipients "are required to implement the Executive Order's views on gender to keep their grants." *Id.* at 31. It says that recipients must "comply with these applicable provisions":  implementing Executive Orders "*as advised by the Department*, unless otherwise restricted by law or by a court of competent jurisdiction." AR 1249–50 (emphasis added). Recipients need to look to the Orders themselves to determine whether they might be "applicable"—and, there, each Order makes abundantly clear it applies only to federal agencies. *See* Defs.' Br. at 48–49. Nor does the December 2025 NOFO "advise" grantees to comply with

26

the Executive Order's views on gender. The text of the NOFO simply does not support the interpretation Plaintiffs press here.

### iii.  The provisions of the December 2025 NOFO are not arbitrary and capricious.

Plaintiffs have not shown that HUD's adoption of the provisions in the December 2025 NOFO was arbitrary and capricious. Indeed, HUD explained its decisions to implement changes to the CoC program. And it rationally connected those changes to its overarching conclusions that previous policies had failed to adequately advance the CoC program's statutory goals of reducing homelessness and optimizing self-sufficiency among individuals and families experiencing homelessness. For those reasons, HUD's issuance of the December 2025 NOFO and the provisions therein was not arbitrary and capricious.

State Plaintiffs continue to challenge HUD's reasoning underlying the December 2025 NOFO because it was "developed contemporaneously" with the NOFO. State Pls.' Reply at 23 (quoting Defs.' Br. at 50 n.11). That argument is meritless. It is entirely acceptable for an agency to develop reasoning while simultaneously and concurrently developing the program that will rely on that reasoning—indeed, in implementing a program, certain issues or concerns might reasonably arise that may require continued revision of the program being developed. Documenting such rationale is eminently reasonable—even necessary, under the APA. For that reason, a court's review of the administrative record is limited to the record "that was before [the agency] at the time [it] made [its] decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (limiting judicial review to the "record the agency presents to the reviewing court"). Indeed, the Supreme Court's explicit recognition that the record might include information available *at the time*—not before, not after—of the agency's decision directly accounts for that flexibility: the record might change

27

right up until the decision, and only *at* the decision is the record fixed. Plaintiffs have provided no valid basis to question HUD's development of the record here.

To the contrary, Plaintiffs carry a heavy burden to show that HUD lacked a rational basis for its decision. *See River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). Conversely, Defendants need only provide that rational basis in the record to be entitled to affirmance. *See id.* (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 290 (1974)). Here, Plaintiffs cite a variety of evidence that they claim shows that HUD's actions lacked a reasonable basis. But, at bottom, their arguments reflect only reasonable disagreement with the conclusions HUD policymakers drew from complementary—and, in some cases, conflicting—evidence. Plaintiffs have failed to show that HUD entirely lacked a rational basis for implementing the provisions in the December 2025 NOFO.

a. <u>Caps on permanent housing funding and Tier 1 renewals</u>

HUD cited sufficient evidence to support its decision to reestablish funding levels for permanent housing—both for new projects and renewals—at amounts aligned with the statutory minimum laid out in the McKinney-Vento Act. Because HUD did so—and because it tied those changes to the statutory requirements of the Act—Plaintiffs cannot show that HUD's decision was arbitrary and capricious.

The December 2025 NOFO itself explains HUD's reasoning for reducing the relative emphasis that the CoC program should put on supporting permanent housing. Plaintiffs do not meaningfully dispute—nor could they—that, despite substantial increases to permanent-housing funding over the last decade, chronic homelessness has only continued to increase. *See* AR 1145. And HUD rationally reasoned that one cause for that disparity might be the CoC program's incentivization of "speed" in providing subsidized housing "rather than the quality of services individuals could receive in order to reach self-sufficiency and independent living." AR 1146.

Neither set of Plaintiffs can point to evidence that "compel[s]" a "contrary conclusion." State Pls.' Reply at 25 (quoting *Atieh v. Riordan*, 797 F.3d 135, 140 (1st Cir. 2015)). Even to the extent that any evidence "undermines" HUD's conclusion, *id.*, Plaintiffs have identified evidence only that the root causes underlying chronic homelessness are indisputably complex. And, as Defendants previously argued, addressing such problems quintessentially calls for the exercise of agency expertise—which the APA directly encourages. *See City of Taunton v. U.S. EPA*, 895 F.3d 120, 126 (1st Cir. 2018); *see also* Defs.' Br. at 52–53. HUD's rational explanation for the failures of such a high emphasis on permanent housing to alleviate chronic homelessness—*i.e.*, that the existing system incentivized speed at the expense of quality—provides a reasonably discernible path for HUD's decisionmaking process. *See Bowman*, 419 U.S. at 286.

Plaintiffs continue to argue that HUD has disregarded the findings Congress made recognizing that permanent supportive housing and rapid rehousing with associated services "have been proven to be effective at reducing homelessness." NAEH Pls.' Reply at 36 (quoting 42 U.S.C. § 11386b(d)(2)); *accord* State Pls.' Reply at 24–25. But Plaintiffs entirely fail to respond to Defendants' argument that HUD *has* prioritized permanent-housing funding—directly in line with the relative emphasis Congress identified in the McKinney-Vento Act. *See* Defs.' Br. at 52–53. Indeed, Congress determined that a minimum of 30 percent of available funding should be allocated to new permanent housing projects. *See* 42 U.S.C. § 11386b(a)(1). HUD implemented that determination. *See* AR 1154. And, of course, Plaintiffs concede that Congress's determination merits weight, *see* NAEH Pls.' Reply at 36—which is why HUD also implemented the 30-percent set-aside for renewal funding of permanent-housing projects. *See* AR 1155. Plaintiffs' argument that "[t]here is absolutely no support for Defendants' contention that Congress intended that only 30 percent of funding go to permanent housing projects" NAEH Pls.' Reply at 36, misses the point.

It is clear that Congress intended that a *minimum* of 30 percent of funding go to permanent housing projects. *See* 42 U.S.C. § 11386b(a)(1). It is Plaintiffs who can cite no evidence that Congress intended to *foreclose* HUD from setting the relative amount exactly at that minimum or to require HUD to set the amount above that minimum. And, where the relative level of funding above 30 percent necessarily calls for some discretion on the agency's part and the application of its policymaking expertise, that lack of contrary direction necessarily dooms Plaintiffs' arbitrary-and-capricious claims. *See Atieh*, 797 F.3d at 140.

Finally, Plaintiffs argue that HUD failed to consider alternatives to its reduction in support for permanent housing and any reliance interests recipients may have on maintaining the existing level of support. *See* State Pls.' Reply at 26–28; NAEH Pls.' Reply at 36–37. Their arguments are belied by direct record evidence.  As Defendants argued in their cross-motion, HUD developed extensive record evidence outlining its consideration of the interests recipients had in receiving permanent-housing funding and how HUD might reasonably mitigate disruption to recipients in the transition away from its previous emphasis on such funding. *See* Defs.' Br. at 51–52 (citing AR 297–98, 1157, 1184–85). HUD expressly noted that communities would have to make "significant shifts in the types of projects they invest in." AR 295. And it determined it could alleviate some of the disruption that might result by ensuring recipients will be fully apprised of the changes they might have to make to "transition projects from one component to another." *Id.* HUD further determined that the "goal of increasing competition" outweighed "concerns about existing grantees being unsure whether" grantees would "receive renewal funding." AR 297. And HUD noted that "immense" flexibility allowed local communities to ensure that, in applying for new CoC funding, they could ensure that "all program participants may be eligible for assistance" if any existing CoC projects became inoperative. AR 298.

In sum, because HUD clearly *did* consider recipients' reliance interests, the Court may not "substitute its judgment" for the agency's in balancing those factors against other competing interests. *Doe v. Noem*, 152 F.4th 272, 290 (1st Cir. 2025) (quoting *River St. Donuts*, 558 F.3d at 114). Here, as in *Doe*, Plaintiffs merely "disagree with" the agency's "reasoning and the weight [it] gave to their significant reliance interests." *Id.* That is not enough to set aside the December 2025 NOFO.

    b.  Application review provisions

As in their opening motions, Plaintiffs fail to show that use of application-review provisions—such as provisions incentivizing the use of supportive and customized services, incentivizing the connection of individuals experiencing homelessness to appropriate first-responder and law-enforcement services, and preventing the use of CoC funding to engage in unlawful activities—is arbitrary and capricious. *See* Defs.' Br. at 55–63. Many of those provisions were informed by—and, in some cases, required under—relevant statutory provisions. And HUD reasonably explained its basis for implementing each provision. For those reasons, HUD's use of the challenged review provisions was not arbitrary and capricious.

*Supportive-service provisions*. The McKenney-Vento Act requires CoC projects to provide supportive services for project residents. *See* 42 U.S.C. § 11385(a). And, as HUD explained, the use of such services tends to help meet individuals' needs and advance "progress towards self-sufficiency and independent living goals." AR 290. Those facts qualify to give HUD a rational basis to incentivize the provision of supportive services in its December 2025 NOFO. Consequently, use of the provisions was not arbitrary and capricious.

Defendants plainly did not "misstat[e]" the law governing supportive services. State Pls.' Reply at 26. The McKinney-Vento Act does not carve out any group of CoCs as exempt from the statutory requirement that "each project shall provide supportive services" for residents and

31

program participants. 42 U.S.C. § 11385(a) ("To the extent practicable, *each project shall provide supportive services* for residents of the project and homeless persons using the project[.]" (emphasis added)). It does recognize that some projects may be unable to do so, and, within reason, lightens the requirement accordingly. *See id.* ("To the extent practicable . . . ."). But the provision *does* apply to all projects—*i.e.*, to "each project," *id.*—and, thus, provides a rational basis for HUD to incentivize such services through application points criteria, *see* AR 1196–97, 1200–03, 1206–07, 1218–21. Further, the December 2025 NOFO does not penalize applicants for failing to provide supportive services, nor does it require applicants to provide those services. *See id.* It merely incentivizes such activities by awarding points to applicants that *do* use required supportive services. *See id.*

Neither does HUD's previous practice of making such services voluntary lead ineluctably to the conclusion that it may never change that policy.[10] *Cf.* NAEH Pls.' Reply at 38. HUD long chose not to require the use of supportive services; it then made a rational finding that increased use of supportive services would advance recovery and self-sufficiency, better serving the goals of the McKinney-Vento Act. *See* AR 290 (citing reports supporting that conclusion). As above, Plaintiffs cite evidence that they believe contradicts or weighs against the evidence HUD considered. *See* NAEH Pls.' Reply at 40. But nothing they cite compels a contrary conclusion to

---

[10] NAEH Plaintiffs' passing references, *see* NAEH Pls.' Reply at 38; *NAEH Litigation*, ECF No. 67-1 at 60–61, to funding under the Violence Against Women Act (VAWA), 34 U.S.C. § 12351, and the Family Violence Prevention Service Act (FVPSA), 42 U.S.C. § 10408, fail to provide any basis for finding HUD failed to consider certain relevant factors. NAEH Plaintiffs assert that the laws "conflict[]." *NAEH Litigation*, ECF No. 67-1 at 60. But that assertion is facially incorrect. Both VAWA and the FVPSA establish entirely separate funding programs disbursing wholly different grants for use in providing support to victims of domestic violence, dating violence, sexual assault, and stalking. *See* 34 U.S.C. § 12351; 42 U.S.C. § 10408. Recipients receive grants that are distinct from and have different requirements than grants offered under the CoC program. *See* 34 U.S.C. § 12351(a); 42 U.S.C. § 10406. The laws plainly do not conflict. Instead, they merely support different needs.

the one HUD reached on the evidence before it. *See Atieh*, 797 F.3d at 140. Where Plaintiffs have

failed to make that showing, this Court may not disturb the agency's decision. *See Doe*, 152 F.4th

at 290. That finding was rational. *See Bowman*, 419 U.S. at 286.

*Disability provision.* HUD similarly provided a rational basis for incentivizing the

provision of "customized services" for CoC participants and exempting participants with

disabilities from being required to use such services. As Defendants explained in their cross-

motion and above, such an exemption complies with the ADA. *See* Defs.' Br. at 57–58. And the

substantive provision itself supports HUD's—and the McKenney-Vento Act's—goal of

optimizing individual self-sufficiency. *See* AR 1146 (citing 42 U.S.C. § 11381(4)). Use of the

provision was, thus, not arbitrary and capricious.

NAEH Plaintiffs revert to the same conclusory argument used to challenge the provision

as contrary to law—*i.e.*, that the provision somehow implements impermissible stereotypes about

disabilities. NAEH Pls.' Reply at 40–41. Plaintiffs fail to develop that argument or to explain how

the provision's existing carveout fails as arbitrary and capricious when such exemptions are

required under the ADA and other relevant statutes.[11]

*Geographic-area and law-enforcement provisions.* Plaintiffs' continued challenges to

HUD's use of geographic-area and law-enforcement provisions fail to show that HUD had no

rational basis for implementing those provisions. As Defendants explained in their cross-motion,

---

[11] Plaintiffs' opening motion cites only the legislative history underlying the passage of the Fair Housing Amendments Act and the Americans with Disabilities Act. *See NAEH Litigation*, ECF No. 67-1 at 62. But when the text of a statute is "unambiguous and the statutory scheme is coherent and consistent," courts "do not look to legislative history or Congressional intent." *Penobscot Nation v. Frey*, 3 F.4th 484, 491 (1st Cir. 2021). Plaintiffs have pointed to no provision that contradicts Defendants' interpretation of applicable law here—and, indeed, the plain text of the ADA *supports* such an exclusion. *See* 42 U.S.C. § 12112 (prohibiting discrimination "on the basis of disability"); *Summers*, 940 F.3d at 139–40 (outlining the proper analysis for courts to assess reasonable disability accommodations).

each provision ties directly to the objectives Congress identified in the McKinney-Vento Act: promoting a community-wide commitment to ending homelessness by quickly rehousing homeless individuals, optimizing individual self-sufficiency, and minimizing trauma to individuals experiencing homelessness. *See* Defs.' Br. at 59 (first citing 42 U.S.C. § 11381; and then citing AR 290, 292, 1151). That rational explanation renders these provisions lawful under the deferential arbitrary-and-capricious standard. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

NAEH Plaintiffs primarily restate their argument that these conditions are arbitrary and capricious because the ability to meet the conditions "is out of the control of the applicants being assessed." NAEH Pls.' Reply at 41. Defendants have rebutted that argument several times over. *See, e.g.*, Defs.' Br. at 46, 59, 61 (explaining that the December 2025 NOFO requires only that CoCs provide a description of how they cooperate with authorities to achieve the goal of connecting individuals camping or using drugs in public with "appropriate services"). HUD adequately considered—and addressed—any concern that these provisions apply to conduct out of CoCs' control by ensuring that the NOFO would assess only *CoCs' own* policies and practices and how they might serve to fulfill certain statutory goals notwithstanding local or State policies that might otherwise impede those goals. *See County of Westchester*, 802 F.3d at 433; AR 1226–27 (asking CoCs to "describe how the CoC cooperates with law enforcement" to achieve the goal of "connect[ing] individuals" with "appropriate services").

NAEH Plaintiffs similarly fail to show that HUD's reliance on SORNA compliance was arbitrary and capricious. The only basis for Plaintiffs' argument is that "there are other ways to identify sex offenders as well." NAEH Pls.' Reply at 41. Even if true, that mere fact does not render HUD's decision arbitrary or capricious. Under the APA, HUD is permitted to choose one

from an available set of policy options—as long as it rationally ties that choice to its desired outcome, such a choice is permissible. *See River St. Donuts*, 558 F.3d at 114. Similar logic applies to HUD's use of law enforcement conditions, which ask how CoCs might cooperate with first responders or law enforcement to connect individuals with "appropriate services." *See, e.g.*, AR 1226–27. Plaintiffs fail to acknowledge HUD's own outreach to stakeholders: it has "heard countless personal stories from individuals for whom interaction with law enforcement was the first step in their path out of homelessness and into recovery." AR 296. And HUD noted reports that, as unsheltered homelessness increased in certain locations around the country, safety risks to people living in public encampments increased. *See* AR 291 ("Data also indicates that people experiencing homelessness are victims of crimes at higher rates than the general public."); *see also* AR 1100–02 (indicating that individuals experiencing homelessness are victimized between nine and 27 times more than the general population, depending on the crime).

That evidence alone provides the sufficient rational link between HUD's choice to incentivize co-response and triage services and the McKinney-Vento Act's goals of decreasing homelessness and increasing self-sufficiency. *See* AR 291 (encouraging cooperation with law enforcement to "address barriers to maintaining housing and increasing self-sufficiency"); *see also* 42 U.S.C. § 11381(1), (4). And, contrary to Plaintiffs' contention, HUD adequately considered the potential costs and benefits of adopting such provisions. *See* AR 295–96 (assessing the "cruel and deadly" harms caused by the "status quo of addiction enablement"); AR 296 (noting previous "counterproductive" policies that "inhibited law enforcement and first responders from providing critical care to people in crisis on the streets"). Such consideration, which need not preemptively address each minute element of the decision that might later be challenged, qualifies as an

articulation of a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

*Risk-review and illegal-activity provisions.* NAEH Plaintiffs have failed to show that the use of a host of illegal-activity provisions was arbitrary and capricious. Those provisions limit funding recipients' ability to use CoC funds for unlawful activities, including illegal racial discrimination, *see* AR 1164, 1194, to operate illegal drug injection sites that violate 21 U.S.C. § 856, *see* AR 1194, and to impede lawful State or local actions related to investigating or preventing illicit activities, *see* AR 1229–30. Such provisions, which ensure that the agency properly stewards federal funding and avoids directly or indirectly causing any legal violations, are not arbitrary and capricious.

NAEH Plaintiffs continue to claim that Defendants have "self-evidently" added the geographic-area and drug-involved premises provisions "as part of the Administration's orchestrated campaign to end activities promoting diversity, equity, and inclusion that have long been considered lawful." NAEH Pls.' Reply at 43. But that fact cannot be self-evident when Defendants have affirmatively constrained these provisions' application in accordance with applicable law. As above, the specific application of such Executive Order provisions and the proper interpretation used to determine whether restrictions violate applicable law is not at issue in this litigation—such questions are for other courts to decide.[12] *See Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (noting a party may "seek redress

---

[12] Defendants do not understand Plaintiffs to make the argument that *any* provision barring illegal discrimination is impermissible. Indeed, such a position would run contrary to decades of civil-rights jurisprudence and the agency's long-standing practice of requiring similar certifications from grantees under the CoC program. *See, e.g.*, AR 142 (requiring compliance with "Title VI of the Civil Rights Act of 1964," which prohibits discrimination in federally assisted programs).

through any of the procedures ordinarily available to it" if the "agency does contravene the law in a particular instance"); *see also Reno v. Flores*, 507 U.S. 292, 301 (1993) (noting that a facial challenge must "establish that no set of circumstances exists under which" the agency action "would be valid" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Hill v. Colorado*, 530 U.S. 703, 733 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack . . . when [the provision] is surely valid 'in the vast majority of its intended applications.'" (citation omitted)). Here, the "set of circumstances" under which HUD's policy would be valid is if its interpretation of "illegal discrimination" comports exactly with the law, as interpreted and applied by federal courts. That is all the December 2025 NOFO says—and such a provision cannot be arbitrary and capricious.

### c. Post-award conditions

The post-award conditions in the December 2025 NOFO, such as the provisions requiring applicants to comply, "as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction," with a series of Executive Orders (including, among others, an Executive Order on discrimination, one on the Hyde Amendment, and one related to "Crime and Disorder") all constrain their effect to applicable law. *See* AR 1250–51; Defs.' Br. at 63 (citing relevant provisions). The conditions all aim to ensure the lawful use of funds administered through the CoC program. That motivation is rational and, further, was explained directly in the December 2025 NOFO, *e.g.*, "[a]wards made under this NOFO will not be used to conduct activities that subsidize or facilitate illegal racial preferences[.]" AR 1250–51. Thus, use of those conditions, which impose no independent obligations on any individual entities other than federal agencies and employees, is not arbitrary and capricious. *See S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1228 (N.D. Cal.) ("[T]he limiting qualifier implicating only [programs] that 'violate any applicable Federal anti-discrimination law' is sufficiently defined because it incorporates by

reference the body of existing federal law."), *appeal filed*, No. 25-4988 (9th Cir. Aug. 7, 2025); *Nat'l Urb. League*, 783 F. Supp. 3d at 102.

### iv.  The December 2025 NOFO did not require notice and comment.

The issuance of a NOFO does not require adherence to the notice-and-comment process necessary for the publication of substantive rules under the APA. Both the structure of the McKinney-Vento Act and an applicable HUD regulation make abundantly clear that NOFOs do not qualify as substantive, formal rules. *See* Defs.' Br. at 64–67 (first citing 42 U.S.C. § 11382(b) (giving HUD only three months after funding appropriation to publish a NOFO); and then citing 24 C.F.R. § 10.1 (establishing that HUD regulations require a 60-day comment period and excepting "statements of policy, interpretive rules," and "rules governing" HUD's organization, practices, or procedures from notice-and-comment requirements)). Plaintiffs have failed to show that HUD's issuance of the December 2025 NOFO failed to observe "procedure required by law." 5 U.S.C. § 706(2)(D).

Apparently backing away from their argument that each of the many challenged provisions in the December 2025 NOFO was required to be issued subject to the APA's notice-and-comment requirements, *see State Litigation*, ECF No. 80 ¶¶ 215–17; *accord NAEH Litigation*, ECF No. 66 ¶ 240 ("The FY25 NOFOs' dramatic restructuring of the CoC Program constitutes a substantive rule . . . ."), Plaintiffs now seem to argue that only *certain* provisions are substantive rules requiring notice and comment,[13] *see, e.g.*, NAEH Pls.' Reply at 45 (challenging only the permanent housing cap and "New Project Earmark"); *see also* State Pls.' Reply at 30 (conceding that

---

[13] To the extent Plaintiffs challenge only a limited subset of provisions for failing to satisfy procedural requirements, they cannot be entitled to the relief they request to set aside the *entire* December 2025 NOFO on that basis. *Cf. NAEH Litigation*, ECF No. 66 ¶ 243 (requesting that both 2025 NOFOs "be declared unlawful and set aside" for failing to abide by notice-and-comment requirements).

"Defendants are not required to go through notice-and-comment 'every time [they] issue[] a NOFO related to the CoC program.' " (quoting Defs.' Br. at 65)).[14] Plaintiffs do not explain their theory for which challenged provisions require notice and comment, which do not, and how the Court might reasonably distinguish between conditions that are sufficiently substantive to merit notice and comment and which are not. *See State Litigation*, ECF No. 81 at 37; State Pls.' Reply at 30; *NAEH Litigation*, ECF No. 67-1 at 71; NAEH Pls.' Reply at 45–46.

Plaintiffs are mistaken, at any rate, that any of the challenged conditions themselves "creates rights, assigns duties, or imposes obligations." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)); *see also Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980) (noting the effect of substantive rules on "private interests"). Indeed, they effect no changes to the CoC program that are not already contemplated under the "basic tenor" of the McKinney-Vento Act. *Azar*, 887 F.3d at 70 (quoting *La Casa del Convaleciente*, 965 F.2d at 1178). The Act contemplates directing 30 percent of available funding to permanent housing projects. *See* 42 U.S.C. § 11386b(a)(1). HUD's decision to abide by that direction merely constitutes its notice to "the public of the agency's construction of the statutes and rules which it administers"—even if that choice "may have a substantial impact on regulated entities." *Azar*, 887 F.3d at 70 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)).

As should be clear, the permanent-housing caps themselves do not effect any changes to the rights or obligations of "private interests" regulated under the CoC program. *Batterton*, 648 F.2d at 702. Instead, they merely denote how *HUD itself* will determine the point at which funding

---

[14] State Plaintiffs do not further clarify which of the specific "rules governing the program" and "new policies" they believe should be subject to notice-and-comment requirements. State Pls.' Reply at 30.

will no longer be available to direct to permanent-housing projects. Applicants have the same right to apply for funding, have their application assessed according to statutory and regulatory criteria, and, if sufficiently qualified, receive funding on that basis that they have always had under the CoC program. But applicants do not have—and have never had—the right to receive *specific funding* for which another applicant is more highly qualified. *Cf. S.D. Beverage & Kup v. United States*, 997 F. Supp. 1343, 1347 (S.D. Cal. 1998) (noting that, in assessing irreparable harm at the preliminary-injunction stage for a procurement award, for such awards "there are generally more losers than winners," and any finding that "a losing procurement participant suffers irreparable harm merely because it did not succeed with its contract proposal would create in the losing party an automatic right to injunctive relief"). In sum, the December 2025 NOFO—and the specific provisions included in the NOFO—represent, at best, policy statements that are exempt from notice-and-comment requirements. *See* 24 C.F.R. § 10.1 (exempting "statements of policy, interpretive rules" and "rules governing the Department's organization or its own internal practices or procedures" from notice-and-comment requirements).[15]

## II.    Plaintiffs' Constitutional Claims Fail.

### A.    HUD did not violate the Spending Clause or the separation of powers.

Plaintiffs fail to show that the December 2025 NOFO and HUD's continuing administration of the CoC program violate the separation of powers or the Spending Clause. Plaintiffs have failed to show that, as challenges to executive spending programs, and not to the constitutionality of spending statutes, Plaintiffs' claims are even cognizable under the Constitution. And, even if they were, each of the challenged provisions is grounded in the statutory requirements

---

[15] Further, even if the Court were to find that the HUD regulation *does* require notice and comment of the December 2025 NOFO or its provisions, the proper remedy here would be to remand to the agency to determine whether the "notice and public procedure are impracticable, unnecessary or contrary to the public interest." 24 C.F.R. § 10.1.

of the McKinney-Vento Act and sufficiently relates to the goals of the program to pass constitutional muster.

Plaintiffs' arguments on the Spending Clause and separation of powers restate the statutory arguments above in an attempt to constitutionalize their claims. *See* State Pls.' Reply at 31–34 (arguing that HUD has "contravene[d] Congress's directions" by establishing unnamed provisions in the NOFO (citation omitted)); NAEH Pls.' Reply at 47–48 (arguing that HUD has "imposed the Provisions" based on "some claimed executive power to take those actions, notwithstanding the dictates of the statute"). But Plaintiffs can only succeed on that showing if they can show HUD's actions actually conflicted with the McKinney-Vento Act. That is merely a statutory claim, and that is exactly the kind of claim *Dalton v. Specter* forecloses. 511 U.S. 462, 472 (1994) (distinguishing "between claims of constitutional violations and claims that an official has acted in excess of his statutory authority"). For all the reasons Defendants have stated above and in their cross-motion, *see* Defs.' Br. at 32–49, none of the challenged provisions violates the law.

State Plaintiffs continue to press the wholly unsupported argument that HUD is effectively canceling or repealing statutorily enacted funding through its limitation on funding for renewals. *See* State Pls.' Reply at 32–33. Were HUD somehow to attempt to unilaterally "cancel appropriations passed by Congress," that action very well might violate the law.[16] *Rhode Island v. Trump*, ---F. Supp. 3d---, 2025 WL 3251113, at *16 (D.R.I. Nov. 21, 2025), *appeal filed*, No. 26-1070 (1st Cir. Jan. 21, 2026). But Plaintiffs can only make that showing if they can point to specific appropriations for renewals that HUD did not make "available" under the McKinney-Vento Act. 42 U.S.C. § 11386b(a)(1). And they cannot do so, because Congress has not specified that funding

---

[16] Though, in any event, such a claim would appear to be an APA claim, not a constitutional one.

for renewals must be available at a designated amount. Moreover, HUD *has* made funding "available" for renewals—under Tier 1, to the tune of 30 percent of each CoC's Annual Renewal Demand, and, under Tier 2, for any application that succeeds under the Tier 2 criteria. *Id.*; *see also* AR 1155, 1233–34. Any argument about HUD's application of its renewal criteria relates, thus, only to the extent to which the criteria—which, to be clear, do not unilaterally enact, repeal, or amend any funding amount that Congress did or did not allocate for the CoC program—comply with the McKinney-Vento Act's renewal provisions. And, as above, that is merely a statutory argument—not a constitutional one. Defendants have thoroughly explained why the renewal cap is not contrary to law. *See* Defs.' Br. at 40–44. The utter absence of any evidence that HUD has declined to spend funding that Congress appropriated for the CoC program, above and beyond the statutory question of whether the renewal cap complies with the McKinney-Vento Act, means that Plaintiffs' separation-of-powers claims fail.

State Plaintiffs attempt to cast HUD's geographic-area restrictions as contributing to the "criminalization of homelessness," which restrictions they assert impermissibly coerce States by being wholly unrelated to the federal interests identified in the CoC program. State Pls.' Reply at 33–34. That rhetoric is wholly unwarranted by HUD's actions here. To the contrary: HUD explained numerous times that its use of the geographic-area provisions was not intended to "see people experiencing homelessness be jailed." AR 296. Instead, HUD "wants to see communities" embrace "a commitment to ending homelessness" by utilizing "every resource and tool for the protection and benefit of their most vulnerable residents." *Id.* For that reason, HUD determined that it would incentivize cooperation between CoCs and law enforcement and first responders: to connect individuals with "life-changing care" and remove them from "harmful, or even deadly, environments." *Id.* Such goals clearly relate to the statutory goals of the CoC program and, thus,

do not violate the Spending Clause.[17] *See South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987); *see also* 42 U.S.C. § 11381(1), (3), (4).

**B.    The December 2025 NOFO does not violate the Tenth Amendment.**

State Plaintiffs fail to rebut Defendants' argument that they are entitled to judgment on State Plaintiffs' Tenth Amendment coercion claim. The provisions in the December 2025 NOFO do not unduly coerce States—those provisions merely provide non-mandatory incentives for CoC funding recipients to implement or adopt certain policies or practices that will advance the statutory goals of the McKinney-Vento Act. They do not mandate wholesale changes to unrelated funding programs in exchange for retaining funding under "other significant independent grants." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (plurality opinion). Because the provisions leave States free to choose whether to accept federal public housing funding, they neither command the States directly nor compel involvement of state officials in a federal regulatory scheme. *NYC C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757, 767 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 1045 (2023). The provisions thus do not violate the Tenth Amendment. *See id.*

State Plaintiffs provide no meaningful rebuttal to this argument. They note only that their Tenth Amendment claim is "part and parcel" with their Spending Clause claim, State Pls.' Reply

---

[17] NAEH Plaintiffs claim Defendants have failed to respond to Plaintiffs' argument that the challenged provisions are ambiguous. *See* NAEH Pls.' Reply at 48. But Plaintiffs' initial argument on that front provides a perfunctory three sentences of discussion that does not specify exactly how the provisions are ambiguous (or even identify specifically which provisions Plaintiffs believe are ambiguous). *See NAEH Litigation*, ECF No. 67-1 at 74. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *R.R. Ave. Props., LLC v. Acadia Ins.*, 37 F.4th 682, 689 n.6 (1st Cir. 2022) (citation omitted). The only provisions Plaintiffs gesture at—the Executive Order–compliance provisions—require only compliance with the law, which, as Defendants explained in their cross-motion, cannot be ambiguous. *See* Defs.' Br. at 72–73; *see also Nat'l Urb. League*, 783 F. Supp. 3d at 94–95 (" '[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack' when the provisions are 'valid in the vast majority of [their] intended applications.' " (second alteration in original) (quoting *Hill*, 530 U.S. at 733)).

at 33 n.7, notwithstanding the fact that they did not make that claim in their motion for summary judgment, *see State Litigation*, ECF No. 81 at 61–63, and rest their claim on independent grounds in their complaint, *see State Litigation*, ECF No. 80 ¶¶ 250–56. And, as explained in Defendants' cross-motion, the geographic-area provisions *do* relate to the statutory goals of the CoC program: to reduce homelessness, promote a community-wide commitment to reducing homelessness, and to quickly rehouse individuals while minimizing trauma. *See* Defs.' Br. at 74–75; *see also* AR 1226 (citing 42 U.S.C. § 11381).

## C.    The December 2025 NOFO does not unconstitutionally restrict speech.

HUD did not violate the limits of its discretion to impose a funding condition that may affect a recipient's First Amendment rights because the condition NAEH Plaintiffs challenge in the December 2025 NOFO imposes *no* restriction on any recipient's speech rights. Plaintiffs have failed to show otherwise.

As for many of NAEH Plaintiffs' challenges, Defendants have thoroughly explained why Plaintiffs' First Amendment challenge to the gender-ideology provision in the November 2025 NOFO is moot.[18] *See* Defs.' Br. at 83. And, as for the provision included in the December 2025 NOFO, that challenge fails because, as Defendants explained above and in their cross-motion, the Order imposes no duty whatsoever on any funding recipients. *See supra* Section I.C.ii.g; Defs. Br. at 77–78. Recipients are, simply, not required "to adopt the Defendants' views on gender" or face penalties "for refusing to do so." NAEH Pls.' Reply at 47. They face no penalty at all, as the December 2025 NOFO and the Order itself make clear. *See* AR 1250; *see also* Defs.' Br. at 77–78.

---

[18] As above, raising this jurisdictional argument does not constitute a waiver of any arguments about any future, hypothetical condition in a forthcoming NOFO, because such a challenge would lead to an impermissible advisory opinion. *See O'Neil*, 116 F.4th at 27.

**D.    Because the December 2025 NOFO does not violate the Constitution, Plaintiffs' contrary-to-constitutional-right APA claims also fail.**

As Defendants previously explained, because Plaintiffs' individual constitutional claims fail, their dependent contrary-to-constitutional-right APA claims also fail. *See* Defs.' Br. at 78.

**III.    Any Relief for Plaintiffs' APA Claims Can Go No Further than Ordering Relief that Is Legally Required.**

Even assuming Plaintiffs succeed on any of their APA claims—as shown above, they have not—the relief they seek continues to go beyond that which this Court is permitted to order. Any relief under the APA can extend no further than relief from the challenged agency actions at issue: either HUD's action to rescind the 2024 NOFO or its implementation of challenged provisions under the December 2025 NOFO. And, further, any specific relief Plaintiffs seek to receive awards under the 2024 NOFO is, at this stage, premature: Congress has mandated that projects with expirations before April 1 be noncompetitively renewed. But it has expressly *not* required the same of projects expiring after April 1. Any further action by the Court here would sweep too broadly.

**A.    Remand under § 706(2) would serve a meaningful purpose.**

Because the APA provides only that a reviewing court may "set aside" any challenged agency action found to be arbitrary or capricious, contrary to law, or without observance of procedure required by law, *see* 5 U.S.C. § 706(2), the only proper relief for Plaintiffs' § 706(2) claims would be either to (1) set aside the rescission of the 2024 NOFO and remand for HUD to take new agency action consistent with the APA or (2) set aside and sever any unlawful provisions of the December 2025 NOFO and permit HUD to operate the CoC program under the lawful portions of the December 2025 NOFO. Plaintiffs continue to request relief for their APA claims that extends far beyond this Court's authority under that Act. *See* State Pls.' Reply at 35-36; NAEH Pls.' Reply at 48-50.

45

As Defendants explained in their cross-motion, § 706(2) of the APA does not provide district courts "jurisdiction to order specific relief." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *see also Me. Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (applying *Palisades*); Defs.' Br. at 79. Where, for example, a court finds that an agency's explanation for an action was sufficiently lacking, resulting in an arbitrary and capricious action, the agency's decision "must be vacated and the matter remanded . . . for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973).

In support of their continued request for injunctive relief, Plaintiffs mainly invoke § 703 of the APA, which permits "structural injunctions." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 23 (D.D.C. 2021); *see* State Pls.' Reply at 35-36; NAEH Pls.' Reply at 49 n.18. Plaintiffs, however, have not shown that this case falls within the "small subset of administrative law cases" that warrant the invocation of this "narrow exception" to the rule against injunctive relief in APA cases. *Berge v. United States*, 949 F. Supp. 2d 36, 42 (D.D.C. 2013).

To begin with, despite Plaintiffs' attempt to assure the Court that such an injunction is not subject to "some heightened burden," *see* State Pls.' Reply at 35, their own citations make clear that an injunction pursuant to § 703 is considered a "doubly exceptional form of relief," *Ramirez*, 568 F. Supp. 3d at 22 (citation omitted); *see also* NAEH Pls.' Reply at 49 (citing *Smith v. Berryhill*, 587 U.S. 471, 488 n.21 (2019), which explains that "remand may be forgone in *rarer cases*, such as where the Government joins the claimant in asking the court to reach the merits or where remand would serve no meaningful purpose" (emphasis added)). This heightened standard is warranted because such an injunction carries "potential separation of powers issues that arise . . . 'when the judicial branch undertakes to restructure the operations of an executive branch of government and

46

to superintend its operations on an ongoing basis.'" *Ramirez*, 568 F. Supp. 3d at 23 (quoting *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018)).

As such, an injunction under § 703 can only be granted where there is "only one rational course for the Agency to follow upon remand." *Berge*, 949 F. Supp. 2d at 43 (citation omitted). In other words, "when 'the outcome of a new administrative proceeding is preordained,' a district court may forego the futile gesture of remand to the agency." *Id.* (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1489 (D.C. Cir. 1995)); *see also Hicks v. Comm'r of Soc. Sec.*, No. 24-5946, 2025 WL 3688892, at *3 (6th Cir. Dec. 19, 2025) (explaining that remand would be futile if it "would only waste administrative resources").

Here, remand to HUD would be far more than a mere "unnecessary formality." *Berge*, 949 F. Supp. 2d at 43 (citation omitted). As Defendants emphasized in their cross-motion, the ways in which HUD could adequately justify rescission of the 2024 NOFO are innumerable. *See* Defs.' Br. at 81. Moreover, even if this Court determines that certain provisions of the December 2025 NOFO are unlawful, those provisions can be severed, which would allow HUD to implement the lawful portions on remand. *See id.* at 82–83; *see also* AR 1251.

Plaintiffs, in an attempt to undermine severability and argue that remand would be futile, complain that the *Government* has not carried its burden of "explain[ing] how the FY25 NOFO[] could 'function sensibly' " without some of the challenged provisions. *See* NAEH Pls.' Reply at 50 (citation omitted). Plaintiffs' reasoning—by shifting the burden onto the Government to justify severability—turns the presumption of severability on its head. Instead, the presumption is very strong, where, as here, the December 2025 NOFO itself contains a severability provision. As the Supreme Court has expressly instructed, "[a]bsent extraordinary circumstances, the Court should adhere to the text of the severability . . . clause." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591

U.S. 610, 624 (2020). As such, it is the Plaintiffs who have failed to carry their burden because they have failed to show that no lawful portion of the December 2025 NOFO could survive without any unlawful portion.

In any event, the December 2025 NOFO is properly severable. As a general matter, "it is fairly unusual for" an unlawful provision to render the "remainder . . . [in]operative." *Id.* at 628.[19] And this case does not present such an unusual circumstance. Take, for instance, Plaintiffs' challenge to the Gender Identity Reservation and Conditions, which incorporates Executive Order 14168 subject to limitations imposed by applicable laws. Even if this Court determines that the condition is unlawful, it is plainly severable from the rest of the NOFO, which is capable of "functioning independently" from this stand-alone condition. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 235 (2020).[20]

Lastly, Plaintiffs attempt to leverage hypothetical future difficulties that CoCs may face in navigating "a mismmash of valid and invalid provisions" to posit that the "better course" is to simply do away with the NOFO "in its entirety." NAEH Pls.' Reply at 50. This argument is a nonstarter. Needless to say, if certain provisions of the December 2025 NOFO are found to be unlawful, HUD would, on remand, remove them from the operative version available to CoCs, thereby eliminating any need for CoCs to navigate "a mismmash of valid and invalid provisions."

---

[19] Indeed, an unfavorable severability ruling is so "unusual" that even *Nasdaq Stock Market LLC v. Securities & Exchange Commission*—the only case cited by Plaintiffs in support of their argument—also ultimately concluded that there was "no need to vacate those portions that direct the . . . inclu[sion] [of] plan features [the court] ha[d] found permissible." 38 F.4th 1126, 1145 (D.C. Cir. 2022).

[20] Notably, courts have determined that provisions of the Executive Order 14168 are severable from one another. *See, e.g.*, *S.F. A.I.D.S. Found.*, 786 F. Supp. 3d at 1214–32 (enjoining only certain provisions of Executive Order 14168). Surely, if provisions of Executive Order 14168 are severable from other inherently interconnected provisions of the *same Executive Order*, then they are severable from the December 2025 NOFO.

*Id.* Besides, severability is not a matter of convenience; it is a mandate. *See Barr*, 591 U.S. at 629 ("[A] severability clause *must* be interpreted according to its terms." (emphasis added)); *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 662 (2022) (holding that a severability clause in an employment contract requiring arbitration of claims under valid portions of the contract preempted a state court rule governing non-individual arbitration claims).

### B. Because remand would serve a meaningful purpose, injunctive relief under § 703 is not warranted, and relief under § 706(1) is limited to those actions specifically required by statute.

Plaintiffs seek relief under the APA for "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The APA, however, does not permit courts to provide direction to agencies under § 706(1) beyond those actions specifically required under the law. *See Norton*, 542 U.S. at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law[.]"). And nothing in either the McKinney-Vento Act or the 2024 NOFO can be read to commit the agency to making any specific CoC funding determinations—*e.g.*, guaranteeing specific project renewals or awarding funding to specific applicants—that the Court may order here. As explained in Defendants' cross-motion, Plaintiffs' attempts to construct a series of deadlines that HUD has purportedly failed to meet stem entirely from HUD's self-designated 2024 NOFO application due date of August 29, 2025, which HUD nullified almost two months before that deadline was to occur. *See* Defs.' Br. at 84. And, at any rate, the contemplated agency action under the McKinney-Vento Act—as Defendants have already explained above—is to issue a NOFO. *See* 42 U.S.C. § 11382(b). Defendants have already done so. There is nothing more, under the Act, for this Court to order.

Both sets of Plaintiffs reiterate their request for relief far broader than authorized under § 706(1) by asking this Court to require that HUD "announce FY 2025 conditional awards for renewal projects that already received FY 2024 funding under the FY 2024-2025 NOFO . . . by

March 2, 2026 or one week after the Court's order, whichever is later" and also "announce all other FY 2025 conditional awards by March 31, 2026 or one week after the Court's order, whichever is later." State Pls.' Reply at 37; *see also* NAEH Pls.' Reply at 3 (same). That relief would be unwarranted in any respect. It appears to be an attempt to modify Defendants' preliminary injunction compliance plan (which stated that they anticipated making determinations of renewals by March 31, 2026), *see* Notice of Revised Implementation Plan at 2–3, *State Litigation*, ECF No. 79-1. Defendants have been operating under the plan that they put forward weeks ago, and Plaintiffs have filed no objection to that plan. Changing course now, in this procedural context, risks undue confusion and mistakes, assuming that such timing is even feasible (which Plaintiffs do not even attempt to demonstrate).

But Plaintiffs' requested relief is particularly inappropriate because of intervening congressional action. Through the 2026 THUD Appropriations Act, Congress dispelled any notion that Plaintiffs' requested relief—on their preferred timeline—is "demanded by law." *Norton*, 542 U.S. at 65. To the contrary, whereas Plaintiffs seek non-competitive renewals of *all* 2025 awards pursuant to the 2024 NOFO by March 2, 2026, the 2026 THUD Appropriations Act requires only that HUD make noncompetitive renewals for awards set to expire in the first quarter of 2026. *See* 2026 THUD Appropriations Act, § 244, H.R. 7148 at 250. As required under the Act, HUD intends to renew CoC awards with expiration dates from January 1 to March 31, 2026, on a noncompetitive basis. And, notwithstanding the lack of a firm deadline in the Act, HUD plans to make such renewals expeditiously.

As for the remaining 2025 awards, the 2026 THUD Appropriations Act requires non-competitive renewals *only* if HUD fails to award them under "a fiscal year 2025 notice of funding opportunity" by April 1, 2026 (for grants set to expire in the second quarter) and July 1, 2026 (for

grants set to expire in the third and fourth quarters of 2026). *Id.* In other words, as long as HUD meets the April 1 and July 1 deadlines, it is permitted to award the remaining 2025 CoC awards on a competitive basis under the operative NOFO. HUD intends to meet Congress' rolling-deadline obligations with respect to renewals for awards set to expire in the second, third, and fourth quarters of 2026 by conducting a competitive review of those applications pursuant to the 2025 December NOFO, barring any court order to the contrary. HUD's course of action is consistent with the express authorization in the 2026 THUD Appropriations Act that the remaining 2025 CoC awards may be awarded pursuant to a new NOFO—*i.e.*, "a fiscal year 2025 notice of funding opportunity." *Id.* Lastly, whereas Plaintiffs request that this Court order the award of non-renewals (*i.e.*, "New Application Awards") by March 31, 2026, *see* NAEH Pls.' Reply at 19, the 2026 THUD Appropriations Act imposes *no* deadline for HUD to make such awards. Nor do Plaintiffs explain how that time would itself be realistic.

Simply put, Congress has stepped in and provided mandatory requirements regarding HUD's issuance of 2025 CoC awards. At this juncture, granting Plaintiffs' requested relief—*i.e.*, expedited and non-competitive renewals of *all* 2025 awards pursuant to the 2024 NOFO—would require this Court to improperly substitute its judgment for that of Congress and effectively re-write the 2026 THUD Appropriations Act. This Court lacks that authority. *See In re Am. Fed'n of Gov't Emps., AFL-CIO*, 837 F.2d 503, 506 (D.C. Cir. 1988) (explaining that under § 706(1), courts "are not free to ignore [Congress's] judgment and rewrite the statute to include a specific timetable").

## CONCLUSION

For the reasons identified above and stated in Defendants' combined Cross-Motion for Summary Judgment (*State Litigation*, ECF No. 83; *NAEH Litigation*, ECF No. 68), Defendants

respectfully restate their request that this Court deny Plaintiffs' Motions for Summary Judgment, grant Defendants' Combined Cross-Motion for Summary Judgment, and enter judgment in Defendants' favor.

DATE: February 6, 2026                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          YAAKOV M. ROTH
                                          Principal Deputy Assistant Attorney General
                                          Civil Division

                                          JOHN BAILEY
                                          Counsel to the Assistant Attorney General
                                          Civil Division

                                          JOSEPH E. BORSON
                                          Assistant Branch Director

                                          */s/ William S. Jankowski*
                                          WILLIAM S. JANKOWSKI
                                          D.C. Bar No. 90021524
                                          PARDIS GHEIBI
                                          PETER R. GOLDSTONE
                                          Trial Attorneys, U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C. 20530
                                          Tel.: (202) 353-7578
                                          Fax: (202) 616-8640
                                          Email: william.s.jankowski@usdoj.gov

                                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on February 6, 2026, the above document was filed with the CM/ECF filing system.

/s/ *William S. Jankowski*