A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, *et al*., | Case Nos. 25-cv-626-MSM-AEM |
| Plaintiffs, | 25-cv-636-MSM-AEM |
| v. | District Judge Mary S. McElroy |
| DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*., | Magistrate Judge Amy E. Moses |
| Defendants. | **DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |
| AND | |
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al*., | |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

I.     Statutory and Regulatory Background ........................................................................ 2

II.    Defendants' 2024 and 2025 Administration of the Continuum of Care Program ............. 6

     A.     The 2024 CoC Program ................................................................... 6

     B.     The 2025 CoC Program ................................................................... 9

LEGAL STANDARD ..................................................................................................... 16

ARGUMENT ................................................................................................................ 17

I.     Plaintiffs' Statutory Claims Fail. ........................................................................... 17

     A.     Defendants' rescission of the 2024 NOFO was not contrary to law, arbitrary and capricious, or unreasonably delayed. ............................. 17

          i.     The rescission was not contrary to the McKinney-Vento Act. ................ 18

          ii.     The November rescission of the 2024 NOFO was not arbitrary and capricious. ............................................................... 21

          iii.     Defendants' December 2025 rescission of the 2024 NOFO was not unreasonably delayed. ........................................................ 24

     B.     Plaintiffs' continued challenges to terms appearing only in the November 2025 NOFO are moot. ............................................................... 30

     C.     Defendants' issuance of the December 2025 NOFO violated neither the APA nor the McKinney-Vento Act. ...................................................... 32

          i.     Plaintiffs' claim that issuance of the December 2025 NOFO was unlawfully or unreasonably withheld is moot because the NOFO has been issued. ................................................................ 33

          ii.     The challenged provisions included in the December 2025 NOFO are not contrary to law. .......................................................... 35

               a.     HUD has authority to impose criteria on applications under the CoC program. .................................................... 36

               b.     Caps on permanent housing funding. .............................. 37

i

c.  Caps on Tier 1 project renewals...................................................... 40

d.  Supportive-service requirements ................................................ 44

e.  Disability provisions ................................................................. 45

f.  Geographic-area provisions ....................................................... 46

g.  Gender-identity provisions......................................................... 48

iii.  The challenged provisions included in the December 2025 NOFO are not arbitrary and capricious.................................................... 49

a.  Caps on permanent housing funding and Tier 1 renewals ............ 51

b.  Application review provisions ....................................... 55

c.  Post-award conditions.................................................... 63

iv.  The December 2025 NOFO is not subject to notice-and-comment requirements under the APA................................................... 64

II.  Plaintiffs' Constitutional Claims Fail. ............................................................ 67

A.  Defendants' December 2025 NOFO complies with the limits of the Spending Clause and does not violate the Constitution's separation of powers. ...................................................................................... 68

B.  Defendants' December 2025 NOFO does not unduly coerce states in violation of the Tenth Amendment. ....................................................... 74

C.  NAEH Plaintiffs' First Amendment challenge to the November 2025 NOFO is moot, and Defendants' December 2025 NOFO does not unconstitutionally restrict speech........................................................ 76

D.  Because the December 2025 NOFO does not violate the Constitution, Plaintiffs' contrary-to-constitutional-right APA claims also fail.......................... 78

III.  The Appropriate Remedy for APA Violations Is Limited to the Agency Action Giving Rise to the Suit Rather than a Forward-Looking Injunction................................. 78

A.  Any relief for Plaintiffs' Section 706(2) claims must permit HUD to exercise its discretion to administer the CoC program within the bounds of the law................................................................................... 79

B.  Any relief for Plaintiffs' Section 706(1) claims must not impermissibly dictate to HUD how it must go about complying with its legal obligations......... 83

CONCLUSION.................................................................................................... 87

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ................................................................................ 77, 78

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
  778 F.2d 850 (D.C. Cir. 1985) ................................................................ 81

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
  145 F.4th 39 (1st Cir. 2025) .................................................................... 21

*Anglers Conservation Network v. Pritzker*,
  809 F.3d 664 (D.C. Cir. 2016) ................................................................ 25

*Atieh v. Riordan*,
  797 F.3d 135 (1st Cir. 2015) ............................................................... 53, 57

*Barlow v. United States*,
  32 U.S. (7 Pet.) 404 (1833)...................................................................... 62

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020) ................................................................................ 83

*Bd. of Educ. for Silver Consol. Schs. v. McMahon*,
  791 F. Supp. 3d 1272 (D.N.M. 2025) ..................................................... 70

*Berge v. United States*,
  949 F. Supp. 2d 36 (D.D.C. 2013) .......................................................... 81

*Bos. Bit Labs, Inc. v. Baker*,
  11 F.4th 3 (1st Cir. 2021) ....................................................................... 31

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ..................................................................... 50, 55, 62

*Brock v. Pierce County*,
  476 U.S. 253 (1986) ...................................................................... 33, 34, 35

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ................................................... 48, 49, 63, 73

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ...................................................................... 22, 56, 58, 61

*Burns v. Johnson*,
    829 F.3d 1 (1st Cir. 2016) ........................................................ 16

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ............................................................... 43

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................... 78, 82

*Camp v. Pitts*,
    411 U.S. 138 (1973) ........................................................... 51, 82

*Cent. Me. Power Co. v. Fed. Energy Regul. Comm'n*,
    252 F.3d 34 (1st Cir. 2001) ...................................................... 80

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) .............................................................. 65

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971), *abrogated on other grounds by*
    *Califano v. Sanders*, 430 U.S. 99, 105 (1977) ................................. 17

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020) ..................................................... 68

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020) ............................................. 36, 70, 73

*Coe v. McHugh*,
    968 F. Supp. 2d 237 (D.D.C. 2013) .............................................. 16

*Committee for Fairness v. Kemp*,
    791 F. Supp. 888 (D.D.C. 1992) ................................................. 67

*Common Cause v. Trump*,
    506 F. Supp. 3d 39 (D.D.C. 2020 ................................................ 48

*County of Los Angeles v. Davis*,
    440 U.S. 625 (1979) .............................................................. 31

*County of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) .............................................. 79, 80

*County of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*,
    802 F.3d 413 (2d Cir. 2015) ................................................. 46, 47

*Ctr. for Biological Diversity v. Zinke,*
   260 F. Supp. 3d 11 (D.D.C. 2017) ........................................................ 86

*Dalton v. Specter,*
   511 U.S. 462 (1994) ................................................................. 68, 69

*Dep't of Educ. v. California,*
   604 U.S. 650 (2025) ...................................................................... 79

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020) ..................................................................... 17, 51

*DL v. District of Columbia,*
   860 F.3d 713 (D.C. Cir. 2017) ............................................................. 81

*Doe v. Leavitt,*
   552 F.3d 75 (1st Cir. 2009) ............................................................... 65

*Doe v. Noem,*
   152 F.4th 272 (1st Cir. 2025) .......................................................... 24, 53

*Env't Def. Ctr., Inc. v. U.S. EPA,*
   344 F.3d 832 (9th Cir. 2003) ............................................................. 75

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................................. 21, 22

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ............................................................. 21, 22, 23

*FDA v. Wages & White Lion Invs., LLC,*
   604 U.S. 542 (2025) ...................................................................... 53

*FEC v. Akins,*
   524 U.S. 11 (1998) ....................................................................... 50

*Fed. Energy Regul. Comm'n v. Mississippi,*
   456 U.S. 742 (1982) ...................................................................... 75

*Field v. Mans,*
   516 U.S. 59 (1995) ....................................................................... 19

*Forest Guardians v. Babbitt,*
   174 F.3d 1178 (10th Cir. 1999) ........................................................... 29

*Gulf of Me. Fisherman's All. v. Daley*,
    292 F.3d 84 (1st Cir. 2002) ........................................................... 31

*Illinois v. Fed. Emergency Mgmt. Agency*,
    801 F. Supp. 3d 75 (D.R.I. 2025) ................................................. 31

*Immigr. & Naturalization Serv. v. Orlando Ventura*,
    537 U.S. 12 (2002) ........................................................................ 79

*In re Barr Lab'ys, Inc.*,
    930 F.2d 72 (D.C. Cir. 1991) ....................................................... 27

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ................................................... 26

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ..................................................... 26

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ....................................................... 79

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*,
    802 F.3d 99 (1st Cir. 2015) ..................................................... 16, 17

*Interstate Com. Comm'n v. N.Y., New Haven & Hartford R.R. Co.*,
    287 U.S. 178 (1932) ...................................................................... 25

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
    559 U.S. 573 (2010) ...................................................................... 62

*Lawson v. FMR LLC*,
    571 U.S. 429 (2014) ...................................................................... 43

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .................................................... 20, 38, 39, 65

*Lindh v. Murphy*,
    521 U.S. 320 (1997) ...................................................................... 19

*Lockhart v. United States*,
    577 U.S. 347 (2016) ...................................................................... 41

*Lowe v. Gagné-Holmes*,
    126 F.4th 747 (1st Cir.), *cert. denied*, 145 S. Ct. 2795 (2025) (mem.) ............................ 31, 32

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (2004) ................................................................. 18

*Marciano v. Adams*,
    No. 22-570-CV, 2023 WL 3477119 (2d Cir. May 16, 2023) ................................. 31

*Me. Med. Ctr. v. Burwell*,
    841 F.3d 10 (1st Cir. 2016) ......................................................... 79

*Midwest Gas Users Ass'n v. Fed. Energy Regul. Comm'n*,
    833 F.2d 341 (D.C. Cir. 1987) ....................................................... 26

*Minuteman Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    291 F. Supp. 3d 174 (D. Mass. 2018) ................................................. 16

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) .................................................................. 59

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
    100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025) ................... 33, 85

*Nat'l Fed'n of Ind. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ............................................................... 74, 76

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
    30 F.3d 1510 (D.C. Cir. 1994) ........................................................ 50

*New York v. U.S. Dep't of Just.*,
    951 F.3d 84 (2d Cir. 2020) ........................................................... 73

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................. 74

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)............................................................... *passim*

*NYC C.L.A.S.H., Inc. v. Fudge*,
    47 F.4th 757 (D.C. Cir. 2022) ...................................................... 73, 75

*Oxfam Am., Inc. v. U.S. SEC*,
    126 F. Supp. 3d 168 (D. Mass. 2015) .................................................. 34

*O'Brien v. Mass. Bay Transp. Auth.*,
    162 F.3d 40 (1st Cir. 1998) .......................................................... 75

*Palisades Gen. Hosp. Inc. v. Leavitt*,
    426 F.3d 400 (D.C. Cir. 2005) ............................................................ 79

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    918 F.3d 151 (D.C. Cir. 2019) ............................................................ 21

*POM Wonderful LLC v. Coca-Cola Co.*,
    573 U.S. 102 (2014) ............................................................ 38

*PPG Indus., Inc. v. United States*,
    52 F.3d 363 (D.C. Cir. 1995) ............................................................ 79, 80

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F. Supp. 3d 10 (D.D.C. 2021), *appeal dismissed*,
    2022 WL 4280690 (D.C. Cir. Sep. 13, 2022) ............................................ 81

*Reno v. Flores*,
    507 U.S. 292 (1993) ............................................................ 48

*Regan v. Taxation with Representation of Wash.*,
    461 U.S. 540 (1983) ............................................................ 78

*River St. Donuts, LLC v. Napolitano*,
    558 F.3d 111 (1st Cir. 2009) ............................................................ 17

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................................ 77

*Salazar ex rel. Salazar v. District of Columbia*,
    896 F.3d 489 (D.C. Cir. 2018) ............................................................ 83

*Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*,
    674 F.3d 97 (1st Cir. 2012) ............................................................ 27

*Sierra Club v. EPA*,
    353 F.3d 976 (D.C. Cir. 2004) ............................................................ 21

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................................ 69, 73, 74

*Spell v. Edwards*,
    962 F.3d 175 (5th Cir. 2020) ............................................................ 31

*Summers v. City of Fitchburg*,
    940 F.3d 133 (1st Cir. 2019) ............................................................ 45

*Telecomms. Rsch. & Action Ctr. v. FCC,*
      750 F.2d 70 (D.C. Cir. 1984) ......................................................... 18, 26, 29, 30

*Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n,*
      829 F.2d 275 (1st Cir. 1987) .................................................................... 26

*Trauma Serv. Grp. v. United States,*
      104 F.3d 1321 (Fed. Cir. 1997) ................................................................ 86

*Trump v. Am. Fed'n of Gov't Emps.,*
      145 S. Ct. 2635 (2025) (mem.) ................................................................ 49

*Util. Air Regul. Grp. v. EPA,*
      573 U.S. 302 (2014) ................................................................................ 36

*United States ex rel. Dunlap v. Black,*
       128 U.S. 40 (1888)................................................................................... 25

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
      435 U.S. 519 (1978) ................................................................................ 64

*Webster v. Doe,*
      486 U.S. 592 (1988) ................................................................................ 36

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,*
      784 F. Supp. 3d 127 (D.D.C.), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025) ...... 69, 70

*Zixiang Li v. Kerry,*
      710 F.3d 995 (9th Cir. 2013) ............................................................ 33, 85

**STATUTES**

5 U.S.C. § 553 ............................................................................. 64, 65, 66, 67

5 U.S.C. § 701 ........................................................................................ 17

5 U.S.C. § 703 ........................................................................................ 80

5 U.S.C. § 706 ................................................................................. *passim*

21 U.S.C. § 856 ...................................................................................... 62

34 U.S.C. § 20912 .................................................................................. 47

42 U.S.C. § 11360 ............................................................................ 4, 5, 6

42 U.S.C. § 11374 ............................................................................................... 3

42 U.S.C. §§ 11381–11389 ............................................................................... 36

42 U.S.C. § 11381 .................................................................................... *passim*

42 U.S.C. § 11382 .................................................................................... *passim*

42 U.S.C. § 11383 ............................................................................................... 3

42 U.S.C. § 11385 ......................................................................... 6, 44, 55, 72

42 U.S.C. § 11386 ............................................................................................ 72

42 U.S.C. § 11386a .................................................................................. *passim*

42 U.S.C. § 11386b .................................................................................. *passim*

42 U.S.C. § 11386c .................................................................................. *passim*

42 U.S.C. § 12132 ..................................................................................... 45, 58

42 U.S.C. § 12711 ..................................................................................... 46, 47

42 U.S.C. § 15002 ............................................................................................ 58

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, 138 Stat. 25 ......................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 ............................................................... 9, 27

**REGULATIONS**

2 C.F.R. § 200.319 ............................................................................................. 4

2 C.F.R. § 200.501 ............................................................................................. 8

24 C.F.R. § 10.1 ........................................................................................ 66, 67

24 C.F.R. § 578.3 .............................................................................................. 6

24 C.F.R. § 578.7 ............................................................................................ 47

24 C.F.R. § 578.21 ............................................................................................ 4

24 C.F.R. § 578.33 ........................................................................................... 4

24 C.F.R. § 578.53 ........................................................................................... 6

24 C.F.R. § 578.75 ....................................................................................... 55, 56

Exec. Order No. 14,168,
    90 Fed. Reg. 8615 (Jan. 20, 2025)..................................................... 48, 49, 63, 77

Exec. Order No. 14,173,
    90 Fed. Reg. 8633 (Jan. 21, 2025)................................................................... 63

Exec. Order No. 14,182,
    90 Fed. Reg. 8751 (Jan. 24, 2025)................................................................... 63

Exec. Order No. 14,218,
    90 Fed. Reg. 10,581 (Feb. 19, 2025)............................................................... 63

Exec. Order No. 14,321,
    90 Fed. Reg. 35,817 (July 24, 2025) ............................................................... 63

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 8 ...................................................................................... 69

**RULES**

Fed. R. Civ. P. 56 ........................................................................................... 16

**OTHER AUTHORITIES**

*Continuum of Care Program*, U.S. Dep't of Hous. & Urb. Dev. (Jan. 8, 2026),
    https://www.hud.gov/hud-partners/community-coc ............................................. 32

*Effective*, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/effective ....................................... 42

*eLOCCS Access Guidelines for Business Partners*, U.S. Dep't of Hous. & Urb. Dev.,
    https://www.hud.gov/hud-partners/eloccs-access..................................................... 8

Grants.gov, FR-6800-N-25, "Version History,"
    https://www.grants.gov/search-results-detail/355762.......................................... 82

*Housing and Urban Development Secretary Nominee Scott Turner Testifies at Confirmation
    Hearing* (C-SPAN, Jan. 16, 2025),
    https://www.c-span.org/program/senate-committee/housing-and-urban-development-
    secretary-nominee-scott-turner-testifies-at-confirmation-hearing/654496 ........................ 10, 22

Marcy Thompson, *After the Shutdown: What Everyone Needs to Know About the Upcoming
    NOFO*, Nat'l All. to End Homelessness (Nov. 11, 2025),
    https://endhomelessness.org/blog/after-the-shutdown-what-everyone-needs-to-know-about-
    the-upcoming-nofo/ ........................................................................................................... 41

The Mark Davis Show, *U.S. Department of Housing and Urban Development (HUD) Secretary
    Scott Turner*, (Mar. 19, 2025),
    https://omny.fm/shows/the-mark-davis-show/march-19-2025-8am-hour ............................... 10

## INTRODUCTION

Plaintiffs in these two related lawsuits disagree with how the Department of Housing and Urban Development (HUD) has decided it will administer its flagship Continuum of Care (CoC) housing-support funding program. But Congress has given HUD the flexibility to administer such programs according to varied policy perspectives and, indeed, pursuant to the will of the democratic process. Mere disagreement with HUD's policy choices cannot serve to invalidate the entire program. And, at bottom, Plaintiffs here do just that: disagree with HUD's policy choices.

In mid-2025, HUD decided to back away from the previous Administration's CoC funding policies, which, in HUD's reasoned judgment, had been proven ineffective by a yearslong failure to make any meaningful progress in addressing what has become an acute and worsening homelessness crisis. HUD's decision to back away from those earlier policies—a decision HUD rationally and reasonably explained—falls squarely within its statutory discretion. And HUD's commensurate decision to restructure the process for applying for housing-support grants—which HUD also rationally explained—similarly accorded with the law. As a result, HUD's decisions—first, to rescind the Notice of Funding Opportunity (NOFO) previously governing its funding program; and, second, to issue a NOFO establishing new criteria for the program—should stand.

Plaintiffs here claim that HUD's decisions to rescind earlier policies and enact new ones violate a bevy of statutory and constitutional provisions. But Plaintiffs read various requirements into the applicable statutory law that simply do not exist. And, as the Supreme Court has made clear time and again, both Congress and the Executive Branch have ample latitude under the

Constitution to administer funding programs as both branches see fit. It takes an exceptional case to transgress the outer limits of that latitude. This case is not one of those exceptions.[1]

## BACKGROUND

### I.     Statutory and Regulatory Background

The primary purposes of the Continuum of Care (CoC) program are to reduce the number of homeless persons and increase their self-sufficiency. The statutory mechanism to achieve these goals is designed to provide funding to nonprofit providers and state and local governments to promote access to and utilization of homelessness-reduction programs nationwide. HUD administers the CoC program under the McKinney-Vento Homeless Assistance Act and other related provisions, including the Department of Housing and Urban Development Reform Act of 1989 and the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009, which amended and reauthorized the McKinney-Vento Act and first established the CoC program.

Per the McKinney-Vento Act, as amended by the HEARTH Act, the congressional purposes underlying the CoC program are to "promote community-wide commitment to the goal of ending homelessness;" "provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness;" "promote access to, and effective utilization of, mainstream programs" aimed at reducing homelessness; and "optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

---

[1] To preserve judicial resources, Defendants have combined their arguments for summary judgment and responses to Plaintiffs' independent motions for summary judgment in each of the related cases into the same brief. Each brief Defendants file today is identical to the corresponding brief filed in the companion case.

The McKinney-Vento Act provides that grants awarded under the CoC program "shall be used to carry out projects" consisting of one or more of several eligible activities, including: "[c]onstruction of new housing units," "[a]cquisition or rehabilitation of a structure," or "[l]easing of property," all "to provide transitional or permanent housing," *id.* § 11383(a)(1)–(3); the provision of "rental assistance," *id.* § 11383(a)(4); and the provision of "[s]upportive" and "rehousing services," *id.* § 11383(a)(6)–(7). Congress required that HUD allocate "a portion equal to not less than 30 percent of the sums made available to carry out" the Emergency Solutions Grants (ESG) Program[2] and the CoC program to "be used for permanent housing for homeless individuals with disabilities and homeless families that include such an individual who is an adult or a minor head of household if no adult is present in the household." *Id.* § 11386b(a)(1). Congress similarly provided that an amount "not less than 10 percent" of all CoC and ESG funding "be used to provide or secure permanent housing for homeless families with children." *Id.* § 11386b(b). In other words, Congress required CoC funding equal to 30 percent—but not more—of total annual CoC and ESG funding to be used for permanent housing. *See id.* And even then, this designation was intended as a jump-start, not a permanent solution: the 30-percent requirement in subsection (a) will permanently end "upon a finding by the Secretary that since the beginning of 2001 at least 150,000 new units of permanent housing for homeless individuals and families with disabilities have been funded" under the CoC program. *Id.* § 11386b(a)(5).

Congress requires the HUD Secretary to "award grants, on a competitive basis, and using the selection criteria" established under the McKinney-Vento Act, "to carry out eligible activities" for "projects that meet the program requirements" under the Act by awarding funds to project

---

[2] This program governs HUD's distribution of assistance for the establishment and maintenance of emergency shelters. *See* 42 U.S.C. § 11374.

sponsors or to "unified funding agencies." *Id.* § 11382(a). The Act provides that the Secretary "shall release a notification of funding availability for grants awarded" under the program "for a fiscal year not later than 3 months after the date of the enactment of the appropriate Act making appropriations" for "such fiscal year." *Id.* § 11382(b). The Act requires that such awards be made "through a national competition between geographic areas based on criteria established by the Secretary," *id.* § 11386a(a), and defines a "geographic area" to be, among other things, a "State, metropolitan city, urban county, town, village," or "a combination or consortia of such, in the United States," *id.* § 11360(9). Both the McKinney-Vento Act and HUD regulations make clear that robust competition of CoC applications across geographic areas is a key feature of the CoC program. *See, e.g.*, *id.* § 11382(a) ("The Secretary shall award grants[] on a competitive basis[.]"); 24 C.F.R. § 578.21(a) ("HUD . . . will award funds to recipients through a national competition[.]"); *id.* § 578.33(d)(2) ("Review criteria for competitively awarded renewals made after August 30, 2012 will be described in the [Notice of Funding Availability]."); *see also* 2 C.F.R. § 200.319(a) ("All procurement transactions under the Federal award must be conducted in a manner that provides full and open competition[.]").

The McKinney-Vento Act also requires HUD to assess "the previous performance of the recipient regarding homelessness" across a variety of metrics, 42 U.S.C. § 11386a(b)(1)(A); "the plan of the recipient, which shall describe" the steps the recipient will take to address the goals of the CoC program, *id.* § 11386a(b)(1)(B); the recipient's methodology for determining funding priority, *id.* § 11386a(b)(1)(C); and the "extent to which the amount of assistance" will be "supplemented with resources from other public and private sources," *id.* § 11386a(b)(1)(D). Congress then permits the Secretary to rely on "such other factors as the Secretary determines to

be appropriate to carry out" the CoC program "in an effective and efficient manner." *Id.* § 11386a(b)(1)(G).

The McKinney-Vento Act also explains that the "[r]enewal of expiring contracts for leasing, rental assistance, or operating costs for permanent housing" projects "may" be funded under "the appropriations account" for housing assistance or under the "section 8 project-based rental assistance account." *Id.* § 11386c(a). The Act then provides that any funds so available— *i.e.*, any funds made available under section 11386c(a) for renewal—"shall be available for the renewal of contracts" in "successive 1-year terms" for tenant-based assistance and "successive terms of up to 15 years at the discretion of the applicant or project sponsor" for "rental assistance and housing operation costs associated with permanent housing projects." *Id.* § 11386c(b). Per the Act, the Secretary "shall determine whether," in his discretion, "to renew a contract for such a permanent housing project on the basis of certification" by an applicant that "(1) there is a demonstrated need for the project" and "(2) the project complies with program requirements and appropriate standards of housing quality and habitability, *as determined by the Secretary*." *Id.* (emphasis added).

As relevant to this litigation, the McKinney-Vento Act defines "permanent housing" to be "community-based housing without a designated length of stay," which "includes both permanent supportive housing and permanent housing without supportive services." *Id.* § 11360(17). "Supportive services" means "services that address the special needs of people served by a project," including "child care services," "employment assistance" programs, the "provision of outpatient health services, food, and case management," certain housing and employment counseling services, mental health services, and "other supportive services necessary to obtain and

maintain housing."[3] *Id.* § 11360(29). "Transitional housing" is defined as "housing the purpose of which is to facilitate the movement of individuals and families experiencing homelessness to permanent housing within 24 months or such longer period as the Secretary determines necessary." *Id.* § 11360(31). A HUD regulation defines a "Continuum of Care" to be "the group organized to carry out the responsibilities required" under the CoC program, which is "composed of representatives of organizations" like "nonprofit homeless providers," "faith-based organizations," "governments," "public housing agencies," and others, "to the extent these groups are represented within the geographic area and are available to participate." 24 C.F.R. § 578.3.

## II.  Defendants' 2024 and 2025 Administration of the Continuum of Care Program

### A.  The 2024 CoC Program

In 2024, Congress authorized HUD to "issue a 2-year notification of funding opportunity, including any alternative procedures or requirements as may be necessary to allocate future appropriations in the second year, for the award of amounts made available for the continuum of care program." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 242, 138 Stat. 25, 386. HUD issued the "FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homelessness Demonstration Program [(YHDP)] Grants" notice of funding opportunity ("2024 NOFO") pursuant to that congressional appropriation in July 2024.

---

[3] The McKinney-Vento Act requires CoC projects, to "the extent practicable," to "provide supportive services for residents of the project and homeless persons using the project." 42 U.S.C. § 11385(a). A longstanding HUD regulation explains that, to fulfill that statutory requirement, "[g]rant funds may be used to pay the eligible costs of supportive services that address the special needs of the program participants." 24 C.F.R. § 578.53(a). Under the regulation, "supportive services must be made available to residents throughout the duration of their residence" in a transitional housing project, and "[p]ermanent supportive housing projects must provide supportive services for the residents to enable them to live as independently as is practicable throughout the duration of their residence in the project." *Id.* § 578.53(b)(1)–(2).

*See* Administrative R. ("AR") at 27, ECF No. 56-2; *see also* AR 170.[4] Under the 2024 NOFO, HUD estimated that approximately $3,524,000,000 of funding would be available for the competition. AR 60. HUD "reserve[d] the right to award fiscal year 2025 funds based on this NOFO competition." *Id.* But HUD did not *commit* to awarding FY 2025 funds under the NOFO. And HUD further "reserve[d] the right to modify this NOFO or issue a supplemental FY 2025 CoC and YHDP NOFO if necessary." AR 31–32. HUD further explained that a reason it might modify the NOFO would be to "accommodate a new CoC or YHDP priority." AR 32.

The 2024 NOFO established two deadlines for submitting applications for funding under the NOFO: October 30, 2024, for FY 2024 funding; and August 29, 2025, for FY 2025 funding. AR 31. Under the two-year framework contemplated by the 2024 Consolidated Appropriations Act, HUD explained that CoCs "are only required to submit one CoC application that will be applicable to the FY 2024 and FY 2025 funds." *Id.* HUD "reserve[d] the right to award available FY 2025 funds" based on the two-year NOFO competition. *Id.* It explained that "[p]rojects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds." AR 50. The NOFO provided a series of requirements for funding applicants and recipients to meet, both in administering programs under the NOFO, *see* AR 63–84, and in applying for and receiving funding under the competition, *see* AR 84–94.

---

[4] For ease of reference, citations to the Administrative Record refer to the bates-labeled page numbers rather than the ECF page numbers. The Administrative Record extends across multiple filings and includes pages 1–4 (AR, *State of Washington v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-626 (D.R.I.) ("*State Litigation*"), ECF No. 54; AR, *Nat'l All. to End Homelessness v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-636 (D.R.I.) ("*NAEH Litigation*"), ECF No. 44), pages 5–283 (AR, *State Litigation*, ECF No. 72-2; AR, *NAEH Litigation*, ECF No. 56-2), and pages 284–1269 (AR, *State Litigation*, ECF Nos. 76, 76-1, 76-2, 76-3, 76-4; AR, *NAEH Litigation*, ECF Nos. ECF Nos. 59, 59-1, 59-2, 59-3, 59-4).

Under the two-year framework, evaluations of applications for renewal funding would happen, HUD explained, on a yearly basis, regardless of whether a recipient was required to submit a new application for project renewal, *see* AR 55 (explaining that HUD would conditionally select project applications provided the applications pass project eligibility and quality thresholds "and if applicable, project renewal threshold[s]"); *see also* AR 86 (explaining that HUD would consider "any project requesting renewal funding as having met" project eligibility threshold "requirements through its previously approved grant application *unless HUD receives information to the contrary* (e.g., monitoring findings, results from investigations by HUD's Office of Inspector General, the recipient does not routinely draw down funds from eLOCCS at least once per quarter, consistently late Annual Performance Report (APR) submissions)" (emphasis added)).[5] Under Office of Management and Budget regulations, this yearly due diligence is required for recipients of federal grants of over $1 million. *See* 2 C.F.R. § 200.501. And, more importantly, the 2024 NOFO itself established threshold review criteria for all renewals. For instance, HUD would "review information in eLOCCS, APRs, and information provided from the local HUD CPD field office" to determine whether renewal projects had met certain minimum project threshold standards. AR 92. Standards that might lead to nonrenewal included failure to comply with timeliness standards for managing grants, indications of project mismanagement, and inadequate financial accounting. *See id.* HUD indicated that it would review all new project applications under a series of additional project quality threshold requirements, like the use of supportive services to help participants obtain permanent housing, specified plans for helping participants obtain program benefits, and ease of access to the program for program participants. *See* AR 87–91.

---

[5] eLOCCS ("e-Line of Credit Control System") is HUD's primary grant disbursement system. *See eLOCCS Access Guidelines for Business Partners*, U.S. Dep't of Hous. & Urb. Dev., https://www.hud.gov/hud-partners/eloccs-access (last visited Jan. 22, 2026).

The 2024 NOFO set out a two-tier funding selection process for FY 2024 funding. *See* AR 55. Tier 1 projects, as designated by CoCs, faced lower selection thresholds: HUD would "conditionally select" such applications, provided the applications passed project eligibility, quality, and renewal threshold review. *See id.* HUD would assess Tier 2 projects using the full scope of project factors included in the NOFO. *See* AR 56. For each individual CoC, HUD established Tier 1 and Tier 2 funding amounts informed by each CoC's "Annual Renewal Demand," the total amount of each CoC's projects that would be eligible for renewal in the CoC competition, as indicated on each CoC's renewal project and priority listings that it would submit to HUD. *See* AR 40, 55. HUD set Tier 1 amounts at 90 percent of each CoC's Annual Renewal Demand, minus the sum of certain annual renewal amounts for non-competitive youth homelessness programs. *See* AR 55. HUD permitted CoCs to place reallocation and renewal projects in Tier 1. *See id.* Tier 2 amounts for each CoC constituted the remaining difference between Tier 1 and the maximum amount of funds each CoC sought in its application. *See* AR 56.

After conducting the FY 2024 competition, HUD announced $3.6 billion in CoC Program awards on January 17, 2025. *See* AR 19.

**B.    The 2025 CoC Program**

In mid-March 2025, Congress appropriated the same amount for the FY 2025 CoC program as it had the year prior. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 12. It also permitted the Secretary to repurpose $100 million in funds that had previously been earmarked for one-time awards for new construction of "new permanent supportive housing," 138 Stat. at 364, to "provide additional amounts for the continuum of care program," 139 Stat. at 40. The 2025 Appropriations Act gave HUD until September 30, 2027, to obligate FY 2025 CoC funds. *See* 139 Stat. at 12, 14 (authorizing the same amounts and

under the same conditions provided in the 2024 Appropriations Act, *see* 138 Stat. at 362, including by advancing appropriations with "a comparable period of availability" as in the 2024 Act).

Since the change in presidential administration in January 2025, HUD officials have made several public statements communicating HUD's intent to reassess its approach to homelessness. As Secretary Turner explained during his confirmation hearing on January 16, 2025, HUD would take the position that "wraparound services," like the incorporation of mental-health and substance-abuse treatment, "are vital and key when it comes to eradicating and attacking homelessness." *Housing and Urban Development Secretary Nominee Scott Turner Testifies at Confirmation Hearing*, at 1:58:30 (C-SPAN, Jan. 16, 2025), https://www.c-span.org/program/senate-committee/housing-and-urban-development-secretary-nominee-scott-turner-testifies-at-confirmation-hearing/654496 ("*Confirmation Hearing*"). In March 2025, the Secretary emphasized that HUD would "look at homelessness from a holistic viewpoint," seeking to boost "wraparound services" to "get to the root" of the expanding homelessness problem in the country. The Mark Davis Show, *U.S. Department of Housing and Urban Development (HUD) Secretary Scott Turner*, at 3:45 (Mar. 19, 2025), https://omny.fm/shows/the-mark-davis-show/march-19-2025-8am-hour.

On June 18, 2025, HUD officials submitted to Congress a statutorily required plan for using recaptured funds to supplement FY 2025 funding. *See* AR 6–17. There, HUD indicated it planned to exercise its discretion to repurpose the $100 million for new permanent supportive housing to provide additional funding for the CoC program. *See* AR 6.

On July 3, 2025, prior to the application window for FY 2025 funding under the 2024 NOFO, HUD announced to recipients that it intended to exercise its discretion under the 2024 Consolidated Appropriations Act to "publish a NOFO for 2025 Continuum of Care (CoC) awards."

10

AR 18. It invited CoCs "to prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants." *Id.*

HUD published a new CoC NOFO on November 13, 2025 ("the November 2025 NOFO"). *See* AR 24. As explained in its notice to recipients, the NOFO made $3.9 billion in awards available under the CoC program. *See id.* HUD explained that it intended to "positively steward . . . valuable taxpayer resources" by pursuing several program goals focused on self-sufficiency, including by promoting treatment and recovery, "[w]elcoming" transitional housing and supportive-services projects, increasing competition for grants, and advancing public safety. *See id.*

The November 2025 NOFO, in relevant part, revisited statutory priorities that had been abandoned by previous Administrations but were integral to the CoC program. These were reflected in the new presidential Administration's focus on pursuing new tactics for addressing homelessness, given an historic increase in the number of unsheltered people in recent years. *See* AR 167; *see also* AR 286–87 (explaining that, throughout the spring and early summer of 2025, HUD "made it a policy priority to make a 'paradigm shift' " away from "Housing First" permanent housing policies. As relevant to this litigation, the NOFO reestablished a 30-percent limit (consistent with the McKinney-Vento Act) on the total amount of a CoC's Annual Renewal Demand that could be used to fund permanent housing projects, *see* AR 170; set the amount of funding for Tier 1 CoC projects at 30 percent of each CoC's Annual Renewal Demand, *see id.*; incentivized applicants to include supportive-service participation requirements in their programs, *see* AR 210, 222; incentivized the creation of projects to provide substance-abuse treatment, *see* AR 233; incentivized CoCs to require participants to take part in supportive services, *see* AR 215–17, 235; incentivized projects to provide "customized services" for participants, *see* AR 211–12;

incentivized taking actions to help reduce substance abuse and promote the safety of program participants by, for example, limiting public drug use and encouraging compliance with sex-offender registry requirements, *see* AR 209–10, 220, 241–42, 264; incentivized partnerships with first responders and law enforcement to promote the safety of program participants, *see* AR 213–14, 236, 238, 241–42; and disincentivized CoCs from engaging in illegal discrimination, *see* AR 179, 209–10, 220, 263–64.

The November 2025 NOFO set an application due date of January 14, 2026, and provided an estimated award date of May 1, 2026. *See* AR 160. After Plaintiffs filed their lawsuits, however, HUD decided in good faith to make revisions to the NOFO and the CoC program to address Plaintiffs' concerns. *See* AR 287. Accordingly, HUD withdrew the November 2025 NOFO on December 8, 2025, in the process thereby notifying Plaintiffs and the Court that the November 2025 NOFO was no longer in effect. *See* AR 1–2; Defs' Notice of Withdrawal of the Challenged 2025 Notice of Funding Opportunity, *State Litigation*, ECF No. 41; Defs' Notice of Withdrawal of the Challenged 2025 Notice of Funding Opportunity, *NAEH Litigation*, ECF No. 39. As soon as was practicable, counsel for HUD notified Plaintiffs and the Court via email on December 17, 2025, that HUD expected to release a revised NOFO prior to or soon after the Court's scheduled hearing on December 19. After revision, HUD published on the evening of December 19, 2025, a revised NOFO ("the December 2025 NOFO"), which replaced the withdrawn November 2025 NOFO.

HUD weighed various considerations before issuing a new NOFO that had the effect of superseding the 2024 NOFO: on one hand, publishing a supplemental NOFO, which could, for example, accommodate a new CoC or distribute funds from a new funding source, *see* AR 32, would be the quickest way to distribute funds and would align with the procedures under the

existing two-year NOFO, *see* AR 293. But, on the other hand, issuance of a new NOFO would allow HUD to pursue the new Administration's priorities and would permit the CoC program to respond to a decade-long homelessness crisis that had resulted in historic highs both in homelessness and in spending to reduce homelessness. *See* AR 293–94. HUD considered certain administrative burdens, both to CoCs and to HUD, and factored in various reliance and timing interests that program stakeholders might have in maintaining the 2024 NOFO and/or the November 2025 NOFO. *See* AR 295–98. But given the failures of the existing policies, HUD ultimately concluded that it should proceed with a revised FY 2025 NOFO "to better accomplish the goals of a community-wide commitment to reducing homelessness and optimizing self-sufficiency." AR 298.

The December 2025 NOFO rescinded certain provisions previously included in the November 2025 NOFO: a scoring incentive to provide service to disabled individuals, excluding those persons suffering from substance-use disorder, *see* AR 216; a scoring provision incentivizing nonprofit organizations to verify the immigration status of participants, *see* AR 243; and several reservations of HUD's right to examine whether applicants had previously conducted or currently conduct activities that "rely on" a "definition of sex other than as binary in humans," AR 210, 220, 263. The December 2025 NOFO also substantively amended certain other provisions: the 30-percent permanent housing cap, which under the new NOFO would apply only to the *renewal* of existing permanent housing projects, *see* AR 1155; a customized-services scoring incentive, clarifying that a carveout for people with disabilities would not exclude substance-use disorder from its definition, *see* AR 1197; certain public-safety provisions, clarifying that, unlike in the November 2025 NOFO, points would not be awarded based on whether state or local laws prohibited public camping or drug use, but would instead be awarded based on whether geographic

areas clear public encampments and connect individuals in such encampments, or using illicit drugs, with "appropriate services," AR 1226–27; and clarifying that applicants must certify they will not engage in "illegal discrimination" and will not operate "illegal drug injection sites" in violation of federal law, AR 1194–95, 1205. HUD added one relevant provision explaining that the CoC program would obligate 30 percent of funds, the minimum required by Congress, for new permanent housing projects for homeless individuals and families—thereby addressing its statutory obligations directly. *See* AR 1154; 42 U.S.C. § 11386b(a)(1). The December 2025 NOFO further included a severability provision, noting that, should any "part or provision" in the NOFO be enjoined, such an injunction "shall not invalidate or affect the legality or enforceability of the remaining provisions" in the NOFO. AR 1251. It also required funding recipients to comply with certain Executive Orders, to the extent those orders imposed any obligations on recipients, and "unless otherwise restricted by law or by a court of competent jurisdiction." AR 1250.

In issuing the December 2025 NOFO, HUD explained that previous presidential Administrations' policies had failed to address what has crystallized into the worst homelessness crisis in recorded history. *See* AR 287, 1145. Per the 2024 Annual Homelessness Assessment Report that HUD submitted to Congress, the "number of people experiencing homelessness on a single night in 2024 was the highest ever recorded." AR 585. The number of children who experienced homelessness increased by 33 percent between 2023 and 2024. *See id.* And the number of people in families with children "had the largest single year increase in homelessness" in those years. *Id.* Chronic homelessness—which policies promoting permanent supportive housing were "intended to address"—also increased to the highest number on record, despite an increase in permanent supportive housing beds available over the same period. AR 287. HUD concluded that a shift in priorities was necessary to address a crisis that has continued to worsen

14

because of more than a decade of policies aimed solely at promoting permanent supportive housing programs. *See id.* So HUD resolved to rebalance the CoC program by returning it "to its original goals of solving homelessness by improving outcomes, expanding competition, and prioritizing treatment, economic independence, and law and order to address the diverse root causes of homelessness." AR 288. HUD emphasized that its revised NOFO was intended to promote the explicit congressional directives for the CoC program to increase self-sufficiency and to prevent or minimize the trauma to individuals, families, and communities caused by homelessness. *See* AR 289–91.

In order to address concerns related to the timing of awards, the December 2025 NOFO established two tracks of review: a "Normal" track, with an application due date of January 28, 2026, and an expedited estimated award date of March 31, 2026; and an "Extended Track," with an application due date of February 25, 2026, and an estimated award date of April 28, 2026. *See* AR 1138. HUD resolved to issue awards expeditiously. Even under the delayed timeframe caused by the initiation of this litigation, the Normal Track award date was consistent with award dates under previous CoC competitions. McKenney Decl. ¶ 3 ("For example, FY 2022 awards were announced March 28, 2023, and FY 2021 awards were announced March 14, 2022."); Ex. A to McKenney Decl. at 1. The Normal track covered all applications except those for new permanent housing projects; the NOFO explained that CoCs seeking funding for new permanent housing projects should apply under the Extended track. *See* AR 1154–55.

State Plaintiffs jointly filed their initial complaint on November 25, 2025. *See* Compl., *State of Washington v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-626 (D.R.I.) ("*State Litigation*"), ECF No. 1. The private plaintiffs, led by Plaintiff National Alliance to End Homelessness (NAEH), jointly filed their initial complaint in the related case on December 1,

2025. *See* Compl., *Nat'l All. to End Homelessness v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-

636 (D.R.I.) ("*NAEH Litigation*"), ECF No. 1. Pursuant to a schedule jointly requested by the

parties, Plaintiffs filed their amended and operative complaints on January 14, 2026. *See* Second

Am. Compl., *State Litigation*, ECF No. 80; First Am. Compl., *NAEH Litigation*, ECF No. 66.

Plaintiffs filed their motions for summary judgment on the same day. *See* Pl. States' Mot. for

Summ. J., *State Litigation*, ECF No. 81; Pls.' Mot. for Summ. J., *NAEH Litigation*, ECF No. 67.

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). On a motion for summary judgment, courts must construe the evidence in the light most

favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *See*

*Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).[6]

For Administrative Procedure Act (APA) claims, summary judgment "serves as the

mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review." *Minuteman*

*Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 190 (D. Mass. 2018)

(quoting *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013)). The "traditional Rule 56

standard does not apply" to APA claims "due to the limited role of a court in reviewing the

administrative record." *Id.* at 189; *see also Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 802

---

[6] Per the parties' joint motions to amend the expedited briefing schedule, the parties have
agreed that no statement of undisputed facts is required and proceed without such a statement
pursuant to the Court's orders granting those motions. *See* Request for Expedited Summ. J. Br. on
All Claims, *State Litigation*, ECF No. 73 at 2; *State Litigation*, Text Order Granting Mot. for
Extension of Time (Jan. 6, 2026); Request for Expedited Summ. J. Br. on All Claims, *NAEH*
*Litigation*, ECF No. 57 at 2; *NAEH Litigation*, Text Order Granting Mot. for Extension of Time
(Jan. 6, 2026).

F.3d 99, 106 (1st Cir. 2015) (explaining that summary-judgment review of administrative-law claims is narrower than traditional summary-judgment review). Under the APA, an agency action may not be set aside unless it is "arbitrary, capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A). And a court may only compel "agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

APA review of final agency action is highly deferential, and the agency's actions are presumed to be valid. *See River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009). "[A] court is not to substitute its judgment for that of the agency," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), but instead must only consider whether the action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Thus, a reviewing court's only role in assessing APA claims is to "determine whether the agency's decision is supported by a rational basis." *River St. Donuts*, 558 F.3d at 114. If so, the court "must affirm." *Id.*

## ARGUMENT

### I.    Plaintiffs' Statutory Claims Fail.

#### A.    Defendants' rescission of the 2024 NOFO was not contrary to law, arbitrary and capricious, or unreasonably delayed.

First, HUD's decision to abandon the prior Administration's 2024 NOFO was a policy-driven decision that was committed to HUD's discretion by applicable law, did not violate the governing statute, and therefore is not subject to vacatur or a stay under the APA. *See* 5 U.S.C. § 701(a)(2). Second, even if the rescission were a final agency action that was not committed to HUD's discretion by law, the rescission would nonetheless still survive § 706(2) scrutiny because

17

it was not arbitrary and capricious. *See id.* § 706(2)(A). And, finally, the rescission was not unreasonably delayed. *See id.* § 706(1); *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984).

### i.  *The rescission was not contrary to the McKinney-Vento Act.*

Plaintiffs argue that HUD acted contrary to law by rescinding the 2024 NOFO after the statutory deadline to issue a new NOFO following congressional appropriation of funding. *See State Litigation*, ECF No. 80 ¶¶ 261–66 (Count Nine); *NAEH Litigation*, ECF No. 66 ¶¶ 180–86 (Count One). Plaintiffs are incorrect. HUD acted within its discretionary statutory authority when it rescinded the 2024 NOFO and replaced it with a new set of criteria for renewals of FY25 CoC funding. Indeed, the McKinney-Vento Act expressly confers wide discretion on the HUD Secretary to devise and, if need be, revise and apply the criteria that the CoC and other housing programs must meet to receive renewal funding.

To start, § 706(2) does not provide the proper standard to challenge HUD's compliance with the McKinney-Vento Act's NOFO-timeliness provision. Section 706(1) does instead. The statutory provision Plaintiffs cite to support their contrary-to-law claim provides only one standard for a court to determine whether HUD's actions complied with the law: whether HUD "release[d] a notification of funding availability for grants awarded under this part for a fiscal year not later than 3 months after the date of the enactment of [appropriations]." 42 U.S.C. § 11382(b). Either the Secretary took the action required under the statute in a timely manner, or, as Plaintiffs allege, he did not. And the APA provision that addresses agency inaction—agency action "withheld"—is § 706(1). "Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (2004). Characterizing the alleged violation as an agency action opens up a contrary-to-law challenge under § 706(2). *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (noting that "agency

action" is the proper characterization to proceed under a § 706(2) claim, where "agency action unlawfully withheld" allows for a § 706(1) claim). And, as explained below, *see infra* Section I.A.iii, C.i, under the appropriate standard, HUD did not unreasonably delay rescission of the 2024 NOFO, and any claim that the December 2025 NOFO was unreasonably delayed is moot.

Rather, to show that HUD's *action* here—*i.e.*, rescinding the 2024 NOFO—was contrary to law, Plaintiffs must point to some provision prohibiting HUD from taking that specific action. And they cannot. Indeed, the only specific requirement in the McKinney-Vento Act that Plaintiffs cite is for HUD *to issue a NOFO. See State Litigation*, ECF No. 81 at 30; *NAEH Litigation*, ECF No. 67-1 at 33; 42 U.S.C. § 11382(b). HUD has done that twice over. It issued the 2024 NOFO, which, at the time, timely satisfied HUD's 2025 obligation to release a NOFO that awarded grants for FY 2025.[7] And then HUD issued the December 2025 NOFO, which satisfied that obligation a second time—albeit later than the 2024 NOFO.

Nothing in the McKinney-Vento Act presents an independent bar to HUD rescinding an earlier-issued NOFO. The fact that there was an obligation to issue a NOFO does not somehow give rise to a negative implication that revising the NOFO would be impossible. Congress did not say that the NOFO—and *only* that NOFO—must be issued within a timeframe. And it did not state that modification of any NOFO is prohibited. *See Field v. Mans*, 516 U.S. 59, 75 (1995) (establishing that courts may only definitively "rul[e] out one of several possible readings of a" statutory term "as the wrong one" when presented with "contrasting statutory sections originally enacted simultaneously"); *Lindh v. Murphy*, 521 U.S. 320, 330 (1997) (citing *Field* for the

---

[7] Of note, the 2024 NOFO was itself late to satisfy HUD's Fiscal Year 2024 obligation under the McKinney-Vento Act. *See* AR 170 (describing July 2024 release of 2024 NOFO); 138 Stat. at 25 (showing passage date of March 9, 2024, for 2024 Appropriations Act). But, as Plaintiffs strenuously argue elsewhere, this fact did not render the 2024 NOFO immediately and currently invalid.

proposition that "negative implications raised by disparate provisions are strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted"). *See generally* 42 U.S.C. § 11382 (setting out requirements for issuing NOFOs, receiving applications for funding, and obligating funds). There are no contrasting provisions to consider here. And, given the wide discretion the Act gives the Secretary to set selection criteria for assessing applications for funding, *see infra* Section I.C.ii; 42 U.S.C. § 11386c(a), (b)(1)(G), it would be structurally inconsistent to read the Act as preventing HUD from revising an earlier-issued NOFO if, for example, new funding becomes available for distribution under the program or insufficient funding exists to ensure that all selected grants are fully funded. *See, e.g.*, 42 U.S.C. § 11386b(a) (discussing requirements that are suspended or terminated depending on funding allocations).

Underscoring that flexibility is the fact that the 2024 Appropriations Act *authorized* HUD to issue a two-year NOFO—but did not *require* it. *See* 138 Stat. at 386 ("[T]he Secretary *may* issue a 2-year notification of funding opportunity[.]" (emphasis added)). The Appropriations Act further contained no provision limiting whether HUD could rescind or otherwise modify that 2-year NOFO. *See id.*; *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that the "allocation of funds from a lump-sum appropriation" without restriction is "traditionally regarded as committed to agency discretion"). And, as above, the NOFO itself reserved to HUD the right to modify or supplement the 2024 NOFO "if necessary." AR 32.

Plaintiffs can point to no provision of law—or even of the 2024 NOFO—that prohibits HUD from modifying, revising, supplementing, or replacing a NOFO. Without any such prohibition, Plaintiffs cannot show that HUD's rescission of the 2024 NOFO was contrary to law.

20

### ii. *The November rescission of the 2024 NOFO was not arbitrary and capricious.*

Plaintiffs further challenge the rescission of the 2024 NOFO as arbitrary and capricious for failure to adequately explain and to consider factors relevant to that rescission. *See State Litigation*, ECF No. 80 ¶¶ 267–72 (Count Ten); *NAEH Litigation*, ECF No. 66 ¶¶ 187–93 (Count Two). But the record reflects that HUD adequately explained the rescission and properly considered all relevant aspects of the decision.

As discussed above, *see supra* Legal Standards, "[t]he APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted). Indeed, when agency policy changes, or when an agency rescinds a prior policy, that change need not "be justified by reasons more substantial than those required to adopt a policy in the first instance." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

Here, HUD's decision to rescind the 2024 NOFO was not arbitrary and capricious. As the First Circuit has explained, "[t]o assess reasonableness, we look to whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) (citation omitted). HUD "need not demonstrate to a court's satisfaction that the reasons for [departing from prior policies] are *better* than the reasons for [retaining them]." *Fox Television*, 556 U.S. at 515. After all, "new administrations are entitled to reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019).

21

As explained above, the 2024 NOFO incorporated the policy choices of the previous Administration. Following the January 2025 change in Administration, HUD determined that it would abandon those policy choices to incorporate new ones, based on its view of the evidence and its view of the appropriate policy priorities. A new Administration's decision to rescind a NOFO premised on the prior Administration's policy directives and preferences is among the type of actions that fall within the "zone of reasonableness" under the APA. *See Prometheus Radio*, 592 U.S. at 423; *see also Fox Television*, 556 U.S. at 514.

Indeed, the full record provides detailed discussion of HUD's reasons for changing prior policies. In HUD's July 3, 2025 rescission email, it explained to CoCs that "770,000 people" are "experiencing homelessness," with "275,000 people unsheltered" on public streets. AR 18. In HUD's view, that suggested that the "status quo is unacceptable for every American, with or without a home." *Id.* HUD noted that it intended to issue a NOFO "focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants." *Id.* Those justifications provide a reasoned basis to explain why HUD determined that it should revise the policies that had previously been in place. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). And HUD rationally connected that need to change the status quo to its decision to "publish a NOFO for 2025" CoC awards under a "new application process." AR 18.

As HUD explained in a later memorandum, HUD "made it a policy priority to make a 'paradigm shift' " away from the permanent-housing focus in prior CoC competitions, AR 286, and to "restore balance" back to the program, AR 288. *Accord Confirmation Hearing*, *supra*, at 1:58:30. During that period, HUD "met with many relevant stakeholders," "weighing factors" for and against maintaining the existing CoC competition. AR 286. HUD acknowledged that

maintaining the CoC program would be the "quickest way to publish a NOFO and select projects for funding," would "significantly decrease the workload of CoCs and recipients," and "satisf[y] the intent of the 2-year process from the 2024 NOFO." AR 293. And, on the other hand, it considered that a new competition "[a]llows for additional selection criteria and project requirements in line with Administration Priorities," would be "the most burdensome workload option for CoCs," would "reduce the quality of applications," and "may reduce funding for existing renewal projects, but would also expand opportunities for diverse projects brought by new providers." *Id.*

HUD determined that a non-competitive supplemental NOFO, along with maintaining an existing system in which renewal projects need not compete for funding, would run "contrary to Congress' intent for the CoC program" to be a national competition. *Id.* It further reasoned that "creating competition" would lead to "the best projects receiv[ing] funding." *Id.* HUD further assessed that, because CoCs are "used to preparing an application for funding on an annual cycle," as had been done for the prior decade, the additional burden to CoCs of a new application would not be great. AR 294. And HUD determined that a new competition would be the best way to "bring new partners to the table" and "invest in types of assistance that have been de-prioritized." *Id.* Similarly, HUD fashioned "Transition Grants" to allow CoCs to shift some of their permanent housing to transitional housing. AR 295. Each of these documented considerations shows that HUD adequately considered and explained its reasons for—and against—rescinding the 2024 NOFO, and rationally reached the conclusion to do so by relying on these justifications. *See Prometheus Radio*, 592 U.S. at 423.

Nor do Plaintiffs' alleged reliance interests on the 2024 NOFO render its recission arbitrary and capricious. Although an agency must consider reliance interests in effecting a change in policy,

the "narrow" arbitrary and capricious standard does not permit a court to displace an agency's consideration of those interests. *Doe v. Noem*, 152 F.4th 272, 290–91 (1st Cir. 2025) (citation omitted). As discussed above, HUD explicitly considered the reliance interests of the existing program beneficiaries. *See* AR 18 ("We recognize this is a new application process for 2025 funding and are committed to providing CoCs the resources needed to serve their communities."); AR 292–94 (describing HUD's considerations for and against setting up a new CoC application process). Moreover, the 2024 NOFO expressly warned that HUD would reserve the right to impose new conditions for 2025 in light of changing priorities or funding sources. Indeed, as far back as July 3, 2025, HUD made public announcements that recipients should prepare to file new "application[s]" for 2025 CoC awards. AR 18.  In the 2024 NOFO itself, HUD merely "reserve[d] the right to award available FY 2025 funds . . . based on [the 2024] NOFO competition," AR 31, while putting recipients on notice that new NOFO conditions may be imposed for 2025 funds "to accommodate a new CoC or YHDP priority or new funding source," AR 31–32. There was simply no guarantee of future selection, or of a timeline for renewals, that would have created adequate reliance interests. And HUD never committed to suspending the statutory requirement that all projects, including renewal projects reviewed only under threshold criteria, are assessed on a competitive basis. *See* AR 91–92.

HUD adequately considered and documented various relevant justifications for backing away from earlier policy that, in HUD's view, was "unacceptable." AR 18. Its decision to rescind the 2024 NOFO was not arbitrary and capricious.

### iii.  Defendants' December 2025 rescission of the 2024 NOFO was not unreasonably delayed.

Plaintiffs challenge HUD's rescission of the FY 24-25 CoC NOFO as unreasonably delayed in violation of 5 U.S.C. § 706(1). *State Litigation*, ECF No. 80 ¶¶ 273–78 (Count Eleven);

*NAEH Litigation*, ECF No. 66 ¶¶ 194–207 (Count Three). But HUD acted with reasonable expedition to communicate its rescission of the 2024 NOFO: it informed stakeholders by July 3, 2025, just more than three months after the mid-March passage of the 2025 Appropriations Act, that it "intend[ed] to publish a NOFO for 2025 Continuum of Care (CoC) awards" and would establish a "new application process for 2025 funding." AR 18. That short delay, which tracks the statutory deadline for issuing a new NOFO for fiscal-year funding, was not unreasonable. And, further, Plaintiffs' attempts to construct a series of additional statutory deadlines that, in their eyes, HUD did not meet, fails—because all of those deadlines flow from the non-statutory, non-regulatory original NOFO application date of August 29, 2025, which HUD publicly nullified nearly two months *before* the deadline was to occur.

Under § 706(1), which supplies the applicable APA standard of review, a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Such relief is limited to actions that are "legally *required*." *Norton*, 542 U.S. at 63. In § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus." *Id.* Such a remedy "was normally limited to enforcement of 'a specific, unequivocal command,' the ordering of a 'precise, definite act . . . about which [an official] had no discretion whatsoever.'" *Id.* (alterations in original) (first quoting *Interstate Com. Comm'n v. N.Y., New Haven & Hartford R.R. Co.*, 287 U.S. 178, 204 (1932); then quoting *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888)). So § 706(1) review occurs within "strict limits" mirroring the "common law writ of mandamus." *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016). And relief is available only where "an agency failed to take a *discrete* agency action that it is *required* to take." *Norton*, 542 U.S. at 64. Indeed, such relief "starts from the premise that issuance

of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear

duty to act." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (citation omitted).

Plaintiffs must clear several significant hurdles to obtain § 706(1) relief. Beyond

identifying a specific statutory duty that requires agency action, a court must find "that the agency

has 'unreasonably delayed' the contemplated action." *In re Bluewater Network*, 234 F.3d 1305,

1315 (D.C. Cir. 2000) (quoting 5 U.S.C. § 706(1)). Such a finding involves weighing a series of

interrelated factors, commonly called the "*TRAC*" factors, after the leading case:

> (1) the time agencies take to make decisions must be governed by a rule of reason,
> (2) where Congress has provided a timetable or other indication of the speed with
> which it expects the agency to proceed in the enabling statute, that statutory scheme
> may supply content for this rule of reason, (3) delays that might be reasonable in
> the sphere of economic regulation are less tolerable when human health and welfare
> are at stake, (4) the court should consider the effect of expediting delayed action on
> agency activities of a higher or competing priority, (5) the court should also take
> into account the nature and extent of the interests prejudiced by delay, and (6) the
> court need not find any impropriety lurking behind agency lassitude in order to hold
> that agency action is unreasonably delayed.

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*") (citations

omitted); *see also Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n*, 829

F.2d 275, 277 (1st Cir. 1987) (applying *TRAC*). Underlying the entire determination is the question

whether "the agency's delay is so egregious as to warrant mandamus." *TRAC*, 750 F.2d at 79.

At best, under the first and second *TRAC* factors, all Plaintiffs can show is that HUD failed

to meet the three-month statutory deadline for issuing an FY2025 NOFO following enactment of

an appropriations bill for 2025. *See* 42 U.S.C. § 11382(b); *TRAC*, 750 F.2d at 80. But Plaintiffs

cannot show that such a delay was unreasonable, given that HUD publicly communicated its

decision to supersede the 2024 NOFO merely two weeks after the three-month window ended. *See*

AR 18; *see also Midwest Gas Users Ass'n v. Fed. Energy Regul. Comm'n*, 833 F.2d 341, 359 (D.C.

Cir. 1987) (noting that "a reasonable time for an agency decision could encompass months,

26

occasionally a year or two, but not several years or a decade" (citation omitted)). And, even if that minor delay were unreasonable, which it is not, such a finding "does not, alone, justify judicial intervention." *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991).

Further, and more importantly, Plaintiffs' primary argument in favor of a strict three-month deadline—that missing the deadline, no matter how minor that delay might be, means that HUD is bound to hold to the earlier NOFO—runs headlong into the longstanding requirement under § 706(1) that courts may order only those discrete actions that are specifically *legally required* by statute. *See Norton*, 542 U.S. at 63; *see also Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 99–100 (1st Cir. 2012). That means, here, that Plaintiffs would need to show the action that HUD "withheld"—*i.e.*, the hypothetical choice to decline to rescind the NOFO and instead keep it in place—is legally required. And, of course, Plaintiffs can point to no statutory provision requiring that NOFOs (be they for one year, two years, or any length of time) must remain in place for the entirety of the term for which the NOFO is valid. *See State Litigation*, ECF No. 81 at 63–64 (arguing only that the McKinney-Vento Act requires releasing a NOFO within three months of appropriations); *NAEH Litigation*, ECF No. 67-1 at 39–41 (arguing the same and also that HUD has failed to conditionally award FY 2025 funding).

The 2024 NOFO itself says the opposite is true: "HUD also reserves the right to modify this NOFO or issue a supplemental FY 2025 CoC and YHDP NOFO if necessary (e.g., to accommodate a new CoC or YHDP priority or new funding source)." AR 31–32. The only action the Court *can* take is to order HUD to take the action the statute contemplates and, per Plaintiffs, is legally required: issuing a NOFO and obligating FY 2025 funds for the CoC program by, at the latest, September 30, 2027. *See* 42 U.S.C. § 11382(b) (establishing that the required action under the McKinney-Vento Act is "releas[ing] a notification of funding availability"); 139 Stat. at 12, 14

27

(establishing, along with the 2024 Appropriations Act, *see* 138 Stat. at 362, that FY 2025 CoC

funds must be obligated by September 30, 2027). And HUD has already issued a new NOFO, thus

starting it along the path to obligating FY 2025 funds well before the 2027 deadline.[8]

  The remaining deadlines Plaintiffs purport the McKinney-Vento Act imposes, in fact, have

no effect on HUD's obligations under this year's CoC program. Both sets of Plaintiffs argue that

HUD faces a January 29, 2026 deadline to make conditional funding awards. *See State Litigation*,

ECF No. 81 at 64 n.21; *NAEH Litigation*, ECF No. 67-1 at 41. But that deadline stems from the

"last date for the submission of applications" for the CoC program—*i.e.*, five months after that

submission deadline. 42 U.S.C. § 11382(c)(2)(A). Plaintiffs argue that the effective submission

deadline was August 29, 2025. *See NAEH Litigation*, ECF No. 67-1 at 41. But as of July 3, 2025,

roughly two months *before* the August 29 deadline, HUD formally nullified the requirements of

the 2024 NOFO. *See* AR 18. The August 29 deadline ceased to exist. Instead, HUD issued the

November 2025 NOFO, which set a January 14, 2026 submission deadline, *see* AR 160, and later

superseded that deadline—well in advance—with the December 2025 NOFO's expedited January

28 deadline. Per the McKinney-Vento Act, then, the most Plaintiffs can show is that HUD is

required to announce awards by June 28, 2026—five months after the effective CoC application

deadline. *See* 42 U.S.C. § 11382(c)(2)(A). HUD is still well within that timeframe, especially

considering that it estimated it would announce awards under the expedited NOFO track by March

31, 2026. *See* AR 1138. And even if HUD missed that upcoming deadline, the proper remedy

would be to make awards as quickly as possible, not to vitiate the December 2025 NOFO in the

---

[8] As explained later, *see infra* Section I.B.c.i, that issuance renders Plaintiffs' § 706(1)
claims entirely moot—by issuing the December 2025 NOFO, Defendants have taken the action
that is legally required under § 11382(b), so there is nothing left for this Court to order to remedy
those claims.

first place. *See supra* Section I.A.i (arguing that, under the proper § 706(1) standard, the only action the Court can order is the one specified by statute).

In sum, because HUD acted reasonably quickly—under the only relevant statutory guidelines—in withdrawing the 2024 NOFO, under *TRAC* factors one and two, Plaintiffs cannot show that the agency acted "egregious[ly]" in its delay in rescinding that NOFO. *TRAC*, 750 F.2d at 72. And any deadlines later than the three-month deadline to issue a NOFO are not, under the law, "concrete statutory deadline[s]." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1191 (10th Cir. 1999).

The third factor asks whether "human health and welfare are at stake." *TRAC*, 750 F.2d at 80. And, as Plaintiffs argue, welfare—the welfare of homeless people in CoC projects—is directly at issue in this litigation. *See NAEH Litigation*, ECF No. 67-1 at 43. But that interest does not cut so strongly in Plaintiffs' favor as they argue. Indeed, the CoC program typically accounts for those interests by disbursing funding under a structure intended to minimize disruption to CoCs. Grants go out on a rolling basis throughout the calendar year—by the end of March 2026, only 10 percent of FY 2024 grant dollars will have expired. *See* McKenney Decl. ¶ 3; Ex. A to McKenney Decl. at 1. Fewer than 38 percent will expire by the end of June. Ex. A to McKenney Decl. at 1. And, as HUD noted in the record, "CoCs have consistently navigated a 'gap in services' posed by awards being announced after some grants have already expired" as, in two of the last four years, HUD did not announce awards until mid- to late March. AR 297. In sum, the funding mechanism for the CoC program takes funding gaps into account and limits the extent of turmoil that might occur at any one given moment due to changes to the program.

The fourth *TRAC* factor weighs heavily in Defendants' favor. The factor, which asks whether expediting delayed action might have an effect on "agency activities of a higher or

competing priority," *TRAC*, 750 F.2d at 80, recognizes that, under the APA, agencies are free to follow their policies without "undue judicial interference," *Norton*, 542 U.S. 66. Here, HUD has determined that its highest priority for the CoC program is to "improve" its "effectiveness" and address the "diverse root causes of homelessness," AR 288, which, in HUD's reasoned judgment, can only be accomplished by running "an entirely new CoC Competition," AR 286.

Plaintiffs have not shown that HUD egregiously and unreasonably delayed in rescinding the 2024 NOFO. *See TRAC*, 750 F.2d at 79–80. They have thus failed to show they should receive relief under their § 706(1) unreasonable-delay claims.

**B.     Plaintiffs' continued challenges to terms appearing only in the November 2025 NOFO are moot.**

Plaintiffs' continued challenges to provisions that do not appear in the December 2025 NOFO are moot. For instance, Plaintiffs challenge the substantive disability-incentive provision in the November 2025 NOFO. *See NAEH Litigation*, ECF No. 67-1 at 53; *State Litigation*, ECF No. 81 at 44–45. That provision of the now-withdrawn November 2025 NOFO, which provided an incentive for projects to serve individuals with disabilities "not including substance use disorder," *see* AR 216, has no counterpart in the December 2025 NOFO, *see NAEH Litigation*, ECF No. 67-2 at 4. And Plaintiffs further continue to challenge the substantive gender-ideology provisions in the November 2025 NOFO, which affirmatively required applicants to take certain steps or to guarantee restrictions on certain activities in order to qualify for funding under the CoC program. *See* AR 210, 220, 263–64; *see also State Litigation*, ECF No. 81 at 42–43; *NAEH Litigation*, ECF No. 67-1 at 54–55, 72–73. But those provisions also have no counterpart in the December 2025 NOFO. *See NAEH Litigation*, ECF No. 67-1 at 24 (explaining that only the Executive Order–compliance condition remains). Any challenges to those provisions are moot.

30

The "sheer 'power' " to "reinstate" a challenged policy "is not a sufficient basis on which

a court can conclude that a challenge remains live." *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 11

(1st Cir. 2021); *see also id.* at 9 ("[I]t makes sense . . . that a case challenging a statute, executive

order or local ordinance usually becomes moot if the challenged law has expired or been

repealed[.]" (second alteration in original) (quoting *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir.

2020))); *Gulf of Me. Fisherman's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002) (noting that the

"promulgation of new regulations and amendment of old regulations are among such intervening

events as can moot a challenge to the regulation in its original form"). The Court "cannot enjoin

what no longer exists," *Lowe v. Gagné-Holmes*, 126 F.4th 747, 755 (1st Cir.) (quoting *Marciano

v. Adams*, No. 22-570-CV, 2023 WL 3477119, at *1 (2d Cir. May 16, 2023)), *cert. denied*, 145 S.

Ct. 2795 (2025) (mem.), and the challenged conditions in the November 2025 NOFO no longer

exist.

Plaintiffs gesture at the voluntary-cessation doctrine to keep their challenges to the

November 2025 NOFO alive. *See State Litigation*, ECF No. 81 at 43 n.13; *NAEH Litigation*, ECF

No. 67-1 at 49 n.17. The voluntary-cessation doctrine does not apply because Plaintiffs provide no

evidence that HUD will simply revert to the terms from the November 2025 NOFO in any

hypothetical future rescinded and reinstated 2025 NOFO. *See County of Los Angeles v. Davis*, 440

U.S. 625, 632–33 (1979); *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F. Supp. 3d 75, 86 (D.R.I.

2025) (explaining that the doctrine "is designed to prevent defendants from manipulating a court's

jurisdiction to evade judicial review of a challenged practice"). Here, Defendants have generated

a new NOFO intended to govern the 2025 CoC program application process that, while currently

stayed, contemplates application award dates in March and April 2026.[9] *See* AR 1138. Defendants not only published the December 2025 NOFO, but they expressly stated their commitment to that NOFO on the CoC website and in a listserv email to applicants. *See* ECF No. 78-1 at 2, *State Litigation* ("If the [preliminary injunction order]is no longer in effect, HUD intends to implement the NOFO issued on December 19, 2025[.]"); ECF No. 61-1 at 2, *NAEH Litigation* (same); *Continuum of Care Program*, U.S. Dep't of Hous. & Urb. Dev. (Jan. 8, 2026), https://www.hud.gov/hud-partners/community-coc (last visited Jan. 22, 2026). Defendants' commitment to the terms of the December 2025 NOFO underscores that Plaintiffs cannot show any reasonable expectation that Defendants will revert to the earlier NOFO terms. *See Lowe*, 126 F.4th at 756. To put it simply, HUD is standing on the December 2025 NOFO.

## C. Defendants' issuance of the December 2025 NOFO violated neither the APA nor the McKinney-Vento Act.

Plaintiffs argue that numerous aspects of HUD's decision to issue the December 2025 NOFO violate the APA and the McKinney-Vento Act in multiple respects. Plaintiffs invoke nearly every APA standard: that issuance of the December 2025 NOFO was unlawfully or unreasonably withheld, that HUD has no statutory authority to issue application criteria, that the various challenged provisions in the NOFO are contrary to law, that the various challenged provisions in the NOFO are arbitrary and capricious, and that issuance of the NOFO violated relevant procedural requirements by failing to follow the notice-and-comment process. Each of Plaintiffs' claims misstates or overlooks relevant statutory provisions, overlooks ample consideration in the record of the relevant issues facing the agency, and fails to account for the procedural flexibility that the

---

[9] Indeed, were the December 2025 NOFO not stayed, applications would be due under the Normal track only five days after the date of this filing. *See* AR 1138.

APA affords to agencies to conduct informal proceedings or to issue interpretive and procedural

guidance. For those reasons, Plaintiffs' statutory challenges to the December 2025 NOFO fail.

> **i.    *Plaintiffs' claim that issuance of the December 2025 NOFO was unlawfully or
> unreasonably withheld is moot because the NOFO has been issued.***

At the outset, State Plaintiffs challenge HUD's issuance of the December 2025 NOFO as

unlawfully or unreasonably delayed in violation of 5 U.S.C. § 706(1). *State Litigation*, ECF No.

80 ¶¶ 273–78 (Count Eleven). But, importantly, the very withheld action of which the States

complain—issuance of a NOFO, *id.* ¶ 275—has occurred. HUD issued the December 2025 NOFO

on December 19, 2025. *See State Litigation*, ECF No. 66. And issuance of that NOFO has started

(or would have started, but for the Court's preliminary injunction) the process of determining

whether to renew contracts under the NOFO. *See State Litigation*, ECF No. 80 ¶ 276.  Because the

challenged action has no longer been withheld, even assuming it ever was, the Court has no basis

to order relief for this claim, and the claim is now moot. *See Norton*, 542 U.S. at 67–68 (explaining

that claims pertaining to actions that "have already been completed" are moot); *Zixiang Li v. Kerry*,

710 F.3d 995, 1002 (9th Cir. 2013) (holding that courts may not order relief under section 706(1)

where the court is unable to "go back in time" to change an action); *Nantucket Residents Against

Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 16 (1st Cir. 2024) (affirming that a

dispute is moot if the court cannot grant effectual relief, applied in that case to a request for

injunctive relief to remedy alleged past violation of a statute), *cert. denied*, 145 S. Ct. 1050 (2025).

Further, in a claim similar to their § 706(1) claims regarding the 2024 NOFO's rescission,

Plaintiffs argue that the McKinney-Vento Act's 3-month deadline to issue a NOFO after an

applicable appropriations bill is passed strips HUD of its authority to issue superseding NOFOs

after the deadline. *See State Litigation*, ECF No. 81 at 16–17; *NAEH Litigation*, ECF No. 67-1 at

15, 33. It does not. The Supreme Court in *Brock v. Pierce County*, 476 U.S. 253 (1986), addressed

a scenario very similar to the one at hand. In *Brock*, the Supreme Court held that a 120-day statutory deadline for the Secretary of Labor to issue a final determination on an allegation of misused funds did not "remove the Secretary's enforcement powers [to disallow those funds] if he fails to issue a final determination . . . within 120 days." *Id.* at 266. Where the statute was silent on any consequences for missing the deadline, as here, the Court found that "courts should not impute to Congress the desire to remedy such a failure by preventing the Secretary from protecting both the public fisc and the integrity of a Government program." *Id*. at 259. In other words, the mere fact that the agency missed a deadline does not prohibit the agency from ever taking that action in the future. Indeed, that is the very point of a failure-to-act claim: the agency must *act* if it has a duty to do so, but has not—which is why courts order agencies to *take* the legally required action if it has missed the deadline to do so. *See Norton*, 542 U.S. at 65 (emphasizing that, when an agency is "compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion," a court's power would extend to an order requiring "prompt" compliance, but nothing further); *Oxfam Am., Inc. v. U.S. SEC*, 126 F. Supp. 3d 168, 172, 175–76 (D. Mass. 2015) (ordering the SEC, where it had missed a deadline to promulgate a rule by more than four years, to "act" by proposing a schedule for expeditiously promulgating the rule).

HUD's decision to reconsider the 2024 NOFO was done in accordance with the efficiency and integrity interests that the Court identified in *Brock*. HUD determined that the 2024 NOFO would not effectively reduce—indeed, that it might actually contribute to an increase in—homelessness. AR 287. HUD subsequently determined that issuing a new NOFO would better accomplish the goals of the CoC program and the McKinney-Vento Act. *See* AR 288–92. And it did so with the knowledge that the 2024 NOFO specifically acknowledged that it could later be superseded, modified, or supplemented. *See* AR 30–31.

34

To force the agency to commit to a prior NOFO—one that the agency has already found to be harmful to the homeless population—merely for missing a deadline to issue a NOFO would prejudice the public interest and is the kind of drastic judicial remedy that the Supreme Court found unwarranted. *See Brock*, 476 U.S. at 260 (noting that the "Court has frequently articulated the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided," meaning that courts should hesitate to "conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." (citation omitted)).

"When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Id.* (footnote omitted). The less drastic remedy here would have been to order HUD to issue a NOFO with eligibility and merit criteria in compliance with law. And HUD has done just that through the December 2025 NOFO.

### ii. The challenged provisions included in the December 2025 NOFO are not contrary to law.

Plaintiffs challenge a wide array of provisions in the December 2025 NOFO as contrary to law under the APA. *See State Litigation*, ECF No. 80 ¶¶ 186–99, 221–27 (Counts One and Four); *NAEH Litigation*, ECF No. 66 ¶¶ 208–22 (Counts Four and Five). Plaintiffs allege that various provisions conflict with the McKinney-Vento Act and other applicable statutes. They also make the argument that HUD lacks any authority to impose conditions like the ones included in the December 2025 NOFO. But HUD does possess the authority to issue application and other criteria under the McKinney-Vento Act. And none of the challenged provisions violates the law.

35

a.   <u>HUD has authority to impose criteria on applications under the CoC program.</u>

Plaintiffs make the wholesale argument that HUD has effectively enacted, amended, or repealed statutory provisions by implementing "its own" conditions on funding distributed under the CoC competition. *State Litigation*, ECF No. 81 at 38; *State Litigation*, ECF No. 80 ¶¶ 221–27 (Count Four); *NAEH Litigation*, ECF No. 67-1 at 49–51. Plaintiffs are plainly incorrect. HUD is not limited only to explicit congressionally imposed criteria; rather, Congress delegated the authority to impose such criteria to the agency. Congress expressly authorized the HUD Secretary to "award funds to recipients through a national competition between geographic areas *based on criteria established by the Secretary*." 42 U.S.C. § 11386a(a) (emphasis added). And Congress further expressly authorized the HUD Secretary to establish "such other factors" for reviewing CoC applications "as the Secretary determines to be appropriate to carry out this part"—*i.e.*, Part C of Title 42, Chapter 119, Subchapter IV of the U.S. Code, *see id.* §§ 11381–11389 ("Continuum of Care Program")—"in an effective and efficient manner." *Id.* § 11386a(b)(1)(G).

Not only is the Secretary not taking actions "outside the bounds of [his] statutory authority," *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020), he is in fact acting *squarely within* an express delegation of power conferred on him by Congress, *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (clarifying that agencies must point to "clear congressional authorization" to exercise "regulatory authority"). And that power—which enables the Secretary to establish criteria if he "determines" they make carrying out the CoC program "effective and efficient," 42 U.S.C. § 11386a(b)(1)(G)—is a broad, discretionary grant of authority. *See Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that a statute permitting an agency head to take an action whenever he "shall *deem* such termination necessary or advisable in the interests of the United States" was wholly discretionary because it "fairly exude[d] deference" to the agency head (citation omitted)).

36

Plaintiffs' challenge to HUD's use of the factors included in the December 2025 NOFO, then, concerns only the extent to which the provisions in the NOFO comply with—or are "of the same kind as," *NAEH Litigation*, ECF No. 67-1 at 50 (citation omitted)—the provisions of the McKinney-Vento Act granting the Secretary that expansive discretion, as well as any other provisions of law that might constrain the agency's authority. But all of Plaintiffs' attempts to claim that the NOFO's criteria are beyond HUD's statutory authorization fail.

### b. Caps on permanent housing funding

Plaintiffs first claim that the December 2025 NOFO's cap on permanent housing funding and its cap on allocating funding to Tier 1 renewals is contrary to the McKinney-Vento Act. *See State Litigation*, ECF No. 81 at 40–41; *NAEH Litigation*, ECF No. 67-1 at 51–52. Not so. No provision of the Act requires HUD to spend 87 percent of CoC appropriations on permanent housing and/or Tier 1 projects, which upholding Plaintiffs' claims here would necessitate. *See State Litigation*, ECF No. 81 at 18 (explaining that 87 percent of all CoC program funds ending in 2026 are designated for permanent housing). Nearly the opposite is true. The McKinney-Vento Act imposes two percentage-specific allocation mandates on HUD: (1) of the amount appropriated for the ESG and CoC program, at least 30 percent must be spent on "permanent housing for homeless individuals with disabilities and homeless families that include such an individual," 42 U.S.C. § 11386b(a)(1); and (2) at least 10 percent of that same total must be spent on "permanent housing for homeless families with children," *id.* § 11386b(b). The NOFO directly satisfies these requirements. *See* AR 1154–55 (setting aside 30 percent, as outlined in 42 U.S.C. § 11386b, for new permanent housing projects and outlining that 30 percent of each CoC's Annual Renewal Demand will fund renewal of existing permanent housing projects).

Further, Congress may occasionally impose specific allocation requirements on the CoC program through the annual appropriations process. For instance, the 2024 Appropriations Act

provided that, of the $3.5 billion appropriated to the CoC program, "$52,000,000 shall be for grants for new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking." 138 Stat. at 363. The December 2025 NOFO, under the 2025 Appropriations Act, also complies with that requirement. *See* AR 1139.

These specific allocation limitations only highlight that, when Congress intends to impose a particular allocation breakdown on HUD, it knows how to do so. Pursuant to the statutory canon of *expressio unius est exclusio alterius*, Congress's silence on the total amount HUD must spend on all permanent housing and Tier 1 projects—aside from its 30-percent permanent-housing minimum—illustrates that it did not intend to impose any such limitation. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 114 (2014) (applying the *expressio unius* canon to conclude that Congress's express inclusion of some statutory limitations implies that it did not intend to impose other limitations); *see also Lincoln*, 508 U.S. at 192 (noting that "where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions" (citation omitted)).

Indeed, HUD's flexibility under this program gave rise to Plaintiffs' funds for permanent housing in the first place: HUD previously *chose* to allocate the vast majority of its CoC funds to permanent housing and Tier 1 projects. It was lawful under the McKinney-Vento Act to make that earlier choice, and HUD's choice now is similarly lawful. The only change has been for HUD to use its discretion to prioritize transitional housing more than it had previously. But HUD's historical choices do not convert into congressional mandates with the passage of time. And, as

the Court explained in *Lincoln*, without a congressional-allocation mandate, courts are not the proper arbiters for evaluating the wisdom of such policy choices by, for instance, picking an arbitrary point at which a reduction in permanent-housing support may have been permissible, but HUD's choice to drop down to the 30-percent minimum is a bridge too far. *See* 508 U.S. at 192. If HUD had the discretion to allocate 87 percent of its CoC funding on permanent housing/Tier 1 renewals previously—which Plaintiffs, of course, do not dispute—it now has the discretion to prioritize transitional housing, as long as it complies with the specific applicable statutory requirements. And it does that.

NAEH Plaintiffs argue that such a cap conflicts with the McKinney-Vento Act's requirement that HUD incentivize congressionally specified permanent housing activities. *See NAEH Litigation*, ECF No. 67-1 at 52 (citing 42 U.S.C. § 11386b(d)). But Plaintiffs ignore that the mechanism through which Congress instructed to provide those incentives—a mechanism that appears in the same statutory provisions Plaintiffs cite—is for HUD to dedicate 30 percent of available funding to permanent housing projects. *See* 42 U.S.C. § 11386b(a). HUD has done exactly that. And, further, the December 2025 NOFO expressly provides that applicants for permanent housing funding will receive merit points for providing the applicants' plans for using such funding for permanent-housing projects and showing that such plans ensure participants are able to obtain and retain permanent housing. *See* AR 1200–03.

Nothing in the McKinney-Vento Act precludes the funding allocation HUD implemented in the December 2025 NOFO. Indeed, the NOFO complies exactly with the relative balance Congress deemed necessary to fund permanent housing projects by tracking the minimum allocation Congress set by statute.

c.  <u>Caps on Tier 1 project renewals</u>

Plaintiffs (unable to identify a congressional mandate for the 87 percent permanent-housing funding they demand) argue that 42 U.S.C. § 11386c(b)—a provision that speaks to contract renewals—somehow binds HUD to Plaintiffs' preferred funding allocation. They allege that the December 2025 NOFO's 30 percent cap on Tier 1 project renewals unlawfully limits the amounts that can be awarded for existing permanent housing because the renewal statutory provision mandates that funding "shall be available for the renewal of contracts" on "the basis of certification by the collaborative applicant," meaning that HUD "lacks discretion to arbitrarily withhold funds that Congress directed it to spend on renewals." *State Litigation*, ECF No. 81 at 40–41 (quoting 42 U.S.C. § 11386c(b)).

Plaintiffs' argument entirely overlooks most of the relevant statutory text. To start, subsection (a) of the statute provides that "[r]enewal of expiring contracts for leasing, rental assistance, or operating costs for permanent housing contracts *may* be funded" under one of two appropriations accounts. 42 U.S.C. § 11386c(a) (emphasis added). And subsection (b) makes clear that its terms are directly limited by the discretionary power outlined in subsection (a): "The sums *made available under subsection (a) shall be available* for the renewal of contracts" under certain terms. *Id.* § 11386c(b) (emphasis added). Nowhere does Congress mandate that all funds must be available to all renewal applicants. Instead, it provides that funds *may* be available for renewals. And the availability of funds does not *entitle* project sponsors to the funds by operation of law— it only assures that some funds are available for renewals at the Secretary's discretion.

The statute requires only that funds—*when made available*—shall be offered "in the case of tenant-based assistance, successive 1-year terms, and in the case of project-based assistance, *successive terms of up to 15 years* at the discretion of the applicant or project sponsor." *Id.* § 11386c(b) (emphasis added). The direct antecedent to the discretion mentioned in the text of the

provision is not the renewal of funds. It is instead the length of the term sought by the applicant. Indeed, the last-antecedent rule makes clear that the phrase "discretion of the applicant or project sponsor" modifies the phrase that immediately precedes it—*i.e.*, "successive terms of up to 15 years." *Id.*; *see also Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." (citation omitted)).

Notably, the phrase "at the discretion of the applicant or project sponsor" does not appear in the first half of the provision, which pertains to "tenant-based assistance" contracts. 42 U.S.C. § 11386c(b). That omission makes sense—and underscores the conclusion that applicants' discretion is limited—because the length of tenant-based-assistance renewals is fixed by statute at 1-year terms. *See id.* But because the length of project-based-assistance contracts is not similarly fixed—*i.e.*, such contracts may be "*up to* 15 years"—Congress included the relevant qualifier to make clear that the length of the latter type of renewals is at the discretion of the recipient. *Id.* (emphasis added). Plaintiffs' attempt to read this qualifier as *mandating* renewals entirely at each applicant's discretion—with no discretion on HUD's part—stretches the qualifier far beyond its reach.[10]

Moreover, subsection (b) itself makes abundantly clear that the Secretary has the ultimate say over "whether to renew a contract":

> The Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for

---

[10] Lead Plaintiff NAEH appears to recognize as much, noting in a November press release that Congress, in passing the continuing resolution providing for government funding last fall, "[did] not include the provision that would require [HUD] to award eligible [CoC] renewals for 12 months." Marcy Thompson, *After the Shutdown: What Everyone Needs to Know About the Upcoming NOFO*, Nat'l All. to End Homelessness (Nov. 11, 2025), https://endhomelessness.org/blog/after-the-shutdown-what-everyone-needs-to-know-about-the-upcoming-nofo/ (last visited Jan. 20, 2026).

> the geographic area that-- (1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary.

*Id.* § 11386c(b). The statute further provides that the Secretary's renewal determination is not limited to those two factors. Subsection (c) provides: "Nothing in this section shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth in a provision of this part other than this section." *Id.* § 11386c(c). The referenced "criteria" are identified in § 11386a: "The Secretary shall award funds to recipients through a national competition between geographic areas based on criteria established by the Secretary." *Id.* § 11386a(a). Importantly, these "criteria" also include "such other factors *as the Secretary determines to be appropriate* to carry out this part in an effective and efficient manner." *Id.* § 11386a(b)(1)(G) (emphasis added). And, contrary to State Plaintiffs' argument, *see State Litigation*, ECF No. 81 at 41, nowhere does the statute indicate that the Secretary's authority is "plainly limited" to "administrative conditions," *id.*

Indeed, the statutory requirements include many deeply substantive criteria, such as an exhaustive assessment of funding recipients' previous performance in addressing homelessness, *see* 42 U.S.C. § 11386a(b)(1)(A), and a description of the extent to which recipients will address the needs of relevant subpopulations, *see id.* § 11386a(b)(1)(B). Indeed, the qualifier that Congress included—that the Secretary may establish criteria to carry out the CoC program in an "effective" manner—implies that Congress intended to confer substantially more authority than to impose merely administrative criteria. *Id.* § 11386a(b)(1)(G); *see also Effective*, Merriam-Webster, https://www.merriam-webster.com/dictionary/effective (last visited Jan. 21, 2026) (providing the definition "producing a decided, decisive, or desired effect").

In short—far from mandating renewals at the recipients' discretion—Congress gave the Secretary the discretion to authorize renewals "in accordance with criteria," 42 U.S.C. § 11386c(c), which are, in turn, "established by the Secretary" himself, *id.* § 11386a(a). Plaintiffs' myopic reading of subsection (b) (which merely reserves some funds for renewals) does not defeat the remainder of subsection (b) or subsection (c)'s specific commitment of renewal discretion to the Secretary. This is especially true given the fact that subsection (c),  which makes clear that the Secretary's ability to set renewal criteria is not limited by § 11386c, is a rule of construction that explicitly thumbs the scale in favor of the Secretary's discretion to renew contracts (and against any interpretation of subsection (b) to the contrary). *See Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 696 (2014) (following Congress' "mandated . . . constru[ction] in favor of a broad protection of religious exercise" (citation omitted)).

Notably, Plaintiffs' unduly restrictive interpretation of subsection (b) is also inconsistent with the nature of CoC awards as *competitive* grants. Section 11382(a) provides that "[t]he Secretary shall award grants[] on a competitive basis." 42 U.S.C. § 11382(a). Similarly, § 11386a(a) provides that "[t]he Secretary shall award funds to recipients through a national competition." *Id.* § 11386a(a). If, as Plaintiffs maintain, over 85 percent of CoC funds must be allotted to renewals at the recipients' discretion, then all but 15 percent of CoC funds are not— and, assuming every recipient seeks renewal, never will be—subject to any competition at all. This tension between Plaintiffs' reading and Congress' mandate that CoC awards be granted on a competitive basis further undermines any claim that the § 11386a mandates renewals. *See Lawson v. FMR LLC*, 571 U.S. 429, 435–37 (2014) (interpreting the relevant provision in a manner that is consistent with the assumptions embedded in other provisions of the same statute). To be sure,

43

HUD has historically spent a majority of its CoC funds on renewals. But HUD's historical exercise of discretion does not become "legally required" over time.

> d.  Supportive-service requirements

State Plaintiffs also argue that the NOFO improperly imposes certain service-requirement conditions, *see State Litigation*, ECF No. 81 at 41–42, because the NOFO awards points (a possible 16 out of a maximum of 130, *see id.* at 19) to certain programs that require participants to take part in supportive services. This allocation of points, Plaintiffs argue, conflicts with the existing statutory selection criteria for prioritizing projects based on the previous performance of service providers. *See id.* at 42.

Plaintiffs provide no explanation for how an incentive—and a mild one, at that—to provide supportive services, which the McKenney-Vento Act and HUD regulations both contemplate and enumerate, conflicts with HUD's complementary obligation to assess applicants' past performance. Nothing in Plaintiffs' argument clarifies how the requirements might be at odds with each other. HUD can both assess applicants' past performance in rapidly providing housing to participants and also provide an incentive to provide supportive services to participants who become housed. Indeed, HUD's decision to provide a—small—incentive to provide such services properly accounts for HUD's responsibility to reward past success in rehousing individuals while similarly incorporating its statutory responsibility to ensure that, "[t]o the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project[.]" 42 U.S.C. § 11385(a). That responsibility, per Congress, is not discretionary—it is mandatory. *See id.*

Plaintiffs' argument fails, though, for an even simpler reason: the NOFO does not *require* participants to require supportive services; it merely allocates certain points to programs that do impose such a requirement. In doing so, the NOFO merely favors—slightly—such service

requirements. Where an applicant can fail to obtain all 16 points and still receive funding, the provision can hardly be said to violate an allegedly contrary statutory provision.

e.  Disability provisions

As explained above, Plaintiffs' continued challenge to the disability provision included in the November 2025 NOFO—and not the December 2025 NOFO—is moot. *See supra* Section I.B. NAEH Plaintiffs continue to challenge a provision in the December 2025 NOFO incentivizing the provision of "customized services" for participants, except for those over age 62 or who have a physical or developmental disability or impairment. *See NAEH Litigation*, ECF No. 67-1 at 53. The December 2025 NOFO clearly lays out this exception. *See* AR 1197. But that exception is likely required by law.

Plaintiffs argue that the provision violates, among other things, the Americans with Disabilities Act (ADA), by "push[ing] service providers to treat people disparately based on type of disability." *NAEH Litigation*, ECF No. 67-1 at 53. But Plaintiffs ignore the plain language of that Act, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Failure to include an exception for disabled individuals unable to work because of their disability would likely, under the APA, constitute a prima facie policy or practice of disability discrimination. *See, e.g.*, *Summers v. City of Fitchburg*, 940 F.3d 133, 139 (1st Cir. 2019) (outlining that public entities must generally "make reasonable modifications in policies, practices, or procedures when . . . necessary to avoid discrimination on the basis of [a] disability," which includes a "refusal to make reasonable accommodations in rules, policies, practices, or services" where such accommodations may be necessary (citation omitted)). The provision is not contrary to law—it is likely *required* by law. The December 2025 NOFO plainly establishes that "services offered must be designed to serve any type of disability . . . not

45

to the exclusion or priority of any one disability over another." AR 1201; *see also* AR 1202–03 (same). Such an exception *complies* with the ADA. It does not violate it.

      f.   Geographic-area provisions

Plaintiffs claim that the December 2025 NOFO discriminates against certain geographic areas in violation of the McKinney-Vento Act's prohibition on establishing criteria "for allocating or denying funds" based on the "adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law." *State Litigation*, ECF No. 81 at 44 (quoting 42 U.S.C. § 12711 ("the local-authority provision")); *accord NAEH Litigation*, ECF No. 67-1 at 53–54.

Plaintiffs' argument suffers from one central flaw, though: the public-encampment and drug-use provisions they challenge do not actually award points merely for demonstrating a state's compliance with the Administration's "favored," *NAEH Litigation*, ECF No. 67-1 at 54, policies. Instead, points are available where applicants "describe how the CoC cooperates with law enforcement to achieve" clearing of encampments and "connect[ion of] individuals" in such places or using illicit drugs publicly with "appropriate services and/or law enforcement." AR 1226–27. The NOFO does not contemplate awarding points based on "the adoption, continuation, or discontinuation" of "any public policy, regulation, or law" in each CoC's jurisdiction. 42 U.S.C. § 12711. It asks instead for *CoCs'* policies for cooperation with state and local officials in connecting individuals with appropriate services. *See* AR 1226–27. The plain text of the McKinney-Vento Act thus does not prohibit such conditions, simply because funding is *not* conditioned on "local policies." *County of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 433 (2d Cir. 2015).

Indeed, the McKinney-Vento Act itself requires that recipients "describe," among other things, "how the number of individuals and families who become homeless will be reduced in the community," 42 U.S.C. § 11386a(b)(1)(B)(i), and "the extent to which the recipient will . . .

46

incorporate comprehensive strategies for reducing homelessness," *id.* § 11386a(b)(1)(B)(iv)(II). A HUD regulation requires the same. *See* 24 C.F.R. § 578.7(c)(1)(iii) (requiring that "[t]he Continuum . . . develop a plan that includes [p]revention strategies"). The public-encampment and drug-use provisions in the NOFO fit within those statutory categories by asking CoCs to identify their policies for reducing homelessness and for developing strategies to connect homeless people with appropriate services. Indeed, the NOFO clarifies the purpose for the provisions: enabling HUD to "determine the effect of location on success in attaining the program goals." AR 1226. The most that HUD did here was to "require[] [CoCs] to assess and analyze *whether*" certain laws "in the jurisdiction impeded" HUD's statutory duties "and, if so, to identify a plan to overcome the effects of such impediments." *County of Westchester*, 802 F.3d at 433. That kind of request does not violate the local-authority statutory provision. *See id.* at 433–34.

And NAEH Plaintiffs' challenge to the December 2025 NOFO's three-point award for CoCs indicating that the state in which they are located substantially complies with the Sex Offender Registration and Notification Act (SORNA) fails for an even more fundamental reason: SORNA is not a local law. *See id.* at 433; *see also* 42 U.S.C. § 12711. SORNA is federal law, and States are required, under the law, to "maintain a jurisdiction-wide sex offender registry conforming to the requirements" of SORNA. 34 U.S.C. § 20912(a). Jurisdictions do not have discretion to "adopt[], continue[], or discontinue[]" compliance with the law; the obligation exists independently of whether the substantive SORNA requirements are "adopted, continued, or discontinued in accordance with the jurisdiction's duly established authority." 42 U.S.C. § 12711. The local-authority provision thus does not apply, at all, to HUD's assessment of whether a state or local jurisdiction complies with federal law. And HUD's provision seeking information on that compliance and its effects on success is certainly not contrary to the McKinney-Vento Act.

g.   Gender-identity provisions

As above, NAEH Plaintiffs' challenges to the substantive gender-ideology provisions in the November 2025 NOFO are moot. *See supra* Section I.B. Plaintiffs' only remaining challenge on this issue is their argument that the Executive Order–compliance provision in the December 2025 NOFO is contrary to law. *See NAEH Litigation*, ECF No. 67-1 at 54. This claim is belied by the text of the NOFO, which provides that CoCs must comply with presidential executive actions, "advised by" HUD, "unless otherwise restricted by law or by a court of competent jurisdiction." AR 1250.

As the D.C. Circuit recognized in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), a directive with a permitted-by-law qualifier cannot violate the law because it explicitly "instructs the agency to follow the law." *Id.* at 33. There, plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction project could require or prohibit bidders or contractors from entering into a project labor agreement. *Id.* at 29. As the D.C. Circuit explained, the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration." *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Similarly, here, the Executive Order–compliance provision explicitly constrains its implementation to applicable laws. Indeed, so does the relevant Executive Order itself. *See* Exec.

48

Order No. 14,168, § 8(b), 90 Fed. Reg. 8615, 8618 (Jan. 20, 2025). As was the case in *Allbaugh*, "[i]n the event that an agency does contravene the law in a particular instance," Plaintiffs may challenge that action as inconsistent with an applicable law. 295 F.3d at 33. Notably, this past Term, the Supreme Court stayed an injunction with respect to an Executive Order regarding government restructuring, which included a similar limited-by-law qualifier. *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (mem.). Writing separately, Justice Sotomayor stated that although "the President cannot restructure federal agencies in a manner inconsistent with congressional mandates," a stay of the injunction was warranted because "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law.' " *Id.* at 2635 (Sotomayor, J., concurring). And, as State Plaintiffs note, the Executive Order "does not impose any obligations on the Plaintiffs," *State Litigation*, ECF No. 81 at 43 n.13, meaning that the NOFO's provision has *no* effect in this litigation, let alone an unlawful one. A stay of the Executive Order–compliance provision is thus unwarranted because the provision itself constrains its applicability to the limits imposed by existing laws.

### iii. The challenged provisions included in the December 2025 NOFO are not arbitrary and capricious.

Plaintiffs challenge a similarly wide array of provisions in the December 2025 NOFO as arbitrary and capricious under the APA. *See State Litigation*, ECF No. 80 ¶¶ 200–12 (Count Two); *NAEH Litigation*, ECF No. 66 ¶¶ 223–36 (Count Six). They assert that Defendants failed to adequately explain the provisions, failed to consider important aspects of the decisions they made, failed to consider alternatives to the provisions HUD chose to implement, and failed to account for significant reliance interests. *See State Litigation*, ECF No. 80 ¶¶ 206, 208, 210; *accord NAEH Litigation*, ECF No. 66 ¶¶ 226–35. But HUD's decisions to implement the provisions of the

December 2025 NOFO were well explained. And it adequately and reasonably considered—and documented—all relevant aspects of the problem before it. *See supra* Legal Standards.

Underpinning each of the conditions Plaintiffs challenge in the December 2025 NOFO is (1) HUD's rational determination that a decade of incentivizing permanent housing—above and beyond what Congress required—had "failed to deliver" on the policy's promises and (2) the agency's reasonable decision to "return the CoC program to its original goals of solving homelessness" by promoting individual self-sufficiency, promoting treatment and recovery, and—at bottom—reducing homelessness. AR 287–88. Those framing determinations alone provide enough clarity that HUD's path to issuing the December 2025 NOFO "may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). But, as explained below, HUD did much more—it provided specific justifications for the changes it made.[11] Consequently, HUD's decision to issue the December 2025 NOFO was not arbitrary and capricious.

_____

[11] State Plaintiffs cast aspersions on HUD's contemporaneous explanations for issuing the December 2025 NOFO by characterizing them as "*post hoc* rationalizations." *State Litigation*, ECF No. 81 at 47–48. But Plaintiffs' attack fails for two reasons: (1) the relevant portions of the administrative record were developed contemporaneously to—and finalized before—issuance of the December 2025 NOFO, *see* AR 299 (showing approval as of 2:59 PM on December 19, 2025); and (2) the record clearly recounts internal agency discussions conducted in advance of both 2025 NOFOs issued for the program, *see* AR 292–93 (recounting stakeholder discussions, including contributions from HUD leadership in August 2025). To the extent aspects of the December 2020 NOFO did not change following review of the November 2025 NOFO—and, Defendants reiterate, substantial portions of the NOFO *did* change—HUD is well within its discretion to hold to the same policies, assuming HUD's deliberation on whether to change the policies satisfies the relevant APA standards. *See FEC v. Akins*, 524 U.S. 11, 25 (1998) (making clear that, in the remand context, an "agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason"); *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 30 F.3d 1510, 1514 (D.C. Cir. 1994) (noting that courts "frequently remand matters to agencies while leaving open the possibility that the agencies can reach exactly the same result as long as they rely on the correct view" of the law, "explain themselves better," or "develop better evidence for their position"). Indeed, remand for further consideration or to take a new agency action—a course the Supreme Court mandates in similar cases—tracks exactly the path

a.  <u>Caps on permanent housing funding and Tier 1 renewals</u>

Plaintiffs' assertions—that HUD failed to consider the potential harm to CoCs and to participants in nationwide CoC programs by its decision to reduce the CoC program's support for permanent housing projects and to decrease the proportion of each CoC's application devoted to funding project renewals, while increasing funding for new transitional-housing and supportive-service projects—are belied by the record. HUD adequately considered the effects of changing such policies—including on the reliance interests that relevant stakeholders held—and determined that the negative effects of those changes were outweighed by the benefits that would accrue from changing course. That determination was squarely within HUD's discretion.

To begin, HUD explicitly provided a process that would allow for CoC grantees to transition gradually to the new NOFO's funding distributions. HUD noted that it "considered the challenges of implementing a transition away from roughly 90% permanent housing projects and roughly 90% 'auto renewals' to a more balanced and competitive approach." AR 297. HUD noted that both the November and December 2025 NOFOs would provide for a "Transition Grant" process that would allow "CoCs to slowly transition their project from one component to another." AR 297–98. HUD noted that it has prepared "detailed guidance" and "real world examples" on transition grants, AR 298; *see also* AR 1184–85, for CoCs on "how program participants currently living in permanent housing that may lose funding or may transition to another type of project may be eligible to receive transitional housing assistance," AR 298; AR 1157 (allowing for reallocation of amounts awarded for "renewal projects to create one or more new project without decreasing the CoC's [Annual Renewal Demand].");  AR 1184–85 (explaining transitional grants). HUD

HUD undertook here. *See Regents of the Univ. of Cal.*, 591 U.S. at 20–21; *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973). The relevant agency action is HUD's decision to issue the *December 2025 NOFO*. The Court has no basis to discount the explanations offered in support of that action simply because certain elements of the December 2025 NOFO resemble the November 2025 NOFO.

similarly indicated that it "has prepared detailed guidance" that it is prepared to distribute to ensure CoCs remain adequately prepared to "serve program participants." *Id.* And HUD noted that, whenever a project in a CoC becomes nonoperational, "all program participants may be eligible for assistance in another project in the CoC," noting that "[l]ocal communities have immense discretion and flexibility to ensure that they are serving their citizens best." *Id.* And even with respect to existing grantees, HUD "recognize[d] that [such] grantees have grant expiration dates that span the calendar year of 2026" and that, in years past, "CoCs have consistently navigated a 'gap in services' posed by awards being announced after some grants have previously expired." AR 297. HUD noted that CoCs "can continue to draw down funds for expenses incurred prior to the expiration of their grants," *id.*, which, again, would ease the transition to new priorities.

In sum, HUD clearly considered the interests stakeholders had in maintaining a system "invested significantly in building permanent housing." *NAEH Litigation*, ECF No. 67-1 at 57. HUD determined that a change in strategy was necessary to better address the statutory goals of the McKinney-Vento and HEARTH Acts. And it determined that it would do all it could to ameliorate the transition to transitional-housing grants as much as possible by providing applicants opportunities to receive transitional funding throughout the FY 2025 program to ensure that CoCs remain able to "serve program participants." AR 298.

Plaintiffs assert repeatedly that HUD has entirely abandoned or "simply disregard[ed]" the "proven" strategy of funding permanent housing, contrary to the explicit direction of Congress, which—in Plaintiffs' view—would render its policy shift arbitrary and capricious. *State Litigation*, ECF No. 81 at 49; *accord NAEH Litigation*, ECF No. 67-1 at 58. This is not so. Rather, HUD has rebalanced its relative emphasis on permanent housing to better align with the relative priority that Congress identified by statute, in turn making more room for new projects. Congress deemed it

prudent to incentivize permanent housing—at a minimum of 30 percent of available CoC and ESG funding in any given fiscal year. *See* 42 U.S.C. § 11386b(a)(1). That is exactly the course HUD has taken in the December 2025 NOFO. *See* AR 1154–55. Far from abandoning or disregarding congressional findings, HUD has instead implemented those findings—in direct alignment with the statutory requirements of the program. *See* AR 1154–55 (establishing a 30-percent funding allocation for permanent housing projects in accordance with 42 U.S.C. § 11386b). That direct incorporation of a congressional directive demonstrates that HUD adequately considered the strategies Congress had found effective in reducing homelessness. Such consideration—paired with HUD's discussion of reliance interests and provision of resources for CoCs to transition away from permanent housing projects—provides an adequately "reasoned explanation for the change." *Doe*, 152 F.4th at 289 (quoting *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025)).

State Plaintiffs attempt to cast doubt on HUD's conclusions that a relative shift toward transitional housing will reduce homelessness by arguing that multiple interrelated factors may have led to the current decade-long increase in homelessness. *See State Litigation*, ECF No. 81 at 49–56. But that kind of scenario—where causation between a policy and an outcome cannot be definitively proven—constitutes exactly the kind of scenario in which agency policymakers have flexibility to pursue their chosen policy. *See Atieh v. Riordan*, 797 F.3d 135, 140 (1st Cir. 2015) (noting that a court "may not disturb the agency's factfinding" where "the raw facts support competing but reasonable inferences."). And, as State Plaintiffs acknowledge, HUD *does* cite evidence supporting its position. *See* AR 287 n.3 (citing *The Future of Housing for the Homeless*, *see* AR 698–710, for the evidence that chronic homelessness has increased by 74.5 percent despite a 24.7 percent increase in permanent supportive housing beds); AR 288 n.4 (citing *How Congress Can Reform Government's Misguided Homelessness Policies*, *see* AR 711–40, for the conclusion

53

that the housing system has incentivized speed in receiving housing rather than "the quality of services individuals can receive in order to reach self-sufficiency"); *State Litigation*, ECF No. 81 at 55 (acknowledging that these two reports "raise perhaps legitimate challenges facing permanent housing projects"). And, in line with the recommendations in those reports, HUD *is* continuing to have permanent housing "play an important role in government's response to homelessness," *State Litigation*, ECF No. 81 at 55 (quoting AR 698)—to the tune of 30 percent of CoC funding, approximately $1.3 billion, *see* AR 1138—exactly in line with the congressional requirement. That consideration was rational and reasonable.

Similar logic applies to HUD's consideration of the relevant factors that led to its decision to reduce the amount of funding that would go to project renewals. Plaintiffs try to brush away a desire to increase competition within the program as somehow irrelevant or inapplicable. *See NAEH Litigation*, ECF No. 67-1 at 58. But Plaintiffs ignore that competition—just like ending homelessness, minimizing trauma, and optimizing self-sufficiency—is an explicit statutory requirement for the CoC program. *See* 42 U.S.C. § 11382(a) ("The Secretary shall award grants[] on a competitive basis[.]"). Ensuring that such a congressional directive—which necessarily entails ensuring that projects within geographic areas be measured against each other prior to award, *see id.* § 11386a(a)—is followed is not arbitrary and capricious. And HUD directly recognized and considered that relevant factor. *See* AR 290. Plaintiffs argue that increased competition somehow implies that Tier 1 projects, which face a less-rigorous application review than Tier 2 projects, *see* AR 1161, 1233–34, "lack merit" or "are otherwise ineffective." *NAEH Litigation*, ECF No. 67-1 at 58. But that characterization entirely misses the independent value that increased competition might serve: ensuring that those projects that *do* clearly have merit— whether Tier 1 or otherwise—rightfully receive CoC funding on that basis. "Competition drives

outcomes, effectiveness, innovation, and accountability[.]" AR 290. Such a determination is, under the APA, "reasonably . . . discerned" and far from arbitrary and capricious. *Bowman*, 419 U.S. at 286.

> b. Application review provisions

NAEH Plaintiffs further challenge a host of provisions throughout the December 2025 NOFO as arbitrary and capricious, arguing that the use of such provisions is not supported with "reasoned decisionmaking." *NAEH Litigation*, ECF No. 67-1 at 58–59. But in each case, Plaintiffs cite the very rationale that shows why HUD's decision *was* reasoned—and thus cannot be arbitrary and capricious.

*Supportive-service provisions*. As above, HUD adequately considered the relevant factors informing its decision to incentivize the provision of supportive-services to program participants.[12] *See* AR 287, 1196–97, 1200–03, 1206–07, 1218–21. First and foremost in those considerations is the McKinney-Vento Act's explicit requirement that CoC projects provide supportive services for residents of all projects. *See* 42 U.S.C. § 11385(a) (requiring that, "[t]o the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project"). HUD's own regulations reflect that requirement: "To the extent practicable, each project must provide supportive services for residents of the project and homeless persons using the project[.]" 24 C.F.R. § 578.75(e); *see also id.* § 578.75(g), (h). And HUD expressly noted that

---

[12] The relevant provisions assign points if a CoC demonstrates that (1) at least 25 percent of points for its permanent housing projects "account" for "[s]upportive service participation requirements," AR 1207; (2) it is creating projects "with the purpose of providing substance abuse treatment" in which "participants are required to take part," AR 1218; (3) projects "require program participants to take part in supportive services," AR 1220; (4) the project will "require program participants to take part in supportive services," and will "provide 40 hours per week of customized services for each participant," AR 1196; (5) the CoC will, for permanent-housing expansions, expand supportive services to program participants, AR 1200; and (6) the proposed project will "require program participants to take part in supportive services," AR 1203.

the December 2025 NOFO would "encourage[] supportive service agreements that meet individual needs and advance individual progress towards self-sufficiency and independent living goals," as set out in the McKinney-Vento Act, "[i]n accordance with 24 [C.F.R. §] 578.75(h)." AR 290. HUD reasonably determined that "[o]ne way to advance both recovery and self-sufficiency is through supportive service participation requirements," noting that such requirements "have been successfully employed in most federal social service programs and have strong bipartisan support." *Id.*; AR 727 (citing, in a Center on Wealth and Poverty report, to other successful social service programs with supportive service requirements, including Pell Grants, unemployment benefits, and the Temporary Assistance for Needy Families program); AR 1032 (showing that 69 percent of all voters support such services).

HUD further recognized that CoCs had not previously been incentivized to require supportive services for project participants. *See* AR 296–97. But, in weighing various policy considerations, including those informed by the McKinney-Vento Act's direct reference to supportive services and the Act's goal of promoting individual self-sufficiency, HUD determined that "supportive services play a critical role in providing an environment that optimizes self-sufficiency and reduces homelessness and returns to homelessness over the long term." AR 297. That determination was rational, reasonable, and supported by both applicable law and the evidence before the agency. *See Burlington*, 371 U.S. at 168.

Plaintiffs point to nothing foreclosing HUD's reasonable view of the factual landscape before it. Plaintiffs reference research noting that Housing First programs are "more effective than treatment first programs," *NAEH Litigation*, ECF No. 67-1 at 60, but Plaintiffs do not dispute that supportive services can have positive benefits in reducing long-term homelessness, *see id.* at 59–60. And HUD relied on evidence suggesting that expanded supportive services could provide

additional benefits under the CoC program. *See, e.g.*, AR 706 (finding that permanent supportive housing is often insufficient to improve the lives of homeless individuals and suggesting that "for tenants with the most acute, unmet needs, the focus should be instead on finding a program that provides a higher level of care" than such programs—for "their own benefit, as well as that of other tenants and the host neighborhood"); AR 838–39 (finding that "[t]wenty percent of participants who reported current regular substance use indicated that they wanted treatment, but were unable to receive it. . . . To avoid preventable institutional care, there is a need for housing options that support independence for those with functional and cognitive impairments. . . . [An] expanded use of the contract mode of in-home supportive services should be considered."); AR 1024–25 (finding that, "[i]n 2022, 90 percent of all households living" in permanent supportive housing with optional supportive services "did not use other parts of the homelessness services system during the year"). HUD reasonably and rationally came to the decision to provide increased incentives for required supportive services based on the "raw facts" before it. *See Atieh*, 797 F.3d at 140.

*Disability provision.* In the December 2025 NOFO, HUD provided that it would award applications two points (out of 10 for the section) where projects "provide 40 hours per week of customized services for each participant," reduced proportionately for employed participants and inapplicable to "participants over age 62 or who have a physical disability/impairment or developmental disability" as defined by law. AR 1196–97. NAEH Plaintiffs challenge this provision as "arbitrary and capricious for lack of a reasoned explanation." *NAEH Litigation*, ECF No. 67-1 at 61–62.

Plaintiffs attempt to cast this provision as a discriminatory work requirement (setting aside the fact that the provision explicitly *exempts* required participation in employment activities by

people with disabilities if their disability "results in substantial functional limitations," 42 U.S.C.

§ 15002, which exemption is required by law, *see id.* § 12132). *See NAEH Litigation*, ECF No.

67-1 at 61–62; AR 1196–97. But here, too, Plaintiffs read too much into the NOFO. The December

2025 NOFO describes the kinds of services that could be considered "customized services": "case

management, employment training, substance use treatment, etc." AR 1196–97. The provision is

not limited to employment. And nowhere does it indicate that CoCs are required *not* to provide

customized services to participants over the age of 62 or who have a physical or developmental

disability or impairment. *See id.* It merely indicates that CoCs are not required to provide such

services to people with disabilities in order to gain the two points under the scoring provision.

CoCs. Indeed, such a requirement likely would run afoul of the Americans with Disabilities Act.

*See* 42 U.S.C. § 12132. Per the NOFO, then, CoCs retain full discretion to decide whether and

how to provide such services to people with disabilities, and they will face no penalty or receive

no benefit for doing so. Otherwise, the provision fits directly within and follows from HUD's

determination that the December 2025 NOFO should hew more closely to the McKinney-Vento's

objective to optimize self-sufficiency among individuals and families experiencing homelessness.

*See* AR 1146 (citing 42 U.S.C. § 11381(4)). As above, such a determination is reasonable and well

supported by the record—including by the statutory requirements applicable to the CoC program.

*See Burlington*, 371 U.S. at 168.

    *Geographic-area and law-enforcement provisions.* Plaintiffs further challenge the

December 2025 NOFO's geographic-area provisions as arbitrary and capricious, arguing that

HUD's justifications for the provisions have "logical gaps," *State Litigation*, ECF No. 81 at 56, or

rely on impermissible factors and on information "Congress deemed irrelevant," *NAEH Litigation*,

ECF No. 67-1 at 63. Those provisions award projects points for "[d]emonstrat[ing], by providing

evidence, that the CoC's entire geographic area . . . [q]uickly clears tents and encampments on public property," "[d]oes not tolerate the public use of illicit drugs," and "quickly connects" individuals camping in public or using drugs "with appropriate services and/or law enforcement." AR 1226–27. The NOFO asks CoCs to provide a description of "how the CoC cooperates with law enforcement to achieve this and the current status of tents and encampments" and "overdoses and illicit drug use in public spaces" in each geographic area. *Id.* Plaintiffs also challenge similar provisions awarding points where CoCs cooperate with first responders and law enforcement to promote use of CoC services, *See* AR 1223–24, and cooperating with—or not impeding—law enforcement in connecting individuals "with services," AR 1227–28. *See NAEH Litigation*, ECF No. 67-1 at 65–66. Again, as above, HUD clearly explained its rationale for including these provisions in the NOFO and, further, tied that rationale directly to the objectives Congress identified in the McKinney-Vento Act: promoting a community-wide commitment to ending homelessness by quickly rehousing homeless individuals and to optimizing individual self-sufficiency. *See* 42 U.S.C. § 11381. Such consideration was not arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

NAEH Plaintiffs argue that the provision incentivizing substantial state compliance with SORNA lacks any connection to the McKinney-Vento Act. To the contrary: as Plaintiffs note, HUD explained that "community compliance with SORNA is indicative of ability to minimize trauma and protect the safety of individuals experiencing homelessness." AR 292. And the December 2025 NOFO further explained that "CoCs should encourage providers to provide trauma informed care and ensure participant safety in programs, especially for youth and survivors of domestic violence, dating violence, sexual assault, and stalking." AR 1151; *see also* AR 290. That statement from the NOFO provides the rational connection between the SORNA provision—

which increases the likelihood that CoCs will be better able to provide safe spaces for victims of such violence by ensuring that there are mechanisms to identify sex offenders who might otherwise be living with victims of sexual offenses—and the McKinney-Vento Act's stated objective of minimizing the trauma caused to individuals, families, and communities caused by homelessness. *See* 42 U.S.C. § 11381(2).

The same reasoning—and the same justifications—underpin HUD's decision to include provisions awarding points where geographic areas clear public encampments and connect individuals with "appropriate services," AR 1226–27, and to encourage CoCs to partner with first responders and law enforcement to help individuals connect with appropriate services like "emergency shelter, treatment programs, reunification with family, transitional housing or independent living," AR 1198–99; *see also* AR 1221, 1223–24, 1227–28. As HUD explained at length, encouraging geographic areas to reduce both public encampments and illicit drug use—by connecting individuals with appropriate services—will have substantial safety benefits to people experiencing homelessness themselves, who "are victims of crime at higher rates than the general public." AR 291; *see also* AR 296 (referencing discussions with CoC stakeholders that showed the value of using law enforcement, first responders, and service providers to respond quickly to people experiencing behavioral health crises, facilitating a path out of homelessness). By encouraging CoCs to engage in such activities, HUD found that it could "address barriers to maintaining housing and increasing self-sufficiency." *Id.* Such goals are squarely within the McKinney-Vento Act's objectives, and HUD adequately explained how these provisions would serve those objectives. HUD further considered that CoCs might have a measure of reliance on previous CoC programs' "silen[ce]" on similar matters, AR 295, but concluded that the status quo had turned out to be "both cruel and deadly" and thus should change, AR 296. It weighed such

interests and came to a similar conclusion for the provision encouraging reduction in public
encampments: "To ignore the truth behind" stories of individuals being helped out of homelessness
by first-responder services "is to deprive individuals of life-changing care and leave them in
harmful, or even deadly, environments. . . . HUD found the last Administration's standpoint on
law enforcement to be counterproductive to the protection of individuals experiencing
homelessness and to the reduction of homelessness generally." *Id.*

HUD has determined, based on both record evidence and on its own outreach with
stakeholders, that encouraging CoCs to cooperate with first responders and law enforcement to
affirmatively seek out appropriate services for homeless individuals can help reduce violence
against and minimize harm to homeless people, in addition to further reducing homelessness and
minimizing the trauma to individuals, families, and communities. *See* AR 291. Plaintiffs provide
no basis to find that determination unreasonable. And, contrary to Plaintiffs' arguments, HUD
sufficiently considered the costs and benefits of such provisions to satisfy deferential APA review.
*See Burlington*, 371 U.S. at 168.

Plaintiffs' aside argument that such policies are "entirely out of the [CoCs'] control,"
*NAEH Litigation*, ECF No. 67-1 at 64, is unavailing for two reasons: (1) many CoCs—*e.g.*, States
and municipalities—*are* responsible for administering such policies in their capacity as CoCs,
regardless of the State or municipality's formal policy, regulation, or law; and (2) the NOFO does
not actually require CoCs to engage in activity outside their control, given that a CoC's response
for these provisions should indicate "how the CoC cooperates with law enforcement to achieve"
the goals of connecting individuals in public encampments or using illicit drugs publicly "with
appropriate services," AR 1226–27. In all, HUD more than provided sufficient explanation to draw

a reasonably discernible path between its use of these provisions and the statutory objectives of the McKinney-Vento Act. *See Bowman*, 419 U.S. at 286.

*Risk-review and illegal-activity provisions.* NAEH Plaintiffs conclusorily challenge a raft of provisions generally aimed at ensuring that CoC funds are not used to engage in unlawful activity. *See NAEH Litigation*, ECF No. 67-1 at 67–68.

Here, each of the provisions Plaintiffs challenge explains that grants must not be used to fund unlawful activities. *See* AR 1164 (requiring submission of a form certifying funds will not be used to promote policies that violate applicable federal antidiscrimination laws); AR 1194 (requiring certification that funds will not advance "illegal" racial discrimination); *id.* (requiring applicants to certify they will not operate sites that violate 21 U.S.C. § 856); AR 1229–30 (reserving HUD's right to review whether applicants had previously facilitated activities impeding lawful actions related to investigating or preventing illicit activities); *see also* AR 296 (explaining that limiting cooperation with law enforcement and first responders can "deprive individuals of life-changing care and leave them in harmful, or even deadly, environments").

By referencing applicable law, HUD provided clear notice to applicants of the standards they are expected to follow in administering federally funded projects. And, of course, applicable law always provides adequate notice—sufficient to qualify as an adequately explained basis—to render reliance on the law within the agency's discretion. *Cf. Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" (quoting *Barlow v. United States*, 32 U.S. (7 Pet.) 404, 411 (1833)). HUD further provided the reason for such provisions: that it intended to "positively steward . . . valuable taxpayer resources." AR 24. Such a determination was rational.

To the extent any CoC believes that the agency "does contravene the law in a particular instance," Plaintiffs may challenge that action as inconsistent with an applicable law. *Allbaugh*, 295 F.3d at 33. And, further, to address CoCs' interests in reliance on prior CoC program competitions, Defendants note that the December 2025 NOFO expressly provided that HUD would "not penalize [any] renewal applicant who sufficiently complied with the terms and conditions [in the 2024 NOFO] that are in direct conflict with those contained therein." AR 1230. In sum, HUD's decision to require certification with applicable law—which HUD has done throughout the history of the CoC program, *see, e.g.*, AR 142–44—was both rationally supported and reasonable.

c.   Post-award conditions

Plaintiffs' attack on the various post-award provisions included in the December 2025 NOFO—*see NAEH Litigation*, ECF No. 67-1 at 68–71—fails for many of the same reasons Plaintiffs' above arguments fail.

As shown, the relevant December 2025 NOFO provisions require continued compliance with applicable law. *See* AR 1249–51. And several of the provisions, which concern Executive Orders applicable to federal agencies that are to be implemented in accordance with applicable law, impose no independent obligations on any entity other than federal agencies and employees. *See* Exec. Order No. 14,173, §§ 4–8, 90 Fed. Reg. 8633, 8634–36 (Jan. 21, 2025); Exec. Order No. 14,218, §§ 2–3, 90 Fed. Reg. 10581, 10581–82 (Feb. 19, 2025); Exec. Order No. 14,168, §§ 3–8; Exec. Order No. 14,182, §§ 3–4, 90 Fed. Reg. 8751, 8751 (Jan. 24, 2025); Exec. Order No. 14,321, §§ 2–6, 90 Fed. Reg. 35817, 35817–19 (July 24, 2025). The Orders bind HUD "to give effect to the policies embodied in the President's direction, to the extent allowed by the law." *Allbaugh*, 295 F.3d at 32. But "[t]he mere possibility" that the agency "might make a legally suspect decision to award a contract or to deny funding for a project," *id.* at 33, does not provide a basis to say that reliance on the policy, to the extent permitted by law, is arbitrary and capricious.

63

### iv. The December 2025 NOFO is not subject to notice-and-comment requirements under the APA.

Plaintiffs allege that HUD failed to comply with required procedure in issuing the December 2025 NOFO by failing to engage in the notice-and-comment process prior to publishing the NOFO. *See State Litigation*, ECF No. 80 ¶¶ 213–20 (Count Three); *NAEH Litigation*, ECF No. 66 ¶¶ 237–43 (Count Seven); *see also* 5 U.S.C. § 706(2)(D). But the NOFO does not enact or amend any substantive rule or provision of law applicable to the CoC program. And requiring HUD to engage in such a process every time it issued any change to a funding solicitation, no matter how minor, to the CoC application process would entirely ossify administration of the program, in direct conflict with the APA. *See* 5 U.S.C. § 553(b)(A) (providing exceptions to notice-and-comment requirements); *see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524–25 (1978) (emphasizing that Congress balanced the need for the public to be informed of changes to substantive rules against substantial flexibility Congress intended to bestow on agencies for the formulation of interpretive or procedural rules).

The APA is very clear that certain agency actions are exempt from notice-and-comment requirements; these actions are not procedurally invalid if they were issued without publication in the Federal Register and opportunity for interested parties to submit comments and information concerning the actions. Specifically, 5 U.S.C. § 553(b)(A) exempts "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." The December 2025 NOFO falls into this exempted zone.

The NOFO should best be understood as embodying a general statement of policy and providing a formal notice of a policy or a set of standards applicable to individual adjudications, operationalized through a set of evaluative criteria (including both disqualifying and incentivizing points-based criteria), reflecting a shift in the favored form of housing assistance to be funded—

in full compliance with the McKinney-Vento Act and other relevant provisions of law. As the Supreme Court has recognized, § 553(b)(A) "exempts 'general statements of policy,' which we have previously described as 'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.' " *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

The NOFO—which preceded the public competition for CoC program funding— quintessentially gives notice to the public and potential applicants for grants of the way in which HUD will exercise its discretionary power to assess applications for project funding, the criteria it will apply, the ways in which those criteria will function and the relative weights given to proposals' performance along those criteria, and the allocation of funds across different categories of housing projects. As such a (re)statement of policy, the APA exempts the December 2025 NOFO from the notice-and-comment requirement. And, of course, to the extent that the NOFO operates as a set of standards to inform the assessment of individual applications, thus functioning as an informal agency adjudication, such an adjudication is not subject to the APA's notice-and-comment or formal-adjudication procedural requirements. *See Doe v. Leavitt*, 552 F.3d 75, 80 (1st Cir. 2009) (explaining that an agency manual and an agency decision, a "creature of [an] adjudicative process," were not entitled to then-applicable *Chevron* deference as "informal agency adjudications" not subject to notice-and-comment rulemaking).

The structure of the McKinney-Vento Act makes abundantly clear that neither Congress nor HUD itself intended to subject HUD to notice-and-comment requirements every time it issued a NOFO related to the CoC program. As Plaintiffs emphasize elsewhere in this litigation, Congress set a statutory deadline for HUD to issue a notification of funding availability for grants under the CoC program: three months after "the date of the enactment of the appropriate Act making

65

appropriations" for HUD for such fiscal year. 42 U.S.C. § 11382(b). But under the APA, agencies must publish a substantive rule "not less than 30 days before" the rule's effective date, 5 U.S.C. § 553(d), and HUD regulations require a public comment period of 60 days, *see* 24 C.F.R. § 10.1. Considering the amount of time it takes the agency to craft a NOFO reflecting Congress's requirements, added to the amount of time necessary to consider and respond to any public comments, the three-month period Congress allocated to release a NOFO following appropriation of funds forecloses any notion that Congress intended such actions to undergo the full notice-and-comment rulemaking process.

Plaintiffs argue that a HUD regulation, 24 C.F.R. § 10.1, which Plaintiffs believe requires HUD to "provide for public participation in rulemaking with respect to all HUD programs and functions, including such matters that relate to public property, loans, grants, benefits, or contracts," means that the December 2025 NOFO is procedurally invalid for having failed to go through the full notice-and-comment process. *State Litigation*, ECF No. 81 at 36 (quoting 24 C.F.R. § 10.1); *accord NAEH Litigation*, ECF No. 67-1 at 71. Plaintiffs flatly overread that regulation, which, in the provision Plaintiffs quote, does not establish any substantive obligation by which HUD must abide and instead provides a general statement of policies related to public participation in HUD programs and functions. *See* 24 C.F.R. § 10.1 (setting forth the "policy of the Department of Housing and Urban Development"). And, further, the regulation expressly provides that "[n]otice and public procedure may also be omitted with respect to statements of policy, interpretive rules, rules governing the Department's organization or its own internal practices or procedures, or if a statute expressly so authorizes." *Id.* The upshot of the rule is, at best, that HUD has chosen to impose upon itself an obligation to abide by notice-and-comment procedures whenever issuing a substantive rule related to grants, which rules the APA ordinarily

66

exempts. *See* 5 U.S.C. § 553(a)(2). Indeed, the regulation, by its own terms, applies only to "notices of proposed rulemaking," 24 C.F.R. § 10.1, which the NOFO—by *its* own terms—is avowedly not, *see* AR 1133, 1138–39 (setting forth the document as a "Program Grants NOFO" and explaining it was being issued pursuant to the 2025 Appropriations Act). Nowhere does this regulation bind HUD, as Plaintiffs intimate it does, to the notice-and-comment procedure for policy statements or interpretive and procedural rules.[13]

## II.     Plaintiffs' Constitutional Claims Fail.

In addition to their statutory claims, Plaintiffs raise a bevy of constitutional challenges to the December 2025 NOFO, including challenges under the Spending Clause, the separation-of-powers doctrine, and the First Amendment. None of these challenges succeeds.

The Spending-Clause doctrine applies only to challenges to *statutory* provisions, not to Executive administration of funding programs. Here, Plaintiffs' claims are not that Congress did not comply with the Spending Clause's mandates, but rather that HUD did not comply with Congress's statutory commands. That is simply a claim that the Executive exceeded its statutory authority—and those freestanding statutory claims, which form the entire basis of Plaintiffs' constitutional challenges here, do not suffice to show a violation of the Constitution. Further, even assessed under the merits of each doctrine, the challenged provisions in the December 2025 NOFO easily satisfy the Constitution's requirements, because they clearly relate to the goals and

---

[13] NAEH Plaintiffs argue that the court's opinion in *Committee for Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992), supports their argument that HUD's changes to the CoC application process necessitate providing the public notice and an opportunity to comment. *See NAEH Litigation*, ECF No. 67-1 at 71. But *Committee for Fairness* hinged on a finding (1) that the changes imposed new and mandatory obligations on applicants and (2) that, as HUD acknowledged in that case, the changes contradicted existing regulations, which HUD later changed. *See* 791 F. Supp. at 893–94. But here, HUD makes no such acknowledgment, and, indeed, contends that the December 2025 NOFO requirements comport entirely with the relevant provisions in the McKinney-Vento Act. *Committee for Fairness* is inapposite.

requirements of the CoC program. For similar reasons, State Plaintiffs' Tenth Amendment claim fails. And NAEH Plaintiffs' First Amendment claim is (1) moot, since it is premised on a funding condition that no longer exists under the operative NOFO, and (2) fails to point to any required action Plaintiffs must take or speech they must make that would violate their First Amendment rights.

A.    **Defendants' December 2025 NOFO complies with the limits of the Spending Clause and does not violate the Constitution's separation of powers.**

Plaintiffs argue that the conditions in the December 2025 NOFO violate the constitutional separation of powers doctrine by usurping Congress's role in appropriating funding. *See State Litigation*, ECF No. 81 at 61–63; *NAEH Litigation*, ECF No. 67-1 at 74–75; *see also State Litigation*, ECF No. 80 ¶¶ 228–49) (Counts Five and Six); *NAEH Litigation*, ECF No. 66 ¶¶ 248–61 (Counts Nine and Ten). Plaintiffs claim that HUD has imposed "extra-statutory conditions on federal grant awards as a tool to obtain compliance" with the administration's policy objectives, thus functionally, in Plaintiffs' view, enacting, repealing, or amending statutes in violation of the Constitution's Spending Clause. *See NAEH Litigation*, ECF No. 67-1 at 74 (quoting *City of Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020)); *State Litigation*, ECF No. 81 at 62. Notably, neither set of Plaintiffs challenges the constitutionality of the statutes that HUD is implementing through the NOFO; rather, Plaintiffs assert that HUD's implementation of those constitutional statutes itself violates the Constitution. *State Litigation*, ECF No. 81 at 62–63; *NAEH Litigation*, ECF No. 67-1 at 74–75.

To start, Plaintiffs' spending-clause and separation-of-powers claims are improperly framed as constitutional claims. As the Supreme Court has confirmed, claims simply alleging that the President or the Executive has exceeded their statutory authority are not "constitutional" claims. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994). The APA and any other relevant statutory

regimes provide the proper framework for reviewing such claims. *See id.* "But longstanding authority holds" that review of constitutional claims "is not available when the statute in question commits the decision to the discretion" of the Executive. *Id.* In *Dalton*, the Court explicitly rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Per the Supreme Court, the Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the underlying statute is itself unconstitutional. *Id.* at 473 & n.5. Plaintiffs' constitutional spending-clause and separation-of-powers claims here rely entirely on their assertion that HUD has acted in excess of its statutory authority by including application criteria in the December 2025 NOFO beyond those criteria specified by statute. *See State Litigation*, ECF No. 81 at 62–63; *NAEH Litigation*, ECF No. 67-1 at 74–75. Such claims are statutory by their nature and, under *Dalton*, are untenable as freestanding constitutional claims.

Under the Spending Clause, the "Constitution empowers Congress to 'lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States.' " *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting U.S. Const. art. I, § 8, cl. 1). But the Spending Clause is inapplicable where, as here, Plaintiffs do not allege that the relevant statute is unlawful. As several district courts—faced with similar Spending-Clause challenges to Executive actions—have recently recognized, the Spending Clause is implicated only "when *Congress* imposes a spending or funding condition." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 162 (D.D.C.) (emphasis added), *appeal filed*, No. 25-5277 (D.C. Cir. July 28, 2025); *see also id.* (examining

69

Supreme Court Spending Clause cases to recognize that the doctrine is only applicable where plaintiffs allege that a statute is unlawful). Where plaintiffs—like Plaintiffs here—fail to challenge "Congressional action," they "cannot state a claim under the Spending Clause." *Id.* at 162–63; *see also Bd. of Educ. for Silver Consol. Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025) (same).

In any event, even if the Spending Clause were applicable here—which it is not—Plaintiffs' challenges still fail on the merits. Far from improperly "amending" or "enacting" statutory funding requirements, the conditions in the December 2025 NOFO—as HUD explained clearly and repeatedly, both in the NOFO and in the agency's contemporaneous rationale for issuing the NOFO—comport fully with and arise entirely out of both the statutory requirements and the congressional purposes outlined in the McKinney-Vento Act, as amended by the HEARTH Act. *See* AR 288–92.

Of course, as Plaintiffs argue, where "nothing in" a "statute indicates that Congress intended to permit" an agency "to create qualification requirements unrelated to the grant program simply to advance its own policy priorities," the agency may not "alter" the requirements of the program. *City of Providence*, 954 F.3d at 39. But Plaintiffs' claims fail on the very terms set out in their argument. For one, the McKinney-Vento Act *explicitly provides the Secretary authority* to impose application requirements "as the Secretary determines to be appropriate to carry out" the CoC program "in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G). For another, each condition *is* related to the grant program.

Take each challenged condition in turn. State Plaintiffs argue that the December 2025 NOFO's 30-percent cap on funding for new and renewals of permanent-housing projects contravenes Congress's direction to fund such projects. Tellingly, though, Plaintiffs cannot cite to

a statutory provision providing that explicit direction. *See State Litigation*, ECF No. 81 at 62–63. That's because, as explained above, *see supra* Section I.B.ii.a, these provisions track *exactly* the only statutory provision relevant to funding amounts for permanent-housing projects: "From the amounts made available to carry out this part for a fiscal year, a portion equal to not less than 30 percent of the sums made available to carry out" the relevant housing-assistance programs "shall be used for permanent housing" for specified individuals. 42 U.S.C. § 11386b(a)(1). Imposing a funding allocation that matches exactly with the minimum amount directed by Congress does not contravene congressional intent. It aligns with it. The decision to set that amount *at* the minimum is fully committed to the Secretary's discretion—and is certainly not unconstitutional.

Further, as established above, neither can Plaintiffs show that the McKinney-Vento Act requires HUD to fund renewals at the levels requested by the CoC for renewal projects under the previous NOFO. The Act merely *permits* HUD to fund renewals using the appropriations account for the CoC program. *Id.* § 11386c(a) ("Renewal . . . *may* be funded" (emphasis added)). It does not *require* HUD to do so, much less at any particular level. And, for those funds made available by the Secretary for renewals under subsection (a), only there does HUD face any obligation under the statute: to make such funds available under certain terms. *See id.* § 11386c(b) ("The sums *made available under subsection (a)* shall be available . . . ." (emphasis added)). Those requirements do not include monetary or numerical thresholds.

Structurally, Plaintiffs' reading is untenable: requiring HUD to renew every permanent-housing project requested could result in a CoC program providing funding only to those CoCs that request renewal, even if the funding levels that resulted might contravene other statutory provisions—like the requirement that HUD not impose any limit on requests for funding of transitional-housing projects, *see id.* § 11386b(c). And further undermining Plaintiffs' position is

71

that Congress emphasized that the HUD Secretary retains full discretion to renew projects in accordance with criteria set forth elsewhere within the statutory provisions governing the CoC program. *See id.* § 11386c(c). Requiring HUD to renew every project seeking renewal directly contravenes those congressional directives.

Similar logic applies to the other challenged conditions. Nowhere is there any statutory directive that prevents HUD from incentivizing the provision of supportive or substance-abuse treatment services to program participants. Indeed, arguably, the McKinney-Vento Act contemplates exactly the kinds of services HUD here seeks to encourage among its CoCs. *See id.* § 11385(a) (requiring that, to "the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project"). And there is no plausible argument that incentivizing a reduction in public homelessness by encouraging CoCs to "connect[] individuals" with "appropriate" homeless-support or substance-abuse services is unrelated to the statutory goals of the CoC program. *See* AR 1226–27; 42 U.S.C. § 11381. To the contrary: they're plainly related. Indeed, by reducing public encampments and ensuring that individuals in such encampments are connected with "appropriate" services, thus directly engaging those individuals with homelessness-reduction services, CoCs would—in HUD's reasoned view—directly serve the McKinney-Vento Act's goals of "increasing self-sufficiency" and promoting "a community-wide effort to reduce homelessness." AR 291–92.

Moreover, the December 2025 NOFO's review and risk provisions also tie directly to the statutory directive for HUD to administer the CoC program "in an effective and efficient manner." 42 U.S.C. §§ 11386(b)(8), 11386a(b)(1)(G). Those provisions enable HUD to verify CoC applicants' compliance with the law. *See, e.g.*, AR 1250 (prohibiting use of funds to subsidize or facilitate "illegal" racial preferences or discrimination), *see* AR 1229–30 (providing that HUD may

evaluate whether an applicant has a history of "subsidizing or facilitating" certain "illicit activities"). It is routine and unexceptional to provide notice that grant recipients are expected to ensure that federal funds are not used for illegal purposes. *See New York v. U.S. Dep't of Just.*, 951 F.3d 84, 110 (2d Cir. 2020) (holding that no constitutional violation arose where an agency provided grant recipients notice that they were expected to certify compliance with statutory provisions); *cf. Allbaugh*, 295 F.3d at 33 (explaining that, where an Executive Order "instructs the agency to follow the law," the "mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy").

Where the agency has imposed requirements within the bounds of the relevant statutory provisions and identified specific policy priorities for imposing those requirements that directly relate to the purposes of the relevant congressional program—here, promoting community-wide commitment to the goal of ending homelessness and optimizing self-sufficiency for individuals and families experiencing homelessness, *see* 42 U.S.C. § 11381(1), (4); AR 287–92, 1145–51—those requirements are not unconstitutional under the separation-of-powers or spending-clause doctrines. *See City of Providence*, 954 F.3d at 39; *Dole*, 483 U.S. at 207–08; *see also NYC C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757, 765–67 (D.C. Cir. 2022) (explaining that a HUD rule prohibiting the use of lit tobacco products in HUD-subsidized housing does not violate the Spending Clause or Tenth Amendment).

**B.      Defendants' December 2025 NOFO does not unduly coerce states in violation of the Tenth Amendment.**

Defendants are entitled to summary judgment on State Plaintiffs' Tenth Amendment coercion claim. *See State Litigation*, ECF No. 80 ¶¶ 250–56 (Count Seven).[14]

"If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]" *New York v. United States*, 505 U.S. 144, 156 (1992). And while Congress's spending power—which, as Defendants explained for Plaintiffs' Spending-Clause claims above, is not even implicated in this case because Defendants do not challenge the constitutionality of an underlying statutory provision—is "subject to several general restrictions articulated" in Supreme Court caselaw, those restrictions are not "severe." *Id.* at 158 (quoting *Dole*, 483 U.S. at 207). Indeed, Congress's spending power is "broad," *see id.*, and only implicates the Tenth Amendment where spending conditions "take the form of threats to terminate other significant independent grants" such that States are coerced into accepting policy changes, *Nat'l Fed'n of Ind. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (plurality opinion) ("*NFIB*"). But conditions on "the use of [appropriated] funds" are permissible, "because that is the means by which Congress ensures that the funds are spent." *Id.* And HUD's geographic-area application incentives[15]—which State Plaintiffs challenged here under the Tenth Amendment—

---

[14] State Plaintiffs do not affirmatively seek summary judgment on this claim. *See State Litigation*, ECF No. 81 at 61–63.

[15] These provisions incentivize CoCs to (1) show that their geographic areas connect individuals in public encampments with appropriate services and to cooperate with law enforcement to achieve this; (2) describe how CoCs cooperate with law enforcement to connect individuals using illicit substances with appropriate services; (3) demonstrate the CoCs utilize standards to help individuals who may pose a danger to themselves; (4) ensure that states are substantially compliant with SORNA and that CoCs adequately track sex offenders; and (5) cooperate and not interfere with law enforcement in connecting individuals violating public-camping or drug-use laws with appropriate services. AR 1226–28.

do just that: ensure that CoC funding flows to CoCs that most effectively "end homelessness, quickly rehouse individuals, and minimize trauma." AR 1226 (citing 42 U.S.C. § 11381).

Indeed, because State Plaintiffs may readily decline to apply for the specific grants to which any offensive conditions are attached, their sovereignty has not been commandeered. *See Fed. Energy Regul. Comm'n v. Mississippi*, 456 U.S. 742, 766 (1982) ("[I]t cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way[.]"); *see also Env't Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 847 (9th Cir. 2003) ("[A]s long as the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive, or otherwise unappealing is insufficient to establish a Tenth Amendment violation." (citation omitted)); *cf. O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 43 (1st Cir. 1998) ("When Congress delineates conditions governing the receipt of federal dollars and a state agency accepts the money on that basis, the Supremacy Clause requires conflicting local law to yield."); *NYC C.L.A.S.H.*, 47 F.4th at 767 ("The Rule, however, leaves the choice to the States of whether to accept federal public housing funding and its attached conditions. The Rule neither commands the States directly . . . nor compels the involvement of state officials in a regulatory scheme. The Rule therefore does not infringe the Tenth Amendment[.]").

Further undermining State Plaintiffs' position is that the conditions they challenge are not mandatory under the NOFO. *See* AR 1226–28. The provisions, which provide that applications might earn up to 13 points—out of a possible 81, *see* AR 1216, under the "CoC Coordination and Engagement" section and out of a total of 130 for the entire application, *see* AR 1206—do not require States to take any action to receive funding under the CoC Competition. They merely *incentivize* CoCs to, where possible, "connect[] individuals" with "appropriate services" aimed at

reducing public encampments and public drug use. AR 1226–27. Such provisions fall well short

of unconstitutional coercion in violation of the Tenth Amendment. *See NFIB*, 567 U.S. at 580–81

(plurality opinion).

### C.     NAEH Plaintiffs' First Amendment challenge to the November 2025 NOFO is moot, and Defendants' December 2025 NOFO does not unconstitutionally restrict speech.

NAEH Plaintiffs raise a First Amendment challenge to the since-rescinded term in the

November 2025 NOFO reserving HUD's right to reduce or reject project applications for evidence

of activities at CoCs that "rely on or otherwise use a definition of sex other than as binary in

humans" and, similarly, requiring applicant certification that awards will not be used to engage in

such activities. AR 210, 220, 263–64; *see NAEH Litigation*, ECF No. 66 ¶¶ 262–72 (Count

Eleven). NAEH Plaintiffs also challenge the December 2025 NOFO's inclusion of standard

Executive Order–compliance certifications explaining that the CoC program would be

administered in accordance with applicable law—including, where relevant and permitted by law,

Executive Orders that govern and bind agency activities.[16] *See* AR 1250.

As explained above, *see supra* Section I.B, NAEH Plaintiffs' challenges to the substantive

gender-ideology provisions in the November 2025 NOFO are moot. NAEH Plaintiffs separately

challenge on First Amendment grounds the December 2025 NOFO's inclusion of one in a series

of provisions outlining the applicable law governing administration of the CoC program, including

the Fair Housing Act, equitable-access regulations, disability statutes, environmental regulations,

and other similar provisions. *See* AR 1249–50. The provision informs applicants that they should

follow and "comply," AR 1249, with a series of Executive Orders "unless otherwise restricted by

---

[16] The 2024 NOFO contained a series of similar and, in some cases, identical certifications for project applicants to "review" and "comply" with, including a provision requiring compliance with a HUD "memorandum" and several Executive Orders. *See* AR 142–44.

law or by a court of competent jurisdiction," AR 1250. The specific Order NAEH Plaintiffs invoke

is Executive Order No. 14,168, *Defending Women from Gender Ideology Extremism and Restoring*

*Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025). *See NAEH*

*Litigation*, ECF No. 67-2 at 12.

As Plaintiffs acknowledge, the federal government has significant discretion to impose

funding conditions in grant programs that "may affect the recipient's exercise of its First

Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214

(2013); *see also Rust v. Sullivan*, 500 U.S. 173, 194 (1991) (dismissing the notion that the

"Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a

program dedicated to advance certain permissible goals, because the program in advancing those

goals necessarily discourages alternative goals").

Here, Defendants' significant discretion is magnified by the fact that Plaintiffs have not

shown—nor can they show—that this provision imposes *anything* on Plaintiffs themselves.[17] All

it does is to direct agencies like HUD to undertake a series of actions, where "consistent with

applicable law," to ensure that federal funds "not be used to promote gender ideology." Exec.

Order No. 14,168 § 3. As both the Order and the NOFO itself make clear, the only obligations

under this provision attach to HUD itself, not to any recipient of funding under the substantive

provisions of the NOFO and any resulting grant agreement. Indeed, as both the Order and NOFO

---

[17] Indeed, State Plaintiffs recognize this fact, noting that the relevant Executive Order "imposes obligations only on the federal government, and not on any funding recipient." *State Litigation*, ECF No. 81 at 22. The Order, which expressly provides that it is to be "implemented consistent with applicable law" and that it would not "impair or otherwise affect" the "authority granted by law to an executive department or agency, or the head thereof," creates no independent obligation for any entity other than the agencies and employees of the United States. Exec. Order No. 14,168, § 8. And here, the federal government has *not* implemented the type of obligation of which Plaintiffs complain; rather, it specifically removed that requirement from the December 2025 NOFO, *see supra*.

make clear, to the extent the Order conflicts with applicable law or has been enjoined "by a court of competent jurisdiction," even HUD is not bound by the Order's terms. AR 1250.

NAEH Plaintiffs have failed to show that Defendants have imposed *any* condition—let alone a condition that unconstitutionally burdens a recipient's First Amendment rights—on applicants under the December 2025 NOFO. *See Agency for Int'l Dev.*, 570 U.S. at 214. Where no such condition exists, no First Amendment violation does either. *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 546 (1983) (rejecting "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State" (citation omitted)).

### D.     Because the December 2025 NOFO does not violate the Constitution, Plaintiffs' contrary-to-constitutional-right APA claims also fail.

In addition to their substantive constitutional claims, each set of Plaintiffs brings an independent contrary-to-constitutional-right claim under the APA. *See State Litigation*, ECF No. 80 ¶¶ 257–260 (Count Eight); *NAEH Litigation*, ECF No. 66 ¶¶ 244–47 (Count Eight).

Under the APA, Plaintiffs can succeed on such claims only if they have shown that the relevant agency action was "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Showing a constitutional violation is necessary to the corresponding APA claim—the statutory claims rise and fall with the substantive constitutional claims. As explained above, the December 2025 NOFO complies with the substantive constitutional provisions Plaintiffs cite in this litigation. *See supra* Section II.A–C. Defendants are thus entitled to summary judgment on Plaintiffs' APA contrary-to-constitutional right claims.

### III.     The Appropriate Remedy for APA Violations Is Limited to the Agency Action Giving Rise to the Suit Rather than a Forward-Looking Injunction.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). As Defendants have explained above, Plaintiffs' APA claims fail on the

merits for several independent reasons. But should the Court hold otherwise, Defendants

emphasize that any relief that the Court orders can extend no further than relief from the challenged

agency action—*i.e.*, from rescission of the 2024 NOFO or from issuance of the December 2025

NOFO.

> **A.      Any relief for Plaintiffs' Section 706(2) claims must permit HUD to exercise
> its discretion to administer the CoC program within the bounds of the law.**

Section 706(2) of the APA does not provide district courts "jurisdiction to order specific

relief," *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005); *see also Me.

Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (applying *Palisades*), including the award of

a contract, *see Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) (explaining

that exclusive jurisdiction for ordering such relief lies under the Tucker Act in the Court of Federal

Claims); *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (noting that the APA's limited

waiver of immunity "does not extend to orders" to enforce contractual obligations), or specific

direction to take an action on a "matter that statutes place primarily in agency hands," *Immigr. &

Naturalization Serv. v. Orlando Ventura*, 537 U.S. 12, 16 (2002). Under "settled principles of

administrative law, when a court reviewing agency action determines that an agency made an error

of law, the court's inquiry is at an end: the case must be remanded to the agency for further action

consistent with the corrected legal standards." *County of Los Angeles v. Shalala*, 192 F.3d 1005,

1011 (D.C. Cir. 1999) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir.

1995)). Accordingly, any relief on Plaintiffs' Section 706(2) claims should be limited to remedying

improper agency action and must leave intact the Executive Branch's discretion to engage in

further consideration of the topic at hand, including by determining how to proceed with awarding

funding for the CoC program and to whom awards should be made.

Indeed, congressional authorization of relief under Section 706(2)—which the APA limits to the option to "set aside" an agency action, 5 U.S.C. § 706(2)—cannot dictate to an agency how it must comply on remand with the specific legal determinations a court makes in finding that the initial agency action violated the APA. *See Cent. Me. Power Co. v. Fed. Energy Regul. Comm'n*, 252 F.3d 34, 47–48 (1st Cir. 2001) (explaining that, after remand to an agency, the agency "must formulate and adopt" justifications for its action "in the first instance"). If the Court determines under Section 706(2) that the rescission of the 2024 NOFO was flawed or that the issuance of the December 2025 NOFO violated the APA, it should refrain from ordering relief that extends beyond this Court's role as an "appellate tribunal" unable to order specific relief under the APA. *See Shalala*, 192 F.3d at 1011–12 (quoting *PPG Indus.*, 52 F.3d at 365).

Plaintiffs' requested relief invites this Court to do just that. NAEH Plaintiffs ask for the Court to "[e]nter an order requiring Defendants to make FY 2025 awards pursuant to the FY24-25 NOFO." *NAEH Litigation*, ECF No. 66 ¶ E (Prayer for Relief); *see also NAEH Litigation*, ECF No. 67 ¶¶ 2–3. While the APA permits the Court to "set aside" certain conditions, assuming those conditions are contrary to law or that their issuance was arbitrary and capricious, the APA does not permit anything more.[18]

Both sets of plaintiffs point to 5 U.S.C. § 703, which governs the form of and venue for judicial review of agency actions, for the proposition that the Court can craft an affirmative order enjoining HUD from, for example, issuing "substantially similar provisions" to those challenged

---

[18] State Plaintiffs correctly recognize that this Court's authority under the APA extends only as far as the option to stay challenged agency actions and order the agency to comply with the corresponding legal obligations flowing from that stay—in the States' case, staying rescission of the 2024 NOFO and conducting the CoC competition under that NOFO. *See State Litigation*, ECF No. 81 at 68, 74–75. But, as described below, State Plaintiffs' requested injunctive relief is still too broad under the APA.

80

in the December 2025 NOFO, *NAEH Litigation*, ECF No. 67-1 at 75, or ever implementing such conditions, *see State Litigation*, ECF No. 81 at 69. Plaintiffs correctly explain that Section 703 contemplates "the issuance of structural injunctions to correct statutory violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 23 (D.D.C. 2021) (citing *DL v. District of Columbia*, 860 F.3d 713, 730–32 (D.C. Cir. 2017)), *appeal dismissed*, 2022 WL 4280690 (D.C. Cir. Sep. 13, 2022). But Plaintiffs fail to acknowledge that such relief is available where "there is 'only one rational course' for the Agency to follow upon remand" or after vacatur. *Berge v. United States*, 949 F. Supp. 2d 36, 43 (D.D.C. 2013) (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 778 F.2d 850, 862 n.19 (D.C. Cir. 1985)). Plaintiffs have not come close to the kind of showing required to prove that HUD has one path, and only one path, to follow in implementing and administering the CoC program. *See Ramirez*, 568 F. Supp. 3d at 25–26 (imposing injunctive relief only because plaintiffs had clearly established (1) an agency possessed statutory duties and (2) the agency breached those duties). HUD is empowered by law to administer the CoC competition using criteria that it "determines to be appropriate to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G). Plaintiffs have failed to provide any basis to prevent HUD from implementing "substantially similar" conditions in this year's or any future CoC NOFO. Indeed, the ways in which HUD could do so—including the ways in which HUD could generate "substantially" or even "minimally" similar conditions, or the rationale HUD could use to provide justifications for such conditions—are innumerable. There is simply not only one course for HUD to follow in administering the CoC program.

Similar logic applies to HUD's rescission of the 2024 NOFO. The APA does not empower this Court to permanently prevent HUD from taking any action rescinding the 2024 NOFO without clearly identifying the nature of the error leading it to order such relief. For instance, should the

81

Court find that the action was "not sustainable on the administrative record made"—*i.e.*, that there was a "failure to explain administrative action as to frustrate effective judicial review"—then it "must" vacate the action and "remand[] to [the agency] for further consideration." *Camp*, 411 U.S. at 142–43. To the extent that Plaintiffs have failed to show there is no conceivable course of events HUD could follow to lawfully rescind the NOFO—and Defendants' position is that Plaintiffs have indeed failed to make that showing—the only proper remedy is remand. As explained above, Defendants did not unreasonably delay in rescinding the 2024 NOFO and issuing a new NOFO. To the contrary, they acted with expedition—and well in advance of the 2024 NOFO's August 2025 application due date—to begin updating the program. *See supra* Sections I.A.iv, I.B.i. Requiring HUD to maintain the 2024 NOFO—even though it has been rescinded and nullified, and its operative deadlines are no longer in effect[19]—would constitute error. AR 1154 ("This NOFO rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homelessness Demonstration Program Grants published on July 31, 2024, and includes several changes."); *see also* Grants.gov, FR-6800-N-25, "Version History," *available at* https://www.grants.gov/search-results-detail/355762 (showing under "Version History" that HUD closed the FY 2024 and FY 2025 NOFO on January 23, 2025).

Indeed, any relief beyond a mere stay or vacatur of the specific challenged conditions in the December 2025 NOFO would be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702. The December 2025 NOFO contains a severability provision. *See* AR 1251 ("If any part or provision of the grant Agreement or terms

---

[19] To the extent that Defendants are required to process renewals pursuant to the 2024 NOFO under the Court's preliminary injunction, they are complying with that order. *See* ECF No. 79-1, *State Litigation*; ECF No. 62-1, *NAEH Litigation*.

of this Notice are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective as to such jurisdiction and only to the extent of such prohibition or enjoinment and shall not invalidate or affect the legality or enforceability of the remaining provisions and applications of the Agreement and Notice."). Should the Court determine that any existing conditions are substantively unlawful, staying those conditions—in accordance with the severability provision— and permitting the remainder of the December 2025 NOFO to go into effect will properly respect the separation of powers by avoiding judicial "restructur[ing of] the operations of an executive branch of government" and "superintend[ence of] its operations on an ongoing basis." *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018). As the Supreme Court has explained in the statutory context, "[c]onstitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020). So true here. "[T]he tail . . . does not wag the dog[.]" *Id.*

Plaintiffs' requested relief is simply too broad. Relief under Section 706(2) is, and should be, limited only to an order setting aside any unlawful agency action.

### B.    Any relief for Plaintiffs' Section 706(1) claims must not impermissibly dictate to HUD how it must go about complying with its legal obligations.

Section 706(1) does permit courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The APA, however, does not allow courts to provide specific direction beyond ordering that the required action occur. *See id.* The APA makes clear that the "action" is the agency's—not one substantively determined or constrained by a court. *See Norton*, 542 U.S. at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ."). Indeed, the Supreme Court has cautioned courts that the APA "protect[s] agencies from undue judicial interference with their

83

lawful discretion," meaning that courts may not "enter general orders compelling compliance with broad statutory mandates" and must limit relief to those requirements specifically identified by statute. *Id.* at 66–67. As explained above, the only mandatory statutory legal obligations applicable to this program require HUD to (1) issue a notice of 2025 CoC funds under 42 U.S.C. § 11382(b) and (2) obligate 2025 CoC funds by September 2027 at the earliest. And nothing in the 2024 NOFO can be read to commit the agency to making any specific determinations—*e.g.*, guaranteeing specific project renewals or awarding funding to specific applicants—that the Court may order here.

Plaintiffs seek relief that this Court is not authorized to afford. NAEH Plaintiffs assert that HUD has failed to (or will fail to) meet a January 29, 2026, deadline to announce conditional awards. *See NAEH Litigation*, ECF No. 67-1 at 46. NAEH Plaintiffs' purported five-month deadline under 42 U.S.C. § 11382(c)(2)(A) derives entirely from the August 29, 2025 submission deadline originally included in the 2024 NOFO—a deadline that HUD withdrew and terminated when it withdrew the 2024 NOFO almost two months before the submission date was to occur— and seven months before the purported deadline. *See* AR 18. Plaintiffs do not point to—nor could they point to—any statutory provision that requires HUD to hold to a deadline it announces if it gives proper notice that the deadline is to change. And such a requirement would run contrary to the discretion that Congress afforded HUD to (1) choose whether to implement a two-year CoC competition, *see* 138 Stat. at 386, and (2) set a deadline for CoC program applications "at such time and in such manner as the Secretary may require," *see* 42 U.S.C. § 11382(c)(1). It also runs contrary to the flexibility Congress afforded HUD to obligate funds for the FY 2025 CoC program by, at the latest, September 2027.

Even if the Court finds there to be a binding timeline under which HUD was required to issue grants under the 2024 NOFO, the proper remedy for a Section 706(1) claim is not to "go back in time" to require HUD to process renewals or to grant awards more quickly than is possible, because this Court would lack jurisdiction to order relief that is impossible to obtain. *Kerry*, 710 F.3d at 1001–02; *Nantucket Residents Against Turbines*, 100 F.4th at 16. Instead, the proper remedy would be to order HUD to proceed with the CoC competition and issuing grants expeditiously—which would occur under the December 2025 NOFO.

Further, NAEH Plaintiffs' proposed bifurcated announcement of conditional awards is unreasonable. *See NAEH Litigation*, ECF No. 67-1 at 47–48. For one, Plaintiffs allege that "many" awards will have expired by early March. *Id.* at 47. But NAEH Plaintiffs in their motion point to only two CoCs with contracts expiring by early March, and only one with a contract expiring by late March. *See* Suppl. Decl. of Ann Marie Oliva ¶¶ 23, 27, 29, *NAEH Litigation*, ECF No. 49-1. And State Plaintiffs' motion similarly provides evidence only of the number of households in New York subject to contracts expiring by May 31, 2026, "or before." *State Litigation*, ECF No. 81 at 75 (quoting Suppl. Decl. of Pascale Leone ¶ 4, ECF No. 57-1). As Plaintiffs acknowledge, CoC recipients hold contracts and renewal projects that will expire throughout the entire 2026 calendar year. *See* Oliva Suppl. Decl. ¶ 15, *NAEH Litigation*, ECF No. 49-1. But most grants expire later in the year: only 10 percent of grant dollars will expire by March 31, 2026, and less than 38 percent expire by June 30, 2026. McKenney Decl. ¶ 3; Ex. A to McKenney Decl. at 1. As explained in its preliminary injunction Implementation Plan under the 2024 NOFO, HUD anticipates selecting awards under that NOFO—should it still be in effect—by March 31, 2026. *See State Litigation*, ECF No. 79-1; *NAEH Litigation*, ECF No. 62-1. And in the December 2025 NOFO, HUD's administration of the program provides for expedited Normal-track award announcements by

85

March 31, 2026 and Extended-track award announcements for new permanent housing projects by April 28, 2026. *See* AR 1138. Even assuming HUD could possibly process renewals and applications under the 2024 NOFO by March 2—it cannot—Plaintiffs have not provided sufficient evidence to support their argument that a March 2 award announcement date, as distinguished from a March 31 announcement date, is necessary and reasonable in this case.

For another, the terms of the NOFOs at issue in this litigation preclude such bifurcated announcements. The 2024 NOFO contemplates that HUD will make funding adjustments when CoCs submit projects that are ineligible for renewal or reallocation. *See* AR 54; *see also* AR 1233 (December 2025 NOFO). Exclusion of those projects leads to recalculation of the final Annual Renewal Demand amount for each CoC. *See id.* Public announcement of such awards may generate a binding expectation of the obligation of those funds to awardees. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) (outlining the course of events that could result in an implied-in-fact contract with the United States). Announcement of one tranche of awardees before finalizing awards for the remaining awardees would necessarily frustrate HUD's ability to satisfy the terms of the NOFOs by recalculating Annual Renewal Demand amounts for CoCs should any later awardees have projects deemed to be ineligible.

As Defendants argued at the preliminary-injunction stage, the relief Plaintiffs seek implicates HUD's "general mode of operations, not any discrete agency action," *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 27 (D.D.C. 2017), by dictating the way in which HUD must carry out its statutory mandate to administer the CoC program, issue a notice of funding opportunity, and obligate 2025 CoC funds. Ordering such relief would improperly dictate how the agency should comply with its legal obligations. *See Norton*, 542 U.S. at 65. This Court lacks such supervisory authority under the APA.

**CONCLUSION**

For the reasons identified above, Defendants respectfully request that this Court deny

Plaintiffs' Motions for Summary Judgment, grant Defendants' Combined Cross-Motion for

Summary Judgment, and enter judgment in Defendants' favor.

DATE: January 23, 2026                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          YAAKOV M. ROTH
                                          Principal Deputy Assistant Attorney General
                                          Civil Division

                                          JOHN BAILEY
                                          Counsel to the Assistant Attorney General
                                          Civil Division

                                          JOSEPH E. BORSON
                                          Assistant Branch Director

                                          */s/ William S. Jankowski*
                                          WILLIAM S. JANKOWSKI
                                          D.C. Bar No. 90021524
                                          PARDIS GHEIBI
                                          PETER R. GOLDSTONE
                                          Trial Attorneys, U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C. 20530
                                          Tel.: (202) 353-7578
                                          Fax: (202) 616-8640
                                          Email: william.s.jankowski@usdoj.gov

                                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on January 23, 2026, the above document was filed with the CM/ECF filing system.

/s/ *William S. Jankowski*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, *et al.*, | Case Nos. 25-cv-626 |
| Plaintiffs, | 25-cv-636 |
| v. | |
| DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | District Judge Mary S. McElroy |
| | Magistrate Judge Amy E. Moses |
| Defendants. | |
| AND | |
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*, | |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | |
| Defendants. | |

### DECLARATION OF CAITLYN J. MCKENNEY IN SUPPORT OF HUD'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Caitlyn J. McKenney, hereby declare as follows:

1.      I am employed by the U.S. Department of Housing and Urban Development ("HUD") as the Deputy Assistant Secretary ("DAS") for Special Needs within the Office of Community Planning and Development ("CPD"). I have served in this capacity since December 28, 2025. Immediately before becoming the DAS, I served as a Policy Advisor for CPD. I have been employed continuously at HUD since April 21, 2025.

2.      My statements herein are based on my personal knowledge and/or my evaluation of information provided to me in my official capacity; on reasonable inquiry; information obtained from various records, systems, databases; or program employees and information portals maintained and relied upon by HUD in the regular course of business.

3.      Attached to this Declaration as Exhibit A is an Excel Spreadsheet entitled "Grant Expiration Data for CoC FY 2024 Grants Eligible for Renewal." Page 1 of Exhibit A is a chart that shows the total amount and number of CoC FY 2024 grants that are eligible for renewal in the FY 2025 CoC competition, on a month-by-month basis which are set to expire each month during CY 2026. Page 2 is a chart which breaks down those same CoC FY 2024 grants by their specific project type, number of grants, and amount, also month-by-month in CY 2026. I have reviewed Exhibit A in its entirety and hereby authenticate and confirm to the best of my knowledge and belief, that the information contained therein is a true and correct representation of the information CPD has for all CoC FY 2024 grants eligible for renewal with FY 2025 funding.

4.      It is important to note that it is not out of the ordinary for renewal grants to expire prior to the announcement of the following year's awards. Historically, projects that have grants with January, February, or March expiration dates have continued to operate prior to the announcement of their next award. For example, FY 2022 awards were announced March 28, 2023, and FY 2021 awards were announced March 14, 2022. Of the 6,359 CoC grants that expire in Calendar Year 2026, 4,015 of them (63.1%) do not expire until the second half of the Calendar Year. Similarly, only 10% of grant dollars expire by the end of March and less than 38% expire by end of June.

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of January 2026 in Washington, DC.

_____
Caitlyn J. McKenney



| TOTAL | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Expiration Month | Number | Cumulative Number | % grants | Cumulative % grants | Amount | Cumulative Amount | % grant money | Cumulative % grant money |
|---|---|---|---|---|---|---|---|---|
| January | 205 | 205 | 3.22% | 3.22% | $ 106,152,003 | $ 106,152,003 | 2.97% | 2.97% |
| February | 138 | 343 | 5.39% | 5.39% | $ 83,600,079 | $ 189,752,082 | 2.34% | 5.31% |
| March | 283 | 626 | 9.84% | 9.84% | $ 172,585,791 | $ 362,337,873 | 4.83% | 10.14% |
| April | 297 | 923 | 14.51% | 14.51% | $ 178,192,023 | $ 540,529,896 | 4.99% | 15.13% |
| May | 330 | 1253 | 19.70% | 19.70% | $ 198,483,017 | $ 739,012,913 | 5.56% | 20.69% |
| June | 1091 | 2344 | 36.86% | 36.86% | $ 616,679,040 | $ 1,355,691,953 | 17.26% | 37.95% |
| July | 467 | 2811 | 44.21% | 44.21% | $ 349,886,210 | $ 1,705,578,163 | 9.79% | 47.74% |
| August | 610 | 3421 | 53.80% | 53.80% | $ 332,650,385 | $ 2,038,228,548 | 9.31% | 57.06% |
| September | 1072 | 4493 | 70.66% | 70.66% | $ 517,408,004 | $ 2,555,636,552 | 14.48% | 71.54% |
| October | 526 | 5019 | 78.93% | 78.93% | $ 297,634,705 | $ 2,853,271,257 | 8.33% | 79.87% |
| November | 627 | 5646 | 88.79% | 88.79% | $ 318,228,917 | $ 3,171,500,174 | 8.91% | 88.78% |
| December | 713 | 6359 | 100.00% | 100.00% | $ 400,781,787 | $ 3,572,281,961 | 11.22% | 100.00% |
| **Grand Total** | **6359** | | | | **$ 3,572,281,961** | | | |

| Expiration Month | HMIS | | Joint TH & PH-RRH | | Permanent Supportive Housing | | Rapid ReHousing | | Safe Haven | | Supportive Services Only | | Transitional Housing | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Amount | Number | Amount | Number | Amount | Number | Amount | Number | Amount | Number | Amount | Number | Amount | Number | Amount |
| January | 9 | $ 1,412,864 | 4 | $ 3,797,335 | 137 | $ 71,138,553 | 24 | $ 20,062,136 | 2 | $ 733,866 | 15 | $ 5,428,508 | 14 | $ 3,578,741 | 205 | $ 106,152,003 |
| February | 5 | $ 521,413 | 4 | $ 907,349 | 100 | $ 71,094,540 | 10 | $ 6,216,654 | | | 6 | $ 1,949,715 | 13 | $ 2,910,408 | 138 | $ 83,600,079 |
| March | 18 | $ 3,716,195 | 12 | $ 9,212,357 | 185 | $ 133,846,267 | 27 | $ 14,837,722 | 3 | $ 806,244 | 19 | $ 4,832,371 | 19 | $ 5,334,635 | 283 | $ 172,585,791 |
| April | 24 | $ 6,093,366 | 7 | $ 2,366,467 | 195 | $ 143,373,559 | 31 | $ 16,936,124 | 4 | $ 945,971 | 25 | $ 6,300,131 | 11 | $ 2,176,405 | 297 | $ 178,192,023 |
| May | 26 | $ 6,495,491 | 10 | $ 4,678,429 | 196 | $ 147,731,628 | 58 | $ 30,832,035 | 3 | $ 1,451,002 | 25 | $ 5,365,182 | 12 | $ 1,929,250 | 330 | $ 198,483,017 |
| June | 82 | $ 20,826,211 | 52 | $ 25,859,915 | 622 | $ 407,283,791 | 187 | $ 120,629,102 | 6 | $ 1,980,874 | 101 | $ 31,440,438 | 41 | $ 8,658,709 | 1091 | $ 616,679,040 |
| July | 18 | $ 3,516,012 | 21 | $ 11,339,793 | 286 | $ 271,877,418 | 80 | $ 46,296,932 | | | 45 | $ 13,532,051 | 17 | $ 3,324,005 | 467 | $ 349,886,210 |
| August | 35 | $ 4,718,389 | 44 | $ 21,749,479 | 318 | $ 228,709,361 | 130 | $ 57,641,803 | 3 | $ 727,343 | 68 | $ 16,483,160 | 12 | $ 2,620,850 | 610 | $ 332,650,385 |
| September | 67 | $ 9,832,216 | 98 | $ 50,457,446 | 458 | $ 270,202,187 | 235 | $ 134,362,082 | 2 | $ 1,275,704 | 182 | $ 44,674,087 | 30 | $ 6,604,283 | 1072 | $ 517,408,004 |
| October | 35 | $ 7,405,637 | 37 | $ 23,227,431 | 254 | $ 183,452,970 | 115 | $ 59,940,232 | 1 | $ 454,634 | 74 | $ 19,797,717 | 10 | $ 3,356,084 | 526 | $ 297,634,705 |
| November | 27 | $ 7,540,926 | 73 | $ 42,667,593 | 264 | $ 150,231,629 | 161 | $ 95,251,215 | 2 | $ 559,728 | 87 | $ 20,291,599 | 13 | $ 1,686,227 | 627 | $ 318,228,917 |
| December | 41 | $ 5,771,589 | 67 | $ 45,942,840 | 291 | $ 177,896,593 | 202 | $ 136,805,489 | 2 | $ 605,152 | 91 | $ 30,221,496 | 19 | $ 3,538,628 | 713 | $ 400,781,787 |
| **Grand Total** | **387** | **$ 77,850,309** | **429** | **$ 242,206,434** | **3306** | **$ 2,256,838,496** | **1260** | **$ 739,811,526** | **28** | **$ 9,540,518** | **738** | **$ 200,316,453** | **211** | **$ 45,718,225** | **6359** | **$ 3,572,281,961** |

Notes:

This spreadseet includes all grants that are eligible for renewal in the FY 2025 CoC Program Competition, including Youth Homelessness Demonstration Program grants.

This includes the following types of grants that have an expiration date in Calendar Year 2026:
-CoC program grants provided through the annual CoC Competition;
-CoC program grants provided through the Special NOFO to Address Unsheltered and Rural Homelessness;
-CoC Program grants provided through the Domestic Violence Bonus.
-Youth Homelessness Demonstration Program grants.

It does not include:
-CoC Planning or UFA costs grants;
-Youth Homelessness System Improvement grants;
-Any type of grant that has an expiration date in Calendar year 2027 or later.

The amounts that are eligible for renewal do not include changes that will be made for Cost of Living Adjustments or changes to Fair Market Rent.

The expiration date is an estimate for some of the grants shown as expiring in December 2026 because their grant agreements have not been executed yet but will be executed soon.

Some of the expiration dates may change as grants can be extended under certain circumstances, although the extended grant cannot receive additional funding.