# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

NATIONAL ALLIANCE TO END
HOMELESSNESS *et al.*,

      *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT *et al.*,

      *Defendants*.

Case No. 1:25-cv-636-MSM-AEM

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE THE DECEMBER 19, 2025 PRELIMINARY INJUNCTIONS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD........................................................................................................ 7

ARGUMENT .................................................................................................................... 8

I.      Plaintiffs Remain Likely to Succeed on the Merits ............................................ 8

II.     Plaintiffs and their Members Continue to Face Irreparable Harm Absent Preliminary Relief............................................................................................... 11

III.    The Balance of Equities and Public Interest Still Strongly Favor Plaintiffs.................... 18

CONCLUSION................................................................................................................ 21

## INTRODUCTION

Two full weeks after Congress passed a law that Defendants claim undercuts the order granting preliminary relief in this case, Defendants filed their motion asking this Court to dissolve that order—and to do so within thirteen days or Defendants will immediately appeal. Defendants base their request on provisions of a new law—the Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026 (THUD Appropriations Act)—that require HUD to non-competitively renew expiring grants on a staggered basis if HUD does not award funds "under a fiscal year 2025 notice of funding opportunity" by specified dates. According to Defendants, these changes make preliminary relief no longer necessary or appropriate.

They are wrong. The appropriations act does not make HUD's actions any more lawful, and dissolving the preliminary injunction would once again throw the Continuum of Care (CoC) program into chaos—causing providers irreparable harm as they struggle to maintain their programs in the face of HUD's destabilizing actions. The preliminary relief is just as warranted now as it was before.

To begin, the appropriations act does not alter Plaintiffs' likelihood of success on the merits. In allowing HUD to make awards "under a fiscal year 2025 notice of funding opportunity," Congress did not implicitly bless HUD's using a new NOFO—or suggest that HUD had acted lawfully in rescinding the FY24-25 NOFO. Rather, it stayed silent on what NOFO Defendants could permissibly use. And in all events, the appropriations act says nothing about the lawfulness of the December NOFO specifically—the only NOFO that Defendants now seek permission to use. The most Defendants say on that is that the appropriations act endorses a single provision of the December NOFO—out of the 29 that Plaintiffs challenge—but the act does not in fact endorse even that lone provision. And, at any rate, even Defendants must

concede that the appropriations act has zero bearing on the myriad other reasons why the December NOFO cannot stand.

Nor does the appropriations act change Plaintiffs' need for relief to guard against irreparable harm. Lifting the preliminary injunction and allowing Defendants to proceed with the December NOFO would throw the nation's homelessness response system into further crisis. The December NOFO would radically (and illegally) alter what the CoC program funds— causing providers to lose critical funding needed to continue providing stable housing and other life-saving services to formerly homeless individuals and families.  Lifting the preliminary injunction would also force Plaintiffs and their members to divert scarce resources away from their missions to respond to the (unlawful) December NOFO—in circumstances that can hardly be considered routine. Plaintiffs and their members would have to dramatically change their programs to meet the unprecedented new criteria, run local competitions and prepare applications in an unprecedently short (and itself unlawful) application period, and navigate an unprecedented partial-year funding process that raises many unanswered questions, all while preparing for the FY 2026 funding process that Congress mandated begin by June 1. As Defendants continue to sow uncertainty, Plaintiffs and their members continue to face risk of irreparable harms: Permanent supportive housing projects have closed, landlords have refused to renew leases with program participants, and people have been forced onto the streets in the cold. The chaos and confusion imposed by Defendants stands in stark contrast to the stability and consistency the CoC Program was designed to promote. If this Court dissolves the preliminary injunction, these harms will only get worse.

The balance of the equities shakes out no differently either. Defendants protest that the preliminary injunction will irretrievably block them from carrying out their preferred December

NOFO. But that NOFO is unlawful, and it is axiomatic that the government does not suffer harm from an injunction that bars it from taking unlawful action. The fact that Congress took action to unequivocally foreclose Defendants' options after July 1 does not give Defendants the right to pursue their unlawful NOFO now. And the reality is that the option Defendants seek permission to pursue—making awards under the December NOFO—is not practicable at this point anyway. The December NOFO is no longer workable—Defendants would have to modify various provisions to account for the non-competitive renewals that HUD now must make and (as Defendants concede) they would have to truncate the NOFO's already-compressed application window. And even if HUD issued yet another revised NOFO, the idea that it could responsibly make awards by July 1 is a pipe dream. In pressing forward with their unlawful NOFO, Defendants would accomplish nothing more than inflicting more harm on homelessness providers and the individuals and families who rely on them.

For these reasons, this Court should deny Defendants' motion to dissolve. Plaintiffs also respectfully submit that the Court need not heed the March 2 deadline that Defendants have imposed. On top of the fact that Defendants waited two weeks to impose it, the March 2 deadline is not the point of no return that Defendants claim. Plaintiffs further submit, however, that expeditious ruling on the cross-motions for summary judgment would serve the interests of justice. Defendants' latest gambit has once again left providers with crippling uncertainty, and an expeditious final resolution would settle that uncertainty for good.

## BACKGROUND

In 2024, Congress authorized HUD to issue a two-year notice of funding opportunity (NOFO) to provide for greater stability and efficiency in the CoC program. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, § 242, 138 Stat. 25, 56 (2024). With that two-year NOFO, HUD could run one competition and use the results to make awards for FY

2024 and then, once funding was appropriated, for FY 2025. AR 31. The two-year NOFO also provided CoCs an opportunity to submit new applications for FY 2025 if they wanted to swap in new projects that would better serve their communities. AR 31. HUD ran this two-year competition and made FY 2024 awards, and should have made FY 2025 awards under that NOFO by January 2026. Declaration of Ann Marie Oliva (NAEH) ¶¶ 57, 67, 73 (Dkt. No. 7-1).

But HUD threw out that plan and—in mid-November, just weeks before FY 2025 awards should have gone out—announced a brand new NOFO for FY 2025 (November NOFO) that dramatically changed what the CoC program would fund. AR 156-283. The new NOFO gave CoCs two months to submit applications and announced that HUD would aim to make awards in May 2026. AR 156, 160.

These moves came on the heels of months of chaos and uncertainty in the CoC program and threw the nation's primary homelessness response system deeper into crisis. Third Supplemental Declaration of Ann Marie Oliva (NAEH) ¶¶ 8-14, 18-19 (describing strain caused by funding freeze, delay in award letters, and inability to draw down funds, resulting in loss of trust among landlords and other partners). Communities scrambled to pull together applications—for projects that had to undergo dramatic change to satisfy the new NOFO, no less—in the compressed two-month application window, and providers braced for funding gaps that some would not be able to bridge. *E.g.*, Oliva (NAEH) 1st Supp. Decl. ¶¶ 18, 20-30, 35 (Dkt. No. 49-1); Oliva (NAEH) 2nd Supp. Decl. ¶ 7 (Dkt. No. 67-3). Given the new NOFO's steep cuts to funding for permanent housing and the resulting uncertainty, providers have had to warn tenants they would soon lose their homes and have stopped accepting new referrals for housing assistance, landlords have lost trust that providers would be able to continue subsidizing rent for units that had housed people for years, and some providers have even closed their doors.

Oliva (NAEH) 3rd Supp. Decl. ¶¶ 25, 60-73; Oliva (NAEH) 1st Supp. Decl. ¶¶ 24, 26-28 (Dkt. No. 49-1); Oliva (NAEH) 2nd Supp. Decl. ¶ 7 (Dkt. No. 67-3). And formerly homeless individuals and families have again found themselves facing uncertainty about where they can safely live. Pls.' Mem. i.s.o. Mot. for Preliminary Relief Under 5 U.S.C. § 705 and for Preliminary Injunction (Pls.' PI Mem.) at 65-67 (Dkt. No. 5-1).

Plaintiffs sued and sought preliminary relief, and on December 8, just hours before the hearing on Plaintiffs' motion, Defendants withdrew the November NOFO, saying it would issue yet another new one. Dkt. No. 39. Following briefing and argument, the Court orally granted preliminary relief on December 19, 2025 (Min. Entry (Dec. 19, 2025)) and memorialized that ruling in a written order entered on December 23, 2025 (Dkt. No. 52). Among other things, the Court's order stayed and preliminarily enjoined HUD's late-stage rescission of the two-year FY24-25 NOFO as well as the November NOFO and its Challenged Conditions, and it enjoined Defendants from giving effect to any further NOFO that would replace the FY24-25 NOFO. Order ¶¶ 2-5 (Dkt. No. 52). That relief has mitigated, and continues to mitigate, Plaintiffs' irreparable harm.

Hours after the court orally granted preliminary relief, Defendants issued another new FY 2025 NOFO (December NOFO) that for the most part retained the same unlawful criteria and conditions that would strip funding from existing projects. AR 1133-1269. The NOFO noted that HUD would not implement the NOFO given this Court's injunction. AR 1137-38.

The parties proceeded to file cross-motions for summary judgment on an expedited basis, with briefing concluding on February 6. Plaintiffs requested that the Court order Defendants to make awards under the FY24-25 NOFO either by March 2 (for projects that had already received awards under the FY24-25 NOFO and thus required no new application or competition) or

March 31 (for projects requiring new applications and more involved review)—or, if the Court ruled later, within one week after the Court's order. Pls.' Mem. i.s.o. Mot. for S.J. (Pls.' MSJ) at 46-47 (Dkt. No. 67-1).

On February 3, Congress enacted and the President signed the Transportation, Housing and Urban Development, and Related Agencies Appropriations Act, 2026 (THUD Appropriations Act). Pub. L. No. 119-75, div. D, 140 Stat. 173 (2026). The appropriations act provides some new instructions for FY 2025 CoC funding to ensure that communities would not be left with additional gaps in funding. In particular, Section 244 requires HUD, "prior to awarding any amounts through a notice of funding opportunity," to non-competitively renew for one year all CoC grants that are expiring or have expired in the first quarter of 2026 (*i.e.*, between January 1, 2026 and March 31, 2026). Pub. L. No. 119-75, div. D, tit. II, § 244, 140 Stat. at 422. It also requires HUD to non-competitively renew later-expiring grants "if awards have not been made under a fiscal year 2025 notice of funding opportunity prior to" set dates— April 1 for grants expiring in the second quarter and July 1 for grants expiring in the third and fourth quarters. *Id.* The upshot is that—assuming HUD complies—communities should not face gaps in funding. The appropriations act did not otherwise change the law governing the CoC program for FY 2025, and it did not specify one way or the other what NOFO HUD could permissibly use to make awards "under a fiscal year 2025 [NOFO]" in lieu of non-competitively renewing projects. *See id.* The law also instructed HUD to get started on FY 2026 awards: under the act's new deadlines for FY 2026, HUD must issue an FY 2026 NOFO by June 1 and make awards by December 1 this year. *Id.*, div. D, tit. II, 140 Stat. at 400.

Plaintiffs promptly notified the Court of this development on February 5 and noted they would confer with Defendants about how the new law affects the scope and timing of the

litigation and would update the Court as soon as possible. Dkt. No. 71 at 2. The parties conferred on February 10, and Plaintiffs informed Defendants they no longer needed a decision on their motion for summary judgment by March 2 or 31 given the appropriations act's guarantee of renewals. At that time, Defendants indicated they still wanted a ruling on summary judgment, but did not mention that they would move to dissolve the order granting preliminary relief or that they would demand a decision by March 2. The parties agreed to continue talking about next steps, including the process and timing for making the first-quarter non-competitive renewals the appropriations act requires (which Defendants have since told Plaintiffs will take them until mid-March to make, or about 1.5 months after the appropriations bill passed). The next day, Plaintiffs notified the Court by email that they no longer had a need for a summary judgment ruling by March 2 or March 31, but that Defendants maintained that expedition was still warranted.

Six days later, Defendants filed the motion to dissolve currently before the Court. Defs.' Combined Mot. to Dissolve the December 19, 2025 Prelim. Inj. (Defs.' Mot. to Dissolve) (Dkt. No. 74). Defendants' motion—filed a full fourteen days after the appropriations law that Defendants claim warrants dissolving the preliminary injunction—asks this Court to lift the preliminary injunction (or rule on summary judgment) within 13 days, by March 2, and advises that Defendants will otherwise immediately appeal the court's non-action to the First Circuit. *Id.* at 3-4. Defendants claim they need a decision by then "to have any chance" of making awards under their preferred December NOFO by July 1. *Id.* at 1.

### LEGAL STANDARD

A court may dissolve a preliminary injunction if there has been a "significant change in circumstances" such that "it is no longer equitable that the judgment should have prospective application." *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 16 (1st Cir. 2008.). Whether the preliminary injunction should remain in place turns on the "same

considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place"—"likelihood of success, the threat of irreparable injury … , the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania v. Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994). Defendants, as the movants, have the burden to show that they should be granted relief from the injunction. *Concilio de Salud*, 551 F.3d at 16.

## ARGUMENT

The preliminary injunction factors all continue to strongly support preliminary relief.

## I.  Plaintiffs Remain Likely to Succeed on the Merits

The THUD Appropriations Act does not alter Plaintiffs' likelihood of success on their claims challenging the rescission of the FY24-25 NOFO and the substance of the November and December NOFOs. Plaintiffs are likely to succeed on those claims for the reasons explained in their summary judgment briefs. Pls.' MSJ at 29-78; Pls.' Reply i.s.o. Mot. for S.J. (Pls.' MSJ Reply) at 4-50 (Dkt. No. 69).

To begin, the THUD Appropriations Act does not change the fact that HUD missed the deadline to issue a new NOFO for FY 2025, nor does it change the fact that HUD's extremely late-stage rescission of the FY24-25 NOFO was arbitrary and capricious. *See* Pls.' MSJ at 33-38; Pls.' MSJ Reply at 4-11. The appropriations act has nothing to say on those subjects. The Act allows HUD to make awards "under *a* fiscal year 2025 notice of funding opportunity," but, contrary to Defendants' contentions, this does not mean that HUD may make awards under "a *new* NOFO." *Contra* Defs.' Mot. to Dissolve at 15 (emphasis added). The appropriations act leaves preexisting laws in place—including the three-month deadline for issuing a new FY 2025 NOFO that Defendants missed and the APA's requirement of reasoned decisionmaking—and leaves it open for the Court to decide what NOFO is permissible under those laws. Likewise, the reference to "a fiscal year 2025 [NOFO]" does not mean a NOFO that is "not the 2024 NOFO,"

as Defendants put it. Defs.' Mot. to Dissolve at 17. The FY24-25 NOFO *is* "a fiscal year 2025 [NOFO]" under which Defendants can properly make awards under the appropriations law.[1] Defendants proclaim that if Congress wanted to require HUD to use the FY24-25 NOFO, it could have said so expressly. Defs.' Reply at 5. But Congress also could have expressly said so if it wanted to authorize HUD to use any of the new FY 2025 NOFOs that HUD had already issued in November and December. Congress did not speak to that either way in the THUD Appropriations Act—leaving its prior enactments to govern.

Second, and more to the point, the THUD Appropriations Act does not change the fact that the December NOFO—the one Defendants now seek to use—is unlawful for a host of reasons. As Plaintiffs have explained, that NOFO exceeds Defendants' statutory authority and violates binding statutes and regulations, the Constitution, and the APA's requirement for reasoned decisionmaking. Pls.' MSJ at 48-75; Pls' MSJ Reply at 24-48. The acknowledgment that HUD can make awards under "a fiscal year 2025 [NOFO]" cannot credibly be read as permission to make awards under the December NOFO specifically despite the myriad ways that NOFO violates the law.

---

[1] At various points, Defendants suggest that the appropriations act requires renewals *under the FY24-25 NOFO* if HUD does not make awards "under a fiscal year 2025 [NOFO]" by the specified dates—such that the permitted "fiscal year 2025 [NOFO]" must be something other than the FY24-25 NOFO. *See* Defs.' Reply i.s.o. Combined Cross Mot. for S.J. at 2, 5 (Dkt. No. 72). That is wrong, as Defendants have since acknowledged. The appropriations act provides for non-competitive renewals, period, not renewals under the FY24-25 (or any other) NOFO. Indeed, it requires Q1 grants to be non-competitively renewed "*prior to* awarding any amounts through a notice of funding opportunity"—*i.e.*, these non-competitive renewals are not themselves awarded through any NOFO. *See* Pub. L. No. 119-75, div. D, tit. II, § 244, 140 Stat. at 422 (emphasis added). And it provides for non-competitive renewals of "all" projects expiring during specified quarters, not just projects that would be eligible for renewal under the FY24-25 NOFO and not just projects that CoCs seek to renew under the FY24-25 NOFO. In a conference on February 10, Defendants acknowledged to Plaintiffs that non-competitive renewals under the appropriations act are distinct from renewals under the FY24-25 NOFO.

The most Defendants muster is a claim that the appropriations law somehow "ratifi[es]" the Tier 1 Allocation in the December NOFO. Defs.' Mot. to Dissolve at 10 n.4. That argument, of course, could not save the December NOFO because, as Plaintiffs have explained, 29 separate provisions of that NOFO individually and in combination make the December NOFO unlawful—and the Tier 1 Allocation is only one of them. Appendix, FY25 NOFOs: Challenged Conditions (Dkt. No. 67-2) (listing challenged provisions).

In any event, Defendants' argument about the Tier 1 Allocation is mistaken. Projects that CoCs select for "Tier 1" based on their local competitions will receive awards without competing with projects in other CoCs, so long as they meet baseline requirements. Pls.' MSJ at 11. The December NOFO permits CoCs to put in Tier 1 projects worth only 30 percent of their annual renewal demand (*i.e.*, the amount needed to renew all expiring projects)—a move that drastically undercuts stability. For all the reasons explained in Plaintiffs' summary judgment briefs, it was arbitrary and capricious to set the Tier 1 Allocation so low. Pls.' MSJ at 56-58; Pls.' MSJ Reply at 33-37. Defendants point out that, in the appropriations act, Congress required the Tier 1 Allocation to be at least 60 percent for FY 2026, but said nothing about FY 2025. Defs.' Mot. to Dissolve at 16-17; Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399 (requiring HUD to "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care," a selection process that corresponds to HUD's "Tier 1" designation). That hardly suggests that it was permissible for HUD to set Tier 1 however low it wanted for FY 2025. Defendants arbitrarily and capriciously adopted a Tier 1 Allocation of only 30 percent without considering CoCs' reliance interests or the destabilizing impacts that unprecedentedly low Tier 1 Allocation would have. Pls.' MSJ at 56-58; Pls.' MSJ Reply at 33-37. Congress's resounding rejection of that approach for FY 2026

only bolsters Plaintiffs' claim that the FY 2025 NOFOs' Tier 1 Allocation was arbitrary and capricious.

## II. Plaintiffs and their Members Continue to Face Irreparable Harm Absent Preliminary Relief

In their brief, Defendants claim that Congress' intervention to require HUD to renew all awards expiring in the first quarter of 2026 (and on a rolling basis thereafter) entirely cures the many harms established by the Plaintiffs. This is incorrect, and Defendants have not met their burden to show that Plaintiffs will no longer suffer irreparable harm absent this Court's preliminary injunction. Very little has changed since the Plaintiffs put forward their detailed factual record of irreparable harm when seeking the preliminary injunction. Pls.' PI Mem. at 63-75 (Dkt. No. 5-1); Decls. i.s.o. Pls.' Mot. (Dkt. Nos. 7-1 to 7-15). Plaintiffs will face the same harms if HUD implements the FY 2025 NOFO now as they would have if HUD had implemented the NOFO in December, including a struggle to accommodate massive changes that would eviscerate permanent housing and facing impossible choices about whether and how to apply for funds. Those harms happen at the time the application is published and would be imminent. Further, Defendants' rush to impose an unprecedented partial-year NOFO amidst renewals and just before a FY2026 NOFO will create new irreparable harms, uncertainty, and confusion.

**First**, dissolution of the preliminary relief entered in this case would resume the severe harms to Plaintiffs, their members, and beneficiaries of CoC-funded programs that existed prior to the Court's entry of relief.

The foundational and extensive changes embodied in the December NOFO will cause harm if Defendants are allowed to open an application process for that NOFO. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 23, 47. This harm happens at the time of the application process, which

Defendants seek to begin imminently if the preliminary relief were dissolved. For example, capping funding for permanent housing at 30 percent of the CoC's annual renewal demand, when funding for permanent housing has not been less than 85 percent over the past decade, will result in a rapid defunding of permanent housing programs. Oliva (NAEH) Decl. ¶ 81 (Dkt. No. 7-1); Oliva (NAEH) 3rd Supp. Decl. ¶¶ 85-89; *see also, e.g.*, Declaration of Michelle Wilcox (Crossroads) ¶¶ 65-68, 70 (Dkt. No. 7-3); Declaration of Rush Frazier (Youth Pride) ¶¶ 54-55 (Dkt. No. 7-4). Guaranteeing renewals of only 30 percent of projects (Tier 1) and instituting a 30 percent cap on renewal of permanent housing projects for only Q3 and Q4 projects arbitrarily forces community decisions based on grant expiration date rather than allowing the community to assess its whole portfolio based on local needs. Oliva (NAEH) 3rd Supp. Decl. ¶ 88. As another example, Plaintiffs YPI and Crossroads both have grants expiring in Q4, and both will continue to face harms from the December NOFO if HUD seeks to use it, including the Geographic Discrimination Conditions, which penalize those Plaintiffs simply because they are located in a state and a local jurisdiction with laws and policies HUD does not like. Frazier (Youth Pride) Decl. ¶¶ 40-45, 63-76 (Dkt. No. 7-4); Wilcox (Crossroads) Decl. ¶¶ 54-58 (Dkt. No. 7-3). YPI will continue to face uncertainty and harm to the core activities of its mission due to the Gender Identity Condition in the December NOFO. Frazier (Youth Pride) Decl. ¶¶ 20-21 (Dkt. No. 7-4). And Crossroads will continue to face harms from the Service Requirements Conditions, which will harm its goodwill with the individuals and families it serves and conflict with the terms of its Family Violence Prevention Services grants. Wilcox (Crossroads) Decl. ¶¶ 35-39 (Dkt. No. 7-3); Declaration of Mary Katherine Rand (Mary Parrish Center) ¶¶ 6-11 (Dkt. No. 7-14) (describing harms due to Service Requirements Conditions).

Plaintiffs previously provided evidence relating to, among other things: the uncertainty and chaos created when providers had budgeted and planned programming based on a two-year funding cycle, the destabilization of local communities caused by the December NOFO's evisceration of funding for permanent housing, the human cost of forcing people out of stable housing and back to the street, the loss of goodwill with the property owners and real estate interests who invested in permanent housing, the loss of expertise in CoCs because some providers cannot comply with challenged conditions, the impossible choice between complying with illegal conditions or foregoing funding, and the irreparable First Amendment harms caused by the challenged conditions. Pls.' PI Mem. at 63-75 (Dkt. No. 5-1). None of these harms is unique to a first-quarter funding cliff. *See also* Pls.' MSJ at 77 (Dkt. No. 67-1) (describing irreparable harm due to loss of opportunity to compete for funds on lawful terms and unrecoverable compliance costs from being forced to prepare applications and run competitions based on illegal provisions).

HUD's continued and chaotic attempts to dismantle the existing CoC program through the Challenged Conditions have caused, and continue to cause, an existential threat to existing CoC networks, which Congress intended to provide safe and stable housing. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 55-60. Plaintiffs already established that referrals to life-saving housing programs were being halted or slowed due to funding uncertainty, loss of landlords willing to participate in CoC programs, and loss of staff. Oliva (NAEH) 1st Supp. Decl. ¶ 24 (Dkt. No. 49-1); Pls.' PI Mem. at 64, 69-70 (Dkt. No. 5-1); *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable."). While the preliminary relief has mitigated these harms, it has not stopped them

completely—and lifting the relief would open the floodgates. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 56-74. One permanent supportive housing project in New York closed as of February 1 due to HUD's actions, forcing eight adults onto the streets during record-breaking frigid temperatures. *Id.* ¶ 62. In Maryland, a landlord refused to renew program participants' leases due to funding uncertainty, *id.* ¶ 66; in Illinois, CoC-funded agencies are struggling to find property owners willing to sign leases. *Id.* ¶ 70. Other NAEH members continue to face impossible choices to protect the welfare of their clients. *Id.* ¶¶ 64-65. CoCs and their nonprofit partners have worked incredibly hard to earn the trust of individuals experiencing homelessness and to develop locally guided networks of care for the people they serve. Further chaos and uncertainty surrounding HUD funding imperils those established networks and could destroy what is left of that trust. *Id.* ¶¶ 53-60; s*ee also* Pls.' PI Mem. at 68 (Dkt. No. 5-1). If HUD is allowed to proceed with the December NOFO, these harms will be exacerbated.

**Second**, allowing HUD to proceed with the unlawful December NOFO at this time would cause further chaos and force CoCs and local homelessness providers to divert scarce resources to an unprecedented and confusing NOFO application process and away from running their programs. In addition, CoCs and providers will have to go through the application process all over again just a month or so later, as the THUD Appropriations Act requires HUD to issue the FY 2026 NOFO by June 1. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 400. Contrary to Defendants' claim that Plaintiffs merely face "routine compliance costs associated with applying for 2025 CoC renewals," Defs.' Mot. to Dissolve at 9, nothing about any impending FY 2025 NOFO implementation would be normal or routine. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 36-49. Responding to a NOFO is a demanding endeavor in any context. But this one would be off the charts—with radically new criteria and funding priorities, an unrealistically abbreviated

14

application window, and many unanswered questions about how it would work given that half the year's funding would already have been non-competitively renewed.

Defendants fundamentally misconstrue the time, expense, and effort that CoCs put into the NOFO application process. Even in a normal year when changes to the programming and application process are minimal, the work required for CoCs and applicants to prepare a collaborative application is resource-intensive and spans several months. Declaration of Sheila Dillon (Boston) ¶¶ 15-16 (Dkt. No. 7-5); Declaration of Kathryn J. Kaminski (Santa Clara) ¶ 24 (Dkt. No. 7-9); Declaration of Shireen McSpadden (San Francisco) ¶ 22 (Dkt. No. 7-10); Declaration of Renee M. Willis (NLIHC) ¶¶ 36-37, 68 (Dkt. No. 7-2). Some jurisdictions spent tens of thousands of dollars and hundreds of hours of staff time to design a local competition in line with the November 2025 NOFO before HUD withdrew it. Oliva (NAEH) 1st Supp. Decl. ¶ 21 (Dkt. No. 49-1). But a successful NOFO response starts long before HUD issues the NOFO. CoCs are already preparing for the FY 2026 NOFO that will be released in June. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 40-42, 49. The application window described in the McKenney declaration is shorter than all previous NOFOs in the last decade. *Id.* ¶¶ 32, 45, 47. A local competitive application process and a collaborative CoC application cannot be properly designed and implemented on a thirty-day timeline. *Id.* ¶¶ 45-47. This is especially true in the case of the FY25 NOFO, which would require CoCs to convert the majority of permanent housing projects—normally handled as renewal applications—into new projects. Pls.' MSJ at 17 (Dkt. No. 67-1). New project applications are more time-intensive than renewals. Oliva (NAEH) 3rd Supp. Decl. ¶ 46.

Further, a mid-year application process under the December NOFO is not the "mere act" that Plaintiffs have done "virtually every year." Defs.' Mot. to Dissolve at 15. The relief HUD

seeks here—to rush to implement an unlawful FY25 NOFO for funding that would otherwise go to third and fourth quarter-expiring awards, when Congress has already required it to renew earlier-expiring awards—is unprecedented and creates additional complications and confusion. To Plaintiffs' knowledge, HUD has never run, and CoCs have never participated in, a partial-year competition. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 32, 34. Stacking this process along with a FY26 NOFO, required by statute to be released by June 1, will create unnecessary risks and processing challenges for HUD and for CoC applicants and recipients, for a number of reasons. *Id.* ¶¶ 30, 32, 38, 46. HUD will need to modify its grants management system (e-snaps), and will have to quickly recalculate the Annual Renewal Demand (ARD) for the remainder of FY25, along with making changes that will impact Tier 1 allocations, permanent housing set asides, and scoring. *Id.* ¶ 38. Further, the ARD must (by statute) be published by the time a new competition begins for FY26 funding, and CoCs must know what the ARD is to make appropriate decisions about the competition. *Id.* ¶ 39. That will not be possible if HUD has not yet selected FY 2025 awards, and if HUD tries to simply estimate or project the ARD without final awards and grant agreements, there will likely be massive discrepancies and errors, disrupting the stability that Congress intended for the CoC program. *Id.* HUD's proposed half-year NOFO process also introduces new complexities: some renewals will no longer be available for replacement with new projects, and CoCs have no way of knowing until a revised NOFO is published how much funding can be set aside for Tier 1 or new permanent housing projects, based on how much money is available nationwide after the noncompetitive renewals for Q1 and Q2. *Id.* ¶ 46. Further, the impacts of a partial-year competition on each CoC will be different based on each CoC's renewal schedule. *Id.* ¶ 44. Some CoCs will have competitive and operational challenges based on their renewal schedule, which will carry over into the FY26 CoC competition as well: a

CoC that has all of its renewals in the second half of the year (as several NAEH members do) will likely be forced to defund a large portion of their current renewal projects under the FY25 NOFO, while a CoC that had mostly Q1 and Q2 renewals will not. *Id.* And implementing a new NOFO policy (like a low Tier 1 allocation threshold) on only a portion of a CoC's portfolio of grants arbitrarily forces community decisions based on grant expiration date rather than allowing the community to assess its whole portfolio based on local needs. *Id.* ¶ 88.

Nor, to Plaintiffs' knowledge, has HUD ever put CoCs in the position of responding to two CoC Program NOFOs with local competitions back-to-back. *Id.* ¶ 46. If the Court were to dissolve the preliminary injunction, it would force CoCs to prepare for and run two CoC Program NOFO application cycles (and the associated local competitions) in immediate succession, irretrievably diverting their resources towards a competition based on a NOFO that this Court previously found Plaintiffs were likely to succeed in challenging. CoCs are already preparing for the FY 2026 NOFO that will be released in June. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 40-42, 49. For some CoCs, once a NOFO is released, key staff members spend 100 percent of their time on the NOFO competition process for the typical 60-to-90-day period during which the NOFO is active. *Id.* ¶¶ 48-49. HUD has not explained how it would logistically manage these back-to-back processes, nor has it provided guidance to CoCs about how to do so. *Id.* ¶¶ 50-52. In light of all this, many NAEH members report that they lack capacity to handle these successive applications, particularly when they may have to effectuate different rules and different Annual Renewal Demand amounts. *Id.* ¶¶ 40-43.

In short, CoC lead agencies and non-profit partners have already dealt with NOFO-response stress, chaos, and additional labor for the past three months, requiring them to cancel or delay other important work. With the FY 2026 NOFO expected by June, dissolving the

preliminary injunction and allowing HUD to reinstate the December NOFO would equate to CoCs essentially working on NOFOs, some overlapping, for close to ten months. Oliva (NAEH) 3rd Supp. Decl. ¶ 43. This has already diverted staff time and resources, *see* Pls.' PI Mem. at 70-71 (Dkt. No. 5-1), and continued strain on these systems will worsen the negative impacts on Plaintiffs and the people they serve. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 30-43. The condensed and duplicate efforts here will result in wasted labor and planning, and will continue to drain resources, which this Court has previously recognized constitutes irreparable harm. *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 476 (D.R.I. 2025) (McElroy, J); *New York v. U.S. Dep't of Just.*, No. 1:25-CV-00345-MSM-PAS, 2025 WL 2618023, at *21 (D.R.I. Sept. 10, 2025) (McElroy, J).

**Third**, as to the first-quarter renewals (and now-likely second-quarter renewals) mandated by the THUD Appropriations Act, HUD has sent no communication to grantees regarding the renewal of funding, the process HUD plans to follow, or the timing of awards. Oliva (NAEH) 3rd Supp. Decl. ¶ 74. These awardees could still face significant uncertainty, and a gap in funding, until HUD actually complies with the recent statutory requirements. *Id*. ¶ 64. Until that money actually flows to awardees, the current injunction, and its assurance that HUD is processing awards under the FY24-25 NOFO, provides certainty that the THUD Appropriations Act alone does not.

In sum, Defendants continue to inject chaos and confusion into a social services system that is, by statute, designed to promote stability and consistency. Plaintiffs will continue to face imminent and irreparable harms if this Court dissolves the preliminary injunction.

## III. The Balance of Equities and Public Interest Still Strongly Favor Plaintiffs

The balance of equities—which merge with the public interest when the government is a party, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—still strongly favor preliminary relief.

Defendants face no harm at all because "[a]n agency is not harmed by an order prohibiting it from violating the law." *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025), *appeal pending*, No. 25-1236; *accord C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) ("It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." (cleaned up)).

Defendants emphasize they will forever (well, for FY 2025) lose their chance to "attempt" to make awards under their preferred December NOFO if this Court does not lift the injunction, but that makes no difference. *See* Defs.' Mot. to Dissolve at 1. Again, Defendants cannot claim harm from losing the chance to carry out unlawful action. *See New York v. Trump*, 769 F. Supp. 3d at 146. Defendants protest that they are harmed from being blocked "from effectuating statutes enacted by representatives of its people." Defs.' Mot. to Dissolve at 9 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025)). They've got that wrong: The preliminary injunction does not block them from effectuating any statute or "congressional directive[s]" or actions that Congress has "endorse[d]." *Contra id.* at 9-10. For the reasons explained above, the December NOFO remains just as unlawful now as it was before Congress enacted the THUD Appropriations Act. *See supra* Section I.

In addition, Congress enacted the THUD Appropriations Act with this Court's preliminary injunction already in place, and it did nothing to suggest the injunction should be lifted. Congress chose to limit HUD's options, and Defendants cannot validly claim they are harmed by the options Congress left them with.

Moreover, the option Defendants want to preserve—making awards under the December NOFO—is not an actual, realistic option anyway for multiple reasons. First, the December NOFO is no longer workable given the THUD Appropriations Act's mandates. Most obviously,

the NOFO's deadlines would have to be changed—and, as Defendants suggest, truncated to 30 days.[2] *See* Declaration of Caitlyn J. McKenney ¶¶ 6-7 (Dkt No. 74-3). But a 30-day application window would be unreasonably short. After all, in response to a NOFO, CoCs must announce their local competitions, providers must apply (to a radically changed set of criteria no less), and CoCs must evaluate those applications and make selections in time to notify applicants 15 days before submitting their own application to HUD. *See* Oliva (NAEH) 3rd Supp. Decl. ¶ 47; AR 1239. In the past decade, the application period has never been shorter than 60 days and is typically longer. Oliva (NAEH) 3rd Supp. Decl. ¶¶ 45, 47, 49. The revised NOFO with its new— and unreasonably short—application window would itself be arbitrary and capricious and should be preliminarily enjoined and stayed under the APA.

Second, even if HUD made needed updates to their preferred NOFO and even if a 30-day application period were workable (it is not), there is no realistic possibility HUD could responsibly make awards by July 1. By starting the NOFO process, HUD would do nothing but introduce even more chaos and uncertainty and drain time and resources from already strapped CoCs and local providers. In claiming they could conceivably make awards by July 1, Defendants explain—in a declaration from an official who has been at HUD for less than a year and has never run a NOFO process—that HUD could complete the threshold, merit, and risk

---

[2] To take just a few other examples, Defendants would also need to revise the NOFO to account for the fact that over a third of the funding the NOFO says it is making available would have already gone to the first- and second-quarter non-competitive renewals, and to explain how much it was making available for which types of projects. Defendants would also have to recalculate the amount CoCs would be permitted to apply for given that many would have received some non-competitive renewals already. And Defendants would have to clarify things like whether awards that were non-competitively renewed would count toward the 30 percent cap on permanent housing renewals that the December NOFO allows CoCs to seek. Defendants have provided no indication they have considered these and other issues, *see* Oliva (NAEH) 3rd Supp. Decl. ¶¶ 38-44, nor have they acknowledged that they could not actually use the December NOFO, but would have to issue yet another revised one.

reviews in 50 days. McKenney Decl. ¶¶ 1, 7 (Dkt. No. 74-3). That is facially implausible given how quickly Defendants have otherwise been able to act. Defendants have represented that they "cannot" "possibly" make awards under the FY24-25 NOFO in less than 50 days—when those awards, unlike awards under the December NOFO, involve few new applications and only minimal review. *See* Defs.' MSJ at 86 (Dkt. No. 68). And Defendants' counsel have advised Plaintiffs' counsel that HUD will need a month and a half to make the first-quarter non-competitive renewals that the THUD Appropriations Act requires—even though those renewals represent only 10 percent of total funding and even though HUD has no discretion in granting them. *See* Declaration of Caitlyn J. McKenney ¶ 4 (Dkt. No. 68-1) (noting that 10 percent of funding expires in the first quarter of 2026).

Defendants claim they will be able to move quickly because, under this Court's order, HUD will have already completed threshold and risk reviews of renewal projects. McKenney Decl. ¶ 7 (Dkt. No. 74-3). But that makes no sense, as most renewal projects will not even be eligible for awards under the December NOFO given the cap on permanent housing renewals and large set-aside for new projects—and so HUD will largely be evaluating entirely different projects. Oliva (NAEH) 3rd Supp. Decl. ¶ 50. At bottom, Defendants' claim that they could possibly make awards on such an expedited timeline fails to account for what the process actually entails. *Id.* ¶¶ 51-52.

The equities do not favor allowing HUD to press forward with an unlawful NOFO that it has no hope of responsibly implementing in the allotted time, particularly given the burdens that will impose on CoCs and providers and the formerly unhoused people who benefit from the CoC program who are already struggling from the months of chaos.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' request that the Court

dissolve the preliminary injunction entered orally on December 19, 2025, and memorialized by written order on December 23, 2025.

February 23, 2026

Respectfully submitted,

AMY R. ROMERO
 (RI Bar No. 8262)
KEVIN LOVE HUBBARD +
 (MA Bar No. 704772)
DELUCA, WEIZENBAUM,
 BARRY & REVENS, LTD.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
 Lawyers' Committee for RI

*Counsel for All Plaintiffs*

TONY LOPRESTI +
 (CA Bar No. 289269)
COUNTY COUNSEL
KAVITA NARAYAN +
 (CA Bar No. 264191)
CHIEF ASSISTANT COUNTY COUNSEL
MEREDITH A. JOHNSON +
 (CA Bar No. 291018)
LEAD DEPUTY COUNTY COUNSEL
STEFANIE WILSON +
 (CA Bar No. 314899)
DEPUTY COUNTY COUNSEL
LEILY ARZY +
 (CA Bar No. 364187)
LITIGATION FELLOW
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org

/s/ Kristin Bateman
KRISTIN BATEMAN +
 (DC Bar No. 90037068)
MADELINE H. GITOMER +
 (DC Bar No. 1023447)
ALESHADYE GETACHEW +
 (DC Bar No. 1007161)
AMAN T. GEORGE +
 (DC Bar No. 1028446)
SIMON C. BREWER +
 (DC Bar No. 90042403)
CHRISTINE L. COOGLE +
 (DC Bar No. 1738913)
YENISEY RODRÍGUEZ +
 (DC Bar No. 1600574)
CARRIE Y. FLAXMAN +
 (DC Bar No. 458681)
ROBIN THURSTON +
 (DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
agetachew@democracyforward.org
ageorge@democracyforward.org
sbrewer@democracyforward.org
ccoogle@democracyforward.org
yenisey.rodriguez@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

DAVID CHIU +
 (CA Bar No. 189542)
CITY ATTORNEY
YVONNE R. MERÉ +
 (CA Bar No. 173594)
CHIEF DEPUTY CITY ATTORNEY
MOLLIE M. LEE +
 (CA Bar No. 251404)
CHIEF OF STRATEGIC ADVOCACY
SARA J. EISENBERG +
 (CA Bar No. 269303)
CHIEF OF COMPLEX AND AFFIRMATIVE
 LITIGATION
RONALD H. LEE +
 (CA Bar No. 238720)
ASST. CHIEF OF COMPLEX AND
 AFFIRMATIVE LITIGATION
MICHAEL LEVIN GESUNDHEIT +
 (CA Bar No. 292930)
DEPUTY CITY ATTORNEY
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102-5402
(415) 554-4240
michael.levin@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*

WALLACE W. DIETZ +
 (TN BPR No. 009949)
DIRECTOR OF LAW
JOHN K. WHITAKER +
 (TN BPR No. 039207)
SENIOR COUNSEL
ABBY GREER +
 (TN BPR No. 041470)

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

LYNETTE LABINGER
 (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
 ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to End Homelessness, National Low Income Housing Coalition, Crossroads RI, and Youth Pride, Inc.*

ANTONIA K. FASANELLI +
 (DC Bar No. 481856)
KATHRYN M. SCOTT +
 (WA Bar No. 38978)*
NATIONAL HOMELESSNESS LAW CENTER
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*

TOBY MERRILL +
 (MA Bar No. 601071)
CASSANDRA CRAWFORD +
 (NC Bar No. 45396)
GRAHAM PROVOST +
 (DC Bar No. 1780222)
PUBLIC RIGHTS PROJECT

ASSISTANT METROPOLITAN ATTORNEY
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
toby@publicrightsproject.org
cassandra@publicrightsproject.org
graham@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*

DAVID J. HACKETT +
 (WA Bar No. 21236)
GENERAL COUNSEL, KING COUNTY
DEPARTMENT OF LOCAL SERVICES
CRISTY J. CRAIG +
(WA Bar No. 27451)
SENIOR DEPUTY PROSECUTING ATTORNEY
OFFICE OF THE KING COUNTY PROSECUTING ATTORNEY
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
david.hackett@kingcounty.gov
cristy.craig@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

+ Admitted *pro hac vice*
* Not admitted in the District of Columbia; practicing under the supervision of members of the D.C. Bar

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2026, I electronically filed the within document, and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

/s/ *Kristin Bateman*
Kristin Bateman