**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

NATIONAL ALLIANCE TO END
HOMELESSNESS, *et al.*,

        *Plaintiffs*,

   v.

U.S. DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, *et al.*,

        *Defendants*.

Case No. 25-cv-636-MSM-AEM

<u>**THIRD SUPPLEMENTAL DECLARATION OF ANN MARIE OLIVA**</u>
<u>**NATIONAL ALLIANCE TO END HOMELESSNESS**</u>

I, Ann Marie Oliva, declare the following under penalty of perjury:

1.     My name is Ann Marie Oliva. I have personal knowledge of the facts contained in this declaration. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

2.     I am the Chief Executive Officer of the National Alliance to End Homelessness (the "Alliance").

3.     During my 10-year tenure at HUD, I administered the Continuum of Care (CoC) Program competition, and many of the operational structures that I understand are currently in place were implemented under my leadership. I also oversaw the implementation of the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which amended the McKinney-Vento Act and formally authorized the CoC Program. This included

1

leading the drafting and clearance of applicable regulations, including the current CoC Interim Rule. I also worked as a HUD technical assistance provider to help CoCs comply with HUD policy and regulations, respond to natural disasters (including Hurricane Katrina), and use data to better inform local decision making.

4.      All told, I have worked in homelessness assistance for more than 30 years. Early in my career I helped to implement the first HUD-funded Continuum of Care (CoC) in the nation (Washington, DC–called the D.C. Initiative), and was for more than nine years a lead member of the District's team that responded to HUD's Notices of Funding Opportunity (NOFOs) for the legacy programs that Congress consolidated in 2009 to form the Continuum of Care Program.

5.      This experience and corresponding expertise provide me with expertise and perspective on the CoC Program application and awards process, as well as the harms our members face as a result of HUD's actions.

6.      I submit this declaration to emphasize the importance of the preliminary relief in this case, and the harms it continues to protect against, particularly those stemming from the reinstatement of the December FY25 NOFO.  I also submit this declaration to explain the additional issues and likely harms raised by the process Defendants contemplate.

**Defendants' Latest Actions Compound the Chaos Faced Over the Past Year**

7.      This most recent action by HUD must be viewed in the context of a year's worth of federal actions that have fundamentally shattered not only funding recipient faith in the agency they largely considered a partner for decades (and across administrations), but the faith and trust between clients and programs, as well as the faith between providers and vendors, landlords and staff who have endured uncertainty, missed payments, chaos and confusion over the past year for no justifiable reason. And this latest action – combined with new Congressional

direction provided through the FY2026 Appropriation – shifts the confusion and chaos largely to Q3 and Q4 renewals.

8.      Therefore, it is important to lay out, comprehensively, all the unexpected and abrupt ways that HUD has caused disruption in the CoC Program in the past year.  While each one separately has caused confusion and uncertainty, together they have contributed to a pattern of chaos within the CoC Program, and a seeming disregard for the harms imposed on program applicants, awardees, and people that desperately rely on the services offered by CoCs.

9.      On January 28, 2025, just 8 days after this administration took office, the U.S. Office of Management and Budget (OMB) blocked the obligation and disbursement of funds to CoC Program participants (and across federal programs), causing deep uncertainty as our members were unable to access the federal financial accounting systems they use to draw down funds or get new grant agreements executed. This forced CoC funding recipients to attempt to work with landlords, other vendors, and staff to delay payments indefinitely – since they did not know when funds would be made available again – so that program participants would not be penalized due to circumstances beyond their control. Although the "pause" by OMB was temporary, it marked the beginning of the chaos and uncertainty that CoC recipients, their staff, program participants, and their vendors would have to endure in the coming year.

10.     One month later, on February 28, 2025, HUD abruptly discontinued an unprecedented number of contracts for HUD Technical Assistance (TA) providers, citing the promotion of diversity, equity, and inclusion as the reason for contract termination. The removal of TA had an immediate and disproportionate impact on smaller CoCs, youth homelessness providers, and providers serving unsheltered people and rural areas. 38 TA providers across the country were furloughed or laid off. For example, the homeless disaster TA team – who focused

exclusively on people experiencing homelessness in the response and recovery phases of natural disasters – was decimated. Many CoC funding recipients lost access to critical TA advisors as they were finalizing important youth homelessness plans, which are a requirement for youth-specific CoC funds. Further, 240 CoCs immediately lost access to their regional TA providers who support them in navigating regulatory guidance, standing up programs, and maintaining compliance with the CoC Program. It would be months before these contracts were reinstated, but damage had already been done by the time they were back in place.

11.    Although HUD announced the conditional award list for most (excluding those in disaster areas) FY2024 grants on January 17, 2025 (the last business day of the Biden Administration), award letters that recipients rely on to prove they have forthcoming federal funds and that should have been routinely processed were significantly delayed by the new Administration, as were routine grant agreements for CoC funds. Grant agreements did not start being processed until on or around March 13, 2025, for renewal grants expiring from January through May 2025. The grant agreements included alarming new language that required grantees to comply with harmful and unlawful new criteria aligned with White House Executive Orders - requirements that prompted litigation by several municipalities.  Within days of issuing them, HUD abruptly pulled back those grant agreements. This was followed by more uncertainty as to when grant agreements (and therefore funding) would start flowing again, and with which harmful terms and conditions included. Roughly 1-2 weeks later, grant agreements began flowing again and included language that was substantially unaltered from the previous agreement.

12.    At the same time, HUD staff that administer the CoC program in the field were being ousted or were leaving on their own through the "fork in the road" offer, or through

retirement. Many field offices that worked closely with CoC grantees were consolidated into "regional hubs," leaving "skeleton staff" operations, as a result of actions by DOGE. The result of these cuts and consolidations has halted once routine operations on which CoCs rely – such as grant agreement execution or technical support with HUD financial management systems significantly – hampering efforts of CoCs and providers to carry out their programs.

13.     On March 15, 2025, Congress appropriated funding for the FY25 CoC Program.

14.     In summary, through just the first few months of the Trump administration, Alliance members faced chaos and confusion that included: a federal funding freeze and rescission of that freeze; a significant delay in award letters and FY 2024 CoC grant agreements, the release of new, substantially altered grant agreements and the rescission - and then reinstatement - of the grant agreements; the loss of HUD field offices; the cancellation and reinstatement of technical assistance; and the need to work with clients, staff and landlords/vendors through cash flow gaps and funding uncertainty. They were subject to this seemingly intentional chaos almost every week as they worked to prevent and end homelessness in their communities.

15.     Then on July 3, 2025, the overall environment in which our members operate was made significantly worse when HUD announced that it intended to publish a new NOFO for FY2025 CoC awards even though the current NOFO was for two years. It provided no information on timing or any specificity or detailed instructions regarding that competition. There were no tangible steps that any CoC could take to prepare. The announcement only created additional confusion and uncertainty for our members.

16.     On July 24, 2025, the White House issued an Executive Order on homelessness seeking to dismantle the foundations of homeless response in the United States by directing

federal agencies to end support for Housing First policies, calling for forced institutionalization, eliminating privacy protections for people experiencing homelessness, eliminating certain harm reduction measures, and more.

17.    In addition to the uncertainty faced by CoCs regarding the regular FY 2025 CoC grant awards, on August 5, 2025 HUD released the results of the CoC Builds competition (a smaller competition to award funds set aside by Congress for the development of badly needed supportive housing), to Congress– but no public award announcement was made. Then, on September 5, 2025 HUD rescinded that NOFO and released its *third* CoC Builds NOFO with an unprecedented seven-day competition period, forcing CoCs to scramble and focus staff and administrative time on putting together applications in an unreasonably short period. This prompted litigation, which continues to make its way through this Court.

18.    Additionally, municipalities engaged in ongoing litigation since May 2025 concerning the terms and conditions of the FY2024 CoC grant agreements had *still* not received grant agreements as of August 2025, forcing the Courts to step in.

19.    Then, in September 2025, HUD quietly and unlawfully stopped issuing new CoC Program grant agreements for Q3 and Q4 nationwide, purportedly due to other pending litigation. This matter was not resolved for months (and I understand from our members was only resolved through Congressional pressure to HUD), creating an additional backlog of unexecuted grant agreements, missed rent and payroll, and adverse impacts on program participants.

20.    More than eight months after Congress appropriated funding for the FY25 CoC Program and four months after sending a cursory email informing CoCs they would have a new FY25 CoC competition, HUD issued a NOFO on November 13, 2025.

21.     That NOFO was withdrawn on December 8, 2025.

22.     A replacement to the withdrawn NOFO was issued on December 19, 2025.

23.     As discussed in my prior declarations, these NOFOs each represented a sea change for the program, reversing years of evidence-based practices and disregarding congressional requirements and priorities.

24.     Plaintiffs were grateful to obtain preliminary relief in this case, which prevented our members from needing to make excruciating decisions as to whether or how they could apply for funding under the new, unlawful FY25 NOFO requirements, on a ridiculously expedited timeline.

25.     Even with the preliminary relief granted by the Court in December 2025, the damage to the nation's homelessness assistance system from the unrelenting, chaotic, and unlawful actions taken by HUD is undeniable, and HUD seems to be unaware of or indifferent to the adverse impact on people experiencing homelessness and the people and programs who serve them. In fact, as described further below, some programs have even closed or temporarily ceased operations as a result of the financial and programmatic uncertainty in the CoC program.

**Congressional Language and Intent**

26.     Congress has also recognized the chaos and uncertainty caused by Defendants. On February 3, 2026, the President signed into law the Consolidated Appropriations Act of 2026 (H.R. 7148), which includes direction intended to remedy the funding lapses caused by Defendants.  Congress took no position on the lawfulness of any NOFO; nor did it attempt to influence any judicial proceedings. However, it did attempt to inject some reliability into a process plagued by the chaos as described above by requiring HUD to immediately and non-competitively award FY25 CoC renewals due in the first quarter. Additionally, Congress set

7

clear benchmarks for HUD for the remainder of FY25 awards. If FY25 CoC funds are not awarded through a lawful NOFO by April 1, HUD must non-competitively award second quarter renewals; if awards are not complete by July 1, then HUD must non-competitively award the remainder of the year's renewal grants set to expire.

27.     That certainty provided by Congress, for our members who now anticipate receiving renewal funding for all awards expiring in Q1 and Q2, may alleviate some of the harms, though HUD has not yet issued any related information or issued any notifications of awards or funds.

28.     However, for Q3 and Q4 renewals, our members remain in jeopardy of experiencing additional and significant harms due to Defendants' stated intention to attempt to award this funding under the December 2025 NOFO.  In fact, the Defendants now seek to use the Congressional language to shift harm primarily from projects receiving and individuals benefiting from awards in Q1 and Q2 to those in Q3 and Q4.

29.     Congress did not impose on HUD a July 1, 2026 "deadline."  It stated that if money had not been awarded pursuant to a NOFO by that time, HUD shall process all Q3 and Q4 renewals noncompetitively. A deadline suggests that Congress *requires* HUD to take specific action prior to that date. Rather, the language here lays out a predictable timeline ensuring that funds get to providers either via a lawful NOFO prior to July 1, 2026, or via noncompetitive renewals.

30.     This is important: Congress did *not* instruct HUD to rush to get awards out under the December NOFO or any NOFO, for that matter. Furthermore, based on my decades of experience and expertise, I have deep concerns about the ability of HUD to responsibly collect and process applications, and award FY25 grant funding by July 1, 2026.

31.     Congress *did* impose a deadline for the FY2026 NOFO release of June 1, 2026, with a deadline of December 1, 2026 to announce FY2026 awards.

**Defendants Cannot Responsibly Make Awards under the December FY25 NOFO by July 1, 2026**

32.     There are four factors outlined below that illustrate why the process outlined by HUD is irresponsible and untenable: first, HUD is currently processing awards under a lawful NOFO and could use that process to meet Congressional benchmarks without causing additional chaos and harm; second, operating a half-year CoC competition has never been done before and creates a number of unnecessary risks for CoC funding recipients and processing challenges for HUD; third, the 30-day application window is insufficient for CoCs that would need to make the radical changes to their program portfolios the FY25 CoC NOFO requires; and fourth, the estimated 50-day review period is absurd given the volume and types of reviews necessary to score and process a new, substantially different CoC competition.

33.     Defendants have stated that "in order to have a chance of meeting" the July 1, 2026 deadline of awarding funding pursuant to a FY25 NOFO, HUD "needs to open the December 2025 NOFO by April 1, 2026."

34.     In my December 1, 2025, Declaration, I set forth the typical stages of a CoC NOFO competition. *See* Oliva (NAEH) Decl. ¶¶ 47-61 (Dkt. No. 7-1). Multiple stages in the process I set forth would need to be altered based on a new, partial-year NOFO.

35.     **First**, it is important to be clear that HUD is currently processing renewals and reallocations under a lawful NOFO (the original FY24-25 CoC NOFO) as required by the Court. Given where they likely are in that process (applications were due February 9, 2026), the Defendants could easily meet the benchmarks set forth by Congress by awarding FY25

renewal/reallocated funding under that NOFO. They could stop the chaos that is irreparably damaging the nation's homelessness assistance system by taking that route.

36.     **Second**, if the Court were to allow the Defendant to proceed with the unlawful December FY25 CoC NOFO, there would soon be <u>three</u> active CoC processes happening at the same time: the FY25 Q1 and Q2 non-competitive renewals, the FY25 Q3 and Q4 Competition, and the FY26 Competition that must begin by June 1, 2026 as required by Congress.

37.     This stacking of processes will create challenges for the agency and for CoC applicants and recipients.

38.     HUD's grants management system (e-snaps) will need to be modified again to accommodate these activities and may face technical challenges in the concurrent execution of these functions. HUD staff will be required to quickly recalculate Annual Renewal Demand (ARD) for the remainder of FY25 and make the required changes to the December FY25 NOFO for a half-year competition. Some of these changes may be significant because of the change to the amount of funding that will be available. The math of Tier 1, permanent housing set asides, and scores all must work with the new competition amount available.

39.     Further, the overlap of FY25 and FY26 CoC competitions will cause significant problems. Defendants acknowledge that, under their (already unrealistic) timeline, awards for FY25 would not be final until very close to July 1. However, the FY26 CoC competition must begin on June 1 as directed by Congress. By statute, the annual renewal demand—the amount needed to renew all expiring awards—must be published by the time the NOFO is launched because annual renewal demand controls the maximum amount CoCs can apply for (outside of bonus funding and funding for certain other discrete activities). Thus, CoCs must know that amount to make appropriate decisions about the competition. But that would not be possible if

HUD had not yet selected FY 2025 awards that would then expire in calendar year 2027 and thus be part of annual renewal demand that governs the FY 2026 competition. If HUD were to project ARD for FY26 without final awards and grant agreements completed for FY25, there would likely be massive discrepancies and errors.

40.     For CoC funding recipients, the challenges are also significant. Requiring CoCs to run the FY2025 NOFO competition beginning on April 1, 2026 will mean that CoCs with Q3 and Q4 grant agreements will be required to participate in the FY2026 competition, which opens June 1st, immediately after the FY2025 competition, possibly with different criteria. Many Alliance members report the lack of capacity to manage back-to-back CoC competitions, which for many members would typically occupy staff time for a six-month period.

41.     A CoC member in Michigan reports "We were beginning to prepare for the FY26 NOFO, which is only 4 months away on its own.  There is no way the CoC or providers would have capacity to have a real competition process twice in less than 6 months."

42.     A CoC member in Mississippi said "I can't even put into words right now how disruptive a 2025 NOFO for the projects in quarters 3 and 4 would be. It would have another NOFO (FY26) being released on its heels. We would be running two competitions back-to-back, with all the planning, resources, and community involvement at a heightened pace with potentially different rules and different ARDs, splitting awards out by quarters."

43.     The sheer amount of bureaucracy required by Defendant's actions is drawing staff time away from the core mission of CoCs and their providers – namely, serving homeless and formerly homeless persons.  As an Alliance member in Arizona reported, "We are short-staffed and have been dealing with NOFO and PIT [point-in-time count] for 3 months. Based on the appropriations bill timeline, we'll have the FY26 NOFO by June. This means we could[ld] spend

up to 10 months straight dealing with NOFOs, which has devastating impacts on the very real work we need to be doing of ending homelessness- Not only for the lead agencies, but also for our applicants. We quite literally do not have time for this."

44.     It is important to note that a half-year competition does not mean that half of the projects for each CoC are included. In fact, the impact on each CoC will be different based on its renewal schedule. Some CoCs will have competitive and operational advantages based on their renewal schedule – a situation that will necessarily carry over into the FY26 CoC Competition. For example, any CoC that has all of its renewals in the second half of the year — as several of our members do — will be at a significant competitive and operational disadvantage as compared to a CoC that has all of its renewals in the first half of the year. The first CoC in this example will likely be forced to defund a large portion of their current renewal projects (if the terms of the December FY25 NOFO are not substantially changed), whereas the second CoC in this example will be able to continue operating at least through 2027.

45.     **Third**, the 30-day application window as described by the Defendants is deeply insufficient given the scope of the changes contemplated in the December FY25 CoC NOFO. Defendants in this case have repeatedly argued that the application windows they have proposed for the FY25 NOFO are appropriate and in line with prior application windows. That is incorrect, and the application window described in the McKenney declaration for this motion (Dkt. No. 74-3) is shorter than all previous NOFOs in the last decade, when the shortest application window ever was 60 days.

46.     But more importantly, the December FY25 NOFO radically alters the CoC Program and its corresponding application requirements.  Even putting aside their illegality, permitting only a condensed, rushed timeline for CoCs and projects to understand and meet these

new requirements, running a local competition for new projects, and deciding which renewal projects may be renewed will cause and create more harm to our members. Putting together new project applications are more time-intensive than applications for renewals. Any argument made by the Defendants that CoCs have had since December 19 (when it was posted) to understand and prepare for the December FY25 CoC NOFO as a justification for the shorter application period is false, as running a half-year NOFO will significantly change the decisions that CoCs would have to make and would introduce new complexities to the process. Not only will some renewals no longer be available for replacement with new projects, but CoCs have no way of knowing until HUD publishes a revised NOFO (which, as an aside, will be the fifth version for FY25) how much funding can be set aside for Tier 1 or new PH projects, based on how much money is available nationwide after non-competitive renewals are awarded for Q1 and Q2. To my knowledge, HUD has not previously run a half-year competition, nor back-to-back competitions.

47. If Defendants were permitted to apply the December FY25 NOFO to Q3 and Q4 renewals, CoCs would be required to announce a local competition; local projects need to apply; the CoC has to evaluate those applications and make selections; CoCs have to tell projects they were not selected and why at least 15 days before submitting their application to HUD; and CoCs have to prepare and submit their own applications. 30 days is simply not enough time. In the last decade, the application window for the CoC program has not been shorter than 60 days. Between 2016 and 2024, the CoC Program Competition application was open for an average of 81 days. And those time frames were for relatively standard competitions.

48. A CoC member in Tennessee, for example, reports that it generally takes approximately 90 days to complete the NOFO competition process. During those 90 days, three

13

staff members dedicated 100 percent of their time to the NOFO application. An additional staff member dedicates 50 percent of their time.

49.     A CoC member in Boston, Massachusetts similarly reports that during the typical 60-to-90-day period when a NOFO is active, a director and a part-time consultant dedicate 80 to 100 percent of their time to NOFO response. The CoC's supportive housing team dedicates 40 to 60 percent of their time to NOFO-related tasks during the application period. Preparations for the local application process begin long before the NOFO is posted as the director and a consultant are already mapping out a timeline and process for the FY26 NOFO that HUD must release by June 1, 2026.

50.     **Fourth**, the HUD 50-day review period as discussed in the Defendant's declaration is absurd. The time period between competition closing and award, on average over the last decade, was 124 days - with 79 days being the shortest amount of time (FY2024) and 179 days being the longest (FY2022). While it is correct that there would be fewer project applications due to the non-competitive renewal of Q1 and Q2 projects, under the terms of the December FY25 CoC NOFO, most of those project applications would be new, given the new criteria, the large set aside for new permanent supportive housing projects, and the cap on permanent housing renewals.

51.     Based on my experience, the review of a new project application takes two to three hours of staff time each – much longer than a renewal project review. In a normal year the number of new projects would be roughly around 300, but in this scenario, it could be as high as 2,000 or more new projects given the parameters of the FY25 CoC NOFO. Those reviews and the fact that the scoring/merit criteria in the December FY25 CoC NOFO is substantially different means it will likely take at least as long, if not more time, for HUD to review and score

both the thousands of project applications and the nearly 400 CoC applications as compared to a

normal year. After review, HUD still needs to complete the administrative steps necessary to

announce accurate awards.

52.     The Alliance and its members are concerned that the declaration submitted by

HUD does not acknowledge or take into account these critical factors. The materials as presented

to the Court indicate a lack of understanding of the program and the grantmaking process. Nor

has HUD provided members with guidance to explain how it would logistically manage back-to-

back NOFO responses with local competitions.

**Chaos Caused by Defendants Threatens the CoC Program**

53.     Taken together, I have significant concerns that HUD's irresponsible actions have

already resulted in significant harm and will result in catastrophic injury to the CoC Program and

our nation's homelessness response system overall.

54.     As stated in my first Declaration, by enacting the HEARTH Act, Congress

enshrined the goal of bringing vulnerable individuals and families **to safe and stable housing** as

quickly as possible without creating unnecessary steps or additional barriers to housing and

services, and without using housing as a reward for behavior modification. *See* Oliva (NAEH)

Decl. ¶ 37 (Dkt. No. 7-1).

55.     The rapid issuance, withdrawal, and reissuance of NOFOs with unprecedented

criteria on a near-impossible timeline still jeopardizes stable housing for tens of thousands

formerly homeless people. It also causes harm to subrecipient agencies who will have very

limited time to plan for and implement changes and who will likely face financial obligations for

leases that will no longer be reimbursable. CoCs are in danger of losing the goodwill and trust

established over decades between CoCs and subrecipient agencies and between the agencies and their clients.

56.     Following Defendants' chaotic actions and passage of the THUD Appropriations Act, the Alliance has heard from hundreds of its members regarding the impacts that are already being felt by the delays and uncertainty associated with the FY2025 CoC Program NOFO funding.  These members spanned almost every state and nearly half of all CoCs.

57.      **Hundreds of members** report negative impacts already being felt as an organization (and on program participants) due to the timing and uncertainty related to the FY2025 CoC NOFO.

58.     **Hundreds of members** report having current recipients expressing concerns about continuing to apply and receive CoC Program funds.

59.     **Hundreds of members** report other community partnerships (i.e., landlords, property owners, matching organizations, etc.) being impacted by the continued timing delays and funding uncertainty.

60.      Of deepest concern, programs providing life-saving housing to formerly homeless people are already closing.  The possibility of another new competition would represent the straw that breaks the entire homelessness response system in many communities.

**a) Programs are closing or leaving housing units vacant and landlords are refusing to participate**

61.     My prior Declarations summarized the halting or slowing of referrals to life-saving housing programs and loss of landlords willing to participate in CoC programs because of the funding uncertainty.  *See* Oliva 1ˢᵗ Supp Decl.  ¶¶ 24, 25, 27-28 (Dkt. 49-1) (describing the pausing or stopping of referrals in Boston, Massachusetts, Santa Clara, California and Nashville, Tennessee); *id*.  ¶¶ 16, 24 (explaining that lapsed or uncertain funding jeopardizes relationships

16

with landlords who work with CoC subrecipients). The injunction, which provides a clear timeframe for applications/no application renewals and processing awards, alleviates some of this uncertainty and enables some programs to keep units filled. However, if Defendants proceed with attempting to make awards under the December NOFO by July 1, our members will be thrust right back into uncertainty and relive the very harms the injunction halted.

62.    Alliance members now report that programs have actually closed or are preparing to do so. A CoC member in New York reported that seven of its PSH projects have either already reallocated funds and closed programs towards the end of 2025 or confirmed their plan to do so in 2026 due to ongoing fears of unsustainable funding. One PSH project in their CoC closed as of February 1, 2026, because of HUD's actions, forcing 8 single adults onto the streets during record-breaking frigid temperatures.

63.    An Alliance member in rural Wyoming reports that one agency shut down a housing project aimed at youth because funding has been so delayed (15 beds lost), and more projects are expected to close or reduce services based on CoC program disruptions/uncertainty in funding.

64.    Other Alliance members are facing impossible choices between program compliance and protecting the lives of their clients.  One member, a CoC in Maryland, had to move 11 clients from one program to another program to ensure housing stability after a grant in quarter 1 expired with no promise of renewal.  The move resulted in immediate vacancies in the CoC units, placing the program in noncompliance giving grounds for loss of CoC funding, because the CoC chose to ensure stability for the program participants. This program ultimately closed its doors permanently.

65.    The financial instability HUD has caused has been untenable for many programs, required programs to take on debt, and leave vacant more lift sustaining homes.  A Continuum of Care in Wisconsin reports "We have already had one organization give up their CoC grant. Other organizations are having to take out low interest lines of credit, while others are holding off on accepting new clients into their permanent supportive housing programs."

66.    A Continuum of Care in Maryland reports "right now many of our clients were do [sic] to sign another year lease, and without guaranteed funding from our program the landlord will no longer renew our participants [sic] lease. This will lead to displacement."

**b) Programs have had to stop accepting new tenants; many currently unhoused persons cannot move into housing**

67.    A CoC member in New York reports "All of our projects had put a pause on taking new referrals into the program. They planned to lift the pause on 2/1 but further uncertainty will delay the lift. CoC funding is the best tool we have to house people from emergency shelter. If pauses continue, we will see further increases in homelessness."

68.    A CoC member in Massachusetts reports "Some programs have decided to no longer accept referrals to openings as they would be unable to support the leases of their participants should funding no longer be available. As such, those that are in shelter or living in places not meant for human habitation do not have access to beds that could resolve their housing crisis."

69.    A CoC member in Minnesota reports "Programs are hesitant to enroll new households due to uncertainty about renewal timing and reimbursement. Housing providers are slowing intake, which delays placements for households prioritized through Coordinated Entry [the system utilized for placing homeless people into permanent housing]. In a rural region with limited housing inventory, even short delays create a backlog that is difficult to unwind."

18

70.    A CoC member in Illinois reports "All 16 of our CoC-funded agencies are impacted by the uncertainty related to the FY2025 CoC NOFO. Each agency was given the discretion to pause referrals to available units and most are choosing to do so - they are choosing to pause based on the uncertainty of renewal funding and not knowing if they can continue to house individuals and families beyond their current grant's expiration date, as well as difficulty identifying landlords/property owners willing to sign leases when they are backed by unstable federal funding."

### c) Programs are forced to reduce services and risk losing staff

71.    A CoC member in Michigan reported that many providers were considering leaving the work as they were facing a $4m decrease in funding before the preliminary injunction, especially recently funded agencies new to HUD's renewal process, with smaller capacity serving rural communities.

72.    A smaller member CoC in California reports there has been a significant reduction in their programmatic hours of operation, and several staff members have been furloughed.

73.    CoC lead agencies and their subrecipient partners have been managing NOFO-response chaos, stress, and labor for three months. They have been managing broader chaos related to the CoC program as outlined earlier in this declaration for more than a year. Projects have been canceled or delayed. HUD's actions threaten the CoC Program's ability to accomplish the goals that Congress set out for it.

## Our Members Continue to Face Significant Harm

74.    Defendants argue repeatedly that CoCs with awards expiring in Q1 and Q2 no longer face harms with respect to that funding, because those awards will be "noncompetitively

renewed no matter what happens in this litigation." D filing at 8.  But the Alliance's members have received no communications from HUD regarding this renewal of funding, the process HUD plans to follow, or the timing of awards. HUD's counsel has informed the Alliance's counsel in this litigation only that they anticipate making noncompetitive renewals for awards expiring in Q1 by "mid-March." Given the uncertainty sowed by HUD over the past few months in particular, these awardees still face significant uncertainty, and a gap in funding, until HUD actually complies with the recent statutory requirements imposed.

**Significant Q3 and Q4 Funding is at Stake**

75.    Nationwide, projects expiring in Q3 and Q4 represent 63% of the total projects eligible for renewal in the FY25 CoC NOFO. *See* McKenney Decl. (Dkt. No. 74-3).

76.    The Q3 and Q4 funding at stake for the local government plaintiffs (all of whom are Alliance members) totals over $141.5 million.

77.    The Boston CoC reports that grants totaling $30.6 million will expire between July 2026 and January 2027, jeopardizing housing for over 1,200 households in permanent housing programs.

78.    The Cambridge CoC reports that 10 projects totaling over $5.15 million in grant awards will expire in Q3 and Q4, totaling over 80% of the CoC funding awarded to the Cambridge CoC.

79.    King County reports that it has 12 permanent supportive housing awards that will expire in Q3 or Q4 of 2026. Collectively, these awards total over $32 million and provide over 1,500 housing units. Two-thirds of those units are funded by a $24 million grant that, under the FY 24-25 NOFO, would renew in Q3 of 2026. These are tenant-based rental assistance units that

require tenants to pay rent on the first of the month. Tenants who cannot pay the full rent amount will likely be evicted.

80.    The Nashville CoC reports that grants expiring in Q3 and Q4 total approximately $5 million, which is nearly half of the CoC's total funding. Without those grants, housing for approximately 900 people will be in immediate jeopardy, with no backup funding secured. One of the grants expiring in the second half of the year is a Planning grant, which covers all the strategic planning, coordination, technical guidance, and application preparation for the CoC process. Another is the Homeless Management Information System (HMIS) grant, which covers 250 individual licenses for 47 agencies and the software for the entire community's database.

81.    The Tucson-Pima CoC reports that $12.5 million in grant funding will expire in the second half of the year, many of them on July 1. This is the vast majority of CoC funding awarded to Tucson-Pima. The timing of the expiration would be particularly harmful in southern Arizona. If funding for permanent housing runs out on July 1, people who have had stable housing for years will become homeless in Tucson at a time when outdoor temperatures will be over 100 degrees. That heat is particularly deadly for seniors, who are more heat-sensitive, and for people with mobility difficulties who cannot easily relocate to find shade or water.

82.    The Santa Clara County CoC reports that it has 18 grants expiring in Q3 and Q4, totaling approximately $15 million. Nine are for permanent supportive housing and nine are for rapid re-housing. All are renewals.

83.    The San Francisco CoC reports that it has 18 grants with performance periods that end between July 1 and December 31, 2026. These grants represent approximately $41.3 million in federal funding and comprise 74 percent of San Francisco's CoC federal grants for the year.

**Proceeding Under the FY25 NOFO Imposes Significant Harms**

84.     In previous declarations, I have discussed at length the myriad harms that will occur if CoCs are forced to proceed under the terms and conditions of the FY25 NOFO. *See, e.g.,* Oliva (NAEH) Decl. ¶¶ 7-9, 75-128 (Dkt. No. 7-1); Oliva (NAEH) 1st Supp. Decl. ¶¶ 18, 24, 26, 35 (Dkt. No. 49-1).

85.     Our members with City and county budgets are impacted under the FY 25 NOFO because local governments would need to allocate significant resources to mitigate the harms of a reduction in funding for permanent housing.

86.     The city of Cambridge, for example, reports that it is currently finalizing its budget for FY 2027, which begins on July 1, 2026. Cambridge will not be able to replace the federal funds for permanent housing that would be lost under the FY25 NOFO.

87.     King County reports that if the FY25 NOFO were issued in mid-2026, the County would be unable to account for the unprecedented changes in funding available for permanent housing. King County's 2026-2027 biennial budget was adopted on November 18, 2025.

88.     Implementing new NOFO policy (like capping PH renewals or a low Tier 1 threshold) on only the portion of a CoCs portfolio of grants expiring in the second half of the year arbitrarily forces community decisions based on grant expiration date rather than allowing the community to assess its whole portfolio based on local needs. An Alliance member CoC in Colorado recently noted that if funding is split, their CoC cannot effectively reallocate funds from a lower performing Q1 project to a high-performing Q4 project because the grants will be rendered siloed, preventing the CoC from using the NOFO as a tool for system-wide improvement.

89.     Some current CoC subrecipients who have developed and refined successful, evidence-based programs may be unable to certify their compliance with new award conditions

or may be otherwise ineligible or non-competitive. CoCs may lose the benefit of experienced partners, and its ability to provide stable services with continuity for its vulnerable community members may be compromised.

Executed this 23rd day of February, 2026

Ann Marie Oliva
Chief Executive Officer, NAEH