**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF WASHINGTON, *et al.*, | Case Nos. 25-cv-626-MSM-AEM |
| Plaintiffs, | 25-cv-636-MSM-AEM |
| v. | District Judge Mary S. McElroy |
| DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | Magistrate Judge Amy E. Moses |
| Defendants. | |
| AND | |
| NATIONAL ALLIANCE TO END HOMELESSNESS, *et al*., | |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*., | |
| Defendants. | |

**DEFENDANTS' STATUS REPORT**

Defendants file this status report pursuant to the Court's order at its April 27, 2026 status conference. Defendants here provide the "granular" detail that the Court requested about the status of Continuum of Care (CoC) renewals for projects that expired in the first quarter of 2026 and are expiring in the second quarter of 2026. Defendants also provide details about the statutory process that HUD and grant recipients are required to follow before final grant agreements may be issued. And Defendants provide an update about their expected timeline for announcing third- and fourth-quarter CoC renewals. Finally, Defendants provide an update on the process that will result in the distribution of final grant agreements.

1

*Overview*. In accordance with this Court's December 23, 2025 preliminary-injunction order, at the beginning of this year, HUD began reviewing and processing all renewal applications up to the point of obligation. *See* Declaration of Caitlyn McKenney ¶ 4, Ex. A. To get to the point of obligation for each quarterly tranche of renewals, and as previously identified in its filed implementation plan, HUD must conduct threshold and risk reviews for each applicant. *Id.* ¶ 4; *see also State Litigation*, ECF No. 79-1; *NAEH Litigation*, ECF No. 62-1. These reviews involve assessing an applicant's threshold eligibility, financial history, capacity, compliance history, past audits, and other risk factors to ensure that they can faithfully steward the funds to further the purposes of the CoC program. Ex. A ¶ 4. Based on these risk reviews, HUD determines whether any special conditions placed on the award would sufficiently resolve any performance concerns. For example, if a recipient failed to submit its annual financial audit report, HUD may condition their award renewal on the submission of the missing audit report. *Id.* These risk reviews are required by longstanding federal statutes, regulations, the FY24-25 NOFO itself (including for non-competitive renewals). *Id.* ¶ n.3; *see also* 42 U.S.C. § 11386c(b)(2); 2 C.F.R. § 200.206 *et seq.*

After the risk review process is complete, HUD can continue the process of obligation of funds—which the Court stopped short of requiring in its preliminary-injunction order. *See* Order ¶ 6, *State of Washington, et al. v. HUD*, No. 25-cv-626 ("*State Litigation*"), ECF No. 68; Order ¶ 6, *NAEH Litigation*, ECF No. 52 (collectively "PI Order"). As Defendants previously explained, the public announcement of funds triggers the obligation process. *See* 42 U.S.C. § 11382(c)(2). HUD then issues individual award letters that notify awardees of any special conditions. *See* Pub. L. No. 119-4, div. A, tit. I, § 1101(a)(12), 139 Stat. 9, 10 (Mar. 15, 2025) (incorporating Pub. L. No. 118-42, div. F, tit. II, § 221, 138 Stat. 25, 380 (Mar. 9, 2024)); 42 U.S.C. § 11382(c)(2), (d).

After completing these steps, HUD commits funds in its budget system and formally obligates the funds by signing an obligation memorandum, pursuant to 42 U.S.C. § 11382(d) and internal controls designed to comply with the Antideficiency Act, 31 U.S.C. § 1341. The obligation process necessitates involvement from and coordination with the Office of Management and Budget and virtually every division of HUD leadership. Consequently, this process typically takes four to six weeks. *See* Ex. A ¶ 5. Once awardees receive an executed grant agreement, they may, as is typical for the CoC funding program, "use funds to reimburse themselves for eligible expenditures they made before the grant agreement's execution, if the expenditures occurred during the fiscal year 2025 period of performance." Ex. A ¶ 10.

Before March 31, 2026, HUD had completed its initial capacity review of all CoC award renewals, totaling 2,623 recipients.[1] *See id.* ¶ 6. HUD had further finalized the grant agreement and agreement addenda templates. *Id.* As Defendants explained in their prior notice to the Court, the 2026 Transportation, Housing and Urban Development, and Related Agencies Appropriations Act ("THUD Appropriations Act") disrupted HUD's grant-renewal process, requiring HUD to prioritize renewing awards according to their expiration dates. THUD Appropriations Act, Pub. L. 119-75, div. D, tit. II, § 244, 140 Stat. 173, 422 (Feb. 3, 2026); *see also* Defs.' Resp. to Pls.' Notice & Request for Status Conference at 4–5, *Nat'l All. to End Homelessness ("NAEH") v. HUD*, No. 25-cv-636 ("*NAEH Litigation*"), ECF No. 85.

*Quarter 1 awards*. Because the intervening THUD Appropriations Act forced HUD to prioritize Q1 renewals first, following the initial capacity review, HUD began the process for

---

[1] "Capacity review" is synonymous with the "threshold" and "risk reviews" HUD previously represented it would conduct—referenced in HUD's FY24-25 CoC NOFO Implementation Plan, filed with the Court on January 12, 2026. *See* Ex. A ¶ 4 n.1; *State Litigation*, ECF No. 79-1 at 1; *NAEH Litigation*, ECF No. 62-1 at 1.

finalizing the 608[2] Q1 renewals. Program staff conducted quality control and verified the accuracy of the Q1 award recipients and amounts. Program staff then submitted the list of Q1 renewals to HUD leadership for approval. Upon leadership approval, HUD issued advance notice of Q1 awards to the Congressional Appropriations Committees. Then on March 31, 2026, HUD publicly announced the Q1 awards, which totaled $349,205,436. HUD began issuing Q1 award letters on April 16, 2026, and finished on April 21, 2026.[3] *Id.*

The next step is finalization and issuance of the grant agreements, all of which are bespoke to individual grantees. *See id.* ¶ 7. Today, HUD finished training field office staff on the CoC grant agreement execution process. *See id.* ¶¶ 7, 10. The training walks field staff through the updated process for FY25 CoC grants, including the implementation of a new grant agreement template, a revised signature order, and a new status-tracking tool that will enable HUD to monitor the status of grants. *See id.* ¶ 7. HUD expects to begin finalizing those packages during this week (the week of May 4). *See id.* ¶ 10. Finalization—a heavily manual process—requires staff to confirm recipient and grant information, incorporate that information into relevant grant documents via mail merge and manual entry, and then send each package to each field office director for signature. *See id.* ¶ 7. The issuance of grant agreements depends on when awardees submit documentation to HUD to satisfy any special conditions on the grants; only when that process is

---

[2] This number reflects the number of fiscal year 2024 grants expiring in the first quarter of this year. Some recipients requested to extend their fiscal year 2024 period of performance and push back their award expiration date into another quarter. HUD generally approves these requests because it allows recipients additional time to spend remaining award amounts before their lapse.

[3] Award letters notify recipients of the details in their awards. Ex. A ¶ 6. They also provide next steps necessary to receive final agreements, including receiving technical training from HUD staff, so that recipients may responsibly uphold terms and conditions of the grant and properly implement program requirements. *See id.* HUD program staff submitted award data to a contractor to assist with finalizing award letters; the contractor sent letters, one by one, via email, resulting in the letters being distributed over a period of several days. *See id.* ¶ 6 n.5.

complete can HUD issue agreements. *See id.* Then grant recipients must sign and return each agreement; upon return of each agreement, if there are no material changes to the terms of the agreement that are beyond the scope of any applicable court order, HUD will execute the agreement, and funds will be available to recipients. *See id.* ¶ 10. Finalization of grant agreements depends on (1) manual processing and (2) grant recipients' cooperation with program requirements; to a large extent, then, the exact date by which grant agreements will be issued for each funding recipient depends on that recipient's own actions.

*Quarter 2 awards*. The staggered schedule set by the THUD Appropriations Act required HUD to triage its resources to advance Q1 renewals before processing Q2 renewals. *See id.* ¶ 6. Consequently, HUD was able to complete its initial risk review of all FY25 renewals before March 31, 2026. But, as discussed above, because it finalized renewals for Q1 awards before it finalized reviews for other quarters, it did not finalize Q2 reviews until mid-April. On April 22, 2026, HUD submitted the three-day advance notification of Q2 awards to Congress. *See id.* ¶ 11. The following Monday, on April 27, 2026, HUD publicly announced 1,826 Q2 awards, which totaled $1,094,870,517. *Id.* HUD began the Q2 fund reservation on that day, and the obligation memo is expected to be complete for Q2 awards on or before May 15, 2026. To expedite the award process, HUD will issue Q2 award letters prior to the obligation memorandum, beginning on May 4, 2026; this process may take several days to complete because of the large number of awards. *See id.* As above, HUD cannot provide a specific deadline as to when all Q2 agreements will be issued, because the issuance of agreements depends on actions that grant recipients must take to meet the requirements for obligation and any special conditions for award that may exist. *See id.*

*Quarters 3 and 4 renewals*. HUD has confirmed that it is now better suited to expeditiously completing the review and award process for Q3 and Q4 awards. *See id.* ¶ 12. As of this filing,

HUD is obtaining final leadership approval for Q3 and Q4 renewals. *See id.* As of now, HUD expects to provide congressional notification of Q3 and Q4 awards by late May, with a public announcement and individualized award letters to follow. *See id.* HUD expects to issue remaining agreements—representing the final tranche of agreements for FY25 CoC funding—by early June, with the understanding that some grant agreements may take longer than others because such agreements may require additional documentation from the awardee before they can be finalized. *See id.*

Pursuant to the Court's standing order at the status conference of April 27, 2026, Defendants will file their next status report on May 11, 2026.

Date: May 4, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

JOHN BAILEY
Counsel to the Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ William S. Jankowski*
WILLIAM S. JANKOWSKI
D.C. Bar No. 90021524
PARDIS GHEIBI
PETER R. GOLDSTONE
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20530
Tel.: (202) 353-7578
Fax: (202) 616-8640
Email: william.s.jankowski@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on May 4, 2026, the above document was filed with the CM/ECF filing system.

_/s/ William S. Jankowski_