A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, <br><br> Defendants. <br><br> AND <br><br> NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*, <br><br> Defendants. | Case Nos. 25-cv-626-MSM-AEM <br> 25-cv-636-MSM-AEM <br><br> District Judge Mary S. McElroy <br> Magistrate Judge Amy E. Moses |

**DECLARATION OF CAITLYN McKENNEY**

I, Caitlyn McKenney, declare as follows:

1. I am employed by the U.S. Department of Housing and Urban Development ("HUD") as Deputy Assistant Secretary for the Office of Special Needs, part of HUD's Office of Community Planning and Development ("CPD"). I have served in this capacity since December 28, 2025.

2. Immediately before serving in this position, I was a Policy Advisor in CPD, a role I held starting April 21, 2025. I have been employed continuously at HUD since that date.

1

3.      My statements herein are based on my personal knowledge and my evaluation of information provided to me in my official capacity; on reasonable inquiry; information obtained from various records, systems, and databases; and program employees and information portals maintained and relied on by HUD in the regular course of business.

4.      In accordance with this Court's December 23, 2025, Preliminary Injunction Order, at the beginning of this year, HUD began reviewing and processing all renewal applications up to the point of initiating the obligation process.[1] The 2026 Transportation, Housing and Urban Development, and Related Agencies Appropriations Act ("THUD Appropriations Act") disrupted HUD's renewal approval process, requiring HUD to prioritize renewing awards according to their expiration dates. THUD Appropriations Act, Pub. L. 119-75, div. D, tit. II, § 244, 140 Stat. 173, 422 (Feb. 3, 2026). To get to the point of obligation for each fiscal year quarter of renewals, HUD must first conduct capacity reviews[2] for each applicant. Capacity reviews for renewals are required by CoC statute, OMB and CoC regulations, and the FY24-25 NOFO itself.[3] These reviews involve assessing an applicant's threshold eligibility, financial history, administrative capacity, compliance history, past audits, and other risk factors to ensure that they can faithfully steward the

---

[1] *FY24-25 CoC NOFO Implementation Plan*, *State of Washington/NAEH v. HUD*, Nos. 25-cv-626/25-cv-636 (D.R.I. Jan. 12, 2026), ECF 79-1 ("HUD publishes this revised and amended report of steps needed to process renewals according to the FY24-25 Notice of Funding Opportunity for the Continuum of Care Competition, which will culminate in the selection of awards, but excluding any actions that may initiate the obligation of funds.").

[2] The term "capacity review" as used here is synonymous with "threshold" and "risk reviews" referenced in HUD's *FY24-25 CoC NOFO Implementation Plan* that was filed with this Court on January 12, 2026.

[3] 42 U.S.C. § 11386c(b)(2); 2 C.F.R. § 200.206 *et seq.*; 24 C.F.R. § 578.33(d)(2); *FY24-25 CoC NOFO*, sec. V.C.1. at 108–109 ("HUD will review renewal projects to determine if project applicants and subrecipients meet the project quality threshold requirements detailed in section III.C.4.c of this NOFO.") and sec. III.C.4. at 59, 64–65 (describing the review criteria for renewals) (Aug. 29, 2025).

funds to further the purposes of the CoC program. Based on these capacity reviews, HUD determines whether any special conditions placed on the award would sufficiently resolve any performance concerns. For example, if a recipient failed to submit its annual financial audit report, HUD may condition their award renewal on the submission of the missing audit report.

5.      Next, in order to begin the process to obligate the funds, HUD must clear three nonconcurrent hurdles: (1) notify the House and Senate Appropriations Committees three business days in advance of a public announcement, (2) issue the public announcement itself, and (3) issue individual award letters that notify awardees of any special conditions. *See* Pub. L. No. 119-4, div. A, tit. I, § 1101(a)(12), 139 Stat. 9, 10 (Mar. 15, 2025) (incorporating Pub. L. No. 118-42, div. F, tit. II, § 221, 138 Stat. 25, 380 (Mar. 9, 2024)); 42 U.S.C. § 11382(c)(2), (d). After completing these steps, HUD takes multiple required financial actions to commit the funds in its budget system and formally obligates the funds by signing an obligation memorandum, pursuant to 42 U.S.C. § 11382(d) and internal controls designed to comply with the Antideficiency Act, 31 U.S.C. § 1341. The obligation process necessitates involvement from and coordination with the Office of Management and Budget and virtually every division of HUD leadership. Consequently, this process typically takes at least four to six weeks. From there, HUD may begin the grant agreement execution phase, which is explained further in Paragraph 7 below.

6.      Before March 31, 2026, HUD's Field Office staff had completed its capacity review of all CoC award renewals, totaling 2,623 recipients. But the intervening THUD Appropriations Act forced HUD to prioritize Q1 renewals first, and HUD needed to invest additional time to expedite the obligation and execution process for Q1 renewals, as opposed to processing all renewals simultaneously. In preparation for executing Q1 renewals, HUD finalized the templates for the grant agreement and addenda prior to March 31. Thereafter, HUD

began the process for finalizing the 608[4] Q1 renewals. Program staff conducted quality control and verified the accuracy of the Q1 award recipients and amounts. Program staff then submitted the list of Q1 renewals to HUD leadership for approval. Upon leadership approval, HUD issued advance notice of Q1 awards to the Congressional Appropriations Committees, which initiated the obligation process described in paragraph 5. Then on March 31, 2026, HUD publicly announced the Q1 awards, which totaled $349,205,436. HUD began issuing Q1 award letters on April 16, 2026, and finished on April 21, 2026.[5] Award letters play an important role in this process because they notify the recipients of any special conditions of their awards, such as accepting technical training from HUD staff in order to strengthen the recipient's administrative capacity to administer the award and comply with program requirements. The day after the issuance of the Q1 award letters, HUD directed that funds be reserved for the Q1 renewals in its accounting system. Once HUD's accounting system verified the fund reservation on April 24, 2026, HUD issued the obligation memorandum for the Q1 renewals that same day.

7.      The next step—which is already underway—is to finalize and execute the relevant grant agreements, all of which are bespoke to the individual grantees. As of the time of this filing, on May 4, 2026, HUD staff across 43 Field Offices have received training on grant agreement execution to ensure quality control and improve on customer service. Training is

---

[4] This number reflects the number of fiscal year 2024 grants expiring in the first quarter of this year. Some recipients requested to extend their fiscal year 2024 period of performance and push back their award expiration date into another quarter. HUD generally approves these requests because it allows recipients additional time to spend their remaining award amounts before the awards lapse.

[5] HUD award and regret letters underwent several layers of review. After congressional notifications went out, program staff submitted the data to a contractor to assist with finalizing each letter, and the contractor then submitted the letters one-by-one via email, which is why the letters were sent out over a period of several days.

critical because the grant agreement execution stage contains numerous steps. While HUD has already established the templates for the grant agreement and addenda, Field Office staff must amend the grant agreements, one by one, to include the awardee's identifying information, period of performance, award amount, breakout of award into amounts for specific activities, any special conditions, and other award-specific information. HUD then conducts a quality control check on each grant agreement to identify and correct any errors (e.g., ensuring the correct award amounts for each activity). After the grant agreement passes quality control, the assigned Field Office staff works with the awardee to gather documentation showing that the awardee has satisfied the special condition, if there is one.[6] If the awardee satisfies the special condition, the Field Office staff then sends the grant agreement to the awardee. Effectively, each Field Office sends the grant agreements to the awardees on a rolling basis (i.e., when a specific grant agreement is ready for the awardee's signature, the Field Offices sends the agreement to the awardee; they are not deliberately sent out in batches). HUD has directed its staff to treat these grant agreements as top priority, but HUD cannot provide a specific date as to when all grant agreements will be issued because the timing of some necessarily depends on when awardees submit documentation to satisfy their special conditions.

8.      To complicate matters, because of the THUD Appropriations Act's expedited timeline, HUD's vendors for the e-SNAPS system—the online portal typically used for CoC award processing—were unable to make critical updates to the system prior to the statutory

---

[6] *FY24-25 CoC NOFO*, at sec. VI.A.1. at 113-114 ("If HUD and the conditionally selected applicant do not finalize the terms and conditions of the award in a timely manner, or the conditionally selected applicant fails to provide the requested information within 90 days, an award will not be made to that applicant. . . . HUD may also impose specific conditions on an award as provided under 2 CFR 200.208."); 2 C.F.R. § 200.208 (authorizing agencies to impose "specific conditions" and requiring advance notification to award recipients of the specific conditions).

deadlines. The e-SNAPS system automates each step of the grant agreement process. However, the current system reflects outdated grant agreement processes. Specifically, the system executes a grant agreement upon the first signee's signature, as opposed to the second signee's signature. Additionally, the system does not contain the fiscal year 2025 grant agreement template. The e-SNAPS update would have corrected the execution date to the second signee's signature and uploaded the current grant agreement template. Because HUD's contractors were unable to make this update prior to the statutory deadlines, HUD had no choice but to manually processing grant agreements (e.g.., typing awardee information by hand, one-by-one, and gathering supplemental awardee documentation over email), for which Field Office staff are receiving training. This technical issue has contributed to the extended award processing timelines.

9.    Field Office staff are also being trained on HUD's new system of tracking the status of grant agreements. HUD had wanted to improve its internal controls and customer service for grant recipients by being more proactive in assisting awardees to satisfy their special conditions. HUD had successfully implemented this tracking system in other non-CoC-related grant programs and is now incorporating this system into the CoC program. While the tracking system adds another layer to the training for Field Office staff, it will ultimately improve HUD's ability to provide technical assistance to recipients to help them resolve any outstanding issues.

10.    After Field Office staff finish their training on May 4, 2026, they will begin the execution process for the 608 Q1 grant agreements. Once HUD issues the grant agreement, addenda, and accompanying letters to the awardee, and the awardee signs and returns the agreement, and if there are no material changes to the terms of the agreement that are outside the scope of any applicable court order, HUD will execute the agreement upon its signature. At the point of execution, funds will be available to CoC grant recipients to draw down. Awardees may

use these funds to reimburse themselves for eligible expenditures they made before the grant agreement's execution, if the expenditures occurred during the fiscal year 2025 period of performance.[7]

11.     Regarding Q2 renewals, on April 22, 2026, HUD submitted the three-day advance notification of Q2 awards to Congress. The following Monday, on April 27, 2026, HUD publicly announced 1,826 Q2 awards, which totaled $1,094,870,517. HUD began the Q2 fund reservation on that day, and HUD expects to obtain final approval from the Office of Management and Budget and HUD's leadership to issue the obligation memorandum for Q2 awards by May 15, 2026. To expedite the award process, HUD will issue Q2 award letters prior to the obligation memorandum, beginning on May 4, 2026, and this process may take several days to complete because of the large number of awards. HUD will then work expeditiously to issue grant agreements as they are finalized, in line with the process for Q1 agreements laid out above.[8] HUD is treating these renewals as top priority, but because some of these renewals depend on awardees' submission of additional documentation, HUD cannot provide a specific deadline as to when all Q2 grant agreements will be issued. HUD reiterates, though, that its new tracker system will enable HUD to be more attentive and supportive of awardees who need to submit

---

[7] *See, e.g.*, Fiscal Year 2024 CoC Grant Agreement, at 4 ("The budget period and performance period of renewal projects funded by this Agreement will begin immediately at the end of the budget period and performance period of the grant being renewed. Eligible costs incurred between the end of Recipient's budget period and performance period under the grant being renewed and the date this Agreement is executed by both parties may be reimbursed with Grants Funds from this Agreement."). HUD plans to include this reimbursement authorization in the fiscal year 2025 grant agreement.

[8] As program staff finish Q1 grant agreements, they will turn to Q2 grant agreements on a rolling basis.

additional documentation, and awardees may be reimbursed for eligible expenses that occurred during the period of performance prior to the grant agreement's execution date.

12.    Now that Field Office staff are about to be fully trained on this grant agreement execution process, and are becoming more proficient in working outside of the e-SNAPS environment and using the new tracker system, HUD is on better footing to consolidate Q3 and Q4 award notifications and executions. HUD is currently obtaining leadership approval for Q3 and Q4 renewals and expects to provide Congressional notification of Q3 and Q4 awards by late May, with a public announcement and award letters to follow. HUD expects to issue the remaining grant agreements by early June, with the understanding that some grant agreements may take longer than others because of additional documentation needed from the awardee.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed May 4, 2026, in Alexandria, Virginia.

CAITLYN MCKENNEY
Digitally signed by CAITLYN MCKENNEY
Date: 2026.05.04 18:16:49 -04'00'

_____

Caitlyn McKenney

8