**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| NATIONAL ALLIANCE TO END HOMELESSNESS,<br><br>NATIONAL LOW INCOME HOUSING COALITION,<br><br>CROSSROADS RHODE ISLAND,<br><br>YOUTH PRIDE, INC.,<br><br>CITY OF BOSTON,<br><br>CITY OF CAMBRIDGE,<br><br>MARTIN LUTHER KING, JR. COUNTY,<br><br>METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY,<br><br>COUNTY OF SANTA CLARA, and<br><br>CITY OF TUCSON,<br><br>       *Plaintiffs*,<br>*v.*<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>SCOTT TURNER, in his official capacity as Secretary of the United States Department of Housing and Urban Development,<br><br>OFFICE OF MANAGEMENT AND BUDGET, and<br><br>RUSSELL VOUGHT, in his official capacity as Director of United States Office of Management and Budget,<br><br>       *Defendants*. | Case No. 25-cv-636-MSM-AEM<br><br>**[PROPOSED] FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      On June 1, the Department of Housing and Urban Development (HUD) issued a notice of funding opportunity (NOFO) for FY 2026 Continuum of Care (CoC) funding that, once again, would radically upend the program in ways contrary to Congress's design. If implemented, this NOFO again threatens to force tens of thousands of people back into homelessness.

2.      Last year, this Court preliminarily stayed, and enjoined HUD from implementing, a new NOFO for FY 2025 CoC funding that contained a host of unlawful provisions.

3.      HUD's FY 2026 NOFO is more of the same. The latest NOFO again seeks to defund strategies Congress identified as effective and to unjustifiably withhold funding from existing projects—while also arbitrarily and capriciously pushing approaches that are ineffective and even harmful.

4.      Without authorization, the FY 2026 NOFO sets aside a whopping $1.3 billion— nearly one-third of available funds—for new projects only, despite Congress's command that appropriated funds be available to renew existing projects, and despite the fact that this set-aside guarantees that significant numbers of existing projects will be ineligible for renewal, no matter how effective.

5.      Further, the NOFO heavily prioritizes new transitional housing and supportive-services-only projects for that $1.3 billion set-aside: New permanent housing projects can receive a share only in the unlikely event that money remains after HUD makes awards to *all* transitional housing and supportive-services-only projects that applied. This approach flies in the face of Congress's express requirement that incentives like that be available only to two specified permanent housing activities that Congress deemed to have proven effective, unless

2

HUD undertakes notice and comment and determines, based on research, that other strategies have also proven effective—which HUD has not done.

6.      The NOFO also adopts a host of selection criteria that will effectively force communities to abandon evidence-based strategies in favor of unproven, ineffective, and even harmful ones. And it forces grantees to agree to comply with requirements that have little or nothing to do with the CoC program—including by committing to adhere to executive orders that, among other things, seek to eradicate lawful diversity, equity, and inclusion initiatives; reject transgender and nonbinary individuals' right to safely exist; and coerce jurisdictions to help with federal immigration enforcement.

7.      This new NOFO will cause devastating and irreparable harms to Plaintiffs and the Plaintiff associations' members, to communities' efforts to address homelessness, and to the people who rely on CoC-funded programs for housing and other support.

8.      HUD's FY 2026 NOFO violates the Administrative Procedure Act and the Constitution and must be set aside.

9.      At the same time, HUD still has not finalized the FY 2025 awards that are long overdue—leaving projects without funding and further disrupting the nation's flagship homelessness response program.

10.     Pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs hereby file this supplemental complaint, which supplements the First Amended Complaint (Dkt. No. 66).

**JURISDICTION AND VENUE**

11.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

3

12. This Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent statutory and injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the APA, 5 U.S.C. §§ 705–706; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

13. Venue properly lies within the District of Rhode Island pursuant to 28 U.S.C. § 1391(e)(1) because this is an action against officers or employees of the United States in their official capacity and agencies of the United States, and Plaintiffs Crossroads Rhode Island and Youth Pride, Inc. reside in this judicial district.

**PARTIES**

14. The supplemental pleading includes the same plaintiffs, other than the City and County of San Francisco, and the same defendants, as well as the two additional defendants listed below.

15. Defendant the Office of Management and Budget (OMB) is an administrative agency within the Office of the President of the United States. OMB is responsible for apportioning congressionally appropriated funding to HUD to be disbursed to grant recipients. *See* 31 U.S.C. § 1513(b); *Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025).

16. Defendant Russell Vought is the Director of OMB. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

## HUD'S UNLAWFUL FY 2026 NOFO WILL CAUSE DEVASTATING HARM

### I.    Congress Appropriates Funding for FY 2026 Continuum of Care Grants

17.    Each year, Congress appropriates significant funding for the Continuum of Care (CoC) program, to provide housing and other support to individuals and families facing homelessness.

18.    For FY 2026, Congress appropriated over $4 billion for the program. Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026 Appropriations Act).

19.    The 2026 Appropriations Act directs HUD to issue a notice of funding opportunity (NOFO) for those funds by June 1, 2026 and to make awards by December 1, 2026. *Id.* at 400.

20.    The 2026 Appropriations Act establishes some new requirements for CoC awards.

21.    For instance, it requires HUD to make a significant portion of FY 2026 awards based on the projects that the local Continuums of Care selected in their local competitions, without those projects needing to compete against projects in other geographic areas. In particular, HUD must "select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant"—that is, at least 60 percent the amount needed to provide one-year renewals of each CoC's expiring grants—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" *Id.* at 399.

22.    The 2026 Appropriations Act also authorizes funding recipients, when implementing the program, to "establish preferences for elderly individuals or families" (as long as it is not a program provided to serve homeless youth) and for "disabled individuals or families as defined by [42 U.S.C. § 11360(10)]"—a definition that covers people with a wide range of

5

disabilities, including physical, mental, emotional, and developmental impairments, impairments arising from substance use, and HIV/AIDS. *Id.* at 401; *see also* 42 U.S.C. § 11360(10). Neither the 2026 Appropriations Act nor any other statute authorizes HUD or funding recipients to establish priorities for people with physical or developmental disabilities over people with mental health, substance use, and other disabilities.

## II.    OMB Restricts HUD's Ability to Award Funds as Congress Intended

23.    By law, OMB must apportion appropriated funds before the agency can obligate them. *See* 31 U.S.C. §§ 1512, 1513(b), 1517(a); *Notice; Delegation of Apportionment Authority*, 90 Fed. Reg. 9737 (Feb. 18, 2025) (noting that the President has delegated responsibility for apportioning funds to the Director of OMB). Apportionment is an administrative process meant to ensure that agencies do not spend funds in excess of what Congress appropriated. *See* 31 U.S.C. § 1512(a).

24.    OMB cannot thwart Congress's will by withholding funds and must make an apportionment within 30 days after an appropriation is enacted (or earlier in some circumstances). *Id.* § 1513(b)(2).

25.    Yet the Director of OMB has taken the position that OMB can and should be "aggressive in wielding" apportionments "on behalf of the President's agenda." Russ Vought, *Executive Office of the President of the United States*, *in* Mandate for Leadership: The Conservative Promise at 45 (2023) (Project 2025), https://perma.cc/7GM8-AGXE.

26.    OMB has done just that with its apportionment of FY 2026 funds for the CoC Program.

27.    On May 22, 2026, just before HUD's deadline to issue the FY 2026 CoC NOFO, OMB apportioned approximately $4 billion that Congress appropriated for the CoC Program in FY 2026. OMB's apportionment, however, contains two footnotes (Apportionment Footnotes)

6

that restrict HUD from obligating the funds unless HUD complies with certain conditions. *Homeless Assistance Grants*, OpenOMB, https://perma.cc/JWZ6-WBGN (last accessed June 17, 2026).

28. OMB designated these footnotes as legally binding, meaning that HUD would violate the Antideficiency Act—and the relevant officials could be subject to administrative and criminal penalties—if they do not follow the footnotes. *See id.*; OMB Circular No. A-11 § 120.34 (2026), https://perma.cc/897F-UUQK; 31 U.S.C. §§ 1517–1519.

29. The first footnote (Grantmaking E.O. Footnote) provides that, "[a]s permissible by law, amounts apportioned for competitive grants only shall be obligated with award agreements that include terms and conditions consistent with the directives provided in: Executive Order 14332, 'Improving Oversight of Federal Grantmaking.'"

30. The Grantmaking E.O. broadly aims to use federal grantmaking to advance political goals not approved by Congress. *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025). That executive order requires agencies across the federal government to revamp their grantmaking processes to ensure increased involvement by political appointees. *See id.* §§ 2(h), 3–4, 90 Fed. Reg. at 38930–32.

31. The Grantmaking E.O. directs responsible appointees to ensure that competitive awards do not "promote, encourage, subsidize, or facilitate" disfavored activities. *Id.* § 4(b)(ii), 90 Fed. Reg. at 38931. For instance, the E.O. states that funds should not promote "denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic." *Id.* § 4(b)(ii)(B), 90 Fed. Reg. at 38931. It also states that funds should not promote "racial discrimination by the grant recipient"—which the Administration has interpreted to include all manner of diversity, equity, and inclusion activities that have long been considered

7

lawful. *Id.* § 4(b)(ii)(A), 90 Fed. Reg. at 38931 The Order also states that funds should not promote "illegal immigration," which the Administration has signaled means funds should not be used to provide assistance to undocumented individuals at all. *Id.* § 4(b)(ii)(C), 90 Fed. Reg. at 38931.

32.    The second footnote (Homelessness E.O. Footnote) provides that, "[a]s permissible by law, amounts apportioned, but not yet obligated as of the date of this apportionment, shall be obligated consistent with the directives provided in: Executive Order 14321, 'Ending Crime and Disorder on America's Streets.'"

33.    The Homelessness E.O. calls for HUD (1) to "end[] support for 'housing first' policies" and to require grantees to "increase requirements" for participants to "use substance abuse treatment or mental health services as a condition of participation"; (2) to freeze funding for organizations that operate safe drug use sites; (3) to prioritize funding for grantees in states and municipalities that enforce laws criminalizing homelessness (including prohibitions on "urban camping and loitering," "urban squatting," and "open illicit drug use"), that have maximalist involuntary commitment standards, and that substantially implement the Sex Offender Registry and Notification Act. *Ending Crime and Disorder on America's Streets*, Exec. Order No. 14321 §§ 3, 5(a)–(c), 90 Fed. Reg. 35817, 35817–19 (Jul. 24, 2025).

34.    No statute grants OMB authority to impose these restrictions in apportioning funds to HUD for the CoC Program.

**III.    HUD Issues a FY 2026 NOFO with a Host of Unlawful Provisions**

35.    On June 1, 2026, HUD issued the NOFO for FY 2026 CoC funding. *FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO*, CPD-2600-DC-0025 (HUD June 1, 2026), https://perma.cc/RUD8-XHJB (FY 2026 NOFO).

36.    HUD did not concurrently inform each CoC of its "pro rata estimated grant amount" as required by 42 U.S.C. § 11386a(b)(2)(A). This information governs each CoC's maximum award amount and therefore the total amount of funding for which they can apply. CoCs thus need this information to be able to complete their applications. To date, HUD still has not provided this statutorily mandated information.

37.    Through a complex web of unlawful and unreasoned provisions (FY 2026 Challenged Provisions), the NOFO again seeks to radically remake the CoC program by withdrawing funding from permanent housing and proven approaches and channeling it to projects that fit the Administration's own ideological vision. The NOFO's changes are unsupported by the evidence or any reasoned decisionmaking, inconsistent with Congress's commands, or both.

### A. Overview of the application and selection process

38.    CoCs exist to provide a coordinated, community-wide response to homelessness. Consistent with that community-wide approach, by statute, CoCs apply for funding on behalf of the CoC's entire geographic area. *See* 42 U.S.C. § 11386a(a). To prepare that application, the CoC conducts a local competition to select which projects to include in its application and how to rank them. *See* 42 U.S.C. § 11382; 24 C.F.R. § 578.9. Then, on behalf of the CoC and all project applicants in that area, the CoC submits an application that lists the projects for which it seeks funding, in priority order. 42 U.S.C. § 11360a; 24 C.F.R. § 578.15.

39.    The NOFO sets out HUD's selection process, which includes several components. Those components evaluate both the individual projects included in each CoC's application and the CoC's application overall.

40. First, HUD conducts a "threshold review" to determine if each individual project is eligible for funding on a pass/fail basis. If a project fails to meet any threshold requirement, it is disqualified from eligibility and any further consideration for funding. FY 2026 NOFO at 58.

41. Second, HUD conducts a "merit review." FY 2026 NOFO at 69. This step evaluates the CoC overall, not individual projects—but the score each CoC receives then factors into a separate score that HUD assigns to individual projects. At this step, HUD scores each CoC by assigning points for various "merit criteria" that generally look to the CoC's approach to homelessness and the overall composition of the projects within its application. As a result, projects on a CoC's application are interdependent, and if a CoC includes disfavored projects on its application, that can drag down the entire CoC's score and thus reduce the entire community's chances of receiving funding.

42. Third, HUD conducts a "risk review." At this step, HUD looks at criteria that purportedly bear on each project "applicant's likelihood of successfully carrying out the project"—but that, as explained further below, in reality attempt to leave HUD with free reign to reject projects on virtually any grounds. *See* HUD FY 2026 NOFO at 86. Under the NOFO, HUD purports to retain discretion to reject awards that do not pass "risk review."

43. Finally, the NOFO states that—after all the other steps—HUD may also consider additional factors like "the overall projected impact on the … priorities in this NOFO." *Id.* at 87. The NOFO states that, "[t]o the extent allowed by law, HUD may exercise its discretion" to make or reject awards based on these additional factors.

44. The NOFO establishes a two-tier system for project applications. Under that system, each CoC's application provides a priority listing of projects, which are grouped in a "Tier 1" and "Tier 2," with Tier 1 being the higher priority.

45. Tier 1 projects are not subject to "merit review." Rather, projects in Tier 1 will be funded so long as they pass threshold review, and so long as HUD does not disqualify them based on the risk review or the other additional factors. In the 2026 Appropriations Act, Congress required that, for FY 2026 funding, Tier 1 be at least 60 percent of each CoC's annual renewal demand, *i.e.*, at least 60 percent of the amount needed to renew for one year all expiring grants. *See* Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399; 42 U.S.C. § 11386a(b)(2)(B); 24 C.F.R. § 578.17(b)(2). The NOFO sets the Tier 1 amount at this bare minimum. FY 2026 NOFO at 90.

46. Tier 2 projects are subject to "merit review" in addition to the other review steps. Tier 2 projects receive individual project scores that take into account three factors: the score the CoC received at the "merit review" stage (worth 50 percent of the project's score), how highly the project was ranked in the CoC's application (worth 40 percent of the project's score), and whether the project mandates participation in supportive services (worth 10 percent of the project's score). *Id.* at 90. That score then factors into which projects receive funding.

47. More specifically, the NOFO establishes a waterfall that designates which types of projects will be funded first. Scores do not factor into the first two levels of the waterfall, which cover certain grants for CoC administration and all Tier 1 projects. But at the following levels of the waterfall, projects are generally selected in order of score, unless they are disqualified based on HUD's review of "risk" or "additional factors." *See id.* at 89.

48. At every step of this selection process, HUD has rigged the system to categorically cut off renewal funding for a significant number of projects and to defund proven strategies.

11

**B. A massive set-aside for new transitional housing and supportive-services-only projects would destabilize the program and defund proven strategies**

49.     The FY 2026 NOFO sets aside $1.3 billion—nearly a third of the available funding—for new projects only, with a priority for transitional housing and supportive-services-only projects (New Project Set-Aside). FY 2026 NOFO at 35–36. This threatens to destabilize communities' homelessness response and defund proven strategies.

50.     By setting aside these funds for new projects only, the NOFO categorically makes existing projects ineligible for that funding. Given the size of the Set-Aside, the inevitable result is that many effective existing projects will not be renewed, forcing tens of thousands of people back into homelessness.

51.     Moreover, the $1.3 billion set-aside will likely go only to new transitional housing and supportive-services-only projects—at the expense of permanent housing projects. Under the selection process that the NOFO establishes, HUD will award amounts from the $1.3 billion set-aside to another type of project (such as permanent housing) if and only if *all* transitional housing and supportive-services-only project applications have already been selected for funding. FY 2026 NOFO at 89. In other words, transitional housing and supportive-services-only projects receive funding first, even if permanent housing or other projects score higher on merit-based criteria.

52.     This New Project Set-Aside creates a significant incentive for CoCs to apply for transitional housing and supportive-services-only projects, as CoCs are otherwise unlikely to receive any portion of the $1.3 billion set-aside. Congress, however, has only authorized HUD to provide incentives for activities that have proven effective at addressing homelessness. 42 U.S.C. § 11386b(d)(1). In the statute, Congress identified only two activities that have proven effective—two types of permanent housing strategies. *Id.* § 11386b(d)(2). Congress also

12

authorized HUD to identify additional activities that have proven effective, but only if it does so "based on research and after notice and comment to the public." *Id.* HUD has not done so for transitional housing or supportive-services-only approaches, and HUD therefore cannot properly provide incentives for these types of projects, as the New Project Set-Aside does.

53.    In addition to ignoring statutory requirements, HUD failed to offer a rational explanation for this Set-Aside. It claimed that the Set-Aside would "restore balance" to the CoC Program, "increase competition," and "broaden the applicant pool." FY 2026 NOFO at 35. But it did not consider or explain how replacing proven strategies with unproven ones, or favoring lower scoring projects in the competition, were desirable or permissible goals. Nor did it consider how this would override local decisionmaking and effectively force communities to seek funding for these types of projects, even though that might not fit their local needs. It likewise did not consider that it actually decreases competition to provide that all new transitional housing and supportive-services-only projects will necessarily win out over any new permanent housing project, or that it could broaden the applicant pool by making projects equally eligible for funding. While there is a place for temporary housing interventions like transitional housing, and while supportive-services-only grants are critical to the well-being of people recovering from homelessness, HUD did not reasonably explain its decision to advantage those approaches to the detriment of others—particularly given the McKinney-Vento Act's stated purpose of "ensuring that individuals and families who become homeless return to permanent housing within 30 days." 42 U.S.C. § 11301 Note.

### C. Selection criteria effectively force communities to abandon proven strategies in favor of unproven or harmful approaches

54. The NOFO establishes criteria that will factor into how projects are selected for funding. Many of those criteria, individually and in combination, will effectively force communities to de-fund proven strategies in favor of unproven and ineffective ones.

55. In addition to specific threshold and merit scoring criteria, the NOFO provides the overall instruction that applications "must support the goals of this NOFO." *Id.* at 11. Given that instruction, as well as the additional factors looking to HUD's assessment of the project's "projected impact" and "[l]ikelihood" of "result[ing] in the benefits expected," *id.* at 11, 87, CoCs as a practical matter must put forth projects adopting the ineffective strategies that the NOFO favors to have any chance of receiving awards.

### 1. Criteria mandating service requirements

56. Various NOFO criteria (Service Requirements Criteria) pressure CoCs to abandon "Housing First"—the approach that prioritizes providing housing to people without any preconditions like sobriety, employment, or participating in treatment or other services.

57. The NOFO proclaims (incorrectly) that "'Housing First' has been a profound failure." FY 2026 NOFO at 28. The NOFO reasons that because certain homelessness metrics have increased while the CoC program has adopted a Housing First approach, that approach has been unsuccessful. *See id.* HUD fails to acknowledge that, as HUD quietly reported just weeks ago, homelessness has more recently gone down. The NOFO, moreover, makes no effort to explain how the prior increases in the metrics HUD points to are attributable to Housing First strategies as opposed to rising housing costs, a decrease in available affordable housing, lasting impacts from the COVID-19 pandemic, and other factors. Nor does the NOFO provide any evidence that abandoning Housing First in favor of mandatory services will lead to better

14

outcomes with respect to drug use, mental health treatment, or housing. And the NOFO fails to grapple with the evidence, including reports produced by HUD itself, that Housing First models are effective.

58.     Based on unsupported conclusions, the NOFO abandons Housing First and instead directs CoCs to "prioritize projects" that impose requirements to participate in treatment and services. FY 2026 NOFO at 31; *see also id.* at 32.

59.     The NOFO includes a host of criteria that pressure CoCs to put forth applications for projects that abandon Housing First and mandate services instead.

60.     For projects subject to merit review, the NOFO makes mandating services the single largest individual scoring factor affecting projects' likelihood of selection within each level of the waterfall. In particular, out of the 100 possible points available to a project, projects will receive up to 10 points if "they have or will incorporate supportive service participation requirements." FY 2026 NOFO at 90. By comparison, projects can receive a total of 50 points for their CoC's score on the dozens of other merit criteria combined. *See id.*

61.     In addition, multiple merit criteria that govern the CoC's score will pressure CoCs to favor projects that eschew Housing First approaches. For instance, the NOFO assigns points for demonstrating that certain percentages of housing projects within the CoC mandate participation in supportive services, *id.* at 79; demonstrating certain numbers of CoC-funded units mandating substance abuse treatment as a condition of participation in the program, *id.* at 78; and for not restricting CoC-funded housing projects from requiring treatment or sobriety as a condition of assistance, *id.* at 85.

62.     Various factors at the threshold review stage also pressure CoCs to put forth projects that mandate services, to reduce the risk that projects will be disqualified at the outset. In

15

particular, the NOFO includes threshold criteria that look to the results that the project will achieve—criteria that necessarily involve subjective assessments and that HUD will evaluate through its pro-service-mandates lens. For example, to get 2 of the 6 required points to pass the threshold review applicable to new transitional housing projects, the applicant must explain how the project "will result in at least 20 hours per week of engagement in services, activities or employment for all participants." FY 2026 NOFO at 63–64. Threshold scoring for permanent housing projects similarly looks to whether the type of supportive services offered "will ensure" certain outcomes—like, for rapid rehousing, that the participant "is able to successfully obtain self-sufficiency and exit homelessness." *Id.* at 67–68. Given the NOFO's strong signals that HUD does not believe Housing First can achieve favorable outcomes, these criteria put pressure on CoCs to select projects that mandate services and that HUD will therefore consider to satisfy these threshold criteria.

63. In imposing these criteria that favor mandatory service requirements, HUD systematically disadvantages projects serving victims of sexual assault and domestic violence. Those providers will often also receive grants under the Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA), which prohibit providers from mandating services. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). And yet, the NOFO's scoring criteria reward the mandated service conditions prohibited by VAWA and FVPSA. Under the NOFO's Service Requirements Criteria, providers that fund their programs from these multiple sources face a steep competitive disadvantage, as they cannot receive a significant number of points. HUD did not consider or address this impact in imposing the Service Requirements Criteria.

## 2.   *Criteria seeking to eliminate harm reduction*

64.     The CoC threshold and scoring criteria also include several provisions (Anti-Harm Reduction Criteria) that seek to eliminate harm reduction programs generally, even independently funded ones.

65.     Harm reduction is an approach to reducing the negative consequences associated with drug use through a variety of public health interventions, such as needle exchanges and methadone treatment. Harm reduction has been shown to reduce the risk of overdose and to improve housing stability and health outcomes, particularly when compared to abstinence-contingent services. Nonetheless, the NOFO pressures CoCs and applicants to end such programs, even independently funded ones.

66.     For example, to get 10 points on merit review, a CoC must "[p]rohibit CoC-funded housing projects from operating drug injection sites or 'safe consumption sites,' knowingly distributing drug paraphernalia on or off property under their control, knowingly permitting the use or distribution of illicit drugs on property under their control, or conducting any of these activities under the pretext of 'harm reduction.'" FY 2026 NOFO at 85. In other words, to avoid losing out on 10 points, CoCs could not seek funding for any projects that operate harm reduction services, even with their own, non-CoC funding.

67.     At the threshold review stage, the NOFO also disqualifies applicants that do not certify that they will not "operate[] illegal drug injection sites or 'safe consumption sites' in violation of 21 U.S.C. 856(a)(1), knowingly permit the use or distribution of illicit drugs on property under their control in violation of 21 U.S.C. 856(a)(2), or knowingly distribute drug paraphernalia in violation of 21 U.S.C. 863" (Safe Drug Use Certification). FY 2026 NOFO at 60; *see also id.* at 108. This requirement applies not just to the grantees' use of grant funds, but also to any activity the grantee engages in, even with non-federal funds. While the condition

17

states only that grantees may not engage in activity that other laws already prohibit, Defendants have an expansive view of what those laws prohibit, and have included this condition to deter harm reduction activities.

68.    This condition also effectively mandates punitive treatment of individuals struggling with addiction. The NOFO clarifies that this condition "is not a requirement that program participants ... be evicted or exited from assistance for a first-time violation of a drug-related program policy or lease requirement"—a clarification that strongly implies that HUD means to impose limitations on continuing to serve participants with more than one violation. It does not violate the law, however, to continue assisting a person even if they violate drug-related requirements more than once.

### 3. *Criteria promoting unproductively punitive law enforcement responses to homelessness*

69.    Various NOFO criteria (Law Enforcement Criteria) pressure CoCs—and states and localities—to adopt and express support for unproductively punitive law enforcement responses, including criminalizing homelessness.

70.    The NOFO imposes a host of threshold and merit criteria that pressure applicants to make unnecessarily aggressive law enforcement responses a central part of their approach, without regard to local conditions that might warrant a different approach.

71.    For example, to get 1 of the 6 required points to pass threshold review, new supportive-services-only street outreach projects must show they have "a history of, or a plan for, partnering with first responders and law enforcement to engage" unhoused people in accessing certain types of assistance. *Id.* at 65. In addition, even though in some communities a law enforcement-based approach can erode trust and make providers less effective, to get this point,

these projects must assist law enforcement to enforce local laws on public camping and public drug use rather than focus on providing services. *Id.*

72.    At the merit review stage, street outreach projects also must cooperate with first responders and law enforcement to receive certain points. *Id.* at 80.

73.    In addition, to receive 14 points, another criterion (Local Policies Criterion) requires CoCs to "provide evidence" that the CoC "cooperates with … local efforts to advance" the following objectives: "[q]uickly clear[ing] tents and encampments,"  "[d]ecreas[ing] the public use of illicit drugs,"  pursuing "involuntary commitment," and "shar[ing] information … in accordance with the Sex Offender Registry and Notification Act (SORNA)." *Id.* at 80–81. Worse, to receive the points, CoCs also cannot take actions that (in HUD's judgment) "interfere with" local efforts to advance those objectives—a restriction that unconstitutionally disadvantages CoCs that advocate against or otherwise express opposition to the policies that the NOFO favors. To receive these points, CoCs must also identify local laws and policies that advance or hinder those goals and explain how the CoC will either leverage or overcome those policies, again compelling CoCs to adopt federal preferences rather than applying the approaches specifically adopted to meet community needs. *Id.*

74.    The NOFO concludes that "[u]nchecked public camping and public illicit drug use inhibit nonprofit providers and local government from effectively addressing homelessness," without providing any support for the assertion. The NOFO offers no legitimate evidence that the federal government's preferred punitive approaches are effective in reducing homelessness, does not address the impacts of exposing more people to the criminal legal system, and fails to take into account Congress's efforts to develop constructive alternatives to criminalizing homelessness.

19

### D. Other provisions disqualify or disadvantage applicants on improper grounds

75. The NOFO also includes other provisions that improperly disqualify applicants that Congress mandated be eligible for funding or that unfairly disadvantage applicants on unjustifiable grounds.

#### 1. Criteria adopting a conception of "self-sufficiency" at odds with the statute

76. The NOFO also adopts multiple criteria (Self-Sufficiency Criteria) that threaten to disqualify applicants that do not, in HUD's judgment, adequately promote "self-sufficiency"—which the NOFO (improperly) defines as "the ability to meet basic needs, including a place to live, *without public or private assistance*." FY 2026 NOFO at 6 (emphasis added).

77. In particular, for renewal projects to pass threshold review, the NOFO states that HUD will assess the "applicant's performance in assisting program participants to achieve and maintain self-sufficiency." *Id.* at 61. Projects that fail HUD's assessment will be disqualified from consideration. Similarly, at the "Risk Review" stage, HUD identifies a project's "[a]bility to promote self-sufficiency and economic independence" as a "sufficient and independent basis" to reject an application. *Id.* at 87.

78. The NOFO's conception of "self-sufficiency" has no grounding in the statute. Far from aiming to end homeless individuals' reliance on any assistance, Congress specifically directed CoCs to *promote* access to, and use of, other mainstream programs that could assist those populations, such as Medicaid or the Supplemental Nutrition Assistance Program. *See* 42 U.S.C. §§ 11313(a)(7), 11381(3), 11386a(b)(1)(D), 11386b(d)(2)(B). And, consistent with the statute, HUD has long considered increasing participants' benefits-based income to be a sign of strong performance. *See id.* § 11386a(b)(1)(A)(v).

79.     The NOFO's unsupported conception of "self-sufficiency," moreover, fails to account for the realities of serving certain communities. For example, many program participants have disabilities, trauma histories, or safety needs that require ongoing support and create barriers to achieving the type of "self-sufficiency" the NOFO envisions. HUD did not consider or explain how assessing projects based on this measure of "self-sufficiency" would undermine providers' ability to serve certain communities effectively.

### 2.   Amorphous "risk review" criteria and additional factors

80.     In the NOFO, HUD also purports to retain discretion to reject awards that do not satisfy amorphous and highly subjective criteria at the "risk review" and additional factor review stages.

81.     The NOFO's "risk review" stage includes undefined criteria such as the applicant's "[a]bility to promote self-sufficiency and economic independence," as well as criteria that look to the applicant's "[h]istory of illegal discrimination" and "[h]istory of … facilitating illicit drug use or other illicit activities that conflict with the purposes of this NOFO"—with HUD, not a court, apparently being the sole arbiter of what is "illegal" and with no explanation of what HUD deems "illegal." *See id.* at 87. The NOFO also states that HUD will rely on potentially unverified information, such as "news reports," to assess applicant's past performance. *Id.* The "risk review" in the NOFO gives HUD substantially more unfettered discretion than ever before to reject an application on these grounds alone.

82.     The NOFO also reserves to HUD the option to consider—and reject projects based on—amorphous additional factors after completing all other review steps. FY 2026 NOFO at 87. These other factors include things like "the overall projected impact on the … priorities in this NOFO," the "[l]ikelihood that the proposed project will result in the benefits expected," and a "[b]road range of recipients beyond recurrent recipients." *Id.* Although the NOFO says that

21

HUD will consider these additional factors "to the extent allowed by law," it does not explain when HUD is allowed to consider these factors.

83.     The unclear and undefined "risk review" criteria and additional factors are largely subjective and leave project applicants with two options—attempt to meet the amorphous criteria and otherwise conform to HUD's wishes or risk having their application tossed out. These factors, moreover, improperly leave room for HUD to reject applicants based on political or ideological favoritism or other arbitrary reasons. These factors contribute to the coercion campaign that pressures CoCs into conforming to HUD's wishes to increase their chances of surviving this step of the review.

### 3. Non-Statutory Threshold Criteria that improperly disqualify Tier 1 projects

84.     The NOFO also includes policy-based threshold review criteria (Non-Statutory Threshold Criteria) that improperly disqualify Tier 1 projects that meet statutory and regulatory requirements.

85.     In the 2026 Appropriations Act, Congress required that HUD award a certain amount of funding—for each CoC, 60 percent of the amount needed to renew all expiring projects—"based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 *et seq.*" Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399. In other words, for this portion of funding, CoCs get to decide which projects receive awards, so long as they are "consistent with" statutory requirements. This corresponds to the projects that CoCs list on "Tier 1" of their applications.

86.     Despite the 2026 Appropriations Act's mandate, the NOFO requires all new projects, including those listed in Tier 1, to pass a threshold review that is not limited to

22

requirements imposed by statute and regulation, but rather also includes multiple policy-based criteria imposed by the NOFO alone.

87.     In particular, for each type of project (*e.g.*, transitional housing, permanent supportive housing, etc.), the applicant must receive a certain number of points. For example, for a new transitional housing project to pass threshold review, it must receive 6 out of 8 available points. To obtain sufficient points, projects must meet criteria that are found nowhere in the statute or regulations. For example:

a.  Transitional housing projects must have a record of having at least 50 percent of participants exit with employment income within 24 months or have a plan to achieve that benchmark (1 point) and must provide services in a way "that will result in" *all* program participants participating in services at least 20 hours per week (2 points). FY 2026 NOFO at 63–64.

a.  Street outreach projects must "partner[] with first responders and law enforcement" and "cooperate … with the enforcement" of public camping and public drug use laws (1 point). *Id.* at 65.

b.  Rapid rehousing projects must show that rental assistance will help participants achieve "self-sufficiency" (meaning no reliance on any public or private assistance, even from mainstream programs) within 24 months (1 point), that supportive services "will ensure that the participant is able to successfully obtain self-sufficiency" so defined (2 points), and that the applicant has a record of having at least 50 percent of participants exit with employment income within 24 months or have a plan to achieve that benchmark (1 point). *Id.* at 6, 67–68.

23

88.    These criteria threaten to disqualify projects that are eligible under the statute and regulations and that Congress mandated that HUD fund if CoCs included them in their Tier 1.

### 4. *Preference for people with certain disabilities, but not other disabilities*

89.    The NOFO also announces a preference for people with certain disabilities, to the exclusion of people with other types of disabilities (Discriminatory Disability Priority).

90.    In particular, the NOFO proclaims that "able-bodied people" should "move to self-sufficiency" while individuals "over 62 years old, physically disabled, [or] developmentally disabled" are "likely to never be able to return to the workforce." FY 2026 NOFO at 30. Based on that discriminatory premise, the NOFO further announces that the latter populations "should be prioritized for Permanent Supportive Housing." *Id.* Contrary to federal disability law, this provision impermissibly relies on stereotypes about disabilities and creates a second-class tier of disabilities that excludes and harms individuals with mental health disabilities and substance use disorders.

91.    Although the NOFO does not award points based on this priority, the statement that this population "should be prioritized" pressures applicants to do just that given that HUD requires applications to "support the goals of this NOFO" and retains discretion to reject or select projects based on their "projected impact" and "[l]ikelihood" of "result[ing]" in the benefits expected." *Id.* at 11, 87.

### 5. *Inequitable eligibility for CoC Bonus funding*

92.    The NOFO also establishes arbitrary limits on CoCs' eligibility for bonus funding (Bonus Limits), and those limits systematically disadvantage communities with higher relative need in favor of communities with lower relative need.

93.     Bonus funding is an amount that CoCs can apply for on top of their statutorily defined need. In particular, the statute requires HUD to take account of the "need within the geographic area for homeless services" when making awards and provides that this need amount is either an amount determined by a regulatory formula that looks to factors related to population size and poverty or the amount "necessary to provide 1 year of renewal funding for all expiring" CoC grants, whichever is higher. 42 U.S.C. §§ 11386a(b)(2)(B), (c)(1); *see also* 24 C.F.R. § 578.17(a)(3). Binding regulations provide that a CoC's maximum award amount (and the maximum amount for which they can apply) is this need amount, plus amounts for a few other items, including "available bonuses." 24 C.F.R. § 578.17(b)(4).

94.     The FY 2026 NOFO provides for a "CoC Bonus," which is an additional amount that CoCs can apply for, for "new project[s]," beyond their statutorily defined need. *See* FY 2026 NOFO at 11–12.

95.     The NOFO sets limits on that CoC Bonus funding that will arbitrarily shift funding away from communities with higher relative need to communities with lower relative need. In particular, the NOFO provides that each CoC can apply for CoC Bonus projects worth up to 15 percent of their statutorily defined need—but further establishes minimum and maximum award amounts that actually make CoCs eligible for widely diverging amounts. *Id.* The specific floors and caps vary based on whether the CoC split or merged in the last three years or not. As an example, the bonus for a CoC that neither split nor merged is a minimum of $500,000 (even if 15 percent of its need is lower) and a maximum of $5 million (even if 15 percent of its need amount is far higher).

96.     This means that the amounts CoCs can apply for bear little relation to their actual need. With these inequitable Bonus Limits, the NOFO makes lower-need CoCs eligible for extra

25

funding equal to as much as 61.2 percent of their need, while leaving higher-need CoCs eligible for an amount equal to only as little as 3.5 percent of their need.

97.     These Bonus Limits will cause communities with higher rates of homelessness—communities that represent more than 40 percent of the total homeless population—to lose access to nearly $93 million in funding.

98.     HUD asserts that these Bonus Limits "afford[] all CoCs a more equitable opportunity to compete for bonus funds," but it does not consider or explain the inequitable impacts of shifting funding away from communities with higher relative need to communities with lower relative need, nor does it consider alternative approaches. *See* FY 2026 NOFO at 36.

### E. Post-award conditions impose ideological restrictions unrelated to the CoC program or otherwise exceed HUD's authority

99.     The FY 2026 NOFO requires successful grantees to agree to award conditions, many of which are the same as or similar to conditions that courts have repeatedly held likely invalid. These award conditions (Post-Award Conditions) include the following.

### 1. Conditions requiring compliance with executive orders

100.     Like the FY 2025 NOFOs that this Court already preliminarily stayed, the FY 2026 NOFO states that grantees "must follow … Presidential Executive Actions affecting federal financial assistance programs" (E.O. Conditions). FY 2026 NOFO at 106–07. The NOFO lists 11 executive orders that grantees must follow, including:

a. Executive orders that broadly seek to eradicate all diversity, equity, and inclusion activities. *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order 14173; *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order 14151; *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332;

b. Executive orders that purport to require adherence to the view that sex is binary and immutable and that people's gender identities should not be recognized. *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168 ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332 (Grantmaking Executive Order);

c. An executive order that purports to bar grant funds from being used to fund or promote elective abortion. *Enforcing the Hyde Amendment*, Executive Order 14182;

d. An executive order directing the end of "support for 'housing first' policies." *Ending Crime and Disorder on America's Streets*, Executive Order 14321 (Homelessness Executive Order); and

e. An executive order that mandates verifying immigration status and seeks to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation." *Ending Taxpayer Subsidization of Open Borders*, Executive Order 14218.

101. The NOFO also separately requires grantees to comply with "immigration requirements" set forth in the *Ending Taxpayer Subsidization of Open Borders* Executive Order. FY 2026 NOFO at 107 (capitalization altered).

102. These executive orders instruct federal agencies on what to do but do not purport to impose obligations on the public. Nonetheless, the NOFO's requirement that grantees

27

"follow" or "[c]ompl[y] with" these executive orders appears to require grantees to act in accordance with those orders' policies. There is no indication that HUD considered or explained the confusion this would cause or the chilling effect this would have on grantees engaging in wholly lawful activities.

### 2. *Safe Drug Use Condition seeking to eliminate harm reduction*

103.   The NOFO also includes a post-award condition (Safe Drug Use Condition) requiring grantees to commit to not violating various drug-related laws. FY 2026 NOFO at 108. This mirrors the threshold Safe Drug Use Certification requirement described above, *supra* ¶ 67, and, for the same reasons as explained above, is meant to deter lawful harm reduction activities and to force grantees to discontinue assistance to any participant who violates a drug-related rule more than once.

### 3. *Provision purporting to restrict judicial relief*

104.   Finally, the NOFO includes a provision (Judicial Restriction) that purports to restrict courts' ability to grant relief that would extend beyond the boundaries of that court's jurisdiction. In particular, the NOFO provides that "if any part or provision of the award agreement or terms of this NOFO are enjoined or held to be void or unenforceable in any jurisdiction, they shall be ineffective *as to such jurisdiction*." FY 2026 NOFO at 108 (emphasis added). But courts have authority to enter orders that are effective outside their geographic jurisdictions, including by granting relief to parties that reside outside the jurisdiction and by staying or invalidating agency actions under the Administrative Procedure Act. The NOFO improperly purports to limit this authority, in a brazen separation-of-powers violation.

III.   **The FY 2026 NOFO Threatens Devastating Harms to Plaintiffs and the Communities They Serve**

105.   If implemented, the FY 2026 NOFO would withdraw funding that communities rely on to house at least 97,000 formerly homeless people, force tens of thousands of those people back into homelessness, and otherwise undermine communities' homelessness response.

106.   This will cause devastating harms to Plaintiffs, members of the Plaintiff Associations (the Alliance and NLIHC), and the homeless and formerly homeless individuals and families they serve.

107.   The FY 2026 NOFO's significant changes threaten the same types of harm that the FY 2025 NOFO's changes threatened, and that Plaintiffs' First Amended Complaint details. *See* First Am. Compl. ¶¶ 164–175, 178–179 (Dkt. No. 66). Plaintiffs and Plaintiff Associations' members are all but guaranteed to lose significant amounts of funding for existing projects—and, in many instances, will need to scale back or end programs, lay off staff, and withdraw support from vulnerable community members. They will lose hard-earned trust and goodwill in the process, both among landlords and other critical partners and among the individuals and families they serve. The NOFO's unlawful provisions put Plaintiffs and Plaintiff Associations' members at a steep competitive disadvantage if they do not conform to Defendants' wishes—and force them to choose now between adhering to their missions and effective strategies or abandoning them to have a shot at obtaining needed funding.

**HUD IS UNREASONABLY DELAYING FINALIZING FY 2025 AWARDS**

108.   At the same time, HUD has unreasonably delayed finalizing the FY 2025 awards that communities need to run their programs *now*.

29

**I.    Congress Enacts a New Law to Guard Against Delays in Awarding FY 2025 Funding**

109.    For FY 2025, Congress appropriated nearly $4 billion for the CoC Program. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 362–63 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(12), 1102, 1105, 11305, 139 Stat. 9, 12, 40 (2025).

110.    By statute, HUD was required to competitively award that funding pursuant to a notice of funding opportunity (NOFO). 42 U.S.C. § 11382. Yet it long delayed awarding those funds. In November 2025, it rescinded a lawful two-year NOFO that HUD had previously issued to govern the awards for FY 2024 and 2025 (FY24-25 NOFO) and replaced it with a new NOFO that contained a host of unlawful criteria and other provisions. The late-stage change guaranteed that communities would face significant gaps in funding, and HUD's new NOFO threatened to force hundreds of thousands of people out of their homes.

111.    Plaintiffs sued, and in December 2025, this Court preliminarily enjoined HUD from implementing its new NOFO. In addition, to mitigate the by-then-inevitable funding gaps, the Court ordered HUD to take all steps necessary to process renewal awards under the FY24-25 NOFO (short of actually making the awards), so that HUD would be ready to promptly make awards—with no further delays—if and when the Court entered final judgment requiring them to do so.

112.    On February 3, 2026, Congress took action to address HUD's ongoing delays in awarding FY 2025 CoC funding. That day, Congress enacted and the President signed the 2026 Appropriations Act. Pub. L. No. 119-75, div. D, 140 Stat. at 323–437. Although the Act generally deals with FY 2026 funding, Congress also included some new requirements for the

30

previously appropriated FY 2025 CoC funding to minimize the funding gaps communities would continue to face as a result of HUD's actions.

113.    In particular, Section 244 requires HUD, "prior to awarding any amounts through a notice of funding opportunity," to non-competitively renew for one year all CoC grants (including youth homelessness demonstration projects and shelter plus care projects) that are expiring or have expired in the first quarter of 2026 (i.e., between January 1, 2026 and March 31, 2026). Pub. L. No. 119-75, div. D, tit. II, § 244, 140 Stat. at 422. It also requires HUD to non-competitively renew later-expiring grants "if awards have not been made under a fiscal year 2025 notice of funding opportunity prior to" set dates—April 1 for grants expiring in the second quarter and July 1 for grants expiring in the third and fourth quarters. *Id.* The requirement to noncompetitively renew projects applies "notwithstanding any inconsistent provisions … in subtitle C of title IV of the McKinney-Vento Homeless Assistance Act," 42 U.S.C. §§ 11381–11389. Pub. L. No. 119-75, div. D, tit. II, § 244, 140 Stat. at 422.

## II.    HUD Is Unreasonably Delaying Fulfilling Congress's Mandate

114.    HUD at this point is required to noncompetitively renew all awards that expired or will expire in all quarters of 2026.

    a.  Under the 2026 Appropriations Act, HUD was immediately required to noncompetitively renew all awards that expired or would expire in the first quarter of 2026 (Q1 awards).

    b.  As of February 17, 2026, HUD acknowledged to Plaintiffs through counsel that it would *not* be able to make awards under a NOFO by April 1 and therefore would also be required to noncompetitively renew awards expiring in the second quarter of 2026 (Q2 awards).

c. As of April 1, 2026, it became clear that, for awards expiring in the third and fourth quarters of the year (Q3 and Q4 awards), only two options were feasible: HUD could (1) noncompetitively renew all awards pursuant to the 2026 Appropriations Act or (2) make awards under the FY24-25 NOFO. On April 17, HUD informed Plaintiffs through counsel that HUD planned to take the first option and noncompetitively renew all awards pursuant to the 2026 Appropriations Act. HUD confirmed this plan in a notice filed with the Court on April 24.

115. A project can access its funds only once it has a final grant agreement from HUD, but HUD is unreasonably delaying issuing those agreements.

116. Although the 2026 Appropriations Act was enacted 4.5 months ago, HUD has sent out grant agreements for only 1861 of the approximately 6,644 required renewals. This means the vast majority of projects—over 70 percent—still have no way to access their FY 2025 grant funds. This inexplicably includes over 30 projects whose existing grants expired in Q1.

117. After Plaintiffs first brought HUD's delays to the Court's attention, HUD made some initial progress—but its pace has once again slowed to a crawl. In the week between June 8 and June 15, HUD issued a mere 134 agreements—a pace that, if it continues, would mean all grantees will not be able to access their FY 2025 funding for another eight months.

118. HUD has continually created unnecessary roadblocks to completing the required renewals.

119. At the outset, HUD stated to Plaintiffs through counsel that it had to complete "individual reviews" that "require threshold financial-management and risk assessments" before it could determine what awards would be renewed. It did not need to do that, however—and

HUD did not undertake such a process in 2021, the last time Congress issued a materially similar directive to noncompetitively renew all expiring grants. *See* Pub. L. No. 116-260, div. L, tit. IV, § 419, 134 Stat. 1182, 1908 (2020).

120.    In any event, the purported need to conduct those reviews could not actually justify Defendants' delays because, pursuant to an earlier order in this case (Dkt. No. 52 at 2–3), HUD should have already largely completed those reviews—and in fact represented to Plaintiffs that they had completed them. If HUD had actually met its obligations under the order, any additional review would have been minimal and would not have justified HUD's delays in even just announcing what awards it would make.

121.    HUD also misleadingly suggested that grant agreements were delayed because grantees needed to satisfy their "special conditions" before HUD could issue the agreements. Dkt. No. 88 at 4 ("The issuance of grant agreements depends on when awardees submit documentation to HUD to satisfy any special conditions on the grants."). But, although HUD failed to mention it, very few grants carry special conditions (for example, only 16 of the 608 Q1 awards). Thus, the (purported) need for grantees to satisfy conditions cannot explain the delay in issuing grant agreements in the vast majority of cases.

122.    HUD has also exacerbated the delays by adding the unnecessary step of requiring HUD to countersign each agreement *after* the grantee signs it. In the past, HUD would send out an agreement, and it would become final immediately upon the grantee's signing it—meaning the grantee could promptly draw down funds. In other words, HUD would sign first. Now, however, HUD will not treat the agreement as final—and allow grantees to draw down funds— until the grantee returns the signed agreement *and HUD countersigns it*. There is no reason to change this order and thereby add this additional step that only causes further delay.

123.    For weeks, HUD has represented that hundreds of Q2 renewals required unspecified "additional preparation"—separate from the special grant conditions—before they could be finalized. After making minimal progress in completing that preparation for some Q2 grants, the number of Q2 grants requiring that work inexplicably spiked, from 266 on June 8 to 299 on June 15.

124.    HUD continues to stall in taking the steps necessary to finalize the renewal awards that the 2026 Appropriations Act mandates.

125.    As a result of HUD's delays, some projects, including projects of Plaintiffs and Plaintiff Associations' members, have already gone without funding for months. And because of HUD's ongoing delays, projects with grants expiring later in the year will also face gaps in funding as the year goes on.

126.    HUD's ongoing delays in finalizing awards are leaving service providers without critical funding—in some instances forcing them to lay off staff, turn away or abruptly end assistance for people needing help, or even end critical programs.

**CLAIMS FOR RELIEF**

**Count 1:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**In Excess of Statutory Authority**
**(against HUD Defendants[1])**

127.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

128.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

---

[1] The "HUD Defendants" are HUD and Secretary Turner.

34

129. The issuance of the FY 2026 NOFO is a final agency action subject to review under the APA.

130. Defendants lack statutory authority to impose the FY 2026 NOFO's New Project Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, and Judicial Restriction. They also lack statutory authority to impose the Non-Statutory Threshold Criteria to Tier 1 projects. Neither HUD's organic statute nor the statutes authorizing the CoC program allow the agency to impose these restrictions and requirements.

131. Those provisions of the FY 2026 NOFO must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**Count 2:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Contrary to Law**
**(against HUD Defendants)**

132. Plaintiffs re-allege and incorporate the above as if set forth fully herein.

133. The APA provides that a court "shall" "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

134. The FY 2026 NOFO's New Project Set-Aside is contrary to the Homeless Assistance Act, as amended by the HEARTH Act, including:

    a. 42 U.S.C. § 11386b(d), which permits HUD to provide incentives only for activities proven effective at combatting homelessness, because the New Project Set-Aside effectively disincentivizes the types of projects Congress has determined are proven effective strategies for addressing homelessness, while incentivizing other, unproven projects that HUD lacks authority to incentivize;

b.  42 U.S.C. § 11386c(b), which provides that funds appropriated for the CoC program "shall be available for the renewal of contracts" for permanent housing, because the New Project Set-Aside ensures that a large portion of funding will not be available for the renewal of permanent housing contracts; and

c.  42 U.S.C. § 11386c(b), which requires HUD to decide whether to renew permanent housing awards based on two enumerated factors, because the New Project Set-Aside ensures that HUD will make the decision whether to renew permanent housing projects based on other, unpermitted factors.

135.    The FY 2026 NOFO's Discriminatory Disability Priority, which deprioritizes individuals with mental disabilities or substance abuse disorders for Permanent Supportive Housing, contradicts multiple binding statutory and regulatory provisions:

a.  The Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, 12181–89, and the Rehabilitation Act of 1973, 29 U.S.C. § 794, which bar discrimination on the basis of disability, because the Discriminatory Disability Priority discriminates based on a person's type of disability and encourages providers to likewise discriminate;

b.  HUD's regulations prohibiting exclusion from housing based on type of disability, as the Discriminatory Disability Priority is likely to result in individuals with disabilities *not* prioritized being excluded from housing.  *See* 24 C.F.R. § 578.93(b)(7) ("[N]o otherwise eligible individuals with disabilities . . . may be excluded on the grounds that they do not have a particular disability."); and

36

c.  HUD's regulations directly applying the Rehabilitation Act's prohibition on discrimination on the basis of disability to HUD's federally funded and federally conducted programs and activities. 24 C.F.R. § 8.4(b) (prohibiting discrimination on the basis of disability); *id.* § 8.3 (defining disability to encompass physical *and* mental impairments, including "emotional illness, drug addiction and alcoholism" as covered disabilities); *id.* § 9.130(b)(1)(ii) (prohibiting discrimination); *id.* § 9.103 (defining disability to encompass physical *and* mental impairments, including "emotional illness, drug addiction and alcoholism").

136.  The Non-Statutory Threshold Criteria are contrary to law as applied to Tier 1 projects because the 2026 Appropriations Act requires HUD to make awards to Tier 1 projects based only on the local CoC's selections, so long as the projects are consistent with statutory requirements. *See* Pub. L. No. 119-75, div. D, tit. II, 140 Stat. at 399.

137.  The FY 2026 NOFO's E.O. Conditions are contrary to law insofar as some require grantees to comply with Executive Orders imposing the view that sex is binary and immutable and that people's gender identities should not be recognized. *See Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025) ("Gender Ideology" Executive Order); *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, 90 Fed. Reg. 38929, 38931 (Aug. 7, 2025) (Grantmaking Executive Order). These E.O. Conditions violate HUD's Equal Access regulation as well as Title VII and other laws barring discrimination on the basis of gender identity.

138.    The FY 2026 NOFO's New Project Set-Aside, Discriminatory Disability Priority, Non-Statutory Threshold Criteria, and E.O. Conditions must be declared unlawful and set aside as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

**Count 3:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Arbitrary and Capricious**
**(against HUD Defendants)**

139.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

140.    Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

141.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (alteration in original) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

142.    The FY 2026 Challenged Provisions are arbitrary and capricious.

143.    HUD has also entirely failed to consider important aspects of the problem when adopting these provisions. Among its many errors, it failed to consider how drastically reducing funding available to renew existing projects, and disfavoring proven permanent housing solutions, would lead to a catastrophic increase in homelessness. It also failed to consider how

the other provisions would exclude or deter people experiencing homelessness from accessing housing.

144.    HUD failed to provide a rational explanation for its departure from the proven strategies that reduce homelessness to the punitive and untested practices in the NOFO that do not advance the CoC Program's statutory purposes. HUD also failed to account for the consequences of increased homelessness and associated human suffering and increased urgent demand for social services caused by the FY 2026 Challenged Provisions on impacted communities.

145.    HUD also failed to adequately explain, and failed to consider the reliance interests related to, the changes in HUD processes. HUD has previously implemented policy shifts more incrementally, so as to limit strain on providers and not risk increasing homelessness. Here, HUD is seeking to impose maximalist changes and a radical overhaul through this NOFO without adequately explaining why such a process is necessary and how it considered the reliance interests of providers and their clients in HUD's prior practices.

146.    HUD also failed to consider or explain how the New Project Set-Aside principally for transitional housing and supportive-services-only projects is consistent with Congress having identified only two activities that have proven effective, both of which are permanent housing strategies.

147.    HUD similarly did not consider how the FY 2026 Challenged Provisions promoting rapid encampment reduction undermined the CoC Program's purpose of "minimizing the trauma and dislocation" when rehousing homeless individuals. *See* 24 C.F.R. § 578.1(b)(2).

148.    HUD failed to articulate a rational justification for, or consider the impact of, its abandonment of proven policies like supporting stable, permanent housing without conditions, or

39

for imposing new restrictions or incentives on grantees, like forgoing all "harm reduction" activities.

149.    HUD did not consider how some of the FY 2026 Challenged Provisions violate or are in tension with binding requirements, such as HUD's Equal Access Rule, other prohibitions on gender identity discrimination, prohibitions on disability discrimination, and provisions of the Violence Against Women Act and Family Violence Prevention Services Act barring grantees from imposing service requirements as a condition of providing housing. HUD did not explain how grantees could effectively comply with these (or similar) binding requirements while also complying with the NOFO's requirements or putting forth applications that would be competitive.

150.    HUD has failed to offer any rational justification for its decision to prioritize individuals with physical and developmental disabilities over those with mental, emotional, or substance abuse disorders, in contravention of HUD regulations and binding statutory requirements. Agency guidance that treats participants differently on the basis of disability and incentivizes applicants for federal funding to do the same—thereby violating federal and state law—is arbitrary and capricious. HUD relies on stereotypes about individuals with physical and developmental disabilities being unable to move towards "self-sufficiency" while those with other types of disabilities are cast as "able-bodied" and "able to recover." FY 2026 NOFO at 30. This conclusory and discriminatory narrative is not supported by any facts or evidence and is not a rational factor for HUD to consider in implementing the CoC program.

151.    And HUD failed to adequately address the substantial reliance interests of CoC applicants, including Plaintiffs and their members and the communities they serve, in withdrawing support from many ongoing permanent housing programs; the reliance interests of

people living in permanent housing whose homes will be lost; the reliance interests of programs organized to provide services to their communities through a Housing First model; and the reliance interests of people in those communities that have benefited from CoC services, but will now be excluded or deterred.

152.     The FY 2026 Challenged Provisions must be declared unlawful and set aside as "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

**Count 4:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Not in Observance of Procedure Required by Law**
**(against HUD Defendants)**

153.     Plaintiffs re-allege and incorporate the above as if set forth fully herein.

154.     The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

155.     The requirement to observe procedure "required by law" includes not just procedures required by governing statutes, but also procedures required by the agency's own regulations.

156.     The New Project Set-Aside constitutes a substantive rule, but Defendants adopted it without complying with the notice-and-comment requirements set forth in HUD's own regulations, 24 C.F.R. § 10.1, and thus failed to observe procedures required by law.

157.     In addition, with the New Project Set-Aside, HUD created an incentive for transitional housing and supportive-services-only projects. But HUD did not first engage in notice and comment to make a determination that those activities have been proven effective, as required by 42 U.S.C. § 11386b(d).

158.     The FY 2026 NOFO's New Project Set-Aside must be declared unlawful and set aside as "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

41

## Count 5:
### Administrative Procedure Act, 5 U.S.C. § 706(1)
### Agency Action Unlawfully Withheld
### (against HUD Defendants)

159.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

160.    The APA provides that a court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

161.    By statute, HUD must "inform each collaborative applicant, at a time concurrent with the release of the notice of funding availability for the grants, of the pro rata estimated grant amount under this part for the geographic area represented by the collaborative applicant." 42 U.S.C. § 11386a(b)(2)(A). That "estimated grant amount" is either an amount determined by formula under the governing regulations or the amount "necessary to provide 1 year of renewal funding for all expiring" awards for that area, whichever is higher. *See id.* § 11386a(b)(2)(B).

162.    By statute, HUD was required to issue the NOFO for FY 2026 CoC funding by June 1, 2026. Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399.

163.    HUD issued the FY 2026 NOFO on June 1, but did not concurrently inform each collaborative applicant of its "pro rata estimated grant amount" as required by 42 U.S.C. § 11386a(b)(2)(A). Nor has it done so to date.

164.    HUD has unlawfully withheld mandatory agency action, and this Court should compel HUD to release CoCs' "estimated grant amounts" immediately.

## Count 6:
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### In Excess of Statutory Authority
### (against OMB Defendants[2])

165.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

---

[2] The "OMB Defendants" are OMB and Director Vought.

166.    The Apportionment Footnotes restrict HUD's ability to obligate appropriated CoC funding and are final agency action subject to review under the APA.

167.    OMB Defendants lack statutory authority to impose the Apportionment Footnotes.

168.    The Apportionment Footnotes must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

**Count 7:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Arbitrary and Capricious**
**(against OMB Defendants)**

169.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

170.    The Apportionment Footnotes are arbitrary and capricious and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

171.    OMB Defendants provided no explanation, let alone a reasoned one, for their decision to impose the Apportionment Footnotes.

172.    OMB Defendants also failed to consider the impacts of imposing those restrictions on the effectiveness of CoC-funded projects or to offer any rational connection between evidence regarding strategies proven effective at reducing homelessness and the Footnotes' restrictions.

173.    The Apportionment Footnotes must be declared unlawful and set aside as "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

**Count 8:**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Contrary to the Constitution**
**(against all Defendants)**

174.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

43

175.    Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

176.    As described in counts 9-11, the Apportionment Footnotes and portions of the FY 2026 NOFO violate various constitutional provisions.

177.    The Apportionment Footnotes and the FY 2026 NOFO's New Project Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Local Policies Criterion, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, Judicial Restriction, and (as applied to Tier 1 projects) the Non-Statutory Threshold Criteria must be declared unlawful and set aside as "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B).

## Count 9:
## Violation of Separation of Powers
## (against all Defendants)

178.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

179.    Under the APA, a "court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

180.    This Court has inherent equitable power to enjoin executive conduct that violates the Constitution, including the separation of powers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

181.    The Constitution vests Congress—not the Executive—with legislative powers, U.S. Const. art. 1, § 1, the spending power, U.S. Const. art. 1, § 8, cl. 1, and the appropriations power, U.S. Const. art. 1, § 9, cl. 7. Absent an express delegation, only Congress is entitled to attach conditions to federal funds.

44

182.    The Constitution exclusively grants the power of the purse to Congress, not the President.

183.    Neither the President nor an executive agency can enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998); *see* U.S. Const. art. I, § 7, cl. 2.

184.    Congress has not authorized OMB Defendants to impose the Apportionment Footnotes, nor has it authorized HUD Defendants to impose the New Project Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria, E.O. Conditions, Judicial Restriction, or (as applied to Tier 1 projects) the Non-Statutory Threshold Criteria.

185.    By imposing these conditions, Defendants are unilaterally attaching new conditions to federal funding without authorization from Congress.

186.    For these reasons, the Apportionment Footnotes and those provisions of the FY 2026 NOFO violate constitutional separation-of-powers protections, and Defendants must be enjoined from enforcing or implementing those provisions.

### Count 10:
### Violation of the Spending Clause
### (against all Defendants)

187.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

188.    The Spending Clause of the U.S. Constitution provides that "Congress"—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

189.    As described above, the Apportionment Footnotes and FY 2026 NOFO violate the separation of powers because multiple provisions are neither expressly nor impliedly authorized

by Congress. For the same reasons, the Apportionment Footnotes and those provisions of the FY 2026 NOFO violate the Spending Clause.

190.    The Spending Clause also requires recipients to have fair notice of conditions that apply to federal funds disbursed to them. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). The grant conditions must be set forth "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

191.    Moreover, funding restrictions may only impose conditions that are reasonably related to the federal interest in the project and the project's objectives. *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).

192.    Provisions of the FY 2026 NOFO violate the Spending Clause by:

   a. Imposing conditions that are ambiguous, including E.O. Conditions that purport to require grantees to comply with executive orders directed to federal agencies and Safe Drug Use Condition and Certification that suggest, without explaining, that various federal laws in fact prohibit long-permitted activities;

   b. Imposing E.O. Conditions that are not germane to the stated purpose of grant program funds; and

   c. With respect to the E.O. Conditions requiring compliance with the "Gender Ideology" and Grantmaking Executive Orders, imposing a condition that purports to require grant recipients to act unconstitutionally by discriminating on the basis of gender identity and sex.

193.    For these reasons, the Apportionment Footnotes and the FY 2026 NOFO's the New Project Set-Aside, Safe Drug Use Condition and Certification, Discriminatory Disability Priority, Self-Sufficiency Criteria, Subjective "Risk Review" and "Additional Factor" Criteria,

46

E.O. Conditions, Judicial Restriction, and (as applied to Tier 1 projects) the Non-Statutory Threshold Criteria violate the Spending Clause, and Defendants must be enjoined from enforcing or implementing them.

**Count 11:**
**First Amendment — Free Speech Clause**
**Local Policies Criterion and E.O. Conditions**
**(against HUD Defendants)**

194.     Plaintiffs re-allege and incorporate the above as if set forth fully herein. This count is asserted on behalf of Plaintiffs the Alliance, NLIHC, Crossroads, Youth Pride, and Plaintiff Associations' members.

195.     This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund*, 561 U.S. at 491 n.2.

196.     The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

197.     While the government may in some circumstances attach conditions to federal funding that "affect the recipient's exercise of its First Amendment rights," there are limits. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). The government may not restrict "protected [speech] outside the scope of the federally funded program." *Id.* at 217 (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). In addition, even in providing what recipients may do with government funding, "the Government may not aim at the suppression of dangerous ideas." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (cleaned up). And where the government imposes a funding condition "not relevant to the objectives of the program," that can violate the First Amendment. *See All. for Open Soc'y*, 570 U.S. at 214.

198.	The Local Policies Criterion violates the First Amendment insofar as it requires applicants to demonstrate that they will "not interfere with or impede" local efforts to advance certain types of local policies, and thereby disadvantages applicants who advocate against or otherwise express disagreement with the policies the NOFO favors.

199.	The E.O. Conditions violate the First Amendment insofar as they require grantees to comply with the "Gender Ideology" and Grantmaking Executive Orders, which impose the view that sex is binary and immutable and that people's gender identities should not be recognized.

200.	Those Conditions restrict speech outside the scope of the funded program. The Local Policies Criterion penalizes CoC applicants that advocate against or express disagreement about the listed local policies, regardless of whether they do so with CoC funds. The "Gender Ideology" E.O. Conditions strays outside the federal program by requiring grantees to adopt the government's view as their own, as there is no way to avoid the topic during day-to-day interactions with people.

201.	Those Conditions are also designed to suppress ideas that the Administration deems dangerous—namely, that criminalizing homelessness and substance use and promoting involuntary commitment are counterproductive to public safety and will make homelessness worse, and that sex is nonbinary and that a person can have a gender identity distinct from their sex assigned at birth. The censorious purpose of these funding conditions render them unconstitutional in violation of the First Amendment.

202.	That the E.O. Conditions have no relevance to the CoC program's purposes of addressing homelessness further shows that the Conditions aim at the suppression of an idea with which the Administration disagrees. That censorious purpose and lack of relation to the

objectives of the CoC program additionally render them unconstitutional under the First Amendment.

203.    No compelling government interest justifies Defendants' viewpoint-based targeting of speech, and the Local Priorities Criterion and E.O. Conditions are not the least restrictive means available to advance whatever interest they serve.

204.    The Local Priorities Criterion and E.O. Conditions requiring compliance with the "Gender Ideology" and Grantmaking Executive Orders violate the First Amendment rights of the nonprofit Plaintiffs, including the Association Plaintiffs and their members, and Defendants must be enjoined from enforcing or implementing them.

**Count 12:**
**Administrative Procedure Act, 5 U.S.C. § 706(1)**
**Agency Action Unreasonably Delayed**
**(against HUD Defendants)**

205.    Plaintiffs re-allege and incorporate the above as if set forth fully herein.

206.    The APA provides that a court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

207.    Congress appropriated funds for the CoC program for FY 2025, and HUD is required to award them. Pub. L. No. 118-42, div. F, tit. II, 138 Stat. 25, 362–63; Pub. L. No. 119-4, §§ 1101(12), 1102, 1105, 139 Stat. 9, 12; *see also* 42 U.S.C. § 11382. The duty to award those funds is nondiscretionary.

208.    In addition, the 2026 Appropriations Act governs *what* FY 2025 awards HUD must make for the CoC program. The Act requires HUD to noncompetitively renew for one year all CoC awards expiring during the first quarter of 2026. Because HUD did not make awards under a NOFO by April 1, 2026, the Act also requires HUD to noncompetitively renew for one

year all CoC awards expiring during the second quarter of 2026. These duties are nondiscretionary.

209.    For the third and fourth quarters of 2026, HUD has two practicable options—to noncompetitively renew all awards pursuant to the 2026 Appropriations Act or to make awards under the FY24-25 NOFO. HUD has committed to the former option. In addition, HUD is required to renew the significant majority of awards regardless of which option HUD chooses—because most awards must be renewed under either of those available options. Renewing those awards is nondiscretionary.

210.    HUD has unreasonably delayed making FY 2025 awards as required by the 2026 Appropriations Act, including by unreasonably delaying issuing and then finalizing grant agreements so that grantees may actually draw down funds.

211.    The Court should thus compel Defendants to make final awards of FY 2025 funding for the CoC Program expeditiously.

## PRAYER FOR RELIEF

WHEREFORE, in addition to the relief requested in the First Amended Complaint, Plaintiffs request that this Court:

A.  Declare unlawful, vacate, and set aside the FY 2026 NOFO;

B.  Stay the FY 2026 NOFO pursuant to 5 U.S.C. § 705 and issue all other necessary and appropriate process to preserve status or rights pending conclusion of the proceedings;

C.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from imposing or implementing the FY 2026 Challenged Provisions, or any substantively similar provisions, on any future HUD CoC competitions or awards in any manner, including by making funding unavailable for renewal awards, prioritizing strategies that do not meet statutory requirements for

incentives and bonuses, prioritizing people with certain disabilities over people with other disabilities, requiring applicants to meet the criteria to be considered for an award or to receive an award, by considering those criteria in selecting awardees, or by requiring grantees to comply with such criteria upon obtaining an award;

D.  Preliminarily and permanently enjoin Defendants from retaliating against any Plaintiff or member of the Plaintiff associations for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit, including but not limited to reducing the amount of a grant award to that Plaintiff or Plaintiff's member; refusing to issue, process, sign, or approve grant applications, grant agreements, or subgrant agreements; refusing to issue, process, sign, or approve any invoice or request for payment, or reducing the amount of such approval or payment; or opening retaliatory investigations;

E.  Declare HUD's ongoing delays in noncompetitively renewing grants expiring in calendar year 2026 to be unreasonable and declare HUD to be in violation of the APA and Section 244 of the THUD Appropriations Act;

F.  Enter an order requiring Defendants to finalize renewal awards of projects expiring in 2026 expeditiously, including by completing all steps necessary for grantees to access funds, within a timeframe established by the Court;

G.  Award Plaintiffs reasonable costs and attorneys' fees; and

H.  Grant any other relief that the Court deems fit and proper.


June 22, 2026                                        Respectfully submitted,

Amy R. Romero                                    /s/ Kristin Bateman
(RI Bar No. 8262)                                 Kristin Bateman +
                                                          (DC Bar No. 90037068)


51

Kevin Love Hubbard +
  (MA Bar No. 704772)
DeLuca, Weizenbaum,
  Barry & Revens, Ltd.
199 North Main Street
Providence, RI 02903
(401) 453-1500
amy@dwbrlaw.com
kevin@dwbrlaw.com
Cooperating counsel,
  Lawyers' Committee for RI

*Counsel for All Plaintiffs*

Tony LoPresti +
  (CA Bar No. 289269)
County Counsel
Kavita Narayan +
  (CA Bar No. 264191)
Chief Assistant County Counsel
Meredith A. Johnson +
  (CA Bar No. 291018)
Lead Deputy County Counsel
Stefanie Wilson +
  (CA Bar No. 314899)
Deputy County Counsel
Leily Arzy +
  (CA Bar No. 364187)
Litigation Fellow
70 West Hedding Street, East Wing
Ninth Floor
San José, CA 95110-1770
(408) 299-5900
meredith.johnson@cco.sccgov.org
stefanie.wilson@cco.sccgov.org
leily.arzy@cco.sccgov.org

*Counsel for Plaintiff County of
Santa Clara*

Madeline H. Gitomer +
  (DC Bar No. 1023447)
Aman T. George +
  (DC Bar No. 1028446)
Simon C. Brewer +
  (DC Bar No. 90042403)
Christine L. Coogle +
  (DC Bar No. 1738913)
Carrie Y. Flaxman +
  (DC Bar No. 458681)
Robin Thurston +
  (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
mgitomer@democracyforward.org
ageorge@democracyforward.org
sbrewer@democracyforward.org
ccoogle@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and Youth
Pride, Inc.*

Lynette Labinger
  (RI Bar No. 1645)
128 Dorrance Street, Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com
Cooperating counsel,
  ACLU Foundation of RI

*Counsel for Plaintiffs National Alliance to
End Homelessness, National Low Income
Housing Coalition, Crossroads RI, and Youth
Pride, Inc.*

52

Toby Merrill +
  (MA Bar No. 601071)
Cassandra Crawford +
  (NC Bar No. 45396)
Graham Provost +
  (DC Bar No. 1780222)
Kayla Svihovec +
  (DC Bar No. 1735588)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
Toby.Merrill@publicrightsproject.org
Cassandra.Crawford@publicrightsproject.org
Graham.Provost@publicrightsproject.org
Kayla.Svihovec@publicrightsproject.org

*Counsel for Plaintiffs City of Boston, City of Cambridge, Martin Luther King, Jr. County, Metropolitan Government of Nashville and Davidson County, City of Tucson*


Wallace W. Dietz +
  (TN BPR No. 009949)
Director of Law
John K. Whitaker +
  (TN BPR No. 039207)
Senior Counsel
Abby Greer +
  (TN BPR No. 041470)
Assistant Metropolitan Attorney
109 Metropolitan Courthouse
P.O. Box 196300
Nashville, TN 37219
(615) 862-6341
wally.dietz@nashville.gov
john.whitaker@nashville.gov
abby.greer@nashville.gov

*Counsel for Plaintiff Metropolitan Government of Nashville and Davidson County*

Antonia K. Fasanelli +
  (DC Bar No. 481856)
Kathryn M. Scott +
  (WA Bar No. 38978)*
National Homelessness Law Center
1400 16th Street, NW, Suite 425
Washington, DC 20036
(202) 638-2535
afasanelli@homelesslaw.org
kmeyerscott@homelesslaw.org

*Counsel for Plaintiffs National Alliance to End Homelessness and National Low Income Housing Coalition*


David J. Hackett +
  (WA Bar No. 21236)
General Counsel, King County Department of Local Services
Christopher M. Sanders +
  (WA Bar No. 47518)
General Counsel to the King County Executive
Cristy J. Craig +
  (WA Bar No. 27451)
Senior Deputy Prosecuting Attorney
Office of the King County Prosecuting Attorney
401 5th Avenue, Suite 600
Seattle, WA 98104
(206) 477-1163
david.hackett@kingcounty.gov
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov

*Counsel for Plaintiff Martin Luther King, Jr. County*

+ Admitted *pro hac vice*
* Not admitted in the District of Columbia; practicing under the supervision of members of the D.C. Bar